Style: Appellant  Harry Bizios

v.Appellee  Town of Lakewood Village, Texas

Case Priority:     Accelerated

Original Proceeding:      No

Case Description:      Injunction

### Trial Court Information

| County | Court Name | Case # | Judge | Court Reporter |
|---|---|---|---|---|
| Denton | 431st District Court | 14-01991-431 | Hon. Jonathan M. Bailey | 431st District Court, Court Reporter, |

### Parties and Attorneys

| Party | Party Name | Remarks | Counsel Code | Person Name | Date On | Date Off |
|---|---|---|---|---|---|---|
| Appellant | Bizios, Harry | | Retained attorney | Arthur J. Anderson | 05/08/2014 | |
| | | | Retained attorney | David F. Johnson | 08/08/2014 | |
| Appellee | Town of Lakewood Village, Texas | | Retained attorney | William Andrew Messer | 05/08/2014 | |

### Interested Entities

| Entity Name | Interested Entity Type | Notice | Date On | Date Off |
|---|---|---|---|---|
| 431st District Court, Court Reporter, | RPT | No | 05/08/2014 9:16AM | |
| Anderson, Arthur J. | RE ATTY | Yes | 05/08/2014 9:17AM | |
| Bailey, Jonathan M. | TC JDG | No | 05/08/2014 9:16AM | |
| Denton County, Civil District Clerk, | DT CLK | No | 05/08/2014 9:16AM | |
| Evans, David L. | ADMJUD | No | 05/08/2014 9:16AM | |
| Johnson, David F. | RE ATTY | No | 08/08/2014 8:58AM | |
| Messer, , William Andrew | RE ATTY | Yes | 05/08/2014 9:17AM | |

### Events and Opinions

| Event Date | Stage | Event | Event Description | Disposition | Grouping | Order Type | Submission |
|---|---|---|---|---|---|---|---|
| 06/24/2015 | SUP CT | BRIEF FLD NO | | | | | |
| 02/26/2015 | SUP CT | PET REVIEW FLD | | | | | |
| 02/06/2015 | SUP CT | MT EXT PET REV DISP | | GRANT | | | |
| 02/06/2015 | SUP CT | MT EXT PET REV FLD | | | | | |
| 12/31/2014 | FILING | OPINION ISSD | | REVREM | | | |
| | | **Opinion Type** | **Author** | | | | |
| | | Original Memorandum | Hon. Bob McCoy | | | | |
| | | **Opinion Type** | **Author** | | | | |
| | | Original Memorandum | Justice Bob McCoy | | | | |
| 12/30/2014 9:53AM | FILING | LTR RECD | ANT | | | | |

Style: Appellant  Harry Bizios

v.Appellee  Town of Lakewood Village, Texas

## Events and Opinions

| Event Date | Stage | Event | Event Description | Disposition | Grouping | Order Type | Submission |
|---|---|---|---|---|---|---|---|
| 09/30/2014 | FILING | SUBMITTED | | | | | Oral |
| 09/26/2014 2:30PM | FILING | AMICUS BRIEF RECD | AMICUS | | | | |
| 09/26/2014 11:49AM | FILING | AMICUS BRIEF RECD | AMICUS | | | | |
| 09/19/2014 | FILING | SUBMISSION/ OA | | | | | Oral |
| 09/11/2014 | FILING | SUBMISSION/ OA | | | | | Oral |
| 08/28/2014 3:46PM | FILING | REPLY BRIEF FLD | ANT | | | | |
| 08/26/2014 | FILING | SUBMISSION/ OA | | | | | Oral |
| 08/20/2014 | FILING | ORDER ENTERED | COURT | | | | |
| 08/18/2014 4:55PM | FILING | RESP FLD | RPT | | | | |
| 08/14/2014 | FILING | MT SUPP RECORD DISP | APE | GRANT | 04 | | |
| 08/11/2014 11:18AM | FILING | MT SUPP RECORD FLD | APE | | 04 | | |
| 08/08/2014 8:56PM | FILING | BRIEF FLD YES | APE | | | | |
| 08/08/2014 | FILING | AT ISSUE | | | | | |
| 08/01/2014 | FILING | MT EXT BRIEF DISP | APE | GRANT | 03 | | |
| 07/31/2014 1:48PM | FILING | MT EXT BRIEF FLD | APE | | 03 | | |
| 07/03/2014 4:02PM | FILING | MT EXT BRIEF DISP | APE | GRANT | 02 | | |
| 07/03/2014 4:02PM | FILING | MT EXT BRIEF FLD | APE | | 02 | | |
| 07/01/2014 4:18PM | FILING | LTR RECD | ANT | | | | |
| 06/25/2014 4:09PM | FILING | BRIEF FLD YES | ANT | | | | |
| 06/19/2014 | FILING | MT EXT BRIEF DISP | ANT | GRANT | 01 | | |
| 06/18/2014 1:54PM | FILING | MT EXT BRIEF FLD | ANT | | 01 | | |
| 06/06/2014 3:38PM | FILING | LTR RECD | ANT | | | | |
| 06/02/2014 2:41PM | FILING | ERPT RECORD FLD | RPT | | | | |
| 05/20/2014 3:15PM | FILING | RPT RECORD NOTICE | RPT | | | | |
| 05/13/2014 10:07AM | FILING | ECLK RECORD FLD | | | | | |
| 05/09/2014 10:03AM | FILING | ADDTL COPY RECD | ANT | | | | |
| 05/07/2014 8:39AM | FILING | NOA FLD/COA | | | | | |
| 05/07/2014 | FILING | DS FLD | | | | | |

Style: Appellant  Harry Bizios

v.Appellee  Town of Lakewood Village, Texas

**Document Summary**

| Stage | Location | File Date | Event | File Description | Index | Volume | Page |
|---|---|---|---|---|---|---|---|
| FILING | Event | 12/31/2014 | OPINION ISSD REVREM | judgment | Y | 80 | 285 |
| FILING | Opinion | 12/31/2014 | OPINION ISSD REVREM | opinion | Y | 80 | 285 |
| FILING | Event | 12/30/2014 9:53AM | LTR RECD ANT | vacation ltr | | | |
| FILING | Event | 09/26/2014 11:49AM | AMICUS BRIEF RECD AMICUS | brief | | | |
| FILING | Event | 09/26/2014 2:30PM | AMICUS BRIEF RECD AMICUS | brief | | | |
| FILING | Event | 08/28/2014 3:46PM | REPLY BRIEF FLD ANT | brief | | | |
| FILING | Event | 08/18/2014 4:55PM | RESP FLD RPT | Response to Order | | | |
| FILING | Event | 08/11/2014 11:18AM | MT SUPP RECORD FLD APE | Appellee's Motion to Supplement Record | | | |
| FILING | Event | 08/08/2014 8:56PM | BRIEF FLD YES APE | Appellee's Brief | | | |
| FILING | Event | 07/31/2014 1:48PM | MT EXT BRIEF FLD APE | motion | | | |
| FILING | Event | 07/03/2014 4:02PM | MT EXT BRIEF FLD APE | motion | | | |
| FILING | Event | 07/01/2014 4:18PM | LTR RECD ANT | ant Vacation Letter | | | |
| FILING | Event | 06/25/2014 4:09PM | BRIEF FLD YES ANT | ANT Brief | | | |
| FILING | Event | 06/18/2014 1:54PM | MT EXT BRIEF FLD ANT | motion | | | |
| FILING | Event | 06/06/2014 3:38PM | LTR RECD ANT | 021400143CV.VacationLetterToCourt | | | |
| FILING | Event | 06/02/2014 2:41PM | ERPT RECORD FLD RPT | Vol. 1 | | | |
| FILING | Event | 06/02/2014 2:41PM | ERPT RECORD FLD RPT | Vol. 2 | | | |
| FILING | Event | 06/02/2014 2:41PM | ERPT RECORD FLD RPT | Vol. 3 | | | |
| FILING | Event | 06/02/2014 2:41PM | ERPT RECORD FLD RPT | Vol. 4 | | | |
| FILING | Event | 05/20/2014 3:15PM | RPT RECORD NOTICE RPT | Court Reporter Status | | | |
| FILING | Event | 05/13/2014 10:07AM | ECLK RECORD FLD | Clerk's Record | | | |
| FILING | Event | 05/09/2014 10:03AM | ADDTL COPY RECD ANT | Notice Of Appeal | | | |
| FILING | Event | 05/07/2014 8:39AM | NOA FLD/COA | Notice of Appeal | | | |
| FILING | Event | 05/07/2014 8:39AM | NOA FLD/COA | Order Granting Temporary Injunction | | | |

Style: Appellant  Harry Bizios

v.Appellee  Town of Lakewood Village, Texas

### Document Summary

| Stage | Location | File Date | Event | File Description | Index | Volume | Page |
|---|---|---|---|---|---|---|---|
| FILING | Event | 05/07/2014 | DS FLD | DocketingStatement.BiziosVs.LakewoodVlg | | | |

### Calendars

| Stage | Set Date | Calendar Name | Reason Set |
|---|---|---|---|
| SUP CT | 02/06/2015 | APPL | CT REVIEW |

### Fees

| Fee Date | Fee Type | Amount | Payment Status | Noticed Date | Payment Type | Party Type | Received From | Check Number |
|---|---|---|---|---|---|---|---|---|
| 08/11/2014 | MT FEE | $10.00 | E-PAID | | Credit Card | APE | Kaira  Cabranes | |
| 07/31/2014 | MT FEE | $10.00 | E-PAID | | Credit Card | APE | Kaira  Cabranes | |
| 07/03/2014 | MT FEE | $10.00 | E-PAID | | Credit Card | APE | Kaira  Cabranes | |
| 06/18/2014 | MT FEE | $10.00 | E-PAID | | Credit Card | ANT | Art  Anderson | |
| 06/02/2014 | RPT RECORD | $2863.00 | PAID | | | RPT | Art Anderson | |
| 05/13/2014 | CLK RECORD | $665.00 | PAID | | | CLK | Art Anderson | |
| 05/09/2014 | INDIGENT | $25.00 | E-PAID | | Credit Card | ANT | Art  Anderson | |
| 05/09/2014 | CHAPTER 51 | $50.00 | E-PAID | | Credit Card | ANT | Art  Anderson | |
| 05/09/2014 | FILING | $100.00 | E-PAID | | Credit Card | ANT | Art  Anderson | |
| 05/09/2014 | STATEWIDE EFILING | $20.00 | E-PAID | | Credit Card | ANT | Art  Anderson | |

# CLERK'S RECORD

VOLUME 1 of 1

Trial Court Cause No. 14-01991-431

In the 431st District Court

of Denton County, Texas

**Honorable, Jonathan Bailey, Judge Presiding**

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS

5/13/2014 10:07:07 AM

DEBRA SPISAK
Clerk

**Town of Lakewood Village**

**VS**

**Harry Bizios**

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS

5/13/2014 10:07:07 AM

DEBRA SPISAK
Clerk

Appealed to the Court of Appeals

for the Second District of Texas, at Fort Worth, Texas

### Attorney for Appellant(s):

**Name:** Arthur J. Anderson

Address: 500 Winstead Building

2728 N. Harwood St.

Dallas, TX 75201

Phone No.: 214-745-5745

Fax No.: 214-745-5390

E-Mail Address: Unknown

SBOT No.: 01165957

Attorney for: Harry Bizios, Appellant(s)

---

Delivered to the Court of Appeals for the 2nd Supreme

Judicial District of Texas at Fort Worth, Texas

on the 13th day of May, 2014

SHERRI ADELSTEIN, DISTRICT CLERK

DENTON COUNTY, DENTON, TEXAS

_____ /s/ *JoAnna Price* _____,

JoAnna Price

Deputy Clerk

COURT OF APPEALS

Cause No. _____

Filed in the Court of Appeals for the 2nd Supreme

Judicial District of Texas, at Fort Worth, Texas, this

_____ day of _____, 2014

_____

By: _____, Deputy

**1**

## INDEX
### 14-01991-431

Front Cover Page                                                                                    1

Index                                                                                              2

Caption                                                                                            3

Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary
and Permanent Injunction, and Request for Disclosure (filed 03/20/14)                               4

Temporary Restraining Order and Order Setting Hearing for Temporary Injunction (filed 03/20/14)    85

Citation issued to Harry Bizios (filed 03/20/14)                                                   87

Temporary Restraining Order issued to Harry Bizios (filed 03/20/14)                                88

Bizios' Motion to Dissolve Temporary Restraining Order (filed 03/24/14)                            89

Letter Regarding Hearing from Adam L. Plumbley (filed 03/25/14)                                    94

Defendant's Trial Brief (filed 04/02/14)                                                           95

Stipulated Facts and Admissiability of Exhibits (filed 04/04/14)                                  109

Agreed Order Extending and Modifying Temporary Restraining Order and Order Setting Hearing for
Temporary Injunction (filed 04/08/14)                                                             500

Town of Lakewood Village's Brief Supporting Injunctive Relief (filed 04/14/14)                    503

Order Granting Temporary Injunction (filed 04/17/14)                                              651

Notice of Appeal (filed 05/06/14)                                                                 656

Defendant's Request for Reporter's Record (filed 05/06/14)                                        658

Request for Preparation of Clerk's Record (filed 05/06/14)                                        660

Docket Sheet                                                                                      662

Bill of Costs                                                                                     663

Clerk's Certificate                                                                               664

Back Cover Page                                                                                   665

CAPTION


THE STATE OF TEXAS                         *

COUNTY OF DENTON                          *


In the 431st Judicial District Court of Denton County, Texas  the Honorable Jonathan Bailey, judge presiding in Cause Number 14-01991-431, the following proceedings were held and the following instruments and other papers were filed in this cause, to-wit:

Trial Court Cause No.  14-01991-431


TOWN OF LAKEWOOD VILLAGE             *  IN THE DISTRICT COURT OF

VS                                   *  DENTON COUNTY, TEXAS

HARRY BIZIOS                         *  431ST JUDICIAL DISTRICT

3

FILED: 3/20/2014 9:42:11 AM
SHERRI ADELSTEIN
Denton County District Clerk
By: Joanna Price, Deputy

Cause No. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § | |
| *Defendant.* | § | _____ JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION, VERIFIED REQUEST FOR TEMPORARY RESTRAINING ORDER, REQUEST FOR TEMPORARY AND PERMANENT INJUNCTION, AND REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, The Town of Lakewood Village, Plaintiff, and files this *Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure*, and would respectfully show unto the Court the following:

### I. DISCOVERY CONTROL PLAN AND REQUEST FOR DISCLOSURE

1.      Discovery is intended to be conducted under Level 2 of Rule 190 of the Texas Rules of Civil Procedure.

2.      Defendant is requested to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 of the Texas Rules of Civil Procedure.

### II. STATEMENT REGARDING DAMAGES

3.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, the Town of Lakewood Village seeks monetary relief of $100,000 or less and non-monetary relief.

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                Page 1
*Town of Lakewood Village v. Harry Bizios*

4

## III. PARTIES

4.     The Town of Lakewood Village ("Town" or "Lakewood Village") is a municipality situated in Denton County, Texas, incorporated in and operating under the laws of the State of Texas.

5.     Harry Bizios is an individual owning real property in Denton County, Texas. Service of process may be made upon Defendant Bizios at 6107 Sweeney Trail, Frisco, Texas 74034.

## IV. VENUE AND JURISDICTION

6.     The Town brings this cause of action to obtain a temporary restraining order and temporary and permanent injunctive relief and recover civil penalties against Defendant pursuant to Subchapter B of Chapter 54 and Section 212.003 of the Texas Local Government Code.

7.     Venue is proper and this Court has jurisdiction pursuant to Section 54.013 and Section 212.003 of the Texas Local Government Code.

## V. FACTS

8.     Defendant Bizios owns the property described as LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON COUNTY, TEXAS, also sometimes known as 3950 or 3960 Spinnaker Run Point, Denton County, Texas (the "Property").

9.     The Property is located in the Extraterritorial Jurisdiction ("ETJ") of Lakewood Village. A copy of the Lakewood Village map is attached as *Exhibit A*, and a depiction that the

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                    Page 2
*Town of Lakewood Village v. Harry Bizios*

5

Property is located in the Lakewood Village ETJ is attached as **Exhibit B**. Pursuant to Chapter 212 of the Texas Local Government Code, Lakewood Village has extended its subdivision regulations to its ETJ. *See* Lakewood Village Ordinance No. 13-07, attached as **Exhibit C**, which extends the subdivision regulations to the ETJ .

10.     Lakewood Village Ordinance No. 11-16, which adopts the 2006 International Residential Code, requires that before beginning new construction of a residential structure, mechanical, electrical, plumbing, and building permits (collectively "Permits") must be obtained. Excerpts of Ordinance No. 11-16 are attached as **Exhibit D**.  This Ordinance, adopting the International Residential Code, relates to:

> [E]stablish[ing] minimum requirements to safeguard the public safety, health, and general welfare through affordability, structural strength, means of egress facilities, stability, sanitation, light and ventilation, energy conservation and safety to life and property from fire and other hazards attributed to the built environment and to provide safety to fire fighters and emergency responders during emergency operations.

*See* IRC 101.3.

11.     Upon information and belief, Defendant Bizios hired a construction company, Allan Hoffmann, LLC ("Contractor"). The Defendant's Contractor is currently engaged in constructing a residential structure on the Property.

12.     Defendant has failed and/or refused to request and obtain Permits for construction of the residential structure on the Property, in violation of the Lakewood Village Ordinances.

13.     The purpose of obtaining Permits and complying with the building criteria contained in the Lakewood Village Ordinances in part is to provide minimum standards to protect the health, safety and welfare of persons and/or property by regulating and controlling the design, construction, quality of materials, and maintenance of structures.

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                    Page 3
*Town of Lakewood Village v. Harry Bizios*

6

14.     The Contractor, on behalf of Defendant, submitted site plans to the Town for the construction work on or about January 27, 2014. The site plans were reviewed by the Town and comments and changes were made to the site plans. The comments and changes were to be discussed with the Contractor at a required pre-construction meeting. The Contractor cancelled the pre-construction meeting on February 19, 2014, and never rescheduled. The Contractor is currently building the residential structure on plans without the Town's comments and changes. Part of the residential structure is being constructed within the 100 year flood plain. The finished floor surface of the structure must be built at or above the 540 msl. The current plans do not contain the level on which the residential structure is being built, and on information and belief, it appears the foundation will be below the required standard. To date, Defendant has not applied for or obtained the required Permits, in violation of the Town's Ordinances.

15.     On Monday, March 10, 2014, Lakewood Village learned that construction work for the residential structure was being conducted on the Property. On that day, the Town Secretary drove to the site and observed construction work had been performed on the Property. A picture of the work is depicted in *Exhibit E*. On Thursday, March 13, 2014, construction work continued at the Property, in violation of the Town's Ordinances. Pictures of the construction on that date are attached in *Exhibit F*. The Building Official for Lakewood Village therefore placed a stop work order ("First Stop Work Order") on the Property for performing work without the required Permits. A copy of the First Stop Work Order (unsigned) is attached as *Exhibit G*, and pictures of posting of the First Stop Work Order are attached as *Exhibit H*. Workers for the Contractor were told about the First Stop Work Order.

16.     On Friday, March 14, 2014, the posted First Stop Work Order had been removed. *See Exhibit I*. Construction work continued on the Property that date, in violation of the Town's

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                                    Page 4
*Town of Lakewood Village v. Harry Bizios*

7

Ordinances, so a stop work order ("Second Stop Work Order") was posted on the Property. A copy of the Second Stop Work Order (unsigned) is attached as *Exhibit J*, and a picture of the posted Second Stop Work Order is attached as *Exhibit K.* The Second Stop Work Order was discussed with the Owner and the Contractor. Nevertheless, construction continued on the Property, in violation of the Town's Ordinances. *See Exhibit L.* On Tuesday, March 18, the Second Stop Work Order had been removed from the Property, *see Exhibit M*, workers were observed leaving the site with construction equipment on that date, *see Exhibit N*, and construction continued on the Property on Wednesday, March 19, 2014, all in violation of the Town's Ordinances.

17.     Upon information and belief, Defendant has begun pier construction work for the foundation of the Property. To date, Defendant has failed to submit an engineer's certification that the pier construction being performed on the Property was done in accordance with an engineer's plan as required by the Town's Ordinances.

18.     To date, and despite ongoing construction of the residential structure on the Property, Defendant has not applied for nor obtained the Permits for the Property.

19.     To date, Defendant has failed to permit the Building Official to inspect the construction work being done on the Property in violation of Ordinance 11-16, which incorporates R109.1 – R109.3 of the International Residential Code.

20.     To date, Defendant has failed to abide by the stop work orders posted on the Property, and discussed with the Owner and Contractor. Failing to abide by a stop work order is proscribed by Ordinance 11-16, which incorporates Chapter R114.2 of the International Residential Code.

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                    Page 5
*Town of Lakewood Village v. Harry Bizios*

8

## VI. CAUSE OF ACTION

21. Subchapter B of Chapter 54 and Section 212.003 of the Texas Local Government Code apply to the Lakewood Village Ordinances.

22. Pursuant to Sections 54.016 and/or Section 212.003(c) of the Texas Local Government Code, Plaintiff requests that the Court issue a temporary restraining order, ordering Defendant to immediately cease any construction on the Property (1) without obtaining necessary permits; (2) without obtaining necessary engineering inspection certificates; (3) without permitting inspections by the Building Official or designee; and (4) in violation of stop work orders from the Building Inspector.

23. Pursuant to Sections 54.012, 54.016, and Section 212.003 of the Texas Local Government Code, Plaintiff requests upon notice and hearing, the issuance of a temporary injunction and a permanent injunction, ordering Defendant to comply with Lakewood Village Ordinances.

24. Section 212.003 of the Local Government Code provides: **"The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable in the extraterritorial jurisdiction."** TEX. LOC. GOV'T CODE ANN. § 212.003(c) (emphasis added). In seeking injunctive relief, it is not necessary for the municipality to prove that another adequate remedy or penalty for a violation does not exist or to show that prosecution in a criminal action has occurred or has been attempted. TEX. LOC. GOV'T CODE § 54.016(b).

25. Pursuant to Section 54.017 of the Texas Local Government Code, Plaintiff requests civil penalties not to exceed one thousand dollars ($1,000) per day for each violation of Lakewood Village Ordinances.

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure        Page 6
*Town of Lakewood Village v. Harry Bizios*

9

26. As a matter of law, Lakewood Village, as a municipality, is not required to post a bond to obtain injunctive relief requiring the Defendant to comply with the Lakewood Village Ordinances.

## VII.  PRAYER

WHEREFORE, Plaintiff the Town of Lakewood Village prays for the following relief:

1) Plaintiff be granted a temporary restraining order, ordering Defendant, his agents, contractors, and employees and the Defendant's representative(s) with control over the Property to allow inspections by the Town's Building Official or designee on the Property, and immediately cease and desist any construction on the Property until such time as they have (1) applied for and obtained approval from the Town of Lakewood Village of necessary permits and inspections; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

2) Plaintiff be granted temporary and permanent injunctive relief as provided herein;

3) Plaintiff be awarded judgment against Defendant for a civil penalty not to exceed one thousand dollars ($1,000) per day for each violation of the Code of Ordinances, Town of Lakewood Village, Texas on the Property;

4) Plaintiff be granted judgment against Defendant for all costs of court;

5) Plaintiff be granted judgment against Defendant for post-judgment interest at the highest legal rate; and

6) Plaintiff be granted such other and further relief, both general or special, at law or in equity, to which it may show itself to be justly entitled.

Respectfully submitted,

_____
WM. ANDREW MESSER
STATE BAR NO. 13472230
andy@txmunicipallaw.com
BRENDA MCDONALD
STATE BAR NO. 14993300
brenda@txmunicipallaw.com
BRETT GARDNER
STATE BAR NO. 24078539

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                  Page 7
*Town of Lakewood Village v. Harry Bizios*

**10**

brett@txmunicipallaw.com
**MESSER ROCKEFELLER & FORT, PLLC**
6351 PRESTON ROAD, SUITE 350
FRISCO, TEXAS 75034
972.668.6400 - TELEPHONE
972.668.6414 - FACSIMILE

**ATTORNEYS FOR PLAINTIFF**
**TOWN OF LAKEWOOD VILLAGE**

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                    Page 8
*Town of Lakewood Village v. Harry Bizios*

11

## VERIFICATION

STATE OF TEXAS
COUNTY OF DENTON

I, Steve Freeman, the Building Official for the Town of Lakewood Village, after being duly sworn, hereby certify that I am qualified and authorized to make this affidavit, and that I have read each and every factual allegation in paragraphs 8-20 of the foregoing pleading and that said factual allegations are within my personal knowledge and are true and correct.

_____
Steve Freeman, Building Official

Subscribed and sworn to before me this 19th day of March 2014.

_____
Notary Public

KAIRA WILLIAMS
My Commission Expires
February 25, 2018

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure
Page 9
*Town of Lakewood Village v. Harry Bizios*

12

## VERIFICATION

STATE OF TEXAS
COUNTY OF DENTON

I, Linda Asbell, Town Secretary for the Town of Lakewood Village, after being duly sworn, hereby certify that I am qualified and authorized to make this affidavit, and that I have read each and every factual allegation in paragraphs 8-20 of the foregoing pleading and that said factual allegations are within my personal knowledge and are true and correct.

_____
Linda Asbell, Town Secretary

Subscribed and sworn to before me this 19th day of March 2014.

_____
Notary Public

KAIRA WILLIAMS
My Commission Expires
February 25, 2018

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure                Page 10
*Town of Lakewood Village v. Harry Bizios*

13

## <u>LOCAL RULE 2.1 CERTIFICATE</u>

I certify that to the best of my knowledge the party against whom relief is sought *ex parte* is not represented by counsel in the matter made the basis of the relief sought.

Certified to this 20th day of March, 2014.

_____
Wm. Andrew Messer

Plaintiff's Original Petition, Request for Temporary Restraining Order,
Request for Temporary and Permanent Injunction, and Request for Disclosure        Page 11
*Town of Lakewood Village v. Harry Bizios*

14

# Exhibit A

# TOWN OF LAKEWOOD VILLAGE
# OFFICIAL MAP



# Exhibit B

# TOWN OF LAKEWOOD VILLAGE
# OFFICIAL MAP





# Exhibit C

**STATE OF TEXAS** )

)       **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instrument is a full, true and correct copy of the Town of Lakewood Village Ordinance 13-07. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 19th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 13-07

**AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, REGULATING SUBDIVISIONS AND OTHER PROPERTY DEVELOPMENTS, PROVIDING FOR PRELIMINARY PLATS, FINAL PLATS, MINOR PLATS, VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS; PROVIDING FOR DEVELOPMENT PROCESS; PROVIDING FOR STANDARDS AND REQUIREMENTS; PROVIDING FOR STREETS AND DRAINAGE, WATER AND SEWER INFRASTRUCTURE; EXTENDING REGULATIONS TO THE TOWN'S EXTRATERRITORIAL JURISDICTION; PROVIDING SEVERABILITY CLAUSE; PROVIDING SAVINGS CLAUSE; PROVIDING A PENALTY NOT TO EXCEED THE SUM OF TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE AND A SEPARATE OFFENSE SHALL BE DEEMED COMMITTED EACH DAY DURING OR ON WHICH A VIOLATION OCCURS OR CONTINUES; PROVIDING A REPEALER; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** the Town Council ("Town Council") desires to amend Ordinance 08-06 and all other ordinances regarding the Town's rules and regulations for subdivisions and property development as authorized by Chapter 212, Texas Local Government Code, as amended; and

**WHEREAS,** the Town Council ("Town Council") desires to review for approval or disapproval plan, plats, and replats filed with the Town as authorized by Chapter 212, Tex. Loc. Gov. Code (Vernon), as amended; and

**WHEREAS,** the Town Council finds that there is a public necessity requiring adoption of this Ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development and extend such rules and regulations to the extraterritorial jurisdiction of the Town ("ETJ") to protect the public health, welfare and safety of the citizens of the Town and the ETJ; and

**WHEREAS,** the Town Council is authorized and empowered to or require the developer to (i) design, install or improve streets, roads, water and a sanitary sewer systems within the Town by constructing, extending, or enlarging such system, and is further authorized to adopt any rules and regulations appropriate to the exercise of such powers, and to (ii) protect the public health, welfare and safety of the citizens of the Town; and

**WHEREAS,** the Town Council has conducted a public hearing on the application of the Town's regulations for subdivisions and property development to its ETJ, and the Town Council finds and determines that all required notices and hearings in this regard have been given and that the meeting at which the public hearing has been held and at which this ordinance is being adopted were open to the public and conducted according to applicable law; and

**WHEREAS,** the Town Council is authorized and empowered to apply the Town's regulations for subdivisions and property development to its ETJ pursuant to Section 212.003 of the Texas Local Government Code; and

**WHEREAS,** the Town Council hereby finds that the adoption of this Ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS :**

## ARTICLE I. IN GENERAL

### Sec. 1. Findings Incorporated.

The findings set forth above are incorporated into the body of this ordinance as if fully set forth herein.

### Sec. 2. Short title.

The following regulations are hereby adopted and shall be known and may be cited as "Town of Lakewood Village Subdivision and Property Development Regulations."

### Sec. 3. Definitions.

The following words, terms, and phrases, when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning. Words not specifically defined shall have the meanings given in Webster's Ninth New Collegiate Dictionary, as revised.

*Accessory structure or building* shall mean a subordinate structure or building customarily incident to and located on the same lot occupied by the main structure or building.

*Applicant* shall mean the owner(s) of the property to be developed.

*Bond* shall mean any form of security, including a cash deposit, surety bond, or instrument of credit in an amount and form approved by the Town.

*Building* shall mean any structure designed or built for the support, enclosure, shelter or protection of persons, animals, chattel or property of any kind.

*Town* means Town of Lakewood Village.

*Town Council* means Town Council of the Town of Lakewood Village.

*Town standards* shall mean those standards and specifications, together with all tables,

charts, graphs, drawings and other attachments hereinafter approved and adopted by the Town Council, which may be amended from time to time, and are administered by the Town staff for the construction and installation of streets, sidewalks, drainage facilities, water and sanitary sewer mains and any other public facilities. All such facilities which are to become the property of the Town upon completion must be constructed in conformance with these standards.

*Construction plans* shall mean the maps, drawings and technical specifications, including bid documents and contract conditions, where applicable, which provide a graphic and written description of the character and scope of the work to be performed prepared for approval by the Town for construction.

*Cross drainage* shall mean a defined waterway course, approximately perpendicular to the proposed roadway, which requires the construction of a bridge, pipes or box culvert, or other structure to conduct drainage under the roadway.

*Developer* shall mean any person, corporation, governmental or other legal entity engaged in the development of property by improving a tract or parcel of land for any use. The term "developer" is intended to include the term "subdivider."

*Development* shall mean the construction of one (1) or more new buildings or structures, or the structural alteration, relocation or enlargement of one (1) or more new buildings or structures of an existing building or structure on one (1) or more building lots or sites, or the installation of site improvements.

*Easement* shall mean a grant by a property owner to the public, a corporation, or persons for a general or specific use of a defined strip or parcel of land, for such purpose as the installation, construction, maintenance and/or repair of utility lines, drainage ditches or channels, or other public services, the ownership or title to the land encompassed by the easement being retained by the owner of the property.

*Engineer* shall mean any person duly authorized under the Texas Engineering Practice Act (V.A.C.S. art. 3271a), as amended, to practice the profession of engineering.

*Engineering plans* shall mean the maps and drawings required for plat approval.

*Lot* shall mean an undivided tract or parcel of land having access to a street, which is designated as a separate and distinct tract or lot number or symbol on a duly approved plat filed of record. The terms "lot" and "tract" shall be used interchangeably.

*Off-site* shall mean any premises not located within the property to be developed, regardless of ownership.

*Owner* shall mean any persons, firm or corporation having legal title to the property.

*Plat* shall mean a map representing a tract of land showing the boundaries of individual properties and streets or a map, drawing, chart, or plan showing the layout of a proposed

subdivision into lots, blocks, streets, parks, school sites, commercial or industrial sites, drainage ways, easements, alleys, which an applicant submits for approval and a copy of which he intends to record with the County Clerk of Denton County.

*Plat, final,* shall mean the map or plan of a proposed development submitted for approval by the Town Council, where required, prepared in accordance with the provisions of this chapter and requested to be filed with the County Clerk of Denton County.

*Plat, preliminary,* shall mean the initial map or plan of a proposed development showing the general layout of streets, blocks and lots, utility systems, and drainage systems.

*Right-of-way* shall mean a strip of land acquired by dedication, prescription or condemnation and intended to be occupied by a road, sidewalk, railroad, electric transmission facility, water mains, sewer mains, storm drainage or other similar facility. Rights-of-way intended for streets, sidewalks, water mains, sewer mains, or any other use involving maintenance by a public agency shall be dedicated to the public use by the plat applicant either by easement or in fee simple title.

*Streets and alleys* shall mean a way for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, throughway, road, avenue, boulevard, lane, alley, place or however otherwise designated. Town streets shall conform to the following classifications:

(1) Arterial streets and highways are those which are used primarily for higher speed and higher volume traffic. Routes for such streets shall provide for cross-town circulation and through-town movements.

(2) Collector streets are those which carry traffic from minor streets to the major system of arterial streets and highways, including the principal entrance, circulation streets of a residential development and streets for circulations within such a development of a residential subdivision.

(3) Minor streets are those, which are used primarily for access to abutting properties.

(4) Marginal access streets are minor streets located parallel to and adjacent to arterial streets and highways, providing access to abutting properties and protection from the traffic of the thoroughfares.

(5) Alleys are minor ways used primarily for access to abutting properties for vehicle service usually to the back or side of a property.

*Structural alterations* shall mean the installation or assembly of any new structural components, or any change to existing structural components, in a system, building or structure.

*Structure* shall mean anything constructed or erected, which requires location on the ground, or attached to something having a location on the ground, including, but not limited to, buildings of all types and ground signs, but exclusive of customary fences or boundary or retaining walls.

*Subdivision* shall mean dividing a tract in two (2) or more parts for the purpose of creating

lots, including an addition to the Town, to lay out suburban, building or other lots or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to the public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks or other parts. "Subdivision" refers to any division irrespective of whether the actual division is made by metes and bounds description in a deed of conveyance or a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A subdivision does not include a division of land into parts greater than five (5) acres, where each part has access and no public improvement is being dedicated.

## Sec. 4. Purpose.

The purpose of this ordinance is to set forth the procedures and standards for development of property, layout and design of subdivisions or real property within the corporate limits of the Town which are intended to promote the health, safety and general welfare of the Town and the safe, orderly, and healthful development of the Town.

## Sec. 5. Compliance required.

(a) Any owner of land who proposes the development of a lot or tract of land located within the corporate limits of the Town or ETJ or the subdivision of a lot or tract located in the corporate limits of the Town or ETJ shall have a plat of the lot or tract of land or subdivision prepared and approved in accordance with all Ordinances of the Town and recorded with the County Clerk of Denton County.

(b) Notwithstanding paragraph (a) above, a plat shall not be required where the development of the lot or tract of land is for the sole purpose of performing alteration(s) or improvements to an existing single-family residence or the auxiliary uses thereto. All such alterations or improvements must be permitted in compliance with all applicable codes and ordinances of the Town

(c) No Final Plat shall be approved within the Town of Lakewood Village or its extraterritorial jurisdiction until the applicant has made adequate provision for thoroughfares as shown on the Thoroughfare Plan (map) as approved by the Town. The Thoroughfare Plan is a guide for the roadway connections and types that will be needed in the future. Subject to Town Council, or designee approval, as long as the connection is made, whether or not it is close to the exact alignment shown on the Thoroughfare Plan, no Thoroughfare Plan amendment should be necessary. The design and construction of the proposed thoroughfare shall be in conformance with the Town's master plans for thoroughfares and with any adopted *Development Standards for Construction* (DSC), and shall be subject to approval by the Town Council, or designee. If a different roadway type is found to be adequate or if the connection is not proposed to be made, then the plat may not be approved unless the thoroughfare plan is amended. A Traffic Impact Analysis may be required prior to approval of the proposed amendment .

## Sec. 6. Extension of Subdivision Rules and Regulations, Building Standards and Construction Permits and Fees, and Uniform Codes to the Extraterritorial Jurisdiction.

This ordinance is hereby adopted under the authority of the Constitution and laws of the State of Texas, including Texas Local Government Code Chapter 212, and is being adopted after conducting a public hearing on the matter.

The Town Council hereby amends Ordinance 08-06, the Town of Lakewood Village Subdivision and Property Regulations by extending the application of the Town of Lakewood Village Subdivision and Property Regulations to the extraterritorial jurisdiction of the Town, as that area may exist from time to time. This ordinance shall be applicable to the filing of plats, the subdivision of land, and development of property within the corporate limits of the Town and its extraterritorial jurisdiction as they may exist from time to time adjusted.

All ordinances of the Town, including Ordinance 10-01, which by such ordinance(s) the Town Council has adopted and made applicable to the Town the uniform codes, including but not limited to those concerning and applicable to building, plumbing, mechanical, energy, fuel and gas, property maintenance, electrical, fire and all appendices thereto, and all ordinance(s) concerning and related to permits and permit fees for building and construction, shall be and are hereby amended to apply and extend all such ordinances and their provisions to the "ETJ" of the Town to the full extent as permitted by law.

The Town shall have all remedies and rights provided by Texas Local Government Code, Chapter 212, with regard to the control and approval of subdivisions and plats and property development both within the Town and within its ETJ to the full extent as permitted by law.

## ARTICLE II. PLATS

### DIVISION 1. GENERALLY

**Sec. 7. Fees.**

The applicant for approval of a preliminary plat, final plat, replat, amended plat, minor plat or modified final plat shall, upon submission of the plat application and all required documentation, pay a nonreturnable fee, as established by the Town Council, for the review and processing of the plat application. Upon approval of the final plat, replat, amended plat or final minor plat, the applicant shall pay an additional recording fee established by the county for recording the plat with the county clerk.

> Preliminary, Replat and Final Plat Review Fees. A preliminary plat, replat, and final plat review fee shall be paid to the Town upon the filing of the preliminary and final plat in accordance with the following schedule: $700 per plat plus $20.00 per lot.

**Sec. 8. Process for approval.**

(a) The plat shall be scheduled for consideration at the next regular meeting of the Town

Council.

(b) If the plat is disapproved by the Town Council, the applicant may correct the items of concern and resubmit the plat for approval one (1) time within six (6) months by paying one-half (1/2) of the original fee. If the plat is disapproved a second time or if a second request is not received within six (6) months of the first disapproval, the applicant will be required to repeat the plat application process from the beginning and pay all standard application fees.

(c) An applicant may withdraw his plat application from consideration at any time during the application process by filing a written notice of withdrawal with the Town. Upon filing the notice to withdraw, the Town shall discontinue processing the plat application. The applicant must file a written request to proceed with further consideration of the plat within six (6) months of withdrawal and the Town shall continue the application process. If the request to proceed with further consideration of the plat is filed more than six (6) months after filing the notice of withdrawal, the applicant shall be required to repeat the plat application process from the beginning and pay the standard application fees.

## Sec. 9. Requirements for approval of application by Town Council.

(a) Within thirty (30) days of the date that the application is deemed administratively complete, the Town Council shall approve a plat if it complies with the requirements of this chapter, the applicant is not in arrears in the payment of any debts owed the Town required by this chapter on a previous plat, it conforms to the general plan of the Town and its current and future streets, alleys, parks, playgrounds, and public utility facilities plans, and it conforms to the Town's general plan for the extension of roads, streets, and public highways, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities.

(b) A plat is considered approved by the Town Council unless it is disapproved within such thirty-day period.

## Sec. 10. Recordation.

(a) Preliminary plats are not recorded with the county clerk.

(b) Applicant shall record all plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(c) Applicant shall record all other plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(d) A final plat shall become null and void six (6) months after its approval by the Town Council, unless the final plat is filed and recorded in Denton County Clerk Real Property Records.

(e) A general development plan shall become null and void six (6) months after its approval by the City Council, unless the general development plan is filed and recorded in Denton County Clerk Real Property Records.

## Sec. 11. Approval of preliminary plats.

Approval of a preliminary plat shall be deemed to be an expression of approval to the layout submitted as a guide to the preparation of the final plat and shall not constitute approval of a final plat.

## DIVISION 2. PRELIMINARY PLATS

## Sec. 12. Form, contents and required documentation.

(a) Preliminary plats shall be filed with the town secretary. The town secretary shall stamp the following notice on the face of each preliminary plat: "Preliminary plat for inspection purposes only and in no way official or approved for record purposes and not approved for construction."

(b) When filing a preliminary plat application, it shall be accompanied by the following minimum documentation:

    (1) Completed preliminary plat application;

    (2) Eight (8) copies of the plat;

    (3) Eight (8) copies of engineering plans;

    (4) Deed showing current ownership of the platted property;

    (5) Tax certificates showing property owner is not in arrears in payment of taxes; and

    (6) Nonrefundable application fee, as established by the Town Council.

(c) Preliminary plats must meet the following criteria and contain the following information:

    (1) Scaled drawing no smaller than 1" = 200' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets);

    (2) Boundary of the subject tract;

    (3) All existing and/or proposed streets and alleys with street names, widths and relation to surrounding existing street patterns;

(4) Approximate width and depth of all proposed lots;

(5) Layout, in dotted lines, of all adjacent lots to the property being platted showing lot size, lot and block numbers, name of existing subdivision or property owner if undeveloped property;

(6) FEMA designated 100-year floodplain boundary;

(7) Date, scale, north point, and small scale location map:

(8) Name and address of all property owners of the property being platted;

(9) Name and address of engineer and surveyor; and

(10) Signed statement of the engineer and/or surveyor who prepared the preliminary plat indicating the records or survey from which the property description of the boundary of the proposed plat was developed.

(d) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Layout of all needed off-site utilities;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size of line, location of manholes and cleanouts;

(4) Drainage plan prepared in accordance with standard 100 year flood frequencies rainfalls which shows the overall analysis of the change of existing condition to fully developed condition and identify approximate location where water will exit the subdivision. Drainage plan shall show all contours for proposed development; and

(5) As-built drawings of existing structures, if applicable.

DIVISION 3. FINAL PLATS

### Sec. 13. Form, contents and required documentation.

(a) Final plats are mandatory.

(b) In cases where a preliminary plat was previously approved, the final plat shall conform to the approved preliminary plat.

(c)     Final plats shall be filed with the City Secretary and shall be accompanied by the following minimum documentation:

(1) Completed final plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes;

(6) A statement on the plat application showing that all fees owed the Town on any prior projects has been paid in full at the time the application was filed; and

(7) Nonrefundable application fee, as established by the Town Council.

(d) Final plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 100' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets and an index sheet shall be drawn on a sheet twenty-four (24) inches by thirty-six (36) inches showing the entire property being platted);

(2) The shape and the exterior boundaries of the property being platted shall be indicated by the use of a distinctive and individual symbol;

(3) The length of all straight lines, deflection angles, radii, arcs, and central angles of all curves shall be given along the property lines of each street or tabulated on the same sheet showing all curve data with its symbol. All dimensions along the lines of each lot with the angles of intersections which they make with each other shall be indicated;

(4) The names of all adjoining subdivisions, the side lines of abutting lots, lot and block numbers, all in dotted lines, and where possible, accurate reference ties to at least two (2) adjacent recognized land corners shall be clearly indicated;

(5) The description and location of all survey monuments placed on the property being platted shall be indicated;

(6) A title shall be indicated, including the name of the property being platted, the name of the applicant and scale and location of the property being platted with reference to original surveys and a north point which may be magnetic or true north, with notation stating which.

(7) FEMA designated 100-year floodplain boundary, including finish floor elevation established a minimum of three feet above the calculated 100 year flood. A

surveyor's certificate shall be placed on the final plat as follows:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my personal supervision, in accordance with the Subdivision and Property Development Regulations of the Town of Lakewood Village, Texas.

---------------------------------
Signature

---------------------------------
Texas Reg. No.

(9) A certificate of ownership and of dedication of all streets, alleys, easements and lands to public use forever, signed and acknowledged before a notary public by the owner of the land, shall appear on the face of the map, containing complete and accurate description of the property being platted and the streets dedicated;

(10) The applicant will furnish the Town a copy of the dedication at the same time the final plat is submitted for approval; and

(11) The following certificate of approval by the Town Council shall be placed on the plat:

Approved this _____ day of _____, 20_____, by the Town Council of the Town of Lakewood Village, Texas.

---------------------------------
Mayor

---------------------------------
Town Secretary

(e) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Street layout and grades;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size and grade of lines, location of manholes and cleanouts, and lift station design;

(4) All drainage structure designs, analysis of as-is and full development for where the water exits the subdivision, analysis of all streets to determine if they meet drainage criteria, FEMA floodplain and floodway boundaries (if applicable), and letter(s) of

release from property owners affected by diversion of water (except for watercourse(s) designated on current Town topography maps); and

(5) As-built drawings of existing structures, if applicable.

## DIVISION 4. VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS*

### Sec. 15. Vacation of plats.

(a) Any plat, replat or amended plat previously recorded with the county clerk may be vacated by the property owner(s) at any time prior to the sale of any lot therein by filing a written signed and acknowledged instrument declaring the same to be vacated and recorded with the county clerk.

(b) If the one (1) or more lots have been sold, the plat, replat or amended plat may be vacated by the property owners by filing a written signed and acknowledged instrument with the town secretary. The vacating instrument must be approved by the Town Council in the same manner as the original plat, replat or amended plat. The Town Council shall disapprove the vacating instrument which abridges or destroys public rights in any of its public uses, improvements, streets, or alleys. Upon approval by the Town Council, the vacating instrument may be recorded with the county clerk and the vacated plat, replat or amended plat shall have no effect.

**State law reference(s)**--Vacating plats, V.T.C.A., Local Government Code § 212.013.

### Sec. 16. Replats without vacating preceding plat.

A replat may be recorded and controls over a previously recorded plat without vacation of that plat if the replat is signed and acknowledged by the owners of the property being platted, does not attempt to amend or remove any covenants or restrictions, and is approved, after a public hearing on the matter, by the Town Council.

### Sec. 17. Plat amendments or corrections.

(a) The Town Council may approve and issue an amended plat, which may be recorded with the county clerk and controls over the preceding plat without vacation of the plat, if the amended plat is signed by the applicant(s) and is solely for one (1) or more of the following purposes:

(1) To correct an error in a course or distance shown on the preceding plat;

(2) To add a course or distance that was omitted on the preceding plat;

(3) To correct an error in the description of the real property shown on the preceding plat;

---

*State law reference–Vacating plats, amending plats, etc., V.T.C.A. Local Government Code § 212.013 et seq.

(4) To indicate monuments set forth after death, disability, or retirement from practice of the engineer or surveyor responsible for setting monuments;

(5) To show the proper location or character of any monument which has been changed in location or character or which originally was shown incorrectly as to location or character on the preceding plat;

(6) To correct any other type of scrivener's or clerical error or omission previously approved by the planning and zoning commission and/or Town Council, including lot numbers, acreage, street names, and identification of adjacent recorded plats;

(7) To correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the other owners in the plat;

(8) To relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement;

(9) To relocate one (1) or more lot lines between one (1) or more adjacent lots where the owner(s) of all such lots join in the application for the plat amendment; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not increase the number of lots; or

(10) To make necessary changes to the preceding plat to create six (6) or fewer lots in the plat if the changes do not affect applicable zoning and other regulations of the Town, and the changes do not attempt to amend or remove any covenants or restrictions and the area covered by the changes is located in an area that the Town Council has approved, after a public hearing, as a residential improvement area.

(11) To replat one or more lots fronting on an existing street if the owners of all those lots join in the application for the amendment; the amendment does not attempt to remove recorded covenants or restrictions or increase the number of lots; and, the amendment does not create or require the creation of a new street or make necessary the extension of municipal facilities.

(b) Notice, a hearing, and the approval of other lot owners are not required for the approval and issuance of an amended plat.

## ARTICLE III. DEVELOPMENT PROCESS

### Sec. 18. Construction of infrastructure.

(a) Following approval of the final plat, the plat applicant shall submit full construction plans for all proposed infrastructure to be constructed for the platted property. Construction plans

submitted shall be in conformance with the approved plat. The Town engineer shall review the submitted plans for compliance with the construction standards adopted by the Town.

(b) Upon approval of construction plans by Town Council, the plat applicant and/or the plat applicant's contractor will provide written notification to the Town engineer of the intent to commence construction of the required infrastructure. No work may be performed unless written notification has been provided to the Town engineer. The written notification shall contain the following information:

(1) Name of the plat or subdivision;

(2) Plat applicant's name;

(3) Contractor's name, address and phone number;

(4) Type of construction to be performed; and

(5) Estimated value of construction contract.

(c) The Town engineer shall issue an acknowledgment of receipt of notification to the developer and/or his contractor.

### Sec. 19. Acceptance of infrastructure.

(a) Upon completion of all required infrastructure, prior to the acceptance of the subdivision by the Town for maintenance, the applicant shall post, or cause to be posted, a maintenance bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form, to guarantee the maintenance of the construction for a period of one (1) year after its completion and acceptance by the Town. In lieu of a maintenance bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form. The actual value of the maintenance bond or letter of credit or cash bond shall be ten (10) percent of the full cost of the water and sewer system and fifteen (15) percent of the full cost of the cost of street and drainage construction, as determined by the estimate of construction costs.

(b) Upon receipt of the approved maintenance bond, irrevocable letter of credit or cash bond, the Town engineer shall issue a written letter of acceptance of the infrastructure and notify the building and development department that the subdivision has been accepted by the Town.

### Sec. 20. Building permits issued prior to completion of infrastructure.

(a) In the event an applicant wishes to obtain building permits prior to acceptance of the subdivision by the Town, the applicant shall post with the Town a completion bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form for all construction included in the approved

construction plans that has not been completed. In lieu of a completion bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form.

(b) Under no circumstances shall building above the foundation be permitted until adequate fire protection is available. Adequate fire protection means:

(1) Town utilities are installed;

(2) Fire hydrants providing protection are operational; and

(3) Streets are open and drivable, street subgrades worked to proper compaction and base course installed, graded and leveled, to facilitate vehicle movement.

(c) After the plat has been recorded and the completion bond, irrevocable letter of credit or cash bond has been received and approved by the Town, the Town engineer shall notify the building and development department, by lot and block numbers, that building permits may be issued.

## Sec. 21. Agreements with the Town.

(a) All agreements entered into between the Town and the developer and/or applicant, as a condition of plat approval, shall be recorded along with the final plat.

(b) The executed agreement shall be submitted to the Town Council in conjunction with the original drawings required for filing and recordation.

## ARTICLE IV. STANDARDS AND REQUIREMENTS

## DIVISION 1. GENERALLY

## Sec. 22. Lots and blocks.

(a) All lots of the plat shall front on a dedicated street.

(b) In general, lots shall conform in width, depth, and area to the pattern already established in the adjacent areas, having due regard to the character of the neighborhood, its particular suitability for residential purposes, and also taking into consideration the natural topography of the ground, drainage, sanitary sewage facilities, and the proposed layout of the streets.

(c) Lots shall have the size, width measurements, front, rear, and side yard requirements required by the current Town Zoning Ordinance..

(d) The area of the lots shall be computed by taking the average width of the lot times the average depth of the lot measured from the street line to the rear lot line.

(e) All sidelines of lots shall be at right angles to straight street lines or radial to curved street lines, unless a variation from this rule would, in the opinion of the Town Council, produce a better lot plan and better utilize the proposed development.

## Sec. 23. Park sites.

The Town Council shall consider offers of land for parks or playgrounds which conform to the current master plan adopted by the Town, provided such plan exists.

## Sec. 24. Use of Town condemnation authority.

(a) Water and sewer mains, force mains and lift stations, streets and drainage ways shall be located in easements or rights-of-way secured and paid for by the applicant. Such easements shall be properly assigned to the Town before service is extended to the subdivision.

(b) In cases where easements cannot be secured by the applicant, the applicant may file a written petition with the Town engineer, accompanying the plat application, requesting that the Town Council utilize its condemnation authority. The written petition must satisfy all of the following criteria:

(1) The applicant must establish that clear evidence of public need exists;

(2) The applicant must establish that the proposed extension is in accordance with the current adopted master utility plan(s), if such plan(s) exists;

(3) The applicant must establish that the proposed extension will be able to serve other development areas;

(4) The applicant must agree to pay all costs of the condemnation; and

(5) The applicant must present written evidence that every practical attempt to secure the needed easements and/or right-of-way has been made by submitting the following:

a. A condemnation appraisal by an independent appraiser as to the current market value and damages, if any, of acquiring the easement and/or right-of-way; and

b. Documentation that a written offer has been made to purchase the easement and/or right-of-way for the appraised value and the offer was rejected.

(c) The petition shall be forwarded to the Town for review and recommendation and scheduled for consideration by the Town Council.

DIVISION 2. STREETS AND DRAINAGE

## Sec. 25. Streets.

(a) Street widths in subdivisions shall conform to:

| Designation | Right-of-Way (feet) | Paving (feet) |
| --- | --- | --- |
| A + major arterial | 110 | 86 |
| A major arterial | 110 | 90 |
| B + minor arterial | 90 | 66 |
| B minor arterial | 80 | 56 |
| C major collector | 70 | 44 |
| D minor collector | 60 | 38 |
| E minor local | 50 | 31 |

(b) Existing streets shall be continued where practical, as determined by the Town Council. Continuations of existing streets shall have the same or greater right-of-way, pavement widths, and composition as the existing streets being connected. Street names shall be continuous.

(c) All necessary street rights-of-way shall be dedicated as part of the platting process and shall be dedicated to the Town without cost.

(d) Dead-end streets may be platted where the land adjoining the plat has not been platted. In the event that such dead-end street exceeds one hundred fifty (150) feet in length or one (1) lot width, from the nearest street intersection, the street will be provided with a cul-de-sac, either permanent or temporary, having a minimum right-of-way radius of fifty (50) feet.

(e) Where dead-end streets are dictated by lot designs, such dead-end streets shall be provided with a permanent cul-de-sac having a minimum right-of-way radius of fifty (50) feet.

(f) No street intersection shall be designed having an inside angle of less than thirty (30) degrees between the two (2) intersecting street lines, nor more than one hundred fifty (150) degrees.

(g) Block lengths between intersecting cross streets or to the end of a cul-de-sac shall be no more than one thousand two hundred (1.200) feet.

(h) Streets, where practical, shall be designed and platted with appropriate regard to topographical features, i.e., creeks and drainage ways, wooded areas, etc., with the aim of creating desirable and attractive treatments of significant existing features. (Ord. No. 95-38, § 1, 4-25-95). Private Streets shall not be allowed.

(i) Driveways; Any driveway or other common access to more than two residences which is not defined in Section 23(a), shall be considered a minor local road and shall conform to defined standards.

(j) Streets shall be concrete with a minimum thickness of 5" and shall meet current Town design standards as determined by the Town engineer.

### Sec. 26. Alleys, reserve strips.

(a) Alleys and/or easements shall be laid in the rear of lots fronting on adjoining streets where practicable. In residential subdivisions, the minimum width of right-of-way of an alley shall not be less than twenty (20) feet. All alleys shall be paved for the entire width of the right-of-way to the same specifications as minor residential streets. The rear or side line easement, where alleys are not provided, shall be a minimum of twenty (20) feet wide, arranged such that each lot shall have an equal ten-foot easement.

(b) No plat showing reserve strips of land controlling access to public ways or adjoining properties will be approved.

### Sec. 27. Drainage in special flood hazard areas.

Drainage structures in areas of special flood hazard in the Town shall comply with the provisions of the Town Ordinances.

### Sec. 28. Drainage not in special flood hazard areas.

(a) Design of all improved open drainage courses and enclosed drainage structures shall be by a registered professional engineer in accordance with the current drainage design standards approved by the Town Council. A review of the downstream drainage system capacity to a point of discharge into the lake area shall be made. The rate of storm water discharge from the proposed development shall not exceed flow capacity of any existing structure or drainage system. This may require storm water detention or retention on site of the project.

(b) The design and construction of all improved open drainage courses and enclosed drainage structures shall provide for adequate access for the performance of necessary maintenance by the Town.

(c) All improved drainage courses and enclosed drainage structures shall be dedicated to the Town and accepted for maintenance by the Town upon approval of the construction by the Town engineer.

(d) The Town shall maintain all improved drainage courses, provided that the original design and construction has been approved by the Town engineer and accepted by the Town for maintenance.

(e) Improved open drainage courses shall conform as follows:
   (1) Open drainage courses which carries runoff from a street, between two (2) lots, to a drainage course running behind lots shall be a concrete-lined flume.

   (2) Open drainage courses running behind lots may be of earthen channel or concrete-lined channel, provided the type of channel used satisfies the design criteria (velocity, type of soil, etc.) in accordance with the current drainage design standards approved by the Town Council.

(3) Where the open drainage course is a concrete-lined flume, the width of the easement shall be equal to the width of the flume. All other open drainage courses require the width of the easement to be equal to the width from top-of-bank to top-of-bank plus maintenance way needs as given in the drainage design standards.

(f) Enclosed drainage courses shall conform as follows:

(1) Cross drainage for right-of-way needs shall be designed to meet the same requirements as its channel.

(2) Permanent structures and improvements may be constructed upon and across improved enclosed drainage courses in business zoning districts and manufacturing zoning districts. Design shall be to accommodate the 100-year frequency flood.

(3) The width to the easement shall be equal to the width of the structure plus a width on each side of the structure to allow maintenance and/or repairs.

## Sec. 29. Street name signs.

Street name signs and markers and traffic control signs, in accordance with standards adopted by the Town, will be required at each intersection. The developer will provide street signs and posts for the markers and make the installations when the subdivision is accepted by the Town for maintenance.

## DIVISION 3. WATER AND SEWER INFRASTRUCTURE

## Sec. 30. General Provisions.

(a) The intent and purpose of this division is to provide equitable charges for water and sewer connections as a proportionate distribution of the cost of the water and sewer main extensions to serve property within the Town. If the existing Town utility facilities are not within or adjacent to a subdivision, the developer shall construct the necessary extension of water and sewer mains, force mains, force mains, and lift stations, including all valves, manholes, and piping necessary to serve any future development of abutting property as specified in this chapter. The developer's engineer shall prepare a proposed plan of service for the subdivision and property along the extension which shall be reviewed by the Town engineer. These facilities shall be constructed in accordance with both the master plan and the Technical and Administrative Manual for Water and Sewer System Development ("Manual").

(b) It is the general policy of the Town that:

(1) Water and sewer mains should be large enough to serve all the lots platted and, should the Town determine oversizing is necessary, the Town may participate in those lines greater than 8" for water and greater than 10" for sewer.

(2) All utilities shall be required to extend across the full width of the last lot platted on each street proposed within the subdivision, in such an alignment that it can be extended to the next property in accordance with the master sewer and water plans for the Town, provided such plan(s) exist. Properties already served by water and sewer shall not be required to install additional facilities unless:

(I) The current lines are not of adequate capacity to serve the proposed development; in which case the applicant will be required to install adequate facilities.

(c) Every lot of the plat shall have direct access to the water and sewer system. Utility service shall be from a water/sewer main located in an abutting right-of-way or through easements from the lot to a water/sewer main.

(e) (1) The terms of this division shall be cumulative of all other ordinances regulating subdivisions, and such other ordinances are not repealed by this division, except to the extent that such other provisions conflict with the terms of this chapter, in which event this chapter shall prevail.

(2) The status of any previously designated line extension, lift station, or main shall be unaffected by this ordinance, save and except the Clear Creek pro rata line, designated in CCM #95-121R. The Clear Creek pro rata line designation is hereby rescinded.

(f) In addition to any other remedy provided by law, the Town and its officers shall have the right to enjoin any violation of this chapter by injunction issued by a court of competent jurisdiction.

## Sec. 31. Water.

(a) No water main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the water master plan, provided such plan exists.

(b) Water system layout shall be looped whenever possible. Dead-end mains shall not exceed one thousand eight hundred (1,800) feet or include three (3) fire hydrants. Single feeds may be permitted at the discretion of the Town engineer; however, any such denial may be appealed to the Town Council. Single feeds should include provisions for looping in future development.

(c) The location of fire hydrant(s) shall comply with and be approved by the Town Engineer and/or Fire Marshall and insurance requirements.

(d) Long water service taps shall be installed while the subdivision is being developed. Short water service taps shall be installed when needed for development. Long water service taps locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of

each water tap. No water service taps smaller than six (6) inches in diameter shall be allowed on water mains larger than twelve (12) inches in diameter.

## Sec. 32. Sewer.

(a) No sewer main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the sewer master plan, provided such plan exists.

(b) Manholes are required any time the alignment, slope, or diameter of the sewer main changes, or when two or more sewer mains intersect. In no case will the maximum spacing between manholes, or from a manhole to cleanout, exceed 500 feet.

(c) Sewer services for sewer mains located in roadways shall be installed while the subdivision is being developed. Sewer services with direct access to the sewer main without encroaching on a roadway may be installed when needed for development. Sewer tap locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. Sewer services six (6) inches and larger require a manhole where they intersect the sewer main. The sewer service shall extend a minimum of ten feet (10') into the lot area.

(d) Minimum lift station capacity shall be one hundred (100) gallons per minute and shall have at least two (2) pumps, each of which shall be capable of pumping the design capacity of the lift station. The minimum size of the wet well shall be such that with any combination of inflow and pumping, the cycle of operation for each pump shall not be less than five (5) minutes and the maximum retention time in the wet well shall not average more than thirty (30) minutes.

(e) Septic system holding tanks or any other sewage retainage facilities for the storage or removal of sewage are prohibited.

## Sec. 33. Costs of Extensions.

a. *Developer initiated.* All costs of all water and sewer main extensions, force mains, and lift stations initiated by a developer in order to provide required service for their development area, shall be paid for by the developer. Such costs may include; but is not necessarily limited to, right-of-way acquisition, pipes, motors, pumps, engineering, construction costs, inspection fees, and all weather access.

In no event shall the Town pay for any costs associated with water and/or sewer improvements.

## Sec. 34. Use of Water and Sewer Tap Fees and Rate Revenues.

Tap fees and rate revenues shall be set in an amount sufficient to maintain and operate the system, with due regard for anticipated needs to improve, update, construct, and maintain the

system.

## Sec. 35. Use of Town Condemnation Authority.

a. Water and sewer mains, force mains, and lift stations shall be located in easements, secured and paid for by the developer, and assigned to the Town before service is extended to the subdivision. For the Town to consider to using condemnation authority to assist a developer in extension of the system, the applicant must show clear evidence that every practical attempt to secure the easement has failed and there is a public need and interest for condemnation. Specific criteria and procedures shall be as stated in the manual.

b. Upon compliance with all procedures by the developer, the Town, at least 10 days prior to the hearing shall notify all property owners within the proposed easement and 200 feet therefrom. A hearing of facts by the Town Council is required. Determination of the Town Council shall be final.

## Sec. 36. Property Owners & Homeowner Associations

**Property Owners Associations or Homeowner Associations which require mandatory membership and who require mandatory fees, dues, levies, or monetary assessments are prohibited.**

## Sec. 37. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this Ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this Ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

## Sec. 38. Savings.

This Ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those Ordinances are in direct conflict with the provisions of this Ordinance; provided, however, that Ordinance No. 08-06 of the Town is hereby repealed, but provided that any complaint, action, cause of action, or claim which prior to the effective date of this Ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that Ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

## Sec. 39. Repealer.

Ordinance 02-05A, Ordinance 00-09, Ordinance 08-06, and Ordinance 11-11 are hereby

repealed.

## Sec. 40. Penalty.

Any person who should violate any provision of this Ordinance or should fail to comply herewith shall for each and every violation or noncompliance be deemed guilty of a misdemeanor and shall be fined not more than $2,000.00 (two thousand dollars) and each day such violation shall be permitted to exist shall be construed a separate offense.

## Sec. 41. Effective Date.

This Ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** the 13th day of **June**, 2013

_____
Mike Schnittker, Mayor

ATTEST:

_____
Linda Asbell, Town Secretary





Town of Lakewood Village
Thoroughfare Plan

# Exhibit D

STATE OF TEXAS          )
                       )          CERTIFICATE TO COPY OF PUBLIC RECORD
COUNTY OF DENTON       )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 11-16. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-16

**AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL RESIDENTIAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Residential Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: Findings Incorporated. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: Adoption of the 2006 International Residential Code. The International Residential Code, 2006 Edition, copyrighted by the International Code Council, Inc., including Appendix G, J, and K, save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Residential code for Lakewood Village, regulating the construction, alteration, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal, and demolition of detached one- and two-family dwellings and multiple single-family dwellings (townhouses) not more than three stories in height with a separate means of egress and related accessory structures in Lakewood Village (the "2006 International Residential Code"). The 2006 International Residential Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: Savings/Repealing Clause. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

**Exhibit "A"**
**Town of Lakewood Village Amendments**
**2006 International Residential Code**

The Following additions, deletions and amendments to the 2006 International Residential Code adopted herein are herby approved and adopted.

**Section 1.**

**Chapter 1. Administration** of the 2006 International Residential Code is amended as follows:

**Section R102 Applicability** of the 2006 International Residential Code is amended as follows:

> **R102.4 Referenced codes and standards.** The codes, when specifically adopted by the Town of Lakewood Village, and standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Where differences occur between provisions of this code and referenced codes and standards, the provisions of this code shall apply. Any reference made to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.
>
> **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and manufacturer's instructions shall apply.

**Section R105 Permits** of the 2006 International Residential Code is amended as follows:

> **R105.2 Work exempt from permit.** Permits shall not be required for the following. Exemption from permit requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this jurisdiction.
> **Building:**
> 1. One-story detached accessory structures used as tool and storage sheds, playhouses and similar uses, provided the floor area does not exceed 250 square feet.
> 2. Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge.
> 3. Water tanks supported directly upon grade if the capacity does not exceed 5,000 gallons (18 927 L) and the ratio of height to diameter or width does not exceed 2 to 1.

E. All remodels, repairs, alterations, must have two (2) copies of the plot plans turned into the Town showing the actual dimensions and shape of the lot to be built upon or altered, the exact sizes and locations on the lot of any already existing buildings, and the location and dimensions of the proposed building or alteration.

F. Two copies of the existing house plans prior to any alterations, remodels or repair must be turned in prior to approval of the permit.

**Section 1C.**

**SECTION 106, BUILDING PLAN PACKET SUBMISSION**

Along with the permit application forms set forth above, the following documents are required prior to any approval being granted in the quantity and detail as specified:

A. Two (2) plot plans containing lot dimensions, plan footprint, set-backs (front, rear and sides) complete address, lot and block, subdivision and phase, utility and easement locations, engineers and contractors names, finish pad elevations, finish floor elevations, topographical elevations, driveways, sidewalks, fence locations, lot area, slab area, and coverage percent. All drawings provided must be to scale.

B. Two (2) foundation designs (11" x 17" drawing and engineer letters) one of which must have an original signature and stamp.

C. Three (3) complete bound sets of construction drawings. Town Copy must be 11" x 17" or application will be automatically rejected without further action or notification by any Town Official. Plans must include elevations, framing details, including soffit overhang details, masonry percentage calculations, square foot calculations, electrical load calculations, electrical panel size, electrical panel location, mechanical specifications, foundation design letter must be address specific. All plans must be drawn by a state licensed architect and must be drawn to scale.

D. Two (2) sets of drainage plans must be provided. Town copy must be 11" x 17" drawn to scale, showing the actual dimensions and shape of the lot to be built upon. The drainage plans must show sea level elevations and all flatwork drawn to scale.

E. Floor plans, elevations, framing, roof plan, electrical and "to be built options" must be clearly shown and detailed. Single sheet submittals are not acceptable. HVAC and Plumbing design drawings are also required. Options reflecting additional buildable space must be identified by the actual square footage area and included in the permit values for total air-conditioned area and or construction area under roof.

CONCRETE REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

FENCE / SCREENING WALL REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

D. Any registered Contractor that fails to maintain compliance with any provisions of this section shall cease all work being performed at the time the Contractor is no longer in compliance.

**Section 109 Inspections**

A. Request for Inspections

B. Building permits will include inspections performed during the following construction stages:

1. T-Pole

2. Plumbing Rough, includes water and sewer tap (form board surveys due at this time on site)

3. Pier and Beam - shall be inspected by the engineer and an approval letter shall be provided to the building official.

4. Foundation

5. Frame

6. Mechanical Rough

7. Electrical Rough

8. Rough Gas

9. Plumbing Top Out

10. 4 foot brick tie inspection and/or Stucco inspection

11. Drywall

12. Electrical/Gas Meter Release

13. Flatwork

14. 100% Final

· All Third party insulation inspections reports are due prior to the electrical/gas meter release.

· At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor will be responsible for turning in all weight tickets to the Town.

· Termite letter, Customer Service Inspection letter, and the Final Grade survey is due on site at the 100% Final Inspection.

· Piers must be inspected by an independent contractor. A copy of the inspection must be supplied to the Town prior to calling in the next inspection.

E. All Sprinkler Contractors must have the Backflow Prevention Form filed with the Town of Lakewood Village prior to hooking the system up to the water supply.

F. All inspections must be performed during daylight hours

**Section 1F.**

A. Upon completion of construction, no one may occupy or move any objects into or onto the property of new construction until a Certificate of Occupancy (100 % Final) inspection has been performed and passed by an official of the Town. Violation of this requirement will result in all utilities being disconnected until such time as a Certificate of Occupancy has been issued after all the proper inspections have been performed.

B. Secondary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met. Any secondary structure built on any adjacent lot must conform to the minimum square footage requirements of that section as stated in the current zoning ordinance as amended or revised unless both lots are re-platted as a single lot and said plat is filed on record with Denton County, Texas. Proper proof of filing with Denton County, Texas must be provided to the Town at the time the building permit is sought.

C. All new building construction will have a garage with the following requirements:

1. There shall be no front-facing garages on any new construction. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

2. There shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth. Where the configuration of the ground is such that conformity with

# Exhibit E



# Exhibit F









03/13/14 15:30



03/13/14   17:32





03/13/14  17:33


'03 13 14 17

# Exhibit G

# Exhibit H



03/13/14   17:35



03/13/14 17:36



# Exhibit I



# Exhibit J



# Exhibit K



# Exhibit L





# Exhibit M





# Exhibit N



Cause No. *14 01991 431*

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | |
| | § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § | |
| | § | |
| | § | |
| *Defendant* | § | *431* JUDICIAL DISTRICT |



## TEMPORARY RESTRAINING ORDER
## AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION

On this 19th day of March, 2014, the Court considered Plaintiff Town of Lakewood Village's application for Temporary Restraining Order. Wm. Andrew Messer, attorney for the Plaintiff, appeared in person. Defendant Harry Bizios did not appear. After reviewing the verified pleadings and arguments of counsel, the Court finds that good cause exists to grant Plaintiff's application for Temporary Restraining Order as Defendant is violating the Town's ordinances.

**IT IS THEREFORE ORDERED** that Defendant Harry Bizios, his agents, contractors, and employees and the Defendant's representative(s) with control over the Property (hereafter defined) shall allow inspections by the Town's Building Official or designee on the Property, and shall immediately cease and desist any construction on the Property described as LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON, COUNTY, TEXAS (the "Property") until such time as they have (1) applied for and obtained approval from the

Temporary Restraining Order -- Page 1
*Town of Lakewood Village v. Harry Bizios, Alan Hoffmann, and Alan Hoffmann, LLC*

85

Town of Lakewood Village of necessary permits; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

This Temporary Restraining Order is issued with notice to Defendant and is ordered because construction without obtaining permits, construction in contravention of a stop work order, and construction without submitting engineering certification on pier work will continue to occur in its absence.

Plaintiff's Application for Temporary Injunction is set for the __2nd__ day of __April__, 2014, at __1:30__ ~~a.m.~~/p.m. The purpose of this hearing shall be to determine whether this Temporary Restraining Order should be made a Temporary Injunction pending a full trial on the merits and whether the Court should enter a Temporary Injunction regarding the violation(s) alleged and the relief requested in Plaintiff's pleadings.

Because Plaintiff is a municipality in the State of Texas, no bond is required.

This Temporary Restraining Order expires fourteen (14) days from the date of issuance, unless otherwise extended.

Signed on __March 20__, 2014, at __10:33__ a.m./~~p.m.~~

_____
**PRESIDING JUDGE**

Temporary Restraining Order -- Page 2
*Town of Lakewood Village v. Harry Bizios, Alan Hoffmann, and Alan Hoffmann, LLC*

STATE OF TEXAS

# CITATION

COUNTY OF DENTON

## CAUSE NO. 14-01991-431

To: Harry Bizios, 6107 Sweeney Trail, Frisco, TX 75034, (or wherever he or she may be found)

**Notice to Defendant/Respondent**: You have been sued. You may employ an attorney. If you, or your attorney, do not file a written answer with the clerk who issued this citation by 10:00 a.m. on the first Monday following the expiration of twenty days after you were served this citation and petition, a default judgment may be taken against you.

| | |
|---|---|
| Court: | 431st Judicial District Court<br>1450 E. McKinney, 2nd Floor, Denton, TX 76209 |
| Cause No. | 14-01991-431 |
| Date of Filing: | 03/20/2014 |
| Document: | Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure |
| Parties in Suit: | The Town of Lakewood Village; Harry Bizios |
| Clerk: | Sherri Adelstein, District Clerk<br>1450 E. McKinney, Suite 1200, Denton, TX 76209 |
| Party or<br>Party's Attorney: | Wm. Andrew Messer<br>6351 Preston Road, Suite 350, Frisco, Texas 75034 |

Issued under my hand and seal of Court at office in Denton, Denton County, Texas on this the 20th day of March, 2014.

By: _____

Rina Shelton, Deputy

## OFFICER'S RETURN

Came to hand on the _____ day of _____, 20_____ at _____M. and executed on the _____ day of _____, 20_____ at _____M., by delivering to the within named _____ in person a true copy of this citation and Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure; Temporary Restraining Order and Order Setting Hearing for Temporary Injunction at

_____.

Service Fees:  $_____

_____ Sheriff/Constable

Service ID No. _____

_____ County, Texas

By: _____

Deputy/Authorized Person

## VERIFICATION

On this day personally appeared _____ known to me to be the person whose name is subscribed on the foregoing instrument and who has stated:  upon penalty of perjury, I attest that the foregoing instrument has been executed by me in this cause pursuant to the Texas Rules of Civil Procedure.  I am over the age of eighteen years and I am not a party to or interested in the outcome of this suit, and have been authorized by the Denton County Courts to serve process.

Subscribed and sworn to before me on this the _____ day of _____, 20__

_____Notary Public

87

STATE OF TEXAS                                                    COUNTY OF DENTON

## TEMPORARY RESTRAINING ORDER

### CAUSE NO. 14-01991-431

To: Harry Bizios, 6107 Sweeney Trail, Frisco, TX 75034, (or wherever he or she may be found.)
Greetings:

Whereas, The Town of Lakewood Village, filed a(n) Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure in the 431st Judicial District Court of Denton County, Texas on 03/20/2014 in suit number 14-01991-431 on the docket of said Court and styled Town of Lakewood Village v. Harry Bizios and appeared as per attached copy of Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure.

And upon presentation of said Pleading and consideration thereof, the Honorable Jonathan Bailey Judge of said Court, made the following order thereon: the requirement for a bond having been posted or waived, you are therefore commanded to desist and refrain from: as per attached copy of Temporary Restraining Order and Order Setting Hearing for Temporary Injunction until and pending the hearing of such Temporary Restraining Order and Order Setting Hearing for Temporary Injunction before the Judge of said Court at 1:30 p.m. on the 2nd day of April, 2014 in the 431st Judicial District Court Courtroom, located at 1450 E. McKinney, 2nd Floor of the Courts Building of Denton County, in the City of Denton, Texas, when and where you will appear to show cause why injunction should not be granted upon such Petition/Application effective until Final Order/Decree in suit.

Issued under my hand and seal of Court at office in Denton, Denton County, Texas on this the 20th day of March, 2014.

Sherri Adelstein, District Clerk
1450 E. McKinney, Suite 1200
Denton, Denton County, TX 76209

By: _____
Rina Shelton, Deputy

### OFFICER'S RETURN

Came to hand on the _____ day of _____, 20_____ at _____M. and executed on the _____ day of _____, 20____ at _____M., by delivering to the within named _____ in person a true copy of this Plaintiff's Original Petition, Verified Request for Temporary Restraining Order, Request for Temporary and Permanent Injunction, and Request for Disclosure and Temporary Restraining Order and Order Setting Hearing for Temporary Injunction at

_____    _____.

Service Fees: $_____            _____ Sheriff/Constable

Service ID No. _____            _____ County, Texas

By: _____
Deputy/Authorized Person

### VERIFICATION

On this day personally appeared _____ known to me to be the person whose name is subscribed on the foregoing instrument and who has stated: upon penalty of perjury, I attest that the foregoing instrument has been executed by me in this cause pursuant to the Texas Rules of Civil Procedure. I am over the age of eighteen years and I am not a party to or interested in the outcome of this suit, and have been authorized by the Denton County Courts to serve process.

Subscribed and sworn to before me on this the _____ day of _____, 20__

_____Notary Public

88

FILED: 3/24/2014 11:14:32 AM
SHERRI ADELSTEIN
Denton County District Clerk
By: Amanda Gonzalez, Deputy

## CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS, | § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § § | |
| *Defendant.* | § § | 431ˢᵗ JUDICIAL DISTRICT |

## BIZIOS' MOTION TO DISSOLVE TEMPORARY RESTRAINING ORDER

Harry Bizios ("Bizios") moves to dissolve the Temporary Restraining Order ("TRO") by the Town of Lakewood Village, Texas ("Town") entered on or about March 20, 2014.

### SUMMARY

The TRO at issue is void and must be dissolved because:

- It dramatically affects Bizios' rights, but was entered without notice to Bizios in violation of Texas Rules of Civil Procedure 39 and 680;

- It fails to state the reason for its issuance by defining the injury and describing why it is irreparable; and

- The Town's actions are illegal.

### BACKGROUND

Bizios owns a lot ("Lot") in the Sunrise Bay at Lake Lewisville Addition ("Subdivision") which received plat approval from Denton County in 1995. The Subdivision is located in the extraterritorial jurisdiction ("ETJ"), not corporate, limits of the Town. As a general law town, Lakewood Village's authority is limited to specific

**89**

grants by the Texas Constitution or statute. Because the Subdivision plat has been recorded, the Town has no subdivision authority under Chapter 212, Tex. Loc. Gov't Code allowing it to enforce its building code in the ETJ. Further, because the Town's ordinances were adopted after the Subdivision plat was approved, Bizios has grandfathered rights under Chapter 245, Tex. Loc. Gov't Code.

## ARGUMENT AND AUTHORITIES

**A.      The Agreed Injunction is void because it was entered without notice to Bizios, without a hearing, and without evidence.**

First and foremost, the TRO is void because it was entered without notice to Bizios. The Texas Rules of Civil Procedure expressly provide that no TRO shall be issued without notice to the adverse party. *See* Tex. R. Civ. P. 680.

Bizios' rights are dramatically affected by the TRO, procured without notice to or the involvement of Bizios. Thus, Bizios was not afforded any opportunity to be heard. Moreover, the TRO itself states that it was entered without a hearing. Because no hearing occurred to support the entry of the TRO, no argument was introduced as to Plaintiff's probable right to recovery and probable injury.

**B.      The TRO is illegal and changes the status quo.**

Lakewood Village is a general law town that lacks the necessary legal authority to extend its building ordinance to its ETJ. In Texas, provision is made for the governance of two types of municipalities, general law cities and home rule cities. *See* generally, Commentary on the History, Status and Function of Title 28, Cities, Towns and Villages, pages XIII to XXXVIII of Volume 2A, V.T.C.S. General law cities are governed by

articles 961 et seq. *See Woolridge v. Folsom*, 564 S.W.2d 471 (Tex. Civ. App.—Dallas 1978, no writ). They are creatures of statute and have no powers except those expressly or impliedly granted by the statute creating them. *City of Uvalde v. Uvalde Electric & Ice Co.,* 250 S.W. 140 (Tex. 1923).

Lakewood Village is unable to cite to legal statutory authority to enforce its building standards in its ETJ including fees, inspection requirements and contractor registration regulations. The Town's reliance on Subchapter A, Chapter 212 of the Texas Local Government Code is misplaced because Subchapter A relates to a city's subdivision and platting powers. The property in question was already platted in Denton County in 1995. Consequently, Subchapter B of Chapter 212 might apply because it defines development as "new construction." Subchapter B, however, does not authorize a city to apply its building standards in the ETJ.

In 2009, the Texas Legislature granted counties the option to exercise building code authority in unincorporated areas of the state. Denton County exercises this option in the Town's ETJ, which is an unincorporated area of the county. As such, the Town's efforts to regulate building codes run directly counter to the intent of the Legislature and are duplicative of the approvals already obtained.

Furthermore, Lakewood Village is prohibited from applying the recently enacted Ordinance to a previously approved subdivision pursuant to Chapter 245, Tex. Loc. Gov't Code. This issue was squarely addressed in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.). The Town has no authority to enforce its building code in the ETJ, and the Town's attempt to do so is illegal.

**WHEREFORE, PREMISES CONSIDERED**, Bizios respectfully requests that the Court dissolve the TRO and grant Bizios such other and further relief to which he may be justly entitled.

Respectfully submitted,

WINSTEAD PC


By: _/s/ Arthur J. Anderson_

Arthur J. Anderson
State Bar No. 01165957
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas  75201
Phone:  214.745.5745
Fax:  214.745.5390
aanderson@winstead.com

Adam L. Plumbley
State Bar No. 24056146
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Phone: 817.420.8200
Fax: 817.420.8201
aplumbley@winstead.com

**ATTORNEYS FOR DEFENDANT HARRY BIZIOS**

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2014, I served a true and correct copy of the foregoing upon the following counsel of record:

William Andrew Messer
Messer, Rockefeller & Fort, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


<u>/s/ Arthur J. Anderson</u>
One of Counsel

**WINSTEAD**

Austin | Charlotte | Dallas | Fort Worth | Houston | San Antonio | The Woodlands | Washington, D.C.

1100 Carter Burgess Plaza
777 Main Street
Fort Worth, Texas 76102

817.420.8200 *OFFICE*
817.420.8201 *FAX*
winstead.com

March 25, 2014

ADAM L. PLUMBLEY
direct dial: (817) 420-8234
aplumbiey@winstead.com

Fax and Email
andy@txmunicipallaw.com

William Andrew Messer, Esq.
Lakewood Village Town Attorney
c/o Messer, Rockefeller & Fort, PLLC
6351 Preston Road, Suite 350
Frisco, TX 75034

Re:    Cause No. 14-01991-431; *Town of Lakewood Village, Texas v. Harry Bizios*, in the District Court of Denton County, Texas, 431st Judicial District

Dear Mr. Messer:

Please be advised that Bizios' Motion to Dissolve Temporary Restraining Order has been set for hearing on April 2, 2014, at 1:30 p.m., the same time as the Town of Lakewood Village's hearing on its Application for Temporary Injunction.

If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Adam L. Plumbley

FILED: 4/2/2014 10:21:37 AM
SHERRI ADELSTEIN
Denton County District Clerk
By: Shelley Mccutcheon, Deputy

## CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS, | § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § § | |
| v. | § § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § § § | |
| *Defendant.* | § § | 431st JUDICIAL DISTRICT |

### DEFENDANT'S TRIAL BRIEF

Defendant Harry Bizios ("Bizios"), files this trial brief against Plaintiff Town of Lakewood Village, Texas ("Town") and states as follows:

### I.
### FACTUAL BACKGROUND

Lakewood Village is a small general law town with a population of around 620. It is unlikely it will ever reach the 5,000 population level needed to hold a home rule charter election. As a result it will never be able to annex Bizios' land. Lakewood Village has no involvement in the platting and development of the Sunrise Bay Addition ("Addition") where Bizios' Lot 84 ("Lot") is located. Over 15 years after the Addition was developed, the Town extended its building code (with its requirement to pay an excessive permit fee) to its extraterritorial jurisdiction ("ETJ").

95

## II.
## ARGUMENT AND AUTHORITIES

**A. Because Lakewood Village is a general law town and extending its building code to the ETJ exceeds statutory authority, the Town is prohibited from extending its building code to the ETJ**

1. General law town ordinance-making authority is extremely limited.

The two predominant classifications of cities in Texas are general law towns (like Lakewood Village) and home rule cities. As a general law town, Lakewood Village (like a county) can only exercise those governmental powers expressly delegated to it by the Texas Legislature. David Brooks, *Municipal Law and Practice*, Texas Practice, Vol. 22, p. 89. The 1912 amendment to the Texas Constitution authorized cities on a local basis to adopt a charter, thus creating home rule cities as mini-legislatures unto themselves. Home rule cities have significantly broader governmental powers than general law towns such as Lakewood Village. *Forwood v. City of Taylor*, 214 S.W.2d 282 (Tex. 1948). In more than one instance, the Texas Supreme Court has recognized that the home rule amendment granted to home rule cities the "'full power of local self-government.'" *City of Houston v. State ex rel City of West University Place*, 142 Tex. 190, 176 S.W.2d 928, 929 (1943). General law towns, on the other hand, derive their power from the Legislature and are restricted by the express language of state statute. Tex. AG Op. JM-169.

2. No Texas statute expressly authorizes Lakewood Village to apply its building code to its ETJ.

The Town claims that its authority to require building permits in the ETJ is implied under the state platting statute, Chapter 212, TEX. LOC. GOV'T CODE. A plat is

only required to be submitted and approved under § 212.004 when a tract of land is subdivided. No such subdivision is involved here, and there is no indication that the Legislature intended to address building permits in the platting statute. "Legislative intent remains the polestar of statutory construction." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995). It is cardinal law in Texas that a court construes a statute, "first, by looking to the plain and common meaning of the statute's words." *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex. 1998).

Ordinary citizens should be able to rely on the plain language of a statute to mean what it says. *See Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 2d. 1488 (1944). Typically, courts will concentrate on the literal text of a statute in order to ascertain its meaning. *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1996).

The Town cites Local Government Code sections 212.002 and 212.003 as authority for its assertion of the power to require builders to obtain building permits in the Town's ETJ. These statutes, however, are directed at the regulation of plats and subdivisions, not building and development. In fact, Subchapter A of Chapter 212 is entitled "Regulation of Subdivisions." This subchapter says nothing about building in general or permits in specific.

Subchapter B, in contrast, is titled "Regulation of Property Development," with "development" defined as "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement." TEX. LOC. GOV'T CODE § 212.043(1). This subchapter, moreover, expressly provides that "[t]his subchapter does

not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction." TEX. LOC. GOV'T CODE § 212.049. The Town attempts to evade this clear prohibition by contending that its power to require building permits in the ETJ arises by implication. Adding verbiage to statutes by implication was expressly forbidden by the Texas Supreme Court in *M. Fitzgerald v. Advanced Spine Fixation*, 996 S.W.2d 865 (Tex. 1999).

In this case, neither the subdivision statute for municipalities (Chapter 212, TEX. LOC. GOVT. CODE) nor any other statute expressly authorizes general law towns to extend their building codes to their ETJs. There are no "truly extraordinary circumstances" justifying the court from enforcing Chapter 212 as written. 996 S.W.2d at 867. In short, the Town has not demonstrated that it has authority, and in fact does not have authority, to require Bizios to obtain building permits for development in the ETJ. Accordingly, Bizios is entitled to judgment declaring that he may continue construction without obtaining building permits from, undergoing inspection by paying fees, or complying with the building code of the City.

    3.    The trial court's ruling violates Texas Supreme Court precedent.

The Texas Supreme Court held in *City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003), that the authority of a county (similar to the authority of general law towns) would not extend beyond the express grant of the statute. In *Boerne*, two county commissioner courts consented to the annexation of county roads to assist in a Boerne annexation. The Supreme Court held that a commissioners court can only exercise those powers "*expressly* given by either the Texas Constitution or the

Legislature (italics added)." *Id.* at 28. If the Constitution or Legislature imposes an obligation, then the commissioners court has an implied authority to exercise the powers needed to fulfill the obligation. In *Boerne,* the statute authorizing "general control" of roads to counties did not authorize them to petition for annexation. Unless a commissioner court's action was restricted to providing for safer roads for public travel, its action would be deemed void as exceeding legislative authority. *Id.* at 29.

Similarly, in this case, the Town does not have express authority to require that building permits be obtained in the ETJ. The Town places sole reliance on the holding in *City of Lucas v. North Texas Municipal Water District* that the platting statute implies that buildings codes can be extended to the ETJ. 724 S.W.2d 811 (Tex. App.—Dallas, 1986, writ ref. n.r.e.). In 1986 (the date of the Lucas opinion), state statutes did not expressly address the adoption and implementation of building codes by municipalities.

The *Lucas* court based its holding on *City of Weslaco v. Carpenter,* 644 S.W. 2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). *Weslaco* involved the partitioning of land into 128 mobile home rental spaces. The developer was attempting to avoid the applicability of the subdivision statute by renting, rather than selling, spaces. The *Lucas* court cites *Weslaco's* holding on subdivisions that the "use of the term is not restricted to the division itself but also encompasses development of the divided tracts." 724 S.W. 2d at 823. The development of the tracts in *Weslaco* referred to subdivision development only because there would be no construction of mobile homes as there would be with site-built housing. While the Corpus Christi Court of Appeals held that the City's subdivision rules and regulations must be followed, there was no discussion in

*Weslaco* that the city would be authorized to extend its building codes into its ETJ. The *Lucas* holding that a general law town has authority under Chapter 212 to extend its building codes to its ETJ has been effectively overruled by the Supreme Court's *Boerne* decision.

The *Lucas* supplemental opinion cites another Corpus Christi opinion in support. *City of Corpus Christi v. Unitarian Church*, 436 S.W. 923 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). However, this case concerned the withholding of a building permit within the municipality because Corpus Christi did not receive a requested right-of-way dedication by plat. While the court held that a city could require platting prior to building permit issuance within its corporate limits, there is not even a hint in the opinion that the court intended to authorize a general law town to extend its building code to its ETJ. Therefore, there is no precedent case law prior to *Lucas* supporting the proposition that Chapter 212 authorizes general law towns to extend their building codes to their ETJ.

The Town of Lakewood Village can provide no city services to the future residents in the subdivisions at issue in this appeal, and the Town cannot unilaterally annex these county residents. *Town of Fairview v. Stover*, No. 05-01-01318-CV, 2002 WL 1981371 *2 (Tex. App.-Dallas 2002, no pet.) (not designated for publication). These houses and their residents will be served by the County, not the Town. The Town has no authority to apply its zoning or house maintenance requirements in its ETJ. Because Lakewood Village will have <u>no</u> authority over these houses and their residents (and

provide no benefits) after construction is completed, the Town should be estopped from applying the Ordinance to these subdivisions.

      4.      More recent changes in State law limit the application of municipal building codes only to buildings within corporate limits.

Since the date of *Lucas*, the Legislature has adopted a state-wide building code requirement that limits its applicability within corporate limits. At the time of the *Lucas* opinion, there were no statutes directly addressing municipal building codes. In 2001, however, the Legislature required all Texas cities pursuant to Senate Bill 365 to adopt the International Residential Code ("IRC") in § 214.212, TEX. LOC. GOVT. CODE ("IRC"):

> "(a)    To protect the public health, safety, and welfare, the International Residential Code, as it existed on May 1, 2001, is adopted as a municipal residential building code in this state.
>
> (b)    The International Residential Code applies to all construction, alteration, remodeling, enlargement and repair of residential structures *in a municipality*."

. . .

TEX. LOC. GOVT. CODE ANN. § 214.212(a)-(b) (Vernon Supp. 2002).

Significantly, § 214.212 requires municipalities to adopt the IRC. It imposes a mandatory uniform residential building code, as opposed to merely providing an optional code that cities may, but are not required to, adopt. The statute expressly authorizes a municipality such as Lakewood Village to apply its building code to construction only "in a municipality," e.g., within its corporate boundaries. To imply that the Legislature intended to allow general towns to also apply their building codes in the ETJ would violate the holdings in *M. Fitzgerald* and *Boerne*.

Another indicia of legislative intent was the introduction, but lack of passage, of HB 609 (by Rep. Smith of Tarrant County) in 2007. This bill would have expressly authorized cities to extend by ordinance their building codes to the ETJ. If the Legislature's interpretation of state statutes was that cities already had the power to require building permits in the ETJ, then HB 609 would have been unnecessary.

Further, it is significant that the Legislature has expressly stated its intent in <u>other</u> statutes as to when a municipality can extend its land use regulations to its ETJ. For example, § 216.003, TEX. LOC. GOVT. CODE authorizes a municipality to regulate "any sign within its corporate limits or *extraterritorial jurisdiction*." Similarly, § 216.902 authorizes a city to "extend the provisions of its outdoor sign regulatory ordinance and enforce the ordinance within its *extraterritorial jurisdiction*." A home rule city may define and prohibit a nuisance "within the limits of the municipality and within 5,000 feet outside the limits." § 217.042, TEX. LOC. GOVT. CODE.

The Legislature has also enacted § 212.041, et. seq., TEX. LOC. GOVT. CODE which applies to development plats. If a city adopts an ordinance under these sections, then any person who proposes development in the ETJ must obtain approval of a development plat. § 212.045, TEX. LOC. GOVT. CODE. However, even under this statute, a municipality is not authorized to require building permits in its ETJ. § 212.049, TEX. LOC. GOVT. CODE.

Extending building codes to the ETJ is excluded from this list of statutes. The Latin maxim: "expressio unius est exclusio alterius" means "expression of one thing is the exclusion of another." *Cameron v. Terrell & Garrett, Inc.*, 628 S.W.2d 535 (Tex.

1981)  If the Legislature intended to allow general law towns to apply the IRC in a municipality and its ETJ, it could have done so. Because extending the building code to the ETJ is not expressly addressed by the Legislature, it is clear that the Legislature did not intend for general law towns to extend their building codes to the ETJ.

**B.    Lakewood Village has no platting authority over the Sunrise Bay Addition, and its subdivision/platting ordinance therefore does not apply.**

Lakewood Village's sole argument that it can extend its building code to the Sunrise Addition and the Lot is based on the platting statute found in Chapter 212, TEX. LOC. GOV'T CODE.  The Town, however, does not have, and never had, platting authority over the Sunrise Addition and the Lot.  The final plat was approved in 1995 by Little Elm and Denton County.   With this approval, Lakewood Village lost its subdivision regulatory power over the Lot.

**C.    The statutory project is protected from the application of new city building permit regulations in accordance with the vested rights statute.**

The concept of vested rights refers to those circumstances where the law prevents governmental interference with a landowner's partially completed development.  David Hartman, *Risky Business:    Vested Real Property Development Rights – The Texas Experience and Proposals for the Texas Legislature to Improve Certainty in the Law*, 30 Tex. Tech L. Rev. 297, 299 (1999).  In passing the Texas vested rights statute, the Texas Legislature clearly intended to protect development rights similar to Appellants' rights in the present case at the expense of municipalities such as Lakewood Village.  The Texas vested rights statute became effective on May 11, 1999, when it was signed by Governor

Bush as an emergency measure, and was subsequently codified as Chapter 245 of the Texas Local Government Code ("Chapter 245"). The purpose of Chapter 245 was to reenact the vested rights statute previously contained in Chapter 481 of the Government Code, which was inadvertently repealed by the 75th Legislature.

When Chapter 245 was added to the Local Government Code by the 76th Legislature in 1999, the Legislature made several findings. Among those findings listed in the Sessions Laws enacting Chapter 245 is:

> Section 1. FINDINGS; INTENT . . . (b) The legislature finds that the repeal of former Subchapter 1, Chapter 481, Government Code, which became effective September 1, 1997, resulted in the reestablishment of administrative and legislative practices <u>that often result in unnecessary governmental regulatory uncertainty that inhibits the economic development of the state and increases the cost of housing and other forms of land development and often resulted in the repeal of previously approved permits causing decreased property and related values, bankruptcies, and failed projects . . .</u> (emphasis added)

Lakewood Village's position that it can apply subsequently enacted regulations to previously permitted projects inhibits economic development and increases the cost of housing in violation of the Legislature's statutory intent. A project that requires a series of permits or approvals in order to reach completion is to be governed by the rules in effect at the time that the first application in that series is made to the appropriate regulatory authority:

> Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted

requirements in effect at the time the original application for the permit is filed.

TEX. LOC. GOVT. CODE, § 245.002.

A permit is defined as a "license, certificate, approval . . . or other form of authorization required by law that a person must have to initiate, continue or complete a project." *Id.* at § 245.001(1). The statute expressly provides that "Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project." *Id.* at § 245.002. In this case, the protected project is the subdivision where Bizios is building his house. The plat (initial permit) for the Subdivision was approved prior to the enactment of the City's subdivision ordinance.

It is undisputed that the City started requiring building permits after the initial permits for the subdivision were approved. As a result, the new regulations cannot be applied pursuant to § 245.002.

The facts in this case are very similar to those in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. denied.). Talty, like Lakewood Village, is a general law town. After plats were approved, lots were sold and houses were under construction, Talty started applying its building code to the previously platted subdivision. It is undisputed in this case that Lakewood Village is attempting to apply its building code after the plat for the subdivision was approved, lots were sold and houses were under construction. The trial court ruled in favor of the Town of Talty.

The Dallas Court of Appeals reversed and rendered in favor of the homebuilder on his Chapter 245 claim. *Id.* at 326. In addition, the Dallas Court of Appeals reversed the trial court's award of attorney's fees to Talty and remanded the issue to the trial court for its reconsideration. *Id.* Subsequently, attorneys' fees were awarded to the homebuilder.

The Dallas Court of Appeals did not reach the issue of whether a general law town could apply its building code in its ETJ. *Id.* at 329. Instead, the court held that the subdivision in that case was a protected project which prohibited Talty from subsequently applying its building code to new housing construction in the ETJ. *Id.* at 328. Just as in the *Hartsell* case, the Town of Lakewood Village is attempting to apply new ordinances to previously platted projects in its ETJ in violation of Chapter 245, TEX. LOC. GOVT. CODE.

**D. Lakewood Village's building permit fees are an unconstitutional tax.**

Whether the building permit fees imposed by the City constitute an occupation tax or a license fee depends upon the primary purpose of the fee when considering the ordinance as a whole. *Hurt v. Cooper*, 130 Tex. 433, 110 S.W.2d 896, 899 (1937); *City of Houston v. Harris County Outdoor Adver. Ass'n*, 879 S.W.2d 322, 326 (Tex. App—Houston [14th Dist.] 1994, writ denied). If the primary purpose of the exaction is for regulation, then it is a license fee; if, however, the primary purpose is to raise revenue, then the exaction is an unconstitutional occupation tax regardless of the name by which it is designated. *Hurt*, 110 S.W.2d at 899; *Harris County Outdoor Adver. Ass'n*, 879 S.W.2d at 326. Lakewood Village's building permit revenues far exceed its costs to run its building inspection program, thus making this cost an unconstitutional tax.

106

## III.
## PRAYER

Bizios respectfully requests that this Court deny the Town's Application for Temporary Injunction and grant such other and further relief, both at law and equity, to which Defendant may be justly entitled.

Respectfully submitted,

WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, TX 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax


By: */s/ Arthur J. Anderson*
      Arthur J. Anderson
      State Bar No. 01165957

**ATTORNEYS FOR DEFENDANT HARRY BIZIOS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2014, a true and correct copy of the foregoing document was sent via electronic filing to the following counsel of record:

William Andrew Messer
Messer, Rockefeller & Fort, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


_____/s/ Arthur J. Anderson_____
ONE OF COUNSEL

DALLAS_1/6263723v.1
56756-1 03/31/2014

FILED: 4/4/2014 3:47:22 PM
SHERRI ADELSTEIN
Denton County District Clerk
By: Joanna Price, Deputy

Cause No. 14-01991-431

| TOWN OF LAKEWOOD VILLAGE, | § | IN THE DISTRICT COURT |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | DENTON COUNTY, TEXAS |
| | § | |
| HARRY BIZIOS, | § | |
| *Defendant.* | § | 431st JUDICIAL DISTRICT |

## STIPULATED FACTS AND ADMISSIABILITY OF EXHIBITS

1. Harry Bizios owns and controls the property located at Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the town of Little Elm, Denton County, Texas, otherwise known as 3950 or 3960 Spinnaker Run Point (the "Property").

2. Mr. Bizios ("Owner") has owned and controlled the Property since June 7, 2013 pursuant to warranty deed no. 2013-69513 when he purchased the Property.

3. The Property is located in the Extraterritorial Jurisdiction ("ETJ") of the general law Town of Lakewood Village, Texas ("Town" or "Lakewood Village") and at all times material has been located in the ETJ of the Town.

4. The Property is located in the Sunrise Bay subdivision. This subdivision is partly located in the Lakewood Village ETJ and partly located in the town of Little Elm and its ETJ.

5. A plat was filed for the Sunrise Bay subdivision with Denton County on August 2, 1995. The plat was approved by Denton County and Little Elm. The plat has not been approved by the Town.

6. The Sunrise Bay subdivision plat was filed by Marcus Smith of "Properties of the Southwest." Bizios currently owns Lot 84.

7. Construction for a residential structure and a retaining wall on the Property is being performed by Allan Hoffmann, LLC, as contractor and agent for the Owner.

8. Construction for the residential structure on the Property began around March 10, 2014 and is currently at the plumbing rough in stage. The Town has not approved a building permit for the Property.

9. Site plans were filed by the Owner and Contractor with the Town on January 27, 2014.

10. The Contractor filed a registration application with the Town on January 27, 2014.

11. The Contractor and the Owner did not pay a permit fee to the Town.

12. The 100 year flood plain is at the 537 msl elevation.

13. The Owner has not provided the Town the finished floor elevation at which the residential structure on the Property is being constructed.

14. The Army Corp of Engineers flowage easement on the Property is 537 msl.

15. The federal government owns Lewisville Lake, which abuts the Property.

16. At all times material, the Owner and Contractor do not have a permit from the Town.

17. At all times material, the Owner and Contractor have not paid permitting fees to the Town.

**109**

The following is a list of admissible exhibits:

| Exhibit No. | Description |
| --- | --- |
| 1 | General Warranty Deed 2013-69513 dated 06/07/13 |
| 2 | Town Limits and ETJ Official Map |
| 3 | Denton County Map of Town and ETJ |
| 4 | Denton County ETJ Map of subdivision |
| 5 | Denton County Map of Contours |
| 6 | Denton County Appraisal District Records of Property |
| 7 | Plat of Sunrise Bay Subdivision |
| 8 | Site plans and Building plans and elevations of 3960 Spinnaker Run Point |
| 9 | Stop Work Order dated 03/13/14 |
| 10 | Stop Work Order dated 03/14/14 |
| 11 | Photographs dated 03/10/14 |
| 12 | Photographs dated 03/13/14 |
| 13 | Photographs dated 03/14/14 |
| 14 | Photographs dated 03/18/14 |
| 15 | Builder's Registration Application dated 01/27/14 |
| 16 | Flowage Easement |
| 17 | Denton County Commissioners Court Order No. 10-0045 dated 01/26/10 |
| 18 | Denton County Notice to Home Builders and Home Buyers |
| 19 | Town of Lakewood Village Ordinance No. 08-06 |
| 20 | Town of Lakewood Village Ordinance No. 08-09 |
| 21 | Town of Lakewood Village Ordinance No. 10-01 |
| 22 | Town of Lakewood Village Ordinance No. 11-04 |
| 23 | Town of Lakewood Village Ordinance No. 11-08 |
| 24 | Town of Lakewood Village Ordinance No. 11-09 |
| 25 | Town of Lakewood Village Ordinance No. 11-11 |
| 26 | Town of Lakewood Village Ordinance No. 11-13 |
| 27 | Town of Lakewood Village Ordinance No. 11-16 |
| 28 | Town of Lakewood Village Ordinance No. 13-07 |
| 29 | 2006 International Residential Building Code, Ch.1 and excerpts |
| 30 | 2005 National Electric Code excerpts |
| 31 | Email between Linda Asbell and Alan Hoffmann dated 03/12/14 |
| 32 | Copy of a map showing Little Elm and Lakewood Village limits. |
| 33 | US Army Corp of Engineer Consent No. DACW63-9-14-0533 |
| 34 | Declaration of Covenants, Conditions and Restrictions Sunrise Bay at Lake Lewisville Section One |
| 35 | Application for Development Permit approved by Denton County |
| 36 | Elevation Certificate |
| 37 | Form Board Survey |

Respectfully submitted,

*Andy Messer*

**WM. ANDREW MESSER**
STATE BAR NO. 13472230
andy@txmunicipallaw.com
**JENNIFER W. DECURTIS**
STATE BAR NO. 24045767
jennifer@txmunicipallaw.com
**BRETT GARDNER**
STATE BAR NO. 24078539
brett@txmunicipallaw.com
**MESSER ROCKEFELLER & FORT, PLLC**
6351 PRESTON ROAD, SUITE 350
FRISCO, TEXAS 75034
972.668.6400 - TELEPHONE
972.668.6414 - FACSIMILE

**ATTORNEYS FOR PLAINTIFF**
**TOWN OF LAKEWOOD VILLAGE**

*Arthur J. Anderson*

Arthur J. Anderson
State Bar No. 01165957
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Phone: 214-745-5745
Facsimile: 214-745-5390
aanderson@winstead.com

Adam L. Plumbley
State Bar No. 24056146
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Phone: 817-420-8200
Facsimile: 817-420-8201
aplumbley@winstead.com

Attorneys for Defendant Harry Bizios

# Exhibit 1

59513

**** **Electronically Filed Document** ****

Denton County
Cynthia Mitchell
County Clerk

Document Number: 2013-69513
Recorded As      : ERX-WARRANTY DEED

Recorded On:        June 07, 2013
Recorded At:        01:42:11 pm
Number of Pages:    3

Recording Fee:      $24.00

Parties:

  Direct- LANGLEY KELLY B
Indirect-

Receipt Number:     1050348
Processed By:       Jane Kline

*********** THIS PAGE IS PART OF THE INSTRUMENT ************

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.



THE STATE OF TEXAS)
COUNTY OF DENTON]

I hereby certify that this instrument was FILED in the File Number sequence on the date/time
printed heron, and was duly RECORDED in the Official Records of Denton County, Texas.



County Clerk
Denton County, Texas



113

Doc-69513



NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

GF#15001425PK/TXPREM

# GENERAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DENTON | § | |

That

### KELLY B. LANGLEY AND WIFE, KATHLEEN LANGLEY

(hereinafter called "Grantor," whether one or more, masculine, feminine or neuter) for and in consideration of the sum of TEN and no/100 DOLLARS and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, paid by

### HARRY J. BIZIOS

whose address is: 6107 Sweeney Trl; Frisco 75034

(hereinafter called "Grantee," whether one or more, masculine, feminine or neuter), for which no lien is retained either express or implied, has Granted, Sold and Conveyed, and by these presents does hereby Grant, Sell and Convey, unto the said Grantee all that certain real property located in Denton County, Texas and described as follows:

LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON COUNTY, TEXAS.

together with all improvements thereon, if any, and all rights, privileges, tenements, hereditaments, rights of way, easements, appendages and appurtenances, in anyway appertaining thereto, and all right, title and interest of Grantor in and to any streets, ways, alleys, strips or gores of land adjoining the above-described property or any part thereof (hereinafter, the "Property").

This deed is executed and delivered subject to all easements, reservations, conditions, covenants and restrictive covenants as the same appear of record in the office of the County Clerk of the county in which the Property is located.

TO HAVE AND TO HOLD the above described Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, his, her or its successors, heirs and assigns, as the case may be, forever; and Grantor does hereby bind Grantor and Grantor's successors, heirs, executors and administrators, as the case may be, to Warrant and Forever Defend all and singular the said Property unto the said Grantee and Grantee's successors, heirs and assigns, as the case may be, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

Executed this the 7TH day of June, 20 13.

_____
KELLY B. LANGLEY

_____
KATHLEEN LANGLEY

## ACKNOWLEDGMENT

STATE OF TEXAS      §
COUNTY OF Dallas      §

Before me, the undersigned authority, on this day personally appeared, **KELLY B. LANGLEY AND KATHLEEN LANGLEY** [check one] ___ known to me or ✓ proved to me through _____TXDL_____ (description of identity card) to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that said person executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 7 day of June, 20 13

_____
Notary Public, State of
Printed name:
Commission expires:

CHERYL WILLIAMS
Notary Public, State of Texas
My Commission Expires
February 16, 2014

After Recording Return To:
**HARRY J. BIZIOS**
6107 Sweeney Trail
Frisco, TX 75034

Page 2

CERTIFIED A TRUE AND CORRECT COPY
OF THE RECORD ON FILE IN MY OFFICE

CYNTHIA MITCHELL
DENTON COUNTY CLERK

3/25/14
Date

By _____
Deputy Clerk

# Exhibit 2

STATE OF TEXAS     )
                     )      **CERTIFICATE TO COPY OF PUBLIC RECORD**
                     )
**COUNTY OF DENTON**   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Resolution 12-01. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**117**

THE TOWN OF LAKEWOOD VILLAGE, TEXAS

RESOLUTION NO. 12-01

A RESOLUTION OF THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, DENTON COUNTY, TEXAS, ADOPTING AN OFFICIAL TOWN MAP OF THE CORPORATE BOUNDARIES AND THE EXTRA TERRITORIAL BOUNDARIES OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS.

NOW, THEREFORE, BE IT RESOLVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

1.　　That the map of the boundaries of the town limits and Extra Territorial Jurisdiction Limits of the Town of Lakewood Village presented to the Town Council at the Town Council meeting held on April 12, 2012 is hereby adopted and approved as the official map of the Town of Lakewood Village, Texas and amends and replaces any previous official map of the Town of Lakewood Village, Texas.

2.　　That the original of this map, attached as exhibit A, shall be maintained in the office of the Town Secretary.

3.　　That the Town Secretary is hereby directed to file with the County Clerk of Denton County a certified copy of this Resolution and map.

PASSED AND APPROVED by the Town Council of the Town of Lakewood Village, Texas this 12th day of April 20012.

ATTEST:

Linda Asbell, Town Secretary

Mike Schnittker, Mayor

118

# TOWN OF LAKEWOOD VILLAGE
## OFFICIAL MAP



119

# Exhibit 3

**DEPARTMENT OF TECHNOLOGY SERVICES**
701 KIMBERLY DR., SUITE A285
DENTON, TX 76208-6301

940-349-4500
Fax: 940-349-4501
www.dentoncounty.com



March 27, 2014

Dear Sir/Madam,

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the maps maintained by the Geographic Information Systems. The same appear of record in my office and said documents are the official records from the public office of the GIS Department of Denton County, Texas, and are kept in said office.

I further certify that I am the Manager of GIS Department of Denton County, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of Denton County this 27th day of March, 2014.

Sincerely,

Rachel Crowe
GIS Manager, Department of Technology Services
Denton County

701 Kimberly Dr.
Suite A285
Denton TX 76208-6301

940-349-4590

Rachel.Crowe@dentoncounty.com

# Lakewood Village



**DENTON COUNTY, TEXAS**
**1846**

Mary Horn- County Judge
Hugh Coleman- Commissioner Precinct 1
Ron Marchant- Commissioner Precinct 2
Bobbie J. Mitchell- Commissioner Precinct 3
Andy Eads- Commissioner Precinct 4



INTERSTATE
U.S. HIGHWAY
STATE HIGHWAY
FARM TO MARKET
MAJOR THOROUGHFARES
MINOR ROADS
CEMETERY
RAILROADS
AIRPORTS
STREAMS
LAKES & PONDS

## City Population

Denton > 100,000
Lewisville 40,000- 100,000
Corinth 10,000- 39,999
Sanger 2,000- 9,999
Ponder < 2,000



NAD 1983 StatePlane
(Zone 5351)
Texas North Central
Lambert Conformal Conic



N
W E
S

1 inch = 0.1 miles
March 25, 2014

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.

CONTACT INFORMATION
LANDMARKMAP GIS: gis.dentoncounty.com
E-MAIL: gis@dentoncounty.com



DEPARTMENT OF
TECHNOLOGY SERVICES

DTS

DENTON ★ COUNTY

122

# Exhibit 4

**STATE OF TEXAS** )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Extra Territorial Jurisdiction Map showing the Sunrise Bay area. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



125

# Exhibit 5

STATE OF TEXAS  )
         )  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON  )

   I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Extra Territorial Jurisdiction Map showing the 2-foot contours of the Bizios Property area.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

   I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

   In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**127**



128

# Exhibit 6

# DENTON CENTRAL APPRAISAL DISTRICT

## CERTIFICATE OF AUTHENTICITY OF OFFICIAL RECORDS

STATE OF TEXAS

COUNTY OF DENTON

BEFORE ME, the undersigned official on this day appeared ROGER HARRIS, who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

My name is ROGER HARRIS. I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

I am custodian of records of the DENTON CENTRAL APPRAISAL DISTRICT. Attached hereto is 1 page of duplicate copies of official records from the District's Appraisal Records. These said pages of records are kept by the Denton Central Appraisal District in the regular course of business, and it was the regular course of business of the Denton Central Appraisal District for a representative of the District with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record; and the record was made at or near the time of receipt of same or reasonable soon thereafter. The records attached hereto are exact duplicates of the originals.

ROGER HARRIS
CUSTODIAN OF THE RECORDS

SUBSCRIDED AND SWORN TO BEFORE ME ON THE 26th day of March, 2014, to certify which witness my hand and official seal.

Hope Pierson
NOTARY PUBLIC in and for the State of Texas

Enclosure:
Owner Records (Screen Prints) for:

PID 182659

Signature

HOPE MARIE PIERSON
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
09-13-2014

130

# DENTON CENTRAL APPRAISAL DISTRICT

## PROPERTY/FIELD REVIEW CARD 2013

2013-0-182659-337558

**PROPERTY ID AND LEGAL DESCRIPTION**

PROP ID: 182659   TYPE: Real   DBA:
SUNRISE BAY AT LAKE LEWISVILLE BLK 1 LOT 84
GEO ID: SN0104A-000001-0000-0084-0000   MAP ID: LE01
REF ID1: 255462   REF ID2: R182659   MAPSCO:
SITUS: 3960 SPINNAKER RUN PT TX 75068-3110   TIF: N
PROP USE:   SUB MKT:
GBA: 0   NRA: 0   UNITS: 0

**OWNER ID, NAME AND ADDRESS**

OWNER ID/%: 337558   100.00%
BIZIOS, HARRY J
6107 SWEENEY TRL
FRISCO, TX 75034-2269 US

EFFECTIVE ACRES: 0.0000
APPR VAL METHOD: Cost

**EXEMPTIONS**

**ENTITIES**
CAD 100%
G01 100%
S10 100%

| VALUE METHOD | | C 2012 VALUES | C 2013 VALUES |
|---|---|---|---|
| IMPROVEMENT | | 0 | 0 |
| LAND MKT | + | 474,430 | 474,430 |
| MARKET | = | 474,430 | 474,430 |
| PROD LOSS | - | 0 | 0 |
| APPRAISED | = | 474,430 | 474,430 |
| HS CAP LOSS | - | 0 | 0 |
| ASSESSED | = | 474,430 | 474,430 |

**REMARKS/SKETCH/COMMANDS**

2012 LISTED for $799,000; PRIME LAKEFRONT. FROM
R43847,43798,44155,65880,43986,43994 PER PLAT L-224-27

I HEREBY CERTIFY THAT THIS IS A TRUE
AND CORRECT COPY OF THE RECORDS OF THE
DENTON CENTRAL APPRAISAL DISTRICT.

DATE __3/26/14__

RUDY DURHAM, CHIEF APPRAISER

BY _Roger Haim_

**GENERAL**

UTILITIES:   LAST APPR YR: 2011   LAST APPR:   CHUCKS
TOPOGRAPHY:   CAP BASIS YR:   NBHD APPR:   CHUCK
ROAD ACCESS:   LAST INSP DATE: 04/12/2012   SUBDV APPR:
ZONING:   NEXT INSP DATE:   LAND APPR:
GROUP CODES: IA-S10   VALUE APPR:
NEXT REASON:   RENT:

**BUILDING PERMITS**

| B# | ISSUE DT | PERMIT # | TYPE | ST | EST VALUE | APPR | BUILDER | COMMENT |
|---|---|---|---|---|---|---|---|---|
| 1 | 02/24/2014 | 2014-0123 | RESCA | | 0 | CHUC | ALAN HOFFMAN CUSTOM | (MA:5536 MA2:1369- |

CHUC ALAN HOFFMAN CUSTOM (MA:5536 MA2:1369-

**INCOME APPROACH DATA**
GPI VAC   EGR   OTHER INC   EGI   EXPENSE   TAXES   NOI   METHOD   INC VALUE

TAX AGENT:   PHONE:
GROSS SQFT:   NET SQFT:
LINKED ACCTS:   RECONCILED VALUE:

**INQUIRY/ARB PROTESTS**
CASE ID   DATE   APPR   STATUS   OWNER COMMENTS   STAFF COMMENTS

**SALES & DEED HISTORY**

| SALE DT | SALE PRICE | TYPE | FIN CD | RATIO CD | FIN CD | FIN TERM | LA SQFT | SP/SQFT | 1ST IMPRV | 2ND IMPRV | GRANTOR | CONSID | DEED | DEED INFO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/07/2013 | 650,000 | CL | 1 | | CONV | 0 YR | 0 | 0.00 | | | LANGLEY, KELLY | | GN | 2013-69513 |
| 06/26/2006 | | | | | | | | | | | LI, XU | | WD | 2006-77041 |
| 02/03/2005 | | | | | | | | | | | BONNER, DAVID | | WD | 05-13294 |

**IMPROVEMENT VALUATION**

| # | TYPE | DESCRIPTION | BUILDER | STY | BUILT | EFF YR | COND | VALUE | DEPR | PHYS | ECON | FUNC | COMP | ADJ | ADJ VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

APPR/SQFT: 0.00   SALE/SQFT:

**LAND VALUATION**

| # | TYPE | SOIL | CLS | TABLE | SC | HS | METH | DIMENSIONS | UNITS STY | UNIT PRICE | ADJ | MASS ADJ | ADJ | MKT VAL | VAL SRC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8 | | | L-SN010 | C5 | N | SL | 2.5000 AC | | 1.35   5.50 | 1.00 | | 1.00 | 474,430 | A |

474,430

IRR Wells: 0   Capacity: 0   IRR/Acre: 0   Oil Wells: 0

**LAND ADJUSTMENTS**

| L# | ADJ TYPE | ADJ AMT | ADJ% |
|---|---|---|---|
| 1. | LVIEW | 550.00 | |

**IMPROVEMENT DETAIL ADJUSTMENTS**
| I# | ADJ TYPE | ADJ AMT | ADJ % | DESCRIPTION |
|---|---|---|---|---|

**IMPROVEMENT FEATURES**
| I# | DESCRIPTION | UNITS | CODE | VALUE |
|---|---|---|---|---|

**PRODUCTIVITY VALUATION**

REGION:   SUBD: SN0104A (100   NBHD: DC130122 (10   SUBSET:   L-SN010

| L# | TYPE | DESCRIPTION | AG | AG USE | AG TABLE | UNITS | CODE | AG UNIT PRC | AG VALUE |
|---|---|---|---|---|---|---|---|---|---|
| 1. | RESIDENT LOT | | N | | | | | 0.00 | 0 |

131

# Exhibit 7

# OWNERS CERTIFICATION

STATE OF TEXAS
COUNTY OF DENTON

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING SITUATED IN DENTON COUNTY, TEXAS, BEING A PORTION OF THE WM. H. PEA SURVEY, ABSTRACT NO. 718, THE J. KING SURVEY, ABSTRACT NO. 1044, THE DR. W. W. BREASHEARS SURVEY, ABSTRACT NO. 1634, THE J. M. CULE SURVEY, ABSTRACT NO. 226, AND THE DAVID M. CULE SURVEY, ABSTRACT NO. 226, BEING THE SAME TRACT OR PARCEL OF LAND DESCRIBED IN VOLUME 611, PAGE 39 OF THE DEED RECORDS OF DENTON COUNTY, TEXAS, BEING FURTHER DESCRIBED IN VOLUME 614, PAGE 39 OF THE DEED RECORDS OF DENTON COUNTY, TEXAS, BEING FURTHER DESCRIBED AND BOUND AS FOLLOWS:

BEGINNING AT A 326.4 ACRE TRACT OF LAND CALLED 315.6 ACRE TRACT, BEING THE NORTHWEST CORNER OF SAID CALLED 315.6 ACRE TRACT;

THENCE SOUTH 85° 18'49" WEST ALONG THE COMMON LINE OF SAID CULE AND PEA SURVEYS, 1935.13

THENCE NORTH 02° 42'00" EAST, 34.57 FEET TO AN 1/2" IRON PIPE FOUND;
THENCE SOUTH 84° 30'00" EAST, 421.17 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 89° 24'00" EAST, 223.12 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 72° 02'38" EAST, 183.79 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 66° 14'00" EAST, 54.54 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 60° 50'12" WEST, 129.06 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 66° 10'50" EAST, 52.36 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 22° 11'06" EAST, 66.32 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 61° 46'25" EAST, 83.69 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 71° 24'04" EAST, 791.49 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 11° 11'04" EAST, 574.62 FEET TO A 5/8" IRON ROD FOUND WITH CAP SET;
THENCE SOUTH 79° 20'32" WEST, 208.46 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 66° 20'34" WEST, 98.71 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 59° 31'11" WEST, 92.72 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 52° 41'04" WEST, 83.40 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 15° 03'25" WEST, 161.20 FEET TO AN 1/2" IRON PIPE FOUND;
THENCE SOUTH 24° 46'52" WEST, 422.77 FEET TO AN 1/2" IRON PIPE FOUND;
THENCE NORTH 60° 06'54" WEST, 159.72 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 23° 14'51" WEST, 72.11 FEET TO AN 1/2" IRON PIPE FOUND;
THENCE NORTH 89° 05'01" WEST, 111.54 FEET TO A 5/8" IRON ROD WITH CAP SET;
THENCE SOUTH 04° 06'21" WEST, 108.14 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 63° 01'43" WEST, 241.38 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 81° 29'27" EAST, 54.01 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 86° 59'11" WEST, 139.67 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 51° 17'56" WEST, 100.68 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 22° 02'18" WEST, 366.80 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 18° 56'52" WEST, 266.75 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 39° 54'41" WEST, 159.87 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 34° 04'13" WEST, 279.14 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 55° 30'32" WEST, 321.94 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 84° 23'51" WEST, 164.79 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 44° 50'35" WEST, 132.58 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 43° 37'54" WEST, 426.79 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 52° 39'19" WEST, 106.26 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 40° 49'22" WEST, 214.64 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 20° 31'00" EAST, 268.42 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 14° 15'27" WEST, 161.43 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 74° 11'27" WEST, 346.65 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 51° 41'32" EAST, 426.79 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 13° 20'01" EAST, 268.39 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 28° 59'37" EAST, 350.12 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 30° 23'41" WEST, 394.13 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 40° 15'45" EAST, 159.72 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 62° 57'21" EAST, 114.63 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 17° 47'40" EAST, 115.64 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 38° 40'59" WEST, 514.83 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 62° 32'36" WEST, 192.91 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 53° 42'11" WEST, 228.94 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 74° 05'37" WEST, 129.23 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 33° 51'38" WEST, 206.96 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 22° 59'13" WEST, 72.42 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 80° 15'58" EAST, 125.18 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 41° 54'00" WEST, 128.09 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 81° 54'16" EAST, 232.98 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 83° 02'00" EAST, 71.71 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 32° 28'16" EAST, 182.57 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 54° 08'07" EAST, 331.45 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 23° 57'59" EAST, 275.32 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 47° 02'10" EAST, 215.43 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 79° 57'57" EAST, 213.08 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 13° 38'26" WEST, 182.60 FEET TO A 5/8" IRON ROD FOUND WITH CAP SET;
THENCE SOUTH 13° 20'26" WEST, 208.76 FEET TO A 5/8" IRON ROD WITH CAP SET;
THENCE SOUTH 65° 06'31" WEST, 217.40 FEET TO A GOVERNMENT MONUMENT FOUND;

THENCE SOUTH 04° 25'32" EAST, 157.85 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 51° 46'08" WEST, 149.83 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 21° 55'56" WEST, 243.71 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 04° 53'49" WEST, 365.66 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 38° 21'36" WEST, 491.89 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 19° 02'58" WEST, 282.89 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 53° 13'24" WEST, 367.65 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 54° 14'25" EAST, 330.49 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 18° 31'15" WEST, 198.45 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 80° 27'10" WEST, 162.24 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 59° 05'29" WEST, 67.57 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 47° 04'03" WEST, 107.42 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 58° 13'49" WEST, 226.48 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 77° 02'46" WEST, 69.05 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 17° 29'39" EAST, 54.18 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 47° 08'47" EAST, 59.36 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 15° 44'41" WEST, 321.61 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 60° 22'19" WEST, 168.37 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 44° 28'49" WEST, 174.51 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 25° 38'44" WEST, 130.92 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 88° 19'23" EAST, 99.89 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE NORTH 87° 56'39" WEST, 306.59 FEET TO A GOVERNMENT MONUMENT FOUND;
THENCE SOUTH 87° 14'07" WEST, 458.90 FEET TO AN 1/2" IRON ROD FOUND;
THENCE SOUTH 86° 04'41" WEST, 521.93 FEET TO AN 1/2" IRON ROD FOUND;
THENCE NORTH 00° 00'18" WEST, 795.09 FEET TO A 5/8" IRON ROD WITH CAP SET;
THENCE NORTH 00° 54'34" EAST, 2555.80 FEET TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 257.157 ACRES OF LAND.

NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS:

THAT, PROPERTIES OF THE SOUTHWEST INC., OWNER, ACTING BY AND THROUGH ITS VICE PRESIDENT, MARCUS SMITH, DULY AUTHORIZED TO SO ACT, DOES HEREBY ADOPT THIS PLAT DESIGNATING THE HEREINABOVE PROPERTY AS " SUNRISE BAY AT LAKE LEWISVILLE", AN ADDITION TO DENTON COUNTY, TEXAS, AND DOES HEREBY DEDICATE TO THE PUBLIC USE FOREVER THE STREETS AND EASEMENTS SHOWN THEREON. THE ACCOMMODATION OF ALL PUBLIC UTILITIES DESIRING TO USE OR USING SAME. ANY PUBLIC UTILITY SHALL HAVE THE RIGHT TO REMOVE AND KEEP REMOVED ALL OR PART OF ANY BUILDINGS, FENCES, TREES, SHRUBS OR OTHER IMPROVEMENTS OR GROWTHS WHICH IN ANY WAY ENDANGER OR INTERFERE WITH THE CONSTRUCTION, MAINTENANCE OR EFFICIENCY OF ITS RESPECTIVE SYSTEMS ON ANY OF THESE EASEMENT STRIPS, AND ANY PUBLIC UTILITY SHALL, AT ALL TIMES, HAVE THE RIGHT OF INGRESS AND EGRESS TO AND FROM AND UPON THE SAID STRIPS FOR THE PURPOSE OF CONSTRUCTING, RECONSTRUCTION, INSPECTING, PATROLLING, MAINTAINING AND ADDING TO OR REMOVING ALL OR PART OF ITS RESPECTIVE SYSTEMS WITHOUT THE NECESSITY AT ANY TIME OF PROCURING THE PERMISSION OF ANYONE.

WITNESS MY HAND, THIS THE _____ DAY OF _____, 1995.

_____
PROPERTIES OF THE SOUTHWEST INC.
MARCUS SMITH, VICE PRESIDENT

STATE OF TEXAS
COUNTY OF DENTON

BEFORE ME, THE UNDERSIGNED AUTHORITY, A NOTARY PUBLIC, IN AND FOR SAID COUNTY AND STATE ON THIS DAY PERSONALLY APPEARED MARCUS SMITH, KNOWN TO ME TO BE THE PERSON WHOSE NAME IS SUBSCRIBED TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME FOR THE PURPOSE AND CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE 31 DAY OF July 1995.

JENNIFER DAWN BROWN
MY COMMISSION EXPIRES
November 5, 1997

Jennifer Dawn Brown
NOTARY PUBLIC IN AND FOR
DENTON COUNTY, TEXAS
MY COMMISSION EXPIRES  1/5/97

# SURVEYOR'S CERTIFICATE

I, JOHNNY D. L. WILLIAMS, REGISTERED PROFESSIONAL SURVEYOR FOR SURVCON, INC., DO HEREBY DECLARE THAT THIS PLAT WAS COMPUTED AND COMPILED BY TURNER COLLIE AND BRADEN INC., UNDER MY SUPERVISION, AND THAT

1.) THE METES AND BOUNDS DESCRIPTION CONTAINED WITHIN THE OWNERS CERTIFICATE HEREON, WAS PREPARED FROM A GROUND SURVEY PERFORMED UNDER MY SUPERVISION.
2.) ALL LOT CORNERS, RIGHT-OF-WAY AND BOUNDARY POINTS SHOWN HEREON, HAVE BEEN ESTABLISHED USING 5/8 " IRON RODS.  IN ACCORDANCE WITH COORDINATE VALUES PROVIDED BY TURNER COLLIE & BRADEN INC.

Johnny D. L. Williams
JOHNNY D. L. WILLIAMS
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS REGISTRATION NO. 4618

STATE OF TEXAS
COUNTY OF DALLAS

BEFORE ME, THE UNDERSIGNED AUTHORITY, A NOTARY PUBLIC, IN AND FOR SAID COUNTY AND STATE ON THIS DAY PERSONALLY APPEARED JOHNNY D.L. WILLIAMS, KNOWN TO ME TO BE THE PERSON WHOSE NAME IS SUBSCRIBED TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME FOR THE PURPOSE AND CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE 31 DAY OF July 1995.

NOTARY PUBLIC
DALLAS COUNTY, TEXAS
COMMISSION EXPIRES

# CERTIFICATE OF APPROVAL

ON THIS 26th DAY OF July, 1995, THE CITY OF LITTLE ELM, TEXAS, HEREBY APPROVES THE FOREGOING PLAT OF ", SUNRISE BAY AT LAKE LEWISVILLE" AN ADDITION TO DENTON COUNTY, TEXAS, SUBMITTED BY PROPERTIES OF THE SOUTHWEST INC., OWNER.

MAYOR
CITY OF LITTLE ELM, TEXAS

# CERTIFICATE OF APPROVAL

ON THIS _____ DAY OF August, 1995, THE COUNTY OF DENTON, TEXAS, HEREBY APPROVES THE FOREGOING PLAT OF ", SUNRISE BAY AT LAKE LEWISVILLE" AN ADDITION TO DENTON COUNTY, TEXAS, SUBMITTED BY PROPERTIES OF THE SOUTHWEST INC., OWNER.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE 31 DAY OF _____, 1995.

Filed for Record in:
DENTON COUNTY, TX
HONOURABLE TIM HODGES/COUNTY
CLERK
On Aug 02 1995
At 9:04am
Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 98.00
Area18 : 6.00
Doc/Mgmt : 21161
Deputy - CASSY

FINAL PLAT

# Sunrise Bay
## AT LAKE LEWISVILLE

DENTON COUNTY, TEXAS
257.1573 ACRES BEING PART OF THE
WM. H. PEA SURVEY, A-1044
DR. W. W. BREASHEARS SURVEY, A-1634
J. KING SURVEY, A-718
DAVID M. CULE SURVEY, A-226

179 LOTS   1 BLOCK
5 COMMON GREEN AREAS   JULY, 1995

PREPARED FOR:
PROPERTIES OF THE SOUTHWEST INC.
100 LAKE RIDGE PARKWAY
CEDAR HILL, TEXAS 75104
(214) 299-9253

PREPARED BY:
TURNER COLLIE & BRADEN INC.
5710 LBJ FREEWAY, SUITE 370
DALLAS, TEXAS 75240, (214) 960-9651

SURVCON, INC.
5710 LBJ FREEWAY, SUITE 370
DALLAS, TEXAS 75240, (214) 458-2173
T.C. & B. JOB NO. 45-94020-203

UTILITY PROVIDERS:
TELEPHONE: SOUTHWESTERN BELL
307 NORTH KENTUCKY STREET
TX, 75067
ELECTRIC: D.C.E.C.
3508 F.M. 2181
CORINTH, TX 76205

VICINITY MAP
n.t.s.



SCALE 1" = 200'

0 200 400 500 600

DR. W. BREASHEARS SUR. A-1634

ROBERT BEER, TRUSTEE
VOL. 614, PG. 399
D.R.D.C.T.

U.S.A.
LAKE LEWISVILLE
RESERVOIR

J. KING SUR. A-718

WM. H. PEA SUR. A-1044

U.S.A.
LAKE LEWISVILLE
RESERVOIR

U.S.A.
LAKE LEWISVILLE
RESERVOIR

JAMES O. DICKSON SUR. A-338

DAVID M. CULE SUR. A-226

J.R.K., INC.
VOL. 1191, PG. 210
D.R.D.C.T.

P.O.B.

NOTE:
THE MAINTENANCE OF DRAINAGEWAYS AND/OR
DRAINAGE IMPROVEMENTS WITHIN THE DRAINAGE
AND/OR UTILITY EASEMENTS SHOWN ON THIS
PLAT ARE THE RESPONSIBILITY OF THE INDIVIDUAL
PROPERTY OWNERS AND NOT DENTON COUNTY.

GENERAL NOTES:
1.) THE RADIUS ON ALL BLOCK CORNERS IS 20.00 FEET UNLESS OTHERWISE NOTED.
2.) ALL EASEMENTS ON LOT LINES ARE CENTERED UNLESS OTHERWISE NOTED.
3.) A 20 FOOT UTILITY / SLOPE EASEMENT ADJOINING ALL RIGHT OF WAYS IS HEREBY DEDICATED. A 10 FOOT SIDELOT U.E. / D.E. IS HEREBY DEDICATED.
4.) ALL BEARINGS REFERENCED TO N.G.S. DATUM STA. B.M. BRASS DISK MONUMENT STAMPED IF 947 1945 N 540426.228 E 2161833.863 ELEVATION 576.48'
5.) U.E. INDICATES UTILITY EASEMENT. V.I.E. INDICATES WATER LINE EASEMENT. D.E. INDICATES DRAINAGE EASEMENT. B.L. INDICATES BUILDING LINE S.E. INDICATES SLOPE EASEMENT.
6.) THAT PROPERTY SHOWN HEREON WHICH IS SITUATED BETWEEN THE 537 FOOT CONTOUR (MEAN SEA LEVEL) AND THE BOUNDARY OF LAKE LEWISVILLE RESERVOIR...
7.) THE DEVELOPMENT OF INDIVIDUAL OWNERS SHALL NOT BLOCK ANY TRIBUTARY RUNOFF.
8.) LAND USE DESIGNATED AS SINGLE FAMILY RESIDENTIAL.
9.) ...
10.) THE AVERAGE PERCOLATION RATE VARIED WITH DISTANCE HAVING A RANGE OF 40 TO 128 MINUTES/INCH. (PROVIDED BY BAILY INSPECTIONS & TESTING)

FINAL PLAT
SUNRISE BAY
AT LAKE LEWISVILLE
SHEET 2 OF 4

T.C. & B. JOB NO. 45-94008-203

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY CLERK
On Aug 02 1995
At 9:04am

Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 96.00
Doc/Mgmt :
Receipt #: 21161
Deputy - CASSY

LEGEND
(1) BLOCK DESIGNATION
— SURVEY LINE
[ ] MIN. FINISH FLOOR ELEVATION

MATCH LINE

PINNACLE BAY POINTE

PINNACLE COURT

SUNRISE COURT

SHORELINE DRIVE

MISTY COVE

GARZA LANE

SUNRISE BAY POINTE

REALTY ALLIANCE OF TEXAS, LTD.
382.579 ACRES
VOL. 2395 D. 132
D.R.D.C.T.



FINAL PLAT
SUNRISE BAY
AT LAKE LEWISVILLE
T.C. & B. JOB NO. 45-94008-203
SHEET 3 OF 4

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY
CLERK
On Aug 02 1995
At 9:04am
Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 98.00
Doc-Mgmt : 6,000
Receipt # 21161
Deputy - CASSY

SCALE 1" = 200'

LEGEND
① BLOCK DESIGNATION
—— SURVEY LINE
588 MIN. FINISH FLOOR ELEVATION

J. KING SUR., A-718

WM. H. PEA SUR., A-1044

C.C. DICKSON SUR., A-339

U.S.A.
LAKE LEWISVILLE
RESERVOIR

LAKEWOOD VILLAGE
FIRST SECTION

LAKEWOOD VILLAGE
SECOND SECTION

MATCH LINE

SHORELINE DRIVE

SEMINAKER RUN POINTE

SUNNAKER RUN POINTE

CONNOR GREEN NO. 5

REALTY ALLIANCE OF TEXAS, LTD.
982.579 ACRES
VOL. 2396 G. 132
D.R.D.C.T.

CAB L PG. 226

CERTIFIED A TRUE AND CORRECT COPY
OF THE RECORD ON FILE IN MY OFFICE
CYNTHIA MITCHELL
HOUSTON COUNTY CLERK
By_____ Deputy
Date

| NOTE TABLE | | | |
|---|---|---|---|
| NOTE | DISTANCE OR ARC LENGTH | BEARING OR DELTA | RADIUS |

| CURVE TABLE | | | | | |
|---|---|---|---|---|---|
| NOTE | ARC LENGTH | DELTA | RADIUS | CHORD BEARING | CHORD DISTANCE |

# Exhibit 8

STATE OF TEXAS      )

                                )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the builder's plans for "3950 Spinaker Run Pointe Rd.". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## GENERAL CONTRACTORS NOTES

1.)Prior to any construction, the Contractor shall familiarize himself with the Contract Documents and Specifications, the Plans, including all notes, the City Standard Details and Specifications and any other applicable Standards or Specifications relevant to the proper completion of the work specified. Failure on the part of the Contractor to familiarize himself with all standards and specifications pertaining to the work shall in no way relieve the Contractor of responsibility for performing the work in accordance with all such applicable Standards and Specifications.

2.)The Contractor shall have in his possession, prior to construction, all necessary permits, licenses, etc. The Contractor shall have at least one set of set of approved Plans and Specifications on-site at all times. The Contractor shall notify city buildings officials and/ or department 24 hours prior to the commencement of any work.

3.)Construction inspection may be performed by representatives of the Owner, Engineer, City, Geotechnical Engineer and Reviewing Authorities and Agencies. Unrestricted access shall be provided to them during normal working hours. The contractor is responsible for understanding and scheduling required inspections.

4.)All contractors must confine their activities to the work area. No encroachments outside of the defined work area will be allowed, unless specifically noted on the plans. Any damage resulting therefrom shall be the Contractor's responsibility to repair.

5.)It will be the responsibility of each contractor to protect all existing public and private utilities throughout the construction of this project. The Contractor shall contact the appropriate utility companies for line locations prior to the commencement of construction and shall assume full liability to those companies for any damages caused to their facilities.

6.)The Contractor shall be responsible for providing the required construction staking necessary to complete the construction in accordance with the plans and specifications.

7.)The Contractor shall be responsible for providing and maintaining all necessary barricading and all other warning and safety devices to protect the public safety and health until all work has been completed and accepted.

8.)If any unforeseen problems or conflicts are encountered in the course of construction, for which an immediate solution is not apparent, the Engineer and Owner shall be notified.

9.)The Contractor shall be responsible for removing any existing structures, fences, debris, or trees that are located within the boundaries of this project, unless otherwise noted on the plans.

10.)General Contractor shall be responsible for coordination of other trades (mech'l, elec'l, etc.) prior to fabrication and installation.

11.)General Contractor to be responsible for coordination of architectural and structural drawings prior to fabrication, forming, or placement of materials. General Contractor shall report discrepancies immediately to architect and shall proceed with construction only after discrepancy has been resolved.

## GENERAL FRAMING NOTES

1.)Structure was designed in accordance to the International Building Code 2003 Edition.

2.)All joists and rafters shall be aligned over studs below.

3.)All exterior corners (inside and out) shall be braced as required. Special city wind strength ordinances may apply

4.)Exterior walls 2 X 4 or 2 X 6 stud framing with veneers as selected, except where shown as 6" wall for plumbing supply and vents.

5.)Interior walls 2 X 4" stud with sheetrock face, except where shown as 6" wall for plumbing supply and vents, and for walls 10' in height or greater.

6.)Unless specifically noted otherwise, framing lumber shall be no. 2 or better southern pine with a modulus of elasticity of 1,600,000 psi. Interior wall studs may be no. 2 or better Douglas fir or S. pine, or no.2 or better SPF.

7.)Wood roof and floor trusses if used shall be fabricated, handled, and erected in accordance with truss plate institute standards and IBC standards. Truss design drawings sealed by a registered professional engineer shall be provided to the owner prior to erection of the trusses. The truss webs and bottom chords shall have their individual 2" thick components glued together as well as nailed per the truss plate pattern. The truss members shall all be minimum 2x4 no.2 or better.

8.) Coordinate and adjust, as necessary, the typical framing member spacing with lighting and electrical locations shown.

9.)When two roofs intersect with different roof pitches, block top of stud walls to align fascia.

10.)Wood connections to be Simpson ties or equivalent.

11.)All structural steel shall be A36 except TS shapes shall be A500 GR. B. Steel joists and joist girders shall meet all specifications of the latest S.J.I. edition. Fy=50 KSI. All bolted connections shall use a325 bolts unless noted otherwise. All welds shall be made using E70 electrodes. Headed studs shall be Nelson or better. Temporary construction bracing of the structural steel frame shall remain in place until after the floor and roof deck attachments have been completed and all permanent bracing has been installed.

## GENERAL CONCRETE NOTES

1.)Do not use foundation outline plan for actual construction. Foundation documents must be drawn & sealed by a registered engineer. Peskuski Home Design assumes no responsibility for slab strength or integrity.

2.)Concrete shall have a minimum compressive strength of 3000 psi at 28 days. Reinforcing steel shall be ASTM A615 grade 60. Lap all reinforcing splices 24" unless noted otherwise. Provide 2'-0" x 2'-0" corner bars to match and lap horizontal reinforcement at all grade beam and wall intersections. 30 bar dia. lap minimum. All reinforcement shall be detailed in accordance with the latest ACI Detailing manual.

3.)Contractor shall coordinate all penetrations, conduit, chambers and embedded items prior to concrete placement. Welded wire fabric and wire shall be lapped the spacing of the cross wires plus 2".

BUILDER COPY
Stairs Shall Comply With IRC Section R311.5.

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

## VICINITY MAP

## SHEET INDEX

| | |
|---|---|
| CS | COVER SHEET |
| | PLAN OVERVIEW |
| A1 | FIRST FLOOR PLAN |
| A2 | SECOND FLOOR PLAN |
| A3 | FRONT/REAR ELEVATIONS |
| A4 | LEFT/RIGHT ELEVATIONS |
| A5 | ROOF/PLAT PLAN |
| A6 | ROOF/PLAT PLAN |
| A7 | CROSS SECTIONS |
| S1 | FOUNDATION/PLUMBING |
| S2 | FOUNDATION/PLUMBING |
| S3 | ROOF FRAMING |
| D1 | DOOR/WINDOW SCHEDULES |
| E1 | CONSTRUCTION DETAILS |
| E2 | FIRST FLOOR ELECTRICAL |
| | SECOND FLOOR ELECTRICAL |

# COVER SHEET

BUILDER COPY

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (107) 082-8376    FAX: (972) 270-0338

PLAN NO. 7134
DATE 10/30/13
SHEET CS

BUILDER COPY



**SITE PLAN**
SCALE 1" = 30'

MASONRY MAILBOX

LAKE LEWISVILLE RESOVOIR

DRAINAGE (AS INDICATED)

All Installations Subject To Field Inspections and Inspector Approval

S 04 DEG 53'49" W 269.66'

N 38 DEG 21'36" W 491.89'

S 43 DEG 20'43" E 585.89'

15' SLOPE & UTILITY EASMT.

20' SIDEYARD SETBACK

20' SIDEYARD SETBACK

20' SLOPE & UTILITY EASMT.

REINFORCED CONCRETE DRIVE

N 34 DEG 54'11" W 295.77'

30' BUILD LINE

20' SLOPE & UTILITY EASMT.

N 55 DEG 07'13" E 116.3'

SPINAKER RUN POINTE ROAD

140

SECOND FLOOR

FIRST FLOOR

Stairs Shall Comply With IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

All Installations Subject To Field Inspections and Inspector Approval

All Foundation Anchorage Shall be Installed Per 2009 IRC Section 403.1.6 Prior to Placement of Concrete.

All Inspections Shall Comply with 2009 IRC Requirements & Adopted Ordinances.

## NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.
2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.
3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.
4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.
5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.
6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS.
7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE
8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS
9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.
10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

### FLOOR PLAN DISCLAIMER

## AREAS

### LIVING
FIRST FLOOR A/C — 5536
SECOND FLOOR A/C — 1369
LOFT — 229

TOTAL LIVING — 7134

### GARAGES
2 CARS — 618
2 CARS — 618
SHOP — 221

### PORCHES
ENTRY - GATE — 175
ENTRY - FRONT DOOR — 123
PRIVATE — 82
BACK SINGLE VOLUME — 471
BACK DBL VOLUME — 505

GARAGES/PORCHES — 2813

TOTAL UNDER ROOF — 9947

## PLAN OVERVIEW

SCALE 3/32" = 1'

---

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 693-8959    FAX: (972) 473-0248

SHEET: A-1

DATE: 11/05/13

PLAN NO.: 7134

PLAN NO. 7134  DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 964-5694   FAX (972) 231-0438

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-2A

NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"x36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC.

WALL TYPES:

6" BRICK
6" STONE
6" BLOCK
6" STUCCO
BRICK 4"
STONE 6"
STONE 4"
STUCCO 6"
STUCCO 4"
INTERIOR 6"
INTERIOR 4"
GLASS WALL
DEMO WALL 1/2"
FOOTING WALL
TO BE REMOVED

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF ANY PREPARATION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS/HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL ELEMENTS AND MATERIALS, ABIDE TO, CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKUSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

FIRST FLOOR
PLAN SCALE 3/16" = 1'

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinance

All Installations Subject To Field Inspections and Inspector Approval

Stairs Shall Comply With IRC Section R311.5

GUEST SUITE
BATH
CLOSET
OUTDOOR KITCHEN
GAMEROOM
NOOK
OUTDOOR LIVING
THEATER/SIMULATOR
KITCHEN
FAMILY
MASTER SUITE
PORCH
PRIVATE GARDEN
MASTER BATH
POOL EQUIP
PANTRY
WET BAR
LAUNDRY
CLOSET/SAFE
EL CLOSET
DINING
LIVING
FOYER
STUDY
PORCH
COURT
MUDROOM
ENTRY
GARDEN - LIMITS TBD

MATCH LINE A-A

142

PLAN NO. 7134  DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (972) 991-9999  FAX (972) 919-9999

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-2B



FIRST FLOOR
PLAN SCALE 3/16" = 1'

**NOTES:**

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO FURTHEST UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 8" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" x 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" x 4" WOOD STUD W/ SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"x36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

**WALL TYPES**

ICF BRICK
ICF STONE
ICF BLOCK
ICF STUCCO
BRICK 6"
BRICK 4"
STONE 6"
STONE 4"
STUCCO 6"
STUCCO 4"
INTERIOR 6"
INTERIOR 4"
DECO WALL 12"
GLASS WALL
EXISTING WALL TO BE REMOVED

**FLOOR PLAN DISCLAIMER**

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS WHERE SHOWN TO BE INCORRECT FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER OR HIS REPRESENTATIVE SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS/HER REQUIREMENTS TO SEE THAT ALL THE WORK AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES, AND REGULATIONS INCLUDING ANY OR ALL HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKUSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

MATCH LINE A-A

DINING
LIVING
COURT
PORCH
STUDY
MUDROOM
ENTRY
GARDEN - LIMITS TBD
MOTOR COURT
SHOP
2 CARS

**NOTES:**

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS IF INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IRC SMOKE DETECTOR LOCATIONS SHOWN ON ACCURATE IF PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

**WALL TYPES**

| | |
|---|---|
| | 10" BRICK |
| | 10" STONE |
| | 10" BLOCK |
| | 10" STUCCO |
| | BRICK 4" |
| | BRICK 6" |
| | STONE 4" |
| | STONE 6" |
| | STUCCO 6" |
| | STUCCO 4" |
| | INTERIOR 6" |
| | INTERIOR 4" |
| | DECO WALL 1/2" |
| | GLASS WALL |
| | CUSTOM WALL TO BE REMOVED |

**FLOOR PLAN DISCLAIMER**

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKURSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKURSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISIONS/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS/HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKURSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKURSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

# SECOND FLOOR PLAN   SCALE: 3/16" = 1'



All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

Stairs Shall Comply With IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

OPEN BELOW

BRIDGE

PORCH

BEDROOM #5

CLOSET

LIVING/SITTING

BATH

BATH

CLOSET

BEDROOM #4

CLOSET

BATH

BEDROOM #3

LOFT

OPEN BELOW

OPEN BELOW

OPEN BELOW

OPEN BELOW

OPEN BELOW



PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (972) 000-0000    FAX (972) 000-0000

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-4

FRONT/NORTH ELEVATION

REAR/SOUTH ELEVATION

ELEVATIONS 1
SCALE 3/16" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

145



PLAN NO. 7134

DATE 11/04/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (xxx) xxx-xxxx    FAX: (972) xxx-xxxx

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-5

LEFT/EAST ELEVATION

RIGHT/WEST ELEVATION

ELEVATIONS 2
SCALE 3/16" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval.

146



PLAN NO. 7134   DATE 11/04/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (09) 096-9690   FAX: (09) 039-0194

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE LD

SHEET A-6

ROOF PLAN
SCALE 1/8" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

PLAT PLAN
SCALE 1" = 30'

LAKE LEWISVILLE RESOVIOR

SPINAKER RUN POINTE ROAD



PLAN NO. 7134

DATE 10/30/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (XX) XXX-XXXX    FAX: (XX) XXX-XXXX

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET S-3

DOOR/WINDOW SCHEDULES
SCALE 1/8" = 1'

FIRST FLOOR

SECOND FLOOR

All Inspections Shall Comply with 2006 IRC Requirements & Adopted Ordinances

All Installations Subject To Field Inspectors and Inspector Approval



PLAN NO. 7134  DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 585-5959  FAX: (972) 529-9538

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET E-1

ELECTRICAL_1
SCALE 3/16" - 1'

149



PLAN NO. 7134
DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (469) 585-0534   FAX: (972) 235-0534

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET E-2

ELECTRICAL_2
SCALE 3/16" = 1'

150



| PLAN NO. | 7134 | | DATE | 11/04/13 |
| --- | --- | --- | --- | --- |

PHD

PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (xx) xxx-xxxx    FAX: (xx) xxx-xxxx

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET

P-1

PERSPECTIVES
NOT TO SCALE

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinance

All Installations Subject
To Field Inspections and
Inspector Approval

151







All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinance

All Installations Subject
To Field Inspections and
Inspector Approval

Framing Plan - First Floor Ceiling



All Inspections Shall Comply with 2006 IRC Requirements & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

Framing Plan - Second Floor Ceiling



All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections an
Inspector Approval

STRAND SYSTEMS ENGINEERING, INC.

Alan Hoffmann
Private Residence
3960 Spinnaker Run
Little Elm, Texas

Mark Bizios

Framing

Lot: 84
Blk: 1

J.B.W.

J.B.H.

10/30/13

Scale 1/8" = 1'-0"

FR 3

1314079

Framing Plan -- Roof Rafter

(01) Roof Support at Sloped Ceiling



1st Floor Plan - Shear Wall Plan

157



2nd Floor Plan - Shear Wall Plan

All Installations Subject To Field Inspections and Inspector Approval

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

Shear Wall Design Calculations - Main

Wind Va=7004 lbs.
Wind Va=9406 lbs.

STRAND SYSTEMS ENGINEERING INC.

Private Residence
Alan Hoffmann
3960 Spinnaker Run
Little Elm, Texas

SW 2

1314079

158

# Exhibit 9

STATE OF TEXAS      )

                           )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Stop Work Order dated March 14, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# STOP WORK ORDER

## 3950 Spinnaker Run Pt.

IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE

AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.

COMMENTS:  **Building Ordinance 11-16**

obtain proper permits

**TOWN OF LAKEWOOD VILLAGE, TEXAS**
972-294-5555

DATE POSTED: ___03/14/14___  Town Representative: _____

THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.

# Exhibit 10

**STATE OF TEXAS**     )

                      )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Stop Work Order dated March 13, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# STOP WORK ORDER

## 3950 Spinnaker Run Pt.

**IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE**

**AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.**

**COMMENTS:** ___ **Building Ordinance 11-16** ___

___ **obtain proper permits** ___

**TOWN OF LAKEWOOD VILLAGE, TEXAS**
972-294-5555

DATE POSTED: ___ 03/13/14 ___    Town Representative: ___

**THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.**

164

# Exhibit 11

STATE OF TEXAS )
) **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photograph taken of 3960 Spinnaker Run Pt. dated March 10, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



03/10/14 18:14

167

# Exhibit 12

STATE OF TEXAS     )

                           )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 13, 2014.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**169**



170



171





03/13/14 15:30

173



03/13/14 17:32 174



03/13/14  17:33 175


03/13/14 17:33 176


03/13/14  17:33  177



03/13/14    17:178



03/13/14  17:36  179



03/13/14  17:42

180

# Exhibit 13

STATE OF TEXAS     )

                       )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 14, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



03/14/14 09:32

183



03/14/14 09:52

184



03/14/14  13:11

185



03/14/14  13:11

186

# Exhibit 14

STATE OF TEXAS      )
                      )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 18, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**188**



03/18/14    18:46 189



03/18/14 18:46

190



03/18/14 18:46

191



192

# Exhibit 15

STATE OF TEXAS     )

                          )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Builder Registration for "3960 Spinnaker Run Pointe". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**194**

# BUILDER REGISTRATION APPLICATION

## BUILDER INFORMATION

DATE 1/27/14

BUILDERS NAME  ALAN  HOFFMANN, LLC / ALAN GILBERT HOFFMANN
        FIRST                 MIDDLE         LAST

BUILDERS ADDRESS  7324 GASTON AVE. #124-341
                      DALLAS, TX 75214

BUILDERS PHONE# 214-324-0056 FAX 214-324-0144 MOBILE 469-688-6450

BUILDERS TRADE NAME  ALAN HOFFMANN, LLC

BUILDERS TAX OR FEDERAL I.D.# _____

List the name, address and phone# of at least two(2) building associations of which you are a member

1>     DALLAS BUILDERS ASSOC.

PHONE# 972-931-4840 MEMBERSHIP# 45-24 / 1124182

2>     TEXAS ASSOCIATION OF BUILDERS

PHONE# 800-252-3625 MEMBERSHIP# 1124182

## PROPERTY OWNERS INFORMATION

PROPERTY OWNER  HARRY               BIZIOS
                 FIRST         MIDDLE        LAST

OWNERS ADDRESS      SWEENEY TRAIL
& TELEPHONE#     FRISCO, TX

ADDRESS OF HOME TO BE BUILT  3960 SPINNAKER RUN POINTE
                     84                        SUNRISE BAY
              LOT          BLOCK       SECTION

ELEVATION GROUND FLOOR LEVEL  539-540 / ELEVATION BEING DONE 1/26/14

TOTAL SQUARE FOOTAGE  9947

(INCLUDES TOTAL SLAB AREA + SECOND FLOOR AREA + PORCHES + DECKS)

Page 4

# Exhibit 16

STATE OF TEXAS )
)
COUNTY OF TARRANT )

QUITCLAIM DEED   526

KNOW ALL MEN BY THESE PRESENTS: That the UNITED STATES OF AMERICA,
acting by and through the Secretary of the Army, under and pursuant to the
powers and authority contained in Public Law 85-500, approved 3 July 1958,
party of the first part, for and in consideration of THIRTEEN THOUSAND FOUR
HUNDRED TWENTY EIGHT AND 17/100 DOLLARS ($13,428.17), to it in hand paid by
Joe A. Reeves and wife, Ruth Gossett Reeves, party of the second part, the
receipt of which is hereby acknowledged, does by these presents bargain,
sell, remise, release and forever quitclaim, without warranty, express or
implied, unto the party of the second part, their heirs, representatives
and assigns, all that right, title and interest which the party of the first
part has or may have had in or to the following described property situate,
lying and being in the County of Denton, State of Texas, to-wit:

### A Portion of Tract E-424

A tract of land situated in the County of Denton, State of Texas,
being part of the Wm. M. Pea Survey (A-1044) and the John King
Survey (A-718), and being part of a 161 acre tract of land
acquired by the United States of America from Joe A. Reeves and
wife, Ruth Gossett Reeves, by deed dated 13 August 1953, and
recorded in Volume 390 at Page 493 of the Deed Records of Denton
County, Texas, said 161 acre tract being designated as Tract No.
E-424 for Garza-Little Elm Reservoir, Texas, and being more
particularly described as follows: From the northwest corner of
said Wm. M. Pea Survey, south 60°40' east, 540 feet to the point
of beginning, said point being the most northerly northwest
corner of said Tract E-424; Thence south 81°25' east, 917.8 feet
to a point; Thence south 66°25' east, 530.3 feet to a point;
Thence south 80°13' east, 138.5 feet to a point; Thence south
23°11' east, 478.1 feet to a point; Thence south 79°59' east,
190.1 feet to a point; Thence south 11°17' east, 604.8 feet to
a point; Thence north 43°45' east, 140 feet to a point in the
east boundary line of said Tract E-424; Thence along the common
line between said Tract E-424 and the tract of land acquired by
the United States of America from J. C. Olsen and designated as
Tract No. E-429-1, south 00°50' west, 265.8 feet to a point;
Thence severing said Tract E-424 as follows: south 86°50' west,
139.0 feet to a 1" iron pin; north 51°24' west, 100.3 feet to a
1" iron pin; north 22°23' west, 445.0 feet to a 1" iron pin;
north 28°05' west, 342.0 feet to a 1" iron pin; north 34°22'
west, 278.7 feet to a 1" iron pin; north 55°45' west, 323.0
feet to a 1" iron pin; south 83°57' west, 294.6 feet to a 1"
iron pin; south 41°00' east, 422.4 feet to a 1" iron pin;
south 20°44' east, 268.0 feet to a 1" iron pin; south 13°48'
west, 160.8 feet to a 1" iron pin; south 73°49' west, 347.4 feet
to a 1" iron pin; south 25°01' east, 426.5 feet to a 1" iron
pin; south 18°06' east, 534.6 feet to a 1" iron pin; south 38°33'

west, 514.3 feet to a 1" iron pin; north 62°38' west, 557.4
feet to a 1" iron pin; south 88°23' west, 114.6 feet to a 1"
iron pin; south 04°07' west, 90.0 feet to a 1" iron pin; south
71°27' east, 130.6 feet to a 1" iron pin; south 29°22' east,
349.8 feet to a 1" iron pin; south 30°29' east, 393.6 feet to
a 1" iron pin; south 26°17' west, 300.8 feet to a 1" iron pin;
south 32°53' east, 93.0 feet to a 1" iron pin; north 32°38'
east, 182.5 feet to a 1" iron pin; north 53°49' east, 331.5
feet to a 1" iron pin; north 80°35' east, 653.3 feet to a 1"
iron pin; south 82°05' east, 226.5 feet to a 1" iron pin;
north 22°21' west, 163.3 feet to a 1" iron pin; north 53°57'
east, 432.6 feet to a 1" iron pin; south 24°05' east, 275.4
feet to a 1" iron pin; south 80°03' east, 212.0 feet to a 1"
iron pin; south 13°19' east, 182.8 feet to a 1" iron pin;
south 13°41' west, 209.0 feet to a 1" iron pin; south 85°04'
west, 217.4 feet to a 1" iron pin; south 04°49' east, 158.0
feet to a 1" iron pin; south 51°20' west, 149.4 feet to a 1"
iron pin; south 21°51' east, 243.6 feet to a 1" iron pin;
south 04°30' west, 369.0 feet to a 1" iron pin; north 38°29'
west, 492.3 feet to a 1" iron pin; south 19°03' west, 281.8
feet to a 1" iron pin; south 52°55' west, 368.0 feet to a 1"
iron pin; south 54°15' east, 330.0 feet to a 1" iron pin;

197

south 18°28' west, 198.0 feet to a 1" iron pin; south 80°43' west, 160.0 feet to a 1" iron pin; north 59°22' west, 326.8 feet to a 1" iron pin; south 15°41' east, 425.2 feet to a 1" iron pin; south 60°37' west, 166.6 feet to a 1" iron pin; north 80°08' east, 180.0 feet to a 1" iron pin; south 43°40' east, 131.0 feet to a 1" iron pin; south 25°00' east, 100 feet to a point in the common line between said Tract E-424 and the tract of land acquired by the United States of America from T. H. Purnell and designated as Tract No. E-415-3; Thence departing from said severance line, along said common line, west, 255.0 feet to the northwest corner of said Tract E-415-3; Thence along the common line between said Tract E-424 and the T. H. Purnell property, south 82°00' west, 120 feet to a point; Thence north 21°36' west, 157.6 feet to a point; Thence north 65°32' east, 469.9 feet to a point; Thence north 43°11' west, 529.1 feet to a point; Thence north 81°57' east, 488.4 feet to a point; Thence north 39°07' east, 1508.1 feet to a point; Thence south 78°41' west, 482.4 feet to a point; Thence south 60°40' west, 388.9 feet to a point; Thence south 42°01' west, 504.6 feet to a point; Thence north 26°27' west, 422.2 feet to a point; Thence south 53°06' west, 977.5 feet to a point; Thence south 06°53' west, 396.2 feet to a point; Thence north 46°44' west, 237.3 feet to a point; Thence north 21°11' east, 1081.8 feet to a point; Thence north 35°52' east, 492.7 feet to a point; Thence north 68°49' west, 682.1 feet to a point; Thence north 30°10' east, 623.1 feet to a point; Thence south 57°41' east, 848.4 feet to a point; Thence north 06°20' east, 619.4 feet to a point; Thence north 51°25' west, 592.3 feet to a point; Thence north 53°40' east, 628.5 feet to a point; Thence north 50°35' west, 1346.1 feet to the point of beginning, containing 108.25 acres, more or less.

Subject to the following:

(1) There shall be reserved to the Government the perpetual right and easement to occasionally overflow, flood, and submerge the herein described lands below an elevation of 537 feet, mean sea level, there being 59.70 acres, more or less, lying below said elevation.

(2) In connection with the above reserved easement, no structure for human habitation shall be constructed or maintained on the herein described lands below an elevation of 537 feet, mean sea level.

(3) With respect to said land and in connection with the above reserved rights and easements, the written consent of the representative of the United States in charge shall be obtained for the type and location of any structure and/or appurtenances thereto now existing or to be erected or constructed below an elevation of 537 feet, mean sea level.

(4) There shall be reserved to the Government the perpetual right to maintain mosquito control and to enter upon the said land for this purpose below an elevation of 537 feet, mean sea level.

(5) Existing easements for public roads, highways, public utilities and pipelines.

TO HAVE AND TO HOLD the foregoing described premises, together with all and singular the rights, privileges and appurtenances thereto in anywise belonging, unto the party of the second part, their heirs, representatives and assigns forever, subject, however, to the restrictions, reservations and conditions hereinbefore set out and any existing encumbrances.

IN WITNESS WHEREOF the party of the first part has caused these presents to be executed in its name by     **Wilber M. Brucker**

Secretary of the Army this 20th day of *December* 1960.

UNITED STATES OF AMERICA

By *Wilber M. Brucker*
      Wilber M. Brucker
      Secretary of the Army

STATE OF VIRGINIA      )
                                          ) SS
COUNTY OF ARLINGTON  )

BEFORE ME, a Notary Public in and for the State of Virginia, County of Arlington, personally appeared *Wilber M. Brucker*  , to me known to be the identical person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the said instrument for the purpose and consideration therein expressed and in the

capacity therein stated and as the act and deed of the United States of

America.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ 20th _____ day of

_Deecember_ _____ 19 6 6.

_Lloyd F. Ford_
NOTARY PUBLIC IN AND FOR
COUNTY OF ARLINGTON,
STATE OF VIRGINIA

My Commission expires:

Lloyd T. Ford, Notary Public
County of Arlington
State of Virginia
My Commission Expires 17 Sept. 1961

FILED FOR RECORD: _19_ day of _January_ A.D.1961 at _10:10_ o'clock _A_.M.
RECORDED: _25_ day of _January_ A.D.1961 at _9:00_ o'clock _A_.M.
By: _____ Deputy   A.J. Barnett, Clerk, County
Court, Denton County, Texas

# Exhibit 17

# Denton County
# Commissioners Court

_____Jan 26, 2010_____
Date

**Court Order Number**

10-0045

10·A

## The Order:

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

Motion by **Mitchell** Seconded by **Eads**

| County Judge | | |
|---|---|---|
| Mary Horn | Yes | X |
| | Abstain | |
| | No | |
| | Absent | |

| Commissioner Pct No 1 | | | Commissioner Pct No 2 | | |
|---|---|---|---|---|---|
| Hugh Coleman | Yes | X | Ron Marchant | Yes | X |
| | Abstain | | | Abstain | |
| | No | | | No | |
| | Absent | | | Absent | |

| Commissioner Pct No 3 | | | Commissioner Pct No 4 | | |
|---|---|---|---|---|---|
| Bobbie J. Mitchell | Yes | X | Andy Eads | Yes | X |
| | Abstain | | | Abstain | |
| | No | | | No | |
| | Absent | | | Absent | |

Motion Carried 5-0-0

**Other Action:** Pulled from Consent _____ No Action _____ Postponed _____

**BY ORDER OF THE COMMISSIONERS COURT:**   **ATTEST:**

_____
Presiding Officer

Cynthia Mitchell, County Clerk
and Ex-Officio Clerk of the
Commissioners Court of
Denton County, Texas

**APPROVED AS TO FORM:**

_____
Assistant District Attorney

_____
Deputy County Clerk

Denton County

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

**WHEREAS,** the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

**WHEREAS,** the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

**NOW, THEREFORE, BE IT RESOLVED,** that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May. 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County - Chapter 233 Tex. Loc. Gov't Code

- Page 1 of 3

202

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

**IN WITNESS THEREOF,** we have hereunto set our hands and caused the great seal of Denton County to be affixed this ___ day of ___, 2010.

ADOPTED IN OPEN COURT the ___ day of January, 2010 upon Motion made by Comm. Mitchell and seconded by Comm. Eads, and 5 members of the court being present and voting.

_____
MARY HORN, COUNTY JUDGE

_____
HUGH COLEMAN, COMMISSIONER
PRECINCT 1

_____
RON MARCHANT, COMMISSIONER
PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code                                                          - Page 2 of 3

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY:

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3

204



# DENTON COUNTY

# NOTICE OF RESIDENTIAL CONSTRUCTION
# IN UNINCORPORATED AREA

| Received |
| --- |
| Permit # |

## BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: _____

BUSINESS ADDRESS:                       MAILING ADDRESS (IF DIFFERENT):

PHONE NUMBER: _____ EMAIL ADDRESS: _____

FAX NUMBER: _____ CONTACT PERSON: _____

## PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[   ] New Residential Construction on Vacant Lot
[   ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):      OR    LOT AND BLOCK # _____

                                             SUBDIVISION: _____

                                             SURVEY: _____

                                             TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: _____

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[   ] INTERNATIONAL RESIDENTIAL CODE -published May 1, 2008
[   ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

AUTHORIZED REPRESENTATIVE SIGNATURE         PRINTED NAME                   DATE



# DENTON COUNTY NOTICE OF RESIDENTIAL CONSTRUCTION INSPECTION COMPLIANCE IN UNINCORPORATED AREA

Received _____

Permit # _____

## INSPECTOR INFORMATION

NAME: _____

BUSINESS ADDRESS: _____     MAILING ADDRESS (IF DIFFERENT):

_____        _____

_____        _____

PHONE NUMBER: _____ EMAIL ADDRESS: _____

FAX NUMBER: _____ PROFESSIONAL REGISTRATION (TYPE AND #) _____

## PROJECT INFORMATION

DATE OF INSPECTION: _____     TYPEOFCONSTRUCTION: (CHECK ONE)

LOCATION                  [ ] New Residential Construction on Vacant Lot
ADDRESS: _____        [ ] Addition to an Existing Residential Unit

_____        RESIDENTIAL CODEUSED IN CONSTRUCTION: (CHECK ONE)

_____

OR  LOT AND BLOCK # _____     [ ] INTERNATIONAL RESIDENTIAL CODE – published May 1, 2008
                                  [ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

SUBDIVISION: _____     CONSTRUCTION PHASE: (CHECK ONE)

SURVEY: _____        [ ] FOUNDATION STAGE (before placement of concrete)
                                  [ ] FRAMING AND MECHANICAL SYSTEMS STATE (before covering
TRACT: _____            with drywall or other interior wall covering)
                                  [ ] COMPLETION

## INSPECTION CONCLUSION

At the indicated stage of construction, the project indicated above is: (check one)

[ ] IN COMPLIANCE
[ ] NOT IN COMPLIANCE

with the residential code used in construction.

COMMENTS:

_____     _____     _____
SIGNATURE OF INSPECTOR           PRINTED NAME           DATE

# AGENDA PLACEMENT MEMO

DATE:        Jan 22, 2010

TO:          Commissioners Court

FROM:        Bennett Howell

SUBJECT:     Resolution - Residential Construction in Unincorporated Areas of
             Denton County

## REQUESTED ACTION/RECOMMENDATION

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local
Government Code, to certain residential construction in unincorporated areas of
Denton County - begun after February 1, 2010, and any appropriate action.

## BACKGROUND

The Texas State Legislature enacted HB 1038 during the 80th Regular Session,
effective September 1, 2007, that provided criteria for the inspection of homes which
heretofore were not subject to the inspection codes of a municipality. The
requirements of this bill was supposed to result in homes that were in greater
compliance with the accepted residential building standards, safer and with fewer
construction defects.

The Legislature also created the Texas Residential Construction Commission (TRCC)
to oversee this new law. The TRCC was also supposed to license builders, monitor
compliance and store the inspection records.

The Legislature during the 81st Regular Session passed HB 2833 which essentially
eliminated the TRCC and placed the responsibility on the county government to
ensure residential home builders were complying with HB 1038. However, HB 2833 did
provide counties with the authority to enact building codes, inspect the structures or
require the builders to provide inspection documentation, it specially stated that
counties cannot charge a fee for this service.

This proposed Resolution provides that the County will be the depository for the home
inspection documentation for homes constructed after February 1, 2010. Home
builders will be required to notify the County when construction is going to begin and
submit documentation that the inspections were made in accordance with HB 2833.

## OPERATIONS AND MAINTENANCE

Denton County Planning Department will provide the forms to the builders and file the
inspection records as part of the current Development Permit Application. This
Resolution will not place any further burdens on the builders since these inspections

were supposed to be occurring prior to 2007.

## LEGAL INFORMATION

The Legal Department has worked closely with the Public Works Department on this Resolution.

## FINANCIAL IMPACT

This Resolution will not have any financial impact on the County or the home builder.

## PROJECT SCHEDULE

The Resolution has an effective date of February 1, 2010.

## PRECEDING COURT ACTION

None

# Denton County
## Commissioners Court
# Request For Agenda Placement

| Submitted By: | Bennett Howell | Requested Agenda Date: | Jan 26, 2010 |
|---|---|---|---|
| Department: | Public Works/Engineering | Grouping: | PUBLIC WORKS |

**Specific Agenda Wording:**

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

# APPROVAL FLOW

## 10 - A - Resolution - Residential Construction in Unincorporated Areas of Denton County



CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF DENTON

I, CYNTHIA MITCHELL, County Clerk of Denton County,
Texas do hereby certify that this is a true & correct
copy as same appears of record in my office.
Witness my hand and seal of office on

3.20.14

Cynthia Mitchell
Denton County Clerk

By Deputy



**210**

# Exhibit 18

**STATE OF TEXAS** )

)      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Notice to Home Builders and Home Buyers. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

    I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand this 1st day of April, 2014.


Bennett C. Howell III, PE, CFM
Denton County
State of Texas



**Denton County**
**Department of Public Works**
**Engineering Division**
1505 East McKinney Street, Suite 175 – Denton, Texas 76209
940.349.3250 phone – 940.349.2991 fax
www.dentoncounty.com



# NOTICE
# Home Builders and Home Buyers

On January 26, 2010, Denton County Commissioners Court approved a resolution that applies to certain residential construction in the unincorporated areas of Denton County.

**This resolution applies to you if:**

- You are building a home in the unincorporated areas of Denton County after February 1, 2010; or
- You are remodeling an existing home in the unincorporated areas of Denton County after February 1, 2010 and the addition increases the square footage or value of the existing home by more than 50%.
- This applies if you are constructing a single-family house or duplex.

**The new home construction and remodel must conform to either:**

- International Residential Code published as of May 1, 2008; or
- The version of the International Residential Code that is applicable in the City of Denton. The State law requires the builder to use either the International Residential Code published as of May 1, 2008 or the International Residential Code adopted by the County Seat, which in Denton County is the City of Denton.

**Building in the Extra Territorial Jurisdiction (ETJ):**


**What are the builder's responsibilities?**

- Three required inspections during the construction project.
    - The foundation stage before the placement of concrete;
    - The framing and mechanical systems stage before covering with drywall or other interior wall covering; and
    - Completion of construction of the residence.

213

o For remodeling projects that meet the definition of this resolution, the number of inspections are based on the scope of work of the project

## Who performs these inspections?

- Licensed Engineer;
- Registered Architect;
- Professional Inspector licensed by the Texas Real Estate Commission;
- Plumbing Inspector employed by a municipality and licensed by the Texas State Board of Plumbers;
- Building Inspector employed by a political subdivision; or
- Individual certified as a residential combination inspector by the Internal Code Council.
- The builder may use the same inspector for all the required inspections or a different inspector for each required inspection.

## Who receives the documentation?

- The builder shall provide the inspection information to the home buyer and Denton County Public Works.
- The required forms are attached to this Notice.

  o The builder uses the first form to notify the County specifically:
  - Location of the new residential construction
  - Approximate date by which the construction will be commenced
  - The version of the International Residential Code used to construct the home
  o The builder uses the second form to document the inspections.

RESOLUTION

APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE,
TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF
DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

WHEREAS, the Texas Legislature passed HB 2833 during the 81st Regular Session,
codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide
for the health, safety and general welfare of all Texans through home construction standards in
the unincorporated areas of counties, and

WHEREAS, the citizens of Denton County desire the construction of quality housing
and wholesome living environments for its citizens living in unincorporated areas.

NOW, THEREFORE, BE IT RESOLVED, that we, the Commissioners Court of
Denton County, in accordance with Section 233.153, Texas Local Government Code, order that
construction of a new single-family house or duplex on a vacant lot begun after February 1,
2010, in the unincorporated areas of Denton County must conform to either the version of the
International Residential Code published as of May 1, 2008 or the version of the International
Residential Code that is applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.153,
Texas Local Government Code, any construction of an addition to an existing single-family
house or duplex, if the addition will increase the square footage or value of the existing
residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated
areas of Denton County must conform to either the version of the International Residential Code
published as of May. 1, 2008 or the version of the International Residential Code that is
applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that notwithstanding the above language and
in accordance with Section 233. 153(c), if the above described construction occurs in the
extraterritorial jurisdiction of a municipality that has adopted a building code for the
municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls
and building code standards under Subchapter F of Section 233.153 of the Texas Local
Government Code have no effect in that municipality's extraterritorial jurisdiction.

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(a),
Texas Local Government Code, a minimum of three inspections must be performed to ensure
substantial building code compliance in the construction of a new single-family house or duplex
or the construction of an addition to an existing single-family house or duplex begun after
February 1, 2010, in the unincorporated areas of Denton County. The three required inspections
during the construction project, as applicable must be performed at (1) the foundation stage,
before the placement of concrete; (2) the framing and mechanical systems stage, before covering
with drywall or other interior wall covering; and (3) completion of construction of the residence.
For remodeling construction to an existing residence in which the structure's square footage or
value will increase by more than 50 percent, the inspection requirements must be performed as

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code                                                    - Page 1 of 3

215

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

**FURTHERMORE, BE IT RESOLVED**, that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

**FURTHERMORE, BE IT RESOLVED**, that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

**IN WITNESS THEREOF**, we have hereunto set our hands and caused the great seal of Denton County to be affixed this _26_ day of _January_, 2010.

**ADOPTED IN OPEN COURT** the _26_ day of January, 2010 upon Motion made by _Bobbie Mitchell_ and seconded by _Andy Eads_, and _5_ members of the court being present and voting.

_Mary Horn_

MARY HORN, COUNTY JUDGE

_Hugh Coleman_

HUGH COLEMAN, COMMISSIONER
PRECINCT 1

_Ron Marchant_

RON MARCHANT, COMMISSIONER
PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code

- Page 2 of 3

216

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY: _____

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3

217



# DENTON COUNTY

## NOTICE OF RESIDENTIAL CONSTRUCTION
## IN UNINCORPORATED AREA

| Received |
|----------|
| Permit # |

### BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: _____

BUSINESS ADDRESS: _____     MAILING ADDRESS (IF DIFFERENT):

_____     _____

_____     _____

PHONE NUMBER: _____     EMAIL ADDRESS: _____

FAX NUMBER: _____     CONTACT PERSON: _____

### PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[  ] New Residential Construction on Vacant Lot
[  ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):    OR   LOT AND BLOCK # _____

_____     SUBDIVISION: _____

_____     SURVEY: _____

_____     TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: _____

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[  ] INTERNATIONAL RESIDENTIAL CODE -published May 1, 2008
[  ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

_____     _____     _____
AUTHORIZED REPRESENTATIVE SIGNATURE     PRINTED NAME     DATE



# DENTON COUNTY NOTICE OF RESIDENTIAL CONSTRUCTION INSPECTION COMPLIANCE IN UNINCORPORATED AREA

Received _____

Permit # _____

## INSPECTOR INFORMATION

NAME: _____

BUSINESS ADDRESS: _____     MAILING ADDRESS (IF DIFFERENT): _____

_____     _____

PHONE NUMBER: _____     EMAIL ADDRESS: _____

FAX NUMBER: _____     PROFESSIONAL REGISTRATION (TYPE AND #) _____

## PROJECT INFORMATION

DATE OF INSPECTION: _____

TYPEOFCONSTRUCTION: (CHECK ONE)

LOCATION
ADDRESS: _____

[ ] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

_____

RESIDENTIAL CODEUSED IN CONSTRUCTION: (CHECK ONE)

_____

OR   LOT AND BLOCK # _____

[ ] INTERNATIONAL RESIDENTIAL CODE – published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

SUBDIVISION: _____

CONSTRUCTION PHASE: (CHECK ONE)

SURVEY: _____

[ ] FOUNDATION STAGE (before placement of concrete)
[ ] FRAMING AND MECHANICAL SYSTEMS STATE (before covering with drywall or other interior wall covering)
[ ] COMPLETION

TRACT: _____

## INSPECTION CONCLUSION

At the indicated stage of construction, the project indicated above is: (check one)

[ ] IN COMPLIANCE
[ ] NOT IN COMPLIANCE

with the residential code used in construction.

COMMENTS:


_____     _____     _____
SIGNATURE OF INSPECTOR          PRINTED NAME                    DATE

219

# Exhibit 19

STATE OF TEXAS    )

                      )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 08-06. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 08-06

AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, REGULATING SUBDIVISIONS AND OTHER PROPERTY DEVELOPMENTS, PROVIDING FOR PRELIMINARY PLATS, FINAL PLATS, MINOR PLATS, VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS; PROVIDING FOR DEVELOPMENT PROCESS; PROVIDING FOR STANDARDS AND REQUIREMENTS; PROVIDING FOR STREETS AND DRAINAGE, WATER AND SEWER INFRASTRUCTURE; PROVIDING SEVERABILITY CLAUSE; PROVIDING SAVINGS CLAUSE; PROVIDING A PENALTY NOT TO EXCEED THE SUM OF TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE AND A SEPARATE OFFENSE SHALL BE DEEMED COMMITTED EACH DAY DURING OR ON WHICH A VIOLATION OCCURS OR CONTINUES; PROVIDING A REPEALER; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council ("Town Council") desires to review for approval or disapproval plan, plats, and replats filed with the Town as authorized by Chapter 212, Tex. Loc. Gov. Code (Vernon), as amended; and

WHEREAS, the Town Council finds that there is a public necessity requiring adoption of this Ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development; and

WHEREAS, the Town Council is authorized and empowered to or require the developer to (i) design, install or improve streets, roads, water and a sanitary sewer systems within the Town by constructing, extending, or enlarging such system, and is further authorized to adopt any rules and regulations appropriate to the exercise of such powers, and to (ii) protect the public health, welfare and safety of the citizens of the Town; and

WHEREAS, the Town Council hereby finds that the adoption of this Ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS :

ARTICLE I. IN GENERAL

Sec. 1. Short title.

The following regulations are hereby adopted and shall be known and may be cited as "Town of Lakewood Village Subdivision and Property Development Regulations."

Sec. 2. Definitions.

The following words, terms, and phrases, when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning. Words not specifically defined shall have the meanings given in Webster's Ninth New Collegiate Dictionary, as revised.

*Accessory structure or building* shall mean a subordinate structure or building customarily incident to and located on the same lot occupied by the main structure or building.

*Applicant* shall mean the owner(s) of the property to be developed.

*Bond* shall mean any form of security, including a cash deposit, surety bond, or instrument of credit in an amount and form approved by the Town.

*Building* shall mean any structure designed or built for the support, enclosure, shelter or protection of persons, animals, chattel or property of any kind.

*Town* means Town of Lakewood Village.

*Town Council* means Town Council of the Town of Lakewood Village.

*Town standards* shall mean those standards and specifications, together with all tables, charts, graphs, drawings and other attachments hereinafter approved and adopted by the Town Council, which may be amended from time to time, and are administered by the Town staff for the construction and installation of streets, sidewalks, drainage facilities, water and sanitary sewer mains and any other public facilities. All such facilities which are to become the property of the Town upon completion must be constructed in conformance with these standards.

*Construction plans* shall mean the maps, drawings and technical specifications, including bid documents and contract conditions, where applicable, which provide a graphic and written description of the character and scope of the work to be performed prepared for approval by the Town for construction.

*Cross drainage* shall mean a defined waterway course, approximately perpendicular to the proposed roadway, which requires the construction of a bridge, pipes or box culvert, or other structure to conduct drainage under the roadway.

*Developer* shall mean any person, corporation, governmental or other legal entity engaged in the development of property by improving a tract or parcel of land for any use. The term "developer" is intended to include the term "subdivider."

*Development* shall mean the construction of one (1) or more new buildings or structures, or the structural alteration, relocation or enlargement of one (1) or more new buildings or structures of an existing building or structure on one (1) or more building lots or sites, or the installation of site improvements.

*Easement* shall mean a grant by a property owner to the public, a corporation, or persons for a general or specific use of a defined strip or parcel of land, for such purpose as the installation, construction, maintenance and/or repair of utility lines, drainage ditches or channels, or other public services, the ownership or title to the land encompassed by the easement being retained by the owner of the property.

*Engineer* shall mean any person duly authorized under the Texas Engineering Practice Act (V.A.C.S. art. 3271a), as amended, to practice the profession of engineering.

*Engineering plans* shall mean the maps and drawings required for plat approval.

*Lot* shall mean an undivided tract or parcel of land having access to a street, which is designated as a separate and distinct tract or lot number or symbol on a duly approved plat filed of record. The terms "lot" and "tract" shall be used interchangeably.

*Off-site* shall mean any premises not located within the property to be developed, regardless of ownership.

*Owner* shall mean any persons, firm or corporation having legal title to the property.

*Plat* shall mean a map representing a tract of land showing the boundaries of individual properties and streets or a map, drawing, chart, or plan showing the layout of a proposed subdivision into lots, blocks, streets, parks, school sites, commercial or industrial sites, drainageways, easements, alleys, which an applicant submits for approval and a copy of which he intends to record with the County Clerk of Denton County.

*Plat, final,* shall mean the map or plan of a proposed development submitted for approval by the Town Council, where required, prepared in accordance with the provisions of this chapter and requested to be filed with the County Clerk of Denton County.

*Plat, preliminary,* shall mean the initial map or plan of a proposed development showing the general layout of streets, blocks and lots, utility systems, and drainage systems.

*Right-of-way* shall mean a strip of land acquired by dedication, prescription or condemnation and intended to be occupied by a road, sidewalk, railroad, electric transmission facility, water mains, sewer mains, storm drainage or other similar facility. Rights-of-way intended for streets, sidewalks, water mains, sewer mains, or any other use involving maintenance by a public agency shall be dedicated to the public use by the plat applicant either by easement or in fee simple title.

*Streets and alleys* shall mean a way for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, throughway, road, avenue, boulevard, lane, alley, place or however otherwise designated. Town streets shall conform to the following classifications:

(1) Arterial streets and highways are those which are used primarily for higher speed and higher volume traffic. Routes for such streets shall provide for cross-town circulation and through-town movements.

(2) Collector streets are those which carry traffic from minor streets to the major system of arterial streets and highways, including the principal entrance, circulation streets of a residential development and streets for circulations within such a development of a residential subdivision.

(3) Minor streets are those, which are used primarily for access to abutting properties.

(4) Marginal access streets are minor streets located parallel to and adjacent to arterial streets and highways, providing access to abutting properties and protection from the traffic of the thoroughfares.

(5) Alleys are minor ways used primarily for access to abutting properties for vehicle service usually to the back or side of a property.

*Structural alterations* shall mean the installation or assembly of any new structural components, or any change to existing structural components, in a system, building or structure.

*Structure* shall mean anything constructed or erected, which requires location on the ground, or attached to something having a location on the ground, including, but not limited to, buildings of all types and ground signs, but exclusive of customary fences or boundary or retaining walls.

*Subdivision* shall mean dividing a tract in two (2) or more parts for the purpose of creating lots, including an addition to the Town, to lay out suburban, building or other lots or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to the public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks or other parts. "Subdivision" refers to any division irrespective of whether the actual division is made by metes and bounds description in a deed of conveyance or a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A subdivision does not include a division of land into parts greater than five (5) acres, where each part has access and no public improvement is being dedicated.

## Sec. 3. Purpose.

The purpose of this ordinance is to set forth the procedures and standards for development of property, layout and design of subdivisions or real property within the corporate limits of the Town which are intended to promote the health, safety and general welfare of the Town and the safe, orderly, and healthful development of the Town.

## Sec. 4. Compliance required.

(a) Any owner of land who proposes the development of a lot or tract of land located within the corporate limits of the Town or the subdivision of a lot or tract located in the corporate limits of the Town shall have a plat of the lot or tract of land or subdivision prepared and approved in accordance with all Ordinances of the Town and recorded with the County Clerk of Denton County.

(b) Notwithstanding paragraph (a) above, a plat shall not be required where the development of the lot or tract of land is for the sole purpose of performing alteration(s) or improvements to an existing single-family residence or the auxiliary uses thereto. All such alterations or improvements must be permitted in compliance with all applicable codes and ordinances of the Town

(c) No Final Plat shall be approved within the Town of Lakewood Village or its extraterritorial jurisdiction until the applicant has made adequate provision for thoroughfares as shown on the Thoroughfare Plan (map) as approved by the Town. The Thoroughfare Plan is a guide for the roadway connections and types that will be needed in the future. Subject to Town Council, or designee approval, as long as the connection is made, whether or not it is close to the exact alignment shown on the Thoroughfare Plan, no Thoroughfare Plan amendment should be necessary. The design and construction of the proposed thoroughfare shall be in conformance with the Town's master plans for thoroughfares and with any adopted *Development Standards for Construction* (DSC), and shall be subject to approval by the Town Council, or designee. If a different roadway type is found to be adequate or if the connection is not proposed to be made, then the plat may not be approved unless the thoroughfare plan is amended. A Traffic Impact Analysis may be required prior to approval of the proposed amendment .

## ARTICLE II. PLATS

### DIVISION 1. GENERALLY

**Sec. 5. Fees.**

The applicant for approval of a preliminary plat, final plat, replat, amended plat, minor plat or modified final plat shall, upon submission of the plat application and all required documentation, pay a nonreturnable fee, as established by the Town Council, for the review and processing of the plat application. Upon approval of the final plat, replat, amended plat or final minor plat, the applicant shall pay an additional recording fee established by the county for recording the plat with the county clerk.

Preliminary, Replat and Final Plat Review Fees.    A preliminary plat review fee and final plat review fee shall be paid to the Town upon the filing of the preliminary and final plat in accordance with the following schedule:

      (a)    Plats that are platted by the acre:
           (1)    $500 per plat plus $10.00 per acre when there are less than three (3) acres; or

           (2)    $600 per plat plus $20.00 per acre when there are three (3) or more acres.

      (b)    For purposes of this section, the term "lot" shall mean any tract of land which is one (1) acre.

## Sec. 6. Process for approval.

(a) The plat shall be scheduled for consideration at the next regular meeting of the Town Council.

(b) If the plat is disapproved by the Town Council, the applicant may correct the items of concern and resubmit the plat for approval one (1) time within six (6) months by paying one-half (1/2) of the original fee. If the plat is disapproved a second time or if a second request is not received within six (6) months of the first disapproval, the applicant will be required to repeat the plat application process from the beginning and pay all standard application fees.

(c) An applicant may withdraw his plat application from consideration at any time during the application process by filing a written notice of withdrawal with the Town. Upon filing the notice to withdraw, the Town shall discontinue processing the plat application. The applicant must file a written request to proceed with further consideration of the plat within six (6) months of withdrawal and the Town shall continue the application process. If the request to proceed with further consideration of the plat is filed more than six (6) months after filing the notice of withdrawal, the applicant shall be required to repeat the plat application process from the beginning and pay the standard application fees.

## Sec. 7. Requirements for approval of application by Town Council.

(a) Within thirty (30) days of the date that the application is deemed administratively complete, the Town Council shall approve a plat if it complies with the requirements of this chapter, the applicant is not in arrears in the payment of any debts owed the Town required by this chapter on a previous plat, it conforms to the general plan of the Town and its current and future streets, alleys, parks, playgrounds, and public utility facilities plans, and it conforms to the Town's general plan for the extension of roads, streets, and public highways, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities.

(b) A plat is considered approved by the Town Council unless it is disapproved within such thirty-day period.

## Sec. 8. Recordation.

(a) Preliminary plats are not recorded with the county clerk.

(b) Applicant shall record all plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(c) Applicant shall record all other plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(d) A final plat shall become null and void six (6) months after its approval by the Town Council, unless the final plat is filed and recorded in Denton County Clerk Real Property Records.

(e) A general development plan shall become null and void six (6) months after its approval by the City Council, unless the general development plan is filed and recorded in Denton County Clerk Real Property Records.

## Sec. 9. Approval of preliminary plats.

Approval of a preliminary plat shall be deemed to be an expression of approval to the layout submitted as a guide to the preparation of the final plat and shall not constitute approval of a final plat.

## DIVISION 2. PRELIMINARY PLATS

### Sec. 10. Form, contents and required documentation.

(a) Preliminary plats shall be filed with the town secretary. The town secretary shall stamp the following notice on the face of each preliminary plat: "Preliminary plat for inspection purposes only and in no way official or approved for record purposes and not approved for construction."

(b) When filing a preliminary plat application, it shall be accompanied by the following minimum documentation:

(1) Completed preliminary plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes; and

(6) Nonrefundable application fee, as established by the Town Council.

(c) Preliminary plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 200' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets);

(2) Boundary of the subject tract;

**228**

(3) All existing and/or proposed streets and alleys with street names, widths and relation to surrounding existing street patterns;

(4) Approximate width and depth of all proposed lots;

(5) Layout, in dotted lines, of all adjacent lots to the property being platted showing lot size, lot and block numbers, name of existing subdivision or property owner if undeveloped property;

(6) FEMA designated 100-year floodplain boundary;

(7) Date, scale, north point, and small scale location map;

(8) Name and address of all property owners of the property being platted;

(9) Name and address of engineer and surveyor; and

(10) Signed statement of the engineer and/or surveyor who prepared the preliminary plat indicating the records or survey from which the property description of the boundary of the proposed plat was developed.

(d) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Layout of all needed off-site utilities;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size of line, location of manholes and cleanouts;

(4) Drainage plan prepared in accordance with standard 100 year flood frequencies rainfalls which shows the overall analysis of the change of existing condition to fully developed condition and identify approximate location where water will exit the subdivision. Drainage plan shall show all contours for proposed development; and

(5) As-built drawings of existing structures, if applicable.

DIVISION 3. FINAL PLATS

### Sec. 11. Form, contents and required documentation.

(a) Final plats are mandatory.

(b) In cases where a preliminary plat was previously approved, the final plat shall conform to the approved preliminary plat.

(c)    Final plats shall be filed with the City Secretary and shall be accompanied by the following minimum documentation:

(1) Completed final plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes;

(6) A statement on the plat application showing that all fees owed the Town on any prior projects has been paid in full at the time the application was filed; and

(7) Nonrefundable application fee, as established by the Town Council.

(d) Final plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 100' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets and an index sheet shall be drawn on a sheet twenty-four (24) inches by thirty-six (36) inches showing the entire property being platted);

(2) The shape and the exterior boundaries of the property being platted shall be indicated by the use of a distinctive and individual symbol;

(3) The length of all straight lines, deflection angles, radii, arcs, and central angles of all curves shall be given along the property lines of each street or tabulated on the same sheet showing all curve data with its symbol. All dimensions along the lines of each lot with the angles of intersections which they make with each other shall be indicated;

(4) The names of all adjoining subdivisions, the side lines of abutting lots, lot and block numbers, all in dotted lines, and where possible, accurate reference ties to at least two (2) adjacent recognized land corners shall be clearly indicated;

(5) The description and location of all survey monuments placed on the property being platted shall be indicated;

(6) A title shall be indicated, including the name of the property being platted, the name of the applicant and scale and location of the property being platted with reference to original surveys and a north point which may be magnetic or true north, with notation stating which.

(7) FEMA designated 100-year floodplain boundary, including finish floor elevation established a minimum of two (2) feet above the calculated 100 year flood. A surveyor's certificate shall be placed on the final plat as follows:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my personal supervision, in accordance with the Subdivision and Property Development Regulations of the Town of Lakewood Village, Texas.

_____
Signature

_____
Texas Reg. No.

(9) A certificate of ownership and of dedication of all streets, alleys, easements and lands to public use forever, signed and acknowledged before a notary public by the owner of the land, shall appear on the face of the map, containing complete and accurate description of the property being platted and the streets dedicated;

(10) The applicant will furnish the Town a copy of the dedication at the same time the final plat is submitted for approval; and

(11) The following certificate of approval by the Town Council shall be placed on the plat:

Approved this _____ day of _____, 20_____, by the Town Council of the Town of Lakewood Village, Texas.

_____
Mayor

_____
Town Secretary

(e) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Street layout and grades;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size and grade of lines, location of manholes and cleanouts, and lift station design;

(4) All drainage structure designs, analysis of as-is and full development for where the water exits the subdivision, analysis of all streets to determine if they meet drainage criteria, FEMA floodplain and floodway boundaries (if applicable), and letter(s) of release from property owners affected by diversion of water (except for watercourse(s) designated on current Town topography maps); and

(5) As-built drawings of existing structures, if applicable.
DIVISION 4. VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS˙

### Sec. 13. Vacation of plats.

(a) Any plat, replat or amended plat previously recorded with the county clerk may be vacated by the property owner(s) at any time prior to the sale of any lot therein by filing a written signed and acknowledged instrument declaring the same to be vacated and recorded with the county clerk.

(b) If the one (1) or more lots have been sold, the plat, replat or amended plat may be vacated by the property owners by filing a written signed and acknowledged instrument with the town secretary. The vacating instrument must be approved by the Town Council in the same manner as the original plat, replat or amended plat. The Town Council shall disapprove the vacating instrument which abridges or destroys public rights in any of its public uses, improvements, streets, or alleys. Upon approval by the Town Council, the vacating instrument may be recorded with the county clerk and the vacated plat, replat or amended plat shall have no effect.

**State law reference(s)**--Vacating plats, V.T.C.A., Local Government Code § 212.013.

### Sec. 14. Replats without vacating preceding plat.

A replat may be recorded and controls over a previously recorded plat without vacation of that plat if the replat is signed and acknowledged by the owners of the property being platted, does not attempt to amend or remove any covenants or restrictions, and is approved, after a public hearing on the matter, by the Town Council.

### Sec. 15. Plat amendments or corrections.

(a) The Town Council may approve and issue an amended plat, which may be recorded with the county clerk and controls over the preceding plat without vacation of the plat, if the amended plat is signed by the applicant(s) and is solely for one (1) or more of the following purposes:

(1) To correct an error in a course or distance shown on the preceding plat;

(2) To add a course or distance that was omitted on the preceding plat;

(3) To correct an error in the description of the real property shown on the preceding plat;

---

˙**State law reference**–Vacating plats, amending plats, etc., V.T.C.A. Local Government Code § 212.013 et seq.

(4) To indicate monuments set forth after death, disability, or retirement from practice of the engineer or surveyor responsible for setting monuments;

(5) To show the proper location or character of any monument which has been changed in location or character or which originally was shown incorrectly as to location or character on the preceding plat;

(6) To correct any other type of scrivener's or clerical error or omission previously approved by the planning and zoning commission and/or Town Council, including lot numbers, acreage, street names, and identification of adjacent recorded plats;

(7) To correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the other owners in the plat;

(8) To relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement;

(9) To relocate one (1) or more lot lines between one (1) or more adjacent lots where the owner(s) of all such lots join in the application for the plat amendment; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not increase the number of lots; or

(10) To make necessary changes to the preceding plat to create six (6) or fewer lots in the plat if the changes do not affect applicable zoning and other regulations of the Town, and the changes do not attempt to amend or remove any covenants or restrictions and the area covered by the changes is located in an area that the Town Council has approved, after a public hearing, as a residential improvement area.

(11) To replat one or more lots fronting on an existing street if the owners of all those lots join in the application for the amendment; the amendment does not attempt to remove recorded covenants or restrictions or increase the number of lots; and, the amendment does not create or require the creation of a new street or make necessary the extension of municipal facilities.

(b) Notice, a hearing, and the approval of other lot owners are not required for the approval and issuance of an amended plat.

## ARTICLE III. DEVELOPMENT PROCESS

### Sec. 16. Construction of infrastructure.

(a) Following approval of the final plat, the plat applicant shall submit full construction plans

for all proposed infrastructure to be constructed for the platted property. Construction plans submitted shall be in conformance with the approved plat. The Town engineer shall review the submitted plans for compliance with the construction standards adopted by the Town.

(b) Upon approval of construction plans by Town Council, the plat applicant and/or the plat applicant's contractor will provide written notification to the Town engineer of the intent to commence construction of the required infrastructure. No work may be performed unless written notification has been provided to the Town engineer. The written notification shall contain the following information:

(1) Name of the plat or subdivision;

(2) Plat applicant's name;

(3) Contractor's name, address and phone number;

(4) Type of construction to be performed; and

(5) Estimated value of construction contract.

(c) The Town engineer shall issue an acknowledgment of receipt of notification to the developer and/or his contractor.

## Sec. 17. Acceptance of infrastructure.

(a) Upon completion of all required infrastructure, prior to the acceptance of the subdivision by the Town for maintenance, the applicant shall post, or cause to be posted, a maintenance bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form, to guarantee the maintenance of the construction for a period of one (1) year after its completion and acceptance by the Town. In lieu of a maintenance bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form. The actual value of the maintenance bond or letter of credit or cash bond shall be ten (10) percent of the full cost of the water and sewer system and fifteen (15) percent of the full cost of the cost of street and drainage construction, as determined by the estimate of construction costs.

(b) Upon receipt of the approved maintenance bond, irrevocable letter of credit or cash bond, the Town engineer shall issue a written letter of acceptance of the infrastructure and notify the building and development department that the subdivision has been accepted by the Town.

## Sec. 18. Building permits issued prior to completion of infrastructure.

(a) In the event an applicant wishes to obtain building permits prior to acceptance of the subdivision by the Town, the applicant shall post with the Town a completion bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the

Town and approved by the Town as to form for all construction included in the approved construction plans that has not been completed. In lieu of a completion bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form.

(b) Under no circumstances shall building above the foundation be permitted until adequate fire protection is available. Adequate fire protection means:

(1) Town utilities are installed;

(2) Fire hydrants providing protection are operational; and

(3) Streets are open and driveable, street subgrades worked to proper compaction and base course installed, graded and leveled, to facilitate vehicle movement.

(c) After the plat has been recorded and the completion bond, irrevocable letter of credit or cash bond has been received and approved by the Town, the Town engineer shall notify the building and development department, by lot and block numbers, that building permits may be issued.

## Sec. 19. Agreements with the Town.

(a) All agreements entered into between the Town and the developer and/or applicant, as a condition of plat approval, shall be recorded along with the final plat.

(b) The executed agreement shall be submitted to the Town Council in conjunction with the original drawings required for filing and recordation.

## ARTICLE IV. STANDARDS AND REQUIREMENTS

### DIVISION 1. GENERALLY

## Sec. 20. Lots and blocks.

(a) All lots of the plat shall front on a dedicated street.

(b) In general, lots shall conform in width, depth, and area to the pattern already established in the adjacent areas, having due regard to the character of the neighborhood, its particular suitability for residential purposes, and also taking into consideration the natural topography of the ground, drainage, sanitary sewage facilities, and the proposed layout of the streets.

(c) Lots shall have the width measurements, front, rear, and side yard requirements required by Town Ordinance 83-1.

(d) The area of the lots shall be computed by taking the average width of the lot times the average depth of the lot measured from the street line to the rear lot line.

(e) All sidelines of lots shall be at right angles to straight street lines or radial to curved street lines, unless a variation from this rule would, in the opinion of the Town Council, produce a better lot plan and better utilize the proposed development.

## Sec. 21. Park sites.

The Town Council shall consider offers of land for parks or playgrounds which conform to the current master plan adopted by the Town, provided such plan exists.

## Sec. 22. Use of Town condemnation authority.

(a) Water and sewer mains, force mains and lift stations, streets and drainageways shall be located in easements or rights-of-way secured and paid for by the applicant. Such easements shall be properly assigned to the Town before service is extended to the subdivision.

(b) In cases where easements cannot be secured by the applicant, the applicant may file a written petition with the Town engineer, accompanying the plat application, requesting that the Town Council utilize its condemnation authority. The written petition must satisfy all of the following criteria:

(1) The applicant must establish that clear evidence of public need exists;

(2) The applicant must establish that the proposed extension is in accordance with the current adopted master utility plan(s), if such plan(s) exists;

(3) The applicant must establish that the proposed extension will be able to serve other development areas;

(4) The applicant must agree to pay all costs of the condemnation; and

(5) The applicant must present written evidence that every practical attempt to secure the needed easements and/or right-of-way has been made by submitting the following:

a. A condemnation appraisal by an independent appraiser as to the current market value and damages, if any, of acquiring the easement and/or right-of-way; and

b. Documentation that a written offer has been made to purchase the easement and/or right-of-way for the appraised value and the offer was rejected.

(c) The petition shall be forwarded to the Town for review and recommendation and scheduled for consideration by the Town Council.

DIVISION 2. STREETS AND DRAINAGE

### Sec. 23. Streets.

(a) Street widths in subdivisions shall conform to:

| Designation | Right-of-Way (feet) | Paving (feet) |
|---|---|---|
| A + major arterial | 110 | 86 |
| A major arterial | 110 | 90 |
| B + minor arterial | 90 | 66 |
| B minor arterial | 80 | 56 |
| C major collector | 70 | 44 |
| D minor collector | 60 | 38 |
| E minor local | 50 | 31 |

(b) Existing streets shall be continued where practical, as determined by the Town Council. Continuations of existing streets shall have the same or greater right-of-way and pavement widths as the existing streets being connected. Street names shall be continuous.

(c) All necessary street rights-of-way shall be dedicated as part of the platting process and shall be dedicated to the Town without cost.

(d) Dead-end streets may be platted where the land adjoining the plat has not been platted. In the event that such dead-end street exceeds one hundred fifty (150) feet in length or one (1) lot width, from the nearest street intersection, the street will be provided with a cul-de-sac, either permanent or temporary, having a minimum right-of-way radius of fifty (50) feet.

(e) Where dead-end streets are dictated by lot designs, such dead-end streets shall be provided with a permanent cul-de-sac having a minimum right-of-way radius of fifty (50) feet.

(f) No street intersection shall be designed having an inside angle of less than thirty (30) degrees between the two (2) intersecting street lines, nor more than one hundred fifty (150) degrees.

(g) Block lengths between intersecting cross streets or to the end of a cul-de-sac shall be no more than one thousand two hundred (1,200) feet.

(h) Streets, where practical, shall be designed and platted with appropriate regard to topographical features, i.e., creeks and drainageways, wooded areas, etc., with the aim of creating desirable and attractive treatments of significant existing features. (Ord. No. 95-38, § I, 4-25-95). Private Streets shall not be allowed.

(i) Driveways; Any driveway or other common access to more than two residences which is not defined in Section 23(a), shall be considered a minor local road and shall conform to defined standards.

## Sec. 24. Alleys, reserve strips.

(a) Alleys and/or easements shall be laid in the rear of lots fronting on adjoining streets where practicable. In residential subdivisions, the minimum width of right-of-way of an alley shall not be less than twenty (20) feet. All alleys shall be paved for the entire width of the right-of-way to the same specifications as minor residential streets. The rear or side line easement, where alleys are not provided, shall be a minimum of twenty (20) feet wide, arranged such that each lot shall have an equal ten-foot easement.

(b) No plat showing reserve strips of land controlling access to public ways or adjoining properties will be approved.

## Sec. 25. Drainage in special flood hazard areas.

Drainage structures in areas of special flood hazard in the Town shall comply with the provisions of the Town Ordinances.

## Sec. 26. Drainage not in special flood hazard areas.

(a) Design of all improved open drainage courses and enclosed drainage structures shall be by a registered professional engineer in accordance with the current drainage design standards approved by the Town Council. A review of the downstream drainage system capacity to a point of discharge into the lake area shall be made. The rate of storm water discharge from the proposed development shall not exceed flow capacity of any existing structure or drainage system. This may require storm water detention or retention on site of the project.

(b) The design and construction of all improved open drainage courses and enclosed drainage structures shall provide for adequate access for the performance of necessary maintenance by the Town.

(c) All improved drainage courses and enclosed drainage structures shall be dedicated to the Town and accepted for maintenance by the Town upon approval of the construction by the Town engineer.

(d) The Town shall maintain all improved drainage courses, provided that the original design and construction has been approved by the Town engineer and accepted by the Town for maintenance.

(e) Improved open drainage courses shall conform as follows:
   (1) Open drainage courses which carries runoff from a street, between two (2) lots, to a drainage course running behind lots shall be a concrete-lined flume.

   (2) Open drainage courses running behind lots may be of earthen channel or concrete-lined channel, provided the type of channel used satisfies the design criteria (velocity, type of soil, etc.) in accordance with the current drainage design standards approved by the Town Council.

(3) Where the open drainage course is a concrete-lined flume, the width of the easement shall be equal to the width of the flume. All other open drainage courses require the width of the easement to be equal to the width from top-of-bank to top-of-bank plus maintenance way needs as given in the drainage design standards.

(f) Enclosed drainage courses shall conform as follows:

(1) Cross drainage for right-of-way needs shall be designed to meet the same requirements as its channel.

(2) Permanent structures and improvements may be constructed upon and across improved enclosed drainage courses in business zoning districts and manufacturing zoning districts. Design shall be to accommodate the 100-year frequency flood.

(3) The width to the easement shall be equal to the width of the structure plus a width on each side of the structure to allow maintenance and/or repairs.

**Sec. 27. Street name signs.**

Street name signs and markers and traffic control signs, in accordance with standards adopted by the Town, will be required at each intersection. The developer will provide street signs and posts for the markers and make the installations when the subdivision is accepted by the Town for maintenance.

DIVISION 3. WATER AND SEWER INFRASTRUCTURE

**Sec. 28. General Provisions.**

(a) The intent and purpose of this division is to provide equitable charges for water and sewer connections as a proportionate distribution of the cost of the water and sewer main extensions to serve property within the Town. If the existing Town utility facilities are not within or adjacent to a subdivision, the developer shall construct the necessary extension of water and sewer mains, force mains, force mains, and lift stations, including all valves, manholes, and piping necessary to serve any future development of abutting property as specified in this chapter. The developer's engineer shall prepare a proposed plan of service for the subdivision and property along the extension which shall be reviewed by the Town engineer. These facilities shall be constructed in accordance with both the master plan and the Technical and Administrative Manual for Water and Sewer System Development ("Manual").

(b) It is the general policy of the Town that:

(1) Water and sewer mains should be large enough to serve all the lots platted and, should the Town determine oversizing is necessary, the Town may participate in those lines greater than 8" for water and greater than 10" for sewer.

(2) All utilities shall be required to extend across the full width of the last lot platted on each street proposed within the subdivision, in such an alignment that it can be extended to the next property in accordance with the master sewer and water plans for the Town, provided such plan(s) exist. Properties already served by water and sewer shall not be required to install additional facilities unless:

    (I) The current lines are not of adequate capacity to serve the proposed development; in which case the applicant will be required to install adequate facilities.

(c) Every lot of the plat shall have direct access to the water and sewer system. Utility service shall be from a water/sewer main located in an abutting right-of-way or through easements from the lot to a water/sewer main.

(d) Water and/or sewer service may not be extended outside the Town limits.

(e) (1) The terms of this division shall be cumulative of all other ordinances regulating subdivisions, and such other ordinances are not repealed by this division, except to the extent that such other provisions conflict with the terms of this chapter, in which event this chapter shall prevail.

(2) The status of any previously designated line extension, lift station, or main shall be unaffected by this ordinance, save and except the Clear Creek pro rata line, designated in CCM #95-121R. The Clear Creek pro rata line designation is hereby rescinded.

(f) In addition to any other remedy provided by law, the Town and its officers shall have the right to enjoin any violation of this chapter by injunction issued by a court of competent jurisdiction.

## Sec. 29. Water.

(a) No water main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the water master plan, provided such plan exists.

(b) Water system layout shall be looped whenever possible. Dead-end mains shall not exceed one thousand eight hundred (1,800) feet or include three (3) fire hydrants. Single feeds may be permitted at the discretion of the Town engineer; however, any such denial may be appealed to the Town Council. Single feeds should include provisions for looping in future development.

(c) The location of fire hydrant(s) shall comply with and be approved by the Town Engineer and/or Fire Marshall and insurance requirements.

(d) Long water service taps shall be installed while the subdivision is being developed. Short water service taps shall be installed when needed for development. Long water service taps locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2

foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. No water service taps smaller than six (6) inches in diameter shall be allowed on water mains larger than twelve (12) inches in diameter.

## Sec. 30. Sewer.

(a) No sewer main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the sewer master plan, provided such plan exists.

(b) Manholes are required any time the alignment, slope, or diameter of the sewer main changes, or when two or more sewer mains intersect. In no case will the maximum spacing between manholes, or from a manhole to cleanout, exceed 500 feet.

(c) Sewer services for sewer mains located in roadways shall be installed while the subdivision is being developed. Sewer services with direct access to the sewer main without encroaching on a roadway may be installed when needed for development. Sewer tap locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. Sewer services six (6) inches and larger require a manhole where they intersect the sewer main. The sewer service shall extend a minimum of ten feet (10') into the lot area.

(d) Minimum lift station capacity shall be one hundred (100) gallons per minute and shall have at least two (2) pumps, each of which shall be capable of pumping the design capacity of the lift station. The minimum size of the wetwell shall be such that with any combination of inflow and pumping, the cycle of operation for each pump shall not be less than five (5) minutes and the maximum retention time in the wetwell shall not average more than thirty (30) minutes.

(e) Septic system holding tanks or any other sewage retainage facilities for the storage or removal of sewage are prohibited.

## Sec. 31. Costs of Extensions.

a. *Developer initiated.* All costs of all water and sewer main extensions, force mains, and lift stations initiated by a developer in order to provide required service for their development area, shall be paid for by the developer. Such costs may include; but is not necessarily limited to, right-of-way acquisition, pipes, motors, pumps, engineering, construction costs, inspection fees, and all weather access.

In no event shall the Town pay for any costs associated with water and/or sewer improvements.

## Sec. 32. Use of Water and Sewer Tap Fees and Rate Revenues.

Tap fees and rate revenues shall be set in an amount sufficient to maintain and operate the

system, with due regard for anticipated needs to improve, update, construct, and maintain the system.

### Sec. 33. Use of Town Condemnation Authority.

a. Water and sewer mains, force mains, and lift stations shall be located in easements, secured and paid for by the developer, and assigned to the Town before service is extended to the subdivision. For the Town to consider to using condemnation authority to assist a developer in extension of the system, the applicant must show clear evidence that every practical attempt to secure the easement has failed and there is a public need and interest for condemnation. Specific criteria and procedures shall be as stated in the manual.

b. Upon compliance with all procedures by the developer, the Town, at least 10 days prior to the hearing shall notify all property owners within the proposed easement and 200 feet therefrom. A hearing of facts by the Town Council is required. Determination of the Town Council shall be final.

### Sec. 34. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this Ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this Ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

### Sec. 35. Savings.

This Ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those Ordinances are in direct conflict with the provisions of this Ordinance; provided, however, that Ordinance No. 93-1 (Revised) of the Town are hereby repealed, but provided that any complaint, action, cause of action, or claim which prior to the effective date of this Ordinance has been initiated or has arisen under or pursuant to Ordinance No. 93-1 (Revised) shall continue to be governed by the provisions of that Ordinance and for that purpose Ordinance No. 93-1 (Revised) shall be deemed to remain and shall continue in full force and effect.

### Sec. 36. Repealer.

Ordinance 02-05A and Ordinance 00-09 are hereby repealed.

### Sec. 37. Penalty.

Any person who should violate any provision of this Ordinance or should fail to comply herewith shall for each and every violation or noncompliance be deemed guilty of a misdemeanor and shall be fined not more than $2,000.00 (two thousand dollars) and each day such violation shall be permitted to exist shall be construed a separate offense.

### Sec. 38.  Effective Date.

This Ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** the **14**[th] day of **August**, 2008

_____
Mike Schnittker, Mayor

ATTEST:

_____
Linda Asbell, City Secretary



# Exhibit 20

STATE OF TEXAS )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 08-09. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**245**

AN ORDINANCE ADOPTING FLOOD DAMAGE PREVENTION GUIDELINES;
PROVIDING A REPEAL CLAUSE; PROVIDING FOR A SEVERABILITY CLAUSE;
PROVIDING FOR AN EFFECTIVE DATE.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN
OF LAKEWOOD VILLAGE, TEXAS THAT THE TOWN HEREBY ADOPTS THE
FOLLOWING:

ARTICLE I: STATUTORY AUTHORIZATION, FINDINGS OF FACT, PURPOSE AND METHODS

## SECTION A. <u>STATUTORY AUTHORIZATION</u>

The Legislature of the State of Texas has in the Flood Control Insurance Act, Texas Water Code, Section 16.315, delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses. Therefore, the Town of Lakewood Village, Texas does ordain as follows:

## SECTION B. <u>FINDINGS OF FACT</u>

(1) The flood hazard areas of Lakewood Village are subject to periodic inundation, which results in loss of life and property, health and safety hazards, disruption of commerce and governmental services, and extraordinary public expenditures for flood protection and relief, all of which adversely affect the public health, safety and general welfare.

(2) These flood losses are created by the cumulative effect of obstructions in floodplains which cause an increase in flood heights and velocities, and by the occupancy of flood hazard areas by uses vulnerable to floods and hazardous to other lands because they are inadequately elevated, flood proofed or otherwise protected from flood damage.

## SECTION C. <u>STATEMENT OF PURPOSE</u>

It is the purpose of this ordinance to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to:

(1) Protect human life and health;

(2) Minimize expenditure of public money for costly flood control projects;

(3) Minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

(4) Minimize prolonged business interruptions;

(5) Minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, streets and bridges located in floodplains;

(6) Help maintain a stable tax base by providing for the sound use and development of flood-prone areas in such a manner as to minimize future flood blight areas; and

(7) Insure that potential buyers are notified that property is in a flood area.

## SECTION D. <u>METHODS OF REDUCING FLOOD LOSSES</u>

In order to accomplish its purposes, this ordinance uses the following methods:

(1) Restrict or prohibit uses that are dangerous to health, safety or property in times of flood, or cause excessive increases in flood heights or velocities;

(2) Require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;

(3) Control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of flood waters;

(4) Control filling, grading, dredging and other development which may increase flood damage;

(5) Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

## ARTICLE 2 DEFINITIONS

Unless specifically defined below, words or phrases used in this ordinance shall be interpreted to give them the meaning they have in common usage and to give this ordinance its most reasonable application.

ALLUVIAL FAN FLOODING - means flooding occurring on the surface of an alluvial fan or similar landform which originates at the apex and is characterized by high-velocity flows; active processes of erosion, sediment transport, and deposition; and unpredictable flow paths.

APEX - means a point on an alluvial fan or similar landform below which the flow path of the major stream that formed the fan becomes unpredictable and alluvial fan flooding can occur.

APPURTENANT STRUCTURE – means a structure which is on the same parcel of property as the principal structure to be insured and the use of which is incidental to the use of the principal structure

AREA OF FUTURE CONDITIONS FLOOD HAZARD – means the land area that would be inundated by the 1-percent-annual chance (100 year) flood based on future conditions hydrology.

AREA OF SHALLOW FLOODING - means a designated AO, AH, AR/AO, AR/AH, or VO zone on a community's Flood Insurance Rate Map (FIRM) with a 1 percent or greater annual chance of flooding to an average depth of 1 to 3 feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and where velocity flow may be evident. Such flooding is characterized by ponding or sheet flow.

AREA OF SPECIAL FLOOD HAZARD - is the land in the floodplain within a community subject to a 1 percent or greater chance of flooding in any given year. The area may be designated as Zone A on the Flood Hazard Boundary Map (FHBM). After detailed rate-making has been completed in preparation for publication of the FIRM, Zone A usually is refined into Zones A, AO, AH, A1-30, AE, A99, AR, AR/A1-30, AR/AE, AR/AO, AR/AH, AR/A, VO, V1-30, VE or V.

BASE FLOOD - means the flood having a 1 percent chance of being equaled or exceeded in any given year.

BASE FLOOD ELEVATION (BFE) – The elevation shown on the Flood Insurance Rate Map (FIRM) and found in the accompanying Flood Insurance Study (FIS) for Zones A, AE, AH, A1-A30, AR, V1-V30, or VE that indicates the water surface elevation resulting from the flood that has a 1% chance of equaling or exceeding that level in any given year - also called the Base Flood.

BASEMENT - means any area of the building having its floor sub grade (below ground level) on all sides.

BREAKAWAY WALL – means a wall that is not part of the structural support of the building and is intended through its design and construction to collapse under specific lateral loading forces, without causing damage to the elevated portion of the building or supporting foundation system.

CRITICAL FEATURE - means an integral and readily identifiable part of a flood protection system, without which the flood protection provided by the entire system would be compromised.

DEVELOPMENT - means any man-made change to improved and unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials.

ELEVATED BUILDING – means, for insurance purposes, a non-basement building, which has its lowest elevated floor, raised above ground level by foundation walls, shear walls, posts, piers, pilings, or columns.

EXISTING CONSTRUCTION - means for the purposes of determining rates, structures for which the "start of construction" commenced before the effective date of the FIRM or before January 1, 1975, for FIRMs effective before that date. "Existing construction" may also be referred to as "existing structures."

EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the floodplain management regulations adopted by a community.

EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means the preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

FLOOD OR FLOODING - means a general and temporary condition of partial or complete inundation of normally dry land areas from:

(1) the overflow of inland or tidal waters.
(2) the unusual and rapid accumulation or runoff of surface waters from any source.

FLOOD ELEVATION STUDY – means an examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e., mudflow) and/or flood-related erosion hazards.

FLOOD INSURANCE RATE MAP (FIRM) - means an official map of a community, on which the Federal Emergency Management Agency has delineated both the special flood hazard areas and the risk premium zones applicable to the community.

FLOOD INSURANCE STUDY (FIS) – see *Flood Elevation Study*

FLOODPLAIN OR FLOOD-PRONE AREA - means any land area susceptible to being inundated by water from any source (see definition of flooding).

FLOODPLAIN MANAGEMENT - means the operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works and floodplain management regulations.

FLOODPLAIN MANAGEMENT REGULATIONS - means zoning ordinances, subdivision regulations, building codes, health regulations, special purpose ordinances (such as a floodplain ordinance, grading ordinance and erosion control ordinance) and other applications of police power. The term describes such state or local regulations, in any combination thereof, which provide standards for the purpose of flood damage prevention and reduction.

FLOOD PROTECTION SYSTEM - means those physical structural works for which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the area within a community subject to a "special flood hazard" and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

FLOOD PROOFING - means any combination of structural and non-structural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures and their contents.

FLOODWAY – see *Regulatory Floodway*

FUNCTIONALLY DEPENDENT USE - means a use, which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities, port facilities that are necessary for the loading and unloading of cargo or passengers, and ship building and ship repair facilities, but does not include long-term storage or related manufacturing facilities.

HIGHEST ADJACENT GRADE - means the highest natural elevation of the ground surface prior to construction next to the proposed walls of a structure.

HISTORIC STRUCTURE - means any structure that is:

(1) Listed individually in the National Register of Historic Places (a listing maintained by the Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register;

(2) Certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district;

(3) Individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of Interior; or

(4) Individually listed on a local inventory or historic places in communities with historic preservation programs that have been certified either:

(a) By an approved state program as determined by the Secretary of the Interior or;

(b) Directly by the Secretary of the Interior in states without approved programs.

LEVEE - means a man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding.

LEVEE SYSTEM - means a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

LOWEST FLOOR - means the lowest floor of the lowest enclosed area (including basement). An unfinished or flood resistant enclosure, usable solely for parking or vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; provided that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirement of Section 60.3 of the National Flood Insurance Program regulations.

MANUFACTURED HOME - means a structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" does not include a "recreational vehicle".

MANUFACTURED HOME PARK OR SUBDIVISION - means a parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

MEAN SEA LEVEL - means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referenced.

NEW CONSTRUCTION - means, for the purpose of determining insurance rates, structures for which the "start of construction" commenced on or after the effective date of an initial FIRM or after December 31, 1974, whichever is later, and includes any subsequent improvements to such structures. For floodplain management purposes, "new construction" means structures for which the "start of construction" commenced on or after the effective date of a floodplain management regulation adopted by a community and includes any subsequent improvements to such structures.

NEW MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by a community.

RECREATIONAL VEHICLE - means a vehicle which is (i) built on a single chassis; (ii) 400 square feet or less when measured at the largest horizontal projections; (iii) designed to be self-propelled or permanently towable by a light duty truck; and (iv) designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

REGULATORY FLOODWAY - means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

RIVERINE – means relating to, formed by, or resembling a river (including tributaries), stream, brook, etc.

SPECIAL FLOOD HAZARD AREA – see *Area of Special Flood Hazard*

START OF CONSTRUCTION - (for other than new construction or substantial improvements under the Coastal Barrier Resources Act (Pub. L. 97-348)), includes substantial improvement and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition placement, or other improvement was within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for basement, footings, piers or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

STRUCTURE – means, for floodplain management purposes, a walled and roofed building, including a gas or liquid storage tank, that is principally above ground, as well as a manufactured home.

SUBSTANTIAL DAMAGE - means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

SUBSTANTIAL IMPROVEMENT - means any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before "start of construction" of the improvement. This term includes structures which have incurred "substantial damage", regardless of the actual repair work performed. The term does not, however, include either: (1) Any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions or (2) Any alteration of a "historic structure", provided that the alteration will not preclude the structure's continued designation as a "historic structure."

VARIANCE – means a grant of relief by a community from the terms of a floodplain management regulation. (For full requirements see Section 60.6 of the National Flood Insurance Program regulations.)

VIOLATION - means the failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without

the elevation certificate, other certifications, or other evidence of compliance required in Section 60.3(b)(5), (c)(4), (c)(10), (d)(3), (e)(2), (e)(4), or (e)(5) is presumed to be in violation until such time as that documentation is provided.

WATER SURFACE ELEVATION - means the height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929 (or other datum, where specified), of floods of various magnitudes and frequencies in the floodplains of coastal or riverine areas.

## ARTICLE 3  GENERAL PROVISIONS

### SECTION A.  LANDS TO WHICH THIS ORDINANCE APPLIES

The ordinance shall apply to all areas of special flood hazard within the jurisdiction of Town of Lakewood Village, Texas.

### SECTION B.  BASIS FOR ESTABLISHING THE AREAS OF SPECIAL FLOOD HAZARD

The areas of special flood hazard identified by the Federal Emergency Management Agency in the current scientific and engineering report entitled, "The Flood Insurance Study (FIS) for Denton County, Texas," dated April 2, 1997, and/Map Number 48121C0415 E (Panel 415 of 750), with accompanying Flood Insurance Rate Maps and/or Flood Boundary-Floodway Maps (FIRM and/or FBFM) dated April 2, 1997. and any revisions thereto are hereby adopted by reference and declared to be a part of this ordinance.

### SECTION C.  ESTABLISHMENT OF DEVELOPMENT PERMIT

A Floodplain Development Permit shall be required to ensure conformance with the provisions of this ordinance.

### SECTION D.  COMPLIANCE

No structure or land shall hereafter be located, altered, or have its use changed without full compliance with the terms of this ordinance and other applicable regulations.

### SECTION E.  ABROGATION AND GREATER RESTRICTIONS

This ordinance is not intended to repeal, abrogate, or impair any existing easements, covenants, or deed restrictions. However, where this ordinance and another ordinance, easement, covenant, or deed restriction conflict or overlap, whichever imposes the more stringent restrictions shall prevail.

### SECTION F.  INTERPRETATION

In the interpretation and application of this ordinance, all provisions shall be; (1) considered as minimum requirements; (2) liberally construed in favor of the governing body; and (3) deemed

neither to limit nor repeal any other powers granted under State statutes.

## SECTION G.  WARNING AND DISCLAIMER OR LIABILITY

The degree of flood protection required by this ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations.  On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. This ordinance does not imply that land outside the areas of special flood hazards or uses permitted within such areas will be free from flooding or flood damages.  This ordinance shall not create liability on the part of the community or any official or employee thereof for any flood damages that result from reliance on this ordinance or any administrative decision lawfully made hereunder.

## ARTICLE 4  ADMINISTRATION

## SECTION A.  DESIGNATION OF THE FLOODPLAIN ADMINISTRATOR

The Mayor is hereby appointed the Floodplain Administrator to administer and implement the provisions of this ordinance and other appropriate sections of 44 CFR (Emergency Management and Assistance - National Flood Insurance Program Regulations) pertaining to floodplain management.

## SECTION B.    DUTIES  &  RESPONSIBILITIES  OF  THE  FLOODPLAIN ADMINISTRATOR

Duties and responsibilities of the Floodplain Administrator shall include, but not be limited to, the following:

(1) Maintain and hold open for public inspection all records pertaining to the provisions of this ordinance.

(2) Review permit application to determine whether to ensure that the proposed building site project, including the placement of manufactured homes, will be reasonably safe from flooding.

(3) Review, approve or deny all applications for development permits required by adoption of this ordinance.

(4) Review permits for proposed development to assure that all necessary permits have been obtained from those Federal, State or local governmental agencies (including Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334) from which prior approval is required.

(5) Where interpretation is needed as to the exact location of the boundaries of the areas of special flood hazards (for example, where there appears to be a conflict between a mapped boundary and actual field conditions) the Floodplain Administrator shall make the necessary

interpretation.

(6) Notify, in riverine situations, adjacent communities and the State Coordinating Agency which is the Texas Water Development Board (TWDB), prior to any alteration or relocation of a watercourse, and submit evidence of such notification to the Federal Emergency Management Agency.

(7) Assure that the flood carrying capacity within the altered or relocated portion of any watercourse is maintained.

(8) When base flood elevation data has not been provided in accordance with Article 3, Section B, the Floodplain Administrator shall obtain, review and reasonably utilize any base flood elevation data and floodway data available from a Federal, State or other source, in order to administer the provisions of Article 5.

(9) When a regulatory floodway has not been designated, the Floodplain Administrator must require that no new construction, substantial improvements, or other development (including fill) shall be permitted within Zones A1-30 and AE on the community's FIRM, unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point within the community.

(10) Under the provisions of 44 CFR Chapter 1, Section 65.12, of the National Flood Insurance Program regulations, a community may approve certain development in Zones A1-30, AE, AH, on the community's FIRM which increases the water surface elevation of the base flood by more than 1 foot, provided that the community first completes all of the provisions required by Section 65.12.

## SECTION C. PERMIT PROCEDURES

(1) Application for a Floodplain Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may include, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured homes, and the location of the foregoing in relation to areas of special flood hazard. Additionally, the following information is required:

(a) Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substantially improved structures;

(b) Elevation in relation to mean sea level to which any nonresidential structure shall be flood proofed;

(c) A certificate from a registered professional engineer or architect that the nonresidential flood proofed structure shall meet the flood proofing criteria of Article 5, Section B (2);

(d) Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development;

(e) Maintain a record of all such information in accordance with Article 4, Section (B)(1);

(2) Approval or denial of a Floodplain Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

(a) The danger to life and property due to flooding or erosion damage;

(b) The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

(c) The danger that materials may be swept onto other lands to the injury of others;

(d) The compatibility of the proposed use with existing and anticipated development;

(e) The safety of access to the property in times of flood for ordinary and emergency vehicles;

(f) The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and facilities such as sewer, gas, electrical and water systems;

(g) The expected heights, velocity, duration, rate of rise and sediment transport of the floodwaters and the effects of wave action, if applicable, expected at the site;

(h) The necessity to the facility of a waterfront location, where applicable;

(i) The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use.

## SECTION D. <u>VARIANCE PROCEDURES</u>

(1) The Appeal Board, as established by the community, shall hear and render judgment on requests for variances from the requirements of this ordinance.

(2) The Appeal Board shall hear and render judgment on an appeal only when it is alleged there is an error in any requirement, decision, or determination made by the Floodplain Administrator in the enforcement or administration of this ordinance.

(3) Any person or persons aggrieved by the decision of the Appeal Board may appeal such decision in the courts of competent jurisdiction.

(4) The Floodplain Administrator shall maintain a record of all actions involving an appeal and shall report variances to the Federal Emergency Management Agency upon request.

(5) Variances may be issued for the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the State Inventory of Historic Places, without regard to the procedures set forth in the remainder of this ordinance.

(6) Variances may be issued for new construction and substantial improvements to be erected on a lot of 1/2 acre or less in size contiguous to and surrounded by lots with existing structures constructed below the base flood level, providing the relevant factors in Section C (2) of this Article have been fully considered. As the lot size increases beyond the 1/2 acre, the technical justification required for issuing the variance increases.

(7) Upon consideration of the factors noted above and the intent of this ordinance, the Appeal Board may attach such conditions to the granting of variances as it deems necessary to further the purpose and objectives of this ordinance (Article 1, Section C).

(8) Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

(9) Variances may be issued for the repair or rehabilitation of historic structures upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum necessary to preserve the historic character and design of the structure.

(10) Prerequisites for granting variances:

(a) Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief.

(b) Variances shall only be issued upon: (i) showing a good and sufficient cause; (ii) a determination that failure to grant the variance would result in exceptional hardship to the applicant, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisances, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

(c) Any application to which a variance is granted shall be given written notice that the structure will be permitted to be built with the lowest floor elevation below the base flood elevation, and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest floor elevation.

(11) Variances may be issued by a community for new construction and substantial improvements and for other development necessary for the conduct of a functionally dependent

use provided that (i) the criteria outlined in Article 4, Section D (1)-(9) are met, and (ii) the structure or other development is protected by methods that minimize flood damages during the base flood and create no additional threats to public safety.

## ARTICLE 5  PROVISIONS FOR FLOOD HAZARD REDUCTION

## SECTION A.  <u>GENERAL STANDARDS</u>

In all areas of special flood hazards the following provisions are required for all new construction and substantial improvements:

(1) All new construction or substantial improvements shall be designed (or modified) and adequately anchored to prevent flotation, collapse or lateral movement of the structure resulting from hydrodynamic and hydrostatic loads, including the effects of buoyancy;

(2) All new construction or substantial improvements shall be constructed by methods and practices that minimize flood damage;

(3) All new construction or substantial improvements shall be constructed with materials resistant to flood damage;

(4) All new construction or substantial improvements shall be constructed with electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities that are designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding;

(5) All new and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

(6) New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the system and discharge from the systems into flood waters; and,

(7) On-site waste disposal systems shall be located to avoid impairment to them or contamination from them during flooding.

## SECTION B.  <u>SPECIFIC STANDARDS</u>

In all areas of special flood hazards where base flood elevation data has been provided as set forth in (i) Article 3, Section B, (ii) Article 4, Section B (8), or (iii) Article 5, Section C (3), the following provisions are required:

(1) Residential Construction - new construction and substantial improvement of any residential structure shall have the lowest floor (including basement), elevated to two (2) feet above the base flood elevation. A registered professional engineer, architect, or land surveyor shall submit a certification to the Floodplain Administrator that the standard of this subsection as

proposed in Article 4, Section C (1) a., is satisfied.

(2) Nonresidential Construction - new construction and substantial improvements of any commercial, industrial or other nonresidential structure shall either have the lowest floor (including basement) elevated to two (2) feet above the base flood level or together with attendant utility and sanitary facilities, be designed so that below the base flood level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and effects of buoyancy. A registered professional engineer or architect shall develop and/or review structural design, specifications, and plans for the construction, and shall certify that the design and methods of construction are in accordance with accepted standards of practice as outlined in this subsection. A record of such certification which includes the specific elevation (in relation to mean sea level) to which such structures are flood proofed shall be maintained by the Floodplain Administrator.

(3) Enclosures - new construction and substantial improvements, with fully enclosed areas below the lowest floor that are usable solely for parking of vehicles, building access or storage in an area other than a basement and which are subject to flooding shall be designed to automatically equalize hydrostatic flood forces on exterior walls by allowing for the entry and exit of floodwaters. Designs for meeting this requirement must either be certified by a registered professional engineer or architect or meet or exceed the following minimum criteria:

(a) A minimum of two openings on separate walls having a total net area of not less than one square inch for every square foot of enclosed area subject to flooding shall be provided.

(b) The bottom of all openings shall be no higher than 1 foot above grade.

(c) Openings may be equipped with screens, louvers, valves, or other coverings or devices provided that they permit the automatic entry and exit of floodwaters.

(4) Manufactured Homes -

(a) Require that all manufactured homes to be placed within Zone A on a community's FHBM or FIRM shall be installed using methods and practices which minimize flood damage. For the purposes of this requirement, manufactured homes must be elevated and anchored to resist flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This requirement is in addition to applicable State and local anchoring requirements for resisting wind forces.

(b) Require that manufactured homes that are placed or substantially improved within Zones A1-30, AH, and AE on the community's FIRM on sites (i) outside of a manufactured home park or subdivision, (ii) in a new manufactured home park or subdivision, (iii) in an expansion to an existing manufactured home park or subdivision, or (iv) in an existing manufactured home park or subdivision on which a manufactured home has incurred "substantial damage" as a result of a flood, be elevated on a permanent foundation such that the lowest floor

of the manufactured home is elevated to two (2) feet above the base flood elevation and be securely anchored to an adequately anchored foundation system to resist flotation, collapse, and lateral movement.

(c) Require that manufactured homes be placed or substantially improved on sites in an existing manufactured home park or subdivision with Zones A1-30, AH and AE on the community's FIRM that are not subject to the provisions of paragraph (4) of this section be elevated so that either:

(i) the lowest floor of the manufactured home is at two (2) feet above the base flood elevation, or

(ii) the manufactured home chassis is supported by reinforced piers or other foundation elements of at least equivalent strength that are no less than 36 inches in height above grade and be securely anchored to an adequately anchored foundation system to resist flotation, collapse, and lateral movement.

(5) Recreational Vehicles - Require that recreational vehicles placed on sites within Zones A1-30, AH, and AE on the community's FIRM either (i) be on the site for fewer than 180 consecutive days, or (ii) be fully licensed and ready for highway use, or (iii) meet the permit requirements of Article 4, Section C (1), and the elevation and anchoring requirements for "manufactured homes" in paragraph (4) of this section. A recreational vehicle is ready for highway use if it is on its wheels or jacking system, is attached to the site only by quick disconnect type utilities and security devices, and has no permanently attached additions.

## SECTION C. STANDARDS FOR SUBDIVISION PROPOSALS

(1) All subdivision proposals including the placement of manufactured home parks and subdivisions shall be consistent with Article 1, Sections B, C, and D of this ordinance.

(2) All proposals for the development of subdivisions including the placement of manufactured home parks and subdivisions shall meet Floodplain Development Permit requirements of Article 3, Section C; Article 4, Section C; and the provisions of Article 5 of this ordinance.

(3) Base flood elevation data shall be generated for subdivision proposals and other proposed development including the placement of manufactured home parks and subdivisions which is greater than 50 lots or 5 acres, whichever is lesser, if not otherwise provided pursuant to Article 3, Section B or Article 4, Section B (8) of this ordinance.

(4) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have adequate drainage provided to reduce exposure to flood hazards.

(5) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have public utilities and facilities such as sewer, gas, electrical and water systems located and constructed to minimize or eliminate flood damage.

## SECTION D.  STANDARDS FOR AREAS OF SHALLOW FLOODING (AO/AH ZONES)

Located within the areas of special flood hazard established in Article 3, Section B, are areas designated as shallow flooding.  These areas have special flood hazards associated with flood depths of 1 to 3 feet where a clearly defined channel does not exist, where the path of flooding is unpredictable, and where velocity flow may be evident.  Such flooding is characterized by ponding or sheet flow; therefore, the following provisions apply:

(1) All new construction and substantial improvements of residential structures have the lowest floor (including basement) elevated to or above the base flood elevation or the highest adjacent grade at least as high as the depth number specified in feet on the community's FIRM (at least 2 feet if no depth number is specified), or

(2) All new construction and substantial improvements of non-residential structures;

(a) have the lowest floor (including basement) elevated to or above the base flood elevation or the highest adjacent grade at least as high as the depth number specified in feet on the community's FIRM (at least two feet if no depth number is specified), or

(b) together with attendant utility and sanitary facilities be designed so that below the base specified flood depth in an AO Zone, or below the Base Flood Elevation in an AH Zone, level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads of effects of buoyancy.

(3) A registered professional engineer or architect shall submit a certification to the Floodplain Administrator that the standards of this Section, as proposed in Article 4, Section C are satisfied.

(4) Require within Zones AH or AO adequate drainage paths around structures on slopes, to guide flood waters around and away from proposed structures.

## SECTION E.  SEVERABILITY

If any section, clause, sentence, or phrase of this Ordinance is held to be invalid or unconstitutional by any court of competent jurisdiction, then said holding shall in no way affect the validity of the remaining portions of this Ordinance.

## SECTION F.  PENALTIES FOR NON COMPLIANCE

No structure or land shall hereafter be constructed, located, extended, converted, or altered without full compliance with the terms of this court order and other applicable regulations. Violation of the provisions of this court order by failure to comply with any of its requirements (including violations of conditions and safeguards established in connection with conditions) shall constitute a misdemeanor.  Any person who violates this court order or fails to comply with

any of its requirements shall upon conviction thereof be fined not more than $500.00 for each violation, and in addition shall pay all costs and expenses involved in the case. Each day a violation continues to exist will constitute a new and separate violation. Nothing herein contained shall prevent Town of Lakewood Village, Texas from taking such other lawful action as is necessary to prevent or remedy any violation.

## SECTION G. <u>EFFECTIVE DATE</u>

This ordinance shall be in full force and effect from and after its date of passage and publication as provided by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, on this 9th day of September 2008.**

APPROVED:

Mike Schnittker,
Mayor

ATTEST:

Linda Asbell,
City Secretary



# Exhibit 21

STATE OF TEXAS      )

                       )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 10-01. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



264

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE 10-01

AN ORDINANCE TO ADOPT THE MOST CURRENT EDITION OF THE INTERNATIONAL RESIDENTIAL CODE, THE INTERNATIONAL BUILDING CODE, THE INTERNATIONAL PLUMBING CODE, THE INTERNATIONAL MECHANICAL CODE, THE INTERNATIONAL ENERGY CODE, THE INTERNATIONAL FUEL AND GAS CODE, THE INTERNATIONAL PROPERTY MAINTENANCE CODE, THE NATIONAL ELECTRICAL CODE, INTERNATIONAL FIRE CODE AND ALL APPENDICES THERETO, AS AMENDED BY THE TERMS OF THIS ORDINANCE; PROVIDING FOR PERMIT FEES; PROVIDING FOR THE REGISTRATION OF BUILDERS AND ALL PERSONS PERFORMING ELECTRICAL, PLUMBING, MECHANICAL, IRRIGATION, IRRIGATION TESTING BACKFLOW, THIRD PARTY INSPECTIONS, ROOFING, FENCING, FRAMING, AND CONCRETE, WORK ON ANY NEW OR EXISTING CONSTRUCTION OR STRUCTURE WITHIN THE TOWN OR THE EXTRATERRITORTIAL JURISDICTION; PROVIDING FOR A BOARD OF APPEALS; PROVIDING FOR PREMISE IDENTIFICATION; PROVIDING FOR INSPECTIONS AND TOWN BUILDING REQUIREMENTS; PROVIDING A PENALTY CLAUSE; PROVIDING A REPEAL OF ORDINANCE 06-06A; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

**WHEREAS,** the Town Council of the Town of Lakewood Village, Texas desires to establish a specific requirement for all building construction;

**WHEREAS,** the State of Texas mandates that it is necessary to establish uniform and minimum standards for the construction, erection, and maintenance of buildings and other structures in order to protect and promote the public health, safety, and welfare of the citizens of the Town and the Extraterritorial Jurisdiction of the Town,

**WHEREAS,** the Town of Lakewood Village desires to adopt the most current set of International and minimum standard building codes;

**NOW, THEREFORE BE IT ORDAINED** by the Town Council of the Town of Lakewood Village, Texas:

## SECTION 1. CODES

The current versions of the International Residential Code, the International Building Code, the International Plumbing Code, the International Mechanical Code, the International Energy Code, the International Fuel and Gas Code, the International Property Maintenance Code, the National Electrical Code, the International Fire Code, and all appendices thereto, as herein after revised or amended are adopted. The said International Building Code, the International Plumbing Code, the International Mechanical Code, the International Energy Code, the International Fuel and Gas Code, the International Property Maintenance Code, the National Electrical Code are incorporated herein as if copied in their entirety.

## SECTION 2. DEFINITIONS

The Town – shall mean the Town of Lakewood Village

Contractor – shall mean any person, firm, corporation, or other entity that is hired by a homeowner or landowner to perform any new construction, remodel, or repair on said homeowner or landowner's real property.

Building Official – shall mean an employee of the Town of Lakewood Village who performs inspections, plan reviews, and is licensed by the State of Texas as a Building Inspector, or any properly qualified person that is employed by the Town that has been appointed to perform such work.

Erosion Control – the containment of all dirt, soils, sand, fill or grass, in such a manner, to prevent said materials from encroaching onto adjacent properties, town easements, drainage culverts, or utility placements

ETJ - shall mean the Extraterritorial Jurisdiction of the Town of Lakewood Village

Masonry – shall be defined as brick, concrete hollow clay tile, concrete block, natural stone, or any combination of these materials that are laid up by unit and set in mortar.

Construction Site Refuse Control - the containment of and weekly or monthly removal of both construction and laborer refuse to prevent said materials from encroaching onto adjacent homeowner properties, town easements, drainage ditches and culverts, and should be in compliance with OSHA and local codes.

## SECTION 3. GENERAL

All Building Permits shall expire 180 days from the date the permit is issued. A permit expiration may be extended if a Contractor issues a construction calendar with the submission packet and the calendar is approved by the Building Official and Mayor. If the Construction Calendar that is provided by the Contractor is not adhered to, the Building Permit shall expire without further action by the Town.

## SECTION 4. BUILDING FEES & REQUIREMENTS

A.    Fees will be outlined in Exhibit A of this ordinnace

B.    Water/Sewer Taps - A licensed plumber that is registered with the Town shall perform all work connecting to the Town utilities.

C.    All sprinkler permits are required to have a final inspection accompanied by a Backflow Prevention Report Form and a Customer Service Inspection Letter. These forms can be obtained from the office of the Town Secretary.

D.  In the construction, maintenance, or repair of any building or structure within the Town or the ETJ, for which a building permit is required by the current building codes, no person shall perform any electrical, plumbing, mechanical, fencing, backflow, concrete, third party inspections, irrigation, or roofing unless and until such time as that person is registered with the Town to perform such work.

E.  All contractors who are required by state law or local ordinance to be licensed must register with the Town of Lakewood Village before applying for permits or performing any work. All contractors registered with the Town, or unregistered, shall perform no work of any sort/kind without being properly licensed. The Mayor or Building Official, upon receipt of a written citizen complaint, shall place said Contractor's registration in investigation status. No inspections will be allowed or permits issued to any Contractor whose registration is in investigation status. The Mayor, in periods of absence from the Town, may designate an individual to act in his/her stead for purposes of this section. The Town shall forward the citizen's written complaint to the Contractor. In the event a Contractor wishes to contest a citizen's complaint, the contractor shall request a complaint review by the Mayor or Building Official. If a written response to the citizen's written complaint is not made by the Contractor within fourteen (14) days of the date the citizen's complaint is mailed to the Contractor, the Mayor or Building Official shall in his/her sole discretion place any condition upon the contractor's registration necessary to rectify the citizen's complaint including, but not limited to, revocation of the contractor's registration. No complaint other than one in writing may be used to revoke or otherwise place any condition upon any contractor's registration. Complaints that do not affect the citizens of the Town of Lakewood Village or residents of the ETJ will be summarily dismissed. The Mayor or Building Official shall issue his/her decision in writing to the Contractor and complaining citizen. The Contractor or citizen may appeal the Mayor or Building Official's decision to the Board of Appeals as set forth in Section 9. An appeal of the Mayor or Building Official's decision must be completed by written document within fourteen (14) days of the date of the Mayor or Building Official's decision. At any appeal to the Board of Appeals, the Contractor or citizen bear the burden to produce evidence establishing any error occurring in the Mayor or Building Official's decision regarding the contractor's registration.

## SECTION 5. PERMIT APPLICATION

A.  A residential permit application consist of five (5) forms, which must be completed and signed by the Contractor and his or her registered mechanical, electrical, and plumbing contractors. These forms are the mechanical permit, electrical permit, plumbing permit, concrete permit, and application for building permit forms.

B.  Detailed and accurate descriptions are required regarding the addresses and legal description of the subject property including Lot, Block and complete subdivision name with correct phase.

C.    All contractors are required to be registered with the town and must have such approved registration on file before any permit will be issued.

## SECTION 6. BUILDING PLAN PACKET SUBMISSION

Along with the permit application forms set forth above, the following documents are required prior to any approval being granted in the quantity and detail as specified:

A.    Two (2) plot plans containing lot dimensions, plan footprint, set-backs (front, rear and sides) complete address, lot and block, subdivision and phase, utility and easement locations, engineers and contractors names, finish pad elevations, finish floor elevations, topographical elevations, driveways, sidewalks, fence locations, lot area, slab area, and coverage percent. All drawings provided must be to scale.

B.    Two (2) foundation designs (11" x 17" drawing and engineer letters) one of which must have an original signature and stamp.

C.    Three (3) complete bound sets of construction drawings. Town Copy must be 11" x 17" or application will be automatically rejected without further action or notification by any Town Official. Plans must include elevations, framing details, including soffit overhang details, masonry percentage calculations, square foot calculations, electrical load calculations, electrical panel size, electrical panel location, mechanical specifications, foundation design letter must be address specific. All plans must be drawn by a state licensed architect and must be drawn to scale.

D.    Two (2) sets of drainage plans must be provided. Town copy must be 11" x 17" drawn to scale, showing the actual dimensions and shape of the lot to be built upon. The drainage plans must show sea level elevations and all flatwork drawn to scale.

E.    Floor plans, elevations, framing, roof plan, electrical and "to be built options" must be clearly shown and detailed. Single sheet submittals are not acceptable. HVAC and Plumbing design drawings are also required. Options reflecting additional buildable space must be identified by the actual square footage area and included in the permit values for total air-conditioned area and or construction area under roof.

F.    Elevation drawings must clearly state that the structure meets the exterior requirements set forth below in Section 11 by the Town of Lakewood Village, or provide masonry calculations (i.e. Front % + Right % + Left % + Rear % = total masonry %)

G.    All drawings must be legible and show proper square footage for air-conditioned and total building areas.

H.    One (1) Energy analysis (i.e.; MecCheck, ResCheck or Energy-Star) shall be provided by a certified professional.

I.	All third party rater information and documentation must be submitted if an Energy Star Home is being constructed or modified.

J.	Electrical Voltage Drop letter shall be provided and must be on the electrical contractors letterhead

K.	Mechanical Air Flow Calculations shall be provided and must be on the mechanical contractors letterhead

L.	A copy of the contract agreement between the contractor and the homeowner/landowner must be provided to the town, unless the homeowner/landowner is the contractor.

## SECTION 7. PLAN REVIEW PROCESS

All plans must be submitted to the Town of Lakewood Village for review. Plans are reviewed in the order they are received. The Town's goal in plan review is a one to two week turn around time for complete and accurately prepared submittal packages. Incomplete submissions may require additional time processing the plan review for the permit.

## SECTION 8. LICENSING AND REGISTRATION REQUIREMENTS

A.	No person shall engage in the business of construction of new buildings or structures, or make any repairs, alterations, or changes to an existing building or structure, unless that person is registered as a Contractor by the Town. Provided however that (i) no license shall be required for work on any building or structure for which a building permit is not required by this code and (ii) persons who occupy and reside within any property as their home shall not be required to obtain a license or register with the Town.

B.	All Contractors must register with the Town of Lakewood Village before applying for permits or performing any work. A master or contractor license in the specific trade is required to register as a Contractor. All licensed Journeymen working for the Contractor shall be listed on the contractor registration form. All work shall be supervised by a licensed individual, who must be within 5 minutes of any job under their supervision. A licensed residential wireman may supervise one helper or apprentice. Any work discovered being performed without the required licensed personnel shall be conspicuously identified to prevent reuse and shall be removed. In addition to a citizen complaint, multiple violations of licensure requirements may result in suspension of a Contractors' registration. Any individuals found performing work without the required registration shall be required to leave the jobsite. A Contractor is defined as set forth above in Section 2. All registrations will expire on December 30th of each year. The General Contractor must carry insurance that covers all subcontractors and the projects they are actively working on under the General Contractor. In the event there is not a General Contractor, each subcontractor is required to supply the Town with a copy of their liability insurance with a minimum $100,000.00 policy coverage for each project. It will be the responsibility of the registered individuals to ensure that this process is complete before permits will be issued and any work in the specific trade is commenced.

The Town reserves the right to deny or revoke any contractor registration if there are justifiable reasons or violations as determined by the Town.

C. The following Contractors disciplines must follow the applicable registration process.

GENERAL CONTRACTORS, BUILDER REGISTRANTS:
1. Contractor registration filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A valid certificate of liability insurance or bond in an amount no less than $1,000,000.00 kept in force for the duration of the project. Each project is required to have it's own policy.
4. Proof of registration with Texas Residential Construction Commission is required at the time of registration and for the duration of the project.

ELECTRICAL REGISTRANTS:
1. Contractor registration filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. All Journeyman and or Wireman performing work must be registered and posses a current license at the time of registration and for the duration of the project.
5. A list of additional persons authorized to sign applications and pick up approved permits for your company.
6. Proof of insurance as set forth in Section 8 (B) above.

PLUMBING REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. All journeyman, tradesman, and apprentices performing work must be registered and possess a current license at the time of registration and for the duration of the project.
5. A list of additional persons authorized to sign applications and pick up approved permits for your company.
6. Proof of insurance as set forth in Section 8 (B) above.

MECHANICAL REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. A list of additional persons authorized to sign and pick up approved permits for your company.
5. Proof of insurance as set forth in Section 8 (B) above.

IRRIGATION REGISTRANT:

1. Contractor registration application filled out completely.
2. A valid Irrigation license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. A list of additional persons authorized to sign applications and pick up approved permits for your company.
5. Proof of insurance as set forth in Section 8 (B) above.

BACKFLOW TESTER REGISTRANTS:
1. Contractor registration application filled out completely.
2. A valid Backflow Testers License is required at the time of registration at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. Proof of insurance as set forth in Section 8 (B) above.

SIGN CONTRACTOR REGISTRANT:
1. Contractor registrant application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A list of additional persons authorized to sign applications and pick up approved permits for your company.
4. Proof of insurance as set forth in Section 8 (B) above.

THIRD PARTY INSPECTOR REGISTRANT:
1. Contractor registration application form filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A list of qualified persons authorized to perform inspections.
4. Proof of certification
5. Proof of insurance as set forth in Section 8 (B) above.

ROOFING REGISTRANT:
1. Contractor registration application filled out completely.
2. Valid State of Texas drivers license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

CONCRETE REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

FENCE / SCREENING WALL REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

D.  Any registered Contractor that fails to maintain compliance with any provisions of this section shall cease all work being performed at the time the Contractor is no longer in compliance.

## SECTION 9. BOARD OF APPEALS

A.  In order to hear and decide appeals of orders, decisions, or determinations made by the Building Official relative to the application and interpretation of this Ordinance, there shall be and is hereby created a Board of Appeals. The Town Council of the Town of Lakewood Village, Texas shall serve as the Board of Appeals. The Building Official shall be an ex-officio member of and shall act as secretary to the Board but shall have no vote on any matter before the Board. The Board shall adopt the rules of procedure for conducting its business, and shall render all decisions and finding in writing to the appellant with a duplicate copy to the Building Official.

1.  The powers of the Board shall be as follows:

   a.  To hear appeals from decisions of the Building Official

   b.  To hear requests for the use of a material or method of construction not prescribed or authorized by this code, and to authorize the use when, in the Board's judgment, the material or method of construction is at least equivalent to that prescribed; and

   c.  To hear complaints, after suspension of any Contractor's registration as set forth in Section 4(I), from the Building Official, or any citizen, arising against any person, firm, or business registered with the Town to perform construction work of any type and shall have the power, after a hearing, to revoke or suspend the registration for any of the following reasons:

   (i)  Chronic violation of these codes and this ordinance:
   (ii)  Misrepresentation of material facts in obtaining the said registration or any renewal thereof:
   (iii)  Chronic failure to secure permits, inspections, or approvals as required by this code;
   (iv)  Use of said registration to obtain a permit for another person, firm, or corporation;
   (v)  Causing liens, other than the registrant's, to be improperly created on a citizen's property;
   (vi)  Threatening any citizen in any manner;
   (vii)  Committing any crime of violence within the Town; or
   (viii)  Committing any single violation of these codes or this ordinance placing any citizen in imminent danger.

2.    The Board of Appeals shall have no authority relative to interpretation of the administration provisions of this Code nor shall the Board be empowered to waive requirements of this Code.

## SECTION 10. PREMISE IDENTIFICATION

A.    Approved numbers or addresses shall be placed on all new and existing buildings in such a position as to be plainly visible and legible from the street or road fronting property. Said numbers shall contrast with their background, and shall comply with the following provisions, as applicable:

1.    Residential occupancies shall have numbers a minimum of six (6) inches in height and be in a contrasting color to the background;

2.    Duplexes shall have street and/or building numbers a minimum of eight (8) inches in height. When deemed necessary by the Town the street and/or building numbers may be required to be of a larger size for immediate and visible identification;

3.    If the structure is more than two hundred (200) feet from a public street, the address shall also appear at the front or main entry to the property with numbers a minimum of six (6) inches in height.

4.    When deemed necessary by the Town street or building numbers may be required on more than one side of the structure or property;

5.    Building and/or street numbers shall be located in an area and lighted in a manner that will make them immediately discernible as approved by the Town.

## SECTION 11 NEW CONSTRUCTION REQUIREMENTS

A.    Temporary buildings or structures such as reviewing stand and other miscellaneous structures, sheds, canopies, or fences used for the protection of the public around and in conjunction with construction work may be erected only by special permit from the Town Building Official for a limited period of time to be designated in said permit; provided, however, that no portable or moveable trailer or similar building or structure shall be permitted during any period of construction.

B.    Temporary buildings or structures need not comply with the type of construction or fire resistive time periods required by this code. Temporary buildings or structures shall be completely removed upon the expiration of the time limit stated in this permit with all surface area restored to its natural state.

C.    Portable toilets shall be provided at all construction job sites for which a building permit is required by this code.

D.	All Contractors will comply with the town's construction site refuse control program as outlined here. All residential and/or commercial construction sites shall be responsible for providing at a minimum, one 20-yard open top roll-off bulk trash container for construction debris and refuse, or a temporary refuse containment structure with minimum dimensions of 8' L x 8' W x 4' H made of 1" exterior plywood secured tightly on all four corners and to the ground in some manner. The container should have a hinged drop down or swing gate on one side for debris removal access. The contractor will also provide a temporary removable top cover either of exterior plywood and or a heavy tarp for either type of debris storage receptacle to prevent flying debris from possible windy or stormy conditions, etc. If a roll-off trash receptacle is used it must be obtained from the waste company that is currently under contract with the Town of Lakewood Village.

Contractors are required to keep construction sites free and clear of trash at all times including no overflowing trash receptacles. The town administrative staff and designated building inspector reserve the right to perform unannounced spot inspections. If the construction site is found in violation of this ordinance then the construction site will be RED FLAGGED and an IMMEDIATE Stop Work Order will be issued with possible suspension of any registration. Once Red Flagged, the contractor will need to take corrective action to bring the work site to an acceptable condition and when compliance is obtained, the Red Flag will be lifted and construction activities may be resumed.

E.	Effective erosion control is required prior to any construction activity and will include the installation of an adequate and repositionable silt fence which should run along the property lot's inside border boundary above and adjacent to the drainage ditch area and the public roadway. The silt fence will be constructed in a practical manner with the necessary openings so as to allow easy entry and exit from the roadway to the property construction site for all necessary construction equipment and machinery.

F.	It is the responsibility of the Contractor to place the proper size culvert on the lot to gain access to the lot prior to any construction. Upon completion of construction the culverts ends must be in concrete and the culvert must continue the direction of the flow of drainage. All culvert sizes are obtained through the Town.

G.	A Contractor is prohibited from adding dirt to the lot, benching the lot, or preparation of the lot prior to obtaining permit approval.

H.	It is the responsibility of the Contractors to keep a copy of all approved plans on the construction site at all times. They must be placed in a water tight container. All paperwork due to the inspector for inspection purposes and in compliance with this ordinance must be placed within this container. The replacement of any lost or stolen permits will be at a cost of $10.00 per occurrence.

I.	Energy Conservation Code Compliance

I All residential construction shall comply with the following simplified requirements or provide other approved energy compliance documentation (i.e. MecCheck, ResCheck, or Energy Star). These are minimum requirements.

  1. Attic Insulation (blown) = R38
  2. Exterior Sloped Ceilings (blanket) = R19
  3. Floor insulation (blanket) = R19
  4. Exterior Wall Insulation = R13
  5. Environmental Air Duct in unconditioned Spaces = R6 (supply & return)
  6. Windows = U.65 SHGC = .40
  7. A/C system efficiency minimum of 13 SEER

2. Each window assembly (doors with 50% or more glazing) is required to display at the time of insulation a certificate rating label indicating the National Fenestration Rating Council has tested the assembly. The label shall not be removed until after insulation inspection has been completed and approved. Window assemblies, which do not bear a certification rating shall be failed and removed from the window opening.

J. Energy Star Homes

1. A third party rater plan review and inspection/testing by RESNET agency certified for the State of Texas will be required. Both voluntary and mandatory compliance will require two complete copies of rater analysis with building plan submission for building permit. Raters air-conditioning must be within 1% of plan/permit area. Contractors shall employ the same rater for plan review, inspection, and testing.

2. A third party verification form must be completely filled out, indicating final "HERS" rating score prior to the builders request for final inspection and certificate of occupancy.

3. To verify compliance with Environmental Protection Agency, the Town of Lakewood Village will not issue a certificate of occupancy until all required documentation has been submitted and approved. This will only apply to homes that fall under this category.

K. Upon completion of construction, no one may occupy or move any objects into or onto the property of new construction until a Certificate of Occupancy inspection has been performed and passed by an official of the Town. This is a separate inspection from the Final 100% complete inspection. Violation of this requirement will result in all utilities being disconnected until such time as a Certificate of Occupancy has been issued after all the proper inspections have been performed.

L. Secondary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met. Any secondary structure

built on any adjacent lot must conform to the minimum square footage requirements of that section as stated in Ordinance 83-01A Section 9 as amended or revised unless both lots are re-platted as a single lot and said plat is filed on record with Denton County, Texas. Proper proof of filing with Denton County, Texas must be provided to the Town at the time the building permit is sought.

M. All new building construction will have a garage with the following requirements:

1. There shall be no front-facing garages on any new construction. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

2. There shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

N. Driveways

1. All new building construction will have a driveway. The pouring requirements are as follows:

   a. The Contractor shall notify the Town of when they are scheduled to pour within 48-hours prior to pouring.
   b. No concrete will be poured before 7:00 a.m.
   c. At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor and concrete registrant will be responsible for turning in all weight tickets to the Town.
   d. As per Weight Ordinance No. 98-09 Section 3 (C) as amended or revised, the gross weight limit on Town streets for a ready-mix concrete truck shall be 58,420 lbs.
   e. The minimum thickness of six (6) inches and minimum compression strength shall be 3000 psi at 28 days.
   f. Driveways shall be a minimum of 10 foot wide, in Town Section 5 driveways shall be a minimum of 12 foot wide.

   g. 3/8 inch rebar with no greater than 16 inch centers is required on all driveway construction. Re-bar placement must be inspected 48-hours prior to the pouring of concrete.
   h. All driveways must properly tie into the street. The Contractor is responsible for any road damage that may occur during the construction of the permitted project. All roads must be restored at least to their original condition prior to receiving their 100% final inspection.
   i. It shall be unlawful for any person, firm, or corporation or other legal entity to erect, construct, enlarge, alter, repair, move, improve, convert, or demolish

any flatwork or driveway or cause to permit the same to be done in violation of this ordinance.

    j.   A driveway permit that would place the water meter, water valve and meter box in the driveway shall provide, as a condition of said permit, for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at an additional cost of $75.00. A licensed plumber who is registered to work in the Town of Lakewood Village shall perform the replacement of the water meter, water valve, and meter box.

O.    A form survey will be completed at the time that the forms are in position before the concrete is poured to ensure that the location of the slab is in compliance with all town ordinances. A copy of the form survey will be submitted to the Town.

P.    Height. There shall be no buildings, residential or commercial, that exceed 35 foot in height. Any exceptions are outlined in the Zoning Ordinance 83-01A, as amended or revised.

Q.    The exterior facades of a main building or structure, excluding glass windows and doors shall be constructed of eighty (80) percent masonry requirement on all new construction for anything over 200 square feet or greater. Cementatious fiber board shall not be considered masonry; cementatious fiber board may be used to replace existing siding on existing structures, with pre-approval of the Building Official. Cementatious fiber board may also be used for architectural features, including window box-outs, bay windows, roof dormers, garage door headers, columns, or other architectural features approved by the Building Official.

R.    Wood roof shingles are prohibited.

S.    The use of Stucco, various types of stucco and installation procedures must have prior approval from the Building Official. If approved, the builder must provide the installer's certification and certificate for the Town's files. Only true three coat stuccoing will be considered. Additional inspections are required at, hath, scratch coat, and brown coat.

T.    Exterior Insulation Finish System (EIFS) shall not be permitted on any construction.

U.    Construction work times shall begin no earlier than 7:00 a.m. and shall end no later than 7:00 p.m.

V.    All roof pitches shall have a minimum of four (4) inches over twelve (12) inches.

W.    The Town will grant approval to initiate electrical service for permanent or temporary use.

X.     All new construction shall have gutters installed in accordance to the submitted drainage plan with the minimum of the entire front of house, all exits, and above all air-conditioning units.

Y.     It is also the responsibility of the Contractor to ensure the grading of the ditches or easements continue the flow of drainage prior to receiving the 100% Final Inspection. Lot to lot drainage is not allowed.

Z.     All property corners must be permanently identifiable.

## SECTION 12 INSPECTION REQUIREMENTS

A. Request for Inspections

FAXED REQUESTS:
Faxed requests will be accepted until 8:00 a.m. for inspection within 48 hours. Official time will be accounted for based on time noted on the received fax. Receipt of any faxed request without a date and time set forth in a proper header will not be processed. Missing the cut off time will require the inspection to be made on the following business day. Fax number is provided in the Contractor Guidelines

TELEPHONE REQUESTS:
Telephone requests will be accepted until 11:00 AM for inspection within 48 hours.
Official time will be accounted for based on the time call is received or by voice mail time stamp. Missing the cut off time will require the inspection to be made on the following business day. All phone numbers are provided in the Contractors Guideline.

Inspector will leave the inspection tag on site in a designated water-tight box that is provided by the Contractor.

B.     Building permits will include inspections performed during the following construction stages:

1. T-Pole
2. Plumbing Rough, form board surveys are due at this time on site
3. Water Tap
4. Sewer Tap
5. Pier and Beam
6. Foundation
7. Pre-frame, prior to any roof decking, soffit, or fascia
8. Frame
9. Mechanical
10. Electrical
11. Plumbing Top Out
12. 4 foot brick tie inspection
13. Electrical/Gas Meter Release

14. Flatwork
15. 100% Final
16. Certificate of Occupancy

- All Third party insulation inspections reports are due prior to the electrical/gas meter release.
- At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor will be responsible for turning in all weight tickets to the Town.
- Inspectors will not provide more than ten (10) items of which need corrected. Once ten (10) items have been noted for corrections the inspection will be stopped and failed until all items have been corrected.
- Termite letter, Customer Service Inspection letter, and the Final Grade survey is due on site at the 100% Final Inspection.
- Piers must be inspected by an independent contractor. A copy of the inspection must be supplied to the Town prior to calling in the next inspection.

C. Mandatory re-inspections. All Contractors shall have one (1) week to fix all items from the prior inspection. The Building Official will immediately fail and discontinue the re-inspection upon finding a prior failed item that was listed on the prior inspection tag. All items must be inspected prior to cover up, i.e. concrete and sheet rock. Mandatory re-inspections shall continue weekly until such time as the inspection is passed, and subject to the re-inspection fees below.

D. Re-inspection fees. The Town shall charge up to $100.00 for the first re-inspection. With each subsequent re-inspection the Town shall increase the re-inspection fee, for the failed inspection only, by $100.00 each time it fails, up to a maximum of $1,000.00 per inspection.

E. Local amendments to the International Plumbing Code for new construction will meet the following:

1. No air admittance valve shall be permitted
2. All underground domestic water supply shall be copper, 1 inch copper type L service line with a one inch meter.
3. Termite shield wire mesh is required on all plumbing into the house.

F. Local amendments to the National Electric Code for new construction will meet the following:

1. Minimum size wire shall be #12.

G. It is the responsibility of the Contractor to provide what the inspector may need to perform the inspections, i.e. a ladder, temporary lighting, etc. Temporary lighting is required for all House Seconds and Rough Inspections to be installed prior to request for

inspections. Should temporary lighting not be in place, the inspection will be failed and subject to 12 (C) above.

H.    All Sprinkler Contractors must have the Backflow Prevention Form filed with the Town of Lakewood Village prior to hooking the system up to the water supply.

I.    All inspections must be performed during daylight hours.

## SECTION 13.    EXISTING   CONSTRUCTION   /   REPAIRS   /   REMODELING REQUIREMENTS

A.    All remodels and repairs for buildings over 200 square feet, inspections are required only as they apply to the permitted improvements, applicable building codes and Town ordinances.

B.    All new construction foundation plans are to be drawn and sealed by an Engineer licensed by the State of Texas.

C.    An application for flatwork must be submitted to the Town for approval. Flatwork must follow all other flatwork requirements within this ordinance.

D.    Erosion control is required prior to any construction and must be maintained throughout construction completion.

E.    All remodels, repairs, alterations, must have two (2) copies of the plot plans turned into the Town showing the actual dimensions and shape of the lot to be built upon or altered, the exact sizes and locations on the lot of any already existing buildings, and the location and dimensions of the proposed building or alteration.

F.    Two copies of the existing house plans prior to any alterations, remodels or repair must be turned in prior to approval of the permit.

## SECTION 14. AUTHORITY OF THE BUILDING OFFICIAL

The Town's Building Official shall have the authority and power to enforce all provisions of all ordinances passed and approved by the Town of Lakewood Village, Texas and all codes contained within this ordinance and all amendments.

## SECTION 15. PENALTY

It shall be unlawful for any person to violate any provision of this ordinance. Any person violating or failing to comply with any provisions hereof shall be fined, upon conviction, in an amount not more than two thousand dollars ($ 2,000.00). Each day during or on which a violation occurs or continues shall be a separate offense.

## SECTION 16. REPEALER

Previous Building Code ordinance 06-06A and all of its amendments and revisions are hereby repealed in their entirety.

## SECTION 17. SEVERABILITY

The provisions of this ordinance are severable and if any section, article, paragraph, sentence, clause, phrase, or word in this ordinance or application thereof to any person or circumstance is held invalid or unconstitutional by a Court of competent jurisdiction such holding shall not affect the validity of the remaining portions of this ordinance despite such invalidity, which remaining portions shall remain in full force and effect.

## SECTION 18. EFFECTIVE DATE

This ordinance shall become effective from and after its date of adoption and publication as required by law.

**PASSED** and **APPROVED** by the Town Council of the Town of Lakewood Village, Texas this the 14th day of January, 2010.

_____
Mike Schnittker, Mayor
Town of Lakewood Village, Texas

ATTEST:

_____
Linda Asbell, Town Secretary
Town of Lakewood Village, Texas



EXHIBIT A
FEES:

A.  Building Permit Fees inside the Town– the building permit fee shall be $1,500.00 for the minimum square footage, plus $1.25 for each square foot of the building or structure which exceeds the minimum square footage requirement of the particular zoning district in which the building is located.

B.  Building Permit Fees inside the ETJ - The building permit fee shall be $1.25 for each square foot of the building

C.  Water/Sewer Taps –The charges for tapping water mains and conveying the water to the property line shall be a minimum of $900.00 plus any other expenses the town incurs. All costs and expenses for labor and materials incurred by the Contractor which costs include, but are not limited to, meter boxes, couplings, tubing, and necessary excavation work are the responsibility of the Contractor. It is the responsibility of the Contractor to ensure all meters, water shut off valves, and fire hydrants are brought up to grade by use of risers prior to receiving the water tap inspections. Meter boxes cannot be made of plastic.

D.  Flatwork Permit Fees –$250.00 for any flatwork, other than foundations, which includes, but is not limited to, flatwork greater than 200 square foot or greater, sidewalks, driveways and patios for the first two inspections, each subsequent inspection shall be $75.00 per inspection after the second inspection.

E.  Driveway Permits –$200.00. A driveway permit that would place the water meter, water valve and meter box in the driveway shall have a condition of said driveway permit for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at the cost of $75.00

F.  Plan Review Fees – When documents are submitted a plan review fee shall be paid at the time of submittal. The plan review fee shall be 65% of the building permit fee. The plan review fee is a separate fee from all other fees and is in addition to the permit fee.

G.  Registration Fees -- General Contractor $500, sub-contractors and others $100 per person/per year

H.  Fence Permit -- $150.00

I.  Sprinkler Permit -- $150.00.

J.  Electrical Permit -- $150.00

K.  Plumbing Permit -- $150.00

L.      Miscellaneous Permits -- $150.00 if not more than two inspections are required. For each inspection required over two an additional fee of $75 will be applicable.

L.      Pool Permits -- $500.00. Ordinance 98-06A is incorporated herein as revised or amended. Soil reports are required for all pool construction prior to permitting.

M.      Spa Permits -- $250.00. Ordinance 98-06A is incorporated herein as revised or amended.

N.      The Board of Appeals fee for structures up to 500 square feet - $100.00, 501 square feet up to 5,000 square feet - $250.00, structures over 5001 square feet - $500.00.

O.      Stucco Exterior Finish -- $250, in addition to any necessary building permits, requires 3 additional inspections.

# Exhibit 22

STATE OF TEXAS      )

                         )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-04. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


*Linda Asbell*
Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**285**

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-04

AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL MECHANICAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Mechanical Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2006 International Mechanical Code</u>. The International Mechanical Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the mechanical code for Lakewood Village, regulating the design, installation, maintenance, addition, alteration, and inspection of mechanical systems that are permanently installed and utilized to provide control of environmental conditions and related processes within Lakewood Village (The "2006 International Mechanical Code"). The 2006 International Mechanical Code is made a part of this Ordinance as if fully set forth herein

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of

the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



**Exhibit "A"**
**Town of Lakewood Village**
**2006 International Mechanical Code**

The following additions, deletions, and amendments to the 2006 International Mechanical Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Mechanical Code is amended as follows:

**Section 102 Applicability** of the 2006 International Mechanical Code is amended as follows:

**102.8 Referenced codes and standards.** The codes and standards referenced herein shall be those that are listed in Chapter 15 and such codes, when specifically adopted, and standards shall be considered as part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

**Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Mechanical Code is amended as follows:

**106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**106.4.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents

for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.5.2 Fee schedule.** The fees for mechanical work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.5.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than 80 percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than 50 percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 3 Regulations** of the 2006 International Mechanical Code is amended as follows:

**Section 304 Installation** of the 2006 International Mechanical Code is amended as follows:

**304.9 Clearances from grade.** Equipment and appliances installed at grade level shall be supported on a level concrete slab extending above adjoining grade a minimum of 3 inches (76 mm) or shall be suspended a minimum of 6 inches (152 mm) above adjoining grade.

**Section 306 Access and service space** of the 2006 International Mechanical Code is amended as follows:

**306.3 Appliances in attics.** Attics containing appliances requiring access shall be provided with an opening and unobstructed passageway large enough to allow removal of the largest appliance. The passageway shall not be less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) in length measured along the center line of the passageway from the opening to the appliance. The passageway shall have continuous unobstructed solid flooring not less than 24 inches (610 mm) wide. A level service space not less than 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present at the front or service side of the appliance. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm by 762 mm), where such

dimensions are large enough to allow removal of the largest appliance. As a minimum, access to the attic space shall be provided by one of the following:

1. Permanent stairs or ladder fastened to the building.
2. A pull down stair with a minimum 300 lb. rating.
3. An access door from an upper floor.

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.

2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**Chapter 5 Exhaust Systems** of the 2006 International Mechanical Code is amended as follows:

**Section 504 Clothes dryer exhaust** of the 2006 International Mechanical Code is amended as follows:

**504.6.1 Maximum length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the outlet terminal. The maximum length of the duct shall be reduced 2 1/2 feet (762 mm) for each 45 degree (0.79 rad) bend and 5 feet (1524 mm) for each 90 degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exception:** Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for such dryer are provided to the code official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by six inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning:** Dryer must be approved for vent length not to exceed 40 feet total developed length (TDL). Duct Size: (*Insert Number*) Total Developed Length: (*Insert Number*)

**Chapter 6 Duct systems** of the 2006 International Mechanical Code is amended as follows:

**Section 603 Duct construction and installation** of the 2006 International Mechanical Code is amended as follows:

**603.6.1.1 Duct length.** For other than residential construction, flexible ducts shall be limited to 5 foot connections at end of duct runs.

End of Exhibit "A"

# Exhibit 23

STATE OF TEXAS )
                    )      **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-08. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

292

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-08

**AN ORDINANCE TO ADOPT THE 2005 NATIONAL ELECTRICAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2005 Edition of the National Electrical Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2005 National Electrical Code</u>. The National Electrical Code, 2005 Edition, copyrighted by the National Fire Protection Association including Annex G, save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Electrical code for Lakewood Village, regulating the construction, alteration, removal, use, and/or maintenance of any electrical wiring, apparatus, device, or system within Lakewood Village (The "2005 National Electrical Code"). The 2005 National Electrical Code including Annex G is made a part of this Ordinance as if fully set forth herein.

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: <u>Penalty Provision</u>. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided,

however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



The following additions, deletions, and amendments to the 2005 National Electrical Code adopted herein are hereby approved and adopted.

**Chapter 3 Wiring Methods and Material** of the 2005 National Electrical Code is amended as follows:

**Article 300 Wiring Methods** of the 2005 National Electrical Code is amended as follows:

### 300.1 Scope
**(A) All Wiring Installations** This article covers wiring methods for all wiring installations unless modified by other articles.

**Article 310 Conductors for General Wiring** of the 2005 National Electrical Code is amended as follows:

### 310.2 Conductors
**(B) Conductor Material** Conductors in this article shall be of copper unless otherwise specified. Use of aluminum 1/0 and larger is allowed for multifamily and commercial use only. All grounding and bonding conductors shall be of copper. All electrical conductors for commercial, office, or industrial installation shall be installed in approved conduits or raceways regardless of type of construction.

**310.5 Minimum Size of Conductors** The minimum size of conductors shall be as shown in Table 310.5, except for low voltage control circuits.

**Table 310.5 Minimum Size of Conductors**

| Conductor Voltage Rating (Volts) | Minimum Conductor Size (AWG) | |
| --- | --- | --- |
| | Copper | Aluminum or Copper-Clad Aluminum (only feeders allowed) |
| 0–2000 | 12 | 1/0 |
| 2001–8000 | 8 | 1/0 |
| 8001–15,000 | 2 | 1/0 |
| 15,001–28,000 | 1 | 1/0 |
| 28,001–35,000 | 1/0 | 1/0 |

### 310.14 Aluminum Conductor Material

Solid aluminum conductors 8, 10, and 12 AWG shall be made of an AA-8000 series electrical grade aluminum alloy conductor material. For multifamily and commercial use only. Stranded aluminum conductors 8 AWG 1/0 through 1000 kcmil marked as Type RHH, RHW, XHHW, THW, THHW, THWN, THHN, service-entrance Type SE Style U and SE Style R shall be made of an AA-8000 series electrical grade aluminum alloy conductor material. Documentation of all installations shall be provided for torque and terminations as required by article 110.

**ARTICLE 334 Nonmetallic-Sheathed Cable: Types NM, NMC, and NMS** of the 2005 National Electrical Code is amended as follows:

**334.12 Uses Not Permitted**

(A) Types NM, NMC, and NMS Types NM, NMC, and NMS cables shall not be permitted as follows:

(1) In any dwelling or structure not specifically permitted in 334.10(1), (2), and (3)

(2) Exposed in dropped or suspended ceilings in other than one- and two-family and multifamily dwellings

(3) As service-entrance cable

(4) In commercial garages having hazardous (classified) locations as defined in 511.3

(5) In theaters and similar locations, except where permitted in 518.4(B)

(6) In motion picture studios

(7) In storage battery rooms

(8) In hoistways or on elevators or escalators

(9) Embedded in poured cement, concrete, or aggregate

(10) In hazardous (classified) locations, except where permitted by the following:

    a.    501.10(B)(3)
    b.    502.10(B)(3)
    c.    504.20

(11) In building where it would be required to pass through either factory or field punched, cut, or drilled slots or holes in metal members.

**Chapter 6 Special Equipment** of the 2005 National Electrical Code is amended as follows:

**ARTICLE 680 Swimming Pools, Fountains, and Similar Installations** of the 2005 National Electrical Code is amended as follows:

**680.71 Protection**

Hydromassage bathtubs and their associated electrical components shall be protected by a dedicated_ground-fault circuit interrupter. All 125-volt, single-

phase receptacles not exceeding 30 amperes and located within 1.5 m (5 ft) measured horizontally of the inside walls of a hydromassage tub shall be protected by a ground-fault circuit interrupter(s).

**Annex G Administration and Enforcement** of the 2005 National Electrical Code is amended as follows:

**80.15 Electrical Board.** This Section deleted in its entirety.

**80.23 Notice of Violations, Penalties.**

Notice of violations and penalties shall conform to 80.23(A) and (B).

(B) Penalties.

(1)   Any person who fails to comply with the provisions of this Code or who fails to carry out an order made pursuant to this Code or violates any condition attached to a permit, approval, or certificate shall be subject to the penalties established by this jurisdiction.

(2)   Failure to comply with the time limits of an abatement notice or other corrective notice issued by the authority having jurisdiction shall result in each day that such violation continues being regarded as a new and separate offense.

(3)   Any person who commences any work on an electrical system before obtaining the necessary permits shall be subject to a Penalty of 100% of the usual permit fee in addition to the required permit fees.

**80.25 Connection to Electricity Supply.**

Connections to the electric supply shall conform to 80.25(A) through (E).

**80.27 Inspector's Qualifications.**

(A) Certificate.

All electrical inspectors shall be certified by a nationally recognized inspector certification program. The certification program shall specifically qualify the inspector in electrical inspections. No person shall be employed as an Electrical Inspector unless that person is the holder of an Electrical Inspector's certificate of qualification, or can obtain the certificate of qualification within 6 months of initial hire issued by a nationally recognized inspector certification program.

(B) Experience.

Electrical inspector applicants shall demonstrate the following:

(1)     Have a demonstrated knowledge of the standard materials and methods used in the installation of electric equipment

(2)     Be well versed in the approved methods of construction for safety to persons and property

(3)     Be well versed in the statutes and ordinances of The Town of Lakewood Village relating to electrical work and the National Electrical Code, as approved by the American National Standards Institute

(4)     Have had at least 1 years' experience as an Electrical Inspector or 5 years in the installation of electrical equipment. In lieu of such experience, the applicant shall be a graduate in electrical engineering or of a similar curriculum of a college or university considered by the Board as having suitable requirements for graduation and shall have had two years' practical electrical experience.

**80.29 Liability for Damages.**

Article 80 shall not be construed to affect the responsibility or liability of any party owning, designing, operating, controlling, or installing any electric equipment for damages to persons or property caused by a defect therein, nor shall the Town of Lakewood Village or any of its employees or agents be held as assuming any such liability by reason of the inspection, reinspection, or other examination authorized.

**80.35 Effective Date.**

Article 80 shall take effect July 1, 2009 after its passage and publication.

**End of Exhibit "A"**

# Exhibit 24

STATE OF TEXAS     )

                     )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-09. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-09

**AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL PLUMBING CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Plumbing Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2006 International Plumbing Code</u>. The International Plumbing Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Plumbing Code for Lakewood Village, regulating the erection, installation, alteration, repairs, relocation, replacement, addition to, use or maintenance of plumbing systems within Lakewood Village (The "2006 International Plumbing Code"). The 2006 International Plumbing Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: <u>Penalty Provision</u>. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and

every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



**Town of Lakewood Village**
**2006 International Plumbing Code**

The following additions, deletions, and amendments to the 2006 International Plumbing Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Plumbing Code is amended as follows:

**Section 102 Applicability** of the 2006 International Plumbing Code is amended as follows:

**102.8 Referenced codes and standards.** The codes and standards referenced herein shall be those that are listed in Chapter 15 and such codes, when specifically adopted, and standards shall be considered as part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

**Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Plumbing Code is amended as follows:

**106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**106.5.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced and received a minimum of one approved inspection within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new

permit shall be first obtained and the fee, therefore, shall be one half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.6.2 Fee schedule.** The fees for Plumbing work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.6.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than 80 percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than 50 percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 9. Vents** of the 2006 International Plumbing Code is amended as follows:

> **Section 917 Air Admittance Valves** of the 2006 International Plumbing Code is amended as follows:
>
> > **917.3 Where permitted.** Individual, branch and circuit vents shall be permitted to terminate with a connection to an individual or branch-type air admittance valve. Stack vents and vent stacks shall be permitted to terminate to stack-type air admittance valves. Individual and branch-type air admittance valves shall vent only fixtures that are on the same floor level and connect to a horizontal branch drain. The horizontal branch drain having individual and branch-type air admittance valves shall conform to Section 917.3.1 or 917.3.2. Stack-type air admittance valves shall conform to Section 917.3.3. Air admittance valves shall only be installed with the prior written approval of the Building Official.

End of Exhibit "A"

# Exhibit 25

STATE OF TEXAS )
                          )   **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON  )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 11-11. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-11

**AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, AMENDING ORDINANCE 08-06 AND ALL OTHER ORDINANCES OF THE TOWN REGULATING SUBDIVISIONS AND OTHER PROPERTY; PROVIDING A SEVERABILITY CLAUSE; PROVIDING A SAVINGS, AMENDMENT AND REPEAL CLAUSE; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** the Town Council ("Town Council") desires to amend Ordinance 08-06 and all other ordinances regarding the Town's rules and regulations for subdivisions and property development as authorized by Chapter 212, Texas Local Government Code, as amended; and

**WHEREAS,** the Town Council finds that there is a public necessity requiring adoption of this ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development and extend such rules and regulations to the extraterritorial jurisdiction of the Town ("ETJ") to protect the public health, welfare and safety of the citizens of the Town and the ETJ; and

**WHEREAS,** the Town Council is authorized and empowered to apply the Town's regulations for subdivisions and property development to its ETJ pursuant to Section 212.003 of the Texas Local Government Code; and

**WHEREAS,** the Town Council has conducted a public hearing on the application of the Town's regulations for subdivisions and property development to its ETJ, and the Town Council finds and determines that all required notices and hearings in this regard have been given and that the meeting at which the public hearing has been held and at which this ordinance is being adopted were open to the public and conducted according to applicable law; and

**WHEREAS,** the Town Council hereby finds and determines that the adoption of this ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

**Sec. 1. Findings Incorporated.**

The findings set forth above are incorporated into the body of this ordinance as if fully set forth herein.

**Sec. 2. Extension of Subdivision Rules and Regulations, Building Standards and**

**Construction Permits and Fees, and Uniform Codes to the Extraterritorial Jurisdiction.**

This ordinance is hereby adopted under the authority of the Constitution and laws of the State of Texas, including Texas Local Government Code Chapter 212, and is being adopted after conducting a public hearing on the matter.

The Town Council hereby amends Ordinance 08-06, the Town of Lakewood Village Subdivision and Property Regulations by extending the application of the Town of Lakewood Village Subdivision and Property Regulations to the extraterritorial jurisdiction of the Town, as that area may exist from time to time. This ordinance shall be applicable to the filing of plats, the subdivision of land, and development of property within the corporate limits of the Town and its extraterritorial jurisdiction as they may exist from time to time adjusted.

All ordinances of the Town, including Ordinance 10-01, which by such ordinance(s) the Town Council has adopted and made applicable to the Town the uniform codes, including but not limited to those concerning and applicable to building, plumbing, mechanical, energy, fuel and gas, property maintenance, electrical, fire and all appendices thereto, and all ordinance(s) concerning and related to permits and permit fees for building and construction, shall be and are hereby amended to apply and extend all such ordinances and their provisions to the ETJ of the Town to the full extent as permitted by law.

The Town shall have all remedies and rights provided by Texas Local Government Code, Chapter 212, with regard to the control and approval of subdivisions and plats and property development both within the Town and within its ETJ to the full extent as permitted by law.

## Sec. 3. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

## Sec. 4. Savings, Amendment and Repeal.

This ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those ordinances are in direct conflict with the provisions of this ordinance; provided, however, that Ordinance No. 08-06 of the Town and all other ordinance and parts of ordinance of the Town in conflict with this ordinance are hereby amended and repealed to the extent of such conflict, but provided that any complaint, action, cause of

action, or claim which prior to the effective date of this ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

**Sec. 5. Effective Date.**

This ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** by the Town Council of the Town of Lakewood Village on the 11th day of March, 2011.

_____
Mike Schnittker, Mayor

ATTEST:

_____
Linda Asbell, Town Secretary



APPROVED AS TO FORM:

_____
Wm. Andrew Messer, Town Attorney

action, or claim which prior to the effective date of this ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

## Sec. 5. Effective Date.

This ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** by the Town Council of the Town of Lakewood Village on the 11th day of March, 2011.

Mike Schnittker, Mayor

ATTEST:

Linda Asbell, Town Secretary



APPROVED AS TO FORM:

Wm. Andrew Messer, Town Attorney
Bennett M. Wyse, Assistant Town Attorney

# Exhibit 26

STATE OF TEXAS     )

                          )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-13. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

312

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-13

**AN ORDINANCE TO ADOPT THE 2006 FUEL GAS CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Fuel Gas Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2006 International Fuel Gas Code</u>. The International Fuel Gas Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Fuel Gas code for Lakewood Village, regulating the design, installation, maintenance, addition, alteration, and inspection of Fuel Gas systems that are permanently installed and utilized to provide control of environmental conditions and related processes within Lakewood Village (The "2006 International Fuel Gas Code"). The 2006 International Fuel Gas Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: <u>Penalty Provision</u>. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and

every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

        SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

        SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 14th day of APRIL, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



314

**Exhibit "A"**

## Town of Lakewood Village
## 2006 International Fuel Gas Code

The following additions, deletions, and amendments to the 2006 International Fuel Gas Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Fuel Gas Code is amended as follows:

**Section 102 Applicability** of the 2006 International Fuel Gas Code is amended as follows:

> **102.8 Referenced codes and standards.** The codes, when specifically adopted by the Town of Lakewood Village, and standards referenced in this code shall be those that are listed in Chapter 8 and such codes and standards shall be considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

> **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Fuel Gas Code is amended as follows:

> **106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

> **106.4.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced and received a minimum of one approved inspection within 180 days from the date of such permit, or if the work

authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.5.2 Fee schedule.** The fees for Fuel Gas work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.5.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than <u>80</u> percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than <u>50</u> percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 3 General Regulations** of the 2006 International Fuel Gas Code is amended as follows:

**Section 305 Installation** of the 2006 International Fuel Gas Code is amended as follows:

**305.7 Clearances from grade.** Equipment and appliances installed at grade level shall be supported on a level concrete slab or other approved material extending above adjoining grade <u>a minimum of 3 inches (76 mm)</u> or shall be suspended a minimum of 6 inches (152 mm) above adjoining grade.

**Section 306 Access and service space** of the 2006 International Fuel Gas Code is amended as follows:

**306.3 Appliances in attics.** Attics containing appliances requiring access shall be provided with an opening and unobstructed passageway large enough to allow removal of the largest appliance. The passageway shall not be less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) in length measured along the center line of the passageway from the opening

to the appliance. The passageway shall have continuous <u>unobstructed</u> solid flooring not less than 24 inches (610 mm) wide. A level service space not less than 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present at the front or service side of the appliance. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm by 762 mm), where such dimensions are large enough to allow removal of the largest appliance. <u>As a minimum, access to the attic space shall be provided by one of the following:</u>

> <u>1. Permanent stairs or ladder fastened to the building.</u>
> <u>2. A pull down stair with a minimum 300 lb. rating.</u>
> <u>3. An access door from an upper floor.</u>

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.

2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**Chapter 6 Specific Appliances** of the 2006 International Fuel Gas Code is amended as follows:

> **Section 614 Clothes dryer exhaust** of the 2006 International Fuel Gas Code is amended as follows:
>
> > **614.6.1 Maximum length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the outlet terminal. The maximum length of the duct shall be reduced 21/2 feet (762 mm) for each 45 degree (0.79 rad) bend and 5 feet (1524 mm) for each 90 degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.
> >
> > **Exception:** Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for such dryer are provided to the code official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, <u>and provided that a 4 inch by six inch sign red in color with white letters is permanently affixed to the structure stating the following:</u>
> >
> > **Warning:** <u>Dryer must be approved for vent length not to exceed 40 feet total developed length (TDL). Duct Size: *(Insert Number)* Total Developed Length: *(Insert Number)*</u>

End of Exhibit "A"

# Exhibit 27

STATE OF TEXAS     )

                         )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 11-16. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**319**

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-16

AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL RESIDENTIAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Residential Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: Findings Incorporated. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: Adoption of the 2006 International Residential Code. The International Residential Code, 2006 Edition, copyrighted by the International Code Council, Inc., including Appendix G, J, and K, save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Residential code for Lakewood Village, regulating the construction, alteration, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal, and demolition of detached one- and two-family dwellings and multiple single-family dwellings (townhouses) not more than three stories in height with a separate means of egress and related accessory structures in Lakewood Village (the "2006 International Residential Code"). The 2006 International Residential Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: Savings/Repealing Clause. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 8th day of SEPTEMBER, 2011.


Mike Schnittker, Mayor
Town of Lakewood Village


ATTEST


Linda Asbell, Town Secretary
Town of Lakewood Village



The Following additions, deletions and amendments to the 2006 International Residential Code adopted herein are herby approved and adopted.

**Section 1.**

**Chapter 1. Administration** of the 2006 International Residential Code is amended as follows:

>**Section R102 Applicability** of the 2006 International Residential Code is amended as follows:

>>**R102.4 Referenced codes and standards.** The codes, when specifically adopted by the Town of Lakewood Village, and standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Where differences occur between provisions of this code and referenced codes and standards, the provisions of this code shall apply. Any reference made to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

>>**Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and manufacturer's instructions shall apply.

>**Section R105 Permits** of the 2006 International Residential Code is amended as follows:

>>**R105.2 Work exempt from permit.** Permits shall not be required for the following. Exemption from permit requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this jurisdiction.
>>**Building:**
>>>1. One-story detached accessory structures used as tool and storage sheds, playhouses and similar uses, provided the floor area does not exceed 250 square feet.
>>>2. Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge.
>>>3. Water tanks supported directly upon grade if the capacity does not exceed 5,000 gallons (18 927 L) and the ratio of height to diameter or width does not exceed 2 to 1.

4. Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

5. Prefabricated swimming pools that are less than 24 inches (610 mm) deep.

6. Swings and other playground equipment.

7. Window awnings supported by an exterior wall which do not project more than 54 inches (1372 mm) from the exterior wall and do not require additional support.

## Section 105, PERMIT APPLICATION

A. A residential permit application consist of five (5) forms, which must be completed and signed by the Contractor and his or her registered mechanical, electrical, and plumbing contractors. These forms are the mechanical permit, electrical permit, plumbing permit, concrete permit, and application for building permit forms.

B. Detailed and accurate descriptions are required regarding the addresses and legal description of the subject property including Lot, Block and complete subdivision name with correct phase.

C. All contractors are required to be registered with the town and must have such approved registration on file before any permit will be issued.

**R105.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 180 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.5 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**Section R106 Construction Documents** of the 2006 International Residential Code is amended as follows:

**R106.1 Submittal documents.** Construction documents, special inspection and structural observation programs and other data shall be submitted in one or more

sets with each application for a permit. The construction documents shall be prepared by a registered design professional where required by the statutes of the jurisdiction in which the project is to be constructed. Where special conditions exist, the building official is authorized to require additional construction documents to be prepared by a registered design professional. Foundation plans shall be submitted with each application and shall be sight specific. These plans shall be designed by an engineer licensed by the State of Texas and shall bear that engineers seal.

**Exception:** The building official is authorized to waive the submission of construction documents and other data not required to be prepared by a registered design professional if it is found that the nature of the work applied for is such that reviewing of construction documents is not necessary to obtain compliance with this code.

**Section 1A.**

**NEW CONSTRUCTION REQUIREMENTS**

A. Temporary buildings or structures such as reviewing stand and other miscellaneous structures, sheds, canopies, or fences used for the protection of the public around and in conjunction with construction work may be erected only by special permit for a limited period of time to be designated in said permit; provided, however, that no portable or moveable trailer or similar building or structure shall be permitted during any period of construction.

B. Temporary buildings or structures need not comply with the type of construction or fire resistive time periods required by this code. Temporary buildings or structures shall be completely removed upon the expiration of the time limit stated in this permit with all surface area restored to its natural state.

C. Portable toilets shall be provided at all construction job sites for which a building permit is required by this code.

D. All Contractors will comply with the town's construction site refuse control program as outlined here. All residential and/or commercial construction sites shall be responsible for providing at a minimum, one 20-yard open top roll-off bulk trash container for construction debris and refuse, or a temporary refuse containment structure with minimum dimensions of 8' L x 8' W x 4' H made of 1" exterior plywood secured tightly on all four corners and to the ground in some manner. The container should have a hinged drop down or swing gate on one side for debris removal access. The contractor will also provide a temporary removable top cover either of exterior plywood and or a heavy tarp for either type of debris storage receptacle to prevent flying debris from possible windy or stormy conditions, etc. If a roll-off trash receptacle is used it must be obtained from the waste company that is currently under contract with the Town of Lakewood Village. Contractors are required to keep construction sites free and clear of trash at

all times including no overflowing trash receptacles. The town administrative staff and designated building inspector reserve the right to perform unannounced spot inspections. If the construction site is found in violation of this ordinance then the construction site will be RED TAGGED and an IMMEDIATE Stop Work Order will be issued with possible suspension of any registration. Once Red Tagged, the contractor will need to take corrective action to bring the work site to an acceptable condition and when compliance is obtained, the Red Tag will be lifted and construction activities may be resumed.

E. Effective erosion control is required prior to any construction activity and will include the installation of an adequate and repositionable silt fence which should run along the property lot's inside border boundary above and adjacent to the drainage ditch area and the public roadway. The silt fence will be constructed in a practical manner with the necessary openings so as to allow easy entry and exit from the roadway to the property construction site for all necessary construction equipment and machinery.

F. It is the responsibility of the Contractor to place the proper size culvert on the lot to gain access to the lot prior to any construction. Upon completion of construction the culverts ends must be in concrete and the culvert must continue the direction of the flow of drainage. All culvert sizes are obtained through the Town.

G. A Contractor is prohibited from benching the lot, or preparation of the lot prior to obtaining permit approval.

H. It is the responsibility of the Contractors to keep a copy of all approved plans on the construction site at all times. They must be placed in a water tight container. All paperwork due to the inspector for inspection purposes and in compliance with this ordinance must be placed within this container. The replacement of any lost or stolen permits will be at a cost of $10.00 per occurrence.

**Section 1B.**

**EXISTING CONSTRUCTION / REPAIRS / REMODELING REQUIREMENTS**

A. All remodels and repairs for buildings over 200 square feet, inspections are required only as they apply to the permitted improvements, applicable building codes and Town ordinances.

B. All new construction foundation plans are to be drawn and sealed by an Engineer licensed by the State of Texas.

C. An application for flatwork must be submitted to the Town for approval. Flatwork must follow all other flatwork requirements within this ordinance.

D. Erosion control is required prior to any construction and must be maintained throughout construction completion.

E. All remodels, repairs, alterations, must have two (2) copies of the plot plans turned into the Town showing the actual dimensions and shape of the lot to be built upon or altered, the exact sizes and locations on the lot of any already existing buildings, and the location and dimensions of the proposed building or alteration.

F. Two copies of the existing house plans prior to any alterations, remodels or repair must be turned in prior to approval of the permit.

**Section 1C.**

**SECTION 106, BUILDING PLAN PACKET SUBMISSION**

Along with the permit application forms set forth above, the following documents are required prior to any approval being granted in the quantity and detail as specified:

A. Two (2) plot plans containing lot dimensions, plan footprint, set-backs (front, rear and sides) complete address, lot and block, subdivision and phase, utility and easement locations, engineers and contractors names, finish pad elevations, finish floor elevations, topographical elevations, driveways, sidewalks, fence locations, lot area, slab area, and coverage percent. All drawings provided must be to scale.

B. Two (2) foundation designs (11" x 17" drawing and engineer letters) one of which must have an original signature and stamp.

C. Three (3) complete bound sets of construction drawings. Town Copy must be 11" x 17" or application will be automatically rejected without further action or notification by any Town Official. Plans must include elevations, framing details, including soffit overhang details, masonry percentage calculations, square foot calculations, electrical load calculations, electrical panel size, electrical panel location, mechanical specifications, foundation design letter must be address specific. All plans must be drawn by a state licensed architect and must be drawn to scale.

D. Two (2) sets of drainage plans must be provided. Town copy must be 11" x 17" drawn to scale, showing the actual dimensions and shape of the lot to be built upon. The drainage plans must show sea level elevations and all flatwork drawn to scale.

E. Floor plans, elevations, framing, roof plan, electrical and "to be built options" must be clearly shown and detailed. Single sheet submittals are not acceptable. HVAC and Plumbing design drawings are also required. Options reflecting additional buildable space must be identified by the actual square footage area and included in the permit values for total air-conditioned area and or construction area under roof.

F. Elevation drawings must clearly state that the structure meets the exterior requirements set forth below in Section 11 by the Town of Lakewood Village, or provide masonry calculations (i.e. Front % + Right % + Left % + Rear % = total masonry %)

G. All drawings must be legible and show proper square footage for air-conditioned and total building areas.

H. One (1) Energy analysis (i.e.; IC3, ResCheck or Energy-Star) shall be provided by a certified professional.

I. All third party rater information and documentation must be submitted if an Energy Star Home is being constructed or modified.

J. Mechanical Air Flow Calculations shall be provided and must be on the mechanical contractors letterhead

**Section R108 Fees** of the 2006 International Residential Code is amended as follows:

> **R108.6 Work commencing before permit issuance.** Any person who commences any work on a building, structure, electrical, gas, mechanical or plumbing system before obtaining the necessary permits shall be subject to a Penalty of 100% of the usual permit fee in addition to the required permit fees.

**Section 1D.**

**REQUIREMENTS**

A. Water/Sewer Taps - A licensed plumber that is registered with the Town shall perform all work connecting to the Town utilities.

B. All sprinkler permits are required to have a final inspection accompanied by a Backflow Prevention Report Form and a Customer Service Inspection Letter. These forms can be obtained from the office of the Town Secretary.

C. In the construction, maintenance, or repair of any building or structure within the Town or the ETJ, for which a building permit is required by the current building codes, no person shall perform any electrical, plumbing, mechanical, fencing, backflow, concrete, third party inspections, irrigation, or roofing unless and until such time as that person is registered with the Town to perform such work.

**Section 1E.**

**LICENSING AND REGISTRATION REQUIREMENTS**

A. No person shall engage in the business of construction of new buildings or structures, or make any repairs, alterations, or changes to an existing building or structure, unless that person is registered as a Contractor by the Town. Provided however that (i) no license shall be required for work on any building or structure for which a building permit is not required by this code and (ii) persons who occupy and reside within any property as their home shall not be required to obtain a license or register with the Town when performing work on their home.

B. All Contractors must register with the Town of Lakewood Village before applying for permits or performing any work. A master or contractor license in the specific trade is required to register as a Contractor. All licensed Journeymen working for the Contractor shall be listed on the contractor registration form. All work shall be supervised by a licensed individual, A licensed residential wireman may supervise one helper or apprentice. Any work discovered being performed without the required licensed personnel shall be conspicuously identified to prevent reuse and shall be removed. In addition to a citizen complaint, multiple violations of licensure requirements may result in suspension of a Contractors' registration. Any individuals found performing work without the required registration shall be required to leave the jobsite. A Contractor is defined as set forth above in Section 2. All registrations will expire on December 30th of each year. The General Contractor must carry insurance that covers all subcontractors and the projects they are actively working on under the General Contractor. In the event there is not a General Contractor, each subcontractor is required to supply the Town with a copy of their liability insurance with a minimum $100,000.00 policy coverage for each project. It will be the responsibility of the registered individuals to ensure that this process is complete before permits will be issued and any work in the specific trade is commenced. The Town reserves the right to deny or revoke any contractor registration if there are justifiable reasons or violations as determined by the Town.

C. The following Contractors disciplines must follow the applicable registration process.

GENERAL CONTRACTORS, BUILDER REGISTRANTS:

1. Contractor registration filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A valid certificate of liability insurance or bond in an amount no less than $1,000,000.00 kept in force for the duration of the project. Each project is required to have its own policy.

ELECTRICAL REGISTRANTS:

1. Contractor registration filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. All Journeyman and or Wireman performing work must be registered and posses a current license at the time of registration and for the duration of the project.

5. A list of additional persons authorized to sign applications and pick up approved permits for your company.

6. Proof of insurance as set forth in Section 8 (B) above.

PLUMBING REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. All journeyman, tradesman, and apprentices performing work must be registered and possess a current license at the time of registration and for the duration of the project.

5. A list of additional persons authorized to sign applications and pick up approved permits for your company.

6. Proof of insurance as set forth in Section 8 (B) above.

MECHANICAL REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. A list of additional persons authorized to sign and pick up approved permits for your company.

5. Proof of insurance as set forth in Section 8 (B) above.

IRRIGATION REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Irrigation license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. A list of additional persons authorized to sign applications and pick up approved permits for your company.

5. Proof of insurance as set forth in Section 8 (B) above.

BACKFLOW TESTER REGISTRANTS:

1. Contractor registration application filled out completely.

2. A valid Backflow Testers License is required at the time of registration at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. Proof of insurance as set forth in Section 8 (B) above.

SIGN CONTRACTOR REGISTRANT:

1. Contractor registrant application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A list of additional persons authorized to sign applications and pick up approved permits for your company.

4. Proof of insurance as set forth in Section 8 (B) above.

THIRD PARTY INSPECTOR REGISTRANT:

1. Contractor registration application form filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A list of qualified persons authorized to perform inspections.

4. Proof of certification

5. Proof of insurance as set forth in Section 8 (B) above.

ROOFING REGISTRANT:

1. Contractor registration application filled out completely.

2. Valid State of Texas drivers license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

CONCRETE REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

FENCE / SCREENING WALL REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

D. Any registered Contractor that fails to maintain compliance with any provisions of this section shall cease all work being performed at the time the Contractor is no longer in compliance.

## Section 109 Inspections

A. Request for Inspections

B. Building permits will include inspections performed during the following construction stages:

1. T-Pole

2. Plumbing Rough, includes water and sewer tap (form board surveys due at this time on site)

3. Pier and Beam - shall be inspected by the engineer and an approval letter shall be provided to the building official.

4. Foundation

5. Frame

6. Mechanical Rough

7. Electrical Rough

8. Rough Gas

9. Plumbing Top Out

10. 4 foot brick tie inspection and/or Stucco inspection

11. Drywall

12. Electrical/Gas Meter Release

13. Flatwork

14. 100% Final

· All Third party insulation inspections reports are due prior to the electrical/gas meter release.

· At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor will be responsible for turning in all weight tickets to the Town.

· Termite letter, Customer Service Inspection letter, and the Final Grade survey is due on site at the 100% Final Inspection.

· Piers must be inspected by an independent contractor. A copy of the inspection must be supplied to the Town prior to calling in the next inspection.

E. All Sprinkler Contractors must have the Backflow Prevention Form filed with the Town of Lakewood Village prior to hooking the system up to the water supply.

F. All inspections must be performed during daylight hours

**Section 1F.**

A. Upon completion of construction, no one may occupy or move any objects into or onto the property of new construction until a Certificate of Occupancy (100 % Final) inspection has been performed and passed by an official of the Town. Violation of this requirement will result in all utilities being disconnected until such time as a Certificate of Occupancy has been issued after all the proper inspections have been performed.

B. Secondary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met. Any secondary structure built on any adjacent lot must conform to the minimum square footage requirements of that section as stated in the current zoning ordinance as amended or revised unless both lots are re-platted as a single lot and said plat is filed on record with Denton County, Texas. Proper proof of filing with Denton County, Texas must be provided to the Town at the time the building permit is sought.

C. All new building construction will have a garage with the following requirements:

1. There shall be no front-facing garages on any new construction. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

2. There shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth. Where the configuration of the ground is such that conformity with

this provision of this ordinance would work a hardship, the Town Council may permit a variance.

**Section 1G.**

A. A form survey will be completed at the time that the forms are in position before the concrete is poured to ensure that the location of the slab is in compliance with all town ordinances. A copy of the form survey will be submitted to the Town.

B. Height. There shall be no buildings, residential or commercial, that exceed 2 ½ stories  Any exceptions are outlined in the Zoning Ordinance 83-01A, as amended or revised.

C. The exterior facades of a main building or structure, excluding glass windows and doors shall be constructed of eighty (80) percent masonry requirement on all new construction for anything over 200 square feet or greater. Cementatious fiber board shall not be considered masonry; cementatious fiber board may be used to replace existing siding on existing structures, with pre-approval of the Building Official. Cementatious fiber board may also be used for architectural features, including window box-outs, bay windows, roof dormers, garage door headers, columns, or other architectural features approved by the Building Official.

D. Wood roof shingles are prohibited.

E. The use of Stucco, various types of stucco and installation procedures must have prior approval from the Building Official. If approved, the builder must provide the installer's certification and certificate for the Town's files. Only true three coat stuccoing will be considered. Additional inspections are required at, hath, scratch coat, and brown coat.

F. Exterior Insulation Finish System (EIFS) shall not be permitted on any construction.

G. Construction work times shall begin no earlier than 7:00 a.m. and shall end no later than 7:00 p.m.

H. All roof pitches shall have a minimum of four (4) inches over twelve (12) inches.

I. The Town will grant approval to initiate electrical service for permanent or temporary use.

J. All new construction shall have gutters installed in accordance to the submitted drainage plan with the minimum of the entire front of house, all exits, and above all air-conditioning units.

K. It is also the responsibility of the Contractor to ensure the grading of the ditches or easements continue the flow of drainage prior to receiving the 100% Final Inspection. Lot to lot drainage is not allowed.


**Section 1H.**

## VARIANCES and BOARD OF APPEALS

A. In order to hear and decide appeals of orders, decisions, or determinations made by the Building Official relative to the application and interpretation of this Ordinance, there shall be and is hereby created a Board of Appeals. The Town Council of the Town of Lakewood Village, Texas shall serve as the Board of Appeals. The Building Official shall be an ex-officio member of and shall act as secretary to the Board but shall have no vote on any matter before the Board. The Board shall adopt the rules of procedure for conducting its business, and shall render all decisions and finding in writing to the appellant with a duplicate copy to the Building Official.

1. The powers of the Board shall be as follows:

a. To hear appeals from decisions of the Building Official

b. To hear requests for the use of a material or method of construction not prescribed or authorized by this code, and to authorize the use when, in the Board's judgment, the material or method of construction is at least equivalent to that prescribed; and

c. To grant or deny variance requests

B. Variance Requests

1. Variances will be considered only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the building and zoning ordinances would cause an undue hardship. Financial considerations are not relevant and will not be considered in the request.

2. A variance which would have a detrimental effect on public health and/or safety will not be considered.

3. Variances for self imposed hardships will not be considered.

4. Approved variances expire 180 days following the approval.

**Section 2.**

**Chapter 2. DEFINITIONS** of the 2006 International Residential Code

The Town – shall mean the Town of Lakewood Village

Contractor – shall mean any person, firm, corporation, or other entity that is hired by a homeowner or landowner to perform any new construction, remodel, or repair on said homeowner or landowner's real property.

Erosion Control – the containment of all dirt, soils, sand, fill or grass, in such a manner, to prevent said materials from encroaching onto adjacent properties, town easements, drainage culverts, or utility placements

ETJ - shall mean the Extraterritorial Jurisdiction of the Town of Lakewood Village

Masonry – shall be defined as brick, concrete hollow clay tile, concrete block, natural stone, or any combination of these materials that are laid up by unit and set in mortar.

Construction Site Refuse Control - the containment of and weekly or monthly removal of both construction and laborer refuse to prevent said materials from encroaching onto adjacent homeowner properties, town easements, drainage ditches and culverts, and should be in compliance with OSHA and local codes.

**Section 3.**

**Chapter 3. Building Planning** of the 2006 International Residential Code is amended as follows:

> **Section 309 Garages and Carports** of the 2006 International Residential Code is amended as follows:
>
> > **Section 309 Carports** shall not be allowed in Lakewood Village.
> >
> > **R309.1 Opening protection.** Openings from a private garage directly into a room used for sleeping purposes shall not be permitted. Other openings between the garage and residence shall be equipped with a self closing, tight fitting solid wood doors not less than 13/8 inches (35 mm) in thickness, solid or honeycomb core steel doors not less than 13/8 inches (35 mm) thick, or 20-minute fire-rated doors.
> >
> > > **R309.1.1 Duct penetration.** Ducts in the garage and ducts penetrating the walls or ceilings separating the dwelling from the garage shall be constructed of a minimum No. 26 gage (0.48 mm) sheet steel or other approved material and shall have no openings into the garage.
> > >
> > > **R309.1.2 Other penetrations.** Penetrations through the separation required in Section R309.2 shall be protected by filling the opening around the penetrating item with approved material to resist the free passage of flame and products of combustion.
> > >
> > > **R309.1.3 Access Openings.** Access openings in the separation required by R309.2 shall have a tight fitting, non-combustible and latching cover.

**R309.2 Separation required.** The garage shall be separated from the residence and its attic area by not less than 5/8-inch (15.9 mm) gypsum board applied to the garage side. Garages beneath habitable rooms shall be separated from all habitable rooms above by not less than 5/8-inch (15.9 mm) Type X gypsum board or equivalent. Where the separation is a floor-ceiling assembly, the structure supporting the separation shall also be protected by not less than 5/8 inch (15.9 mm) gypsum board or equivalent. Garages located less than 5 feet (1524 mm) from a dwelling unit on the same lot shall be protected with not less than 5/8-inch (15.9 mm) gypsum board applied to the interior side of exterior walls that are within this area. Openings in these walls shall be regulated by Section R309.1. This provision does not apply to garage walls that are perpendicular to the adjacent dwelling unit wall.

**Section 313 Smoke Alarms** of the 2006 International Residential Code is added as follows:

**R313.4 Carbon Monoxide Detector.** A carbon monoxide detector shall be installed for each 1,000 square feet (305 m2 ) of living area. Carbon monoxide detectors shall be placed adjacent to openings in enclosures for fuel burning appliances, at least one location per floor level and at garage entrances, Power source shall be same as required by section R313.3 for smoke detectors.

**Section 319 Site Address** of the 2006 International Residential Code is amended as follows:

A. Approved numbers or addresses shall be placed on all new and existing buildings in such a position as to be plainly visible and legible from the street or road fronting property. Said numbers shall contrast with their background, and shall comply with the following provisions, as applicable:

1. Residential occupancies shall have numbers a minimum of six (6) inches in height and be in a contrasting color to the background;

2. Duplexes shall have street and/or building numbers a minimum of eight (8) inches in height. When deemed necessary by the Town the street and/or building numbers may be required to be of a larger size for immediate and visible identification;

3. If the structure is more than two hundred (200) feet from a public street, the address shall also appear at the front or main entry to the property with numbers a minimum of six (6) inches in height.

4. When deemed necessary by the Town street or building numbers may be required on more than one side of the structure or property;

5. Building and/or street numbers shall be located in an area and lighted in a manner that will make them immediately discernible as approved by the Town.

**Section 4.**

**Chapter 4. Foundations** of the 2006 International Residential Code is amended as follows:

**Section 403 Footings** of the 2006 International Residential Code is amended as follows:

**R403.1.8 Foundations on expansive soils.** Foundation and floor slabs for buildings located on expansive soils shall be designed in accordance with Section 1805.8 of the *International Building Code*, the American Society of Civil Engineers Texas Section Recommended Practice for the Design of Residential Foundations Version 1 as it currently exists or may be amended, or other accepted industry standards that may be acceptable to the Building Official. All foundations shall be designed by a registered Professional Engineer in the State of Texas and all drawings and documentation must be signed and sealed. Documentation shall include:

1. Design letter referencing soils report number, date of report, soils, and engineer name; specific location including lot, block, and subdivision; specific design criteria including soil bearing capacity, plasticity index, and potential vertical rise. The Engineer shall also approve a concrete mix design with performance criteria based on soils and seasonal conditions.
2. Signed and sealed drawings clearly indicating strand and reinforcement placement, pier size, depth, location, and reinforcing, beam size and location, and special details. Design calculations must be included. One ledger size copy of plans and calculations will be included in the permanent permit file for each project.
3. Design engineer must perform a pre-pour inspection and provide the Building Official with signed and sealed document stating that the foundation has been inspected and approved. This inspection must take place prior to requesting a foundation inspection from the Building Official. The engineer shall be present during placement of concrete to verify concrete mix design and seasonal conditions during placement, and verify tensioning and elongation of cables.
4. Rough grading of lot after form removal to maintain drainage away from foundation during the construction process.

5. Prior to receiving a Certificate of Occupancy, a final survey indicating final grade elevations and verifying positive drainage away from the foundation, and evidence from the homeowner that they have received a copy of foundation maintenance instructions must be submitted to the Building Official.
6. The Engineer must provide to the Building Official a letter of Final Acceptance stating that the foundation has been placed in compliance with the design prior to the issuance of a Certificate of Occupancy.
7. Anchorage shall be installed before foundation is approved for pouring, per Section 403.1.6

**R403.1.7.3 Foundation elevation** of the 2006 International Residential Code is amended as follows: No cross lot drainage shall be allowed.

**Section 4A.**

Driveways
1. All new building construction will have a driveway. The pouring requirements are as follows:
a. The Contractor shall notify the Town of when they are scheduled to pour within 48-hours prior to pouring.
b. No concrete will be poured before 7:00 a.m.
c. At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor and concrete registrant will be responsible for turning in all weight tickets to the Town.
d. As per Weight Ordinance No. 98-09 Section 3 (C) as amended or revised, the gross weight limit on Town streets for a ready-mix concrete truck shall be58,420 lbs.
e. The minimum thickness of four inches and minimum compression strength shall be 3000 psi at 28 days.
f. Driveways shall be a minimum of 10 foot wide, in Town Section 5 driveways shall be a minimum of 12 foot wide.
g. 3/8 inch rebar with no greater than 16 inch centers is required on all drivewayconstruction. Re-bar placement must be inspected 48-hours prior to the pouring of concrete.
h. All driveways must properly tie into the street. The Contractor is responsiblefor any road damage that may occur during the construction of the permitted project. All roads must be restored at least to their original condition prior to receiving their 100% final inspection. It shall be unlawful for any person, firm, or corporation or other legal entity to erect, construct, enlarge, alter, repair, move, improve, convert, or demolish any flatwork or driveway or cause to permit the same to be done in violation of this ordinance.
j. A driveway permit that would place the water meter, water valve and meter

box in the driveway shall provide, as a condition of said permit, for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at an additional cost of $75.00. A licensed plumber who is registered to work in the Town of Lakewood Village shall perform the replacement of the water meter, water valve, and meter box.

## Section 5.

**Chapter 13. General Mechanical System Requirements** of the 2006 International Residential Code is amended as follows:

**Section 1305 Appliances Access** of the 2006 International Residential Code is amended as follows:

**M1305.1.3 Appliances in attics.** Attics containing appliances requiring access shall have with an opening and a clear and unobstructed passageway large enough to allow removal of the largest appliance, but not less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) long when measured along the centerline of the passageway from the opening to the appliance. The passageway shall have continuous unobstructed solid flooring in accordance with Chapter 5 not less than 24 inches (610 mm) wide. A level service space at least 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present along all sides of the appliance where access is required. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm) by 762 mm), where such dimensions are large enough to allow removal of the largest appliance. As a minimum, access to the attic space shall be provided by one of the following:

1. A permanent stair.
2. A pull down stair with a minimum 300 lb. rating.
3. An access door from an upper floor.

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.
2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**M1305.1.4.1 Ground clearance.** Appliances supported from the ground shall be level and firmly supported on a concrete slab extending above the adjoining ground a minimum of 3 inches (76mm). Appliances suspended from the floor shall have a clearance of not less than 6 inches (152 mm) from the ground.

**Section 6.**

**Chapter 15. Exhaust Systems** of the 2006 International Residential Code is amended as follows:

**Section 1502 Clothes Dryer Exhaust** of the 2006 International Residential Code is amended as follows:

**M1502.3 Duct size.** The diameter of the exhaust duct shall be as required by the clothes dryer's listing and the manufacturer's Installation instructions. Duct size shall be at least the diameter of the appliance outlet and shall be a minimum nominal size of 4" (102mm) in diameter. The size duct shall not be reduced along its developed length nor at the point of termination.

**M1502.6 Duct length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the wall or roof termination. The maximum length of the duct shall be reduced 2.5 feet (762 mm) for each 45-degree (0.8 rad) bend and 5 feet (1524 mm) for each 90-degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exceptions:**
Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for the dryer are provided to the building official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by 6 inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning: Dryer must be approved for vent length not to exceed 40 feet total developed length (*TDL*.)**
**Duct Size: (*Number*)**
**Total Developed Length: (*Number*)**

**Chapter 24. Fuel Gas** of the 2006 International Residential Code is amended as follows:

**Section 2439 Clothes Dryer Exhaust** of the 2006 International Residential Code is amended as follows:

**G2439.5.1 Maximum Length.**
The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the wall or roof termination. The maximum length of the duct shall be reduced 2.5 feet (762 mm) for each 45-degree (0.8 rad) bend and 5 feet (1524 mm) for each 90-degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exceptions:**
Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for the dryer are provided to the building official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by 6 inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning: Dryer must be approved for vent length not to exceed 40 feet total developed length (*TDL*.)**
**Duct Size:** (*Number*)
**Total Developed Length:** (*Number*)

## Section 7.

**Chapter 31. Vents** of the 2006 International Residential Code is amended as follows:

> **Section 3114 Air admittance Valves** of the 2006 International Residential Code is amended as follows:
>
> > **P3114.3 Where permitted.** Individual vents, branch vents, circuit vents, and stack vents may be permitted to terminate with a connection to an air admittance valve. Air admittance valves shall only be installed with the prior written approval of the Building Official.

## Section 8.

**Chapter 33. General Requirements** of the 2006 International Residential Code is amended as follows:

> **Section 3306 Electrical conductors and Connections** of the 2006 International Residential Code is amended as follows:
>
> > **E3306.2 Conductor material.** Conductors used to conduct current shall be of copper as provided in Chapters 33 through 42. Where the conductor material is not specified, the material and the sizes given in these chapters shall apply to copper conductors. Where other materials are used, the conductor sizes shall be changed accordingly.
> >
> > **E3306.3 Minimum size of conductors.** The minimum size of conductors for feeders and branch circuits shall be 12 AWG copper. The minimum size of service conductors shall be as specified in Chapter 35. The minimum size of class 2 remote control, signaling and power-limited circuits conductors shall be as specified in Chapter 42.

**Chapter 35. Services** of the 2006 International Residential Code is amended as follows:

**Section 3501 General Services** of the 2006 International Residential Code is amended as follows:

**E3501.2 Number of services.** One-and two-family dwellings or Property zoned single family (SF) or Two Family (2F) district(s) shall be supplied by only one service. Additional service for an accessory use(s) shall only be installed with the prior approval of the Building Official.

**Chapter 36. Branch Circuit Feeder Requirements** of the 2006 International Residential Code is amended as follows:

**Section 3602 Branch Circuit Ratings** of the 2006 International Residential Code is amended as follows:

**E3602.5 Branch circuits serving multiple loads or outlets.** General-purpose branch circuits shall supply lighting outlets, appliances, equipment or receptacle outlets, and combinations of such. The rating of a fastened-in-place appliance or equipment, where used in combination on the same branch circuit with light fixtures, receptacles, and/or other appliances or equipment not fastened in place, shall not exceed 50 percent of the branch-circuit rating. Multi-outlet branch circuits serving lighting or receptacles shall be limited to a maximum branch-circuit rating of 20 amperes. The maximum number of outlets connected to general purpose branch circuits shall be ten (10) for 15-amp circuits, and thirteen (13) for 20-amp circuits.

**End of Exhibit "A"**

# Exhibit 28

STATE OF TEXAS     )

                      )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instrument is a full, true and correct copy of the Town of Lakewood Village Ordinance 13-07. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 19th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**344**

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 13-07

**AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, REGULATING SUBDIVISIONS AND OTHER PROPERTY DEVELOPMENTS, PROVIDING FOR PRELIMINARY PLATS, FINAL PLATS, MINOR PLATS, VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS; PROVIDING FOR DEVELOPMENT PROCESS; PROVIDING FOR STANDARDS AND REQUIREMENTS; PROVIDING FOR STREETS AND DRAINAGE, WATER AND SEWER INFRASTRUCTURE; EXTENDING REGULATIONS TO THE TOWN'S EXTRATERRITORIAL JURISDICTION; PROVIDING SEVERABILITY CLAUSE; PROVIDING SAVINGS CLAUSE; PROVIDING A PENALTY NOT TO EXCEED THE SUM OF TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE AND A SEPARATE OFFENSE SHALL BE DEEMED COMMITTED EACH DAY DURING OR ON WHICH A VIOLATION OCCURS OR CONTINUES; PROVIDING A REPEALER; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** the Town Council ("Town Council") desires to amend Ordinance 08-06 and all other ordinances regarding the Town's rules and regulations for subdivisions and property development as authorized by Chapter 212, Texas Local Government Code, as amended; and

**WHEREAS,** the Town Council ("Town Council") desires to review for approval or disapproval plan, plats, and replats filed with the Town as authorized by Chapter 212, Tex. Loc. Gov. Code (Vernon), as amended; and

**WHEREAS,** the Town Council finds that there is a public necessity requiring adoption of this Ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development and extend such rules and regulations to the extraterritorial jurisdiction of the Town ("ETJ") to protect the public health, welfare and safety of the citizens of the Town and the ETJ; and

**WHEREAS,** the Town Council is authorized and empowered to or require the developer to (i) design, install or improve streets, roads, water and a sanitary sewer systems within the Town by constructing, extending, or enlarging such system, and is further authorized to adopt any rules and regulations appropriate to the exercise of such powers, and to (ii) protect the public health, welfare and safety of the citizens of the Town; and

**WHEREAS,** the Town Council has conducted a public hearing on the application of the Town's regulations for subdivisions and property development to its ETJ, and the Town Council finds and determines that all required notices and hearings in this regard have been given and that the meeting at which the public hearing has been held and at which this ordinance is being adopted were open to the public and conducted according to applicable law; and

**WHEREAS,** the Town Council is authorized and empowered to apply the Town's regulations for subdivisions and property development to its ETJ pursuant to Section 212.003 of the Texas Local Government Code; and

**WHEREAS,** the Town Council hereby finds that the adoption of this Ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS :**

## ARTICLE I. IN GENERAL

### Sec. 1. Findings Incorporated.

The findings set forth above are incorporated into the body of this ordinance as if fully set forth herein.

### Sec. 2. Short title.

The following regulations are hereby adopted and shall be known and may be cited as "Town of Lakewood Village Subdivision and Property Development Regulations."

### Sec. 3. Definitions.

The following words, terms, and phrases, when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning. Words not specifically defined shall have the meanings given in Webster's Ninth New Collegiate Dictionary, as revised.

*Accessory structure or building* shall mean a subordinate structure or building customarily incident to and located on the same lot occupied by the main structure or building.

*Applicant* shall mean the owner(s) of the property to be developed.

*Bond* shall mean any form of security, including a cash deposit, surety bond, or instrument of credit in an amount and form approved by the Town.

*Building* shall mean any structure designed or built for the support, enclosure, shelter or protection of persons, animals, chattel or property of any kind.

*Town* means Town of Lakewood Village.

*Town Council* means Town Council of the Town of Lakewood Village.

*Town standards* shall mean those standards and specifications, together with all tables,

**346**

charts, graphs, drawings and other attachments hereinafter approved and adopted by the Town Council, which may be amended from time to time, and are administered by the Town staff for the construction and installation of streets, sidewalks, drainage facilities, water and sanitary sewer mains and any other public facilities. All such facilities which are to become the property of the Town upon completion must be constructed in conformance with these standards.

*Construction plans* shall mean the maps, drawings and technical specifications, including bid documents and contract conditions, where applicable, which provide a graphic and written description of the character and scope of the work to be performed prepared for approval by the Town for construction.

*Cross drainage* shall mean a defined waterway course, approximately perpendicular to the proposed roadway, which requires the construction of a bridge, pipes or box culvert, or other structure to conduct drainage under the roadway.

*Developer* shall mean any person, corporation, governmental or other legal entity engaged in the development of property by improving a tract or parcel of land for any use. The term "developer" is intended to include the term "subdivider."

*Development* shall mean the construction of one (1) or more new buildings or structures, or the structural alteration, relocation or enlargement of one (1) or more new buildings or structures of an existing building or structure on one (1) or more building lots or sites, or the installation of site improvements.

*Easement* shall mean a grant by a property owner to the public, a corporation, or persons for a general or specific use of a defined strip or parcel of land, for such purpose as the installation, construction, maintenance and/or repair of utility lines, drainage ditches or channels, or other public services, the ownership or title to the land encompassed by the easement being retained by the owner of the property.

*Engineer* shall mean any person duly authorized under the Texas Engineering Practice Act (V.A.C.S. art. 3271a), as amended, to practice the profession of engineering.

*Engineering plans* shall mean the maps and drawings required for plat approval.

*Lot* shall mean an undivided tract or parcel of land having access to a street, which is designated as a separate and distinct tract or lot number or symbol on a duly approved plat filed of record. The terms "lot" and "tract" shall be used interchangeably.

*Off-site* shall mean any premises not located within the property to be developed, regardless of ownership.

*Owner* shall mean any persons, firm or corporation having legal title to the property.

*Plat* shall mean a map representing a tract of land showing the boundaries of individual properties and streets or a map, drawing, chart, or plan showing the layout of a proposed

subdivision into lots, blocks, streets, parks, school sites, commercial or industrial sites, drainage ways, easements, alleys, which an applicant submits for approval and a copy of which he intends to record with the County Clerk of Denton County.

*Plat, final*, shall mean the map or plan of a proposed development submitted for approval by the Town Council, where required, prepared in accordance with the provisions of this chapter and requested to be filed with the County Clerk of Denton County.

*Plat, preliminary*, shall mean the initial map or plan of a proposed development showing the general layout of streets, blocks and lots, utility systems, and drainage systems.

*Right-of-way* shall mean a strip of land acquired by dedication, prescription or condemnation and intended to be occupied by a road, sidewalk, railroad, electric transmission facility, water mains, sewer mains, storm drainage or other similar facility. Rights-of-way intended for streets, sidewalks, water mains, sewer mains, or any other use involving maintenance by a public agency shall be dedicated to the public use by the plat applicant either by easement or in fee simple title.

*Streets and alleys* shall mean a way for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, throughway, road, avenue, boulevard, lane, alley, place or however otherwise designated. Town streets shall conform to the following classifications:

(1) Arterial streets and highways are those which are used primarily for higher speed and higher volume traffic. Routes for such streets shall provide for cross-town circulation and through-town movements.

(2) Collector streets are those which carry traffic from minor streets to the major system of arterial streets and highways, including the principal entrance, circulation streets of a residential development and streets for circulations within such a development of a residential subdivision.

(3) Minor streets are those, which are used primarily for access to abutting properties.

(4) Marginal access streets are minor streets located parallel to and adjacent to arterial streets and highways, providing access to abutting properties and protection from the traffic of the thoroughfares.

(5) Alleys are minor ways used primarily for access to abutting properties for vehicle service usually to the back or side of a property.

*Structural alterations* shall mean the installation or assembly of any new structural components, or any change to existing structural components, in a system, building or structure.

*Structure* shall mean anything constructed or erected, which requires location on the ground, or attached to something having a location on the ground, including, but not limited to, buildings of all types and ground signs, but exclusive of customary fences or boundary or retaining walls.

*Subdivision* shall mean dividing a tract in two (2) or more parts for the purpose of creating

**348**

lots, including an addition to the Town, to lay out suburban, building or other lots or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to the public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks or other parts. "Subdivision" refers to any division irrespective of whether the actual division is made by metes and bounds description in a deed of conveyance or a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A subdivision does not include a division of land into parts greater than five (5) acres, where each part has access and no public improvement is being dedicated.

## Sec. 4. Purpose.

The purpose of this ordinance is to set forth the procedures and standards for development of property, layout and design of subdivisions or real property within the corporate limits of the Town which are intended to promote the health, safety and general welfare of the Town and the safe, orderly, and healthful development of the Town.

## Sec. 5. Compliance required.

(a) Any owner of land who proposes the development of a lot or tract of land located within the corporate limits of the Town or ETJ or the subdivision of a lot or tract located in the corporate limits of the Town or ETJ shall have a plat of the lot or tract of land or subdivision prepared and approved in accordance with all Ordinances of the Town and recorded with the County Clerk of Denton County.

(b) Notwithstanding paragraph (a) above, a plat shall not be required where the development of the lot or tract of land is for the sole purpose of performing alteration(s) or improvements to an existing single-family residence or the auxiliary uses thereto. All such alterations or improvements must be permitted in compliance with all applicable codes and ordinances of the Town

(c) No Final Plat shall be approved within the Town of Lakewood Village or its extraterritorial jurisdiction until the applicant has made adequate provision for thoroughfares as shown on the Thoroughfare Plan (map) as approved by the Town. The Thoroughfare Plan is a guide for the roadway connections and types that will be needed in the future. Subject to Town Council, or designee approval, as long as the connection is made, whether or not it is close to the exact alignment shown on the Thoroughfare Plan, no Thoroughfare Plan amendment should be necessary. The design and construction of the proposed thoroughfare shall be in conformance with the Town's master plans for thoroughfares and with any adopted *Development Standards for Construction* (DSC), and shall be subject to approval by the Town Council, or designee. If a different roadway type is found to be adequate or if the connection is not proposed to be made, then the plat may not be approved unless the thoroughfare plan is amended. A Traffic Impact Analysis may be required prior to approval of the proposed amendment .

## Sec. 6. Extension of Subdivision Rules and Regulations, Building Standards and Construction Permits and Fees, and Uniform Codes to the Extraterritorial Jurisdiction.

This ordinance is hereby adopted under the authority of the Constitution and laws of the State of Texas, including Texas Local Government Code Chapter 212, and is being adopted after conducting a public hearing on the matter.

The Town Council hereby amends Ordinance 08-06, the Town of Lakewood Village Subdivision and Property Regulations by extending the application of the Town of Lakewood Village Subdivision and Property Regulations to the extraterritorial jurisdiction of the Town, as that area may exist from time to time. This ordinance shall be applicable to the filing of plats, the subdivision of land, and development of property within the corporate limits of the Town and its extraterritorial jurisdiction as they may exist from time to time adjusted.

All ordinances of the Town, including Ordinance 10-01, which by such ordinance(s) the Town Council has adopted and made applicable to the Town the uniform codes, including but not limited to those concerning and applicable to building, plumbing, mechanical, energy, fuel and gas, property maintenance, electrical, fire and all appendices thereto, and all ordinance(s) concerning and related to permits and permit fees for building and construction, shall be and are hereby amended to apply and extend all such ordinances and their provisions to the "ETJ" of the Town to the full extent as permitted by law.

The Town shall have all remedies and rights provided by Texas Local Government Code, Chapter 212, with regard to the control and approval of subdivisions and plats and property development both within the Town and within its ETJ to the full extent as permitted by law.

## ARTICLE II. PLATS

### DIVISION 1. GENERALLY

**Sec. 7. Fees.**

The applicant for approval of a preliminary plat, final plat, replat, amended plat, minor plat or modified final plat shall, upon submission of the plat application and all required documentation, pay a nonreturnable fee, as established by the Town Council, for the review and processing of the plat application. Upon approval of the final plat, replat, amended plat or final minor plat, the applicant shall pay an additional recording fee established by the county for recording the plat with the county clerk.

> Preliminary, Replat and Final Plat Review Fees. A preliminary plat, replat, and final plat review fee shall be paid to the Town upon the filing of the preliminary and final plat in accordance with the following schedule: $700 per plat plus $20.00 per lot.

**Sec. 8. Process for approval.**

(a) The plat shall be scheduled for consideration at the next regular meeting of the Town

Council.

(b) If the plat is disapproved by the Town Council, the applicant may correct the items of concern and resubmit the plat for approval one (1) time within six (6) months by paying one-half (1/2) of the original fee. If the plat is disapproved a second time or if a second request is not received within six (6) months of the first disapproval, the applicant will be required to repeat the plat application process from the beginning and pay all standard application fees.

(c) An applicant may withdraw his plat application from consideration at any time during the application process by filing a written notice of withdrawal with the Town. Upon filing the notice to withdraw, the Town shall discontinue processing the plat application. The applicant must file a written request to proceed with further consideration of the plat within six (6) months of withdrawal and the Town shall continue the application process. If the request to proceed with further consideration of the plat is filed more than six (6) months after filing the notice of withdrawal, the applicant shall be required to repeat the plat application process from the beginning and pay the standard application fees.

### Sec. 9. Requirements for approval of application by Town Council.

(a) Within thirty (30) days of the date that the application is deemed administratively complete, the Town Council shall approve a plat if it complies with the requirements of this chapter, the applicant is not in arrears in the payment of any debts owed the Town required by this chapter on a previous plat, it conforms to the general plan of the Town and its current and future streets, alleys, parks, playgrounds, and public utility facilities plans, and it conforms to the Town's general plan for the extension of roads, streets, and public highways, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities.

(b) A plat is considered approved by the Town Council unless it is disapproved within such thirty-day period.

### Sec. 10. Recordation.

(a) Preliminary plats are not recorded with the county clerk.

(b) Applicant shall record all plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(c) Applicant shall record all other plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(d) A final plat shall become null and void six (6) months after its approval by the Town Council, unless the final plat is filed and recorded in Denton County Clerk Real Property Records.

(e) A general development plan shall become null and void six (6) months after its approval by the City Council, unless the general development plan is filed and recorded in Denton County Clerk Real Property Records.

## Sec. 11. Approval of preliminary plats.

Approval of a preliminary plat shall be deemed to be an expression of approval to the layout submitted as a guide to the preparation of the final plat and shall not constitute approval of a final plat.

## DIVISION 2. PRELIMINARY PLATS

## Sec. 12. Form, contents and required documentation.

(a) Preliminary plats shall be filed with the town secretary. The town secretary shall stamp the following notice on the face of each preliminary plat: "Preliminary plat for inspection purposes only and in no way official or approved for record purposes and not approved for construction."

(b) When filing a preliminary plat application, it shall be accompanied by the following minimum documentation:

(1) Completed preliminary plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes; and

(6) Nonrefundable application fee, as established by the Town Council.

(c) Preliminary plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 200' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets);

(2) Boundary of the subject tract;

(3) All existing and/or proposed streets and alleys with street names, widths and relation to surrounding existing street patterns;

(4) Approximate width and depth of all proposed lots;

(5) Layout, in dotted lines, of all adjacent lots to the property being platted showing lot size, lot and block numbers, name of existing subdivision or property owner if undeveloped property;

(6) FEMA designated 100-year floodplain boundary;

(7) Date, scale, north point, and small scale location map;

(8) Name and address of all property owners of the property being platted;

(9) Name and address of engineer and surveyor; and

(10) Signed statement of the engineer and/or surveyor who prepared the preliminary plat indicating the records or survey from which the property description of the boundary of the proposed plat was developed.

(d) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Layout of all needed off-site utilities;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size of line, location of manholes and cleanouts;

(4) Drainage plan prepared in accordance with standard 100 year flood frequencies rainfalls which shows the overall analysis of the change of existing condition to fully developed condition and identify approximate location where water will exit the subdivision. Drainage plan shall show all contours for proposed development; and

(5) As-built drawings of existing structures, if applicable.

DIVISION 3. FINAL PLATS

**Sec. 13. Form, contents and required documentation.**

(a) Final plats are mandatory.

(b) In cases where a preliminary plat was previously approved, the final plat shall conform to the approved preliminary plat.

(c)      Final plats shall be filed with the City Secretary and shall be accompanied by the following minimum documentation:

(1) Completed final plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes;

(6) A statement on the plat application showing that all fees owed the Town on any prior projects has been paid in full at the time the application was filed; and

(7) Nonrefundable application fee, as established by the Town Council.

(d) Final plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 100' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets and an index sheet shall be drawn on a sheet twenty-four (24) inches by thirty-six (36) inches showing the entire property being platted);

(2) The shape and the exterior boundaries of the property being platted shall be indicated by the use of a distinctive and individual symbol;

(3) The length of all straight lines, deflection angles, radii, arcs, and central angles of all curves shall be given along the property lines of each street or tabulated on the same sheet showing all curve data with its symbol. All dimensions along the lines of each lot with the angles of intersections which they make with each other shall be indicated;

(4) The names of all adjoining subdivisions, the side lines of abutting lots, lot and block numbers, all in dotted lines, and where possible, accurate reference ties to at least two (2) adjacent recognized land corners shall be clearly indicated;

(5) The description and location of all survey monuments placed on the property being platted shall be indicated;

(6) A title shall be indicated, including the name of the property being platted, the name of the applicant and scale and location of the property being platted with reference to original surveys and a north point which may be magnetic or true north, with notation stating which.

(7) FEMA designated 100-year floodplain boundary, including finish floor elevation established a minimum of three feet above the calculated 100 year flood. A

surveyor's certificate shall be placed on the final plat as follows:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my personal supervision, in accordance with the Subdivision and Property Development Regulations of the Town of Lakewood Village, Texas.

_____
Signature

_____
Texas Reg. No.

(9) A certificate of ownership and of dedication of all streets, alleys, easements and lands to public use forever, signed and acknowledged before a notary public by the owner of the land, shall appear on the face of the map, containing complete and accurate description of the property being platted and the streets dedicated;

(10) The applicant will furnish the Town a copy of the dedication at the same time the final plat is submitted for approval; and

(11) The following certificate of approval by the Town Council shall be placed on the plat:

Approved this _____ day of _____, 20_____, by the Town Council of the Town of Lakewood Village, Texas.

_____
Mayor

_____
Town Secretary

(e) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Street layout and grades;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size and grade of lines, location of manholes and cleanouts, and lift station design;

(4) All drainage structure designs, analysis of as-is and full development for where the water exits the subdivision, analysis of all streets to determine if they meet drainage criteria, FEMA floodplain and floodway boundaries (if applicable), and letter(s) of

release from property owners affected by diversion of water (except for watercourse(s) designated on current Town topography maps); and

(5) As-built drawings of existing structures, if applicable.

## DIVISION 4. VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS[*]

### Sec. 15. Vacation of plats.

(a) Any plat, replat or amended plat previously recorded with the county clerk may be vacated by the property owner(s) at any time prior to the sale of any lot therein by filing a written signed and acknowledged instrument declaring the same to be vacated and recorded with the county clerk.

(b) If the one (1) or more lots have been sold, the plat, replat or amended plat may be vacated by the property owners by filing a written signed and acknowledged instrument with the town secretary. The vacating instrument must be approved by the Town Council in the same manner as the original plat, replat or amended plat. The Town Council shall disapprove the vacating instrument which abridges or destroys public rights in any of its public uses, improvements, streets, or alleys. Upon approval by the Town Council, the vacating instrument may be recorded with the county clerk and the vacated plat, replat or amended plat shall have no effect.

**State law reference(s)**--Vacating plats, V.T.C.A., Local Government Code § 212.013.

### Sec. 16. Replats without vacating preceding plat.

A replat may be recorded and controls over a previously recorded plat without vacation of that plat if the replat is signed and acknowledged by the owners of the property being platted, does not attempt to amend or remove any covenants or restrictions, and is approved, after a public hearing on the matter, by the Town Council.

### Sec. 17. Plat amendments or corrections.

(a) The Town Council may approve and issue an amended plat, which may be recorded with the county clerk and controls over the preceding plat without vacation of the plat, if the amended plat is signed by the applicant(s) and is solely for one (1) or more of the following purposes:

(1) To correct an error in a course or distance shown on the preceding plat;

(2) To add a course or distance that was omitted on the preceding plat;

(3) To correct an error in the description of the real property shown on the preceding plat;

---

[*]**State law reference**–Vacating plats, amending plats, etc., V.T.C.A. Local Government Code § 212.013 et seq.

**356**

(4) To indicate monuments set forth after death, disability, or retirement from practice of the engineer or surveyor responsible for setting monuments;

(5) To show the proper location or character of any monument which has been changed in location or character or which originally was shown incorrectly as to location or character on the preceding plat;

(6) To correct any other type of scrivener's or clerical error or omission previously approved by the planning and zoning commission and/or Town Council, including lot numbers, acreage, street names, and identification of adjacent recorded plats;

(7) To correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the other owners in the plat;

(8) To relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement;

(9) To relocate one (1) or more lot lines between one (1) or more adjacent lots where the owner(s) of all such lots join in the application for the plat amendment; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not increase the number of lots; or

(10) To make necessary changes to the preceding plat to create six (6) or fewer lots in the plat if the changes do not affect applicable zoning and other regulations of the Town, and the changes do not attempt to amend or remove any covenants or restrictions and the area covered by the changes is located in an area that the Town Council has approved, after a public hearing, as a residential improvement area.

(11) To replat one or more lots fronting on an existing street if the owners of all those lots join in the application for the amendment; the amendment does not attempt to remove recorded covenants or restrictions or increase the number of lots; and, the amendment does not create or require the creation of a new street or make necessary the extension of municipal facilities.

(b) Notice, a hearing, and the approval of other lot owners are not required for the approval and issuance of an amended plat.

## ARTICLE III. DEVELOPMENT PROCESS

### Sec. 18. Construction of infrastructure.

(a) Following approval of the final plat, the plat applicant shall submit full construction plans for all proposed infrastructure to be constructed for the platted property. Construction plans

submitted shall be in conformance with the approved plat. The Town engineer shall review the submitted plans for compliance with the construction standards adopted by the Town.

(b) Upon approval of construction plans by Town Council, the plat applicant and/or the plat applicant's contractor will provide written notification to the Town engineer of the intent to commence construction of the required infrastructure. No work may be performed unless written notification has been provided to the Town engineer. The written notification shall contain the following information:

(1) Name of the plat or subdivision;

(2) Plat applicant's name;

(3) Contractor's name, address and phone number;

(4) Type of construction to be performed; and

(5) Estimated value of construction contract.

(c) The Town engineer shall issue an acknowledgment of receipt of notification to the developer and/or his contractor.

**Sec. 19. Acceptance of infrastructure.**

(a) Upon completion of all required infrastructure, prior to the acceptance of the subdivision by the Town for maintenance, the applicant shall post, or cause to be posted, a maintenance bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form, to guarantee the maintenance of the construction for a period of one (1) year after its completion and acceptance by the Town. In lieu of a maintenance bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form. The actual value of the maintenance bond or letter of credit or cash bond shall be ten (10) percent of the full cost of the water and sewer system and fifteen (15) percent of the full cost of the cost of street and drainage construction, as determined by the estimate of construction costs.

(b) Upon receipt of the approved maintenance bond, irrevocable letter of credit or cash bond, the Town engineer shall issue a written letter of acceptance of the infrastructure and notify the building and development department that the subdivision has been accepted by the Town.

**Sec. 20. Building permits issued prior to completion of infrastructure.**

(a) In the event an applicant wishes to obtain building permits prior to acceptance of the subdivision by the Town, the applicant shall post with the Town a completion bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form for all construction included in the approved

construction plans that has not been completed. In lieu of a completion bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form.

(b) Under no circumstances shall building above the foundation be permitted until adequate fire protection is available. Adequate fire protection means:

(1) Town utilities are installed;

(2) Fire hydrants providing protection are operational; and

(3) Streets are open and drivable, street subgrades worked to proper compaction and base course installed, graded and leveled, to facilitate vehicle movement.

(c) After the plat has been recorded and the completion bond, irrevocable letter of credit or cash bond has been received and approved by the Town, the Town engineer shall notify the building and development department, by lot and block numbers, that building permits may be issued.

**Sec. 21. Agreements with the Town.**

(a) All agreements entered into between the Town and the developer and/or applicant, as a condition of plat approval, shall be recorded along with the final plat.

(b) The executed agreement shall be submitted to the Town Council in conjunction with the original drawings required for filing and recordation.

**ARTICLE IV. STANDARDS AND REQUIREMENTS**

DIVISION 1. GENERALLY

**Sec. 22. Lots and blocks.**

(a) All lots of the plat shall front on a dedicated street.

(b) In general, lots shall conform in width, depth, and area to the pattern already established in the adjacent areas, having due regard to the character of the neighborhood, its particular suitability for residential purposes, and also taking into consideration the natural topography of the ground, drainage, sanitary sewage facilities, and the proposed layout of the streets.

(c) Lots shall have the size, width measurements, front, rear, and side yard requirements required by the current Town Zoning Ordinance..

(d) The area of the lots shall be computed by taking the average width of the lot times the average depth of the lot measured from the street line to the rear lot line.

(e) All sidelines of lots shall be at right angles to straight street lines or radial to curved street lines, unless a variation from this rule would, in the opinion of the Town Council, produce a better lot plan and better utilize the proposed development.

**Sec. 23. Park sites.**

The Town Council shall consider offers of land for parks or playgrounds which conform to the current master plan adopted by the Town, provided such plan exists.

**Sec. 24. Use of Town condemnation authority.**

(a) Water and sewer mains, force mains and lift stations, streets and drainage ways shall be located in easements or rights-of-way secured and paid for by the applicant. Such easements shall be properly assigned to the Town before service is extended to the subdivision.

(b) In cases where easements cannot be secured by the applicant, the applicant may file a written petition with the Town engineer, accompanying the plat application, requesting that the Town Council utilize its condemnation authority. The written petition must satisfy all of the following criteria:

(1) The applicant must establish that clear evidence of public need exists;

(2) The applicant must establish that the proposed extension is in accordance with the current adopted master utility plan(s), if such plan(s) exists;

(3) The applicant must establish that the proposed extension will be able to serve other development areas;

(4) The applicant must agree to pay all costs of the condemnation; and

(5) The applicant must present written evidence that every practical attempt to secure the needed easements and/or right-of-way has been made by submitting the following:

    a. A condemnation appraisal by an independent appraiser as to the current market value and damages, if any, of acquiring the easement and/or right-of-way; and

    b. Documentation that a written offer has been made to purchase the easement and/or right-of-way for the appraised value and the offer was rejected.

(c) The petition shall be forwarded to the Town for review and recommendation and scheduled for consideration by the Town Council.

DIVISION 2. STREETS AND DRAINAGE

**Sec. 25. Streets.**

(a) Street widths in subdivisions shall conform to:

| Designation | Right-of-Way (feet) | Paving (feet) |
|---|---|---|
| A + major arterial | 110 | 86 |
| A major arterial | 110 | 90 |
| B + minor arterial | 90 | 66 |
| B minor arterial | 80 | 56 |
| C major collector | 70 | 44 |
| D minor collector | 60 | 38 |
| E minor local | 50 | 31 |

(b) Existing streets shall be continued where practical, as determined by the Town Council. Continuations of existing streets shall have the same or greater right-of-way, pavement widths, and composition as the existing streets being connected. Street names shall be continuous.

(c) All necessary street rights-of-way shall be dedicated as part of the platting process and shall be dedicated to the Town without cost.

(d) Dead-end streets may be platted where the land adjoining the plat has not been platted. In the event that such dead-end street exceeds one hundred fifty (150) feet in length or one (1) lot width, from the nearest street intersection, the street will be provided with a cul-de-sac, either permanent or temporary, having a minimum right-of-way radius of fifty (50) feet.

(e) Where dead-end streets are dictated by lot designs, such dead-end streets shall be provided with a permanent cul-de-sac having a minimum right-of-way radius of fifty (50) feet.

(f) No street intersection shall be designed having an inside angle of less than thirty (30) degrees between the two (2) intersecting street lines, nor more than one hundred fifty (150) degrees.

(g) Block lengths between intersecting cross streets or to the end of a cul-de-sac shall be no more than one thousand two hundred (1,200) feet.

(h) Streets, where practical, shall be designed and platted with appropriate regard to topographical features, i.e., creeks and drainage ways, wooded areas, etc., with the aim of creating desirable and attractive treatments of significant existing features. (Ord. No. 95-38, § I, 4-25-95). Private Streets shall not be allowed.

(i) Driveways; Any driveway or other common access to more than two residences which is not defined in Section 23(a), shall be considered a minor local road and shall conform to defined standards.

(j) Streets shall be concrete with a minimum thickness of 5" and shall meet current Town design standards as determined by the Town engineer.

## Sec. 26. Alleys, reserve strips.

(a) Alleys and/or easements shall be laid in the rear of lots fronting on adjoining streets where practicable. In residential subdivisions, the minimum width of right-of-way of an alley shall not be less than twenty (20) feet. All alleys shall be paved for the entire width of the right-of-way to the same specifications as minor residential streets. The rear or side line easement, where alleys are not provided, shall be a minimum of twenty (20) feet wide, arranged such that each lot shall have an equal ten-foot easement.

(b) No plat showing reserve strips of land controlling access to public ways or adjoining properties will be approved.

## Sec. 27. Drainage in special flood hazard areas.

Drainage structures in areas of special flood hazard in the Town shall comply with the provisions of the Town Ordinances.

## Sec. 28. Drainage not in special flood hazard areas.

(a) Design of all improved open drainage courses and enclosed drainage structures shall be by a registered professional engineer in accordance with the current drainage design standards approved by the Town Council. A review of the downstream drainage system capacity to a point of discharge into the lake area shall be made. The rate of storm water discharge from the proposed development shall not exceed flow capacity of any existing structure or drainage system. This may require storm water detention or retention on site of the project.

(b) The design and construction of all improved open drainage courses and enclosed drainage structures shall provide for adequate access for the performance of necessary maintenance by the Town.

(c) All improved drainage courses and enclosed drainage structures shall be dedicated to the Town and accepted for maintenance by the Town upon approval of the construction by the Town engineer.

(d) The Town shall maintain all improved drainage courses, provided that the original design and construction has been approved by the Town engineer and accepted by the Town for maintenance.

(e) Improved open drainage courses shall conform as follows:
   (1) Open drainage courses which carries runoff from a street, between two (2) lots, to a drainage course running behind lots shall be a concrete-lined flume.

   (2) Open drainage courses running behind lots may be of earthen channel or concrete-lined channel, provided the type of channel used satisfies the design criteria (velocity, type of soil, etc.) in accordance with the current drainage design standards approved by the Town Council.

(3) Where the open drainage course is a concrete-lined flume, the width of the easement shall be equal to the width of the flume. All other open drainage courses require the width of the easement to be equal to the width from top-of-bank to top-of-bank plus maintenance way needs as given in the drainage design standards.

(f) Enclosed drainage courses shall conform as follows:

(1) Cross drainage for right-of-way needs shall be designed to meet the same requirements as its channel.

(2) Permanent structures and improvements may be constructed upon and across improved enclosed drainage courses in business zoning districts and manufacturing zoning districts. Design shall be to accommodate the 100-year frequency flood.

(3) The width to the easement shall be equal to the width of the structure plus a width on each side of the structure to allow maintenance and/or repairs.

**Sec. 29. Street name signs.**

Street name signs and markers and traffic control signs, in accordance with standards adopted by the Town, will be required at each intersection. The developer will provide street signs and posts for the markers and make the installations when the subdivision is accepted by the Town for maintenance.

DIVISION 3. WATER AND SEWER INFRASTRUCTURE

**Sec. 30. General Provisions.**

(a) The intent and purpose of this division is to provide equitable charges for water and sewer connections as a proportionate distribution of the cost of the water and sewer main extensions to serve property within the Town. If the existing Town utility facilities are not within or adjacent to a subdivision, the developer shall construct the necessary extension of water and sewer mains, force mains, force mains, and lift stations, including all valves, manholes, and piping necessary to serve any future development of abutting property as specified in this chapter. The developer's engineer shall prepare a proposed plan of service for the subdivision and property along the extension which shall be reviewed by the Town engineer. These facilities shall be constructed in accordance with both the master plan and the Technical and Administrative Manual for Water and Sewer System Development ("Manual").

(b) It is the general policy of the Town that:

(1) Water and sewer mains should be large enough to serve all the lots platted and, should the Town determine oversizing is necessary, the Town may participate in those lines greater than 8" for water and greater than 10" for sewer.

(2) All utilities shall be required to extend across the full width of the last lot platted on each street proposed within the subdivision, in such an alignment that it can be extended to the next property in accordance with the master sewer and water plans for the Town, provided such plan(s) exist. Properties already served by water and sewer shall not be required to install additional facilities unless:

(I) The current lines are not of adequate capacity to serve the proposed development; in which case the applicant will be required to install adequate facilities.

(c) Every lot of the plat shall have direct access to the water and sewer system. Utility service shall be from a water/sewer main located in an abutting right-of-way or through easements from the lot to a water/sewer main.

(e) (1) The terms of this division shall be cumulative of all other ordinances regulating subdivisions, and such other ordinances are not repealed by this division, except to the extent that such other provisions conflict with the terms of this chapter, in which event this chapter shall prevail.

(2) The status of any previously designated line extension, lift station, or main shall be unaffected by this ordinance, save and except the Clear Creek pro rata line, designated in CCM #95-121R. The Clear Creek pro rata line designation is hereby rescinded.

(f) In addition to any other remedy provided by law, the Town and its officers shall have the right to enjoin any violation of this chapter by injunction issued by a court of competent jurisdiction.

**Sec. 31. Water.**

(a) No water main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the water master plan, provided such plan exists.

(b) Water system layout shall be looped whenever possible. Dead-end mains shall not exceed one thousand eight hundred (1,800) feet or include three (3) fire hydrants. Single feeds may be permitted at the discretion of the Town engineer; however, any such denial may be appealed to the Town Council. Single feeds should include provisions for looping in future development.

(c) The location of fire hydrant(s) shall comply with and be approved by the Town Engineer and/or Fire Marshall and insurance requirements.

(d) Long water service taps shall be installed while the subdivision is being developed. Short water service taps shall be installed when needed for development. Long water service taps locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of

each water tap. No water service taps smaller than six (6) inches in diameter shall be allowed on water mains larger than twelve (12) inches in diameter.

**Sec. 32. Sewer.**

(a) No sewer main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the sewer master plan, provided such plan exists.

(b) Manholes are required any time the alignment, slope, or diameter of the sewer main changes, or when two or more sewer mains intersect. In no case will the maximum spacing between manholes, or from a manhole to cleanout, exceed 500 feet.

(c) Sewer services for sewer mains located in roadways shall be installed while the subdivision is being developed. Sewer services with direct access to the sewer main without encroaching on a roadway may be installed when needed for development. Sewer tap locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. Sewer services six (6) inches and larger require a manhole where they intersect the sewer main. The sewer service shall extend a minimum of ten feet (10') into the lot area.

(d) Minimum lift station capacity shall be one hundred (100) gallons per minute and shall have at least two (2) pumps, each of which shall be capable of pumping the design capacity of the lift station. The minimum size of the wet well shall be such that with any combination of inflow and pumping, the cycle of operation for each pump shall not be less than five (5) minutes and the maximum retention time in the wet well shall not average more than thirty (30) minutes.

(e) Septic system holding tanks or any other sewage retainage facilities for the storage or removal of sewage are prohibited.

**Sec. 33. Costs of Extensions.**

a. *Developer initiated.* All costs of all water and sewer main extensions, force mains, and lift stations initiated by a developer in order to provide required service for their development area, shall be paid for by the developer. Such costs may include; but is not necessarily limited to, right-of-way acquisition, pipes, motors, pumps, engineering, construction costs, inspection fees, and all weather access.

In no event shall the Town pay for any costs associated with water and/or sewer improvements.

**Sec. 34. Use of Water and Sewer Tap Fees and Rate Revenues.**

Tap fees and rate revenues shall be set in an amount sufficient to maintain and operate the system, with due regard for anticipated needs to improve, update, construct, and maintain the

system.

## Sec. 35. Use of Town Condemnation Authority.

a. Water and sewer mains, force mains, and lift stations shall be located in easements, secured and paid for by the developer, and assigned to the Town before service is extended to the subdivision. For the Town to consider to using condemnation authority to assist a developer in extension of the system, the applicant must show clear evidence that every practical attempt to secure the easement has failed and there is a public need and interest for condemnation. Specific criteria and procedures shall be as stated in the manual.

b. Upon compliance with all procedures by the developer, the Town, at least 10 days prior to the hearing shall notify all property owners within the proposed easement and 200 feet therefrom. A hearing of facts by the Town Council is required. Determination of the Town Council shall be final.

## Sec. 36. Property Owners & Homeowner Associations

**Property Owners Associations or Homeowner Associations which require mandatory membership and who require mandatory fees, dues, levies, or monetary assessments are prohibited.**

## Sec. 37. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this Ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this Ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

## Sec. 38. Savings.

This Ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those Ordinances are in direct conflict with the provisions of this Ordinance; provided, however, that Ordinance No. 08-06 of the Town is hereby repealed, but provided that any complaint, action, cause of action, or claim which prior to the effective date of this Ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that Ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

## Sec. 39. Repealer.

Ordinance 02-05A, Ordinance 00-09, Ordinance 08-06, and Ordinance 11-11 are hereby

repealed.

## Sec. 40. Penalty.

Any person who should violate any provision of this Ordinance or should fail to comply herewith shall for each and every violation or noncompliance be deemed guilty of a misdemeanor and shall be fined not more than $2,000.00 (two thousand dollars) and each day such violation shall be permitted to exist shall be construed a separate offense.

## Sec. 41. Effective Date.

This Ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** the **13**th day of **June** , 2013

_____
Mike Schnittker, Mayor

ATTEST:

_____
Linda Asbell, Town Secretary



Town of Lakewood Village
Thoroughfare Plan

# Exhibit 29

STATE OF TEXAS      )

                    )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the 2006 International Residential Code, Chapter 1, Part 1, R101.1 – R114.2. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



**370**

# Part I—Administrative

## CHAPTER 1

# SCOPE AND ADMINISTRATION

**PART 1—SCOPE AND APPLICATION**

**SECTION R101**

**GENERAL**

**R101.1 Title.** These provisions shall be known as the *Residential Code for One- and Two-family Dwellings* of [NAME OF JURISDICTION], and shall be cited as such and will be referred to herein as "this code."

**R101.2 Scope.** The provisions of the *International Residential Code for One- and Two-family Dwellings* shall apply to the construction, *alteration*, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal and demolition of detached one- and two-family dwellings and townhouses not more than three stories above *grade plane* in height with a separate means of egress and their *accessory structures*.

**Exceptions:**

1. Live/work units complying with the requirements of Section 419 of the *International Building Code* shall be permitted to be built as one- and two-family *dwellings* or townhouses. Fire suppression required by Section 419.5 of the *International Building Code* when constructed under the *International Residential Code for One- and Two-family Dwellings* shall conform to Section P2904.

2. Owner-occupied lodging houses with five or fewer guestrooms shall be permitted to be constructed in accordance with the *International Residential Code for One- and Two-family Dwellings* when equipped with a fire sprinkler system in accordance with Section P2904.

**R101.3 Intent.** The purpose of this code is to establish minimum requirements to safeguard the public safety, health and general welfare through affordability, structural strength, means of egress facilities, stability, sanitation, light and ventilation, energy conservation and safety to life and property from fire and other hazards attributed to the built environment and to provide safety to fire fighters and emergency responders during emergency operations.

**SECTION R102**

**APPLICABILITY**

**R102.1 General.** Where there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable. Where, in any specific case, different sections of this code specify different materials, methods of construction or other requirements, the most restrictive shall govern.

**R102.2 Other laws.** The provisions of this code shall not be deemed to nullify any provisions of local, state or federal law.

**R102.3 Application of references.** References to chapter or section numbers, or to provisions not specifically identified by number, shall be construed to refer to such chapter, section

or provision of this code.

**R102.4 Referenced codes and standards.** The codes and standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference and as further regulated in Sections R102.4.1 and R102.4.2.

**Exception:** Where enforcement of a code provision would violate the conditions of the *listing* of the *equipment* or *appliance*, the conditions of the *listing* and manufacturer's instructions shall apply.

**R102.4.1 Differences.** Where differences occur between provisions of this code and referenced codes and standards, the provisions of this code shall apply.

**R102.4.2 Provisions in referenced codes and standards.** Where the extent of the reference to a referenced code or standard includes subject matter that is within the scope of this code, the provisions of this code, as applicable, shall take precedence over the provisions in the referenced code or standard.

**R102.5 Appendices.** Provisions in the appendices shall not apply unless specifically referenced in the adopting ordinance.

**R102.6 Partial invalidity.** In the event any part or provision of this code is held to be illegal or void, this shall not have the effect of making void or illegal any of the other parts or provisions.

**R102.7 Existing structures.** The legal occupancy of any structure existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, the *International Property Maintenance Code* or the *International Fire Code*, or as is deemed necessary by the *building official* for the general safety and welfare of the occupants and the public.

**R102.7.1 Additions, alterations or repairs.** *Additions, alterations* or repairs to any structure shall conform to the requirements for a new structure without requiring the existing structure to comply with all of the requirements of this code, unless otherwise stated. *Additions, alterations* or repairs shall not cause an existing structure to become unsafe or adversely affect the performance of the building.

# PART 2—ADMINISTRATION AND ENFORCEMENT
# SECTION R103
# DEPARTMENT OF BUILDING SAFETY

**R103.1 Creation of enforcement agency.** The department of building safety is hereby created and the official in charge thereof shall be known as the *building official.*

**R103.2 Appointment.** The *building official* shall be appointed by the chief appointing authority of the *jurisdiction.*

**R103.3 Deputies.** In accordance with the prescribed procedures of this *jurisdiction* and with the concurrence of the appointing authority, the *building official* shall have the authority to appoint a deputy *building official*, the related technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as delegated by the *building official.*

## SECTION R104
## DUTIES AND POWERS OF THE BUILDING OFFICIAL

**R104.1 General.** The *building official* is hereby authorized and directed to enforce the provisions of this code. The *building official* shall have the authority to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions. Such interpretations, policies and procedures shall be in conformance with the intent and purpose of this code. Such policies and procedures shall not have the effect of waiving requirements specifically provided for in this code.

**R104.2 Applications and permits.** The *building official* shall receive applications, review *construction documents* and issue permits for the erection and alteration of buildings and structures, inspect the premises for which such permits have been issued and enforce compliance with the provisions of this code.

**R104.3 Notices and orders.** The *building official* shall issue all necessary notices or orders to ensure compliance with this code.

**R104.4 Inspections.** The *building official* is authorized to make all of the required inspections, or the *building official* shall have the authority to accept reports of inspection by *approved agencies* or individuals. Reports of such inspections shall be in writing and be certified by a responsible officer of such *approved* agency or by the responsible individual. The *building official* is authorized to engage such expert opinion as deemed necessary to report upon unusual technical issues that arise, subject to the approval of the appointing authority.

**R104.5 Identification.** The *building official* shall carry proper identification when inspecting structures or premises in the performance of duties under this code.

**R104.6 Right of entry.** Where it is necessary to make an inspection to enforce the provisions of this code, or where the *building official* has reasonable cause to believe that there exists in a structure or upon a premises a condition which is contrary to or in violation of this code which makes the structure or premises unsafe, dangerous or hazardous, the *building official* or designee is authorized to enter the structure or premises at reasonable times to inspect or to perform the duties imposed by this code, provided that if such structure or premises be occupied that credentials be presented to the occupant and entry requested. If such structure or premises be unoccupied, the *building official* shall first make a reasonable effort to locate the owner or other person having charge or control of the structure or premises and request entry. If entry is refused, the *building official* shall have recourse to the remedies provided by law to secure entry.

**R104.7 Department records.** The *building official* shall keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued. Such records shall be retained in the official records for the period required for the retention of public records.

**R104.8 Liability.** The *building official*, member of the board

of appeals or employee charged with the enforcement of this code, while acting for the *jurisdiction* in good faith and without malice in the discharge of the duties required by this code or other pertinent law or ordinance, shall not thereby be rendered liable personally and is hereby relieved from personal liability for any damage accruing to persons or property as a result of any act or by reason of an act or omission in the discharge of official duties. Any suit instituted against an officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by legal representative of the *jurisdiction* until the final termination of the proceedings. The *building official* or any subordinate shall not be liable for cost in any action, suit or proceeding that is instituted in pursuance of the provisions of this code.

**R104.9 Approved materials and equipment.** Materials, *equipment* and devices *approved* by the *building official* shall be constructed and installed in accordance with such approval.

**R104.9.1 Used materials and equipment.** Used materials, *equipment* and devices shall not be reused unless *approved* by the *building official*.

**R104.10 Modifications.** Wherever there are practical difficulties involved in carrying out the provisions of this code, the *building official* shall have the authority to grant modifications for individual cases, provided the *building official* shall first find that special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and purpose of this code and that such modification does not lessen health, life and fire safety or structural requirements. The details of action granting modifications shall be recorded and entered in the files of the department of building safety.

**R104.10.1 Flood hazard areas.** The *building official* shall not grant modifications to any provision related to flood hazard areas as established by Table R301.2(1) without the granting of a variance to such provisions by the board of appeals.

**R104.11 Alternative materials, design and methods of construction and equipment.** The provisions of this code are not intended to prevent the installation of any material or to prohibit any design or method of construction not specifically prescribed by this code, provided that any such alternative has been *approved*. An alternative material, design or method of construction shall be *approved* where the *building official* finds that the proposed design is satisfactory and complies with the intent of the provisions of this code, and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed in this code. Compliance with the specific performance-based provisions of the International Codes in lieu of specific requirements of this code shall also be permitted as an alternate.

**R104.11.1 Tests.** Whenever there is insufficient evidence

of compliance with the provisions of this code, or evidence that a material or method does not conform to the requirements of this code, or in order to substantiate claims for alternative materials or methods, the *building official* shall have the authority to require tests as evidence of compliance to be made at no expense to the *jurisdiction*. Test methods shall be as specified in this code or by other recognized test standards. In the absence of recognized and accepted test methods, the *building official* shall approve the testing procedures. Tests shall be performed by an *approved* agency. Reports of such tests shall be retained by the *building official* for the period required for retention of public records.

## SECTION R105
## PERMITS

**R105.1 Required.** Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, shall first make application to the *building official* and obtain the required *permit*.

**R105.2 Work exempt from permit.** *Permits* shall not be required for the following. Exemption from *permit* requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this *jurisdiction*.

**Building:**

1. One-story detached *accessory structures* used as tool and storage sheds, playhouses and similar uses, provided the floor area does not exceed 200 square feet (18.58 m2).

2. Fences not over 7 feet (2134 mm) high.

3. Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge.

4. Water tanks supported directly upon *grade* if the capacity does not exceed 5,000 gallons (18 927 L) and the ratio of height to diameter or width does not exceed 2 to 1.

5. Sidewalks and driveways.

6. Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

7. Prefabricated swimming pools that are less than 24 inches (610 mm) deep.

8. Swings and other playground equipment.

9. Window awnings supported by an exterior wall which do not project more than 54 inches (1372 mm) from the exterior wall and do not require additional support.

10. Decks not exceeding 200 square feet (18.58 m2) in area, that are not more than 30 inches (762 mm) above *grade* at any point, are not attached to a *dwelling* and do not serve the exit door required by

Section R311.4.

**Electrical:**

1. *Listed* cord-and-plug connected temporary decorative lighting.

2. Reinstallation of attachment plug receptacles but not the outlets therefor.

3. Replacement of branch circuit overcurrent devices of the required capacity in the same location.

4. Electrical wiring, devices, *appliances,* apparatus or *equipment* operating at less than 25 volts and not capable of supplying more than 50 watts of energy.

5. Minor repair work, including the replacement of lamps or the connection of *approved* portable electrical *equipment* to *approved* permanently installed receptacles.

**Gas:**

1. Portable heating, cooking or clothes drying *appliances.*

2. Replacement of any minor part that does not alter approval of *equipment* or make such *equipment* unsafe.

3. Portable-fuel-cell *appliances* that are not connected to a fixed piping system and are not interconnected to a power grid.

**Mechanical:**

1. Portable heating *appliances.*

2. Portable ventilation *appliances.*

3. Portable cooling units.

4. Steam, hot- or chilled-water piping within any heating or cooling *equipment* regulated by this code.

5. Replacement of any minor part that does not alter approval of *equipment* or make such *equipment* unsafe.

6. Portable evaporative coolers.

7. Self-contained refrigeration systems containing 10 pounds (4.54 kg) or less of refrigerant or that are actuated by motors of 1 horsepower (746 W) or less.

8. Portable-fuel-cell *appliances* that are not connected to a fixed piping system and are not interconnected to a power grid.

The stopping of leaks in drains, water, soil, waste or vent pipe; provided, however, that if any concealed trap, drainpipe, water, soil, waste or vent pipe becomes defective and it becomes necessary to remove and replace the same with new material, such work shall be considered as new work and a *permit* shall be obtained and inspection made as provided in this code.

The clearing of stoppages or the repairing of leaks in pipes, valves or fixtures, and the removal and reinstallation of water closets, provided such repairs do not involve or require the replacement or rearrangement of valves, pipes or fixtures.

**R105.2.1 Emergency repairs.** Where *equipment* replacements and repairs must be performed in an emergency situation, the *permit* application shall be submitted within the

next working business day to the *building official*.

**R105.2.2 Repairs.** Application or notice to the *building official* is not required for ordinary repairs to structures, replacement of lamps or the connection of *approved* portable electrical *equipment* to *approved* permanently installed receptacles. Such repairs shall not include the cutting away of any wall, partition or portion thereof, the removal or cutting of any structural beam or load-bearing support, or the removal or change of any required means of egress, or rearrangement of parts of a structure affecting the egress requirements; nor shall ordinary repairs include *addition* to, *alteration* of, replacement or relocation of any water supply, sewer, drainage, drain leader, gas, soil, waste, vent or similar piping, electric wiring or mechanical or other work affecting public health or general safety.

**R105.2.3 Public service agencies.** A *permit* shall not be required for the installation, alteration or repair of generation, transmission, distribution, metering or other related *equipment* that is under the ownership and control of public service agencies by established right.

**R105.3 Application for permit.** To obtain a *permit*, the applicant shall first file an application therefor in writing on a form furnished by the department of building safety for that purpose. Such application shall:

1. Identify and describe the work to be covered by the *permit* for which application is made.

2. Describe the land on which the proposed work is to be done by legal description, street address or similar description that will readily identify and definitely locate the proposed building or work.

3. Indicate the use and occupancy for which the proposed work is intended.

4. Be accompanied by *construction documents* and other information as required in Section R106.1.

5. State the valuation of the proposed work.

6. Be signed by the applicant or the applicant's authorized agent.

7. Give such other data and information as required by the *building official*.

**R105.3.1 Action on application.** The *building official* shall examine or cause to be examined applications for permits and amendments thereto within a reasonable time after filing. If the application or the *construction documents* do not conform to the requirements of pertinent laws, the *building official* shall reject such application in writing stating the reasons therefor. If the *building official* is satisfied that the proposed work conforms to the requirements of this code and laws and ordinances applicable thereto, the *building official* shall issue a *permit* therefor as soon as practicable.

**R105.3.1.1 Determination of substantially improved or substantially damaged existing buildings in flood hazard areas.** For applications for reconstruction, rehabilitation, *addition* or other improvement of existing buildings or structures located in a flood hazard area as established by Table R301.2(1), the *building*

*official* shall examine or cause to be examined the *construction documents* and shall prepare a finding with regard to the value of the proposed work. For buildings that have sustained damage of any origin, the value of the proposed work shall include the cost to repair the building or structure to its predamaged condition. If the *building official* finds that the value of proposed work equals or exceeds 50 percent of the market value of the building or structure before the damage has occurred or the improvement is started, the finding shall be provided to the board of appeals for a determination of substantial improvement or substantial damage. Applications determined by the board of appeals to constitute substantial improvement or substantial damage shall require all existing portions of the entire building or structure to meet the requirements of Section R322.

**R105.3.2 Time limitation of application.** An application for a *permit* for any proposed work shall be deemed to have been abandoned 180 days after the date of filing unless such application has been pursued in good faith or a *permit* has been issued; except that the *building official* is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.4 Validity of permit.** The issuance or granting of a *permit* shall not be construed to be a *permit* for, or an *approval* of, any violation of any of the provisions of this code or of any other ordinance of the *jurisdiction*. Permits presuming to give authority to violate or cancel the provisions of this code or other ordinances of the *jurisdiction* shall not be valid. The issuance of a *permit* based on *construction documents* and other data shall not prevent the *building official* from requiring the correction of errors in the *construction documents* and other data. The *building official* is also authorized to prevent occupancy or use of a structure where in vio

lation of this code or of any other ordinances of this *jurisdiction*.

**R105.5 Expiration.** Every *permit* issued shall become invalid unless the work authorized by such *permit* is commenced within 180 days after its issuance, or if the work authorized by such *permit* is suspended or abandoned for a period of 180 days after the time the work is commenced. The *building official* is authorized to grant, in writing, one or more extensions of time, for periods not more than 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.6 Suspension or revocation.** The *building official* is authorized to suspend or revoke a *permit* issued under the provisions of this code wherever the *permit* is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provisions of this code.

**R105.7 Placement of permit.** The building *permit* or copy thereof shall be kept on the site of the work until the completion

of the project.

**R105.8 Responsibility.** It shall be the duty of every person who performs work for the installation or repair of building, structure, electrical, gas, mechanical or plumbing systems, for which this code is applicable, to comply with this code.

**R105.9 Preliminary inspection.** Before issuing a *permit,* the *building official* is authorized to examine or cause to be examined buildings, structures and sites for which an application has been filed.

## SECTION R106
## CONSTRUCTION DOCUMENTS

**R106.1 Submittal documents.** Submittal documents consisting of *construction documents,* and other data shall be submitted in two or more sets with each application for a *permit.* The *construction documents* shall be prepared by a registered *design professional* where required by the statutes of the *jurisdiction* in which the project is to be constructed. Where special conditions exist, the *building official* is authorized to require additional *construction documents* to be prepared by a registered *design professional.*

**Exception:** The *building official* is authorized to waive the submission of *construction documents* and other data not required to be prepared by a registered *design professional* if it is found that the nature of the work applied for is such that reviewing of *construction documents* is not necessary to obtain compliance with this code.

**R106.1.1 Information on construction documents.** *Construction documents* shall be drawn upon suitable material. Electronic media documents are permitted to be submitted when *approved* by the *building official. Construction documents* shall be of sufficient clarity to indicate the location, nature and extent of the work proposed and show in detail that it will conform to the provisions of this code and relevant laws, ordinances, rules and regulations, as determined by the *building official.* Where required by the *building official,* all braced wall lines, shall be identified on the *construction documents* and all pertinent information including, but not limited to, bracing methods, location and length of braced wall panels, foundation requirements of braced wall panels at top and bottom shall be provided.

**R106.1.2 Manufacturer's installation instructions.** Manufacturer's installation instructions, as required by this code, shall be available on the job site at the time of inspection.

**R106.1.3 Information for construction in flood hazard areas.** For buildings and structures located in whole or in part in flood hazard areas as established by Table R301.2(1), *construction documents* shall include:

1. Delineation of flood hazard areas, floodway boundaries and flood zones and the design flood elevation, as appropriate;

2. The elevation of the proposed lowest floor, including *basement*; in areas of shallow flooding (AO Zones), the height of the proposed lowest floor, including *basement,* above the highest adjacent

*grade*;

3. The elevation of the bottom of the lowest horizontal structural member in coastal high hazard areas (V Zone); and

4. If design flood elevations are not included on the community's Flood Insurance Rate Map (FIRM), the *building official* and the applicant shall obtain and reasonably utilize any design flood elevation and floodway data available from other sources.

**R106.2 Site plan or plot plan.** The *construction documents* submitted with the application for *permit* shall be accompanied by a site plan showing the size and location of new construction and existing structures on the site and distances from *lot lines*. In the case of demolition, the site plan shall show construction to be demolished and the location and size of existing structures and construction that are to remain on the site or plot. The *building official* is authorized to waive or modify the requirement for a site plan when the application for permit is for alteration or repair or when otherwise warranted.

**R106.3 Examination of documents.** The *building official* shall examine or cause to be examined *construction documents* for code compliance.

**R106.3.1 Approval of construction documents.** When the *building official* issues a *permit*, the *construction documents* shall be *approved* in writing or by a stamp which states "REVIEWED FOR CODE COMPLIANCE." One set of *construction documents* so reviewed shall be retained by the *building official*. The other set shall be returned to the applicant, shall be kept at the site of work and shall be open to inspection by the *building official* or his or her authorized representative.

**R106.3.2 Previous approvals.** This code shall not require changes in the *construction documents*, construction or designated occupancy of a structure for which a lawful *permit* has been heretofore issued or otherwise lawfully authorized, and the construction of which has been pur

sued in good faith within 180 days after the effective date of this code and has not been abandoned.

**R106.3.3 Phased approval.** The *building official* is authorized to issue a *permit* for the construction of foundations or any other part of a building or structure before the *construction documents* for the whole building or structure have been submitted, provided that adequate information and detailed statements have been filed complying with pertinent requirements of this code. The holder of such *permit* for the foundation or other parts of a building or structure shall proceed at the holder's own risk with the building operation and without assurance that a *permit* for the entire structure will be granted.

**R106.4 Amended construction documents.** Work shall be installed in accordance with the *approved construction documents*, and any changes made during construction that are not in compliance with the *approved construction documents* shall be resubmitted for approval as an amended set of *construction documents*.

**R106.5 Retention of construction documents.** One set of *approved construction documents* shall be retained by the *building official* for a period of not less than 180 days from date of completion of the permitted work, or as required by state or local laws.

## SECTION R107
## TEMPORARY STRUCTURES AND USES

**R107.1 General.** The *building official* is authorized to issue a *permit* for temporary structures and temporary uses. Such permits shall be limited as to time of service, but shall not be permitted for more than 180 days. The *building official* is authorized to grant extensions for demonstrated cause.

**R107.2 Conformance.** Temporary structures and uses shall conform to the structural strength, fire safety, means of egress, light, ventilation and sanitary requirements of this code as necessary to ensure the public health, safety and general welfare.

**R107.3 Temporary power.** The *building official* is authorized to give permission to temporarily supply and use power in part of an electric installation before such installation has been fully completed and the final certificate of completion has been issued. The part covered by the temporary certificate shall comply with the requirements specified for temporary lighting, heat or power in NFPA 70.

**R107.4 Termination of approval.** The *building official* is authorized to terminate such *permit* for a temporary structure or use and to order the temporary structure or use to be discontinued.

## SECTION R108
## FEES

**R108.1 Payment of fees.** A *permit* shall not be valid until the fees prescribed by law have been paid. Nor shall an amendment to a *permit* be released until the additional fee, if any, has been paid.

**R108.2 Schedule of permit fees.** On buildings, structures, electrical, gas, mechanical and plumbing systems or *alterations* requiring a *permit*, a fee for each *permit* shall be paid as required, in accordance with the schedule as established by the applicable governing authority.

**R108.3 Building permit valuations.** Building *permit* valuation shall include total value of the work for which a *permit* is being issued, such as electrical, gas, mechanical, plumbing equipment and other permanent systems, including materials and labor.

**R108.4 Related fees.** The payment of the fee for the construction, alteration, removal or demolition for work done in connection with or concurrently with the work authorized by a building *permit* shall not relieve the applicant or holder of the *permit* from the payment of other fees that are prescribed by law.

**R108.5 Refunds.** The *building official* is authorized to establish a refund policy.

**R108.6 Work commencing before permit issuance.** Any person who commences work requiring a *permit* on a building, structure, electrical, gas, mechanical or plumbing system before obtaining the necessary permits shall be subject to a fee established by the applicable governing authority that

shall be in addition to the required *permit* fees.

## SECTION R109
## INSPECTIONS

**R109.1 Types of inspections.** For onsite construction, from time to time the *building official*, upon notification from the *permit* holder or his agent, shall make or cause to be made any necessary inspections and shall either approve that portion of the construction as completed or shall notify the *permit* holder or his or her agent wherein the same fails to comply with this code.

**R109.1.1 Foundation inspection.** Inspection of the foundation shall be made after poles or piers are set or trenches or *basement* areas are excavated and any required forms erected and any required reinforcing steel is in place and supported prior to the placing of concrete. The foundation inspection shall include excavations for thickened slabs intended for the support of bearing walls, partitions, structural supports, or *equipment* and special requirements for wood foundations.

**R109.1.2 Plumbing, mechanical, gas and electrical systems inspection.** Rough inspection of plumbing, mechanical, gas and electrical systems shall be made prior to covering or concealment, before fixtures or *appliances* are set or installed, and prior to framing inspection.

**Exception:** Backfilling of ground-source heat pump loop systems tested in accordance with Section M2105.1 prior to inspection shall be permitted.

**R109.1.3 Floodplain inspections.** For construction in flood hazard areas as established by Table R301.2(1), upon placement of the lowest floor, including *basement*, and prior to further vertical construction, the *building official* shall require submission of documentation, prepared

and sealed by a registered *design professional*, of the elevation of the lowest floor, including *basement*, required in Section R322.

**R109.1.4 Frame and masonry inspection.** Inspection of framing and masonry construction shall be made after the roof, masonry, all framing, firestopping, draftstopping and bracing are in place and after the plumbing, mechanical and electrical rough inspections are *approved*.

**R109.1.5 Other inspections.** In addition to the called inspections above, the *building official* may make or require any other inspections to ascertain compliance with this code and other laws enforced by the *building official*.

**R109.1.5.1 Fire-resistance-rated construction inspection.** Where fire-resistance-rated construction is required between *dwelling units* or due to location on property, the *building official* shall require an inspection of such construction after all lathing and/or wallboard is in place, but before any plaster is applied, or before wallboard joints and fasteners are taped and finished.

**R109.1.6 Final inspection.** Final inspection shall be made after the permitted work is complete and prior to occupancy.

**R109.1.6.1 Elevation documentation.** If located in a flood hazard area, the documentation of elevations required in Section R322.1.10 shall be submitted to the *building official* prior to the final inspection.

**R109.2 Inspection agencies.** The *building official* is authorized to accept reports of *approved* agencies, provided such agencies satisfy the requirements as to qualifications and reliability.

**R109.3 Inspection requests.** It shall be the duty of the *permit* holder or their agent to notify the *building official* that such work is ready for inspection. It shall be the duty of the person requesting any inspections required by this code to provide access to and means for inspection of such work.

**R109.4 Approval required.** Work shall not be done beyond the point indicated in each successive inspection without first obtaining the approval of the *building official*. The *building official* upon notification, shall make the requested inspections and shall either indicate the portion of the construction that is satisfactory as completed, or shall notify the *permit* holder or an agent of the *permit* holder wherein the same fails to comply with this code. Any portions that do not comply shall be corrected and such portion shall not be covered or concealed until authorized by the *building official*.

## SECTION R110
## CERTIFICATE OF OCCUPANCY

**R110.1 Use and occupancy.** No building or structure shall be used or occupied, and no change in the existing occupancy classification of a building or structure or portion thereof shall be made until the *building official* has issued a certificate of occupancy therefor as provided herein. Issuance of a certificate of occupancy shall not be construed as an approval of a violation of the provisions of this code or of other ordinances of the *jurisdiction*. Certificates presuming to give authority to violate or cancel the provisions of this code or other ordinances of the *jurisdiction* shall not be valid.

**Exceptions:**

1. Certificates of occupancy are not required for work exempt from permits under Section R105.2.
2. Accessory buildings or structures.

**R110.2 Change in use.** Changes in the character or use of an existing structure shall not be made except as specified in Sections 3408 and 3409 of the *International Building Code*.

**R110.3 Certificate issued.** After the *building official* inspects the building or structure and finds no violations of the provisions of this code or other laws that are enforced by the department of building safety, the *building official* shall issue a certificate of occupancy which shall contain the following:

1. The building *permit* number.
2. The address of the structure.
3. The name and address of the owner.
4. A description of that portion of the structure for which the certificate is issued.
5. A statement that the described portion of the structure has been inspected for compliance with the requirements of this code.
6. The name of the *building official*.
7. The edition of the code under which the *permit* was

issued.

8. If an automatic sprinkler system is provided and whether the sprinkler system is required.

9. Any special stipulations and conditions of the building *permit*.

**R110.4 Temporary occupancy.** The *building official* is authorized to issue a temporary certificate of occupancy before the completion of the entire work covered by the *permit*, provided that such portion or portions shall be occupied safely. The *building official* shall set a time period during which the temporary certificate of occupancy is valid.

**R110.5 Revocation.** The *building official* shall, in writing, suspend or revoke a certificate of occupancy issued under the provisions of this code wherever the certificate is issued in error, or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this code.

## SECTION R111
## SERVICE UTILITIES

**R111.1 Connection of service utilities.** No person shall make connections from a utility, source of energy, fuel or power to any building or system that is regulated by this code for which a *permit* is required, until *approved* by the *building official*. SCOPE AND ADMINISTRATION

8 2012 INTERNATIONAL RESIDENTIAL CODE®

**R111.2 Temporary connection.** The *building official* shall have the authority to authorize and approve the temporary connection of the building or system to the utility, source of energy, fuel or power.

**R111.3 Authority to disconnect service utilities.** The *building official* shall have the authority to authorize disconnection of utility service to the building, structure or system regulated by this code and the referenced codes and standards set forth in Section R102.4 in case of emergency where necessary to eliminate an immediate hazard to life or property or when such utility connection has been made without the approval required by Section R111.1 or R111.2. The *building official* shall notify the serving utility and whenever possible the owner and occupant of the building, structure or service system of the decision to disconnect prior to taking such action if not notified prior to disconnection. The owner or occupant of the building, structure or service system shall be notified in writing as soon as practical thereafter.

## SECTION R112
## BOARD OF APPEALS

**R112.1 General.** In order to hear and decide appeals of orders, decisions or determinations made by the *building official* relative to the application and interpretation of this code, there shall be and is hereby created a board of appeals. The *building official* shall be an ex officio member of said board but shall have no vote on any matter before the board. The board of appeals shall be appointed by the governing body and shall hold office at its pleasure. The board shall adopt rules of procedure for conducting its business, and shall render all decisions and findings in writing to the appellant with

a duplicate copy to the *building official*.

**R112.2 Limitations on authority.** An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or an equally good or better form of construction is proposed. The board shall have no authority to waive requirements of this code.

**R112.2.1 Determination of substantial improvement in flood hazard areas.** When the *building official* provides a finding required in Section R105.3.1.1, the board of appeals shall determine whether the value of the proposed work constitutes a substantial improvement. A substantial improvement means any repair, reconstruction, rehabilitation, *addition* or improvement of a building or structure, the cost of which equals or exceeds 50 percent of the market value of the building or structure before the improvement or repair is started. If the building or structure has sustained substantial damage, all repairs are considered substantial improvement regardless of the actual repair work performed. The term does not include:

1. Improvements of a building or structure required to correct existing health, sanitary or safety code violations identified by the *building official* and which are the minimum necessary to assure safe living conditions; or

2. Any alteration of an historic building or structure, provided that the alteration will not preclude the continued designation as an historic building or structure. For the purpose of this exclusion, an historic building is:

2.1. *Listed* or preliminarily determined to be eligible for *listing* in the National Register of Historic Places; or

2.2. Determined by the Secretary of the U.S. Department of Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined to qualify as an historic district; or

2.3. Designated as historic under a state or local historic preservation program that is *approved* by the Department of Interior.

**R112.2.2 Criteria for issuance of a variance for flood hazard areas.** A variance shall be issued only upon:

1. A showing of good and sufficient cause that the unique characteristics of the size, configuration or topography of the site render the elevation standards in Section R322 inappropriate.

2. A determination that failure to grant the variance would result in exceptional hardship by rendering the *lot* undevelopable.

3. A determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

4. A determination that the variance is the minimum necessary to afford relief, considering the flood hazard.

5. Submission to the applicant of written notice specifying the difference between the design flood elevation and the elevation to which the building is to be built, stating that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced floor elevation, and stating that construction below the design flood elevation increases risks to life and property.

**R112.3 Qualifications.** The board of appeals shall consist of members who are qualified by experience and training to pass on matters pertaining to building construction and are not employees of the *jurisdiction*.

**R112.4 Administration.** The *building official* shall take immediate action in accordance with the decision of the board.

## SECTION R113
## VIOLATIONS

**R113.1 Unlawful acts.** It shall be unlawful for any person, firm or corporation to erect, construct, alter, extend, repair, move, remove, demolish or occupy any building, structure or

*equipment* regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

**R113.2 Notice of violation.** The *building official* is authorized to serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, moving, removal, demolition or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan *approved* thereunder, or in violation of a *permit* or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation.

**R113.3 Prosecution of violation.** If the notice of violation is not complied with in the time prescribed by such notice, the *building official* is authorized to request the legal counsel of the *jurisdiction* to institute the appropriate proceeding at law or in equity to restrain, correct or abate such violation, or to require the removal or termination of the unlawful occupancy of the building or structure in violation of the provisions of this code or of the order or direction made pursuant thereto.

**R113.4 Violation penalties.** Any person who violates a provision of this code or fails to comply with any of the requirements thereof or who erects, constructs, alters or repairs a building or structure in violation of the *approved construction documents* or directive of the *building official,* or of a *permit* or certificate issued under the provisions of this code, shall be subject to penalties as prescribed by law.

## SECTION R114
## STOP WORK ORDER

**R114.1 Notice to owner.** Upon notice from the *building official*

that work on any building or structure is being prosecuted contrary to the provisions of this code or in an unsafe and dangerous manner, such work shall be immediately stopped. The stop work order shall be in writing and shall be given to the owner of the property involved, or to the owner's agent or to the person doing the work and shall state the conditions under which work will be permitted to resume.

**R114.2 Unlawful continuance.** Any person who shall continue any work in or about the structure after having been served with a stop work order, except such work as that person is directed to perform to remove a violation or unsafe condition, shall be subject to penalties as prescribed by law.

STATE OF TEXAS     )

                             )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R308.6.5 of Chapter 3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



                                       *Linda Asbell*

                                       Linda Asbell, TRMC, Town Secretary

                                       Town of Lakewood Village

                                       Denton County

                                        State of Texas

**R308.6.5 Screens not required.** Screens shall not be required when fully tempered glass is used as single glazing or the inboard pane in multiple glazing and either of the following conditions are met:

1. Glass area 16 square feet (1.49 m2) or less. Highest point of glass not more than 12 feet (3658 mm) above a walking surface or other accessible area, nominal glass thickness not more than 3/16 inch (4.8 mm), and (for multiple glazing only) the other pane or panes **fully tempered**, laminated or wired glass.

2. Glass area greater than 16 square feet (1.49 m2). Glass sloped 30 degrees (0.52 rad) or less from vertical, and highest point of glass not more than 10 feet (3048 mm) above a walking surface or other accessible area.

STATE OF TEXAS   )
          )  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

  I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R308.4 of Chapter 3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

  I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

  In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**390**

R308.4 Hazardous locations.

The following shall be considered specific hazardous locations for the purposes of glazing:

1.  Glazing in swinging doors except jalousies.
2.  Glazing in fixed and sliding panels of sliding door assemblies and panels in sliding and bifold closet door assemblies.
3.  Glazing in storm doors.
4.  Glazing in all unframed swinging doors.
5.  Glazing in doors and enclosures for hot tubs, whirlpools, saunas, steam rooms, bathtubs and showers. Glazing in any part of a building wall enclosing these compartments where the bottom exposed edge of the glazing is less than 60 inches (1524 mm) measured vertically above any standing or walking surface.
6.  Glazing, in an individual fixed or operable panel adjacent to a door where the nearest vertical edge is within a 24-inch (610 mm) arc of the door in a closed position and whose bottom edge is less than 60 inches (1524 mm) above the floor or walking surface.
7.  Glazing in an individual fixed or operable panel, other than those locations described in Items 5 and 6 above, that meets all of the following conditions:
7.1.  Exposed area of an individual pane larger than 9 square feet (0.836 m2).
7.2.  Bottom edge less than 18 inches (457 mm) above the floor.
7.3.  Top edge more than 36 inches (914 mm) above the floor.
7.4.  One or more walking surfaces within 36 inches (914 mm) horizontally of the glazing.
8.  All glazing in railings regardless of an area or height above a walking surface. Included are structural baluster panels and nonstructural infill panels.
9.  Glazing in walls and fences enclosing indoor and outdoor swimming pools, hot tubs and spas where the bottom edge of the glazing is less than 60 inches (1524 mm) above a walking surface and within 60 inches (1524 mm) horizontally of the water's edge. This shall apply to single glazing and all panes in multiple glazing.
10.  Glazing adjacent to stairways, landings and ramps within 36 inches (914 mm) horizontally of a walking surface when the exposed surface of the glass is less than 60 inches (1524 mm) above the plane of the adjacent walking surface.
11.  Glazing adjacent to stairways within 60 inches (1524 mm) horizontally of the bottom tread of a stairway in any direction when the exposed surface of the glass is less than 60 inches (1524 mm) above the nose of the tread.

Exception: The following products, materials and uses are exempt from the above hazardous locations:
1.  Openings in doors through which a 3-inch (76 mm) sphere is unable to pass.
2.  Decorative glass in Items 1, 6 or 7.
3.  Glazing in Section R308.4, Item 6, when there is an intervening wall or other permanent barrier between the door and the glazing.
4.  Glazing in Section R308.4, Item 6, in walls perpendicular to the plane of the door in a closed position, other than the wall toward which the door swings when opened, or where access through the door is to a closet or storage area 3 feet (914 mm) or less in depth. Glazing in these applications shall comply with Section R308.4, Item 7.
5.  Glazing in Section R308.4, Items 7 and 10, when a protective bar is installed on the accessible side(s) of the glazing 36 inches ± 2 inches (914 mm ± 51 mm) above the floor. The bar shall be capable of withstanding a horizontal load of 50 pounds per linear foot (730 N/m) without contacting the glass and be a minimum of 1½ inches (38 mm) in height.
6.  Outboard panes in insulating glass units and other multiple glazed panels in Section R308.4, Item 7, when the bottom edge of the glass is 25 feet (7620 mm) or more above grade, a roof, walking surfaces, or other horizontal [within 45 degrees (0.79 rad) of horizontal] surface adjacent to the glass exterior.
7.  Louvered windows and jalousies complying with the requirements of Section R308.2.

8. Mirrors and other glass panels mounted or hung on a surface that provides a continuous backing support.

9. Safety glazing in Section R308.4, Items 10 and 11, is not required where:

9.1. The side of a stairway, landing or ramp has a guardrail or handrail, including balusters or in-fill panels, complying with the provisions of Sections 1013 and 1607.7 of the International Building Code; and

9.2. The plane of the glass is more than 18 inches (457 mm) from the railing; or

9.3. When a solid wall or panel extends from the plane of the adjacent walking surface to 34 inches (863 mm) to 36 inches (914 mm) above the floor and the construction at the top of that wall or panel is capable of withstanding the same horizontal load as the protective bar.

10. Glass block panels complying with Section R610.

STATE OF TEXAS        )

                                )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R331.5 of Chapter 3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



_Linda Asbell_

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**393**

Section 311.5 and all other stair requirements

**R311.5 Construction.**
**R311.5.1 Attachment.** Exterior landings, decks, balconies, stairs and similar facilities shall be positively anchored to the primary structure to resist both vertical and lateral forces or shall be designed to be self-supporting. Attachment shall not be accomplished by use of toenails or nails subject to withdrawal.

**R311.6 Hallways.** The minimum width of a hallway shall be not less than 3 feet (914 mm).

**R311.7 Stairways.**
**R311.7.1 Width.** Stairways shall not be less than 36 inches (914 mm) in clear width at all points above the permitted handrail height and below the required headroom height. Handrails shall not project more than 4.5 inches (114 mm) on either side of the stairway and the minimum clear width of the stairway at and below the handrail height, including treads and landings, shall not be less than $31_{1/2}$ inches (787 mm) where a handrail is installed on one side and 27 inches (698 mm) where handrails are provided on both sides.
**Exception:** The width of spiral stairways shall be in accordance with Section R311.7.10.1.

**R311.7.2 Headroom.** The minimum headroom in all parts of the stairway shall not be less than 6 feet 8 inches (2032 mm) measured vertically from the sloped line adjoining the tread nosing or from the floor surface of the landing or platform on that portion of the stairway.
**Exception:** Where the nosings of treads at the side of a flight extend under the edge of a floor opening through which the stair passes, the floor opening shall be allowed to project horizontally into the required headroom a maximum of $4_{3/4}$ inches (121 mm).

**R311.7.3 Vertical rise.** A flight of stairs shall not have a vertical rise larger than 12 feet (3658 mm) between floor levels or landings.

**R311.7.4 Walkline.** The walkline across winder treads shall be concentric to the curved direction of travel through the turn and located 12 inches (305 mm) from the side where the winders are narrower. The 12-inch (305 mm) dimension shall be measured from the widest point of the clear stair width at the walking surface of the winder. If winders are adjacent within the flight, the point of the widest clear stair width of the adjacent winders shall be used.

**R311.7.5 Stair treads and risers.** Stair treads and risers shall meet the requirements of this section. For the purposes of this section all dimensions and dimensioned surfaces shall be exclusive of carpets, rugs or runners.

**R311.7.5.1 Risers.** The maximum riser height shall be $7_{3/4}$ inches (196 mm). The riser shall be measured vertically between leading edges of the adjacent treads. The greatest riser height within any flight of stairs shall not

exceed the smallest by more than 3/8 inch (9.5 mm). Risers shall be vertical or sloped from the underside of the nosing of the tread above at an angle not more than 30 degrees (0.51 rad) from the vertical. Open risers are permitted provided that the opening between treads does not permit the passage of a 4-inch-diameter (102 mm) sphere.

**Exception:** The opening between adjacent treads is not limited on stairs with a total rise of 30 inches (762 mm) or less.

**R311.7.5.2 Treads.** The minimum tread depth shall be 10 inches (254 mm). The tread depth shall be measured horizontally between the vertical planes of the foremost projection of adjacent treads and at a right angle to the tread's leading edge. The greatest tread depth within any flight of stairs shall not exceed the smallest by more than 3/8 inch (9.5 mm).

**R311.7.5.2.1 Winder treads.** Winder treads shall have a minimum tread depth of 10 inches (254 mm) measured between the vertical planes of the foremost projection of adjacent treads at the intersections with the walkline. Winder treads shall have a minimum tread depth of 6 inches (152 mm) at any point within the clear width of the stair. Within any flight of stairs, the largest winder tread depth at the walkline shall not exceed the smallest winder tread by more than 3/8 inch (9.5 mm). Consistently shaped winders at the walkline shall be allowed within the same flight of stairs as rectangular treads and do not have to be within 3/8 inch (9.5 mm) of the rectangular tread depth.

**R311.7.5.3 Nosings.** The radius of curvature at the nosing shall be no greater than 9/16 inch (14 mm). A nosing not less than 3/4 inch (19 mm) but not more than 1 1/4 inches (32 mm) shall be provided on stairways with solid risers. The greatest nosing projection shall not exceed the smallest nosing projection by more than 3/8 inch (9.5 mm) between two stories, including the nosing at the level of floors and landings. Beveling of nosings shall not exceed 1/2 inch (12.7 mm).

**Exception:** A nosing is not required where the tread depth is a minimum of 11 inches (279 mm).

STATE OF TEXAS      )

                      )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R403.1.6 of Chapter 4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

Section 403.1.6 Anchor Bolts

**R403.1.6 Foundation anchorage.** Sill plates and walls supported directly on continuous foundations shall be anchored to the foundation in accordance with this section. Wood sole plates at all exterior walls on monolithic slabs, wood sole plates of *braced wall panels* at building interiors on monolithic slabs and all wood sill plates shall be anchored to the foundation with anchor bolts spaced a maximum of 6 feet (1829 mm) on center. Bolts shall be at least 1/2 inch (12.7 mm) in diameter and shall extend a minimum of 7 inches (178 mm) into concrete or grouted cells of concrete masonry units. A nut and washer shall be tightened on each anchor bolt. There shall be a minimum of two bolts per plate section with one bolt located not more than 12 inches (305 mm) or less than seven bolt diameters from each end of the plate section. Interior bearing wall sole plates on monolithic slab foundation that are not part of a *braced wall panel* shall be positively anchored with *approved* fasteners. Sill plates and sole plates shall be protected against decay and termites where required by Sections R317 and R318. Cold-formed steel framing systems shall be fastened to wood sill plates or anchored directly to the foundation as required in Section R505.3.1 or R603.3.1.

**Exceptions:**
1. Foundation anchorage, spaced as required to provide equivalent anchorage to 1/2-inch-diameter (12.7 mm) anchor bolts.
2. Walls 24 inches (610 mm) total length or shorter connecting offset *braced wall panels* shall be anchored to the foundation with a minimum of one anchor bolt located in the center third of the plate section and shall be attached to adjacent *braced wall panels* at corners as shown in item 8 of Table R602.3(1).
3. Connection of walls 12 inches (305 mm) total length or shorter connecting offset *braced wall panels* to the foundation without anchor bolts shall be permitted. The wall shall be attached to adjacent *braced wall panels* at corners as shown in item 8 of Table R602.3(1).

**R404.3 Wood sill plates.** Wood sill plates shall be a minimum of 2-inch by 4-inch (51 mm by 102 mm) nominal lumber.

Sill plate anchorage shall be in accordance with Sections R403.1.6 and R602.11.

STATE OF TEXAS )
                      )       **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

       I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R404 of Chapter 4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

       I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

       In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**399**

## SECTION R404
## FOUNDATION AND RETAINING WALLS

**R404.1 Concrete and masonry foundation walls.** Concrete foundation walls shall be selected and constructed in accordance with the provisions of Section R404.1.2. Masonry foundation walls shall be selected and constructed in accordance with the provisions of Section R404.1.1.

**R404.4 Retaining walls.** Retaining walls that are not laterally supported at the top and that retain in excess of 24 inches (610 mm) of unbalanced fill shall be designed to ensure stability against overturning, sliding, excessive foundation pressure and water uplift. Retaining walls shall be designed for a safety factor of 1.5 against lateral sliding and overturning.

STATE OF TEXAS     )

                       )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R602.3.2 of Chapter 6 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**401**

**R602.3.2 Top plate.** Wood stud walls shall be capped with a double top plate installed to provide overlapping at corners and intersections with bearing partitions. End joints in top plates shall be offset at least 24 inches (610 mm). Joints in plates need not occur over studs. Plates shall be not less than 2-inches (51 mm) nominal thickness and have a width at least equal to the width of the studs.

**STATE OF TEXAS** )

**COUNTY OF DENTON** )

**CERTIFICATE TO COPY OF PUBLIC RECORD**

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R602.10 of Chapter 6 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**403**

## R602.10 Wall bracing.

All exterior walls shall be braced in accordance with this section. In addition, interior braced wall lines shall be provided in accordance with Section R602.10.1.1. For buildings in Seismic Design Categories $D_0$, $D_1$ and $D_2$, walls shall be constructed in accordance with the additional requirements of Sections R602.10.9, R602.10.11, and R602.11.

STATE OF TEXAS      )

                             )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R703.7.4 and Section R703.7.4.1 of Chapter 7 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**405**

**R703.7.4 Anchorage.** Masonry veneer shall be anchored to the supporting wall studs with corrosion-resistant metal ties embedded in mortar or grout and extending into the veneer a minimum of 1 1/2 inches (38 mm), with not less than 5/8-inch (15.9 mm) mortar or grout cover to outside face. Masonry veneer shall conform to Table R703.7.4.

**R703.7.4.1 Size and spacing.** Veneer ties, if strand wire, shall not be less in thickness than No. 9 U.S. gage [(0.148 inch) (4 mm)] wire and shall have a hook embedded in the mortar joint, or if sheet metal, shall be not less than No. 22 U.S. gage by [(0.0299 inch) (0.76 mm)] 7/8 inch (22 mm) corrugated. Each tie shall support support not more than 2.67 square feet (0.25 m2) of wall area and shall be spaced not more than 32 inches (813 mm) on center horizontally and 24 inches (635 mm) on center vertically.

**STATE OF TEXAS** )

**COUNTY OF DENTON** )

**CERTIFICATE TO COPY OF PUBLIC RECORD**

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R703.7.6 of Chapter 7 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



**R703.7.6 Weepholes.** Weepholes shall be provided in the outside wythe of masonry walls at a maximum spacing of 33 inches (838 mm) on center. Weepholes shall not be less than 3/16 inch (5 mm) in diameter.

STATE OF TEXAS   )
         )  **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON )

   I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R1003.4 of Chapter 10 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

   I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

   In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

         *Linda Asbell*
         Linda Asbell, TRMC, Town Secretary
         Town of Lakewood Village
         Denton County
         State of Texas





TOP OF CHIMNEY MUST BE AT LEAST 2 FT HIGHER THAN PEAK OR HIGHEST PORTION OF ROOF WITHIN 10 FT HORIZONTALLY.

3 FT MIN HEIGHT ABOVE ROOF WHERE CHIMNEY PENETRATES.

MIN. 4 IN. SOLID MASONRY

6 IN. MIN

MIN $^5/_8$ IN. FLUE LINER

METAL CLEANOUT DOOR (OPTIONAL)

UNDISTURBED SOIL BELOW FROST LINE

MIN 12 IN. THICK CONCRETE FOUNDATION

6 IN. MIN

6 IN. MIN

For SI: 1 inch = 25.4 mm, 1 foot = 304.8 mm.

**Figure R1003.2**
**TYPICAL MASONRY CHIMNEY**

**R1003.4 Seismic anchorage.** Masonry and concrete chimneys and foundations in Seismic Design Category $D_0$, $D_1$ or $D_2$ shall be anchored at each floor, ceiling or roof line more than 6 feet (1829 mm) above grade, except where constructed completely within the exterior walls. Anchorage shall conform to the requirements in Section R1003.4.1.

❖ Fireplaces and chimneys must be connected to floor and roof diaphragms to prevent overturning during earthquakes. Chimneys must be anchored at the ceiling line of roof and ceiling assemblies and at floor levels below the roof. Such anchorage is of lesser importance where the floor assembly is 6 feet (1829 mm) or less above grade.

**R1003.4.1 Anchorage.** Two $^3/_{16}$-inch by 1-inch (5 mm by 25 mm) straps shall be embedded a minimum of 12 inches (305 mm) into the chimney. Straps shall be hooked around the outer bars and extend 6 inches (152 mm) beyond the bend. Each strap shall be fastened to a minimum of four floor joists with two $^1/_2$-inch (13 mm) bolts.

❖ The prescriptive requirements in this section are traditional for typical fireplaces and chimneys. More substantial anchorage may be required in areas of high seismicity, for large fireplaces or where the distance between floor and roof diaphragms is large.

**R1003.5 Corbeling.** Masonry chimneys shall not be corbeled more than one-half of the chimney's wall thickness from a wall or foundation, nor shall a chimney be corbeled from a wall or foundation that is less than 12 inches (305 mm) thick unless it projects equally on each side of the wall, except that on the second story of a two-story dwelling, corbeling of chimneys on the exterior of the enclosing walls may equal the wall thickness. The projection of a single course shall not exceed one-half the unit height or one-third of the unit bed depth, whichever is less.

❖ Corbeling is the projection of masonry from the surface of the wall or fireplace in small increments for each course of masonry. The chimney should not be corbeled more than one-half of its wall thickness from the wall or foundation. A single course is not permitted

STATE OF TEXAS      )

                           )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**   )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 11 N1101.1 – N1101.3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**411**

# CHAPTER 11
# ENERGY EFFICIENCY

**N1101.1 Scope.** This chapter regulates the energy efficiency for the design and construction of buildings regulated by this code.

*Note: The text of the following Sections N1101.2 through N1105 is extracted from the 2012 edition of the* International Energy Conservation Code—Residential Provisions *and has been editorially revised to conform to the scope and application of this code. The section numbers appearing in parenthesis after each section number are the section numbers of the corresponding text in the* International Energy Conservation Code—Residential Provisions.

**N1101.2 (R101.3) Intent.** This code shall regulate the design and construction of buildings for the effective use and conservation of energy over the useful life of each building. This code is intended to provide flexibility to permit the use of innovative approaches and techniques to achieve this objective. This code is not intended to abridge safety, health or environmental requirements contained in other applicable codes or ordinances.

**N1101.3 (R101.4.3) Additions, alterations, renovations or repairs.** Additions, alterations, renovations or repairs to an existing building, building system or portion thereof shall conform to the provisions of this code as they relate to new construction without requiring the unaltered portion(s) of the existing building or building system to comply with this code. Additions, alterations, renovations or repairs shall not create an unsafe or hazardous condition or overload existing building systems. An addition shall be deemed to comply with this code if the addition alone complies or if the existing building and addition comply with this code as a single building.

**Exception:** The following need not comply provided the energy use of the building is not increased:

1. Storm windows installed over existing fenestration.

2. Glass only replacements in an existing sash and frame.

3. Existing ceiling, wall or floor cavities exposed during construction provided that these cavities are filled with insulation.

4. Construction where the existing roof, wall or floor cavity is not exposed.

5. Reroofing for roofs where neither the sheathing nor the insulation is exposed. Roofs without insulation in the cavity and where the sheathing or insulation is

exposed during reroofing shall be insulated either above or below the sheathing.

6. Replacement of existing doors that separate *conditioned space* from the exterior shall not require the installation of a vestibule or revolving door, provided, however, that an existing vestibule that separates a *conditioned space* from the exterior shall not be removed.

7. Alterations that replace less than 50 percent of the luminaires in a space, provided that such alterations do not increase the installed interior lighting power.

8. Alterations that replace only the bulb and ballast within the existing luminaires in a space provided that the *alteration* does not increase the installed interior lighting power.

STATE OF TEXAS     )

                   )    **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 15 M1507.4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

414

Exhaust Systems

**M1507.4 Local exhaust rates.** *Local exhaust* systems shall be designed to have the capacity to exhaust the minimum air flow rate determined in accordance with Table M1507.4.
**TABLE M1507.4**
**MINIMUM REQUIRED LOCAL EXHAUST RATES FOR ONE- AND TWO-FAMILY DWELLINGS**
For SI: 1 cubic foot per minute = 0.0004719 m3/s.
**AREA TO BE EXHAUSTED EXHAUST RATES**
Kitchens
100 cfm intermittent or 25 cfm continuous
Bathrooms-Toilet Rooms
Mechanical exhaust capacity of 50 cfm intermittent or 20 cfm continuous

STATE OF TEXAS    )

                         )        **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 31 P3101.1, P3101.1, P3112.1, and P3112.2 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


*Linda Asbell*

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**416**

## VENT SYSTEMS

**P3101.1 General.** This chapter shall govern the selection and installation of piping, tubing and fittings for vent systems. This chapter shall control the minimum diameter of vent pipes, circuit vents, branch vents and individual vents, and the size and length of vents and various aspects of vent stacks and stack vents. Additionally, this chapter regulates vent grades and connections, height above fixtures and relief vents for stacks

### SECTION P3104
### VENT CONNECTIONS AND GRADES

**P3104.1 Connection.** All individual branch and circuit vents shall connect to a vent stack, stack vent or extend to the open air.

**Exception:** Individual, branch and circuit vents shall be permitted to terminate at an *air admittance valve* in accordance with Section P3114.

Town Ordinance prohibits air admittance valves

### SECTION P3112
### ISLAND FIXTURE VENTING

**P3112.1 Limitation.** Island fixture venting shall not be permitted for fixtures other than sinks and lavatories. Kitchen sinks with a dishwasher waste connection, a food waste grinder, or both, in combination with the kitchen sink waste, shall be permitted to be vented in accordance with this section.

**P3112.2 Vent connection.** The island fixture vent shall connect to the *fixture drain* as required for an individual or common vent. The vent shall rise vertically to above the drainage outlet of the fixture being vented before offsetting horizontally or vertically downward. The vent or branch vent for multiple island fixture vents shall extend not less than 6 inches (152 mm) above the highest island fixture

**STATE OF TEXAS** )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3902.12 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**Definition- ARC-FAULT CIRCUIT INTERRUPTER.** A device
intended to provide protection from the effects of arc-faults
by recognizing characteristics unique to arcing and by functioning
to de-energize the circuit when an arc-fault is
detected.

**E3902.12 Arc-fault circuit-interrupter protection.** All
branch circuits that supply 120-volt, single-phase, 15- and
20-ampere outlets installed in family rooms, dining rooms,
living rooms, parlors, libraries, dens, bedrooms, sunrooms,
recreations rooms, closets, hallways and similar rooms or
areas shall be protected by a combination type arc-fault circuit
interrupter installed to provide protection of the branch
circuit.

STATE OF TEXAS     )

                      )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3907.2 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**420**

**Definition: WEATHERPROOF.** Constructed or protected so that exposure to the weather will not interfere with successful operation.

**E3907.2 Damp and wet locations.** In damp or wet locations, cabinets and panelboards of the surface type shall be placed or equipped so as to prevent moisture or water from entering and accumulating within the cabinet, and shall be mounted to provide an air-space not less than 1/4 inch (6.4 mm) between the enclosure and the wall or other supporting surface. Cabinets installed in wet locations shall be weatherproof. For enclosures in wet locations, raceways and cables entering above the level of uninsulated live parts shall be installed with fittings listed for wet locations.

STATE OF TEXAS )
                           )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3909.8 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


*Linda Asbell*
_____
Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**422**

## SECTION E3908

**E3908.8 Types of equipment grounding conductors.** The equipment grounding conductor run with or enclosing the circuit conductors shall be one or more or a combination of the following:

1. A copper, aluminum or copper-clad conductor. This conductor shall be solid or stranded; insulated, covered or bare; and in the form of a wire or a busbar of any shape.
2. Rigid metal conduit.
3. Intermediate metal conduit.
4. Electrical metallic tubing.
5. Armor of Type AC cable in accordance with Section E3908.4.

# Exhibit 30

STATE OF TEXAS      )

                            )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Article 250 of the 2005 National Electrical Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

*Linda Asbell*
_____
Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**425**

The neutral conductor shall have an ampacity of not less than the maximum current rating of the grounding impedance. In no case shall the neutral conductor be smaller than 8 AWG copper or 6 AWG aluminum or copper-clad aluminum.

**(C) System Neutral Connection.** The system neutral conductor shall not be connected to ground except through the grounding impedance.

> FPN: The impedance is normally selected to limit the ground-fault current to a value slightly greater than or equal to the capacitive charging current of the system. This value of impedance will also limit transient overvoltages to safe values. For guidance, refer to criteria for limiting transient overvoltages in ANSI/IEEE 142-1991, *Recommended Practice for Grounding of Industrial and Commercial Power Systems.*

**(D) Neutral Conductor Routing.** The conductor connecting the neutral point of the transformer or generator to the grounding impedance shall be permitted to be installed in a separate raceway. It shall not be required to run this conductor with the phase conductors to the first system disconnecting means or overcurrent device.

**(E) Equipment Bonding Jumper.** The equipment bonding jumper (the connection between the equipment grounding conductors and the grounding impedance) shall be an unspliced conductor run from the first system disconnecting means or overcurrent device to the grounded side of the grounding impedance.

**(F) Grounding Electrode Conductor Location.** The grounding electrode conductor shall be attached at any point from the grounded side of the grounding impedance to the equipment grounding connection at the service equipment or first system disconnecting means.

**(G) Equipment Bonding Jumper Size.** The equipment bonding jumper shall be sized in accordance with (1) or (2) as follows:

(1) Where the grounding electrode conductor connection is made at the grounding impedance, the equipment bonding jumper shall be sized in accordance with 250.66, based on the size of the service entrance conductors for a service or the derived phase conductors for a separately derived system.

(2) Where the grounding electrode conductor is connected at the first system disconnecting means or overcurrent device, the equipment bonding jumper shall be sized the same as the neutral conductor in 250.36(B).

### III. Grounding Electrode System and Grounding Electrode Conductor

**250.50 Grounding Electrode System.** All grounding electrodes as described in 250.52(A)(1) through (A)(6) that are present at each building or structure served shall be bonded together to form the grounding electrode system. Where none of these grounding electrodes exist, one or more of the grounding electrodes specified in 250.52(A)(4) through (A)(7) shall be installed and used.

*Exception: Concrete-encased electrodes of existing buildings or structures shall not be required to be part of the grounding electrode system where the steel reinforcing bars or rods are not accessible for use without disturbing the concrete.*

**250.52 Grounding Electrodes.**

**(A) Electrodes Permitted for Grounding.**

**(1) Metal Underground Water Pipe.** A metal underground water pipe in direct contact with the earth for 3.0 m (10 ft) or more (including any metal well casing effectively bonded to the pipe) and electrically continuous (or made electrically continuous by bonding around insulating joints or insulating pipe) to the points of connection of the grounding electrode conductor and the bonding conductors. Interior metal water piping located more than 1.52 m (5 ft) from the point of entrance to the building shall not be used as a part of the grounding electrode system or as a conductor to interconnect electrodes that are part of the grounding electrode system.

*Exception: In industrial and commercial buildings or structures where conditions of maintenance and supervision ensure that only qualified persons service the installation, interior metal water piping located more than 1.52 m (5 ft) from the point of entrance to the building shall be permitted as a part of the grounding electrode system or as a conductor to interconnect electrodes that are part of the grounding electrode system, provided that the entire length, other than short sections passing perpendicular through walls, floors, or ceilings, of the interior metal water pipe that is being used for the conductor is exposed.*

**(2) Metal Frame of the Building or Structure.** The metal frame of the building or structure, where any of the following methods are used to make an earth connection:

(1) 3.0 m (10 ft) or more of a single structural metal member in direct contact with the earth or encased in concrete that is in direct contact with the earth

(2) The structural metal frame is bonded to one or more of the grounding electrodes as defined in 250.52(A)(1), (A)(3), or (A)(4)

(3) The structural metal frame is bonded to one or more of the grounding electrodes as defined in 250.52(A)(5) or (A)(6) that comply with 250.56, or

(4) Other approved means of establishing a connection to earth.

**(3) Concrete-Encased Electrode.** An electrode encased by at least 50 mm (2 in.) of concrete, located within and near the bottom of a concrete foundation or footing that is in direct contact with the earth, consisting of at least 6.0 m (20 ft) of one or more bare or zinc galvanized or other electrically conductive coated steel reinforcing bars or rods of not less than 13 mm (½ in.) in diameter, or consisting of at least 6.0 m (20 ft) of bare copper conductor not smaller than 4 AWG. Reinforcing bars shall be permitted to be bonded together by the usual steel tie wires or other effective means.

**(4) Ground Ring.** A ground ring encircling the building or structure, in direct contact with the earth, consisting of at least 6.0 m (20 ft) of bare copper conductor not smaller than 2 AWG.

**(5) Rod and Pipe Electrodes.** Rod and pipe electrodes shall not be less than 2.5 m (8 ft) in length and shall consist of the following materials.

(a) Electrodes of pipe or conduit shall not be smaller than metric designator 21 (trade size ¾) and, where of iron or steel, shall have the outer surface galvanized or otherwise metal-coated for corrosion protection.

(b) Electrodes of rods of iron or steel shall be at least 15.87 mm (⅝ in.) in diameter. Stainless steel rods less than 16 mm (⅝ in.) in diameter, nonferrous rods, or their equivalent shall be listed and shall not be less than 13 mm (½ in.) in diameter.

**(6) Plate Electrodes.** Each plate electrode shall expose not less than 0.186 m² (2 ft²) of surface to exterior soil. Electrodes of iron or steel plates shall be at least 6.4 mm (¼ in.) in thickness. Electrodes of nonferrous metal shall be at least 1.5 mm (0.06 in.) in thickness.

**(7) Other Local Metal Underground Systems or Structures.** Other local metal underground systems or structures such as piping systems, underground tanks, and underground metal well casings that are not effectively bonded to a metal water pipe.

**(B) Electrodes Not Permitted for Grounding.** The following shall not be used as grounding electrodes:

(1) Metal underground gas piping system

(2) Aluminum electrodes

FPN: See 250.104(B) for bonding requirements of gas piping.

**250.53 Grounding Electrode System Installation.**

FPN: See 547.9 and 547.10 for special grounding and bonding requirements for agricultural buildings.

**(A) Rod, Pipe, and Plate Electrodes.** Where practicable, rod, pipe, and plate electrodes shall be embedded below permanent moisture level. Rod, pipe, and plate electrodes shall be free from nonconductive coatings such as paint or enamel.

**(B) Electrode Spacing.** Where more than one of the electrodes of the type specified in 250.52(A)(5) or (A)(6) are used, each electrode of one grounding system (including that used for air terminals) shall not be less than 1.83 m (6 ft) from any other electrode of another grounding system. Two or more grounding electrodes that are effectively bonded together shall be considered a single grounding electrode system.

**(C) Bonding Jumper.** The bonding jumper(s) used to connect the grounding electrodes together to form the grounding electrode system shall be installed in accordance with 250.64(A), (B), and (E), shall be sized in accordance with 250.66, and shall be connected in the manner specified in 250.70.

**(D) Metal Underground Water Pipe.** Where used as a grounding electrode, metal underground water pipe shall meet the requirements of 250.53(D)(1) and (D)(2).

**(1) Continuity.** Continuity of the grounding path or the bonding connection to interior piping shall not rely on water meters or filtering devices and similar equipment.

**(2) Supplemental Electrode Required.** A metal underground water pipe shall be supplemented by an additional electrode of a type specified in 250.52(A)(2) through (A)(7). Where the supplemental electrode is a rod, pipe, or plate type, it shall comply with 250.56. The supplemental electrode shall be permitted to be bonded to the grounding electrode conductor, the grounded service-entrance conductor, the nonflexible grounded service raceway, or any grounded service enclosure.

*Exception: The supplemental electrode shall be permitted to be bonded to the interior metal water piping at any convenient point as covered in 250.52(A)(1), Exception.*

**(E) Supplemental Electrode Bonding Connection Size.** Where the supplemental electrode is a rod, pipe, or plate electrode, that portion of the bonding jumper that is the sole connection to the supplemental grounding electrode shall not be required to be larger than 6 AWG copper wire or 4 AWG aluminum wire.

**(F) Ground Ring.** The ground ring shall be buried at a depth below the earth's surface of not less than 750 mm (30 in.).

**(G) Rod and Pipe Electrodes.** The electrode shall be installed such that at least 2.44 m (8 ft) of length is in contact with the soil. It shall be driven to a depth of not less than

2.44 m (8 ft) except that, where rock bottom is encountered, the electrode shall be driven at an oblique angle not to exceed 45 degrees from the vertical or, where rock bottom is encountered at an angle up to 45 degrees, the electrode shall be permitted to be buried in a trench that is at least 750 mm (30 in.) deep. The upper end of the electrode shall be flush with or below ground level unless the aboveground end and the grounding electrode conductor attachment are protected against physical damage as specified in 250.10.

**(H) Plate Electrode.** Plate electrodes shall be installed not less than 750 mm (30 in.) below the surface of the earth.

**250.54 Supplementary Grounding Electrodes.** Supplementary grounding electrodes shall be permitted to be connected to the equipment grounding conductors specified in 250.118 and shall not be required to comply with the electrode bonding requirements of 250.50 or 250.53(C) or the resistance requirements of 250.56, but the earth shall not be used as an effective ground-fault current path as specified in 250.4(A)(5) and 250.4(B)(4).

**250.56 Resistance of Rod, Pipe, and Plate Electrodes.** A single electrode consisting of a rod, pipe, or plate that does not have a resistance to ground of 25 ohms or less shall be augmented by one additional electrode of any of the types specified by 250.52(A)(2) through (A)(7). Where multiple rod, pipe, or plate electrodes are installed to meet the requirements of this section, they shall not be less than 1.8 m (6 ft) apart.

FPN: The paralleling efficiency of rods longer than 2.5 m (8 ft) is improved by spacing greater than 1.8 m (6 ft).

**250.58 Common Grounding Electrode.** Where an ac system is connected to a grounding electrode in or at a building or structure, the same electrode shall be used to ground conductor enclosures and equipment in or on that building or structure. Where separate services, feeders, or branch circuits supply a building and are required to be connected to a grounding electrode(s), the same grounding electrode(s) shall be used.

Two or more grounding electrodes that are effectively bonded together shall be considered as a single grounding electrode system in this sense.

**250.60 Use of Air Terminals.** Air terminal conductors and driven pipes, rods, or plate electrodes used for grounding air terminals shall not be used in lieu of the grounding electrodes required by 250.50 for grounding wiring systems and equipment. This provision shall not prohibit the required bonding together of grounding electrodes of different systems.

FPN No. 1: See 250.106 for spacing from air terminals. See 800.100(D), 810.21(J), and 820.100(D) for bonding of electrodes.

FPN No. 2: Bonding together of all separate grounding electrodes will limit potential differences between them and between their associated wiring systems.

**250.62 Grounding Electrode Conductor Material.** The grounding electrode conductor shall be of copper, aluminum, or copper-clad aluminum. The material selected shall be resistant to any corrosive condition existing at the installation or shall be suitably protected against corrosion. The conductor shall be solid or stranded, insulated, covered, or bare.

**250.64 Grounding Electrode Conductor Installation.** Grounding electrode conductors shall be installed as specified in 250.64(A) through (F).

**(A) Aluminum or Copper-Clad Aluminum Conductors.** Bare aluminum or copper-clad aluminum grounding conductors shall not be used where in direct contact with masonry or the earth or where subject to corrosive conditions. Where used outside, aluminum or copper-clad aluminum grounding conductors shall not be terminated within 450 mm (18 in.) of the earth.

**(B) Securing and Protection Against Physical Damage.** Where exposed, a grounding electrode conductor or its enclosure shall be securely fastened to the surface on which it is carried. A 4 AWG or larger copper or aluminum grounding electrode conductor shall be protected where exposed to physical damage. A 6 AWG grounding electrode conductor that is free from exposure to physical damage shall be permitted to be run along the surface of the building construction without metal covering or protection where it is securely fastened to the construction; otherwise, it shall be in rigid metal conduit, intermediate metal conduit, rigid nonmetallic conduit, electrical metallic tubing, or cable armor. Grounding electrode conductors smaller than 6 AWG shall be in rigid metal conduit, intermediate metal conduit, rigid nonmetallic conduit, electrical metallic tubing, or cable armor.

**(C) Continuous.** Grounding electrode conductor(s) shall be installed in one continuous length without a splice or joint except as permitted in (1) through (4):

(1) Splicing shall be permitted only by irreversible compression-type connectors listed as grounding and bonding equipment or by the exothermic welding process.

(2) Sections of busbars shall be permitted to be connected together to form a grounding electrode conductor.

(3) Bonding jumper(s) from grounding electrode(s) and grounding electrode conductor(s) shall be permitted to be connected to an aluminum or copper busbar not less than 6 mm × 50 mm (¼ in. × 2 in.). The busbar shall be securely fastened and shall be installed in an accessible location. Connections shall be made by a listed connector or by the exothermic welding process.

(4) Where aluminum busbars are used, the installation shall comply with 250.64(A).

**(D) Grounding Electrode Conductor Taps.** Where a service consists of more than a single enclosure as permitted in 230.71(A), it shall be permitted to connect taps to the common grounding electrode conductor. Each such tap conductor shall extend to the inside of each such enclosure. The common grounding electrode conductor shall be sized in accordance with 250.66, based on the sum of the circular mil area of the largest ungrounded service entrance conductors. Where more than one set of service entrance conductors as permitted by 230.40, Exception No. 2 connect directly to a service drop or lateral, the common grounding electrode conductor shall be sized in accordance with Table 250.66 Note 1. The tap conductors shall be permitted to be sized in accordance with the grounding electrode conductors specified in 250.66 for the largest conductor serving the respective enclosures. The tap conductors shall be connected to the common grounding electrode conductor in such a manner that the common grounding electrode conductor remains without a splice or joint.

**(E) Enclosures for Grounding Electrode Conductors.** Ferrous metal enclosures for grounding electrode conductors shall be electrically continuous from the point of attachment to cabinets or equipment to the grounding electrode and shall be securely fastened to the ground clamp or fitting. Nonferrous metal enclosures shall not be required to be electrically continuous. Ferrous metal enclosures that are not physically continuous from cabinets or equipment to the grounding electrode shall be made electrically continuous by bonding each end of the raceway or enclosure to the grounding electrode conductor. Bonding shall apply at each end and to all intervening ferrous raceways, boxes, and enclosures between the service equipment and the grounding electrode. The bonding jumper for a grounding electrode conductor raceway or cable armor shall be the same size as, or larger than, the required enclosed grounding electrode conductor. Where a raceway is used as protection for a grounding electrode conductor, the installation shall comply with the requirements of the appropriate raceway article.

**(F) To Electrode(s).** A grounding electrode conductor shall be permitted to be run to any convenient grounding electrode available in the grounding electrode system, or to one or more grounding electrode(s) individually, or to the aluminum or copper busbar as permitted in 250.64(C). The grounding electrode conductor shall be sized for the largest grounding electrode conductor required among all the electrodes connected to it.

**250.66 Size of Alternating-Current Grounding Electrode Conductor.** The size of the grounding electrode conductor of a grounded or ungrounded ac system shall not be less than given in Table 250.66, except as permitted in 250.66(A) through (C).

> FPN: See 250.24(C) for size of ac system conductor brought to service equipment.

**Table 250.66 Grounding Electrode Conductor for Alternating-Current Systems**

| Size of Largest Ungrounded Service-Entrance Conductor or Equivalent Area for Parallel Conductors[a] (AWG/kcmil) | | Size of Grounding Electrode Conductor (AWG/kcmil) | |
| --- | --- | --- | --- |
| Copper | Aluminum or Copper-Clad Aluminum | Copper | Aluminum or Copper-Clad Aluminum[b] |
| 2 or smaller | 1/0 or smaller | 8 | 6 |
| 1 or 1/0 | 2/0 or 3/0 | 6 | 4 |
| 2/0 or 3/0 | 4/0 or 250 | 4 | 2 |
| Over 3/0 through 350 | Over 250 through 500 | 2 | 1/0 |
| Over 350 through 600 | Over 500 through 900 | 1/0 | 3/0 |
| Over 600 through 1100 | Over 900 through 1750 | 2/0 | 4/0 |
| Over 1100 | Over 1750 | 3/0 | 250 |

Notes:
1. Where multiple sets of service-entrance conductors are used as permitted in 230.40, Exception No. 2, the equivalent size of the largest service-entrance conductor shall be determined by the largest sum of the areas of the corresponding conductors of each set.
2. Where there are no service-entrance conductors, the grounding electrode conductor size shall be determined by the equivalent size of the largest service-entrance conductor required for the load to be served.
[a]This table also applies to the derived conductors of separately derived ac systems.
[b]See installation restrictions in 250.64(A).

**(A) Connections to Rod, Pipe, or Plate Electrodes.** Where the grounding electrode conductor is connected to rod, pipe, or plate electrodes as permitted in 250.52(A)(5) or (A)(6), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than 6 AWG copper wire or 4 AWG aluminum wire.

**(B) Connections to Concrete-Encased Electrodes.** Where the grounding electrode conductor is connected to a concrete-encased electrode as permitted in 250.52(A)(3), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than 4 AWG copper wire.

**(C) Connections to Ground Rings.** Where the grounding electrode conductor is connected to a ground ring as permitted in 250.52(A)(4), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than the conductor used for the ground ring.

# Exhibit 31

STATE OF TEXAS  )
         )  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON  )

   I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the email and attachment from Linda Asbell to Alan Hoffmann dated March 12, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

   I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

   In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


           *Linda Asbell*
          Linda Asbell, TRMC, Town Secretary
          Town of Lakewood Village
          Denton County
          State of Texas

# Linda Asbell

| | |
|---|---|
| **From:** | Linda Asbell <linda@lakewoodvillagetx.us> |
| **Sent:** | Wednesday, March 12, 2014 5:01 PM |
| **To:** | 'Alan Hoffmann' |
| **Cc:** | 'Harry Bizios' |
| **Subject:** | RE: 3950 Spinnaker Run Pt |
| **Attachments:** | 2014_03_12_16_29_29.pdf |

Alan,

Attached is the document we discussed. This is a letter prepared by the Town Attorney and directly relates to your questions.

As I stated in our conversation, the building permit approval process was delayed because your HVAC contractor postponed registration. Registration of all subs is a requirement of the permit release. The plans were approved on February 6th. The permit is ready for release upon receipt of the building permit fee and attendance of a mandatory pre-construction meeting (originally scheduled for February 19th). All pre-construction meetings are scheduled for 5pm. Let me know your availability and I will be happy to reschedule the meeting with the building inspector.

Please review the attached document and let me know if you have any questions.

Linda Asbell, TRMC
Town Secretary
972-294-5555 (direct)
www.lakewoodvillagetx.us



**From:** Alan Hoffmann [mailto:alan@alanhoffmanncompany.com]
**Sent:** Wednesday, March 12, 2014 3:47 PM
**To:** Linda Asbell
**Cc:** Harry Bizios
**Subject:** Re: 3950 Spinaker Run Pt

Linda,

First of all. The building inspector never approved the plans. After the lengthy wait of your permit process, I began to do some legal research with regard Lakewood Village's ability to review plans.

My client and I believe you have misrepresented
your authority to the ETJ residents and it is my understanding and the property owner's understanding that you have no right to review plans, collect fees, inspect or visit construction sites in your ETJ.

So I will be sending a courier tomorrow to pickup all plans and engineering with respect to this project and any entrance by your city's representatives, inspectors and or employees will be considered an act of trespassing.

1

432

# MESSER, CAMPBELL & BRADY

### A LIMITED LIABILITY PARTNERSHIP
## ATTORNEYS

6351 PRESTON ROAD, SUITE 350
FRISCO, TEXAS 75034
972.424.7200 · TELEPHONE
972.424.7244 · FACSIMILE
www.mcblawfirm.net

August 7, 2012

*Via electronic mail:* ▓▓▓▓▓▓▓▓▓▓

Re:     **Town of Lakewood Village's authority to enforce building regulations in its Extraterritorial Jurisdiction**

Mr. ▓▓▓▓▓▓

You recently inquired as to the Town of Lakewood Village's authority to enforce building regulations in its Extraterritorial Jurisdiction. This brief memorandum serves to respond to your inquiry.

Texas municipalities have been granted the statutory authority to apply by ordinance their subdivision regulations, including platting, building standards and permitting, in their extraterritorial jurisdiction ("ETJ"). Texas Local Government Code Section 212.003 states that:

### § 212.003 Extension of Rules to Extraterritorial Jurisdiction

(a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002... .

Section 212.002 of the Local Government Code states that "the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction." Other Local Government Code provisions support the right of Texas municipalities to enforce subdivision regulations in the ETJ. For instance, Section 214.904 governs the application of permits required by a municipality to erect or improve a building or structure in the corporate limits or ETJ. Similarly, Section 242.001 governs interlocal agreements by a municipality to regulate subdivision plats and permits in the ETJ. Additionally, Section 233.153(c), which addresses county building regulations in unincorporated areas, specifically states that "if a municipality located within [an unincorporated area of a county] has adopted a building code in the municipality's extraterritorial jurisdiction, the *building code adopted by the municipality controls* and building code standards under this subchapter have no effect in the municipality's extraterritorial jurisdiction." (emphasis added). Therefore, the Town's regulations in its ETJ control over Denton County's regulations.

433

In interpreting the extent of this statutory authority that has been granted to municipalities, courts in Texas have repeatedly upheld the ability of municipalities to regulate subdivisions and enforce ordinances in their ETJ. *Hartsell v. Town of Talty*, 130 S.W.3d 325, 328 (Tex. App. – Dallas 2004, pet. denied)("ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction"); *Levy v. City of Plano*, 2001 WL 1382520, *2 (Tex. App. – Dallas 2001, no pet.)(City could apply subdivision regulations to property in its ETJ); *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 823 (Tex. App. – Dallas 1986, writ ref'd n.r.e.)(city has statutory authority to extend its subdivision ordinances and ordinances regulating development, such as those specifying design, construction and maintenance standards, to its extraterritorial jurisdiction). The Supreme Court has noted that the purpose of platting and subdivision regulations is to "ensure that the subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith*, 687 S.W.2d 300, 302 (Tex. 1985).

In *Levy v. City of Plano*, *supra*, the Dallas court of appeals stated the city of Plano's subdivision regulations applied to the ETJ. In *Milestone Potranco Dev. v. City of San Antonio*, 298 S.W.3d 242, 245 (Tex. App. – San Antonio 2009, pet. denied), the San Antonio court of appeals upheld the city of San Antonio's tree preservation ordinance to the ETJ because it promoted the health of the municipality and healthful development of the community. In *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811 (Tex. App. – Dallas, writ ref'd n.r.e.), the Dallas court of appeals upheld the application of the city of Lucas' construction-related ordinances and building permits to the ETJ. The Dallas court of Appeals in *Lucas* specifically addressed the extent of a city's authority to enforce subdivision regulations in the ETJ:

> Were we to hold that building standards are not contemplated by [Section 212.003(a)], we would be left with a statute that grants authority over the laying out of streets, alleys and lot boundaries, but precludes authority over the most important part of a subdivision. Consequently, we conclude that the power over subdivisions conferred by [Section 212.003(a)] necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof. *Id.* at 823-24.

In conclusion, based on the statutory and case authorities, Lakewood Village as a Texas municipality may lawfully enforce its subdivision regulations and construction-related ordinances in its ETJ, issue building and construction-related permits for improvements in its ETJ, and enforce other non-zoning regulations in its ETJ.

Very truly yours,

Wm. Andrew Messer
Town Attorney

WAM/jms

434

# Exhibit 32



Ord 561
5/2002

Ord 50
3/1973

Ord 73
9/1976

Ord 791
10/2006

Ord 792
10/2006

Ord 685
1/2005

Ord 578
11/2002

Ord 337
11/1995

Ord 41
10/1971

Ord 442
6/1999

Ord 673
11/2004

Ord 338
11/1995

Ord 40
8/1971

Ord 339
11/1995

Ord 318
3/1994

Ord 39
8/1971

Ord 88
3/1977

Ord 790
10/2006

Ord 19
7/1966

Radius created by
Ord. 88 3/1977
Distance measured with GIS
2,602

Ord 386
3/1997

Ord 360
8/1996

Ord 59
9/1974

Ord 843
8/2007

Incorporated 4/26/77
Population 620

**Town of Little Elm**
**Denton County, Texas**

LITTLE ELM

ETJ Little Elm and Lakewood Village

0    950    1,900    3,800
Feet

1 inch = 1,644.16 feet

**Legend**

NAME, TYPE

Lakewood Village, CITY

Lakewood Village, ETJ

Little Elm, CITY

Little Elm, ETJ

**436**

# Exhibit 33

U. S. Army, Corps of Engineers
ATTN: CESWF-RE-M
P. O. Box 17300
Fort Worth, TX 76102-0300


January 28, 2014

Mr. Harry Bizios
3960 Spinnaker Run Point
Little Elm, Texas 75068

Dear Mr. Bizios:

    Enclosed are two fully executed copies of Consent DACW63-9-14-0533 for your records. Per condition 10 of your consent a copy must be filed at the county of record under the referenced tract number. Once recorded a copy must be provided to us so that we will know the consent is officially on record. You have 90-days to provide us with proof of recording or your consent may be terminated.

If you have any questions related to your rights or responsibilities as provided for in the consent, please contact Mrs. Vicki Akers at 817-886-1114.

Joanne Murphy
Realty Specialist
Fort Worth District

Enclosures



438

**DEPARTMENT OF THE ARMY**
**CORPS OF ENGINEERS**
**FORT WORTH DISTRICT**

**Project: Lewisville Lake, Texas**
**Tract No. E-465E**

**WHEREAS**, the United States has acquired a perpetual flowage easement over Tract No. E-465E, Lewisville Lake, Texas, recorded in Deed Records, volume 463, pp. 444, of Denton County, Texas.

**WHEREAS,** said easement grants to the United States the right of prior approval for any structure to be located within the easement area, which area is under the administrative control of the Fort Worth District, Corps of Engineers.

**WHEREAS,** the United States has been requested to grant approval for a riprap retaining wall to be placed on the above-identified tract.

**NOW THEREFORE,** the United States hereby gives consent to Mr. Harry Bizios to place a riprap retaining wall at the location shown on **Exhibits A and B**.

**PROVIDED HOWEVER,** that this consent is subject to the following conditions:

1. All activities conducted on the premises shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

2. The giving of this consent does not in any way subordinate the United States' prior easement rights. The United States shall in no case be liable for any damage or injury to the structures herein consented to, which may be caused by any action of the United States under its easement, or that may result from future operations undertaken by the United States, and no claim or right to compensation shall accrue from such exercise of the United States' easement rights.

3. The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the consented activity.

4. This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the consentee shall obtain such permission as may be required on account of any other existing rights. It is understood that this consent does not eliminate the necessity for obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat. 1151; 33

**439**

U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344) or any other permit or license which may be required by Federal, state, interstate or local laws in connection with the use of the premises.

5. All cut and fill material must produce at least a balanced total in volume. Construction associated with the riprap retaining wall must not result in a loss of flood storage or interfere with the operation of Lewisville Lake.

6. The retaining wall structure must not be constructed to exceed elevation 537.00' msl.

7. Each end of the retaining wall must tie in to maintain the integrity of the retaining wall.

8. The bags used must be equivalent to Sakrete Rip-Rap Scrim or better.

9. Any uncured or crushed cured cement product used, including bags will be removed from the flowage easement to prevent environmental hazards.

10. The grantee is responsible for ensuring that the fully executed consent is officially recorded and filed and a copy is provided to the undersigned Real Estate Contracting Officer within 30 days of receipt.

**IN WITNESS WHEREOF,** I have hereunto set my hand by authority of the Secretary of the Army, this 27 day of January , 2014.

Rocky D. Lee
District Chief of Real Estate
Real Estate Contracting Officer

**THIS CONSENT** is also executed by the grantee this 24 day of January, 2014.

Harry Bizios

440

# Consent, R- Rap Retaining Wall, Tract E 465 E
## 3960 Spinnaker Run Point , Little Elm, TX 75068



130    65    0    130 Feet

## Lewisville Lake
### Legend

⚠  Boundary Monuments

        Lewisville 537' Contour

☐  Fee Boundary

■ ■ ■  R-Rap - Erosion Control

Map Created By   Craig Kislingbury   12/9/2013

US Army Corps
of Engineers

Exhibit-A

EXHIBIT A

**441**

442

# Exhibit 34

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS SUNRISE BAY AT LAKE LEWISVILLE SECTION ONE

STATE OF TEXAS        *                       045795

KNOWN ALL MEN BY THESE PRESENTS:

COUNTY OF DENTON*

This Declaration, made on the date hereinafter set forth by PROPERTIES OF THE SOUTHWEST INC., a Delaware corporation, duly authorized to do business in the State of Texas, hereinafter referred to as "Developer."

## WITNESSETH:

WHEREAS, Developer is the Owner of that certain Tract of land known as SUNRISE BAY AT LAKE LEWISVILLE of approximately 257.1573 Acres of land situated in Denton County, Texas (hereinafter referred to as the "Subdivision"), with the Plat ("Plat") of Sunrise Bay at Lake Lewisville SECTION ONE containing approximately 257.1573 acres (hereinafter referred to as "SECTION ONE"), recorded in the office of the County Clerk of Denton County, Texas on the 2nd day of August, 1995, after having been approved as provided by law, and being recorded in Cabinet L , Slide 224-227 of the Map Records of Denton County, Texas; and

WHEREAS, it is the desire of Developer to place certain restrictions, easements, covenants, conditions, stipulations and reservations (herein sometimes referred to as the "Restrictions") upon and against such SECTION ONE in order to establish a uniform plan for it's development, improvement and sale, and to insure the preservation of such uniform plan for the benefit of both the present and future Owners of Tracts in SECTION ONE;

NOW, THEREFORE, Developer hereby adopts, establishes and imposes upon SECTION ONE, and declares the following reservations, easements, restrictions, covenants and conditions, applicable thereto, all of which are for the purposes of enhancing and protecting the value, desirability and attractiveness of said Property, which Restrictions shall run with said Property and title or interest therein, or any part thereof, and shall insure to the benefit of each Owner thereof. Developer also declares that SECTION ONE shall be subject to the jurisdiction of the "Association" (as hereinafter defined).

## ARTICLE I
## DEFINITIONS

**Section 1.01 "Accessory Building"** shall mean and refer to a subordinate building, attached to or detached from the Dwelling (as hereinafter defined).

**Section 1.02 "Annexable Area"** shall mean and refer to any additional property made subject to the jurisdiction of the Association pursuant to the provisions set forth herein, including, without limitation, any property adjacent to or in the proximity of the Subdivision.

**Section 1.03 "Association"** shall mean and refer to the Sunrise Bay at Lake Lewisville Property Owners Association, and its successors and assigns.

1
07/11/95

ClibPDF - www.fastio.com

**Section 1.04 "Board of Directors"** shall mean and refer to the Board of Directors of the Association.

**Section 1.05 "Builders"** shall mean and refer to persons or entities that purchase Tracts and build speculative or custom homes thereon for third party purchasers.

**Section 1.06 "Common Area"** shall mean all real property (including the improvements thereto) within the Subdivision owned by the Developer and/or the Association for the common use and enjoyment of the Owners.

**Section 1.07 "Contractor"** shall mean and refer to the person or entity with whom an Owner contracts to construct a residential Dwelling on such Owner's Tract.

**Section 1.08 "Developer"** shall mean and refer to Properties of the Southwest, Inc. and its successors and assigns.

**Section 1.09 "Dwelling"** shall mean and refer to a building having accommodations for and occupied by not more than one Family (as hereinafter defined).

**Section 1.10 "Front Yard"** shall mean and refer to a space on a Tract facing a Street (as hereinafter defined) and extending across the front of the Tract between the Side Lines (as hereinafter defined) and being the horizontal distance between the Street Line (as hereinafter defined) and the Dwelling or any projection thereof other than the projection of the usual steps and eave over-hangs.

**Section 1.11 "Garage"** shall mean and refer to an Accessory Building or a portion of a Dwelling in which motor-driven vehicles are stored.

**Section 1.12 "Height"** shall mean and refer to the measurement from the average established grade at the Street Line abutting the Tract or, if higher, from the highest natural ground level of the two points where the Front Setback Line (as hereinafter defined) intersects the two Side Lines of the Tract, to the highest point of the Improvement being measured.

**Section 1.13 "Owner"** shall mean and refer to the record Owner, whether one or more persons or entities, of fee simple title to any Tract which is a part of the Subdivision, including (i) contract sellers (a seller under a Contract-for-Deed), but excluding those having such interest merely a security for the performance of an obligation, (ii) Developer (except as otherwise provided herein), and (iii) Builders.

**Section 1.14 "Plat"** shall collectively mean and refer to: (i) the Final Plat of Sunrise Bay Section 1, recorded at Cabinet _L_, Slide _224-227_ Map Records, Denton County, Texas.

**Section 1.15 "Preferred Builder"** shall mean a builder who has been researched, investigated and approved by Properties of the Southwest, Inc.

**Section 1.16 "Rear Line"** shall mean the opposite of Street Line.

**Section 1.17 "Rear Yard"** shall mean and refer to a space extending across the rear of a Tract from one Side Line to the other Side Line and being the horizontal distance between the Rear Line and the Dwelling or any projection thereof other than the projection of the usual steps and eave over-hangs.

2
07/11/95

ClibPDF - www.fastio.com

**Section 1.18** "Side Line" shall mean and refer to any boundary line of a Tract which is not a Street Line or Rear Line.

**Section 1.19** "Street" shall mean and refer to the roadways dedicated by the Developer to Denton County, Texas, by the Plat or any subsequent re-plat of SECTION ONE and any other portions of the Subdivision deeded or dedicated to and accepted by Denton County, Texas as public streets and roadways.

**Section 1.20** "Street Line" shall mean and refer to that boundary line of a Tract which is also the boundary line of a Street.

**Section 1.21** "Sunrise Bay at Lake Lewisville" shall mean and refer to SECTION ONE and any other sections of Sunrise Bay at Lake Lewisville hereafter made subject to the jurisdiction of the Association.

**Section 1.22** "Tract" shall mean and refer to any plot of land identified as a Tract or homesite on the Plat of SECTION ONE. For purposes of this instrument, "Tract" shall not be deemed to include any portion of the "Common Areas" or "Unrestricted Reserves" (defined herein as any Common Areas and Unrestricted Reserves shown on the Plat) in SECTION ONE, regardless of the use made of such area.

**Section 1.23** "Water Front" shall mean and refer to any property adjacent to the Corps of Engineers Property.


## ARTICLE II
## RESERVATIONS, EXCEPTION AND DEDICATIONS

**Section 2.01** <u>Recorded Subdivision Map of the Property</u>. The Plat ("Plat") of SECTION ONE dedicates for use as such, subject to the limitations as set forth therein, the roads, streets and easements shown thereon. The Plat further establishes certain restrictions applicable to SECTION ONE. All dedications, restrictions and reservations created herein or shown on the Plat, replats or amendments of the Plat of SECTION ONE recorded or hereafter recorded shall be construed as being included in each contract, deed, or conveyance executed or to be executed by or on behalf of Developer, whether specifically referred to therein or not.

**Section 2.02** <u>Easements</u>. Developer reserves for public use the utility easements shown on the Plat or that have been or hereafter may be created by separate instrument recorded in the Real Property Records of Denton County, Texas, for the purpose of constructing, maintaining and repairing a system or systems of electric lighting, electric power, telegraph and telephone line or lines, storm surface drainage, cable television, or any other utility the Developer sees fit to install in, across and/or under SECTION ONE for the benefit of the subdivision or any part thereof. All utility easements in SECTION ONE may be used for the construction of drainage swales in order to provide for improved surface drainage of the Reserves, Common Area, Tracts and/or all other areas of the subdivision or any part thereof. Should any utility company furnishing a service covered by the general easement herein provided request a specific easement by separate recordable document, Developer, without the joiner of any other Owner, shall have the right to grant such easement on said property without conflicting with the terms hereof. Any utility company serving the subdivision shall have the right to enter upon any utility easement for the purpose of installation, repair and maintenance of their respective facilities. Neither Developer nor any utility

ClibPDF - www.fastio.com

company, political subdivision or other authorized entity using the easements herein referred to shall be liable for any damages done by them or their assigns, agents, employees, or servants, to fences, shrubbery, trees and lawns or any other property of the Owner on the property covered by said easements.

**Section 2.03** <u>Title Subject to Easements</u>. It is expressly agreed and understood that the title conveyed by Developer to any of the Tracts by contract deed or other conveyance shall be subject to any easement affecting same for roadways or drainage, electric lighting, electric power, telegraph or telephone purposes and other easements hereafter granted affecting the Tracts. The Owners of the respective Tracts shall not be deemed to own pipes, wires, conduits or other service lines running through their Tracts which are utilized for or service other Tracts, but each Owner shall have an easement in and to the aforesaid facilities as shall be necessary for the use, maintenance and enjoyment of his Tract. The Developer may convey title to said easements to the public, a public utility company or the Association.

**Section 2.04** <u>Utility Easements</u>.

> a. Utility ground and aerial easements have been dedicated in accordance with the Plat and by separate recorded easement documents.

> b. No building shall be located over, under, upon or across any portion of any utility easement. The Owner of each Tract shall have the right to construct, keep and maintain concrete drives, fences, and similar improvements across any utility easement, and any public utility shall be entitled to cross such easements at all times for purposes of gaining access to and from such Tracts, provided, however, any concrete drive, fence or similar improvement placed upon such utility easement by the Owner shall be constructed, maintained and used at Owner's risk and, as such, the Owner of each Tract subject to said utility easements shall be responsible for (i) any and all repairs to the concrete drives, fences and similar improvements which cross or are located upon such utility easements and (ii) repairing any damage to said improvements caused by any public utility in the course of installing, operating, maintaining, repairing, or removing its facilities located within the utility easements.

**ARTICLE III**
**USE RESTRICTIONS**

**Section 3.01** <u>Single Family Residential Construction</u>. No building shall be erected, altered, placed or permitted to remain on any Tract other than one Dwelling unit per each Tract to be used for residential purposes. Detached Garages and work shops may be constructed on the property at the same time as the main Dwelling is being built, or any time thereafter, so long as they are of good construction, kept in good repair, and are not used for residential purposes. All dwellings, detached Garages and work shops must be approved in writing by the Architectural Control Committee prior to being erected, altered or placed on the property. The term "Dwelling" does not include single or double wide manufactured homes, and said manufactured homes are not permitted within the Subdivision. All dwellings must have at least 2000 square feet of living area, excluding porches, for a single story Dwelling, and 2400 square feet for a two story Dwelling, measured from the exterior walls, under one roof. The exterior walls of both the first and second stories of any

4
07/11/95

ClibPDF - www.fastio.com

Dwelling shall consist of not less than 70% masonry (including stucco) or masonry veneer construction, unless the Committee shall have granted its prior written consent to a lesser percentage which shall be in such amount as the Committee shall in it's sole discretion determine. Such masonry material shall be of quality and appearance equal or superior to standard clay, slate common brick, color pigment portland cement brick, stucco or quarried stone. Exterior material of any Dwelling, other than the required masonry portion, shall be a material which, in the sole opinion of the Committee, compliments the architecture of the Dwelling. The roof of any Dwelling shall be of either wood shingle, composition shingle, copper, tile, slate or standing seam metal. The use of sheet metal or similar material on either the roof or exterior sides of any Dwelling other than as flashing, is hereby prohibited. Each Dwelling shall be constructed so as to have not less than a two (2) car, nor more than a five (5) car Garage, which Garage may be detached from the Dwelling. No individual water system shall be permitted in the subdivision. All Dwellings must be built with new construction material. Any building, structure or improvement commenced on any Tract shall be completed as to exterior finish and appearance within six (6) months after the laying of the foundation. As used herein, the term "residential purposes" shall be construed to prohibit mobile homes or trailers being placed on said Tracts, or the use of said Tracts for duplex houses, condominiums, townhouses, or apartment houses. All Tracts shall be for residential purposes and all homes must be site constructed. No driveways will be permitted to take access directly on Garza Lane.

**Section 3.02** <u>Composite Building Site</u>. Any Owner of one or more adjoining Tracts (or portions thereof) may, with the prior written approval of the Committee, and Denton County, consolidate such Tracts or portions into one building site, with the privilege of placing or constructing improvements on such resulting site, in which case the side set-back lines shall be measured from the resulting side property lines rather than from the Tract lines as indicated to the Plat.

**Section 3.03** <u>Location of the Improvements upon the Tract</u>. The minimum dimension of Tracts and yards, and the minimum Tract area per family shall be as follows:

    a.    Tract area: The minimum Tract area in this District shall be one acre.

    b.    Front Yard: There shall be a Front Yard having a depth of 50 feet.

    c.    Side Yard: The minimum distance from the side building line to the Side Line shall be 20 feet.

    d.    Rear Yard: For Tracts with areas of 1 acre or more - 20 feet.

    e.    Width of Tract: The minimum width of Tract shall be determined as follows: (i) For Tracts with areas of 1 acre or more - 120 feet. (ii) The width of the Tract shall be measured at the Street line. Building setback line for dwellings located on cul-de-sacs and other odd shaped Tracts may be less than those set forth immediately above if approved by the committee. The side yard of corner Tracts having adjoining two (2) sides shall have a thirty (30) foot side yard.

    f.    Height Regulations: The maximum Height shall be two stories, but not to exceed thirty-five (35) feet per Dwelling. Height limit for any

ClibPDF - www.fastio.com

Accessory Building shall be twenty-five (25) feet. Provided, however, as to any Tract, the Architectural Control Committee may waive or alter any such setback line if, in the exercise of the Architectural Control committee's sole discretion, such waiver, or alteration is necessary to permit effective utilization of a Tract. Any such waiver or alteration must be in writing and recorded in the Deed of Records of Denton County, Texas. All such dwellings must be served with water and electricity.

**Section 3.04** Use of Temporary Structures. No structure of a temporary character, whether trailer, basement, tent, shack, Garage, barn or other outbuilding shall be maintained or used on any Tract at any time as a residence, either temporarily or permanently; provided, however, that Developer reserves the exclusive right to erect, place and maintain such facilities in or upon any property in the Subdivision that it owns as in its sole discretion may be necessary or convenient while selling Tracts, selling or constructing residences and constructing other improvements within the Subdivision. Developer reserves the right to sell the lot that the temporary sales office is located on and lease said office back from the purchaser of the lot.

**Section 3.05** Walls and Fences. Walls and fences, if any, must be approved prior to construction by the Committee. Fences are not permitted from the front line of the house to the public right-of-way, and no closer than the building setback line on the side street line. All fences must be maintained to the satisfaction of the Board of Directors. No barbed wire fences shall be located, erected or allowed to remain on any Tract. All fences fronting Garza Lane and Pinnacle Point shall be constructed in accordance with plans adopted by the Committee. A maximum Height of any fence shall not exceed six (6) feet. No fencing will be allowed along the Corps of Engineer Property lines. All mailboxes must be of masonry construction and approved by the Architectural Control Committee.

**Section 3.06** Prohibition of Offensive Activities. No Activity, whether for profit or not, shall be conducted on any Tract which is not related to single family residential purposes, unless said activity meets the following criteria:

a.      No additional exterior sign of activity is present,

b.      It is the type of action that usually happens in a home,

c.      No additional traffic, that would not be there normally, is created,

d.      The entity or activity maintains an office or place of business elsewhere, and

e.      Nothing dangerous is present that shouldn't be there. This restriction is waived in regard to the customary sales activities required to sell homes in the Subdivision.

f.      The discharge or use of firearms is expressly prohibited.

g.      The Board shall have the sole and absolute discretion to determine what constitutes a nuisance or annoyance.

**Section 3.07** Garbage and Trash Disposal. Garbage and trash or other debris accumulated in this Subdivision shall not be permitted to be dumped at any place upon adjoining land where a nuisance to any residence of this

ClibPDF - www.fastio.com

Subdivision is or may be created. No Tract shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be allowed to accumulate, shall be kept in sanitary containers and shall be disposed of regularly. During the construction period, the builder is required to maintain a dumpster and a portable toilet on the building site. All equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition.

**Section 3.08** Junked Motor Vehicles Prohibited. No Tract shall be used as a depository for abandoned or junked motor vehicles. No junk of any kind or character, or dilapidated structure or building of any kind or character, shall be kept on any Tract.

**Section 3.09** Signs. No signs, advertisement, billboards or advertising structure of any kind may be erected or maintained on any Tract without the consent in writing of the Architectural Control Committee and Properties of the Southwest, Inc., except one (1) professionally made sign not more than twenty-four inches by twenty-four inches, advertising an Owner's Tract for sale or rent, and one (1) professionally made sign, not more than twelve inches (12") wide by twenty-four inches (24") long identifying the Tract Owners name or names. However, no for sale by owner signs will be allowed until the development is completely sold out. No builder signs except Preferred Builders signs shall be allowed on any Tract. Preferred Builders shall be allowed to place one professionally made sign on his Tract, or on any Tract that he is contracted to construct a home, not more than thirty-six inches (36") by thirty-six (36") inches. A builder that is not a Preferred Builder that purchases a Tract for his or her own use, or for a speculative home, may place one sign, during the construction period only, not to exceed above mentioned size. All other signs are prohibited. Developer or any member of the Committee shall have the right to remove any such sign, advertisement or billboard or structure which is placed on any Tract in violation of these restrictions, and in doing so, shall not be liable, and are hereby expressly relieved from, any liability for trespass or other tort in connection therewith, or arising from such removal.

**Section 3.10** Animal Husbandry. No animals, livestock or poultry of any kind shall be raised, bred or kept on any Tract; provided however, that dogs, cats, or other common household pets may be kept on a Tract. Animals are not to be raised, bred or kept for commercial purposes or for food. Pets must be kept in a kennel, dog run, or fenced in area that confines said dog(s) to that area. Dogs will not be permitted to run loose in the subdivision and must be vaccinated for rabies according to State law once a year and registered with Denton County, Texas once a year. In no evnt shall more than four (4) dogs and/or cats and one litter thereof be permitted on any lot.

**Section 3.11** Mineral Development. No commercial oil drilling, oil development operations, oil refining, quarrying or mining operation of any kind shall be permitted upon or in any Tract. No derrick or other structures designed for the use of boring for oil or natural gas shall be erected, maintained or permitted upon any Tract.

**Section 3.12** Drainage. Natural established drainage patterns of Streets, Tracts or roadway ditches will not be impaired by any person or persons. Driveway culverts must be installed and will be of sufficient size to afford proper drainage of ditches without backing water up into ditch or diverting flow. Drainage culvert installation is subject to the inspection and approval of Denton County, and must be installed prior to any construction on Tract.

ClibPDF - www.fastio.com

All driveways must be constructed of reinforced concrete in accordance with standard detail adopted by the Architectural Control Committee.

**Section 3.13** Re-subdividing. No Tract shall be re-subdivided and only one Dwelling and one Accessory Building may be located upon a Tract.

**Section 3.14** Leasing. Except in conjunction with the leasing or renting of the Dwelling on the Tract to the same party, no Accessory Building shall be leased or rented.

**Section 3.15** Uses and maintenance of the Tract and All Improvements Located Thereon. Without limiting the foregoing, the following restrictions shall apply to all Tracts:

    a. No boat, jet-ski, aircraft, travel trailer, motor home, mobile home, camper body or similar vehicle or equipment may be parked for storage in the Front Yard of any Dwelling or parked on any Street in the Subdivision, nor shall any such vehicle or equipment be parked for storage in the Side Yard or Rear Yard of any Dwelling unless completely concealed from public view. All boats so parked or stored in the Side Yard or Rear Yard must at all times also be stored on a trailer. No such vehicle or equipment shall be used as a residence temporarily or permanently. This restriction shall not apply to any vehicle, machinery or equipment temporarily parked and in use for the construction, maintenance or repair of a Dwelling in the immediate vicinity.

    b. Trucks with tonnage in excess of one and one-half tons shall not be permitted to park overnight within the Subdivision except those used by a builder during the construction of improvements. Any vehicle with painted advertisements or business placards on its body shall not be permitted to park overnight on any Street within the Subdivision except for those vehicles used by a builder during the construction of improvements.

    c. No vehicle of any size which transports inflammatory or explosive cargo may be kept in the Subdivision at any time.

    d. No vehicles or similar equipment shall be parked or stored in an area visible from any Street except passenger automobiles, passenger vans, motorcycles, pick-up trucks and pick-up trucks with attached bed campers that are in operating condition and have current license Plates and inspection stickers and are in daily use as motor vehicles on the streets and highways of the State of Texas.

**Section 3.16** Antennas. Antennas of any kind shall not exceed five feet above the roof of the Dwelling or Accessory Building. One satellite disc or other instrument or structure may be placed in the rear yard so long as it is completely screened from view from any Street and from the lake. However, it shall be no closer than thirty (30) foot from the corps property line.

**Section 3.17** Duty of Maintenance. Owners and occupants (including lessees) of any Tract shall jointly and severally have the duty and responsibility, at their sole cost and expense, to keep that Tract so owned or occupied, including improvements and grounds in connection therewith, in a well-maintained, safe, clean and attractive condition at all times. Such maintenance includes, but is not limited to the following:

ClibPDF - www.fastio.com

a.   Prompt removal of all litter, trash, refuse and wastes

b.   Lawn mowing

c.   Tree and shrub pruning

d.   Watering

e.   Keeping exterior lighting and mechanical facilities in working order

f.   Keeping lawn and garden areas alive, free of weeds and attractive

g.   Keeping driveways in good repair

h.   Complying with all government health and policy requirements

i.   Repair of exterior damage to improvements

**Section 3.18** <u>Enforcement</u>. If, in the opinion of the Board of Directors or the Committee any such Owner or occupant (including lessees) has failed to comply with any of the foregoing restrictions or has failed in any of the foregoing duties or responsibilities, then the Committee or the Association shall deliver to such Owner or occupant (including lessees) written notice of such failure and such Owner or occupant (including lessees) must within ten (10) days from and after delivery of such notice, comply with the restrictions and/or perform the care and maintenance required. Should any such Owner or occupant (including lessees) fail to fulfill this duty and responsibility within such period, then the Committee, or the Association, or their designated agents are hereby authorized to enter onto the premises and correct such violations and perform such care and maintenance as necessary without any liability for damages for wrongful entry, trespass or otherwise to any person. The Owners and occupants (including lessees) of any Tract on which such work is performed shall promptly reimburse the Committee or the Association for such cost. If such Owner or occupant (including lessees) shall fail to reimburse the Committee or the Association within 30 Days from and after delivery by the Association of an invoice setting forth the costs incurred by the association for such work, then said indebtedness shall be a debt of the Owner and occupant (including lessees) jointly and severally.

## ARTICLE IV
## ARCHITECTURAL CONTROL COMMITTEE

**Section 4.01** <u>Basic Control</u>.

a.   No building or other improvements of any character shall be erected or placed, or the erection or placing thereof commenced or changes made in the design or exterior appearance thereof (excluding, without limitation, painting, staining or siding), or any addition or exterior alteration made thereto after original construction, or demolition or destruction by voluntary action made thereto after original construction, on any Tract in the Subdivision until the obtaining of the necessary approval (as hereinafter provided) from the Committee, and Denton County, of the construction plans and specifications for the construction or alteration of such improvements or demolition or destruction of existing improvements by voluntary action.

ClibPDF - www.fastio.com

b.      Each application made to the Committee, or to the Developer under Section 4.02. below shall be accompanied by three sets of plans and specifications for all proposed construction (initial or alteration) to be done on such Tract, including plot plans showing location on the Tract.    Upon receipt, the Architectural Control Committee shall forward one set of the plans and specifications to the Developer.

**Section 4.02**  Architectural Control Committee.

a.      The authority to grant or withhold architectural control approval as referred to above is initially vested in the Developer; provided, however, the authority of the Developer shall cease and terminate upon the election of the Architectural Control Committee of the Association (sometimes herein referred to as the "Committee"), in which event such authority shall be vested in and exercised by the Committee (as provided in (b) below), hereinafter referred to, except as to plans and specifications and plot plans theretofore submitted to the Developer which shall continue to exercise such authority over all such plans, specifications and plot plans.   The term "Committee", as used in this Declaration, shall mean or refer to the Developer until the election of the Architectural Control Committee as provided below.

b.      At such time as seventy-five percent (75%) of all of the Tracts in all Sections of the Subdivision are conveyed by Developer (from time to time hereafter referred to as the "Control Transfer Date") the Developer shall cause an instrument transferring control to the Association to be placed of record in the Real Property Records of Denton County, Texas (which instrument shall include the Control Transfer Date). Thereupon, the Association shall elect a committee of three (3) members to be known as the Sunrise Bay at Lake Lewisville Architectural Control Committee.  From and after the Control Transfer Date, each member of the Committee must be an Owner of property in some Section of Sunrise Bay at Lake Lewisville Subdivision. Additionally, the Developer shall have the right to discontinue the exercise of architectural control privileges and arrange for the transfer to the Association at any time prior to the Control Transfer Date by filing a statement and instrument to such effect in the Real Property Records of Denton County, Texas.

**Section 4.03**  Effect of Inaction.  Approval or disapproval as to architectural control matters as set forth in the preceding provisions of this Declaration shall be in writing.  In the event that the authority exercising the prerogative of approval or disapproval (whether the Developer or the Committee) fails to approve or disapprove in writing any plans and specifications and plot plans received by it in compliance with the preceding provisions within thirty (30) days following such submissions, such plans and specifications and plot plan shall be deemed approved and the construction of any such building and other improvements may be commenced and proceeded with in compliance with all such plans and specifications and plot plan and all of the other terms and provisions hereof.

**Section 4.04**  Effect of Approval.  The granting of the aforesaid approval (whether in writing or by lapse of time) shall constitute only an expression of opinion by the Committee that the terms and provisions hereof shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plot plan; and such approval shall not constitute any nature of waiver or estoppel either as to the persons expressing such approval or any other person in the event that such

10
07/11/95

building and/or improvements are not constructed in accordance with such plans and specifications and plot plan, but, nevertheless, fail to comply with the provisions hereof. Further, no person exercising any prerogative of approval of disapproval shall incur any liability by reasons of the good faith exercise thereof.

**Section 4.05** Variance. The Developer and the Committee, and Denton County, may authorize variances from compliance with any of the provisions of this Declaration or minimum acceptable construction standards or regulations and requirements as promulgated from time to time by the Developer and the committee when circumstances such as topography, natural obstructions, Tract configuration, Tract size, hardship, aesthetic or environmental considerations may require a variance. The Developer, the Committee, and Denton County, reserve the right to grant variances as to building set-back lines, minimum square footage of the residence and other items. Such variances must be evidenced in writing and shall become effective when signed by the Developer or by at least a majority of the members of the Committee. If any such variances are granted, no violation of the provisions of this Declaration shall be deemed to have occurred with respect to the matter for which the variance is granted; provided, however, that the granting of a variance shall not operate to waive any of the provisions of this Declaration for any purpose except as to the particular property and particular provisions hereof covered by the variance, nor shall the granting of any variance by the Developer or the Committee, effect in any way the Owner's obligation to comply with all governmental laws and Denton County regulations affecting the property concerned and the Plat.

## ARTICLE V
## SUNRISE BAY AT LAKE LEWISVILLE
## PROPERTY OWNERS ASSOCIATION

**Section 5.01** Membership. Every person or entity who is a record Owner of any Tract which is subject to the Maintenance charge (or could be following the withdrawal of an exemption therefrom) and other assessments provided herein, including contract sellers, shall be a "Member" of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation or those having only an interest in the mineral estate. Owners shall have one membership for each Tract owned by such Member. Memberships shall be appurtenant to and may not be separated from the ownership of the Tracts. Regardless of the number of persons who may own a Tract (such as husband and wife, or joint tenants, etc.) there shall be but one membership for each Tract. Additionally, the Directors of the Association must be Members of the Association (as more particularly described in the By-laws). Ownership of the Tracts shall be the sole qualification for membership. The voting rights of the Members are set forth in the Bylaws of the Association.

**Section 5.02** Non-Profit Corporation. Sunrise Bay at Lake Lewisville Property Owners Association, Inc., a non-profit corporation, has been (or will be) organized and it shall be governed by the Articles of Incorporation and Bylaws of said Association; and all duties, obligations, benefits, liens and rights hereunder in favor of the Association shall vest in said corporation.

**Section 5.03** Bylaws. The Association has adopted or may adopt whatever Bylaws it may choose to govern the organization or operation of the Subdivision and the use and enjoyment of the Tracts and Common Areas,

provided that the same are not in conflict with the terms and provisions hereof.

**Section 5.04**  <u>Owner's Right of Enjoyment</u>.  Every Owner shall have a beneficial interest of use and enjoyment in and to the Common Areas and such right shall be appurtenant to and shall pass with the title to every assessed Tract, subject to the following provisions:

a.  The right of the Association, with respect to the Common Areas, to limit the number of guests of Owners;

b.  The right of the Association to charge reasonable admission and other fees for the use of any facility situated upon the Common Areas;

c.  The right of the Association, in accordance with its Articles and Bylaws (and until seventy-five percent (75%) of all Tracts in the Subdivision are sold, subject to the prior written approval of the Developer), to (i) borrow money for the purpose of improving and maintaining the Common Areas and facilities (including borrowing from the Developer or any entity affiliated with the Developer) and (ii) mortgage said property, however, the rights of such mortgagee of said property shall be subordinate to the rights of the Owners hereunder;

d.  The right of the Association to suspend the Member's voting rights and the Member's and "Related Users" (as hereinafter defined) right to use any recreational facilities within the Common Areas during any period in which the Maintenance Charge or any assessment against his Tract remains unpaid;

e.  The right of the Association to suspend the Member's voting rights and the Member's and Related Users' right to use any recreational facilities within the Common Area, after notice and hearing by the Board of Directors, for the infraction or violation by such Member or Related Users of this Declaration or the "Rules and Regulations", as hereinafter defined, which suspension shall continue for the duration of such infraction or violation, plus a period not to exceed sixty (60) days following the cessation or curing of such infraction or violation.

## ARTICLE VI
## MAINTENANCE FUND

**Section 6.01**  <u>Maintenance Fund Obligation</u>.  Each Owner of a Tract by acceptance of a deed therefore, whether or not it shall be expressed in any such deed or other conveyance, is deemed to covenant and agrees to pay to the Association a monthly maintenance charge (the "Maintenance Charge"), and any other assessments or charges hereby levied.  The Maintenance Charge and any other assessments or charges hereby levied, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on the Tracts and shall be a continuing lien upon the property against which each such Maintenance Charge and other charges and assessments are made.

**Section 6.02**  <u>Basis of the Maintenance Charge</u>.

a.  The Maintenance Charge referred to shall be used to create a fund to be known as the "Maintenance Fund", which shall be used as

12
07/11/95

ClibPDF - www.fastio.com

herein provided; and each such Maintenance Charge (except as otherwise hereinafter provided) shall be paid by the Owner of each Tract to the Association. The Maintenance Charge for the year of purchase shall be pro-rated at closing and then shall be paid annually, in advance, on or before the first day of the first month of each calendar year. Provided, however, that if an Owner owns more than one Tract in the Subdivision, such Owner shall pay only twice the assessment of one (1) Tract no matter how many Tracts are owned. In the event an Owner obtains consent from the Committee for a Composite Building site pursuant to Section 3.02 hereof, such Composite Building Site shall, for this purpose, be considered one Tract beginning upon the completion of the improvements thereon.

b. Any Maintenance Charge not paid within thirty (30) days after the due date shall bear interest from the due date at the lesser of (i) the rate of eighteen percent (18%) per annum or (ii) the maximum rate permitted by law. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the hereinafter described lien against the Owner's Tract. No Owner may waive or otherwise escape liability for the Maintenance Charge by non-use of any Common Areas or recreational facilities available for use by Owners of the Subdivision or by the abandonment of his Tract.

c. The exact amount of the Maintenance Charge applicable to each Tract will be determined by the Developer. All other matters relating to the Maintenance Charge and the collection, expenditures and administration of the Maintenance Fund shall be determined by the Developer or the Board of Directors of the Association, subject to contrary provisions hereof.

d. The Association, from and after the Control Transfer Date, shall have the further right at any time, with a majority vote of all Association members, to adjust or alter said Maintenance Charge from year to year as it deems proper to meet the reasonable operation expenses and reserve requirements of the Association in order for the Association to carry out its duties hereunder.

**Section 6.03** <u>Creation of Lien and Personal Obligation</u>. In order to secure the payment of the Maintenance Charge, and other charges and assessments hereby levied, each Owner of a Tract in the Subdivision, by such party's acceptance of a deed thereto, hereby grants to the Association a contractual lien on such Tract which may be foreclosed on by non- judicial foreclosure and pursuant to the provisions of Section 51.002 of the Texas Property Code (and any successor statute); and each such Owner hereby expressly grants the Association a power of sale in connection therewith. The Association shall, whenever it proceeds with non-judicial foreclosure pursuant to the provisions of said Section 51.002 of the Texas Property Code and said power of sale, designate in writing a Trustee to post or cause to be posted all required notices of such foreclosure sale and to conduct such foreclosure sale. The Trustee may be changed at any time and from time to time by the Association by means of written instrument executed by the President or any Vice-President of the Association and filed for record in the Real Property Records of Denton County, Texas. In the event that the Association has determined to non-judicially foreclose the lien provided herein pursuant to the provisions of said Section 51.002 of the Texas Property Code and to exercise the power of sale hereby granted, the Association, or the Association's agent, shall give notice of foreclosure sale as provided by the Texas Property Code as then amended. Upon request by the Association, Trustee shall give any further

13
07/11/95

ClibPDF - www.fastio.com

notice of foreclosure sale as may be required by the Texas Property Code as then amended, and shall convey such Tract to the highest bidder for cash by General Warranty Deed. Out of the proceeds of such sale, if any, there shall first be paid all expenses incurred by the Association in connection with such default, including reasonable attorney's fees and a reasonable trustee's fee; second, from such proceeds there shall be paid to the Association an amount equal to the amount in default; and third, the remaining balance shall be paid to such Owner. Following any such foreclosure, each occupant of any such Tract foreclosed on and each occupant of any improvements thereon shall be deemed to be a tenant at sufferance and may be removed from possession by any and all lawful means, including a judgment for possession in an action of forcible detainer and the issuance of a writ of restitution thereunder.

In the event of non-payment by any Owner of any Maintenance Charge or other charge or assessment levied hereunder, the Association may, in addition to foreclosing the lien hereby retained, and exercising the remedies provided herein, upon ten (10) days prior written notice thereof to such nonpaying Owner, exercise all other rights and remedies available at law or in equity.

It is the intent of the provisions of this Section 6.03 to comply with the provisions of said Section 51.002 of the Texas Property Code relating to non-judicial sales by power of sale and, in the event of the amendment of said Section 51.002 of the Texas Property code hereafter, the President or any Vice-President of the Association, acting without joinder of any other Owner or mortgagee or other person may, by amendment to this Declaration filed in the Real Property Records of Denton County, Texas, amend the provisions hereof so as to comply with said amendments to Section 51.002 of the Texas Property Code.

**Section 6.04** Notice of Lien. In addition to the right of the Association to enforce the Maintenance Charge or other charge or assessment levied hereunder, the Association may file a claim or lien against the Tract of the delinquent Owner by recording a notice ("Notice of Lien") setting forth:

a. The amount of the claim of delinquency,

b. The interest thereon,

c. The costs of collection which have accrued thereon,

d. The legal description and Street address of the Tract against which the lien is claimed and

e. The name of the Owner thereof.

Such Notice of Lien shall be signed and acknowledged by an officer of the Association or other duly authorized agent of the Association. The lien shall continue until the amounts secured thereby and all subsequently accruing amounts are fully paid or otherwise satisfied. When all amounts claimed under the Notice of Lien and all other costs and assessments which may have accrued subsequent to the filing of the Notice of Lien have been fully paid or satisfied, the Association shall execute and record a notice releasing the lien upon payment by the Owner of a reasonable fee as fixed by the Board of Directors to cover the preparation and recordation of such release of lien instrument.

14
07/11/95

**Section 6.05** <u>Liens Subordinate to Mortgages</u>. The lien described in this Article VI shall be deemed subordinate to a first lien or other liens of any bank, insurance company, savings and loan Association, university, pension and profit sharing trusts or plans, or any other third party lender, including Developer, which may have heretofore or may hereafter lend money in good faith for the purchase or improvement of any Tract and any renewal, extension, rearrangement or refinancing thereof. Each such mortgagee of a mortgage encumbering a Tract who obtains title to such Tract pursuant to the remedies provided in the deed of trust or mortgage or by judicial foreclosure shall take title to the Tract free and clear of any claims for unpaid Maintenance Charges or other charges of assessments against such Tract which accrued prior to the time such holder acquired title to such Tract. No such sale or transfer shall relieve such holder from liability for any Maintenance Charge or other charges or assessments thereafter becoming due or from the lien thereof. Any other sale or transfer of a Tract shall not affect the Association's lien for Maintenance Charges or other charges or assessments. The Association shall make a good faith effort to give each such mortgagee sixty (60) days advance written notice of the Association's proposed foreclosure of the lien described in Section 6.01 hereof, which notice shall be sent to the nearest office of such mortgagee by prepaid United States registered or Certified mail, return receipt requested, and shall contain a statement of delinquent Maintenance Charges or other charges or assessments upon which the proposed action is based; provided, however, that the Association's failure to give such notice shall not impair or invalidate any foreclosure conducted by the Association pursuant to the provisions of this Article VI.

**Section 6.06** <u>Purpose of the Maintenance Charge</u>. The Maintenance Charge levied by the Developer or the Association shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the Owners of the Subdivision and other portions of the Annexable Area which hereafter may become subject to the jurisdiction of the Association. In particular, the Maintenance Charge shall be used for any improvement or services in furtherance of these purposes and the performance of the Association's duties described in Article VIII, including the maintenance of any Common Areas, any Drainage Easements and the establishment and maintenance of a reserve fund for maintenance of any Common Areas. The Maintenance Fund may be expended by the Developer or the Association for any purposes which, in the judgment of the Association, will tend to maintain the property values in the Subdivision, including, but not limited to, providing funds for the actual cost to the Association of all taxes, insurance, repairs, energy charges, replacement and maintenance of the Common Area as may from time to time be authorized by the Association. Except for the Association's use of the Maintenance Charge to perform its duties described in this Declaration and in the Bylaws, the use of the Maintenance Charge for any of these purposes is permissive and not mandatory. It is understood that the judgment of the Association as to the expenditure of said funds shall be final and conclusive so long as such judgment is exercised in good faith.

**Section 6.07** <u>Exempt Property.</u> The following property subject to this Declaration shall be exempt from the Maintenance Charge and all other charges and assessments created herein:

    a.    All properties dedicated to and accepted by a local public authority;

    b.    The Common Area and;

15
07/11/95

c. All properties owned by a charitable or nonprofit organization exempt from taxation by the laws of the State of Texas; however, no land or improvements devoted to Dwelling use shall be exempt from said Maintenance Charge.

**Section 6.08** Handling of Maintenance Charges. The collection and management of the Maintenance Charge or other charge or assessment levied hereunder, shall be performed by the Developer until the Control Transfer Date, at which time the Developer shall deliver to the Association all funds on hand together with all books and records of receipt and disbursements. The Developer and, upon transfer, the Association, shall maintain separate special accounts for these funds, and Owners shall be provided, at least annually, information on the Maintenance Fund.

## ARTICLE VII
## DEVELOPER'S RIGHTS AND RESERVATIONS

**Section 7.01** Period of Developer's Rights and Reservations. Developer shall have, retain and reserve certain rights as hereinafter set forth with respect to the Association and the Common Area from the date hereof, until the earlier to occur of

a. The Control Transfer date or

b. Developer's written notice to the Association of Developer's termination of the rights described in Article VII hereof.

The rights and reservations hereinafter set forth shall be deemed excepted and reserved in each conveyance of a Tract by Developer to an Owner whether or not specifically stated therein and in each deed or other instrument by which any property within the Common Area is conveyed by Developer. The rights, reservations and easements hereafter set forth shall be prior and superior to any other provisions of this Declaration and may not, without Developer's prior written consent, be modified, amended, rescinded or affected by any amendment of this Declaration. Developer's consent to any one such amendment shall not be construed as a consent to any other or subsequent amendment.

**Section 7.02** Right to Construct Additional Improvements in Common Area. Developer shall have and hereby reserves the right (without the consent of any other Owner), but shall not be obligated, to construct additional improvements within the Common Area at any time and from time to time in accordance with this Declaration for the improvement and enhancement thereof and for the benefit of the Association and Owners, so long as such construction does not directly result in the increase of such Maintenance Charge. Developer shall, upon the Control Transfer Date, convey or transfer such improvements to the Association and the Association shall be obligated to accept title to, care for and maintain the same as elsewhere provided in this Declaration.

**Section 7.03** Developer's Rights to Use Common Areas in Promotion and Marketing of the Property. Developer shall have and hereby reserves the right to reasonable use of the Common Area and of services offered by the Association in connection with the promotion and marketing of land within the boundaries of the Subdivision. Without limiting the generality of the foregoing, Developer may erect and maintain on any part of the Common Area such signs, temporary buildings and other structures as Developer may

16
07/11/95

ClibPDF - www.fastio.com

reasonably deem necessary or proper in connection with the promotion, development and marketing of land within the Property; may use vehicles and equipment within the Common Area for promotional purposes; and may permit prospective purchasers of property within the boundaries of the Property, who are not Owners or Members of the Association, to use the Common Area at reasonable times and in reasonable numbers; and may refer to the services offered by the Association in connection with the development, promotion and marketing of the Property.

**Section 7.04** <u>Developer's Rights to Grant and Create Easements.</u> Developer shall have and hereby reserves the right, without the consent of any other Owner or the Association, to grant or create temporary or permanent easements, for access, utilities, pipeline easement, cable television systems, communication and security systems, drainage, water and other purposes incidental to development, sale, operation and maintenance of the Subdivision, located in, on, under, over and across;

    a.    The Tracts or other property owned by Developer,

    b.    The Common Area, and

    c.    Existing utility easements

Developer also reserves the right, without the consent of any other Owner or the Association, to grant or create temporary or permanent easements for access over and across the streets and roads within the Subdivision.

**Section 7.05** <u>Developer's Rights to Convey Additional Common Area to the Association.</u> Developer shall have and hereby reserves the right, but shall not be obligated to, convey additional real property and improvements thereon, if any, to the Association as Common Area at any time and from time to time in accordance with this Declaration, without the consent of any other Owner or the Association.

**Section 7.06** <u>Annexation of Annexable Area.</u> Additional residential property and common areas outside of the Subdivision including, without limitation, the Annexable Area, may, at any time and from time to time, be annexed by the Developer into the real property which becomes subject to the jurisdiction and benefit of the Association, without the consent of the Owners or any other party; provided, however, such additional residential property may be made subject to the jurisdiction of the Association, shall be entitled to the use and benefit of all Common Areas that are or may become subject to the jurisdiction of the Association, provided that such annexed property is impressed with and subject to at least the Maintenance Charge imposed hereby.

## ARTICLE VIII
## DUTIES AND POWERS OF THE PROPERTY OWNERS
## ASSOCIATION

**Section 8.01** <u>General Duties and Powers of the Association.</u> The Association has been formed to further the common interest of the Members. The Association, acting through the Board of Directors or though persons to whom the Board of Directors has delegated such powers (and subject to the provisions of the Bylaws), shall have the duties and powers hereinafter set forth and, in general, the power to do anything that may be necessary or

17
07/11/95

ClibPDF - www.fastio.com

desirable to further the common interest of the members, to maintain, improve and enhance the Common Areas and to improve and enhance the attractiveness, desirability and safety of the Subdivision. The Association shall have the authority to act as the agent to enter into any and all contracts on behalf of the Members in order to carry out the duties, powers and obligations of the Association as set forth in this Declaration.

**Section 8.02**  <u>Duty to Accept the Property and Facilities Transferred by Developer</u>. The Association shall accept title to any property, including any improvements thereon and personal property transferred to the Association by Developer, and equipment related thereto, together with the responsibility to perform any and all administrative functions and recreation functions associated therewith (collectively herein referred to as "Functions"), provided that such property and Functions are not inconsistent with the terms of this Declaration. Property interests transferred to the Association by Developer may include fee simple title, easements, leasehold interests and licenses to use such property. Any property or interest in property transferred to the Association by Developer shall, except to the extend otherwise specifically approved by resolution of the Board of Directors, be transferred to the Association free and clear of all liens and mortgages (other than the lien for property taxes and assessments not then due and payable), but shall be subject to the terms of this Declaration, the terms of any declaration of covenants, conditions and restrictions annexing such property to the Common Area, and all easements, covenants, conditions, restrictions and equitable servitude or other encumbrances which do not materially affect the Owners authorized to use such property. Except as otherwise specifically approved by resolution of the Board of Directors, no property or interest in property transferred to the Association by the Developer shall impose upon the Association any obligation to make monetary payments to Developer or any affiliate of Developer including, but not limited to, any purchase price, rent, charge or fee. The property or interest in property transferred to the Association by Developer shall not impose any unreasonable or special burdens of ownership of property, including the management maintenance, replacement and operation thereof.

**Section 8.03**  <u>Duty to Manage and Care for the Common Area</u>. The Association shall manage, operate, care for, maintain and repair all Common Areas and keep the same in a safe, attractive and desirable condition for the use and enjoyment of the Members. The duty to operate, manage and maintain the Common Areas shall include, but not be limited to the following: establishment, operation and maintenance of a security system, if any, for the Subdivision; management, maintenance, repair and upkeep of the Subdivision entrances and other Common Areas.

**Section 8.04**  <u>Other Insurance Bonds</u>. The Association shall obtain such insurance as may be required by law, including workmen's compensation insurance, and shall have the power to obtain such other insurance and such fidelity, indemnity or other bonds as the Association shall deem necessary or desirable.

**Section 8.05**  <u>Duty to Prepare Budgets</u>. The Association shall prepare budgets for the Association, which budgets shall include a reserve fund for the maintenance of all Common Areas.

**Section 8.06**  <u>Duty to Levy and Collect the Maintenance Charge</u>. The Association shall levy, collect and enforce the Maintenance Charge and other charges and assessments as elsewhere provided in this Declaration.

**Section 8.07** <u>Duty to Provide Annual Review</u>. The Association shall provide for an annual unaudited independent review of the accounts of the Association. Copies of the review shall be made available to any Member who requests a copy of the same upon payment by such Member of the reasonable cost of copying the same.

**Section 8.08** <u>Duties with Respect to Architectural Approvals</u>. The Association shall perform functions to assist the Committee as elsewhere provided in Article IV of this Declaration.

**Section 8.09** <u>Power to Acquire Property and Construct Improvements</u>. The Association may acquire property or an interest in property (including leases) for the common benefit of Owners including improvements and personal property. The Association may construct improvements on the Common Areas and may demolish existing improvements.

**Section 8.10** <u>Power to Adopt Rules and Regulations</u>. The Association may adopt, amend, repeal and enforce rules and regulations ("Rules and Regulations"), fines, levies and enforcement provisions as may be deemed necessary or desirable with respect to the interpretation and implementation of this Declaration, the operation of the Association, the use and enjoyment of the Common Areas, and the use of any other property, facilities or improvements owned or operated by the Association.

**Section 8.11** <u>Power to Enforce Restrictions and Rules and Regulations</u>. The Association (and any Owner with respect only to the remedies described in (b) or (c), below) shall have the power to enforce the provisions of this Declaration and the Rules and Regulations and shall take such action as the Board of Directors deems necessary or desirable to cause such compliance by each Member. Without limiting the generality of the foregoing, the Association shall have the power to enforce the provisions of this Declaration and of Rules and Regulations of the Association by any one or more of the following means:

    a.    By entry upon any property within the Subdivision after notice and hearing (unless a bona fide emergency exists in which event this right of entry may be exercised without notice, written or oral) to the Owner in such manner as to avoid any unreasonable or unnecessary interference with the lawful possession, use or enjoyment of the improvements situated thereon by the Owner or any other person, without liability by the Association to the Owner thereof, for the purpose of enforcement of this Declaration or the Rules and Regulations;

    b.    By commencing and maintaining actions and suits to restrain and enjoin any breach or threatened breach of the provisions of this Declaration or the Rules and Regulations;

    c.    By exclusion, after notice and hearing, of any Member from use of any recreational facilities within the Common Areas during and for up to sixty (60) days following any breach of this Declaration or such Rules and Regulations by such Member, unless the breach is a continuing breach in which case exclusion shall continue for so long as such breach continues;

    d.    By suspension, after notice and hearing, of the voting rights of a Member during and for up to sixty (60) days following any breach by such Member of a provision of this Declaration or such Rules and

Regulations, unless the breach is a continuing breach in which case such suspension shall continue for so long as such breach continues;

e.      By levying and collecting, after notice and hearing, an assessment against any Member for breach of this Declaration or such Rules and Regulations by such Member which assessment reimbursed the Association for the costs incurred by the Association in connection with such breach;

f.      By levying and collecting, after notice and hearing, reasonable and uniformly applied fines and penalties, established in advance in the Rules and Regulations of the Association, from any Member for breach of this Declaration or such Rules and Regulations by such Member; and

g.      By taking action itself to cure or abate such violation and to charge the expenses thereof, if any, to such violating Members, plus attorney's fees incurred by the Association with respect to exercising such remedy.

Before the Board may invoke the remedies provided above, it shall give registered notice of such alleged violation to Owner, and shall afford the Owner a hearing. If, after the hearing, a violation is found to exist, the Board's right to proceed with the listed remedies shall become absolute. Each day a violation continues shall be deemed a separate violation. Failure of the Association, the Developer, or of any Owner to take any action upon any breach or default with respect to any of the foregoing violations shall not be deemed a waiver of their right to take enforcement action thereafter or upon a subsequent breach or default.

**Section 8.12**    <u>Power to Grant Easements</u>. In addition to any blanket easements described in this Declaration, the Association shall have the power to grant access, utility, drainage, water facility and other such easements in, on, over or under the Common Area.

### ARTICLE IX
### GENERAL PROVISIONS

**Section 9.01**   <u>Term</u>. The provisions hereof shall run with all property in Section One and shall be binding upon all Owners and all persons claiming under them for a period of forty (40) years from the date this Declaration is recorded, after which time said Declaration shall be automatically extended for successive periods of ten (10) years each, unless an instrument, signed by Owners (including Developer) who are entitled to cast not less than two-thirds (2/3rds) of the votes of all the Owners has been recorded agreeing to amend or change, in whole or in part, this Declaration.

**Section 9.02**   <u>Amendments</u>. This Declaration may be amended or changed, in whole or in part, at any time by the written agreement or signed ballot of Owners (including the Developer) entitled to cast not less than two-thirds (2/3rds) of the votes of all of the Owners. If the Declaration is amended by a written instrument signed by those Owners entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Owners of the Association, such amendment must be approved by said Owners within three hundred sixty-five (365) days of the date the first Owner executes such amendment. The date an Owner's signature is acknowledged shall constitute prima facie evidence of the date of execution of said amendment by such Owner. Those Members (Owners, including the Developer) entitled to cast not less than two-

thirds (2/3rds) of all of the votes of the Members of the Association may also vote to amend this Declaration, in person, or by proxy, at a meeting of the Members (Owners, including the Declarant) duly called for such purpose, written notice of which shall be given to all Owners at least ten (10) days and not more than sixty (60) days in advance and shall set forth the purpose of such meeting. Notwithstanding any provision contained in the Bylaws to the contrary, a quorum, for purposes of such meeting, shall consist of Members (in person or by proxy) not less than seventy percent (70%) of all of the votes of the Members entitled to be cast. Any such amendment shall become effective when an instrument is filed for record in the Real Property Records of Denton County, Texas, accompanied by a certificate, signed by a majority of the Board of Directors, stating that the required number of Members (Owners, including the Developer) executed the instrument amending this Declaration or cast a written vote, in person or by proxy, in favor of said amendment at the meeting called for such purpose. Copies of the written ballots pertaining to such amendment shall be retained by the Association for a period of not less than three (3) years after the date of filing of the amendment or termination.

**Section 9.03** Amendments by the Developer. The Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged, and filed for record for the purpose of correcting any typographical or grammatical error, oversight, ambiguity or inconsistency appearing herein, provided that any such amendment shall be consistent with and in furtherance of the general plan and scheme of development as evidenced by this Declaration and shall not impair or adversely affect the vested property or other rights of any Owner or his mortgagee. Additionally, Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner of other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of permitting the Owners to enjoy the benefits from technological advances, such as security, communications or energy-related devices or equipment which did not exist or were not in common use in residential subdivisions at the time this Declaration was adopted. Likewise, the Developer shall have and reserves the right at any time and from time to time prior to the control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of prohibiting the use of any device or apparatus developed and/or available for residential use following the date of this Declaration if the use of such device or apparatus will adversely affect the Association or will adversely affect the property values within the Subdivision.

**Section 9.04** Severability. Each of the provisions of this Declaration shall be deemed independent and severable and the invalidity or un-enforceability or partial invalidity or partial un-enforceability of any provision or portion hereof shall not affect the validity or enforceability of any other provision.

**Section 9.05** Liberal Interpretation. The provisions of this Declaration shall be liberally construed as a whole to effectuate the purpose of this Declaration.

**Section 9.06** Successors and Assigns. The provisions hereof shall be binding upon and inure to the benefit of the Owners, the Developer and the Association, and their respective heirs, legal representatives, executors, administrators, successors and assigns.

21
07/11/95

464

ClibPDF - www.fastio.com

**Section 9.07** <u>Effect of Violations on Mortgages</u>. No violation of the provisions herein contained, or any portion thereof, shall affect the lien of any mortgage or deed of trust presently or hereafter placed of record or otherwise affect the rights of the mortgagee under any such mortgage, the holder of any such lien or beneficiary of any such deed of trust; and any such mortgage, lien or deed of trust may, nevertheless, be enforced in accordance with its terms, subject, nevertheless, to the provisions herein contained.

**Section 9.08** <u>Terminology</u>. All personal pronouns used in this Declaration and all exhibits attached hereto, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Title of Articles and Sections are for convenience only and neither limit nor amplify the provisions of this Declaration itself. The terms "herein", "hereof" and similar terms, as used in this instrument, refer to the entire agreement and are not limited to referring only to the specific paragraph, section or article in which such terms appear. All references in this Declaration to Exhibits shall refer to the Exhibits attached hereto.

IN WITNESS WHEREOF, the undersigned, being the Developer herein, has hereunto set its hand of this ___12___ day of ___July___, 19_95_

PROPERTIES OF THE SOUTHWEST, INC.

BY: _____
MARCUS SMITH VICE-PRESIDENT

STATE OF TEXAS   *
COUNTY OF DENTON *

This instrument was acknowledged before me on the ___12___ day of ___July___, 1995, by MARCUS SMITH, Vice-President of PROPERTIES OF THE SOUTHWEST INC., a Delaware corporation, on behalf of said corporation.

_____
Notary Public, State of Texas

> REBECCA A. HEARN
> MY COMMISSION EXPIRES
> April 7, 1997

ClibPDF - www.fastio.com

ClibPDF - www.fastio.com

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY
CLERK

On Aug 02 1995
At 9:04am

Doc/Num  : 95-R0045795
Doc/Type :        RST
Recording:     47.00
Doc/Mgmt :      6.00
Receipt #:     21161
 Deputy - CASSY

466

# Exhibit 35

**STATE OF TEXAS** )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Permit Number 2014-0123. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand this 1st day of April, 2014.

_____

Bennett C. Howell III, PE, CFM
Denton County
State of Texas

# APPLICATION FOR DEVELOPMENT PERMIT (ADP) (02/10)

JAN 2 2 2014

Denton County Flood Damage Prevention Ordinance
Planning Department, Denton County, Texas

20140123

---

**PART A – APPLICANT INFORMATION**   ☑ RESIDENTIAL PERMIT   ☐ COMMERCIAL PERMIT

First Name: ALAN HOFFMANN
Last Name:
Address: 7329 GASTON AVE. #725-341
City, State, Zip: Dallas, TX. 75214

Company:
Phone: 2A-325-0096
Fax:
Email:
* 469-688-6450

**PART B – PROPERTY INFORMATION**

DCAD 'R' #: 182659

Land Area (Acres):
Owner's First Name:                      Owner's Address:
Owner's Last Name:                       Owner's City, State, Zip:

[X] Property is part of a Subdivision:        – or –       ☐ Property is part of an Abstract:
Name: Sunrise Bay @ Lake Lewisville          Number:
Phase:                                       Name:
Block:                                       DCAD Tract:
Lot: 84                                      County Tract:

**PART C – DEVELOPMENT INFORMATION**     3960 Spinnaker Run Point

Application is for:   ☑ House   ☐ Manufactured House   ☐ Excavation/Fill
☐ Other (if "Other", describe the proposed improvement on the line below)

**Building Square Footage:**

☑ Address or Road Name: 3960 Spinnaker Run    ☑ Address Requested: (Y) (N)   ☑ Precinct # |

APPLICANT MUST ATTACH A SITE PLAN SHOWING LOCATION OF PROPOSED AND EXISTING IMPROVEMENTS, THEIR DISTANCE TO AT LEAST TWO PROPERTY LINES, DISTANCE FROM THE ENTRY ROAD, NORTH ARROW SHOWING ORIENTATION OF PROPERTY, PERMIT APPICATION FROM THE FIRE MARSHAL AND ANY OTHER REQUIRED DOCUMENTATION.   ☑ Lakewood Village ETJ

---

Acknowledgment: The Flood Insurance Rate Maps (FIRM) and other flood data used by Denton County in evaluating flood hazards to proposed developments are considered reasonable and accurate for regulatory purposes and are based on the best available scientific and engineering data. On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. Issuance of a Development Permit in accordance with the Denton County Flood Damage Prevention Ordinance does not imply that development outside the areas of special flood hazard will be free from flooding or flood damage. Issuance of a permit shall not create liability on the part of Denton County or any officer or employee of Denton County in the event flooding or flood damage does occur.

Construction of improvements should not be commenced at the above location until the Owner/Applicant is in compliance with all applicable regulations regarding floodplain management, subdivision platting, and zoning for the government of Denton County. This permit does not waive any other restrictions or regulations imposed privately or by law.

Applicant verifies that she/he has signed this application in the capacity designated, if any, and further attests that she/he has read this document, and that the statement contained herein and any attachments are true, accurate and factual.

Violation of this verification may result in Applicant being prosecuted under Texas Penal Code §37.10 (a) (1)

**PART D – SIGNATURE**          ☐ THIS PERMIT EXPIRES 2 YEARS FROM APPROVAL DATE
Signature:
Date: 1/21/14

**PART E – DENTON COUNTY USE ONLY**     #2434          *For Office Use Only!*

Permit Number: 20140123          Fees Paid (Y) (N)
                                 Cash:
FIRM Panel #: 48121C0415G        Check #:                    APPROVED BY
                                 In SFHA: (Y) (N)        DENTON COUNTY PLANNING DEPT.
Reviewer: GL                     Zone: X
Engineering Review: (Y) (N)      X NORC - 1-22-14          INITIALS GL
                                 NORCIC -                  DATE 2-24-14
Fire Marshal Permit: #
Culvert Permit: # RBE

**Denton County Planning Department**          (940) 349-2990: Main • (940) 349-2991: Fax
1505 E. McKinney St, Ste 175, Denton, TX 76209-4887     (972) 434-8868: Metro • www.dentoncounty.com

ELEVATION CERTIFICATE Required "BFE IS 537"   **469**



EXHIBIT

3960 Spinnaker Run Pointe

SPINNAKER RUN POINTE
(60' R.O.W.)

PROPERTY DESCRIPTION: Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

537 Line as Located in Field

U.S.A.
Lake Lewisville Reservoir

PROPOSED RESIDENCE
3960 Spinnaker Run Pointe

Zone "X"
(Unshaded)

Zone "AE"

Harry Bizios

| Date: | 02/21/14 |
| ASC No. | PLOT PLAN |
| Drawn/Clk | L.G. / D.L.A. |
| Client | Harry Bizios |

Arthur Surveying Co., Inc.
Professional Land Surveyors

470



SITE PLAN
SCALE 1" = 30'

MASONRY
MAILBOX

LAKE LEWISVILLE
RESOVOIR

DRAINAGE
(AS INDICATED)

| SHEET C-1 | ALAN HOFFMANN COMPANY<br>BIZIOS RESIDENCE<br>3960 SPINNAKER RUN POINTE RD | PHD<br>PESKUSKI HOME DESIGN<br>DALLAS, TEXAS<br>PHONE: (972) 092-8862   FAX: (972) 475-0608 | DATE 01/22/14 | PLAN NO. 7134 |

471



# DENTON COUNTY

## NOTICE OF RESIDENTIAL CONSTRUCTION
## IN UNINCORPORATED AREA



1/22/14
Received

2040123
Permit #

BUILDER / CONTRACTOR INFORMATION      , LLC DBA

COMPANY NAME: ALAN HOFFMANN Company

BUSINESS ADDRESS:            MA          ILING ADDRESS (IF DIFFERENT):
7314 GASTON AVE #129-341

DALLAS, TX 75214

PHONE NUMBER: 214.329-0046    EMAIL ADDRESS: ALAN@ALANHOFFMANNcompany.com

FAX NUMBER: 214-324-0199    CONTACT PERSON: ALAN HOFFMANN

---

PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[X] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):      OR    LOT AND BLOCK # 84    BLOCK 1

3960 SPINNAKER RUN POINTE    SUBDIVISION: SUNRISE BAY AT LAKE LEWISVILLE

LITTLE ELM, TX. 75068    SURVEY:

TRACT:

PLANNED DATE TO BEGIN CONSTRUCTION: JAN. 26th 2014

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[X] INTERNATIONAL RESIDENTIAL CODE - published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE - applicable in Denton

---

AUTHORIZED REPRESENTATIVE SIGNATURE          PRINTED NAME: Alan Hoffman      DATE: 1/21/14

472



PLAT PLAN
SCALE 1" 30'

SPINAKER RUN POINTE ROAD

N 55 DEG 07'13" E    116.5'

LAKE LEWISVILLE
RESOVOIR

ROOF PLAN
SCALE 18" 1'

SHEET
A-6

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (480) 092-6655    FAX (978) 876-9655

PLAN NO.
7134

DATE
10/08/13

473

Little Elm

Little Elm

R182666

R182653

SPINNAKER RUN PT

Little Elm ETJ

R182658

R182663

R182658

R182658

R182658

R182658

Lakewood Village ETJ

R182666

AUTUMN MIST/CV

Denton County

R182666

Little Elm

R159279

R151177



LandmarkGIS

SPINNAKER BAY POINT

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.



N

0    115    230    460
Feet

http://gis.dentoncounty.com

DENTON COUNTY
Technology
Services
Geographic Information Systems





ELEVATIONS 1
SCALE 3/16" = 1'

FRONT/NORTH ELEVATION

REAR/SOUTH ELEVATION

SHEET A-4

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINNAKER RUN POINTE RD

PHD
PISKWSKI HOME DESIGN

PLAN No. 7134

DATE 10/08/13



FIRST FLOOR
PLAN SCALE 3/16" = 1'

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (469) 984-8088    FAX: (972) 575-4626

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

PLAN NO. 7134
DATE 10/08/13
SHEET A-2A

PLAN NO. 7134
DATE 10/08/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (972) 931 5638    FAX (972) 475 0436

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINNAKER RUN POINTE RD

SHEET A-3

NOTES

1. COMPLY WITH ALL STATE, COUNTY AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 7" ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS - INTERIOR BEARING FOOTINGS AT AND NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2"x 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS MIN. FULL 2" x 4" STUDS WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL, FOR PLUMBING SUPPLY AND VENTS.

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE.

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS.

9. PER SECTION 907.2.16.1 W/L SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON HOUSE PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE. DIMENSIONS, OPENINGS ARE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

WALL TYPES

BRICK 2
BRICK 3
STONE 4
STONE 6
STUCCO 4
STUCCO 6
INTERIOR 4.5
INTERIOR 4
DEMO WALL 12
GLASS WALL

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR AND / OR WALL OWNER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES OR MODIFICATION NECESSARY TO COMPLY TO THE STATE OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE FEVERIFICATION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR SINGLE RESIDENTIAL CONSTRUCTION PURPOSES AND MAY NOT BE EXHAUSTIVE OR BASED ON ALL APPLICABLE REQUIREMENTS. CONTRACTORS AND / OR OWNERS SHOULD INDEPENDENTLY VERIFY AND TAKE FULL RESPONSIBILITY FOR THE CONSTRUCTION AND IT SHALL BE HIS/HER RESPONSIBILITY TO BE SURE ANY REQUIRED INSPECTIONS AND CODE COMPLIANCE ARE MET WITH ALL APPLICABLE LOCAL, STATE AND FEDERAL REGULATIONS. PESKUSKI HOME DESIGN DOES NOT GUARANTEE THAT THESE DOCUMENTS WILL MEET ALL THE REQUIREMENTS AND THE PLANS ARE NOT INTENDED TO LAND CODES. THESE PLANS CONTAIN CONFIDENTIAL INFORMATION AND DO NOT PROVIDE ANY FINISHES AND ARE NECESSARY TO THE. IT SHALL BE THE DOCUMENTS OF THIS PROJECT - PESKUSKI HOME DESIGN DOES NOT REMAIN WORK OR MAY RESULT IN STRUCTURAL MEMBERS.

SECOND FLOOR
PLAN    SCALE 3/16" = 1'



479

SECOND FLOOR

FIRST FLOOR



NOTES

## AREAS

### LIVING
| | |
|---|---|
| FIRST FLOOR A/C | 5536 |
| SECOND FLOOR A/C | 1369 |
| LOFT | 229 |
| **TOTAL LIVING** | **7134** |

### GARAGES
| | |
|---|---|
| 2 CARS | 618 |
| 2 CARS | 618 |
| SHOP | 221 |

### PORCHES
| | |
|---|---|
| ENTRY - GATE | 175 |
| ENTRY - FRONT DOOR | 123 |
| PRIVATE | 82 |
| BACK SNGLE VOLUME | 471 |
| BACK DBL VOLUME | 505 |

| | |
|---|---|
| **GARAGES/PORCHES** | **2813** |
| **TOTAL UNDER ROOF** | **9947** |

## PLAN OVERVIEW

SCALE 3/32" - 1'

| SHEET | A-1 | ALAN HOFFMANN COMPANY BIZIOS RESIDENCE 3950 SPINAKER RUN POINTE RD | **PHD** PESKUSKI HOME DESIGN DALLAS TEXAS | DATE 10/18/13 | PLAN NO 7134 |

# DENTON COUNTY CULVERT/DRIVE PERMIT APPLICATION

Landowner: _Norby Bizios_     Phone: _____

Mailing Address: _7324 Gaston Ave    Dallas TX_ _____

       Street       Cit      y      State      Zip

Contact/Installer Name: _____ Phone: _____

Road Name: _____ R# _182659_ _____

Location Description: _____

_____

Will a septic system be installed on the property? _no_ _____

Is there an existing septic system? _yes_ _____ (This will be verified by the inspector.)

> For Official Use Only
>
> Permit Fee: $15.00 paid by: Check # _2434_ ___ or Cash [☐]  Receipt # _37001_
>
> Development Permit # _____ RB West ___ RB East _✓_

It is understood that this is not a permit and is only an application for a permit once the following requirements and conditions have been met. This application expires after 60 days.

## A COPY OF THIS DOCUMENT MUST BE POSTED ON SITE
**Failure to do so will result in work stoppage.**

I have read and understand this document and the culvert process instructions.

Applicant Signature: _[signature]_    Printed: _[signature]_

> For Official Use Only
>
> Date: _1/22/14_      Taken By: _[signature]_

> For Inspector Use Only
>
> Pre-insp: _____ Staked: _____ Grade insp: _____
>
> Form insp: _____ Final insp: _____ Free Insp: _____
>
> Notes: _____
>
> _____
>
> _____

480



481



Panel #: = 0415

Landmark-GIS © Denton County

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.

N

0    80    160    320
Feet

http://gis.dentoncounty.com

DENTON COUNTY
Technology
Services
Geographic Information Systems

482

2014 0123

# ELEVATION CERTIFICATE

**Important: Read the instructions on pages 1–9.**

OMB No. 1660-0008
Expiration Date: July 31, 2015

## SECTION A – PROPERTY INFORMATION

**FOR INSURANCE COMPANY USE**

Policy Number:

A1. Building Owner's Name

Company NAIC Number:

A2. Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.
3960 Spinnaker Run Point

City Little Elm    State TX    ZIP Code 75068

A3. Property Description (Lot and Block Numbers, Tax Parcel Number, Legal Description, etc.)
Lot 84, Block 1 of Sunrise Bay at Lake Lewisville - Tax Parcel Number 182659

A4. Building Use (e.g., Residential, Non-Residential, Addition, Accessory, etc.) Residential
A5. Latitude/Longitude: Lat. 33.14809 Long. 96.96500  Horizontal Datum: ☐ NAD 1927 ☐ NAD 1983
A6. Attach at least 2 photographs of the building if the Certificate is being used to obtain flood insurance.
A7. Building Diagram Number 1B
A8. For a building with a crawlspace or enclosure(s):
   a) Square footage of crawlspace or enclosure(s)    n/a    sq ft
   b) Number of permanent flood openings in the crawlspace or enclosure(s) within 1.0 foot above adjacent grade    n/a
   c) Total net area of flood openings in A8.b    n/a    sq in
   d) Engineered flood openings?    ☐ Yes    ☒ No

A9. For a building with an attached garage:
   a) Square footage of attached garage    n/a    sq ft
   b) Number of permanent flood openings in the attached garage within 1.0 foot above adjacent grade    n/a
   c) Total net area of flood openings in A9.b    n/a    sq in
   d) Engineered flood openings?    ☐ Yes    ☒ No

## SECTION B – FLOOD INSURANCE RATE MAP (FIRM) INFORMATION

B1. NFIP Community Name & Community Number
Denton County - 480774

B2. County Name
Denton

B3. State
TX

| B4. Map/Panel Number 48121C0415 | B5. Suffix G | B6. FIRM Index Date 4-18-2011 | B7. FIRM Panel Effective/Revised Date 4-18-2011 | B8. Flood Zone(s) AE | B9. Base Flood Elevation(s) (Zone AO, use base flood depth) 537 |
|---|---|---|---|---|---|

B10. Indicate the source of the Base Flood Elevation (BFE) data or base flood depth entered in Item B9.
   ☐ FIS Profile    ☒ FIRM    ☐ Community Determined    ☐ Other/Source: _____
B11. Indicate elevation datum used for BFE in Item B9: ☐ NGVD 1929    ☒ NAVD 1988    ☐ Other/Source: _____
B12. Is the building located in a Coastal Barrier Resources System (CBRS) area or Otherwise Protected Area (OPA)?    ☐ Yes    ☒ No
   Designation Date: _____    ☐ CBRS    ☐ OPA

## SECTION C – BUILDING ELEVATION INFORMATION (SURVEY REQUIRED)

C1. Building elevations are based on:    ☒ Construction Drawings*    ☐ Building Under Construction*    ☐ Finished Construction
   *A new Elevation Certificate will be required when construction of the building is complete.
C2. Elevations – Zones A1–A30, AE, AH, A (with BFE), VE, V1–V30, V (with BFE), AR, AR/A, AR/AE, AR/A1–A30, AR/AH, AR/AO. Complete Items C2.a–h below according to the building diagram specified in Item A7. In Puerto Rico only, enter meters.
   Benchmark Utilized: _____    Vertical Datum: _____
   Indicate elevation datum used for the elevations in items a) through h) below. ☐ NGVD 1929 ☐ NAVD 1988 ☐ Other/Source: _____
   Datum used for building elevations must be the same as that used for the BFE.

Check the measurement used.

   a) Top of bottom floor (including basement, crawlspace, or enclosure floor)    539.00    ☐ feet    ☐ meters
   b) Top of the next higher floor    ___.___    ☐ feet    ☐ meters
   c) Bottom of the lowest horizontal structural member (V Zones only)    ___.___    ☐ feet    ☐ meters
   d) Attached garage (top of slab)    ___.___    ☐ feet    ☐ meters
   e) Lowest elevation of machinery or equipment servicing the building    ___.___    ☐ feet    ☐ meters
      (Describe type of equipment and location in Comments)
   f) Lowest adjacent (finished) grade next to building (LAG)    ___.___    ☐ feet    ☐ meters
   g) Highest adjacent (finished) grade next to building (HAG)    ___.___    ☐ feet    ☐ meters
   h) Lowest adjacent grade at lowest elevation of deck or stairs, including structural support    ___.___    ☐ feet    ☐ meters

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION

This certification is to be signed and sealed by a land surveyor, engineer, or architect authorized by law to certify elevation information. *I certify that the information on this Certificate represents my best efforts to interpret the data available. I understand that any false statement may be punishable by fine or imprisonment under 18 U.S. Code, Section 1001.*

☐ Check here if comments are provided on back of form.
☐ Check here if attachments.

Were latitude and longitude in Section A provided by a licensed land surveyor?    ☐ Yes    ☒ No

Certifier's Name Douglas L. Arthur    License Number 4357
Title RPLS    Company Name Arthur Surveying Company
Address 220 Elm Street, St. 200    City Lewisville    State TX    ZIP Code 75067
Signature    Date 2/20/2014    Telephone 972-221-9439

*STATE OF TEXAS*
*REGISTERED*
DOUGLAS L. ARTHUR
4357
*PROFESSIONAL*
*LAND SURVEYOR*

FEMA Form 086-0-33 (7/12)    See reverse side for continuation.    Replaces all previous editions.

**483**

## ELEVATION CERTIFICATE, page 2

| IMPORTANT: In these **spaces, copy** the **corresponding** information from Section A. | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.<br>3960 Spinnaker Run Point | Policy Number: |
| City Little Elm      State TX   ZIP Code 75068 | Company NAIC Number: |

### SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION (CONTINUED)

Copy both sides of this Elevation Certificate for (1) community official, (2) insurance agent/company, and (3) building owner.

Comments

Signature _[signature]_    Date 2/20/2014

### SECTION E – BUILDING ELEVATION INFORMATION (SURVEY NOT REQUIRED) FOR ZONE AO AND ZONE A (WITHOUT BFE)

For Zones AO and A (without BFE), complete Items E1–E5. If the Certificate is intended to support a LOMA or LOMR-F request, complete Sections A, B, and C. For Items E1–E4, use natural grade, if available. Check the measurement used. In Puerto Rico only, enter meters.

E1. Provide elevation information for the following and check the appropriate boxes to show whether the elevation is above or below the highest adjacent grade (HAG) and the lowest adjacent grade (LAG).
   a) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
   b) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the LAG.
E2. For Building Diagrams 6–9 with permanent flood openings provided in Section A Items 8 and/or 9 (see pages 8–9 of Instructions), the next higher floor (elevation C2.b in the diagrams) of the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
E3. Attached garage (top of slab) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
E4. Top of platform of machinery and/or equipment servicing the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
E5. Zone AO only: If no flood depth number is available, is the top of the bottom floor elevated in accordance with the community's floodplain management ordinance? ☐ Yes ☐ No ☐ Unknown. The local official must certify this information in Section G.

### SECTION F – PROPERTY OWNER (OR OWNER'S REPRESENTATIVE) CERTIFICATION

The property owner or owner's authorized representative who completes Sections A, B, and E for Zone A (without a FEMA-issued or community-issued BFE) or Zone AO must sign here. The statements in Sections A, B, and E are correct to the best of my knowledge.

Property Owner's or Owner's Authorized Representative's Name

| Address | City | State | ZIP Code |
|---|---|---|---|
| Signature | Date | Telephone | |

Comments

☐ Check here if attachments.

### SECTION G – COMMUNITY INFORMATION (OPTIONAL)

The local official who is authorized by law or ordinance to administer the community's floodplain management ordinance can complete Sections A, B, C (or E), and G of this Elevation Certificate. Complete the applicable item(s) and sign below. Check the measurement used in Items G8–G10. In Puerto Rico only, enter meters.

G1. ☐  The information in Section C was taken from other documentation that has been signed and sealed by a licensed surveyor, engineer, or architect who is authorized by law to certify elevation information. (Indicate the source and date of the elevation data in the Comments area below.)

G2. ☐  A community official completed Section E for a building located in Zone A (without a FEMA-issued or community-issued BFE) or Zone AO.

G3. ☐  The following information (Items G4–G10) is provided for community floodplain management purposes.

| G4. Permit Number | G5. Date Permit Issued | G6. Date Certificate Of Compliance/Occupancy Issued |
|---|---|---|
| | | |

G7.  This permit has been issued for: ☐ New Construction  ☐ Substantial Improvement
G8.  Elevation of as-built lowest floor (including basement) of the building: _____._____ ☐ feet ☐ meters Datum _____
G9.  BFE or (in Zone AO) depth of flooding at the building site: _____._____ ☐ feet ☐ meters Datum _____
G10. Community's design flood elevation: _____._____ ☐ feet ☐ meters Datum _____

| Local Official's Name | Title |
|---|---|
| Community Name | Telephone |
| Signature | Date |

Comments

☐ Check here if attachments.

FEMA Form 086-0-33 (7/12)                Replaces all previous editions.

**484**

# Building Photographs

See Instructions for Item A6.

**IMPORTANT: In these spaces, copy the corresponding information from Section A.**

| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No. | | | FOR INSURANCE COMPANY USE |
|---|---|---|---|
| | | | Policy Number: |
| City | State | ZIP Code | Company NAIC Number: |

If using the Elevation Certificate to obtain NFIP flood insurance, affix at least 2 building photographs below according to the instructions for Item A6. Identify all photographs with date taken; "Front View" and "Rear View"; and, if required, "Right Side View" and "Left Side View." When applicable, photographs must show the foundation with representative examples of the flood openings or vents, as indicated in Section A8. If submitting more photographs than will fit on this page, use the Continuation Page.





20140123

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.

N

| 0 | 95 | 190 | 380 |
|---|----|-----|-----|
Feet

http://gis.dentoncounty.com

Little Elm

SPINNAKER RUN PT

AUTUMN MIST CV

R182657
R182658
R18265
R182660
R268913
R182649
R182647
R182669
R182664
R182665

Panel # = 0415

Landmark GIS



This is an official copy of a portion of the above referenced flood map. It was extracted using F-MIT On-Line. This map does not reflect changes or amendments which may have been made subsequent to the date on the title block. For the latest product information about National Flood Insurance Program flood maps check the FEMA Flood Map Store at www.msc.fema.gov

Federal Emergency Management Agency

**MAP NUMBER**
48121C0415G

**MAP REVISED**
APRIL 18, 2011

Notice to User: The Map Number shown below should be used when placing map orders; the Community Number shown above should be used on insurance applications for the subject community.

**COMMUNITY**

| COMMUNITY | NUMBER | PANEL | SUFFIX |
|---|---|---|---|
| DENTON COUNTY | 480774 | 0415 | G |
| LAKEWOOD VILLAGE, TOWN OF | 481683 | 0415 | G |
| LITTLE ELM, TOWN OF | 481152 | 0415 | G |
| OAK POINT, CITY OF | 481539 | 0415 | G |
| THE COLONY, CITY OF | 481561 | 0415 | G |

**PANEL 415 OF 750**
(SEE MAP INDEX FOR FIRM PANEL LAYOUT)

## FIRM

FLOOD INSURANCE RATE MAP

**DENTON COUNTY, TEXAS**
AND INCORPORATED AREAS

PANEL 0415G

NATIONAL FLOOD INSURANCE PROGRAM

NFIP

MAP SCALE 1" = 1000'

500    0    1000    2000

FEET
METERS

487

## Property Details for account 182659

## Tax Information

The Denton Central Appraisal District is not responsible for the assessment or collection of taxes for this or any other property. If you have a question regarding your tax bill please contact the **Denton County Tax Assessor / Collector**.

## General Information

| | |
|---|---|
| Property ID | 182659 |
| Geograhic ID | SN0104A-000001-0000-0084-0000 |
| Legal Description | Sunrise Bay At Lake Lewisville Blk 1 Lot 84 |
| Situs Address | 3960 Spinnaker Run Pt Tx 75068-3110 |
| Property Type | Real |
| Neighborhood | DC13012L |
| | Sunrise Bay At Lake Lewisville (lake Fr |
| Abstract/Subdivision | SN0104A |
| | All properties in SN0104A |
| | View Plat |
| Owner ID | 621297 |
| Owner Name | Langley, Kelly B |
| Percent Ownership | 100 |
| Mailing Address | 18540 Vista Del Sol Dr |
| | Dallas, TX 75287-4019 |
| Taxing Jurisdictions | G01 (Denton County) |
| | S10 (Little Elm Isd) |
| Exemptions | N/A |
| View Map | Denton CAD GIS |

## 2012 Certified Values

| | | |
|---|---|---|
| Total Improvement Value | (+) | $0 |
| Land Homesite Value | (+) | $0 |
| Land Non-Homesite Value | (-) | $474,430 |
| Agricultural Market Value | (+) | $0 |
| Timber Market Value | (+) | $0 |
| Total Market Value | (=) | $474,430 |
| Agricultural Use Reduction | (-) | $0 |
| Timber Use Reduction | (-) | $0 |
| Appraised Value | (=) | $474,430 |
| Homestead Cap What's this? | (-) | $0 |
| Assessed Value | (=) | $474,430 |

## 2012 Estimated Taxes

| Entity Name | Tax Rate Per $100 | Taxable Value | Calculated Taxes | Tax Ceiling Amount |
|---|---|---|---|---|
| Denton County | 0.282867% | $474,430.00 | $1,342.01 | N/A |
| Little ELM | 1.54% | $474,430.00 | $7,306.22 | N/A |
| Estimated Total Taxes | | | | $8,648.23 |

**DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES.** You will receive an official tax bill from the appropriate agency when they are prepared. Taxes are collected by the agency sending you the official tax bill. To see a listing of agencies that collect taxes for your property, click here

U. S. Army, Corps of Engineers
ATTN: CESWF-RE-M
P. O. Box 17300
Fort Worth, TX 76102-0300

January 28, 2014

Mr. Harry Bizios
3960 Spinnaker Run Point
Little Elm, Texas 75068

Dear Mr. Bizios:

Enclosed are two fully executed copies of Consent DACW63-9-14-0533 for your records. Per condition 10 of your consent a copy must be filed at the county of record under the referenced tract number. Once recorded a copy must be provided to us so that we will know the consent is officially on record. You have 90-days to provide us with proof of recording or your consent may be terminated.

If you have any questions related to your rights or responsibilities as provided for in the consent, please contact Mrs. Vicki Akers at 817-886-1114.

Joanne Murphy
Realty Specialist
Fort Worth District

Enclosures



489

Consent No. DACW63-9-14-0533

**DEPARTMENT OF THE ARMY**
**CORPS OF ENGINEERS**
**FORT WORTH DISTRICT**

Project: Lewisville Lake, Texas
Tract No. E-465E

WHEREAS, the United States has acquired a perpetual flowage easement over Tract No. E-465E, Lewisville Lake, Texas, recorded in Deed Records, volume 463, pp. 444, of Denton County, Texas.

WHEREAS, said easement grants to the United States the right of prior approval for any structure to be located within the easement area, which area is under the administrative control of the Fort Worth District, Corps of Engineers.

WHEREAS, the United States has been requested to grant approval for a riprap retaining wall to be placed on the above-identified tract.

NOW THEREFORE, the United States hereby gives consent to Mr. Harry Bizios to place a riprap retaining wall at the location shown on **Exhibits A and B**.

PROVIDED HOWEVER, that this consent is subject to the following conditions:

1. All activities conducted on the premises shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

2. The giving of this consent does not in any way subordinate the United States' prior easement rights. The United States shall in no case be liable for any damage or injury to the structures herein consented to, which may be caused by any action of the United States under its easement, or that may result from future operations undertaken by the United States, and no claim or right to compensation shall accrue from such exercise of the United States' easement rights.

3. The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the consented activity.

4. This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the consentee shall obtain such permission as may be required on account of any other existing rights. It is understood that this consent does not eliminate the necessity for obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat 1151; 33

**490**

Consent, R- Rap Retaining Wall, Tract E 465 E
3960 Spinnaker Run Point , Little Elm, TX  75068



130     65     0          130 Feet

## Lewisville Lake
### Legend

EXHIBIT A

491

# Gary Cook

From:        Linda Asbell [linda@lakewoodvillagetx.us]
Sent:        Wednesday, February 19, 2014 4:27 PM
To:          Gary Cook
Subject:    RE: 20140123

No issues at all.  They have already started the permit process with us.

Thank you.

Linda Asbell, TRMC
Town Secretary
972-294-5555 (direct)
www.lakewoodvillagetx.us



**From:** Gary Cook [mailto:Gary.Cook@dentoncounty.com]
**Sent:** Wednesday, February 19, 2014 4:05 PM
**To:** linda@lakewoodvillagetx.us
**Subject:** 20140123

Hey Linda — I've got a permit for a house in your ETJ. Do you have any issues with it?
Thanks Gary

**From:** PublicWorks@dentoncounty.com [mailto:PublicWorks@dentoncounty.com]
**Sent:** Wednesday, February 19, 2014 4:06 PM
**To:** Gary Cook
**Subject:** Attached Image

**492**



## Public Works
## Denton County

1505 E. McKinney St, Ste 175
Denton, Texas 76209
(940) 349-2990: Main
(940) 349-2991: Fax
www.dentoncounty.com

# RECEIPT

| Date |
|---|
| 22-Jan-14 |

| Employee |
|---|
| DRAWER 2 |

| Customer |
|---|
| ALAN HOFFMANN |

7324 GASTON AVE
DALLAS , TX  75214
USA

| Order Date |
|---|
| 22-Jan-14 |

| Customer ID |
|---|
| 6399 |

| Order ID |
|---|
| 37001 |

| Product Name | Category | Quantity | Unit Price | Discount | Extended Price |
|---|---|---|---|---|---|
| IN F.P. DEVELOPMENT PERMIT | PERMIT | 1 | $50.00 | 0% | $50.00 |
| CULVERT | CULVERT | 1 | $15.00 | 0% | $15.00 |

| | |
|---|---|
| Subtotal | $65.00 |
| Total Due | $65.00 |
| Payments | $65.00 |
| Check # | 2434 |
| Balance | $0.00 |

493

# Exhibit 36

# ELEVATION CERTIFICATE

**Important: Read the instructions on pages 1–9.**

OMB No. 1660-0008
Expiration Date: July 31, 2015

## SECTION A – PROPERTY INFORMATION

**FOR INSURANCE COMPANY USE**

Policy Number:

Company NAIC Number:

A1. Building Owner's Name

A2. Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.
3960 Spinnaker Run Point

City Little Elm    State TX    ZIP Code 75068

A3. Property Description (Lot and Block Numbers, Tax Parcel Number, Legal Description, etc.)
Lot 84, Block 1 of Sunrise Bay at Lake Lewisville - Tax Parcel Number 182659

A4. Building Use (e.g., Residential, Non-Residential, Addition, Accessory, etc.) Residential
A5. Latitude/Longitude: Lat. 33.14809  Long. 96.96500    Horizontal Datum: ☐ NAD 1927 ☐ NAD 1983
A6. Attach at least 2 photographs of the building if the Certificate is being used to obtain flood insurance.
A7. Building Diagram Number 1B
A8. For a building with a crawlspace or enclosure(s):

  a) Square footage of crawlspace or enclosure(s)    n/a    sq ft
  b) Number of permanent flood openings in the crawlspace or enclosure(s) within 1.0 foot above adjacent grade    n/a
  c) Total net area of flood openings in A8.b    n/a    sq in
  d) Engineered flood openings?    ☐ Yes  ☒ No

A9. For a building with an attached garage:

  a) Square footage of attached garage    n/a    sq ft
  b) Number of permanent flood openings in the attached garage within 1.0 foot above adjacent grade    n/a
  c) Total net area of flood openings in A9.b  n/a    sq in
  d) Engineered flood openings?    ☐ Yes  ☒ No

## SECTION B – FLOOD INSURANCE RATE MAP (FIRM) INFORMATION

| B1. NFIP Community Name & Community Number | B2. County Name | B3. State |
|---|---|---|
| Denton County - 480774 | Denton | TX |

| B4. Map/Panel Number 48121C0415 | B5. Suffix G | B6. FIRM Index Date 4-18-2011 | B7. FIRM Panel Effective/Revised Date 4-18-2011 | B8. Flood Zone(s) AE | B9. Base Flood Elevation(s) (Zone AO, use base flood depth) 537 |
|---|---|---|---|---|---|

B10. Indicate the source of the Base Flood Elevation (BFE) data or base flood depth entered in Item B9.

  ☐ FIS Profile  ☒ FIRM  ☐ Community Determined    ☐ Other/Source: _____

B11. Indicate elevation datum used for BFE in Item B9: ☐ NGVD 1929  ☒ NAVD 1988  ☐ Other/Source: _____
B12. Is the building located in a Coastal Barrier Resources System (CBRS) area or Otherwise Protected Area (OPA)?    ☐ Yes  ☒ No
Designation Date: _____    ☐ CBRS  ☐ OPA

## SECTION C – BUILDING ELEVATION INFORMATION (SURVEY REQUIRED)

C1. Building elevations are based on:    ☒ Construction Drawings*    ☐ Building Under Construction*    ☐ Finished Construction
*A new Elevation Certificate will be required when construction of the building is complete.
C2. Elevations – Zones A1–A30, AE, AH, A (with BFE), VE, V1–V30, V (with BFE), AR, AR/A, AR/AE, AR/A1–A30, AR/AH, AR/AO. Complete Items C2.a–h below according to the building diagram specified in Item A7. In Puerto Rico only, enter meters.

Benchmark Utilized: _____    Vertical Datum: _____
Indicate elevation datum used for the elevations in items a) through h) below. ☐ NGVD 1929 ☐ NAVD 1988 ☐ Other/Source: _____
Datum used for building elevations must be the same as that used for the BFE.

Check the measurement used.

|  |  |  |  |
|---|---|---|---|
| a) Top of bottom floor (including basement, crawlspace, or enclosure floor) | 540.04 | ☐ feet | ☐ meters |
| b) Top of the next higher floor | n/a. _____ | ☐ feet | ☐ meters |
| c) Bottom of the lowest horizontal structural member (V Zones only) | n/a. _____ | ☐ feet | ☐ meters |
| d) Attached garage (top of slab) | n/a. _____ | ☐ feet | ☐ meters |
| e) Lowest elevation of machinery or equipment servicing the building (Describe type of equipment and location in Comments) | n/a. _____ | ☐ feet | ☐ meters |
| f) Lowest adjacent (finished) grade next to building (LAG) | 537.10 | ☐ feet | ☐ meters |
| g) Highest adjacent (finished) grade next to building (HAG) | 539.30 | ☐ feet | ☐ meters |
| h) Lowest adjacent grade at lowest elevation of deck or stairs, including structural support | n/a. _____ | ☐ feet | ☐ meters |

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION

This certification is to be signed and sealed by a land surveyor, engineer, or architect authorized by law to certify elevation information. *I certify that the information on this Certificate represents my best efforts to interpret the data available. I understand that any false statement may be punishable by fine or imprisonment under 18 U.S. Code, Section 1001.*

☐ Check here if comments are provided on back of form.
☐ Check here if attachments.

Were latitude and longitude in Section A provided by a licensed land surveyor?    ☐ Yes  ☒ No

Certifier's Name Douglas L. Arthur    License Number 4357

Title RPLS    Company Name Arthur Surveying Company

Address 220 Elm Street, St 200    City Lewisville    State TX    ZIP Code 75067

Signature    Date 3/7/2014.    Telephone 972-221-9439

*STATE OF TEXAS*
*REGISTERED*
DOUGLAS L. ARTHUR
4357
*PROFESSIONAL*
*LAND SURVEYOR*

**495**

# ELEVATION CERTIFICATE, page 2

**IMPORTANT: In these spaces, copy the corresponding information from Section A.**

| | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.<br>3960 Spinnaker Run Point | Policy Number: |
| City  Little Elm                     State  TX     ZIP Code  75068 | Company NAIC Number: |

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION (CONTINUED)

Copy both sides of this Elevation Certificate for (1) community official, (2) insurance agent/company, and (3) building owner.

Comments

Signature                                                                 Date

## SECTION E – BUILDING ELEVATION INFORMATION (SURVEY NOT REQUIRED) FOR ZONE AO AND ZONE A (WITHOUT BFE)

For Zones AO and A (without BFE), complete Items E1–E5. If the Certificate is intended to support a LOMA or LOMR-F request, complete Sections A, B, and C. For Items E1–E4, use natural grade, if available. Check the measurement used. In Puerto Rico only, enter meters.

E1. Provide elevation information for the following and check the appropriate boxes to show whether the elevation is above or below the highest adjacent grade (HAG) and the lowest adjacent grade (LAG).
   a) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____  □ feet □ meters □ above or □ below the HAG.
   b) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____  □ feet □ meters □ above or □ below the LAG.

E2. For Building Diagrams 6–9 with permanent flood openings provided in Section A Items 8 and/or 9 (see pages 8–9 of Instructions), the next higher floor (elevation C2.b in the diagrams) of the building is _____._____ □ feet □ meters □ above or □ below the HAG.

E3. Attached garage (top of slab) is _____._____  □ feet □ meters □ above or □ below the HAG.

E4. Top of platform of machinery and/or equipment servicing the building is _____._____ □ feet □ meters □ above or □ below the HAG.

E5. Zone AO only: If no flood depth number is available, is the top of the bottom floor elevated in accordance with the community's floodplain management ordinance? □ Yes  □ No  □ Unknown. The local official must certify this information in Section G.

## SECTION F – PROPERTY OWNER (OR OWNER'S REPRESENTATIVE) CERTIFICATION

The property owner or owner's authorized representative who completes Sections A, B, and E for Zone A (without a FEMA-issued or community-issued BFE) or Zone AO must sign here. The statements in Sections A, B, and E are correct to the best of my knowledge.

Property Owner's or Owner's Authorized Representative's Name

| Address | City | State | ZIP Code |
|---|---|---|---|
| Signature | Date | Telephone | |

Comments

□ Check here if attachments.

## SECTION G – COMMUNITY INFORMATION (OPTIONAL)

The local official who is authorized by law or ordinance to administer the community's floodplain management ordinance can complete Sections A, B, C (or E), and G of this Elevation Certificate. Complete the applicable item(s) and sign below. Check the measurement used in Items G8–G10. In Puerto Rico only, enter meters.

G1. □  The information in Section C was taken from other documentation that has been signed and sealed by a licensed surveyor, engineer, or architect who is authorized by law to certify elevation information. (Indicate the source and date of the elevation data in the Comments area below.)

G2. □  A community official completed Section E for a building located in Zone A (without a FEMA-issued or community-issued BFE) or Zone AO.

G3. □  The following information (Items G4–G10) is provided for community floodplain management purposes.

| G4. Permit Number | G5. Date Permit Issued | G6. Date Certificate Of Compliance/Occupancy Issued |
|---|---|---|
| | | |

G7. This permit has been issued for:  □ New Construction  □ Substantial Improvement

G8. Elevation of as-built lowest floor (including basement) of the building: _____._____ □ feet □ meters  Datum _____

G9. BFE or (in Zone AO) depth of flooding at the building site: _____._____ □ feet □ meters  Datum _____

G10. Community's design flood elevation: _____._____ □ feet □ meters  Datum _____

| Local Official's Name | Title |
|---|---|
| Community Name | Telephone |
| Signature | Date |

Comments

□ Check here if attachments.

# Building Photographs

See Instructions for Item A6.

**IMPORTANT: In these spaces, copy the corresponding information from Section A.**

| | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No. | Policy Number: |
| City                          State      ZIP Code | Company NAIC Number: |

If using the Elevation Certificate to obtain NFIP flood insurance, affix at least 2 building photographs below according to the instructions for Item A6. Identify all photographs with date taken; "Front View" and "Rear View"; and, if required, "Right Side View" and "Left Side View." When applicable, photographs must show the foundation with representative examples of the flood openings or vents, as indicated in Section A8. If submitting more photographs than will fit on this page, use the Continuation Page.

FRONT VIEW



# Exhibit 37



FORMS SURVEY
3960 Spinnaker Run Pointe

U.S.A.
Lake Lewisville Resorvoir
S 04°53'49" W 269.66'

Subdivision Boundary

522' Elev line

FORMS
3960 Spinnaker Run Pointe
top of forms = 540.04'

537 Line as located on the ground.

Top of bank

Top of bank

N 38°21'36" W 491.89'

U.S.A.
Lake Lewisville Resorvoir

Subdivision Boundary

C.O.E. MON.

Zone "AE"

Lot 83

TBM SET 60D IN TREE

91.8'
18.0'
33.6'
15.5'
64.0'
14.0'
25.0'
304.6'

5.8'
16.4'
24.5'
4.0'
5.7'
3.6'
19.1'
27.8'
24.0'
54.3'

Zone "X"
(Unshaded)

S 43°20'43" E 585.89'

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

N 34°54'11" W 295.77'

Lot 85

LOT 82

50' BLDG. LINE

20' SLOPE ESMT. & UTIL. ESMT.

F.I.R.

N55°07'13"E
91.30'

F.I.R.

N 55°07'13" E 116.30'
ER=560.6'
ER=561.5'

F.I.R.

SPINNAKER RUN POINTE
(60' R.O.W.)

SCALE
1" = 60'
N

Note:
• This survey was prepared without the benefit of title search, therefore to search of recorded easements was performed on subject property. The purpose of the survey is to locate forms on shown property, therefore all other improvements may not be shown.
• The bearings shown hereon are based on the above referenced recorded map or plat unless otherwise noted.
• Elevations shown are relative to this site.

Arthur Surveying Co., Inc.
Professional Land Surveyors

LEWISVILLE
220 Elm St., #200
Lewisville, TX 75057
Ph. 972.221.9439
TPBRN# 10063800
arthursurveying.com
Established 1994

STATE OF TEXAS
REGISTERED
DOUGLAS L. ARTHUR
4357
PROFESSIONAL
LAND SURVEYOR

Arthur Surveying Company

Harry Bizios

| Date: | 03/07/14 |
| ASC No. | 140375 |
| Drawn/Chk | L.G. / D.L.A. |
| Client | Harry Bizios |

PROPERTY DESCRIPTION: Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

LEGEND - C.M.= Controlling Monument; F.I.R.= Found Iron Rod; F.I.P.= Found Iron Pipe; F.C.P.= Fence Corner Post. OHE=Overhead Electric. S.I.R.= Set Iron Rods 1/2" diameter with yellow cap stamped "Arthur Surveying Company". All found iron rods are 1/2" diameter unless otherwise noted. —x— (fence/ ⅊ post) —OHE— (overhead power)

FLOOD NOTE: It is my opinion that the property described hereon is partially within the 100-year flood zone area according to the Federal Emergency Management Agency Flood Insurance Rate Map Community-Panel No. 481152 0415 G, present Effective Date of map April 18, 2011, herein property situated within Zone "X" (Unshaded), Zone "AE".

CAUSE NO. 14-01991-431

FILED
2014 APR -8 PM 3:03
SHERRI ADELSTEIN
DISTRICT COURT DENTON CO., TX
BY _____ DEPUTY

TOWN OF LAKEWOOD VILLAGE,  §  IN THE DISTRICT COURT

*Plaintiff,*  §
§
v.  §
§  DENTON COUNTY, TEXAS
§
HARRY BIZIOS,  §
§
*Defendant.*  §  431ST JUDICIAL DISTRICT

## AGREED ORDER EXTENDING AND MODIFYING TEMPORARY RESTRAINING ORDER AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION

On the 2nd day of April, 2014, the Court considered arguments and agreement of the parties regarding Plaintiff Town of Lakewood Village's ("Town") application for Temporary Injunction. Wm. Andrew Messer, attorney for the Plaintiff, appeared in person. Art Anderson, attorney for Defendant, also appeared. After considering the agreement of the parties and the Court's docket, the Court finds that good cause exists to grant an extension and modification of the Temporary Restraining Order issued by this Court on March 20, 2014 ("TRO") and to reset the hearing on Plaintiff's Temporary Injunction.

**IT IS THEREFORE ORDERED AND AGREED** that the TRO shall be and is hereby extended in that Defendant Harry Bizios, his agents, contractors, and employees and the Defendant's representative(s) with control over the Property, described as Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, and addition to the City of Little Elm, Denton County, Texas, according to the plat thereof recorded in Cabinet L, page 224, plat records, Denton County, Texas (the "Property"), shall allow inspections by the Town's Building Official or designee on the Property, until the later of such time as plaintiff's application for temporary injunction may be heard or April 17, 2014.

Extended Temporary Restraining Order -- Page 1
*Town of Lakewood Village v. Harry Bizios*

500

**IT IS FURTHER ORDERED AND AGREED** that the TRO shall be and is hereby modified in that Defendant Harry Bizios, his agents, contractors, and employees and the Defendant's representative(s) with control over the Property shall immediately cease and desist any construction on the Property except as follows:

1. Defendant shall be allowed to complete the plumbing rough-in work, including water tap and on-site sewage facility connection, on the Property in compliance with the Town's regulations and shall submit to, and pass, a plumbing rough-in work inspection to be performed by the Town;

2. Defendant shall submit a form board survey to the Town and said survey and all completed work shall comply with the Town's minimum finished floor elevation of 540 msl;

3. Defendant shall be allowed to complete pier installation in compliance with the Town's regulations, which shall be inspected by a professional engineer and an approval letter shall be provided by Defendant to the Town;

4. Defendant shall be allowed to complete the work necessary to pass a "pre-pour inspection" on the Property in compliance with the Town's regulations and shall submit to such inspection to be performed by the Town; and

5. Upon completion of and inspections involving 1-4 above, Defendant shall be allowed to pour the foundation on the Property in compliance with the Town's regulations.

**IT IS FURTHER ORDERED AND AGREED** that the Town shall not assess the fees involving the steps above until further hearing before the Court. The Town shall also perform these inspections during normal business hours. Defendant shall provide the Town with at least one business day notice that Defendant is ready for any inspection.

**IT IS FURTHER ORDERED AND AGREED** that Plaintiff's Application for Temporary Injunction is set for hearing on the 15th day of April, 2014, at 9:00 a.m. The purpose of this hearing shall be to determine whether this Extended and Modified Temporary Restraining Order should be made a Temporary Injunction pending a full trial on the merits. Neither party waives its legal rights, remedies and argument by entering into this Agreed Order.

Extended Temporary Restraining Order -- Page 2
*Town of Lakewood Village v. Harry Bizios*

501

Because Plaintiff is a municipality in the State of Texas, no bond is required.

This Extended and Modified Temporary Restraining Order expires on April 17, 2014.

Signed on April **8**, 2014, at **10:25** a.m./p.m.

_____
**PRESIDING JUDGE**

AGREED:

_____
WM. ANDREW MESSER
*Plaintiff's Counsel*

_____
ART ANDERSON
*Defendant's Counsel*

DALLAS_1/6270655v.2
56756-1 04/04/2014

FILED: 4/14/2014 2:01:15 PM
SHERRI ADELSTEIN
Denton County District Clerk
By: Paul Montalvo, Deputy

CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS | § § § § § § § § § § § § | IN THE DISTRICT COURT |
| *Plaintiff,* | | |
| v. | | |
| | | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | | |
| *Defendant.* | | 431ST JUDICIAL DISTRICT |

## TOWN OF LAKEWOOD VILLAGE'S
## BRIEF SUPPORTING INJUNCTIVE RELIEF

Plaintiff Town of Lakewood Village, Texas ("Town") files this brief supporting injunctive relief. The Town would note for the Court that the issues in this case are significant for all 1,131 municipalities in the State of Texas, and most are of first impression in this Court.

### I.
### BACKGROUND

The Town of Lakewood Village is a Type A general law city, incorporated in 1977, and is a political subdivision of the State of Texas. Surrounding its town limits, the Town by statute has a one-half mile area designated as its extraterritorial jurisdiction ("ETJ"). TEX. LOC. GOV'T CODE § 42.021(a)(1). The Town's ETJ is depicted in the map attached as **Exhibit A**. The Legislature has declared, as state policy, that a municipality's ETJ is to promote and protect the general health, safety, and welfare of persons residing in and adjacent to a municipality. TEX. LOC. GOV'T CODE § 42.001. The Town, thus by statute, has a vested interest to promote and protect the general health, safety, and welfare of those in its ETJ, including specifically the defendant Harry Bizios and his property. The defendant's property is located in the subdivision of Sunrise Bay, and the defendant's property (the "Property") is undisputedly located in the

1

503

Town's ETJ. The Property has a steep downfall from the front to the back of the Property (approximately 21 feet) and is partially located within the 100-year floodplain. See map depicting the Property and floodplain, **Exhibit B**. The Town has the statutory authority to annex properties in its ETJ, TEX. LOC. GOV'T CODE § 43.051, pursuant to various means. *See* TEX. LOC. GOV'T CODE § 43.024 (annexation upon request of area voters); § 43.028 (annexation of areas sparsely occupied on petition of landowners). The Town's current population is approximately 559, and based on development within the Town's limits, it is anticipated that the Town's residency will double in the next 10 years. The Town would then have the statutory authority to annex an area without consent of residents when it provides water or sewer to the area. TEX. LOC. GOV'T CODE § 43.033. The Town has furthered its vested interest in its ETJ through the regulation of subdivisions, development, and building codes. The Town adopted Ordinance No. 10-01 on January 14, 2010, which extended its building codes to the Town's ETJ, and Ordinance No. 13-07 on June 13, 2013 (previously Ord. No. 11-11 adopted March 11, 2011), which extended its subdivision regulations to its ETJ. The Town's building codes include heightened standards enacted as local amendments from the national standards in order to increase the health, safety and welfare of those building in both the Town's limits and its ETJ. The same heightened standards apply equally to residences built in the Town's limits and ETJ. Since the Town extended its building codes and subdivision regulations to the ETJ, three properties in the Sunrise Bay subdivision have come to the Town and complied with its building codes and subdivision regulations. *See* **Exhibits C, D, and E** demonstrating building code compliance for properties located at 3964 Spinnaker Run Point (April 2013), 3904 Spinnaker Run Point (March 2013), and 6613 Autumn Mist Cove (January 2012, February 2012, April 2012, and June 2012). The defendant filed building plans with the Town on January 27, 2014, registered a contractor

2

504

with the Town, and scheduled a pre-construction meeting with the Town. *See* **Exhibits F and G**, The defendant subsequently cancelled the pre-construction meeting and has failed to comply with the Town's building codes and subdivision regulations, which are enacted to promote and protect the health, safety, and welfare of persons and property in the Sunrise Bay subdivision and other areas of the ETJ. A failure to build according to the Town's standards is a violation of law.

## II.
### DEFENDANT'S ISSUES

Defendant appears to be making three arguments: (1) there is no statute authorizing a general law Texas municipality to extend subdivision rules for development to its ETJ; (2) defendant has vested rights under a 1995 plat filed with Denton County and town of Little Elm, but not submitted or approved by Lakewood Village; and (3) the permit fees, which are a recoupment of costs for the Town, are an unconstitutional tax. None of the defendant's issues have merit. Instead, the defendant is violating the Town's ordinances and building codes, and therefore, the Town is entitled to injunctive relief. TEX. CIV. PRAC. & REM. CODE § 212.003(c).

## III.
### TEXAS MUNICIPALITIES HAVE THE STATUTORY AUTHORITY TO EXTEND THEIR SUBDIVISION RULES FOR DEVELOPMENT TO THE ETJ

Texas municipalities have been granted the statutory authority to apply, by ordinance, their subdivision rules regarding development, including platting, building standards and permitting in their ETJ. TEX. LOC. GOV'T CODE §§ 212.003(a), 212.003, 214,212, 42.001; *see also Hartsell v. Town of Talty*, 130 S.W.3d 325, 328 (Tex. App. – Dallas 2004, pet. denied)("ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction"); *Levy v. City*

3

*of Plano*, 2001 WL 1382520, \*2 (Tex. App. – Dallas 2001, no pet.)(city subdivision regulations apply to the city's ETJ"); *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 823 (Tex. App. – Dallas 1986, writ ref'd n.r.e.)("Article 970a [recodified; now, § 212.003(a)] confers authority upon a city to extend its subdivision ordinances to its extraterritorial jurisdiction. ... Consequently, ordinances regulating development, such as those specifying design, construction and maintenance standards, may be extended by a city into its extraterritorial jurisdiction").

## 1.    *The Statutes*

The authority of Texas municipalities to apply their subdivision regulations to the ETJ is contained in the Local Government Code. Section 212.003 of the Local Government Code states in pertinent part:

**§ 212.003 Extension of Rules to Extraterritorial Jurisdiction**

(a) The governing body of a municipality by ordinance may extend to the *extraterritorial jurisdiction* of the municipality *the application of municipal ordinances* adopted under Section 212.002 ... .

TEX. LOC. GOV'T CODE § 212.003(a)(emphasis added). Section 212.002 states in pertinent part that:

**§ 212.002 Rules**

[T]he governing body of a municipality *may adopt rules governing plats and subdivisions of land*...to promote the health, safety, morals, or general welfare.

TEX. LOC. GOV'T CODE § 212.002 (emphasis added). So, the Legislature by §§ 212.002 & .003 has authorized Texas municipalities to extend their subdivision rules to the ETJ. There is also statutory authority authorizing municipal permits and updated, localized building codes in the ETJ. Section 214.212 of the Local Government Code states:

4

## § 214.212 International Residential Code

(a) To protect the public health, safety, and welfare the International Residential Code, as it existed on May 1, 2001, is adopted as a municipal residential building code in this state.

(b) The International Residential Code applies to all construction, alteration remodeling, enlargement, and repair of residential structures in a municipality.

TEX. LOC. GOV'T CODE § 212.002.[1] "Municipality" is defined as *"a general-law municipality,* home-rule municipality, or special-law municipality." TEX. LOC. GOV'T CODE § 1.005(3)(emphasis added). A "municipality" (including a general law municipality, like Lakewood Village) may adopt later versions of the International Residential Code and also adopt local amendments. TEX. LOC. GOV'T CODE § 212.002(c)(d). Lakewood Village has done that. Read in conjunction with § 212.003 which authorizes Texas municipalities to extend subdivision rules "to the extraterritorial jurisdiction," § 214.904(a) authorizes Texas municipalities to extend their permitting for development to the "extraterritorial jurisdiction." Section 214.904(a) of the Local Government Code states:

> This section applies only to a permit required by a municipality to erect or improve a building or other structure in the municipality or its *extraterritorial jurisdiction.*

TEX. LOC. GOV'T CODE § 212.904(a)(emphasis added). The Legislature also adopted the 2008 International Residential Code in unincorporated areas of virtually every county in the State (Tex. Loc. Gov't Code § 233.153(a)) *except* where a municipality has "adopted a building code in the municipality's extraterritorial jurisdiction," in which case, the building code adopted by the

---

[1]    Section 214.212(a)-(c) requires municipalities across the state to adopt the International Residential Code ("IRC"). It imposes a mandatory uniform residential building code, as opposed to merely providing an optional code that cities may but are not required to adopt. Municipalities may adopt amendments to the IRC that are more restrictive than the standards in the IRC. Tex. Leg. Council, letter opinion September 19, 2003. Before enactment of section 214.212, Texas cities were not required to use any particular building code, and this fact at times required builders to understand and comply with multiple building codes. There is thus one standard for residential construction under the IRC but with local more stringent amendments.

5

municipality controls. Tex. Loc. Gov't Code § 233.153(c). Section 233.153 expressly states the Legislature's intent that municipalities have the authorization to extend application of adopted building codes into their extraterritorial jurisdiction.

## 2. *The Statutory Intent*

Lest there be any doubt that the Legislature has authorized Texas municipalities to extend subdivision rules regarding development to the ETJ, the Court need look no further than the expressed statutory intent contained in the foundational "Rules" statute, § 212.002. Rules that govern plats and subdivisions are made to promote:

the safe, orderly, and healthy *development* of the municipality.

TEX. LOC. GOV'T CODE § 212.002. This intent is buttressed by § 42.001. The Legislature has declared, as state policy, that a municipality's ETJ is to promote and protect the general health, safety, and welfare of persons residing in and *adjacent to a municipality.* TEX. LOC. GOV'T CODE § 42.001. Development of a Texas municipality occurs in the adjacent ETJ by annexation. The plain meaning of the statutory intent of §§ 212.002 and 42.001 allows the same building standards to apply in a city's limits and in its ETJ which may become part of the city. Otherwise, there would be an incongruity of building standard in a city's limit and in its ETJ.

The Supreme Court has further noted that the purpose of platting and subdivision regulations is to "ensure that the subdivisions are *safely constructed* and to promote the *orderly development of the community." City of Round Rock v. Smith,* 687 S.W.2d 300, 302 (Tex. 1985)(emphasis added). When the purpose of legislative enactment is obvious from the language of the law itself, there is nothing left to construction. *Fitgerald v. Advanced Spine*

6

*Fixation Systems*, 996 S.W.2d 864, 866 (Tex. 1999). The United States Supreme Court has also stated that a court should not apply rules of construction to unambiguous language barring exceptional circumstances. *See Burlington Northern R.R. Co. v. Oklahoma Tax Comm.*, 481 U.S. 454, 461 (1987). The statutory purpose for authorizing subdivision rules is plain; it is allowed both in city limits and the ETJ. The statutory purpose supports Lakewood Village's injunctive relief.

### 3.    *Defendant's Arguments*

Defendant argues that § 212.049 of the Local Government Code prevents the Town from regulating its building codes within its ETJ, but that is simply not the case. Two subchapters in Local Government Code chapter 212 govern platting — subchapter A and subchapter B. *See* TEX. LOC. GOV'T CODE § 212.042.The Town is governed by subchapter A, including §§ 212.002 & .003. A municipality may also choose to be governed by subchapter B, the Development Plats statutes, which formerly applied only to the city of Houston.[2] Development plats in subchapter B are different than the traditional plats in subchapter A. To be governed by subchapter B (in which § 212.049 is located), the provisions of subchapter B have to be specifically invoked and affirmatively adopted by ordinance. TEX. LOC. GOV'T CODE § 212.041. The Town has not adopted subchapter B, so its provisions simply do not apply.[3]

Defendant also argues that § 214.212, by requiring adoption of the International Residential Code, somehow limit a Texas municipality's building codes' authority to its city limits only. *See* defendant's trial brief, p.7. This interpretation is not in the language of §214.212; however, the Legislature does state under a section titled "Time for Issuance of

---

[2]    As first enacted, this law was applicable to any "unzoned city" with a population exceeding 1.5 million. *See* BROOKS, TEXAS MUNICIPAL LAW AND PRACTICE §21.03 n. 78, *citing* Acts 1985, 69th Leg., p. 2187, ch. 568.

[3]    Development plats deal with developing and construction of property that is not subdivided. Here, the Property has been subdivided by plat. So, development platting rules are not applicable to the Property, even if the Town had adopted subchapter B.

Municipal Building Permit:"

> This section applies only to a permit required by a municipality to erect or improve a building or other structure in the municipality *or its extraterritorial jurisdiction.*

TEX. LOC. GOV'T CODE § 214.904(a) (emphasis added). The defendant's interpretation also runs afoul of the Legislature's express handling of adoption of residential building codes in a municipality's extraterritorial jurisdiction. TEX. LOC. GOV'T CODE § 253.153(a), (c). If Texas municipalities are unable to extend building codes and subdivision rules to their ETJ, as defendant contends, then these provisions written by the Texas Legislature would be both futile and useless. The defendant's argument runs afoul of settled statutory construction and the Texas Legislature. *See City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex.1995) (citing *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex.1987))(courts "will not read statutory language to be pointless if it is reasonably susceptible of another construction."). *Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 300 (Tex.1990); *Hunter v. Fort Worth Cap. Corp.*, 620 S.W.2d 547, 551 (Tex.1981)( "the legislature is never presumed to do a useless act."). *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex.1981) (a cardinal rule of statutory construction is that the legislature is never presumed to do a useless or meaningless act.). Sections 214.904 and 233.153(c) are specific authority that building codes applied through permitting are authorized in the ETJ. The defendant's argument is without merit. It should also be declined for a second reason — it is contrary to the established principle that the public interest to be favored over any private interest. TEX. GOV'T CODE § 311.021(5). Thus, the Town's ability to enforce its subdivision regulations and building codes, to promote and protect the health, safety, and welfare of persons in the Sunrise Bay subdivision should be, by statute, favored over any single property owner in the Sunrise Bay subdivision. If defendant's argument prevailed, a single property

8

owner's interest would predominate over the interest of all Texas municipalities. This is not, and should not, be the law. The position advocated by the defendant runs counter to the Texas Legislature's enactment and statutory intent.

*4.     Other Statutes Support Lakewood Village*

Indeed, other statutes plainly demonstrate that Texas municipalities have the authority to regulate in their ETJ.[4]  For example, § 233.153(c) of the Local Government Code allows municipalities to regulate their building codes in the extraterritorial jurisdiction, to the exclusion of counties. Denton County has recognized by unanimous court order that:

> [I]f … construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the *building code adopted by the municipality controls*[,] and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code [applicable to Texas counties] have *no effect* in that municipality's extraterritorial jurisdiction."

DENTON COUNTY COMM. COURT ORDER NO. 10-0045 (emphasis added). *See* **Exhibit H.** The Denton County Court Order tracks exactly the language of Local Government Code § 233.153(c):

> Subchapter F. Residential Building Code Standards Applicable to Unincorporated Areas of Certain Counties
>
> If a municipality located within a county to which this subchapter applies[5] has adopted a building code in the municipality's extraterritorial jurisdiction, the building code adopted by the municipality[6] controls... .

---

[4]  In contrast to subdivision regulation power, and for clarification, Texas municipalities do not possess the statutory authority to zone property  (*i.e.*, regulate the height, number, bulk or size of buildings) in their ETJ. Tex. Loc. Gov't Code § 212.003(a)(1)-(5). The legislative history of House Bill 3187, which amended Section 212.003, stated it "prohibits the application of zoning regulations in ETJ areas." COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3187, 71st Leg., R.S. (1989).

[5]  Subchapter F applies to a county with a population of more than 100 or has adopted the provisions of Subchapter F.

[6]  It is clear that the legislature refers to a municipality in a general sense, not solely a home-rule city to the exclusion of general law cities. When a statute only applies to a home-rule city,  the legislature so indicates. *Compare* § 217.041 ("applies only to a home-rule municipality") with § 217.021 ("applies only to a Type

9

Tex. Loc. Gov't Code §§ 233.153(c), 152. Denton County recognizes this standard. The Denton County Department of Public Works, Engineering Division, issued a Notice to "Home Builders" and "Home Buyers" stating:

**Building in the Extra Territorial Jurisdiction ("ETJ")**

If you are building in the ETJ of a municipality that has adopted a building code for the municipality's ETJ, then *the builder follows the municipality's codes.*

*See* **Exhibit** I (emphasis added). Thus, there are multiple statutory bases for Lakewood Village to enforce its development rules and building codes in its ETJ.

## 5. *City of Boerne Is Inapplicable*

Defendant cites the case of *City of San Antonio v. City of Boerne* for the premise that the authority of a county does not extend beyond the express grant of a statute regarding roadway annexation.111 S.W.3d 22 (Tex. 2003). *Beorne* is distinguishable. This case has nothing to do with a county's abilities or with a county's roadway power. It is also distinguishable because the issue in *Boerne* was one of general control versus a specific annexation authority. The Court in *Boerne* noted that "petitioning a municipality to annex portions of county roads is *unrelated* to a commissioner's court's specific duty to ensure safe travel." *Id.* at 28-29. *Beorne* is a red herring. This case deals with the exercise of authority to ensure safe construction by enforcement of building codes for the safe, orderly, and healthy development of the municipality in its ETJ, as authorized by Tex. Loc. Gov't Code § 212.002, .003, and to promote and protect the general health, safety, and welfare of persons residing in and adjacent to a municipality in the ETJ, as authorized by Tex. Loc. Gov't Code § 42.001. In other words, the issues are related. The idea espoused by defendant that *Boerne* implicitly overrules, without

---

B general-law municipality"). Additionally, "municipality" is defined as "a general-law municipality, home-rule municipality, or special-law municipality." Tex. Loc. Gov't Code § 1.005(3).

10

mentioning, *City of Lucas* is nonsensical.

### 6.   *City of Lucas* And *City of Weslaco* Are Controlling

The case involving the City of Lucas applying its building codes to the ETJ is directly on point. *City of Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 823 (Tex. App.—Dallas, 1986, writ ref. n.r.e.). Lucas, a general law town, applied its city ordinances involving subdivision rules to its ETJ. The North Texas Municipal Water District sought to construct a wastewater treatment plant on a 75 acre tract within Lucas's ETJ. The water district argued that Luca's subdivision rules did not apply to its ETJ. The Dallas Court of Appeals disagreed. *Id.* at 817. It held that the former TEX. REV. CIV. STAT. ANN. art. 970a §4 confers authority upon a city to extend its subdivision ordinances into its ETJ. *Id.* at 817, 823. Art. 970a §4 stated: "the governing body of any city may extend by ordinance to all of the area under its extraterritorial jurisdiction the application of such city's ordinance establishing rules and regulations governing plats and subdivisions of land." *Id. at 817.* This is the same enabling language of §§ 212.002 & .003 of the Local Government Code under which the Town derives its authority. *Lucas* specifically holds that "ordinances regulating development, such as those specifying design, construction and maintenance standards, may be extended by a city into its extraterritorial jurisdiction." *Id.* at 823. Notably, the Dallas Court of Appeals stated:

> Were we to hold that building standards are not contemplated by article 970a, we would be left with a statute that grants authority over the laying out of streets, alleys and lot boundaries, but precludes authority over the most important part of a subdivision. Consequently, we conclude that the power over subdivisions conferred by article 970a necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof. *Id.* at 823-824.

The Corpus Christi Court of Appeals came to the same conclusion in *City of Weslaco v. Carpenter*, 644 S.W.2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). The city of Weslaco sought to permanently enjoin a landowner from constructing a mobile home park

11

located within the ETJ. Weslaco had extended its subdivision rules to the ETJ, including for "construction," "permits," "licensing," and "inspections." *Id.* at 602. Art. 970s [now, §§ 212.002 & .003 of the Local Government Code] authorized rules regarding "subdivision of land" to be extended to the ETJ. *Id.* at 602. Because the word "subdivision" is not defined by statute, the Corpus Christi court found: "The normal, common-sense meaning of the term 'subdivision' is expressed in Black's Law Dictionary (5th ed. 1979) as '[d]ivision into smaller parts of the same thing or subject-matter. The division of a lot, tract or parcel of land into two or more lots, tracts, parcels or other divisions of land for sale *or development.*'" *Id.* at 603 (emphasis in original). The court noted that it had similarly found in *Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Civ. App. – Corpus Christi 1968, writ ref'd n.r.e.) that "subdivision of land" includes for *development purposes. Id.* at 603. It was also important that the provision of subdivision rules in the ETJ comported with the legislative findings "to promote and protect the general health, safety and welfare of persons residing within and adjacent to cities of the state... ." *Id.* at 603. The Corpus Christi court, finding that Weslaco's subdivision rules apply to the ETJ, mandated that an injunction issue in favor of the city of Weslaco, as:

> The injunction sought by [Weslaco] arises not only from proper interpretation of pertinent statutes and ordinances but also as a valid exercise of [Weslaco's] police power, which by its very nature involves the regulation of subdivision development 'to prevent the use thereof in a manner that is detrimental to the public interest. The police power may be loosely described as the power of the sovereign to prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the 'general welfare.'

*Id.* at 604 (citations omitted). This same reasoning, the application of the Legislature's intent, and the exercise of police power applies to this case.[7]

---

[7] Notably, the defendant has no contrary authority to *Lucas* and *Weslaco* on point.

12

## 7.   Valid Exercise Of Police Power

All property is held subject to the valid exercise of the police power. *See City of College Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex.1984); *Woodson Lumber Co. v. City of College Station*, 752 S.W.2d 744, 746 (Tex.App.—Houston [1st Dist.] 1988, no writ). A city may enact reasonable regulations to promote the health, safety, and general welfare of its people. *Turtle Rock Corp.*, 680 S.W.2d at 805. The United States Supreme Court has stated, "government regulation — by definition — involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property." *Andrus v. Allard*, 444 U.S. 51, 65 (1979). As Justice Holmes stated in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922): "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation, and must yield to the police power." Many Texas municipalities extend the application of their subdivision regulations to their ETJ. *See* City of Fate, Code of Ordinances § 38-2; City of Heath, Code of Heath § 158.01; City of Double Oak, Code of Ordinances § 10.101; City of Highland Village, Highland Village Subdivision Ordinance § 1.1; City of Copper Canyon, Copper Canyon Subdivision Ordinance § 1.1.[8] It is entrenched in Texas

---

[8]   Texas courts have repeatedly upheld the ETJ subdivision regulation principle in other contexts. In *City of Austin v. Quick*, 930 S.W.2d 678 (Tex. App. – Austin 1996), the Austin court of appeals upheld the city of Austin's application of its watershed pollution standards as regulations to the ETJ. This holding was affirmed by the Texas Supreme Court. *Quick v. City of Austin*, 7 S.W.3d 109 (Tex. 1998). This same principle has also been acknowledged by the federal Fifth Circuit Court of Appeals in New Orleans. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 170 n. 2 (5th Cir. 1996)("Texas law allows municipalities to enact water quality standards applicable to the preservation and development of lands outside of the municipalities' corporate limits, in an area referred to as the municipalities'' extraterritorial jurisdiction"). In *Levy v. City of Plano*, 2001 WL 1382520 (Tex. App. – Dallas 2001, no pet.), the Dallas Court of Appeals stated the city of Plano's subdivision regulations applied to the ETJ. In *Milestone Potranco Dev. v. City of San Antonio*, 298 S.W.3d 242, 245 (Tex. App. – San Antonio 2009, pet. denied), the San Antonio Court of Appeals upheld the city of San Antonio's tree preservation ordinance to the ETJ because it promoted the health of the municipality and healthful development of the community.

13

jurisprudence that a city may, as a valid exercise of its police power, enact reasonable regulations for the purpose of promoting the health, safety, and general welfare of its people. *City of Brookside Village v. Comeau*, 633 S.W.2d 790, 792 (Tex.1982), *cert. denied*, 459 U.S. 1087 (1982); *City of College Station v. Turtle Rock Corporation*, 680 S.W.2d 802, 805 (Tex.1984); *Ex parte Woodall*, 154 S.W.3d 698, 702 (Tex.App.-El Paso 2004, pet. ref'd). Such police power occurred here. Lakewood Village extended its subdivision rules to the ETJ as a valid exercise of police power. The subdivision rules should be enforced.

## IV.
## DEFENDANT HAS NO VESTED RIGHTS

Defendant insists that he has accrued vested rights in a plat filed with Denton County in 1995, which would allegedly exempt Defendant from the Town's building regulations. For this theory, defendant relies on Tex. Loc. Gov't Code § 245.002(b): "A project that requires a series of permits or approvals in order to reach completion is to be governed by the rules in effect at the time of the first permit in that series...." Tex. Loc. Gov't Code §245.002(b). The defendant's theory is misplaced for several reasons: the county does not regulate building, plumbing, mechanical, and electrical safety and would therefore leave the area subject to little regulation or oversight whatsoever; the plat was never submitted to Lakewood Village; and Lakewood Village's building codes are exempt from the vested rights statute.

1. *The Town's Building Regulations Are Exempted From The Vested Rights Statute*

Texas has a vested rights statute in Local Government Code chapter 245. It does not apply here. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats must be considered

14

collectively to be one series of permits for a project. TEX. LOC. GOV'T CODE § 245.002(b); *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674 (Tex. App.—Austin 2004, no pet.); Tex. Atty Gen. op. JC-0425 (2001). The term "project" is defined in chapter 245 as an "endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." TEX. LOC. GOV'T CODE § 245.001. A plat for the Sunrise Bay subdivision was filed and approved by Denton County and the town of Little Elm in 1995. The plat was never filed with, or approved by, Lakewood Village. The plat's existence was not known by the Town until this lawsuit, some 19 years later. Defendant claims that the plat is the first permit in a series of permits. *See* defendant's trial brief, p. 11. At least one court has determined that the subdivision or platting of land is a different project than the vertical construction on existing lots like building permits. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167 (5th Cir. 1996)(interpreting former Tex. Gov't Code Ch. 481, the predecessor to Tex. Loc. Gov't Code Ch. 245, which states the same language). The Court in *City of Austin* reasoned:

> If any action were to freeze development regulations…a developer would not have to build in accordance with the latest building, fire, plumbing, mechanical, or electrical codes, but would be permitted to build under codes that might be years old. In addition, the developer would not be required to comply with drainage and watershed regulations. This would result in shoddy development and create an obvious public safety problem which could expose the developer, and possibly the City, to liability for personal injury. This result is contrary to the public interest in health, safety, and welfare. *Id.* at 170.

The necessity for this theory of outdated building codes was called into question by the *Hartsell* case on which the defendant relies. *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex.

15

App.—Dallas 2004, reh. den.).[9] The Dallas Court of Appeals stated regarding the concern of using outdated building codes, "Chapter 245 addresses this concern in other sections.... See Tex. Local Gov't Code Ann. § 245.004-245.005(Vernon Supp.2004)(Chapter 245 does not apply to permits more than two years old for construction of building for human occupation where regulation at issue adopts only uniform building or similar code...)." *Id.* at 328. Section 245.004 provides exemptions to the applicability of Chapter 245. For example, § 245.004 states:

> "§ 245.004 Exemptions
>
> This chapter does not apply to:
>
> (1) A permit that is at least two years old, is issued for the construction of a building or structure intended for human occupancy or habitation, and is issued under laws, ordinances, procedures, rules or regulations adopting only:
>
>> (A) Uniform building, fire, electrical, plumbing, or mechanical codes adopted by a recognized national code organization; or
>>
>> (B) Local amendments to those codes enacted solely to address imminent threats of destruction of property or injury to persons;

TEX. LOC. GOV'T CODE § 245.004. Assuming, for purposes of argument, that the Town is bound by a plat it had no notice of, then the plat from 1995 is the first permit in a series of permits, as required by § 245.002(b), is well over two years old and would be subject to the Town's current building codes. The Town adopted the International Residential Code, Building Code, Plumbing Code, Mechanical Code, Energy Code, Fuel and Gas Code, Property Maintenance Code National Electrical Code, International Fire Code and applied all of these uniform codes to its extraterritorial jurisdiction via Ordinance No. 10-01. These codes are uniform codes as described in § 245.004(1)(A), which were adopted by the International Code

---

[9] Significantly, *Hartsell* held that "ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction". *Id.* at 328.

16

Council. Several of these codes and ordinances address imminent threats of destruction of property or injury to persons as well. For example, Ordinance 11-16 is a local amendment to the National Electric Code and provides that the conductors used to conduct current must be a minimum size of 12 AWG copper. *See* Ord. No. 11-16(p. 22), Sec. 8, Ch. 33, Sec. E3306.2. This is a stricter guideline than the IRC made for safety to prevent imminent destruction and personal injury. The County does not regulate this issue, so absent the Town's regulation, it would be unregulated. Likewise, Section 245.004(11) exempts "regulations to prevent the imminent destruction of property or injury to persons...." if the regulations do not affect zoning issues. The Town's regulations have nothing to do with zoning issues and are made to promote the public health, safety, and welfare of the citizens of the Town and the extraterritorial jurisdiction of the Town. *See* preamble, Ordinance No. 10-01. Another exemption, § 245.004(6) allows fees imposed in conjunction with development permits. Lakewood Village charges fees for building permits within its ETJ that are necessary to offset the costs of this regulation. All fees are exempt from the vested rights statute.

2. *Defendant Cannot Claim Rights To Regulations To A Permit Never Issued By The Town, And The Town Had No Notice Of The Plat*

The *Hartsell* case, on which defendant relies, is further distinguished because it involves a plat filed with the town of Talty and building regulations of the same town. In *Hartsell*, the town of Talty had an ordinance in place regulating the filing of plats. 130 S.W.3d at 326. The developer filed a plat with the Town, which the Town first approved on January 10, 2001. *Id.* The town subsequently enacted an ordinance extending its building codes into its ETJ effective December 1, 2002. *Id.* The developer then filed a lawsuit against Talty seeking declaratory relief that it was not subject to the building code ordinance, which the court agreed. This set of facts is completely different from the present case. First, in *Hartsell* the plat was only one year old when

17

the ordinance was passed so the exemption in under § 245.004 (1) did not apply; whereas, in this case, the exemption plainly applies. Second, the plat in this case was with the County and Little Elm, not with the *Town*, which is a different regulatory agency under § 245.002.

Section 245.002(a) states "[e]ach regulatory agency shall consider the approval...." This indicates that there is a difference for filing with each regulatory agency. In *Shumaker Enterprises, Inc. v. City of Austin*, the Austin Court of Appeals ruled that filing an application with one regulatory agency (in *Shumaker* it was the county, as here), does not "freeze" or "vest" the regulations as to another regulatory agency (in *Shumaker* it was the city, as here). 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.).[10] The court stated, "under the plain language of the statute, therefore, the City must consider the application for a city permit solely on the basis of the requirements in effect at the time the application *to the city* was filed." *Id.* at 815. Defendant filed a permit application with the Lakewood Village on January 27, 2014. Under § 245.002(a) and *Shumaker*, Lakewood Village is entitled to enforce its current regulations under the vested rights statute.

The Austin Court in *Shumaker* additionally held that the filing of the permit with a different regulatory agency does not provide fair notice to another regulatory agency as required under the vested rights statute. 325 S.W.3d at 815. Not only did the defendant's predecessor developer file the plat with a different regulatory agency, but it failed to give the Town fair notice of the plat. Under chapter 245, vested rights only accrue on the filing of an original application or plan for development or plat application that "gives the regulatory agency fair

---

[10] The Dallas Court of Appeals rejected an owner's somewhat similar vesting argument in *2218 Bryan St., Ltd. v. City of Dallas*, 175 S.W.3d 58 (Tex. App.—Dallas, pet denied). The *Bryan* case involved an owner who submitted an application for demolition during a moratorium while the city of Dallas was contemplating an historic overlay district. The district was passed and Dallas denied the application. There was no vesting because the original permit application was not "accepted" and therefore not "filed" as required by Chapter 245. *Id.* Because the 1995 plat was never filed with the Town, it did not provide an avenue for vested rights with the Town.

18

notice of the project and the nature of the permit sought." TEX. LOC. GOV'T CODE § 245.002(a-1). When the plat was filed in 1995, the Town was never given any type of notice regarding the plat filing or project at Sunrise Bay. Pursuant to § 245.002(a-1), the Town is not bound by any 1995 vested rights under the plat.

Stated simply, defendant's interest to pursue claimed property rights that are 19 years old is barred as a matter of law by Chapter 245.

## V.
## THE TOWN'S BUILDING PERMIT FEES ARE A PERMISSIBLE LICENSE FEE

Defendant complains that the building permit and inspection fees assessed by the Town are an unconstitutional tax. *See* defendant's trial brief, p. 12. The Town objects to this issue as it has no relevance to injunctive relief. TRE 402. *If* the defendant files a counterclaim asserting this claim for relief,[11] it should be heard during the course of the case (or the case could be removed to U.S. District Court if federal constitutional claims are made). The claim for affirmative relief currently has no place at the injunction hearing.

If the Court is inclined to rule on the constitutionality of the Town's building permit fees at a temporary injunction hearing, the Town is prepared to offer evidence that its fees are constitutional. At the beginning, statutes or ordinances imposing a license fee under police power are *prima facie* valid, and presumed to be reasonable. *City of Forth Worth v. Gulf Refining Co., et al.,* 83 S.W.2d 610, 618 (1935); *City of Houston v. Harris County Outdoor Adver. Ass'n,* 879 S.W.2d 322, 326 (Tex. App.—Houston [14th Dist.] 1994, writ denied), and the defendant as the

---

[11] Often, these claims are affirmatively asserted by property owners as plaintiffs. *See Lowenberg v. City of Dallas,* 261 S.W.3d 54 (Tex. 2008)(owners and operators of commercial buildings sued for unconstitutional taking under federal and state constitution for fire registration fee); *Harper v. City of Wichita Falls,* 105 S.W.2d 743 (Tex. Civ. App. – Fort Worth 1937 (property owner sued city for enjoin enforcement of its ordinances and fees thereunder); *El Paso Apt. Ass'n v. City of El Paso,* 415 Fed. Appx. 574, 2011 WL 811680 (5th Cir. 2011)(owners and managers of apartment complexes sued for federal constitutional claims and injunctive relief);. These claims are also at times certified by a court of appeals to the Supreme Court. *See Hurt v. Cooper,* 110 S.W.2d 896 (1937)(Dallas Court of Appeals certified 6 questions to be answered by the Supreme Court).

party attacking the fee has the burden to offer evidence to support this affirmative claim. *See City of Forth Worth v. Gulf Refining Co., et al.*, 83 S.W.2d at 619 (1935); *El Paso Apt. Association v. City of El Paso*, 415 Fed. Appx. 574, 2011 WL 811680, \*581 (5th Cir. 2011)(it is party attacking the fee's burden to show that the exaction bears *no* reasonable relationship to the duties to be performed by the city and its officers).

The Texas Constitution, art. VIII sec. 1(f) contains no provisions specifically limiting the amount of a licensing fee which may be imposed but the charge must be sufficient that such a charge is "reasonable for purposes of regulation when tested by general constitutional guaranties." *City of Fort Worth v. Gulf Refining Co*, 83 S.W.2d at 619. The Supreme Court has acknowledged that "it is sometimes difficult to determine whether a given enactment should be classified as a regulatory measure or as a tax measure." *Hurt v. Cooper*, 130 Tex. 433, 110 S.W.2d 896, 899 (1937). The principle of distinction generally recognized is that, if the primary purpose of the fee is for regulation, then it is a permissible regulatory fee; however, if the primary purpose of the fee is to raise revenue, then it is an unconstitutional occupation tax, regardless of the name by which it is designated. *Hurt v. Cooper*, 110 S.W.2d at 899; *City of Forth Worth*, 83 S.W.2d at 617; *City of Houston*, 879 S.W.2d at 326. The critical issue is whether the fee is intended to raise revenue in excess of that reasonably needed for regulation. *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 461 (Tex. 1997); *see City of Houston*, 879 S.W.2d at 326 ("Before such legislation will be declared void, the unreasonable and oppressive nature of the exaction must be clearly apparent from the record."). If the actual conferral of regulatory authority shows that the charge was intended primarily for regulation, then it will be characterized as a license fee rather than taxes. *TracFone Wireless, Inc., v. Commission on State Emergency*, 397 S.W.3d 173 (Tex. 2013). Here, the Town's

20

building permit and inspection fees are calculated based on the cost recovery for direct labor costs for these services, materials in administering the permits, and administrative overhead costs for services, computers, utilities, etc. attributable to permitting and inspections. Just considering inspections alone, over 13 separate inspections are required by the Town during the construction of an approximate 10,000 square foot residential structure on the Property. Together, all of these costs are $2.00 per air-conditioned square foot. The Town's fees have a direct relationship between the fees charged and the services provided, and the fees are reasonably necessary to cover the costs of regulation. Therefore, there is no unlawful occupation tax under Article VIII, Sec. 1(f) of the Texas Constitution

## VI.
## PRAYER

A municipality is entitled to injunctive relief in district court to enjoin the violation of municipal ordinances or codes applicable in the ETJ. Tex. Civ. Prac. & Rem. Code § 212.003(c). The defendant is violating the Town's ordinances and building codes, and therefore, the Town is entitled to injunctive relief. The Town seeks all other legal and equitable relief to which it is entitled.

Respectfully submitted,

WM. ANDREW MESSER
STATE BAR NO. 13472230
andy@txmunicipallaw.com
JENNIFER W. DECURTIS
STATE BAR NO. 24045767
jennifer@txmunicipallaw.com
BRENDA MCDONALD
STATE BAR NO. 14993300
brenda@txmunicipallaw.com
MESSER ROCKEFELLER & FORT, PLLC
6351 PRESTON ROAD, SUITE 350

21

**523**

FRISCO, TEXAS 75034
972.668.6400 - TELEPHONE
972.668.6414 - FACSIMILE

*Counsel for Plaintiff*
*Town of Lakewood Village*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing brief was served on counsel of record in this case via e-service and email on April 14, 2014.

_____
**WM. ANDREW MESSER**

22

524

# Exhibit A

# TOWN OF LAKEWOOD VILLAGE
## OFFICIAL MAP



Oak Point
City Limits

Oak Point
ETJ

Little Elm
City Limits

Little Elm
ETJ ⟶

Lakewood Village ETJ

Lakewod Village
Town Limits

Lakewood Village ETJ

526



527

# Exhibit B



FORMS SURVEY

3960 Spinnaker Run Pointe

SCALE 1" = 60'

U.S.A.
Lake Lewisville Reservoir
S 04°53'49" W 269.66'

Subdivision Boundary

522' Elev line

Top of bank

FORMS 3960 Spinnaker Run Pointe
top of forms = 540.04'

5.17' Line as located on the ground.

Zone "AE"

N 38°21'36" W 491.89'
U.S.A. Lake Lewisville Reservoir

Subdivision Boundary
C.O.E. MON.

Lot 83

TBM SET 600 IN TREE

85.85'
−20.0'
6.8'
16.4'
24.5'
4.0'
5.7'
3.6'
19.7'
27.8'
20.0'
91.8'
20.1'
18.0'
33.6'
24.0'
15.5'
−22.6'
64.0'
14.0'
25.0'
54.3'

S 43°20'43" E 585.89'

Zone "X"
(Unshaded)

22.7'

304.6'

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

N 34°54'11" W 295.77'

Lot 85

Lot 82

50' BLDG. LINE

20' SLOPE ESMT.
& UTIL. ESMT.

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

F.I.R.

N55°07'13"E 91.30'
N 55°07'13" E 116.30'
ER=561.5'
ER=560.6'

SPINNAKER RUN POINTE
(60' R.O.W.)

Arthur Surveying Co., Inc.
Professional Land Surveyors
LEWISVILLE
220 Elm St., # 200
Lewisville, TX 75057
Ph. 972.221.9439
TPE/NE 10003800
Established 1992

STATE OF TEXAS
REGISTERED
DOUGLAS L. ARTHUR
4357
PROFESSIONAL LAND SURVEYOR

Arthur Surveying Company
Harry Bizios

| | |
|---|---|
| Date: | 03/07/14 |
| ASC No. | 140375 |
| Drawn/Chk | L.G. / D.L.A. |
| Client | Harry Bizios |

PROPERTY DESCRIPTION: Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

Note: This survey was prepared without the benefit of a title search, therefore no search of recorded easements was performed on subject property. The purpose of the survey is to locate forms on subject property, therefore all other improvements may not be shown.
The bearings shown hereon are based on the above referenced recorded map or plat unless otherwise noted. Elevations shown are relative to this site.

LEGEND: C.M. = Controlling Monument; F.I.R. = Found Iron Rod; F.I.P. = Found Iron Pipe; F.C.P. = Fence Corner Post. OH = Overhead Electric. S.I.R. = Set Iron Rods 1/2" diameter with yellow cap stamped "Arthur Surveying Company". All found iron rods are 1/2" diameter unless otherwise noted. —x— (fence) E (post) OHE (overhead power)

FLOOD NOTE: It is my opinion that the property described hereon is partially within the 100-year flood zone area according to the Federal Emergency Management Agency Flood Insurance Rate Map Community-Panel No. 481153 0415 G, present Effective Date of map April 18, 2011, herein property situated within Zone "X" (Unshaded), Zone "AE".

529



Little Elm

R268973

R182649

R182647

R182657.

R182658

R182659

R182660

SPINNAKER·RUN·PT

Panel # = 0415

R182664

R182665

R182669

AUTUMN·MIST·CV

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.



20140123

N

0    95    190    380 Feet

http://gis.dentoncounty.com

DENTON COUNTY
Technology
Services

530



This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.

Panel #: 0415

Landmark GIS © Denton County

http://gis.dentoncounty.com

0   80   160   320   Feet

Technology Services

DENTON COUNTY

R182657
R182658
R182659
R268913
R182649
R182648
R182663
R182664
R182665

SPINNAKER RUN PL

540
560
550

531

# Exhibit C

STATE OF TEXAS    )

                           )      CERTIFICATE TO COPY OF PUBLIC RECORD

COUNTY OF DENTON    )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Plumbing Permit Application for 3964 Spinnaker Run Pointe dated April 18, 2013. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

533



# PLUMBING PERMIT

**APPLICANT**
DATE _4-18-13_

NAME _C J HUGHES_
ADDRESS _3964 Spinnaker_
PHONE _817-917-0777 cell_

**DESCRIPTION & DRAWING**
DESCRIBE WHERE THE PLUMBING WILL BE PLACED ON YOUR PROPERTY.

_3 ft gas line from wall to
island in kitchen
Plumbing - Kitchen sink & bathroom_

PLOT PLAN

...tion to prevent an outdoor slab from being placed ( ... an existing customer-owned (private) undergro ... gas line, such as in the case of sidewalks and open ... The prohibition on piping within a slab is app ... ...le to all slabs. Exceptions 1 and 2 relate to Sec ... ...8.6.1; see the commentary for that section ( ... ...mmentary Figure 404.14.1).



Figure 404.11
GAS PIPING IN CONDUIT
UNDERGROUND BENEATH BUILDING

Figure 404.14.1
INSTALLATION OF PLASTIC TO METALLIC PIPING

contained in the manufacturer's installation instruc-tions. Gas outlets for CSST systems must be installed with the termination fitting designed specifically for that purpose and provided by the CSST manufacturer.

**4.14 Plastic pipe.** The installation of plastic pipe shall com-...with Sections 404.14.1 through 404.14.3.

This section places restrictions on the location and op-erating pressures for plastic pipe in addition to stating nstallation requirements specific to plastic pipe.

**.14.1 Limitations.** Plastic pipe shall be installed outside leground only. Plastic pipe shall not be used within or ler any building or slab or be operated at pressures greater 1100 psig (689 kPa) for natural gas or 30 psig (207 kPa) for gas.

**Exceptions:**

1. Plastic pipe shall be permitted to terminate above ground outside of buildings where installed in premanufactured anodeless risers or service head adapter risers that are installed in ...

is inserted in a piping material for fuel gas use buildings.

❖ Because of the potential hazard associated with th use of a material that has lower resistance to physica damage and heat as compared to metallic pipe. Insta lation of plastic pipe and tubing is limited to areas th are both outside of the building and undergrou Plastic pipe and tubing are widely used for und ground gas distribution systems because of their eas of installation and inherent resistance to corrosio Polyethylene (PE) pipe is the only allowable plas pipe for use with LP-gas, and the code user is directe to the referenced standard, NFPA 58, which require that PE piping materials comply with ASTM D 25 The exception makes it clear that if an equivalent lev of physical protection is installed, plastic pipe may ter minate above ground outside of the building. It is com mon practice for gas utility companies to insta pre-manufactured riser assemblies at their metal ...

**.14.2 Connections.** Connections made outside and un nd between metallic and plastic piping shall be made of transition fittings categorized as Category I in accorda th ASTM D 2513.

Because installation of plastic piping is allowed o where both outside and underground, the same pl ... require... holds for joining plastic and metallic pipi Mechanical compression joints use an elastome seal that must be compatible not only with the pip material but also with the gas that is conveyed in t system. The manufacturer's instructions normally quire use of an internal stiffener insert in conjuncti ...

**From:** Wayne Snell
**Sent:** Wednesday, April 24, 2013 2:56 PM
**To:** Steve Freeman
**Subject:** IFGC

**SECTION 403 (IFGS)**
**PIPING MATERIALS**
**403.1 General.** Materials used for piping systems shall comply with the requirements of this chapter or shall be approved.
**403.2 Used materials.** Pipe, fittings, valves and other materials shall not be used again except where they are free of foreign materials and have been ascertained to be adequate for the service intended.
**403.3 Other materials.** Material not covered by the standards specifications listed herein shall be investigated and tested to determine that it is safe and suitable for the proposed service, and, in addition, shall be recommended for that service by the manufacturer and shall be approved by the code official.
**403.4 Metallic pipe.** Metallic pipe shall comply with Sections 403.4.1 through 403.4.4.
**403.4.1 Cast iron.** Cast-iron pipe shall not be used.
**403.4.2 Steel.** Steel and wrought-iron pipe shall be at least of standard weight (Schedule 40) and shall comply with one of the following standards:
1. ASME B 36.10, 10M;
2. ASTM A 53; or
3. ASTM A 106.
**403.4.3 Copper and brass.** Copper and brass pipe shall not be used if the gas contains more than an average of 0.3 grains of hydrogen sulfide per 100 standard cubic feet of gas (0.7 milligrams per 100 liters). Threaded copper, brass and aluminum-alloy pipe shall not be used with gases corrosive to such materials.
**403.4.4 Aluminum.** Aluminum-alloy pipe shall comply with ASTM B241 (except that the use of alloy 5456 is prohibited), and shall be marked at each end of each length indicating compliance. Aluminum-alloy pipe shall be coated to protect against external corrosion where it is in contact with masonry, plaster, or insulation, or is subject to repeated wettings by such liquids aswater, detergents, or sewage. Aluminum-alloy pipe shall not be used in exterior locations or underground.
**403.5 Metallic tubing.** Seamless copper, aluminum alloy and steel tubing shall not be used with gases corrosive to such materials.
**403.5.1 Steel tubing.** Steel tubing shall comply withASTM A 254 or ASTM A 539.
**403.5.2 Copper and brass tubing.** Copper tubing shall comply with Standard TypeKor L ofASTMB88 orASTM B 280.
Copper and brass tubing shall not be used if the gas contains more than an average of 0.3 grains of hydrogen sulfide per 100 standard cubic feet of gas (0.7 milligrams per 100 liters).
**403.5.3 Aluminum tubing.** Aluminum-alloy tubing shall comply with ASTM B 210 or ASTM B 241. Aluminum-alloy tubing shall be coated to protect against external corrosion where it is in contact with masonry, plaster or insulation, or is subject to repeated wettings by such liquids

1

**536**

as water, detergent or sewage.

Aluminum-alloy tubing shall not be used in exterior locations or underground.

**403.5.4 Corrugated stainless steel tubing.** Corrugated stainless steel tubing shall be listed in accordance with ANSI LC 1/CSA 6.26.

**403.6 Plastic pipe, tubing and fittings.** Plastic pipe, tubing and fittings used to supply fuel gas shall be used outdoors, underground, only, and shall conform to ASTM D 2513. Pipe shall be marked "Gas" and "ASTM D 2513."

**403.6.1 Anodeless risers.** Plastic pipe, tubing and anodeless risers shall comply with the following:

1. Factory-assembled anodeless risers shall be recommended by the manufacturer for the gas used and shall be leak tested by the manufacturer in accordance with written procedures.

2. Service head adapters and field-assembled anodeless risers incorporating service head adapters shall be recommended by the manufacturer for the gas used, and shall be designed and certified to meet the requirements of Category I of ASTM D 2513, and U.S. Department of Transportation, Code of Federal Regulations, Title 49, Part 192.281(e). The manufacturer shall provide the user with qualified installation instructions as prescribed by the U.S. Department of Transportation, Code of Federal Regulations, Title 49, Part 192.283(b).

**403.6.2 LP-gas systems.** The use of plastic pipe, tubing and fittings in undiluted liquefied petroleum gas piping systems shall be in accordance with NFPA 58.

**403.6.3 Regulator vent piping.** Plastic pipe, tubing and fittings used to connect regulator vents to remote vent terminations shall be PVC conforming to UL 651. PVC vent piping shall not be installed indoors.

**403.7 Workmanship and defects.** Pipe, tubing and fittings shall be clear and free from cutting burrs and defects in structure or threading, and shall be thoroughly brushed, and chip and scale blown.

Defects in pipe, tubing and fittings shall not be repaired. Defective pipe, tubing and fittings shall be replaced (see Section 406.1.2).

**403.8 Protective coating.** Where in contact with material or atmosphere exerting a corrosive action, metallic piping and fittings coated with a corrosion-resistant material shall be used. External or internal coatings or linings used on piping or components shall not be considered as adding strength.

**403.9 Metallic pipe threads.** Metallic pipe and fitting threads shall be taper pipe threads and shall comply with ASME B1.20.1.

**403.9.1 Damaged threads.** Pipe with threads that are stripped, chipped, corroded or otherwise damaged shall not be used. Where a weld opens during the operation of cutting or threading, that portion of the pipe shall not be used.

**403.9.2 Number of threads.** Field threading of metallic pipe shall be in accordance with Table 403.9.2.

**403.9.3 Thread compounds.** Thread (joint) compounds (pipe dope) shall be resistant to the action of liquefied petroleum gas or to any other chemical constituents of the gases to be conducted through the piping.

**403.10 Metallic piping joints and fittings.** The type of piping joint used shall be suitable for the pressure-temperature conditions and shall be selected giving consideration to joint tightness and mechanical strength under the service conditions. The

2

joint shall be able to sustain the maximum end force caused by the internal pressure and any additional forces caused by temperature expansion or contraction, vibration, fatigue or the weight of the pipe and its contents.

**TABLE 403.9.2**
**SPECIFICATIONS FOR THREADING METALLIC PIPE**

| IRON PIPE SIZE (inches) | APPROXIMATE LENGTH OF THREADED PORTION (inches) | APPROXIMATE NUMBER OF THREADS TO BE CUT |
|---|---|---|
| 1/2 | 3/4 | 10 |
| 3/4 | 3/4 | 10 |
| 1 | 7/8 | 10 |
| 1 1/4 | 1 | 11 |
| 1 1/2 | 1 | 11 |
| 2 | 1 | 11 |
| 2 1/2 | 1 1/2 | 12 |
| 3 | 1 1/2 | 12 |
| 4 | 1 5/8 | 13 |

For SI: 1 inch = 25.4 mm.

**403.10.1 Pipe joints.** Pipe joints shall be threaded, flanged, brazed or welded. Where nonferrous pipe is brazed, the brazing materials shall have a melting point in excess of 1,000°F (538°C). Brazing alloys shall not contain more than 0.05-percent phosphorus.

**403.10.2 Tubing joints.** Tubing joints shall be either made with approved gas tubing fittings or brazed with a material having a melting point in excess of 1,000°F (538°C).Brazing alloys shall not containmore than 0.05-percent phosphorus.

**403.10.3 Flared joints.** Flared joints shall be used only in systems constructed from nonferrous pipe and tubing where experience or tests have demonstrated that the joint is suitable for the conditions and where provisions are made in the design to prevent separation of the joints.

**403.10.4 Metallic fittings.** Metallic fittings shall comply with the following:

1. Threaded fittings in sizes larger than 4 inches (102 mm) shall not be used except where approved.

2. Fittings used with steel or wrought-iron pipe shall be steel, brass, bronze, malleable iron or cast iron.

3. Fittings used with copper or brass pipe shall be copper, brass or bronze.

4. Fittings used with aluminum-alloy pipe shall be of aluminum alloy.

5. Cast-iron fittings:

5.1. Flanges shall be permitted.

5.2. Bushings shall not be used.

5.3. Fittings shall not be used in systems containing flammable gas-air mixtures.

5.4. Fittings in sizes 4 inches (102 mm) and larger shall not be used indoors except where approved. 5.5. Fittings in sizes 6 inches (152 mm) and larger shall not be used except where approved.

6. Aluminum-alloy fittings. Threads shall not form the joint seal.

7. Zinc aluminum-alloy fittings. Fittings shall not be used in systems containing flammable gas-air mixtures.

8. Special fittings. Fittings such as couplings, proprietary-type joints, saddle tees, gland-type compression fittings, and flared, flareless or compression-type tubing fittings shall be: used within the fitting manufacturer's pressure-temperature recommendations;

3

used within the service conditions anticipated with respect to vibration, fatigue, thermal expansion or contraction; installed or braced to prevent separation of the joint by gas pressure or external physical damage; and shall be approved.

**403.11 Plastic pipe, joints and fittings.** Plastic pipe, tubing and fittings shall be joined in accordance with the manufacturer's instructions. Such joint shall comply with the following:

1. The joint shall be designed and installed so that the longitudinal pull-out resistance of the joint will be at least equal to the tensile strength of the plastic piping material.

2. Heat-fusion joints shall be made in accordance with qualified procedures that have been established and proven by test to produce gas-tight joints at least as strong as the pipe or tubing being joined. Joints shall be made with the joining method recommended by the pipe manufacturer. Heat fusion fittings shall be marked "ASTM D 2513."

3. Where compression-type mechanical joints are used, the gasket material in the fitting shall be compatible with the plastic piping and with the gas distributed by the system. An internal tubular rigid stiffener shall be used in conjunction with the fitting. The stiffener shall be flush with the end of the pipe or tubing and shall extend at least to the outside end of the compression fitting when installed. The stiffener shall be free of rough or sharp edges and shall not be a force fit in the plastic. Split tubular stiffeners shall not be used.

4. Plastic piping joints and fittings for use in liquefied petroleum gas piping systems shall be in accordance with NFPA 58.

**403.12 Flanges.** All flanges shall comply with ASME B16.1, ASMEB16.20 orMSSSP-6. The pressure-temperature ratings shall equal or exceed that required by the application.

**403.12.1 Flange facings.** Standard facings shall be permitted for use under this code. Where 150-pound (1034 kPa) pressure-rated steel flanges are bolted to Class 125 cast-iron flanges, the raised face on the steel flange shall be removed.

**403.12.2 Lapped flanges.** Lapped flanges shall be used only above ground or in exposed locations accessible for inspection.

**403.13 Flange gaskets.** Material for gaskets shall be capable of withstanding the design temperature and pressure of the piping system, and the chemical constituents of the gas being conducted, without change to its chemical and physical properties. The effects of fire exposure to the joint shall be considered in choosing material. Acceptable materials include metal or metal-jacketed asbestos (plain or corrugated), asbestos, and aluminum "O" rings and spiral wound metal gaskets. When a flanged joint is opened, the gasket shall be replaced. Full-face gaskets shall be used with all bronze and cast-iron flanges.

If you have any questions or if I can be of any assistance please let me know.

Thank You

Wayne K. Snell Jr., C.B.O., Building Official
Development Services
Town of Prosper
www.prospertx.gov

4

539

STATE OF TEXAS                    )
                                  )        CERTIFICATE TO COPY OF PUBLIC RECORD
COUNTY OF DENTON      )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of tickets for inspections performed at 3964 Spinnaker Run Pointe dated April 23, 2013 through August 20, 2013. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


_____
Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**540**



Project Address __3964 Spinnaker Run__

Builder's Name _____

| Comments | Type of Inspection | PASS | FAIL |
|---|---|---|---|
| | Plbg Final | | Fail |
| Need gas test on | | | |
| gas line to Kitchen | | | |
| Island, i Need 15 psi on 30 PSI Test Gauge | | | |
| Recall when Ready. | | | |

Inspector _Steve Helms_    Date _4-23-13_    Re-Inspection Fee Required  YES  NO

541



Project Address __3964 Spinnaker__

Builder's Name_____

| Comments | Type of Inspection | PASS | FAIL |
|---|---|---|---|
|  | Rough Gas | Pass |  |
| Gas Test ok |  |  |  |
|  |  |  |  |
| Silicon Caulk PVC Sleeve in Kitchen Island |  |  |  |
|  |  |  |  |

Inspector _Stev Helm_  Date _5/28/13_  Re-Inspection Fee Required  YES  NO

542



Project Address _3964 Spindle Run Point_

Builder's Name_____

| Comments | Type of Inspection | PASS | FAIL |
|---|---|---|---|
| | Frame | PASS | |
| | | | |
| | | | |
| | | | |

| Inspector | Steve Freeman | Date | 8-20-13 | Re-Inspection Fee Required YES NO |
|---|---|---|---|---|

543

# Exhibit D

STATE OF TEXAS     )
                              )
                              )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Pool Enclosure Permit Application for 3904 Spinnaker Run Pointe dated March 18, 2013. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

545

# INSPECTIONS COPY



Approved 3-19-2013
Steve Freeman



## LAKEWOOD VILLAGE

# FENCE PERMIT
## $25.00

All Installations Subject
To Field Inspections and
Inspector Approval

DATE _____

**PROPERTY OWNER INFORMATION**

NAME _____

ADDRESS _____

PHONE _____

**CONTRACTOR INFORMATION (IF APPLICABLE)**
(Note: Contractor must register with the Town)

NAME _____

ADDRESS _____

PHONE _____

**FENCE**

IS FENCE A POOL ENCLOSURE? Y or N (If yes, $150 fee applies and must meet more stringent pool enclosure guidelines to pass inspection)

HEIGHT _____    LENGTH _____

MATERIAL TO BE USED _____    WATERFRONT PROPERTY Y or N

NOTE: Fence cannot impede or change drainage on property.

**DESCRIPTION & DRAWING**
DESCRIBE WHERE THE FENCE WILL BE PLACED ON YOUR PROPERTY.

See redlines on Plans - Gates must met Pool
Barrier Requirements - Appendix G, 2006 IRC Codes
See attached printout

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

546



BRICK
RESIDENCE
3904

POOL
BRICK

LANDSCAPE
TIMBERS

INSPECTIONS COPY

BLOCK

547

INSPECTIONS COPY

# APPENDIX G

# SWIMMING POOLS, SPAS AND HOT TUBS

## SECTION AG101
## GENERAL

AG101.1 General. The provisions of this appendix shall control the design and construction of swimming pools, spas and hot tubs installed in or on the lot of a one- or two-family dwelling.

## SECTION AG102
## DEFINITIONS

AG102.1 General. For the purposes of these requirements, the terms used shall be defined as follows and as set forth in Chapter 2.

ABOVE-GROUND/ON-GROUND POOL. See "Swimming pool."

BARRIER. A fence, wall, building wall or combination thereof which completely surrounds the swimming pool and obstructs access to the swimming pool.

HOT TUB. See "Swimming pool."

IN-GROUND POOL. See "Swimming pool."

RESIDENTIAL. That which is situated on the premises of a detached one- or two-family dwelling or a one-family townhouse not more than three stories in height.

SPA, NONPORTABLE. See "Swimming pool."

SPA, PORTABLE. A nonpermanent structure intended for recreational bathing, in which all controls, water-heating and water-circulating equipment are an integral part of the product.

SWIMMING POOL. Any structure intended for swimming or recreational bathing that contains water over 24 inches (610 mm) deep. This includes in-ground, above-ground and on-ground swimming pools, hot tubs and spas.

SWIMMING POOL, INDOOR. A swimming pool which is totally contained within a structure and surrounded on all four sides by the walls of the enclosing structure.

SWIMMING POOL, OUTDOOR. Any swimming pool which is not an indoor pool.

## SECTION AG103
## SWIMMING POOLS

AG103.1 In-ground pools. In-ground pools shall be designed and constructed in conformance with ANSI/NSPI-5 as listed in Section AG108.

AG103.2 Above-ground and on-ground pools. Above-ground and on-ground pools shall be designed and constructed in conformance with ANSI/NSPI-4 as listed in Section AG108.

## SECTION AG104
## SPAS AND HOT TUBS

AG104.1 Permanently installed spas and hot tubs. Permanently installed spas and hot tubs shall be designed and constructed in conformance with ANSI/NSPI-3 as listed in Section AG108.

AG104.2 Portable spas and hot tubs. Portable spas and hot tubs shall be designed and constructed in conformance with ANSI/NSPI-6 as listed in Section AG108.

## SECTION AG105
## BARRIER REQUIREMENTS

AG105.1 Application. The provisions of this chapter shall control the design of barriers for residential swimming pools, spas and hot tubs. These design controls are intended to provide protection against potential drownings and near-drownings by restricting access to swimming pools, spas and hot tubs.

AG105.2 Outdoor swimming pool. An outdoor swimming pool, including an in-ground, above-ground or on-ground pool, hot tub or spa shall be surrounded by a barrier which shall comply with the following:

1. The top of the barrier shall be at least 48 inches (1219 mm) above grade measured on the side of the barrier which faces away from the swimming pool. The maximum vertical clearance between grade and the bottom of the barrier shall be 2 inches (51 mm) measured on the side of the barrier which faces away from the swimming pool. Where the top of the pool structure is above grade, such as an above-ground pool, the barrier may be at ground level, such as the pool structure, or mounted on top of the pool structure. Where the barrier is mounted on top of the pool structure, the maximum vertical clearance between the top of the pool structure and the bottom of the barrier shall be 4 inches (102 mm).

2. Openings in the barrier shall not allow passage of a 4-inch-diameter (102 mm) sphere.

3. Solid barriers which do not have openings, such as a masonry or stone wall, shall not contain indentations or protrusions except for normal construction tolerances and tooled masonry joints.

4. Where the barrier is composed of horizontal and vertical members and the distance between the tops of the horizontal members is less than 45 inches (1143 mm), the horizontal members shall be located on the swimming pool side of the fence. Spacing between vertical members shall not exceed $1^3/_4$ inches (44 mm) in width. Where there are decorative cutouts within vertical members, spacing within the cutouts shall not exceed $1^3/_4$ inches (44 mm) in width.

**548**

5. Where the barrier is composed of horizontal and vertical members and the distance between the tops of the horizontal members is 45 inches (1143 mm) or more, spacing between vertical members shall not exceed 4 inches (102 mm). Where there are decorative cutouts within vertical members, spacing within the cutouts shall not exceed $1^3/_4$ inches (44 mm) in width.

6. Maximum mesh size for chain link fences shall be a $2^1/_4$-inch (57 mm) square unless the fence has slats fastened at the top or the bottom which reduce the openings to not more than $1^3/_4$ inches (44 mm).

7. Where the barrier is composed of diagonal members, such as a lattice fence, the maximum opening formed by the diagonal members shall not be more than $1^3/_4$ inches (44 mm).

8. Access gates shall comply with the requirements of Section AG105.2, Items 1 through 7, and shall be equipped to accommodate a locking device. Pedestrian access gates shall open outward away from the pool and shall be self-closing and have a self-latching device. Gates other than pedestrian access gates shall have a self-latching device. Where the release mechanism of the self-latching device is located less than 54 inches (1372 mm) from the bottom of the gate, the release mechanism and openings shall comply with the following:

    8.1. The release mechanism shall be located on the pool side of the gate at least 3 inches (76 mm) below the top of the gate; and

    8.2. The gate and barrier shall have no opening larger than $1/_2$ inch (13 mm) within 18 inches (457 mm) of the release mechanism.

9. Where a wall of a dwelling serves as part of the barrier, one of the following conditions shall be met:

    9.1. The pool shall be equipped with a powered safety cover in compliance with ASTM F 1346; or

    9.2. Doors with direct access to the pool through that wall shall be equipped with an alarm which produces an audible warning when the door and/or its screen, if present, are opened. The alarm shall be listed in accordance with UL 2017. The audible alarm shall activate within 7 seconds and sound continuously for a minimum of 30 seconds after the door and/or its screen, if present, are opened and be capable of being heard throughout the house during normal household activities. The alarm shall automatically reset under all conditions. The alarm system shall be equipped with a manual means, such as touch pad or switch, to temporarily deactivate the alarm for a single opening. Deactivation shall last for not more than 15 seconds. The deactivation switch(es) shall be located at least 54 inches (1372 mm) above the threshold of the door; or

    9.3. Other means of protection, such as self-closing doors with self-latching devices, which are approved by the governing body, shall be acceptable so long as the degree of protection afforded is not less than the protection afforded by Item 9.1 or 9.2 described above.

10. Where an above-ground pool structure is used as a barrier or where the barrier is mounted on top of the pool structure, and the means of access is a ladder or steps:

    10.1. The ladder or steps shall be capable of being secured, locked or removed to prevent access; or

    10.2. The ladder or steps shall be surrounded by a barrier which meets the requirements of Section AG105.2, Items 1 through 9. When the ladder or steps are secured, locked or removed, any opening created shall not allow the passage of a 4-inch-diameter (102 mm) sphere.

**AG105.3 Indoor swimming pool.** Walls surrounding an indoor swimming pool shall comply with Section AG105.2, Item 9.

**AG105.4 Prohibited locations.** Barriers shall be located to prohibit permanent structures, equipment or similar objects from being used to climb them.

**AG105.5 Barrier exceptions.** Spas or hot tubs with a safety cover which complies with ASTM F 1346, as listed in Section AG107, shall be exempt from the provisions of this appendix.

### SECTION AG106
### ENTRAPMENT PROTECTION FOR SWIMMING POOL AND SPA SUCTION OUTLETS

**AG106.1 General.** Suction outlets shall be designed to produce circulation throughout the pool or spa. Single-outlet systems, such as automatic vacuum cleaner systems, or multiple suction outlets, whether isolated by valves or otherwise, shall be protected against user entrapment.

**AG106.2 Suction fittings.** Pool and spa suction outlets shall have a cover that conforms to ANSI/ASME A112.19.8M, or an 18 inch × 23 inch (457 mm by 584 mm) drain grate or larger, or an approved channel drain system.

Exception: Surface skimmers

**AG106.3 Atmospheric vacuum relief system required.** Pool and spa single- or multiple-outlet circulation systems shall be equipped with atmospheric vacuum relief should grate covers located therein become missing or broken. This vacuum relief system shall include at least one approved or engineered method of the type specified herein, as follows:

1. Safety vacuum release system conforming to ASME A112.19.17; or

2. An approved gravity drainage system.

**AG106.4 Dual drain separation.** Single or multiple pump circulation systems have a minimum of two suction outlets of the approved type. A minimum horizontal or vertical distance of 3 feet (914 mm) shall separate the outlets. These suction outlets shall be piped so that water is drawn through them simultaneously through a vacuum-relief-protected line to the pump or pumps.

**AG106.5 Pool cleaner fittings.** Where provided, vacuum or pressure cleaner fitting(s) shall be located in an accessible posi-

# Exhibit E

| STATE OF TEXAS | ) | |
|---|---|---|
| | ) | **CERTIFICATE TO COPY OF PUBLIC RECORD** |
| COUNTY OF DENTON | ) | |

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Residential Pool/Spa Permit Application for 6613 Autumn Mist Cove dated January 10, 2012. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

551

INSPECTIONS COPY



# RESIDENTIAL SWIMMING POOL/SPA PERMIT APPLICATION

**LAKEWOOD** VILLAGE

Project Address: 6613 Autumn Mist Cove
(PRINT LEGIBLY)

Legal Description: Lot 91 Block 1 Subdivision Sunrise Bay Phase ___

Property Owner: Jason Guadman Owner Phone: (469) 367-1488

| Contractor Name (Company) | Contact Name | Contact Phone Number |
|---|---|---|
| Pool: Riverbend Sander | Wynn Gardner | 214-437-3935 |
| Electric: Tee Pee Electric | Tony Perdue | 214-475-3961 |
| Plumbing: Plumbing Prof Alcala | Sam Alcala | 214-478-5157 |

All contractors must hold a current registration with the Town and be in good standing in order for applications to be accepted or processed.

**TYPE OF WORK:** ☑ Pool/Spa Combination   ☐ Pool-Inground   ☐ Pool-Above Ground   ☐ Spa Only
(SELECT ONE)

Valuation of Work: $ 110,000    w/fire pit    Square Footage (Total Area): 1,001

Heater: (YES) NO    Diving Board: (YES) NO    P-Trap: YES /(NO)
(If yes: LP Gas/Natural Gas)    (P-Trap & Backwash line required on all sanitary sewer properties)
(LP Gas requires Railroad Commission paperwork be provided in permit bag prior to pool final.)

Deck encroaching into drainage easement shall not be a structural element of the pool structure.

New Fences surrounding pools, not done by pool contractor, require separate permits and are subject to special requirements. (Refer to Appendix G, Section AG105, 2006 IRC, for Pool Barrier Requirements)

EVERY PERMIT ISSUED SHALL BECOME INVALID UNLESS THE WORK ON THE SITE AUTHORIZED BY SUCH PERMIT IS COMPLETED WITHIN 90 DAYS AFTER ISSUANCE. ALL PERMITS REQUIRE FINAL INSPECTION.

I HEREBY CERTIFY THAT I HAVE READ AND EXAMINED THIS APPLICATION AND KNOW THE SAME TO BE TRUE AND CORRECT. ALL PROVISIONS OF LAWS AND ORDINANCES GOVERNING THIS TYPE OF WORK WILL BE COMPLIED WITH WHETHER SPECIFIED OR NOT. THE GRANTING OF A PERMIT DOES NOT PRESUME TO GIVE AUTHORITY TO VIOLATE OR CANCEL THE PROVISIONS OF ANY OTHER STATE OR LOCAL LAW REGULATING CONSTRUCTION OR THE PERFORMANCE OF CONSTRUCTION.

Signature of Applicant: _____    Date: 1/6/12

Contact Name: Wynn Gardner 214-437-3935 Phone: _____
(PRINT LEGIBLY)

| PLANS EXAMINER USE ONLY: | |
|---|---|
| Plans Approved By: Steve Freeman | Permit Fee: $ |
| Date Approved: 1/12/2012 | |
| Special Conditions / Comments: | |
| See Redlines | |

Permits expire after 90 days of issuance. Permits are not transferable.

Revised 11-14-06

INSPECTIONS COPY

APPLICATION FOR DEVELOPMENT PERMIT (ADP) (02/10)
Denton County Flood Damage Prevention Ordinance
Planning Department, Denton County, Texas

PART A – APPLICANT INFORMATION          ☐ RESIDENTIAL PERMIT   ☐ COMMERCIAL PERMIT

First Name: Wynn Gardner                 Company: RIVERBEND SANDEE Pods
Last Name: Gardner                       Phone: 214-431-3935
Address: 3129 O Henry                    Fax:
City, State, Zip: Garland, TX. 75042     Email:

PART B – PROPERTY INFORMATION

DCAD'R' #: 182664                        Land Area (Acres): 2.19 AC
Owner's First Name: Mson                 Owner's Address:
Owner's Last Name: Groomon               Owner's City, State, Zip:

☐ Property is part of a Subdivision:    -- or --   ☐ Property is part of an Abstract:
Name: Sunset Bay @ Lewisville Lake                 Number:
Phase:                                             Name:
Block: I                                           DCAD Tract:
Lot: 91                                            County Tract:

6613 AUTUMN MIST Cove

PART C – DEVELOPMENT INFORMATION

Application is for:   ☐ House     ☐ Manufactured House     ☐ Excavation/Fill
                     ☐ Other (if "Other", describe the proposed improvement on the line below)
In ground pool, SPA, Firepit          Building Square Footage: 1,001
☐ Address or Road Name: 6613 AUTUMN MIST Cove   ☐ Address Requested: (Y) (N)   ☐ Precinct # 1

APPLICANT MUST ATTACH A SITE PLAN SHOWING LOCATION OF PROPOSED AND EXISTING IMPROVEMENTS,
THEIR DISTANCE TO AT LEAST TWO PROPERTY LINES, DISTANCE FROM THE ENTRY ROAD, NORTH ARROW
SHOWING ORIENTATION OF PROPERTY, PERMIT APPICATION FROM THE FIRE MARSHAL AND ANY OTHER
REQUIRED DOCUMENTATION.          ☐ Lakewood Village ETJ

Acknowledgment: The Flood Insurance Rate Maps (FIRM) and other flood data used by Denton County in evaluating flood hazards to proposed
developments are considered reasonable and accurate for regulatory purposes and are based on the best available scientific and engineering data.
On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. Issuance of a Development
Permit in accordance with the Denton County Flood Damage Prevention Ordinance does not imply that development outside the areas of special
flood hazard will be free from flooding or flood damage. Issuance of a permit shall not create liability on the part of Denton County or any officer
or employee of Denton County in the event flooding or flood damage does occur.

Construction of improvements should not be commenced at the above location until the Owner/Applicant is in compliance with all applicable
regulations regarding floodplain management, subdivision platting, and zoning for the government of Denton County. This permit does not waive
any other restrictions or regulations imposed privately or by law.

Applicant verifies that she/he has signed this application in the capacity designated, if any, and further attests that she/he has read this document,
and that the statement contained herein and any attachments are true, accurate and factual.

Violation of this verification may result in Applicant being prosecuted under Texas Penal Code §37.10 (a) (1)

PART D – SIGNATURE                          ☐ Request Architectural Plans be returned upon approval
Signature: [signature]
Date: 12/19/11                              CC# 802083

PART E – DENTON COUNTY USE ONLY                                    For Office Use Only!

Permit Number: 2011 1434           Fees Paid: (Y) (N)
                                   Cash:
FIRM Panel #: 48/2/80 4156         Check #: 802083
Reviewer: SSV                      In SFHA: (Y) (N)
                                   Zone: X
Engineering Review: (Y) (N)        NORC -
Fire Marshal Permit: #             NORCIC -                        SSV
☐ Culvert Permit: # RbE                                           12/21/2011

Denton County Planning Department
1505 E. McKinney St, Ste 175, Denton, TX 76209-4887

(940) 349-2990: Main – (940) 349-2991: Fax
(972) 434-8868: Metro – www.dentoncounty.com

No Fill or buildings below 537' Elevation
without Army Corp of Engineer Approval.
permit is void if construction not above 537' Elevation.

553



* 100 YT FLOOD PLAM
APPROX 90' FROM BACK
OF HOUSE

554

INSPECTIONS COPY





All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

LAWN

36'-8"

48'-4"

8'-9"

DIG TESS

1234567890

MC-1

MC-2

STANDARD ROCK COPING
w/ Waterline Tile

MIN.
MAX.

ROCK TYPE

556



## GENERAL SPECIFICATIONS

Unless otherwise stated in the Contract, the construction of pool will conform to the following specifications.

### POOL/SPA

Surface Sq. Ft.: 1,001
Perimeter: 156
Pool Size: 484" x 183"

### POOL ONLY

Surface Sq. Ft.:
Perimeter:
Gallons: 4

### EXCAVATION

1. Buyers POOL Site is Located inside Loop 635 which requires excavated pool trucked to a dump site over 3 miles from the POOL SITE. Large
   required equipment to excavate Buyers POOL Site will be. Pit-end loader will be required to move pool soil to a remote dump truck l from the pool site.
   day of Excavation, we will pre grade or cut down yard 0 Feet at the pool. We will remove 0 Square Feet of Concrete. We will saw cut Square Feet of concrete.

### STRUCTURE

2. The pool structure will be built for Normal Soil conditions as stated on Contrac the normal structure due to soil conditions, if any, are as follows;
   Steel Schedule: Super Structure
   Chemical Injection: Chemical In
   Piers: Helical Pier
   Gunite: None

5. Seller will install three (3) gunite steps per plan that total 12 square feet in th the depth of the third step will vary depending on the step locations. The follo additional structural items are included in the pool:
   # of Benches: 2 Total Length 14 Ft Sundeck #1 Total Square
   # of Loveseats: 2 Pool Out of Ground: Expanded Pool Beam:

### TILE/COPING

6. Seller to install 353 ft. of 6" ceramic waterline tile and 0 ft. of 6" rock tile a

7. Seller will use decorative masonry materials to construct pool as specified on

### ELECTRICAL

8. Seller's electrical installation will meet current National Electrical Codes and l codes and includes complete wiring of all equipment shown.

9. Seller has included all brass and PVC conduit necessary for proper electrical

### EQUIPMENT

10. Filter: Jandy NL Backwash Vlv Upgrade tion Pump: INTELLIFLO PUM

11. Automatic Time Clock & Freeze Sensor included for the Circulation pump if c not selected.

12. Chlorine Dispenser - Rainbow 320. Optional Additional Type: Aqua Pure S:

13. Computer Center: Jandy PDA PS8 (Pool/Spa) Side Control/None

14. Additional Booster Motor(s) included with pool: 2

15. Heater Size with Electronic Ignition: JANDY LRZ400 NATURAL HEAT
    Gas Line: 0 feet (Hookup and Pit installation is not included)

16. Bar-B-Que Gas Line: 0 feet to heater and Hookup if gas line is included.

17. Diving Board Size and Type: SR SMITH 6 FT DIVE BOARD WHITE

18. Cleaning System: Polaris 280 Type of Slide: None

### SPA SPECIFICATIONS

19. Spa Elevation: 18 Inches. Spa will have Two (2) Safety Main Drains :

---

Depth is measured from water surface

STORAGE ROOM

SINK

SHOWER

TOILET

CABANA BY OTHERS
874 S.F.

TEXTURED CONCRETE
BY RIVERBEND SANDLER

*(handwritten, red)* Gates/Barriers Shall be Installed Per 2056 IRC Codes

99'-3"

460 S.F.
concrete

INSPECTIONS COPY

ELECTRIC
ELECTRIC - N/A
ELECTRIC

COSERV
APPROVED POOL PLANS

GAS
GAS

557





16. Bar-B-Que Gas Line: 0 feet (Hookup and Pit installation is not included)
17. Diving Board Size and Type: SR SMITH 6 FT DIVE BOARD WHITE
18. Cleaning System: Polaris 280 Type of Slide: None

## SPA SPECIFICATIONS

19. Spa Elevation: 18 Inches. Spa will have Two (2) Safety Main Drains and F
20. # of Hydro Therapy Jets: 8 Air Blower Type and Size:
21. Optional Spa Booster System NOT included

## POOL PLUMBING

22. The pool will have 2 SKIMMERS, 8 RETURNS and 2 SAFETY MAIN 1
23. Seller will use a minimum of 2" SUCTION and 1 1/2" RETURN LINES.
24. Seller will install an overflow outlet to drain excess water from pool and an integr refill line attached to the hose bib if accessible. Optional Fillline: Letro Autofill
25. Seller will install a Backwash Line to P-Trap with sight glass and vent valve...... 1
26. Seller will install a Separation Tank.
27. Seller uses positive lock Jandy Never-Lube valves at equipment

## DECKING & POOL DRAINAGE SYSTEM

28. If Seller installs concrete decking, the thickness of the concrete will be 4", the stee reinforcement will be 3/8" rebar on 12" centers and the cushion sand under the co decks will be a minimum of 4".
29. Type of Deck: Deck - Colored Release Texture
    Other Decking:
    Square feet of Turndown Beams: 50
    Expansion Joints: Expansion Joints Sawcut
30. Mastic will be installed between coping and concrete deck. Color: Deco Seal Tar
31. If Seller installs concrete decks, Seller will install drains in immediate pool area us sewer/drain pipe. Brass drain grates are used on deck drains. Down spouts in th immediate pool area will be connected and /or planter drains will be installed in the area and tied into drainage system.
    Deck Drains will run out from pool 40 feet and will terminate at the Yard
    There is a sump pump included to pump excess water from pool area........ 1

## POOL INTERIOR FINISH

Type of Interior Finish: River Sand Prem Finish    Color: Not Selected

## ADDITIONAL SPECIFICATIONS

Buyer is responsible for the cost to repair any UTILITIES damaged during constru the pool and meeting all National and City BARRIER CODE REQUIREMENTS.

Deck Steps Length: 0
# of Deck Piers: 0

Sq. Ft.: 3
Sq. Ft.: 0

## CUSTOMER INFORMATION 103523

Mapsco: 461H

Name: JASON GOODMAN
Address: 6613 AUTUMN MIST COVE
City: LITTLE ELM    State: Texas    Zip: 75068
Job Site Address: 6613 AUTUMN MIST COVE
City: LITTLE ELM    State: Texas    Zip: 75068
Home Phone: 469-247-1488    Work Phone:
Cell Phone 1: 469-247-1488    Cell Phone 2:
Subdivision: SUNRISE BAY AT LEWISVILLE LAKE
Lot: 91    Block: 1
RESIDENTIAL ☒  COMMERCIAL ☐  NEW HOME CONST. 1

Submitted
By: _____ (Design Consultant Signature)    Date: _____

Buyer: _____ (Buyer Signature)    Date: _____

Buyer: _____ (Authorized Buyer/Other Signature)    Date: _____
Accepted
By: _____ HANK HENRY    Date: _____

FUTURE GARAGE

99'-3"

95'-1"

ACCESS: TRACK HOE & DUMP TRUCK

Installations Subject
Field Inspections And
Inspector Approval

DO NOT DO THIS!

#12 PONY
w/FRAME Required
the same distance

RETAIL STORE LOCATION
2001 COIT ROAD
SUITE 160
PLANO, TX 75093

ND SANDLER POOLS INC. WITHOUT PRIOR WRITTEN CONSENT.

nish type. Do not turn on pool light when pool is empty.

SCALE 1/8"=1'-0"

Construction Department Notes

Construction Supervisor: _____
Construction Notes: _____

STATE OF TEXAS )
)                    **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of tickets for inspections performed at 6613 Autumn Mist Cove dated January 16, 2012 through August 21, 2012. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# Town of
# Lakewood Village

| Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|
| Belly Stl | PASS | |

**Project Address** 6613 Autum Miso Com

**Builder's Name**

**COMMENTS**

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Sten Kama | 1/16/2012 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

561

# Town of
# Lakewood Village

| | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| **Project Address** 6613 Autumn Mist Cove | electrical underground | | |
| **Builder's Name** Riverbend Pools | | | |
| **COMMENTS** | | bss | |
| | | | |
| | | | |
| | | | |

| Town Permit Number See Pictures | Inspector Stan Freeman | Date 2/22/12 | Reinspection Fee Required Yes No |
|---|---|---|---|

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

562

# Town of Lakewood Village

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

| Type of Inspection | PASS OK to proceed | FAIL call for re-Inspection |
|---|---|---|

**Project Address**
8610 Autumn Mist

Deck steel. — PASS

**Builder's Name**

**COMMENTS**

Installing Pavers on deck

All metal Bonding in Place.

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| | | | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

563

# Town of Lakewood Village

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

| Project Address | 6613 Autum Mist Co | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|---|
| | Pool Gas | PASS | | |
| Builder's Name | River bend | | | |
| COMMENTS | | | | |

Talked to Homeowner

Cobana Permit has NOT been applied for yet.

He will come in 4/3/12 to apply.

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Steve | 4/7/12 | Yes   No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

564

# Town of Lakewood Village

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

| Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|

**Project Address** 6613 Autumn Mist Cove

**Builder's Name**

**COMMENTS**

| Type of Inspection | PASS | FAIL |
|---|---|---|
| PLBG Rough | Pass | |
| Water Service | Pass | |
| Foundation | Pass W/c | |

Picked up 3rd party insp. approval

Install chairs under cobbs before Pouring

OK to Pour

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Stuart Pen | 4/11/12 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

565

**Town of Lakewood Village**

DO NOT REMOVE TICKET FROM INSPECTION PACKET

| Project Address | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| 6613 Autom Mist Cove | Yard Sewr | PASS | |
| **Builder's Name** Jason Goodno | | | |

**COMMENTS**

Connection from Arbor
Back into House,

OK to Cover — water test - OK

| Town Permit Number | Inspector Steve Heen | Date 4-24-12 | Reinspection Fee Required Yes No |
|---|---|---|---|

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

566

# Town of Lakewood Village

| Project Address | 6613 Autum Mist Cove | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|---|
| Builder's Name | Jason Goodman | Elec Rough (Partial) | PASS WC | |

**COMMENTS**

I was asked to do a "Partial" electrical Rough inspection so contractor could cover ceiling area of Cabana.

✓ Install ground Band @ Pancake Box before next inspection → Partial Inspection

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Steu Arana | 5/11/12 | Yes   No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

567

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

Town of Lakewood Village
T E X A S

Project Address _6613 Autum Mist Cove_

Builder's Name _Gardner_

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| 1) Install ground bonds on Pancake Boxes in ceiling 2) Polyseal Top Plates to attic 3) No water in shower - install Boots on corners 4) Install T.O. for Heap test @ lav 5) Support PVC drain + DWV vent @ 4' o.c. 6) Secure NM wiring within 8" of Plastic Boxes 7) Install shield plates to protect PVC with 1.5" of members edge 8) Seal Chase to attic 9) mm 2% Position drainage on Horz vent in attic 10) min 1" to Combust gas; B vent through Roof 10.) Need 3rd party eng. letter for Slab | Frame | | Fail |
| | Elec Rough | | Fail |
| | Plbg T/O | | Fail |

| Town Permit Number | Inspector | Date | Re-inspection Fee Required |
|---|---|---|---|
| See pictures | Stan Klein | 6/5/12 | YES / NO |

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

568

Town of
Lakewood Village
T E X A S

Project Address _6613 Autumn Mist Cove_

Builder's Name _Jesse Goodman_

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| Water leak @ Shower | Frame | ~~Pass~~ | Fail |
| Install Boots @ Bookside | Elec Rough | Pass | |
| of Shower - Retest shower | PLBG T/O | | Fail |
| | Preplaster | | Fail |
| No Pripour letter on Slab | | | |
| No Pool Protection device | | | |
| on site     - OK to insulate - ~~~~ OK to drywall | | | |
| Gates on fence must swing away from pool area | | | |
| | | | |
| Install vent for attic area - Jenn Air vent now installed | | | |
| from outside to Roof. | | | |

| Town Permit Number _See pictures_ | Inspector _Steve Green_ | Date _6/11/12_ | Re-inspection Fee Required YES    NO |
|---|---|---|---|

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

569

Project Address _6613 Autom Mist Cove_

Builder's Name _Jesan Goodman_

| Comments | Type of Inspection | PASS<br>OK to proceed | FAIL<br>Call for re-inspection |
|---|---|---|---|
| | Preplaster<br>Reinspector | PASS | |
| Pool affidavit delivered<br>to Town Hall | PLB6 T/0 | Pass | |
| | | | |
| Ok to Preplaster-Pool | | | |

| Town Permit Number<br>see picture | Inspector<br>Stev Meldmor | Date<br>6/14/2 | Re-inspection Fee Required<br>YES    NO |
|---|---|---|---|

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

570

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

Town of
Lakewood Village
T E X A S

Project Address _6613 Avton Ast Com_

Builder's Name _Jesa Goodman_

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| Prepar letter in office | Frame | Pass | |
| | Drywall | Pass | |
| | | | |
| | | | |
| | | | |

| Town Permit Number | Inspector | Date | Re-inspection Fee Required |
|---|---|---|---|
| See Picture | Stan Man | 6/15/12 | YES    NO |

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

571

# Town of
# Lakewood Village

| | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|

**Project Address** 6613 Autum Mist Cove   Pool Fim!   Fail

**Builder's Name** River bed Sandler

**COMMENTS**

No GFCI outlet within
10-20 FT of Pools Edge

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Steve Green | 7-10-12 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

572



**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

Project Address  6613 Autumn Mist Cove

Builder's Name  Jason Goodman

| Comments | Type of Inspection | PASS | FAIL |
|---|---|---|---|
| Accessory Structure | C/O | Pass | |
| | | | |
| | | | |
| | | | |

Inspector  _Steve Brown_        Date  8/21/12      Re-Inspection Fee Required  YES  NO

573

**STATE OF TEXAS**      )

                               )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**   )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of tickets for inspections performed at 6613 Autumn Mist Cove dated January 16, 2012 through August 21, 2012.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# Town of Lakewood Village

| Project Address | 6613 Autum Miso Con | Type of Inspection | PASS Ok to proceed | FAIL call for re-inspection |
|---|---|---|---|---|
| | | Belly Stal | PASS | |
| Builder's Name | | | | |
| COMMENTS | | | | |
| | | | | |
| | | | | |
| | | | | |

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See pictures | Steven Rama | 1/16/2012 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

575

# Town of Lakewood Village

| | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| **Project Address** 6613 Autumn Mist Cove | electrical underground | | |
| **Builder's Name** Riverbend Pools | | bss | |
| **COMMENTS** | | | |
| | | | |
| | | | |
| | | | |

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| See Pictures | Steve Freeman | 2/23/12 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

576

# Town of Lakewood Village

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

| Project Address | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| 8610 Autumn Mist | Deck steel | PASS | |
| Builder's Name | | | |

| COMMENTS | | | |
|---|---|---|---|
| Installing Piers on deck | | | |
| All metal Bonding in Place. | | | |

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| | | | Yes   No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

577

# Town of Lakewood Village

| | Type of Inspection | PASS<br>OK to proceed | FAIL<br>call for re-inspection |
|---|---|---|---|
| **Project Address** 6613 Autum Mist Co | Pool Gas | PASS | |
| **Builder's Name** River bend | | | |
| **COMMENTS** | | | |
| Talked to Homeowner | | | |
| Cobana Permit has NOT been applied for yet. | | | |
| He will come in 4/3/12 to apply. | | | |

| Town Permit Number<br>See pictures | Inspector<br>Steve | Date 4/2/12 | Reinspection Fee Required<br>Yes    No |
|---|---|---|---|

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

578

**Town of Lakewood Village**

DO NOT REMOVE TICKET FROM INSPECTION PACKET

| Project Address | 6613 Autumn Mist Cove | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|---|
| | | Plbg Rough | Pass | |
| Builder's Name | | water Service | Pass | |
| | | Foundation | Pass W/c | |
| COMMENTS | | | | |
| | Picked up 3rd party insp. approval | | | |
| | Install chairs under cobbs before Pouring | | | |
| | OK to Pour | | | |

| Town Permit Number | Inspector | Date | Reinspection Fee Required |
|---|---|---|---|
| see pictures | Stacy Fenn | 4/11/12 | Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

579

# Town of Lakewood Village

| Project Address | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| 6613 Autom Mist Cove | Yard Sewr | PASS | |
| **Builder's Name** Jason Goodan | | | |
| **COMMENTS** Connection from Arbor Box into House, | | | |

OK to Cover — water test – OK

| Town Permit Number | Inspector Steven Keen | Date 4-24-12 | Reinspection Fee Required Yes    No |
|---|---|---|---|

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

580

# Town of Lakewood Village

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

| Project Address 6613 Autum Mist Cove | Type of Inspection Elec Rough (Partial) | PASS OK to proceed PASS W/C | FAIL call for re-inspection |
|---|---|---|---|
| Builder's Name Jason Goodman | | | |

**COMMENTS**

I was asked to do a "Partial" electrical Rough inspection so contractor could cover ceiling area of Cobana.

Install ground Bond @ Pancake Box before next inspection > Partial Inspection -

| Town Permit Number See pictures | Inspector Steve Frame | Date 5/11/12 | Reinspection Fee Required Yes  No |
|---|---|---|---|

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

581

Town of
**Lakewood Village**
T E X A S

Project Address _6613 Autum Mist Cove_

Builder's Name _Gardner_

| Comments 1) Install ground Bonds on Pancake Boxes in Ceiling 2) Polyseal Top Plates to attic 3) No water in shower - install Boots on Corners 4) Install 10 Fr Heap test e lar 5) Support PVC drain + DWV vent @ 4' o.c. 6) Secure NM wiring within 8" of Plastic Boxes 7) Install shield plates to Protect PVC with 1.5" of members edge 8) Seal Chase to attic 9) min 2% Positive drainage on Horz Vent in attic 10) min 1" to Combustibles - B vent through Roof 10.) Need 3rd party eng. letter for Slab | Type of Inspection | **PASS** OK to proceed | **FAIL** Call for re-inspection |
|---|---|---|---|
| | Frame | | Fail |
| | Elec Rough | | Fail |
| | Plbg T/O | | Fail |
| | | | |

| Town Permit Number | Inspector | Date | Re-inspection Fee Required |
|---|---|---|---|
| See pictures | | 6/5/12 | YES  NO |

582

**Town of Lakewood Village TEXAS**

Project Address: 6613 Autumn Mist Cove

Builder's Name: Jason Goodman

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| Water leak @ Shower | Frame | ~~PASS~~ | Fail |
| Install Boots to Backside of Shower - Retest shower | Elec Rough | Pass | |
| | Plbg T/O | | Fail |
| No Prepour letter on Slab | Preplaster | | Fail |
| No Pool Protection device on site — OK to insulate ~~_____~~ OK to drywall | | | |
| Gates on Fence must swing away from Pool area | | | |
| Install vent for attic area - Jenn Air vent now installed from outside to Roof. | | | |

| Town Permit Number | Inspector | Date | Re-inspection Fee Required |
|---|---|---|---|
| See pictures | Steve Green | 6/11/12 | YES     NO |

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

583

**Town of Lakewood Village T E X A S**

Project Address _6613 Autom Mist Cove_

Builder's Name _Jesan Goodman_

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| | Preplaster | PASS | |
| | Re-spector | | |
| Pool affidavit delivered to Town Hall | PLB6 T/O | Pass | |
| | | | |
| Ok to Preplaster Pool | | | |

| Town Permit Number | Inspector | Date | Re-inspection Fee Required |
|---|---|---|---|
| See pi avec | Steu Melmor | 6/14/12 | YES    NO |

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

584

**DO NOT REMOVE TICKET FROM INSPECTION PACKET**

Town of
Lakewood Village
T E X A S

Project Address: 6613 Avian Mst Com

Builder's Name: Jesse Goodman

| Comments | Type of Inspection | PASS OK to proceed | FAIL Call for re-inspection |
|---|---|---|---|
| | Frame | Pass | |
| Prepar letter in office | Drywall | Pass | |
| | | | |
| | | | |
| | | | |
| | | | |

| Town Permit Number | Inspector | Date | Re-Inspection Fee Required |
|---|---|---|---|
| See Picture | Stan Than | 6/15/12 | YES    NO |

Town of Lakewood Village • 100 South Highridge Drive • Lakewood Village, TX 75068 • 972-294-5555

585

**Town of Lakewood Village**

| | Type of Inspection | PASS OK to proceed | FAIL call for re-inspection |
|---|---|---|---|
| Project Address 6613 Autum Miss Cove | Pool Finl | | Fail |
| Builder's Name River bed Sandler | | | |
| COMMENTS | | | |
| No GFCI outlet within 10-20 FT of Pools Edge | | | |

| Town Permit Number See pictures | Inspector Stein Green | Date 7-10-12 | Reinspection Fee Required Yes    No |

Town of Lakewood Village • 100 S. Highridge Dr. • Lakewood Village, TX 75068 • 972-294-5555

586



Project Address __6613 Autumn Mist Cove__

Builder's Name __Jason Goodman__

| Comments | Type of Inspection | PASS | FAIL |
|---|---|---|---|
| Accessory Structure | C/0 | Pass | |
| | | | |
| | | | |
| | | | |

| Inspector | Date 8/21/12 | Re-Inspection Fee Required YES NO |
|---|---|---|

587

STATE OF TEXAS        )

                                  )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the letter from Linda Asbell to Jason Goodman dated February 21, 2012. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

588



February 21, 2012

Mr. Jason Goodman,
6613 Autumn Mist Cove
Little Elm, TX 75068

VIA:   Hand Delivery & USPS Regular Delivery

**RE: Pool Permit**

Dear Mr. Goodman;

The Town of Lakewood Village would like to welcome you to the area.  Although you received conflicting information from Denton County about the permitting process for your property, we have resolved this issue with them.  The Town of Lakewood Village is the permitting authority for any construction on properties located inside the Lakewood Village Extra Territorial Jurisdiction (ETJ).

In 2009 the Texas Legislature adopted provisions that requires counties to adopt all applicable construction (plumbing, electrical, residential etc.) in the unincorporated areas.  That same legislation stated that if the unincorporated property is located in the ETJ of a municipality and that municipality has adopted construction codes then the municipal codes prevail.  In January 2010 the Town of Lakewood Village began issuing permits and performing inspections in the ETJ.

We have staff available to assist you if you have any questions throughout your building process so please feel free to contact us at any time.  As your property is located in the ETJ it is required that you apply for, and receive, an approved building permit prior to beginning any construction.  The builder and subcontractors will be required to register with the Town prior to beginning work on the property.

Please contact me directly if you have any questions.

Sincerely,

Linda Asbell
Town Secretary

*Linda Asbell, Town Secretary*
*linda@lakewoodvillagetx.us*
*100 Highridge Drive,  Lakewood Village, Texas 75068*
*972-294-5555, 972-292-0812 fax*
*www.lakewoodvillagetx.us*

589

STATE OF TEXAS    )

                       )        **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Cabana/Outdoor Kitchen Permit Application for 6613 Autumn Mist Cove dated April 3, 2012. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



590

# PATIO PERMIT



## LAKEWOOD VILLAGE

**APPLICANT**

DATE 4/3/2012

NAME Jason Goodman
ADDRESS 663 Autumn Mist Cove Little Elm TX 75068
PHONE 968-247-1488

HEIGHT 26-28'        LENGTH
TYPE Cabana           COLOR

**DESCRIPTION & DRAWING**
DESCRIBE WHERE THE PATIO WILL BE PLACED ON YOUR PROPERTY.
See Attached

---

PLOT PLAN

Electric - Brian
419-625-7444

Plumbing - Sam
Water
Gas      214-478-5757

Foundation - Jose
Greg Baggerly
972-935-3012

"See All Redlines on Plans"

Required Inspections:
PLUMBING Rough
Water Service
Foundation
Frame
Elec Rough
PLBG Top/out
Elec. Final
Bldg. Final

**All Installations Subject To Field Inspections And Inspector Approval**

**All Inspections Shall Comply With 2006 IRC Requirements & Adopted Ordinances**

DRAW PATIO, ALONG WITH HOUSE LOCATION IN THIS BOX.

591



All Installations Subject
To Field Inspections And
Inspector Approval

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

JASON GOODMAN
SUNRISE BAY AT LAKE LEWISVILLE
6613 AUTUMN MIST COVE, LITTLE ELM, TEXAS
LOT: 91    BLOCK: 1    PLAN: POOL

S2

Childress Engineering Services



All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections And
Inspector Approval

FOUNDATION PLAN

TOTAL SQUARE FOOTAGE OF
HOUSE 2,1601 SQ FT.

**JASON GOODMAN**
SUNRISE BAY AT LAKE LEWISVILLE
6613 AUTUMN MIST COVE, LITTLE ELM, TEXAS
LOT: 91    BLOCK: 1    PLAN: POOL

**S1**

Childress Engineering Services

593



All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections And
Inspector Approval

Build Fireplace Per Chpt 10, 2006 IRC Codes

Fireplace must Terminate 2 Ft Above Roof line

measured 10 Ft Horizontal spacing

Plumbing / Electric / Gas / Water



Posts shall be
anchored to
concrete + or as
Top unit
Approved brackets.

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
to Field Inspections And
Inspector Approval

595

All Inspections Shall Comply With 2006 IRC Requirements & Adopted Ordinances

All Installations Subject To Field Inspections And Inspector Approval

**596**

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections And
Inspector Approval

FISHING LAKE

min 2 FT Above Roofline measured 10 FT Horizontal



All Installations Subject
To Field Inspections And
Inspector Approval

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances



ROOF PLAN

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections And
Inspector Approval

1. Choose Style:
Specialty

2. Choose Material:
Choose...



# SPECIALTY

Specialty Openings. Find the perfect garage door to complement your home and personality with an aluminum full-view garage door or an ornamental iron garage door. Express your style with the perfect match to your home.


Clean, simple lines and a full view with this contemporary garage door.
R-Value: N/A
Warranty: 5 Yrs
Price: $$$$$

Wrought iron ornamental beauty added to your garage door.
R-Value: 13
Warranty: 2 Yrs
Price: $$$$$

GARAGE DOORS      OPENERS & ACCESSORIES      BEFORE YOU BUY      SERVICE & SUPPORT      FIND A DEALER

BECOME A DEALER

DOOR DESIGNER

MY FAVORITES

ABOUT US

2 — 9x7
1 — 10x8

DOOR DESIGN CONTEST

*All Installations Subject To Field Inspections And Inspector Approval*

*All Inspections Shall Comply With 2006 IRC Requirements & Adopted Ordinances*

STATE OF TEXAS      )

                        )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**   )

       I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Pool Enclosure Permit Application for 6613 Autumn Mist Cove dated June 4, 2012. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

       I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

       In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



601



# FENCE PERMIT
## $25.00

All Inspections
Shall Comply With
2006 IRC Requirements
& Adopted Ordinances

DATE    6-4-12

## PROPERTY OWNER INFORMATION

NAME    Jason Goodman

ADDRESS    6613 Anthem most OGK

PHONE    469-247-1488

## CONTRACTOR INFORMATION (IF APPLICABLE)
(Note: Contractor must register with the Town)

NAME    Lifetime Fence - Jimmy

ADDRESS    2700 Lea Meadow Ln Corinth TX

PHONE    214-952-3966

## FENCE

IS FENCE A POOL ENCLOSURE? Y or N  (If yes, $150 fee applies and must meet more stringent pool enclosure guidelines to pass inspection)

HEIGHT    4'          LENGTH    353'

MATERIAL TO BE USED    Iron     WATERFRONT PROPERTY Y or N

NOTE:  Fence cannot impede or change drainage on property.

## DESCRIPTION & DRAWING
DESCRIBE WHERE THE FENCE WILL BE PLACED ON YOUR PROPERTY.

Back of property

Fence shall be constructed per
Appendix G- 2006 IRC Codes
Gates & Barriers.

All Installations Subject
To Field Inspections And
Inspector Approval

Pool affidavit Required
@ Prepour Inspect

602

DRAWING

## PLOT PLAN



6613 Misty Cove

House

Pool

Lake

DRAW FENCE, ALONG WITH HOUSE LOCATION IN THIS BOX.



Ordered By:

Allegiance Tit
3301 Eldorad
Suite 100
McKinney, Tex
phone 972-56
fax 972-562-0

Surveyed By:

TerraCorp

www.terracorpsurvey.com
orders@terracorpsurvey.com
(P) 972-805-4526
(F) 972-805-4527

TerraCorp Associates LLC #101858-00
3960 Broadway Blvd.
Suite 236
Garland, TX 75043

LOT 90

MONUMENT
E424-42

20' DRAINAGE EASEMENT

S 68°24'33" E (S 67°08'48" E) 208.47' 208.4

10' DRAIN & UTIL EASEMEN

20' DRAINAGE EASEME

TRANS TEL

IPF
(CM)



FOLDER COPY

**Property Address:**

6613 Autumn Mist Cove, Little Elm, TX 75058

**Client Order Number:**

1118769-ALMK

**Certified To:**

Jason A. Goodman; Allegiance Title Company

**Legal Description:**

Lot 91, Block 1, Sunrise Bay at Lake Lewisville, an Addition to Denton County, Texas, according to Map or Plat Thereof Recorded in Cabinet L, Page(s), 224 of the Map and/or Plat Records of Denton County, Texas.

**TerraCorp Order No.:**

TX11091002

**Completed Date:**

09/06/11

Spinnaker Run

Autumn Mist Cove

## NOTES

1. Bearings shown hereon are based on NAD83(CORS96, EPOCH 2002) tied to the Texas Coordinate System of 1983, North Central Zone (4202) using the Geoshack "GeoNet" RTK GPS Network.

The convergence/mapping angle is 00°50'12" with a combined scale factor of 0.999852061.

2. The following items are from Schedule B. Commitment for Title Insurance, Stewart Title Guaranty Company, GF No. 1118739-ALMK, issued August 30, 2011.

10c. A fifty foot building line along the front property line as set out on plat recorded in Cabinet L, Page 224 of the Plat Records of Denton County, Texas.

10d. The Slope Easement, Utility, Drainage and Flowage Easement(s) as set out on recorded plat recorded in Cabinet L, Page 224 of the Plat Records of Denton County, Texas.

10e. Flowage Easement described in instrument recorded in Volume 463, Page 444, of the Deed Records, Denton County, Texas.

FLOOD NOTE

Subject property is shown on the National Flood Insurance Program Flood Insurance Rate for Denton County, Texas and Incorporated Areas, Map No. 48121C0415G, dated April 18, 2011. All of the subject property appears to be located in "Zone X", "Zone X (Shaded) and "Zone AE" on said map. Relevant zone is defined on said map as follows: "Zone X" – Areas determined to be outside the 0.2% annual chance flood. "Zone X (Shaded)" – Areas of 0.2% annual chance flood; areas if 1% annual chance flood with average depths less than 1 foot annual chance flood; areas if 1 square mile; and areas protected by levees from 1% annu..

U.S.A.
LAKE LEWISVILLE
RESERVOIR



MONUMENT
424–43
D (CM)

S 17°44'50" W

199.00'

LAWN

LAWN

606

10g. The Slope Easement, Utility, Drainage and Floodway Easement recorded plat recorded in Cabinet L, Page 224 of the Plat Records of Denton County, Texas.

10e. Flowage Easement described in instrument recorded in Volume 463, Page 444, of the Deed Records, Denton County, Texas s.

FLOOD NOTE

Subject property is shown on the National Flood Insurance Program Flood Insurance Rate Map for Denton County, Texas and Incorporated Areas, Map No. 48121C0415G, dated April 18, 2011. All of the subject property appears to be located in "Zone X", "Zone X(Shaded) and "Zone X" on said map. Relevant zone is defined on said map as follows: "Zone X" - Areas determined to be outside the 0.2% annual chance flood; "Zone X (Shaded)" - Areas of 0.2% annual chance flood; areas if 1% annual chance flood with average depths less than 1 foot or with drainage areas less than 1 square mile, and areas protected by levees from 1% annual chance flood. "Zone AE" - Special Flood Hazard Areas (SFHAs) subject to inundation by the 15 annual chance flood. Base flood elevations determined.

## LEGEND

A/C. ...... AIR CONDITION
(CM) ...... CONTROL MONUMENT
CAP ...... CORRAGATED METAL PIPE
CO. ...... CLEANOUT
SRF ...... STEEL RGD FOUND
TEL ...... TELEPHONE PEDESTAL
TRANS. ...... ELECTRIC TRANSFORMER
( ) ...... PLAT/DEED CALLS
WM ...... WATER METER

I hereby certify that this plat represents the results of a survey made on the ground on the 1st day of September, 2011.

Signed 6th day of August, 2011



N

Scale 1" = 50'

# Exhibit F

**STATE OF TEXAS** )

**COUNTY OF DENTON** )

                  **CERTIFICATE TO COPY OF PUBLIC RECORD**

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the builder's plans for "3950 Spinaker Run Pointe Rd.". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


*Linda Asbell*

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**609**

## GENERAL CONTRACTORS NOTES

1.) Prior to any construction, the Contractor shall familiarize himself with the Contract Documents and Specifications, the Plans, including all notes, the City Standard Details and Specifications and any other applicable Standards or Specifications relevant to the proper completion of the work specified. Failure on the part of the Contractor to familiarize himself with all standards and specifications pertaining to the work shall in no way relieve the Contractor of responsibility for performing the work in accordance with all such applicable Standards and Specifications.

2.) The Contractor shall have in his possession, prior to construction, all necessary permits, licenses, etc. The Contractor shall have at least one set of set of approved Plans and Specifications on-site at all times. The Contractor shall notify city buildings officials and/ or department 24 hours prior to the commencement of any work.

3.) Construction inspection may be performed by representatives of the Owner, Engineer, City, Geotechnical Engineer and Reviewing Authorities and Agencies. Unrestricted access shall be provided to them during normal working hours. The contractor is responsible for understanding and scheduling required inspections.

4.) All contractors must confine their activities to the work area. No encroachments outside of the defined work area will be allowed, unless specifically noted on the plans. Any damage resulting therefrom shall be the Contractor's responsibility to repair.

5.) It will be the responsibility of each contractor to protect all existing public and private utilities throughout the construction of this project. The Contractor shall contact the appropriate utility companies for line locations prior to the commencement of construction and shall assume full liability to those companies for any damages caused to their facilities.

6.) The Contractor shall be responsible for providing the required construction staking necessary to complete the construction in accordance with the plans and specifications.

7.) The Contractor shall be responsible for providing and maintaining all necessary barricading and all other warning and safety devices to protect the public safety and health until all work has been completed and accepted.

8.) If any unforeseen problems or conflicts are encountered in the course of construction, for which an immediate solution is not apparent, the Engineer and Owner shall be notified.

9.) The Contractor shall be responsible for removing any existing structures, fences, debris, or trees that are located within the boundaries of this project, unless otherwise noted on the plans.

10.) General Contractor shall be responsible for coordination of other trades (mech'l, elect, etc) prior to fabrication and installation.

11.) General Contractor to be responsible for coordination of architectural and structural drawings prior to fabrication, forming, or placement of materials. General Contractor shall report discrepancies immediately to architect and shall proceed with construction only after discrepancy has been resolved.

## GENERAL FRAMING NOTES

1.) Structure was designed in accordance to the International Building Code 2003 Edition.

2.) All joists and rafters shall be aligned over studs below.

3.) All exterior corners (inside and out) shall be braced as required. Special city wind strength ordinances may apply

4.) Exterior walls 2 X 4 or 2 X 6 stud framing with veneers as selected, except where shown as 6" wall for plumbing supply and vents.

5.) Interior walls 2" X 4" stud with sheetrock face, except where shown as 6" wall for plumbing supply and vents, and for walls 10' in height or greater.

6.) Unless specifically noted otherwise, framing lumber shall be no. 2 or better southern pine with a modulus of elasticity of 1,600,000 psi. Interior wall studs may be no. 2 or better SPF, Douglas fir or S. pine, or no.2 or better SPF.

7.) Wood roof and floor trusses if used shall be fabricated, handled, and erected in accordance with truss plate institute standards and IBC standards. Truss design drawings sealed by a registered professional engineer shall be provided to the owner prior to erection of the trusses. The truss webs and bottom chords shall have their individual 2" thick components glued together as well as nailed per the truss plate pattern. The truss members shall all be minimum 2x4 no.2 or better.

8.) Coordinate and adjust, as necessary, the typical framing member spacing with lighting and electrical locations shown.

9.) When two roofs intersect with different roof pitches, block top of stud walls to align fascia.

10.) Wood connections to be Simpson ties or equivalent.

11.) All structural steel shall be A36 except TS shapes shall be A500 GR. B, Steel joists and joist girders shall meet all specifications of the latest S.J.I. edition. Fy=50 KSI. All bolted connections shall use a325 bolts unless noted otherwise. All welds shall be made using E70 electrodes. Headed studs shall be Nelson or better. Temporary construction bracing of the structural steel frame shall remain in place until after the floor and roof deck attachments have been completed and all permanent bracing has been installed.

## GENERAL CONCRETE NOTES

1.) Do not use foundation outline plan for actual construction. Foundation documents must be drawn & sealed by a registered engineer. Peskuski Home Design assumes no responsibility for slab strength or integrity.

2.) Concrete shall have a minimum compressive strength of 3000 psi at 28 days. Reinforcing steel shall be ASTM A615 grade 60. Lap all reinforcing splices 24" unless noted otherwise. Provide 2'-0" x 2'-0" corner bars to match and lap horizontal reinforcement at all grade beam and wall intersections, 30 bar dia. lap minimum. All reinforcement shall be detailed in accordance with the latest ACI Detailing manual.

3.) Contractor shall coordinate all penetrations, conduit, chamfers and embedded items prior to concrete placement. Welded wire fabric and wire shall be lapped the spacing of the cross wires plus 2".



VICINITY MAP

## SHEET INDEX

CS    COVER SHEET
A1    PLAN OVERVIEW
A2    FIRST FLOOR PLAN
A3    SECOND FLOOR PLAN
A4    FRONT/REAR ELEVATIONS
A5    LEFT/RIGHT ELEVATIONS
A6    ROOF/PLAT PLAN
A7    CROSS SECTIONS
S1    FOUNDATION/PLUMBING
S2    ROOF FRAMING
S3    DOOR/WINDOW SCHEDULES
D1    CONSTRUCTION DETAILS
E1    FIRST FLOOR ELECTRICAL
E2    SECOND FLOOR ELECTRICAL

## COVER SHEET

BUILDER COPY

Stairs Shall Comply
With IRC Section R311.5.

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

| PLAN NO. | 7134 |
| --- | --- |
| DATE | 10/30/13 |

## PHD
### PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (107) 692-9975    FAX: (352) 270-0338

## ALAN HOFFMANN COMPANY
## BIZIOS RESIDENCE
### 3950 SPINAKER RUN POINTE RD

SHEET
CS

BUILDER COPY



SITE PLAN
SCALE 1" = 30'

All installations Subject
To Field Inspections and
Inspector Approval

LAKE LEWISVILLE
RESOVOIR

DRAINAGE
(AS INDICATED)

S 04 DEG 53'49" W
269.66'

N 38 DEG 21'36" W
491.89'

S 43 DEG 20'43" E
585.89'

10' SLOPE & UTILITY EASMT

30' SIDEYARD SETBACK

30' SIDEYARD SETBACK

20' SLOPE & UTILITY EASMT

REINFORCED CONCRETE DRIVE

N 34 DEG 54'11" W
295.77'

50' BUILD LINE

20' SLOPE & UTILITY EASMT

N 55 DEG 07'13" E  116.3'

SPINAKER RUN POINTE ROAD

MASONRY
MAILBOX

PLAN NO.
7134

DATE
01/22/14

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (xx) xxx-xxxx
FAX: (xxx) xxx-xxxx

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3960 SPINNAKER RUN POINTE RD

SHEET
C-1

## SECOND FLOOR

## FIRST FLOOR







Stairs Shall Comply With IRC Section R311.5

All Inspections Shall Comply with 2006 IRC Requirements & Adopted Ordinances

All Penetrations Through Slab Must be Installed Per 2006 IRC Section R311.5 Prior to Placement of Concrete

All Installations Subject To Field Inspections and Inspector Approval

### NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.
2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.
3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.
4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.
5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.
6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS
7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE
8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS
9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.
10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"x36" PAGE

### AREAS

| LIVING | |
|---|---|
| FIRST FLOOR A/C | 5536 |
| SECOND FLOOR A/C | 1369 |
| LOFT | 229 |
| **TOTAL LIVING** | **7134** |
| | |
| GARAGES | |
| 2 CARS | 618 |
| 2 CARS | 618 |
| SHOP | 221 |
| | |
| PORCHES | |
| ENTRY - GATE | 175 |
| ENTRY - FRONT DOOR | 123 |
| PRIVATE | 82 |
| BACK SNGLE VOLUME | 471 |
| BACK DBL VOLUME | 505 |
| | |
| GARAGES/PORCHES | 2813 |
| | |
| TOTAL UNDER ROOF | 9947 |

## PLAN OVERVIEW

SCALE 3/32" = 1'

### ALAN HOFFMANN COMPANY
### BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-1

**PHD**
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (469) 682-8858   FAX: (972) 278-0238

PLAN NO. 7134
DATE 11/05/13



# FIRST FLOOR PLAN SCALE 3/16" = 1'

**ALAN HOFFMANN COMPANY**
**BIZIOS RESIDENCE**
**3950 SPINAKER RUN POINTE RD**

**PHD**
PIESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 945-9936  FAX (972) 298-0228

PLAN NO. **7134**
DATE **11/05/13**
SHEET **A-2A**

613

614

MOTOR COURT

MATCH LINE A-A

MATCH LINE A-A

2 CARS

SHOP

2 CARS

GARDEN - LIMITS TBD

ENTRY

MUDROOM

COURT

STUDY

PORCH

LIVING

DINING

All Installations Subject
To Field Inspections anytime
Inspector Approval

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinance

## NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS.

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE.

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS.

9. PER SECTION 907.2.18.1 IRC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

### WALL TYPES

ICF BRICK

ICF STONE

ICF BLOCK

BRICK 4"

BRICK 6"

STONE 4"

STONE 6"

STUCCO 4"

STUCCO 6"

INTERIOR 4"

INTERIOR 6"

DEED WALL 12"

EXISTING WALL
TO BE REMOVED

## FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THE DOCUMENTS. HE SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE EXECUTION OF ANY CONSTRUCTION OR DESIGN. THESE DOCUMENTS ARE INTENDED FOR GENERAL DESIGN PURPOSES AND MAY NOT CONTAIN ALL CONSTRUCTION DETAILS OR FULLY SPECIFIED REQUIREMENTS.

## FIRST FLOOR PLAN
SCALE 3/16" = 1'

| SHEET | ALAN HOFFMANN COMPANY | PHD | PLAN NO. |
| A-2B | BIZIOS RESIDENCE | PESKUSKI HOME DESIGN | 7134 |
| | 3950 SPINAKER RUN POINTE RD | DALLAS, TEXAS | DATE |
| | | PHONE (800) 692-8936  FAX: (972) 279-0298 | 11/05/13 |



PLAN NO. 7134
DATE 11/05/13

PHD
PIESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 964-6606    FAX (972) 254-0238

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINNAKER RUN POINTE RD

SHEET A-3

## SECOND FLOOR PLAN

SCALE: 3/16" = 1'

### NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS.

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.10.1 IRC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAPER.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL. THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

### WALL TYPES

- 10" BRICK
- 10" STONE
- 10" BLOCK
- 10" STUCCO
- BRICK 6"
- BRICK 4"
- STONE 6"
- STONE 4"
- STUCCO 6"
- STUCCO 4"
- INTERIOR 6"
- INTERIOR 4"
- DEED WALL 1/2"
- GLASS WALL
- EXISTING WALL TO BE REMOVED

### FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PIESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO AND/OR DURING CONSTRUCTION. PIESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE SOLELY RESPONSIBLE TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENT AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER'S ASSOCIATION RESTRICTIONS. PIESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PIESKUSKI HOME DESIGN DOES NOT PROVIDE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

Stairs Shall Comply With IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

PORCH

BRIDGE

BRIDGE

OPEN BELOW

OPEN BELOW

OPEN BELOW

OPEN BELOW

OPEN BELOW

OPEN BELOW

BEDROOM #5

BEDROOM #4

BEDROOM #3

LIVING/SITTING

LOFT

CLOSET

CLOSET

CLOSET

BATH

BATH

BATH



ELEVATIONS 1
SCALE 3/16" = 1'

FRONT/NORTH ELEVATION

REAR/SOUTH ELEVATION

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 964-9934   FAX: (972) 226-0234

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET
A-4

PLAN NO.
7134

DATE
11/05/13

616



RIGHT/WEST ELEVATION

LEFT/EAST ELEVATION

ELEVATIONS 2
SCALE: 3/16" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

| SHEET | ALAN HOFFMANN COMPANY | PHD | DATE | PLAN NO. |
|---|---|---|---|---|
| A-5 | BIZIOS RESIDENCE<br>3950 SPINAKER RUN POINTE RD | PESKUSKI HOME DESIGN<br>DALLAS, TEXAS<br>PHONE: (469) 693-8656    FAX: (972) 250-0238 | 11/04/13 | 7134 |

PLAN NO. 7134

DATE 11/04/13

PHD

PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (xxx) xxx-xxxx   FAX: (xxx) xxx-xxxx

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-6



**ROOF PLAN**
SCALE 1/8" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

**PLAT PLAN**
SCALE 1" = 30'

LAKE LEWISVILLE RESOVOIR

SPINAKER RUN POINTE ROAD



619



PLAN NO. 7134    DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 964-9696    FAX: (975) 964-0304

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET E-1

ELECTRICAL 1
SCALE: 3/16" = 1'

ELECTRICAL SYMBOLS/ NOTES

All Inspections Shall Comply with 2006 IFC Requirements & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

ELECTRICAL SYSTEM GROUND TO BE PROVIDED PER NEC. ART. 250-81

CONVENIENCE OUTLETS IN BATHROOMS, KITCHEN COUNTERTOPS WITHIN SIX FEET OF THE KITCHEN SINK, OUTDOORS, AND IN GARAGES AND BASEMENTS (OTHER THAN FOR LAUNDRY OR SIMILAR EQUIPMENT) SHALL BE GFCI PROTECTED. NEC. ART. 210-8.

THE ELECTRICAL PLAN(S) INCLUDED IN THESE DOCUMENTS ISARE INTENDED AS A GUIDE ONLY. THE GENERAL CONTRACTOR/BUILDER SHALL VERIFY ALL ELECTRICAL SERVICE, INSTALLATION AND THE LOCATION OF ALL SWITCHES, FIXTURES, EQUIPMENT, OUTLETS, ELECTRICAL PANEL, ETC. ACCORDING TO LOCAL AND NATIONAL ELECTRICAL CODES.

LIGHTING SHOWN IS OPTIONAL AND IS AT THE DISCRETION OF THE OWNER.



PLAN NO. 7134  DATE 11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (800) 684-8936  FAX: (972) 524-6524

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET E-2

### ELECTRICAL_2
SCALE: 3/16" - 1'



**PERSPECTIVES**

NOT TO SCALE

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

622



Foundation Plan
Scale: 1/8" = 1'-0"

All Installations Subject
To Field Inspections and/or
Inspector Approval

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances





Framing Plan -- First Floor Ceiling

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

STRAND SYSTEMS ENGINEERING INC.

Private Residence
3960 Spinnaker Run
Little Elm, Texas

Alan Hoffmann
Lot 84        Blk. 1
Frank Bizios

Framing

FR 1

1314079

**625**





STRAND SYSTEMS
ENGINEERING INC.

Builder shall provide connection and
supporting brackets for framing shown
on this sheet per Manufacturer
Specified Code and Local Code
requirements.

Plans By: Bizjos

Alan Hoffmann
Private Residence
3960 Spinnaker Run
Little Elm, Texas

Lot: 84      Blk: 1

Scale: 1/8" = 1'0"

Date: 10/30/13

Drawn: J.D.W.

Checked: J.B.H.

Code: Framing

FR 2

ID: 1314079

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

Framing Plan - Second Floor Ceiling



All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

Framing Plan ... Roof Rafter

Roof Support of Sloped Ceiling

627



628



2nd Floor Plan - Shear Wall Plan

629

# Exhibit G

STATE OF TEXAS     )
                        )    **CERTIFICATE TO COPY OF PUBLIC RECORD**
                        )

**COUNTY OF DENTON**   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Builder Registration for "3960 Spinnaker Run Pointe". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

631

# BUILDER REGISTRATION APPLICATION

## BUILDER INFORMATION

DATE 1/27/14

BUILDERS NAME   ALAN   HOFFMANN, LLC   / ALAN GILBERT HOFFMANN
                FIRST        MIDDLE            LAST

BUILDERS ADDRESS  7325 GASTON AVS. #124-341
                  DALLAS, TX 75214

BUILDERS PHONE# 214-324-0096 FAX 214-324-0199 MOBILE 469-688-6450

BUILDERS TRADE NAME  ALAN HOFFMANN, LLC

BUILDERS TAX OR FEDERAL I.D.# _____
List the name, address and phone# of at least two(2) building associations of which you are a member

1>      DALLAS BUILDERS ASSOC.

PHONE#   772-931-9840  MEMBERSHIP#  45-24 / 1124185

2>      TEXAS ASSOCIATION OF BUILDERS

PHONE#   800-252-3625  MEMBERSHIP#  1124185

## PROPERTY OWNERS INFORMATION

PROPERTY OWNER        HARRY                      BIZIOS
                      FIRST         MIDDLE        LAST

OWNERS ADDRESS            SWEENEY TRAIL
& TELEPHONE#         FRISCO, TX

ADDRESS OF HOME TO BE BUILT    3960 SPINNAKER RUN POINTE
                               84                        SUNRISE BAY
                               LOT        BLOCK          SECTION

ELEVATION GROUND FLOOR LEVEL    539-540 /ELEVATION BEING DONE 1/28/14

TOTAL SQUARE FOOTAGE            9947
                               (INCLUDES TOTAL SLAB AREA + SECOND FLOOR AREA + PORCHES
                               + DECKS)

Page 4

632

# Exhibit H

# Denton County
# Commissioners Court

_____Jan 26, 2010_____
### Date

**Court Order Number**

10-0045

## The Order:

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action,

Motion by **Mitchell** Seconded by **Eads**

| County Judge | | |
|---|---|---|
| Mary Horn | Yes | X |
| | Abstain | |
| | No | |
| | Absent | |

| Commissioner Pct No 1 | | | Commissioner Pct No 2 | | |
|---|---|---|---|---|---|
| Hugh Coleman | Yes | X | Ron Marchant | Yes | X |
| | Abstain | | | Abstain | |
| | No | | | No | |
| | Absent | | | Absent | |

| Commissioner Pct No 3 | | | Commissioner Pct No 4 | | |
|---|---|---|---|---|---|
| Bobbie J. Mitchell | Yes | X | Andy Eads | Yes | X |
| | Abstain | | | Abstain | |
| | No | | | No | |
| | Absent | | | Absent | |

Motion Carried **5 - 0 - 0**

**Other Action:** Pulled from Consent _____ No Action _____ Postponed _____

**BY ORDER OF THE COMMISSIONERS COURT:**    **ATTEST:**

Presiding Officer

Cynthia Mitchell, County Clerk
and Ex-Officio Clerk of the
Commissioners Court of
Denton County, Texas

**APPROVED AS TO FORM:**

Assistant District Attorney

Deputy County Clerk

Denton County

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

WHEREAS, the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

WHEREAS, the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

NOW, THEREFORE, BE IT RESOLVED, that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May. 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code                                                                 - Page 1 of 3

635

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

IN WITNESS THEREOF, we have hereunto set our hands and caused the great seal of Denton County to be affixed this ___26th___ day of ___January___, 2010.

ADOPTED IN OPEN COURT the 26th day of January, 2010 upon Motion made by ___Comm. Mitchell___ and seconded by ___Comm. Eads___, and ___5___ members of the court being present and voting.

_____
MARY HORN, COUNTY JUDGE

_____         _____
HUGH COLEMAN, COMMISSIONER              RON MARCHANT, COMMISSIONER
PRECINCT 1                              PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code                                              • Page 2 of 3

636

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY: _____

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3

637



# DENTON COUNTY

# NOTICE OF RESIDENTIAL CONSTRUCTION
# IN UNINCORPORATED AREA

| Received |
|---|
| Permit # |

## BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: _____

BUSINESS ADDRESS:                                          MAILING ADDRESS (IF DIFFERENT):

_____          _____

_____          _____

PHONE NUMBER: _____     EMAIL ADDRESS: _____

FAX NUMBER: _____     CONTACT PERSON: _____

## PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[  ] New Residential Construction on Vacant Lot
[  ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):        OR    LOT AND BLOCK # _____

_____          SUBDIVISION: _____

_____          SURVEY: _____

_____          TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: _____

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[  ] INTERNATIONAL RESIDENTIAL CODE -published May 1, 2008
[  ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

_____        _____        _____
AUTHORIZED REPRESENTATIVE SIGNATURE        PRINTED NAME        DATE



638



# DENTON COUNTY NOTICE OF RESIDENTIAL CONSTRUCTION INSPECTION COMPLIANCE IN UNINCORPORATED AREA

| Received |
| --- |
| Permit # |

## INSPECTOR INFORMATION

NAME: _____

BUSINESS ADDRESS:            MAILING ADDRESS (IF DIFFERENT):

_____       _____

_____       _____

PHONE NUMBER: _____ EMAIL ADDRESS: _____

FAX NUMBER: _____ PROFESSIONAL REGISTRATION (TYPE AND #) _____

## PROJECT INFORMATION

DATE OF INSPECTION: _____

LOCATION
ADDRESS: _____

_____

_____

OR   LOT AND BLOCK # _____

SUBDIVISION: _____

SURVEY: _____

TRACT: _____

TYPEOFCONSTRUCTION: (CHECK ONE)

[ ] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

RESIDENTIAL CODEUSED IN CONSTRUCTION: (CHECK ONE)

[ ] INTERNATIONAL RESIDENTIAL CODE – published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

CONSTRUCTION PHASE: (CHECK ONE)

[ ] FOUNDATION STAGE (before placement of concrete)
[ ] FRAMING AND MECHANICAL SYSTEMS STATE (before covering with drywall or other interior wall covering)
[ ] COMPLETION

## INSPECTION CONCLUSION

At the indicated stage of construction, the project indicated above is: (check one)

[ ] IN COMPLIANCE
[ ] NOT IN COMPLIANCE

with the residential code used in construction.

COMMENTS:

_____    _____    _____
SIGNATURE OF INSPECTOR        PRINTED NAME        DATE

**639**

# AGENDA PLACEMENT MEMO

**DATE:**          Jan 22, 2010

**TO:**            Commissioners Court

**FROM:**          Bennett Howell

**SUBJECT:**       Resolution - Residential Construction in Unincorporated Areas of
Denton County

## REQUESTED ACTION/RECOMMENDATION

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local
Government Code, to certain residential construction in unincorporated areas of
Denton County - begun after February 1, 2010, and any appropriate action.

## BACKGROUND

The Texas State Legislature enacted HB 1038 during the 80th Regular Session,
effective September 1, 2007, that provided criteria for the inspection of homes which
heretofore were not subject to the inspection codes of a municipality. The
requirements of this bill was supposed to result in homes that were in greater
compliance with the accepted residential building standards, safer and with fewer
construction defects.

The Legislature also created the Texas Residential Construction Commission (TRCC)
to oversee this new law. The TRCC was also supposed to license builders, monitor
compliance and store the inspection records.

The Legislature during the 81st Regular Session passed HB 2833 which essentially
eliminated the TRCC and placed the responsibility on the county government to
ensure residential home builders were complying with HB 1038. However, HB 2833 did
provide counties with the authority to enact building codes, inspect the structures or
require the builders to provide inspection documentation, it specially stated that
counties cannot charge a fee for this service.

This proposed Resolution provides that the County will be the depository for the home
inspection documentation for homes constructed after February 1, 2010. Home
builders will be required to notify the County when construction is going to begin and
submit documentation that the inspections were made in accordance with HB 2833.

## OPERATIONS AND MAINTENANCE

Denton County Planning Department will provide the forms to the builders and file the
inspection records as part of the current Development Permit Application. This
Resolution will not place any further burdens on the builders since these inspections

were supposed to be occurring prior to 2007.

## LEGAL INFORMATION

The Legal Department has worked closely with the Public Works Department on this Resolution.

## FINANCIAL IMPACT

This Resolution will not have any financial impact on the County or the home builder.

## PROJECT SCHEDULE

The Resolution has an effective date of February 1, 2010.

## PRECEDING COURT ACTION

None



# Denton County
## Commissioners Court
# Request For Agenda Placement

| | | | |
|---|---|---|---|
| **Submitted By:** | Bennett Howell | **Requested Agenda Date:** | Jan 26, 2010 |
| **Department:** | Public Works/Engineering | **Grouping:** | PUBLIC WORKS |

**Specific Agenda Wording:**

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

# APPROVAL FLOW

### 10 - A - Resolution - Residential Construction in Unincorporated Areas of Denton County



CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF DENTON

I, CYNTHIA MITCHELL, County Clerk of Denton County,
Texas do hereby certify that this is a true & correct
copy as same appears of record in my office.
Witness my hand and seal of office on

3·20·14



Cynthia Mitchell
Denton County Clerk

By Deputy

643

# Exhibit I

STATE OF TEXAS         )

                                     )        CERTIFICATE TO COPY OF PUBLIC RECORD

COUNTY OF DENTON     )

        I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Notice and Resolution – Certain Residential Construction in Unincorporated Areas of Denton County. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

        I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

        In witness whereof I have hereunto set my hand this 14th day of April, 2014.


Bennett C. Howell, III, PE, CFM


**645**



# Denton County
# Department of Public Works
## Engineering Division
1505 East McKinney Street, Suite 175 – Denton, Texas 76209
940.349.3250 phone – 940.349.2991 fax
www.dentoncounty.com



# NOTICE
# Home Builders and Home Buyers

On January 26, 2010, Denton County Commissioners Court approved a resolution that applies to certain residential construction in the unincorporated areas of Denton County.

**This resolution applies to you if:**

- You are building a home in the unincorporated areas of Denton County after February 1, 2010; or
- You are remodeling an existing home in the unincorporated areas of Denton County after February 1, 2010 and the addition increases the square footage or value of the existing home by more than 50%.
- This resolution applies if you are constructing a single-family house or duplex.

**The new home construction and remodel must conform to either:**

- International Residential Code published as of May 1, 2008; or
- The version of the International Residential Code that is applicable in the City of Denton. The State law requires the builder to use either the International Residential Code published as of May 1, 2008 or the International Residential Code adopted by the County Seat, which in Denton County is the City of Denton.

**Building in the Extra Territorial Jurisdiction (ETJ):**

If you are building in the ETJ of a municipality that has adopted a building code for the municipality's ETJ, then the builder follows the municipality's codes. However, the builder is still required to submit the necessary paperwork to Denton County Public Works.

**What are the builder's responsibilities?**

- Three required inspections during the construction project.
  - The foundation stage before the placement of concrete;

**646**

o The framing and mechanical systems stage before covering with drywall or other interior wall covering; and

o Completion of construction of the residence.

o For remodeling projects that meet the definition of this resolution, the number of inspections are based on the scope of work of the project

**Who performs these inspections?**

- Licensed Engineer;
- Registered Architect;
- Professional Inspector licensed by the Texas Real Estate Commission;
- Plumbing Inspector employed by a municipality and licensed by the Texas State Board of Plumbers;
- Building Inspector employed by a political subdivision; or
- Individual certified as a residential combination inspector by the International Code Council.
- The builder may use the same inspector for all the required inspections or a different inspector for each required inspection.

**Who receives the documentation?**

- The builder shall provide the inspection information to the home buyer and Denton County Public Works.
- The required forms are attached to this Notice.

  o The builder uses the first form to notify the County specifically:
  - Location of the new residential construction
  - Approximate date by which the construction will be commenced
  - The version of the International Residential Code used to construct the home
  o The builder uses the second form to document the inspections.

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

WHEREAS, the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

WHEREAS, the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

NOW, THEREFORE, BE IT RESOLVED, that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May. 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

FURTHERMORE, BE IT RESOLVED, that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code                                                                    - Page 1 of 3

648

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

IN WITNESS THEREOF, we have hereunto set our hands and caused the great seal of Denton County to be affixed this ___26___ day of ___January___, 2010.

ADOPTED IN OPEN COURT the _26_ day of January, 2010 upon Motion made by ___Bobbie Mitchell___ and seconded by ___Andy Emus___, and _5_ members of the court being present and voting.

_____
MARY HORN, COUNTY JUDGE

_____
HUGH COLEMAN, COMMISSIONER
PRECINCT 1

_____
RON MARCHANT, COMMISSIONER
PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code

- Page 2 of 3

649

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY: _____

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3

650

Cause No. 14-01991-431

FILED

2014 APR 17 AM 11: 14

~~IN THE DISTRICT COURT OF~~
SHERRI ADELSTEIN
DISTRICT CLERK DENTON CO., TX

BY ___JGP___ DEPUTY

TOWN OF LAKEWOOD VILLAGE,　§
　　　*Plaintiff,*　　　　　　　　§
　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　§
v.　　　　　　　　　　　　　　§　　IN THE DISTRICT COURT OF
　　　　　　　　　　　　　　　§　　DENTON COUNTY, TEXAS
　　　　　　　　　　　　　　　§
HARRY BIZIOS,　　　　　　　　§
　　　*Defendant.*　　　　　　　　§　　431st JUDICIAL DISTRICT

## ORDER GRANTING TEMPORARY INJUNCTION

On this day came to be considered the Plaintiff, the Town of Lakewood Village's, Request for Temporary Injunction against Defendant, Harry Bizios.

The Court, having considered the Request, the evidence presented, arguments of counsel, and the pleadings on file in this case, is of the opinion that Plaintiff's Request for a Temporary Injunction should be GRANTED.

**IT IS THEREFORE ORDERED** that Defendant Harry Bizios and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf, shall allow inspections by the Town of Lakewood Village's Building Official or designee on the Property, and shall immediately cease and desist any construction on the Property described as LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON, COUNTY, TEXAS (the "Property") until such time as they have (1) applied for and obtained approval from the Town of Lakewood Village of necessary permits; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

**ORDER GRANTING TEMPORARY INJUNCTION – PAGE 1**

651

The Court finds from the facts and evidence set forth in Plaintiff's Request and the evidence adduced at the hearing on this matter, that Plaintiff has suffered and will continue to suffer a probable injury inasmuch as harm is imminent from Defendant's violations of the Town of Lakewood Village's Ordinances, including by constructing a single family residence without a building permit issued by the Town and inspections and plan approval by the Town. Without injunctive relief, defendant will engage in the activities enjoined. The Court further finds that unless Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf are immediately enjoined as described above, Defendant will continue to violate the Town Ordinances. Injunctive relief is warranted in this cause, as the Town has suffered and will continue to suffer violations of its duly-enacted Ordinances with no recourse to prevent such violations.

The Court also finds from the facts and evidence set forth in the Request and evidence adduced at the hearing on this matter that Plaintiff has a probable right to relief at final hearing and that there is a substantial likelihood that Plaintiff will prevail on the merits at trial, that a temporary injunction issued to Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf regarding the above-described acts is reasonable under the circumstances. The Court finds the violation is itself a finding of injury.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall forthwith issue a writ of Temporary Injunction in conformity with the law and terms of this Order. Plaintiff as a municipality is not required to give bond to secure a temporary injunction. Once effective, this Order shall remain in full force and effect until Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or

<u>ORDER GRANTING TEMPORARY INJUNCTION – PAGE 2</u>

acting on his behalf fully comply with the above-described actions by allowing inspections by the Town of Lakewood Village's Building Official or designee on the Property, and immediately ceasing and desisting any construction on the Property until such time as they have (1) applied for and obtained approval from the Town of Lakewood Village of necessary permits; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

**IT IS FURTHER ORDERED** that this Temporary Injunction shall remain in effect pending entry of final judgment on the permanent injunction and final trial on the merits. It is therefore ordered that this case be set for trial on _January 5_, 2015 at _9:00_ a.m./~~p.m.~~

Rendered on April 16, 2014, at 5:00 p.m., and Signed on April 17, 2014, at 11:00 a.m.

_____
**PRESIDING JUDGE**

| | |
|---|---|
| **From:** | Jonathan Bailey |
| **Sent:** | Thursday, April 17, 2014 11:30 AM |
| **To:** | Anderson, Art |
| **Cc:** | 'andy@txmunicipallaw.com'; 'kaira@txmunicipallaw.com'; 'Jennifer DeCurtis (jennifer@txmunicipallaw.com)'; Denise Spalding; Mellony Ariail |
| **Subject:** | RE: re: Town of Lakewood Village v. Harry Bizios; No. 14-01991-431 |
| **Attachments:** | 0996_001.pdf |



Counsel,

Attached you will find the Order Granting Temporary Injunction entered and filed in this case.

Should you have any questions or requests for clarification, please "reply all" to this message.

Sincerely,

*Jonathan Bailey*

JUDGE PRESIDING
431ST DISTRICT COURT
1450 E. McKinney Street
Denton, Texas 76209
Phone: (940) 349-4370
Fax: (940) 349-4371
dentoncounty.com/431

*Please note that use of the Court's email address in this case is authorized solely for the limited purpose indicated. **Do not** communicate with the Court regarding this case by email **except** as expressly requested or permitted herein.*

---

**From:** Paul, Paget [mailto:PPaul@winstead.com] **On Behalf Of** Anderson, Art
**Sent:** Thursday, April 17, 2014 9:18 AM
**To:** Anderson, Art; Jonathan Bailey
**Cc:** 'andy@txmunicipallaw.com'; 'kaira@txmunicipallaw.com'; 'Jennifer DeCurtis (jennifer@txmunicipallaw.com)'; Denise Spalding; Mellony Ariail
**Subject:** RE: re: Town of Lakewood Village v. Harry Bizios; No. 14-01991-431

My apologies. Attached is the document in WORD (instead of the previously sent pdf).

---

**From:** Paul, Paget **On Behalf Of** Anderson, Art
**Sent:** Wednesday, April 16, 2014 4:53 PM
**To:** 'Jonathan.Bailey@dentoncounty.com'
**Cc:** andy@txmunicipallaw.com; kaira@txmunicipallaw.com; Jennifer DeCurtis (jennifer@txmunicipallaw.com); Denise Spalding; Mellony Ariail; Anderson, Art
**Subject:** re: Town of Lakewood Village v. Harry Bizios; No. 14-01991-431

1

654

Mr. Messer forwarded to us a new version of the proposed Order. Attached in WORD is our redlined version. In order to prevent expensive reconstruction, we respectfully request that the attached Order be approved by the Court.

Regards,

Art Anderson
Winstead PC | 500 Winstead Building | 2728 N. Harwood Street | Dallas, Texas 75201
214.745.5745 *direct* | 214.745.5390 *fax* | aanderson@winstead.com | www.winstead.com

# WINSTEAD

IRS Circular 230 Required Notice--IRS regulations require that we inform you as follows: Any U.S. federal tax advice contained in this communication (including any attachments) is not intended to be used and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or tax-related matter[s].

Information contained in this transmission is attorney privileged and confidential. It is intended for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone.

--

**655**

FILED: 5/6/2014 2:07:55 PM
SHERRI ADELSTEIN
Denton County District Clerk
By: Joanna Price, Deputy

CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS, | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § § § | |
| *Defendant.* | § | 431st JUDICIAL DISTRICT |

## NOTICE OF APPEAL

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Defendant Harry Bizios, pursuant to Tex. R. App. P. 25.1, and files this, his Notice of Appeal in the above numbered and styled cause indicating his desire to appeal from the Order of the trial court entered on April 17, 2014, with said appeal to be taken to the Court of Appeals for the Second District of Texas at Fort Worth. The appeal is accelerated pursuant to Tex. R. App. P. 28.1 and Tex. Civ. Prac. & Rem. Code § 51.014(a)(4).

656

Respectfully submitted,

WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax


By:  /s/ Arthur J. Anderson
     Arthur J. Anderson
     State Bar No. 01165957

**ATTORNEYS FOR DEFENDANTS**


## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of May, 2014, a true and correct copy of the foregoing was served by electronic filing to the following counsel of record:

William Andrew Messer, Esq.
MESSER, ROCKEFELLER & FORT, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


     /s/ Arthur J. Anderson
     ONE OF COUNSEL


DALLAS_1/6279713v.1
56756-1 05/06/2014

## CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS, | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § § § | |
| *Defendant.* | § | 431st JUDICIAL DISTRICT |

## DEFENDANT'S REQUEST FOR REPORTER'S RECORD

TO THE COURT REPORTER OF SAID COURT:

Harry Bizios, Defendant in the above numbered and styled cause, has filed a notice of appeal pursuant to Rule 25.1 of the Texas Rules of Appellate Procedure. He formally requests the Court Reporter of this Court to prepare and deliver the Reporter's Record to the Court of Appeals for purposes of appeal.

### I.

Please prepare an original and one copy of the reporter's record containing all testimony from all of the witnesses, all discussions between the judge and lawyers, all bench conferences, and all exhibits offered at the temporary injunction hearing in this cause.

### II.

Plaintiffs will forward payment for the cost of the Reporter's Record as soon as it is notified of the amount due.

DEFENDANT'S REQUEST FOR REPORTERS' RECORD – Page 1

658

Respectfully submitted,

WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax


By: /s/ Arthur J. Anderson
       Arthur J. Anderson
       State Bar No. 01165957

## ATTORNEYS FOR DEFENDANT


## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of May, 2014, a true and correct copy of the foregoing was served by electronic filing to the following counsel of record:

William Andrew Messer, Esq.
MESSER, ROCKEFELLER & FORT, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


/s/ Arthur J. Anderson
ONE OF COUNSEL

DEFENDANT'S REQUEST FOR REPORTERS' RECORD – Page 2

FILED: 5/6/2014 2:11:00 PM
SHERRI ADELSTEIN
Denton County District Clerk
By: Joanna Price, Deputy

CAUSE NO. 14-01991-431

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, TEXAS, | § § § § § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § § | |
| v. | § § | DENTON COUNTY, TEXAS |
| HARRY BIZIOS, | § § | |
| *Defendant.* | § | 431st JUDICIAL DISTRICT |

## REQUEST FOR PREPARATION OF CLERK'S RECORD

Pursuant to Texas Rule of Appellate Procedure 35, Defendant Harry Bizios notifies the court clerk for the 431st Judicial District Court of Denton County that he has filed a notice of appeal with the Fort Worth Court of Appeals, located in Fort Worth, Texas, on May 6, 2014. Defendant requests the preparation of the Clerk's Record on appeal. Defendant requests that the Clerk include all of the documents in the court's file in the Clerk's Record, including but not limited to:

a)     Court's docket sheet;

b)     All materials designated in Texas Rule of Appellate Procedure 34.5;

c)     All pleadings, motions, briefs and orders thereon;

d)     All correspondence authored by the parties or their attorneys of record;

e)     All correspondence authored by Judge Jonathan Bailey;

f)     Defendant's Notice of Appeal filed on May 6, 2014;

g)     Defendant's Request for Preparation of the Reporter's Record filed on May 6, 2014; and

REQUEST FOR PREPARATION OF CLERK'S RECORD – Page 1                    660

h)      Defendant's Request for Preparation of the Clerk's Record filed May 6, 2014.

Respectfully submitted,

WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax


By:    /s/ Arthur J. Anderson
        Arthur J. Anderson
        State Bar No. 01165957

**ATTORNEYS FOR DEFENDANT HARRY BIZIOS**


## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of May, 2014, a true and correct copy of the foregoing was served by electronic filing to the following counsel of record:

William Andrew Messer, Esq.
MESSER, ROCKEFELLER & FORT, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034


                /s/ Arthur J. Anderson
                ONE OF COUNSEL


DALLAS_1/6279688v.1
56756-1 05/06/2014f

# Judicial Docket Entries

*Cause No. 14-01991-431*

# Sherri Adelstein

PO Box 2146, Denton, Texas 76202-2146
PH: 940-349-2200 FAX: 940-349-2201

## DENTON COUNTY
## THE STATE OF TEXAS

## BILL OF COST

Cause: 14-01991-431
TOWN OF LAKEWOOD VILLAGE
V.
HARRY BIZIOS

| Fees | Init | Balance |
|------|------|---------|
| Clerk's Record Cost for Appeal (Civil) | 665.00 | 0.00 |

| | | |
|------|------|---------|
| Total | 665.00 | 0.00 |

I certify that the above foregoing is a true and correct statement of the Bill of Costs associated with the above numbered and entitled cause on May 13, 2014.

Sherri Adelstein, District Clerk
Denton County, Texas

By: _____

Deputy Clerk

663

# CLERK'S CERTIFICATE

THE STATE OF TEXAS          *

COUNTY OF DENTON        *

I, Sherri Adelstein, Clerk of the District Courts of Denton County, Texas do hereby certify that the documents contained in this record to which this certification is attached are all the documents specified by Texas Rule of Appellate Procedure 34.5(a) and all other documents timely requested by the parties to this proceeding under Texas Rule of Appellate Procedure 34.5(b).

Given under my hand and seal at my office in Denton, Denton County, Texas this 13th day of May, 2014.

Sherri Adelstein
District Clerk
Denton County, Texas

_____ /s/ *JoAnna Price* _____,
JoAnna Price
Deputy Clerk
Civil/Family Division



664

665

REPORTER'S RECORD

VOLUME 1 OF 4 VOLUMES

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
6/2/2014 2:41:22 PM
DEBRA SPISAK
Clerk

TRIAL COURT CAUSE NO. 14-01992-431

COURT OF APPEALS NO. 02-14-00143-CV

TOWN OF LAKEWOOD VILLAGE, ) IN THE DISTRICT COURT
TEXAS                     )
                          )
VS.                       ) DENTON COUNTY, TEXAS
                          )
HARRY BIZIOS              ) 431ST JUDICIAL DISTRICT

*********************************************

MASTER INDEX

*********************************************

On the 15th and 16th days of April, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jonathan Bailey, Judge Presiding, held in Denton, Denton County, Texas.

Proceedings reported by realtime machine shorthand.

Mellony Ariail, CRR, RMR
Official Court Reporter - 431st District Court

A P P E A R A N C E S

MR. W. ANDREW MESSER
SBOT NO. 13472230
MS. JENNIFER A. DeCURTIS
SBOT NO. 24045767
MS. BRENDA N. McDONALD
SBOT NO. 14993300
Messer, Rockefeller & Fort, PLLC
6351 Preston Road
Suite 350
Frisco, Texas 75034
Telephone:  (972) 668-6400
E-mail: andy@txmunicipallaw.com;
jennifer@txmunicipallaw.com; and
brenda@txmuicipallaw.com
Counsel for Plaintiff


MR. ARTHUR J. ANDERSON
SBOT NO. 01165957
Winstead PC
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone:  (214) 745-5400
E-mail: aanderson@winstead.com
Counsel for Defendant

VOLUME 1

MASTER INDEX

                                                    PAGE VOL.

Reporter's Certificate  ..........................10    1

                         VOLUME 2

MOTION FOR TEMPORARY INJUNCTION; MOTION TO DISSOLVE TRO
             AND DENY TEMPORARY INJUNCTION

APRIL 15, 2014
                                                    PAGE VOL.

Caption ..........................................1    2

Appearances ......................................2    2

Proceedings .....................................15    2

Opening statement by Mr. Messer .................27    2

Opening statement by Mr. Anderson ...............50    2

PLAINTIFF'S WITNESSES

Linda Asbell                    Direct    Cross    VD
   By Ms. DeCurtis              59 v2
   By Mr. Anderson                        87 v2
   By Ms. DeCurtis              108 v2
   By Mr. Anderson                        111 v2

Steve Freeman                   DIRECT    CROSS    VD
   By Ms. DeCurtis              117 v2

Argument requested by the Court .................142    2

Argument by Mr. Messer ..........................143    2

Argument by Mr. Anderson ........................146    2

Steve Freeman            (Cont)DIRECT    CROSS    VD
   By Ms. DeCurtis              148 v2
   By Mr. Anderson                        149 v2

Adjournment  ....................................173    2

MASTER INDEX (CONTINUED)

                                                    PAGE VOL.

Reporter's Certificate ..........................174   2

                    VOLUME 3

MOTION FOR TEMPORARY INJUNCTION; MOTION TO DISSOLVE TRO
           AND DENY TEMPORARY INJUNCTION

APRIL 16, 2014
                                                    PAGE VOL.

Caption ...........................................1   3

Appearances .......................................2   3

Proceedings ......................................12   3

DEFENDANT'S WITNESSES

Alan Hoffmann                    DIRECT    CROSS    VD
   By Mr. Anderson               14 v3
   By Mr. Messer                                    28 v3
   By Mr. Anderson               29 v3
   By Mr. Messer                          43 v3
   By Mr. Anderson               57 v3

Harry Bizios                     DIRECT    CROSS    VD
   By Mr. Anderson               61 v3

Evidence Closed ..................................66   3

Closing Statement by Mr. Messer ..................69   3

Closing Statement by Mr. Anderson ................77   3

Final Closing Statement by Mr. Messer ............90   3

Court's Ruling ...................................94   3

Adjournment ....................................104   3

Reporter's Certificate .........................105   3

MASTER INDEX (CONTINUED)

VOLUME 4

EXHIBIT VOLUME

**ALPHABETICAL INDEX OF WITNESSES**

|  | DIRECT | CROSS | VD |
|---|---|---|---|
| Asbell, Linda | 59 v2<br>108 v2 | 87 v2<br>111 v2 | |
| Bizios, Harry | 61 v3 | | |
| Freeman, Steve | 117 v2<br>148 v2 | 149 v2 | |
| Hoffmann, Alan | 14 v3<br>29 v3<br>57 v3 | 43 v3 | 28 v3 |

**STIPULATED EXHIBITS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | General Warranty Deed 2013-69513 6/7/13 | 16 v2 | 16 v2 |
| 2 | Town Limits and ETJ Official Map | 16 v2 | 16 v2 |
| 3 | Denton County Map of Town and ETJ | 16 v2 | 16 v2 |
| 4 | Denton County ETJ Map of Subdivision | 16 v2 | 16 v2 |
| 5 | Denton County Map of Contours | 16 v2 | 16 v2 |
| 6 | Denton County Appraisal District Records of Property | 16 v2 | 16 v2 |
| 7 | Plat of Sunrise Bay Subdivision | 16 v2 | 16 v2 |

**STIPULATED EXHIBITS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 8 | Site Plans and Building Plans and Elevations of 3960 Spinnaker Run Pointe | 16 v2 | 16 v2 |
| 9 | Stop Work Order 3/13/14 | 16 v2 | 16 v2 |
| 10 | Stop Work Order 3/14/14 | 16 v2 | 16 v2 |
| 11 | Photographs dated 3/10/14 | 16 v2 | 16 v2 |
| 12 | Photographs dated 3/13/14 | 16 v2 | 16 v2 |
| 13 | Photographs dated 3/14/14 | 16 v2 | 16 v2 |
| 14 | Photographs dated 3/18/14 | 16 v2 | 16 v2 |
| 15 | Builder's Registration Application dated 1/27/14 | 16 v2 | 16 v2 |
| 16 | Flowage Easement | 16 v2 | 16 v2 |
| 17 | Denton County Commissioners Court Order No. 10-0045 1/26/10 | 16 v2 | 16 v2 |
| 18 | Denton County Notice to Home Builders and Home Buyers | 16 v2 | 16 v2 |
| 19 | Town of Lakewood Village Ordinance No. 08-06 | 16 v2 | 16 v2 |
| 20 | Town of Lakewood Village Ordinance No. 08-09 | 16 v2 | 16 v2 |

| | **STIPULATED EXHIBITS** | | |
|---|---|---|---|
| **EXHIBIT** | **DESCRIPTION** | **OFFERED** | **ADMITTED** |
| 21 | Town of Lakewood Village Ordinance No. 10-01 | 16 v2 | 16 v2 |
| 22 | Town of Lakewood Village Ordinance No. 11-04 | 16 v2 | 16 v2 |
| 23 | Town of Lakewood Village Ordinance No. 11-08 | 16 v2 | 16 v2 |
| 24 | Town of Lakewood Village Ordinance No. 11-09 | 16 v2 | 16 v2 |
| 25 | Town of Lakewood Village Ordinance No. 11-11 | 16 v2 | 16 v2 |
| 26 | Town of Lakewood Village Ordinance No. 11-13 | 16 v2 | 16 v2 |
| 27 | Town of Lakewood Village Ordinance 11-16 | 16 v2 | 16 v2 |
| 28 | Town of Lakewood Village Ordinance No. 13-07 | 16 v2 | 16 v2 |
| 29 | 2006 International Residential Building Code, Ch. 1 and excerpts | 16 v2 | 16 v2 |
| 30 | 2005 National Electric Code excerpts | 16 v2 | 16 v2 |
| 31 | Email between Linda Asbell and Alan Hoffmann 3/12/14 | 16 v2 | 16 v2 |

**STIPULATED EXHIBITS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 32 | Copy of a map showing Little Elm and Lakewood Village limits | 16 v2 | 16 v2 |
| 33 | US Army Corp of Engineer Consent No. DACW63-9-14-0533 | 16 v2 | 16 v2 |
| 34 | Declaration of Covenants, Conditions and Restrictions Sunrise Bay at Lake Lewisville Section One | 16 v2 | 16 v2 |
| 35 | Application for Development Permit approved by Denton County | 16 v2 | 16 v2 |
| 36 | Elevation Certificate | 16 v2 | 16 v2 |
| 37 | Form Board Survey | 16 v2 | 16 v2 |

**EXHIBITS OFFERED BY PLAINTIFF**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Certified Copy of Denton County Notice to Home Builders and Home Buyers | 113 v2 | 115 v2 |
| 2 | Plumbing Permit (Record Only) | 160 v2 | 161 v2 |
| 3 | Fence Permit (Record Only) | 160 v2 | 161 v2 |
| 4 | Residential Swimming Pool/Spa Permit Application (Record Only) | 160 v2 | 161 v2 |
| 8A | Blowup of Plf. Ex. 8 | 155 v2 | 156 v2 |

**EXHIBITS OFFERED BY DEFENDANT**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Resume of Alan Hoffmann | 14 v3 | 15 v3 |
| 2 | Rendering | 27 v3 | 29 v3 |
| 3 | Aerial Picture of Bizios Lot | 33 v3 | 33 v3 |

STATE OF TEXAS

COUNTY OF DENTON

I, Mellony Ariail, Official Court Reporter in and for the 431st District Court of Denton, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND this the 1st day of June, 2014.

/s/ Mellony Ariail
Mellony Ariail, CRR, RMR, CBC
Texas CSR 3729
Official Court Reporter
431st District Court
1450 E. McKinney Street
Denton, Texas 76209
940.349.4372
mellony.ariail@dentoncounty.com
Expiration: 12/31/2014

REPORTER'S RECORD

VOLUME 2 OF 4 VOLUMES

TRIAL COURT CAUSE NO. 14-01992-431

COURT OF APPEALS NO. 02-14-00143-CV

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
6/2/2014 2:41:22 PM
DEBRA SPISAK
Clerk

TOWN OF LAKEWOOD VILLAGE, ) IN THE DISTRICT COURT
TEXAS )
)
VS. ) DENTON COUNTY, TEXAS
)
HARRY BIZIOS ) 431ST JUDICIAL DISTRICT

*********************************************

MOTION FOR TEMPORARY INJUNCTION;
MOTION TO DISSOLVE TRO AND DENY TEMPORARY INJUNCTION

*********************************************

On the 15th day of April, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jonathan Bailey, Judge Presiding, held in Denton, Denton County, Texas.

Proceedings reported by realtime machine shorthand.

Mellony Ariail, CRR, RMR
Official Court Reporter - 431st District Court

A P P E A R A N C E S

MR. W. ANDREW MESSER
SBOT NO. 13472230
MS. JENNIFER A. DeCURTIS
SBOT NO. 24045767
MS. BRENDA N. McDONALD
SBOT NO. 14993300
Messer, Rockefeller & Fort, PLLC
6351 Preston Road
Suite 350
Frisco, Texas 75034
Telephone:  (972) 668-6400
E-mail: andy@txmunicipallaw.com;
jennifer@txmunicipallaw.com; and
brenda@txmuicipallaw.com
Counsel for Plaintiff


MR. ARTHUR J. ANDERSON
SBOT NO. 01165957
Winstead PC
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone:  (214) 745-5400
E-mail: aanderson@winstead.com
Counsel for Defendant

VOLUME 2

MOTION FOR TEMPORARY INJUNCTION; MOTION TO DISSOLVE TRO

AND DENY TEMPORARY INJUNCTION

APRIL 15, 2014

PAGE VOL.

Caption .........................................1    2

Appearances .....................................2    2

Proceedings .....................................8    2

Opening statement by Mr. Messer .................20   2

Opening statement by Mr. Anderson ...............43   2

PLAINTIFF'S WITNESSES

Linda Asbell                      Direct    Cross    VD
   By Ms. DeCurtis                52 v2
   By Mr. Anderson                          80 v2
   By Ms. DeCurtis               101 v2
   By Mr. Anderson                         104 v2

Steve Freeman                     DIRECT    CROSS    VD
   By Ms. DeCurtis               110 v2

Argument requested by the Court .................135  2

Argument by Mr. Messer ..........................136  2

Argument by Mr. Anderson ........................139  2

Steve Freeman            (Cont)DIRECT    CROSS    VD
   By Ms. DeCurtis               141 v2
   By Mr. Anderson                         142 v2

Adjournment  ....................................166  2

Reporter's Certificate ..........................167  2

ALPHABETICAL INDEX OF WITNESSES

|  | DIRECT | CROSS | VD |
|---|---|---|---|
| Asbell, Linda | 52 v2 | 80 v2 | |
| | 101 v2 | 104 v2 | |
| Freeman, Steve | 110 v2 | 142 v2 | |
| | 141 v2 | | |

STIPULATED EXHIBITS

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | General Warranty Deed 2013-69513 6/7/13 | 9 v2 | 9 v2 |
| 2 | Town Limits and ETJ Official Map | 9 v2 | 9 v2 |
| 3 | Denton County Map of Town and ETJ | 9 v2 | 9 v2 |
| 4 | Denton County ETJ Map of Subdivision | 9 v2 | 9 v2 |
| 5 | Denton County Map of Contours | 9 v2 | 9 v2 |
| 6 | Denton County Appraisal District Records of Property | 9 v2 | 9 v2 |
| 7 | Plat of Sunrise Bay Subdivision | 9 v2 | 9 v2 |
| 8 | Site Plans and Building Plans and Elevations of 3960 Spinnaker Run Pointe | 9 v2 | 9 v2 |
| 9 | Stop Work Order 3/13/14 | 9 v2 | 9 v2 |

STIPULATED EXHIBITS (CONT)

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 10 | Stop Work Order 3/14/14 | 9 v2 | 9 v2 |
| 11 | Photographs dated 3/10/14 | 9 v2 | 9 v2 |
| 12 | Photographs dated 3/13/14 | 9 v2 | 9 v2 |
| 13 | Photographs dated 3/14/14 | 9 v2 | 9 v2 |
| 14 | Photographs dated 3/18/14 | 9 v2 | 9 v2 |
| 15 | Builder's Registration Application dated 1/27/14 | 9 v2 | 9 v2 |
| 16 | Flowage Easement | 9 v2 | 9 v2 |
| 17 | Denton County Commissioners Court Order No. 10-0045 1/26/10 | 9 v2 | 9 v2 |
| 18 | Denton County Notice to Home Builders and Home Buyers | 9 v2 | 9 v2 |
| 19 | Town of Lakewood Village Ordinance No. 08-06 | 9 v2 | 9 v2 |
| 20 | Town of Lakewood Village Ordinance No. 08-09 | 9 v2 | 9 v2 |
| 21 | Town of Lakewood Village Ordinance No. 10-01 | 9 v2 | 9 v2 |
| 22 | Town of Lakewood Village Ordinance No. 11-04 | 9 v2 | 9 v2 |

STIPULATED EXHIBITS (CONT)

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 23 | Town of Lakewood Village Ordinance No. 11-08 | 9 v2 | 9 v2 |
| 24 | Town of Lakewood Village Ordinance No. 11-09 | 9 v2 | 9 v2 |
| 25 | Town of Lakewood Village Ordinance No. 11-11 | 9 v2 | 9 v2 |
| 26 | Town of Lakewood Village Ordinance No. 11-13 | 9 v2 | 9 v2 |
| 27 | Town of Lakewood Village Ordinance 11-16 | 9 v2 | 9 v2 |
| 28 | Town of Lakewood Village Ordinance No. 13-07 | 9 v2 | 9 v2 |
| 29 | 2006 International Residential Building Code, Ch. 1 and excerpts | 9 v2 | 9 v2 |
| 30 | 2005 National Electric Code excerpts | 9 v2 | 9 v2 |
| 31 | Email between Linda Asbell and Alan Hoffmann 3/12/14 | 9 v2 | 9 v2 |
| 32 | Copy of a map showing Little Elm and Lakewood Village limits | 9 v2 | 9 v2 |
| 33 | US Army Corp of Engineer Consent No. DACW63-9-14-0533 | 9 v2 | 9 v2 |

STIPULATED EXHIBITS (CONT)

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 34 | Declaration of Covenants, Conditions and Restrictions Sunrise Bay at Lake Lewisville Section One | 9 v2 | 9 v2 |
| 35 | Application for Development Permit approved by Denton County | 9 v2 | 9 v2 |
| 36 | Elevation Certificate | 9 v2 | 9 v2 |
| 37 | Form Board Survey | 9 v2 | 9 v2 |

EXHIBITS OFFERED BY PLAINTIFF

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| 1 | Certified Copy of Denton County Notice to Home Builders and Home Buyers | 106 v2 | 108 v2 |
| 2 | Plumbing Permit (Record Only) | 153 v2 | 154 v2 |
| 3 | Fence Permit (Record Only) | 153 v2 | 154 v2 |
| 4 | Residential Swimming Pool/Spa Permit Application (Record Only) | 153 v2 | 154 v2 |
| 8A | Blowup of Plf. Ex. 8 | 155 v2 | 156 v2 |

P R O C E E D I N G S

THE COURT: Cause No. 14-01991-431, styled Town of Lakewood Village Texas, Plaintiff, versus Harry Bizios, B-I-Z-I-O-S, Defendant. I will take judicial notice of the entire contents of the Court's file, note this case is set on the Court's docket for hearing on the application for temporary injunction requested by the plaintiff and the motion to dissolve the temporary restraining order and deny the temporary injunction requested by plaintiff and filed by the defendant.

I will ask counsel at this time to enter their appearances, beginning with plaintiff.

MR. MESSER: Andy Messer, Jennifer DeCurtis, and Brenda McDonald for the Town of Lakewood Village.

MR. ANDERSON: Art Anderson on behalf of the defendant, Harry Bizios.

THE COURT: Okay. Counsel, as you are aware, it's about 11:30. My plan is to go for about an hour and then break for lunch, bring you back at 2:00. I've got another docket scheduled at 1:30, some of which I'll be able to get out of the way fairly quickly, and what I can't get out of the way fairly quickly, they will either be reset and told to come back much later in the afternoon after I anticipate having the opportunity

to complete your hearing. So just wanted to give you an update about what the schedule kind of looks like for the remainder of the day. That's assuming that you-all can't complete this in the next hour, which I thought would be a pretty big stretch.

And with that, the Court has received a copy of what was filed on April 4th with the clerk's office, Stipulated Facts and Admissibility of Exhibits, which appears to have been signed by both plaintiff and defendant's counsel, and if there is no objection, I will admit those stipulated facts and exhibits.

MR. ANDERSON: Judge, we do have one correction before that happens.

THE COURT: Okay.

MR. ANDERSON: On Stipulated Fact 13, that should read that prior to the institution of this litigation, the owner did not provide the Town the finished floor elevation. It was just a residential structure on the property was being constructed. They have those now, so it wouldn't be correct because they have been provided.

THE COURT: So rather than has not provided, it would be did not provide prior to the filing of the petition.

MR. MESSER: I'm fine with that. That's

true.

MR. ANDERSON: And I guess the second -- just want to make sure we have an understanding. The admissibility of exhibits is for the purposes of this hearing only. If this were to eventually go to trial, we would like to reserve objections for that.

THE COURT: That certainly is understandable. And I will admit the Stipulated Facts 1 through 17, and the Exhibits 1 through 37. And because they have been filed with the clerk's office in their entirety and with the limitations that you-all have just stated, rather than making those part of the court reporter's record, they're part of the clerk's record and will be part of any appellate record as a result.

So it will make life easier for my court reporter if I just say they're part of the record pursuant to them being in the Court's file, but pursuant to the record we're making now, they are part of the evidentiary record that forms the basis for this requested relief.

And you-all may proceed.

MR. MESSER: I've got two other.

THE COURT: Okay.

MR. MESSER: I've got certified copies of four documents that are, I think, going to be our only

other exhibits.  And I'll hand them to Mr. Bizios' counsel.

MR. ANDERSON:  Should we just wait until those are proffered to the witnesses, Your Honor?

THE COURT:  Are they being offered as admissible by agreement or --

MR. MESSER:  Not necessarily.

THE COURT:  -- or is there some dispute as to their admissibility?

MR. MESSER:  I don't think there will be a dispute as to their admissibility, other than maybe three of them deal with properties in the same subdivision, so there's probably a relevancy issue.  But other than that, I don't think --

THE COURT:  Then here's how we'll handle it.  If you'll just tender them to Mr. Anderson, I'm going to ask him to look at them, and when he's finished looking at them to get an idea of what you'll be offering, hand them back to you, and then at the time you wish to use them or offer them, if he has no reasonable basis for objection, he can let us know so we can bypass any unnecessary predicate and otherwise state his objections when you do offer them, okay?

MR. MESSER:  Sure.  The only other issue I have, Your Honor, is I would like to invoke the Rule.

MR. ANDERSON: Yes. The only witnesses we have that we expect to testify are the defendant and then our contractor who we also plan to have testify as an expert, so we would like to request that he be exempt from the Rule.

THE COURT: With the understanding that the only defense witnesses are either a party or a purported expert that would potentially be excluded from the Rule, do you dispute that the individual purporting to be an expert will, in fact, meet the qualifications and be permitted to testify in that capacity?

MR. MESSER: I don't know. I've never met him, so I don't know -- I don't know if he's going to talk about his actions as a witness or give opinions as an expert. I don't know how that -- that's going to go. So at this point, it would be premature for me to be able to say one way or the other.

THE COURT: And sometimes a witness can be both a fact and an expert witness.

MR. ANDERSON: That's what we anticipate, Judge.

THE COURT: Before making an arbitrary ruling, Mr. Anderson, let me ask you this.

MR. ANDERSON: Sure.

THE COURT: Seems to me if the witness is

undoubtedly going to be giving factual testimony and may or may not be permitted to give expert testimony, they are probably subject to the Rule. But do you have an argument for why the witness should be excluded from that application of the Rule?

MR. ANDERSON: Sure, Judge. Mr. Hoffmann is a contractor that's an expert in terms of both being a contractor and also the specific type of construction for this house, which is unique. It's called IFC. I think one of the issues that the City's going to raise is whether or not the plans meet the requirements of the Residential Building Code. He has a lot of experience in that, special training and certifications, and, therefore, we believe he would clearly meet the requirements of being an expert and is entitled to stay in here and listen to their testimony.

THE COURT: Any response?

MR. MESSER: I think maybe it goes into the merits, but I'm not sure which building code he's referring to. There's one that's in the plans that were submitted to the Town, there's one that the county says applies, and there's one that the Town says applies. So I don't know if he knows about the details and the differences of each one of those or not.

MR. ANDERSON: Sounds like a great

question on cross, Judge.

THE COURT: I'm going to exclude him. I understand that you-all have not yet had the luxury of discovery and may need that to better educate yourselves about each other's positions, but that alone may leave the Court in a poor position of estimating the nature and scope of the witness' testimony. But given that he will, at the very least, be providing factual testimony and may or may not at this point be permitted to -- and qualified to give expert testimony, I'm going to exclude him under the Rule.

Does plaintiff have any witnesses that may be subject to the Rule as well?

MR. MESSER: Potentially. Out of fairness, I think that's a great point to talk about. We have a person, an accountant, a professor, that's on our council that may talk about the permitting fees for the Town. The defendants have brought up the constitutionality of those fees, but don't say whether they're federal or state claims. They haven't filed a counterclaim. In my view, the amount of the fees and whether they're constitutional or not don't have a bearing upon injunctive relief and we shouldn't get to them at this hearing.

THE COURT: Well beyond the scope of even

my question, so here's how I'm going to deal with it. I need you both to bring forward any witness, party or not, fact or expert, that you intend to call at this hearing. If they're not sworn in right now, they're not testifying in this hearing. Bring them all forward. If you're already at counsel table, you can stay at counsel table but just remain standing, if you would.

Please come forward, gentlemen. Ma'am, you're co-counsel, correct?

MS. DeCURTIS: Correct.

THE COURT: Would the five of you that are not attorneys please raise your right hand.

(Witnesses sworn by the Court)

THE COURT: Has everyone answered yes, everyone that's standing with their hand up, at least? You can put your hands down.

Sir, please state your name.

MR. BIZIOS: Harry Bizios.

THE COURT: You are the defendant in this case?

MR. BIZIOS: Yes.

THE COURT: You can have a seat but make sure you continue to listen.

Sir, your name?

MR. HOFFMAN: Allen Hoffman.

THE COURT: Would you come on up, sir. If you'll just remain in this trio.

Ma'am, your name?

MS. ASBELL: Linda Asmo Asbell.

THE COURT: Thank you. You can go ahead and have a seat, but if you'll continue to listen to my instructions.

Sir, your name?

MR. VARGUS: Mark Vargus, V-A-R-G-U-S.

THE COURT: Your name, sir?

MR. FREEMAN: Steve Freeman, building official for Lakewood Village.

THE COURT: Okay. The first set of instructions I'm going to give only apply to the three of you, and then I'm going to give some final instructions that will apply to all of you that may testify. So you need to listen carefully so that I don't have to repeat it five times, hopefully. That makes things go a lot quicker.

As to the three of you, a rule of law has been invoked that will require you to remain outside the courtroom during the testimony of all other witnesses. Additionally, until you're released today and told you're free to go, you are prohibited from discussing this case amongst yourselves, or with the parties, or

with the attorneys in the presence of any other witnesses or parties, okay?

The point of that rule is we don't want your testimony to be influenced by what you hear other people have said or hear they're going to say or by anything that the attorneys may say in your presence that's not purely related to your testimony alone. So please not only refrain from discussion of this case, but refrain from permitting anybody to discuss this case in your presence until I release you today.

The attorneys know what the scope of that instruction is, and if they want to talk to you and you want to talk to them during a break that I anticipate having over lunch, that's fine, just make sure it's between you and the attorney and not in front of anyone else that's a party or witness in this case. Make sense? Okay.

The last set of instructions would apply to all witnesses uniformly. Please listen carefully to the questions the attorneys ask and try to answer the questions directly without volunteering extra information that they didn't really ask you for. If their question just asks for something that can be answered by yes or no, leave it at yes or no. The more you volunteer or say beyond what really was necessary to

answer the question, the more likely it's going to draw an objection that you're being nonresponsive to the question. So please try to listen carefully and just answer the questions they ask.

Secondly, please do not interrupt the attorneys by answering before they've completed the question; that is, let them finish their question completely before you begin your response that way you're not talking over them. If you talk over them or if they talk over you, it makes my job and the court reporter's job difficult and sometimes impossible. Even though we talk over each other all the time in conversation, it does not work well at all in a court context, so please try not to interrupt them.

Likewise, I don't allow the attorneys to talk over you or interrupt you for any reason, even if they don't like what you're saying, unless they're making a legal objection.

Now, they're allowed to make a legal objection at any time. All they have to do is stand up and state their objection. So if you see them standing up or if you hear them beginning to interrupt you for that purpose, please go ahead and stop whatever it is you're saying so that not only I can hear their objection, but rule on it. And if it is a proper

objection, I don't want to hear what you would have been saying when it wasn't properly before me anyway. Does that make sense?

And do the attorneys understand my expectations with respect to objections and no interruptions otherwise?

MR. ANDERSON: Yes.

MR. MESSER: Yes.

THE COURT: Very good. Who's your first witness, Counsel?

MR. MESSER: Probably Linda.

THE COURT: Okay. Then would the three of you please have a seat outside the courtroom, either in the waiting room or the hallway outside.

Mr. Anderson, as to your witness, it doesn't sound realistic that we would reach him until after our break anyway. You don't anticipate calling him in your case, do you, Mr. Messer?

MR. MESSER: No, Your Honor.

THE COURT: Okay. If you want to cut him loose and just tell him to be back here at 2:00 o'clock, that's fine with me, as I don't foresee any way we're going to get to his testimonial needs until after the lunch break and then some. If you don't care either way, then he can stick around.

MR. ANDERSON:  He doesn't care.

THE COURT:  All right, very well.

Mr. Messer, go right ahead.  Do you wish to give an opening statement?

OPENING STATEMENT

MR. MESSER:  Yes.  I do have a notebook I prepared to streamline matters.  I've given a copy to Mr. Anderson.  Most of it is the statute, laws and some of the exhibits that are already before the Court.

THE COURT:  Thank you.  I don't know much about the law, so it's good to have it.  At least then I can't make that excuse.

MR. MESSER:  If it please the Court, this is what I guess I would call a difficult land use case. It really is illustrative of the tension that exists between Texas cities and property owners and development rights.  It's perfectly keyed up to deal with some issues in the law that, quite frankly, are issues of first impression for this Court and many courts across the state of Texas.

I -- I believe in representing municipalities, which is exclusively what I do, that if the case goes further, that it will likely make law that will impact property owners in 1100 plus cities across the state of Texas because of the issues that are in

front of this Court.

THE COURT: So in this case, the Court's statement that it doesn't know much law is actually not a bad thing because there's not much law to know.

MR. MESSER: And I'm happy to try to go through what I believe are the relevant statutes and cases. And, frankly, I think there's probably not much contention on that. It's just a matter of how they're interpreted.

And, I guess, fortunately for the Court, a lot of the facts are stipulated -- basic facts are stipulated, basic documents are stipulated. So really -- I know there will be testimony and some documents offered, but in my view, the issues of law are paramount in this case.

THE COURT: Okay.

MR. MESSER: Basically, what the Town of Lakewood Village is seeking is to have the property owner, Mr. Bizios, comply with the Town's building regulations, code and inspections. Mr. Bizios' property, undisputedly, is in the extraterritorial jurisdiction of the Town of Lakewood Village. That's undisputed. He purchased the property -- he's a brand-new property owner to the area. He purchased this piece of property in 2013, just last year.

That property is in a subdivision that's called Sunrise Bay. Part of that subdivision, Sunrise Bay -- and we'll go through some of the documents you can see of Sunrise Bay and where this property is situated, but part of this subdivision is undisputedly in the ETJ, extraterritorial jurisdiction, of the Town. And his property, undisputedly, is in the ETJ of the Town.

These are some of the building plans that he submitted to the Town. He's seeking to build about a 10,000 square foot residential structure on this piece of property that fronts the lake, Lake Lewisville. It's a very large residence, and to date, Mr. Bizios and his contractor, who you just met, have refused to comply with the Town's standards and the Town's codes.

They've given us their plans, but they don't have the comment from the building official. So they're building without the Town's comments. They don't have a permit from the Town. They haven't sought a building permit from the Town. There have been two "stop work" orders issued on that property, which they've ignored. So that's basically the underlying facts.

What the case really boils down to, if you look -- and let me point out to you --

THE COURT: Just let me ask for a quick clarification. When you say two stop work orders, you're talking about from the --

MR. MESSER: From the Town.

THE COURT: -- Town, not from this Court relative to the temporary restraining order?

MR. MESSER: I'm not trying to imply that in any way.

THE COURT: That usually gets my blood pressure --

MR. MESSER: Right.

THE COURT: -- raised immediately, so I wanted clarification.

MR. MESSER: Right. But it makes our blood pressure rise when we post in red stop work orders on the property and they snub their nose at it.

So if you just look in my notebook, the first tab, I'll try to -- try to outline some of the area and the facts for the Court. So the very first tab deals with the map. And you can see -- you can see the Town of Lakewood Village's city limits, and then you can also see in the hash mark what's called the ETJ, Lakewood Village ETJ, which is thethe Town's extraterritorial jurisdiction. And that's significant.

By law, every city in Texas has an ETJ.

I'm just going to, for common usage, call it ETJ. And the ETJ by statute depends upon how many residents the Town has. If the Town has less than 5,000, then it's a half-mile ETJ around the border of the city limits.

So what you see in this map on Exhibit 1 is the one mine extraterritorial jurisdiction around Lakewood Village, but you can see Oak Point's ETJ and their city limits to the top left. You can also see Little Elm city limits and a little bit of their ETJ --

THE COURT: For sake of my visualization, this is the area just east of the toll bridge over Lake Lewisville that was completed several years back; is that correct?

MR. MESSER: Exactly. And, actually, you see there's a roadway that goes north and south and then goes west. That is Eldorado Parkway north and south, and that is the toll bridge that goes over to I-35.

THE COURT: Unfortunately, a police officer stopped me on that bridge a few years back, so I know exactly where we're talking about.

MR. MESSER: Right. And so the next page on Exhibit 1 in red, you can see build sites with a little X mark on it. That is where Mr. Bizios' property is. It's basically on a little area that juts out into the lake. And then the next page behind Tab 1, you can

see the area that we're talking about, that is part of the Sunrise Bay subdivision, and what's in blue is Mr. Bizios' tract.

THE COURT: Okay.

MR. MESSER: This case, I think, boils down to, on a policy level, what does an ETJ mean? What can happen in an extraterritorial jurisdiction for a city? Because what is happening in this case will be the same exact things, same exact rights that happen across the state of Texas. No different.

So ETJ is basically, in my view, built for two things -- or made for two things. One, is that protects a Town's limits. So if you look at that map, the ETJ, a city can annex in the ETJ, not beyond it. But that tells them this area is protected from any other city, any other municipality, this is ours. You can't -- you can't intrude upon that. That's exclusively our area.

So if Lakewood Village sought to annex in that area, and there's various ways that can happen. There's a general law city, mostly they're consensual but that's not exclusive.

So this area that's in Tab 1, that's exclusively Lakewood Village's. Little Elm can't intrude there; Oak Point can't intrude there. If these

property owners sought to be annexed and they're contiguous to the Town, the Town would have that ability by the law. So that's one issue involving what an ETJ is about.

Second issue is -- which kind of dovetails into the annexation piece, which is building codes and subdivision regulations. So if -- if development occurs in the ETJ, as it is in this case, it seems to me that towns should have the ability to make sure that what's built right next door to them -- say there's a piece of property that's right on the other side of their Town limits. You have one house that's in the Town limits and one that's right beside it but it's in the ETJ, shouldn't those both have the same building standards? You would think logically so --

THE COURT: That's one argument that could be made.

MR. MESSER: And that's what we're trying to do. We want to make sure that the properties that are in our ETJ -- and it's not only Sunrise Bay, there's other properties, other divisions, that this would apply to. We want to make sure that the building standards protect the health, safety and welfare of the people in our ETJ to our standards and that the properties, the residences, are built to the Town's standards.

And if you look at that, Your Honor, I think on policy level, there's case law that flushes that out, that shows that's the intent for the ETJ, which goes back to the issue, what's an ETJ for?

Let me kind of go beyond that and tell you a little bit about the Town and some of the facts. So this Town, Lakewood Village, it's a Type A general law municipality. I believe it was incorporated in 1977. I showed you the toll bridge in Little Elm and Oak Point, that the ETJ is one-half mile around the city limits. And the property at issue here is on Spinnaker Run Pointe.

And Spinnaker Run Pointe, if you look at the documents, they have different addresses. At some places it says 3950 Spinnaker Run Pointe; other places it says 3960. Either way, it's the same property. It's defined the same way in our statement of facts. Either way, they're in the ETJ of Lakewood Village.

So if you look at the stipulated facts documents in the exhibits on Tab 4, you can see very clearly where this area is. So kind of look at, on a cross level, the Town and its ETJ. If you want to focus in just on this subdivision, it's under tab -- I think it's Tab 4.

THE COURT: I see it.

MR. MESSER: And you can see what's labeled Lakewood Village ETJ. It's kind of a tannish color. And that property is at the end of Spinnaker Run Pointe. It's CAD No. R182659, the one that juts out into the lake. And you can see the other half -- other part of that subdivision is in Little Elm's ETJ and Little Elm city limits. So it's got -- it's divided. But the part that we're talking about today is undisputedly within the Lakewood Village ETJ.

This property, it's a long, rectangular tract. If you look at Tab 5 of the stipulated documents, this is a topo map that shows you on two-foot contours the lay of that property. I think there's another one as well. Give me one second, Your Honor.

THE COURT: I see the one under Tab 5, unless the other one is particularly --

MR. MESSER: Basically, the lay of the land, this property at the front where Spinnaker Run Pointe is is high, and there's a steep dropoff between the front of that property and the rear of that property.

If you look at the contour lines, the front of that property is at 558 mean sea level. The back part of it is at 526. So there's a slope difference from the front of that property to the back

of that property of 32 feet.  She's pointing -- there's another one on Tab 35, I believe, as well that's from the county.

THE COURT:  I follow you.

MR. MESSER:  Anyway, I just wanted to show you where that is.  And there's also a significant -- by building close to the lake, which can be a health safety issue, if you look at Tab 35, the third page in, you can see from a survey where the hundred-year floodplain is.  Actually, the Corps of Engineers, in your document, has a flowage easement up to that line.  And that line, you can see on that, it says Exhibit Spinnaker Road.  This is what it looks like.  If you would like me to approach, I can --

THE COURT:  Yeah, I'm not sure I'm seeing that.

MR. MESSER:  It's the third page in.

THE COURT:  Okay.  I've got it.

MR. MESSER:  And you can see this flowage line in zone AE, which is the 100-year floodplain.  And it says labeled 537 line is located in field.  So everything on the downside of that property down to the lake is in the 100-year floodplain.  And if you look at the footprint of this property, this 10,000 square foot residence, it touches that floodplain about four or five

places. So the finished floor elevation of that residence is going to be very important.

And, again, if you look at this, it's 537. If you look at the plat, I believe the plat that was filed in this case -- which Lakewood Village never -- it was never filed with Lakewood Village -- I think it's 537 as well.

THE COURT: Counsel, this may be irrelevant, but as I follow you, I'm thinking this: So long as it's disclosed to a potential buyer, the homeowner or property owner is aware of that fact, why does the city care?

MR. MESSER: Because it's a health safety issue. That's a great question. So if it's at 537, the Town has a standard. The Town wants to protect -- because there's so much lake frontage around Lakewood Village. If you look, there's a significant number of property in Lakewood Village that front the lake. So they want to make sure that everybody's protected, everybody's health is protected, the kiddos are safe, properties are safe, surrounding properties and families are safe.

And so the Town's building elevation standard is 540. That's not -- if you look at what's been submitted in this case -- and that's not on the

plans -- it's not on the plans that were submitted to the Town.

If you look at the plans that were submitted to the Town, you can't tell where they're building -- or what the elevation is that they're building at. If you look at the county documents on Tab 35, they say that they're building to 539.

THE COURT: The Corps of Engineers sets it at 537; the county sets it at 539; and Lakewood Village sets it at 540?

MR. MESSER: Right.

THE COURT: Okay.

MR. MESSER: To us, that's a difference, and it's a big difference between what's on the plat which was filed in 1995 and what we have currently today. And it deals with health and safety issues. And it's one reason that, you know, we think it's important that the properties in our ETJ comply with our building standards.

There's another reason for that as well, though, and if you look at our local amendments, we adopted the International Residential Code, I believe it's the 2006 version. But by law, we're entitled -- besides adopting the International Residential Code, the IRC, we're entitled to soup it up, to make more

stringent standards, heightened standards, which we did.

And we have -- there's an ordinance in here, Your Honor, where we adopted that. We've extended all our building codes to the ETJ, subdivisions rules to the ETJ. So they all apply there by ordinance, which is what's required by statute, and we have about 20 pages of local amendments that we want to make sure are followed in our ETJ, and those are really for health and safety purposes, and you're going to hear testimony about that. And why -- why -- if you look through this -- look through the plans, you'll hear about that.

But there are comments made throughout the plans by the Town's building official. And they're handwritten. There's -- there's one right -- I don't know if you can see that. There's multiple comments made by the build official. They're on the plans that were filed with the Town by Mr. Bizios' contractor. There was a preconstruction conference to be able to review these amendments, these changes, by the Town's building official with the owner and his contractor. They canceled that meeting. They went ahead and built on the property without the benefit of these comments on their plans.

They also -- besides filing the plans for our review, they also registered the contractors under

our ordinances to be able to build on our ETJ. So they basically submitted to our ETJ rules and regulations and then stopped.

If you look at Tab 4 of the notebook, Denton County itself recognizes Lakewood Village's ability to exclusively control the jurisdiction here. So, there's Tab 5. This is a notice that's issued by the Department of Public Works engineering division by Denton County. At the bottom of the first page, it has a heading that says building in the extraterritorial jurisdiction. And again, it's noticed to homebuilders and homebuyers, just as Mr. Bizios is.

And it says, if you're building in the ETJ of a municipality that has adopted a building code with a municipality's ETJ, which Lakewood Village has, then the builder follows the municipality's codes, which they're not. Exactly why we're here today.

And if you look at -- behind that, there was a resolution that was passed by Denton County on January 26, 2010, the first page of that resolution --

THE COURT: What tab are you looking at?

MR. MESSER: It's still on Tab 4 of the notebook, and it's four pages into it.

THE COURT: Okay. I'm sorry, I've got three notebooks here and --

MR. MESSER:  Right.  I understand.

THE COURT:  -- two of them are tabbed with numbers, so I was looking in the wrong notebook.  I'm with you.

MR. MESSER:  This is Tab 4, and it's -- the heading should say Denton County Department of Public Works.

THE COURT:  I'm with you.

MR. MESSER:  And the resolution says, furthermore, be it resolved, notwithstanding the above language.  That all talks about the county standards. And it talks about, in accordance with Section 233.153(c) of the local Government Code, if the above construction occurs in the ETJ of a municipality that has adopted a build code for the municipality's ETJ, the building code adopted by the municipality controls.

That's what we have here.  So we know now Denton County is telling builders and homebuilders that if you build in the ETJ of a city like Lakewood Village and they've adopted build codes in the ETJ, you've got to follow that municipality's building codes, which is what we're seeking the injunctive relief for.

It's significant, Your Honor.  I think that when these rules and regulations were extended by the Town, I think they did that in 2010.  And since

2010, there have been three other properties in the Sunrise Bay subdivision --

MR. ANDERSON: Your Honor, we object. That's not evidence that's introduced. If he's going to talk about what's been stipulated, that's different, but that has not been introduced.

THE COURT: And fair enough, I'll sustain the objection. But let me also make another point. We're 22 minutes into your opening statement, which has contained a lot of argument --

MR. MESSER: Yes, sir.

THE COURT: -- and I've heard no evidence yet. You-all are well aware of the time constraints that we're working under. We're not going to finish this today if this pace continues. So if you'll just focus on an opening statement and then begin presenting your evidence, that gives us a much better shot at completing this today. I don't mean to imply that your opening argument hasn't been very helpful in focusing the Court on the issue because it has, but we do need to kind of move along.

MR. MESSER: Yes, sir. So let me focus just on some of the photographs, what we think -- what's happening on site, then I'm going to talk about --

MR. ANDERSON: Your Honor, we agree that

there was work there. I guess I would just ask, as you said -- we know that there's been work there, we agree to it, we agree that we didn't get the permit. I think all that stuff's been stipulated.

MR. MESSER: Okay. Fair. That's fair.

THE COURT: I'm not sure what we've just agreed to, so...

MR. MESSER: I think what he's saying, Your Honor, is they agree that they're out there building, constructing on the property without a permit, without complying with our codes, and they ignored our stop work orders.

MR. ANDERSON: We disagree about noncompliance. We agree we did not get a permit and pay an exorbitant fee. We agree with that.

MR. MESSER: Okay. So I will try to -- to move along, Your Honor.

So if you look at just the photographs, the photographs of my notebook -- of our injunction notebook, basically what they show is construction activity. They're Tabs 2 and 3. And what they show, Your Honor, is basically thethe Town discovered this was happening around March 10th. You can see the dates on these photographs, March 10th. They discovered there was building activity about 3:28 that day. And then

they ended up posting a stop work order on the property. That's part -- that's under Tab 3 --

MR. ANDERSON: Judge, I'm just going to object. You asked for a short opening statement. We're going through all the testimony and all the factual evidence that is there, and I'm afraid I'm going to get squeezed out because I'm not going to have time to give a relatively short --

THE COURT: I'm not going to squeeze you out, but they're the ones that want the temporary injunction, and it's dissolved today if I don't rule on it.

MR. ANDERSON: I understand.

THE COURT: If you've used up three hours and they don't get a chance to respond, then I'm going to dissolve the TRO and tell y'all to come back in a month or two, and that's kind of the cost of not using your time wisely.

MR. MESSER: So, Your Honor, if you look under Tab 3, stop work order, you can see the building officials posting it on site. You can see it after it's posted. That happened twice by the Town, and then twice they ignored the stop work order. So let me talk about the legal issues.

The back of the notebook, you can see

there's these statutes, and under Tab 16 is basically a summary of the statutes that we believe, and the law of why we can extend our regulations and rules to the ETJ.

And if you look at 212.003(a) and 212.002 -- and these are all provisions of the local Government Code. 212.003(a) says, the governing body by ordinance may extend to --

THE REPORTER: I have no idea what you just said.

THE COURT: It's been my experience that a human being can read far faster than any court reporter can type. So when you're reading something, just read it in a more conversational pace and we'll be okay.

MR. MESSER: Sure. So the first statute is 212.003(a), and it's entitled extension of rules to extraterritorial jurisdiction. And it says, the governing body of a municipality by ordinance may extend to the exterritorial jurisdiction of the municipality the application of municipal ordinances adopted under 212.002, which is the next statute that I quote here. It's entitled rules. And, again, this is in Tab 16 of my notebook, Your Honor.

THE COURT: Well, again, I've got two notebooks. They're both tabbed with numbers, and so I need you to say the exhibit notebook or the --

MR. MESSER: Temporary injunction notebook.

THE COURT: -- temporary injunction notebook so I know which one you're referring me back and forth to.

MR. MESSER: Yes, sir. So it's Tab 16.

THE COURT: Go ahead.

MR. MESSER: So under 212.003, by ordinance, we can extend our rules under whatever 212.002 says. 212.002 is entitled rules. Again, this applies to all municipalities across the state of Texas whether it's general law or home rule. It says, the governing body may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote safe, orderly and healthy development of the municipality.

So under 212.002 and 003, we can adopt rules that promote development in our ETJ. The legislature says this.

The purpose of the ETJ under 42.001 says, the legislature declares the policy of this state to designate certain areas as the extraterritorial jurisdiction of municipalities to do what? To promote and protect the general health, safety and welfare of persons residing in and adjacent to municipalities,

which is exactly what we have here, just like Sunrise Bay is adjacent to Lakewood Village.

Then there's two other provisions that I think are critical, because if -- if the defendant's position is correct, these statutes are useless, they mean nothing. And instead, we think they have a plain meaning. One deals with building permits. 214.904(a) says, this section applies only to a permit required by the municipality to erect or improve a building or other structure in the municipality or its ETJ. This gives us specific statutory authority for permit nothing the ETJ.

233.153(c) deals mainly with counties, but there's a section, part C, that carves out cities. And it says, if a municipality located within a county to which this subchapter applies, which is almost every county in the state of Texas, has adopted a building code in the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls -- the building code adopted by the municipality controls in the ETJ and the building code standard under this subchapter for counties have no effect. That gives us the exclusive right for building codes and permits in the ETJ of Sunrise Bay, which is part of Lakewood Village's extraterritorial jurisdiction.

So that's the statutory authority that deals with that, Your Honor. There's a couple of cases on point there in your notebook, the temporary injunction notebook. One of them is the City of Lucas versus North Texas Municipal Water District. And there's another one, the City of Weslaco versus Carver. Those are the only two cases directly on point. There's not a case that's binding that I know of out of the Fort Worth Court of Appeals or the Texas Supreme Court.

So what happened in Lucas, Lucas is a general law municipality, just like Lakewood Village. There was a tract of land about 70-something acres that was in their ETJ where the water district wanted to build this huge treatment plant. They didn't want to abide by Lucas' subdivision rules in the ETJ. They had a lawsuit about it. The Dallas Court of Appeals ended up finding in favor of Lucas and saying that the property owner had to use the building codes for the City of Lucas. Same exact issue as we have here, no different.

And then in the City of Weslaco, it's a very similar case where there was a subdivision of land, and there was a -- I think it was a mobile home park that they were trying to get around the subdivision rules, and the Court held that -- and that was in the

ETJ of Weslaco, and the Court held and actually entered a permanent injunction against the property owner finding that Weslaco's rules and subdivision regulations in the ETJ apply, and until the property owner complied with those rules, there was a permanent injunction --

THE COURT: Counsel, I'm sorry, I'm just going to have to cut you off. You've been going for more than a half hour on what is essentially a closing argument. You know, this isn't an opening statement, period --

MR. MESSER: I'm sorry.

THE COURT: -- this is just a closing argument. And while it's been helpful to me, I've heard zero evidence, and I don't have time for a full day hearing, much less something to spill over into the rest of this week. I'm just going to have to cut you off and allow response by the defendants before we break for lunch.

MR. MESSER: Just one other --

THE COURT: I've tried to be delicate, but that was 10 or 15 minutes ago. So if you'll --

MR. MESSER: The only other issue I have --

THE COURT: No, just please have a seat and I'm going to turn it over to the defense.

Opening statement only.

OPENING STATEMENT

MR. ANDERSON:  Your Honor, if I may, I want to try to keep it brief, but I'm going to try to address some of the issues that Mr. Messer raised that I think are not going to be reflected by the evidence and are inaccurate reflections of the law.

I think the critical issue in this case, Judge, is the fact that Lakewood Village is a general law town, and the distinction between a general law town and a home rule is basically, when you get to a 5,000 population, you can have an election, you can adopt a charter.  When you become home rule, you've got power. Basically, you have all of the powers that a political subdivision has that aren't prohibited by the Constitution or by the legislature.

Flip that over to a general law town like Lakewood Village, which only has about 600 people in it, they are limited only to what the legislature authorizes them to do, and that's significant.

And so there is no statute that expressly authorizes Lakewood Village to impose their building code in the ETJ.  Not to say it hasn't happened, and Mr. Messer says it's implied, but there's nothing expressly that authorizes it.

Number two is, I think Mr. Messer was making it out like Mr. Bizios has tried to avoid complying with the codes. That's incorrect. He's -- this is basically more than a million dollar house construction, Judge. This is not something that's not going to meet the codes. We'll testify that it does. He simply wants to apply for and obtain permits from those governmental entities that are legally authorized to do that.

So, for example, this issue that we had on the 537 contour, he got his permit from the corps. The corps has jurisdiction for that. It took several months and they had to do a lot of studies, but he's got that. He's got the flood certificate elevation. The corps has approved it. Matter of fact, there's a retaining wall that's built within that 537 elevation and that's been approved by the corps. He got approvals through Denton County. Denton County has a development application requirement that requires inspections for foundation and those types of things. He has that approval. He just doesn't believe that a city, to be honest with you, Judge, should be able to bully people and force them to obtain permits and to pay fees they're not legally authorized to do. And so that's the issue from his standpoint.

It's not a health safety issue at all, Judge. It is simply the standpoint of a city trying to impose their will on an individual and trying to impose a regulation, which they don't have the legal right to do that.

The -- and I'm going to be real brief in mine because I think the case law -- I totally disagree with Mr. Messer. There are cases that are on point, and I'm, I guess, too aware of them because I've actually tried them and argued them before the Court of Appeals.

The first one in ours is an older case not on point on the building code issue, but that's when Judge Gabriel was a district judge here before she went on the Court of Appeals. And in that case, North Lake tried to annex our client's property involuntarily, and Judge Gabriel ruled that -- it was upheld by the Fort Worth Court of Appeals that a general law town cannot do that.

So while Mr. Messer said we're interested in the housing stock that gets built in the ETJ because we may annex it, they don't have the authority to annex it. They can't annex it. When they become a home rule city, they can go annex involuntarily. There's a few provisions from general law towns. Like, if they provide water or sewer, they may be able to annex it,

maybe not. They don't provide water and sewer. They don't provide any services here, none at all. Everything comes from Little Elm or else is provided by the county.

The second case, Your Honor, is a Fort Worth Court of Appeals case, so when Mr. Messer says there are no Fort Worth Court of Appeals cases, this is one that we tried where -- similar issues. City of Runaway Bay extended their building code to the ETJ, and the Court of Appeals held that -- they did not expressly state in their ordinance that they were applying it to their ETJ and said that, basically, unless you expressly state that, then it's not valid. We never got to the issue of does a general law town have the authority or not.

But, Judge, if you could look on the last page in footnote four, that basically is where the argument is and where the Court -- you know, to be honest with you, I thought I was going to convince him to strike down the whole ordinance, but I was unsuccessful. But that is probably the best argument -- and I'm not going to read through it. But it's probably the best argument with regards to the differing opinions as to whether or not there's authority or not as a general law town for a city to extend their building

code to the ETJ.

But as you can see at the end, regardless or not of whether they have the authority to extend in this case, they said that it was not a valid extension of that part. My experience is, is that from the Court of Appeals' standpoint, they don't really look favorably on the extension of building codes into the ETJ, but they would prefer not to strike it down. They would prefer to take a lesser, you know, action in terms of saying you can't extend it here.

And in that discussion by the Court of Appeals, Your Honor, it refers to the Milestone Potranco Development case in San Antonio. And I think, Judge, this is the opportunity for you to make a ruling where you would not actually strike it down, the City's ordinance, although I would prefer that, but similar to this case and the Hartsell case, which I also tried, the Courts of Appeal made a more limited ruling, like I said.

The issue here in the San Antonio case, San Antonio extends their tree ordinance into their ETJ. So the developer goes, you know, that's not really a subdivision regulation-type of thing. You can't do that. And in addition, it's overbroad because it applies to situations that don't involve platting. So

platting is going through the subdivision process.

And the Court of Appeals said, yeah, they had the authority to do it; however, it's -- it will not be applied and cannot be applied to situations where actual platting is not involved.  In other words, I've got a vacant tract of land, I'm a developer, I'm coming out and I want to develop it for a residential subdivision, when that happens, that's when this type of ordinance can be extended because it's part of the subdivision regulatory process.

And that's exactly -- under the next document, Judge, under 2, under 212.007, in this case, the Sunrise Bay plat was approved by the county and by the City of Little Elm.  Sunrise Bay is located in the corporate limits of Little Elm, the ETJ of Little Elm, and Lakewood Village.

As you can see under here, if a tract in the ETJ lies in more than one municipality, the largest city controls the platted process.  So Little Elm has always been bigger than Lakewood Village.  I mean, it's got 30,000 people or something now.

So when that plat was approved, Lakewood Village did not have any platting authority, and they don't have any platting authority today.  It's a platted subdivision.  It's been done.

So as a result of that, if their extension is pursuant to 212, which is the subdivision ordinance, it has to be in accordance as part of the platting process. They don't have any subdivision authority here.

And so like the Milestone case and the other ones, the first argument we make is they have no authority whatsoever. It's not expressly. They don't have it.

Number two is they don't in this case, because even if they did have the authority, it can't be extended here for the reason that they don't have subdivision authority over this property or anywhere within Sunrise Bay, if that makes any sense.

The last part, Judge, deals with the vested rights argument. The Hartsell case, if there's another way to address the issue, involved a subdivision. City of Talty extends their building code into the ETJ, tries to make Mr. Hartsell comply with the building code. Dallas Court of Appeals said no. Under the vested rights statute, which is Chapter 245, the property's already platted, the city can't come in and enact a building code that applies later.

I do apologize, Judge. I just felt like I needed to address some of Mr. Messer's arguments. But

the primary policy reason he's saying is we need to protect the housing stock because we may annex this property. Well, there's no reason to protect the housing stock here. All of those houses are very, very nice. They all meet code. You know, basically, the contractors want to make sure that they meet code, basically, for any potential liability purposes, but they can't annex it.

So while I can understand that there may be that policy of we need to protect the housing stock because we might annex it in the future, that doesn't apply here. Thank you, Judge.

THE COURT: Okay. Y'all come on back at 2:00 o'clock. When we started this, I didn't envision the need for a clock, but I will have a clock counting down the rest of the time this afternoon and inclusive of the time that's already been spent.

You know, we're an hour in and I have yet to hear a single witness utter a word, and while I appreciate that a lot of evidence has been admitted by stipulation, I fear that that leaves us in a poor position to complete this hearing today. And looking at our docket for Wednesday and Thursday, I simply do not have the ability to bring you back, not this week at least.

With that in mind, please try to be concise in presenting the remainder of your -- or presenting your testimony and evidence, as well as the remainder of your arguments, when we do return this afternoon.  See y'all at 2:00 o'clock.

(Recess taken)

THE COURT:  With that, we're back on the record in the Lakewood Village case.  Mr. Messer, please call your first witness.

MS. DeCURTIS:  Your Honor, Jennifer DeCurtis here on behalf of the Town.  And for Your Honor's convenience, we are only looking at the exhibit list notebook.  So when I refer to a specific exhibit, it is out of that.

THE COURT:  Okay.  Thank you.

MS. DeCURTIS:  The Town of Lakewood Village calls Linda Asbell as the first witness.  May I sit during direct?

THE COURT:  Please.  I prefer counsel to remain seated.  Standing up is a signal to me and the witness that you're objecting, unless you need to approach the witness.  You don't have to ask for permission to approach your own witness or client, only if you're approaching an adverse witness or client would I ask you to request permission to approach.

MS. DeCURTIS:  Thank you, Your Honor.

THE COURT:  I don't anticipate fist-fighting in this case, but you can imagine in a lot of more contention cases, especially domestic cases, asking for permission to approach is necessary to literally keep the peace at times.

You may proceed.

MS. DeCURTIS:  Hopefully, we'll be peaceful in this case.

THE COURT:  And, ma'am, I'll just remind you, you've previously been sworn.  You are still under oath.

THE WITNESS:  Yes, sir.

THE COURT:  Go ahead.

LINDA ASBELL, having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DeCURTIS:

Q.   Could you state your name for the record, please?

A.   Linda Asbell.

Q.   Where do you work?

A.   The Town of Lakewood Village.

Q.   And what is your position?

A.   Town secretary.

Q.    How long have you done that?

A.    I started my municipal career in 1990.  I have been with the Town of Lakewood Village since 2007.

Q.    Do you have any certifications relevant to your occupation?

A.    I'm the Texas registered municipal clerk.

Q.    Is that current?

A.    It is.

Q.    As part of your duties, you keep records of the Town's ordinances, correct?

A.    Yes, I do.

Q.    And you're sometimes called upon to perform building inspection functions under the authority of the building official of the Town, are you not?

A.    I am.

Q.    Okay.  So you're familiar with the processes and procedures for obtaining permits and the like, correct?

A.    Yes, I am.

Q.    Okay.  And you're also intimately familiar and have personal knowledge of the Town's official filings, records and ordinances; isn't that right?

A.    Correct.

Q.    And currently, what is the population of Lakewood Village?

A.   Approximately 620.

Q.   And what type of municipality is Lakewood Village?

A.   We're Type A.

Q.   Is that a general law city?

A.   Yes, it is.

Q.   Okay.  And you're currently at 620 population. Did the Town pass a comprehensive master plan?

A.   We have.

Q.   As part of that plan, did the council determine the future growth of the Town?

A.   Anticipated is in the neighborhood of 2,500.

Q.   So the Town currently has the ability to annex properties, does it not?

A.   Yes, we do.

Q.   And when it reaches 2,500, it has an expanded ability to do so, correct?

A.   Correct.

Q.   Okay.  Are you familiar with the property located at 3950, also 3960, Spinnaker Run Pointe?

A.   Yes, I am.

Q.   How are you familiar with that property?

A.   They filed a permit application with us, and I've been to the property.

Q.   Do you know who owns this property?

A.    Mr. Bizios.

Q.    Have you ever met Mr. Bizios?

A.    We met once.

Q.    One time.  And was he the one that filed the plans with the city?

A.    No.  I believe it was his builder, Mr. Hoffman.

Q.    Mr. Hoffman is Mr. Bizios' builder?

A.    Yes.

Q.    And when I refer to the property, you'll understand that I'm referring to the property located at 3950 or 3960 Spinnaker Point Run, would you not?

A.    Yes, ma'am.

Q.    Is the property located in a subdivision?

A.    It is.

Q.    Which subdivision?

A.    Sunrise Bay.

Q.    Is it in the Town of Lakewood Village?

A.    It's in our ETJ.

Q.    And what is an ETJ?

A.    It's an extraterritorial jurisdiction.

Q.    And why is it important to have an extraterritorial jurisdiction?

A.    It's set aside exclusively for the growth of the city, and it's for quality of life and health and safety reasons for citizens.

Q.    If you could, just please turn to Exhibit 2 in the notebook in front of you.

A.    Okay.

Q.    Would you tell the Court what this is?

A.    Um, this is resolution that adopts our official Town map.

Q.    And if you could turn to the official Town map. The map shows where the city limits are, correct?

A.    It does.

Q.    And are the city limits actually outlined in red?

A.    Uh-huh.

Q.    And does this map also show the ETJ, or extraterritorial jurisdiction, of the Town?

A.    It does, yes.

Q.    And how is that notated?

A.    The diagonal slashes.

Q.    So it looks like the ETJ actually extends out into the lake, does it not?

A.    It does.

Q.    It's a half mile ETJ, correct?

A.    Yes.

Q.    And where is the Town of Little Elm on this particular map?

A.    To the north and east.

THE COURT: So if I pull a houseboat up to that shore within the diagonal area, would that houseboat then be subject to the extraterritorial jurisdiction of Lakewood Village?

THE WITNESS: It depends on where you pull it up. There are some private properties.

THE COURT: I don't know the answer. I'm just being funny. I was hoping you would say I don't know. Apparently you --

THE WITNESS: I do know.

THE COURT: -- purport to know.

THE WITNESS: Depends on whether you're renovating your boat.

THE COURT: I don't have a houseboat, I just thought it was a novel question.

Sorry to interrupt you. Go ahead.

Y'all are bordering on talking over one another --

MS. DeCURTIS: Sorry.

THE COURT: -- possibly because you're trying to be quick --

MS. DeCURTIS: I am.

THE COURT: -- but try not to kill my court reporter. She's had a busy day already.

MS. DeCURTIS: Just let me know if I'm

going a little too fast.

Q.   (BY MS. DeCURTIS) If you'd turn to Exhibit 4 and look at the attachment to the certification.  What does that show?

A.   That shows the ETJ of the city.

Q.   And is the ETJ -- you say of the city.  You mean Town of Lakewood Village?

A.   Yes.

Q.   Is that ETJ marked in yellow?

A.   It is.

Q.   Okay.  And does it also show the ETJ of Little Elm?

A.   It does, in light green.

Q.   In light green.  And if you look at this particular map, can you see the property that is Mr. Bizios' property --

A.   Yes.

Q.   -- on this map?  And can you tell the Court for the Court's reference the property number or number listed on that map that indicates Mr. Bizios' property?

A.   It's our number 182659.

Q.   So this particular lot is wholly within Lakewood Village's ETJ, is it not?

A.   It is.

Q.   Okay.  Your ETJ goes into the lake, but who

regulates this lake?

A.    The US Army Corps of Engineers.

Q.    And is part of that regulation the Army Corps of Engineers actually maintains a flowage easement for properties like this, correct?

A.    They do.

Q.    What does that mean?

A.    That means that they control elevations at mean sea level 537 and below.

Q.    If you'll turn to Exhibit 5 and just look at the attachment.  Could you tell the Court what that was?

A.    It is a topography map of Mr. Bizios' property.

Q.    And you can tell from this map in increments of two what the mean sea level is; is that correct?

A.    That's correct.

Q.    Do you know why the Army Corps of Engineers has a mean sea level of 537?

A.    It's for the health and safety, protection of private property and the people that are on this shoreline.

Q.    Does it also relate to the 100-year floodplain?

A.    It does.  That's what the 537 line indicates.

Q.    Okay.  And the Lakewood Village actually requires its own finished floor elevation, does it not?

A.    We do.

Q.   And do you know what ordinance that's in?

A.   I believe that's 1307.

Q.   And do you know what the MSL is for Lakewood Village?

A.   540.

Q.   And do you have any idea what this particular structure is being built at?

A.   I don't.

Q.   Is this property also within the unincorporated area of the county?

A.   Yes, it is.

Q.   Denton County?

A.   Yes, ma'am.

Q.   Okay.  Was a plat ever filed for Sunrise Bay subdivision with the Town?

A.   No, it was not.

Q.   Was there a plat filed with any government agency?

A.   As far as I know, with the county of Denton and the Town of Little Elm.

Q.   Prior to the builder filing plans with the city, did you have any knowledge of the plat?

A.   I did not.

Q.   You would not have had any reason to review this plat to know that Lakewood Village was not a party

to the filing before this issue --

A.   No.

Q.   -- would you have?  Did you do a diligent search of the records of Lakewood Village to determine whether or not the Town received notice of this plat?

A.   Yes, I did.

Q.   And did you find anything?

A.   I did not.

Q.   And you looked at the council meetings, the agendas, the past minutes, did you not?

A.   Yes, I did.

Q.   You did a thorough search, did you not?

A.   Yes, I did.

THE COURT:  Ma'am, you're repeatedly doing exactly what I warned all of the witnesses to try not to do.  I'm not upset, I just want to let you know we need to be really conscious about interrupting each other.

THE WITNESS:  Oh.  Thank you, Your Honor.

MS. DeCURTIS:  I'm sorry.  I have in my mind that I need to be very expeditious with my time, Your Honor.  I will try to slow down.

Q.   (BY MS. DeCURTIS) So you found no evidence that the Town had received any type of notice regarding the plat that was filed with Denton County, did you?

A.   Correct.

Q. Okay. If you'll look at Exhibit No. 17. This is a resolution that was adopted by the Denton County Commissioner's Court, wasn't it?

A. Yes, it is.

Q. And if you look at the resolution, does it tell who was responsible for platting and regulations in the city's extraterritorial jurisdiction?

A. It does. It says the cities are responsible.

Q. You indicated that the builder had filed plans with the city, correct?

A. Yes.

Q. And did he apply for a permit?

A. He did apply.

Q. Was that permit approved?

A. The process was never completed.

Q. Why not?

A. He canceled the mandatory preconstruction meeting and did not pay the building fees.

Q. And that was all that he had left to do, correct?

A. Correct.

Q. So he did submit plans?

A. Yes.

Q. And did he -- was it required that he have his subcontractors registered?

A.   It is required.

Q.   And did he do that?

A.   He did.

Q.   Okay.  And do you know if a preconstruction meeting was actually scheduled?

A.   There was one scheduled.

Q.   And did he attend?

A.   He did not.  He canceled a few hours before the meeting.

Q.   Did he say why?

A.   He said he had a conflict and would reschedule.

Q.   And a permit is actually required to build a structure in this location, isn't it?

A.   Correct, yes.

Q.   Which ordinance requires a permit to be built in this particular area?

A.   I believe that's Ordinance 1116.

Q.   And 1116 also adopted a uniform code called the International Residential Code, correct?

A.   Yes.

Q.   Do you know who publishes that code?

A.   The International Code Council.

Q.   Is that a uniform code that was adopted by the city?

A.   It is.

Q.   And were those codes extended to the Town's ETJ by ordinance?

A.   Yes, they were.

Q.   And do you know what ordinance that is?

A.   1001.

Q.   There are also ordinances that extend the Town's other uniform regulations, such as plumbing, mechanical and electrical, correct?

A.   Correct.

Q.   Okay.  If you look at the -- this particular resolution, it indicates, if construction occurs in a city's ETJ where the city has adopted a building code, then the city code applies, correct?

A.   Yes.

Q.   And as part of this order, if the homebuilder seeks a permit with Denton County, would it have required inspection?

A.   It does.

Q.   How many inspections does Denton County require?

A.   It requires three third-party inspections.

Q.   So not even an inspector by Denton County?

A.   Correct.

Q.   Other than those three inspections, is there any further oversight by the county?

A.   No.

Q.   And the Lakewood Village ordinance actually requires 14 difference inspections, doesn't it?

A.   That's correct.

Q.   Has the homebuilder or owner authorized or requested the inspections required by Lakewood Village?

A.   Not until the temporary restraining order was modified.

Q.   You actually went out on the property, didn't you?

A.   I did.

Q.   And what date was that the first time?

A.   March the 10th.

Q.   What did you see?

A.   I saw form boards in place.

Q.   And could you explain to the Court what form boards are?

A.   Form boards are structures to indicate where the house is going to be placed on the lot.

Q.   If you'll turn to Exhibit 11.

THE COURT:  I tell you what, that's kind of a transition point, so I'm going to just stop you there briefly.  If y'all need to confer during the break, you're welcome to, but I'm going to take care of a couple matters real quick.

(Recess taken)

THE COURT: Back on the record in the Lakewood Village case. Sorry for the interruption.

Please continue, Counsel.

Q. (BY MS. DeCURTIS) Ms. Asbell, we were previously talking about the property located at 3950 and 3960 Spinnaker Point Run, and you were indicating that there is a permit required by the Town's ordinance in order to construct a structure on that property, correct?

A. Correct.

Q. Okay. And is a permit still required even when the property has already been platted?

A. Yes, that's correct.

Q. And even if the plat was long ago, say 1995, would it still be required on the property?

A. Yes, it would.

Q. Now, we're just going to -- we were talking briefly about you visiting the property and I had asked you to turn to Exhibit No. 11. And tell the Court what exactly this shows.

A. This is a picture that shows the condition of the property when I went out there on March the 10th and saw the form boards in place.

Q. And by form boards, you had mentioned to the

Court that that's what shape the house is going to take on the floor, correct?

A. Correct. That's the wooden structure shown on the picture.

Q. Is that when you contacted the building official?

A. I did.

Q. Who is the building official for Lakewood Village?

A. Steve Freeman.

Q. But this was after -- this particular visit was after the building plans had already been filed with the city, correct?

A. Correct.

Q. What date were those filed?

A. January the 27th.

Q. But there was not an approval permit for this location, correct?

A. Correct.

Q. Okay. And when you visited March 10th, did you see a retaining wall that had also been constructed on the property?

A. I did. It's down below site line at the end of the property in this picture.

Q. Would that wall have also required a building

permit?

A. It would.

Q. And did they obtain a building permit for that wall?

A. They did not.

Q. Did the building official visit this property to your knowledge?

A. He did.

Q. When did he do that?

A. On March the 13th.

Q. Were you on the property that day also?

A. I was.

Q. And what did you see that day?

A. I saw workers present and drilling rigs for piers.

Q. Is that for the foundation?

A. Yes.

Q. So the building official actually met you at the property that day?

A. He did.

Q. If you turn to Exhibit No. 12, were these photographs that you took on March 13th when you went there that day?

A. Yes.

Q. As part of your position, do you usually

prepare stop work orders --

A.   Yes.

Q.   -- for the building official?  And did you prepare one for this property on this day?

A.   Yes.  That's part of my duties and I did that date.

Q.   If you'll just look at the first picture. Could you tell the Court what that shows?

A.   That shows work in progress on the property without an active permit.

Q.   And same for the second and the third?

A.   Yes.

Q.   And the fourth?

A.   Yes.

Q.   And the fifth, what does that show?

A.   1731, that is the same property.  Those are concrete trucks that were on site when the building official arrived.

Q.   And if you turn to the next one, does that show the concrete piers?

A.   I believe that's the holes for the piers, yes.

Q.   Had they already poured the concrete at that point on the piers?

A.   I can't say personally.

Q.   But this is basically a depiction of the form

board, is it not?

A.  It is, and it shows the hole for the pier.

Q.  If you look at the next one, could you tell the Court what that is?

A.  That is a drilling rig that drills the holes for the piers.

Q.  And the following picture?

A.  Another hole for the pier.

Q.  And if you turn to the next picture, is that a picture of the building official --

A.  That is --

Q.  -- for the Town?

A.  Yes, it is.  That's Steve Freeman.

Q.  What is he doing in that picture?

A.  He is signing the stop work order.

Q.  So the stop work order was signed on site?

A.  Yes, it was.

Q.  If you'll turn to Exhibit No. 9.  Look at the attachment.  Is this a copy of the stop work order placed on the property that day?

A.  It is.

Q.  This is actually dated March 13th, is it not?

A.  Correct.

Q.  And it was signed by the building official on site, correct?

A.   Yes, it was.

Q.   Okay.  And if you turn back to the exhibits in Exhibit No. 12 and turn to the last page, does this show that same stop work order posted on a tree?

A.   It does.

Q.   Okay.  After this stop work order was posted on this property, did you see anybody on the property?

A.   I did.

Q.   Who did you see?

A.   I saw a pickup truck with workers in it coming up the drive.

Q.   And did they say anything to you?

A.   They stopped and they asked --

MR. ANDERSON:  Objection, hearsay, Your Honor.

THE COURT:  As to that question, the objection's overruled.  Please just answer the question. The question was, and did they say anything to you?

THE WITNESS:  Yes, they did.

Q.   (BY MS. DeCURTIS) Okay.  And what did you say to them?

A.   I stated that the stop work order indicated that they could not work until a proper permit had been pulled.

Q.   And did they actually remove the stop work

order?

A.    The stop work order was removed.  I don't know who did it.

Q.    But you don't know who removed the order, correct?

A.    Correct.

Q.    Okay.  If you'll turn to Exhibit No. 13.  These are photographs that you took the following day, correct?

A.    Yes.

Q.    So you went out to the property, I'm assuming, in the morning, correct?

A.    Yes, 9:30 that next morning.

Q.    And is this a picture of the same tree that had previously had a stop work order posted?

A.    It is.

Q.    And this particular photograph shows that it had been removed, correct?

A.    Correct.

Q.    So what did you do when you determined that it had been removed?

A.    I contacted the building official and asked for direction.

Q.    And what did the building official do?

A.    He authorized me to post a second stop work

order.

Q. And did you do that?

A. I did.

Q. So you posted a second stop work order under the authority of the building official?

A. Correct.

Q. And if you look at the second photograph in Exhibit 13. Is that a copy of the second stop work order?

A. It is.

Q. -- that you posted? And who is that individual in the photograph?

A. Mr. Bizios.

Q. That's the defendant, correct?

A. Correct.

Q. And if you turn to Exhibit No. 10 and look at the attachment. Is this a copy of the second stop work order that was actually posted on the property that day?

A. It is.

Q. And it's actually dated the 14th, is it not?

A. Yes.

Q. And this was also signed on site?

A. It was.

Q. With permission of the building official?

A. Correct.

Q.    Did you talk to the owner at the time that you posted the second stop work order?

A.    Yes.

Q.    And what did the owner say to you?

A.    He told me that I was trespassing and I needed to leave the property.

Q.    Did he say anything else?

A.    He said that he could go to Home Depot and get some red paper and post it and have just as much authority as I did.

Q.    And if you go to the next page, what does that show?

A.    I'm sorry, which exhibit are we on?

Q.    This is on Exhibit 13, and it is the third photograph.  Could you tell the Court what that shows?

A.    That shows a concrete truck that has driven through the stop work order, dropped concrete and is coming back up the drive.

Q.    So the owner continued working even after the second stop work order was posted, correct?

A.    Correct.

Q.    And did you say anything else to the owner while you were there?

A.    I indicated that we have the authority and I was posting a stop work order.

Q.    And did you go back to the property?

A.    I did.

Q.    What date did you do that?

A.    I believe it was the 17th or 18th.

Q.    If you'd turn to Exhibit No. 14, were these photographs that you took on March 18th?

A.    Yes, it is.

Q.    What did you see on that day when you went?

A.    I saw this pickup truck pulling out with trenching equipment and trenches -- new trenches on the property for plumbing rough.

Q.    And could you explain to the Court what a plumbing rough is?

A.    They're laying plumbing underground which will be below the foundation in preparation for the foundation work.

Q.    And so this first photograph shows that there's a truck with some sort of -- what is that on the back? Are you --

A.    I believe it's a trencher.

Q.    A trencher.  And then if you turn to the following page, what does that show?

A.    That shows that work has been done on the property with the trench lines in it.

Q.    Is the stop work order still there?

A.   No, it is not.

Q.   So someone removed the second stop work order, correct?

A.   Correct.

Q.   Do you know who removed it?

A.   I do not.

Q.   There are other houses within Sunrise Bay in Lakewood Village's ETJ, correct?

A.   Yes.

Q.   That are currently built?

A.   Yes.

Q.   And were they built before or after Lakewood Village extended their building codes to the extraterritorial jurisdiction?

A.   They were built before.

Q.   But some of them had been renovated, were they not?

A.   Correct.

Q.   And renovations that required permits, didn't they?

A.   Yes, they did.

Q.   Okay.  I'm going to show you --

         MS. DeCURTIS:  If I could approach, Your Honor?

         THE COURT:  Yes.

MS. DeCURTIS: Actually, we'll do all of these at the same time.

Q. (BY MS. DeCURTIS) I'm going to show you what's been premarked Petitioner's Exhibit 2, Petitioner's Exhibit No. 3, and Petitioner's Exhibit No. 4. Could you tell the Court what those are?

A. These are applications for permit.

Q. And are those certified copies of public documents?

A. Yes, they are.

MS. DeCURTIS: Your Honor, at this time I would like to offer Petitioner's Exhibits 2, 3 and 4 into evidence.

MR. ANDERSON: We object. These are, I think, remodeling permits for other houses in the ETJ. We object on the basis of relevance. It's our understanding that those homeowners felt like they were forced to go ahead and get those permits, and it really has no relevance to the issues in this case as to whether or not the ordinances are legal or not.

THE COURT: What is your response?

MS. DeCURTIS: My response is it goes directly to the fact that other individuals in similar circumstance to Mr. Bizios are aware of the regulations in that area and they have been in compliance with the

law.

THE COURT:  The objection is sustained.

MR. ANDERSON:  Thank you, Your Honor.

Q.  (BY MS. DeCURTIS) Exhibit No. 3, I believe, is 3964 Spinnaker Run Pointe, isn't it?

A.  Exhibit 2?

Q.  Exhibit 2, excuse me.

A.  Yes.

Q.  Okay.  And what is that permit for?

A.  It is a plumbing permit.

Q.  And could you tell the Court when this permit was pulled?

A.  April 18th, 2013.

Q.  And was that approved at the Town of Lakewood Village?

A.  It was approved.

Q.  And 3964 Spinnaker Run Pointe is in the Town's extraterritorial jurisdiction, isn't it?

A.  Correct.

Q.  Okay.  And if you look at Exhibit No. 3, is that a permit for 3904 Spinnaker Run Pointe?

A.  It is.

Q.  And could you tell the Court what that permit is for?

A.  That is for a pool enclosure.

Q.   And what date was that permit?

A.   March the 18th, 2013.

Q.   And was that also approved?

A.   It was.

MR. ANDERSON:  Your Honor, I guess I'm going to object.  I think you indicated that those documents could not be introduced, and, yet, all's we're doing is hearing testimony about the documents.

THE COURT:  So what's your objection?

MR. ANDERSON:  Relevance, Your Honor.

THE COURT:  Sustained.

MR. ANDERSON:  Thank you, Your Honor.

Q.   (BY MS. DeCURTIS) So the builder, Mr.-- the builder for Mr. Bizios started out by applying for a permit with the Town like everyone else in the subdivision but then stopped; is that right --

MR. ANDERSON:  Objection, Your Honor. That's an assumption based upon the documents that were not admitted into evidence which we objected to as to relevance.  It lacks foundation.  We object.

THE COURT:  I'm going to let you finish the question because he cut you off in mid-sentence, and I'm going to instruct the witness not to answer the question, but I want to hear the question in its entirety before I rule on the objection.  Can you finish

your question?

MS. DeCURTIS:  I'll withdraw the question.

THE COURT:  Do you want me to reread it to you, or do you want to just go to something else?

MS. DeCURTIS:  No, I'll just go to something else.

THE COURT:  Go ahead.

Q.   (BY MS. DeCURTIS) Did Mr. Bizios or the builder indicate why they stopped the process for the permit that was filed with Lakewood Village?

A.   I believe he said he believed that I misrepresented our authority.

Q.   So at that point was when the Town was forced to file this lawsuit, correct?

A.   Correct.

MS. DeCURTIS:  No further questions for this witness.

MR. ANDERSON:  May I, Your Honor?

THE COURT:  Go right ahead.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q.   Ms. Asbell, was there an attempt to annex this portion of Sunrise Bay by Lakewood Village in the 2010 time frame?

A.   No.

Q. Was there any discussion about annexing this portion of Runaway Bay in the 2010 time frame?

A. Runaway Bay, no.

Q. Sunrise Bay, sorry. I was thinking of my other lawsuit. Sunrise Bay?

A. I'm not sure that I understand your question.

Q. Okay. Are you aware of any discussions about the potential annexation of this portion of Sunrise Bay that's in Lakewood's ETJ by the Town of Lakewood Village?

A. We discuss things like that regularly, yes.

Q. And was part of that discussion basically the Town annexing the ETJ that is located within Sunrise Bay that is within Lakewood Village's jurisdiction?

A. There is that potential, yes.

Q. And the decision was made by the residents that they did not want to be annexed by Lakewood Village, correct?

A. I'm not aware that the citizens were involved in the discussions.

Q. But the bottom line is Lakewood Village has not annexed that property today, correct?

A. Not today, correct.

Q. And they could not annex it today unless the residence submitted a petition consenting to the

annexation, correct?

A. Under the circumstances we have today, that's correct.

Q. That's what I'm asking.

A. Yes.

Q. Today if Lakewood Village tried to unilaterally annex Mr. Bizios' lot and the surrounding lots, they would be legally prohibited from doing that, correct?

A. Unless I received a petition from the residents, correct.

Q. Unilaterally means without having the petition.

A. Okay. Yes.

Q. So you understand Lakewood Village is a general law town, correct?

A. That is correct.

Q. So Lakewood Village is different than Little Elm because that's a home rule city, correct?

A. Correct.

Q. And you do understand the differences because you've had some training as a city secretary between the powers of a general law town versus a home rule city; is that correct?

MR. MESSER: Your Honor, I'm going to object because I think he's really asking her for legal opinions --

MR. ANDERSON:  I think he asked for about 15 --

THE COURT:  Hold on, hold on.  Don't interrupt each other, period.

MR. ANDERSON:  Yes, sir.

THE COURT:  It's rude, and I've been pretty clear, I don't like people talking over each other anyway.

MR. ANDERSON:  Apologize, Judge.

THE COURT:  I will always give fair opportunity to respond when it's your turn, but while one attorney's talking, it's their turn.  Please complete your objection.

MR. MESSER:  I think that he's asking for opinions about foundation that deal with legal issues.

THE COURT:  Okay.  What's your response?

MR. ANDERSON:  The response is I think in direct she was asked numerous questions on legal issues and also on the authority to annex.  She said they couldn't annex today.  They could build the population, they could annex.  She was making numerous legal opinions, if you want to call them that, but they're basically within her framework as being the city secretary and the training she's had as part of that, Your Honor.

THE COURT: The objection's overruled.

You can ask the question.

MR. ANDERSON: And I'll try to rephrase. And I do apologize, Judge, prior.

THE COURT: Not mad, I'm just particular.

MR. ANDERSON: I understand totally.

Q. (BY MR. ANDERSON) Do you understand the difference between a general law town and a home rule city like Little Elm?

A. I do.

Q. And do you understand that as a general law town, Lakewood Village can only take those actions which are expressly authorized by the Texas legislature and one of these statutes or by the Texas Constitution?

A. Correct.

Q. And that Little Elm, on the other hand, as a charter home rule city has police powers, that they can take whatever actions that are pursuant to the police powers as long as they are not prohibited by the legislature or the Constitution?

MR. MESSER: Same objection, Your Honor. That's very detailed dealing with the constitutional police powers.

MS. DeCURTIS: Also relevance.

THE COURT: Only -- I'm going to have to

at this point since -- you know, our local rules require, and I think it's pretty common practice throughout the state anyway, that when one attorney -- even though a client may be represented by multiple attorneys, when one attorney presents the witness, that's the attorney that's got to make the objections. You don't get to tag team. So please bear that in mind. I need to hear from one attorney for each side with respect to each individual witness that may be called.

The second thing is, I understand the nature of your objection and I believe that does go pretty far beyond the scope of what this witness would be qualified or appropriate to ask, so I'm going to sustain that objection. You're welcome to try a different way or ask to break it up and ask it a different way.

Q. (BY MR. ANDERSON) Ms. Asbell, as -- is Little Elm's population greater than Lakewood Village's?

A. It is.

Q. And at least for the last 30 years, has Little Elm's population always been greater than Lakewood Village's?

A. I believe so.

Q. And what services would Lakewood Village supply to Mr. Bizios' property?

A.    Building department services.

Q.    Other than the dispute that we have today, are there any services that Lakewood Village would provide?

A.    No.  He's not in the corporate limits.

Q.    So the city is not going to provide him fire protection services?

A.    He doesn't pay taxes that cover that service.

Q.    And he's not going to be provided police service?

A.    Correct.  Again, he doesn't pay taxes that cover that.

Q.    And the city doesn't provide water to this area, does it?

A.    No, it does not.

Q.    Is water provided by Little Elm?

A.    It is.

Q.    And does it provide sewer service?

A.    No.

Q.    And so in the Town's brief that it filed last night, it says the Town's current population is approximately 559.  I think you said it was approximately 620?

A.    Correct.

Q.    And so which of those is correct?

A.    I'm going to assume it's somewhere between --

it's a moving number at times.

Q.   Okay.

THE COURT:  That's 10 percent of the population that changed overnight.  Not a lot of towns can say that.

MR. ANDERSON:  It's a fast growing area of the county, Judge.

Q.   (BY MR. ANDERSON) And in the brief it says, based on development within the Town's limit, it is anticipated that the Town's residency will double in the next 10 years.  Do you agree with that statement?

A.   Yes.

Q.   And then it said, the Town would then have the statutory authority to annex an area without consent of resident when it provides water or service to the area.  But it doesn't provide water service, does it?

A.   Not currently.

Q.   Well, that's -- that's what I'm asking.  Does it provide water service?

A.   No, sir, not currently.

Q.   Does it provide sewer service?

A.   No.

Q.   And does it even have a sewer system?

A.   Of course we do.

Q.   Okay.  And is the certificate of convenience a

necessity by the state for this area that is included within Lakewood Village's CCA?

A. No, not currently.

Q. So legally, you don't have the authority to extend water and sewer to this area, correct?

A. Not currently.

Q. And as a result of that, that provision in the local Government Code that's cited by -- in the brief 43.0033 states that when a Town has a population of a thousand, it can annex it if it provides water or sewer to the area, correct?

A. Correct.

Q. And y'all provide neither, correct?

A. I'm sorry, I didn't hear you.

Q. You provide neither service, water or sewer?

A. Not to date, correct.

Q. And it also says that if that happens, that after a year, the residents could vote to disannex if they wanted to, correct?

A. I'm sorry, I don't, off the top of my head, know that part of the statute.

THE COURT: Is it disannex or de-annex?

MR. ANDERSON: I think they're the same things, Judge.

THE COURT: Un-annexed?

MR. ANDERSON: I don't know that one.

THE COURT: How many prefixes are proper under the English language?

Q. (BY MR. ANDERSON) And does the Town maintain the roads within the subdivision?

A. The Sunrise Bay subdivision?

Q. Correct.

A. No.

Q. Those roads are maintained either by the county if it's in the ETJ, or by Little Elm if it's within their city limits?

A. Correct.

THE COURT: And I'm going to actually ask a serious question. What if it's outside the city limits of Little Elm but within their ETJ?

THE WITNESS: The county would cover them.

MR. ANDERSON: The county would do it. Unless the city decides for whatever reason out of the goodness of their heart that they'll go ahead and maintain them, it would be county?

THE COURT: And this is kind of getting to a question I had during opening arguments while I was looking at the maps. There are places where Little Elm's ETJ and Lakewood Village's ETJ actually overlap; is that correct?

THE WITNESS: There's no overlap. There are some properties where the backyards of some properties are in the Little Elm ETJ and the front portion of the property is in the Lakewood Village ETJ.

THE COURT: So in the event that the provisions adopted by Little Elm -- in that kind of example, the provisions adopted by Little Elm are contrary to the provisions adopted by Lakewood Village, who prevails?

THE WITNESS: It would depend on where the majority of the structure would lie within the property.

THE COURT: Let's just assume you've got a house that's fifty-fifty. It's a mess, isn't it?

THE WITNESS: That would be up to you then, I guess.

THE COURT: I don't like that answer.

All right. Sometimes devil's advocate is fun, but go ahead.

Q. (BY MR. ANDERSON) The plat for Sunrise Bay is, I think, Exhibit 7. And you agree that plat was approved by both Little Elm and by Denton County, correct?

A. Correct.

Q. So that would be consistent with the statutory language that for a tract located in the ETJ of more

than one municipality, the authority responsible for approving the plat is the municipality of the largest population.  And so that would be -- Little Elm has a larger population than Lakewood Village?

THE COURT:  Hold on.

MS. DeCURTIS:  Objection, Your Honor.  I think this is delving a little bit more into the legal conclusions than what she's qualified to testify to, again.

THE COURT:  The question is multifarious.  And there are parts of it that may be properly objectionable and parts that are not, so I'm going to again ask you to back up and ask a single question at a time so that I know which question I may be sustaining or overruling an objection to.

THE WITNESS:  Am I waiting to answer?

THE COURT:  If you'll just wait for another question.  I've sustained the objection on different grounds and redirected counsel to ask a single question.

Q.   (BY MR. ANDERSON) You would agree with me that in 1995, Little Elm's population was greater than Lakewood Village, correct?

A.   I believe it was.

Q.   And so do you have any reason to dispute that

the plat, which was in Exhibit 7, was not validly approved and recorded?

MS. DeCURTIS:  Objection, Your Honor.  I think that the witness has no foundation for this question.

THE COURT:  Overruled.  It's --

MS. DeCURTIS:  She lacks personal knowledge and it requires some sort of legal interpretation of whether or not the plat is valid.

THE COURT:  Overruled.  To the extent that the door's at least been opened to this subject matter by the direct testimony, I'm going to permit the question.

Do you remember the question?

THE WITNESS:  Can you restate, please?

THE COURT:  And so do you have any reason to dispute that the plat which was in Exhibit 7 was not validly approved and recorded?

THE WITNESS:  My answer to that is I don't know.

THE COURT:  Please ask your next question.

Q.   (BY MR. ANDERSON) And what would be the building permit fee that the city would charge for Mr. Bizios' house?

A.   I don't remember the exact number.  I believe

it's $14,646.

Q.   And that's based upon a calculation of $2 per square foot times the amount of square feet in the house exclusive of the garage and porch?

MS. DeCURTIS:  Your Honor, I'm going to object as to relevance to the temporary injunction hearing that we're having today.  He's going towards the merits of his unconstitutionality claim.  As we talked about in opening statements, we were objecting to the relevancy of that line of questioning.

THE COURT:  What is the relevance of --

MR. ANDERSON:  I think they opened the door, Judge.  They said that the reason that they're doing this is because of all of these, you know, kind of public health and safety reasons, and we want these houses to be similar to the houses that we have within our jurisdiction, and it's -- the relevance is that we believe and will argue that this is basically just a money grab by the Town.  It really has nothing to do with those reasons.

MS. DeCURTIS:  That is not relevant --

THE COURT:  Hold on.  The objection is sustained.  And, Counsel, especially because we do have some time constraints we need to operate with under, I'm going to advise you of a local rule that a lot of

attorneys are not familiar with, and that is that attorneys are not permitted to provide argument on objections, only to state a legal objection, and they're not permitted to respond to legal objections unless the Court invites it.  Believe it or not, that's actually in our local rules approved by the Supreme Court, and I've found that sometimes that's a good rule to enforce just to get things moving along.  If I think I'm not sure of what a proper ruling should be to an objection, I'll invite response.  And if I'm sure that I grasp the objection, I would rather just rule and move on.

MS. DeCURTIS:  Thank you.

THE COURT:  Please ask your next question.

Q.   (BY MR. ANDERSON) With regards to the retaining wall issue, if you could look at Exhibit 33.

THE COURT:  Are we talking about in your exhibits?

MR. ANDERSON:  Stipulation.  I don't think I have exhibits other than the stipulated exhibits.

THE COURT:  I just want to make sure I have the right folder in front of me.

Q.   (BY MR. ANDERSON) Have you seen this document before?

A.   I have.

Q.   Do you understand that the retaining wall, that

approval goes through the department of the army -- that the department of the army has to approve the retaining wall?

A.   Yes.

Q.   And as a matter of fact, that anything that happens within the flowage easement, that's regulated by the corps, correct?

A.   Yes, it is.

Q.   And it actually says in the second paragraph on the second page, that the flowage easement grants to the United States the right of prior approval for any structure to be located within the easement area, which area is under the administrative control of the Fort Worth District Corps of Engineers.  Do you see that?

A.   I do see that.

Q.   And so you would agree with me that the department of the army which has jurisdiction over the flowage easement and what can go in the flowage easement has approved the retaining wall, correct?

A.   I'm sorry.  Ask the question again.

Q.   Sure.  That the retaining wall, which has been built within the flowage easement, has been approved by the department of the army which has jurisdiction, correct?

A.   I do see that they have approved it.

Q.   And if you could look at page -- Exhibit 35. That's the application for development permit approved by Denton County, correct?

A.   Yes.

Q.   And it's been signed and approved by the Denton County Planning Department?

A.   Yes.

Q.   And my copy, I don't think -- do you have a good copy that has the inspections on the lower left-hand corner?

MS. DeCURTIS:  No.

MR. ANDERSON:  All right.

Q.   (BY MR. ANDERSON) You understand that the county requires inspections of the house construction?

A.   I know they require three inspections.

Q.   Okay.

MR. ANDERSON:  Judge, we'll need -- I think we're in agreement that the bottom left-hand corner where there's some blurred printing is actually where those three are listed so we need to find a better copy or else we'll --

THE COURT:  Are you talking about on the first page --

MR. ANDERSON:  Yes, Your Honor.

THE COURT:  -- of Exhibit 35?

MR. ANDERSON:  It has the colors and it says read A, certificate required.  But --

THE COURT:  Yeah.  The black part I can see some smudges, but I certainly can't make out what that text is if that's what you're referring to.

Q.   (BY MR. ANDERSON) But you would agree that the county does have a process for requiring inspections for certain stages of construction, correct?

A.   The county does have a process.

Q.   And do you have any firsthand knowledge the house is not being constructed according to uniform building codes?

A.   That's not my area.  I'm sorry.

Q.   When you were talking about the form boards, the elevation, is that the same elevation that the parties have agreed to in the TRO?

A.   540?  I'm sorry, what are you asking --

Q.   I think so.  Is that --

A.   We agreed in the TRO -- yes, I believe we agreed to 540.

Q.   Okay.  And so the agreement is acceptable to the Town, correct, in terms of the elevation that the structure's built to?

A.   Compliance with the 540, yes.

Q.   Okay.  So the parties are in agreement on that,

right?

A.   Yes.

Q.   And would you agree that if Lakewood Village lacks the authority to require a building permit on Mr. Bizios' property, that he would have the right to go ahead and build his house without having Lakewood Village oversight?

MS. DeCURTIS:  Objection, Your Honor. That's sort of a confusing question.

THE COURT:  To you or to me or to her?

MS. DeCURTIS:  I think to anybody.  It's very vague.

THE COURT:  I'm going to overrule the objection.

You can answer it.

THE WITNESS:  Honestly, I was going to ask him to restate it because I didn't understand what he was asking.  I'm sorry.

THE COURT:  Sometimes whether an objection is sustained or overruled, it's effective.  You can take the witness' answer as you get it.

THE WITNESS:  It is the truth.  I was going to ask again.

THE COURT:  I'm not suggesting there's gamesmanship going on.

Q.    (BY MR. ANDERSON) Let me kind of give you an example.

A.    Okay.

Q.    If Lakewood Village does not have the necessary legal authority to regulate the construction of Mr. Bizios' house, would you agree with me that Lakewood Village, you or the building officials, should not have posted the stop work orders on the property?

A.    I believe I understand your question and I agree.

Q.    And so if Mr. Bizios was proceeding with the building of his house on the basis of, you know, consultation with counsel and others that Lakewood Village did not have the legal authority to require compliance, then would you agree that he can continue to build his house?

A.    Absent a ruling --

MS. DeCURTIS:  Objection, Your Honor. That really calls for a legal conclusion, I think, and interpreting a court order.

THE COURT:  Sustained.

Please ask another question.

Q.    (BY MR. ANDERSON) Do you agree that all of the legal consents that are required for Mr. Bizios to build on his property, other than that dispute that we're here

today about, the applicability of Lakewood Village's building code, that he has obtained those necessary consents?

A. Short of the building permit from Lakewood Village, it appears he has received all of the required permits.

Q. And would you agree that the extension of the building code by the Town is based upon the state platting statute?

MS. DeCURTIS: Objection, Your Honor. I think that goes a little bit too far into the legal theory.

THE COURT: So what exactly is your objection?

MS. DeCURTIS: Legal opinion. Calls for a legal opinion. She has lack of personal knowledge of that issue.

THE COURT: Sustained.

MR. ANDERSON: Okay. Pass the witness, Judge.

THE COURT: We're going to go ahead and take a break there. Why don't y'all come on back at 20 till. That's 15 minutes from now. We'll resume at that point.

Ma'am, at that point if you'd like to just

come on up and have a seat, we'll pick up where we left off.

THE WITNESS:  Yes, sir.

(Recess taken)

THE COURT:  Back on the record.  It is -- defendant had passed the witness just before the break, so it's the plaintiff's turn.

Any redirect?

MS. DeCURTIS:  Yes, Your Honor.

THE COURT:  Go right ahead.

REDIRECT EXAMINATION

BY MS. DeCURTIS:

Q.  Ms. Asbell, I just have a few questions for you.  If you'll provide the sewer service currently to Sunrise Bay subdivision.

A.  They are on individual septic systems.

Q.  So no government agency currently provides sewer service to that particular area; is that correct?

A.  Correct.

Q.  And does the Town have a sewer infrastructure that can currently be extended to that area?

A.  Yes.

Q.  What about Little Elm?

A.  No.

Q.  So which entity out of Little Elm or Lakewood

Village would be more able to provide sewer to Sunrise Bay?

A.   Lakewood Village.

Q.   So in the future, it's possible that the Town actually could provide sewer services to the area?

A.   Easily.

Q.   So even if there was currently what's called a certificate of necessity, or CCN, with the City of Little Elm, they still wouldn't be able to provide the service, correct?

A.   Correct.

Q.   As part of the agreed temporary restraining order that we entered in this case, the Town agreed to perform inspections on the property to make sure the property was in initial compliance with some of the Town's building codes, correct?

A.   Yes.

Q.   Did the Town actually perform an inspection on the property?

A.   We have, yes.

Q.   When did you do that?

A.   That was performed today.

Q.   What type of inspection was that?

A.   A plumbing rough.

Q.   And did they pass that inspection?

A.    They did not.

Q.    Why did they not pass that inspection?

A.    They have two islands that are plumbed contrary to code there's a problem with the water service line, and their foam board survey was not on site as required.

Q.    So currently, it isn't constructed insofar as the Town's ordinances, is it?

A.    Correct.

Q.    Okay.  If you will turn to Exhibit No. 33.  Opposing counsel had asked you a question regarding the army corps of engineer easement and he had you look at some language -- I think -- I believe it was the second whereas.  If you go down to "provided however" to number one, could you tell the Court what that states?

A.    It states that all activities conducted on the premises shall comply with all applicable federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

Q.    So even if they -- even if the defendant had a permit from the army corps of engineers, that would not preclude the Town from having them comply with the town's ordinances, correct?

A.    Correct.

MS. DeCURTIS:  No further questions, Your Honor.

THE COURT:  Mr. Anderson?

RECROSS-EXAMINATION

BY MR. ANDERSON:

Q.   Does the retaining wall in the flowage easement comply with the Town's ordinances?

A.   No, it was not permitted.

Q.   Substantively?

A.   I don't know.

Q.   Okay.  And the certificate of convenience and necessity that your counsel asked you about is basically a permit that's issued by the state that indicates which entity can provide water or sewer service within that area; is that correct?

A.   That's correct.

Q.   And Little Elm has the CCN for Mr. Bizios' property, correct?

A.   I am not sure who has the sewer.  I believe the water is -- is there.

Q.   Okay.  Currently, Lakewood Village does not have the right to extend sewer into this area, correct?

A.   We do not have a CCN for that area.

Q.   And of the houses that were built in Sunrise Bay division before the city adopted their code extending to the ETJ, are you aware of any of those houses having significant construction defects?

MS. DeCURTIS:  Objection, Your Honor. He's always already called into question the relevancy. Any type of testimony -- he's opening the door to what we've already discussed regarding the houses that -- or the permits.  So if he's going to be -- if you're going to allow that testimony, we request that our testimony regarding the other permits be brought in.

THE COURT:  I have no idea what your objection is.

MS. DeCURTIS:  My objection is relevance, or we request that since he's opened the door, that we be allowed to reintroduce the permits that you had originally sustained his objection to.

THE COURT:  The objection as to relevance is sustained.

Please ask your next question.

Q.  (BY MR. ANDERSON) Does the city enforce any other ordinances in their ETJ, other than its building code?

A.  All related codes to building subdivision --

Q.  Including mechanical, electrical?

A.  All of those.

Q.  Okay.  But other than those codes, does it apply any other ordinances?

A.  The subdivision and platting.

Q.   So as to Sunrise Bay, which has already been platted by Little Elm and Denton County, the only code that would be applied in their ETJ would be the building code; is that correct?

A.   The building and related ordinances, yes.

Q.   Right.

MR. ANDERSON:  Pass the witness, Judge.

MS. DeCURTIS:  No further questions, Judge.

THE COURT:  Ma'am, you can have a seat with your attorney.

THE WITNESS:  Thank you, sir.

THE COURT:  Attorneys, sorry.

Please call your next witness.

MS. DeCURTIS:  Your Honor, as a housekeeping matter, we would like to introduce one more exhibit to the Court.  We had actually discussed it before, and this one is a slight variation of a Denton County Commissioners order.  The resolution is actually stipulated in the record, but the notice is a different notice that the county has certified.  And it's a public -- certified document.

THE COURT:  I'm not following you.

MS. DeCURTIS:  We would offer this document at this time as Petitioner's Exhibit 1.

THE COURT: Well, I've already got an Exhibit 1. Is it a duplicate? I'm just confused. So rather than --

MS. DeCURTIS: It should have been tagged to the end, Your Honor, but this is Petitioner's Exhibit 1.

THE COURT: Okay.

MS. DeCURTIS: In particular, is what the stamp says.

If I could approach, Judge?

THE COURT: So as opposed to the stipulated exhibits, this is distinguished as Petitioner's Exhibit 1?

MS. DeCURTIS: That's correct.

THE COURT: And did I understand that this is a duplicate of one of the other exhibits that's already been admitted, with a slight variation?

MS. DeCURTIS: Yes.

THE COURT: What's the variation?

MR. MESSER: If I may, Your Honor. Deals with the third paragraph on the form.

MR. ANDERSON: Which exhibit are y'all talking about?

MS. DeCURTIS: No. 18.

THE COURT: Okay. So it is not an exact

duplicate of Exhibit 18, but substantially similar with a slight variation and your --

MR. MESSER:  Yes.

THE COURT:  -- representing it's a certified copy of a public record; is that correct?

MS. DeCURTIS:  Yes.

THE COURT:  Any objection?

MR. ANDERSON:  I don't have any objection. I'm just confused because Exhibit 18 is stipulated to as well.  So which one is the accurate one?

MR. MESSER:  We think this one is.

MR. ANDERSON:  Okay.

THE COURT:  Okay.  There being no objection, Petitioner's Exhibit 1 is admitted, but I'll note that while I don't care if an attorney is confused, I do care if I'm confused and I am confused likewise as to why we're getting a duplicate, so you may point out the differences.

MR. ANDERSON:  Yeah, we don't object, Judge.

MS. DeCURTIS:  If I may I approach, I can point out the differences.

THE COURT:  If you need to come up, you're welcome to, Mr. Anderson.

MS. DeCURTIS:  The county certified this

copy.

THE COURT: Oh, that one's colored, this is black and white?

MS. DeCURTIS: Well, that's not the only difference. If you look here, regarding the exact issue that we're here on today --

THE COURT: Oh, there's a paragraph that's omitted here?

MS. DeCURTIS: Correct. And so we went back to the county and we said, you know, here's the other language. They certified this one. They purposefully removed it from that document, Your Honor, in my opinion.

THE COURT: They, the county?

MS. DeCURTIS: Yes.

THE COURT: Okay. Well, they're both admitted, and I, at least, now understand what the difference is and --

MR. ANDERSON: Is that one certified by Bennett Howell as well, Judge? It would be on the first page.

THE COURT: Yes.

MR. ANDERSON: Okay.

MS. DeCURTIS: So it's this paragraph right here, Your Honor. You can read it, and I'll hand

it to you and you can read it.

THE COURT: Okay.

MS. DeCURTIS: And at this time, the Town of Lakewood Village would call Steve Freeman to the stand.

THE COURT: And just to further clarify for the record, Petitioner's Exhibit 1 will be made part of the court reporter's record.

MS. DeCURTIS: Yes, Your Honor.

THE COURT: In contrast to all of the other stipulated exhibits which are before the Court for evidentiary purposes but will remain part of the clerk's record since they've been filed.

MS. DeCURTIS: That's correct.

THE COURT: Okay. Go right ahead.

Sir, I'll just remind you, you've previously been sworn, and you are still under oath. If you'll make sure you speak right into that microphone, please, and try to follow the instructions I gave you earlier.

STEVE FREEMAN, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. DeCURTIS:

Q. Would you state your full name for the record,

sir?

A.   Steve Freeman.

Q.   How are you currently employed?

A.   I'm the building official for Lakewood Village.

Q.   And how long have you been the building official?

A.   Since March of 2009.

Q.   And do you also hold another position?

A.   Yes.  I'm the chief building inspector in Prosper, Texas.

Q.   And how long have you been there?

A.   10 years this coming July.

Q.   Before you were at Prosper, what did you do?

A.   I was building inspector in Flower Mound.

Q.   For how long?

A.   Six years.

Q.   And have you written any publications relevant to your occupation?

A.   Yes.  I've written seven national publications, comprehensive study guides to help others become certified in building, plumbing, electrical, mechanical, and energy.

Q.   And do you have any certifications relevant to your occupation?

A.   Yes, I do.  I'm a combination residential

building inspector covering building, mechanical, energy, electrical, and plumbing.  Also state licensed plumbing inspector, and also certified in commercial plumbing and building.

Q.   And are all of those certifications current?

A.   Yes, they are.

Q.   Are you familiar with the property located at 3950 and 3960 Spinnaker Point Run?

A.   Yes, I am.

Q.   How are you familiar with it?

A.   I've been on site in the past.

Q.   When was the first time you were familiar with the property?

A.   I observed 3950 when I was inspecting the neighbor's property on remodel.

Q.   And was 3950 -- and when I refer to the property, I'm going to be referring to 3950 or 3960 Spinnaker Point run.

A.   Correct.

Q.   Was it a vacant lot at the time you --

A.   Yes, it was.

Q.   -- adjacent property?

         Just wait until I'm finished.

A.   Sorry.  Yes.

Q.   Is that in the Town of Lakewood Village?

A.    It's in the ETJ, extraterritorial jurisdiction area of Lakewood Village.

Q.    Thank you.  Do you know who owns this property?

A.    Mr. Harry Bizios.

Q.    And did you communicate with Mr. Bizios at all regarding this property?

A.    I've never talked to the man.

Q.    Who did you communicate with?

A.    I talked with Alan Hoffmann, who was the builder for Harry.

Q.    So he was the builder employed by Mr. Bizios to represent him in his construction, correct?

A.    Correct.

Q.    And a builder for that property actually filed plans with Town, didn't he?

A.    That's correct.

Q.    And do you know when those were filed?

A.    About late January.

Q.    Okay.  I'm going to show you this demonstrative document?  Can you just tell the Court what these are?

MS. DeCURTIS:  And, Your Honor, if I could just move it closer?

THE COURT:  Go ahead.

Mr. Anderson, you can move around the courtroom, if you need to, to observe the references to

this demonstrative aid.

MR. ANDERSON:  Thank you, Your Honor.

Q.  (BY MS. DeCURTIS) Could you tell the Court what these are?

A.  Those are the set of plans that we received for the house that they were going to build.

Q.  And so you actually reviewed these plans, correct?

A.  Yes, I did.

Q.  And you made notations or comments to the plans?

A.  Several notations.

Q.  And do these particular plans here have your notations on them?

A.  Yes.

Q.  And are they handwritten and stamped?

A.  There are stamps and handwritten notes, yes.

Q.  Okay.  And here it says, general frame notes. Who is responsible for writing those notes?

A.  The architect designed this house.

Q.  And if you look at number one, it says, "The structure was designed in accordance to the International Building Code 2003 Edition," does it not?

A.  Yes, it does.

Q.  Okay.  And if you look over here, is this your

stamp?

A. Yes. We use stamps to show our current codes that we have adopted and inspect under.

Q. And it says, "All inspectors shall comply with 2006 IRC requirements and documented ordinances," does it not?

A. That's correct.

Q. Okay. And do you know if they ever agreed to abide by the 2006 IRC International Building Code in this case?

A. I have no response on that.

Q. Okay. And then there's another stamp up here saying, the stairs shall comply with IRC Section R311.5, doesn't it?

A. Correct.

Q. And what exactly does that require?

A. That's to ensure that the stairs are built correctly so nobody would trip and fall down.

Q. So that's a health and safety issue?

A. Sure.

Q. Turning to the next page, this is a copy of the site plan, correct?

A. Yes, it is.

Q. Do you know what this line is here?

A. That would be a floodplain, floodplain line

where it goes up -- that's next to Lewisville Lake, so they show a 537 mark on all the lakefront properties.

Q. And who designates that as a 537 mark?

A. The Corps of Engineers.

Q. So the Army Corps of Engineers has an interest in this property as well?

A. Yes, they do.

Q. And what's the purpose of that?

A. To keep people from building in an area where the house would be flooded.

Q. And in this case, this particular structure is actually touching or built right up next to the 537 MSL, is it not?

A. Yes, it is.

Q. In at least three points, right?

A. Yes.

Q. Okay. Do you know why the Army Corps of Engineers chooses the 537 MSL?

A. It's from their 100-year flood history.

Q. So it's a method of protection, right?

A. Correct.

Q. And the Town has its own ordinances concerning the finished floor elevation on the house?

A. That's correct.

Q. And what is that elevation as required by the

Town?

A.   The Town requires 540 feet above sea level.

Q.   Do you happen to know the ordinance that is?

A.   That would be under our ordinance 1307.

Q.   Okay.  And this particular design shows some issues if you're that close to the 537 line, does it not?

A.   Yes.  There could be major issues.

Q.   So if the ordinance says that it needs to be --

THE REPORTER:  I can't hear you.

Q.   (BY MS. DeCURTIS) If the ordinance says that it's supposed to be at 540 MSL, and they're up against a 537 MSL, what do they have to do?

A.   You would have to build a retaining wall and build the pad up.

Q.   But they've already built a retaining wall on this property, correct?

A.   There is a retaining wall on the property.

Q.   And do you know where that is?

A.   Along the line shown where the -- where the house and back down below there's another -- there's a retaining wall down in the floodplain area.

Q.   And that's by the lakefront, is it not?

A.   Yes, yes.

Q.   And, in fact, the retaining wall was built

wholly within the Army Corps of Engineers easement, was it not?

A.    That's correct.

Q.    So if the Town ordinance requires a 540 MSL, that's extra protection, correct?

A.    Yes, it is.

Q.    And as far as the retaining wall is concerned, we require a permit for that, by the Town ordinance, do we not?

A.    We do require permits for retaining wall.

Q.    To your knowledge, did they ever apply for a permit for that retaining wall that's already built?

A.    No.

Q.    Okay.  As part of the permitting on the retaining wall, you would have required an engineering study, wouldn't you have?

A.    Anything over 24 inches in height requires an engineer design.

Q.    And when an engineer reviews a retaining wall, what are they looking for?

A.    To keep it from having lateral movement for blowouts and -- where water would come into it to keep it in place.

Q.    And does that also protect the adjacent property as well?

A.    Sure.

Q.    How so?

A.    To keep from washouts going onto the property, or failure of the wall.

Q.    Okay.  Now, here it looks like we have the plan overview, correct?

A.    Correct.

Q.    And this is the first floor that has to be on the 540 MSL; is that right?

A.    Yes.

Q.    And this is a copy of the second floor plans?

A.    That's correct.

Q.    Okay.  On the first floor plans, there's some handwritten notations.  Are these yours?

A.    Yes, they are.

Q.    Okay.  The first one says, "5/8-inch rock walls per Town ordinance."  Can you explain to the Court what that means?

A.    Under our 11-16 ordinance, we require 5/8-inch Sheetrock on all walls and garages which keeps fire hazard to a lower rate.

Q.    And that's a more specific requirement than the International Residential --

A.    Yeah, it's stricter.

Q.    It's a Town amendment, isn't it?

A.    Yes, it is.

Q.    And it's a safety hazard if it's not done correctly, correct?

A.    Correct.

Q.    Okay.  Here we have portal framed header under Section 602.10.  Would you tell the Court what that is?

A.    The weakest point in the house is your garage door openings, and so what we do is we want to help the builder build it to the specifications of section 602.10.  Portal framing goes all the way across the top, instead of just stopping at the openings for the headers.

Q.    And that's a safety issue, isn't it?

A.    Yes, it is.

Q.    And it actually goes to the structural integrity, doesn't it?

A.    Yes, it does.

Q.    And here you have a comment, "No studor vents per Town ordinance."  Could you explain to the Court what that means?

THE COURT:  First of all, I'm going to back you up.  I'm not sure what we're looking at.  Is this a blow-up of one of the exhibits that's been admitted?

MS. DeCURTIS:  That's correct, Your Honor.

MR. ANDERSON: Exhibit 8.

THE COURT: It's never been referenced so that the record is clear, nor so that I'm clear as to what we're looking at. In other words, the last five, 10 minutes of testimony is completely out of context with respect to what you're asking these questions in reference to.

MS. DeCURTIS: These go straight to Exhibit list No. 8, Your Honor, and these are all on that particular exhibit. This building plan is page 3 of Exhibit 8.

THE COURT: Okay.

MS. DeCURTIS: I'm sorry.

THE COURT: Thank you.

Q. (BY MS. DeCURTIS) And we were just talking about studor vents. Could you tell the Court what that is?

A. Actually, that's a layman's term. The codes call it an air admittance device. And those have a mechanical piece, instead of venting out of the house through the roof, it vents into the kitchen area and eventually when you have a moving part, it will fail. So we don't want to have those installed so no sewer gas can go into the living area of the house.

Q. So you actually require them to be vented

outside --

A.   Yes.

Q.   -- is that right?  Okay.  And that's a local amendment, correct, to the --

A.   That's under 11-16 amendments.

Q.   Okay.  And Lakewood Village actually performed an inspection on Mr. Bizios' property pursuant to the extended temporary restraining order, didn't it?

A.   Yes.

Q.   When did that occur?

A.   Earlier today.

Q.   And do you know what inspection that was?

A.   That was plumbing rough and water service inspection.

Q.   And did they pass?

A.   No, they did not.

Q.   Why did they not pass?

A.   There was no form board survey on site, there were two studor vent air admittance vents installed, and no copper was installed into the forms.  That's another part of the amendments where we require 20-foot of copper so we can have a copper riser coming into the house, and it was all PVC.

Q.   So at this time based on the plumbing rough in, they are actually constructing studor vents at this

time?

A.   That's correct.

Q.   And that's not in compliance with the Town ordinance?

A.   No, ma'am.

Q.   And you believe that that poses a safety issue?

A.   Yes, ma'am.

Q.   Okay.  Here you have a comment that says 'tempered glass' with an arrow.  Can you explain to the Court what that is?

A.   Tempered glass is installed in hazardous locations to keep, mostly small kids -- if they're playing around and fall into the glass.  It breaks up into really, really small pieces, and they don't get cut badly.

THE COURT:  Lots of little cuts instead of big ones.

THE WITNESS:  Yeah.  Lots of little bitty ones instead of a big gash.  That's exactly what it is?

THE COURT:  Reasonable minds can differ as to which is worse, but I understand what you're saying.

Q.   (BY MS. DeCURTIS) Is that a requirement from the IRC?

A.   Yes, it is.

Q.   And do you know what section that would be?

A. I believe that's Section 308.

Q. Okay. And let's see, here you have a comment, that says -- and, actually, there's two of them in here, "Strap top plates were not overlapped 24-inches." Could you tell the Court what that means?

A. What that is is on your top plates on any single-family dwelling, such as this, they require a 24-inch overlap. And when you get in to cut corners where it goes into angles, they're not able to do that. So what they do is they strap the plates together to give it structural integrity so they can't pull apart.

Q. And that's a requirement of the IRC?

A. Yes, it is.

Q. And over here there are also some additional notes. Were those also written by the architect?

A. Yes.

Q. And you circled these. Is this your circle?

A. Yes.

Q. And why did you circle those?

A. Just to note what they're installing, two-by-four walls, ICF walls, they have all kinds of different things, and I felt it worthy of circling it so when we go out into the field to inspect, we're making sure and knowing what we're looking at.

Q. Now, one of the items that you circled, it

says, "Minimum finished floor elevation will be at least two feet above minimum FEMA 100-year floodplain elevation or as noted on site," correct?

A.   That's correct.

Q.   So we've already established that the FEMA 100-year floodplain was 537 MSL, didn't we?

A.   Correct.

Q.   So two feet above that would be 539, correct?

A.   That's correct.

Q.   And that would not equal 540 as required by the Town of Lakewood Village, correct?

A.   That's correct, yes.

Q.   Okay.  And this particular plan document actually shows the square footage of this house, and it looks like it's almost 10,000 square feet, correct?

A.   That's correct.

Q.   And about 7,000 square feet of liveable space, correct?

A.   Yes, ma'am.

Q.   Okay.  Here we have a small comment regarding exhaust to outside required, and you have an arrow pointing to the laundry, do you not?

A.   Yes, I do.

Q.   And is that a requirement of the IRC?

A.   When looking at the plans and doing the plan

review, a laundry room without a window requires a fan to take out any of the moisture. So I noted it to make sure the builder was aware of it.

Q. And what happens if you don't do that?

A. You get black mold.

Q. And again, this is the first floor, so it has to be built at 540, correct?

A. Correct.

Q. I'm going to show you, again, the first floor plan and looks like it's the opposite side of the house. You have another notation here regarding the 5/8-inch Sheetrock. That's the same issue regarding the garage, correct?

A. Correct, correct.

Q. There's also a notation up at the top that says, "GFCI required"?

A. Yes. There's specific areas of any house that requires GFCI protection. That's beyond exteriors, in the garages, bathrooms, and in the kitchen area. So I was noting it, making sure that they were aware, and also per the inspections, to make sure we check that.

Q. Okay. And up here under the note, the architect actually put, "Comply with all state, county, and local building codes, ordinances and regulations pertaining to construction," didn't they?

A.    That's correct.

Q.    Okay.  We're going to look at the front elevation of these building plans.  Now, it looks like here you've written a notation, correct?

A.    That's correct.

Q.    And that says, "10 feet/two feet will require." Can you explain what that means?

A.    Chapter 10, on the chimneys, they want to make sure that the chimney is built high enough, that you would get correct draw.  And also the codes require the chimney where it terminates must be two foot above measured horizontally back to the roof line at 10 feet. In other words, they don't want it too short.  So I was just noting to make sure and check that.

Q.    What is the purpose of that rule?

A.    If you're burning wood you have to get it high enough so you're not popping sparks on top of the structure and to draw the combustion out of the chimney.

Q.    And so that poses a safety or danger of personal injury?

A.    It could.

Q.    Okay.  And that's an IRC requirement, isn't it?

A.    Yes.

Q.    Here you have annotation, "Four-foot brick inspection required."  Is that something the IRC

requires, or is that something the Town requires?

A.   The Town requires four-foot brick inspections.

Q.   So that's a specific local amendment, correct?

A.   Correct.

Q.   And what is the purpose of that?

A.   It's to make sure they clean out the bottom of -- behind the brick or behind the stone in order to let the water out of the bottom of the -- your exterior of your facade.

Q.   And does it check anything else regarding the brick while you're there?

A.   While we're checking the brick ties, they're required to be installed at 2.67 square feet, about that far apart.

Q.   And if it isn't constructed like that, what could happen?

A.   The wall could fall off and kill somebody.

Q.   And the county doesn't regulate these types of issues we discussed, does it?

A.   Not those kind of inspections.

Q.   Okay.  I'm going to show you the electrical plans, or what have been notated as electrical plans. You have some comments written on these.  And this comment appears to say, "CWG required Ufer or secondary grade required."  Could you explain to the Court what

that means?

A.   Yes.  On the NEC codes, they require two ways of grounding a house, and it's to keep people from being electrocuted.

Q.   When you say two ways, is CWG --

A.   CWG is called a cold water ground.  And in the field, most electricians will run from the panel box to a copper line to make sure if there's a short or anything, it goes down into the ground.  And a Ufer ground is, basically, a piece of rebar that's run into the foundation, 20-foot long, and they'll put the No. 4 AWG wiring, that's bear wire, which will go to the panel box.  Again, it's for protection of the occupants in the home.

Q.   So it's almost like a redundancy, isn't it?

A.   Yes.

Q.   And what is the purpose of that redundancy?

A.   To keep people from getting hurt or being electrocuted.

Q.   And the Town of Lakewood Village has adopted the National Electric Code, hasn't it?

A.   The 2005 Series, yes.

Q.   And they extended it to their ETJ, correct?

A.   Yes, they have.

Q.   Okay.  And without looking -- without the Town

looking for this particular grounding or making sure that it's there, there's no other oversight regarding electrical, is there?

A.    No.

Q.    The county doesn't do that, right?

A.    Not that I know of.

Q.    Okay.  Here you have notated, "Arc fault required in all bedrooms"?

A.    Yes.

Q.    And that's per NEC, which is the National Electric Code, correct?

A.    It's actually the IRC and the NEC, both codes.

Q.    And could you tell the Court what that is.

A.    What it is, the third major reason for fires in America start in the bedrooms, and they're started from arc faults.  That's basically from people making the bed and jamming it into the wall, and it loosens up the outlet.  And after time, it starts arcing and that causes fires.  So they put them in all the bedrooms.

Q.    And so this is an added protection --

A.    That's correct.

Q.    -- from electrocution, basically, and fire?

A.    Mostly from fire.

Q.    Okay.  I'm going to show you the second electrical plan.  And here you have written down at the

bottom, "No. 12 AWG wiring required per Town ordinance," correct?

A.   That's correct.

Q.   Now, this isn't an IRC requirement, right?

A.   That's a Town ordinance.

Q.   Do you know what the IRC requires?

A.   In most places they use 14-gauge wiring, and that is allowed per the -- it's allowed per the IRC, but by our local amendment, we just have everybody put in straight No. 12 AWG wiring.

Q.   Why is there a difference?

A.   You can actually put more outlets on a branch circuit.  It's a heavier wire gauge.

Q.   So it's a stricter requirement than is --

A.   It is stricter.

Q.   -- required by the electrical code, right?

A.   Yes.

Q.   And here -- let's go to the next one.

I'm going to show you the foundation. Here you have noted, "Anchors are required to be installed at foundation inspection per Town ordinances." Could you explain to the Court what that is?

A.   What we do is when we go out for a foundation inspection, we look to make sure the anchor bolts are put in place before we allow them to pour so we know

that they're put in correctly.  We can see them easier.

Q.    And what are the purposes of anchor bolts?

A.    To hold your structure to your foundation.

Q.    And this particular foundation plan is not stamped by a professional engineer, is it?

A.    No, it's not.

Q.    And the Town would require a professional engineer certification before they would pass on a foundation, right?

A.    Yes.

Q.    I just have a couple more questions, and then we'll move on.

THE COURT:  While you're flipping, let me just take a minute to let y'all know in terms of relativity the time that you've used today.  Plaintiff has used about 95 minutes on the record relative to 40 minutes by the defendant.

And I would note that it's almost 4:30 in the afternoon, closing in on the end of the ordinary business day.  Given that this is the second of five witnesses that were sworn, I'm increasingly anxious about the realities of finishing this case today.  And looking ahead at the docket for tomorrow and Thursday, with Friday being a holiday in which the courthouse is closed, having a hearing on Monday that's ordered by the

Court of Appeals, and then a jury trial for someone that has been in jail for a long time and will certainly take priority facing potential life in prison, there's no time in the next week that I can foresee being able to get back to this. And so I hope that you will take this information with the same level of concern that I have in letting you know where we stand.

MS. DeCURTIS: Well, I think we're finished with these. I think you get the point.

THE COURT: I'm absolutely not trying to rush anybody or cut anything off.

MS. DeCURTIS: We were at the end.

THE COURT: It's just -- it is what it is and --

Q. (BY MS. DeCURTIS) So were these plans ever approved by you?

A. They were approved to a point to where we would set up a -- what we call a pre-con meeting, where I have the builder come in, we go over the red lines, anything else that needs to be brought in so we can check them off. And then they pick up the permit, pay for it, and we start the process of building the house.

Q. And was a pre-con meeting scheduled?

A. It was scheduled, but then it was canceled by Mr. Hoffmann.

Q.    Do you know why?

A.    He said he had other things he had to be at.

Q.    Did the Town ask you to inspect the property after this?

A.    They asked me to go out and inspect the property to see if any work had been performed.

Q.    And what date did you do that?

A.    I went out on March 13th -- or February 13th, excuse me.

Q.    March 13th sound familiar?

A.    Yes.

Q.    March 13th of this year?  You went out on March 13th of this year, correct?

A.    March 13th, yes.

Q.    Okay.  And what did you find when you went out there?

A.    I found cement trucks on site, workers on site, pier machines were on site and not working, and the piers had been poured already.  They drilled in and put piers in to hold up the foundation.

Q.    And form boards were in place, were they not?

A.    Yes, they were.

Q.    And the Town requires the permit to be approved before those form boards are placed, correct?

A.    Before any work's performed, yes.

Q.   When you saw the work on the property, what did you do?

A.   I told Linda Asbell to bring a stop work order and place the stop work order on site.

Q.   And you actually were there when she placed the stop work order?

A.   Yes, I --

Q.   Or you placed the stop work order?

A.   I put it up on the 13th.

Q.   And do you know what happened with that stop work order?

A.   On the 14th I got a call from Linda saying the stop work order was gone, and I gave her authority through my position to repost it.

Q.   And to your knowledge, the Town had no notice of the plat that was filed with Denton County, did it?

A.   No.

Q.   The Town never received any copy of any survey for this property, did it?

A.   No.

THE COURT:  Counsel, I'm sorry, I'm going to interrupt you real quick.  I'm going to entertain or request some argument.  Why does that matter?  If it is undisputed that the plat was, in fact, properly filed with the clerk's office in 1995?  What's the relevance

of whether Lakewood Village happened to figure that out, whether by being informed of that by the defendant or through their own due diligence?  I may not be following that line of questioning or that point.

MR. MESSER:  If I may, Your Honor.  It deals with an application of the vested rights statute, which basically says if a regulatory agency, of which Lakewood Village is, doesn't have fair notice of a project, such as this, at the time of filing, vested rights statute doesn't apply to it, and it can apply its current regulation when a permit is filed recently.

THE COURT:  But is the act of filing with the county clerk's office where property records are supposed to be filed, is that not, as a matter of law, fair notice?

MR. MESSER:  I wouldn't agree with that.

THE COURT:  Why not?

MR. MESSER:  Because I don't think it is. I don't think this statute -- it talks about -- talks about that.  If I might find it real quick, Your Honor.

THE COURT:  Isn't that the entire purpose behind having real property records filed with the clerk's office, because there's potentially no other realistic way of giving the entire world notice of the claimed real property rights that are reflected in that

document filed with the clerk's office.

MR. MESSER: Give me one second, Your Honor. If you look at 245.002.(a-1), that's the section that we're dealing with in the vested rights statute.

THE COURT: This is in the Local Government Code?

MR. MESSER: In the Local Government Code. It's also in my temporary injunction notebook, Tab 11.

THE COURT: Thank you. Give me just a second. 245.002(a-1), you've got it highlighted.

MR. MESSER: It reads, "Rights to which a permit applicant is entitled under this chapter accrue," so that's the vesting part of it. When? "On the filing of an original application or plan for development or plat application," which this one was filed in 1995, would "give the regulatory agent," which is Lakewood Village, "fair notice of the project and the nature of the permit sought."

What we believe, Your Honor, is that we didn't know about this plat until this lawsuit.

THE COURT: Uh-huh.

MR. MESSER: And that's our position. We don't think simple filing of it and never presenting it to Lakewood Village is fair notice. And there's a case that deals with this that says -- it's where a plat was

filed with the county and not a city, and the Austin Court of Appeals -- I think it's the Shumaker case that's in the notebook, it's Tab 14 in the temporary injunction notebook. Same exact issue happened, and they said, nope, you want to have vested rights to a particular regulatory agency, you've got to file it with that agency. If you don't, it's not binding. That's not fair notice.

THE COURT: In other words, what you're saying is that the defendant, in order to afford itself the advantage of the filing of that plat with the county in 1995 would have had to file that plat or give actual notice to Lakewood Village before undertaking the construction in this case?

MR. MESSER: Yes. And that same argument was made -- this same argument was made in that case. It says -- in that case the property owner argues, on Tab 14 the headnote 2, talks about that section "should be construed to mean that all jurisdictions' land development laws are locked in for a project once an application is filed with" -- and it's italicized -- "any interested regulatory agency."

And they go on to say in the plain language of the statute, "the City must consider the application for a City permit solely on the basis of the

requirements in effect at the time the application to the City" -- that's italicized -- "was filed."

THE COURT: Okay --

MR. MESSER: So we're going to apply our rules under the vested rights statute by the rules we have in place now, and we didn't have fair notice of this since 1995. That's how we read that.

THE COURT: Okay. And in fairness, and I apologize for kind of derailing you in the middle of examination, but I'll back up and refresh your memory as to where you left off. But I wouldn't be interrupting if I didn't think this was significant, at least, at this time.

Counsel, do you have a reply that you would like to offer now while I'm still on the subject?

MR. ANDERSON: Sure, Judge. I just wonder if everybody in the Town just fell asleep for about 25 years since every one of those tracts that's on the road is on a platted lot, as shown in the appraisal district records -- as a matter of fact, it's shown on their own maps.

You know, we've got Exhibit 4 that, basically, shows every lot within the subdivision, which is the city map. For them to say they didn't know it was platted -- the only way you can sell land, Judge,

for a house is to plat it. For them to say we didn't know it was platted, I'm trying not to allege a nefarious motive to that response, but that just defies credibility that they didn't know that the Sunrise Bay addition, which has been there for 25 years and has individual houses on individual lots, wasn't platted.

Now, if they didn't do the due diligence and go look at -- as a matter of fact, their own maps all show, basically, each one of those lots that are there. If they want to say, hey, we didn't know, you know, because we didn't see the plat, okay. But for them to say, we didn't know it was platted just defies credibility. Their own maps even show that. That's been Sunrise Bay addition, addition is a subdivided tract of land for 20, you know, something years.

THE COURT: So correct me if I'm oversimplifying your response, but essentially your response is hogwash?

MR. ANDERSON: It would be stronger if you were not in court, Your Honor.

MR. MESSER: I would love to hear why the Austin Court of Appeals --

MR. ANDERSON: They got it wrong --

MR. MESSER: -- in the Shumaker case because it's --

MR. ANDERSON: If we have more time, Judge, I'll be happy to do that, but I'll stick with hogwash for right now.

THE COURT: Okay. All right. I appreciate it, but that question's been nagging me. And then when you were on that subject in your questioning, I wanted to go ahead and interrupt and get an answer to that, at least as far as your perspectives.

When I interrupted, literally, the Town never received any copy of any survey for this property, did it? And the answer was no, and that's where I interrupted. Do you remember where you left off?

MS. DeCURTIS: Yes.

DIRECT EXAMINATION (CONTINUED)

BY MS. DeCURTIS:

Q. Neither the owner or the homebuilder has received a permit from the Town Town, correct?

A. No.

Q. And the work that the homebuilder has done required a permit, didn't it?

A. Yes.

Q. Is that a Lakewood Village ordinance?

A. Yes.

Q. And do you know which ordinance that is?

A. It's under 11-16.

Q.   In all, if you were not inspecting this property, no other government authority would be making sure there was not a substantial danger, as we've gone through and talked about today, correct?

A.   Correct.

MR. ANDERSON:  Objection, Your Honor. There's no foundation for that question because they've already indicated that the county requires inspections as well.

THE COURT:  Objection's overruled.  Goes to the weight, not the admissibility of the opinion.

Go ahead.

MS. DeCURTIS:  No other questions, Your Honor.

THE COURT:  When I said opinion, I meant the testimony.

Go ahead.

MR. ANDERSON:  May I proceed, Judge?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MR. ANDERSON:

Q.   Mr. Freeman, your full-time job is in Prosper, Texas, correct?

A.   Yes, sir.

Q.   And so you plan inspections in Lakewood Village

in the evening or after hours, correct?

A.    After hours, after 5:00 p.m.

Q.    Because the Town wants you to be at work during the day in Prosper, correct?

A.    That's correct.

Q.    And so how much do you charge for inspection?

A.    $50 per inspection.

Q.    And so there's supposed to be how many inspections?

A.    14.   Unless they fail, then there has to be reinspections.

Q.    And do you invoice the homebuilder, or do you invoice the city?

A.    I invoice the city --

MR. MESSER:  Objection, Your Honor --

THE COURT:  I'm listening.

MS. DeCURTIS:  Objection, Your Honor. This particular line of questioning is, again, going toward the fee issue that we think is irrelevant to the temporary injunction today.

THE COURT:  Is there any other reason that you're offering it?

MS. DeCURTIS:  Relevance --

MR. ANDERSON:  May I respond to it?

THE COURT:  I was looking at you, so --

MR. ANDERSON: It goes to bias. Obviously, if he has the right to go ahead and inspect, he gets paid for every inspection.

THE COURT: He can nitpick, and multiply that 50 each time there's a new problem with the inspection.

Okay. I'll overrule the objection, I'll permit it.

Go ahead.

Q. (BY MR. ANDERSON) So the question was, this $50 per inspection, do you invoice the Town or do you invoice the homeowner?

A. I invoice the Town.

Q. Okay. And so for the plan review, how much was that?

A. That is $600.

Q. And so if all the inspections were clean, plus the plan review, $600 plus $600, your total fee would be $1,200 for a house like this?

A. Approximately, that way.

Q. Now, with regard to -- I'm going to kind of narrow this down, but of the items that you discussed regarding Exhibit 8, which we have a blown-up version here. For example, you said it's important that the finished floor elevation be at 540, correct?

A.    It's per the Town ordinances.

Q.    Right.  And do you understand that that's what we've agreed to, we have a temporary restraining order that, basically, agrees that we'll put it at 540?

A.    Yes.

Q.    Okay.  So that's not an issue, right?  As long as we both agree it's 540, there's no issue with regards to the finished floor elevation?

A.    There would be no issue as long as it would be surveyed by a licensed surveyor.

Q.    Sure.  I understand --

A.    -- shown on the form board survey, sure.

        MR. ANDERSON:  I'm sorry, Judge.  I did not mean to cut him off.

        THE COURT:  You know, if y'all are already correcting yourselves, that makes me very happy.  That means I've done my job well today, and I'll just sit back and watch.  I appreciate that.  Self-governance is best for all of us.

Q.    (BY MR. ANDERSON) And so I think the second item you've brought up as an issue was the retaining wall that's already been built.  You've gone out and looked at the retaining wall, correct?

A.    I saw it from the Spinnaker Road.

Q.    I thought you went out and put a stop work

order on the retaining wall?

A.   That's right off the road.

Q.   Okay.  And did you see anything that would indicate the retaining wall was not built correctly or presented a safety issue?

A.   I wasn't able to see it.  It was too far away.

Q.   Okay.  But your concern was it needs to be engineered because it's above a certain height?

A.   That's what the codes call for.

Q.   And so if it was engineered, that would address your concern, that specific concern, correct?

A.   Once I had it in hand and was able to review it, yes.

Q.   I think you said your issue was whether or not it was an engineered design.  If it was engineered, it was engineered correctly, that would address your concern, correct?

A.   That would address it, yes.

Q.   And I'm not going to go through each one of these notes that you put on here, but it seemed to me a lot of them were sort of advisory comments.  You know, for example, on the Sheetrock, you said, must be 5/8-inch thick Sheetrock, correct?

A.   Correct.  We call that red lines, and a lot of it is heads up.

Q.    Sure.

A.    I use a lot of codes to reference the reason why.

Q.    And I appreciate that.  I guess what I want to point out is, a lot of that discussion that you had with the City's counsel wasn't saying that these site plans violated anything, you're just saying, I'm giving you the heads up that our code requires 5/8-inch Sheetrock, as an example?

A.    That's what I do on all my plan reviews.

Q.    And so I would like for you to take that concept, okay, those things that are kind of comments and are advisory and those sorts of things and put that aside.  Out of the remaining items that you remarked on, how many of those were you, basically, saying this violates the codes?

A.    Non-engineered foundation would be the biggest one.

Q.    Okay.  Anything else?

A.    Not to my knowledge.

Q.    Well, there is one.  I'm trying not to mislead you because I'm trying to understand it.  But you said, for example, the studor -- is it studor vent?

A.    Yeah.  That's a layman's term.  It's an air admittance valve.

Q.    Okay.  And you said that you went out to the site, and you said that it didn't pass because it has studor vents in accordance with -- I guess were constructed in accordance with the drawings?

A.    I was not on site.  I was told by the inspector on site.

Q.    Okay.  Who was the inspector?

A.    Brian Ausenbaugh.

Q.    So you don't have any first-hand knowledge, then.  So when -- I thought the question was, was there violations?  You didn't say, I heard from somebody else that there was a violation?

A.    I was sent pictures.

Q.    I'm sorry?

A.    I was sent pictures by an iPhone.

Q.    You were sent pictures by somebody else?

A.    By the inspector, yes.

Q.    Okay.  So you weren't out there on site for that?

A.    Not physically.

Q.    Was that -- okay.  And that's because you were working at your regular job?

A.    It was because I was here all day.

Q.    That's true.  But I think you said that the violation was the fact that there was going to be a

studor vent as indicated on the site plan; is that right?

A.   Correct, correct.

Q.   And you would agree -- okay.  Let's kind of go back.  I'm looking for substantive violations that you might have put on here that were different than advisory comments.  Do you understand the distinction?

A.   Correct.  And because it was noted not to -- we don't allow that to be installed that way, there are different kinds of venting on -- many different ways of venting, and one of the ways we put into ordinance amendments was to keep those from being installed.

Q.   Right.  And so I -- I don't necessarily agree with why, but I agree with the process.  And so that would be -- and I know that you put on Exhibit 8 that was a substantive issue with regards to compliance with the code?

A.   That's correct.

Q.   And remember, we had those other things that were advisory?

A.   That's correct.

Q.   And so other than the studor vent, was there any other one of those markups that you testified to or that were located in Exhibit 8 that where, basically, you're saying, this violates our code?

A.   Well, I wasn't able to have a pre-con meeting in where we go over all of the requirements for inspections with Step 1, 2, 3, 4 --

MR. ANDERSON:   Your Honor, I object as nonresponsive.  I wasn't asking about pre-con meetings.

THE COURT:   Sustained.

Q.   (BY MR. ANDERSON) Did you understand what my question was?

A.   Is there any other issues?

Q.   On the drawing -- where you put the bubbles on Exhibit 8 and you wrote in and you testified to at length with the City's counsel -- let me go back.

We have these advisory comments, 5/8-inch Sheetrock, and then we have issues as to whether or not the drawings as submitted comply with the codes or not, and you had a concern about the foundation not having an engineering seal.  But that's not a substantive violation, it's procedural, I guess.

But the only one that I've heard so far, and I want to make sure I'm correct, is the fact that you said that our local amendments to the International Residential Code prevents studor vents?

Is there anything else that you've testified to with regards to Exhibit 8 that was a violation -- that you thought was a violation of the

code?

A.    No.  No other violations.

Q.    Okay.  And so most of the -- virtually, all of your comments were really just advisory, when you go out on the field, look out for this, anchor bolts, things like that; is that fair?

A.    It helps the builder know what is going to be inspected, and it helps the inspector know to check it when they go out and do a field inspection.

Q.    Sure.  Now, on the studor vents, studor vents are allowed under the International Residential Code, correct?

A.    They are allowed in the 2006 IRC codes, yes.

Q.    And the 2006 IRC code is the official building code for the state of Texas, correct?

A.    Unless there's an amendment to the code.

Q.    But every city has to adopt the same building code, correct?

A.    They -- they do adopt the codes, yes.

Q.    Okay.  There's a statutory requirement that they adopt the International Residential Code, correct?

A.    Whatever the Town decides to adopt is what they're going to do.

Q.    Well, you understand the legislature mandates the code that the cities have to adopt?

A.    I'm not a lawyer.  I don't go into those areas. I inspect.

Q.    Fair enough.

THE COURT:  Don't brag, sir.

Q.    (BY MR. ANDERSON) The Judge is giving you a compliment.

But there are lots of cities in the state of Texas that allow studor vents; would you agree with that?

A.    There are cities that do.

Q.    City of Dallas is an example?

A.    I don't know.

Q.    Okay.  And do you have any experience with ICF houses?

A.    I've done several ICF houses in Flower Mound and in Prosper, Texas.

Q.    And have you inspected those yourself?

A.    Yes, I have.

Q.    Can you tell the Judge what does ICF mean?

A.    Integrated concrete formed walls.  And what they do is they have insulation on the outside formed in -- or they pour concrete into it, and it's an excellent product.

Q.    And you understand that's what Mr. Bizios' house is going to be constructed of?

A.   It was noted.  Yeah, I looked at it.

MR. ANDERSON:  I'm sorry, Judge.  Let me look real quick.

THE COURT:  Go ahead.

MR. ANDERSON:  Your Honor, we pass the witness.

MS. DeCURTIS:  No further questions, Your Honor.

THE COURT:  Sir, you can step down.  Is this witness free to go?

MR. ANDERSON:  Yes, Your Honor, from our standpoint.

MS. DeCURTIS:  Yes.

THE COURT:  Sir, you're free to leave the building.  You're released from my prior instructions. The quicker you get out of the building, the less time they have to change their mind.

THE WITNESS:  I'm out of here.

THE COURT:  What says the plaintiff?

MR. MESSER:  We have two more housekeeping matters, Your Honor.

THE COURT:  Okay.

MR. MESSER:  One, I'm going to go back to Petitioner's Exhibits 2, 3 and 4, and I'm going to reoffer them.

MR. ANDERSON: We've got the same objection, Judge. I'm not sure why we're redoing this. They've been denied once.

THE COURT: Forgive me, but refresh my memory.

MR. MESSER: Okay.

THE COURT: What are you offering?

MR. MESSER: These are certified copies of documents from three properties in the Sunrise Bay subdivision in the ETJ of Lakewood Village where these three other property owners complied with the Town's building codes after the codes were extended into the ETJ.

And we believe -- and I would make an offer of proof, Your Honor, we believe these were relevant to proof that the Town ETJ -- the Town has jurisdiction in its building -- of the building codes in the ETJ. I think that's relevant. I think the jurisdiction of the Town of its code to the ETJ is relevant, and the fees are relevant to that issue.

THE COURT: Okay. I'm going to sustain and renew my prior ruling, sustain the objection. And I'll certainly make them part of the court reporter's record as an offer of proof.

MR. MESSER: Yes, sir.

THE COURT: If you'll tender them to me at this time.

MR. MESSER: Yes, sir. Petitioner's 2, 3 and 4.

THE COURT: Is there anything further from the plaintiff?

MR. MESSER: The only thing further, Your Honor, and I would like to ask opposing counsel if we can do this, I would like the full-size building plans to be part of the record just because it's such hard -- it's harder to see them.

MR. ANDERSON: I agree, Judge. On the reduced version, it's almost impossible to read.

MR. MESSER: So I just think it will be helpful for everybody. I don't know if we want to put it as Exhibit 8A.

THE COURT: Let me interrupt with this suggestion. The Court of Appeals does not accept the physical exhibits that are admitted by the Court any longer. If somebody appeals this, it's all going to be submitted to them electronically. So they get whatever form and quality of exhibit they get electronically. And there are now meticulous rules about the minutia involved in properly submitting those electronically. That is, I'm happy to accept them, but they're going to

stay here with the court reporter and never be in front of the Court of Appeals anyway, so I'm not sure that it effectuates the purpose that you would be offering them for.

MR. MESSER: Fair.

THE COURT: They may be helpful to me because I had eye strain trying to make out in the 8-and-a-half-by-11 version of those exhibits the handwritten notations, but I think because they were referenced thoroughly by the testimony, the record should be reflective of what may not be visible to the naked eye, but I'm just not sure -- I'm happy to make them part of this record since they're simply blown-up duplicates, but the practical reality is, unless you can present them in electronic format to the court reporter in a way that they can be submitted and properly accepted by the Court of Appeals, what's in our physical possession doesn't really make any difference.

MR. MESSER: I think we can submit them in electronic form. I guess I would have to share them with opposing counsel and make sure he sees they're verbatim. Maybe that's a simpler way to deal with it.

THE COURT: In the event that this is appealed, and I have every reason to believe that it will be, y'all can do your best to submit by agreement

an electronic version of what will be more readily visible to the Court of Appeals' naked eye than what has been presented in hard copy today.  And I'll certainly accept those for purposes of our record.

Just so we're clear, have they been marked independently?  And if I'm correct, that's essentially a blown up but otherwise exact duplicate of what is contained in stipulated Exhibit 8?

MR. MESSER:  Yes.

THE COURT:  Okay.  Then we'll just call that Big Stipulated Exhibit 8, and it will be admitted for this record.

MR. MESSER:  All right.

THE COURT:  Anything further for the plaintiff?

MR. MESSER:  We have nothing else, Your Honor.

THE COURT:  All right.  Housekeeping. Mr. Anderson?

MR. ANDERSON:  Yes, sir.

THE COURT:  Do you still anticipate calling a witness other than your client?

MR. ANDERSON:  That may be the only witness we may call to speed this along, is Mr. Hoffmann, he's the contractor.

THE COURT: How long do you anticipate you'll need to present your evidence. Again, I'm not trying to cut anybody off, but at some point I have to be realistic.

MR. ANDERSON: I would say 20 to 30.

THE COURT: And then given time for cross, we would be well beyond 5:00 o'clock. So here's what we're going to do, then. Just for record purposes at this point, again, just so the record reflects the relative use of time that I mentioned earlier, the plaintiff has used an hour and 50 minutes on the record, while defendant has used exactly half of that.

And so in fairness, I certainly anticipate defendant should be entitled to present evidence affirmatively. But because there is so little factual dispute and, primarily, issues of law for the Court to determine, and considering the novelty of those issues, I would like to take these binders home with me tonight. And if I cause reinjury to my shoulder, I do hold both of you liable for that and will be billing you --

MR. ANDERSON: Not my motion.

THE COURT: -- for the second surgery on my shoulder -- yeah, yours is pretty small, but plaintiff's is big. The point is, I would like to go back through all this tonight. It's always much more

effective to try to make decisions -- legal decisions on questions of law when you've got the context of the case in front of you rather than trying to read a bear record or a pleading.

And what I'm going to do, the current agreed and extended TRO is set to expire at midnight tomorrow night, or 12:01 tomorrow night. And so it will remain in effect, at least through tomorrow.

What I anticipate doing is sometime tomorrow telling you one of two things: If I conclude that the plaintiff has not met its burden and is not entitled to the issuance of a temporary injunction, and that the temporary restraining order should be dissolved or allowed to simply dissolve by operation of law at midnight, I will notify you of that fact and there's frankly no need, that I see, to return at all.

Mr. Anderson, is that correct? I don't think there's any other relief you would be asking for. If you win, you win, and you don't need to say anything further.

MR. ANDERSON: Yes, I think that's correct, Your Honor.

THE COURT: On the other hand, if I conclude there's any possibility I will grant plaintiff's temporary injunction and deny defendant's

request for relief, I will direct you-all to arrange with my coordinator for a date to come back and do that as soon as possible. But like I said, there is no foreseeable time that that's going to occur until at least Thursday of next week, based upon currently scheduled matters.

MR. ANDERSON: Judge, that -- I'm sorry.

THE COURT: Go ahead.

MR. ANDERSON: I'm afraid to even say anything. That puts -- well, obviously, if you rule that they haven't met their burden and the TRO expires and the temporary injunction is denied, that obviously satisfies our issue.

THE COURT: Sure.

MR. ANDERSON: The concern I have is we've got this interim gap of time where, you know, I have a little bit of concern about you possibly saying, well, I think they might have met their burden, but I haven't put on any evidence yet. But it is that gap in time, because we're out there wanting to keep building.

For example, the studor vent, Mr. Hoffmann is going to get up and say every city allows this, it's part of the International Residential Code, there's no health and safety issue. But I have a concern about -- while we're under this kind of working together issue

but we're supposed to pass these inspections, we're not going to pass that inspection because we don't like studor vents --

THE COURT: Hold on. You're kind of getting ahead of me.

MR. ANDERSON: I am, but I have a concern about that gap in time because you're saying tomorrow maybe -- you know, there's a possibility the temporary injunction might be granted, so if I hear Mr. Anderson's evidence, it will be 10 days from now.

THE COURT: No, no, no. That's not what I'm saying. Back up and don't get ahead of me and hear me out.

MR. ANDERSON: Okay.

THE COURT: The possibility number one is that plaintiff loses, temporary injunction is denied, so there's really no need for you-all to come back. Possibility two is, it is not going to be that plaintiff wins and you don't get to present your case, but it is plaintiff may win, I'm still not persuaded that they lose, and you-all need a new date.

And the real question then becomes, what is the status quo, if any, between tomorrow and the time that you-all can come back? And that's kind of where you were going. In other words, the temporary

injunction, the temporary restraining order is currently set to expire at midnight tomorrow night.  And what conditions, if any, should be extended until such time as we return for the completion of this hearing and the presentation of defendant's evidence is a question that I will entertain your argument about now.

MR. ANDERSON:  I apologize, Judge, but can it be extended under the rules since it's already been extended once?

THE COURT:  Well, the last time it was extended, it was extended by agreement.  Hold on.  Let me back up and look at the -- I know what you're saying, but let me refresh my memory.  Was this actually originally set for hearing on April 2nd?

MS. DeCURTIS:  Actually, the party can consent to a longer extended period of time under 680.

THE COURT:  Right.

MR. ANDERSON:  The TRO was issued on March 20th.

THE COURT:  It was set originally for April 2nd --

MR. ANDERSON:  The temporary injunction hearing, correct.

THE COURT:  At that time it was extended by agreement because it could not be heard on that date.

And so the answer to your question is, no, the Court cannot extend it again absent an agreement of the parties.

So the reality is if that second scenario is the Court's response to you tomorrow, and I'm hopeful that I'll be able to intelligently digest this stuff tonight and feel comfortable that I've made an informed decision to give you that direction the first thing in the morning tomorrow.

If the second scenario is in play, the Court would only have the authority to extend the TRO if it were prepared to grant the temporary injunction, and that would violate defendant's due process otherwise, because defend hasn't had an opportunity to put on their case. Sorry, kind of thinking out loud. And the only other option would be for you-all to agree to some manner of extension.

Is it safe for me to assume that is not currently something you're inclined to do in the event the Court is not inclined to deny the temporary injunction altogether?

MR. MESSER: We -- I mean, I have to talk --

MR. ANDERSON: He's more than happy to. Here's my concern, Judge -- well, I'll just ask since

we're on the record.  My concern is the studor vent, because they're out there building it, and I don't want to have to go rip it out.

MR. MESSER:  I know.  If you pour concrete and we don't have an inspection, it's even worse.

MR. ANDERSON:  If you'll agree we can put in the studor vent, which virtually every other city in the state does, I'm fine.  If you're going to say no, I don't know what I can do, Judge.

MR. MESSER:  Okay.  I have to talk to people -- I'm not able to make that decision.

THE COURT:  I understand.  I don't have any choice.  This is just what I'm going to have to do.

Mr. Messer, what's your e-mail address?

MR. MESSER:  Andy@txmunicipallaw.com.

THE COURT:  Okay.  Mr. Anderson?

MR. ANDERSON:  Aanderson@winstead.com.

THE COURT:  So that's two A's to begin?

MR. ANDERSON:  Yes, sir.  And it's S-O-N. And Winstead is W-I-N-S-T-E-A-D.

THE COURT:  Okay.  Check your e-mails in the morning.  You-all are ordered to return tomorrow at 10:00 o'clock.  That's all I can do.  I have no idea right now how I'm going to pull that off.  That's just cramming y'all into a space I know right now, at least,

you don't fit, but I have to give defendant the opportunity to put on their case, at least with some reasonable and relative acknowledgment of the amount of time that plaintiff has been allowed.

But listen carefully. If I conclude at some time before 8:00 o'clock tomorrow morning that plaintiff is simply not getting the temporary injunction, I will notify you by e-mail and you don't have to be here. Submit an order, in effect, granting your relief and denying the issuance of the temporary injunction and that part of it is, at least, done.

So I wanted to make sure you understood that so you don't waste time coming down here in the event that's my conclusion. But if I conclude otherwise, I'll see y'all at 10:00 o'clock, and we'll figure out scheduling as we go. I did have one case on the docket tomorrow that has canceled, so that's, at least, one step in the right direction.

But right now I've got two others that appear that they're going to need to be heard, and I'll just figure out some way to finish this hearing tomorrow, if that's what we're going to need to do, okay?

MR. ANDERSON: Yes, sir.

MR. MESSER: Exhibit Big 8 right here.

THE COURT: If you'll tender that, y'all are free to go and check your e-mails. Or at least don't blame me if you waste your trip down here and an e-mail was sent timely.

(Proceedings recessed)

STATE OF TEXAS

COUNTY OF DENTON

I, Mellony Ariail, Official Court Reporter in and for the 431st District Court of Denton, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND this the 1st day of June, 2014.

/s/ Mellony Ariail
Mellony Ariail, CRR, RMR, CBC
Texas CSR 3729
Official Court Reporter
431st District Court
1450 E. McKinney Street
Denton, Texas 76209
940.349.4372
mellony.ariail@dentoncounty.com
Expiration: 12/31/2014

REPORTER'S RECORD

VOLUME 3 OF 4 VOLUMES

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
6/23/2014 2:41:22 PM
DEBRA SPISAK
Clerk

TRIAL COURT CAUSE NO. 14-01992-431

COURT OF APPEALS NO. 02-14-00143-CV

TOWN OF LAKEWOOD VILLAGE, ) IN THE DISTRICT COURT
TEXAS                      )
                           )
VS.                        ) DENTON COUNTY, TEXAS
                           )
HARRY BIZIOS               ) 431ST JUDICIAL DISTRICT

*********************************************

MOTION FOR TEMPORARY INJUNCTION; MOTION TO
DISSOLVE TRO AND DENY TEMPORARY INJUNCTION (CONTINUED)

*********************************************

On the 16th day of April, 2014, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Jonathan Bailey, Judge Presiding, held in Denton, Denton County, Texas.

Proceedings reported by realtime machine shorthand.

Mellony Ariail, CRR, RMR
Official Court Reporter - 431st District Court

A P P E A R A N C E S

MR. W. ANDREW MESSER
SBOT NO. 13472230
MS. JENNIFER A. DeCURTIS
SBOT NO. 24045767
MS. BRENDA N. McDONALD
SBOT NO. 14993300
Messer, Rockefeller & Fort, PLLC
6351 Preston Road
Suite 350
Frisco, Texas 75034
Telephone:  (972) 668-6400
E-mail: andy@txmunicipallaw.com;
jennifer@txmunicipallaw.com; and
brenda@txmuicipallaw.com
Counsel for Plaintiff


MR. ARTHUR J. ANDERSON
SBOT NO. 01165957
Winstead PC
5400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
Telephone:  (214) 745-5400
E-mail: aanderson@winstead.com
Counsel for Defendant

VOLUME 3

MOTION FOR TEMPORARY INJUNCTION; MOTION TO DISSOLVE TRO

AND DENY TEMPORARY INJUNCTION (Continued)

APRIL 16, 2014

| | PAGE | VOL. |
|---|---|---|
| Caption ........................................ | 1 | 3 |
| Appearances .................................... | 2 | 3 |
| Proceedings .................................... | 5 | 3 |

DEFENDANT'S WITNESSES

| | DIRECT | CROSS | VD |
|---|---|---|---|
| Alan Hoffmann | | | |
| By Mr. Anderson | 7 v3 | | |
| By Mr. Messer | | | 21 v3 |
| By Mr. Anderson | 22 v3 | | |
| By Mr. Messer | | 36 v3 | |
| By Mr. Anderson | 50 v3 | | |
| | | | |
| Harry Bizios | DIRECT | CROSS | VD |
| By Mr. Anderson | 54 v3 | | |

| | PAGE | VOL. |
|---|---|---|
| Evidence Closed ............................... | 59 | 3 |
| Closing Statement by Mr. Messer ............... | 62 | 3 |


ALPHABETICAL INDEX OF WITNESSES

| | DIRECT | CROSS | VD |
|---|---|---|---|
| Bizios, Harry | 54 v3 | | |
| Hoffmann, Alan | 7 v3 | 36 v3 | 21 v3 |
| | 22 v3 | | |
| | 50 v3 | | |

EXHIBITS OFFERED BY DEFENDANT

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Resume of Alan Hoffmann | 7 v3 | 8 v3 |
| 2 | Rendering | 20 v3 | 22 v3 |
| 3 | Aerial Picture of Bizios Lot | 26 v3 | 26 v3 |

P R O C E E D I N G S

THE COURT:  Cause No. 14-01991-431 styled Town of Lakewood Village versus Harry Bizios.  This is a continuation of the hearing on the request for temporary injunction and to dissolve the temporary restraining order that the Court began yesterday, April 15, 2014. I've explained briefly off the record to counsel that the Court was able to manipulate its docket this morning in a manner that allows them the remainder of the Court's time this morning.

It is now 10:17 a.m., but I do have other matters scheduled this afternoon and tomorrow that will prevent us from spilling over.  So we're just going to have to finish this hearing at or about noon today. Based upon the usage of time yesterday; that is, plaintiff having used almost exactly two times the amount of time that defendant used, in the remaining, roughly, hour and a half of time on the record that we have today, I'm going to allocate 60 minutes for the defendant and 30 minutes for the plaintiff, and that will be inclusive of any direct or cross-examination and argument offered.

I will keep track of that time and let you know as it's winding down.  Where we left off, plaintiff had just rested their case, and so it's defendant's

turn.

In reviewing the various materials, briefs, pleadings, and cases cited yesterday provided to the Court well into the evening last night, the Court concluded and communicated by email to the attorneys that it was not prepared to simply deny the plaintiff's requested relief without further hearing and argument, and I'm more compelled at this time to think that a portion, at least, of the remaining time that each of you have would be well spent in argument. So I would urge you to account for that in the way you use your time between now and the noon hour. With that, Mr. Anderson --

MR. ANDERSON: Just, can I ask for clarification?

THE COURT: Certainly.

MR. ANDERSON: Does the one hour include closing arguments?

THE COURT: Yes. That's your time. You use it however you see fit.

MR. ANDERSON: Okay. I guess I should have thought that through.

ALAN HOFFMANN, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q.   Can you please state your name for the record?

A.   Alan Hoffmann.

THE COURT:  Let me just remind you, you were sworn yesterday, and you're still under oath at this time.

THE WITNESS:  Yes, thank you.

THE COURT:  Please continue, Mr. Anderson.

Q.   (BY MR. ANDERSON) What's your occupation?

A.   Homebuilder and developer.

Q.   What's the name of your business?

A.   I do business as Alan Hoffman Company, and it's Alan Hoffmann, LLC.

Q.   And how long have you been a homebuilder?

A.   Going on 20 years.

MR. ANDERSON:  Your Honor, we would offer Defendant's Exhibit 1 which is Mr. Hoffmann's resumé. I've given a copy to Mr. Messer?

THE COURT:  Mr. Messer, any objections?

MR. MESSER:  I have no objections.

THE COURT:  Defendant's Exhibit 1 is admitted.

Q.   (BY MR. ANDERSON) Mr. Hoffmann, do you have any particular specialty with respect to the types of homes that you build?

A.   Yes.  I build exclusively ICF homes, which are -- is an insulated concrete form home.

Q.   And how many builders out there build these ICF homes?

A.   There are several around the country, but I predominantly -- in the area, I'm the only one doing it exclusively that I know of, but there's several around the country that do it exclusively.

Q.   Can you tell the Court, what does it mean when you say it's an ICF home?

A.   It's a forming system for concrete.  And they're large, polystyrene blocks that look like giant LEGO® blocks and they fit together and then create a hollow wall cavity which you pour concrete in the middle and rebar steel.

Q.   And what's the advantage to an ICF home?

A.   Well, they're really structurally superior, they handle very high winds, they're -- and the other benefit is they're extremely energy efficient.

Q.   Are you the contractor/homebuilder for Mr. Bizios' home?

A.   Yes.

Q. And approximately how much do you think the construction cost will be for this house?

A. Well, right -- we -- we've had a target budget, but it's grown a little bit more. But we're going to be, I believe right now, about 1.2, roughly.

Q. Is that 1.2 million?

A. Yes.

Q. And how many houses have you built?

A. ICFs now, completely, about 40. And then I've done -- been involved in, roughly, between 80 and 90 projects.

Q. In front of you there's a book that looks like this.

A. Okay.

Q. And if you could pull or look at Exhibit 34. You'll have to kind of move some of this around.

A. Oh, I see. Okay. I'm on the first page of that.

Q. I -- it -- I'm sorry.

A. I thought I was. Okay. Here we go.

Q. And this is entitled, the "Declaration of Covenants, Conditions, and Restrictions, Sunrise Bay at Lake Lewisville, Section 1," correct?

A. Correct.

Q. And in the first paragraph it states that

Sunrise Bay is an addition that's been platted according to the plat recorded in a certain cabinet and slide approved in 1995; is that correct?

A. Correct.

Q. And as part of the declaration -- this declaration covers Mr. Bizios' property?

A. Yes.

Q. And does it include the establishment of an architectural control committee?

A. Yes.

Q. And can you tell the Court, what does that mean, from your experience?

A. Well, whenever --

MR. MESSER: Your Honor, I'm going to object. I'm not sure -- based on relevance, I don't see how CCRs by an HOA is relevant to building standards by the Town.

THE COURT: That kind of goes to the heart of both of your arguments, but respond beyond quickly because I'm already wondering about that as part of my review last night anyway.

MR. ANDERSON: Sure. Two things. It's going to be a notice issue, because they're saying they didn't have notice. Number two is the fact that we have been following the rules. Their argument is we don't

follow the rules, so I'm kind of going and saying, here's what we did to follow the rules.

THE COURT: They're also saying that if it's more than two years old, which this obviously was, that it's not applicable, that there's an exemption, right?

MR. ANDERSON: If I have to include this in my legal argument --

THE COURT: That's what I'm inviting.

MR. ANDERSON: Yes. This is in 245.004 in the Hartsell case, Your Honor. We addressed that identical issue before the Dallas Court of Appeals. That refers to a permit for construction of a house, not for a plat. And here's where it gets confusing. We've got two different concepts; we have a project, and a permit. So A permit, for example, if you look on 245 -- I'm sorry, Judge. Do you have a code in front of you?

THE COURT: No. But I can put my hands on it pretty quickly.

MR. ANDERSON: I think it's in our tab in our exhibit book.

THE COURT: Tab 11, I've got it.

MR. ANDERSON: 245.001 talks about permits in a series of permits, and a plat is considered to be a permit, okay? A building permit is considered to be a

permit. A project is, basically, everything that goes on during the construction process.

THE COURT: It's more specific and follows the permit?

MR. ANDERSON: Right. For example, if you look at 245.002(b), it says, "if a series of permits is required for a project, the ordinances... or other properly adopted requirements in effect at the time the original application for the first permit in that series... shall be the sole basis for consideration of all subsequent permits."

So, for example, Your Honor, in the Hartsell case, that's where Talty is a general law town, they approve a plat in their ETJ -- that's the only distinction here. They approve a plat in their ETJ. After the plat's approved, they extend their building code to the ETJ. The Dallas Court of Appeals says, you know, this is a series of projects. What the city tried to argue in that case is they were two different projects; the subdivision process and building process.

And the Court of Appeals says, that doesn't make any sense. The whole purpose of Chapter 245 is to protect developers and builders. Basically, it was enacted in response to the city changing the rules in the game after a project had started. That's

the whole purpose. If you look at the legislative intent, that's what it says in the original code that created it.

THE COURT: I'm sure we'll get deeper into this in argument later, but for purposes of the objection, the objection's overruled. You can reask the question, or you can answer it, if you remember it, at this point.

THE WITNESS: Sure. I think I forgot it.

MR. ANDERSON: Sure.

Q. (BY MR. ANDERSON) So these in Exhibit 34 are called CCRs, correct?

A. Yes.

Q. And is an architectural control committee part of the CCRs?

A. Yes. It's -- the architectural control committees are built in several subdivisions that have them. And the primary intent is usually to preserve the quality of the structures being built.

Q. And is there a requirement that you obtain consent of the architectural control committee before you start construction, according to this document?

A. Yes.

Q. And who are the members of the architectural control committee?

A.   They're residents of the community, and on this board, it's Marshall Boerio and John Greenslade.

Q.   They're people that own lots and houses and are residents in the community; is that correct?

A.   Correct, yeah.

Q.   And did you obtain the necessary approvals?

A.   Yes.

Q.   Okay.  And after that, were you directed to obtain any governmental approvals?

A.   I knew that I had to obtain county development permit, and I knew I had to obtain review per septic, but they had told me about the fact that the Town of Lakewood Village was asserting a permitting process.

Q.   Who serves this area with water?

A.   Little Elm.

Q.   And is there any sewer provided?

A.   No.  You have to do septic.

Q.   So they all have septic, correct?

A.   Yes.

Q.   And it would cost millions of dollars to extend sewer; is that fair?

A.   Yes.

Q.   And so after the architectural control committee approved your plans, you submitted a development permit with the county; is that correct?

A.    Yes.

Q.    And if you could look at Exhibit 35.

A.    Okay.

Q.    The first page is the certificate, the second one is the application; do you see that?

A.    Yes.

Q.    And was that approved by the county?

A.    Yes.

Q.    And in the lower left-hand corner, you can't -- it looks like it's smudged out, but what was supposed to be --

A.    Well, on the copy I have, it has, I think, plumbing -- or -- one was a final inspection, and one was plumbing, like a Sheetrock, and the other one, I think, was foundation.

Q.    Okay.  And if you could look at Exhibit 36, what is that document?

A.    It's an elevation certificate.

Q.    And what does that mean?

A.    When you're building near a lake -- and I've built near several lakes -- you have to have your foundation above a certain level because the -- you can't build toward the lake past this -- at this lake 537, 537 feet above sea level.  And so you have to have your foundation above a minimum for -- I think FEMA is

two feet.  On this house, we're going to be at 540 and a half.

Q.   And so -- I think that part of the TRO is you agreed to, at least, have a 540 elevation because the Town requested it and you agreed to that?

A.   Yeah.

Q.   Okay.  So the elevation certificate indicates -- well, did the Corps approve the retaining wall that was built on this property upon its easement?

A.   Yes.

Q.   And was that wall engineered, to the best of your knowledge?

A.   Oh, definitely.

Q.   If you could look at Exhibit 37.

A.   Yes.

Q.   What is that document?

A.   This is a forms survey.  It shows where the forms lie for the foundation in regard to the 537 line.

Q.   And so this is a document that the city has, correct?

A.   Well, I -- I -- yes.  I submitted it to the county.

Q.   Okay.  So, for example -- you weren't here to listen to it, but there was testimony yesterday that the city's building inspector stated that the construction

that's been done out there pursuant to the TRO --

A.   Uh-huh.

Q.   -- was rejected, there was a substantive reason we'll get to in a minute, but there was a procedural reason that this forms survey was not located on site?

A.   What do you mean located on site?

Q.   That's what he said.  I guess my point is, the document that shows the forms survey is the one that's in Exhibit 37, correct?

A.   Yeah.  I had the surveyor go out there.  This is their drawing.

Q.   And are you currently having inspections done?

A.   Yes.

Q.   And how many have been completed?

A.   One, two, three.

Q.   And can you tell the Court, what are they?

A.   Well, the piers are being drilled -- I have my engineer who has a represent -- field representative that goes out and inspects and compares to the design that they've drawn, and they inspect the process.  And they'll inspect the pier holes and make sure the steel is placed, and they were -- because there were so many piers here, they were there two days.  So I had two pier inspections.

Q.   And who inspected the piers?

A.    Strand Systems Engineering.

Q.    Can you tell the Court a little bit about the reputation and quality of Strand Systems?

A.    Strand has been doing work for me over 15 years, and they are licensed in 50 states.  They do vast amounts of residential foundation engineering.

Q.    Any other inspections that you've done?

A.    I've done a plumbing inspection.

Q.    Okay.  Any others?

A.    Not at this time.

Q.    All right.  I think the testimony has been that there was initially a submittal to Lakewood Village --

A.    Yes.

Q.    Let me kind of finish the question.

A.    Sorry.

Q.    I probably should have stopped.  That -- an initial building permit plan, which was in Exhibit A, was submitted to the city; is that correct?

A.    That's correct.

Q.    And why was that submitted to the city?

A.    At the advice of the architectural control review committee -- architectural control committee.

Q.    And had you or Mr. Bizios received any legal advice at that point in time as to whether or not Lakewood Village had the authority to require a building

permit be submitted to them?

A.   No.

Q.   Why did you decide not to pursue the building permit application with Lakewood Village?

A.   Due to the fact of the process -- I can get a permit in Dallas in a day.  I present all my submittals to engineering and get it turned around very quickly.  This process was just lingering, and I began concern when they were also requiring me to have all my subcontractors register in advance of the approval of the permit, which is not customary around the municipalities.  And so I began to kind of question the whole process with the Town and began to ask questions of people.

Q.   And how much does it cost for the subcontractors to register with the Town?

A.   It's a hundred dollars a year.

Q.   And how many subcontractors are you going to have on this job?

A.   I'll have at least a dozen.

Q.   That's, basically, a $1,200 compensation to the Town, correct?

A.   Yeah.

Q.   And so the requirement to register before the project starts, you're saying that's abnormal and is not

typical?

A.    Well, to withhold a permit is highly uncustomary.

MR. ANDERSON:  We move to admit Defendant's Exhibit 2.

THE COURT:  Any objection?

MR. MESSER:  The only comment, Your Honor, on Exhibit 2 is that that rendering isn't -- there are variations between that rendering and the building plan submitted to the Town.  If we can just point out the differences, I'm fine with it being admitted.

THE COURT:  Well, I'm not hearing a legal objection.

MR. MESSER:  It's not a true and accurate representation of the building according to the building plan.

THE COURT:  Sustained.

Q.    (BY MR. ANDERSON) Okay.  Is this a true and accurate representation of what you're going to build on the property?

A.    Yes.

MR. ANDERSON:  Move to admit, Judge.

THE COURT:  Okay.  Any objection?

MR. MESSER:  May I take him on voir dire a second?

THE COURT: Go ahead.

MR. ANDERSON: I'll be happy to ask him the differences.

MR. MESSER: Yeah. That's all I'm trying to do.

MR. ANDERSON: Is it admitted?

THE COURT: I've admitted it -- actually, I'm sorry. I gave leave to question the witness, if you would like to.

MR. MESSER: Sure. Let me do it real quickly.

THE COURT: It sounds to me like stuff that would be properly subject to cross-examination.

MR. MESSER: It might be. Before it's admitted --

THE COURT: In other words, the voir dire is only going to be as to the admissibility, not as to the weight that it should be given.

MR. MESSER: Right, I understand.

VOIR DIRE EXAMINATION

BY MR. MESSER:

Q. Would you point out the differences between this rendering and the building plans?

A. Well, we've added a fence around the motor court area.

Q. How about the windows? It looks like the windows are different.

A. We've changed -- we've changed some -- well, right here we had some changes to the front to the left, the upper windows, but they were shorter in that version.

Q. Right. I think those are the only differences that I'm aware of. Do you see any others?

A. Not really.

MR. MESSER: Okay. Then I have no objection, Your Honor, with those noted differences.

THE COURT: Okay. Then it's admitted.

DIRECT EXAMINATION (CONTINUED)

BY MR. ANDERSON:

Q. Just a follow-up, Mr. Hoffman. Are there any substantive changes with regards, other than the facade treatment and the fence, any substantive changes with regards to the construction?

A. Not really.

Q. Okay. Yesterday during Mr. Freeman's testimony, he said that he has to inspect, basically, during the evenings because he has a regular job in Prosper. Does that pose any issues to you?

A. Yes.

Q. What are those?

A.   Well, they want me present at the inspections. It's highly uncustomary to require inspections outside of normal business hours.  I've never encountered that in 20 years.

THE COURT:  I'm sorry.  I was listening. I've learned to multitask.

MR. ANDERSON:  I figured.

Q.   (BY MR. ANDERSON) Does the amount of the fee bother you; is that one of the reasons for not submitting?

MR. MESSER:  Objection, Your Honor, to relevance.

THE COURT:  Sustained.

MR. ANDERSON:  May I make argument, Judge?

THE COURT:  Sure.

MR. ANDERSON:  You told me not to unless I ask, so...

It's relevant, Judge, again for the reason that they say we're just skirting our obligations and not -- kind of willy-nilly not agreeing to comply with their requirements, but there are reasons for that that, I think, are appropriate to be put forth in the record.

THE COURT:  Well, except that those reasons relate to your position that they don't have the authority to be posing any requirements, not just that

there's a cost that your client either doesn't want or cannot afford to pay. In other words, I fail to see the relevance.

MR. ANDERSON: Okay.

Q. (BY MR. ANDERSON) Do the construction drawings for the house meet the requirements of the International Residential Building Code?

MR. MESSER: I object, Your Honor, because it's vague. It doesn't identify which version of the building code, which is important.

THE COURT: Sustained.

Q. (BY MR. ANDERSON) Does it meet the requirements of a building code?

A. Yes.

Q. And which one?

A. I have designed it based on IRC 2009.

Q. And is the 2009 code more stringent than the 2006 code?

A. Yes.

Q. And so you decided to make it even a higher level of construction and safety by complying with the 2009 code?

A. Yes.

Q. Now, the subs that you hire, are they basically quality subcontractors who are well-versed in their

particular codes, whether it's the plumbing code, electrical code, et cetera?

A. Yes.

Q. And do you make sure that they meet the requirements of those codes when they construct the house?

A. Yes.

Q. And do they have a legal obligation to make sure there's no defects that could be created by not complying with the code?

A. Most definitely.

Q. And so you're also having inspections of the house pursuant to the Denton County Development Regulations, correct?

A. Correct.

Q. Now, if you could, look at Exhibit 7. Have you seen this plat before?

A. Yes.

Q. And what's the approximate size of Mr. Bizios' lot?

A. It's big. It's about two acres. It's over two acres.

Q. If you could look at sheet 3 of 4 of the plat?

A. Sheet 304.

Q. 3 of 4.

A.    Okay.

Q.    My eyes are not that good.  Mr. Bizios's lot is the one that kind of is close to the, I guess, right-hand side that juts into the lake; is that fair?

A.    Yeah.  It has a point, yeah.  It's a sharp point on it.  It's Lot 84.

MR. ANDERSON:  Your Honor, we move to admit Defendant's Exhibit 3, which is an aerial showing this area.

MR. MESSER:  No objection.

THE COURT:  Defendant's Exhibit 3 is admitted.

Q.    (BY MR. ANDERSON) Now, are most of the lots in the area, are they built out with houses?

A.    For the most -- yeah.  There's a few lots that are left.

Q.    Okay.  So would it be fair to say that most of Sunrise Bay addition has developed lots that have houses located on them?

A.    Yes.

Q.    And would it be fair to say, looking at the plat, that Mr. Bizios has one of the larger lots?  Can you see any lots on the plat that are greater than five acres, or does it appear that, virtually, all of them are less than five acres?

A.   Looks like most of them are less than five acres.

Q.   And --

MR. ANDERSON:  Your Honor, we would ask that you take judicial notice that under Chapter 212 of the local Government Code, that there's a statutory requirement for plat property and if there's a tract that's less than five acres.

THE COURT:  I will not do so.

MR. ANDERSON:  Okay.

THE COURT:  The rule of evidence requires that the Court take judicial notice of such matter if it is provided to the Court.  I don't have it readily available to me, but if you provide it to me, I will certainly take judicial notice of it.

MR. ANDERSON:  I'll wait till closing, Judge.

THE COURT:  Okay.

Q.   (BY MR. ANDERSON) Now, I would like to direct your attention to the easel.  That's a --

THE COURT:  By the way, I'm doing a speech on that for an upcoming CLE, and that's the only reason I know.

MR. ANDERSON:  I guess I'm learning a lot.

Q.   (BY MR. ANDERSON) This is Exhibit 8, which is

basically markups of the plans.  And Mr. Freeman testified that virtually every one of his comments that's in a little bubble that's handwritten was an advisory and did not represent a code violation.  For example, he said there was an indication that Sheetrock should be 5/8-inch in thickness?

A.  Uh-huh.

Q.  Is that something that you comply with routinely?

A.  I have been using 5/8 rock for several years on all my homes.  I don't use half-inch.

Q.  And there was a question that he stated regarding the chimney and where it's located, and he said it had to be a certain height to make sure embers did not fall on the roof.  Does the chimney you have planned meet that requirement?

A.  Yes.  It's pace occurring, and it will be -- they're deeply aware of the code requirements.  They have huge liability.

Q.  And so the advisory comments that Mr. Freeman stated on the drawings, are you complying with those anyway?

A.  Yes.

Q.  And those requirements are pursuant to the International Residential Code, correct?

A.   Yes, 2009.

Q.   And 2006?

A.   Yeah, prior to that.

Q.   What they're saying is 2006 applies, so I want to make sure -- I understand that the 2009 is more stringent than the 2006, but I just want to make sure that the testimony is that these requirements would -- that you're going to meet those that are put in place; is that correct?

MR. MESSER:  Object, Your Honor, multifarious.  And also, we're not saying it's just 2006.  We're saying it's 2006 plus 20 pages of local amendments.  But my objection is, I'm not sure what his question is.

MR. ANDERSON:  I can reask him.

THE COURT:  The objection is sustained. I'm not sure either, so ...

MR. ANDERSON:  Sure.

Q.   (BY MR. ANDERSON) Does -- you're going to -- are you going to comply with the comments that are in the bubbles on the sheet?

A.   Yes.

Q.   And is it your understanding that whether those are reflective of the 2006 code or the 2009 code, you're going to meet those requirements?

A.    Well, there was one.

Q.    Are you talking about the vent?

A.    Yes.

Q.    Okay.  Tell -- can you explain to the Judge what the issue is with the studor vent?

A.    A studor vent is a vent designed for an application where you can't run a vent stack from an area.  You can't -- because there's an open air -- if you have an island with a sink in it, they're designed to be a venting tool when you don't have a vent application, where you can't put a stack, okay?  I use them everywhere.  They're approved by municipalities all over Dallas/Fort Worth, and I have built multiple homes with multiple studor vents.

Q.    So --

A.    And they do comply with code.

Q.    So Mr. Freeman had said, I think in response to a question by the city's counsel, that there was a health-safety reason for not including studor vents.  Do you agree with that?

A.    No, no.

Q.    And are you aware of any other cities that don't allow studor vents?

A.    Probably Prosper.

Q.    Just because Mr. Freeman's there?  But

generally, would you agree that that is a suitable construction, that they may have a -- some sort of policy reason for not including them, but it is allowed by the International Residential Code?

A.    Yes, it is.

Q.    And with regards to the finished floor elevation, you've agreed to meet the city's request of the 240 (sic), correct?

A.    540.  I'll actually be exceeding it.

THE COURT:  Give me just a second, Counsel.

(Pause in proceedings)

THE COURT:  Please continue.  I'm sorry.

Q.    (BY MR. ANDERSON) There was one other question regarding the foundation plan that's attached to part of Exhibit 8.  I think Mr. Freeman said it didn't have an engineering seal on it.  Is there a reason for that?

A.    At that time when I submitted it, the ICF manufacturer that I was using went bankrupt in December. And so the drawings were going to be -- I was waiting for the stamp on the drawing for them to approve the new forms that were going to be used that are illustrated in there, and that's why I submitted it without it.

Q.    And do you have an engineering stamp on it now?

A.    Yeah, I do.

Q. And so regardless of whether the 2003, 2006, or 2009 building code is applied, with regards to the comments by the building inspector, you're compliant with everything except for the studor vent issue; is that correct?

A. Yes.

Q. If you could look at the -- this is kind of keeping in mind the lot layout at the bottom of the plat, if you could look at Exhibit 4.

A. Okay.

Q. And that's an official record from the city according to the certificate. If you could look at the colored map on the attachment.

A. Yes.

Q. And does the depiction of the lots that are shown reflect the same depiction that's on the plat?

A. To my recollection, yes. The layout looks the same.

Q. And if you could look at Exhibit 5, this again is a contour map that's in the official records of the city that, I think, has been testified to before. The red lines that are shown, do they, basically, match up with the lot lines that are shown on the improved plat?

A. Yes, it looks like it.

Q. If you could look at Exhibit 6, this is from

the Denton Central Appraisal District. If you look in the upper left-hand corner, this is regards Mr. Bizios' lot. Does it give the location of Sunrise Bay at lake Lewisville, Block 1, Lot 84?

A. Yes.

Q. As a matter of fact, in the stipulations -- oh, yeah. The address. In the stipulations we have No. 6, Bizios currently owns Lot 84, and the parties have agreed to, so that would be consistent, correct?

A. Uh-huh, yes.

THE COURT: Quick question that just came to my mind. The $1.2 million that you referenced earlier for the estimated value of construction, that excludes the value of the land that's reflected on Exhibit 6, correct?

THE WITNESS: Yes.

THE COURT: Okay.

Q. (BY MR. ANDERSON) Okay. If you could look at Exhibit 28. And I'm not sure if this is properly labeled in mine or yours, but if you could look at the very last page.

A. The last page of 28?

Q. Is it a colored drawing of the town's thoroughfare plan?

A. Yes.

Q. And does the lot layout that's shown with regards to that portion that is north of the city limits within the Sunrise Bay addition, do the lots there shown on that map reflect those in the plat?

A. Yes. I see Mr. Bizios' lot.

Q. Is the answer yes?

A. Yes.

Q. Are you -- is this house going to be constructed in the same manner as houses you've built within the corporate limits of other municipalities?

A. Yes.

Q. If the Court allows you to recommence construction, when will the project be completed?

A. I suspect we should be into the next year. It's going to take about, at least, 10 or 11 months. I want to do it quicker, but the labor pool is tighter now.

Q. When you're within the corporate limits of a city, do you have any issues with regards to filing a building permit with that city?

A. No.

Q. Why do you have an issue here?

A. I just -- after the time that I spent waiting for the permit, I began to ask questions of knowledgeable people and, really, was concerned with --

THE COURT: You didn't call me.

(Laughter)

THE COURT: So we're clear, I had no independent conversation with this witness. Other knowledgeable people.

THE WITNESS:

A. And I just -- there became a glaring issue that became really clear as to whether the Town really had the ability to do what they were doing, and that concerned me.

Q. (BY MR. ANDERSON) If you could look at Exhibit 35, and go about five pages in. There's a colored drawing that says Spinnaker Bay Point. Do you see that?

A. Yes.

Q. And where it has, I guess, a one, is that Mr. Bizios' lot?

A. Yes.

Q. And do the red lines, are those consistent with the approved plat, showing the different lots?

A. Yes.

Q. And if you could keep going, there's another drawing that's right before the elevation certificate that has the contour lines?

A. Yes -- oh, okay. Yeah.

Q. And it also has red lines for the different

lots, correct?

A. Right.

Q. Are those consistent with the approved plat?

A. Yes.

THE COURT: Just so you know, it's 25 minutes remaining.

MR. ANDERSON: Thank you, Judge. We pass the witness.

THE COURT: When I give those heads up, I don't mean to push you, but you would be surprised how often that's the exact response.

CROSS-EXAMINATION

BY MR. MESSER:

Q. Mr. Hoffmann, my name is Andy Messer. I represent the Town of Lakewood Village. You and I have never met before today, have we?

A. No.

Q. Okay. This set of building plans up here, we're calling it big 8, do you see that?

A. You're calling it what?

Q. Big 8.

A. Okay, sure.

Q. They're also in Tab 8 in your notebook, if you want to turn there. Do you see that?

A. Yes.

Q. That's the plans that you submitted to the Town for their consideration, true?

A. Yes.

Q. And you also submitted a form to the Town to register as a contractor with Lakewood Village, true?

A. Uh-huh.

Q. You filled out that form in your own handwriting, didn't you?

A. I did.

Q. You gave a detail of the project to the Town, didn't you?

A. I didn't hear the question.

Q. You gave the details of the project to the Town for their consideration, didn't you?

A. Yes.

Q. And as the contractor on this project, you're representing Mr. Bizios as his agent, true?

A. Yes.

Q. You have the ability to represent him for all details with the Town involved in this project, true?

A. No, no.

MR. ANDERSON: I object, Your Honor. I think that requires a legal conclusion. I'm not sure which exactly -- he has exact authorization.

THE COURT: Sustained.

Q.    (BY MR. MESSER) Anything dealing with the Town's contractors, inspections, plans, you can represent Mr. Bizios to the Town; isn't that true?  And isn't that what you did here?

A.    Not in all instances.

Q.    You did it with the dealings you had with the Town, right?

MR. ANDERSON:  I'm going to object, vague and ambiguous, Your Honor.

THE COURT:  Sustained.

Q.    (BY MR. MESSER) When you came to drop off the plans to the Town, your name's on those plans, true?

A.    My company name, yes.

Q.    Right.  And it also says Mr. Bizios as the owner, true?

A.    Yes.

Q.    So you're representing him to the Town at that point in time, true?

A.    I'm representing the plans --

MR. ANDERSON:  I object --

Q.    (BY MR. MESSER) And also when you -- and if you look at Exhibit 15, 15, I think, is your registration certificate you turned in to the Town, true?

A.    Yes.

Q.    And you've listed the property owner as

Mr. Bizios, true?

A. Correct.

Q. These plans that you submitted on the first page, if you'll turn to the first page and, again, it's Tab 8.

A. What section?

Q. Tab 8, the very first page. If you can look on here, too --

MR. MESSER: If I may approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. MESSER) If you look on the very first page under general framing notes; do you see that?

A. Correct.

Q. And it says, "Structure was designed in accordance to the International Building Code 2003 Edition, doesn't it?

A. That's correct, but the engineering drawings were designed by a structural engineer, and so those notes would be disregarded by my framing contractor.

Q. Well, these are the plans you submitted for the Town to consider, true?

A. But there's framing engineering in there too.

Q. Does it say 2003, sir?

A. It would -- that says 2003.

Q.   So which is correct, 2003 or 2009?   Which version are you actually going to build it according to?

A.   2009.

Q.   So what's on that plan is not accurate?

A.   I submitted engineering.

Q.   And then there's a plan on -- there's a sheet in there, I think it's three pages in.   I'll show it to you.

MR. MESSER:   Your Honor, if I may approach?

THE COURT:   Yes.

Q.   (BY MR. MESSER) Three pages in there's a note on this plan, I believe.   You see the note that says, "No studor vents per Town ordinance"?

A.   I see it.

Q.   Now, you've never seen this note before, have you, before the lawsuit?

A.   Not until I saw this book.

Q.   And that's because you canceled the meeting with the building inspector to go over these comments, didn't you?

A.   I couldn't make the meeting.   I was summoned at that time.

Q.   I understand.   And so you've been building this structure without the notes given by the Town, true?

MR. ANDERSON: Objection. I will object, Your Honor, that is not substantiated by his testimony.

THE COURT: I can't hear you.

MR. ANDERSON: I'm sorry, Your Honor.

THE COURT: My hearing got better.

MR. ANDERSON: Sorry, Judge. That's been asked and answered. He testified that it did meet all the requirements of all the comments except for the one comment regarding studor vents.

THE COURT: And the objection is overruled.

Go ahead.

Q.    (BY MR. MESSER) So you've been building this structure without the building plans that the Town has that has the comments on it, true?

A.    The property's not in the Town.

Q.    I understand. You don't have the plans that have the comments, do you?

A.    No.

Q.    So you've been building it without the Town's comments, true?

A.    Yes.

Q.    And you said -- you told the Judge that you were going to comply with all the building requirements; do you remember that testimony?

A.    I said I wasn't going to comply with the studor vent.

Q.    Other than that?

A.    Yeah.

Q.    All right.  How would the Town even know that you do comply or don't comply if they can't go out there and inspect it?  You're not going to allow them to inspect, are you?

A.    I think that's what we're here to determine.

Q.    And if you continue on, you're not going to allow them to inspect, true?

A.    Well, I think that's up to the Court.

Q.    But if it was up to you, you wouldn't do it?

A.    My preference would not.  I have independent inspectors.

Q.    I understand.  And so if the Court does not intervene, you're going to continue to build and you're not going to allow inspections by the Town, true?

A.    That would be my -- that's why we're here.

Q.    I understand.  But that's true, isn't it?  You wouldn't allow it to happen without the Court's intervention?

A.    I really work at the -- at the request of my client, and I'm going to really seek to meet his desire.

Q.    And that would be not to allow inspections as

you've done in the past?

A. I think he has that decision to make after the Court ruling today.

Q. Well, you've already made the decision once or twice, haven't you? Look at tab 13.

A. Yes, I --

Q. The second photograph there.

A. I think it's clear we proceeded.

Q. Do you see the second photograph that's dated 3/14/14 at 9:52 a.m.?

A. Yes.

Q. That's a photograph of the property that we've been talking about, isn't it?

A. Absolutely.

Q. And that's the owner that's depicted there, isn't it?

A. Uh-huh.

Q. Is that a yes?

A. That's -- and I was there also.

Q. Yeah, and you're to the right of him in this picture, right?

A. Correct.

Q. And do you see the red note, stop work order sign posted?

A. Yes.

Q.   And then work continued after the posting of that sign, true?

A.   Absolutely.

Q.   And who took the sign down?

A.   Mr. Bizios took the first one down.

Q.   And who took the second one down?

A.   I don't know who took the second one down.

Q.   But you continued to work regardless of the stop work orders, true?

A.   That's correct.

Q.   If you look at Tab 35.

THE COURT:  Mr. Messer, if you're not going to be referring to this, do you mind if we move this back so I can see you, hear you, and potentially yell at you without being blocked?

Q.   (BY MR. MESSER) Okay.  So on Tab 35, do you see the -- you were looking at before with opposing counsel this colored picture that says -- it's like in tan and orange, looks like this, sir?

A.   Yes.

Q.   That's a depiction of the floodplain, true?

A.   Correct.

Q.   And so the part that's in yellow is what's in the 100-year floodplain, right?

A.   Yes.

Q.    And the part that's in -- I'm just going to say orange, orangish color, is the part that's not in the floodplain, true?

A.    Correct.

Q.    And so the piece of property --

A.    It's not -- let me add, that drawing is not entirely accurate.

THE COURT:  Can I ask you to cite me to which of those pages you're referring to?

MR. MESSER:  Yes, sir, Your Honor.  It's on Tab 35, and it's about four pages in.

THE COURT:  Okay.  I think I just found it.  It says, "Spinnaker Bay Point" at the bottom?

MS. DeCURTIS:  Yes, sir.

MR. MESSER:  Yes, Your Honor.

THE COURT:  Okay.

MR. MESSER:  And it's on --

Q.    (BY MR. ANDERSON) Property 1 is the Bizios tract, true?

A.    Yes.

Q.    So according to this document, it looks to me like about half of the tract is in the 100-year floodplain, right?

A.    I -- we have a survey that says the absolute areas that are in the 537 and are not.  This is -- I

wouldn't say that these are -- this is an overview. This is, like, a long-distance view, and I don't think it's entirely accurate.

Q. I understand. But according to this document, which has been submitted to Denton County, right?

A. Which one?

Q. All the documents in Tab 35 have been submitted to Denton County, right?

A. Yes.

Q. None of those have been given to the Town, true?

A. Correct.

Q. So the Town doesn't have the benefit of any of these document from you, right?

A. Correct.

Q. All right. So if -- this document that shows the 100-year floodplain shows about half of the tract of Mr. Bizios' property is in the 100-year floodplain, true?

A. I can't tell you whether it's a half or whether it's a third. Some of the tract is in the lake, some of it is not.

THE COURT: It shows about half of it is in the lake too, which I'm sure the Corps of Engineers would take issue with too.

Q.    (BY MR. MESSER) And under the same tab, sir, the second page in.  It looks like it's a survey, it says, "Exhibit 3960 Spinnaker Run Pointe;" do you see that?

A.    Yes.

Q.    Shows a footprint of the residential property by the 537 line; do you see that?

A.    Correct.

Q.    The 537 line is the floodplain line, true?

A.    Well, it's the no-build line.  You don't want to build past that point.

Q.    Right.  And so everything outside of that would be in the 100-year floodplain?

A.    It's in the floodplain, yes.

Q.    The property is not -- the property that's going to be built is not in the floodplain, true?

A.    Correct.

Q.    But as I counted, there's four places right up next to the floodplain, true?

A.    Uh-huh.

Q.    Have you ever built a structure next to the 100-year floodplain before?

A.    Yes.

Q.    Okay.  And so you know that this could be a life-safety issue, don't you?

A.   Yes.

Q.   Because if the water raises up in the lake, which is part of the risk of living on the lake, that could put somebody's life in jeopardy, couldn't it?

A.   This house is on 30-foot piers into rock.

Q.   I understand.  You've said that you may build this to the 540 level, true?

A.   I'm going to build it to 540 and six inches.

Q.   And that's really to the Town's standards, right?

A.   It exceeds the Town's standards.

Q.   But you only agreed to that in the temporary restraining order, right?

A.   No.  I was going to build --

THE REPORTER:  I didn't get your question.

A.   The minimum that I have --

THE COURT:  Hold on.  She didn't get the question.

THE WITNESS:  Oh, okay.  Sorry.

THE REPORTER:  I didn't get your question that he's trying to answer.

Q.   (BY MR. MESSER) So you're agreeing to build the house at the 540 level at this point in time?

A.   Yes.

Q.   And that's throughout the project, regardless

of what's in the agreed order?

A.   My --

MR. ANDERSON:  I'm going to object, Judge. That's vague and ambiguous.  I don't understand the question.

THE COURT:  I'm going to give your witness the same opportunity I gave one of their witnesses yesterday and say, "The objection's overruled.  You can answer it if you understand the question."

THE WITNESS:  I'm not sure --

THE COURT:  Then you're supposed to go, "I don't understand the question."

THE WITNESS:  I'm not sure I understand what's going on.

THE COURT:  The objection's overruled, but it was effective nonetheless.

Q.   (BY MR. MESSER) My question is:  Today, you're willing to build the property at the 540 level, true?

A.   It is being built above the 540 level.

Q.   And that's being continued for the duration of the project?

A.   That's correct.

Q.   Okay.  But you understand you're doing that to try to take the property out of the floodplain so that if the water rises, people will be safe?

A.   Yes.   I've built multiple properties in -- I've built homes in floodplains, I've built them near floodplains.  I understand the danger.

Q.   Right.  So it's a life-safety issue?

A.   Possibly.

Q.   So if the water rises too high, it is, isn't it?

A.   Well, historically, it's gotten to 536.

Q.   Are you here to give any kind of opinions about meteorology or when or the probability of this lake rising to a certain level?

A.   I do not own a crystal ball.

Q.   I take it that's a no?

A.   That's a no.

THE COURT:  I'm going to go ahead and interrupt there.  We're going to take a break and then return.  Be back here at 25 after.  It's a little more than 10 minutes.  Just so you know, Mr. Anderson, you have 24 minutes left.  And, Mr. Messer, you have just under 15 minutes left and we'll see you at 25 after.

(Recess taken)

THE COURT:  Mr. Messer, you may continue.

MR. MESSER:  Pass the witness.

REDIRECT EXAMINATION

BY MR. ANDERSON:

Q.   Just to confirm, there was some questions regarding the health safety building out of the 537 line, which is basically a contour line, correct?

A.   Correct.

Q.   And the elevations that you're using meet the Town's requirements, which represent the health and safety standard, correct?

A.   Correct.

Q.   The fact that there's some adjacency to the portion of the building of the 537 line doesn't mean you're not meeting the city's requirements of the 537 for the city, correct?

A.   Yes, definitely not.  I don't feel, given what we're doing, it's going to be a health-safety issue --

(Interruption in proceedings)

THE REPORTER:  You can go ahead.

MR. ANDERSON:  Are you ready, Judge?

THE COURT:  Yes.

Q.   (BY MR. ANDERSON) Mr. Hoffmann, in addition -- you've testified that there are, I guess, incentives on your subcontractors and you to make sure you comply with the International Residential Code; is that correct?

A.   Yes, yes.

Q.   And you have -- have you obtained all of the necessary permits to develop the house, other than the

Lakewood Village permit?

A.   Yes.

Q.   Is there anything in the --

A.   Well, I have not gotten the septic yet, but I have the design in place, but that's typically a little bit later.

Q.   The septic comes near the end of the process?

A.   Right.

Q.   And so is there anything in the Town's regulatory regime involving its building code application that, in your opinion, adds to the health and safety and structure durability of this house?

MR. MESSER:  Objection, it's overbroad.

THE COURT:  I have no idea what your question was.  Can you reask it?

MR. ANDERSON:  Sure.

THE COURT:  Break it up, whatever you need to do.

Q.    (BY MR. ANDERSON) Is there anything in the Town's building permit regulation process that will enhance the health, the safety, or the durability of the house that you're building?

A.   Not that I can see.

MR. ANDERSON:  No further questions, Judge.

MR. MESSER:  I don't have anything else, Your Honor.

THE COURT:  Okay.  Any objection to this witness being released?

MR. ANDERSON:  No objection.

THE COURT:  Okay.  Sir, you're free to go, and you are released from the instructions I gave you yesterday.

THE WITNESS:  There's an exhibit here. Does that go to the Judge?

THE COURT:  What's it marked?

THE WITNESS:  3.

THE COURT:  Yeah.  That was admitted earlier.

MR. MESSER:  Judge, I do have one other witness that's out in the hall.  I would like to call him as rebuttal.

THE COURT:  We'll get there.

Mr. Anderson, do you have any other witnesses?

MR. ANDERSON:  Yeah.  We call Mr. Bizios.

THE COURT:  Okay.  I'll remind you, you're still under oath.

HARRY BIZIOS,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q.   Mr. Bizios, can you give your full name for the record?

A.   Harry Bizios.

Q.   Are you currently employed?

A.   I'm retired.

Q.   What was your occupation or job before you retired?

A.   I worked for Lennox International.  I was their president and chief operating officer.

Q.   Where is Lennox based?

A.   Richardson, Texas.

Q.   Is Lennox a multibillion-dollar corporation?

A.   About a three-and-a-half billion dollar corporation.

Q.   And why did you decide to buy Lot 84 of the Sunrise Bay addition?

A.   Well, I fell in love with it.  I always wanted to be on the lake, and I wanted to build my dream home close to the water.  And when I saw that lot, I thought I had to have it.

Q.   When you bought the property, where did you

think the property was located from a governmental jurisdiction standpoint?

A.     I thought it was located in the jurisdiction of Little Elm.  My address, as a matter of fact, is 3960 Spinnaker Run Pointe, Little Elm.

Q.     And what does the plat say is the jurisdictional area?

A.     Little Elm in Denton.

Q.     Now, are there any signs or monuments that indicate, when a person's traveling in a car, they would be entering the Sunrise Bay addition?

A.     Yes.  There are two monuments; one on the north and one on the south as you're going down El Dorado.

Q.     Have those monument signs been there a long time?

MR. MESSER:  Objection --

A.     As long as -- as I know.  They've, obviously, been there for a long time.

Q.     (BY MR. ANDERSON) Did you originally authorize the submittal of the building permit plan of Exhibit 8 to the Town?

A.     I did.

Q.     Why?

A.     We thought we had to.

Q.     And at that point in time, had you discussed

the jurisdictional issue with an attorney?

A.    Not at that point in time.

Q.    Did you subsequently decide not to pursue the building permit process with Lakewood Village?

A.    I did.

Q.    And why did you decide not to pursue that?

A.    Well, because after consulting with an attorney, I found out that what they were doing and what they were asking for was illegal.  They were overstepping their bounds and municipality, and I objected to that.  I've talked to some of my neighbors, and they went through a similar issue, but they didn't want to take the litigation on because of the cost --

MR. MESSER:  I object, Your Honor.  He's talking about hearsay.

THE COURT:  Just state your legal objection.  Sustained.

Go ahead.

Q.    (BY MR. ANDERSON) I'm just asking for you.  Why did you decide not to pursue -- why was it important to you not to pursue the building permit process?

A.    It's a matter of principle.  It's a matter of principle, and I wanted to take a stand on this.  It was not a financial issue because I've already spent a lot more money on you, Art, than I would have spent had I

paid the permit.  And I intend to spend a lot more money, as necessary.  This is a matter of principle with me, and it's outrageous that a municipality can impose rules that are illegal on nearby citizens.

Q.   And can you vote in Lakewood Village and Lake Shores --

A.   No, I can't.

Q.   Do you receive any services from Lakewood Village?

A.   No, I don't.

THE COURT:  Service of process, right?  You're talking about other services?

MR. ANDERSON:  Yes.

Q.   (BY MR. ANDERSON) Do you receive or will you receive any municipal services from Lakewood Village, other than service of process?

A.   Not that I know of, no.

THE COURT:  You can disregard my attempts of humor.  The Court of Appeals does, so ...

THE WITNESS:  I enjoy your humor.

Q.   (BY MR. ANDERSON) And who maintains the road in front of your lot?

A.   Denton County.

Q.   Do you have any interest of being annexed into Lakewood Village?

A.   No.  I have zero interest.  And if there ever was any interest, I have even less now.

Q.   Do you have any issues with regards to the safety of the house that's being built, its durability, its quality of construction without complying with the Town's ordinance following hearing all the evidence in this case?

A.   None whatsoever.  As a matter of fact, I am convinced that when it's all said and done, I will have the highest quality, safest, most durable house in the subdivision.  If a tornado or an earthquake were to happen, mine will still be standing.

Q.   And just as a housekeeping matter, Mr. Freeman had raised the issue yesterday regarding the retaining wall that was built within the flowage easement.  Do you recall that testimony?

A.   I do.

Q.   Did you obtain all the necessary consents from the Corps to build that engineering wall?

A.   I did.  It was a laborious process.  It took five months, but I got all the permits.  I had to have engineering studies stamped by professional engineers, got all those and erected the wall.

Q.   So the concern Mr. Freeman had was this engineer -- was this approved by an engineering company?

And is it your testimony that you obtained the necessary engineering report that, basically, said that the retaining wall was safely constructed?

A.   Yes, it is.  And as a matter of fact, the Corps of Engineers will not accept it if it isn't stamped by a professional engineer and done by a professional.

MR. ANDERSON:  We pass the witness, Your Honor.

MR. MESSER:  I have nothing, Your Honor.

THE COURT:  Okay.  Sir, you can step down and join your attorney.

Mr. Anderson, any other witnesses?

MR. ANDERSON:  No, Your Honor.

THE COURT:  Okay.  Any rebuttal?

MR. MESSER:  No, Your Honor.

THE COURT:  You said you had rebuttal.

MR. MESSER:  I said I have another witness that might have rebuttal, but now we don't in light of the proceedings.  That's what it was, Your Honor.

THE COURT:  Certainly.  At this point the evidence is closed, then, and any witnesses previously placed under the rule are released from it.  If you need to get somebody to come in, you're welcome to, but that leaves you-all just under 15 minutes apiece for argument, which is good for me.

In short, when we left off yesterday, I had a heavy lean towards denying plaintiff's request for injunction, and that's why I left that first possibility open, that after further consideration and review last night, if that was the conclusion that the Court was going to draw, that you-all would not have to come back down here today.

Obviously, based on my communication with you-all shortly before midnight, I decided I wasn't so sure, and that's why we've come back today and now completed the hearing and provided defendant full opportunity for presentation of evidence and for both parties to present further argument.

Quite frankly, based upon the stipulated evidence admitted and the additional testimony and evidence presented, I really don't see that there are significant material factual disputes that dictate a decision here so much as there are just pure questions of law that the Court is in need of resolving, at least at this first stage.

And I'm struck by, and appreciate, the high level of competence of counsel in briefing the issues and simply note that they are complex, that there don't appear, to me, to be any cases cited by both of you that are strictly on point. And that all of the

cases I've reviewed are potentially distinguishable in some way, potentially in substantial and material ways. And that leaves me at this point with some leans, but absolutely no idea what the proper and correct decision is.

I will make a decision at the end of your arguments that I believe to be proper and correct and have little doubt that regardless of what that decision is, the Court of Appeals will reverse me, and we'll do it all over again down the road.

So I'm going to hear you out and do what I think is dictated by the law and await the Court of Appeals' direction as to whether or not I flipped the coin properly or not.

I don't mean to be flippant about it. That's not at all what I intend to do. I'm just saying that it's a complicated issue with good attorneys and good arguments, and it's a lot tougher call than I'm used to having to make when it's based upon discretion or factual determinations rather than interpretation of very complicated statutes coupled with real property regulations and ordinances.

So since y'all have gotten plenty of time, I wanted to step up to the pulpit for a few minutes and tell you I appreciate the hard work you put into it, but

also resent it because it's made my job much more difficult than it should be.

Anyway, Mr. Messer?

MR. MESSER: Thank you, Your Honor. May it please the Court, Counsel. Rhetorically, I would ask, how was the Town to know? You have the opinion of the builder, the contractor that says, yeah, I'm going to meet every code, I'm going to meet it, I'm going to meet it. But how is the Town going to know that? It's not communicated to us, and they won't let us on the property to see.

Just because he has an opinion they'll do it, that's not how it works. Property owners shouldn't have the discretion to be able to do willy-nilly what they want to do and decide I want to obey this law, but not this law. Government would be in chaos if that happened. We need some uniformity in what we do, particularly in circumstances like this.

I guess I would simply say the property owner simply does not have the right to make those types of decisions, especially not even communicate them to the jurisdiction that they're in.

THE COURT: And we wouldn't be here today unless I were not yet convinced that Lakewood Village has the right to dictate those, so convince me.

MR. MESSER: Fair enough. So, Judge, again I would go to my temporary injunction notebook, Tab 16. I'm going to talk about the two legal issues that I think are in front of the Court. The first one deals with extending our building codes for development issues in the ETJ. And so this is a sheet I put together of the statutes and the law, and I want to talk a little bit about the cases.

So if you look at 212.003 and 212.002, it says we can apply our rules in the ETJ, and the reason is for the safe, orderly, and healthy development of the municipality. That's exactly what the ETJ is for, development in the ETJ.

And so if you look at the Weslaco case, that's what they hinge their decision on. They look at what does development mean? They say, yeah, that includes codes and inspections, and that is connotated by the word "development." So it's express statutory authority 212.003 and 002 that allows a Texas municipality to put their building subdivision rules and inspections in their ETJ.

And the reason is simple, because that is our exclusive right to be able to annex there. Whether it happens or not, that's not the point. It is our exclusive right to do that, and the house right there at

the city limits and the house right across the city limits in the ETJ should both be built to the same standards, they should both be built to the 540 line.

THE COURT: And just to make sure I haven't misunderstood this. It's really not a right, it's a prospective right based upon population growth that, based upon the testimony, is not projected to trigger that right within the next 10 years; is that correct?

MR. MESSER: Partially. The other part of it is, if a property owner asks to be annexed, which that could happen -- I don't know what's going to happen in the future, but if the property owner signs the consent, "I want to be annexed," we have the ability to do that.

THE COURT: Okay.

MR. MESSER: So there's both unilateral and consensual annexations.

THE COURT: And certainly property owners that are then opposed, presumably Mr. Bizios at the very least, would have the ability to oppose it?

MR. MESSER: That's fair, but it is our exclusive right; nobody else's. Not Little Elm, not Oak Point. It is our right.

THE COURT: At this point in time, it's

not a right, it's a potential or prospective right sometime down the road?

MR. MESSER: Yeah. All I'm saying is the ability to annex is ours, it's nobody else's. Whether it happens, yeah, you're right.

THE COURT: We're using different terminology for the same concept, but okay.

MR. MESSER: And so the reason is simple. If you look at the statutory authority, and the intent is in 212.002 and 42.001 is to promote the development in the ETJ, in the areas adjacent to the municipalities, and for the municipality.

So it's clear. There's statutory authority that allows home rule cities and general law cities alike to do this. Really, I think that is buttressed by these two other statutes that I don't see how they get around. And no cases ever discuss them, Your Honor.

It's the one that deals with permits in the ETJ. If that -- if we don't have the right to extend our codes in the ETJ, how can that statute ever apply? It would be useless for that statute to be written, and we know that the legislature's never presumed to do a useless act.

The same holds true for 233.153, all

right. That statute basically says -- deals with counties and counties' building codes. But it says, if a municipality has a building code adopted in the ETJ, which we have undisputably, our code applies exclusively. You have an exhibit by Denton County that recognizes that, and it gives notice to property owners and builders.

You've got a municipality that's got a building code, you've got to go to the municipality. That was a resolution that was passed five-oh by the Denton County Commissioners Court that says exactly the same thing, it mirrors state law. If that -- we do not have this ability, that law, what Denton County has done, is rendered useless. To me, those two very specific provisions are huge stumbling blocks.

THE COURT: What's to say that the county's not acting beyond its authority in issuing that order?

MR. MESSER: They may be. They may be.

THE COURT: In other words, I'm sure that's what the defendant would argue, that if the Town of Lakewood Village authority is limited to that which is provided by statute, then no matter what the Denton County Commissioners Court orders, that's not statute, and that's not going to extend the Town's authority.

MR. MESSER: You're right, but that statute -- the order of Denton County Commissioners Court is based upon 233.153. That statute gives us this authority. That statute's what is the enabling act for Denton County to make their unanimous decision. So they go hand in hand.

Talking about some of the cases, Your Honor, that has interpretation. You know, Mr. Anderson gave you a notebook, and I'm glad he did, because there's a case that's very helpful to us in here. It's involving the San Antonio Court of Appeals, the Milestone Potranco Development case.

That case dealt with a tree preservation ordinance. A tree preservation ordinance. And the issue was, could the City of San Antonio use that tree preservation ordinance in its ETJ? And the San Antonio court held for the same reasons that are applicable here, yeah, you can extend it to the ETJ based on 212.002 and 212.003.

And so my view is, if a tree preservation ordinance by 212.002 and 003 can be used in the ETJ in San Antonio, why can't the building codes and inspection authority be extended likewise? There's no difference. And that's the case he's using.

There's two other cases that we've cited

that are in our book that mirror that same result. It's the one involving the Town of Lucas. Lucas was a general law municipality. North Texas Municipal Water District wanted to build their large treatment plant on 75 acres in their ETJ. The water district did not want to use the Lucas building codes. Same exact theory as we have here, same exact arguments. And the Dallas Court of Appeals held that they have to.

And it was telling the way they talked about it. They said, "Were we to hold that the building standards are not contemplated by the 212 statutes, we would be left with the statute" --

THE REPORTER: I'm sorry. We would be left with the statute?

MR. MESSER: I'm sorry. Let me slow down just a second.

-- "that grants authority over the laying out of streets, alleys and lot boundaries, but precludes authority over the most important part of a subdivision. Consequently, we conclude the power over subdivisions conferred in 212 gives the right to issue regulations regarding construction of housing, buildings, and the components thereof."

And so you've got the San Antonio Court of Appeals that's done this, you've got the Dallas Court of

Appeals that's done this.

There's one other case, the Corpus Christi Court of Appeals did the same thing in the Weslaco case. They extended the building codes. And they're the ones, the Court of Appeals granted a permanent injunction against the developer until there's compliance with the codes.

You've got -- I understand the Fort Worth Court of Appeals hasn't rendered an opinion on this. The Sunrise Bay case that they rely upon is not on point, because exactly what we did here is exactly what Sunrise Bay didn't. They didn't have an ordinance that extended their subdivision regulations to the ETJ. That case never got to the point where we're at. They had evidence, et cetera, but it's totally distinguishable.

So you've got the Corpus Christi court, San Antonio court, and the Dallas court all in uniformity. And they say that a city can extend these type of regulations to the ETJ.

So in order for the defendant's position to prevail, it would have to be contrary to the express language of the 212 statutes, contrary to the permitting statute in 214.904, contrary to the 233 statute involving county authority and the exclusion they give municipalities that extend the building code, and

contrary to these three other Courts of Appeals, Your Honor.

It's a pretty hefty burden, in my view, that they have to overcome in order to prevail.

THE COURT: Do you want to save a few minutes for rebuttal?

MR. MESSER: Yes, sir, Your Honor. I think I've got a couple minutes left.

THE COURT: You've got four.

MR. MESSER: I do have some issues on vested rights I'm happy to address on close.

THE COURT: I'm just letting you know where you are and seeing what you want to do with that remaining time.

MR. MESSER: Thank you.

THE COURT: Mr. Anderson?

MR. ANDERSON: Thank you, Your Honor. Your Honor, if you wouldn't mind, we'll be referring to the very small notebook.

THE COURT: This is the one I chose to carry in my bad arm.

MR. ANDERSON: Even with a bad shoulder. Good.

I think the Court's questioning is on point, which is, okay, I see these things in the

statute, but where is there anything that expressly says a general law town has the authority to require the issuance of a building permit in the ETJ?

And so Mr. Messer says, it's clearly in there. It's not. I mean, you can review all the statutes you want. There's nothing that relates to that. As a matter of fact, there's only one provision that addresses that, which we'll go into, for a certain type of platting and getting a building permit that a legislature said you're specifically not authorized to require a building permit in the ETJ.

Your Honor, the only code that I know of in the statutes that addresses building codes, and I don't have it in there, but I want to give this to you, Judge, is 214.212, and it says, "To protect the public health, safety, and welfare, the International Residential Code is adopted as a municipal residential building code in this state," and then B, states, "The International Residential Code applies to all construction, alteration, remodeling, enlargement, and repair of residential structures in a municipality."

There is absolutely no reference to the ability to require permits in the ETJ. Judge, if I may, I can go ahead and give you that page.

THE COURT: Okay. Is this what you asked

me to take judicial notice of earlier?

MR. ANDERSON: Yes.

THE COURT: Okay. I will now take judicial notice of it.

MR. ANDERSON: So the critical component is, contrary to what Mr. Messer says, we wouldn't be wrestling with this, Judge, if it was expressly set forth in the statute that a general law town has the ability to obtain a building permit in its ETJ. We wouldn't be here.

So the issue is, has the legislature given express authority somewhere else for them to do that? And so, if we could talk briefly, I think he raised the issue on annexation, Judge. And I think there was a little bit of lack of clarity with regards to some of Mr. Messer's answers, but I just want to make sure.

A home rule city has the authority to annex unilaterally over the property owner's lack of consent. Today as a general law town, the legislative structure for annexation says if you're less than a thousand, you have to get their consent. Mr. Bizios says, "You're never going to get my consent." So they are prohibited from annexing his property.

There is a provision in 43.033 which gives the authority, if they reach a population of a

thousand -- and what their brief says, that will be in 10 years -- then they can do so if they provide water or sewer. Well, water's already provided by Little Elm. All these lots are going to be on septic, as the testimony indicated.

As Mr. Hoffmann testified, it would be millions of dollars to extend sewer, plus there's the fact that there's the certificate of convenience and necessity issued by the TCQ for sewer that's issued to Little Elm that there's no indication that they're going to give that up. So I think that the prospective odds - I think that was the question, the prospective annexation, the possibilities under that provision are nil.

The next way you can do that is if you get to a 5,000 population and have the home rule charter election and become home rule, and Ms. Asbell testified their ultimate buildout is anticipated to be 2500. So there is absolutely no way that they can annex this property, which is one of the reasons that they stated previously as to why it would make sense to give them the authority to regulate the building process in their ETJ.

Again, that's exemplified in the City of Northlake versus East Justin JV where Judge Gabriel

said, basically, if you're a general law town, you've got to comply with the ordinances strictly.

The Runaway Bay, I agree with Mr. Messer that there is a distinction, and I think that's probably what the Court was referring to at the beginning saying there's a distinction. It's pretty close, but there is a distinction because the Court said, I'm not going to overrule -- or I'm not going to strike this ordinance -- well, actually, they did say that. I'm not going to rule that you cannot annex into your ETJ, but I'm going to strike this ordinance because it did not expressly state that it was applied.

But I think if you look at footnote 4, Judge, that -- basically, I think the Court of Appeals is reciting the arguments that I made at the Court -- to the Court on that particular case. And it says, "Rhino argues that 'this subchapter says nothing about building in general or permits in specific' and does not confer authority on the City to extend its building code as opposed to 'rules governing plats and subdivisions' to its ETJ, especially in light of section 212.049 which provides that 'this subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its [ETJ]."

And that's kind of the first part. So what it's referring to there is, if you look on the next tab on 3, there's a Subchapter A and a Subchapter B in the platting statute, that's Chapter 212. And as a matter of fact, Mr. Messer says, we can do this because we're a regulating development within our ETJ.

Well, Subchapter A states that this is for subdivisions of land. So if you want to subdivide land and put in public improvements, that's what Subchapter A addresses, regulation of subdivisions. As we indicated, and we'll go through here, the Town has no regulatory authority for subdivisions on this tract of land. Zero. They don't have any authority.

And the reason is, as we'll go into, is the statutory provision that says if you have an addition, the city with the largest population with their ETJ controls that process. That's why that plat was approved by the county, because it's in the county, and also by the City of Little Elm, because they have a bigger population than Lakewood Village.

So Lakewood Village has no legal authority to apply its subdivision regulations in terms of requiring a plat or anything else because this property was approved by Little Elm and the county in accordance with their provisions.

So if this is regulated by Subchapter B, which is regulation of property development, which I think is what Mr. Messer argued, if you look on the next page on 212.049, which the Court of Appeals refers to, Judge, on that footnote 4 we were reading, says "This subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its [ETJ]."

So under A, they don't have any authority there because of the provision that is in the next section which says that the largest city with ETJ has the authority to regulate subdivisions. And if they're saying they have it under B, that expressly says the legislative intent that you can't require a building code here.

The next argument, Your Honor, is under the Milestone -- so this is kind of the follow-up, and this is how the cases have come down, the ones I've been involved in. I think the only two cases that involve extension of building codes to ETJs are the Runaway Bay case and the Town of Talty case, the Hartsell case, both of which the Court ruled for the developer but didn't reach the fundamental question -- which you're correct -- which is, do they have the authority or not?

So if the Court were -- where I could

foresee an argument at the Court of Appeals, if it came up that way, would be that without reaching a fundamental question under one, under two, what I just argued, that they don't have the authority, pursuant to the Subdivision Statute, to extend their codes due to the fact that Section 212.007 specifically says the city that has the larger ETJ is the one that has the authority to approve plats.

The Milestone Potranco case, I think Mr. Messer says that's, of course his case. I always hate to put cases in my booklet that support him. The point there is that the Court of Appeals -- the argument was raised, can you apply the tree ordinance separate and apart from the subdivision process? In other words, people were concerned, I own a house, I've got a tree, they're going to permit me from cutting down a tree on my own lot for firewood or for whatever reason. And the Court of Appeals says, no, this only applies as part of the subdivision platting process.

That's basically the only time that it will apply, and it puts the standards for land development are consolidated in the development standards. The overall structure demonstrates that these are applicable to the city's ETJ and are intended to be limited in their application to the subdivision of

land and land development.

So that basically is where the Court of Appeals is saying, unless it's part of the subdivision process, then these particular ordinances cannot be applied.

And then the last argument, Your Honor, concerns the vested rights statute. And that's basically what the Court -- the Dallas Court of Appeals held in the --

THE COURT: Hartsell.

MR. ANDERSON: -- Hartsell case. I would like to go ahead, because you raised the issue on the exemptions, which is in 245.004, and I've had to deal with this a lot in terms of this particular one under number one. It's important to distinguish between projects and permits and which permits it applies to.

So it says, "This chapter does not apply to a permit that is at least two years old, is issued for the construction of a building or structure intended for human occupancy or habitation."

Okay. So that's a permit for a building permit, if that makes sense. We also have a permit for the plat, which is 20 years old, 1995, approximately. That's not what this exemption applies to, okay?

That that -- this only applies to a

building permit that is at least two years old for a house. And, basically, I think the intent, although I don't really know, is not to let that building permit just languish out there and not actually start construction. If there's changes, then you would have to bring it up to the Uniform Building Code requirements. Other than that, it meets the requirements.

And with regards to notice, Your Honor, I think the evidence -- you know, the city secretary hadn't been there that long, the building inspector is on and off with what he does, right, this is not his day job, this is something he does at night, things like that.

Saying we didn't know about that plat, well, that's, you know, disingenuous because the Statute 212 specifically states that if you're going to subdivide and convey tracts of land that are five acres or less in size -- it's 212.004. Judge, may I approach?

THE COURT: Yes.

MR. ANDERSON: I'm going to actually -- if I can have my book back and make sure that you got the copy.

Under 212.004, it states that you have to go in and get it platted. So it -- as the testimony

also indicated in the exhibits, most -- virtually all of the city maps show the lots that were in the subdivision.

So for the city to say, wow, we didn't even know there was a plat out there is just wrong. Maybe individuals may or may not have, but it's just obvious that if you're out there building houses on the northern part of the Town and each one of those is on about two or three acres, which is less than five, there had to be a plat.

Now, they may not have known specifically about 1995, but that's their fault. I mean, easily you could have gone and seen this in the deed of records. You can't have an addition unless it's been platted. So we have Sunrise Bay addition signs, we've got the houses that have been built on the individual lots. And according to several of the Town's maps, show the platted lots.

So to say, wow, we didn't know about this plat here clearly is just -- maybe individuals did not, but from a collective knowledge and from constructive notice that it's clear that they did.

Finally, Judge, Mr. Messer said we have some terrible burden which, hopefully, our argument with regards to the law has met that, but I think the point

is they have a burden. They're the plaintiff, they're trying to get the temporary injunction.

There's no testimony that I -- that I heard or any evidence that says there's any imminent, health, safety or danger, any issue that's there with regards to the quality of the construction. We have safeguards upon safeguards.

And frankly, Judge, sometimes, you know, the private sector is as good. When you have really quality contractors and subcontractors, all of which are going to comply with the code as indicated by the testimony anyway, that they are as concerned about complying with code as meeting any city regulations.

Then finally, Judge, I know you didn't want to hear it, but the bottom line is, there is testimony that the fee by the city secretary was -- she said was going to be in excess of $14,000. The testimony by the building inspector said that the actual fee for reviewing all the plans and doing all the inspections would be $1,200.

MR. MESSER: Your Honor, I think this is not relevant.

THE COURT: Okay. Your objection is noted. It's overruled.

Go ahead.

MR. ANDERSON: Okay. I'm just pointing out that there's collection of fees of $14,000, and they're paying the building official $1,200. And so we believe that it's clear that this has really nothing to do with health, safety, those types of things. There's no question that this house is going to be built according to code, and it's going to be built in the most safe way possible.

I think the real issue for the Town, and that's why they've got three lawyers here and lots of folks at the table, is because they want to make sure that they have that revenue source which, really, they are not entitled to.

Thank you, Your Honor.

THE COURT: And just to be clear, I didn't decline to hear anything that was properly before me, but with respect to the position stated in your pleading that there was some constitutional basis to challenge that fee, I didn't consider that to be a necessary issue with respect to the injunction. And as a result, rendered that evidence irrelevant to the issue of whether an injunction is properly issued. And the constitutional arguments as to the fee can be raised at a later time, if any.

Mr. Messer?

MR. MESSER: Thank you, Your Honor. Just briefly. If the Court does not grant this injunctive relief, then this project goes forward, they go out there and they pour that foundation in a day, a couple of days, they're at risk, they're at peril. Because then we could make them go out there, tear it up so we could then inspect, if injunctive relief is not granted. It's very difficult to unscramble the eggs at this point. It's very simple to allow this to go forward and allow the inspection to happen, the way they properly should.

One brief comment about Mr. Anderson's arguments is what he didn't say. He didn't say a word about 214.904 or 233.153, the very statutes that talk about our building permits in the ETJ and our exclusive right to do that when we have building codes in the ETJ. The statutes are clear. They give us that authority. He didn't say one word about it.

Didn't say one word about the Lucas case or the Weslaco case. All those things are clearly in our favor that will allow injunctive relief that happen to allow us to make inspections in the ETJ.

If you want to look at the vested rights, really, the Austin Court of Appeals got it right. In our notebook we cited here, Your Honor, Tab 14, the

Shumaker case versus Austin, the same exact thing where a developer was picking and choosing what they were wanting to do. They're saying, you know what? The plat was given by the county, but the city never addressed it.

And the Austin Court of Appeals said, if you're going to try to have vested rights, you've got to submit that to that regulatory authority, the city. And if it's not submitted to the city, it's not binding on the city, and you don't have any vested rights. Exactly the same argument that we have here.

And there's also some exclusions that apply here, Your Honor. Actually, if you look at 245.006, they can't enforce the vested rights statutes unless they have a claim for mandamus, declaratory injunctive relief, which they don't have. So they can't even have these rights in the first place.

But if you want to look at the exceptions, the whole point of this under 245.004(1) is to allow cities to have updated building codes so that we don't have to apply a 1995 building code to this standard. If that's what they wanted, well, they're not doing it. They're using an updated version of the building code.

So the very exception that talks about vested rights says it excludes building codes by

municipality, just like we have here. So I think the vested rights argument is not as complicated, to me, as the statutory authority and the issues involving 212.

And I think those statutes, the permitting statutes, and the exclusive ability to have codes in the ETJ, along with these cases that we cited, we've provided to the Court, clearly give us the right to injunctive relief.

And it's a little bit -- I think, actually, the plaintiffs, I think a little bit, it's like a venue forum shopping. They're trying to pick and choose who they want to go with. Well, we'll start with the Town. No, we don't want the Town. We don't like the Town. There's something that they don't like about it, well then, we'll go to the county.

Well, 233 gives the city -- if you read it -- if we have building codes that we've enacted in the extraterritorial jurisdiction, then ours control. That's what the statute says, and the county's have no effect.

That gives us the exclusive right. Just as if you had exclusive jurisdiction or venue in one case, no other court has that venue. It's exactly the same peril as we have here. We have the exclusive right to have the building codes in our ETJ, and not a word

was said by them.

So we think that the Court should do just exactly what the Corpus Christi Court of Appeals did in the Weslaco case and enter a temporary injunction until they comply with our ordinances.

Thank you.

THE COURT: The final legal question that I would ask for very brief feedback from you both about. If I understand the appellate remedies available, based upon the granting or denial of a temporary injunction, there is no traditional or interlocutory right to appeal. It would only be through the issuance of a -- well, through the filing of a petition for writ of mandamus, and the issuance of mandamus, that either party would be able to bring the issue to the Court of Appeals; is that correct, or incorrect?

MR. MESSER: I think that's incorrect, Your Honor. I don't have my Civil Practice and Remedies Code here, but I think it's Chapter 54 -- yeah, 54.014. And one of the subparts is injunctive relief under temporary injunction, so --

THE COURT: So it would be an interlocutory appeal?

MR. MESSER: If there's an interlocutory appeal at this stage, whatever the Court's decision is.

THE COURT: Frankly, one of the statutes cited -- and it runs together at some point. One of the statutes cited yesterday, I noticed, referenced the city's remedies in the district court being related to injunctions and referenced mandamus, I believe. But that's why I was a bit confused as to what either party's appellate remedies would be, but I didn't mean to sidetrack us.

So do you concur, Mr. Anderson, that there's provision for an interlocutory appeal?

MR. ANDERSON: That's my recollection, Judge.

THE COURT: If the framework for my evaluation of this request for injunctive relief were merely pursuant to the traditional criteria listed in the Rules of Civil Procedure or based upon this Court's judgment of equity, quite frankly, there would be no injunction. In other words, what I've concluded is the law is not a law that I particularly like or care for, and I don't think a city should have the ability to tell a property owner what to do with property for which they provide no services, just as a matter of fundamental equity and fairness.

But that's to say that I've concluded that the city, the Town, is within its authority, and the

injunction will issue, the motion to dissolve the temporary restraining order is denied, and the injunction requested is granted.

Anything further?

Mr. Anderson, looks like you're 2 and 0 so far on these related issues with the Court of Appeals in Fort Worth, and against the backdrop of my comments, if they up your record to 3 and 0 and reverse this and send it back to me, it won't hurt my feelings. In fact, I'll be comforted from an equitable standpoint that I got it wrong, and that ended up being a good thing. But based upon these well-briefed and argued positions, the coin landed on tails and that means the plaintiff wins.

MR. MESSER: I do have a proposed order, Your Honor.

THE COURT: If you'll bring it up. Does this track your pleading and petition?

MR. MESSER: I believe it does.

THE COURT: Do you have any objections to the form?

MR. ANDERSON: I haven't looked at it, Judge.

THE COURT: Feel free to take a minute to look at it.

MR. ANDERSON: Judge, I do have some

comments.

THE COURT: Okay.

MR. ANDERSON: On the first page, yes, we've got a little bit of a procedural question on the studor vent. It's been installed. Pursuant to the TRO, we were allowed to continue. And we would ask for whatever relief is necessary from the Town that we don't have to go rip that out and redo that part, because we proceeded in good faith with regards to the TRO, which basically said we could continue to do plumbing.

THE COURT: Right. Well, to the extent that this would simply apply from this moment forward and it's not intended to undo or modify the terms of the prior agreed temporary restraining order, it appears that the immediately cease and desist --

MR. ANDERSON: Right. The issue we, have I think, technically is they went out and looked at it and said, yeah, you put it in, but that studor vent doesn't comply. I don't even know what it is, Judge, but whatever it is, it's in there, and it's kind of hard --

THE COURT: It's a studor vent. Come on, Mr. Anderson.

MR. ANDERSON: But it's expensive to redo, and so we would just ask that that part be exempted out

from the scope --

THE COURT: Well, my point is, at least not the first page you referenced, I don't think that it requires anything to be undone.

MR. ANDERSON: Okay. Well, that's -- if we have that agreement, I'm --

THE COURT: I'm looking at the language and it says, "Shall immediately cease and desist any construction." That means further or future. It just means don't do anything else. It doesn't undo or order the remedial deconstruction or modification of anything that's already in place.

MR. ANDERSON: Yeah, I know, Your Honor, but it --

MR. MESSER: I can't agree with that unless my client would agree with that, and it's part of our code. I can't see how I can say, "You don't have to meet our code."

THE COURT: I guess my point is, I'm not real sure what modification you're proposing, or what specific part of this proposed injunction you have taken issue with as to form, at least.

MR. ANDERSON: Yeah. That's -- on the first page, it's an issue of clarity, and if the Court can confirm it. I don't know if we need to put it on

the record by revising the order to state that all the improvements that have been put on the property to date do not have to go back and get permits and go back and get approvals is acceptable. If it goes from here forward, then that's not a problem.

THE COURT: That's been clarified here on the record, and I think it's clear from the terms of the injunction, that "defendant shall cease and desist any construction on the property," and that means from this point forward and does not remediate any conditions present at this point in time.

MR. MESSER: I just want to point out, Your Honor, they failed the inspection yesterday. This doesn't remedy that?

THE COURT: Nor is it intended to.

MS. DeCURTIS: They'll have a final plumbing inspection that they won't be able to pass if they don't change it.

THE COURT: Again, not my concern. I'm concerned with entering a temporary injunction from this point forward that maintains a status quo subject to the determination at the Court of Appeals that this Court did not have the authority to enter that injunction and pending a final determination of the merits of the underlying lawsuit.

MR. MESSER:  Okay.

MR. ANDERSON:  So to make sure that I understand.  On the first page when it says, "Immediately cease and desist any construction on the property," that's any new construction after today; is that correct?

THE COURT:  Correct.

MR. ANDERSON:  Okay.

THE COURT:  And yet it goes on to say, "until such time as they have applied for and obtained approval."  So, in theory, construction may continue, even in the face of this injunction, if those three subsequent conditions are met.

MR. ANDERSON:  Sure, I understand.

THE COURT:  Make sense?

MR. ANDERSON:  I just want to make sure that it's clear that for construction prior to today, there's not a necessity to meet 1, 2 and 3.  For any new construction after today, there's a requirement to meet 1, 2 and 3.

THE COURT:  Yes.  That's a good way of clarifying it.

MR. ANDERSON:  Thank you, Your Honor.

THE COURT:  And if that means that the current condition will preclude there from being

approvals under 1, 2 and 3, then so be it.

MR. ANDERSON: What does that mean, Judge? I'm sorry.

THE COURT: If the city, if the Town, will not provide approval for any further permits, or based upon the current condition of the property, then the injunction, I believe, prevents there from being further construction.

MR. ANDERSON: I'm sorry, Judge, I'm trying not to be obtuse, but I've got a practical problem that we really need to address.

THE COURT: And I'm happy to address it, but I'm not following you.

MR. ANDERSON: Okay. My issue is, we've got construction out there. There's specific issue on this vent, and it failed inspection. The typical code would say, you can't do anymore construction until you get us a permit that showed all the past construction has been approved, okay?

THE COURT: Right.

MR. ANDERSON: And so that, I think, is the issue --

MR. MESSER: There was some other one, too. There was copper on the plumbing part of it that was not done. So there was more than one issue --

(Sotto Voce discussion between Mr. Anderson and Mr. Messer)

THE COURT: Here's the problem. My bailiff yesterday didn't get a lunch, I hardly got a lunch, the court reporter didn't get a lunch. Not doing it again today. I've got to cut this off because I've got another docket starting in an hour.

Typically if a party objects to the proposed form of an order, they provide me with their proposed language. You may be being obtuse, I may just be dense. I'm just not following what it is about this language that you take issue with and what modification to it you would propose to address the issue as you see it. I'm just not understanding.

MR. ANDERSON: The modification we would request is for all construction on the property to date, no permits are required and no modifications to the construction that's been done are required in order to obtain additional permits. That's the additional language we would request.

THE COURT: Okay. Here's what we're going to do. When you get back to your office this afternoon, reply all to the message that I sent you-all late last night. Attach to it a Word document containing whatever language that you propose be modified from what they've

submitted.  In fact, if y'all can provide that document to him in Word format, that will maybe get us that much farther ahead.

MR. MESSER:  Sure.

THE COURT:  And then assuming you want this injunction entered before 5:00 o'clock today, respond promptly --

MR. MESSER:  Yes.

THE COURT:  -- with any objections you have; that is, if y'all can work it out and figure out what form is proper -- for whatever reasons, I'm just not grasping the specific language that you take issue with or what you believe the language should say, and we need to resolve it before 5:00 o'clock today.

MR. ANDERSON:  I understand the timing issue.  If I could ask just one quick question.

THE COURT:  Certainly.

MR. ANDERSON:  There's a lot of language on page 2, which you would have in a typical temporary injunction form, but I don't think there's anything that they've shown about plaintiff suffering immediate and irreparable harm.

THE COURT:  That should be stricken, because as I understand it, that's neither the plaintiff's burden to prove, nor was it a factor.  In

fact, I think I alluded to the fact that if it were, the decision may be different.

MR. ANDERSON:  And I don't think you found that the injunction would not cause undue harm to defendant as far as --

THE COURT:  Same thing applies there. That's pursuant to the traditional framework within which the Rules of Civil Procedure require an injunction or injunctive relief to be considered, but that is not applicable to this case.

So here's what we're going to do.  As soon as possible, please modify your proposed order to eliminate those provisions, reply all, and Mr. Anderson will then reply all with his proposal.  Y'all can go back and forth as long as you want this afternoon, with or without the Court's being part of those conversations, but at 5:00 o'clock today, I'm going to take all of that into consideration and enter some order.

I'll also say that I will not be here at that time.  I will be doing that remotely as my surgical follow-up is at 4:00 something today.  So getting a hard copy, a physical copy of the order will not be possible until tomorrow morning, but you'll at least know the substantive decision by my remote communication to your

messages.

MR. ANDERSON:  Very good.

THE COURT:  Thank you.

MR. MESSER:  Thank you, Your Honor.

(Proceedings adjourned)

STATE OF TEXAS

COUNTY OF DENTON

I, Mellony Ariail, Official Court Reporter in and for the 431st District Court of Denton, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND this the 1st day of June, 2014.

/s/ Mellony Ariail
Mellony Ariail, CRR, RMR, CBC
Texas CSR 3729
Official Court Reporter
431st District Court
1450 E. McKinney Street
Denton, Texas 76209
940.349.4372
mellony.ariail@dentoncounty.com
Expiration:  12/31/2014

REPORTER'S RECORD

VOLUME 4 OF 4 VOLUMES

TRIAL COURT CAUSE NO. 14-01991-431

COURT OF APPEALS NO. 02-14-00143-CV

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
6/2/2014 2:41:22 PM
DEBRA SPISAK
Clerk

TOWN OF LAKEWOOD VILLAGE, ) IN THE DISTRICT COURT
TEXAS                     )
                          )
VS.                       ) DENTON COUNTY, TEXAS
                          )
HARRY BIZIOS              ) 431ST JUDICIAL DISTRICT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

EXHIBIT VOLUME

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VOLUME 4

EXHIBIT VOLUME

PAGE VOL.

Reporter's Certificate with Cost ..................3    4

Stipulated Exhibits Index ........................5    4

Plaintiff's Exhibits Index ......................8    4

Defendant's Exhibits Index ......................8    4

TRIAL COURT CAUSE NO. 14-01991-431

COURT OF APPEALS NO. 02-14-00143-CV

| TOWN OF LAKEWOOD VILLAGE, TEXAS | ) | IN THE DISTRICT COURT |
|---|---|---|
| VS. | ) | DENTON COUNTY, TEXAS |
| HARRY BIZIOS | ) | 431ST JUDICIAL DISTRICT |

STATE OF TEXAS

COUNTY OF DENTON

I, Mellony Ariail, Official Court Reporter in and for the 431st District Court of Denton, State of Texas, do hereby certify that the following exhibits constitute true and complete duplicates of the original exhibits, excluding physical evidence, offered into evidence during the MOTION FOR TEMPORARY INJUNCTION; MOTION TO DISSOLVE TRO AND DENY TEMPORARY INJUNCTION in the above-entitled and numbered cause as set out herein before the Honorable Jonathan Bailey, Judge of the 431st District Court of Denton County, State of Texas.

I further certify that the total cost for the preparation of this Reporter's Record is $2,836.00 and was paid by Mr. Art Anderson.

WITNESS MY OFFICIAL HAND this the 1st day of June, 2014.

/s/ Mellony Ariail
Mellony Ariail, CRR, RMR, CBC
Texas CSR 3729
Official Court Reporter
431st District Court
1450 E. McKinney Street
Denton, Texas 76209
mellony.ariail@dentoncounty.com
Telephone:  940.349.4372
Expiration:  12/31/2014

STIPULATED EXHIBITS

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | General Warranty Deed 2013-69513 6/7/13 | 9 v2 | 9 v2 |
| 2 | Town Limits and ETJ Official Map | 9 v2 | 9 v2 |
| 3 | Denton County Map of Town and ETJ | 9 v2 | 9 v2 |
| 4 | Denton County ETJ Map of Subdivision | 9 v2 | 9 v2 |
| 5 | Denton County Map of Contours | 9 v2 | 9 v2 |
| 6 | Denton County Appraisal District Records of Property | 9 v2 | 9 v2 |
| 7 | Plat of Sunrise Bay Subdivision | 9 v2 | 9 v2 |
| 8 | Site Plans and Building Plans and Elevations of 3960 Spinnaker Run Pointe | 9 v2 | 9 v2 |
| 9 | Stop Work Order 3/13/14 | 9 v2 | 9 v2 |
| 10 | Stop Work Order 3/14/14 | 9 v2 | 9 v2 |
| 11 | Photographs dated 3/10/14 | 9 v2 | 9 v2 |
| 12 | Photographs dated 3/13/14 | 9 v2 | 9 v2 |
| 13 | Photographs dated 3/14/14 | 9 v2 | 9 v2 |
| 14 | Photographs dated 3/18/14 | 9 v2 | 9 v2 |

STIPULATED EXHIBITS (Cont)

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
| --- | --- | --- | --- |
| 15 | Builder's Registration Application dated 1/27/14 | 9 v2 | 9 v2 |
| 16 | Flowage Easement | 9 v2 | 9 v2 |
| 17 | Denton County Commissioners Court Order No. 10-0045 1/26/10 | 9 v2 | 9 v2 |
| 18 | Denton County Notice to Home Builders and Home Buyers | 9 v2 | 9 v2 |
| 19 | Town of Lakewood Village Ordinance No. 08-06 | 9 v2 | 9 v2 |
| 20 | Town of Lakewood Village Ordinance No. 08-09 | 9 v2 | 9 v2 |
| 21 | Town of Lakewood Village Ordinance No. 10-01 | 9 v2 | 9 v2 |
| 22 | Town of Lakewood Village Ordinance No. 11-04 | 9 v2 | 9 v2 |
| 23 | Town of Lakewood Village Ordinance No. 11-08 | 9 v2 | 9 v2 |
| 24 | Town of Lakewood Village Ordinance No. 11-09 | 9 v2 | 9 v2 |
| 25 | Town of Lakewood Village Ordinance No. 11-11 | 9 v2 | 9 v2 |

| STIPULATED EXHIBITS (Cont) | | | |
| --- | --- | --- | --- |
| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
| 26 | Town of Lakewood Village Ordinance No. 11-13 | 9 v2 | 9 v2 |
| 27 | Town of Lakewood Village Ordinance 11-16 | 9 v2 | 9 v2 |
| 28 | Town of Lakewood Village Ordinance No. 13-07 | 9 v2 | 9 v2 |
| 29 | 2006 International Residential Building Code, Ch. 1 and excerpts | 9 v2 | 9 v2 |
| 30 | 2005 National Electric Code excerpts | 9 v2 | 9 v2 |
| 31 | Email between Linda Asbell and Alan Hoffmann 3/12/14 | 9 v2 | 9 v2 |
| 32 | Copy of a map showing Little Elm and Lakewood Village limits | 9 v2 | 9 v2 |
| 33 | US Army Corps of Engineer Consent No. DACW63-9-14-0533 | 9 v2 | 9 v2 |
| 34 | Declaration of Covenants, Conditions and Restrictions Sunrise Bay at Lake Lewisville Section One | 9 v2 | 9 v2 |
| 35 | Application for Development Permit approved by Denton County | 9 v2 | 9 v2 |
| 36 | Elevation Certificate | 9 v2 | 9 v2 |
| 37 | Form Board Survey | 9 v2 | 9 v2 |

EXHIBITS OFFERED BY PLAINTIFF

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Certified Copy of Denton County Notice to Home Builders and Home Buyers | 106 v2 | 108 v2 |
| 2 | Plumbing Permit (Record Only) | 153 v2 | 154 v2 |
| 3 | Fence Permit (Record Only) | 153 v2 | 154 v2 |
| 4 | Residential Swimming Pool/Spa Permit Application (Record Only) | 153 v2 | 154 v2 |
| 8A | Blowup of Plf. Ex. 8 | 155 v2 | 156 v2 |

EXHIBITS OFFERED BY DEFENDANT

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 1 | Resume of Alan Hoffmann | 7 v3 | 8 v3 |
| 2 | Rendering | 20 v3 | 22 v3 |
| 3 | Aerial Picture of Bizios Lot | 26 v3 | 26 v3 |



PLAINTIFF'S EXHIBITS

STATE OF TEXAS )
)  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Notice and Resolution – Certain Residential Construction in Unincorporated Areas of Denton County. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand this 14th day of April, 2014.

Bennett C. Howell, III, PE, CFM


PETITIONER'S
EXHIBIT
1



# Denton County
# Department of Public Works
### Engineering Division
1505 East McKinney Street, Suite 175 – Denton, Texas 76209
940.349.3250 phone – 940.349.2991 fax
www.dentoncounty.com



# NOTICE
# Home Builders and Home Buyers

On January 26, 2010, Denton County Commissioners Court approved a resolution that applies to certain residential construction in the unincorporated areas of Denton County.

**This resolution applies to you if:**

- You are building a home in the unincorporated areas of Denton County after February 1, 2010; or
- You are remodeling an existing home in the unincorporated areas of Denton County after February 1, 2010 and the addition increases the square footage or value of the existing home by more than 50%.
- This resolution applies if you are constructing a single-family house or duplex.

**The new home construction and remodel must conform to either:**

- International Residential Code published as of May 1, 2008; or
- The version of the International Residential Code that is applicable in the City of Denton. The State law requires the builder to use either the International Residential Code published as of May 1, 2008 or the International Residential Code adopted by the County Seat, which in Denton County is the City of Denton.

**Building in the Extra Territorial Jurisdiction (ETJ):**

If you are building in the ETJ of a municipality that has adopted a building code for the municipality's ETJ, then the builder follows the municipality's codes. However, the builder is still required to submit the necessary paperwork to Denton County Public Works.

**What are the builder's responsibilities?**

- Three required inspections during the construction project.
  - The foundation stage before the placement of concrete;

- The framing and mechanical systems stage before covering with drywall or other interior wall covering; and
- Completion of construction of the residence.
- For remodeling projects that meet the definition of this resolution, the number of inspections are based on the scope of work of the project

## Who performs these inspections?

- Licensed Engineer;
- Registered Architect;
- Professional Inspector licensed by the Texas Real Estate Commission;
- Plumbing Inspector employed by a municipality and licensed by the Texas State Board of Plumbers;
- Building Inspector employed by a political subdivision; or
- Individual certified as a residential combination inspector by the International Code Council.
- The builder may use the same inspector for all the required inspections or a different inspector for each required inspection.

## Who receives the documentation?

- The builder shall provide the inspection information to the home buyer and Denton County Public Works.
- The required forms are attached to this Notice.

  - The builder uses the first form to notify the County specifically:
    - Location of the new residential construction
    - Approximate date by which the construction will be commenced
    - The version of the International Residential Code used to construct the home
  - The builder uses the second form to document the inspections.

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

**WHEREAS,** the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

**WHEREAS,** the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

**NOW, THEREFORE, BE IT RESOLVED,** that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May. 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

IN WITNESS THEREOF, we have hereunto set our hands and caused the great seal of Denton County to be affixed this __26__ day of __January__, 2010.

ADOPTED IN OPEN COURT the _26_ day of January, 2010 upon Motion made by _Bobbie Mitchell_ and seconded by _Andy Emps_, and _5_ members of the court being present and voting.

_____
MARY HORN, COUNTY JUDGE

_____
HUGH COLEMAN, COMMISSIONER
PRECINCT 1

_____
RON MARCHANT, COMMISSIONER
PRECINCT 2

STATE OF TEXAS      )

                             )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Plumbing Permit Application for 3964 Spinnaker Run Pointe dated April 18, 2013. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

_Linda Asbell_

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

PETITIONER'S
EXHIBIT
2

PENGAD 800-631-6989



# PLUMBING PERMIT

**APPLICANT**
DATE    4-18-13

NAME    C J HUGHES
ADDRESS    3964 Spinnaker
PHONE    817-917-0777 cell

### DESCRIPTION & DRAWING
DESCRIBE WHERE THE PLUMBING WILL BE PLACED ON YOUR PROPERTY.

3 ft gas line from wall to
island in kitchen
Plumbing - Kitchen sink & bathroom

PLOT PLAN



**Figure 404.11**
**GAS PIPING IN CONDUIT**
**UNDERGROUND BENEATH BUILDING**

Labels in figure: GAS PIPING, ANNULAR OPENING SEALED, METALLIC OR PLASTIC CONDUIT, FLOOR SLAB, SOIL, CONDUIT VENTED TO OUTDOORS, INSECT SCREEN, GRADE, ANNULAR OPENING SEALED, SLEEVE THROUGH FOUNDATION WALL

tion to prevent an outdoor slab from being placed (
an existing customer-owned (private) undergro
gas line, such as in the case of sidewalks and open
tios. The prohibition on piping within a slab is app
ble to all slabs. Exceptions 1 and 2 relate to Sec
403.6.1; see the commentary for that section (
Commentary Figure 404.14.1).



**Figure 404.14.1**
**INSTALLATION OF PLASTIC TO METALLIC PIPING**

Labels in figure: CONDUIT VENTED TO OUTDOORS, INSECT SCREEN, PLASTIC, METAL, CATEGORY I TRANSITION FITTING

contained in the manufacturer's installation instructions. Gas outlets for CSST systems must be installed with the termination fitting designed specifically for that purpose and provided by the CSST manufacturer.

**4.14 Plastic pipe.** The installation of plastic pipe shall com-
/ with Sections 404.14.1 through 404.14.3.

This section places restrictions on the location and op-
erating pressures for plastic pipe in addition to stating
nstallation requirements specific to plastic pipe.

**I.14.1 Limitations.** Plastic pipe shall be installed outside
lerground only. Plastic pipe shall not be used within or
ler any building or slab or be operated at pressures greater
1 100 psig (689 kPa) for natural gas or 30 psig (207 kPa) for
gas.

**Exceptions:**

1. Plastic pipe shall be permitted to terminate above
   ground outside of buildings where installed in
   premanufactured anodeless risers or service head
   adapter risers that are installed in

is inserted in a piping material for fuel gas use in
buildings.

❖ Because of the potential hazard associated with the
use of a material that has lower resistance to physica
damage and heat as compared to metallic pipe, insta-
lation of plastic pipe and tubing is limited to areas that
are both outside of the building and underground
Plastic pipe and tubing are widely used for under-
ground gas distribution systems because of their ease
of installation and inherent resistance to corrosion
Polyethylene (PE) pipe is the only allowable plasti
pipe for use with LP-gas, and the code user is directed
to the referenced standard, NFPA 58, which requires
that PE piping materials comply with ASTM D 2513.
The exception makes it clear that if an equivalent level
of physical protection is installed, plastic pipe may ter-
minate above ground outside of the building. It is com-
mon practice for gas utility companies to instal
pre-manufactured riser assemblies at their meter set-
tings. Such risers

**404.14.2 Connections.** Connections made outside and unc
ground between metallic and plastic piping shall be made c
with transition fittings categorized as Category I in accorda
with ASTM D 2513.

❖ Because installation of plastic piping is allowed o
where both outside and underground, the same
quirement holds for joining plastic and metallic pipi
Mechanical compression joints use an elastome
seal that must be compatible not only with the pip
material but also with the gas that is conveyed in t
system. The manufacturer's instructions normally
quire use of an internal stiffener insert in conjuncti
with the fitting for additional

**From:** Wayne Snell
**Sent:** Wednesday, April 24, 2013 2:56 PM
**To:** Steve Freeman
**Subject:** IFGC

## SECTION 403 (IFGS)
## PIPING MATERIALS

**403.1 General.** Materials used for piping systems shall comply with the requirements of this chapter or shall be approved.

**403.2 Used materials.** Pipe, fittings, valves and other materials shall not be used again except where they are free of foreign materials and have been ascertained to be adequate for the service intended.

**403.3 Other materials.** Material not covered by the standards specifications listed herein shall be investigated and tested to determine that it is safe and suitable for the proposed service, and, in addition, shall be recommended for that service by the manufacturer and shall be approved by the code official.

**403.4 Metallic pipe.** Metallic pipe shall comply with Sections 403.4.1 through 403.4.4.

**403.4.1 Cast iron.** Cast-iron pipe shall not be used.

**403.4.2 Steel.** Steel and wrought-iron pipe shall be at least of standard weight (Schedule 40) and shall comply with one of the following standards:

1. ASME B 36.10, 10M;
2. ASTM A 53; or
3. ASTM A 106.

**403.4.3 Copper and brass.** Copper and brass pipe shall not be used if the gas contains more than an average of 0.3 grains of hydrogen sulfide per 100 standard cubic feet of gas (0.7 milligrams per 100 liters). Threaded copper, brass and aluminum-alloy pipe shall not be used with gases corrosive to such materials.

**403.4.4 Aluminum.** Aluminum-alloy pipe shall comply with ASTM B241 (except that the use of alloy 5456 is prohibited), and shall be marked at each end of each length indicating compliance. Aluminum-alloy pipe shall be coated to protect against external corrosion where it is in contact with masonry, plaster, or insulation, or is subject to repeated wettings by such liquids as water, detergents, or sewage. Aluminum-alloy pipe shall not be used in exterior locations or underground.

**403.5 Metallic tubing.** Seamless copper, aluminum alloy and steel tubing shall not be used with gases corrosive to such materials.

**403.5.1 Steel tubing.** Steel tubing shall comply with ASTM A 254 or ASTM A 539.

**403.5.2 Copper and brass tubing.** Copper tubing shall comply with Standard Type K or L of ASTM B88 or ASTM B 280.

Copper and brass tubing shall not be used if the gas contains more than an average of 0.3 grains of hydrogen sulfide per 100 standard cubic feet of gas (0.7 milligrams per 100 liters).

**403.5.3 Aluminum tubing.** Aluminum-alloy tubing shall comply with ASTM B 210 or ASTM B 241. Aluminum-alloy tubing shall be coated to protect against external corrosion where it is in contact with masonry, plaster or insulation, or is subject to repeated wettings by such liquids

1

as water, detergent or sewage.

Aluminum-alloy tubing shall not be used in exterior locations or underground.

**403.5.4 Corrugated stainless steel tubing.** Corrugated stainless steel tubing shall be listed in accordance with ANSI LC 1/CSA 6.26.

**403.6 Plastic pipe, tubing and fittings.** Plastic pipe, tubing and fittings used to supply fuel gas shall be used outdoors, underground, only, and shall conform to ASTM D 2513. Pipe shall be marked "Gas" and "ASTM D 2513."

**403.6.1 Anodeless risers.** Plastic pipe, tubing and anodeless risers shall comply with the following:

1. Factory-assembled anodeless risers shall be recommended by the manufacturer for the gas used and shall be leak tested by the manufacturer in accordance with written procedures.

2. Service head adapters and field-assembled anodeless risers incorporating service head adapters shall be recommended by the manufacturer for the gas used, and shall be designed and certified to meet the requirements of Category I of ASTM D 2513, and U.S. Department of Transportation, Code of Federal Regulations, Title 49, Part 192.281(e). The manufacturer shall provide the user with qualified installation instructions as prescribed by the U.S. Department of Transportation, Code of Federal Regulations, Title 49, Part 192.283(b).

**403.6.2 LP-gas systems.** The use of plastic pipe, tubing and fittings in undiluted liquefied petroleum gas piping systems shall be in accordance with NFPA 58.

**403.6.3 Regulator vent piping.** Plastic pipe, tubing and fittings used to connect regulator vents to remote vent terminations shall be PVC conforming to UL 651. PVC vent piping shall not be installed indoors.

**403.7 Workmanship and defects.** Pipe, tubing and fittings shall be clear and free from cutting burrs and defects in structure or threading, and shall be thoroughly brushed, and chip and scale blown.

Defects in pipe, tubing and fittings shall not be repaired. Defective pipe, tubing and fittings shall be replaced (see Section 406.1.2).

**403.8 Protective coating.** Where in contact with material or atmosphere exerting a corrosive action, metallic piping and fittings coated with a corrosion-resistant material shall be used. External or internal coatings or linings used on piping or components shall not be considered as adding strength.

**403.9 Metallic pipe threads.** Metallic pipe and fitting threads shall be taper pipe threads and shall comply with ASME B1.20.1.

**403.9.1 Damaged threads.** Pipe with threads that are stripped, chipped, corroded or otherwise damaged shall not be used. Where a weld opens during the operation of cutting or threading, that portion of the pipe shall not be used.

**403.9.2 Number of threads.** Field threading of metallic pipe shall be in accordance with Table 403.9.2.

**403.9.3 Thread compounds.** Thread (joint) compounds (pipe dope) shall be resistant to the action of liquefied petroleum gas or to any other chemical constituents of the gases to be conducted through the piping.

**403.10 Metallic piping joints and fittings.** The type of piping joint used shall be suitable for the pressure-temperature conditions and shall be selected giving consideration to joint tightness and mechanical strength under the service conditions. The

2

joint shall be able to sustain the maximum end force caused by the internal pressure and any additional forces caused by temperature expansion or contraction, vibration, fatigue or the weight of the pipe and its contents.

**TABLE 403.9.2**
**SPECIFICATIONS FOR THREADING METALLIC PIPE**

| IRON PIPE SIZE (inches) | APPROXIMATE LENGTH OF THREADED PORTION (inches) | APPROXIMATE NUMBER OF THREADS TO BE CUT |
|---|---|---|
| 1/2 | 3/4 | 10 |
| 3/4 | 3/4 | 10 |
| 1 | 7/8 | 10 |
| 1 1/4 | 1 | 11 |
| 1 1/2 | 1 | 11 |
| 2 | 1 | 11 |
| 2 1/2 | 1 1/2 | 12 |
| 3 | 1 1/2 | 12 |
| 4 | 1 5/8 | 13 |

For SI: 1 inch = 25.4 mm.

**403.10.1 Pipe joints.** Pipe joints shall be threaded, flanged, brazed or welded. Where nonferrous pipe is brazed, the brazing materials shall have a melting point in excess of 1,000°F (538°C). Brazing alloys shall not contain more than 0.05-percent phosphorus.

**403.10.2 Tubing joints.** Tubing joints shall be either made with approved gas tubing fittings or brazed with a material having a melting point in excess of 1,000°F (538°C).Brazing alloys shall not containmore than 0.05-percent phosphorus.

**403.10.3 Flared joints.** Flared joints shall be used only in systems constructed from nonferrous pipe and tubing where experience or tests have demonstrated that the joint is suitable for the conditions and where provisions are made in the design to prevent separation of the joints.

**403.10.4 Metallic fittings.** Metallic fittings shall comply with the following:

1. Threaded fittings in sizes larger than 4 inches (102 mm) shall not be used except where approved.
2. Fittings used with steel or wrought-iron pipe shall be steel, brass, bronze, malleable iron or cast iron.
3. Fittings used with copper or brass pipe shall be copper, brass or bronze.
4. Fittings used with aluminum-alloy pipe shall be of aluminum alloy.
5. Cast-iron fittings:
5.1. Flanges shall be permitted.
5.2. Bushings shall not be used.
5.3. Fittings shall not be used in systems containing flammable gas-air mixtures.
5.4. Fittings in sizes 4 inches (102 mm) and larger shall not be used indoors except where approved. 5.5. Fittings in sizes 6 inches (152 mm) and larger shall not be used except where approved.
6. Aluminum-alloy fittings. Threads shall not form the joint seal.
7. Zinc aluminum-alloy fittings. Fittings shall not be used in systems containing flammable gas-air mixtures.
8. Special fittings. Fittings such as couplings, proprietary-type joints, saddle tees, gland-type compression fittings, and flared, flareless or compression-type tubing fittings shall be: used within the fitting manufacturer's pressure-temperature recommendations;

3

used within the service conditions anticipated with respect to vibration, fatigue, thermal expansion or contraction; installed or braced to prevent separation of the joint by gas pressure or external physical damage; and shall be approved.

**403.11 Plastic pipe, joints and fittings.** Plastic pipe, tubing and fittings shall be joined in accordance with the manufacturer's instructions. Such joint shall comply with the following:

1. The joint shall be designed and installed so that the longitudinal pull-out resistance of the joint will be at least equal to the tensile strength of the plastic piping material.

2. Heat-fusion joints shall be made in accordance with qualified procedures that have been established and proven by test to produce gas-tight joints at least as strong as the pipe or tubing being joined. Joints shall be made with the joining method recommended by the pipe manufacturer. Heat fusion fittings shall be marked "ASTM D 2513."

3. Where compression-type mechanical joints are used, the gasket material in the fitting shall be compatible with the plastic piping and with the gas distributed by the system. An internal tubular rigid stiffener shall be used in conjunction with the fitting. The stiffener shall be flush with the end of the pipe or tubing and shall extend at least to the outside end of the compression fitting when installed. The stiffener shall be free of rough or sharp edges and shall not be a force fit in the plastic. Split tubular stiffeners shall not be used.

4. Plastic piping joints and fittings for use in liquefied petroleum gas piping systems shall be in accordance with NFPA 58.

**403.12 Flanges.** All flanges shall comply with ASME B16.1, ASMEB16.20 orMSSSP-6. The pressure-temperature ratings shall equal or exceed that required by the application.

**403.12.1 Flange facings.** Standard facings shall be permitted for use under this code. Where 150-pound (1034 kPa) pressure-rated steel flanges are bolted to Class 125 cast-iron flanges, the raised face on the steel flange shall be removed.

**403.12.2 Lapped flanges.** Lapped flanges shall be used only above ground or in exposed locations accessible for inspection.

**403.13 Flange gaskets.** Material for gaskets shall be capable of withstanding the design temperature and pressure of the piping system, and the chemical constituents of the gas being conducted, without change to its chemical and physical properties. The effects of fire exposure to the joint shall be considered in choosing material. Acceptable materials include metal or metal-jacketed asbestos (plain or corrugated), asbestos, and aluminum "O" rings and spiral wound metal gaskets. When a flanged joint is opened, the gasket shall be replaced. Full-face gaskets shall be used with all bronze and cast-iron flanges.

If you have any questions or if I can be of any assistance please let me know.

Thank You

Wayne K. Snell Jr., C.B.O., Building Official
Development Services
Town of Prosper
www.prospertx.gov

4

**STATE OF TEXAS** )

)   **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

 I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Pool Enclosure Permit Application for 3904 Spinnaker Run Pointe dated March 18, 2013. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

 I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

 In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

*Linda Asbell*

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



PETITIONER'S
EXHIBIT
3

PENGAD 800-631-6989



*Approved 3-19-2015*
*Steve Freeman*

# FENCE PERMIT
## $25.00

**All Installations Subject
To Field Inspections and
~~Inspector Approval~~**

DATE _____3-18-15_____

## PROPERTY OWNER INFORMATION

NAME _____Mind Hughee_____

ADDRESS _____3107 Spinnaker Cir_____

PHONE _____972-292-1143_____

## CONTRACTOR INFORMATION (IF APPLICABLE)
(Note: Contractor must register with the Town)

NAME _____Lifetime Fence_____

ADDRESS _____1321 Justin Rd #126 Lewisville TX_____

PHONE _____214-952-3966_____

## FENCE

IS FENCE A POOL ENCLOSURE? Y or N  (If yes, $150 fee applies and must meet more
stringent pool enclosure guidelines to pass inspection)

HEIGHT _____4'_____          LENGTH _____~~B/W~~ 47'_____

MATERIAL TO BE USED _____Iron_____     WATERFRONT PROPERTY   Y  or  N

NOTE:  Fence cannot impede or change drainage on property.

## DESCRIPTION & DRAWING
DESCRIBE WHERE THE FENCE WILL BE PLACED ON YOUR PROPERTY.

_See redlines on Plans - Gates must met Pool_

_Barrier Requirements- Appendix G. 2006 IRC Codes_

_See attached printout._

**All Inspections
Shall Comply with
2006 IRC Requirement
~~& Adopted Ordinances~~**



# APPENDIX G

# SWIMMING POOLS, SPAS AND HOT TUBS

## SECTION AG101
## GENERAL

**AG101.1 General.** The provisions of this appendix shall control the design and construction of swimming pools, spas and hot tubs installed in or on the lot of a one- or two-family dwelling.

## SECTION AG102
## DEFINITIONS

**AG102.1 General.** For the purposes of these requirements, the terms used shall be defined as follows and as set forth in Chapter 2.

**ABOVE-GROUND/ON-GROUND POOL.** See "Swimming pool."

**BARRIER.** A fence, wall, building wall or combination thereof which completely surrounds the swimming pool and obstructs access to the swimming pool.

**HOT TUB.** See "Swimming pool."

**IN-GROUND POOL.** See "Swimming pool."

**RESIDENTIAL.** That which is situated on the premises of a detached one- or two-family dwelling or a one-family townhouse not more than three stories in height.

**SPA, NONPORTABLE.** See "Swimming pool."

**SPA, PORTABLE.** A nonpermanent structure intended for recreational bathing, in which all controls, water-heating and water-circulating equipment are an integral part of the product.

**SWIMMING POOL.** Any structure intended for swimming or recreational bathing that contains water over 24 inches (610 mm) deep. This includes in-ground, above-ground and on-ground swimming pools, hot tubs and spas.

**SWIMMING POOL, INDOOR.** A swimming pool which is totally contained within a structure and surrounded on all four sides by the walls of the enclosing structure.

**SWIMMING POOL, OUTDOOR.** Any swimming pool which is not an indoor pool.

## SECTION AG103
## SWIMMING POOLS

**AG103.1 In-ground pools.** In-ground pools shall be designed and constructed in conformance with ANSI/NSPI-5 as listed in Section AG108.

**AG103.2 Above-ground and on-ground pools.** Above-ground and on-ground pools shall be designed and constructed in conformance with ANSI/NSPI-4 as listed in Section AG108.

## SECTION AG104
## SPAS AND HOT TUBS

**AG104.1 Permanently installed spas and hot tubs.** Permanently installed spas and hot tubs shall be designed and constructed in conformance with ANSI/NSPI-3 as listed in Section AG108.

**AG104.2 Portable spas and hot tubs.** Portable spas and hot tubs shall be designed and constructed in conformance with ANSI/NSPI-6 as listed in Section AG108.

## SECTION AG105
## BARRIER REQUIREMENTS

**AG105.1 Application.** The provisions of this chapter shall control the design of barriers for residential swimming pools, spas and hot tubs. These design controls are intended to provide protection against potential drownings and near-drownings by restricting access to swimming pools, spas and hot tubs.

**AG105.2 Outdoor swimming pool.** An outdoor swimming pool, including an in-ground, above-ground or on-ground pool, hot tub or spa shall be surrounded by a barrier which shall comply with the following:

1. The top of the barrier shall be at least 48 inches (1219 mm) above grade measured on the side of the barrier which faces away from the swimming pool. The maximum vertical clearance between grade and the bottom of the barrier shall be 2 inches (51 mm) measured on the side of the barrier which faces away from the swimming pool. Where the top of the pool structure is above grade, such as an above-ground pool, the barrier may be at ground level, such as the pool structure, or mounted on top of the pool structure. Where the barrier is mounted on top of the pool structure, the maximum vertical clearance between the top of the pool structure and the bottom of the barrier shall be 4 inches (102 mm).

2. Openings in the barrier shall not allow passage of a 4-inch-diameter (102 mm) sphere.

3. Solid barriers which do not have openings, such as a masonry or stone wall, shall not contain indentations or protrusions except for normal construction tolerances and tooled masonry joints.

4. Where the barrier is composed of horizontal and vertical members and the distance between the tops of the horizontal members is less than 45 inches (1143 mm), the horizontal members shall be located on the swimming pool side of the fence. Spacing between vertical members shall not exceed $1^3/_4$ inches (44 mm) in width. Where there are decorative cutouts within vertical members, spacing within the cutouts shall not exceed $1^3/_4$ inches (44 mm) in width.

5. Where the barrier is composed of horizontal and vertical members and the distance between the tops of the horizontal members is 45 inches (1143 mm) or more, spacing between vertical members shall not exceed 4 inches (102 mm). Where there are decorative cutouts within vertical members, spacing within the cutouts shall not exceed $1^3/_4$ inches (44 mm) in width.

6. Maximum mesh size for chain link fences shall be a $2^1/_4$-inch (57 mm) square unless the fence has slats fastened at the top or the bottom which reduce the openings to not more than $1^3/_4$ inches (44 mm).

7. Where the barrier is composed of diagonal members, such as a lattice fence, the maximum opening formed by the diagonal members shall not be more than $1^3/_4$ inches (44 mm).

8. Access gates shall comply with the requirements of Section AG105.2, Items 1 through 7, and shall be equipped to accommodate a locking device. Pedestrian access gates shall open outward away from the pool and shall be self-closing and have a self-latching device. Gates other than pedestrian access gates shall have a self-latching device. Where the release mechanism of the self-latching device is located less than 54 inches (1372 mm) from the bottom of the gate, the release mechanism and openings shall comply with the following:

   8.1. The release mechanism shall be located on the pool side of the gate at least 3 inches (76 mm) below the top of the gate; and

   8.2. The gate and barrier shall have no opening larger than $^1/_2$ inch (13 mm) within 18 inches (457 mm) of the release mechanism.

9. Where a wall of a dwelling serves as part of the barrier, one of the following conditions shall be met:

   9.1. The pool shall be equipped with a powered safety cover in compliance with ASTM F 1346; or

   9.2. Doors with direct access to the pool through that wall shall be equipped with an alarm which produces an audible warning when the door and/or its screen, if present, are opened. The alarm shall be listed in accordance with UL 2017. The audible alarm shall activate within 7 seconds and sound continuously for a minimum of 30 seconds after the door and/or its screen, if present, are opened and be capable of being heard throughout the house during normal household activities. The alarm shall automatically reset under all conditions. The alarm system shall be equipped with a manual means, such as touch pad or switch, to temporarily deactivate the alarm for a single opening. Deactivation shall last for not more than 15 seconds. The deactivation switch(es) shall be located at least 54 inches (1372 mm) above the threshold of the door; or

   9.3. Other means of protection, such as self-closing doors with self-latching devices, which are approved by the governing body, shall be acceptable so long as the degree of protection afforded

is not less than the protection afforded by Item 9.1 or 9.2 described above.

10. Where an above-ground pool structure is used as a barrier or where the barrier is mounted on top of the pool structure, and the means of access is a ladder or steps:

   10.1. The ladder or steps shall be capable of being secured, locked or removed to prevent access; or

   10.2. The ladder or steps shall be surrounded by a barrier which meets the requirements of Section AG105.2, Items 1 through 9. When the ladder or steps are secured, locked or removed, any opening created shall not allow the passage of a 4-inch-diameter (102 mm) sphere.

**AG105.3 Indoor swimming pool.** Walls surrounding an indoor swimming pool shall comply with Section AG105.2, Item 9.

**AG105.4 Prohibited locations.** Barriers shall be located to prohibit permanent structures, equipment or similar objects from being used to climb them.

**AG105.5 Barrier exceptions.** Spas or hot tubs with a safety cover which complies with ASTM F 1346, as listed in Section AG107, shall be exempt from the provisions of this appendix.

## SECTION AG106
## ENTRAPMENT PROTECTION FOR SWIMMING POOL AND SPA SUCTION OUTLETS

**AG106.1 General.** Suction outlets shall be designed to produce circulation throughout the pool or spa. Single-outlet systems, such as automatic vacuum cleaner systems, or multiple suction outlets, whether isolated by valves or otherwise, shall be protected against user entrapment.

**AG106.2 Suction fittings.** Pool and spa suction outlets shall have a cover that conforms to ANSI/ASME A112.19.8M, or an 18 inch × 23 inch (457 mm by 584 mm) drain grate or larger, or an approved channel drain system.

Exception: Surface skimmers

**AG106.3 Atmospheric vacuum relief system required.** Pool and spa single- or multiple-outlet circulation systems shall be equipped with atmospheric vacuum relief should grate covers located therein become missing or broken. This vacuum relief system shall include at least one approved or engineered method of the type specified herein, as follows:

1. Safety vacuum release system conforming to ASME A112.19.17; or

2. An approved gravity drainage system.

**AG106.4 Dual drain separation.** Single or multiple pump circulation systems have a minimum of two suction outlets of the approved type. A minimum horizontal or vertical distance of 3 feet (914 mm) shall separate the outlets. These suction outlets shall be piped so that water is drawn through them simultaneously through a vacuum-relief-protected line to the pump or pumps.

**AG106.5 Pool cleaner fittings.** Where provided, vacuum or pressure cleaner fitting(s) shall be located in an accessible posi-

| STATE OF TEXAS | ) | |
|---|---|---|
| | ) | **CERTIFICATE TO COPY OF PUBLIC RECORD** |
| COUNTY OF DENTON | ) | |

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Residential Pool/Spa Permit Application for 6613 Autumn Mist Cove dated January 10, 2012.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas





PETITIONER'S
EXHIBIT
4



# RESIDENTIAL SWIMMING POOL/SPA
# PERMIT APPLICATION

Project Address: ___6l13 Autumn Mist Cove___
(PRINT LEGIBLY)

Legal Description: Lot __9l__ Block __1__ Subdivision __Sunrise Bay__ Phase _____

Property Owner: __Jason Goodman__ Owner Phone: (469) 247-1488

| Contractor Name (Company) | Contact Name | Contact Phone Number |
|---|---|---|
| Pool: RIVERBEND SANDER | Wynn Gardner | 214-437-3935 |
| Electric: TEEPEE Electric | Tony Perdue | 214-475-3961 |
| Plumbing: Plumbing Pro Alcala | Sam Alcala | 214-478-5157 |

All contractors must hold a current registration with the Town and be in good standing in order for applications to be accepted or processed.

**TYPE OF WORK:** ☑ Pool/Spa Combination ☐ Pool-Inground ☐ Pool-Above Ground ☐ Spa Only
(SELECT ONE)

Valuation of Work: $ __110,000__ ~~with firepit~~ Square Footage (Total Area): __1,001__

**Heater:** YES / NO **Diving Board:** YES / NO **P-Trap:** YES / NO
(If yes: LP Gas/Natural Gas) (P-Trap & Backwash line **required** on all sanitary sewer properties)
(LP Gas requires Railroad Commission paperwork be provided in permit bag prior to pool final.)

**Deck encroaching into drainage easement shall not be a structural element of the pool structure.**

**New Fences surrounding pools, not done by pool contractor, require separate permits and are subject to special requirements. (Refer to Appendix G, Section AG105, 2006 IRC, for Pool Barrier Requirements)**

EVERY PERMIT ISSUED SHALL BECOME INVALID UNLESS THE WORK ON THE SITE AUTHORIZED BY SUCH PERMIT IS COMPLETED WITHIN 90 DAYS AFTER ISSUANCE. **ALL PERMITS REQUIRE FINAL INSPECTION.**

I HEREBY CERTIFY THAT I HAVE READ AND EXAMINED THIS APPLICATION AND KNOW THE SAME TO BE TRUE AND CORRECT. ALL PROVISIONS OF LAWS AND ORDINANCES GOVERNING THIS TYPE OF WORK WILL BE COMPLIED WITH WHETHER SPECIFIED OR NOT. THE GRANTING OF A PERMIT DOES NOT PRESUME TO GIVE AUTHORITY TO VIOLATE OR CANCEL THE PROVISIONS OF ANY OTHER STATE OR LOCAL LAW REGULATING CONSTRUCTION OR THE PERFORMANCE OF CONSTRUCTION.

Signature of Applicant: _____ Date: __1/10/12__

Contact Name: __Wynn Gardner 214-437-3935__ Phone: _____
(PRINT LEGIBLY)

| PLANS EXAMINER USE ONLY: | |
|---|---|
| Plans Approved By: Steve Freeman | Permit Fee: $ |
| Date Approved: 1/12/2012 | |
| Special Conditions / Comments: See Redlines | |

Permits expire after 90 days of issuance. Permits are not transferable.

Revised 11-14-06

**APPLICATION FOR DEVELOPMENT PERMIT (ADP) (02/10)** DEC 1 9 2011

RECEIVED

Denton County Flood Damage Prevention Ordinance

Planning Department, Denton County, Texas

2011 1434

**PART A – APPLICANT INFORMATION**      ☒ RESIDENTIAL PERMIT   ☐ COMMERCIAL PERMIT

First Name: Wynn Gardner          Company: Riverbend Sander Pools

Last Name: Gardner               Phone: 214-437-3935

Address: 3729 O Henry            Fax: _____

City, State, Zip: Garland, TX 75042   Email: _____

**PART B – PROPERTY INFORMATION**

DCAD 'R' #: 182666               Land Area (Acres): 2.19 AC

Owner's First Name: Jason         Owner's Address: _____

Owner's Last Name: Goodman        Owner's City, State, Zip: _____

☒ Property is part of a Subdivision:      -- or --      ☐ Property is part of an Abstract:

Name: Sunrise Bay @ Lakeside Lake           Number: _____

Phase: _____                          Name: _____

Block: I                                   DCAD Tract: _____

Lot: 91                                    County Tract: _____

6613 Autumn Mist Cove

**PART C – DEVELOPMENT INFORMATION**

Application is for:     ☐ House     ☐ Manufactured House     ☐ Excavation/Fill

☒ Other (if "Other", describe the proposed improvement on the line below)

In ground pool, spa, firepit          Building Square Footage: 1,001

☐ Address or Road Name: 6613 Autumn Mist Cove ☒ Address Requested: (Y) (N)   ☒ Precinct # 1

APPLICANT MUST ATTACH A SITE PLAN SHOWING LOCATION OF PROPOSED AND EXISTING IMPROVEMENTS, THEIR DISTANCE TO AT LEAST TWO PROPERTY LINES, DISTANCE FROM THE ENTRY ROAD, NORTH ARROW SHOWING ORIENTATION OF PROPERTY, PERMIT APPICATION FROM THE FIRE MARSHAL AND ANY OTHER REQUIRED DOCUMENTATION.     ☐ Lakewood Village ETJ

Acknowledgment: The Flood Insurance Rate Maps (FIRM) and other flood data used by Denton County in evaluating flood hazards to proposed developments are considered reasonable and accurate for regulatory purposes and are based on the best available scientific and engineering data. On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. Issuance of a Development Permit in accordance with the Denton County Flood Damage Prevention Ordinance does not imply that development outside the areas of special flood hazard will be free from flooding or flood damage. Issuance of a permit shall not create liability on the part of Denton County or any officer or employee of Denton County in the event flooding or flood damage does occur.

Construction of improvements should not be commenced at the above location until the Owner/Applicant is in compliance with all applicable regulations regarding floodplain management, subdivision platting, and zoning for the government of Denton County. This permit does not waive any other restrictions or regulations imposed privately or by law.

Applicant verifies that she/he has signed this application in the capacity designated, if any, and further attests that she/he has read this document, and that the statement contained herein and any attachments are true, accurate and factual.

Violation of this verification may result in Applicant being prosecuted under Texas Penal Code §37.10 (a) (1)

**PART D – SIGNATURE**        ☒ Request Architectural Plans be returned upon approval

Signature: Wynn _____

Date: 12/19/11                        CK# 802083

**PART E – DENTON COUNTY USE ONLY**                    *For Office Use Only!*

Permit Number: 2011 1434            Fees Paid: (Y) (N)

                                    Cash: _____

FIRM Panel #: 48/2/CO 415 G         Check #: 802083

Reviewer: SW                        In SFHA: (Y) (N)

                                    Zone: X

Engineering Review: (Y) (N)         NORC - _____

Fire Marshal Permit: #              NORCIC - _____

☐ Culvert Permit: # RBE

SW

12/21/2011

Denton County Planning Department          (940) 349-2990: Main • (940) 349-2991: Fax

1505 E. McKinney St, Ste 175, Denton, TX 76209-4887    (972) 434-8868: Metro • www.dentoncounty.com

NO FILL OR BUILDING BELOW 537° ELEVATION WITHOUT ARMY CORP OF ENGINEER APPROVAL. PERMIT IS VOID IF CONSTRUCTION NOT ABOVE 537° ELEVATION.



AUTUMN MIST COVE

Lakewood Village
ETJ

2106

21'

60'

* 100 YR FLOOD PLAIN
APPROX 90' FROM BACK
OF HOUSE

INSPECTIONS COPY







SPECTIONS COPY

☐ GAS  ☑ ELECTRIC
COSERV
APPROVED POOL PLANS

☑ ELECTRIC
☐ GAS

26'4"  12'0"  10'0"

48'4"

Depth is measured from water surface

24"

stone steps

stone steps

STORAGE ROOM

CABANA BY OTHERS

874 S.F.

rese beam

TEXTURED CONCRETE
BY RIVERBEND SANDLER

460 S.F.

SINK

concrete

SHOWER

-12"

TOILET

99'-3"

## GENERAL SPECIFICATIONS

Unless otherwise stated in the Contract, the construction of pool will conform to the following specifications.

| POOL/SPA | POOL ONLY |
|---|---|
| Surface Sq. Ft. : 1,001 | Surface Sq. Ft. : |
| Perimeter: 156 | Perimeter: |
| Pool Size: 48'4" x 18'3" | Gallons: 4 |

### EXCAVATION

1. Buyers POOL Site is Located inside Loop 635 which requires excavated pool trucked to a dump site over 3 miles from the POOL SITE.............................

2. The required equipment to excavate Buyers POOL Site will be _____ Large nt-end loader will be required to move pool soil to a remote dump truck l feet from the pool site.............................

3. e day of Excavation, we will pre grade or cut down yard 0 Feet at the ol. We will remove 0 Square Feet of Concrete. We will saw cut eet of concrete.

### STRUCTURE

4. The pool structure will be built for Normal Soil conditions as stated on Contrac from the normal structure due to soil conditions, if any, are as follows:
   Piers: Helical Pier _____ Steel Schedule: Super Structure
   Gunite: None _____ Chemical Injection: Chemical In

5. Seller will install three (3) gunite steps per plan that total 12 square feet in th the depth of the third step will vary depending on the step locations. The follo additional structural items are included in the pool:
   # of Benches: 2 Total Length 14 Ft....... Sundeck #: 1 Total Square
   # of Loveseats: 2 Pool Out of Ground: _____ Expanded Pool Beam:

### TILE/COPING

6. Seller to install 353 ft. of 6" ceramic waterline tile and 0 ft. of 6" rock tile a

7. Seller will use decorative masonry materials to construct pool as specified on

### ELECTRICAL

8. Seller's electrical installation will meet current National Electrical Codes and l codes and includes complete wiring of all equipment shown.

9. Seller has included all brass and PVC conduit necessary for proper electrical

### EQUIPMENT

10. Filter: Jandy NL Backwash Vlv Upgrade Circulation Pump: INTELLIFLO PUM

11. Automatic Time Clock & Freeze Sensor included for the Circulation pump if c not selected.

12. Chlorine Dispenser - Rainbow 320. Optional Additional Type: Aqua Pure S

13. Computer Center: Jandy PDA PS8 (Pool/Spa) Spa Side Control: None

14. Additional Booster Motor(s) included with pool: 2

15. Heater Size with Electronic Ignition: JANDY LRZ400 NATURAL HEAT
    Gas Line: 0 feet to heater and Hookup if gas line is included.

16. Bar-B-Que Gas Line: 0 feet (Hookup and Pit installation is not included)

17. Diving Board Size and Type: SR SMITH 6 FT DIVE BOARD WHITE

18. Cleaning System: Polaris 280 Type of Slide: None

### SPA SPECIFICATIONS

19. Spa Elevation: 18 Inches. Spa will have Two (2) Safety Main Drains a



textured concrete

stone step

textured concrete
49B S.F.

bench

pool beam

textured concrete

26'-2"

21'-6"

15 S.F.

15 S.F.

15 S.F.

EXISTING CONCRETE STAYS

residence

RIVERBEND SANDLER'S EXCLUSIVE EXPANDED 18"
SUPER STRUCTURE w / 1/2" STEEL ON 10" CENTER
INCLUDED IN PROPOSAL

MIN.
MAX.

ROCK TYPE

☐ ROLLING ROCK
☐ BOLDERS

☐ SLAB ROCK

STANDARD BEAM

waterline

Revised 02-18-05

11-A

EXPANDED BEAM PROFILE

BARS CUT BACK OF STONE

COPING

POOL BEAM AND SHELL

10"

18"

FACE STONE

Revised 10-28-09

8-C

PLAN

103523

COPYRIGHT 2011: THIS PLAN MAY NOT BE USED OR REPRODUCED, OTHER THAN

Buyer to wet down gunite once daily for seven days and when plastered. to brush plaster in accordance with requirements for

RIVERBEND POOL

4016 W. PLANO PKWY.



99'-3"

95'-1"

FUTURE GARAGE

Do NOT Dowel into Foundt.

#12 and
Wiring Required
for Future
Terrace

Installations Subject
Field Inspections And
Inspector Approval

ACCESS; TRACK HOE &
DUMP TRUCK

ND SANDLER POOLS INC. WITHOUT PRIOR WRITTEN CONSENT.

nish type. Do not turn on pool light when pool is empty.

SCALE 1/8"=1'-0"

NDLER

RETAIL STORE LOCATION
2001 COIT ROAD
SUITE 160
PLANO, TX 75093

**Construction Department Notes**

Construction Supervisor: _____

Construction Notes: _____

USE FROM

16. Bar-B-Que Gas Line: 0 feet (Hookup and Pit installation is not included)

17. Diving Board Size and Type: SR SMITH 6 FT DIVE BOARD WHITE

18. Cleaning System: Polaris 280    Type of Slide: None

### SPA SPECIFICATIONS

19. Spa Elevation: 18    Inches.  Spa will have Two (2) Safety Main Drains and F

20. # of Hydro Therapy Jets: 8    Air Blower Type and Size: _____

21. Optional Spa Booster System NOT included

### POOL PLUMBING

22. The pool will have 2 SKIMMERS, 8 RETURNS and 2 SAFETY MAIN

23. Seller will use a minimum of 2" SUCTION and 1 1/2" RETURN LINES.

24. Seller will install an overflow outlet to drain excess water from pool and an integr
refill line attached to the hose bib if accessible.  Optional Filline: Letro Autofill

25. Seller will install a Backwash Line to P-Trap with sight glass and vent valve......

26. Seller will install a Separation Tank.....................................................

27. Seller uses positive lock Jandy Never-Lube valves at equipment.

### DECKING & POOL DRAINAGE SYSTEM

28. If Seller installs concrete decking, the thickness of the concrete will be 4", the stee
reinforcement will be 3/8" rebar on 12" centers and the cushion sand under the co
decks will be a minimum of 4".

29. Type of Deck: Deck - Colored Release Texture    Sq. Ft.: 3
Other Decking: _____    Sq. Ft.: 0
Square feet of Turndown Beams: 50    Deck Steps Length: 0
Expansion Joints: Expansion Joints Sawcut    # of Deck Piers: 0

30. Mastic will be installed between coping and concrete deck.  Color: Deco Seal Tar

31. If Seller installs concrete decks, Seller will install drains in immediate pool area us
sewer/drain pipe.  Brass drain grates are used on deck drains.  Down spouts in th
immediate pool site will be connected and /or planter drains will be installed in the
area and tied into drainage system.
Deck Drains will run out from pool 40 feet and will terminate at the Yard
There is a sump pump included to pump excess water from pool area...........

### POOL INTERIOR FINISH

Type of Interior Finish: River Sand Prem Finish    Color: Not Selected

### ADDITIONAL SPECIFICATIONS

Buyer is responsible for the cost to repair any UTILITIES damaged during constru
the pool and meeting all National and City BARRIER CODE REQUIREMENTS.

### CUSTOMER INFORMATION  103523

Name: JASON GOODMAN    Mapsco: 461H
Address: 6613 AUTUMN MIST COVE
City: LITTLE ELM    State: Texas    Zip: 75068
Job Site Address: 6613 AUTUMN MIST COVE
City: LITTLE ELM    State: Texas    Zip: 75068
Home Phone: 469-247-1488    Work Phone: _____
Cell Phone 1: 469-247-1488    Cell Phone 2: _____
Subdivision: SUNRISE BAY AT LEWISVILLE LAKE
Lot: 91    Block: 1
RESIDENTIAL ☒  COMMERCIAL ☐  NEW HOME CONST.
Submitted
By: _____ (Design Consultant Signature)    Date: _____

Buyer: _____ (Buyer Signature)    Date: _____

Buyer: _____ (Buyer Signature)    Date: _____
Accepted
By: HANK HENRY    Date: _____
(Riverbend Sandler Officer Signature)
Builder: JASON GOODMAN

Plaintiff's Exhibit 8A

Blown-up Duplicate of Plaintiff's

Stipulated Exhibit 8

(Not included)

STIPULATED EXHIBITS

# Exhibit 1

**\*\*\*\* Electronically Filed Document \*\*\*\***

Denton County
Cynthia Mitchell
County Clerk

---

Document Number: 2013-69513
Recorded As       : ERX-WARRANTY DEED

Recorded On:        June 07, 2013
Recorded At:        01:42:11 pm
Number of Pages:    3

Recording Fee:      $24.00

Parties:

Direct- LANGLEY KELLY B
Indirect-

Receipt Number:     1050348
Processed By:       Jane Kline

---

\*\*\*\*\*\*\*\*\*\*\*\* THIS PAGE IS PART OF THE INSTRUMENT \*\*\*\*\*\*\*\*\*\*\*\*

Any provision herein which restricts the Sale, Rental or use of the described REAL PROPERTY
because of color or race is invalid and unenforceable under federal law.

---



THE STATE OF TEXAS)
COUNTY OF DENTON]

I hereby certify that this instrument was FILED in the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Denton County, Texas.



County Clerk
Denton County, Texas



Doc-69513



NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

GF#15001425PK/TXPREM

# GENERAL WARRANTY DEED

| | | |
|---|---|---|
| STATE OF TEXAS | § | |
| | § | KNOW ALL MEN BY THESE PRESENTS: |
| COUNTY OF DENTON | § | |

That

**KELLY B. LANGLEY AND WIFE, KATHLEEN LANGLEY**

(hereinafter called "Grantor," whether one or more, masculine, feminine or neuter) for and in consideration of the sum of TEN and no/100 DOLLARS and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, paid by

**HARRY J. BIZIOS**
whose address is:   6107 Sweeney Trl; Frisco 75034

(hereinafter called "Grantee," whether one or more, masculine, feminine or neuter), for which no lien is retained either express or implied, has Granted, Sold and Conveyed, and by these presents does hereby Grant, Sell and Convey, unto the said Grantee all that certain real property located in Denton County, Texas and described as follows:

LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON COUNTY, TEXAS.

together with all improvements thereon, if any, and all rights, privileges, tenements, hereditaments, rights of way, easements, appendages and appurtenances, in anyway appertaining thereto, and all right, title and interest of Grantor in and to any streets, ways, alleys, strips or gores of land adjoining the above-described property or any part thereof (hereinafter, the "Property").

This deed is executed and delivered subject to all easements, reservations, conditions, covenants and restrictive covenants as the same appear of record in the office of the County Clerk of the county in which the Property is located.



Doc-69513

TO HAVE AND TO HOLD the above described Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee, his, her or its successors, heirs and assigns, as the case may be, forever; and Grantor does hereby bind Grantor and Grantor's successors, heirs, executors and administrators, as the case may be, to Warrant and Forever Defend all and singular the said Property unto the said Grantee and Grantee's successors, heirs and assigns, as the case may be, against every person whomsoever lawfully claiming, or to claim the same, or any part thereof.

Executed this the 7TH day of June, 2013.

_____
KELLY B. LANGLEY

_____
KATHLEEN LANGLEY

## ACKNOWLEDGMENT

STATE OF TEXAS                    §
COUNTY OF Dallas                  §

Before me, the undersigned authority, on this day personally appeared, **KELLY B. LANGLEY AND KATHLEEN LANGLEY** [check one] ___ known to me or ✓ proved to me through _____TXDL_____ (description of identity card) to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that said person executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 7 day of June, 20 13

_____
Notary Public, State of
Printed name:
Commission expires:

CHERYL WILLIAMS
Notary Public, State of Texas
My Commission Expires
February 16, 2014

After Recording Return To:
**HARRY J. BIZIOS**
6107 Sweeney Trail
Frisco, TX 75034

Page 2

CERTIFIED A TRUE AND CORRECT COPY
OF THE RECORD ON FILE IN MY OFFICE
CYNTHIA MITCHELL
DENTON COUNTY CLERK
3/28/14
Date
By
Deputy Clerk

# Exhibit 2

**STATE OF TEXAS**      )

                                  )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**      )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Resolution 12-01. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## THE TOWN OF LAKEWOOD VILLAGE, TEXAS

## RESOLUTION NO. 12-01

A RESOLUTION OF THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, DENTON COUNTY, TEXAS, ADOPTING AN OFFICIAL TOWN MAP OF THE CORPORATE BOUNDARIES AND THE EXTRA TERRITORIAL BOUNDARIES OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS.

NOW, THEREFORE, BE IT RESOLVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

1.      That the map of the boundaries of the town limits and Extra Territorial Jurisdiction Limits of the Town of Lakewood Village presented to the Town Council at the Town Council meeting held on April 12, 2012 is hereby adopted and approved as the official map of the Town of Lakewood Village, Texas and amends and replaces any previous official map of the Town of Lakewood Village, Texas.

2.      That the original of this map, attached as exhibit A, shall be maintained in the office of the Town Secretary.

3.      That the Town Secretary is hereby directed to file with the County Clerk of Denton County a certified copy of this Resolution and map.

PASSED AND APPROVED by the Town Council of the Town of Lakewood Village, Texas this 12th day of April 20012.

Mike Schnittker, Mayor

ATTEST:

Linda Asbell, Town Secretary

# TOWN OF LAKEWOOD VILLAGE
## OFFICIAL MAP



Oak Point
City Limits

Oak Point
ETJ

Little Elm
City Limits

Little Elm
ETJ →

Lakewood Village ETJ

Lakewod Village
Town Limits

Lakewood Village ETJ

# Exhibit 3

**DEPARTMENT OF TECHNOLOGY SERVICES**
701 KIMBERLY DR., SUITE A285
DENTON, TX 76208-6301



940-349-4500
Fax: 940-349-4501
www.dentoncounty.com

March 27, 2014

Dear Sir/Madam,

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the maps maintained by the Geographic Information Systems. The same appear of record in my office and said documents are the official records from the public office of the GIS Department of Denton County, Texas, and are kept in said office.

I further certify that I am the Manager of GIS Department of Denton County, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of Denton County this 27th day of March, 2014.

Sincerely,

Rachel Crowe
GIS Manager, Department of Technology Services
Denton County

701 Kimberly Dr.
Suite A285
Denton TX 76208-6301

940-349-4590

Rachel.Crowe@dentoncounty.com

# Lakewood Village



DENTON COUNTY, TEXAS
1846

Mary Horn- County Judge
Hugh Coleman- Commissioner Precinct 1
Ron Marchant- Commissioner Precinct 2
Bobbie J. Mitchell- Commissioner Precinct 3
Andy Eads- Commissioner Precinct 4



INTERSTATE
U.S. HIGHWAY
STATE HIGHWAY
FARM TO MARKET
MAJOR THOROUGHFARES
MINOR ROADS
CEMETERY
RAILROADS
AIRPORTS
STREAMS
LAKES & PONDS

## City Population

Denton > 100,000
Lewisville 40,000- 100,000
Corinth 10,000- 39,999
Sanger 2,000- 9,999
Ponder < 2,000



N



NAD 1983 StatePlane
(Zone 5351)
Texas North Central
Lambert Conformal Conic

N
W          E
S

1 inch = 0.1 miles
March 25, 2014

This product is for informational purposes
and may not have been prepared for or be
suitable for legal, engineering, or surveying
purposes. It does not represent an on-the-ground
survey and represents only the approximate
relative location of property boundaries.

Denton County does not guarantee the correctness
or accuracy of any features on this product and
assumes no responsibility in connection therewith.
This product may be revised at any time without
notification to any user.

CONTACT INFORMATION
LANDMARKMAP GIS: gis.dentoncounty.com
E-MAIL: gis@dentoncounty.com



DEPARTMENT OF
TECHNOLOGY SERVICES

DTS

DENTON ★ COUNTY

# Exhibit 4

**STATE OF TEXAS** )

**COUNTY OF DENTON** )

**CERTIFICATE TO COPY OF PUBLIC RECORD**

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Extra Territorial Jurisdiction Map showing the Sunrise Bay area. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# Exhibit 5

STATE OF TEXAS     )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON     )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Extra Territorial Jurisdiction Map showing the 2-foot contours of the Bizios Property area. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# Exhibit 6

# DENTON CENTRAL APPRAISAL DISTRICT

## CERTIFICATE OF AUTHENTICITY OF OFFICIAL RECORDS

STATE OF TEXAS

COUNTY OF DENTON

      BEFORE ME, the undersigned official on this day appeared ROGER HARRIS, who is personally known to me, and first being duly sworn according to law upon his oath deposed and said:

      My name is ROGER HARRIS. I am over 18 years of age. I have never been convicted of a crime, and I am fully competent to make this affidavit. I have personal knowledge of the facts stated herein, and they are all true and correct.

      I am custodian of records of the DENTON CENTRAL APPRAISAL DISTRICT. Attached hereto is 1 page of duplicate copies of official records from the District's Appraisal Records. These said pages of records are kept by the Denton Central Appraisal District in the regular course of business, and it was the regular course of business of the Denton Central Appraisal District for a representative of the District with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record; and the record was made at or near the time of receipt of same or reasonable soon thereafter. The records attached hereto are exact duplicates of the originals.

ROGER HARRIS
CUSTODIAN OF THE RECORDS

      SUBSCRIDED AND SWORN TO BEFORE ME ON THE 26th day of March, 2014, to certify which witness my hand and official seal.

NOTARY PUBLIC in and for the State of Texas

Enclosure:
Owner Records (Screen Prints) for:

PID 182659

Signature

HOPE MARIE PIERSON
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
09-13-2014

## PROPERTY ID AND LEGAL DESCRIPTION

PROP ID: 182659   TYPE: Real   DBA:
SUNRISE BAY AT LAKE LEWISVILLE BLK 1 LOT 84
GEO ID : SN0104A-000001-0000-0084-0000    MAP ID: LE01
REF ID1: 255462   REF ID2: R182659   MAPSCO:
SITUS : 3960 SPINNAKER RUN PT TX 75068-3110   TIF: N
PROP USE:    SUB MKT:
GBA : 0    NRA: 0    UNITS : 0

## OWNER ID, NAME AND ADDRESS

BIZIOS, HARRY J    OWNER ID: 337558
6107 SWEENEY TRL    100.00%
FRISCO, TX 75034-2269 US

EFFECTIVE ACRES: 0.0000

APPR VAL METHOD: Cost

## EXEMPTIONS / ENTITIES

CAD 100%
G01 100%
S10 100%

## VALUE METHOD

| | C 2012 VALUES | C 2013 VALUES |
|---|---|---|
| IMPROVEMENT | 0 | 0 |
| LAND MKT + | 474,430 | 474,430 |
| MARKET = | 474,430 | 474,430 |
| PROD LOSS - | 0 | 0 |
| APPRAISED = | 474,430 | 474,430 |
| HS CAP LOSS - | 0 | 0 |
| ASSESSED = | 474,430 | 474,430 |

## GENERAL

UTILITIES:
TOPOGRAPHY:
ROAD ACCESS:
ZONING:
GROUP CODES: IA-S10
NEXT REASON:

LAST APPR YR: 2011   LAST APPR: CHUCKS
CAP BASIS YR:   NBHD APPR: CHUCK
LAST INSP DATE: 04/12/2012   SUBDV APPR:
NEXT INSP DATE:   LAND APPR:
  VALUE APPR:
  RENT:

## REMARKS / SKETCH COMMANDS

2012 LISTED for $799,000; PRIME LAKEFRONT. FROM
R43847,43798,44155,65860,43986,43994 PER PLAT L-224-27

DATE 3/26/14

I HEREBY CERTIFY THAT THIS IS A TRUE
AND CORRECT COPY OF THE RECORDS OF THE
DENTON CENTRAL APPRAISAL DISTRICT.

RUDY DURHAM, CHIEF APPRAISER

BY _Roger Harris_

## BUILDING PERMITS

| B# | ISSUE DT | PERMIT # | TYPE | ST | EST VALUE | APPR | BUILDER | COMMENT |
|---|---|---|---|---|---|---|---|---|
| 1 | 02/24/2014 | 2014-0123 | RESCA | | 0 | CHUC | ALAN HOFFMAN CUSTOM | (MA:5536MA2:1369- |

## INCOME APPROACH DATA

| GPI | VAC | EGR | OTHER INC | EGI | EXPENSE | TAXES | NOI | METHOD | INC VALUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

TAX AGENT:    PHONE:
GROSS SQFT:    NET SQFT:
LINKED ACCTS:    RECONCILED VALUE:

## INQUIRY / ARB PROTESTS

| CASE ID | DATE | APPR | STATUS | OWNER COMMENTS | STAFF COMMENTS |
|---|---|---|---|---|---|
| | | | | | |

## SALES & DEED HISTORY

| SALE DT | SALE PRICE | TYPE | RATIO CD | FIN CD | FIN TERM | LA SQFT | SP / SQFT | 1ST IMPRV | 2ND IMPRV | GRANTOR | CONSID | DEED | DEED INFO |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/07/2013 | 650,000 | CL | I | CONV | 0 YR | 0 | 0.00 | | | LANGLEY, KELLY | | GN | 2013-69513 |
| 06/26/2006 | | | | | | | | | | LI, XU | | WD | 2006-77041 |
| 02/03/2005 | | | | | | | | | | BONNER, DAVID | | WD | 05-13294 |

## IMPROVEMENT VALUATION   LIVING AREA: 0   APPR/SQFT: 0.00   SALE/SQFT:

| I# | TYPE DESCRIPTION | MTHD | CLASS/SUBCL | AREA | UNIT PRICE | UNITS | STY | BUILT | EFF YR | COND. | VALUE | DEPR | PHYS | ECON | FUNC | COMP | ADJ | ADJ VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | |

## IMPROVEMENT DETAIL ADJUSTMENTS

| I# | ADJ TYPE | ADJ AMT | ADJ % |
|---|---|---|---|
| | | | |

## IMPROVEMENT FEATURES

| DESCRIPTION | UNITS | CODE | VALUE |
|---|---|---|---|
| | | | |

REGION:   SUBD: SN0104A (100   NBHD: DC13012L (10   SUBSET:

## LAND VALUATION   IRR Wells: 0   Capacity: 0   IRR Acres: 0.0000   Oil Wells: 0

| L# | DESCRIPTION | TYPE | SOIL | CLS | TABLE | SC | HS | METH | DIMENSIONS | UNIT PRICE | ADJ | MASS ADJ | VAL SRC | MKT VAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | RESIDENT LOT | 8 | | | L-SN010 | C5 | N | SL | 2.5000 AC | 1.35 | 5.50 | 1.00 | A | 474,430 |
| | | | | | | | | | | | | | | 474,430 |

## LAND ADJUSTMENTS

| L# | ADJ TYPE | ADJ AMT | ADJ % |
|---|---|---|---|
| 1. | LVIEW | 550.00 | |

## PRODUCTIVITY VALUATION

| AG | AG USE | AG TABLE | AG UNIT PRC | AG VALUE |
|---|---|---|---|---|
| N | | | 0.00 | 0 |
| | | | | 0 |

# Exhibit 7

Cab L Pg. 224

OWNERS CERTIFICATION

STATE OF TEXAS
COUNTY OF DENTON

ALL THAT CERTAIN TRACT OR PARCEL OF LAND BEING SITUATED IN DENTON COUNTY, TEXAS, BEING A PORTION OF THE DR. W. BREASHEARS SURVEY, ABSTRACT NO. 1634, AND THE J. KING SURVEY, ABSTRACT NO. 718, AND THE WM. H. PEA SURVEY, ABSTRACT NO. 1044, AND THE DAVID M. CULE SURVEY, ABSTRACT NO. 226, BEING A PORTION OF THAT CALLED 315.6 ACRE TRACT AS DESCRIBED IN VOLUME 383, PAGE 69 OF DEED RECORDS OF DENTON COUNTY, TEXAS, AND BEING A PORTION OF THAT CALLED 30.963 ACRE TRACT AS DESCRIBED IN VOLUME 614, PAGE 399 OF THE DEED RECORDS OF DENTON COUNTY, TEXAS, BEING FURTHER DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT 5/8" IRON ROD WITH CAP SET IN THE SOUTH LINE OF THE DAVID M. CULE SURVEY, ABSTRACT NO. 226 AT THE NORTHWEST CORNER OF THE WM. H. PEA SURVEY, ABSTRACT NO. 1044, SAME BEING THE NORTHWEST CORNER OF SAID CALLED 315.6 ACRE TRACT:

THENCE SOUTH 05°18'53" EAST ALONG THE COMMON LINE OF SAID CULE AND PEA SURVEYS, 1935.13 FEET TO AN 1/2" IRON ROD FOUND:

THENCE NORTH 02°42'00" EAST, 34.57 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 84°30'00" EAST, 421.17 FEET TO AN 1/2" IRON PIPE FOUND:
THENCE SOUTH 89°24'00" EAST, 223.12 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 56°14'00" EAST, 183.79 FEET TO GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 72°02'38" EAST, 54.54 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 00°50'12" WEST, 129.06 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 66°10'50" EAST, 52.36 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 22°11'06" EAST, 66.32 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 61°46'25" EAST, 83.59 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 71°24'04" EAST, 791.49 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 11°11'04" WEST, 574.62 FEET TO A 5/8" IRON ROD WITH CAP SET:
THENCE SOUTH 78°20'32" WEST, 288.46 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 66°20'34" WEST, 98.71 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 50°31'11" WEST, 92.72 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 52°41'04" EAST, 83.40 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 15°03'25" EAST, 161.20 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 24°46'52" WEST, 422.77 FEET TO AN 1/2" IRON PIPE FOUND:
THENCE NORTH 60°06'54" WEST, 159.72 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 23°14'51" WEST, 72.11 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 89°05'01" WEST, 111.54 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 04°06'21" WEST, 108.14 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 63°01'43" WEST, 241.38 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 01°29'27" EAST, 54.01 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 86°58'11" WEST, 139.67 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 51°17'56" WEST, 100.68 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 22°02'18" WEST, 366.80 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 18°56'52" WEST, 266.75 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 39°54'41" WEST, 159.87 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 34°04'13" WEST, 279.14 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 55°30'32" WEST, 321.94 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 84°23'51" WEST, 164.79 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 44°58'35" WEST, 182.38 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 65°35'27" WEST, 132.50 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 43°37'54" EAST, 248.13 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 52°39'19" EAST, 106.29 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 40°45'22" EAST, 214.64 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 20°31'00" EAST, 268.42 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 14°15'27" WEST, 161.43 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 74°11'27" WEST, 346.65 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 51°41'32" EAST, 426.79 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 13°20'01" EAST, 260.39 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 25°04'08" EAST, 160.60 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 17°47'40" EAST, 115.64 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 38°40'59" WEST, 514.83 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 62°22'36" WEST, 192.91 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 53°42'11" WEST, 228.94 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 74°05'37" WEST, 129.46 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 33°51'30" WEST, 206.96 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 22°58'13" WEST, 72.42 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 00°15'58" EAST, 125.18 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 49°54'00" WEST, 128.09 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 81°54'16" EAST, 232.98 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 28°59'37" EAST, 350.12 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 30°33'41" EAST, 394.13 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 62°57'21" WEST, 85.72 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 20°57'48" EAST, 52.61 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 38°56'39" WEST, 129.23 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 06°52'14" EAST, 59.15 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 35°57'10" WEST, 92.24 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 44°06'22" EAST, 43.34 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 83°52'00" EAST, 71.71 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 32°28'16" EAST, 182.57 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 54°08'07" EAST, 331.45 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 82°01'52" EAST, 161.08 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 22°13'51" EAST, 237.62 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 20°39'49" EAST, 140.59 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 48°15'45" EAST, 159.72 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 76°36'22" EAST, 154.63 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 24°02'01" EAST, 135.42 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 00°44'59" EAST, 37.52 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 82°50'20" EAST, 225.68 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 22°25'30" WEST, 162.93 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 54°09'04" EAST, 433.66 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 23°57'59" EAST, 275.32 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 47°02'13" EAST, 215.43 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 79°57'57" EAST, 213.00 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 13°20'29" EAST, 182.80 FEET TO A 5/8" IRON ROD WITH CAP SET:
THENCE SOUTH 13°38'26" WEST, 208.76 FEET TO A 5/8" IRON ROD WITH CAP SET:
THENCE SOUTH 85°02'31" WEST, 217.40 FEET TO A GOVERNMENT MONUMENT FOUND:

THENCE SOUTH 04°25'32" EAST, 157.85 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 51°46'08" WEST, 149.83 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 21°55'56" EAST, 243.71 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 38°21'36" WEST, 491.89 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 19°02'58" WEST, 282.09 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 53°13'24" WEST, 367.65 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 54°14'25" EAST, 330.49 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 18°31'15" WEST, 198.45 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 00°27'10" WEST, 162.24 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 59°05'29" WEST, 67.57 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 47°04'03" WEST, 107.42 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 58°13'49" WEST, 226.48 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 77°02'46" WEST, 69.85 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 17°29'39" EAST, 54.10 FEET TO AN 1/2" IRON ROD FOUND:
THENCE NORTH 47°08'47" EAST, 59.36 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 15°44'41" WEST, 321.61 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 60°22'19" WEST, 168.37 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE NORTH 79°53'23" WEST, 179.51 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 44°28'49" WEST, 130.92 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 25°38'44" WEST, 99.89 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 88°19'23" EAST, 306.59 FEET TO A GOVERNMENT MONUMENT FOUND:
THENCE SOUTH 87°58'39" WEST, 450.90 FEET TO AN 1/2" IRON PIPE FOUND:
THENCE SOUTH 87°14'07" WEST, 521.93 FEET TO AN 1/2" IRON ROD FOUND:
THENCE SOUTH 86°04'41" WEST, 795.09 FEET TO AN 1/2" IRON PIPE FOUND:
THENCE NORTH 00°00'18" WEST, 2555.28 FEET TO A 5/8" IRON ROD WITH CAP SET:
THENCE NORTH 00°54'34" EAST, 2581.40 TO THE POINT OF BEGINNING AND CONTAINING A COMPUTED AREA OF 257.157 ACRES OF LAND.

NOW THEREFORE KNOW ALL MEN BY THESE PRESENTS:

THAT, PROPERTIES OF THE SOUTHWEST INC., OWNER, ACTING BY AND THROUGH ITS VICE PRESIDENT, MARCUS SMITH, DULY AUTHORIZED TO SO ACT, DOES HEREBY ADOPT THIS PLAT DESIGNATING THE HEREINABOVE PROPERTY AS " SUNRISE BAY AT LAKE LEWISVILLE", AN ADDITION TO DENTON COUNTY, TEXAS, AND DOES HEREBY DEDICATE TO THE PUBLIC USE FOREVER THE STREETS AND EASEMENTS SHOWN ON THIS PLAT FOR THE MUTUAL USE AND ACCOMODATION OF ALL PUBLIC UTILITIES DESIRING TO USE OR USING SAME. ANY PUBLIC UTILITY SHALL HAVE THE RIGHT TO REMOVE AND KEEP REMOVED ALL OR PART OF ANY BUILDINGS, FENCES, TREES, SHRUBS OR OTHER IMPROVEMENTS OR GROWTHS WHICH IN ANY WAY ENDANGER OR INTERFERE WITH THE CONSTRUCTION, MAINTENANCE OR EFFICIENCY OF ITS RESPECTIVE SYSTEMS ON ANY OF THESE EASEMENT STRIPS AND ANY PUBLIC UTILITY SHALL, AT ALL TIMES, HAVE THE RIGHT OF INGRESS AND EGRESS TO AND FROM AND UPON THE SAID STRIPS FOR THE PURPOSE OF CONSTRUCTING, RECONSTRUCTION, INSPECTING, PATROLLING, MAINTAINING AND ADDING TO OR REMOVING ALL OR PART OF ITS RESPECTIVE SYSTEMS WITHOUT THE NECESSITY AT ANY TIME OF PROCURING THE PERMISSION OF ANYONE.

WITNESS MY HAND, THIS THE ___31___ DAY OF ___July___, 1995.

PROPERTIES OF THE SOUTHWEST INC.

MARCUS SMITH, VICE PRESIDENT

STATE OF TEXAS
COUNTY OF DENTON

BEFORE ME, THE UNDERSIGNED AUTHORITY, A NOTARY PUBLIC, IN AND FOR SAID COUNTY AND STATE ON THIS DAY PERSONALLY APPEARED MARCUS SMITH, KNOWN TO ME TO BE THE PERSON WHOSE NAME IS SUBSCRIBED TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME FOR THE PURPOSE AND CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE ___31___ DAY OF ___July___, 1995.

Jennifer Dawn Brown
NOTARY PUBLIC IN AND FOR
DENTON COUNTY, TEXAS
COMMISSION EXPIRES ___11/5/97___

JENNIFER DAWN BROWN
MY COMMISSION EXPIRES
November 5, 1997

SURVEYOR'S CERTIFICATE

I, JOHNNY D. L. WILLIAMS, REGISTERED PROFESSIONAL SURVEYOR FOR SURVCON, INC., DO HEREBY DECLARE THAT THIS PLAT WAS COMPUTED AND COMPILED BY TURNER COLLIE AND BRADEN INC., UNDER MY SUPERVISION, AND THAT

1.) THE METES AND BOUNDS DESCRIPTION CONTAINED WITHIN THE OWNERS CERTIFICATE HEREON, WAS PREPARED FROM A GROUND SURVEY PERFORMED UNDER MY SUPERVISION.
2.) ALL LOT CORNERS, RIGHT-OF-WAY AND BOUNDARY POINTS SHOWN HEREON, HAVE BEEN ESTABLISHED USING 5/8 " IRON RODS, IN ACCORDANCE WITH COORDINATE VALUES PROVIDED BY TURNER COLLIE & BRADEN INC.

JOHNNY D. L. WILLIAMS
REGISTERED PROFESSIONAL LAND SURVEYOR
TEXAS REGISTRATION NO. 4818

STATE OF TEXAS
COUNTY OF DALLAS

BEFORE ME, THE UNDERSIGNED AUTHORITY, A NOTARY PUBLIC, IN AND FOR SAID COUNTY AND STATE ON THIS DAY PERSONALLY APPEARED JOHNNY D.L. WILLIAMS, KNOWN TO ME TO BE THE PERSON WHOSE NAME IS SUBSCRIBED TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME FOR THE PURPOSE AND CONSIDERATION THEREIN EXPRESSED.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS THE ___31___ DAY OF ___July___, 1995.

NOTARY PUBLIC
DALLAS COUNTY, TEXAS
COMMISSION EXPIRES

CERTIFICATE OF APPROVAL

ON THIS ___28TH___ DAY OF ___July___, 1995, THE CITY OF LITTLE ELM, TEXAS, HEREBY APPROVES THE FOREGOING PLAT OF ", SUNRISE BAY AT LAKE LEWISVILLE" AN ADDITION TO DENTON COUNTY, TEXAS, SUBMITTED BY PROPERTIES OF THE SOUTHWEST INC., OWNER.

MAYOR
CITY OF LITTLE ELM, TEXAS

CERTIFICATE OF APPROVAL

ON THIS ___1___ DAY OF ___August___, 1995, THE COUNTY OF DENTON, TEXAS, HEREBY APPROVES THE FOREGOING PLAT OF ", SUNRISE BAY AT LAKE LEWISVILLE" AN ADDITION TO DENTON COUNTY, TEXAS, SUBMITTED BY PROPERTIES OF THE SOUTHWEST INC., OWNER.

DENTON COUNTY, TEXAS



FINAL PLAT

Sunrise Bay
AT LAKE LEWISVILLE

DENTON COUNTY, TEXAS
257.1573 ACRES PART OF THE
WM. H. PEA SURVEY, A-1044
DR. W. BREASHEARS SURVEY, A-1634
J. KING SURVEY, A-718
DAVID M. CULE SURVEY, A-226

PREPARED FOR:
PROPERTIES OF THE SOUTHWEST INC.
100 LAKE RIDGE PARKWAY
CEDAR HILL, TEXAS 75104
(214) 299-5253

179 LOTS
5 COMMON GREEN AREAS

1 BLOCK
JULY, 1995

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY CLERK

On Aug 02 1995
At 9:04am

Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 98.00
Doc/Mgmt : 6.00
Receipt #: 21161
Deputy - CASSY

TURNER COLLIE & BRADEN INC.
5710 LBJ FREEWAY, SUITE 370
DALLAS, TEXAS 75240, (214) 960-9651

PREPARED BY:
SURVCON INC.
5710 LBJ FREEWAY, SUITE 370
DALLAS, TEXAS 75240, (214) 458-2173

UTILITY PROVIDERS:
TELEPHONE: SOUTHWESTERN BELL
307 NORTH KENTUCKY STREET
MCKINNEY, TX. 75069
ELECTRIC: D.C.E.C.
3501 F.M. 2181
CORINTH, TX. 76205

T.C. & B. JOB NO. 45-94008-203

SHEET 1 OF 4

VICINITY MAP
N.T.S.

PRINCETON
MCKINNEY
LITTLE ELM
FAIRVIEW
PROJECT LOCATION
LUCAS
LEWISVILLE
PLANO
MURPHY WYLIE
CARROLLTON
COPPELL
FARMERS ADDISON
BRANCH
RICHARDSON
ROWLETT
IRVING
GARLAND
UNIVERSITY PARK
HIGHLAND PARK
DALLAS
SUNNYVALE
MESQUITE





Cab L Pg. 225

P.O.B.

DAVID M. CULE SUR. A-226

J.R.K., INC.
VOL. 1191, PG. 210
D.R.B.C.T.

DR. W. BREASHEARS SUR. A-1634

A. ROBERT BEER, TRUSTEE
VOL. 614, PG. 399
D.R.D.C.T.

JAMES O. DICKSON SUR. A-338

REALTY ALLIANCE OF TEXAS, LTD.
382.579 ACRES
VOL. 2395 G. 132
D.R.D.C.T.

U.S.A.
LAKE LEWISVILLE
RESERVOIR

WM. H. PEA SUR., A-1044

J. KING SUR. A-718

J. KING SUR. A-8

NOTE:
THE MAINTENANCE OF DRAINAGEWAYS AND/OR DRAINAGE IMPROVEMENTS WITHIN THE DRAINAGE AND/OR UTILITY EASEMENTS SHOWN ON THIS PLAT ARE THE RESPONSIBILITY OF THE INDIVIDUAL PROPERTY OWNERS AND NOT DENTON COUNTY.

MATCH LINE
MATCH LINE
MATCH LINE

SCALE 1" = 200'
0 200 400 500 600

GENERAL NOTES:
1.) THE RADIUS ON ALL BLOCK CORNERS IS 20.00 FEET UNLESS OTHERWISE NOTED.
2.) ALL EASEMENTS ON LOT LINES ARE CENTERED UNLESS OTHERWISE NOTED.
3.) A 20 FOOT UTILITY / SLOPE EASEMENT ADJOINING ALL RIGHT OF WAYS IS HEREBY DEDICATED. A 10 FOOT SIDELOT U.E. / D.E. IS HEREBY DEDICATED.
4.) ELEVATIONS REFERENCED TO N.G.S. DATUM SITE B.M. - BRASS DISK MONUMENT STAMPED F 947 1948 N 540426.228 E 2161833.063 ELEVATION 576.40
5.) U.E. INDICATES UTILITY EASEMENT; W.L.E. INDICATES WATER LINE EASEMENT; D.E. INDICATES DRAINAGE EASEMENT; B.L. INDICATES BUILDING LINE. S.E. INDICATES SLOPE EASEMENT.
6.) THAT PROPERTY SHOWN HEREON WHICH IS SITUATED BETWEEN THE 537 FOOT CONTOUR (MEAN SEA LEVEL) AND THE BOUNDARY OF LAKE LEWISVILLE RESERVOIR, IS SITUATED IN FLOOD ZONE A16 (100 YR. FLOOD) PER FEMA MAPS NO. 480774 0150C, DATED 11/20/91 AND NO. 480774 0225C, DATED 9/14/90. THIS PROPERTY IS ALSO SUBJECT TO AN EASEMENT RESERVED IN A QUITCLAIM DEED REC'D IN VOL. 483 PG.444 D.R.D.C.T.. IN THIS DEED THE U.S.A. RETAINS THE PERPETUAL RIGHT TO FLOOD THAT PORTION OF THE PROPERTY BELOW THE ELEVATION OF 537 FEET (MEAN SEA LEVEL.)
7.) THE DEVELOPMENT OF INDIVIDUAL OWNERS SHALL NOT BLOCK ANY TRIBUTARY RUNOFF.
8.) LAND USE DESIGNATED AS SINGLE FAMILY RESIDENTIAL.
9.) A D.E. IS HEREBY DEDICATED FROM 20 FEET ON EITHER SIDE OF THE CENTERLINE OF ANY AND ALL CREEKS, GULLIES, RAVINES, DRAWS, SLOUGHS, OR OTHER NATURAL DRAINAGE COURSES LOCATED IN SAID PLAT ARE HEREBY DEDICATED TO THE PUBLIC AS EASEMENTS FOR DRAINAGE PURPOSES. ALL COMMON GREENS ARE ALSO HEREBY DEDICATED AS DRAINAGE EASEMENTS FOR DRAINAGE PURPOSES.
10.) THE AVERAGE PERCOLATION RATE VARIED WITH DISTANCE HAVING A RANGE OF 40 TO 120 MINUTES/INCH. (PROVIDED BY BAILY INSPECTIONS & TESTING)

LEGEND

(1) BLOCK DESIGNATION

SURVEY LINE

530 MIN. FINISH FLOOR ELEVATION

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY CLERK

On Aug 02 1995
At 9:04am

Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 98.00
Doc/Mgmt : 6.00
Receipt #: 21161
Deputy - CASSY

FINAL PLAT
SUNRISE BAY
AT LAKE LEWISVILLE

T.C. & B. JOB NO. 45-94008-203

SHEET 2 OF 4

MATCH LINE

MATCH LINE

MATCH LINE

SCALE 1" = 200'

WM. H. PEA SUR., A-1044

U.S.A.
LAKE LEWISVILLE
RESERVOIR

J. KING SUR., A-718

REALITY ALLIANCE OF TEXAS, LTD.
362,579 ACRES
VOL. 2395 Pg. 132
C.R.D.C.T.

C.C. DICKSON SUR. A-339

FISHERMANS COVE

SHORELINE DRIVE

SPINNAKER RUN POINTE

NAUTICAL COVE

SHORELINE DRIVE

SPINNAKER RUN POINT

U.S.A.
LAKE LEWISVILLE
RESERVOIR

U.S.A.
LAKE LEWISVILLE
RESERVOIR

LAKEWOOD VILLAGE
SECOND SECTION

LAKEWOOD VILLAGE
FIRST SECTION

LEGEND

① BLOCK DESIGNATION

———— SURVEY LINE

538 MIN. FINISH FLOOR ELEVATION

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY
CLERK

On Aug 02 1995
At 9:04am

Doc/Num : 95-R0045794
Doc/Type : PLA
Recording: 98.00
Doc/Mgmt : 6.00
Receipt #: 21161
Deputy - CASSY

FINAL PLAT

SUNRISE BAY
AT LAKE LEWISVILLE

T.C. & B. JOB NO. 45-94008-203

SHEET 3 OF 4



Cab L Pg. 227

NOTE TABLE

| NOTE | DISTANCE OR ARC LENGTH | BEARING OR DELTA | RADIUS |
|---|---|---|---|
| 1 | 31.42 | 90-00-00 | 20.00 |
| 2 | 31.42 | 90-00-00 | 20.00 |
| 3 | 18.43 | N 0-54-34E | |
| 4 | 14.57 | N13-02-04E | |
| 5 | 45.86 | N13-02-04E | |
| 6 | 19.19 | 54-59-00 | 20.00 |
| 7 | 44.24 | 47-01-32 | 60.00 |
| 8 | 43.76 | 41-46-09 | 60.00 |
| 9 | 50.00 | 47-44-47 | 60.00 |
| 10 | 7.80 | 20-03-13 | 20.00 |
| 11 | 9.02 | 26-07-12 | 20.00 |
| 12 | 12.06 | 1-27-40 | 470.00 |
| 13 | 38.43 | S 0-54-34W | |
| 14 | 47.12 | 90-00-00 | 30.00 |
| 15 | 24.42 | S89-05-26E | |
| 16 | 24.75 | 65-13-11 | 20.00 |
| 17 | 17.91 | 51-19-04 | 20.00 |
| 18 | 31.42 | 90-00-00 | 20.00 |
| 19 | 17.91 | 51-19-04 | 20.00 |
| 20 | 29.75 | 85-13-11 | 20.00 |
| 21 | 32.13 | S51-27-00E | |
| 22 | 17.91 | 51-19-04 | 20.00 |
| 23 | 43.20 | 41-15-11 | 60.00 |
| 24 | 17.91 | 51-19-04 | 20.00 |
| 25 | 32.13 | N51-27-00W | |
| 26 | 17.50 | 1-55-42 | 520.00 |
| 27 | 32.80 | N89-05-26W | |
| 28 | 23.00 | S43-37-54E | |
| 29 | 44.40 | S74-11-27E | |
| 30 | 46.57 | 5-02-02 | 530.00 |
| 31 | 31.42 | 90-00-00 | 20.00 |
| 32 | 31.42 | 90-00-00 | 20.00 |
| 33 | 17.40 | 1-56-18 | 530.00 |
| 34 | 45.33 | 4-51-23 | 530.00 |
| 35 | 15.61 | S51-19-21E | |
| 36 | 17.91 | 51-19-04 | 20.00 |
| 37 | 36.70 | 36-57-21 | 60.00 |
| 38 | 44.10 | 42-06-45 | 60.00 |
| 39 | 17.91 | 51-19-04 | 20.00 |
| 40 | 46.36 | N61-19-21W | |
| 41 | 23.13 | S72-37-05E | |
| 42 | 32.44 | N62-32-36W | |
| 43 | 22.06 | N44-34-22W | |
| 44 | 48.00 | S 0-16-50E | |
| 45 | 31.42 | 90-00-00 | 20.00 |
| 46 | 31.42 | 90-00-00 | 20.00 |
| 47 | 40.75 | 4-51-51 | 480.00 |
| 48 | 17.91 | 51-19-04 | 20.00 |
| 49 | 32.75 | 31-16-26 | 60.00 |
| 50 | 39.50 | 37-43-11 | 60.00 |
| 51 | 41.40 | 39-32-03 | 60.00 |
| 52 | 47.30 | 45-10-05 | 60.00 |

NOTE TABLE

| NOTE | DISTANCE OR ARC LENGTH | BEARING OR DELTA | RADIUS |
|---|---|---|---|
| 160 | 60.42 | N13-02-04E | |
| 161 | 14.66 | N 0-54-34E | |
| 162 | 47.67 | N71-25-17E | |
| 163 | 155.95 | N40-02-00E | |
| 164 | 158.76 | N60-07-41E | |
| 165 | 68.19 | S40-45-29E | |
| 166 | 60.00 | N34-52-47W | |
| 167 | 121.04 | S22-05-24W | |
| 168 | 60.00 | N39-16-36E | |
| 169 | 18.43 | N 0-54-34E | |
| 170 | 60.42 | N13-02-04E | |
| 171 | 60.42 | S13-02-04W | |
| 172 | 38.43 | S 0-54-34W | |
| 173 | 90.31 | N12-15-27E | |
| 174 | 90.31 | S12-15-27W | |
| 175 | 32.13 | S51-27-00E | |
| 176 | 32.13 | N51-27-00W | |
| 177 | 91.41 | S 0-54-34W | |
| 178 | 60.31 | S11-13-14E | |
| 179 | 170.41 | S 0-54-34W | |
| 180 | 126.71 | S39-34-54W | |
| 181 | 101.31 | S 0-00-10E | |
| 182 | 169.02 | S23-18-18E | |
| 183 | 5.73 | S40-45-29E | |
| 184 | 5.73 | N48-45-29W | |
| 185 | 169.02 | N23-18-18W | |
| 186 | .06 | N71-25-17E | |
| 187 | 93.50 | N40-02-00E | |
| 188 | 93.50 | S46-02-00W | |
| 189 | .06 | S71-25-17W | |
| 190 | 60.13 | S07-14-07W | |
| 191 | 62.01 | S33-30-42W | |
| 192 | 94.31 | S60-07-41W | |
| 193 | 94.31 | N60-07-41E | |
| 194 | 62.01 | N33-30-42E | |
| 195 | 101.31 | N 0-00-10W | |
| 196 | 126.71 | N39-34-54E | |
| 197 | 60.31 | N11-13-14W | |
| 198 | 71.41 | N 0-54-34E | |
| 199 | 160.00 | N 0-54-34E | |
| 200 | 65.06 | S50-43-24E | |
| 201 | 94.38 | N81-48-23W | |
| 202 | 73.02 | N22-05-24E | |
| 203 | 68.19 | S46-10-05W | |
| 204 | 58.91 | N89-59-42E | |
| 205 | 101.31 | S 0-00-10E | |
| 206 | 55.36 | S58-10-40W | |
| 207 | 73.02 | S22-05-24W | |
| 208 | 46.20 | N 0-54-34E | |
| 209 | 127.01 | S22-27-24E | |
| 210 | 62.50 | S65-35-27W | |
| 211 | 72.42 | S22-58-13W | |

CURVE TABLE

| NOTE | ARC LENGTH | DELTA | RADIUS | CHORD BEARING | CHORD DISTANCE |
|---|---|---|---|---|---|
| 1 | 361.32 | 37-30-26 | 550.00 | S70-16-19E | 354.86 |
| 2 | 448.54 | 56-21-18 | 450.00 | N07-05-39W | 426.44 |
| 3 | 442.57 | 56-21-02 | 450.00 | N28-18-48W | 424.95 |
| 4 | 310.91 | 39-25-12 | 450.00 | N15-47-18E | 304.77 |
| 5 | 303.73 | 38-40-28 | 450.00 | N20-14-44E | 298.00 |
| 6 | 105.06 | 12-07-48 | 500.00 | N05-09-28W | 105.66 |
| 7 | 105.06 | 12-07-48 | 500.00 | N05-09-20W | 105.66 |
| 8 | 105.01 | 12-07-30 | 500.00 | N06-59-19E | 105.61 |
| 9 | 105.01 | 12-07-30 | 500.00 | N06-58-19E | 105.61 |
| 10 | 118.30 | 23-23-17 | 290.00 | N51-43-34E | 117.56 |
| 11 | 138.67 | 26-29-59 | 300.00 | N46-53-11E | 137.43 |
| 12 | 289.60 | 33-11-06 | 500.00 | N58-14-16E | 285.67 |
| 13 | 103.58 | 11-42-37 | 500.00 | N60-58-30E | 103.22 |
| 14 | 122.79 | 17-35-16 | 400.00 | S51-27-00E | 122.31 |
| 15 | 324.95 | 37-40-05 | 500.00 | S70-12-23E | 323.65 |
| 16 | 362.24 | 34-35-24 | 600.00 | S60-01-08E | 356.76 |
| 17 | 325.58 | 31-05-00 | 600.00 | S66-15-53E | 321.53 |
| 18 | 243.04 | 69-40-46 | 200.00 | S12-40-59E | 228.04 |
| 19 | 412.11 | 118-03-48 | 200.00 | N73-14-40E | 342.98 |
| 20 | 47.12 | 90-00-00 | 30.00 | S44-05-26E | 42.43 |
| 21 | 31.42 | 90-00-00 | 20.00 | N45-54-34E | 28.28 |
| 22 | 112.16 | 12-07-30 | 530.00 | N06-58-19E | 111.95 |
| 23 | 51.50 | 6-16-39 | 470.00 | N89-53-44E | 51.47 |
| 24 | 19.19 | 54-59-00 | 20.00 | N20-44-05W | 18.46 |
| 25 | 245.81 | 282-28-30 | 50.00 | S86-59-20E | 75.13 |
| 26 | 16.82 | 48-18-25 | 20.00 | S30-09-42W | 16.32 |
| 27 | 64.30 | 8-57-34 | 530.00 | S07-33-17W | 64.34 |
| 28 | 95.46 | 12-07-30 | 470.00 | S06-58-19W | 95.28 |
| 29 | 31.42 | 90-00-00 | 20.00 | S44-05-26E | 28.28 |
| 30 | 66.41 | 8-34-04 | 500.00 | S05-48-24E | 66.40 |
| 31 | 29.75 | 85-13-11 | 20.00 | N54-02-03E | 27.08 |
| 32 | 17.91 | 51-19-04 | 20.00 | N13-24-05W | 17.32 |
| 33 | 295.96 | 282-30-06 | 60.00 | S77-44-30E | 75.08 |
| 34 | 17.91 | 51-19-04 | 20.00 | S37-54-59W | 17.32 |
| 35 | 29.75 | 85-13-11 | 20.00 | S38-21-09E | 27.08 |
| 36 | 217.77 | 21-30-44 | 580.00 | S52-12-22E | 216.44 |
| 37 | 17.91 | 51-19-04 | 20.00 | S77-06-32E | 17.32 |
| 38 | 295.96 | 282-30-00 | 60.00 | S33-33-00W | 75.08 |
| 39 | 17.91 | 51-19-04 | 20.00 | N25-47-20W | 17.32 |
| 40 | 341.61 | 37-30-26 | 520.00 | N70-16-19W | 335.50 |
| 41 | 31.42 | 90-00-00 | 20.00 | S45-54-34W | 28.28 |
| 42 | 49.50 | 12-07-46 | 470.00 | S05-09-22E | 99.52 |
| 43 | 112.21 | 12-07-46 | 530.00 | S05-09-20E | 112.00 |
| 44 | 31.42 | 90-00-00 | 20.00 | S44-05-26E | 28.28 |
| 45 | 349.36 | 37-46-05 | 530.00 | S70-12-23E | 343.07 |
| 46 | 17.91 | 51-19-04 | 20.00 | S76-50-53E | 17.32 |
| 47 | 295.90 | 282-30-00 | 60.00 | S30-48-39W | 75.00 |
| 48 | 17.91 | 51-19-04 | 20.00 | N25-39-46W | 17.32 |
| 49 | 389.01 | 37-46-05 | 470.00 | N70-12-23W | 304.24 |
| 50 | 31.42 | 90-00-00 | 20.00 | S45-54-34W | 28.28 |


CERTIFIED A TRUE AND CORRECT COPY OF THE RECORD ON FILE IN MY OFFICE
CYNTHIA MITCHELL
DENTON COUNTY CLERK
Date By Deputy Clerk

# Exhibit 8

STATE OF TEXAS     )

                      )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the builder's plans for "3950 Spinaker Run Pointe Rd.". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



## GENERAL CONTRACTORS NOTES

1.) Prior to any construction, the Contractor shall familiarize himself with the Contract Documents and Specifications, the Plans, including all notes, the City Standard Details and Specifications and any other applicable Standards or Specifications relevant to the proper completion of the work specified. Failure on the part of the Contractor to familiarize himself with all standards and specifications pertaining to the work shall in no way relieve the Contractor of responsibility for performing the work in accordance with all such applicable Standards and Specifications.

2.) The Contractor shall have in his possession, prior to construction, all necessary permits, licenses, etc. The Contractor shall have at least one set of set of approved Plans and Specifications on-site at all times. The Contractor shall notify city buildings officials and/ or department 24 hours prior to the commencement of any work.

3.) Construction inspection may be performed by representatives of the Owner, Engineer, City, Geotechnical Engineer and Reviewing Authorities and Agencies. Unrestricted access shall be provided to them during normal working hours. The contractor is responsible for understanding and scheduling required inspections.

4.) All contractors must confine their activities to the work area. No encroachments outside of the defined work area will be allowed, unless specifically noted on the plans. Any damage resulting therefrom shall be the Contractor's responsibility to repair.

5.) It will be the responsibility of each contractor to protect all existing public and private utilities throughout the construction of this project. The Contractor shall contact the appropriate utility companies for line locations prior to the commencement of construction and shall assume full liability to those companies for any damages caused to their facilities.

6.) The Contractor shall be responsible for providing the required construction staking necessary to complete the construction in accordance with the plans and specifications.

7.) The Contractor shall be responsible for providing and maintaining all necessary barricading and all other warning and safety devices to protect the public safety and heath until all work has been completed and accepted.

8.) If any unforeseen problems or conflicts are encountered in the course of construction, for which an immediate solution is not apparent, the Engineer and Owner shall be notified.

9.) The Contractor shall be responsible for removing any existing structures, fences, debris, or trees that are located within the boundaries of this project, unless otherwise noted on the plans.

10.) General Contractor shall be responsible for coordination of other trades (mech'l, elec'l, etc.) prior to fabrication and installation.

11.) General Contractor to be responsible for coordination of architectural and structural drawings prior to fabrication, forming, or placement of materials. General Contractor shall report discrepancies immediately to architect and shall proceed with construction only after discrepancy has been resolved.

## GENERAL FRAMING NOTES

1.) Structure was designed in accordance to the International Building Code 2003 Edition.

2.) All joists and rafters shall be aligned over studs below.

3.) All exterior corners (inside and out) shall be braced as required. Special city wind strength ordinances may apply

4.) Exterior walls 2 X 4 or 2 X 6 stud framing with veneers as selected, except where shown as 6" wall for plumbing supply and vents.

5.) Interior walls 2" X 4" stud with sheetrock face, except where shown as 6" wall for plumbing supply and vents, and for walls 10' in height or greater.

6.) Unless specifically noted otherwise, framing lumber shall be no. 2 or better southern pine with a modulus of elasticity of 1,600,000 psi. Interior wall studs may be no. 2 or better Douglas fir or S. pine, or no.2 or better SPF.

7.) Wood roof and floor trusses if used shall be fabricated, handled, and erected in accordance with truss plate institute standards and IBC standards. Truss design drawings sealed by a registered professional engineer shall be provided to the owner prior to erection of the trusses. The truss webs and bottom chords shall have their individual 2" thick components glued together as well as nailed per the truss plate pattern. The truss members shall all be minimum 2x4 no.2 or better.

8.) Coordinate and adjust, as necessary, the typical framing member spacing with lighting and electrical locations shown.

9.) When two roofs intersect with different roof pitches, block top of stud walls to align fascia.

10.) Wood connections to be Simpson ties or equivalent.

11.) All structural steel shall be A36 except TS shapes shall be A500 GR. B. Steel joists and joist girders shall meet all specifications of the latest S.J.I. edition. Fy=50 KSI. All bolted connections shall use a325 bolts unless noted otherwise. All welds shall be made using E70 electrodes. Headed studs shall be Nelson or better. Temporary construction bracing of the structural steel frame shall remain in place until after the floor and roof deck attachments have been completed and all permanent bracing has been installed.

## GENERAL CONCRETE NOTES

1.) Do not use foundation outline plan for actual construction. Foundation documents must be drawn & sealed by a registered engineer. Peskuski Home Design assumes no responsibility for slab strength or integrity.

2.) Concrete shall have a minimum compressive strength of 3000 psi at 28 days. Reinforcing steel shall be ASTM A615 grade 60. Lap all reinforcing splices 24" unless noted otherwise. Provide 2'-0" x 2'-0" corner bars to match and lap horizontal reinforcement at all grade beam and wall intersections. 30 bar dia. lap minimum. All reinforcement shall be detailed in accordance with the latest ACI Detailing manual.

3.) Contractor shall coordinate all penetrations, conduit, chamfers and embedded items prior to concrete placement. Welded wire fabric and wire shall be lapped the spacing of the cross wires plus 2".



BUILDER COPY

Stairs Shall Comply With IRC Section R311.5

All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval



## VICINITY MAP

## SHEET INDEX

| CS | COVER SHEET |
| A1 | PLAN OVERVIEW |
| A2 | FIRST FLOOR PLAN |
| A3 | SECOND FLOOR PLAN |
| A4 | FRONT/REAR ELEVATIONS |
| A5 | LEFT/RIGHT ELEVATIONS |
| A6 | ROOF/PLAT PLAN |
| A7 | CROSS SECTIONS |
| S1 | FOUNDATION/PLUMBING |
| S2 | ROOF FRAMING |
| S3 | DOOR/WINDOW SCHEDULES |
| D1 | CONSTRUCTION DETAILS |
| E1 | FIRST FLOOR ELECTRICAL |
| E2 | SECOND FLOOR ELECTRICAL |

## COVER SHEET

PLAN NO.
**7134**

DATE
**10/30/13**

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS

BUILDER COPY

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET
**CS**



SITE PLAN
SCALE 1" = 30'

LAKE LEWISVILLE RESOVOIR

DRAINAGE (AS INDICATED)

All Installations Subject To Field Inspections and Inspector Approval

MASONRY MAILBOX

SPINAKER RUN POINTE ROAD



**FIRST FLOOR**

**SECOND FLOOR**

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE

### NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS.

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

### AREAS

**LIVING**

| | |
|---|---|
| FIRST FLOOR A/C | 5536 |
| SECOND FLOOR A/C | 1369 |
| LOFT | 229 |
| **TOTAL LIVING** | 7134 |

**GARAGES**

| | |
|---|---|
| 2 CARS | 618 |
| 2 CARS | 618 |
| SHOP | 221 |

**PORCHES**

| | |
|---|---|
| ENTRY - GATE | 175 |
| ENTRY - FRONT DOOR | 123 |
| PRIVATE | 82 |
| BACK SNGLE VOLUME | 471 |
| BACK DBL VOLUME | 505 |
| **GARAGES/PORCHES** | 2813 |
| **TOTAL UNDER ROOF** | 9947 |

# PLAN OVERVIEW

SCALE: 3/32" = 1'

**PLAN NO.**

# 7134

DATE

## 11/05/13

**PHD**

PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 693-9906    FAX (972) 578-8245

**ALAN HOFFMANN COMPANY**
**BIZIOS RESIDENCE**
3950 SPINAKER RUN POINTE RD

SHEET

## A-1

*Handwritten / red annotations:*

Stairs Shall Comply With IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

All Inspections Shall Comply with 2006 IRC Requirements & Adopted Ordinances

All Foundation Anchorage Shall be Installed Per 2006 IRC Section 403.1.6 Prior to Placement of Concrete

IRC Shall Comply IRC Section R311.5

Stairs Shall Comply With IRC Section R311.5

All Installations Subject To Field Inspections and Inspector Approval

No stair under Tem access

Tapered Beam



PLAN NO.

**7134**

DATE

**11/05/13**

**PHD**

PESKUSKI HOME DESIGN

DALLAS, TEXAS

PHONE (469) 645-8936    FAX (972) 473-9236

**ALAN HOFFMANN COMPANY**

**BIZIOS RESIDENCE**

**3950 SPINAKER RUN POINTE RD**

# FIRST FLOOR

## PLAN SCALE 3/16" - 1'

SHEET

**A-2A**

NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES. IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL - THICKNESS OF VENEERS, FOOTINGS, SHEETROCK.

WALL TYPES

ICF BRICK
ICF STONE
ICF BLOCK
ICF STUCCO
BRICK 6"
BRICK 4"
STONE 6"
STONE 4"
STUCCO 6"
STUCCO 4"
INTERIOR 6"
INTERIOR 4"
DEMO WALL 12"
GLASS WALL
FOOTING WALL
TO BE REMOVED

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKUSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).



**MOTOR COURT**

**All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances**

**All Installations Subject To Field Inspections and Inspector Approval**

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKUSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

# FIRST FLOOR
## PLAN SCALE: 3/16" = 1'

---

## NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES. IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL - THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

## WALL TYPES

| | |
|---|---|
| ICF BRICK | |
| ICF STONE | |
| ICF BLOCK | |
| ICF STUCCO | |
| BRICK 6" | |
| BRICK 4" | |
| STONE 6" | |
| STONE 4" | |
| STUCCO 6" | |
| STUCCO 4" | |
| INTERIOR 6" | |
| INTERIOR 4" | |
| DECO WALL 12" | |
| GLASS WALL | |
| EXISTING WALL TO BE REMOVED | |

**PLAN NO.**
## 7134

**DATE**
## 11/05/13

## PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (___) ___-____   FAX: (___) ___-____

## ALAN HOFFMANN COMPANY
## BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

**SHEET**
## A-2B



## NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION.

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED.

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE.

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS 6" INTO NATURAL GRADE UNLESS OTHERWISE NOTED.

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED.

6. INTERIOR WALLS 2" X 4" WOOD STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS.

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.18.1 IBC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN.

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE.

11. WINDOW HEADER HEIGHTS TO MATCH EXISTING WINDOWS UNLESS NOTED OTHERWISE.

12. DIMENSIONS SHOWN MEASURE TO STUD WALL - THICKNESS OF VENEERS, FOOTINGS, SHEETROCK, ETC. NOT INCLUDED.

## WALL TYPES

| | |
|---|---|
| ICF BRICK | |
| ICF STONE | |
| ICF BLOCK | |
| ICF STUCCO | |
| BRICK 6" | |
| BRICK 4" | |
| STONE 6" | |
| STONE 4" | |
| STUCCO 6" | |
| STUCCO 4" | |
| INTERIOR 6" | |
| INTERIOR 4" | |
| DECO WALL 12" | |
| GLASS WALL | |
| EXISTING WALL TO BE REMOVED | |

### FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR/BUILDER SHALL EXAMINE AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND CONDITIONS OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY DISCREPANCIES AND/OR OMISSIONS PRIOR TO THE START OF CONSTRUCTION. PESKUSKI HOME DESIGN WILL BE RESPONSIBLE ONLY FOR THE REVISION/CORRECTION OF THESE DOCUMENTS. THESE DOCUMENTS ARE INTENDED FOR GENERAL RESIDENTIAL CONSTRUCTION PURPOSES AND ARE NOT EXHAUSTIVELY DETAILED OR FULLY SPECIFIED. THE GENERAL CONTRACTOR/BUILDER (OR HIS/HER REPRESENTATIVE) SHALL BE ON SITE TO SUPERVISE CONSTRUCTION AND IT SHALL BE HIS/HER RESPONSIBILITY TO SELECT, VERIFY, RESOLVE, AND INSTALL ALL EQUIPMENTS AND MATERIALS, AND TO CONTROL THE QUALITY THEREOF. ALL WORK PERFORMED ON THIS PROJECT SHALL MEET OR EXCEED THE CURRENT EDITION OF THE UNIFORM BUILDING CODE, AND ALL APPLICABLE STATE AND LOCAL ORDINANCES, CODES AND REGULATIONS, INCLUDING ANY DEED OR HOMEOWNER ASSOCIATION RESTRICTIONS. PESKUSKI HOME DESIGN SHALL BE NOTIFIED IMMEDIATELY OF ANY DISCREPANCY WITHIN THESE DOCUMENTS PERTAINING TO SAID CODES. IT IS THE RESPONSIBILITY OF THE GENERAL CONTRACTOR/BUILDER TO PROVIDE ANY ENGINEERING NECESSARY TO THE STABILITY OF THE STRUCTURE(S) OF THIS PROJECT. PESKUSKI HOME DESIGN DOES NOT INDICATE NOR IMPLY ANY EXACT STRUCTURAL MEMBER(S).

**BEDROOM #5**

**BEDROOM #4**

**BEDROOM #3**

**BATH**

**BATH**

**BATH**

**CLOSET**

**CLOSET**

**CLOSET**

**LIVING/SITTING**

**PORCH**

**BRIDGE**

**BRIDGE**

**OPEN BELOW**

**OPEN BELOW**

**OPEN BELOW**

**OPEN BELOW**

**OPEN BELOW**

**LOFT**

*Stairs Shall Comply With IRC Section R311.5*

*All Inspections Shall Comply with 2006 IRC Requirement & Adopted Ordinances*

*All Installations Subject To Field Inspections and Inspector Approval*

*Stairs Shall Comply With IRC Section R311.5*

## SECOND FLOOR PLAN
SCALE: 3/16" - 1'

PLAN NO.
**7134**

DATE
**11/05/13**

## PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 693-5656    FAX (972) 693-0938

## ALAN HOFFMANN COMPANY
## BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET
**A-3**



FRONT/NORTH ELEVATION

REAR/SOUTH ELEVATION

ELEVATIONS 1

SCALE: 3/16" = 1'

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

PLAN NO.
7134

DATE
11/05/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (972) 555-0199   FAX (972) 555-0199

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET
A-4



LEFT/EAST ELEVATION

RIGHT/WEST ELEVATION

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

ELEVATIONS 2

SCALE: 3/16" = 1'

PLAN NO.

7134

DATE

11/04/13

PHD

PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (469) 585-5806  FAX: (972) 578-8880

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET

A-5



## ROOF PLAN
SCALE: 1/8" - 1'

1ST FLOOR ROOF PLAN
2ND FLOOR ROOF PLAN

All Inspections Shall Comply with 2006 IRC Requirment & Adopted Ordinances

All Installations Subject To Field Inspections and Inspector Approval

## PLAT PLAN
SCALE: 1" - 30'

SPINAKER RUN POINTE ROAD

LAKE LEWISVILLE RESOVOIR

S 43 DEG 20'43" E     585.89'
20' SLOPE & UTILITY EASMT.
20' SIDEYARD SETBACK
N 55 DEG 07'13" E  116.3'
20' SLOPE & UTILITY EASMT
50' BUILD LINE
N 34 DEG 54'11" W     295.77'
20' SIDEYARD SETBACK
20' SLOPE & UTILITY EASMT
N 38 DEG 21'36" W     491.89'
S 04 DEG 53'49" W
269.66'

PLAN NO.
**7134**

DATE
**11/04/13**

## PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (972) 478-0538    FAX: (972) 478-0538

## ALAN HOFFMANN COMPANY
## BIZIOS RESIDENCE
## 3950 SPINAKER RUN POINTE RD

SHEET
**A-6**



FIRST FLOOR

SECOND FLOOR

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

DOOR/WINDOW SCHEDULES

SCALE: 1/8" = 1'

PLAN NO.

7134

DATE

10/30/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (972) 692-9950    FAX: (972) 258-0288

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET

S-3



ELECTRICAL_1

SCALE: 3/16" - 1'

PLAN NO.

7134

DATE

11/05/13

PHD

PESKUSKI HOME DESIGN

DALLAS, TEXAS

PHONE (469) 693-8069    FAX: (972) 578-0236

ALAN HOFFMANN COMPANY

BIZIOS RESIDENCE

3950 SPINAKER RUN POINTE RD

SHEET

E-1

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

ELECTRICAL SYMBOLS/ NOTES

ELECTRICAL SYSTEM GROUND TO BE PROVIDED PER NEC, ART. 250-81

CONVENIENCE OUTLETS IN BATHROOMS, KITCHEN COUNTERTOPS WITHIN SIX FEET OF THE KITCHEN SINK, OUTDOORS, AND IN GARAGES AND BASEMENTS (OTHER THAN FOR LAUNDRY OR SIMILAR EQUIPMENT) SHALL BE GFCI PROTECTED. NEC, ART. 210-8.

THE ELECTRICAL PLAN(S) INCLUDED IN THESE DOCUMENTS IS/ARE INTENDED AS A GUIDE ONLY. THE GENERAL CONTRACTOR/BUILDER SHALL VERIFY ALL ELECTRICAL SERVICE, INSTALLATION, AND THE LOCATION OF ALL: SWITCHES, FIXTURES, EQUIPMENT, OUTLETS, ELECTRICAL PANEL, ETC, ACCORDING TO LOCAL AND NATIONAL ELECTRICAL CODES.

LIGHTING SHOWN IS OPTIONAL AND IS AT THE DISCRETION OF THE OWNER.



**ELECTRICAL SYMBOLS/ NOTES**

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

ELECTRICAL SYSTEM GROUND TO BE PROVIDED PER NEC, ART. 250-81

CONVENIENCE OUTLETS IN BATHROOMS, KITCHEN COUNTERTOPS WITHIN SIX
FEET OF THE KITCHEN SINK, OUTDOORS, AND IN GARAGES AND BASEMENTS
(OTHER THAN FOR LAUNDRY OR SIMILAR EQUIPMENT) SHALL BE GFCI
PROTECTED. NEC, ART. 210-8.

THE ELECTRICAL PLAN(S) INCLUDED IN THESE DOCUMENTS IS/ARE INTENDED
AS A GUIDE ONLY. THE GENERAL CONTRACTOR/BUILDER SHALL VERIFY ALL
ELECTRICAL SERVICE, INSTALLATION, AND THE LOCATION OF ALL: SWITCHES,
FIXTURES, EQUIPMENT, OUTLETS, ELECTRICAL PANEL, ETC. ACCORDING TO
LOCAL AND NATIONAL ELECTRICAL CODES.

LIGHTING SHOWN IS OPTIONAL AND IS AT THE DISCRETION OF THE OWNER.

# ELECTRICAL_2

SCALE 3/16" - 1'

PLAN NO.

**7134**

DATE

**11/05/13**

**PHD**
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (469) 685-9509     FAX: (972) 758-0938

**ALAN HOFFMANN COMPANY**
**BIZIOS RESIDENCE**
3950 SPINAKER RUN POINTE RD

SHEET

**E-2**

PLAN NO. 7134    DATE 11/04/13

PHD

PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE: (xx) xxx-xxxx    FAX: (xx) xxx-xxxx

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET P-1



PERSPECTIVES
NOT TO SCALE

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinance

All Installations Subject
To Field Inspections and
Inspector Approval



Foundation Plan
Scale: 1/8" = 1'-0"

All Inspections
Shall Comply with
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections and/or
Inspecto... Approval



Alan Hoffmann
Private Residence
3960 Spinnaker Run
Little Elm, Texas

FD 2

1314079



Framing Plan - First Floor Ceiling

All Installations Subject
To Field Inspections and
Inspector Approval

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

| | 10/30/13 | Alon Hoffmann |
|---|---|---|
| FR | J.D.W. | Private Residence |
| 1314079 | J.B.H. | Lot: 84    Blk: 1 |
| 1 | Framing | 3960 Spinnaker Run |
| | Scale: 1/8" = 1'-0" | Little Elm, Texas |
| | | Pool: Bizios |

STRAND SYSTEMS
ENGINEERING INC.

| DATE | REV. # | REVISIONS | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |



Framing Plan - Second Floor Ceiling

All Inspections
Shall Comply with
2006 IRC Requirement
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval

Alan Hoffmann
Private Residence
Lot: 84    Blk: 1
3960 Spinnaker Run
Little Elm, Texas
Plans: Bizios

DATE 10/30/13
J.D.W.
J.B.H.
Framing
Scale: 1/8" = 1'-0"

FR
2

1314079

STRAND SYSTEMS
ENGINEERING INC.



All Inspections
Shall Comply with
2006 IRC Residential
& Adopted Ordinances

All Installations Subject
To Field Inspection an
Inspector Approval

STRAND SYSTEMS
ENGINEERING, INC.

Alan Hoffmann
Private Residence
3960 Spinnaker Run
Little Elm, Texas
Mary Bizios

Framing Plan -- Roof Rafter

(01) Roof Support at Sloped Ceilings



1st Floor Plan - Shear Wall Plan

This plan was designed based on a windspeed of :
90 MPH and Exposure B

WD
1
Wind Va=7004 lbs.

WD
2
Wind Va=9405 lbs.

WD
1
Wind Va=7004 lbs.

WD
2
Wind Va=9405 lbs.

**Shear Wall Notes:**

1. The exterior stud frame walls on this level shall be continuously sheathed with 7/16" Oriented Strand Board (OSB) or APA Rated structural sheathing. Sheathing fasteners shall be 8d common or 0.131"x3" nails. All panel edges shall be fastened at 6in. O.C. U.N.O. on plans. Field nailing requirements shall be 12in. O.C. U.N.O. Engineered shear walls shall be per plan and shall be installed and nailed in accordance with the Sheathing Schedule.

2. All Designated ICF shear wall segments shall have (1)#4 grade 60 vertical bar located within 6" of each end, U.N.O. Typical vertical reinforcing located within 6" of each end of shear wall may be used in lieu of vertical shear wall end bars.





A

B

C

D

## Shear Wall Design Calculations - Main

### WD 1

| Wall Line | Nominal Wall Thickness | Wall Type | Min Solid Wall Req'd (ft) | Solid Length Provided (ft) | Shear Demand ($v_u$) (k) | Shear Capacity of Concrete Wall ($\phi V_c$) (k) | Longitudinal Reinforcement Provided (Grade 60) |
|---|---|---|---|---|---|---|---|
| A | 6-inches | Waffle | 1'-9" | 2'-3" | 1.40 | 8.48 | #4 bars @ 24" OC |
| B | 6-inches | Waffle | 4'-11" | 10'-7" | 2.10 | 33.48 | #4 bars @ 24" OC |
| C | 6-inches | Waffle | 4'-11" | 6'-7" | 2.10 | 16.96 | #4 bars @ 24" OC |
| D | 6-inches | Waffle | 3'-4" | 6'-0" | 1.40 | 17.28 | #4 bars @ 24" OC |
| | | | Total WD 1: | 7.00 | 73.2 | | |

### WD 2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | 6-inches | Waffle | 10'-11" | 11'-6" | 2.83 | 32.88 | #4 bars @ 24" OC |
| 2 | 6-inches | Waffle | 5'-6" | 15'-11" | 4.70 | 45.84 | #4 bars @ 24" OC |
| 3 | 6-inches | Waffle | 4'-5" | 5'-11" | 1.88 | 17.04 | #4 bars @ 24" OC |
| | | | Total WD 2: | 9.40 | 95.76 | | |

## 2nd Floor Plan - Shear Wall Plan

All Inspections
Shall Comply with
2006 IRC Requirements
& Adopted Ordinances

All Installations Subject
To Field Inspections and
Inspector Approval





STRAND SYSTEMS
ENGINEERING INC.

Alan Hoffmann
Private Residence
84
3960 Spinnaker Run
Little Elm, Texas

11/19/13
B.B.
W.B.G.
SWR3

SW
2

1314079

# Exhibit 9

**STATE OF TEXAS** )

                              )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Stop Work Order dated March 14, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# STOP WORK ORDER

## 3950 Spinnaker Run Pt.

**IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE**

**AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.**

COMMENTS:  ___Building Ordinance 11-16_____

_____obtain proper permits_____

**TOWN OF LAKEWOOD VILLAGE, TEXAS**
972-294-5555

DATE POSTED: ___03/14/14___ Town Representative: _____

**THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.**

# Exhibit 10

**STATE OF TEXAS**    )

                            )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Stop Work Order dated March 13, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# STOP WORK ORDER

**3950 Spinnaker Run Pt.**

**IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE**

**AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.**

COMMENTS: ___Building Ordinance 11-16_____

___obtain proper permits___

**TOWN OF LAKEWOOD VILLAGE, TEXAS**
972-294-5555

DATE POSTED: __03/13/14__ Town Representative: _____

**THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.**

# Exhibit 11

STATE OF TEXAS  )
        )  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

  I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photograph taken of 3960 Spinnaker Run Pt. dated March 10, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

  I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

  In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# Exhibit 12

**STATE OF TEXAS**    )

                         )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 13, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas










03/13/14   15:30


03/13/14  17:32




03/13/14   17:33


03/13/14  17:33



03/13/14    17:35





# Exhibit 13

STATE OF TEXAS      )

                        )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 14, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

 

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



03/14/14   09:32



03/14/14   09:52



03/14/14    13:11


03/14/14 13:11

# Exhibit 14

| STATE OF TEXAS | ) | |
|---|---|---|
| | ) | CERTIFICATE TO COPY OF PUBLIC RECORD |
| COUNTY OF DENTON | ) | |

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the photographs taken of 3960 Spinnaker Run Pt. dated March 18, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



03/18/14    18:46


03/18/14   18:46



03/18/14  18:46



# Exhibit 15

STATE OF TEXAS            )
                         )       **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON          )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Builder Registration for "3960 Spinnaker Run Pointe". The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# BUILDER REGISTRATION APPLICATION

## BUILDER INFORMATION

DATE 1/27/14

BUILDERS NAME ALAN HOFFMANN, LLC / ALAN GILBERT HOFFMANN
               FIRST                MIDDLE         LAST

BUILDERS ADDRESS 7325 GASTON AVE. #126-391
DALLAS, TX 75214

BUILDERS PHONE# 214-324-0056 FAX 214-324-0199 MOBILE 469-688-6450

BUILDERS TRADE NAME ALAN HOFFMANN, LLC

BUILDERS TAX OR FEDERAL I.D.#_____

List the name, address and phone# of at least two(2) building associations of which you are a member

1> DALLAS BUILDERS ASSOC.

PHONE# 972-931-9840 MEMBERSHIP# 45-24 / 112418

2> TEXAS ASSOCIATION OF BUILDERS

PHONE# 800-252-3625 MEMBERSHIP# 112418

## PROPERTY OWNERS INFORMATION

PROPERTY OWNER HARRY           BIZIOS
                   FIRST                MIDDLE         LAST

OWNERS ADDRESS & TELEPHONE# SWEENEY TRAIL
FRISCO, TX

ADDRESS OF HOME TO BE BUILT 3960 SPINNAKER RUN POINTE
                                 84                          SUNRISE BAY
                              LOT             BLOCK         SECTION

ELEVATION GROUND FLOOR LEVEL 539-540 / ELEVATION BEING DONE 1/28/14

TOTAL SQUARE FOOTAGE 9947

(INCLUDES TOTAL SLAB AREA + SECOND FLOOR AREA + PORCHES + DECKS)

Page 4

# Exhibit 16

STATE OF TEXAS        )
                      )
COUNTY OF TARRANT     )

QUITCLAIM DEED        7    526

KNOW ALL MEN BY THESE PRESENTS: That the UNITED STATES OF AMERICA,
acting by and through the Secretary of the Army, under and pursuant to the
powers and authority contained in Public Law 85-500, approved 3 July 1958,
party of the first part, for and in consideration of THIRTEEN THOUSAND FOUR
HUNDRED TWENTY EIGHT AND 17/100 DOLLARS ($13,428.17), to it in hand paid by
Joe A. Reeves and wife, Ruth Gossett Reeves, party of the second part, the
receipt of which is hereby acknowledged, does by these presents bargain,
sell, remise, release and forever quitclaim, without warranty, express or
implied, unto the party of the second part, their heirs, representatives
and assigns, all that right, title and interest which the party of the first
part has or may have had in or to the following described property situate,
lying and being in the County of Denton, State of Texas, to-wit:

A Portion of Tract E-424

A tract of land situated in the County of Denton, State of Texas,
being part of the Wm. M. Pea Survey (A-1044) and the John King
Survey (A-718), and being part of a 161 acre tract of land
acquired by the United States of America from Joe A. Reeves and
wife, Ruth Gossett Reeves, by deed dated 13 August 1953, and
recorded in Volume 390 at Page 493 of the Deed Records of Denton
County, Texas, said 161 acre tract being designated as Tract No.
E-424 for Garza-Little Elm Reservoir, Texas, and being more
particularly described as follows: From the northwest corner of
said Wm. M. Pea Survey, south 60°40' east, 540 feet to the point
of beginning, said point being the most northerly northwest
corner of said Tract E-424; Thence south 81°25' east, 917.8 feet
to a point; Thence south 66°25' east, 530.3 feet to a point;
Thence south 80°13' east, 138.5 feet to a point; Thence south
23°11' east, 478.1 feet to a point; Thence south 79°59' east,
190.1 feet to a point; Thence south 11°17' east, 604.8 feet to
a point; Thence north 43°45' east, 140 feet to a point in the
east boundary line of said Tract E-424; Thence along the common
line between said Tract E-424 and the tract of land acquired by
the United States of America from J. C. Olsen and designated as
Tract No. E-429-1, south 00°50' west, 265.8 feet to a point;
Thence severing said Tract E-424 as follows: south 86°50' west,
139.0 feet to a 1" iron pin; north 51°24' west, 100.3 feet to a
1" iron pin; north 22°23' west, 445.0 feet to a 1" iron pin;
north 28°05' west, 342.0 feet to a 1" iron pin; north 34°22'
west, 278.7 feet to a 1" iron pin; north 55°45' west, 323.0
feet to a 1" iron pin; south 83°57' west, 294.6 feet to a 1"
iron pin; south 41°00' east, 422.4 feet to a 1" iron pin;
south 20°44' east, 268.0 feet to a 1" iron pin; south 13°48'
west, 160.8 feet to a 1" iron pin; south 73°49' west, 347.4 feet
to a 1" iron pin; south 25°01' east, 426.5 feet to a 1" iron
pin; south 18°06' east, 534.6 feet to a 1" iron pin; south 38°33'

west, 514.3 feet to a 1" iron pin; north 62°38' west, 557.4
feet to a 1" iron pin; south 88°23' west, 114.6 feet to a 1"
iron pin; south 04°07' west, 90.0 feet to a 1" iron pin; south
71°27' east, 130.6 feet to a 1" iron pin; south 29°22' east,
349.8 feet to a 1" iron pin; south 30°29' east, 393.6 feet to
a 1" iron pin; south 26°17' west, 300.8 feet to a 1" iron pin;
south 32°53' east, 93.0 feet to a 1" iron pin; north 32°38'
east, 182.5 feet to a 1" iron pin; north 53°49' east, 331.5
feet to a 1" iron pin; north 80°35' east, 653.3 feet to a 1"
iron pin; south 82°05' east, 226.5 feet to a 1" iron pin;
north 22°21' west, 163.3 feet to a 1" iron pin; north 53°57'
east, 432.6 feet to a 1" iron pin; south 24°05' east, 275.4
feet to a 1" iron pin; south 80°03' east, 212.0 feet to a 1"
iron pin; south 13°19' east, 182.8 feet to a 1" iron pin;
south 13°41' west, 209.0 feet to a 1" iron pin; south 85°04'
west, 217.4 feet to a 1" iron pin; south 04°49' east, 158.0
feet to a 1" iron pin; south 51°20' west, 149.4 feet to a 1"
iron pin; south 21°51' east, 243.6 feet to a 1" iron pin;
south 04°30' west, 369.0 feet to a 1" iron pin; north 38°29'
west, 492.3 feet to a 1" iron pin; south 19°03' west, 281.8
feet to a 1" iron pin; south 52°55' west, 368.0 feet to a 1"
iron pin; south 54°15' east, 330.0 feet to a 1" iron pin;

south 18°28' west, 198.0 feet to a 1" iron pin; south 80°43' west, 160.0 feet to a 1" iron pin; north 59°22' west, 326.8 feet to a 1" iron pin; south 15°41' east, 425.2 feet to a 1" iron pin; south 60°37' west, 166.6 feet to a 1" iron pin; north 80°08' east, 180.0 feet to a 1" iron pin; south 43°40' east, 131.0 feet to a 1" iron pin; south 25°00' east, 100 feet to a point in the common line between said Tract E-424 and the tract of land acquired by the United States of America from T. H. Purnell and designated as Tract No. E-415-3; Thence departing from said severance line, along said common line, west, 255.0 feet to the northwest corner of said Tract E-415-3; Thence along the common line between said Tract E-424 and the T. H. Purnell property, south 82°00' west, 120 feet to a point; Thence north 21°36' west, 157.6 feet to a point; Thence north 65°32' east, 469.9 feet to a point; Thence north 43°11' west, 529.1 feet to a point; Thence north 81°57' east, 488.4 feet to a point; Thence north 39°07' east, 1508.1 feet to a point; Thence south 78°41' west, 482.4 feet to a point; Thence south 60°40' west, 388.9 feet to a point; Thence south 42°01' west, 504.6 feet to a point; Thence north 26°27' west, 422.2 feet to a point; Thence south 53°06' west, 977.5 feet to a point; Thence south 06°53' west, 396.2 feet to a point; Thence north 46°44' west, 237.3 feet to a point; Thence north 21°11' east, 1081.8 feet to a point; Thence north 35°52' east, 492.7 feet to a point; Thence north 68°49' west, 682.1 feet to a point; Thence north 30°10' east, 623.1 feet to a point; Thence south 57°41' east, 848.4 feet to a point; Thence north 06°20' east, 619.4 feet to a point; Thence north 51°25' west, 592.3 feet to a point; Thence north 53°40' east, 628.5 feet to a point; Thence north 50°35' west, 1346.1 feet to the point of beginning, containing 108.25 acres, more or less.

Subject to the following:

(1) There shall be reserved to the Government the perpetual right and easement to occasionally overflow, flood, and submerge the herein described lands below an elevation of 537 feet, mean sea level, there being 59.70 acres, more or less, lying below said elevation.

(2) In connection with the above reserved easement, no structure for human habitation shall be constructed or maintained on the herein described lands below an elevation of 537 feet, mean sea level.

(3) With respect to said land and in connection with the above reserved rights and easements, the written consent of the representative of the United States in charge shall be obtained for the type and location of any structure and/or appurtenances thereto now existing or to be erected or constructed below an elevation of 537 feet, mean sea level.

(4) There shall be reserved to the Government the perpetual right to maintain mosquito control and to enter upon the said land for this purpose below an elevation of 537 feet, mean sea level.

(5) Existing easements for public roads, highways, public utilities and pipelines.

TO HAVE AND TO HOLD the foregoing described premises, together with all and singular the rights, privileges and appurtenances thereto in anywise belonging, unto the party of the second part, their heirs, representatives and assigns forever, subject, however, to the restrictions, reservations and conditions hereinbefore set out and any existing encumbrances.

IN WITNESS WHEREOF the party of the first part has caused these presents to be executed in its name by    **Wilber M. Brucker**

Secretary of the Army this 20th day of *December* 1960.

UNITED STATES OF AMERICA

By _Wilber M. Brucker_
    Wilber M. Brucker
    Secretary of the Army

STATE OF VIRGINIA   )
               ) SS
COUNTY OF ARLINGTON )

BEFORE ME, a Notary Public in and for the State of Virginia, County of Arlington, personally appeared *Wilber M. Brucker* , to me known to be the identical person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the said instrument for the purpose and consideration therein expressed and in the

capacity therein stated and as the act and deed of the United States of

America.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ *20th* _____ day of

_____ *December* _____ 19*60*.

_____
NOTARY PUBLIC IN AND FOR
COUNTY OF ARLINGTON,
STATE OF VIRGINIA

My Commission expires:

Lloyd T. Ford, Notary Public
County of Arlington
State of Virginia
My Commission Expires 17 Sept. 1963

---

FILED FOR RECORD: *19* day of *January* A.D.1961 at *10:10* o'clock *A*.M.
RECORDED: *25* day of *January* A.D.1961 at *9:00* o'clock *A*.M.

A.J. Barnett, Clerk, County
By:_____Deputy   Court, Denton County, Texas

# Exhibit 17

# Denton County
# Commissioners Court

_____Jan 26, 2010_____
Date

10-0045

## Court Order Number

10-A

### The Order:

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

Motion by **Mitchell**  Seconded by **Eads**

| | | |
|---|---|---|
| County Judge | Yes | X |
| Mary Horn | Abstain | ___ |
| | No | ___ |
| | Absent | ___ |

| | | | | | |
|---|---|---|---|---|---|
| Commissioner Pct No 1 | Yes | X | Commissioner Pct No 2 | Yes | X |
| Hugh Coleman | Abstain | ___ | Ron Marchant | Abstain | ___ |
| | No | ___ | | No | ___ |
| | Absent | ___ | | Absent | ___ |
| Commissioner Pct No 3 | Yes | X | Commissioner Pct No 4 | Yes | X |
| Bobbie J. Mitchell | Abstain | ___ | Andy Eads | Abstain | ___ |
| | No | ___ | | No | ___ |
| | Absent | ___ | | Absent | ___ |

Motion Carried **5-0-0**

**Other Action:** Pulled from Consent _____ No Action _____ Postponed _____

**BY ORDER OF THE COMMISSIONERS COURT:**    **ATTEST:**

Presiding Officer

Cynthia Mitchell, County Clerk
Ex-Officio Clerk of the
Commissioners Court of
Denton County, Texas

**APPROVED AS TO FORM:**

Deputy County Clerk

Assistant District Attorney

Denton County

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

**WHEREAS,** the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

**WHEREAS,** the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

**NOW, THEREFORE, BE IT RESOLVED,** that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May. 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

**IN WITNESS THEREOF,** we have hereunto set our hands and caused the great seal of Denton County to be affixed this _26th_ day of _January_ , 2010.

**ADOPTED IN OPEN COURT** the _26th_ day of January, 2010 upon Motion made by _Comm. Mitchell_ and seconded by _Comm. Eads_ , and _5_ members of the court being present and voting.

_Mary Horn_

MARY HORN, COUNTY JUDGE

_Hugh Coleman_                    _Ron Marchant_

HUGH COLEMAN, COMMISSIONER        RON MARCHANT, COMMISSIONER
PRECINCT 1                        PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code                                              - Page 2 of 3

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY:

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County –
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3



# DENTON COUNTY

# NOTICE OF RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREA

Received

Permit #

## BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: _____

BUSINESS ADDRESS:                               MAILING ADDRESS (IF DIFFERENT):

_____          _____

_____          _____

PHONE NUMBER: _____ EMAIL ADDRESS: _____

FAX NUMBER: _____ CONTACT PERSON: _____

## PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[ ] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):        OR   LOT AND BLOCK # _____

_____          SUBDIVISION: _____

_____          SURVEY: _____

_____          TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: _____

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[ ] INTERNATIONAL RESIDENTIAL CODE -published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

AUTHORIZED REPRESENTATIVE SIGNATURE        PRINTED NAME                                DATE



# DENTON COUNTY NOTICE OF RESIDENTIAL CONSTRUCTION INSPECTION COMPLIANCE IN UNINCORPORATED AREA

Received _____

Permit # _____

## INSPECTOR INFORMATION

NAME: _____

BUSINESS ADDRESS: _____  MAILING ADDRESS (IF DIFFERENT): _____

_____  _____

_____  _____

PHONE NUMBER: _____  EMAIL ADDRESS: _____

FAX NUMBER: _____  PROFESSIONAL REGISTRATION (TYPE AND #) _____

## PROJECT INFORMATION

DATE OF INSPECTION: _____

LOCATION
ADDRESS: _____

_____

_____

OR   LOT AND BLOCK # _____

SUBDIVISION: _____

SURVEY: _____

TRACT: _____

TYPEOFCONSTRUCTION: (CHECK ONE)

[ ] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

RESIDENTIAL CODEUSED IN CONSTRUCTION: (CHECK ONE)

[ ] INTERNATIONAL RESIDENTIAL CODE – published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

CONSTRUCTION PHASE: (CHECK ONE)

[ ] FOUNDATION STAGE (before placement of concrete)
[ ] FRAMING AND MECHANICAL SYSTEMS STATE (before covering with drywall or other interior wall covering)
[ ] COMPLETION

## INSPECTION CONCLUSION

At the indicated stage of construction, the project indicated above is: (check one)

[ ] IN COMPLIANCE
[ ] NOT IN COMPLIANCE

with the residential code used in construction.

COMMENTS:

_____  _____  _____
SIGNATURE OF INSPECTOR        PRINTED NAME        DATE

# AGENDA PLACEMENT MEMO

DATE: Jan 22, 2010

TO: Commissioners Court

FROM: Bennett Howell

SUBJECT: Resolution - Residential Construction in Unincorporated Areas of Denton County

## REQUESTED ACTION/RECOMMENDATION

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

## BACKGROUND

The Texas State Legislature enacted HB 1038 during the 80th Regular Session, effective September 1, 2007, that provided criteria for the inspection of homes which heretofore were not subject to the inspection codes of a municipality. The requirements of this bill was supposed to result in homes that were in greater compliance with the accepted residential building standards, safer and with fewer construction defects.

The Legislature also created the Texas Residential Construction Commission (TRCC) to oversee this new law. The TRCC was also supposed to license builders, monitor compliance and store the inspection records.

The Legislature during the 81st Regular Session passed HB 2833 which essentially eliminated the TRCC and placed the responsibility on the county government to ensure residential home builders were complying with HB 1038. However, HB 2833 did provide counties with the authority to enact building codes, inspect the structures or require the builders to provide inspection documentation, it specially stated that counties cannot charge a fee for this service.

This proposed Resolution provides that the County will be the depository for the home inspection documentation for homes constructed after February 1, 2010. Home builders will be required to notify the County when construction is going to begin and submit documentation that the inspections were made in accordance with HB 2833.

## OPERATIONS AND MAINTENANCE

Denton County Planning Department will provide the forms to the builders and file the inspection records as part of the current Development Permit Application. This Resolution will not place any further burdens on the builders since these inspections

were supposed to be occurring prior to 2007.

## LEGAL INFORMATION

The Legal Department has worked closely with the Public Works Department on this Resolution.

## FINANCIAL IMPACT

This Resolution will not have any financial impact on the County or the home builder.

## PROJECT SCHEDULE

The Resolution has an effective date of February 1, 2010.

## PRECEDING COURT ACTION

None

## Denton County
### Commissioners Court
# Request For Agenda Placement

| Submitted By: | Bennett Howell | Requested Agenda Date: | Jan 26, 2010 |
|---|---|---|---|
| Department: | Public Works/Engineering | Grouping: | PUBLIC WORKS |

**Specific Agenda Wording:**

Approval of a resolution applying Subchapter F, Chapter 233, Texas Local Government Code, to certain residential construction in unincorporated areas of Denton County - begun after February 1, 2010, and any appropriate action.

# APPROVAL FLOW

### 10 - A - Resolution - Residential Construction in Unincorporated Areas of Denton County



Hardy Burke is getting sign. He will send me a signed one.
1/27/10

CERTIFIED COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF DENTON

I, CYNTHIA MITCHELL, County Clerk of Denton County,
Texas do hereby certify that this is a true & correct
copy as same appears of record in my office.
Witness my hand and seal of office on

3.20.14

Cynthia Mitchell
Denton County Clerk

By Deputy


# Exhibit 18

**STATE OF TEXAS** )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Notice to Home Builders and Home Buyers. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

    I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand this 1st day of April, 2014.

Bennett C. Howell III, PE, CFM
Denton County
State of Texas




**Denton County**
**Department of Public Works**
**Engineering Division**
**1505 East McKinney Street, Suite 175 – Denton, Texas 76209**
**940.349.3250 phone – 940.349.2991 fax**
**www.dentoncounty.com**

# NOTICE
# Home Builders and Home Buyers

On January 26, 2010, Denton County Commissioners Court approved a resolution that applies to certain residential construction in the unincorporated areas of Denton County.

**This resolution applies to you if:**

- You are building a home in the unincorporated areas of Denton County after February 1, 2010; or
- You are remodeling an existing home in the unincorporated areas of Denton County after February 1, 2010 and the addition increases the square footage or value of the existing home by more than 50%.
- This applies if you are constructing a single-family house or duplex.

**The new home construction and remodel must conform to either:**

- International Residential Code published as of May 1, 2008; or
- The version of the International Residential Code that is applicable in the City of Denton. The State law requires the builder to use either the International Residential Code published as of May 1, 2008 or the International Residential Code adopted by the County Seat, which in Denton County is the City of Denton.

**Building in the Extra Territorial Jurisdiction (ETJ):**

**What are the builder's responsibilities?**

- Three required inspections during the construction project.
  - The foundation stage before the placement of concrete;
  - The framing and mechanical systems stage before covering with drywall or other interior wall covering; and
  - Completion of construction of the residence.

o  For remodeling projects that meet the definition of this resolution, the number of inspections are based on the scope of work of the project

**Who performs these inspections?**

- Licensed Engineer;
- Registered Architect;
- Professional Inspector licensed by the Texas Real Estate Commission;
- Plumbing Inspector employed by a municipality and licensed by the Texas State Board of Plumbers;
- Building Inspector employed by a political subdivision; or
- Individual certified as a residential combination inspector by the Internal Code Council.
- The builder may use the same inspector for all the required inspections or a different inspector for each required inspection.

**Who receives the documentation?**

- The builder shall provide the inspection information to the home buyer and Denton County Public Works.
- The required forms are attached to this Notice.

    o  The builder uses the first form to notify the County specifically:
      - Location of the new residential construction
      - Approximate date by which the construction will be commenced
      - The version of the International Residential Code used to construct the home
    o  The builder uses the second form to document the inspections.

# RESOLUTION

## APPLYING SUBCHAPTER F. CHAPTER 233, TEXAS LOCAL GOVERNMENT CODE, TO CERTAIN RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREAS OF DENTON COUNTY - BEGUN AFTER FEBRUARY 1, 2010

**WHEREAS,** the Texas Legislature passed HB 2833 during the 81st Regular Session, codified in Sections 233.151 through 233.157 of the Texas Local Government Code, to provide for the health, safety and general welfare of all Texans through home construction standards in the unincorporated areas of counties, and

**WHEREAS,** the citizens of Denton County desire the construction of quality housing and wholesome living environments for its citizens living in unincorporated areas.

**NOW, THEREFORE, BE IT RESOLVED,** that we, the Commissioners Court of Denton County, in accordance with Section 233.153, Texas Local Government Code, order that construction of a new single-family house or duplex on a vacant lot begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.153, Texas Local Government Code, any construction of an addition to an existing single-family house or duplex, if the addition will increase the square footage or value of the existing residential building by more than 50 percent, begun after February 1, 2010, in the unincorporated areas of Denton County must conform to either the version of the International Residential Code published as of May 1, 2008 or the version of the International Residential Code that is applicable in the City of Denton, Texas; and

**FURTHERMORE, BE IT RESOLVED,** that notwithstanding the above language and in accordance with Section 233. 153(c), if the above described construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code have no effect in that municipality's extraterritorial jurisdiction.

**FURTHERMORE, BE IT RESOLVED,** that in accordance with Section 233.154(a), Texas Local Government Code, a minimum of three inspections must be performed to ensure substantial building code compliance in the construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County. The three required inspections during the construction project, as applicable must be performed at (1) the foundation stage, before the placement of concrete; (2) the framing and mechanical systems stage, before covering with drywall or other interior wall covering; and (3) completion of construction of the residence. For remodeling construction to an existing residence in which the structure's square footage or value will increase by more than 50 percent, the inspection requirements must be performed as

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code

- Page 1 of 3

necessary based on the scope of work of the construction project. The builder is responsible for contracting to perform the required inspections with (1) licensed engineer; (2) a registered architect; (3) a professional inspector licensed by the Texas Real Estate Commission; (4) a plumbing inspector employed by a municipality and licensed by the Texas State Board of Plumbing Inspectors; (5) a building inspector employed by a political subdivision; or (6) an individual certified as a residential combination inspector by the International Code Council. A builder may use the same inspector for all the required inspections or a different inspector for each required inspection; and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(b), Texas Local Government Code, a builder performing construction of a new single-family house or duplex or the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must, prior to beginning the construction project, provide notice to the Director of Public Works/Engineering. The Denton County Commissioners Court prescribes the Notice of Residential Construction in Unincorporated Areas attached to this Resolution as the required Notice. The notice must include (1) the location of the new residential construction; (2) the approximate date by which the new residential construction will be commenced; and (3) the version of the International Residential Code that will be used by the builder to construct the new residential construction, and

FURTHERMORE, BE IT RESOLVED, that in accordance with Section 233.154(c), Texas Local Government Code, not later than the 10th day after the date of a final inspection, a builder performing construction of a new single-family house or duplex of the construction of an addition to an existing single-family house or duplex begun after February 1, 2010, in the unincorporated areas of Denton County must submit notice to (1) the Director of Public Works/Engineering and (2) the person for whom the new residential construction is being built, if different from the builder, stating whether or not the inspection showed compliance with the building code standards applicable to that phase of construction. The Denton County Commissioners Court prescribes the Notice of Residential Construction Inspection Compliance in Unincorporated Areas attached to this Resolution as the required Notice.

IN WITNESS THEREOF, we have hereunto set our hands and caused the great seal of Denton County to be affixed this _26_ day of _January_, 2010.

ADOPTED IN OPEN COURT the _26_ day of January, 2010 upon Motion made by _Debbie Mitchell_ and seconded by _Andy Eads_, and _5_ members of the court being present and voting.

_____
MARY HORN, COUNTY JUDGE

_____
HUGH COLEMAN, COMMISSIONER
PRECINCT 1

_____
RON MARCHANT, COMMISSIONER
PRECINCT 2

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code

- Page 2 of 3

BOBBIE J. MITCHELL, COMMISSIONER
PRECINCT 3

ANDY EADS, COMMISSIONER
PRECINCT 4

ATTEST:

CYNTHIA MITCHELL, County Clerk and Ex-Officio
Clerk of the Commissioners Court of Denton County

BY: _____

Resolution – Certain Residential Construction in Unincorporated Areas of Denton County -
Chapter 233 Tex. Loc. Gov't Code

- Page 3 of 3



# DENTON COUNTY

## NOTICE OF RESIDENTIAL CONSTRUCTION IN UNINCORPORATED AREA

| Received |
| --- |
| Permit # |

### BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: _____

BUSINESS ADDRESS: _____    MAILING ADDRESS (IF DIFFERENT): _____

PHONE NUMBER: _____    EMAIL ADDRESS: _____

FAX NUMBER: _____    CONTACT PERSON: _____

### PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[  ] New Residential Construction on Vacant Lot
[  ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):    OR    LOT AND BLOCK # _____

_____    SUBDIVISION: _____

_____    SURVEY: _____

_____    TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: _____

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[  ] INTERNATIONAL RESIDENTIAL CODE -published May 1, 2008
[  ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

AUTHORIZED REPRESENTATIVE SIGNATURE    PRINTED NAME    DATE



# DENTON COUNTY NOTICE OF RESIDENTIAL CONSTRUCTION INSPECTION COMPLIANCE IN UNINCORPORATED AREA

| Received |
| --- |
| Permit # |

## INSPECTOR INFORMATION

NAME: _____

BUSINESS ADDRESS: _____          MAILING ADDRESS (IF DIFFERENT): _____

_____          _____

_____          _____

PHONE NUMBER: _____          EMAIL ADDRESS: _____

FAX NUMBER: _____          PROFESSIONAL REGISTRATION (TYPE AND #) _____

## PROJECT INFORMATION

DATE OF INSPECTION: _____          TYPEOFCONSTRUCTION: (CHECK ONE)

LOCATION
ADDRESS: _____          [ ] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

_____          RESIDENTIAL CODEUSED IN CONSTRUCTION: (CHECK ONE)

_____          [ ] INTERNATIONAL RESIDENTIAL CODE – published May 1, 2008
OR   LOT AND BLOCK # _____          [ ] INTERNATIONAL RESIDENTIAL CODE – applicable in Denton

SUBDIVISION: _____          CONSTRUCTION PHASE: (CHECK ONE)

SURVEY: _____          [ ] FOUNDATION STAGE (before placement of concrete)
[ ] FRAMING AND MECHANICAL SYSTEMS STATE (before covering
TRACT: _____          with drywall or other interior wall covering)
[ ] COMPLETION

## INSPECTION CONCLUSION

At the indicated stage of construction, the project indicated above is: (check one)

[ ] IN COMPLIANCE
[ ] NOT IN COMPLIANCE

with the residential code used in construction.

COMMENTS:

_____          _____          _____
SIGNATURE OF INSPECTOR          PRINTED NAME          DATE

# Exhibit 19

**STATE OF TEXAS** )

                            )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 08-06. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 08-06

AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, REGULATING SUBDIVISIONS AND OTHER PROPERTY DEVELOPMENTS, PROVIDING FOR PRELIMINARY PLATS, FINAL PLATS, MINOR PLATS, VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS; PROVIDING FOR DEVELOPMENT PROCESS; PROVIDING FOR STANDARDS AND REQUIREMENTS; PROVIDING FOR STREETS AND DRAINAGE, WATER AND SEWER INFRASTRUCTURE; PROVIDING SEVERABILITY CLAUSE; PROVIDING SAVINGS CLAUSE; PROVIDING A PENALTY NOT TO EXCEED THE SUM OF TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE AND A SEPARATE OFFENSE SHALL BE DEEMED COMMITTED EACH DAY DURING OR ON WHICH A VIOLATION OCCURS OR CONTINUES; PROVIDING A REPEALER; AND PROVIDING AN EFFECTIVE DATE.

**WHEREAS,** the Town Council ("Town Council") desires to review for approval or disapproval plan, plats, and replats filed with the Town as authorized by Chapter 212, Tex. Loc. Gov. Code (Vernon), as amended; and

**WHEREAS,** the Town Council finds that there is a public necessity requiring adoption of this Ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development; and

**WHEREAS,** the Town Council is authorized and empowered to or require the developer to (i) design, install or improve streets, roads, water and a sanitary sewer systems within the Town by constructing, extending, or enlarging such system, and is further authorized to adopt any rules and regulations appropriate to the exercise of such powers, and to (ii) protect the public health, welfare and safety of the citizens of the Town; and

**WHEREAS,** the Town Council hereby finds that the adoption of this Ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS :**

## ARTICLE I. IN GENERAL

### Sec. 1. Short title.

The following regulations are hereby adopted and shall be known and may be cited as "Town of Lakewood Village Subdivision and Property Development Regulations."

Sec. 2. Definitions.

The following words, terms, and phrases, when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning. Words not specifically defined shall have the meanings given in Webster's Ninth New Collegiate Dictionary, as revised.

*Accessory structure or building* shall mean a subordinate structure or building customarily incident to and located on the same lot occupied by the main structure or building.

*Applicant* shall mean the owner(s) of the property to be developed.

*Bond* shall mean any form of security, including a cash deposit, surety bond, or instrument of credit in an amount and form approved by the Town.

*Building* shall mean any structure designed or built for the support, enclosure, shelter or protection of persons, animals, chattel or property of any kind.

*Town* means Town of Lakewood Village.

*Town Council* means Town Council of the Town of Lakewood Village.

*Town standards* shall mean those standards and specifications, together with all tables, charts, graphs, drawings and other attachments hereinafter approved and adopted by the Town Council, which may be amended from time to time, and are administered by the Town staff for the construction and installation of streets, sidewalks, drainage facilities, water and sanitary sewer mains and any other public facilities. All such facilities which are to become the property of the Town upon completion must be constructed in conformance with these standards.

*Construction plans* shall mean the maps, drawings and technical specifications, including bid documents and contract conditions, where applicable, which provide a graphic and written description of the character and scope of the work to be performed prepared for approval by the Town for construction.

*Cross drainage* shall mean a defined waterway course, approximately perpendicular to the proposed roadway, which requires the construction of a bridge, pipes or box culvert, or other structure to conduct drainage under the roadway.

*Developer* shall mean any person, corporation, governmental or other legal entity engaged in the development of property by improving a tract or parcel of land for any use. The term "developer" is intended to include the term "subdivider."

*Development* shall mean the construction of one (1) or more new buildings or structures, or the structural alteration, relocation or enlargement of one (1) or more new buildings or structures of an existing building or structure on one (1) or more building lots or sites, or the installation of site improvements.

*Easement* shall mean a grant by a property owner to the public, a corporation, or persons for a general or specific use of a defined strip or parcel of land, for such purpose as the installation, construction, maintenance and/or repair of utility lines, drainage ditches or channels, or other public services, the ownership or title to the land encompassed by the easement being retained by the owner of the property.

*Engineer* shall mean any person duly authorized under the Texas Engineering Practice Act (V.A.C.S. art. 3271a), as amended, to practice the profession of engineering.

*Engineering plans* shall mean the maps and drawings required for plat approval.

*Lot* shall mean an undivided tract or parcel of land having access to a street, which is designated as a separate and distinct tract or lot number or symbol on a duly approved plat filed of record. The terms "lot" and "tract" shall be used interchangeably.

*Off-site* shall mean any premises not located within the property to be developed, regardless of ownership.

*Owner* shall mean any persons, firm or corporation having legal title to the property.

*Plat* shall mean a map representing a tract of land showing the boundaries of individual properties and streets or a map, drawing, chart, or plan showing the layout of a proposed subdivision into lots, blocks, streets, parks, school sites, commercial or industrial sites, drainageways, easements, alleys, which an applicant submits for approval and a copy of which he intends to record with the County Clerk of Denton County.

*Plat, final,* shall mean the map or plan of a proposed development submitted for approval by the Town Council, where required, prepared in accordance with the provisions of this chapter and requested to be filed with the County Clerk of Denton County.

*Plat, preliminary,* shall mean the initial map or plan of a proposed development showing the general layout of streets, blocks and lots, utility systems, and drainage systems.

*Right-of-way* shall mean a strip of land acquired by dedication, prescription or condemnation and intended to be occupied by a road, sidewalk, railroad, electric transmission facility, water mains, sewer mains, storm drainage or other similar facility. Rights-of-way intended for streets, sidewalks, water mains, sewer mains, or any other use involving maintenance by a public agency shall be dedicated to the public use by the plat applicant either by easement or in fee simple title.

*Streets and alleys* shall mean a way for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, throughway, road, avenue, boulevard, lane, alley, place or however otherwise designated. Town streets shall conform to the following classifications:

(1) Arterial streets and highways are those which are used primarily for higher speed and higher volume traffic. Routes for such streets shall provide for cross-town circulation and through-town movements.

(2) Collector streets are those which carry traffic from minor streets to the major system of arterial streets and highways, including the principal entrance, circulation streets of a residential development and streets for circulations within such a development of a residential subdivision.

(3) Minor streets are those, which are used primarily for access to abutting properties.

(4) Marginal access streets are minor streets located parallel to and adjacent to arterial streets and highways, providing access to abutting properties and protection from the traffic of the thoroughfares.

(5) Alleys are minor ways used primarily for access to abutting properties for vehicle service usually to the back or side of a property.

*Structural alterations* shall mean the installation or assembly of any new structural components, or any change to existing structural components, in a system, building or structure.

*Structure* shall mean anything constructed or erected, which requires location on the ground, or attached to something having a location on the ground, including, but not limited to, buildings of all types and ground signs, but exclusive of customary fences or boundary or retaining walls.

*Subdivision* shall mean dividing a tract in two (2) or more parts for the purpose of creating lots, including an addition to the Town, to lay out suburban, building or other lots or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to the public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks or other parts. "Subdivision" refers to any division irrespective of whether the actual division is made by metes and bounds description in a deed of conveyance or a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A subdivision does not include a division of land into parts greater than five (5) acres, where each part has access and no public improvement is being dedicated.

## Sec. 3. Purpose.

The purpose of this ordinance is to set forth the procedures and standards for development of property, layout and design of subdivisions or real property within the corporate limits of the Town which are intended to promote the health, safety and general welfare of the Town and the safe, orderly, and healthful development of the Town.

## Sec. 4. Compliance required.

(a) Any owner of land who proposes the development of a lot or tract of land located within the corporate limits of the Town or the subdivision of a lot or tract located in the corporate limits of the Town shall have a plat of the lot or tract of land or subdivision prepared and approved in accordance with all Ordinances of the Town and recorded with the County Clerk of Denton County.

(b) Notwithstanding paragraph (a) above, a plat shall not be required where the development of the lot or tract of land is for the sole purpose of performing alteration(s) or improvements to an existing single-family residence or the auxiliary uses thereto. All such alterations or improvements must be permitted in compliance with all applicable codes and ordinances of the Town

(c) No Final Plat shall be approved within the Town of Lakewood Village or its extraterritorial jurisdiction until the applicant has made adequate provision for thoroughfares as shown on the Thoroughfare Plan (map) as approved by the Town. The Thoroughfare Plan is a guide for the roadway connections and types that will be needed in the future. Subject to Town Council, or designee approval, as long as the connection is made, whether or not it is close to the exact alignment shown on the Thoroughfare Plan, no Thoroughfare Plan amendment should be necessary. The design and construction of the proposed thoroughfare shall be in conformance with the Town's master plans for thoroughfares and with any adopted *Development Standards for Construction* (DSC), and shall be subject to approval by the Town Council, or designee. If a different roadway type is found to be adequate or if the connection is not proposed to be made, then the plat may not be approved unless the thoroughfare plan is amended. A Traffic Impact Analysis may be required prior to approval of the proposed amendment .

## ARTICLE II. PLATS

### DIVISION 1. GENERALLY

**Sec. 5. Fees.**

The applicant for approval of a preliminary plat, final plat, replat, amended plat, minor plat or modified final plat shall, upon submission of the plat application and all required documentation, pay a nonreturnable fee, as established by the Town Council, for the review and processing of the plat application. Upon approval of the final plat, replat, amended plat or final minor plat, the applicant shall pay an additional recording fee established by the county for recording the plat with the county clerk.

Preliminary, Replat and Final Plat Review Fees.    A preliminary plat review fee and final plat review fee shall be paid to the Town upon the filing of the preliminary and final plat in accordance with the following schedule:

(a)    Plats that are platted by the acre:
(1)    $500 per plat plus $10.00 per acre when there are less than three (3) acres; or

(2)    $600 per plat plus $20.00 per acre when there are three (3) or more acres.

(b)    For purposes of this section, the term "lot" shall mean any tract of land which is one (1) acre.

## Sec. 6. Process for approval.

(a) The plat shall be scheduled for consideration at the next regular meeting of the Town Council.

(b) If the plat is disapproved by the Town Council, the applicant may correct the items of concern and resubmit the plat for approval one (1) time within six (6) months by paying one-half (1/2) of the original fee. If the plat is disapproved a second time or if a second request is not received within six (6) months of the first disapproval, the applicant will be required to repeat the plat application process from the beginning and pay all standard application fees.

(c) An applicant may withdraw his plat application from consideration at any time during the application process by filing a written notice of withdrawal with the Town. Upon filing the notice to withdraw, the Town shall discontinue processing the plat application. The applicant must file a written request to proceed with further consideration of the plat within six (6) months of withdrawal and the Town shall continue the application process. If the request to proceed with further consideration of the plat is filed more than six (6) months after filing the notice of withdrawal, the applicant shall be required to repeat the plat application process from the beginning and pay the standard application fees.

## Sec. 7. Requirements for approval of application by Town Council.

(a) Within thirty (30) days of the date that the application is deemed administratively complete, the Town Council shall approve a plat if it complies with the requirements of this chapter, the applicant is not in arrears in the payment of any debts owed the Town required by this chapter on a previous plat, it conforms to the general plan of the Town and its current and future streets, alleys, parks, playgrounds, and public utility facilities plans, and it conforms to the Town's general plan for the extension of roads, streets, and public highways, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities.

(b) A plat is considered approved by the Town Council unless it is disapproved within such thirty-day period.

## Sec. 8. Recordation.

(a) Preliminary plats are not recorded with the county clerk.

(b) Applicant shall record all plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(c) Applicant shall record all other plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(d) A final plat shall become null and void six (6) months after its approval by the Town Council, unless the final plat is filed and recorded in Denton County Clerk Real Property Records.

(e) A general development plan shall become null and void six (6) months after its approval by the City Council, unless the general development plan is filed and recorded in Denton County Clerk Real Property Records.

## Sec. 9. Approval of preliminary plats.

Approval of a preliminary plat shall be deemed to be an expression of approval to the layout submitted as a guide to the preparation of the final plat and shall not constitute approval of a final plat.

## DIVISION 2. PRELIMINARY PLATS

### Sec. 10. Form, contents and required documentation.

(a) Preliminary plats shall be filed with the town secretary. The town secretary shall stamp the following notice on the face of each preliminary plat: "Preliminary plat for inspection purposes only and in no way official or approved for record purposes and not approved for construction."

(b) When filing a preliminary plat application, it shall be accompanied by the following minimum documentation:

    (1) Completed preliminary plat application;

    (2) Eight (8) copies of the plat;

    (3) Eight (8) copies of engineering plans;

    (4) Deed showing current ownership of the platted property;

    (5) Tax certificates showing property owner is not in arrears in payment of taxes; and

    (6) Nonrefundable application fee, as established by the Town Council.

(c) Preliminary plats must meet the following criteria and contain the following information:

    (1) Scaled drawing no smaller than 1" = 200' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets);

    (2) Boundary of the subject tract;

(3) All existing and/or proposed streets and alleys with street names, widths and relation to surrounding existing street patterns;

(4) Approximate width and depth of all proposed lots;

(5) Layout, in dotted lines, of all adjacent lots to the property being platted showing lot size, lot and block numbers, name of existing subdivision or property owner if undeveloped property;

(6) FEMA designated 100-year floodplain boundary;

(7) Date, scale, north point, and small scale location map;

(8) Name and address of all property owners of the property being platted;

(9) Name and address of engineer and surveyor; and

(10) Signed statement of the engineer and/or surveyor who prepared the preliminary plat indicating the records or survey from which the property description of the boundary of the proposed plat was developed.

(d) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Layout of all needed off-site utilities;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size of line, location of manholes and cleanouts;

(4) Drainage plan prepared in accordance with standard 100 year flood frequencies rainfalls which shows the overall analysis of the change of existing condition to fully developed condition and identify approximate location where water will exit the subdivision. Drainage plan shall show all contours for proposed development; and

(5) As-built drawings of existing structures, if applicable.

DIVISION 3. FINAL PLATS

**Sec. 11. Form, contents and required documentation.**

(a) Final plats are mandatory.

(b) In cases where a preliminary plat was previously approved, the final plat shall conform to the approved preliminary plat.

(c)    Final plats shall be filed with the City Secretary and shall be accompanied by the following minimum documentation:

(1) Completed final plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes;

(6) A statement on the plat application showing that all fees owed the Town on any prior projects has been paid in full at the time the application was filed; and

(7) Nonrefundable application fee, as established by the Town Council.

(d) Final plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 100' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets and an index sheet shall be drawn on a sheet twenty-four (24) inches by thirty-six (36) inches showing the entire property being platted);

(2) The shape and the exterior boundaries of the property being platted shall be indicated by the use of a distinctive and individual symbol;

(3) The length of all straight lines, deflection angles, radii, arcs, and central angles of all curves shall be given along the property lines of each street or tabulated on the same sheet showing all curve data with its symbol. All dimensions along the lines of each lot with the angles of intersections which they make with each other shall be indicated;

(4) The names of all adjoining subdivisions, the side lines of abutting lots, lot and block numbers, all in dotted lines, and where possible, accurate reference ties to at least two (2) adjacent recognized land corners shall be clearly indicated;

(5) The description and location of all survey monuments placed on the property being platted shall be indicated;

(6) A title shall be indicated, including the name of the property being platted, the name of the applicant and scale and location of the property being platted with reference to original surveys and a north point which may be magnetic or true north, with notation stating which.

(7) FEMA designated 100-year floodplain boundary, including finish floor elevation established a minimum of two (2) feet above the calculated 100 year flood. A surveyor's certificate shall be placed on the final plat as follows:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my personal supervision, in accordance with the Subdivision and Property Development Regulations of the Town of Lakewood Village, Texas.

_____
Signature

_____
Texas Reg. No.

(9) A certificate of ownership and of dedication of all streets, alleys, easements and lands to public use forever, signed and acknowledged before a notary public by the owner of the land, shall appear on the face of the map, containing complete and accurate description of the property being platted and the streets dedicated;

(10) The applicant will furnish the Town a copy of the dedication at the same time the final plat is submitted for approval; and

(11) The following certificate of approval by the Town Council shall be placed on the plat:

Approved this _____ day of _____, 20_____, by the Town Council of the Town of Lakewood Village, Texas.

_____
Mayor

_____
Town Secretary

(e) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Street layout and grades;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size and grade of lines, location of manholes and cleanouts, and lift station design;

(4) All drainage structure designs, analysis of as-is and full development for where the water exits the subdivision, analysis of all streets to determine if they meet drainage criteria, FEMA floodplain and floodway boundaries (if applicable), and letter(s) of release from property owners affected by diversion of water (except for watercourse(s) designated on current Town topography maps); and

(5) As-built drawings of existing structures, if applicable.
DIVISION 4. VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS*

### Sec. 13. Vacation of plats.

(a) Any plat, replat or amended plat previously recorded with the county clerk may be vacated by the property owner(s) at any time prior to the sale of any lot therein by filing a written signed and acknowledged instrument declaring the same to be vacated and recorded with the county clerk.

(b) If the one (1) or more lots have been sold, the plat, replat or amended plat may be vacated by the property owners by filing a written signed and acknowledged instrument with the town secretary. The vacating instrument must be approved by the Town Council in the same manner as the original plat, replat or amended plat. The Town Council shall disapprove the vacating instrument which abridges or destroys public rights in any of its public uses, improvements, streets, or alleys. Upon approval by the Town Council, the vacating instrument may be recorded with the county clerk and the vacated plat, replat or amended plat shall have no effect.

**State law reference(s)**--Vacating plats, V.T.C.A., Local Government Code § 212.013.

### Sec. 14. Replats without vacating preceding plat.

A replat may be recorded and controls over a previously recorded plat without vacation of that plat if the replat is signed and acknowledged by the owners of the property being platted, does not attempt to amend or remove any covenants or restrictions, and is approved, after a public hearing on the matter, by the Town Council.

### Sec. 15. Plat amendments or corrections.

(a) The Town Council may approve and issue an amended plat, which may be recorded with the county clerk and controls over the preceding plat without vacation of the plat, if the amended plat is signed by the applicant(s) and is solely for one (1) or more of the following purposes:

(1) To correct an error in a course or distance shown on the preceding plat;

(2) To add a course or distance that was omitted on the preceding plat;

(3) To correct an error in the description of the real property shown on the preceding plat;

---

'**State law reference**–Vacating plats, amending plats, etc., V.T.C.A. Local Government Code § 212.013 et seq.

(4) To indicate monuments set forth after death, disability, or retirement from practice of the engineer or surveyor responsible for setting monuments;

(5) To show the proper location or character of any monument which has been changed in location or character or which originally was shown incorrectly as to location or character on the preceding plat;

(6) To correct any other type of scrivener's or clerical error or omission previously approved by the planning and zoning commission and/or Town Council, including lot numbers, acreage, street names, and identification of adjacent recorded plats;

(7) To correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the other owners in the plat;

(8) To relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement;

(9) To relocate one (1) or more lot lines between one (1) or more adjacent lots where the owner(s) of all such lots join in the application for the plat amendment; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not increase the number of lots; or

(10) To make necessary changes to the preceding plat to create six (6) or fewer lots in the plat if the changes do not affect applicable zoning and other regulations of the Town, and the changes do not attempt to amend or remove any covenants or restrictions and the area covered by the changes is located in an area that the Town Council has approved, after a public hearing, as a residential improvement area.

(11) To replat one or more lots fronting on an existing street if the owners of all those lots join in the application for the amendment; the amendment does not attempt to remove recorded covenants or restrictions or increase the number of lots; and, the amendment does not create or require the creation of a new street or make necessary the extension of municipal facilities.

(b) Notice, a hearing, and the approval of other lot owners are not required for the approval and issuance of an amended plat.

## ARTICLE III. DEVELOPMENT PROCESS

### Sec. 16. Construction of infrastructure.

(a) Following approval of the final plat, the plat applicant shall submit full construction plans

for all proposed infrastructure to be constructed for the platted property. Construction plans submitted shall be in conformance with the approved plat. The Town engineer shall review the submitted plans for compliance with the construction standards adopted by the Town.

(b) Upon approval of construction plans by Town Council, the plat applicant and/or the plat applicant's contractor will provide written notification to the Town engineer of the intent to commence construction of the required infrastructure. No work may be performed unless written notification has been provided to the Town engineer. The written notification shall contain the following information:

(1) Name of the plat or subdivision;

(2) Plat applicant's name;

(3) Contractor's name, address and phone number;

(4) Type of construction to be performed; and

(5) Estimated value of construction contract.

(c) The Town engineer shall issue an acknowledgment of receipt of notification to the developer and/or his contractor.

### Sec. 17. Acceptance of infrastructure.

(a) Upon completion of all required infrastructure, prior to the acceptance of the subdivision by the Town for maintenance, the applicant shall post, or cause to be posted, a maintenance bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form, to guarantee the maintenance of the construction for a period of one (1) year after its completion and acceptance by the Town. In lieu of a maintenance bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form. The actual value of the maintenance bond or letter of credit or cash bond shall be ten (10) percent of the full cost of the water and sewer system and fifteen (15) percent of the full cost of the cost of street and drainage construction, as determined by the estimate of construction costs.

(b) Upon receipt of the approved maintenance bond, irrevocable letter of credit or cash bond, the Town engineer shall issue a written letter of acceptance of the infrastructure and notify the building and development department that the subdivision has been accepted by the Town.

### Sec. 18. Building permits issued prior to completion of infrastructure.

(a) In the event an applicant wishes to obtain building permits prior to acceptance of the subdivision by the Town, the applicant shall post with the Town a completion bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the

Town and approved by the Town as to form for all construction included in the approved construction plans that has not been completed. In lieu of a completion bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form.

(b) Under no circumstances shall building above the foundation be permitted until adequate fire protection is available. Adequate fire protection means:

    (1) Town utilities are installed;

    (2) Fire hydrants providing protection are operational; and

    (3) Streets are open and driveable, street subgrades worked to proper compaction and base course installed, graded and leveled, to facilitate vehicle movement.

(c) After the plat has been recorded and the completion bond, irrevocable letter of credit or cash bond has been received and approved by the Town, the Town engineer shall notify the building and development department, by lot and block numbers, that building permits may be issued.

### Sec. 19. Agreements with the Town.

(a) All agreements entered into between the Town and the developer and/or applicant, as a condition of plat approval, shall be recorded along with the final plat.

(b) The executed agreement shall be submitted to the Town Council in conjunction with the original drawings required for filing and recordation.

### ARTICLE IV. STANDARDS AND REQUIREMENTS

### DIVISION 1. GENERALLY

### Sec. 20. Lots and blocks.

(a) All lots of the plat shall front on a dedicated street.

(b) In general, lots shall conform in width, depth, and area to the pattern already established in the adjacent areas, having due regard to the character of the neighborhood, its particular suitability for residential purposes, and also taking into consideration the natural topography of the ground, drainage, sanitary sewage facilities, and the proposed layout of the streets.

(c) Lots shall have the width measurements, front, rear, and side yard requirements required by Town Ordinance 83-1.

(d) The area of the lots shall be computed by taking the average width of the lot times the average depth of the lot measured from the street line to the rear lot line.

(e) All sidelines of lots shall be at right angles to straight street lines or radial to curved street lines, unless a variation from this rule would, in the opinion of the Town Council, produce a better lot plan and better utilize the proposed development.

## Sec. 21. Park sites.

The Town Council shall consider offers of land for parks or playgrounds which conform to the current master plan adopted by the Town, provided such plan exists.

## Sec. 22. Use of Town condemnation authority.

(a) Water and sewer mains, force mains and lift stations, streets and drainageways shall be located in easements or rights-of-way secured and paid for by the applicant. Such easements shall be properly assigned to the Town before service is extended to the subdivision.

(b) In cases where easements cannot be secured by the applicant, the applicant may file a written petition with the Town engineer, accompanying the plat application, requesting that the Town Council utilize its condemnation authority. The written petition must satisfy all of the following criteria:

(1) The applicant must establish that clear evidence of public need exists;

(2) The applicant must establish that the proposed extension is in accordance with the current adopted master utility plan(s), if such plan(s) exists;

(3) The applicant must establish that the proposed extension will be able to serve other development areas;

(4) The applicant must agree to pay all costs of the condemnation; and

(5) The applicant must present written evidence that every practical attempt to secure the needed easements and/or right-of-way has been made by submitting the following:

a. A condemnation appraisal by an independent appraiser as to the current market value and damages, if any, of acquiring the easement and/or right-of-way; and

b. Documentation that a written offer has been made to purchase the easement and/or right-of-way for the appraised value and the offer was rejected.

(c) The petition shall be forwarded to the Town for review and recommendation and scheduled for consideration by the Town Council.

DIVISION 2. STREETS AND DRAINAGE

## Sec. 23. Streets.

(a) Street widths in subdivisions shall conform to:

| Designation | Right-of-Way (feet) | Paving (feet) |
|---|---|---|
| A + major arterial | 110 | 86 |
| A major arterial | 110 | 90 |
| B + minor arterial | 90 | 66 |
| B minor arterial | 80 | 56 |
| C major collector | 70 | 44 |
| D minor collector | 60 | 38 |
| E minor local | 50 | 31 |

(b) Existing streets shall be continued where practical, as determined by the Town Council. Continuations of existing streets shall have the same or greater right-of-way and pavement widths as the existing streets being connected. Street names shall be continuous.

(c) All necessary street rights-of-way shall be dedicated as part of the platting process and shall be dedicated to the Town without cost.

(d) Dead-end streets may be platted where the land adjoining the plat has not been platted. In the event that such dead-end street exceeds one hundred fifty (150) feet in length or one (1) lot width, from the nearest street intersection, the street will be provided with a cul-de-sac, either permanent or temporary, having a minimum right-of-way radius of fifty (50) feet.

(e) Where dead-end streets are dictated by lot designs, such dead-end streets shall be provided with a permanent cul-de-sac having a minimum right-of-way radius of fifty (50) feet.

(f) No street intersection shall be designed having an inside angle of less than thirty (30) degrees between the two (2) intersecting street lines, nor more than one hundred fifty (150) degrees.

(g) Block lengths between intersecting cross streets or to the end of a cul-de-sac shall be no more than one thousand two hundred (1,200) feet.

(h) Streets, where practical, shall be designed and platted with appropriate regard to topographical features, i.e., creeks and drainageways, wooded areas, etc., with the aim of creating desirable and attractive treatments of significant existing features. (Ord. No. 95-38, § I, 4-25-95). Private Streets shall not be allowed.

(i) Driveways; Any driveway or other common access to more than two residences which is not defined in Section 23(a), shall be considered a minor local road and shall conform to defined standards.

## Sec. 24. Alleys, reserve strips.

(a) Alleys and/or easements shall be laid in the rear of lots fronting on adjoining streets where practicable. In residential subdivisions, the minimum width of right-of-way of an alley shall not be less than twenty (20) feet. All alleys shall be paved for the entire width of the right-of-way to the same specifications as minor residential streets. The rear or side line easement, where alleys are not provided, shall be a minimum of twenty (20) feet wide, arranged such that each lot shall have an equal ten-foot easement.

(b) No plat showing reserve strips of land controlling access to public ways or adjoining properties will be approved.

## Sec. 25. Drainage in special flood hazard areas.

Drainage structures in areas of special flood hazard in the Town shall comply with the provisions of the Town Ordinances.

## Sec. 26. Drainage not in special flood hazard areas.

(a) Design of all improved open drainage courses and enclosed drainage structures shall be by a registered professional engineer in accordance with the current drainage design standards approved by the Town Council. A review of the downstream drainage system capacity to a point of discharge into the lake area shall be made. The rate of storm water discharge from the proposed development shall not exceed flow capacity of any existing structure or drainage system. This may require storm water detention or retention on site of the project.

(b) The design and construction of all improved open drainage courses and enclosed drainage structures shall provide for adequate access for the performance of necessary maintenance by the Town.

(c) All improved drainage courses and enclosed drainage structures shall be dedicated to the Town and accepted for maintenance by the Town upon approval of the construction by the Town engineer.

(d) The Town shall maintain all improved drainage courses, provided that the original design and construction has been approved by the Town engineer and accepted by the Town for maintenance.

(e) Improved open drainage courses shall conform as follows:
   (1) Open drainage courses which carries runoff from a street, between two (2) lots, to a drainage course running behind lots shall be a concrete-lined flume.

   (2) Open drainage courses running behind lots may be of earthen channel or concrete-lined channel, provided the type of channel used satisfies the design criteria (velocity, type of soil, etc.) in accordance with the current drainage design standards approved by the Town Council.

(3) Where the open drainage course is a concrete-lined flume, the width of the easement shall be equal to the width of the flume. All other open drainage courses require the width of the easement to be equal to the width from top-of-bank to top-of-bank plus maintenance way needs as given in the drainage design standards.

(f) Enclosed drainage courses shall conform as follows:

(1) Cross drainage for right-of-way needs shall be designed to meet the same requirements as its channel.

(2) Permanent structures and improvements may be constructed upon and across improved enclosed drainage courses in business zoning districts and manufacturing zoning districts. Design shall be to accommodate the 100-year frequency flood.

(3) The width to the easement shall be equal to the width of the structure plus a width on each side of the structure to allow maintenance and/or repairs.

### Sec. 27. Street name signs.

Street name signs and markers and traffic control signs, in accordance with standards adopted by the Town, will be required at each intersection. The developer will provide street signs and posts for the markers and make the installations when the subdivision is accepted by the Town for maintenance.

DIVISION 3. WATER AND SEWER INFRASTRUCTURE

### Sec. 28. General Provisions.

(a) The intent and purpose of this division is to provide equitable charges for water and sewer connections as a proportionate distribution of the cost of the water and sewer main extensions to serve property within the Town. If the existing Town utility facilities are not within or adjacent to a subdivision, the developer shall construct the necessary extension of water and sewer mains, force mains, force mains, and lift stations, including all valves, manholes, and piping necessary to serve any future development of abutting property as specified in this chapter. The developer's engineer shall prepare a proposed plan of service for the subdivision and property along the extension which shall be reviewed by the Town engineer. These facilities shall be constructed in accordance with both the master plan and the Technical and Administrative Manual for Water and Sewer System Development ("Manual").

(b) It is the general policy of the Town that:

(1) Water and sewer mains should be large enough to serve all the lots platted and, should the Town determine oversizing is necessary, the Town may participate in those lines greater than 8" for water and greater than 10" for sewer.

(2) All utilities shall be required to extend across the full width of the last lot platted on each street proposed within the subdivision, in such an alignment that it can be extended to the next property in accordance with the master sewer and water plans for the Town, provided such plan(s) exist. Properties already served by water and sewer shall not be required to install additional facilities unless:

(I) The current lines are not of adequate capacity to serve the proposed development; in which case the applicant will be required to install adequate facilities.

(c) Every lot of the plat shall have direct access to the water and sewer system. Utility service shall be from a water/sewer main located in an abutting right-of-way or through easements from the lot to a water/sewer main.

(d) Water and/or sewer service may not be extended outside the Town limits.

(e) (1) The terms of this division shall be cumulative of all other ordinances regulating subdivisions, and such other ordinances are not repealed by this division, except to the extent that such other provisions conflict with the terms of this chapter, in which event this chapter shall prevail.

(2) The status of any previously designated line extension, lift station, or main shall be unaffected by this ordinance, save and except the Clear Creek pro rata line, designated in CCM #95-121R. The Clear Creek pro rata line designation is hereby rescinded.

(f) In addition to any other remedy provided by law, the Town and its officers shall have the right to enjoin any violation of this chapter by injunction issued by a court of competent jurisdiction.

## Sec. 29. Water.

(a) No water main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the water master plan, provided such plan exists.

(b) Water system layout shall be looped whenever possible. Dead-end mains shall not exceed one thousand eight hundred (1,800) feet or include three (3) fire hydrants. Single feeds may be permitted at the discretion of the Town engineer; however, any such denial may be appealed to the Town Council. Single feeds should include provisions for looping in future development.

(c) The location of fire hydrant(s) shall comply with and be approved by the Town Engineer and/or Fire Marshall and insurance requirements.

(d) Long water service taps shall be installed while the subdivision is being developed. Short water service taps shall be installed when needed for development. Long water service taps locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2

foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. No water service taps smaller than six (6) inches in diameter shall be allowed on water mains larger than twelve (12) inches in diameter.

## Sec. 30. Sewer.

(a) No sewer main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the sewer master plan, provided such plan exists.

(b) Manholes are required any time the alignment, slope, or diameter of the sewer main changes, or when two or more sewer mains intersect. In no case will the maximum spacing between manholes, or from a manhole to cleanout, exceed 500 feet.

(c) Sewer services for sewer mains located in roadways shall be installed while the subdivision is being developed. Sewer services with direct access to the sewer main without encroaching on a roadway may be installed when needed for development. Sewer tap locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. Sewer services six (6) inches and larger require a manhole where they intersect the sewer main. The sewer service shall extend a minimum of ten feet (10') into the lot area.

(d) Minimum lift station capacity shall be one hundred (100) gallons per minute and shall have at least two (2) pumps, each of which shall be capable of pumping the design capacity of the lift station. The minimum size of the wetwell shall be such that with any combination of inflow and pumping, the cycle of operation for each pump shall not be less than five (5) minutes and the maximum retention time in the wetwell shall not average more than thirty (30) minutes.

(e) Septic system holding tanks or any other sewage retainage facilities for the storage or removal of sewage are prohibited.

## Sec. 31. Costs of Extensions.

a. *Developer initiated.* All costs of all water and sewer main extensions, force mains, and lift stations initiated by a developer in order to provide required service for their development area, shall be paid for by the developer. Such costs may include; but is not necessarily limited to, right-of-way acquisition, pipes, motors, pumps, engineering, construction costs, inspection fees, and all weather access.

In no event shall the Town pay for any costs associated with water and/or sewer improvements.

## Sec. 32. Use of Water and Sewer Tap Fees and Rate Revenues.

Tap fees and rate revenues shall be set in an amount sufficient to maintain and operate the

system, with due regard for anticipated needs to improve, update, construct, and maintain the system.

## Sec. 33. Use of Town Condemnation Authority.

a. Water and sewer mains, force mains, and lift stations shall be located in easements, secured and paid for by the developer, and assigned to the Town before service is extended to the subdivision. For the Town to consider to using condemnation authority to assist a developer in extension of the system, the applicant must show clear evidence that every practical attempt to secure the easement has failed and there is a public need and interest for condemnation. Specific criteria and procedures shall be as stated in the manual.

b. Upon compliance with all procedures by the developer, the Town, at least 10 days prior to the hearing shall notify all property owners within the proposed easement and 200 feet therefrom. A hearing of facts by the Town Council is required. Determination of the Town Council shall be final.

## Sec. 34. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this Ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this Ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

## Sec. 35. Savings.

This Ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those Ordinances are in direct conflict with the provisions of this Ordinance; provided, however, that Ordinance No. 93-1 (Revised) of the Town are hereby repealed, but provided that any complaint, action, cause of action, or claim which prior to the effective date of this Ordinance has been initiated or has arisen under or pursuant to Ordinance No. 93-1 (Revised) shall continue to be governed by the provisions of that Ordinance and for that purpose Ordinance No. 93-1 (Revised) shall be deemed to remain and shall continue in full force and effect.

## Sec. 36. Repealer.

Ordinance 02-05A and Ordinance 00-09 are hereby repealed.

## Sec. 37. Penalty.

Any person who should violate any provision of this Ordinance or should fail to comply herewith shall for each and every violation or noncompliance be deemed guilty of a misdemeanor and shall be fined not more than $2,000.00 (two thousand dollars) and each day such violation shall be permitted to exist shall be construed a separate offense.

## Sec. 38. Effective Date.

This Ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** the **14th** day of **August**, 2008

Mike Schnittker, Mayor

ATTEST:

Linda Asbell, City Secretary

# Exhibit 20

**STATE OF TEXAS** )

) **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 08-09. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

AN ORDINANCE ADOPTING FLOOD DAMAGE PREVENTION GUIDELINES;
PROVIDING A REPEAL CLAUSE; PROVIDING FOR A SEVERABILITY CLAUSE;
PROVIDING FOR AN EFFECTIVE DATE.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN
OF LAKEWOOD VILLAGE, TEXAS THAT THE TOWN HEREBY ADOPTS THE
FOLLOWING:

ARTICLE I: STATUTORY AUTHORIZATION, FINDINGS OF FACT, PURPOSE AND METHODS

## SECTION A. STATUTORY AUTHORIZATION

The Legislature of the State of Texas has in the Flood Control Insurance Act, Texas Water Code, Section 16.315, delegated the responsibility of local governmental units to adopt regulations designed to minimize flood losses. Therefore, the Town of Lakewood Village, Texas does ordain as follows:

## SECTION B. FINDINGS OF FACT

(1) The flood hazard areas of Lakewood Village are subject to periodic inundation, which results in loss of life and property, health and safety hazards, disruption of commerce and governmental services, and extraordinary public expenditures for flood protection and relief, all of which adversely affect the public health, safety and general welfare.

(2) These flood losses are created by the cumulative effect of obstructions in floodplains which cause an increase in flood heights and velocities, and by the occupancy of flood hazard areas by uses vulnerable to floods and hazardous to other lands because they are inadequately elevated, flood proofed or otherwise protected from flood damage.

## SECTION C. STATEMENT OF PURPOSE

It is the purpose of this ordinance to promote the public health, safety and general welfare and to minimize public and private losses due to flood conditions in specific areas by provisions designed to:

(1) Protect human life and health;

(2) Minimize expenditure of public money for costly flood control projects;

(3) Minimize the need for rescue and relief efforts associated with flooding and generally undertaken at the expense of the general public;

(4) Minimize prolonged business interruptions;

(5) Minimize damage to public facilities and utilities such as water and gas mains, electric, telephone and sewer lines, streets and bridges located in floodplains;

(6) Help maintain a stable tax base by providing for the sound use and development of flood-prone areas in such a manner as to minimize future flood blight areas; and

(7) Insure that potential buyers are notified that property is in a flood area.

## SECTION D. METHODS OF REDUCING FLOOD LOSSES

In order to accomplish its purposes, this ordinance uses the following methods:

(1) Restrict or prohibit uses that are dangerous to health, safety or property in times of flood, or cause excessive increases in flood heights or velocities;

(2) Require that uses vulnerable to floods, including facilities which serve such uses, be protected against flood damage at the time of initial construction;

(3) Control the alteration of natural floodplains, stream channels, and natural protective barriers, which are involved in the accommodation of flood waters;

(4) Control filling, grading, dredging and other development which may increase flood damage;

(5) Prevent or regulate the construction of flood barriers which will unnaturally divert flood waters or which may increase flood hazards to other lands.

## ARTICLE 2 DEFINITIONS

Unless specifically defined below, words or phrases used in this ordinance shall be interpreted to give them the meaning they have in common usage and to give this ordinance its most reasonable application.

ALLUVIAL FAN FLOODING - means flooding occurring on the surface of an alluvial fan or similar landform which originates at the apex and is characterized by high-velocity flows; active processes of erosion, sediment transport, and deposition; and unpredictable flow paths.

APEX - means a point on an alluvial fan or similar landform below which the flow path of the major stream that formed the fan becomes unpredictable and alluvial fan flooding can occur.

APPURTENANT STRUCTURE – means a structure which is on the same parcel of property as the principal structure to be insured and the use of which is incidental to the use of the principal structure

AREA OF FUTURE CONDITIONS FLOOD HAZARD – means the land area that would be inundated by the 1-percent-annual chance (100 year) flood based on future conditions hydrology.

AREA OF SHALLOW FLOODING - means a designated AO, AH, AR/AO, AR/AH, or VO zone on a community's Flood Insurance Rate Map (FIRM) with a 1 percent or greater annual chance of flooding to an average depth of 1 to 3 feet where a clearly defined channel does not exist, where the path of flooding is unpredictable and where velocity flow may be evident. Such flooding is characterized by ponding or sheet flow.

AREA OF SPECIAL FLOOD HAZARD - is the land in the floodplain within a community subject to a 1 percent or greater chance of flooding in any given year. The area may be designated as Zone A on the Flood Hazard Boundary Map (FHBM). After detailed rate-making has been completed in preparation for publication of the FIRM, Zone A usually is refined into Zones A, AO, AH, A1-30, AE, A99, AR, AR/A1-30, AR/AE, AR/AO, AR/AH, AR/A, VO, V1-30, VE or V.

BASE FLOOD - means the flood having a 1 percent chance of being equaled or exceeded in any given year.

BASE FLOOD ELEVATION (BFE) – The elevation shown on the Flood Insurance Rate Map (FIRM) and found in the accompanying Flood Insurance Study (FIS) for Zones A, AE, AH, A1-A30, AR, V1-V30, or VE that indicates the water surface elevation resulting from the flood that has a 1% chance of equaling or exceeding that level in any given year - also called the Base Flood.

BASEMENT - means any area of the building having its floor sub grade (below ground level) on all sides.

BREAKAWAY WALL – means a wall that is not part of the structural support of the building and is intended through its design and construction to collapse under specific lateral loading forces, without causing damage to the elevated portion of the building or supporting foundation system.

CRITICAL FEATURE - means an integral and readily identifiable part of a flood protection system, without which the flood protection provided by the entire system would be compromised.

DEVELOPMENT - means any man-made change to improved and unimproved real estate, including but not limited to buildings or other structures, mining, dredging, filling, grading, paving, excavation or drilling operations or storage of equipment or materials.

ELEVATED BUILDING – means, for insurance purposes, a non-basement building, which has its lowest elevated floor, raised above ground level by foundation walls, shear walls, posts, piers, pilings, or columns.

EXISTING CONSTRUCTION - means for the purposes of determining rates, structures for which the "start of construction" commenced before the effective date of the FIRM or before January 1, 1975, for FIRMs effective before that date. "Existing construction" may also be referred to as "existing structures."

EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including, at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed before the effective date of the floodplain management regulations adopted by a community.

EXPANSION TO AN EXISTING MANUFACTURED HOME PARK OR SUBDIVISION - means the preparation of additional sites by the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads).

FLOOD OR FLOODING - means a general and temporary condition of partial or complete inundation of normally dry land areas from:

> (1) the overflow of inland or tidal waters.
> (2) the unusual and rapid accumulation or runoff of surface waters from any source.

FLOOD ELEVATION STUDY – means an examination, evaluation and determination of flood hazards and, if appropriate, corresponding water surface elevations, or an examination, evaluation and determination of mudslide (i.e., mudflow) and/or flood-related erosion hazards.

FLOOD INSURANCE RATE MAP (FIRM) - means an official map of a community, on which the Federal Emergency Management Agency has delineated both the special flood hazard areas and the risk premium zones applicable to the community.

FLOOD INSURANCE STUDY (FIS) – see *Flood Elevation Study*

FLOODPLAIN OR FLOOD-PRONE AREA - means any land area susceptible to being inundated by water from any source (see definition of flooding).

FLOODPLAIN MANAGEMENT - means the operation of an overall program of corrective and preventive measures for reducing flood damage, including but not limited to emergency preparedness plans, flood control works and floodplain management regulations.

FLOODPLAIN MANAGEMENT REGULATIONS - means zoning ordinances, subdivision regulations, building codes, health regulations, special purpose ordinances (such as a floodplain ordinance, grading ordinance and erosion control ordinance) and other applications of police power. The term describes such state or local regulations, in any combination thereof, which provide standards for the purpose of flood damage prevention and reduction.

FLOOD PROTECTION SYSTEM - means those physical structural works for which funds have been authorized, appropriated, and expended and which have been constructed specifically to modify flooding in order to reduce the extent of the area within a community subject to a "special flood hazard" and the extent of the depths of associated flooding. Such a system typically includes hurricane tidal barriers, dams, reservoirs, levees or dikes. These specialized flood modifying works are those constructed in conformance with sound engineering standards.

FLOOD PROOFING - means any combination of structural and non-structural additions, changes, or adjustments to structures which reduce or eliminate flood damage to real estate or improved real property, water and sanitary facilities, structures and their contents.

FLOODWAY – see *Regulatory Floodway*

FUNCTIONALLY DEPENDENT USE - means a use, which cannot perform its intended purpose unless it is located or carried out in close proximity to water. The term includes only docking facilities, port facilities that are necessary for the loading and unloading of cargo or passengers, and ship building and ship repair facilities, but does not include long-term storage or related manufacturing facilities.

HIGHEST ADJACENT GRADE - means the highest natural elevation of the ground surface prior to construction next to the proposed walls of a structure.

HISTORIC STRUCTURE - means any structure that is:

(1) Listed individually in the National Register of Historic Places (a listing maintained by the Department of Interior) or preliminarily determined by the Secretary of the Interior as meeting the requirements for individual listing on the National Register;

(2) Certified or preliminarily determined by the Secretary of the Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined by the Secretary to qualify as a registered historic district;

(3) Individually listed on a state inventory of historic places in states with historic preservation programs which have been approved by the Secretary of Interior; or

(4) Individually listed on a local inventory or historic places in communities with historic preservation programs that have been certified either:

(a) By an approved state program as determined by the Secretary of the Interior or;

(b) Directly by the Secretary of the Interior in states without approved programs.

LEVEE - means a man-made structure, usually an earthen embankment, designed and constructed in accordance with sound engineering practices to contain, control, or divert the flow of water so as to provide protection from temporary flooding.

LEVEE SYSTEM - means a flood protection system which consists of a levee, or levees, and associated structures, such as closure and drainage devices, which are constructed and operated in accordance with sound engineering practices.

LOWEST FLOOR - means the lowest floor of the lowest enclosed area (including basement). An unfinished or flood resistant enclosure, usable solely for parking or vehicles, building access or storage in an area other than a basement area is not considered a building's lowest floor; provided that such enclosure is not built so as to render the structure in violation of the applicable non-elevation design requirement of Section 60.3 of the National Flood Insurance Program regulations.

MANUFACTURED HOME - means a structure transportable in one or more sections, which is built on a permanent chassis and is designed for use with or without a permanent foundation when connected to the required utilities. The term "manufactured home" does not include a "recreational vehicle".

MANUFACTURED HOME PARK OR SUBDIVISION - means a parcel (or contiguous parcels) of land divided into two or more manufactured home lots for rent or sale.

MEAN SEA LEVEL - means, for purposes of the National Flood Insurance Program, the National Geodetic Vertical Datum (NGVD) of 1929 or other datum, to which base flood elevations shown on a community's Flood Insurance Rate Map are referenced.

NEW CONSTRUCTION - means, for the purpose of determining insurance rates, structures for which the "start of construction" commenced on or after the effective date of an initial FIRM or after December 31, 1974, whichever is later, and includes any subsequent improvements to such structures. For floodplain management purposes, "new construction" means structures for which the "start of construction" commenced on or after the effective date of a floodplain management regulation adopted by a community and includes any subsequent improvements to such structures.

NEW MANUFACTURED HOME PARK OR SUBDIVISION - means a manufactured home park or subdivision for which the construction of facilities for servicing the lots on which the manufactured homes are to be affixed (including at a minimum, the installation of utilities, the construction of streets, and either final site grading or the pouring of concrete pads) is completed on or after the effective date of floodplain management regulations adopted by a community.

RECREATIONAL VEHICLE - means a vehicle which is (i) built on a single chassis; (ii) 400 square feet or less when measured at the largest horizontal projections; (iii) designed to be self-propelled or permanently towable by a light duty truck; and (iv) designed primarily not for use as a permanent dwelling but as temporary living quarters for recreational, camping, travel, or seasonal use.

REGULATORY FLOODWAY - means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height.

RIVERINE – means relating to, formed by, or resembling a river (including tributaries), stream, brook, etc.

SPECIAL FLOOD HAZARD AREA – see *Area of Special Flood Hazard*

START OF CONSTRUCTION - (for other than new construction or substantial improvements under the Coastal Barrier Resources Act (Pub. L. 97-348)), includes substantial improvement and means the date the building permit was issued, provided the actual start of construction, repair, reconstruction, rehabilitation, addition placement, or other improvement was within 180 days of the permit date. The actual start means either the first placement of permanent construction of a structure on a site, such as the pouring of slab or footings, the installation of piles, the construction of columns, or any work beyond the stage of excavation; or the placement of a manufactured home on a foundation. Permanent construction does not include land preparation, such as clearing, grading and filling; nor does it include the installation of streets and/or walkways; nor does it include excavation for basement, footings, piers or foundations or the erection of temporary forms; nor does it include the installation on the property of accessory buildings, such as garages or sheds not occupied as dwelling units or not part of the main structure. For a substantial improvement, the actual start of construction means the first alteration of any wall, ceiling, floor, or other structural part of a building, whether or not that alteration affects the external dimensions of the building.

STRUCTURE – means, for floodplain management purposes, a walled and roofed building, including a gas or liquid storage tank, that is principally above ground, as well as a manufactured home.

SUBSTANTIAL DAMAGE - means damage of any origin sustained by a structure whereby the cost of restoring the structure to its before damaged condition would equal or exceed 50 percent of the market value of the structure before the damage occurred.

SUBSTANTIAL IMPROVEMENT - means any reconstruction, rehabilitation, addition, or other improvement of a structure, the cost of which equals or exceeds 50 percent of the market value of the structure before "start of construction" of the improvement. This term includes structures which have incurred "substantial damage", regardless of the actual repair work performed. The term does not, however, include either: (1) Any project for improvement of a structure to correct existing violations of state or local health, sanitary, or safety code specifications which have been identified by the local code enforcement official and which are the minimum necessary to assure safe living conditions or (2) Any alteration of a "historic structure", provided that the alteration will not preclude the structure's continued designation as a "historic structure."

VARIANCE – means a grant of relief by a community from the terms of a floodplain management regulation. (For full requirements see Section 60.6 of the National Flood Insurance Program regulations.)

VIOLATION - means the failure of a structure or other development to be fully compliant with the community's floodplain management regulations. A structure or other development without

the elevation certificate, other certifications, or other evidence of compliance required in Section 60.3(b)(5), (c)(4), (c)(10), (d)(3), (e)(2), (e)(4), or (e)(5) is presumed to be in violation until such time as that documentation is provided.

WATER SURFACE ELEVATION - means the height, in relation to the National Geodetic Vertical Datum (NGVD) of 1929 (or other datum, where specified), of floods of various magnitudes and frequencies in the floodplains of coastal or riverine areas.

## ARTICLE 3  GENERAL PROVISIONS

## SECTION A.  <u>LANDS TO WHICH THIS ORDINANCE APPLIES</u>

The ordinance shall apply to all areas of special flood hazard within the jurisdiction of Town of Lakewood Village, Texas.

## SECTION B.  <u>BASIS FOR ESTABLISHING THE AREAS OF SPECIAL FLOOD HAZARD</u>

The areas of special flood hazard identified by the Federal Emergency Management Agency in the current scientific and engineering report entitled, "The Flood Insurance Study (FIS) for <u>Denton County, Texas</u>," dated April 2, 1997, <u>and/Map Number 48121C0415 E (Panel 415 of 750)</u>, with accompanying Flood Insurance Rate Maps and/or Flood Boundary-Floodway Maps (FIRM and/or FBFM) dated April 2, 1997. and any revisions thereto are hereby adopted by reference and declared to be a part of this ordinance.

## SECTION C.  <u>ESTABLISHMENT OF DEVELOPMENT PERMIT</u>

A Floodplain Development Permit shall be required to ensure conformance with the provisions of this ordinance.

## SECTION D.  <u>COMPLIANCE</u>

No structure or land shall hereafter be located, altered, or have its use changed without full compliance with the terms of this ordinance and other applicable regulations.

## SECTION E.  <u>ABROGATION AND GREATER RESTRICTIONS</u>

This ordinance is not intended to repeal, abrogate, or impair any existing easements, covenants, or deed restrictions. However, where this ordinance and another ordinance, easement, covenant, or deed restriction conflict or overlap, whichever imposes the more stringent restrictions shall prevail.

## SECTION F.  <u>INTERPRETATION</u>

In the interpretation and application of this ordinance, all provisions shall be; (1) considered as minimum requirements; (2) liberally construed in favor of the governing body; and (3) deemed

neither to limit nor repeal any other powers granted under State statutes.

## SECTION G.  WARNING AND DISCLAIMER OR LIABILITY

The degree of flood protection required by this ordinance is considered reasonable for regulatory purposes and is based on scientific and engineering considerations.  On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. This ordinance does not imply that land outside the areas of special flood hazards or uses permitted within such areas will be free from flooding or flood damages.  This ordinance shall not create liability on the part of the community or any official or employee thereof for any flood damages that result from reliance on this ordinance or any administrative decision lawfully made hereunder.

## ARTICLE 4  ADMINISTRATION

## SECTION A.  DESIGNATION OF THE FLOODPLAIN ADMINISTRATOR

The Mayor is hereby appointed the Floodplain Administrator to administer and implement the provisions of this ordinance and other appropriate sections of 44 CFR (Emergency Management and Assistance - National Flood Insurance Program Regulations) pertaining to floodplain management.

## SECTION B.  DUTIES & RESPONSIBILITIES OF THE FLOODPLAIN ADMINISTRATOR

Duties and responsibilities of the Floodplain Administrator shall include, but not be limited to, the following:

(1) Maintain and hold open for public inspection all records pertaining to the provisions of this ordinance.

(2) Review permit application to determine whether to ensure that the proposed building site project, including the placement of manufactured homes, will be reasonably safe from flooding.

(3) Review, approve or deny all applications for development permits required by adoption of this ordinance.

(4) Review permits for proposed development to assure that all necessary permits have been obtained from those Federal, State or local governmental agencies (including Section 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. 1334) from which prior approval is required.

(5) Where interpretation is needed as to the exact location of the boundaries of the areas of special flood hazards (for example, where there appears to be a conflict between a mapped boundary and actual field conditions) the Floodplain Administrator shall make the necessary

interpretation.

(6) Notify, in riverine situations, adjacent communities and the State Coordinating Agency which is the Texas Water Development Board (TWDB), prior to any alteration or relocation of a watercourse, and submit evidence of such notification to the Federal Emergency Management Agency.

(7) Assure that the flood carrying capacity within the altered or relocated portion of any watercourse is maintained.

(8) When base flood elevation data has not been provided in accordance with Article 3, Section B, the Floodplain Administrator shall obtain, review and reasonably utilize any base flood elevation data and floodway data available from a Federal, State or other source, in order to administer the provisions of Article 5.

(9) When a regulatory floodway has not been designated, the Floodplain Administrator must require that no new construction, substantial improvements, or other development (including fill) shall be permitted within Zones A1-30 and AE on the community's FIRM, unless it is demonstrated that the cumulative effect of the proposed development, when combined with all other existing and anticipated development, will not increase the water surface elevation of the base flood more than one foot at any point within the community.

(10) Under the provisions of 44 CFR Chapter 1, Section 65.12, of the National Flood Insurance Program regulations, a community may approve certain development in Zones A1-30, AE, AH, on the community's FIRM which increases the water surface elevation of the base flood by more than 1 foot, provided that the community first completes all of the provisions required by Section 65.12.

## SECTION C. <u>PERMIT PROCEDURES</u>

(1) Application for a Floodplain Development Permit shall be presented to the Floodplain Administrator on forms furnished by him/her and may include, but not be limited to, plans in duplicate drawn to scale showing the location, dimensions, and elevation of proposed landscape alterations, existing and proposed structures, including the placement of manufactured homes, and the location of the foregoing in relation to areas of special flood hazard. Additionally, the following information is required:

(a) Elevation (in relation to mean sea level), of the lowest floor (including basement) of all new and substantially improved structures;

(b) Elevation in relation to mean sea level to which any nonresidential structure shall be flood proofed;

(c) A certificate from a registered professional engineer or architect that the nonresidential flood proofed structure shall meet the flood proofing criteria of Article 5, Section B (2);

(d) Description of the extent to which any watercourse or natural drainage will be altered or relocated as a result of proposed development;

(e) Maintain a record of all such information in accordance with Article 4, Section (B)(1);

(2) Approval or denial of a Floodplain Development Permit by the Floodplain Administrator shall be based on all of the provisions of this ordinance and the following relevant factors:

(a) The danger to life and property due to flooding or erosion damage;

(b) The susceptibility of the proposed facility and its contents to flood damage and the effect of such damage on the individual owner;

(c) The danger that materials may be swept onto other lands to the injury of others;

(d) The compatibility of the proposed use with existing and anticipated development;

(e) The safety of access to the property in times of flood for ordinary and emergency vehicles;

(f) The costs of providing governmental services during and after flood conditions including maintenance and repair of streets and bridges, and public utilities and facilities such as sewer, gas, electrical and water systems;

(g) The expected heights, velocity, duration, rate of rise and sediment transport of the floodwaters and the effects of wave action, if applicable, expected at the site;

(h) The necessity to the facility of a waterfront location, where applicable;

(i) The availability of alternative locations, not subject to flooding or erosion damage, for the proposed use.

## SECTION D. VARIANCE PROCEDURES

(1) The Appeal Board, as established by the community, shall hear and render judgment on requests for variances from the requirements of this ordinance.

(2) The Appeal Board shall hear and render judgment on an appeal only when it is alleged there is an error in any requirement, decision, or determination made by the Floodplain Administrator in the enforcement or administration of this ordinance.

(3) Any person or persons aggrieved by the decision of the Appeal Board may appeal such decision in the courts of competent jurisdiction.

(4) The Floodplain Administrator shall maintain a record of all actions involving an appeal and shall report variances to the Federal Emergency Management Agency upon request.

(5) Variances may be issued for the reconstruction, rehabilitation or restoration of structures listed on the National Register of Historic Places or the State Inventory of Historic Places, without regard to the procedures set forth in the remainder of this ordinance.

(6) Variances may be issued for new construction and substantial improvements to be erected on a lot of 1/2 acre or less in size contiguous to and surrounded by lots with existing structures constructed below the base flood level, providing the relevant factors in Section C (2) of this Article have been fully considered. As the lot size increases beyond the 1/2 acre, the technical justification required for issuing the variance increases.

(7) Upon consideration of the factors noted above and the intent of this ordinance, the Appeal Board may attach such conditions to the granting of variances as it deems necessary to further the purpose and objectives of this ordinance (Article 1, Section C).

(8) Variances shall not be issued within any designated floodway if any increase in flood levels during the base flood discharge would result.

(9) Variances may be issued for the repair or rehabilitation of historic structures upon a determination that the proposed repair or rehabilitation will not preclude the structure's continued designation as a historic structure and the variance is the minimum necessary to preserve the historic character and design of the structure.

(10) Prerequisites for granting variances:

(a) Variances shall only be issued upon a determination that the variance is the minimum necessary, considering the flood hazard, to afford relief.

(b) Variances shall only be issued upon: (i) showing a good and sufficient cause; (ii) a determination that failure to grant the variance would result in exceptional hardship to the applicant, and (iii) a determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, create nuisances, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

(c) Any application to which a variance is granted shall be given written notice that the structure will be permitted to be built with the lowest floor elevation below the base flood elevation, and that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced lowest floor elevation.

(11) Variances may be issued by a community for new construction and substantial improvements and for other development necessary for the conduct of a functionally dependent

use provided that (i) the criteria outlined in Article 4, Section D (1)-(9) are met, and (ii) the structure or other development is protected by methods that minimize flood damages during the base flood and create no additional threats to public safety.

## ARTICLE 5  PROVISIONS FOR FLOOD HAZARD REDUCTION

## SECTION A.  GENERAL STANDARDS

In all areas of special flood hazards the following provisions are required for all new construction and substantial improvements:

(1) All new construction or substantial improvements shall be designed (or modified) and adequately anchored to prevent flotation, collapse or lateral movement of the structure resulting from hydrodynamic and hydrostatic loads, including the effects of buoyancy;

(2) All new construction or substantial improvements shall be constructed by methods and practices that minimize flood damage;

(3) All new construction or substantial improvements shall be constructed with materials resistant to flood damage;

(4) All new construction or substantial improvements shall be constructed with electrical, heating, ventilation, plumbing, and air conditioning equipment and other service facilities that are designed and/or located so as to prevent water from entering or accumulating within the components during conditions of flooding;

(5) All new and replacement water supply systems shall be designed to minimize or eliminate infiltration of flood waters into the system;

(6) New and replacement sanitary sewage systems shall be designed to minimize or eliminate infiltration of flood waters into the system and discharge from the systems into flood waters; and,

(7) On-site waste disposal systems shall be located to avoid impairment to them or contamination from them during flooding.

## SECTION B.  SPECIFIC STANDARDS

In all areas of special flood hazards where base flood elevation data has been provided as set forth in (i) Article 3, Section B, (ii) Article 4, Section B (8), or (iii) Article 5, Section C (3), the following provisions are required:

(1) Residential Construction - new construction and substantial improvement of any residential structure shall have the lowest floor (including basement), elevated to two (2) feet above the base flood elevation. A registered professional engineer, architect, or land surveyor shall submit a certification to the Floodplain Administrator that the standard of this subsection as

proposed in Article 4, Section C (1) a., is satisfied.

(2) Nonresidential Construction - new construction and substantial improvements of any commercial, industrial or other nonresidential structure shall either have the lowest floor (including basement) elevated to two (2) feet above the base flood level or together with attendant utility and sanitary facilities, be designed so that below the base flood level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads and effects of buoyancy. A registered professional engineer or architect shall develop and/or review structural design, specifications, and plans for the construction, and shall certify that the design and methods of construction are in accordance with accepted standards of practice as outlined in this subsection. A record of such certification which includes the specific elevation (in relation to mean sea level) to which such structures are flood proofed shall be maintained by the Floodplain Administrator.

(3) Enclosures - new construction and substantial improvements, with fully enclosed areas below the lowest floor that are usable solely for parking of vehicles, building access or storage in an area other than a basement and which are subject to flooding shall be designed to automatically equalize hydrostatic flood forces on exterior walls by allowing for the entry and exit of floodwaters. Designs for meeting this requirement must either be certified by a registered professional engineer or architect or meet or exceed the following minimum criteria:

(a) A minimum of two openings on separate walls having a total net area of not less than one square inch for every square foot of enclosed area subject to flooding shall be provided.

(b) The bottom of all openings shall be no higher than 1 foot above grade.

(c) Openings may be equipped with screens, louvers, valves, or other coverings or devices provided that they permit the automatic entry and exit of floodwaters.

(4) Manufactured Homes -

(a) Require that all manufactured homes to be placed within Zone A on a community's FHBM or FIRM shall be installed using methods and practices which minimize flood damage. For the purposes of this requirement, manufactured homes must be elevated and anchored to resist flotation, collapse, or lateral movement. Methods of anchoring may include, but are not limited to, use of over-the-top or frame ties to ground anchors. This requirement is in addition to applicable State and local anchoring requirements for resisting wind forces.

(b) Require that manufactured homes that are placed or substantially improved within Zones A1-30, AH, and AE on the community's FIRM on sites (i) outside of a manufactured home park or subdivision, (ii) in a new manufactured home park or subdivision, (iii) in an expansion to an existing manufactured home park or subdivision, or (iv) in an existing manufactured home park or subdivision on which a manufactured home has incurred "substantial damage" as a result of a flood, be elevated on a permanent foundation such that the lowest floor

of the manufactured home is elevated to two (2) feet above the base flood elevation and be securely anchored to an adequately anchored foundation system to resist flotation, collapse, and lateral movement.

(c) Require that manufactured homes be placed or substantially improved on sites in an existing manufactured home park or subdivision with Zones A1-30, AH and AE on the community's FIRM that are not subject to the provisions of paragraph (4) of this section be elevated so that either:

(i) the lowest floor of the manufactured home is at two (2) feet above the base flood elevation, or

(ii) the manufactured home chassis is supported by reinforced piers or other foundation elements of at least equivalent strength that are no less than 36 inches in height above grade and be securely anchored to an adequately anchored foundation system to resist flotation, collapse, and lateral movement.

(5) Recreational Vehicles - Require that recreational vehicles placed on sites within Zones A1-30, AH, and AE on the community's FIRM either (i) be on the site for fewer than 180 consecutive days, or (ii) be fully licensed and ready for highway use, or (iii) meet the permit requirements of Article 4, Section C (1), and the elevation and anchoring requirements for "manufactured homes" in paragraph (4) of this section. A recreational vehicle is ready for highway use if it is on its wheels or jacking system, is attached to the site only by quick disconnect type utilities and security devices, and has no permanently attached additions.

## SECTION C. STANDARDS FOR SUBDIVISION PROPOSALS

(1) All subdivision proposals including the placement of manufactured home parks and subdivisions shall be consistent with Article 1, Sections B, C, and D of this ordinance.

(2) All proposals for the development of subdivisions including the placement of manufactured home parks and subdivisions shall meet Floodplain Development Permit requirements of Article 3, Section C; Article 4, Section C; and the provisions of Article 5 of this ordinance.

(3) Base flood elevation data shall be generated for subdivision proposals and other proposed development including the placement of manufactured home parks and subdivisions which is greater than 50 lots or 5 acres, whichever is lesser, if not otherwise provided pursuant to Article 3, Section B or Article 4, Section B (8) of this ordinance.

(4) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have adequate drainage provided to reduce exposure to flood hazards.

(5) All subdivision proposals including the placement of manufactured home parks and subdivisions shall have public utilities and facilities such as sewer, gas, electrical and water systems located and constructed to minimize or eliminate flood damage.

# SECTION D.  <u>STANDARDS FOR AREAS OF SHALLOW FLOODING (AO/AH ZONES)</u>

Located within the areas of special flood hazard established in Article 3, Section B, are areas designated as shallow flooding.  These areas have special flood hazards associated with flood depths of 1 to 3 feet where a clearly defined channel does not exist, where the path of flooding is unpredictable, and where velocity flow may be evident.  Such flooding is characterized by ponding or sheet flow; therefore, the following provisions apply:

(1) All new construction and substantial improvements of residential structures have the lowest floor (including basement) elevated to or above the base flood elevation or the highest adjacent grade at least as high as the depth number specified in feet on the community's FIRM (at least 2 feet if no depth number is specified), or

(2) All new construction and substantial improvements of non-residential structures;

(a) have the lowest floor (including basement) elevated to or above the base flood elevation or the highest adjacent grade at least as high as the depth number specified in feet on the community's FIRM (at least two feet if no depth number is specified), or

(b) together with attendant utility and sanitary facilities be designed so that below the base specified flood depth in an AO Zone, or below the Base Flood Elevation in an AH Zone, level the structure is watertight with walls substantially impermeable to the passage of water and with structural components having the capability of resisting hydrostatic and hydrodynamic loads of effects of buoyancy.

(3) A registered professional engineer or architect shall submit a certification to the Floodplain Administrator that the standards of this Section, as proposed in Article 4, Section C are satisfied.

(4) Require within Zones AH or AO adequate drainage paths around structures on slopes, to guide flood waters around and away from proposed structures.

## SECTION E.  SEVERABILITY

If any section, clause, sentence, or phrase of this Ordinance is held to be invalid or unconstitutional by any court of competent jurisdiction, then said holding shall in no way affect the validity of the remaining portions of this Ordinance.

## SECTION F.  PENALTIES FOR NON COMPLIANCE

No structure or land shall hereafter be constructed, located, extended, converted, or altered without full compliance with the terms of this court order and other applicable regulations. Violation of the provisions of this court order by failure to comply with any of its requirements (including violations of conditions and safeguards established in connection with conditions) shall constitute a misdemeanor.  Any person who violates this court order or fails to comply with

any of its requirements shall upon conviction thereof be fined not more than $500.00 for each violation, and in addition shall pay all costs and expenses involved in the case. Each day a violation continues to exist will constitute a new and separate violation. Nothing herein contained shall prevent Town of Lakewood Village, Texas from taking such other lawful action as is necessary to prevent or remedy any violation.

## SECTION G. EFFECTIVE DATE

This ordinance shall be in full force and effect from and after its date of passage and publication as provided by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, on this 9th day of September 2008.**

APPROVED:

Mike Schnittker,
Mayor

ATTEST:

Linda Asbell,
City Secretary

# Exhibit 21

| STATE OF TEXAS | ) | |
|---|---|---|
| | ) | **CERTIFICATE TO COPY OF PUBLIC RECORD** |
| **COUNTY OF DENTON** | ) | |

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 10-01. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE 10-01

AN ORDINANCE TO ADOPT THE MOST CURRENT EDITION OF THE INTERNATIONAL RESIDENTIAL CODE, THE INTERNATIONAL BUILDING CODE, THE INTERNATIONAL PLUMBING CODE, THE INTERNATIONAL MECHANICAL CODE, THE INTERNATIONAL ENERGY CODE, THE INTERNATIONAL FUEL AND GAS CODE, THE INTERNATIONAL PROPERTY MAINTENANCE CODE, THE NATIONAL ELECTRICAL CODE, INTERNATIONAL FIRE CODE AND ALL APPENDICES THERETO, AS AMENDED BY THE TERMS OF THIS ORDINANCE; PROVIDING FOR PERMIT FEES; PROVIDING FOR THE REGISTRATION OF BUILDERS AND ALL PERSONS PERFORMING ELECTRICAL, PLUMBING, MECHANICAL, IRRIGATION, IRRIGATION TESTING BACKFLOW, THIRD PARTY INSPECTIONS, ROOFING, FENCING, FRAMING, AND CONCRETE, WORK ON ANY NEW OR EXISTING CONSTRUCTION OR STRUCTURE WITHIN THE TOWN OR THE EXTRATERRITORTIAL JURISDICTION; PROVIDING FOR A BOARD OF APPEALS; PROVIDING FOR PREMISE IDENTIFICATION; PROVIDING FOR INSPECTIONS AND TOWN BUILDING REQUIREMENTS; PROVIDING A PENALTY CLAUSE; PROVIDING A REPEAL OF ORDINANCE 06-06A; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council of the Town of Lakewood Village, Texas desires to establish a specific requirement for all building construction;

WHEREAS, the State of Texas mandates that it is necessary to establish uniform and minimum standards for the construction, erection, and maintenance of buildings and other structures in order to protect and promote the public health, safety, and welfare of the citizens of the Town and the Extraterritorial Jurisdiction of the Town,

WHEREAS, the Town of Lakewood Village desires to adopt the most current set of International and minimum standard building codes;

NOW, THEREFORE BE IT ORDAINED by the Town Council of the Town of Lakewood Village, Texas:

## SECTION 1. CODES

The current versions of the International Residential Code, the International Building Code, the International Plumbing Code, the International Mechanical Code, the International Energy Code, the International Fuel and Gas Code, the International Property Maintenance Code, the National Electrical Code, the International Fire Code, and all appendices thereto, as herein after revised or amended are adopted. The said International Building Code, the International Plumbing Code, the International Mechanical Code, the International Energy Code, the International Fuel and Gas Code, the International Property Maintenance Code, the National Electrical Code are incorporated herein as if copied in their entirety.

## SECTION 2. DEFINITIONS

The Town – shall mean the Town of Lakewood Village

Contractor – shall mean any person, firm, corporation, or other entity that is hired by a homeowner or landowner to perform any new construction, remodel, or repair on said homeowner or landowner's real property.

Building Official – shall mean an employee of the Town of Lakewood Village who performs inspections, plan reviews, and is licensed by the State of Texas as a Building Inspector, or any properly qualified person that is employed by the Town that has been appointed to perform such work.

Erosion Control – the containment of all dirt, soils, sand, fill or grass, in such a manner, to prevent said materials from encroaching onto adjacent properties, town easements, drainage culverts, or utility placements

ETJ - shall mean the Extraterritorial Jurisdiction of the Town of Lakewood Village

Masonry – shall be defined as brick, concrete hollow clay tile, concrete block, natural stone, or any combination of these materials that are laid up by unit and set in mortar.

Construction Site Refuse Control - the containment of and weekly or monthly removal of both construction and laborer refuse to prevent said materials from encroaching onto adjacent homeowner properties, town easements, drainage ditches and culverts, and should be in compliance with OSHA and local codes.

## SECTION 3. GENERAL

All Building Permits shall expire 180 days from the date the permit is issued. A permit expiration may be extended if a Contractor issues a construction calendar with the submission packet and the calendar is approved by the Building Official and Mayor. If the Construction Calendar that is provided by the Contractor is not adhered to, the Building Permit shall expire without further action by the Town.

## SECTION 4. BUILDING FEES & REQUIREMENTS

A.      Fees will be outlined in Exhibit A of this ordinnace

B.      Water/Sewer Taps - A licensed plumber that is registered with the Town shall perform all work connecting to the Town utilities.

C.      All sprinkler permits are required to have a final inspection accompanied by a Backflow Prevention Report Form and a Customer Service Inspection Letter. These forms can be obtained from the office of the Town Secretary.

D.    In the construction, maintenance, or repair of any building or structure within the Town or the ETJ, for which a building permit is required by the current building codes, no person shall perform any electrical, plumbing, mechanical, fencing, backflow, concrete, third party inspections, irrigation, or roofing unless and until such time as that person is registered with the Town to perform such work.

E.    All contractors who are required by state law or local ordinance to be licensed must register with the Town of Lakewood Village before applying for permits or performing any work. All contractors registered with the Town, or unregistered, shall perform no work of any sort/kind without being properly licensed. The Mayor or Building Official, upon receipt of a written citizen complaint, shall place said Contractor's registration in investigation status. No inspections will be allowed or permits issued to any Contractor whose registration is in investigation status. The Mayor, in periods of absence from the Town, may designate an individual to act in his/her stead for purposes of this section. The Town shall forward the citizen's written complaint to the Contractor. In the event a Contractor wishes to contest a citizen's complaint, the contractor shall request a complaint review by the Mayor or Building Official. If a written response to the citizen's written complaint is not made by the Contractor within fourteen (14) days of the date the citizen's complaint is mailed to the Contractor, the Mayor or Building Official shall in his/her sole discretion place any condition upon the contractor's registration necessary to rectify the citizen's complaint including, but not limited to, revocation of the contractor's registration. No complaint other than one in writing may be used to revoke or otherwise place any condition upon any contractor's registration. Complaints that do not affect the citizens of the Town of Lakewood Village or residents of the ETJ will be summarily dismissed. The Mayor or Building Official shall issue his/her decision in writing to the Contractor and complaining citizen. The Contractor or citizen may appeal the Mayor or Building Official's decision to the Board of Appeals as set forth in Section 9. An appeal of the Mayor or Building Official's decision must be completed by written document within fourteen (14) days of the date of the Mayor or Building Official's decision. At any appeal to the Board of Appeals, the Contractor or citizen bear the burden to produce evidence establishing any error occurring in the Mayor or Building Official's decision regarding the contractor's registration.

## SECTION 5. PERMIT APPLICATION

A.    A residential permit application consist of five (5) forms, which must be completed and signed by the Contractor and his or her registered mechanical, electrical, and plumbing contractors. These forms are the mechanical permit, electrical permit, plumbing permit, concrete permit, and application for building permit forms.

B.    Detailed and accurate descriptions are required regarding the addresses and legal description of the subject property including Lot, Block and complete subdivision name with correct phase.

C.  All contractors are required to be registered with the town and must have such approved registration on file before any permit will be issued.

## SECTION 6. BUILDING PLAN PACKET SUBMISSION

Along with the permit application forms set forth above, the following documents are required prior to any approval being granted in the quantity and detail as specified:

A.  Two (2) plot plans containing lot dimensions, plan footprint, set-backs (front, rear and sides) complete address, lot and block, subdivision and phase, utility and easement locations, engineers and contractors names, finish pad elevations, finish floor elevations, topographical elevations, driveways, sidewalks, fence locations, lot area, slab area, and coverage percent. All drawings provided must be to scale.

B.  Two (2) foundation designs (11" x 17" drawing and engineer letters) one of which must have an original signature and stamp.

C.  Three (3) complete bound sets of construction drawings. Town Copy must be 11" x 17" or application will be automatically rejected without further action or notification by any Town Official. Plans must include elevations, framing details, including soffit overhang details, masonry percentage calculations, square foot calculations, electrical load calculations, electrical panel size, electrical panel location, mechanical specifications, foundation design letter must be address specific. All plans must be drawn by a state licensed architect and must be drawn to scale.

D.  Two (2) sets of drainage plans must be provided. Town copy must be 11" x 17" drawn to scale, showing the actual dimensions and shape of the lot to be built upon. The drainage plans must show sea level elevations and all flatwork drawn to scale.

E.  Floor plans, elevations, framing, roof plan, electrical and "to be built options" must be clearly shown and detailed. Single sheet submittals are not acceptable. HVAC and Plumbing design drawings are also required. Options reflecting additional buildable space must be identified by the actual square footage area and included in the permit values for total air-conditioned area and or construction area under roof.

F.  Elevation drawings must clearly state that the structure meets the exterior requirements set forth below in Section 11 by the Town of Lakewood Village, or provide masonry calculations (i.e. Front % + Right % + Left % + Rear % = total masonry %)

G.  All drawings must be legible and show proper square footage for air-conditioned and total building areas.

H.  One (1) Energy analysis (i.e.; MecCheck, ResCheck or Energy-Star) shall be provided by a certified professional.

I.      All third party rater information and documentation must be submitted if an Energy Star Home is being constructed or modified.

J.      Electrical Voltage Drop letter shall be provided and must be on the electrical contractors letterhead

K.      Mechanical Air Flow Calculations shall be provided and must be on the mechanical contractors letterhead

L.      A copy of the contract agreement between the contractor and the homeowner/landowner must be provided to the town, unless the homeowner/landowner is the contractor.

## SECTION 7. PLAN REVIEW PROCESS

All plans must be submitted to the Town of Lakewood Village for review. Plans are reviewed in the order they are received. The Town's goal in plan review is a one to two week turn around time for complete and accurately prepared submittal packages. Incomplete submissions may require additional time processing the plan review for the permit.

## SECTION 8. LICENSING AND REGISTRATION REQUIREMENTS

A.      No person shall engage in the business of construction of new buildings or structures, or make any repairs, alterations, or changes to an existing building or structure, unless that person is registered as a Contractor by the Town. Provided however that (i) no license shall be required for work on any building or structure for which a building permit is not required by this code and (ii) persons who occupy and reside within any property as their home shall not be required to obtain a license or register with the Town.

B.      All Contractors must register with the Town of Lakewood Village before applying for permits or performing any work. A master or contractor license in the specific trade is required to register as a Contractor. All licensed Journeymen working for the Contractor shall be listed on the contractor registration form. All work shall be supervised by a licensed individual, who must be within 5 minutes of any job under their supervision. A licensed residential wireman may supervise one helper or apprentice. Any work discovered being performed without the required licensed personnel shall be conspicuously identified to prevent reuse and shall be removed. In addition to a citizen complaint, multiple violations of licensure requirements may result in suspension of a Contractors' registration. Any individuals found performing work without the required registration shall be required to leave the jobsite. A Contractor is defined as set forth above in Section 2. All registrations will expire on December 30th of each year. The General Contractor must carry insurance that covers all subcontractors and the projects they are actively working on under the General Contractor. In the event there is not a General Contractor, each subcontractor is required to supply the Town with a copy of their liability insurance with a minimum $100,000.00 policy coverage for each project. It will be the responsibility of the registered individuals to ensure that this process is complete before permits will be issued and any work in the specific trade is commenced.

The Town reserves the right to deny or revoke any contractor registration if there are justifiable reasons or violations as determined by the Town.

C. The following Contractors disciplines must follow the applicable registration process.

GENERAL CONTRACTORS, BUILDER REGISTRANTS:
1. Contractor registration filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A valid certificate of liability insurance or bond in an amount no less than $1,000,000.00 kept in force for the duration of the project. Each project is required to have it's own policy.
4. Proof of registration with Texas Residential Construction Commission is required at the time of registration and for the duration of the project.

ELECTRICAL REGISTRANTS:
1. Contractor registration filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. All Journeyman and or Wireman performing work must be registered and posses a current license at the time of registration and for the duration of the project.
5. A list of additional persons authorized to sign applications and pick up approved permits for your company.
6. Proof of insurance as set forth in Section 8 (B) above.

PLUMBING REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. All journeyman, tradesman, and apprentices performing work must be registered and possess a current license at the time of registration and for the duration of the project.
5. A list of additional persons authorized to sign applications and pick up approved permits for your company.
6. Proof of insurance as set forth in Section 8 (B) above.

MECHANICAL REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid Masters license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. A list of additional persons authorized to sign and pick up approved permits for your company.
5. Proof of insurance as set forth in Section 8 (B) above.

IRRIGATION REGISTRANT:

1. Contractor registration application filled out completely.
2. A valid Irrigation license is required at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. A list of additional persons authorized to sign applications and pick up approved permits for your company.
5. Proof of insurance as set forth in Section 8 (B) above.

BACKFLOW TESTER REGISTRANTS:
1. Contractor registration application filled out completely.
2. A valid Backflow Testers License is required at the time of registration at the time of registration and for the duration of the project.
3. A valid State of Texas driver's license or photo I.D. card.
4. Proof of insurance as set forth in Section 8 (B) above.

SIGN CONTRACTOR REGISTRANT:
1. Contractor registrant application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A list of additional persons authorized to sign applications and pick up approved permits for your company.
4. Proof of insurance as set forth in Section 8 (B) above.

THIRD PARTY INSPECTOR REGISTRANT:
1. Contractor registration application form filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. A list of qualified persons authorized to perform inspections.
4. Proof of certification
5. Proof of insurance as set forth in Section 8 (B) above.

ROOFING REGISTRANT:
1. Contractor registration application filled out completely.
2. Valid State of Texas drivers license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

CONCRETE REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

FENCE / SCREENING WALL REGISTRANT:
1. Contractor registration application filled out completely.
2. A valid State of Texas driver's license or photo I.D. card.
3. Proof of insurance as set forth in Section 8 (B) above.

D.    Any registered Contractor that fails to maintain compliance with any provisions of this section shall cease all work being performed at the time the Contractor is no longer in compliance.

## SECTION 9. BOARD OF APPEALS

A.    In order to hear and decide appeals of orders, decisions, or determinations made by the Building Official relative to the application and interpretation of this Ordinance, there shall be and is hereby created a Board of Appeals. The Town Council of the Town of Lakewood Village, Texas shall serve as the Board of Appeals. The Building Official shall be an ex-officio member of and shall act as secretary to the Board but shall have no vote on any matter before the Board. The Board shall adopt the rules of procedure for conducting its business, and shall render all decisions and finding in writing to the appellant with a duplicate copy to the Building Official.

   1.    The powers of the Board shall be as follows:

      a.    To hear appeals from decisions of the Building Official

      b.    To hear requests for the use of a material or method of construction not prescribed or authorized by this code, and to authorize the use when, in the Board's judgment, the material or method of construction is at least equivalent to that prescribed; and

      c.    To hear complaints, after suspension of any Contractor's registration as set forth in Section 4(I), from the Building Official, or any citizen, arising against any person, firm, or business registered with the Town to perform construction work of any type and shall have the power, after a hearing, to revoke or suspend the registration for any of the following reasons:

         (i)     Chronic violation of these codes and this ordinance:
         (ii)    Misrepresentation of material facts in obtaining the said registration or any renewal thereof:
         (iii)   Chronic failure to secure permits, inspections, or approvals as required by this code;
         (iv)    Use of said registration to obtain a permit for another person, firm, or corporation;
         (v)     Causing liens, other than the registrant's, to be improperly created on a citizen's property;
         (vi)    Threatening any citizen in any manner;
         (vii)   Committing any crime of violence within the Town; or
         (viii)  Committing any single violation of these codes or this ordinance placing any citizen in imminent danger.

2.  The Board of Appeals shall have no authority relative to interpretation of the administration provisions of this Code nor shall the Board be empowered to waive requirements of this Code.

## SECTION 10. PREMISE IDENTIFICATION

A.  Approved numbers or addresses shall be placed on all new and existing buildings in such a position as to be plainly visible and legible from the street or road fronting property. Said numbers shall contrast with their background, and shall comply with the following provisions, as applicable:

1.  Residential occupancies shall have numbers a minimum of six (6) inches in height and be in a contrasting color to the background;

2.  Duplexes shall have street and/or building numbers a minimum of eight (8) inches in height. When deemed necessary by the Town the street and/or building numbers may be required to be of a larger size for immediate and visible identification;

3.  If the structure is more than two hundred (200) feet from a public street, the address shall also appear at the front or main entry to the property with numbers a minimum of six (6) inches in height.

4.  When deemed necessary by the Town street or building numbers may be required on more than one side of the structure or property;

5.  Building and/or street numbers shall be located in an area and lighted in a manner that will make them immediately discernible as approved by the Town.

## SECTION 11 NEW CONSTRUCTION REQUIREMENTS

A.  Temporary buildings or structures such as reviewing stand and other miscellaneous structures, sheds, canopies, or fences used for the protection of the public around and in conjunction with construction work may be erected only by special permit from the Town Building Official for a limited period of time to be designated in said permit; provided, however, that no portable or moveable trailer or similar building or structure shall be permitted during any period of construction.

B.  Temporary buildings or structures need not comply with the type of construction or fire resistive time periods required by this code. Temporary buildings or structures shall be completely removed upon the expiration of the time limit stated in this permit with all surface area restored to its natural state.

C.  Portable toilets shall be provided at all construction job sites for which a building permit is required by this code.

D.    All Contractors will comply with the town's construction site refuse control program as outlined here. All residential and/or commercial construction sites shall be responsible for providing at a minimum, one 20-yard open top roll-off bulk trash container for construction debris and refuse, or a temporary refuse containment structure with minimum dimensions of 8' L x 8' W x 4' H made of 1" exterior plywood secured tightly on all four corners and to the ground in some manner. The container should have a hinged drop down or swing gate on one side for debris removal access. The contractor will also provide a temporary removable top cover either of exterior plywood and or a heavy tarp for either type of debris storage receptacle to prevent flying debris from possible windy or stormy conditions, etc. If a roll-off trash receptacle is used it must be obtained from the waste company that is currently under contract with the Town of Lakewood Village.

Contractors are required to keep construction sites free and clear of trash at all times including no overflowing trash receptacles. The town administrative staff and designated building inspector reserve the right to perform unannounced spot inspections. If the construction site is found in violation of this ordinance then the construction site will be RED FLAGGED and an IMMEDIATE Stop Work Order will be issued with possible suspension of any registration. Once Red Flagged, the contractor will need to take corrective action to bring the work site to an acceptable condition and when compliance is obtained, the Red Flag will be lifted and construction activities may be resumed.

E.    Effective erosion control is required prior to any construction activity and will include the installation of an adequate and repositionable silt fence which should run along the property lot's inside border boundary above and adjacent to the drainage ditch area and the public roadway. The silt fence will be constructed in a practical manner with the necessary openings so as to allow easy entry and exit from the roadway to the property construction site for all necessary construction equipment and machinery.

F.    It is the responsibility of the Contractor to place the proper size culvert on the lot to gain access to the lot prior to any construction. Upon completion of construction the culverts ends must be in concrete and the culvert must continue the direction of the flow of drainage. All culvert sizes are obtained through the Town.

G.    A Contractor is prohibited from adding dirt to the lot, benching the lot, or preparation of the lot prior to obtaining permit approval.

H.    It is the responsibility of the Contractors to keep a copy of all approved plans on the construction site at all times. They must be placed in a water tight container. All paperwork due to the inspector for inspection purposes and in compliance with this ordinance must be placed within this container. The replacement of any lost or stolen permits will be at a cost of $10.00 per occurrence.

I.    Energy Conservation Code Compliance

1    All residential construction shall comply with the following simplified requirements or provide other approved energy compliance documentation (i.e. MecCheck, ResCheck, or Energy Star). These are minimum requirements.

    1.    Attic Insulation (blown) = R38
    2.    Exterior Sloped Ceilings (blanket) = R19
    3.    Floor insulation (blanket) = R19
    4.    Exterior Wall Insulation = R13
    5.    Environmental Air Duct in unconditioned Spaces = R6 (supply & return)
    6.    Windows = U.65 SHGC = .40
    7.    A/C system efficiency minimum of 13 SEER

2.    Each window assembly (doors with 50% or more glazing) is required to display at the time of insulation a certificate rating label indicating the National Fenestration Rating Council has tested the assembly. The label shall not be removed until after insulation inspection has been completed and approved. Window assemblies, which do not bear a certification rating shall be failed and removed from the window opening.

J.    Energy Star Homes

1.    A third party rater plan review and inspection/testing by RESNET agency certified for the State of Texas will be required. Both voluntary and mandatory compliance will require two complete copies of rater analysis with building plan submission for building permit. Raters air-conditioning must be within 1% of plan/permit area. Contractors shall employ the same rater for plan review, inspection, and testing.

2.    A third party verification form must be completely filled out, indicating final "HERS" rating score prior to the builders request for final inspection and certificate of occupancy.

3.    To verify compliance with Environmental Protection Agency, the Town of Lakewood Village will not issue a certificate of occupancy until all required documentation has been submitted and approved. This will only apply to homes that fall under this category.

K.    Upon completion of construction, no one may occupy or move any objects into or onto the property of new construction until a Certificate of Occupancy inspection has been performed and passed by an official of the Town. This is a separate inspection from the Final 100% complete inspection. Violation of this requirement will result in all utilities being disconnected until such time as a Certificate of Occupancy has been issued after all the proper inspections have been performed.

L.    Secondary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met. Any secondary structure

built on any adjacent lot must conform to the minimum square footage requirements of that section as stated in Ordinance 83-01A Section 9 as amended or revised unless both lots are re-platted as a single lot and said plat is filed on record with Denton County, Texas. Proper proof of filing with Denton County, Texas must be provided to the Town at the time the building permit is sought.

M.    All new building construction will have a garage with the following requirements:

    1.    There shall be no front-facing garages on any new construction. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

    2.    There shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

N.    Driveways

    1. All new building construction will have a driveway. The pouring requirements are as follows:

        a. The Contractor shall notify the Town of when they are scheduled to pour within 48-hours prior to pouring.
        b. No concrete will be poured before 7:00 a.m.
        c. At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor and concrete registrant will be responsible for turning in all weight tickets to the Town.
        d. As per Weight Ordinance No. 98-09 Section 3 (C) as amended or revised, the gross weight limit on Town streets for a ready-mix concrete truck shall be 58,420 lbs.
        e. The minimum thickness of six (6) inches and minimum compression strength shall be 3000 psi at 28 days.
        f. Driveways shall be a minimum of 10 foot wide, in Town Section 5 driveways shall be a minimum of 12 foot wide.

        g. 3/8 inch rebar with no greater than 16 inch centers is required on all driveway construction. Re-bar placement must be inspected 48-hours prior to the pouring of concrete.
        h. All driveways must properly tie into the street. The Contractor is responsible for any road damage that may occur during the construction of the permitted project. All roads must be restored at least to their original condition prior to receiving their 100% final inspection.
        i. It shall be unlawful for any person, firm, or corporation or other legal entity to erect, construct, enlarge, alter, repair, move, improve, convert, or demolish

any flatwork or driveway or cause to permit the same to be done in violation of this ordinance.

    j.   A driveway permit that would place the water meter, water valve and meter box in the driveway shall provide, as a condition of said permit, for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at an additional cost of $75.00. A licensed plumber who is registered to work in the Town of Lakewood Village shall perform the replacement of the water meter, water valve, and meter box.

O.    A form survey will be completed at the time that the forms are in position before the concrete is poured to ensure that the location of the slab is in compliance with all town ordinances. A copy of the form survey will be submitted to the Town.

P.    Height. There shall be no buildings, residential or commercial, that exceed 35 foot in height. Any exceptions are outlined in the Zoning Ordinance 83-01A, as amended or revised.

Q.    The exterior facades of a main building or structure, excluding glass windows and doors shall be constructed of eighty (80) percent masonry requirement on all new construction for anything over 200 square feet or greater. Cementatious fiber board shall not be considered masonry; cementatious fiber board may be used to replace existing siding on existing structures, with pre-approval of the Building Official. Cementatious fiber board may also be used for architectural features, including window box-outs, bay windows, roof dormers, garage door headers, columns, or other architectural features approved by the Building Official.

R.    Wood roof shingles are prohibited.

S.    The use of Stucco, various types of stucco and installation procedures must have prior approval from the Building Official. If approved, the builder must provide the installer's certification and certificate for the Town's files. Only true three coat stuccoing will be considered. Additional inspections are required at, hath, scratch coat, and brown coat.

T.    Exterior Insulation Finish System (EIFS) shall not be permitted on any construction.

U.    Construction work times shall begin no earlier than 7:00 a.m. and shall end no later than 7:00 p.m.

V.    All roof pitches shall have a minimum of four (4) inches over twelve (12) inches.

W.    The Town will grant approval to initiate electrical service for permanent or temporary use.

X.    All new construction shall have gutters installed in accordance to the submitted drainage plan with the minimum of the entire front of house, all exits, and above all air-conditioning units.

Y.    It is also the responsibility of the Contractor to ensure the grading of the ditches or easements continue the flow of drainage prior to receiving the 100% Final Inspection. Lot to lot drainage is not allowed.

Z.    All property corners must be permanently identifiable.

## SECTION 12 INSPECTION REQUIREMENTS

A. <u>Request for Inspections</u>

<u>FAXED REQUESTS:</u>
Faxed requests will be accepted <u>until 8:00 a.m.</u> for inspection within 48 hours. Official time will be accounted for based on time noted on the received fax. Receipt of any faxed request without a date and time set forth in a proper header will not be processed. Missing the cut off time will require the inspection to be made on the following business day. Fax number is provided in the Contractor Guidelines

<u>TELEPHONE REQUESTS:</u>
Telephone requests will be accepted <u>until 11:00 AM</u> for inspection within 48 hours.
Official time will be accounted for based on the time call is received or by voice mail time stamp. Missing the cut off time will require the inspection to be made on the following business day. All phone numbers are provided in the Contractors Guideline.

Inspector will leave the inspection tag on site in a designated water-tight box that is provided by the Contractor.

B.    Building permits will include inspections performed during the following construction stages:

1. T-Pole
2. Plumbing Rough, form board surveys are due at this time on site
3. Water Tap
4. Sewer Tap
5. Pier and Beam
6. Foundation
7. Pre-frame, prior to any roof decking, soffit, or fascia
8. Frame
9. Mechanical
10. Electrical
11. Plumbing Top Out
12. 4 foot brick tie inspection
13. Electrical/Gas Meter Release

14. Flatwork
15. 100% Final
16. Certificate of Occupancy

- All Third party insulation inspections reports are due prior to the electrical/gas meter release.
- At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor will be responsible for turning in all weight tickets to the Town.
- Inspectors will not provide more than ten (10) items of which need corrected. Once ten (10) items have been noted for corrections the inspection will be stopped and failed until all items have been corrected.
- Termite letter, Customer Service Inspection letter, and the Final Grade survey is due on site at the 100% Final Inspection.
- Piers must be inspected by an independent contractor. A copy of the inspection must be supplied to the Town prior to calling in the next inspection.

C.  Mandatory re-inspections. All Contractors shall have one (1) week to fix all items from the prior inspection. The Building Official will immediately fail and discontinue the re-inspection upon finding a prior failed item that was listed on the prior inspection tag. All items must be inspected prior to cover up, i.e. concrete and sheet rock. Mandatory re-inspections shall continue weekly until such time as the inspection is passed, and subject to the re-inspection fees below.

D.  Re-inspection fees. The Town shall charge up to $100.00 for the first re-inspection. With each subsequent re-inspection the Town shall increase the re-inspection fee, for the failed inspection only, by $100.00 each time it fails, up to a maximum of $1,000.00 per inspection.

E.  Local amendments to the International Plumbing Code for new construction will meet the following:

1. No air admittance valve shall be permitted
2. All underground domestic water supply shall be copper, 1 inch copper type L service line with a one inch meter.
3. Termite shield wire mesh is required on all plumbing into the house.

F.  Local amendments to the National Electric Code for new construction will meet the following:

1. Minimum size wire shall be #12.

G.  It is the responsibility of the Contractor to provide what the inspector may need to perform the inspections, i.e. a ladder, temporary lighting, etc. Temporary lighting is required for all House Seconds and Rough Inspections to be installed prior to request for

inspections. Should temporary lighting not be in place, the inspection will be failed and subject to 12 (C) above.

H.      All Sprinkler Contractors must have the Backflow Prevention Form filed with the Town of Lakewood Village prior to hooking the system up to the water supply.

I.      All inspections must be performed during daylight hours.

## SECTION 13. EXISTING CONSTRUCTION / REPAIRS / REMODELING REQUIREMENTS

A.      All remodels and repairs for buildings over 200 square feet, inspections are required only as they apply to the permitted improvements, applicable building codes and Town ordinances.

B.      All new construction foundation plans are to be drawn and sealed by an Engineer licensed by the State of Texas.

C.      An application for flatwork must be submitted to the Town for approval. Flatwork must follow all other flatwork requirements within this ordinance.

D.      Erosion control is required prior to any construction and must be maintained throughout construction completion.

E.      All remodels, repairs, alterations, must have two (2) copies of the plot plans turned into the Town showing the actual dimensions and shape of the lot to be built upon or altered, the exact sizes and locations on the lot of any already existing buildings, and the location and dimensions of the proposed building or alteration.

F.      Two copies of the existing house plans prior to any alterations, remodels or repair must be turned in prior to approval of the permit.

## SECTION 14. AUTHORITY OF THE BUILDING OFFICIAL

The Town's Building Official shall have the authority and power to enforce all provisions of all ordinances passed and approved by the Town of Lakewood Village, Texas and all codes contained within this ordinance and all amendments.

## SECTION 15. PENALTY

It shall be unlawful for any person to violate any provision of this ordinance. Any person violating or failing to comply with any provisions hereof shall be fined, upon conviction, in an amount not more than two thousand dollars ($ 2,000.00). Each day during or on which a violation occurs or continues shall be a separate offense.

## SECTION 16. REPEALER

Previous Building Code ordinance 06-06A and all of its amendments and revisions are hereby repealed in their entirety.

## SECTION 17. SEVERABILITY

The provisions of this ordinance are severable and if any section, article, paragraph, sentence, clause, phrase, or word in this ordinance or application thereof to any person or circumstance is held invalid or unconstitutional by a Court of competent jurisdiction such holding shall not affect the validity of the remaining portions of this ordinance despite such invalidity, which remaining portions shall remain in full force and effect.

## SECTION 18. EFFECTIVE DATE

This ordinance shall become effective from and after its date of adoption and publication as required by law.

**PASSED** and **APPROVED** by the Town Council of the Town of Lakewood Village, Texas this the 14th day of January, 2010.


_____
Mike Schnittker, Mayor
Town of Lakewood Village, Texas


ATTEST:


_____
Linda Asbell, Town Secretary
Town of Lakewood Village, Texas



EXHIBIT A
FEES:

A.    Building Permit Fees inside the Town– the building permit fee shall be $1,500.00 for the minimum square footage, plus $1.25 for each square foot of the building or structure which exceeds the minimum square footage requirement of the particular zoning district in which the building is located.

B.    Building Permit Fees inside the ETJ - The building permit fee shall be $1.25 for each square foot of the building

C.    Water/Sewer Taps –The charges for tapping water mains and conveying the water to the property line shall be a minimum of $900.00 plus any other expenses the town incurs. All costs and expenses for labor and materials incurred by the Contractor which costs include, but are not limited to, meter boxes, couplings, tubing, and necessary excavation work are the responsibility of the Contractor. It is the responsibility of the Contractor to ensure all meters, water shut off valves, and fire hydrants are brought up to grade by use of risers prior to receiving the water tap inspections. Meter boxes cannot be made of plastic.

D.    Flatwork Permit Fees –$250.00 for any flatwork, other than foundations, which includes, but is not limited to, flatwork greater than 200 square foot or greater, sidewalks, driveways and patios for the first two inspections, each subsequent inspection shall be $75.00 per inspection after the second inspection.

E.    Driveway Permits –$200.00. A driveway permit that would place the water meter, water valve and meter box in the driveway shall have a condition of said driveway permit for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at the cost of $75.00

F.    Plan Review Fees – When documents are submitted a plan review fee shall be paid at the time of submittal. The plan review fee shall be 65% of the building permit fee. The plan review fee is a separate fee from all other fees and is in addition to the permit fee.

G.    Registration Fees -- General Contractor $500, sub-contractors and others $100 per person/per year

H.    Fence Permit -- $150.00

I.    Sprinkler Permit -- $150.00.

J.    Electrical Permit -- $150.00

K.    Plumbing Permit -- $150.00

L.   Miscellaneous Permits -- $150.00 if not more than two inspections are required. For each inspection required over two an additional fee of $75 will be applicable.

L.   Pool Permits -- $500.00. Ordinance 98-06A is incorporated herein as revised or amended. Soil reports are required for all pool construction prior to permitting.

M.   Spa Permits -- $250.00. Ordinance 98-06A is incorporated herein as revised or amended.

N.   The Board of Appeals fee for structures up to 500 square feet - $100.00, 501 square feet up to 5,000 square feet - $250.00, structures over 5001 square feet - $500.00.

O.   Stucco Exterior Finish -- $250, in addition to any necessary building permits, requires 3 additional inspections.

# Exhibit 22

**STATE OF TEXAS**  )

)  **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**  )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-04. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-04

**AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL MECHANICAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE**

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Mechanical Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2006 International Mechanical Code</u>. The International Mechanical Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the mechanical code for Lakewood Village, regulating the design, installation, maintenance, addition, alteration, and inspection of mechanical systems that are permanently installed and utilized to provide control of environmental conditions and related processes within Lakewood Village (The "2006 International Mechanical Code"). The 2006 International Mechanical Code is made a part of this Ordinance as if fully set forth herein

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of

the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



The following additions, deletions, and amendments to the 2006 International Mechanical Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Mechanical Code is amended as follows:

**Section 102 Applicability** of the 2006 International Mechanical Code is amended as follows:

**102.8 Referenced codes and standards.** The codes and standards referenced herein shall be those that are listed in Chapter 15 and such codes, when specifically adopted, and standards shall be considered as part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

**Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Mechanical Code is amended as follows:

**106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**106.4.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents

for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.5.2 Fee schedule.** The fees for mechanical work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.5.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than 80 percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than 50 percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 3 Regulations** of the 2006 International Mechanical Code is amended as follows:

**Section 304 Installation** of the 2006 International Mechanical Code is amended as follows:

**304.9 Clearances from grade.** Equipment and appliances installed at grade level shall be supported on a level concrete slab extending above adjoining grade a minimum of 3 inches (76 mm) or shall be suspended a minimum of 6 inches (152 mm) above adjoining grade.

**Section 306 Access and service space** of the 2006 International Mechanical Code is amended as follows:

**306.3 Appliances in attics.** Attics containing appliances requiring access shall be provided with an opening and unobstructed passageway large enough to allow removal of the largest appliance. The passageway shall not be less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) in length measured along the center line of the passageway from the opening to the appliance. The passageway shall have continuous unobstructed solid flooring not less than 24 inches (610 mm) wide. A level service space not less than 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present at the front or service side of the appliance. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm by 762 mm), where such

dimensions are large enough to allow removal of the largest appliance. As a minimum, access to the attic space shall be provided by one of the following:

1. Permanent stairs or ladder fastened to the building.
2. A pull down stair with a minimum 300 lb. rating.
3. An access door from an upper floor.

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.

2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**Chapter 5 Exhaust Systems** of the 2006 International Mechanical Code is amended as follows:

**Section 504 Clothes dryer exhaust** of the 2006 International Mechanical Code is amended as follows:

**504.6.1 Maximum length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the outlet terminal. The maximum length of the duct shall be reduced 2 1/2 feet (762 mm) for each 45 degree (0.79 rad) bend and 5 feet (1524 mm) for each 90 degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exception:** Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for such dryer are provided to the code official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by six inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning:** Dryer must be approved for vent length not to exceed 40 feet total developed length (TDL). Duct Size: (*Insert Number*) Total Developed Length: (*Insert Number*)

**Chapter 6 Duct systems** of the 2006 International Mechanical Code is amended as follows:

**Section 603 Duct construction and installation** of the 2006 International Mechanical Code is amended as follows:

**603.6.1.1 Duct length.** For other than residential construction, flexible ducts shall be limited to 5 foot connections at end of duct runs.

End of Exhibit "A"

# Exhibit 23

**STATE OF TEXAS** )
                    )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-08. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# TOWN OF LAKEWOOD VILLAGE, TEXAS

## ORDINANCE NO. 11-08

**AN ORDINANCE TO ADOPT THE 2005 NATIONAL ELECTRICAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2005 Edition of the National Electrical Code, save and except the deletions and amendments set forth below.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:**

SECTION 1: <u>Findings Incorporated</u>. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: <u>Adoption of the 2005 National Electrical Code</u>. The National Electrical Code, 2005 Edition, copyrighted by the National Fire Protection Association including Annex G, save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Electrical code for Lakewood Village, regulating the construction, alteration, removal, use, and/or maintenance of any electrical wiring, apparatus, device, or system within Lakewood Village (The "2005 National Electrical Code"). The 2005 National Electrical Code including Annex G is made a part of this Ordinance as if fully set forth herein.

SECTION 3: <u>Savings/Repealing Clause</u>. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: <u>Penalty Provision</u>. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided,

however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



The following additions, deletions, and amendments to the 2005 National Electrical Code adopted herein are hereby approved and adopted.

**Chapter 3 Wiring Methods and Material** of the 2005 National Electrical Code is amended as follows:

**Article 300 Wiring Methods** of the 2005 National Electrical Code is amended as follows:

**300.1 Scope**
**(A) All Wiring Installations** This article covers wiring methods for all wiring installations unless modified by other articles.

**Article 310 Conductors for General Wiring** of the 2005 National Electrical Code is amended as follows:

**310.2 Conductors**
**(B) Conductor Material** Conductors in this article shall be of copper unless otherwise specified. Use of aluminum 1/0 and larger is allowed for multifamily and commercial use only. All grounding and bonding conductors shall be of copper. All electrical conductors for commercial, office, or industrial installation shall be installed in approved conduits or raceways regardless of type of construction.

**310.5 Minimum Size of Conductors** The minimum size of conductors shall be as shown in Table 310.5, except for low voltage control circuits.

**Table 310.5 Minimum Size of Conductors**

| Conductor Voltage Rating (Volts) | Minimum Conductor Size (AWG) | |
|---|---|---|
| | Copper | Aluminum or Copper-Clad Aluminum Aluminum (only feeders allowed) |
| 0–2000 | 12 | 1/0 |
| 2001–8000 | 8 | 1/0 |
| 8001–15,000 | 2 | 1/0 |
| 15,001–28,000 | 1 | 1/0 |
| 28,001–35,000 | 1/0 | 1/0 |

**310.14 Aluminum Conductor Material**

Solid aluminum conductors 8, 10, and 12 AWG shall be made of an AA-8000 series electrical grade aluminum alloy conductor material. For multifamily and commercial use only. Stranded aluminum conductors 8 AWG 1/0 through 1000 kcmil marked as Type RHH, RHW, XHHW, THW, THHW, THWN, THHN, service-entrance Type SE Style U and SE Style R shall be made of an AA-8000 series electrical grade aluminum alloy conductor material. Documentation of all installations shall be provided for torque and terminations as required by article 110.

**ARTICLE 334 Nonmetallic-Sheathed Cable: Types NM, NMC, and NMS** of the 2005 National Electrical Code is amended as follows:

### 334.12 Uses Not Permitted
(A) Types NM, NMC, and NMS Types NM, NMC, and NMS cables shall not be permitted as follows:

- (1) In any dwelling or structure not specifically permitted in 334.10(1), (2), and (3)
- (2) Exposed in dropped or suspended ceilings in other than one- and two-family and multifamily dwellings
- (3) As service-entrance cable
- (4) In commercial garages having hazardous (classified) locations as defined in 511.3
- (5) In theaters and similar locations, except where permitted in 518.4(B)
- (6) In motion picture studios
- (7) In storage battery rooms
- (8) In hoistways or on elevators or escalators
- (9) Embedded in poured cement, concrete, or aggregate
- (10) In hazardous (classified) locations, except where permitted by the following:
  - a. 501.10(B)(3)
  - b. 502.10(B)(3)
  - c. 504.20
- (11) In building where it would be required to pass through either factory or field punched, cut, or drilled slots or holes in metal members.

**Chapter 6 Special Equipment** of the 2005 National Electrical Code is amended as follows:

**ARTICLE 680 Swimming Pools, Fountains, and Similar Installations** of the 2005 National Electrical Code is amended as follows:

### 680.71 Protection
Hydromassage bathtubs and their associated electrical components shall be protected by a dedicated_ground-fault circuit interrupter. All 125-volt, single-

phase receptacles not exceeding 30 amperes and located within 1.5 m (5 ft) measured horizontally of the inside walls of a hydromassage tub shall be protected by a ground-fault circuit interrupter(s).

**Annex G Administration and Enforcement** of the 2005 National Electrical Code is amended as follows:

**80.15 Electrical Board.** This Section deleted in its entirety.

**80.23 Notice of Violations, Penalties.**

Notice of violations and penalties shall conform to 80.23(A) and (B).

(B) Penalties.

(1)     Any person who fails to comply with the provisions of this Code or who fails to carry out an order made pursuant to this Code or violates any condition attached to a permit, approval, or certificate shall be subject to the penalties established by this jurisdiction.

(2)     Failure to comply with the time limits of an abatement notice or other corrective notice issued by the authority having jurisdiction shall result in each day that such violation continues being regarded as a new and separate offense.

(3)     Any person who commences any work on an electrical system before obtaining the necessary permits shall be subject to a Penalty of 100% of the usual permit fee in addition to the required permit fees.

**80.25 Connection to Electricity Supply.**

Connections to the electric supply shall conform to 80.25(A) through (E).

**80.27 Inspector's Qualifications.**

(A) Certificate.

All electrical inspectors shall be certified by a nationally recognized inspector certification program. The certification program shall specifically qualify the inspector in electrical inspections. No person shall be employed as an Electrical Inspector unless that person is the holder of an Electrical Inspector's certificate of qualification, or can obtain the certificate of qualification within 6 months of initial hire issued by a nationally recognized inspector certification program.

(B) Experience.

Electrical inspector applicants shall demonstrate the following:

(1)    Have a demonstrated knowledge of the standard materials and methods used in the installation of electric equipment

(2)    Be well versed in the approved methods of construction for safety to persons and property

(3)    Be well versed in the statutes and ordinances of The Town of Lakewood Village relating to electrical work and the National Electrical Code, as approved by the American National Standards Institute

(4)    Have had at least 1 years' experience as an Electrical Inspector or 5 years in the installation of electrical equipment. In lieu of such experience, the applicant shall be a graduate in electrical engineering or of a similar curriculum of a college or university considered by the Board as having suitable requirements for graduation and shall have had two years' practical electrical experience.

**80.29 Liability for Damages.**

Article 80 shall not be construed to affect the responsibility or liability of any party owning, designing, operating, controlling, or installing any electric equipment for damages to persons or property caused by a defect therein, nor shall the Town of Lakewood Village or any of its employees or agents be held as assuming any such liability by reason of the inspection, reinspection, or other examination authorized.

**80.35 Effective Date.**

Article 80 shall take effect July 1, 2009 after its passage and publication.

**End of Exhibit "A"**

# Exhibit 24

**STATE OF TEXAS**      )

                         )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**     )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-09. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 11-09

AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL PLUMBING CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Plumbing Code, save and except the deletions and amendments set forth below.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

SECTION 1: Findings Incorporated. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: Adoption of the 2006 International Plumbing Code. The International Plumbing Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Plumbing Code for Lakewood Village, regulating the erection, installation, alteration, repairs, relocation, replacement, addition to, use or maintenance of plumbing systems within Lakewood Village (The "2006 International Plumbing Code"). The 2006 International Plumbing Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: Savings/Repealing Clause. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and

every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 12th day of MAY, 2011.

_____
Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

_____
Linda Asbell, Town Secretary
Town of Lakewood Village

**Town of Lakewood Village**
**2006 International Plumbing Code**

The following additions, deletions, and amendments to the 2006 International Plumbing Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Plumbing Code is amended as follows:

 **Section 102 Applicability** of the 2006 International Plumbing Code is amended as follows:

> **102.8 Referenced codes and standards.** The codes and standards referenced herein shall be those that are listed in Chapter 15 and such codes, when specifically adopted, and standards shall be considered as part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

> **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Plumbing Code is amended as follows:

> **106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

> **106.5.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced and received a minimum of one approved inspection within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new

permit shall be first obtained and the fee, therefore, shall be one half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.6.2 Fee schedule.** The fees for Plumbing work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.6.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than 80 percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than 50 percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 9. Vents** of the 2006 International Plumbing Code is amended as follows:

**Section 917 Air Admittance Valves** of the 2006 International Plumbing Code is amended as follows:

**917.3 Where permitted.** Individual, branch and circuit vents shall be permitted to terminate with a connection to an individual or branch-type air admittance valve. Stack vents and vent stacks shall be permitted to terminate to stack-type air admittance valves. Individual and branch-type air admittance valves shall vent only fixtures that are on the same floor level and connect to a horizontal branch drain. The horizontal branch drain having individual and branch-type air admittance valves shall conform to Section 917.3.1 or 917.3.2. Stack-type air admittance valves shall conform to Section 917.3.3. Air admittance valves shall only be installed with the prior written approval of the Building Official.

End of Exhibit "A"

# Exhibit 25

**STATE OF TEXAS**      )

                        )        **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 11-11. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 11-11

AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, AMENDING ORDINANCE 08-06 AND ALL OTHER ORDINANCES OF THE TOWN REGULATING SUBDIVISIONS AND OTHER PROPERTY; PROVIDING A SEVERABILITY CLAUSE; PROVIDING A SAVINGS, AMENDMENT AND REPEAL CLAUSE; AND PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council ("Town Council") desires to amend Ordinance 08-06 and all other ordinances regarding the Town's rules and regulations for subdivisions and property development as authorized by Chapter 212, Texas Local Government Code, as amended; and

WHEREAS, the Town Council finds that there is a public necessity requiring adoption of this ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development and extend such rules and regulations to the extraterritorial jurisdiction of the Town ("ETJ") to protect the public health, welfare and safety of the citizens of the Town and the ETJ; and

WHEREAS, the Town Council is authorized and empowered to apply the Town's regulations for subdivisions and property development to its ETJ pursuant to Section 212.003 of the Texas Local Government Code; and

WHEREAS, the Town Council has conducted a public hearing on the application of the Town's regulations for subdivisions and property development to its ETJ, and the Town Council finds and determines that all required notices and hearings in this regard have been given and that the meeting at which the public hearing has been held and at which this ordinance is being adopted were open to the public and conducted according to applicable law; and

WHEREAS, the Town Council hereby finds and determines that the adoption of this ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

Sec. 1. Findings Incorporated.

The findings set forth above are incorporated into the body of this ordinance as if fully set forth herein.

Sec. 2. Extension of Subdivision Rules and Regulations, Building Standards and

**Construction Permits and Fees, and Uniform Codes to the Extraterritorial Jurisdiction.**

This ordinance is hereby adopted under the authority of the Constitution and laws of the State of Texas, including Texas Local Government Code Chapter 212, and is being adopted after conducting a public hearing on the matter.

The Town Council hereby amends Ordinance 08-06, the Town of Lakewood Village Subdivision and Property Regulations by extending the application of the Town of Lakewood Village Subdivision and Property Regulations to the extraterritorial jurisdiction of the Town, as that area may exist from time to time. This ordinance shall be applicable to the filing of plats, the subdivision of land, and development of property within the corporate limits of the Town and its extraterritorial jurisdiction as they may exist from time to time adjusted.

All ordinances of the Town, including Ordinance 10-01, which by such ordinance(s) the Town Council has adopted and made applicable to the Town the uniform codes, including but not limited to those concerning and applicable to building, plumbing, mechanical, energy, fuel and gas, property maintenance, electrical, fire and all appendices thereto, and all ordinance(s) concerning and related to permits and permit fees for building and construction, shall be and are hereby amended to apply and extend all such ordinances and their provisions to the ETJ of the Town to the full extent as permitted by law.

The Town shall have all remedies and rights provided by Texas Local Government Code, Chapter 212, with regard to the control and approval of subdivisions and plats and property development both within the Town and within its ETJ to the full extent as permitted by law.

**Sec. 3. Severability.**

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

**Sec. 4. Savings, Amendment and Repeal.**

This ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those ordinances are in direct conflict with the provisions of this ordinance; provided, however, that Ordinance No. 08-06 of the Town and all other ordinance and parts of ordinance of the Town in conflict with this ordinance are hereby amended and repealed to the extent of such conflict, but provided that any complaint, action, cause of

action, or claim which prior to the effective date of this ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

### Sec. 5. Effective Date.

This ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** by the Town Council of the Town of Lakewood Village on the 11th day of March, 2011.

_____
Mike Schnittker, Mayor

ATTEST:

_____
Linda Asbell, Town Secretary

APPROVED AS TO FORM:

_____
Wm. Andrew Messer, Town Attorney

action, or claim which prior to the effective date of this ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

### Sec. 5. Effective Date.

This ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** by the Town Council of the Town of Lakewood Village on the 11th day of March, 2011.

Mike Schnittker, Mayor

ATTEST:

Linda Asbell, Town Secretary



APPROVED AS TO FORM:

Wm. Andrew Messer, Town Attorney
Bennett M. Wyse, Assistant Town Attorney

# Exhibit 26

STATE OF TEXAS       )

                              )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**   )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Town of Lakewood Village Ordinance 11-13. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 11-13

AN ORDINANCE TO ADOPT THE 2006 FUEL GAS CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Fuel Gas Code, save and except the deletions and amendments set forth below.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

SECTION 1: Findings Incorporated. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: Adoption of the 2006 International Fuel Gas Code. The International Fuel Gas Code, 2006 Edition, copyrighted by the International Code Council, Inc., save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Fuel Gas code for Lakewood Village, regulating the design, installation, maintenance, addition, alteration, and inspection of Fuel Gas systems that are permanently installed and utilized to provide control of environmental conditions and related processes within Lakewood Village (The "2006 International Fuel Gas Code"). The 2006 International Fuel Gas Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: Savings/Repealing Clause. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and

every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 14th day of APRIL, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



**Exhibit "A"**

**Town of Lakewood Village**
**2006 International Fuel Gas Code**

The following additions, deletions, and amendments to the 2006 International Fuel Gas Code adopted herein are hereby approved and adopted.

**Chapter 1. Administration** of the 2006 International Fuel Gas Code is amended as follows:

       **Section 102 Applicability** of the 2006 International Fuel Gas Code is amended as follows:

       **102.8 Referenced codes and standards.** The codes, when specifically adopted by the Town of Lakewood Village, and standards referenced in this code shall be those that are listed in Chapter 8 and such codes and standards shall be considered part of the requirements of this code to the prescribed extent of each such reference. Where differences occur between provisions of this code and the referenced standards, the provisions of this code shall apply. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Any reference to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted by the Town of Lakewood Village as it currently exist or may be amended. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

       **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and the manufacturer's installation instructions shall apply.

**Section 106 Permits** of the 2006 International Fuel Gas Code is amended as follows:

       **106.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

       **106.4.3 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced and received a minimum of one approved inspection within 180 days from the date of such permit, or if the work

authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be ~~one-half~~ the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**106.5.2 Fee schedule.** The fees for Fuel Gas work shall be as indicated in the Town of Lakewood Village Building Inspections Fee Schedule

**106.5.3 Fee refunds.** The code official shall authorize the refunding of fees as follows.

1. The full amount of any fee paid hereunder which was erroneously paid or collected.

2. Not more than <u>80</u> percent of the permit fee paid when no work has been done under a permit issued in accordance with this code.

3. Not more than <u>50</u> percent of the plan review fee paid when an application for a permit for which a plan review fee has been paid is withdrawn or canceled before any plan review effort has been expended.

The code official shall not authorize the refunding of any fee paid, except upon written application filed by the original permittee not later than 180 days after the date of fee payment.

**Chapter 3 General Regulations** of the 2006 International Fuel Gas Code is amended as follows:

**Section 305 Installation** of the 2006 International Fuel Gas Code is amended as follows:

**305.7 Clearances from grade.** Equipment and appliances installed at grade level shall be supported on a level concrete slab or other approved material extending above adjoining grade <u>a minimum of 3 inches (76 mm)</u> or shall be suspended a minimum of 6 inches (152 mm) above adjoining grade.

**Section 306 Access and service space** of the 2006 International Fuel Gas Code is amended as follows:

**306.3 Appliances in attics.** Attics containing appliances requiring access shall be provided with an opening and unobstructed passageway large enough to allow removal of the largest appliance. The passageway shall not be less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) in length measured along the center line of the passageway from the opening

to the appliance. The passageway shall have continuous <u>unobstructed</u> solid flooring not less than 24 inches (610 mm) wide. A level service space not less than 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present at the front or service side of the appliance. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm by 762 mm), where such dimensions are large enough to allow removal of the largest appliance. <u>As a minimum, access to the attic space shall be provided by one of the following:</u>

> 1. <u>Permanent stairs or ladder fastened to the building.</u>
> 2. <u>A pull down stair with a minimum 300 lb. rating.</u>
> 3. <u>An access door from an upper floor.</u>

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.

2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**Chapter 6 Specific Appliances** of the 2006 International Fuel Gas Code is amended as follows:

> **Section 614 Clothes dryer exhaust** of the 2006 International Fuel Gas Code is amended as follows:

> > **614.6.1 Maximum length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the outlet terminal. The maximum length of the duct shall be reduced 2 1/2 feet (762 mm) for each 45 degree (0.79 rad) bend and 5 feet (1524 mm) for each 90 degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

> > **Exception:** Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for such dryer are provided to the code official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, <u>and provided that a 4 inch by six inch sign red in color with white letters is permanently affixed to the structure stating the following:</u>

> > **Warning:** <u>Dryer must be approved for vent length not to exceed 40 feet total developed length (TDL). Duct Size: (*Insert Number*) Total Developed Length: (*Insert Number*)</u>

End of Exhibit "A"

# Exhibit 27

STATE OF TEXAS      )

                       )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

       I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the Town of Lakewood Village Ordinance 11-16. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

       I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

       In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 16th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 11-16

AN ORDINANCE TO ADOPT THE 2006 INTERNATIONAL RESIDENTIAL CODE, WITHIN THE TOWN OF LAKEWOOD VILLAGE AND THE TOWN OF LAKEWOOD VILLAGE EXTRATERRITORTIAL JURISDICTION; PROVIDING A SAVINGS/REPEALING CLAUSE, PROVIDING A PENALTY CLAUSE; PROVIDING A SEVERABILITY CLAUSE; PROVIDING AN EFFECTIVE DATE.

WHEREAS, the Town Council of the Town of Lakewood Village, Texas ("Town Council") has investigated and determined that it would be advantageous and beneficial to the citizens of the Town of Lakewood Village, Texas and the citizens inside the Town of Lakewood Village Extraterritorial Jurisdiction (collectively "Lakewood Village") to adopt the 2006 Edition of the International Residential Code, save and except the deletions and amendments set forth below.

NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS:

SECTION 1: Findings Incorporated. The findings set forth above are incorporated into the body of this Ordinance as if fully set forth herein.

SECTION 2: Adoption of the 2006 International Residential Code. The International Residential Code, 2006 Edition, copyrighted by the International Code Council, Inc., including Appendix G, J, and K, save and except the deletions and amendments set forth in Exhibit "A", attached hereto and incorporated herein for all purposes, is hereby adopted as the Residential code for Lakewood Village, regulating the construction, alteration, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal, and demolition of detached one- and two-family dwellings and multiple single-family dwellings (townhouses) not more than three stories in height with a separate means of egress and related accessory structures in Lakewood Village (the "2006 International Residential Code"). The 2006 International Residential Code is made a part of this Ordinance as if fully set forth herein.

SECTION 3: Savings/Repealing Clause. All provisions of any ordinance in conflict with this Ordinance are hereby repealed to the extent they are in conflict; but such repeal shall not abate any pending prosecution for violation of the repealed ordinance, nor shall the repeal prevent a prosecution from being commenced for any violation if occurring prior to the repeal of the ordinance. Any remaining portion of conflicting ordinances shall remain in full force and effect.

SECTION 4: Penalty Provision. Any person, firm, corporation or business entity violating this Ordinance shall be deemed guilty of a misdemeanor, and upon conviction therefore, shall be fined a sum not exceeding Two Thousand Dollars ($2,000.00), and each and every day that such violation continues shall be considered a separate offense; provided, however, that such penal provision shall not preclude a suit to enjoin such violation. Lakewood Village retains all legal rights and remedies available to it pursuant to local, state and federal law.

SECTION 5: Severability. If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason, held to be unconstitutional or invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. Lakewood Village hereby declares that it would have passed this Ordinance, and each section, subsection, clause or phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses, and phrases be declared unconstitutional.

SECTION 6: Effective Date. This Ordinance shall become effective upon its passage and publication as required by law.

**DULY PASSED AND APPROVED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS,** on this 8th day of SEPTEMBER, 2011.

Mike Schnittker, Mayor
Town of Lakewood Village

ATTEST

Linda Asbell, Town Secretary
Town of Lakewood Village



The Following additions, deletions and amendments to the 2006 International Residential Code adopted herein are herby approved and adopted.

**Section 1.**

**Chapter 1. Administration** of the 2006 International Residential Code is amended as follows:

> **Section R102 Applicability** of the 2006 International Residential Code is amended as follows:

> > **R102.4 Referenced codes and standards.** The codes, when specifically adopted by the Town of Lakewood Village, and standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference. Whenever amendments have been adopted to the referenced codes and standards, each reference to said code and standard shall be considered to reference the amendments as well. Where differences occur between provisions of this code and referenced codes and standards, the provisions of this code shall apply. Any reference made to NFPA 70 or the ICC Electrical Code shall mean the Electrical Code as adopted. Where requirements in this code conflict with any requirements of other adopted codes by the Town of Lakewood Village the most stringent requirements shall apply.

> > **Exception:** Where enforcement of a code provision would violate the conditions of the listing of the equipment or appliance, the conditions of the listing and manufacturer's instructions shall apply.

> **Section R105 Permits** of the 2006 International Residential Code is amended as follows:

> > **R105.2 Work exempt from permit.** Permits shall not be required for the following. Exemption from permit requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this jurisdiction.
> > **Building:**
> > > 1. One-story detached accessory structures used as tool and storage sheds, playhouses and similar uses, provided the floor area does not exceed 250 square feet.
> > > 2. Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge.
> > > 3. Water tanks supported directly upon grade if the capacity does not exceed 5,000 gallons (18 927 L) and the ratio of height to diameter or width does not exceed 2 to 1.

4. Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

5. Prefabricated swimming pools that are less than 24 inches (610 mm) deep.

6. Swings and other playground equipment.

7. Window awnings supported by an exterior wall which do not project more than 54 inches (1372 mm) from the exterior wall and do not require additional support.

## Section 105, PERMIT APPLICATION

A. A residential permit application consist of five (5) forms, which must be completed and signed by the Contractor and his or her registered mechanical, electrical, and plumbing contractors. These forms are the mechanical permit, electrical permit, plumbing permit, concrete permit, and application for building permit forms.

B. Detailed and accurate descriptions are required regarding the addresses and legal description of the subject property including Lot, Block and complete subdivision name with correct phase.

C. All contractors are required to be registered with the town and must have such approved registration on file before any permit will be issued.

**R105.3.2 Time limitation of application.** An application for a permit for any proposed work shall be deemed to have been abandoned ~~180~~ 90 days after the date of filing unless such application has been pursued in good faith or a permit has been issued; except that the building official is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.5 Expiration.** Every permit issued by the code official under the provisions of this code shall expire by limitation and become null and void if the work authorized by such permit is not commenced within 180 days from the date of such permit, or if the work authorized by such permit is suspended or abandoned at any time after the work is commenced for a period of 180 days. Before such work recommences, a new permit shall be first obtained and the fee, therefore, shall be one-half the amount required for a new permit for such work, provided no changes have been made or will be made in the original construction documents for such work, and provided further that such suspension or abandonment has not exceeded one year.

**Section R106 Construction Documents** of the 2006 International Residential Code is amended as follows:

**R106.1 Submittal documents.** Construction documents, special inspection and structural observation programs and other data shall be submitted in one or more

sets with each application for a permit. The construction documents shall be prepared by a registered design professional where required by the statutes of the jurisdiction in which the project is to be constructed. Where special conditions exist, the building official is authorized to require additional construction documents to be prepared by a registered design professional. Foundation plans shall be submitted with each application and shall be sight specific. These plans shall be designed by an engineer licensed by the State of Texas and shall bear that engineers seal.

**Exception:** The building official is authorized to waive the submission of construction documents and other data not required to be prepared by a registered design professional if it is found that the nature of the work applied for is such that reviewing of construction documents is not necessary to obtain compliance with this code.

**Section 1A.**

**NEW CONSTRUCTION REQUIREMENTS**

A. Temporary buildings or structures such as reviewing stand and other miscellaneous structures, sheds, canopies, or fences used for the protection of the public around and in conjunction with construction work may be erected only by special permit for a limited period of time to be designated in said permit; provided, however, that no portable or moveable trailer or similar building or structure shall be permitted during any period of construction.

B. Temporary buildings or structures need not comply with the type of construction or fire resistive time periods required by this code. Temporary buildings or structures shall be completely removed upon the expiration of the time limit stated in this permit with all surface area restored to its natural state.

C. Portable toilets shall be provided at all construction job sites for which a building permit is required by this code.

D. All Contractors will comply with the town's construction site refuse control program as outlined here. All residential and/or commercial construction sites shall be responsible for providing at a minimum, one 20-yard open top roll-off bulk trash container for construction debris and refuse, or a temporary refuse containment structure with minimum dimensions of 8' L x 8' W x 4' H made of 1" exterior plywood secured tightly on all four corners and to the ground in some manner. The container should have a hinged drop down or swing gate on one side for debris removal access. The contractor will also provide a temporary removable top cover either of exterior plywood and or a heavy tarp for either type of debris storage receptacle to prevent flying debris from possible windy or stormy conditions, etc. If a roll-off trash receptacle is used it must be obtained from the waste company that is currently under contract with the Town of Lakewood Village. Contractors are required to keep construction sites free and clear of trash at

all times including no overflowing trash receptacles. The town administrative staff and designated building inspector reserve the right to perform unannounced spot inspections. If the construction site is found in violation of this ordinance then the construction site will be RED TAGGED and an IMMEDIATE Stop Work Order will be issued with possible suspension of any registration. Once Red Tagged, the contractor will need to take corrective action to bring the work site to an acceptable condition and when compliance is obtained, the Red Tag will be lifted and construction activities may be resumed.

E. Effective erosion control is required prior to any construction activity and will include the installation of an adequate and repositionable silt fence which should run along the property lot's inside border boundary above and adjacent to the drainage ditch area and the public roadway. The silt fence will be constructed in a practical manner with the necessary openings so as to allow easy entry and exit from the roadway to the property construction site for all necessary construction equipment and machinery.

F. It is the responsibility of the Contractor to place the proper size culvert on the lot to gain access to the lot prior to any construction. Upon completion of construction the culverts ends must be in concrete and the culvert must continue the direction of the flow of drainage. All culvert sizes are obtained through the Town.

G. A Contractor is prohibited from benching the lot, or preparation of the lot prior to obtaining permit approval.

H. It is the responsibility of the Contractors to keep a copy of all approved plans on the construction site at all times. They must be placed in a water tight container. All paperwork due to the inspector for inspection purposes and in compliance with this ordinance must be placed within this container. The replacement of any lost or stolen permits will be at a cost of $10.00 per occurrence.

**Section 1B.**

**EXISTING CONSTRUCTION / REPAIRS / REMODELING REQUIREMENTS**

A. All remodels and repairs for buildings over 200 square feet, inspections are required only as they apply to the permitted improvements, applicable building codes and Town ordinances.

B. All new construction foundation plans are to be drawn and sealed by an Engineer licensed by the State of Texas.

C. An application for flatwork must be submitted to the Town for approval. Flatwork must follow all other flatwork requirements within this ordinance.

D. Erosion control is required prior to any construction and must be maintained throughout construction completion.

E. All remodels, repairs, alterations, must have two (2) copies of the plot plans turned into the Town showing the actual dimensions and shape of the lot to be built upon or altered, the exact sizes and locations on the lot of any already existing buildings, and the location and dimensions of the proposed building or alteration.

F. Two copies of the existing house plans prior to any alterations, remodels or repair must be turned in prior to approval of the permit.

**Section 1C.**

**SECTION 106, BUILDING PLAN PACKET SUBMISSION**

Along with the permit application forms set forth above, the following documents are required prior to any approval being granted in the quantity and detail as specified:

A. Two (2) plot plans containing lot dimensions, plan footprint, set-backs (front, rear and sides) complete address, lot and block, subdivision and phase, utility and easement locations, engineers and contractors names, finish pad elevations, finish floor elevations, topographical elevations, driveways, sidewalks, fence locations, lot area, slab area, and coverage percent. All drawings provided must be to scale.

B. Two (2) foundation designs (11" x 17" drawing and engineer letters) one of which must have an original signature and stamp.

C. Three (3) complete bound sets of construction drawings. Town Copy must be 11" x 17" or application will be automatically rejected without further action or notification by any Town Official. Plans must include elevations, framing details, including soffit overhang details, masonry percentage calculations, square foot calculations, electrical load calculations, electrical panel size, electrical panel location, mechanical specifications, foundation design letter must be address specific. All plans must be drawn by a state licensed architect and must be drawn to scale.

D. Two (2) sets of drainage plans must be provided. Town copy must be 11" x 17" drawn to scale, showing the actual dimensions and shape of the lot to be built upon. The drainage plans must show sea level elevations and all flatwork drawn to scale.

E. Floor plans, elevations, framing, roof plan, electrical and "to be built options" must be clearly shown and detailed. Single sheet submittals are not acceptable. HVAC and Plumbing design drawings are also required. Options reflecting additional buildable space must be identified by the actual square footage area and included in the permit values for total air-conditioned area and or construction area under roof.

F. Elevation drawings must clearly state that the structure meets the exterior requirements set forth below in Section 11 by the Town of Lakewood Village, or provide masonry calculations (i.e. Front % + Right % + Left % + Rear % = total masonry %)

G. All drawings must be legible and show proper square footage for air-conditioned and total building areas.

H. One (1) Energy analysis (i.e.; IC3, ResCheck or Energy-Star) shall be provided by a certified professional.

I. All third party rater information and documentation must be submitted if an Energy Star Home is being constructed or modified.

J. Mechanical Air Flow Calculations shall be provided and must be on the mechanical contractors letterhead

**Section R108 Fees** of the 2006 International Residential Code is amended as follows:

> **R108.6 Work commencing before permit issuance.** Any person who commences any work on a building, structure, electrical, gas, mechanical or plumbing system before obtaining the necessary permits shall be subject to a Penalty of 100% of the usual permit fee in addition to the required permit fees.

**Section 1D.**

**REQUIREMENTS**

A. Water/Sewer Taps - A licensed plumber that is registered with the Town shall perform all work connecting to the Town utilities.

B. All sprinkler permits are required to have a final inspection accompanied by a Backflow Prevention Report Form and a Customer Service Inspection Letter. These forms can be obtained from the office of the Town Secretary.

C. In the construction, maintenance, or repair of any building or structure within the Town or the ETJ, for which a building permit is required by the current building codes, no person shall perform any electrical, plumbing, mechanical, fencing, backflow, concrete, third party inspections, irrigation, or roofing unless and until such time as that person is registered with the Town to perform such work.

**Section 1E.**

**LICENSING AND REGISTRATION REQUIREMENTS**

A. No person shall engage in the business of construction of new buildings or structures, or make any repairs, alterations, or changes to an existing building or structure, unless that person is registered as a Contractor by the Town. Provided however that (i) no license shall be required for work on any building or structure for which a building permit is not required by this code and (ii) persons who occupy and reside within any property as their home shall not be required to obtain a license or register with the Town when performing work on their home.

B. All Contractors must register with the Town of Lakewood Village before applying for permits or performing any work. A master or contractor license in the specific trade is required to register as a Contractor. All licensed Journeymen working for the Contractor shall be listed on the contractor registration form. All work shall be supervised by a licensed individual, A licensed residential wireman may supervise one helper or apprentice. Any work discovered being performed without the required licensed personnel shall be conspicuously identified to prevent reuse and shall be removed. In addition to a citizen complaint, multiple violations of licensure requirements may result in suspension of a Contractors' registration. Any individuals found performing work without the required registration shall be required to leave the jobsite. A Contractor is defined as set forth above in Section 2. All registrations will expire on December 30th of each year. The General Contractor must carry insurance that covers all subcontractors and the projects they are actively working on under the General Contractor. In the event there is not a General Contractor, each subcontractor is required to supply the Town with a copy of their liability insurance with a minimum $100,000.00 policy coverage for each project. It will be the responsibility of the registered individuals to ensure that this process is complete before permits will be issued and any work in the specific trade is commenced. The Town reserves the right to deny or revoke any contractor registration if there are justifiable reasons or violations as determined by the Town.

C. The following Contractors disciplines must follow the applicable registration process.

GENERAL CONTRACTORS, BUILDER REGISTRANTS:

1. Contractor registration filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A valid certificate of liability insurance or bond in an amount no less than $1,000,000.00 kept in force for the duration of the project. Each project is required to have its own policy.

ELECTRICAL REGISTRANTS:

1. Contractor registration filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. All Journeyman and or Wireman performing work must be registered and posses a current license at the time of registration and for the duration of the project.

5. A list of additional persons authorized to sign applications and pick up approved permits for your company.

6. Proof of insurance as set forth in Section 8 (B) above.

PLUMBING REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. All journeyman, tradesman, and apprentices performing work must be registered and possess a current license at the time of registration and for the duration of the project.

5. A list of additional persons authorized to sign applications and pick up approved permits for your company.

6. Proof of insurance as set forth in Section 8 (B) above.

MECHANICAL REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Masters license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. A list of additional persons authorized to sign and pick up approved permits for your company.

5. Proof of insurance as set forth in Section 8 (B) above.

IRRIGATION REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid Irrigation license is required at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. A list of additional persons authorized to sign applications and pick up approved permits for your company.

5. Proof of insurance as set forth in Section 8 (B) above.

BACKFLOW TESTER REGISTRANTS:

1. Contractor registration application filled out completely.

2. A valid Backflow Testers License is required at the time of registration at the time of registration and for the duration of the project.

3. A valid State of Texas driver's license or photo I.D. card.

4. Proof of insurance as set forth in Section 8 (B) above.

SIGN CONTRACTOR REGISTRANT:

1. Contractor registrant application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A list of additional persons authorized to sign applications and pick up approved permits for your company.

4. Proof of insurance as set forth in Section 8 (B) above.

THIRD PARTY INSPECTOR REGISTRANT:

1. Contractor registration application form filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. A list of qualified persons authorized to perform inspections.

4. Proof of certification

5. Proof of insurance as set forth in Section 8 (B) above.

ROOFING REGISTRANT:

1. Contractor registration application filled out completely.

2. Valid State of Texas drivers license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

CONCRETE REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

FENCE / SCREENING WALL REGISTRANT:

1. Contractor registration application filled out completely.

2. A valid State of Texas driver's license or photo I.D. card.

3. Proof of insurance as set forth in Section 8 (B) above.

D. Any registered Contractor that fails to maintain compliance with any provisions of this section shall cease all work being performed at the time the Contractor is no longer in compliance.

## Section 109 Inspections

A. Request for Inspections

B. Building permits will include inspections performed during the following construction stages:

1. T-Pole

2. Plumbing Rough, includes water and sewer tap (form board surveys due at this time on site)

3. Pier and Beam - shall be inspected by the engineer and an approval letter shall be provided to the building official.

4. Foundation

5. Frame

6. Mechanical Rough

7. Electrical Rough

8. Rough Gas

9. Plumbing Top Out

10. 4 foot brick tie inspection and/or Stucco inspection

11. Drywall

12. Electrical/Gas Meter Release

13. Flatwork

14. 100% Final

· All Third party insulation inspections reports are due prior to the electrical/gas meter release.

· At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor will be responsible for turning in all weight tickets to the Town.

· Termite letter, Customer Service Inspection letter, and the Final Grade survey is due on site at the 100% Final Inspection.

· Piers must be inspected by an independent contractor. A copy of the inspection must be supplied to the Town prior to calling in the next inspection.

E. All Sprinkler Contractors must have the Backflow Prevention Form filed with the Town of Lakewood Village prior to hooking the system up to the water supply.

F. All inspections must be performed during daylight hours

**Section 1F.**

A. Upon completion of construction, no one may occupy or move any objects into or onto the property of new construction until a Certificate of Occupancy (100 % Final) inspection has been performed and passed by an official of the Town. Violation of this requirement will result in all utilities being disconnected until such time as a Certificate of Occupancy has been issued after all the proper inspections have been performed.

B. Secondary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met. Any secondary structure built on any adjacent lot must conform to the minimum square footage requirements of that section ás stated in the current zoning ordinance as amended or revised unless both lots are re-platted as a single lot and said plat is filed on record with Denton County, Texas. Proper proof of filing with Denton County, Texas must be provided to the Town at the time the building permit is sought.

C. All new building construction will have a garage with the following requirements:

1. There shall be no front-facing garages on any new construction. Where the configuration of the ground is such that conformity with this provision of this ordinance would work a hardship, the Town Council may permit a variance.

2. There shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth. Where the configuration of the ground is such that conformity with

this provision of this ordinance would work a hardship, the Town Council may permit a variance.

**Section 1G.**

A. A form survey will be completed at the time that the forms are in position before the concrete is poured to ensure that the location of the slab is in compliance with all town ordinances. A copy of the form survey will be submitted to the Town.

B. Height. There shall be no buildings, residential or commercial, that exceed 2 ½ stories Any exceptions are outlined in the Zoning Ordinance 83-01A, as amended or revised.

C. The exterior facades of a main building or structure, excluding glass windows and doors shall be constructed of eighty (80) percent masonry requirement on all new construction for anything over 200 square feet or greater. Cementatious fiber board shall not be considered masonry; cementatious fiber board may be used to replace existing siding on existing structures, with pre-approval of the Building Official. Cementatious fiber board may also be used for architectural features, including window box-outs, bay windows, roof dormers, garage door headers, columns, or other architectural features approved by the Building Official.

D. Wood roof shingles are prohibited.

E. The use of Stucco, various types of stucco and installation procedures must have prior approval from the Building Official. If approved, the builder must provide the installer's certification and certificate for the Town's files. Only true three coat stuccoing will be considered. Additional inspections are required at, hath, scratch coat, and brown coat.

F. Exterior Insulation Finish System (EIFS) shall not be permitted on any construction.

G. Construction work times shall begin no earlier than 7:00 a.m. and shall end no later than 7:00 p.m.

H. All roof pitches shall have a minimum of four (4) inches over twelve (12) inches.

I. The Town will grant approval to initiate electrical service for permanent or temporary use.

J. All new construction shall have gutters installed in accordance to the submitted drainage plan with the minimum of the entire front of house, all exits, and above all air-conditioning units.

K. It is also the responsibility of the Contractor to ensure the grading of the ditches or easements continue the flow of drainage prior to receiving the 100% Final Inspection. Lot to lot drainage is not allowed.

**Section 1H.**

## VARIANCES and BOARD OF APPEALS

A. In order to hear and decide appeals of orders, decisions, or determinations made by the Building Official relative to the application and interpretation of this Ordinance, there shall be and is hereby created a Board of Appeals. The Town Council of the Town of Lakewood Village, Texas shall serve as the Board of Appeals. The Building Official shall be an ex-officio member of and shall act as secretary to the Board but shall have no vote on any matter before the Board. The Board shall adopt the rules of procedure for conducting its business, and shall render all decisions and finding in writing to the appellant with a duplicate copy to the Building Official.

1. The powers of the Board shall be as follows:

a. To hear appeals from decisions of the Building Official

b. To hear requests for the use of a material or method of construction not prescribed or authorized by this code, and to authorize the use when, in the Board's judgment, the material or method of construction is at least equivalent to that prescribed; and

c. To grant or deny variance requests

B. Variance Requests

1. Variances will be considered only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the building and zoning ordinances would cause an undue hardship. Financial considerations are not relevant and will not be considered in the request.

2. A variance which would have a detrimental effect on public health and/or safety will not be considered.

3. Variances for self imposed hardships will not be considered.

4. Approved variances expire 180 days following the approval.

**Section 2.**

**Chapter 2. DEFINITIONS** of the 2006 International Residential Code

The Town – shall mean the Town of Lakewood Village

Contractor – shall mean any person, firm, corporation, or other entity that is hired by a homeowner or landowner to perform any new construction, remodel, or repair on said homeowner or landowner's real property.

Erosion Control – the containment of all dirt, soils, sand, fill or grass, in such a manner, to prevent said materials from encroaching onto adjacent properties, town easements, drainage culverts, or utility placements

ETJ - shall mean the Extraterritorial Jurisdiction of the Town of Lakewood Village

Masonry – shall be defined as brick, concrete hollow clay tile, concrete block, natural stone, or any combination of these materials that are laid up by unit and set in mortar.

Construction Site Refuse Control - the containment of and weekly or monthly removal of both construction and laborer refuse to prevent said materials from encroaching onto adjacent homeowner properties, town easements, drainage ditches and culverts, and should be in compliance with OSHA and local codes.

**Section 3.**

**Chapter 3. Building Planning** of the 2006 International Residential Code is amended as follows:

**Section 309 Garages and Carports** of the 2006 International Residential Code is amended as follows:

**Section 309 Carports** shall not be allowed in Lakewood Village.

**R309.1 Opening protection.** Openings from a private garage directly into a room used for sleeping purposes shall not be permitted. Other openings between the garage and residence shall be equipped with <u>a self closing, tight fitting</u> solid wood doors not less than 13/8 inches (35 mm) in thickness, solid or honeycomb core steel doors not less than 13/8 inches (35 mm) thick, or 20-minute fire-rated doors.

**R309.1.1 Duct penetration.** Ducts in the garage and ducts penetrating the walls or ceilings separating the dwelling from the garage shall be constructed of a minimum No. 26 gage (0.48 mm) sheet steel or other approved material and shall have no openings into the garage.

**R309.1.2 Other penetrations.** Penetrations through the separation required in Section R309.2 shall be protected by filling the opening around the penetrating item with approved material to resist the free passage of flame and products of combustion.

**R309.1.3 Access Openings.** Access openings in the separation required by R309.2 shall have a tight fitting, non-combustible and latching cover.

**R309.2 Separation required.** The garage shall be separated from the residence and its attic area by not less than 5/8-inch (15.9 mm) gypsum board applied to the garage side. Garages beneath habitable rooms shall be separated from all habitable rooms above by not less than 5/8-inch (15.9 mm) Type X gypsum board or equivalent. Where the separation is a floor-ceiling assembly, the structure supporting the separation shall also be protected by not less than 5/8 inch (15.9 mm) gypsum board or equivalent. Garages located less than 5 feet (1524 mm) from a dwelling unit on the same lot shall be protected with not less than 5/8-inch (15.9 mm) gypsum board applied to the interior side of exterior walls that are within this area. Openings in these walls shall be regulated by Section R309.1. This provision does not apply to garage walls that are perpendicular to the adjacent dwelling unit wall.

**Section 313 Smoke Alarms** of the 2006 International Residential Code is added as follows:

**R313.4 Carbon Monoxide Detector.** A carbon monoxide detector shall be installed for each 1,000 square feet (305 m2 ) of living area. Carbon monoxide detectors shall be placed adjacent to openings in enclosures for fuel burning appliances, at least one location per floor level and at garage entrances, Power source shall be same as required by section R313.3 for smoke detectors.

**Section 319 Site Address** of the 2006 International Residential Code is amended as follows:

A. Approved numbers or addresses shall be placed on all new and existing buildings in such a position as to be plainly visible and legible from the street or road fronting property. Said numbers shall contrast with their background, and shall comply with the following provisions, as applicable:

1. Residential occupancies shall have numbers a minimum of six (6) inches in height and be in a contrasting color to the background;

2. Duplexes shall have street and/or building numbers a minimum of eight (8) inches in height. When deemed necessary by the Town the street and/or building numbers may be required to be of a larger size for immediate and visible identification;

3. If the structure is more than two hundred (200) feet from a public street, the address shall also appear at the front or main entry to the property with numbers a minimum of six (6) inches in height.

4. When deemed necessary by the Town street or building numbers may be required on more than one side of the structure or property;

5. Building and/or street numbers shall be located in an area and lighted in a manner that will make them immediately discernible as approved by the Town.

**Section 4.**

**Chapter 4. Foundations** of the 2006 International Residential Code is amended as follows:

**Section 403 Footings** of the 2006 International Residential Code is amended as follows:

**R403.1.8 Foundations on expansive soils.** Foundation and floor slabs for buildings located on expansive soils shall be designed in accordance with Section 1805.8 of the *International Building Code*, the American Society of Civil Engineers Texas Section Recommended Practice for the Design of Residential Foundations Version 1 as it currently exists or may be amended, or other accepted industry standards that may be acceptable to the Building Official. All foundations shall be designed by a registered Professional Engineer in the State of Texas and all drawings and documentation must be signed and sealed. Documentation shall include:

1. Design letter referencing soils report number, date of report, soils, and engineer name; specific location including lot, block, and subdivision; specific design criteria including soil bearing capacity, plasticity index, and potential vertical rise. The Engineer shall also approve a concrete mix design with performance criteria based on soils and seasonal conditions.
2. Signed and sealed drawings clearly indicating strand and reinforcement placement, pier size, depth, location, and reinforcing, beam size and location, and special details. Design calculations must be included. One ledger size copy of plans and calculations will be included in the permanent permit file for each project.
3. Design engineer must perform a pre-pour inspection and provide the Building Official with signed and sealed document stating that the foundation has been inspected and approved. This inspection must take place prior to requesting a foundation inspection from the Building Official. The engineer shall be present during placement of concrete to verify concrete mix design and seasonal conditions during placement, and verify tensioning and elongation of cables.
4. Rough grading of lot after form removal to maintain drainage away from foundation during the construction process.

5. Prior to receiving a Certificate of Occupancy, a final survey indicating final grade elevations and verifying positive drainage away from the foundation, and evidence from the homeowner that they have received a copy of foundation maintenance instructions must be submitted to the Building Official.
6. The Engineer must provide to the Building Official a letter of Final Acceptance stating that the foundation has been placed in compliance with the design prior to the issuance of a Certificate of Occupancy.
7. Anchorage shall be installed before foundation is approved for pouring, per Section 403.1.6

**R403.1.7.3 Foundation elevation** of the 2006 International Residential Code is amended as follows: No cross lot drainage shall be allowed.

**Section 4A.**

Driveways

1. All new building construction will have a driveway. The pouring requirements are as follows:

a. The Contractor shall notify the Town of when they are scheduled to pour within 48-hours prior to pouring.

b. No concrete will be poured before 7:00 a.m.

c. At the time of the scheduled pour, and prior to driving to the location of the pour, the Contractor and concrete registrant will be responsible for turning in all weight tickets to the Town.

d. As per Weight Ordinance No. 98-09 Section 3 (C) as amended or revised, the gross weight limit on Town streets for a ready-mix concrete truck shall be58,420 lbs.

e. The minimum thickness of four inches and minimum compression strength shall be 3000 psi at 28 days.

f. Driveways shall be a minimum of 10 foot wide, in Town Section 5 driveways shall be a minimum of 12 foot wide.

g. 3/8 inch rebar with no greater than 16 inch centers is required on all drivewayconstruction. Re-bar placement must be inspected 48-hours prior to the pouring of concrete.

h. All driveways must properly tie into the street. The Contractor is responsiblefor any road damage that may occur during the construction of the permitted project. All roads must be restored at least to their original condition prior to receiving their 100% final inspection. It shall be unlawful for any person, firm, or corporation or other legal entity to erect, construct, enlarge, alter, repair, move, improve, convert, or demolish any flatwork or driveway or cause to permit the same to be done in violation of this ordinance.

j. A driveway permit that would place the water meter, water valve and meter

box in the driveway shall provide, as a condition of said permit, for the removal of the water meter, water valve, and meter box out of the driveway, at the home and/or land owners expense. Replacement of the water meter, water valve, and meter box shall be in a manner were the meter can be serviced with an additional inspection on the plumbing performed by the Building Official at an additional cost of $75.00. A licensed plumber who is registered to work in the Town of Lakewood Village shall perform the replacement of the water meter, water valve, and meter box.

## Section 5.

**Chapter 13. General Mechanical System Requirements** of the 2006 International Residential Code is amended as follows:

**Section 1305 Appliances Access** of the 2006 International Residential Code is amended as follows:

**M1305.1.3 Appliances in attics.** Attics containing appliances requiring access shall have with an opening and a clear and unobstructed passageway large enough to allow removal of the largest appliance, but not less than 30 inches (762 mm) high and 22 inches (559 mm) wide and not more than 20 feet (6096 mm) long when measured along the centerline of the passageway from the opening to the appliance. The passageway shall have continuous unobstructed solid flooring in accordance with Chapter 5 not less than 24 inches (610 mm) wide. A level service space at least 30 inches (762 mm) deep and 30 inches (762 mm) wide shall be present along all sides of the appliance where access is required. The clear access opening dimensions shall be a minimum of 20 inches by 30 inches (508 mm) by 762 mm), where such dimensions are large enough to allow removal of the largest appliance. As a minimum, access to the attic space shall be provided by one of the following:

1. A permanent stair.
2. A pull down stair with a minimum 300 lb. rating.
3. An access door from an upper floor.

**Exceptions:**
1. The passageway and level service space are not required where the appliance can be serviced and removed through the required opening.
2. Where the passageway is unobstructed and not less than 6 feet (1829 mm) high and 22 inches (559 mm) wide for its entire length, the passageway shall be not more than 50 feet (15 250 mm) long.

**M1305.1.4.1 Ground clearance.** Appliances supported from the ground shall be level and firmly supported on a concrete slab extending above the adjoining ground a minimum of 3 inches (76mm). Appliances suspended from the floor shall have a clearance of not less than 6 inches (152 mm) from the ground.

**Section 6.**

**Chapter 15. Exhaust Systems** of the 2006 International Residential Code is amended as follows:

**Section 1502 Clothes Dryer Exhaust** of the 2006 International Residential Code is amended as follows:

**M1502.3 Duct size.** The diameter of the exhaust duct shall be as required by the clothes dryer's listing and the manufacturer's Installation instructions. Duct size shall be at least the diameter of the appliance outlet and shall be a minimum nominal size of 4" (102mm) in diameter. The size duct shall not be reduced along its developed length nor at the point of termination.

**M1502.6 Duct length.** The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the wall or roof termination. The maximum length of the duct shall be reduced 2.5 feet (762 mm) for each 45-degree (0.8 rad) bend and 5 feet (1524 mm) for each 90-degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exceptions:**
Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for the dryer are provided to the building official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by 6 inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning: Dryer must be approved for vent length not to exceed 40 feet total developed length (*TDL*.)**
**Duct Size:** (*Number*)
**Total Developed Length:** (*Number*)

**Chapter 24. Fuel Gas** of the 2006 International Residential Code is amended as follows:

**Section 2439 Clothes Dryer Exhaust** of the 2006 International Residential Code is amended as follows:

**G2439.5.1 Maximum Length.**
The maximum length of a clothes dryer exhaust duct shall not exceed 25 feet (7620 mm) from the dryer location to the wall or roof termination. The maximum length of the duct shall be reduced 2.5 feet (762 mm) for each 45-degree (0.8 rad) bend and 5 feet (1524 mm) for each 90-degree (1.6 rad) bend. The maximum length of the exhaust duct does not include the transition duct.

**Exceptions:**
Where the make and model of the clothes dryer to be installed is known and the manufacturer's installation instructions for the dryer are provided to the building official, the maximum length of the exhaust duct, including any transition duct, shall be permitted to be in accordance with the dryer manufacturer's installation instructions, and provided that a 4 inch by 6 inch sign red in color with white letters is permanently affixed to the structure stating the following:

**Warning:  Dryer must be approved for vent length not to exceed 40 feet total developed length (*TDL*.)**
**Duct Size: (*Number*)**
**Total Developed Length: (*Number*)**

**Section 7.**

**Chapter 31.  Vents** of the 2006 International Residential Code is amended as follows:

> **Section 3114 Air admittance Valves** of the 2006 International Residential Code is amended as follows:
>
> > **P3114.3 Where permitted.** Individual vents, branch vents, circuit vents, and stack vents may be permitted to terminate with a connection to an air admittance valve.  Air admittance valves shall only be installed with the prior written approval of the Building Official.

**Section 8.**

**Chapter 33.  General Requirements** of the 2006 International Residential Code is amended as follows:

> **Section 3306 Electrical conductors and Connections** of the 2006 International Residential Code is amended as follows:
>
> > **E3306.2 Conductor material.** Conductors used to conduct current shall be of copper as provided in Chapters 33 through 42. Where the conductor material is not specified, the material and the sizes given in these chapters shall apply to copper conductors. Where other materials are used, the conductor sizes shall be changed accordingly.
> >
> > **E3306.3 Minimum size of conductors.** The minimum size of conductors for feeders and branch circuits shall be 12 AWG copper. The minimum size of service conductors shall be as specified in Chapter 35. The minimum size of class 2 remote control, signaling and power-limited circuits conductors shall be as specified in Chapter 42.

**Chapter 35.  Services** of the 2006 International Residential Code is amended as follows:

**Section 3501 General Services** of the 2006 International Residential Code is amended as follows:

**E3501.2 Number of services.** One-and two-family dwellings or Property zoned single family (SF) or Two Family (2F) district(s) shall be supplied by only one service. Additional service for an accessory use(s) shall only be installed with the prior approval of the Building Official.

**Chapter 36. Branch Circuit Feeder Requirements** of the 2006 International Residential Code is amended as follows:

**Section 3602 Branch Circuit Ratings** of the 2006 International Residential Code is amended as follows:

**E3602.5 Branch circuits serving multiple loads or outlets.** General-purpose branch circuits shall supply lighting outlets, appliances, equipment or receptacle outlets, and combinations of such. The rating of a fastened-in-place appliance or equipment, where used in combination on the same branch circuit with light fixtures, receptacles, and/or other appliances or equipment not fastened in place, shall not exceed 50 percent of the branch-circuit rating. Multi-outlet branch circuits serving lighting or receptacles shall be limited to a maximum branch-circuit rating of 20 amperes. The maximum number of outlets connected to general purpose branch circuits shall be ten (10) for 15-amp circuits, and thirteen (13) for 20-amp circuits.

**End of Exhibit "A"**

# Exhibit 28

**STATE OF TEXAS** )

) **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

I hereby certify, in the performance of the functions of my office, that the attached instrument is a full, true and correct copy of the Town of Lakewood Village Ordinance 13-07. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 19th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

TOWN OF LAKEWOOD VILLAGE, TEXAS

ORDINANCE NO. 13-07

AN ORDINANCE OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS, REGULATING SUBDIVISIONS AND OTHER PROPERTY DEVELOPMENTS, PROVIDING FOR PRELIMINARY PLATS, FINAL PLATS, MINOR PLATS, VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS; PROVIDING FOR DEVELOPMENT PROCESS; PROVIDING FOR STANDARDS AND REQUIREMENTS; PROVIDING FOR STREETS AND DRAINAGE, WATER AND SEWER INFRASTRUCTURE; EXTENDING REGULATIONS TO THE TOWN'S EXTRATERRITORIAL JURISDICTION; PROVIDING SEVERABILITY CLAUSE; PROVIDING SAVINGS CLAUSE; PROVIDING A PENALTY NOT TO EXCEED THE SUM OF TWO THOUSAND DOLLARS ($2,000.00) FOR EACH OFFENSE AND A SEPARATE OFFENSE SHALL BE DEEMED COMMITTED EACH DAY DURING OR ON WHICH A VIOLATION OCCURS OR CONTINUES; PROVIDING A REPEALER; AND PROVIDING AN EFFECTIVE DATE.

**WHEREAS,** the Town Council ("Town Council") desires to amend Ordinance 08-06 and all other ordinances regarding the Town's rules and regulations for subdivisions and property development as authorized by Chapter 212, Texas Local Government Code, as amended; and

**WHEREAS,** the Town Council ("Town Council") desires to review for approval or disapproval plan, plats, and replats filed with the Town as authorized by Chapter 212, Tex. Loc. Gov. Code (Vernon), as amended; and

**WHEREAS,** the Town Council finds that there is a public necessity requiring adoption of this Ordinance, said public necessity being the need to establish rules and regulations for subdivisions and property development and extend such rules and regulations to the extraterritorial jurisdiction of the Town ("ETJ") to protect the public health, welfare and safety of the citizens of the Town and the ETJ; and

**WHEREAS,** the Town Council is authorized and empowered to or require the developer to (i) design, install or improve streets, roads, water and a sanitary sewer systems within the Town by constructing, extending, or enlarging such system, and is further authorized to adopt any rules and regulations appropriate to the exercise of such powers, and to (ii) protect the public health, welfare and safety of the citizens of the Town; and

**WHEREAS,** the Town Council has conducted a public hearing on the application of the Town's regulations for subdivisions and property development to its ETJ, and the Town Council finds and determines that all required notices and hearings in this regard have been given and that the meeting at which the public hearing has been held and at which this ordinance is being adopted were open to the public and conducted according to applicable law; and

**WHEREAS,** the Town Council is authorized and empowered to apply the Town's regulations for subdivisions and property development to its ETJ pursuant to Section 212.003 of the Texas Local Government Code; and

**WHEREAS,** the Town Council hereby finds that the adoption of this Ordinance is in the best interests of the health, safety and welfare of the citizens of the Town.

**NOW, THEREFORE, BE IT ORDAINED BY THE TOWN COUNCIL OF THE TOWN OF LAKEWOOD VILLAGE, TEXAS :**

## ARTICLE I. IN GENERAL

### Sec. 1. Findings Incorporated.

The findings set forth above are incorporated into the body of this ordinance as if fully set forth herein.

### Sec. 2. Short title.

The following regulations are hereby adopted and shall be known and may be cited as "Town of Lakewood Village Subdivision and Property Development Regulations."

### Sec. 3. Definitions.

The following words, terms, and phrases, when used in this chapter, shall have the meaning ascribed to them in this section, except where the context clearly indicates a different meaning. Words not specifically defined shall have the meanings given in Webster's Ninth New Collegiate Dictionary, as revised.

*Accessory structure or building* shall mean a subordinate structure or building customarily incident to and located on the same lot occupied by the main structure or building.

*Applicant* shall mean the owner(s) of the property to be developed.

*Bond* shall mean any form of security, including a cash deposit, surety bond, or instrument of credit in an amount and form approved by the Town.

*Building* shall mean any structure designed or built for the support, enclosure, shelter or protection of persons, animals, chattel or property of any kind.

*Town* means Town of Lakewood Village.

*Town Council* means Town Council of the Town of Lakewood Village.

*Town standards* shall mean those standards and specifications, together with all tables,

charts, graphs, drawings and other attachments hereinafter approved and adopted by the Town Council, which may be amended from time to time, and are administered by the Town staff for the construction and installation of streets, sidewalks, drainage facilities, water and sanitary sewer mains and any other public facilities. All such facilities which are to become the property of the Town upon completion must be constructed in conformance with these standards.

*Construction plans* shall mean the maps, drawings and technical specifications, including bid documents and contract conditions, where applicable, which provide a graphic and written description of the character and scope of the work to be performed prepared for approval by the Town for construction.

*Cross drainage* shall mean a defined waterway course, approximately perpendicular to the proposed roadway, which requires the construction of a bridge, pipes or box culvert, or other structure to conduct drainage under the roadway.

*Developer* shall mean any person, corporation, governmental or other legal entity engaged in the development of property by improving a tract or parcel of land for any use. The term "developer" is intended to include the term "subdivider."

*Development* shall mean the construction of one (1) or more new buildings or structures, or the structural alteration, relocation or enlargement of one (1) or more new buildings or structures of an existing building or structure on one (1) or more building lots or sites, or the installation of site improvements.

*Easement* shall mean a grant by a property owner to the public, a corporation, or persons for a general or specific use of a defined strip or parcel of land, for such purpose as the installation, construction, maintenance and/or repair of utility lines, drainage ditches or channels, or other public services, the ownership or title to the land encompassed by the easement being retained by the owner of the property.

*Engineer* shall mean any person duly authorized under the Texas Engineering Practice Act (V.A.C.S. art. 3271a), as amended, to practice the profession of engineering.

*Engineering plans* shall mean the maps and drawings required for plat approval.

*Lot* shall mean an undivided tract or parcel of land having access to a street, which is designated as a separate and distinct tract or lot number or symbol on a duly approved plat filed of record. The terms "lot" and "tract" shall be used interchangeably.

*Off-site* shall mean any premises not located within the property to be developed, regardless of ownership.

*Owner* shall mean any persons, firm or corporation having legal title to the property.

*Plat* shall mean a map representing a tract of land showing the boundaries of individual properties and streets or a map, drawing, chart, or plan showing the layout of a proposed

subdivision into lots, blocks, streets, parks, school sites, commercial or industrial sites, drainage ways, easements, alleys, which an applicant submits for approval and a copy of which he intends to record with the County Clerk of Denton County.

*Plat, final,* shall mean the map or plan of a proposed development submitted for approval by the Town Council, where required, prepared in accordance with the provisions of this chapter and requested to be filed with the County Clerk of Denton County.

*Plat, preliminary,* shall mean the initial map or plan of a proposed development showing the general layout of streets, blocks and lots, utility systems, and drainage systems.

*Right-of-way* shall mean a strip of land acquired by dedication, prescription or condemnation and intended to be occupied by a road, sidewalk, railroad, electric transmission facility, water mains, sewer mains, storm drainage or other similar facility. Rights-of-way intended for streets, sidewalks, water mains, sewer mains, or any other use involving maintenance by a public agency shall be dedicated to the public use by the plat applicant either by easement or in fee simple title.

*Streets and alleys* shall mean a way for vehicular traffic, whether designated as a street, highway, thoroughfare, parkway, throughway, road, avenue, boulevard, lane, alley, place or however otherwise designated. Town streets shall conform to the following classifications:

(1) Arterial streets and highways are those which are used primarily for higher speed and higher volume traffic. Routes for such streets shall provide for cross-town circulation and through-town movements.

(2) Collector streets are those which carry traffic from minor streets to the major system of arterial streets and highways, including the principal entrance, circulation streets of a residential development and streets for circulations within such a development of a residential subdivision.

(3) Minor streets are those, which are used primarily for access to abutting properties.

(4) Marginal access streets are minor streets located parallel to and adjacent to arterial streets and highways, providing access to abutting properties and protection from the traffic of the thoroughfares.

(5) Alleys are minor ways used primarily for access to abutting properties for vehicle service usually to the back or side of a property.

*Structural alterations* shall mean the installation or assembly of any new structural components, or any change to existing structural components, in a system, building or structure.

*Structure* shall mean anything constructed or erected, which requires location on the ground, or attached to something having a location on the ground, including, but not limited to, buildings of all types and ground signs, but exclusive of customary fences or boundary or retaining walls.

*Subdivision* shall mean dividing a tract in two (2) or more parts for the purpose of creating

lots, including an addition to the Town, to lay out suburban, building or other lots or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to the public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks or other parts. "Subdivision" refers to any division irrespective of whether the actual division is made by metes and bounds description in a deed of conveyance or a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A subdivision does not include a division of land into parts greater than five (5) acres, where each part has access and no public improvement is being dedicated.

## Sec. 4. Purpose.

The purpose of this ordinance is to set forth the procedures and standards for development of property, layout and design of subdivisions or real property within the corporate limits of the Town which are intended to promote the health, safety and general welfare of the Town and the safe, orderly, and healthful development of the Town.

## Sec. 5. Compliance required.

(a) Any owner of land who proposes the development of a lot or tract of land located within the corporate limits of the Town or ETJ or the subdivision of a lot or tract located in the corporate limits of the Town or ETJ shall have a plat of the lot or tract of land or subdivision prepared and approved in accordance with all Ordinances of the Town and recorded with the County Clerk of Denton County.

(b) Notwithstanding paragraph (a) above, a plat shall not be required where the development of the lot or tract of land is for the sole purpose of performing alteration(s) or improvements to an existing single-family residence or the auxiliary uses thereto. All such alterations or improvements must be permitted in compliance with all applicable codes and ordinances of the Town

(c) No Final Plat shall be approved within the Town of Lakewood Village or its extraterritorial jurisdiction until the applicant has made adequate provision for thoroughfares as shown on the Thoroughfare Plan (map) as approved by the Town. The Thoroughfare Plan is a guide for the roadway connections and types that will be needed in the future. Subject to Town Council, or designee approval, as long as the connection is made, whether or not it is close to the exact alignment shown on the Thoroughfare Plan, no Thoroughfare Plan amendment should be necessary. The design and construction of the proposed thoroughfare shall be in conformance with the Town's master plans for thoroughfares and with any adopted *Development Standards for Construction* (DSC), and shall be subject to approval by the Town Council, or designee. If a different roadway type is found to be adequate or if the connection is not proposed to be made, then the plat may not be approved unless the thoroughfare plan is amended. A Traffic Impact Analysis may be required prior to approval of the proposed amendment .

## Sec. 6. Extension of Subdivision Rules and Regulations, Building Standards and Construction Permits and Fees, and Uniform Codes to the Extraterritorial Jurisdiction.

This ordinance is hereby adopted under the authority of the Constitution and laws of the State of Texas, including Texas Local Government Code Chapter 212, and is being adopted after conducting a public hearing on the matter.

The Town Council hereby amends Ordinance 08-06, the Town of Lakewood Village Subdivision and Property Regulations by extending the application of the Town of Lakewood Village Subdivision and Property Regulations to the extraterritorial jurisdiction of the Town, as that area may exist from time to time. This ordinance shall be applicable to the filing of plats, the subdivision of land, and development of property within the corporate limits of the Town and its extraterritorial jurisdiction as they may exist from time to time adjusted.

All ordinances of the Town, including Ordinance 10-01, which by such ordinance(s) the Town Council has adopted and made applicable to the Town the uniform codes, including but not limited to those concerning and applicable to building, plumbing, mechanical, energy, fuel and gas, property maintenance, electrical, fire and all appendices thereto, and all ordinance(s) concerning and related to permits and permit fees for building and construction, shall be and are hereby amended to apply and extend all such ordinances and their provisions to the "ETJ" of the Town to the full extent as permitted by law.

The Town shall have all remedies and rights provided by Texas Local Government Code, Chapter 212, with regard to the control and approval of subdivisions and plats and property development both within the Town and within its ETJ to the full extent as permitted by law.

## ARTICLE II. PLATS

### DIVISION 1. GENERALLY

**Sec. 7. Fees.**

The applicant for approval of a preliminary plat, final plat, replat, amended plat, minor plat or modified final plat shall, upon submission of the plat application and all required documentation, pay a nonreturnable fee, as established by the Town Council, for the review and processing of the plat application. Upon approval of the final plat, replat, amended plat or final minor plat, the applicant shall pay an additional recording fee established by the county for recording the plat with the county clerk.

> Preliminary, Replat and Final Plat Review Fees. A preliminary plat, replat, and final plat review fee shall be paid to the Town upon the filing of the preliminary and final plat in accordance with the following schedule: $700 per plat plus $20.00 per lot.

**Sec. 8. Process for approval.**

(a) The plat shall be scheduled for consideration at the next regular meeting of the Town

Council.

(b) If the plat is disapproved by the Town Council, the applicant may correct the items of concern and resubmit the plat for approval one (1) time within six (6) months by paying one-half (1/2) of the original fee. If the plat is disapproved a second time or if a second request is not received within six (6) months of the first disapproval, the applicant will be required to repeat the plat application process from the beginning and pay all standard application fees.

(c) An applicant may withdraw his plat application from consideration at any time during the application process by filing a written notice of withdrawal with the Town. Upon filing the notice to withdraw, the Town shall discontinue processing the plat application. The applicant must file a written request to proceed with further consideration of the plat within six (6) months of withdrawal and the Town shall continue the application process. If the request to proceed with further consideration of the plat is filed more than six (6) months after filing the notice of withdrawal, the applicant shall be required to repeat the plat application process from the beginning and pay the standard application fees.

### Sec. 9. Requirements for approval of application by Town Council.

(a) Within thirty (30) days of the date that the application is deemed administratively complete, the Town Council shall approve a plat if it complies with the requirements of this chapter, the applicant is not in arrears in the payment of any debts owed the Town required by this chapter on a previous plat, it conforms to the general plan of the Town and its current and future streets, alleys, parks, playgrounds, and public utility facilities plans, and it conforms to the Town's general plan for the extension of roads, streets, and public highways, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities.

(b) A plat is considered approved by the Town Council unless it is disapproved within such thirty-day period.

### Sec. 10. Recordation.

(a) Preliminary plats are not recorded with the county clerk.

(b) Applicant shall record all plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(c) Applicant shall record all other plats with the county clerk upon the Town Council's approval of the plat and the applicant's submission of the required recording fee to the County.

(d) A final plat shall become null and void six (6) months after its approval by the Town Council, unless the final plat is filed and recorded in Denton County Clerk Real Property Records.

(e) A general development plan shall become null and void six (6) months after its approval by the City Council, unless the general development plan is filed and recorded in Denton County Clerk Real Property Records.

## Sec. 11. Approval of preliminary plats.

Approval of a preliminary plat shall be deemed to be an expression of approval to the layout submitted as a guide to the preparation of the final plat and shall not constitute approval of a final plat.

DIVISION 2. PRELIMINARY PLATS

## Sec. 12. Form, contents and required documentation.

(a) Preliminary plats shall be filed with the town secretary. The town secretary shall stamp the following notice on the face of each preliminary plat: "Preliminary plat for inspection purposes only and in no way official or approved for record purposes and not approved for construction."

(b) When filing a preliminary plat application, it shall be accompanied by the following minimum documentation:

(1) Completed preliminary plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes; and

(6) Nonrefundable application fee, as established by the Town Council.

(c) Preliminary plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 200' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets);

(2) Boundary of the subject tract;

(3) All existing and/or proposed streets and alleys with street names, widths and relation to surrounding existing street patterns;

(4) Approximate width and depth of all proposed lots;

(5) Layout, in dotted lines, of all adjacent lots to the property being platted showing lot size, lot and block numbers, name of existing subdivision or property owner if undeveloped property;

(6) FEMA designated 100-year floodplain boundary;

(7) Date, scale, north point, and small scale location map;

(8) Name and address of all property owners of the property being platted;

(9) Name and address of engineer and surveyor; and

(10) Signed statement of the engineer and/or surveyor who prepared the preliminary plat indicating the records or survey from which the property description of the boundary of the proposed plat was developed.

(d) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Layout of all needed off-site utilities;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size of line, location of manholes and cleanouts;

(4) Drainage plan prepared in accordance with standard 100 year flood frequencies rainfalls which shows the overall analysis of the change of existing condition to fully developed condition and identify approximate location where water will exit the subdivision. Drainage plan shall show all contours for proposed development; and

(5) As-built drawings of existing structures, if applicable.

DIVISION 3. FINAL PLATS

**Sec. 13. Form, contents and required documentation.**

(a) Final plats are mandatory.

(b) In cases where a preliminary plat was previously approved, the final plat shall conform to the approved preliminary plat.

(c)     Final plats shall be filed with the City Secretary and shall be accompanied by the following minimum documentation:

(1) Completed final plat application;

(2) Eight (8) copies of the plat;

(3) Eight (8) copies of engineering plans;

(4) Deed showing current ownership of the platted property;

(5) Tax certificates showing property owner is not in arrears in payment of taxes;

(6) A statement on the plat application showing that all fees owed the Town on any prior projects has been paid in full at the time the application was filed; and

(7) Nonrefundable application fee, as established by the Town Council.

(d) Final plats must meet the following criteria and contain the following information:

(1) Scaled drawing no smaller than 1" = 100' on a sheet size no greater than twenty-four (24) inches by thirty-six (36) inches (multiple sheets may be submitted; however, each sheet must be registered and match lines to allow assembly of the multiple sheets and an index sheet shall be drawn on a sheet twenty-four (24) inches by thirty-six (36) inches showing the entire property being platted);

(2) The shape and the exterior boundaries of the property being platted shall be indicated by the use of a distinctive and individual symbol;

(3) The length of all straight lines, deflection angles, radii, arcs, and central angles of all curves shall be given along the property lines of each street or tabulated on the same sheet showing all curve data with its symbol. All dimensions along the lines of each lot with the angles of intersections which they make with each other shall be indicated;

(4) The names of all adjoining subdivisions, the side lines of abutting lots, lot and block numbers, all in dotted lines, and where possible, accurate reference ties to at least two (2) adjacent recognized land corners shall be clearly indicated;

(5) The description and location of all survey monuments placed on the property being platted shall be indicated;

(6) A title shall be indicated, including the name of the property being platted, the name of the applicant and scale and location of the property being platted with reference to original surveys and a north point which may be magnetic or true north, with notation stating which.

(7) FEMA designated 100-year floodplain boundary, including finish floor elevation established a minimum of three feet above the calculated 100 year flood. A

surveyor's certificate shall be placed on the final plat as follows:

KNOW ALL MEN BY THESE PRESENTS:

That I, _____, do hereby certify that I prepared this plat from an actual and accurate survey of the land and that the corner monuments shown thereon were properly placed under my personal supervision, in accordance with the Subdivision and Property Development Regulations of the Town of Lakewood Village, Texas.

_____
Signature

_____
Texas Reg. No.

(9) A certificate of ownership and of dedication of all streets, alleys, easements and lands to public use forever, signed and acknowledged before a notary public by the owner of the land, shall appear on the face of the map, containing complete and accurate description of the property being platted and the streets dedicated;

(10) The applicant will furnish the Town a copy of the dedication at the same time the final plat is submitted for approval; and

(11) The following certificate of approval by the Town Council shall be placed on the plat:

Approved this _____ day of _____, 20_____, by the Town Council of the Town of Lakewood Village, Texas.

_____
Mayor

_____
Town Secretary

(e) The engineering plans shall be in compliance with the current adopted construction standards of the Town and shall consist of the following:

(1) Street layout and grades;

(2) Water system layout, including size of line and fire hydrant location;

(3) Sewer system layout, including size and grade of lines, location of manholes and cleanouts, and lift station design;

(4) All drainage structure designs, analysis of as-is and full development for where the water exits the subdivision, analysis of all streets to determine if they meet drainage criteria, FEMA floodplain and floodway boundaries (if applicable), and letter(s) of

release from property owners affected by diversion of water (except for watercourse(s) designated on current Town topography maps); and

(5) As-built drawings of existing structures, if applicable.

## DIVISION 4. VACATION OF PLATS, REPLATS AND AMENDMENT OF PLATS*

### Sec. 15. Vacation of plats.

(a) Any plat, replat or amended plat previously recorded with the county clerk may be vacated by the property owner(s) at any time prior to the sale of any lot therein by filing a written signed and acknowledged instrument declaring the same to be vacated and recorded with the county clerk.

(b) If the one (1) or more lots have been sold, the plat, replat or amended plat may be vacated by the property owners by filing a written signed and acknowledged instrument with the town secretary. The vacating instrument must be approved by the Town Council in the same manner as the original plat, replat or amended plat. The Town Council shall disapprove the vacating instrument which abridges or destroys public rights in any of its public uses, improvements, streets, or alleys. Upon approval by the Town Council, the vacating instrument may be recorded with the county clerk and the vacated plat, replat or amended plat shall have no effect.

**State law reference(s)**--Vacating plats, V.T.C.A., Local Government Code § 212.013.

### Sec. 16. Replats without vacating preceding plat.

A replat may be recorded and controls over a previously recorded plat without vacation of that plat if the replat is signed and acknowledged by the owners of the property being platted, does not attempt to amend or remove any covenants or restrictions, and is approved, after a public hearing on the matter, by the Town Council.

### Sec. 17. Plat amendments or corrections.

(a) The Town Council may approve and issue an amended plat, which may be recorded with the county clerk and controls over the preceding plat without vacation of the plat, if the amended plat is signed by the applicant(s) and is solely for one (1) or more of the following purposes:

(1) To correct an error in a course or distance shown on the preceding plat;

(2) To add a course or distance that was omitted on the preceding plat;

(3) To correct an error in the description of the real property shown on the preceding plat;

---

*State law reference–Vacating plats, amending plats, etc., V.T.C.A. Local Government Code § 212.013 et seq.

(4) To indicate monuments set forth after death, disability, or retirement from practice of the engineer or surveyor responsible for setting monuments;

(5) To show the proper location or character of any monument which has been changed in location or character or which originally was shown incorrectly as to location or character on the preceding plat;

(6) To correct any other type of scrivener's or clerical error or omission previously approved by the planning and zoning commission and/or Town Council, including lot numbers, acreage, street names, and identification of adjacent recorded plats;

(7) To correct an error in courses and distances of lot lines between two (2) adjacent lots where both lot owners join in the application for plat amendment and neither lot is abolished; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not have a material adverse effect on the property rights of the other owners in the plat;

(8) To relocate a lot line in order to cure an inadvertent encroachment of a building or improvement on a lot line or on an easement;

(9) To relocate one (1) or more lot lines between one (1) or more adjacent lots where the owner(s) of all such lots join in the application for the plat amendment; provided, that such amendment does not attempt to remove recorded covenants or restrictions and does not increase the number of lots; or

(10) To make necessary changes to the preceding plat to create six (6) or fewer lots in the plat if the changes do not affect applicable zoning and other regulations of the Town, and the changes do not attempt to amend or remove any covenants or restrictions and the area covered by the changes is located in an area that the Town Council has approved, after a public hearing, as a residential improvement area.

(11) To replat one or more lots fronting on an existing street if the owners of all those lots join in the application for the amendment; the amendment does not attempt to remove recorded covenants or restrictions or increase the number of lots; and, the amendment does not create or require the creation of a new street or make necessary the extension of municipal facilities.

(b) Notice, a hearing, and the approval of other lot owners are not required for the approval and issuance of an amended plat.

## ARTICLE III. DEVELOPMENT PROCESS

### Sec. 18. Construction of infrastructure.

(a) Following approval of the final plat, the plat applicant shall submit full construction plans for all proposed infrastructure to be constructed for the platted property. Construction plans

submitted shall be in conformance with the approved plat. The Town engineer shall review the submitted plans for compliance with the construction standards adopted by the Town.

(b) Upon approval of construction plans by Town Council, the plat applicant and/or the plat applicant's contractor will provide written notification to the Town engineer of the intent to commence construction of the required infrastructure. No work may be performed unless written notification has been provided to the Town engineer. The written notification shall contain the following information:

(1) Name of the plat or subdivision;

(2) Plat applicant's name;

(3) Contractor's name, address and phone number;

(4) Type of construction to be performed; and

(5) Estimated value of construction contract.

(c) The Town engineer shall issue an acknowledgment of receipt of notification to the developer and/or his contractor.

### Sec. 19. Acceptance of infrastructure.

(a) Upon completion of all required infrastructure, prior to the acceptance of the subdivision by the Town for maintenance, the applicant shall post, or cause to be posted, a maintenance bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form, to guarantee the maintenance of the construction for a period of one (1) year after its completion and acceptance by the Town. In lieu of a maintenance bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form. The actual value of the maintenance bond or letter of credit or cash bond shall be ten (10) percent of the full cost of the water and sewer system and fifteen (15) percent of the full cost of the cost of street and drainage construction, as determined by the estimate of construction costs.

(b) Upon receipt of the approved maintenance bond, irrevocable letter of credit or cash bond, the Town engineer shall issue a written letter of acceptance of the infrastructure and notify the building and development department that the subdivision has been accepted by the Town.

### Sec. 20. Building permits issued prior to completion of infrastructure.

(a) In the event an applicant wishes to obtain building permits prior to acceptance of the subdivision by the Town, the applicant shall post with the Town a completion bond executed by a corporate surety or corporate sureties duly authorized to do business in this state, payable to the Town and approved by the Town as to form for all construction included in the approved

construction plans that has not been completed. In lieu of a completion bond, the applicant may submit either an irrevocable letter of credit payable to the Town and approved by the Town as to form or a cash bond payable to the Town and approved by the Town as to form.

(b) Under no circumstances shall building above the foundation be permitted until adequate fire protection is available. Adequate fire protection means:

(1) Town utilities are installed;

(2) Fire hydrants providing protection are operational; and

(3) Streets are open and drivable, street subgrades worked to proper compaction and base course installed, graded and leveled, to facilitate vehicle movement.

(c) After the plat has been recorded and the completion bond, irrevocable letter of credit or cash bond has been received and approved by the Town, the Town engineer shall notify the building and development department, by lot and block numbers, that building permits may be issued.

**Sec. 21. Agreements with the Town.**

(a) All agreements entered into between the Town and the developer and/or applicant, as a condition of plat approval, shall be recorded along with the final plat.

(b) The executed agreement shall be submitted to the Town Council in conjunction with the original drawings required for filing and recordation.

**ARTICLE IV. STANDARDS AND REQUIREMENTS**

DIVISION 1. GENERALLY

**Sec. 22. Lots and blocks.**

(a) All lots of the plat shall front on a dedicated street.

(b) In general, lots shall conform in width, depth, and area to the pattern already established in the adjacent areas, having due regard to the character of the neighborhood, its particular suitability for residential purposes, and also taking into consideration the natural topography of the ground, drainage, sanitary sewage facilities, and the proposed layout of the streets.

(c) Lots shall have the size, width measurements, front, rear, and side yard requirements required by the current Town Zoning Ordinance..

(d) The area of the lots shall be computed by taking the average width of the lot times the average depth of the lot measured from the street line to the rear lot line.

(e) All sidelines of lots shall be at right angles to straight street lines or radial to curved street lines, unless a variation from this rule would, in the opinion of the Town Council, produce a better lot plan and better utilize the proposed development.

**Sec. 23. Park sites.**

The Town Council shall consider offers of land for parks or playgrounds which conform to the current master plan adopted by the Town, provided such plan exists.

**Sec. 24. Use of Town condemnation authority.**

(a) Water and sewer mains, force mains and lift stations, streets and drainage ways shall be located in easements or rights-of-way secured and paid for by the applicant. Such easements shall be properly assigned to the Town before service is extended to the subdivision.

(b) In cases where easements cannot be secured by the applicant, the applicant may file a written petition with the Town engineer, accompanying the plat application, requesting that the Town Council utilize its condemnation authority. The written petition must satisfy all of the following criteria:

(1) The applicant must establish that clear evidence of public need exists;

(2) The applicant must establish that the proposed extension is in accordance with the current adopted master utility plan(s), if such plan(s) exists;

(3) The applicant must establish that the proposed extension will be able to serve other development areas;

(4) The applicant must agree to pay all costs of the condemnation; and

(5) The applicant must present written evidence that every practical attempt to secure the needed easements and/or right-of-way has been made by submitting the following:

a. A condemnation appraisal by an independent appraiser as to the current market value and damages, if any, of acquiring the easement and/or right-of-way; and

b. Documentation that a written offer has been made to purchase the easement and/or right-of-way for the appraised value and the offer was rejected.

(c) The petition shall be forwarded to the Town for review and recommendation and scheduled for consideration by the Town Council.

DIVISION 2. STREETS AND DRAINAGE

**Sec. 25. Streets.**

(a) Street widths in subdivisions shall conform to:

| Designation | Right-of-Way (feet) | Paving (feet) |
| --- | --- | --- |
| A + major arterial | 110 | 86 |
| A major arterial | 110 | 90 |
| B + minor arterial | 90 | 66 |
| B minor arterial | 80 | 56 |
| C major collector | 70 | 44 |
| D minor collector | 60 | 38 |
| E minor local | 50 | 31 |

(b) Existing streets shall be continued where practical, as determined by the Town Council. Continuations of existing streets shall have the same or greater right-of-way, pavement widths, and composition as the existing streets being connected. Street names shall be continuous.

(c) All necessary street rights-of-way shall be dedicated as part of the platting process and shall be dedicated to the Town without cost.

(d) Dead-end streets may be platted where the land adjoining the plat has not been platted. In the event that such dead-end street exceeds one hundred fifty (150) feet in length or one (1) lot width, from the nearest street intersection, the street will be provided with a cul-de-sac, either permanent or temporary, having a minimum right-of-way radius of fifty (50) feet.

(e) Where dead-end streets are dictated by lot designs, such dead-end streets shall be provided with a permanent cul-de-sac having a minimum right-of-way radius of fifty (50) feet.

(f) No street intersection shall be designed having an inside angle of less than thirty (30) degrees between the two (2) intersecting street lines, nor more than one hundred fifty (150) degrees.

(g) Block lengths between intersecting cross streets or to the end of a cul-de-sac shall be no more than one thousand two hundred (1,200) feet.

(h) Streets, where practical, shall be designed and platted with appropriate regard to topographical features, i.e., creeks and drainage ways, wooded areas, etc., with the aim of creating desirable and attractive treatments of significant existing features. (Ord. No. 95-38, § I, 4-25-95). Private Streets shall not be allowed.

(i) Driveways; Any driveway or other common access to more than two residences which is not defined in Section 23(a), shall be considered a minor local road and shall conform to defined standards.

(j) Streets shall be concrete with a minimum thickness of 5" and shall meet current Town design standards as determined by the Town engineer.

**Sec. 26. Alleys, reserve strips.**

(a) Alleys and/or easements shall be laid in the rear of lots fronting on adjoining streets where practicable. In residential subdivisions, the minimum width of right-of-way of an alley shall not be less than twenty (20) feet. All alleys shall be paved for the entire width of the right-of-way to the same specifications as minor residential streets. The rear or side line easement, where alleys are not provided, shall be a minimum of twenty (20) feet wide, arranged such that each lot shall have an equal ten-foot easement.

(b) No plat showing reserve strips of land controlling access to public ways or adjoining properties will be approved.

**Sec. 27. Drainage in special flood hazard areas.**

Drainage structures in areas of special flood hazard in the Town shall comply with the provisions of the Town Ordinances.

**Sec. 28. Drainage not in special flood hazard areas.**

(a) Design of all improved open drainage courses and enclosed drainage structures shall be by a registered professional engineer in accordance with the current drainage design standards approved by the Town Council. A review of the downstream drainage system capacity to a point of discharge into the lake area shall be made. The rate of storm water discharge from the proposed development shall not exceed flow capacity of any existing structure or drainage system. This may require storm water detention or retention on site of the project.

(b) The design and construction of all improved open drainage courses and enclosed drainage structures shall provide for adequate access for the performance of necessary maintenance by the Town.

(c) All improved drainage courses and enclosed drainage structures shall be dedicated to the Town and accepted for maintenance by the Town upon approval of the construction by the Town engineer.

(d) The Town shall maintain all improved drainage courses, provided that the original design and construction has been approved by the Town engineer and accepted by the Town for maintenance.

(e) Improved open drainage courses shall conform as follows:
　　(1) Open drainage courses which carries runoff from a street, between two (2) lots, to a drainage course running behind lots shall be a concrete-lined flume.

　　(2) Open drainage courses running behind lots may be of earthen channel or concrete-lined channel, provided the type of channel used satisfies the design criteria (velocity, type of soil, etc.) in accordance with the current drainage design standards approved by the Town Council.

(3) Where the open drainage course is a concrete-lined flume, the width of the easement shall be equal to the width of the flume. All other open drainage courses require the width of the easement to be equal to the width from top-of-bank to top-of-bank plus maintenance way needs as given in the drainage design standards.

(f) Enclosed drainage courses shall conform as follows:

(1) Cross drainage for right-of-way needs shall be designed to meet the same requirements as its channel.

(2) Permanent structures and improvements may be constructed upon and across improved enclosed drainage courses in business zoning districts and manufacturing zoning districts. Design shall be to accommodate the 100-year frequency flood.

(3) The width to the easement shall be equal to the width of the structure plus a width on each side of the structure to allow maintenance and/or repairs.

**Sec. 29. Street name signs.**

Street name signs and markers and traffic control signs, in accordance with standards adopted by the Town, will be required at each intersection. The developer will provide street signs and posts for the markers and make the installations when the subdivision is accepted by the Town for maintenance.

DIVISION 3. WATER AND SEWER INFRASTRUCTURE

**Sec. 30. General Provisions.**

(a) The intent and purpose of this division is to provide equitable charges for water and sewer connections as a proportionate distribution of the cost of the water and sewer main extensions to serve property within the Town. If the existing Town utility facilities are not within or adjacent to a subdivision, the developer shall construct the necessary extension of water and sewer mains, force mains, force mains, and lift stations, including all valves, manholes, and piping necessary to serve any future development of abutting property as specified in this chapter. The developer's engineer shall prepare a proposed plan of service for the subdivision and property along the extension which shall be reviewed by the Town engineer. These facilities shall be constructed in accordance with both the master plan and the Technical and Administrative Manual for Water and Sewer System Development ("Manual").

(b) It is the general policy of the Town that:

(1) Water and sewer mains should be large enough to serve all the lots platted and, should the Town determine oversizing is necessary, the Town may participate in those lines greater than 8" for water and greater than 10" for sewer.

(2) All utilities shall be required to extend across the full width of the last lot platted on each street proposed within the subdivision, in such an alignment that it can be extended to the next property in accordance with the master sewer and water plans for the Town, provided such plan(s) exist. Properties already served by water and sewer shall not be required to install additional facilities unless:

    (I) The current lines are not of adequate capacity to serve the proposed development; in which case the applicant will be required to install adequate facilities.

(c) Every lot of the plat shall have direct access to the water and sewer system. Utility service shall be from a water/sewer main located in an abutting right-of-way or through easements from the lot to a water/sewer main.

(e) (1) The terms of this division shall be cumulative of all other ordinances regulating subdivisions, and such other ordinances are not repealed by this division, except to the extent that such other provisions conflict with the terms of this chapter, in which event this chapter shall prevail.

    (2) The status of any previously designated line extension, lift station, or main shall be unaffected by this ordinance, save and except the Clear Creek pro rata line, designated in CCM #95-121R. The Clear Creek pro rata line designation is hereby rescinded.

(f) In addition to any other remedy provided by law, the Town and its officers shall have the right to enjoin any violation of this chapter by injunction issued by a court of competent jurisdiction.

## Sec. 31. Water.

(a) No water main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the water master plan, provided such plan exists.

(b) Water system layout shall be looped whenever possible. Dead-end mains shall not exceed one thousand eight hundred (1,800) feet or include three (3) fire hydrants. Single feeds may be permitted at the discretion of the Town engineer; however, any such denial may be appealed to the Town Council. Single feeds should include provisions for looping in future development.

(c) The location of fire hydrant(s) shall comply with and be approved by the Town Engineer and/or Fire Marshall and insurance requirements.

(d) Long water service taps shall be installed while the subdivision is being developed. Short water service taps shall be installed when needed for development. Long water service taps locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of

each water tap. No water service taps smaller than six (6) inches in diameter shall be allowed on water mains larger than twelve (12) inches in diameter.

**Sec. 32. Sewer.**

(a) No sewer main shall be extended unless the diameter of any such extended main is a minimum of six (6) inches inside the subdivision. Larger mains may be required per the sewer master plan, provided such plan exists.

(b) Manholes are required any time the alignment, slope, or diameter of the sewer main changes, or when two or more sewer mains intersect. In no case will the maximum spacing between manholes, or from a manhole to cleanout, exceed 500 feet.

(c) Sewer services for sewer mains located in roadways shall be installed while the subdivision is being developed. Sewer services with direct access to the sewer main without encroaching on a roadway may be installed when needed for development. Sewer tap locations shall be clearly marked with a plastic valve box directly above the tap. A ½ inch x 2 foot steel rod shall be driven vertically 6" inches below the ground surface for the location of each water tap. Sewer services six (6) inches and larger require a manhole where they intersect the sewer main. The sewer service shall extend a minimum of ten feet (10') into the lot area.

(d) Minimum lift station capacity shall be one hundred (100) gallons per minute and shall have at least two (2) pumps, each of which shall be capable of pumping the design capacity of the lift station. The minimum size of the wet well shall be such that with any combination of inflow and pumping, the cycle of operation for each pump shall not be less than five (5) minutes and the maximum retention time in the wet well shall not average more than thirty (30) minutes.

(e) Septic system holding tanks or any other sewage retainage facilities for the storage or removal of sewage are prohibited.

**Sec. 33. Costs of Extensions.**

a. *Developer initiated.* All costs of all water and sewer main extensions, force mains, and lift stations initiated by a developer in order to provide required service for their development area, shall be paid for by the developer. Such costs may include; but is not necessarily limited to, right-of-way acquisition, pipes, motors, pumps, engineering, construction costs, inspection fees, and all weather access.

In no event shall the Town pay for any costs associated with water and/or sewer improvements.

**Sec. 34. Use of Water and Sewer Tap Fees and Rate Revenues.**

Tap fees and rate revenues shall be set in an amount sufficient to maintain and operate the system, with due regard for anticipated needs to improve, update, construct, and maintain the

system.

## Sec. 35. Use of Town Condemnation Authority.

a. Water and sewer mains, force mains, and lift stations shall be located in easements, secured and paid for by the developer, and assigned to the Town before service is extended to the subdivision. For the Town to consider to using condemnation authority to assist a developer in extension of the system, the applicant must show clear evidence that every practical attempt to secure the easement has failed and there is a public need and interest for condemnation. Specific criteria and procedures shall be as stated in the manual.

b. Upon compliance with all procedures by the developer, the Town, at least 10 days prior to the hearing shall notify all property owners within the proposed easement and 200 feet therefrom. A hearing of facts by the Town Council is required. Determination of the Town Council shall be final.

## Sec. 36. Property Owners & Homeowner Associations

**Property Owners Associations or Homeowner Associations which require mandatory membership and who require mandatory fees, dues, levies, or monetary assessments are prohibited.**

## Sec. 37. Severability.

It is hereby declared to be the intention of the Town Council that if any of the sections, paragraphs, sentences, clauses, and phrases of this Ordinance shall be declared unconstitutional or invalid by the valid judgment or decree of any court of competent jurisdiction, such unconstitutionality or invalidity shall not effect any of the remaining phrases, clauses, sentences, paragraphs, or sections of this Ordinance of unconstitutional or invalid phrases, clauses, sentences paragraphs or sections.

## Sec. 38. Savings.

This Ordinance shall be cumulative of all other ordinances of the Town and shall not repeal any of the provisions of those ordinances except in those instances where the provisions of those Ordinances are in direct conflict with the provisions of this Ordinance; provided, however, that Ordinance No. 08-06 of the Town is hereby repealed, but provided that any complaint, action, cause of action, or claim which prior to the effective date of this Ordinance has been initiated or has arisen under or pursuant to Ordinance No. 08-06 shall continue to be governed by the provisions of that Ordinance and for that purpose Ordinance No. 08-06 shall be deemed to remain and shall continue in full force and effect.

## Sec. 39. Repealer.

Ordinance 02-05A, Ordinance 00-09, Ordinance 08-06, and Ordinance 11-11 are hereby

repealed.

## Sec. 40. Penalty.

Any person who should violate any provision of this Ordinance or should fail to comply herewith shall for each and every violation or noncompliance be deemed guilty of a misdemeanor and shall be fined not more than $2,000.00 (two thousand dollars) and each day such violation shall be permitted to exist shall be construed a separate offense.

## Sec. 41. Effective Date.

This Ordinance shall become effective from and after its date of passage and publication as provided by law.

**PASSED AND APPROVED** the **13th** day of **June**, 2013

Mike Schnittker, Mayor

ATTEST:

Linda Asbell, Town Secretary





Town of Lakewood Village
# Thoroughfare Plan

Denton County Thoroughfare Plan

Lakewood Village Approximate 1/2 Mile ETJ Line

Lewisville Lake

Future Toll Bridge

Major Arterial

Residential Entrance

Commercial Entrance

Old Lake Dallas Dam

Lewisville Lake

**Thoroughfare Types**
- Type M4D
- Type C2U Existing
- Type C2U Proposed
- Major Arterial
- Future Toll Bridge
- Entry Feature / Roundabout
- Lakewood Village City Limits
- Lakewood Village Approx. ETJ
- Little Elm City Limits
- Old Lake Dallas Dam
- Residential Areas
- Public/Semi-Public
- Lake Lewisville
- 100 Year Floodplain

RIGHT OF WAY 60'
C2U - Collector

RIGHT OF WAY 90'
M4D - Minor Thoroughfare

RIGHT OF WAY 120'
Eldorado Parkway P7U

Landiscor Aerial Oct. 2007

# Exhibit 29

STATE OF TEXAS     )

                         )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the 2006 International Residential Code, Chapter 1, Part 1, R101.1 – R114.2. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

_Linda Asbell_

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



# Part I—Administrative

## CHAPTER 1

# SCOPE AND ADMINISTRATION

**PART 1—SCOPE AND APPLICATION**

### SECTION R101
### GENERAL

**R101.1 Title.** These provisions shall be known as the *Residential Code for One- and Two-family Dwellings* of **[NAME OF JURISDICTION]**, and shall be cited as such and will be referred to herein as "this code."

**R101.2 Scope.** The provisions of the *International Residential Code for One- and Two-family Dwellings* shall apply to the construction, *alteration*, movement, enlargement, replacement, repair, equipment, use and occupancy, location, removal and demolition of detached one- and two-family dwellings and townhouses not more than three stories above *grade plane* in height with a separate means of egress and their *accessory structures*.

**Exceptions:**

1. Live/work units complying with the requirements of Section 419 of the *International Building Code* shall be permitted to be built as one- and two-family *dwellings* or townhouses. Fire suppression required by Section 419.5 of the *International Building Code* when constructed under the *International Residential Code for One- and Two-family Dwellings* shall conform to Section P2904.

2. Owner-occupied lodging houses with five or fewer guestrooms shall be permitted to be constructed in accordance with the *International Residential Code for One- and Two-family Dwellings* when equipped with a fire sprinkler system in accordance with Section P2904.

**R101.3 Intent.** The purpose of this code is to establish minimum requirements to safeguard the public safety, health and general welfare through affordability, structural strength, means of egress facilities, stability, sanitation, light and ventilation, energy conservation and safety to life and property from fire and other hazards attributed to the built environment and to provide safety to fire fighters and emergency responders during emergency operations.

### SECTION R102
### APPLICABILITY

**R102.1 General.** Where there is a conflict between a general requirement and a specific requirement, the specific requirement shall be applicable. Where, in any specific case, different sections of this code specify different materials, methods of construction or other requirements, the most restrictive shall govern.

**R102.2 Other laws.** The provisions of this code shall not be deemed to nullify any provisions of local, state or federal law.

**R102.3 Application of references.** References to chapter or section numbers, or to provisions not specifically identified by number, shall be construed to refer to such chapter, section

or provision of this code.

**R102.4 Referenced codes and standards.** The codes and standards referenced in this code shall be considered part of the requirements of this code to the prescribed extent of each such reference and as further regulated in Sections R102.4.1 and R102.4.2.

**Exception:** Where enforcement of a code provision would violate the conditions of the *listing* of the *equipment* or *appliance*, the conditions of the *listing* and manufacturer's instructions shall apply.

**R102.4.1 Differences.** Where differences occur between provisions of this code and referenced codes and standards, the provisions of this code shall apply.

**R102.4.2 Provisions in referenced codes and standards.** Where the extent of the reference to a referenced code or standard includes subject matter that is within the scope of this code, the provisions of this code, as applicable, shall take precedence over the provisions in the referenced code or standard.

**R102.5 Appendices.** Provisions in the appendices shall not apply unless specifically referenced in the adopting ordinance.

**R102.6 Partial invalidity.** In the event any part or provision of this code is held to be illegal or void, this shall not have the effect of making void or illegal any of the other parts or provisions.

**R102.7 Existing structures.** The legal occupancy of any structure existing on the date of adoption of this code shall be permitted to continue without change, except as is specifically covered in this code, the *International Property Maintenance Code* or the *International Fire Code*, or as is deemed necessary by the *building official* for the general safety and welfare of the occupants and the public.

**R102.7.1 Additions, alterations or repairs.** *Additions, alterations* or repairs to any structure shall conform to the requirements for a new structure without requiring the existing structure to comply with all of the requirements of this code, unless otherwise stated. *Additions, alterations* or repairs shall not cause an existing structure to become unsafe or adversely affect the performance of the building.

## PART 2—ADMINISTRATION AND ENFORCEMENT
## SECTION R103
## DEPARTMENT OF BUILDING SAFETY

**R103.1 Creation of enforcement agency.** The department of building safety is hereby created and the official in charge thereof shall be known as the *building official*.

**R103.2 Appointment.** The *building official* shall be appointed by the chief appointing authority of the *jurisdiction*.

**R103.3 Deputies.** In accordance with the prescribed procedures of this *jurisdiction* and with the concurrence of the appointing authority, the *building official* shall have the authority to appoint a deputy *building official*, the related technical officers, inspectors, plan examiners and other employees. Such employees shall have powers as delegated by the *building official*.

## SECTION R104
## DUTIES AND POWERS OF THE BUILDING OFFICIAL

**R104.1 General.** The *building official* is hereby authorized and directed to enforce the provisions of this code. The *building official* shall have the authority to render interpretations of this code and to adopt policies and procedures in order to clarify the application of its provisions. Such interpretations, policies and procedures shall be in conformance with the intent and purpose of this code. Such policies and procedures shall not have the effect of waiving requirements specifically provided for in this code.

**R104.2 Applications and permits.** The *building official* shall receive applications, review *construction documents* and issue permits for the erection and alteration of buildings and structures, inspect the premises for which such permits have been issued and enforce compliance with the provisions of this code.

**R104.3 Notices and orders.** The *building official* shall issue all necessary notices or orders to ensure compliance with this code.

**R104.4 Inspections.** The *building official* is authorized to make all of the required inspections, or the *building official* shall have the authority to accept reports of inspection by *approved agencies* or individuals. Reports of such inspections shall be in writing and be certified by a responsible officer of such *approved* agency or by the responsible individual. The *building official* is authorized to engage such expert opinion as deemed necessary to report upon unusual technical issues that arise, subject to the approval of the appointing authority.

**R104.5 Identification.** The *building official* shall carry proper identification when inspecting structures or premises in the performance of duties under this code.

**R104.6 Right of entry.** Where it is necessary to make an inspection to enforce the provisions of this code, or where the *building official* has reasonable cause to believe that there exists in a structure or upon a premises a condition which is contrary to or in violation of this code which makes the structure or premises unsafe, dangerous or hazardous, the *building official* or designee is authorized to enter the structure or premises at reasonable times to inspect or to perform the duties imposed by this code, provided that if such structure or premises be occupied that credentials be presented to the occupant and entry requested. If such structure or premises be unoccupied, the *building official* shall first make a reasonable effort to locate the owner or other person having charge or control of the structure or premises and request entry. If entry is refused, the *building official* shall have recourse to the remedies provided by law to secure entry.

**R104.7 Department records.** The *building official* shall keep official records of applications received, permits and certificates issued, fees collected, reports of inspections, and notices and orders issued. Such records shall be retained in the official records for the period required for the retention of public records.

**R104.8 Liability.** The *building official*, member of the board

of appeals or employee charged with the enforcement of this code, while acting for the *jurisdiction* in good faith and without malice in the discharge of the duties required by this code or other pertinent law or ordinance, shall not thereby be rendered liable personally and is hereby relieved from personal liability for any damage accruing to persons or property as a result of any act or by reason of an act or omission in the discharge of official duties. Any suit instituted against an officer or employee because of an act performed by that officer or employee in the lawful discharge of duties and under the provisions of this code shall be defended by legal representative of the *jurisdiction* until the final termination of the proceedings. The *building official* or any subordinate shall not be liable for cost in any action, suit or proceeding that is instituted in pursuance of the provisions of this code.

**R104.9 Approved materials and equipment.** Materials, *equipment* and devices *approved* by the *building official* shall be constructed and installed in accordance with such approval.

**R104.9.1 Used materials and equipment.** Used materials, *equipment* and devices shall not be reused unless *approved* by the *building official.*

**R104.10 Modifications.** Wherever there are practical difficulties involved in carrying out the provisions of this code, the *building official* shall have the authority to grant modifications for individual cases, provided the *building official* shall first find that special individual reason makes the strict letter of this code impractical and the modification is in compliance with the intent and purpose of this code and that such modification does not lessen health, life and fire safety or structural requirements. The details of action granting modifications shall be recorded and entered in the files of the department of building safety.

**R104.10.1 Flood hazard areas.** The *building official* shall not grant modifications to any provision related to flood hazard areas as established by Table R301.2(1) without the granting of a variance to such provisions by the board of appeals.

**R104.11 Alternative materials, design and methods of construction and equipment.** The provisions of this code are not intended to prevent the installation of any material or to prohibit any design or method of construction not specifically prescribed by this code, provided that any such alternative has been *approved.* An alternative material, design or method of construction shall be *approved* where the *building official* finds that the proposed design is satisfactory and complies with the intent of the provisions of this code, and that the material, method or work offered is, for the purpose intended, at least the equivalent of that prescribed in this code. Compliance with the specific performance-based provisions of the International Codes in lieu of specific requirements of this code shall also be permitted as an alternate.

**R104.11.1 Tests.** Whenever there is insufficient evidence

of compliance with the provisions of this code, or evidence that a material or method does not conform to the requirements of this code, or in order to substantiate claims for alternative materials or methods, the *building official* shall have the authority to require tests as evidence of compliance to be made at no expense to the *jurisdiction*. Test methods shall be as specified in this code or by other recognized test standards. In the absence of recognized and accepted test methods, the *building official* shall approve the testing procedures. Tests shall be performed by an *approved* agency. Reports of such tests shall be retained by the *building official* for the period required for retention of public records.

## SECTION R105
## PERMITS

**R105.1 Required.** Any owner or authorized agent who intends to construct, enlarge, alter, repair, move, demolish or change the occupancy of a building or structure, or to erect, install, enlarge, alter, repair, remove, convert or replace any electrical, gas, mechanical or plumbing system, the installation of which is regulated by this code, or to cause any such work to be done, shall first make application to the *building official* and obtain the required *permit*.

**R105.2 Work exempt from permit.** *Permits* shall not be required for the following. Exemption from *permit* requirements of this code shall not be deemed to grant authorization for any work to be done in any manner in violation of the provisions of this code or any other laws or ordinances of this *jurisdiction*.

**Building:**

1. One-story detached *accessory structures* used as tool and storage sheds, playhouses and similar uses, provided the floor area does not exceed 200 square feet (18.58 m2).

2. Fences not over 7 feet (2134 mm) high.

3. Retaining walls that are not over 4 feet (1219 mm) in height measured from the bottom of the footing to the top of the wall, unless supporting a surcharge.

4. Water tanks supported directly upon *grade* if the capacity does not exceed 5,000 gallons (18 927 L) and the ratio of height to diameter or width does not exceed 2 to 1.

5. Sidewalks and driveways.

6. Painting, papering, tiling, carpeting, cabinets, counter tops and similar finish work.

7. Prefabricated swimming pools that are less than 24 inches (610 mm) deep.

8. Swings and other playground equipment.

9. Window awnings supported by an exterior wall which do not project more than 54 inches (1372 mm) from the exterior wall and do not require additional support.

10. Decks not exceeding 200 square feet (18.58 m2) in area, that are not more than 30 inches (762 mm) above *grade* at any point, are not attached to a *dwelling* and do not serve the exit door required by

Section R311.4.

**Electrical:**

1. *Listed* cord-and-plug connected temporary decorative lighting.

2. Reinstallation of attachment plug receptacles but not the outlets therefor.

3. Replacement of branch circuit overcurrent devices of the required capacity in the same location.

4. Electrical wiring, devices, *appliances,* apparatus or *equipment* operating at less than 25 volts and not capable of supplying more than 50 watts of energy.

5. Minor repair work, including the replacement of lamps or the connection of *approved* portable electrical *equipment* to *approved* permanently installed receptacles.

**Gas:**

1. Portable heating, cooking or clothes drying *appliances.*

2. Replacement of any minor part that does not alter approval of *equipment* or make such *equipment* unsafe.

3. Portable-fuel-cell *appliances* that are not connected to a fixed piping system and are not interconnected to a power grid.

**Mechanical:**

1. Portable heating *appliances.*

2. Portable ventilation *appliances.*

3. Portable cooling units.

4. Steam, hot- or chilled-water piping within any heating or cooling *equipment* regulated by this code.

5. Replacement of any minor part that does not alter approval of *equipment* or make such *equipment* unsafe.

6. Portable evaporative coolers.

7. Self-contained refrigeration systems containing 10 pounds (4.54 kg) or less of refrigerant or that are actuated by motors of 1 horsepower (746 W) or less.

8. Portable-fuel-cell *appliances* that are not connected to a fixed piping system and are not interconnected to a power grid.

The stopping of leaks in drains, water, soil, waste or vent pipe; provided, however, that if any concealed trap, drainpipe, water, soil, waste or vent pipe becomes defective and it becomes necessary to remove and replace the same with new material, such work shall be considered as new work and a *permit* shall be obtained and inspection made as provided in this code.

The clearing of stoppages or the repairing of leaks in pipes, valves or fixtures, and the removal and reinstallation of water closets, provided such repairs do not involve or require the replacement or rearrangement of valves, pipes or fixtures.

**R105.2.1 Emergency repairs.** Where *equipment* replacements and repairs must be performed in an emergency situation, the *permit* application shall be submitted within the

next working business day to the *building official*.

**R105.2.2 Repairs.** Application or notice to the *building official* is not required for ordinary repairs to structures, replacement of lamps or the connection of *approved* portable electrical *equipment* to *approved* permanently installed receptacles. Such repairs shall not include the cutting away of any wall, partition or portion thereof, the removal or cutting of any structural beam or load-bearing support, or the removal or change of any required means of egress, or rearrangement of parts of a structure affecting the egress requirements; nor shall ordinary repairs include *addition* to, *alteration* of, replacement or relocation of any water supply, sewer, drainage, drain leader, gas, soil, waste, vent or similar piping, electric wiring or mechanical or other work affecting public health or general safety.

**R105.2.3 Public service agencies.** A *permit* shall not be required for the installation, alteration or repair of generation, transmission, distribution, metering or other related *equipment* that is under the ownership and control of public service agencies by established right.

**R105.3 Application for permit.** To obtain a *permit*, the applicant shall first file an application therefor in writing on a form furnished by the department of building safety for that purpose. Such application shall:

1. Identify and describe the work to be covered by the *permit* for which application is made.

2. Describe the land on which the proposed work is to be done by legal description, street address or similar description that will readily identify and definitely locate the proposed building or work.

3. Indicate the use and occupancy for which the proposed work is intended.

4. Be accompanied by *construction documents* and other information as required in Section R106.1.

5. State the valuation of the proposed work.

6. Be signed by the applicant or the applicant's authorized agent.

7. Give such other data and information as required by the *building official*.

**R105.3.1 Action on application.** The *building official* shall examine or cause to be examined applications for permits and amendments thereto within a reasonable time after filing. If the application or the *construction documents* do not conform to the requirements of pertinent laws, the *building official* shall reject such application in writing stating the reasons therefor. If the *building official* is satisfied that the proposed work conforms to the requirements of this code and laws and ordinances applicable thereto, the *building official* shall issue a *permit* therefor as soon as practicable.

**R105.3.1.1 Determination of substantially improved or substantially damaged existing buildings in flood hazard areas.** For applications for reconstruction, rehabilitation, *addition* or other improvement of existing buildings or structures located in a flood hazard area as established by Table R301.2(1), the *building*

*official* shall examine or cause to be examined the *construction documents* and shall prepare a finding with regard to the value of the proposed work. For buildings that have sustained damage of any origin, the value of the proposed work shall include the cost to repair the building or structure to its predamaged condition. If the *building official* finds that the value of proposed work equals or exceeds 50 percent of the market value of the building or structure before the damage has occurred or the improvement is started, the finding shall be provided to the board of appeals for a determination of substantial improvement or substantial damage. Applications determined by the board of appeals to constitute substantial improvement or substantial damage shall require all existing portions of the entire building or structure to meet the requirements of Section R322.

**R105.3.2 Time limitation of application.** An application for a *permit* for any proposed work shall be deemed to have been abandoned 180 days after the date of filing unless such application has been pursued in good faith or a *permit* has been issued; except that the *building official* is authorized to grant one or more extensions of time for additional periods not exceeding 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.4 Validity of permit.** The issuance or granting of a *permit* shall not be construed to be a *permit* for, or an *approval* of, any violation of any of the provisions of this code or of any other ordinance of the *jurisdiction*. Permits presuming to give authority to violate or cancel the provisions of this code or other ordinances of the *jurisdiction* shall not be valid. The issuance of a *permit* based on *construction documents* and other data shall not prevent the *building official* from requiring the correction of errors in the *construction documents* and other data. The *building official* is also authorized to prevent occupancy or use of a structure where in vio-

lation of this code or of any other ordinances of this *jurisdiction*.

**R105.5 Expiration.** Every *permit* issued shall become invalid unless the work authorized by such *permit* is commenced within 180 days after its issuance, or if the work authorized by such *permit* is suspended or abandoned for a period of 180 days after the time the work is commenced. The *building official* is authorized to grant, in writing, one or more extensions of time, for periods not more than 180 days each. The extension shall be requested in writing and justifiable cause demonstrated.

**R105.6 Suspension or revocation.** The *building official* is authorized to suspend or revoke a *permit* issued under the provisions of this code wherever the *permit* is issued in error or on the basis of incorrect, inaccurate or incomplete information, or in violation of any ordinance or regulation or any of the provisions of this code.

**R105.7 Placement of permit.** The building *permit* or copy thereof shall be kept on the site of the work until the completion

of the project.

**R105.8 Responsibility.** It shall be the duty of every person who performs work for the installation or repair of building, structure, electrical, gas, mechanical or plumbing systems, for which this code is applicable, to comply with this code.

**R105.9 Preliminary inspection.** Before issuing a *permit*, the *building official* is authorized to examine or cause to be examined buildings, structures and sites for which an application has been filed.

## SECTION R106
## CONSTRUCTION DOCUMENTS

**R106.1 Submittal documents.** Submittal documents consisting of *construction documents*, and other data shall be submitted in two or more sets with each application for a *permit*.

The *construction documents* shall be prepared by a registered *design professional* where required by the statutes of the *jurisdiction* in which the project is to be constructed. Where special conditions exist, the *building official* is authorized to require additional *construction documents* to be prepared by a registered *design professional*.

**Exception:** The *building official* is authorized to waive the submission of *construction documents* and other data not required to be prepared by a registered *design professional* if it is found that the nature of the work applied for is such that reviewing of *construction documents* is not necessary to obtain compliance with this code.

**R106.1.1 Information on construction documents.** *Construction documents* shall be drawn upon suitable material. Electronic media documents are permitted to be submitted when *approved* by the *building official*. *Construction documents* shall be of sufficient clarity to indicate the location, nature and extent of the work proposed and show in detail that it will conform to the provisions of this code and relevant laws, ordinances, rules and regulations, as determined by the *building official*. Where required by the *building official*, all braced wall lines, shall be identified on the *construction documents* and all pertinent information including, but not limited to, bracing methods, location and length of braced wall panels, foundation requirements of braced wall panels at top and bottom shall be provided.

**R106.1.2 Manufacturer's installation instructions.** Manufacturer's installation instructions, as required by this code, shall be available on the job site at the time of inspection.

**R106.1.3 Information for construction in flood hazard areas.** For buildings and structures located in whole or in part in flood hazard areas as established by Table R301.2(1), *construction documents* shall include:

1. Delineation of flood hazard areas, floodway boundaries and flood zones and the design flood elevation, as appropriate;

2. The elevation of the proposed lowest floor, including *basement*; in areas of shallow flooding (AO Zones), the height of the proposed lowest floor, including *basement*, above the highest adjacent

*grade;*

3. The elevation of the bottom of the lowest horizontal structural member in coastal high hazard areas (V Zone); and

4. If design flood elevations are not included on the community's Flood Insurance Rate Map (FIRM), the *building official* and the applicant shall obtain and reasonably utilize any design flood elevation and floodway data available from other sources.

**R106.2 Site plan or plot plan.** The *construction documents* submitted with the application for *permit* shall be accompanied by a site plan showing the size and location of new construction and existing structures on the site and distances from *lot lines*. In the case of demolition, the site plan shall show construction to be demolished and the location and size of existing structures and construction that are to remain on the site or plot. The *building official* is authorized to waive or modify the requirement for a site plan when the application for permit is for alteration or repair or when otherwise warranted.

**R106.3 Examination of documents.** The *building official* shall examine or cause to be examined *construction documents* for code compliance.

**R106.3.1 Approval of construction documents.** When the *building official* issues a *permit*, the *construction documents* shall be *approved* in writing or by a stamp which states "REVIEWED FOR CODE COMPLIANCE." One set of *construction documents* so reviewed shall be retained by the *building official*. The other set shall be returned to the applicant, shall be kept at the site of work and shall be open to inspection by the *building official* or his or her authorized representative.

**R106.3.2 Previous approvals.** This code shall not require changes in the *construction documents*, construction or designated occupancy of a structure for which a lawful *permit* has been heretofore issued or otherwise lawfully authorized, and the construction of which has been pur

sued in good faith within 180 days after the effective date of this code and has not been abandoned.

**R106.3.3 Phased approval.** The *building official* is authorized to issue a *permit* for the construction of foundations or any other part of a building or structure before the *construction documents* for the whole building or structure have been submitted, provided that adequate information and detailed statements have been filed complying with pertinent requirements of this code. The holder of such *permit* for the foundation or other parts of a building or structure shall proceed at the holder's own risk with the building operation and without assurance that a *permit* for the entire structure will be granted.

**R106.4 Amended construction documents.** Work shall be installed in accordance with the *approved construction documents*, and any changes made during construction that are not in compliance with the *approved construction documents* shall be resubmitted for approval as an amended set of *construction documents*.

**R106.5 Retention of construction documents.** One set of *approved construction documents* shall be retained by the *building official* for a period of not less than 180 days from date of completion of the permitted work, or as required by state or local laws.

## SECTION R107
## TEMPORARY STRUCTURES AND USES

**R107.1 General.** The *building official* is authorized to issue a *permit* for temporary structures and temporary uses. Such permits shall be limited as to time of service, but shall not be permitted for more than 180 days. The *building official* is authorized to grant extensions for demonstrated cause.

**R107.2 Conformance.** Temporary structures and uses shall conform to the structural strength, fire safety, means of egress, light, ventilation and sanitary requirements of this code as necessary to ensure the public health, safety and general welfare.

**R107.3 Temporary power.** The *building official* is authorized to give permission to temporarily supply and use power in part of an electric installation before such installation has been fully completed and the final certificate of completion has been issued. The part covered by the temporary certificate shall comply with the requirements specified for temporary lighting, heat or power in NFPA 70.

**R107.4 Termination of approval.** The *building official* is authorized to terminate such *permit* for a temporary structure or use and to order the temporary structure or use to be discontinued.

## SECTION R108
## FEES

**R108.1 Payment of fees.** A *permit* shall not be valid until the fees prescribed by law have been paid. Nor shall an amendment to a *permit* be released until the additional fee, if any, has been paid.

**R108.2 Schedule of permit fees.** On buildings, structures, electrical, gas, mechanical and plumbing systems or *alterations* requiring a *permit*, a fee for each *permit* shall be paid as required, in accordance with the schedule as established by the applicable governing authority.

**R108.3 Building permit valuations.** Building *permit* valuation shall include total value of the work for which a *permit* is being issued, such as electrical, gas, mechanical, plumbing equipment and other permanent systems, including materials and labor.

**R108.4 Related fees.** The payment of the fee for the construction, alteration, removal or demolition for work done in connection with or concurrently with the work authorized by a building *permit* shall not relieve the applicant or holder of the *permit* from the payment of other fees that are prescribed by law.

**R108.5 Refunds.** The *building official* is authorized to establish a refund policy.

**R108.6 Work commencing before permit issuance.** Any person who commences work requiring a *permit* on a building, structure, electrical, gas, mechanical or plumbing system before obtaining the necessary permits shall be subject to a fee established by the applicable governing authority that

shall be in addition to the required *permit* fees.

## SECTION R109
## INSPECTIONS

**R109.1 Types of inspections.** For onsite construction, from time to time the *building official*, upon notification from the *permit* holder or his agent, shall make or cause to be made any necessary inspections and shall either approve that portion of the construction as completed or shall notify the *permit* holder or his or her agent wherein the same fails to comply with this code.

**R109.1.1 Foundation inspection.** Inspection of the foundation shall be made after poles or piers are set or trenches or *basement* areas are excavated and any required forms erected and any required reinforcing steel is in place and supported prior to the placing of concrete. The foundation inspection shall include excavations for thickened slabs intended for the support of bearing walls, partitions, structural supports, or *equipment* and special requirements for wood foundations.

**R109.1.2 Plumbing, mechanical, gas and electrical systems inspection.** Rough inspection of plumbing, mechanical, gas and electrical systems shall be made prior to covering or concealment, before fixtures or *appliances* are set or installed, and prior to framing inspection.

**Exception:** Backfilling of ground-source heat pump loop systems tested in accordance with Section M2105.1 prior to inspection shall be permitted.

**R109.1.3 Floodplain inspections.** For construction in flood hazard areas as established by Table R301.2(1), upon placement of the lowest floor, including *basement*, and prior to further vertical construction, the *building official* shall require submission of documentation, prepared

and sealed by a registered *design professional*, of the elevation of the lowest floor, including *basement*, required in Section R322.

**R109.1.4 Frame and masonry inspection.** Inspection of framing and masonry construction shall be made after the roof, masonry, all framing, firestopping, draftstopping and bracing are in place and after the plumbing, mechanical and electrical rough inspections are *approved*.

**R109.1.5 Other inspections.** In addition to the called inspections above, the *building official* may make or require any other inspections to ascertain compliance with this code and other laws enforced by the *building official*.

**R109.1.5.1 Fire-resistance-rated construction inspection.** Where fire-resistance-rated construction is required between *dwelling units* or due to location on property, the *building official* shall require an inspection of such construction after all lathing and/or wallboard is in place, but before any plaster is applied, or before wallboard joints and fasteners are taped and finished.

**R109.1.6 Final inspection.** Final inspection shall be made after the permitted work is complete and prior to occupancy.

**R109.1.6.1 Elevation documentation.** If located in a flood hazard area, the documentation of elevations required in Section R322.1.10 shall be submitted to the *building official* prior to the final inspection.

**R109.2 Inspection agencies.** The *building official* is authorized to accept reports of *approved* agencies, provided such agencies satisfy the requirements as to qualifications and reliability.

**R109.3 Inspection requests.** It shall be the duty of the *permit* holder or their agent to notify the *building official* that such work is ready for inspection. It shall be the duty of the person requesting any inspections required by this code to provide access to and means for inspection of such work.

**R109.4 Approval required.** Work shall not be done beyond the point indicated in each successive inspection without first obtaining the approval of the *building official*. The *building official* upon notification, shall make the requested inspections and shall either indicate the portion of the construction that is satisfactory as completed, or shall notify the *permit* holder or an agent of the *permit* holder wherein the same fails to comply with this code. Any portions that do not comply shall be corrected and such portion shall not be covered or concealed until authorized by the *building official*.

## SECTION R110
## CERTIFICATE OF OCCUPANCY

**R110.1 Use and occupancy.** No building or structure shall be used or occupied, and no change in the existing occupancy classification of a building or structure or portion thereof shall be made until the *building official* has issued a certificate of occupancy therefor as provided herein. Issuance of a certificate of occupancy shall not be construed as an approval of a violation of the provisions of this code or of other ordinances of the *jurisdiction*. Certificates presuming to give authority to violate or cancel the provisions of this code or other ordinances of the *jurisdiction* shall not be valid.

**Exceptions:**
1. Certificates of occupancy are not required for work exempt from permits under Section R105.2.
2. Accessory buildings or structures.

**R110.2 Change in use.** Changes in the character or use of an existing structure shall not be made except as specified in Sections 3408 and 3409 of the *International Building Code*.

**R110.3 Certificate issued.** After the *building official* inspects the building or structure and finds no violations of the provisions of this code or other laws that are enforced by the department of building safety, the *building official* shall issue a certificate of occupancy which shall contain the following:
1. The building *permit* number.
2. The address of the structure.
3. The name and address of the owner.
4. A description of that portion of the structure for which the certificate is issued.
5. A statement that the described portion of the structure has been inspected for compliance with the requirements of this code.
6. The name of the *building official*.
7. The edition of the code under which the *permit* was

issued.

8. If an automatic sprinkler system is provided and whether the sprinkler system is required.

9. Any special stipulations and conditions of the building *permit*.

**R110.4 Temporary occupancy.** The *building official* is authorized to issue a temporary certificate of occupancy before the completion of the entire work covered by the *permit*, provided that such portion or portions shall be occupied safely. The *building official* shall set a time period during which the temporary certificate of occupancy is valid.

**R110.5 Revocation.** The *building official* shall, in writing, suspend or revoke a certificate of occupancy issued under the provisions of this code wherever the certificate is issued in error, or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this code.

## SECTION R111
## SERVICE UTILITIES

**R111.1 Connection of service utilities.** No person shall make connections from a utility, source of energy, fuel or power to any building or system that is regulated by this code for which a *permit* is required, until *approved* by the *building official*. SCOPE AND ADMINISTRATION

**R111.2 Temporary connection.** The *building official* shall have the authority to authorize and approve the temporary connection of the building or system to the utility, source of energy, fuel or power.

**R111.3 Authority to disconnect service utilities.** The *building official* shall have the authority to authorize disconnection of utility service to the building, structure or system regulated by this code and the referenced codes and standards set forth in Section R102.4 in case of emergency where necessary to eliminate an immediate hazard to life or property or when such utility connection has been made without the approval required by Section R111.1 or R111.2. The *building official* shall notify the serving utility and whenever possible the owner and occupant of the building, structure or service system of the decision to disconnect prior to taking such action if not notified prior to disconnection. The owner or occupant of the building, structure or service system shall be notified in writing as soon as practical thereafter.

## SECTION R112
## BOARD OF APPEALS

**R112.1 General.** In order to hear and decide appeals of orders, decisions or determinations made by the *building official* relative to the application and interpretation of this code, there shall be and is hereby created a board of appeals. The *building official* shall be an ex officio member of said board but shall have no vote on any matter before the board. The board of appeals shall be appointed by the governing body and shall hold office at its pleasure. The board shall adopt rules of procedure for conducting its business, and shall render all decisions and findings in writing to the appellant with

a duplicate copy to the *building official.*

**R112.2 Limitations on authority.** An application for appeal shall be based on a claim that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or an equally good or better form of construction is proposed. The board shall have no authority to waive requirements of this code.

**R112.2.1 Determination of substantial improvement in flood hazard areas.** When the *building official* provides a finding required in Section R105.3.1.1, the board of appeals shall determine whether the value of the proposed work constitutes a substantial improvement. A substantial improvement means any repair, reconstruction, rehabilitation, *addition* or improvement of a building or structure, the cost of which equals or exceeds 50 percent of the market value of the building or structure before the improvement or repair is started. If the building or structure has sustained substantial damage, all repairs are considered substantial improvement regardless of the actual repair work performed. The term does not include:

1. Improvements of a building or structure required to correct existing health, sanitary or safety code violations identified by the *building official* and which are the minimum necessary to assure safe living conditions; or

2. Any alteration of an historic building or structure, provided that the alteration will not preclude the continued designation as an historic building or structure. For the purpose of this exclusion, an historic building is:

2.1. *Listed* or preliminarily determined to be eligible for *listing* in the National Register of Historic Places; or

2.2. Determined by the Secretary of the U.S. Department of Interior as contributing to the historical significance of a registered historic district or a district preliminarily determined to qualify as an historic district; or

2.3. Designated as historic under a state or local historic preservation program that is *approved* by the Department of Interior.

**R112.2.2 Criteria for issuance of a variance for flood hazard areas.** A variance shall be issued only upon:

1. A showing of good and sufficient cause that the unique characteristics of the size, configuration or topography of the site render the elevation standards in Section R322 inappropriate.

2. A determination that failure to grant the variance would result in exceptional hardship by rendering the *lot* undevelopable.

3. A determination that the granting of a variance will not result in increased flood heights, additional threats to public safety, extraordinary public expense, cause fraud on or victimization of the public, or conflict with existing local laws or ordinances.

4. A determination that the variance is the minimum necessary to afford relief, considering the flood hazard.

5. Submission to the applicant of written notice specifying the difference between the design flood elevation and the elevation to which the building is to be built, stating that the cost of flood insurance will be commensurate with the increased risk resulting from the reduced floor elevation, and stating that construction below the design flood elevation increases risks to life and property.

**R112.3 Qualifications.** The board of appeals shall consist of members who are qualified by experience and training to pass on matters pertaining to building construction and are not employees of the *jurisdiction*.

**R112.4 Administration.** The *building official* shall take immediate action in accordance with the decision of the board.

## SECTION R113
## VIOLATIONS

**R113.1 Unlawful acts.** It shall be unlawful for any person, firm or corporation to erect, construct, alter, extend, repair, move, remove, demolish or occupy any building, structure or

*equipment* regulated by this code, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

**R113.2 Notice of violation.** The *building official* is authorized to serve a notice of violation or order on the person responsible for the erection, construction, alteration, extension, repair, moving, removal, demolition or occupancy of a building or structure in violation of the provisions of this code, or in violation of a detail statement or a plan *approved* thereunder, or in violation of a *permit* or certificate issued under the provisions of this code. Such order shall direct the discontinuance of the illegal action or condition and the abatement of the violation.

**R113.3 Prosecution of violation.** If the notice of violation is not complied with in the time prescribed by such notice, the *building official* is authorized to request the legal counsel of the *jurisdiction* to institute the appropriate proceeding at law or in equity to restrain, correct or abate such violation, or to require the removal or termination of the unlawful occupancy of the building or structure in violation of the provisions of this code or of the order or direction made pursuant thereto.

**R113.4 Violation penalties.** Any person who violates a provision of this code or fails to comply with any of the requirements thereof or who erects, constructs, alters or repairs a building or structure in violation of the *approved construction documents* or directive of the *building official,* or of a *permit* or certificate issued under the provisions of this code, shall be subject to penalties as prescribed by law.

## SECTION R114
## STOP WORK ORDER

**R114.1 Notice to owner.** Upon notice from the *building official*

that work on any building or structure is being prosecuted contrary to the provisions of this code or in an unsafe and dangerous manner, such work shall be immediately stopped. The stop work order shall be in writing and shall be given to the owner of the property involved, or to the owner's agent or to the person doing the work and shall state the conditions under which work will be permitted to resume.

**R114.2 Unlawful continuance.** Any person who shall continue any work in or about the structure after having been served with a stop work order, except such work as that person is directed to perform to remove a violation or unsafe condition, shall be subject to penalties as prescribed by law.

STATE OF TEXAS )

)       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R308.6.5 of Chapter 3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**R308.6.5 Screens not required.** Screens shall not be required when fully tempered glass is used as single glazing or the inboard pane in multiple glazing and either of the following conditions are met:

1. Glass area 16 square feet (1.49 m2) or less. Highest point of glass not more than 12 feet (3658 mm) above a walking surface or other accessible area, nominal glass thickness not more than 3/16 inch (4.8 mm), and (for multiple glazing only) the other pane or panes **fully tempered**, laminated or wired glass.

2. Glass area greater than 16 square feet (1.49 m2). Glass sloped 30 degrees (0.52 rad) or less from vertical, and highest point of glass not more than 10 feet (3048 mm) above a walking surface or other accessible area.

**STATE OF TEXAS**     )

                              )        **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

       I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R308.4 of Chapter 3 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

       I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

       In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

R308.4 Hazardous locations.

The following shall be considered specific hazardous locations for the purposes of glazing:

1. Glazing in swinging doors except jalousies.
2. Glazing in fixed and sliding panels of sliding door assemblies and panels in sliding and bifold closet door assemblies.
3. Glazing in storm doors.
4. Glazing in all unframed swinging doors.
5. Glazing in doors and enclosures for hot tubs, whirlpools, saunas, steam rooms, bathtubs and showers. Glazing in any part of a building wall enclosing these compartments where the bottom exposed edge of the glazing is less than 60 inches (1524 mm) measured vertically above any standing or walking surface.
6. Glazing, in an individual fixed or operable panel adjacent to a door where the nearest vertical edge is within a 24-inch (610 mm) arc of the door in a closed position and whose bottom edge is less than 60 inches (1524 mm) above the floor or walking surface.
7. Glazing in an individual fixed or operable panel, other than those locations described in Items 5 and 6 above, that meets all of the following conditions:
7.1. Exposed area of an individual pane larger than 9 square feet (0.836 m2).
7.2. Bottom edge less than 18 inches (457 mm) above the floor.
7.3. Top edge more than 36 inches (914 mm) above the floor.
7.4. One or more walking surfaces within 36 inches (914 mm) horizontally of the glazing.
8. All glazing in railings regardless of an area or height above a walking surface. Included are structural baluster panels and nonstructural infill panels.
9. Glazing in walls and fences enclosing indoor and outdoor swimming pools, hot tubs and spas where the bottom edge of the glazing is less than 60 inches (1524 mm) above a walking surface and within 60 inches (1524 mm) horizontally of the water's edge. This shall apply to single glazing and all panes in multiple glazing.
10. Glazing adjacent to stairways, landings and ramps within 36 inches (914 mm) horizontally of a walking surface when the exposed surface of the glass is less than 60 inches (1524 mm) above the plane of the adjacent walking surface.
11. Glazing adjacent to stairways within 60 inches (1524 mm) horizontally of the bottom tread of a stairway in any direction when the exposed surface of the glass is less than 60 inches (1524 mm) above the nose of the tread.

Exception: The following products, materials and uses are exempt from the above hazardous locations:
1. Openings in doors through which a 3-inch (76 mm) sphere is unable to pass.
2. Decorative glass in Items 1, 6 or 7.
3. Glazing in Section R308.4, Item 6, when there is an intervening wall or other permanent barrier between the door and the glazing.
4. Glazing in Section R308.4, Item 6, in walls perpendicular to the plane of the door in a closed position, other than the wall toward which the door swings when opened, or where access through the door is to a closet or storage area 3 feet (914 mm) or less in depth. Glazing in these applications shall comply with Section R308.4, Item 7.
5. Glazing in Section R308.4, Items 7 and 10, when a protective bar is installed on the accessible side(s) of the glazing 36 inches ± 2 inches (914 mm ± 51 mm) above the floor. The bar shall be capable of withstanding a horizontal load of 50 pounds per linear foot (730 N/m) without contacting the glass and be a minimum of 1½ inches (38 mm) in height.
6. Outboard panes in insulating glass units and other multiple glazed panels in Section R308.4, Item 7, when the bottom edge of the glass is 25 feet (7620 mm) or more above grade, a roof, walking surfaces, or other horizontal [within 45 degrees (0.79 rad) of horizontal] surface adjacent to the glass exterior.
7. Louvered windows and jalousies complying with the requirements of Section R308.2.

8.   Mirrors and other glass panels mounted or hung on a surface that provides a continuous backing support.

9.   Safety glazing in Section R308.4, Items 10 and 11, is not required where:

9.1.   The side of a stairway, landing or ramp has a guardrail or handrail, including balusters or in-fill panels, complying with the provisions of Sections 1013 and 1607.7 of the International Building Code; and

9.2.   The plane of the glass is more than 18 inches (457 mm) from the railing; or

9.3.   When a solid wall or panel extends from the plane of the adjacent walking surface to 34 inches (863 mm) to 36 inches (914 mm) above the floor and the construction at the top of that wall or panel is capable of withstanding the same horizontal load as the protective bar.

10.   Glass block panels complying with Section R610.

STATE OF TEXAS            )

                         )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R331.5 of Chapter 3 of the 2006 International Residential Code.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



_Linda Asbell_

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**R311.5 Construction.**
**R311.5.1 Attachment.** Exterior landings, decks, balconies, stairs and similar facilities shall be positively anchored to the primary structure to resist both vertical and lateral forces or shall be designed to be self-supporting. Attachment shall not be accomplished by use of toenails or nails subject to withdrawal.

**R311.6 Hallways.** The minimum width of a hallway shall be not less than 3 feet (914 mm).

**R311.7 Stairways.**
**R311.7.1 Width.** Stairways shall not be less than 36 inches (914 mm) in clear width at all points above the permitted handrail height and below the required headroom height. Handrails shall not project more than 4.5 inches (114 mm) on either side of the stairway and the minimum clear width of the stairway at and below the handrail height, including treads and landings, shall not be less than 31 1/2 inches (787 mm) where a handrail is installed on one side and 27 inches (698 mm) where handrails are provided on both sides.
**Exception:** The width of spiral stairways shall be in accordance with Section R311.7.10.1.

**R311.7.2 Headroom.** The minimum headroom in all parts of the stairway shall not be less than 6 feet 8 inches (2032 mm) measured vertically from the sloped line adjoining the tread nosing or from the floor surface of the landing or platform on that portion of the stairway.
**Exception:** Where the nosings of treads at the side of a flight extend under the edge of a floor opening through which the stair passes, the floor opening shall be allowed to project horizontally into the required headroom a maximum of 4 3/4 inches (121 mm).

**R311.7.3 Vertical rise.** A flight of stairs shall not have a vertical rise larger than 12 feet (3658 mm) between floor levels or landings.

**R311.7.4 Walkline.** The walkline across winder treads shall be concentric to the curved direction of travel through the turn and located 12 inches (305 mm) from the side where the winders are narrower. The 12-inch (305 mm) dimension shall be measured from the widest point of the clear stair width at the walking surface of the winder. If winders are adjacent within the flight, the point of the widest clear stair width of the adjacent winders shall be used.

**R311.7.5 Stair treads and risers.** Stair treads and risers shall meet the requirements of this section. For the purposes of this section all dimensions and dimensioned surfaces shall be exclusive of carpets, rugs or runners.

**R311.7.5.1 Risers.** The maximum riser height shall be 7 3/4 inches (196 mm). The riser shall be measured vertically between leading edges of the adjacent treads. The greatest riser height within any flight of stairs shall not

exceed the smallest by more than 3/8 inch (9.5 mm). Risers shall be vertical or sloped from the underside of the nosing of the tread above at an angle not more than 30 degrees (0.51 rad) from the vertical. Open risers are permitted provided that the opening between treads does not permit the passage of a 4-inch-diameter (102 mm) sphere.

**Exception:** The opening between adjacent treads is not limited on stairs with a total rise of 30 inches (762 mm) or less.

**R311.7.5.2 Treads.** The minimum tread depth shall be 10 inches (254 mm). The tread depth shall be measured horizontally between the vertical planes of the foremost projection of adjacent treads and at a right angle to the tread's leading edge. The greatest tread depth within any flight of stairs shall not exceed the smallest by more than 3/8 inch (9.5 mm).

**R311.7.5.2.1 Winder treads.** Winder treads shall have a minimum tread depth of 10 inches (254 mm) measured between the vertical planes of the foremost projection of adjacent treads at the intersections with the walkline. Winder treads shall have a minimum tread depth of 6 inches (152 mm) at any point within the clear width of the stair. Within any flight of stairs, the largest winder tread depth at the walkline shall not exceed the smallest winder tread by more than 3/8 inch (9.5 mm). Consistently shaped winders at the walkline shall be allowed within the same flight of stairs as rectangular treads and do not have to be within 3/8 inch (9.5 mm) of the rectangular tread depth.

**R311.7.5.3 Nosings.** The radius of curvature at the nosing shall be no greater than 9/16 inch (14 mm). A nosing not less than 3/4 inch (19 mm) but not more than 1 1/4 inches (32 mm) shall be provided on stairways with solid risers. The greatest nosing projection shall not exceed the smallest nosing projection by more than 3/8 inch (9.5 mm) between two stories, including the nosing at the level of floors and landings. Beveling of nosings shall not exceed 1/2 inch (12.7 mm).

**Exception:** A nosing is not required where the tread depth is a minimum of 11 inches (279 mm).

STATE OF TEXAS     )

                             )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R403.1.6 of Chapter 4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


                            Linda Asbell, TRMC, Town Secretary
                            Town of Lakewood Village
                            Denton County
                            State of Texas



**R403.1.6 Foundation anchorage.** Sill plates and walls supported directly on continuous foundations shall be anchored to the foundation in accordance with this section. Wood sole plates at all exterior walls on monolithic slabs, wood sole plates of *braced wall panels* at building interiors on monolithic slabs and all wood sill plates shall be anchored to the foundation with anchor bolts spaced a maximum of 6 feet (1829 mm) on center. Bolts shall be at least 1/2 inch (12.7 mm) in diameter and shall extend a minimum of 7 inches (178 mm) into concrete or grouted cells of concrete masonry units. A nut and washer shall be tightened on each anchor bolt. There shall be a minimum of two bolts per plate section with one bolt located not more than 12 inches (305 mm) or less than seven bolt diameters from each end of the plate section. Interior bearing wall sole plates on monolithic slab foundation that are not part of a *braced wall panel* shall be positively anchored with *approved* fasteners. Sill plates and sole plates shall be protected against decay and termites where required by Sections R317 and R318. Cold-formed steel framing systems shall be fastened to wood sill plates or anchored directly to the foundation as required in Section R505.3.1 or R603.3.1.

**Exceptions:**

1. Foundation anchorage, spaced as required to provide equivalent anchorage to 1/2-inch-diameter (12.7 mm) anchor bolts.

2. Walls 24 inches (610 mm) total length or shorter connecting offset *braced wall panels* shall be anchored to the foundation with a minimum of one anchor bolt located in the center third of the plate section and shall be attached to adjacent *braced wall panels* at corners as shown in item 8 of Table R602.3(1).

3. Connection of walls 12 inches (305 mm) total length or shorter connecting offset *braced wall panels* to the foundation without anchor bolts shall be permitted. The wall shall be attached to adjacent *braced wall panels* at corners as shown in item 8 of Table R602.3(1).

**R404.3 Wood sill plates.** Wood sill plates shall be a minimum of 2-inch by 4-inch (51 mm by 102 mm) nominal lumber.

Sill plate anchorage shall be in accordance with Sections R403.1.6 and R602.11.

STATE OF TEXAS       )

                              )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON    )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R404 of Chapter 4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## SECTION R404
## FOUNDATION AND RETAINING WALLS

**R404.1 Concrete and masonry foundation walls.** Concrete foundation walls shall be selected and constructed in accordance with the provisions of Section R404.1.2. Masonry foundation walls shall be selected and constructed in accordance with the provisions of Section R404.1.1.

**R404.4 Retaining walls.** Retaining walls that are not laterally supported at the top and that retain in excess of 24 inches (610 mm) of unbalanced fill shall be designed to ensure stability against overturning, sliding, excessive foundation pressure and water uplift. Retaining walls shall be designed for a safety factor of 1.5 against lateral sliding and overturning.

STATE OF TEXAS     )

                           )        **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R602.3.2 of Chapter 6 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**R602.3.2 Top plate.** Wood stud walls shall be capped with a double top plate installed to provide overlapping at corners and intersections with bearing partitions. End joints in top plates shall be offset at least 24 inches (610 mm). Joints in plates need not occur over studs. Plates shall be not less than 2-inches (51 mm) nominal thickness and have a width at least equal to the width of the studs.

STATE OF TEXAS     )

                    )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R602.10 of Chapter 6 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## R602.10 Wall bracing.

All exterior walls shall be braced in accordance with this section. In addition, interior braced wall lines shall be provided in accordance with Section R602.10.1.1. For buildings in Seismic Design Categories $D_0$, $D_1$ and $D_2$, walls shall be constructed in accordance with the additional requirements of Sections R602.10.9, R602.10.11, and R602.11.

STATE OF TEXAS      )

                         )       **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R703.7.4 and Section R703.7.4.1 of Chapter 7 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**R703.7.4 Anchorage.** Masonry veneer shall be anchored to the supporting wall studs with corrosion-resistant metal ties embedded in mortar or grout and extending into the veneer a minimum of 1 1/2 inches (38 mm), with not less than 5/8-inch (15.9 mm) mortar or grout cover to outside face. Masonry veneer shall conform to Table R703.7.4.

**R703.7.4.1 Size and spacing.** Veneer ties, if strand wire, shall not be less in thickness than No. 9 U.S. gage [(0.148 inch) (4 mm)] wire and shall have a hook embedded in the mortar joint, or if sheet metal, shall be not less than No. 22 U.S. gage by [(0.0299 inch) (0.76 mm)] 7/8 inch (22 mm) corrugated. Each tie shall support support not more than 2.67 square feet (0.25 m2) of wall area and shall be spaced not more than 32 inches (813 mm) on center horizontally and 24 inches (635 mm) on center vertically.

**STATE OF TEXAS**      )

                          )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**     )

      I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R703.7.6 of Chapter 7 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

      I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

      In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas



**R703.7.6 Weepholes.** Weepholes shall be provided in the outside wythe of masonry walls at a maximum spacing of 33 inches (838 mm) on center. Weepholes shall not be less than 3/16 inch (5 mm) in diameter.

**STATE OF TEXAS**     )
                                  )       **CERTIFICATE TO COPY OF PUBLIC RECORD**
                                  )
**COUNTY OF DENTON**     )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Section R1003.4 of Chapter 10 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas





TOP OF CHIMNEY MUST BE AT LEAST 2 FT HIGHER THAN PEAK OR HIGHEST PORTION OF ROOF WITHIN 10 FT HORIZONTALLY.

3 FT MIN HEIGHT ABOVE ROOF WHERE CHIMNEY PENETRATES.

MIN. 4 IN. SOLID MASONRY

6 IN. MIN

MIN $\frac{5}{8}$ IN. FLUE LINER

METAL CLEANOUT DOOR (OPTIONAL)

UNDISTURBED SOIL BELOW FROST LINE

MIN 12 IN. THICK CONCRETE FOUNDATION

6 IN. MIN

6 IN. MIN

For SI: 1 inch = 25.4 mm, 1 foot = 304.8 mm.

**Figure R1003.2**
**TYPICAL MASONRY CHIMNEY**

**R1003.4 Seismic anchorage.** Masonry and concrete chimneys and foundations in Seismic Design Category $D_0$, $D_1$ or $D_2$ shall be anchored at each floor, ceiling or roof line more than 6 feet (1829 mm) above grade, except where constructed completely within the exterior walls. Anchorage shall conform to the requirements in Section R1003.4.1.

❖ Fireplaces and chimneys must be connected to floor and roof diaphragms to prevent overturning during earthquakes. Chimneys must be anchored at the ceiling line of roof and ceiling assemblies and at floor levels below the roof. Such anchorage is of lesser importance where the floor assembly is 6 feet (1829 mm) or less above grade.

**R1003.4.1 Anchorage.** Two $^3/_{16}$-inch by 1-inch (5 mm by 25 mm) straps shall be embedded a minimum of 12 inches (305 mm) into the chimney. Straps shall be hooked around the outer bars and extend 6 inches (152 mm) beyond the bend. Each strap shall be fastened to a minimum of four floor joists with two $^1/_2$-inch (13 mm) bolts.

❖ The prescriptive requirements in this section are traditional for typical fireplaces and chimneys. More substantial anchorage may be required in areas of high seismicity, for large fireplaces or where the distance between floor and roof diaphragms is large.

**R1003.5 Corbeling.** Masonry chimneys shall not be corbeled more than one-half of the chimney's wall thickness from a wall or foundation, nor shall a chimney be corbeled from a wall or foundation that is less than 12 inches (305 mm) thick unless it projects equally on each side of the wall, except that on the second story of a two-story dwelling, corbeling of chimneys on the exterior of the enclosing walls may equal the wall thickness. The projection of a single course shall not exceed one-half the unit height or one-third of the unit bed depth, whichever is less.

❖ Corbeling is the projection of masonry from the surface of the wall or fireplace in small increments for each course of masonry. The chimney should not be corbeled more than one-half of its wall thickness from the wall or foundation. A single course is not permitted

STATE OF TEXAS )

)      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 11 N1101.1 – N1101.3 of the 2006 International Residential Code.  The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# CHAPTER 11
# ENERGY EFFICIENCY

**N1101.1 Scope.** This chapter regulates the energy efficiency for the design and construction of buildings regulated by this code.

*Note: The text of the following Sections N1101.2 through N1105 is extracted from the 2012 edition of the* International Energy Conservation Code—Residential Provisions *and has been editorially revised to conform to the scope and application of this code. The section numbers appearing in parenthesis after each section number are the section numbers of the corresponding text in the* International Energy Conservation Code—Residential Provisions.

**N1101.2 (R101.3) Intent.** This code shall regulate the design and construction of buildings for the effective use and conservation of energy over the useful life of each building. This code is intended to provide flexibility to permit the use of innovative approaches and techniques to achieve this objective. This code is not intended to abridge safety, health or environmental requirements contained in other applicable codes or ordinances.

**N1101.3 (R101.4.3) Additions, alterations, renovations or repairs.** Additions, alterations, renovations or repairs to an existing building, building system or portion thereof shall conform to the provisions of this code as they relate to new construction without requiring the unaltered portion(s) of the existing building or building system to comply with this code. Additions, alterations, renovations or repairs shall not create an unsafe or hazardous condition or overload existing building systems. An addition shall be deemed to comply with this code if the addition alone complies or if the existing building and addition comply with this code as a single building.

**Exception:** The following need not comply provided the energy use of the building is not increased:

1. Storm windows installed over existing fenestration.

2. Glass only replacements in an existing sash and frame.

3. Existing ceiling, wall or floor cavities exposed during construction provided that these cavities are filled with insulation.

4. Construction where the existing roof, wall or floor cavity is not exposed.

5. Reroofing for roofs where neither the sheathing nor the insulation is exposed. Roofs without insulation in the cavity and where the sheathing or insulation is

exposed during reroofing shall be insulated either above or below the sheathing.

6. Replacement of existing doors that separate *conditioned space* from the exterior shall not require the installation of a vestibule or revolving door, provided, however, that an existing vestibule that separates a *conditioned space* from the exterior shall not be removed.

7. Alterations that replace less than 50 percent of the luminaires in a space, provided that such alterations do not increase the installed interior lighting power.

8. Alterations that replace only the bulb and ballast within the existing luminaires in a space provided that the *alteration* does not increase the installed interior lighting power.

**STATE OF TEXAS** )
                        )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 15 M1507.4 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.



Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**M1507.4 Local exhaust rates.** *Local exhaust* systems shall be designed to have the capacity to exhaust the minimum air flow rate determined in accordance with Table M1507.4.

**TABLE M1507.4**

**MINIMUM REQUIRED LOCAL EXHAUST RATES FOR ONE- AND TWO-FAMILY DWELLINGS**

For SI: 1 cubic foot per minute = 0.0004719 m3/s.

**AREA TO BE EXHAUSTED EXHAUST RATES**

Kitchens

100 cfm intermittent or 25 cfm continuous

Bathrooms-Toilet Rooms

Mechanical exhaust capacity of 50 cfm intermittent or 20 cfm continuous

**STATE OF TEXAS** )

)     **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON** )

    I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Chapter 31 P3101.1, P3101.1, P3112.1, and P3112.2 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

    I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

    In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## VENT SYSTEMS

**P3101.1 General.** This chapter shall govern the selection and installation of piping, tubing and fittings for vent systems. This chapter shall control the minimum diameter of vent pipes, circuit vents, branch vents and individual vents, and the size and length of vents and various aspects of vent stacks and stack vents. Additionally, this chapter regulates vent grades and connections, height above fixtures and relief vents for stacks

### SECTION P3104
### VENT CONNECTIONS AND GRADES

**P3104.1 Connection.** All individual branch and circuit vents shall connect to a vent stack, stack vent or extend to the open air.

**Exception:** Individual, branch and circuit vents shall be permitted to terminate at an *air admittance valve* in accordance with Section P3114.

Town Ordinance prohibits air admittance valves

### SECTION P3112
### ISLAND FIXTURE VENTING

**P3112.1 Limitation.** Island fixture venting shall not be permitted for fixtures other than sinks and lavatories. Kitchen sinks with a dishwasher waste connection, a food waste grinder, or both, in combination with the kitchen sink waste, shall be permitted to be vented in accordance with this section.

**P3112.2 Vent connection.** The island fixture vent shall connect to the *fixture drain* as required for an individual or common vent. The vent shall rise vertically to above the drainage outlet of the fixture being vented before offsetting horizontally or vertically downward. The vent or branch vent for multiple island fixture vents shall extend not less than 6 inches (152 mm) above the highest island fixture

STATE OF TEXAS                )

                              )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON       )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3902.12 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

**Definition- ARC-FAULT CIRCUIT INTERRUPTER.** A device intended to provide protection from the effects of arc-faults by recognizing characteristics unique to arcing and by functioning to de-energize the circuit when an arc-fault is detected.

**E3902.12 Arc-fault circuit-interrupter protection.** All branch circuits that supply 120-volt, single-phase, 15- and 20-ampere outlets installed in family rooms, dining rooms, living rooms, parlors, libraries, dens, bedrooms, sunrooms, recreations rooms, closets, hallways and similar rooms or areas shall be protected by a combination type arc-fault circuit interrupter installed to provide protection of the branch circuit.

STATE OF TEXAS  )
        )  **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON )

   I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3907.2 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

   I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

   In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

            Linda Asbell, TRMC, Town Secretary
            Town of Lakewood Village
            Denton County
            State of Texas

**Definition: WEATHERPROOF.** Constructed or protected so that exposure to the weather will not interfere with successful operation.

**E3907.2 Damp and wet locations.** In damp or wet locations, cabinets and panelboards of the surface type shall be placed or equipped so as to prevent moisture or water from entering and accumulating within the cabinet, and shall be mounted to provide an air-space not less than 1/4 inch (6.4 mm) between the enclosure and the wall or other supporting surface. Cabinets installed in wet locations shall be weatherproof. For enclosures in wet locations, raceways and cables entering above the level of uninsulated live parts shall be installed with fittings listed for wet locations.

STATE OF TEXAS     )
                     )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of E3909.8 of the 2006 International Residential Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

## SECTION E3908

**E3908.8 Types of equipment grounding conductors.** The equipment grounding conductor run with or enclosing the circuit conductors shall be one or more or a combination of the following:

1. A copper, aluminum or copper-clad conductor. This conductor shall be solid or stranded; insulated, covered or bare; and in the form of a wire or a busbar of any shape.
2. Rigid metal conduit.
3. Intermediate metal conduit.
4. Electrical metallic tubing.
5. Armor of Type AC cable in accordance with Section E3908.4.

# Exhibit 30

STATE OF TEXAS          )
                        )          **CERTIFICATE TO COPY OF PUBLIC RECORD**
COUNTY OF DENTON    )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Article 250 of the 2005 National Electrical Code. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

The neutral conductor shall have an ampacity of not less than the maximum current rating of the grounding impedance. In no case shall the neutral conductor be smaller than 8 AWG copper or 6 AWG aluminum or copper-clad aluminum.

**(C) System Neutral Connection.** The system neutral conductor shall not be connected to ground except through the grounding impedance.

> FPN: The impedance is normally selected to limit the ground-fault current to a value slightly greater than or equal to the capacitive charging current of the system. This value of impedance will also limit transient overvoltages to safe values. For guidance, refer to criteria for limiting transient overvoltages in ANSI/IEEE 142-1991, *Recommended Practice for Grounding of Industrial and Commercial Power Systems.*

**(D) Neutral Conductor Routing.** The conductor connecting the neutral point of the transformer or generator to the grounding impedance shall be permitted to be installed in a separate raceway. It shall not be required to run this conductor with the phase conductors to the first system disconnecting means or overcurrent device.

**(E) Equipment Bonding Jumper.** The equipment bonding jumper (the connection between the equipment grounding conductors and the grounding impedance) shall be an unspliced conductor run from the first system disconnecting means or overcurrent device to the grounded side of the grounding impedance.

**(F) Grounding Electrode Conductor Location.** The grounding electrode conductor shall be attached at any point from the grounded side of the grounding impedance to the equipment grounding connection at the service equipment or first system disconnecting means.

**(G) Equipment Bonding Jumper Size.** The equipment bonding jumper shall be sized in accordance with (1) or (2) as follows:

(1) Where the grounding electrode conductor connection is made at the grounding impedance, the equipment bonding jumper shall be sized in accordance with 250.66, based on the size of the service entrance conductors for a service or the derived phase conductors for a separately derived system.

(2) Where the grounding electrode conductor is connected at the first system disconnecting means or overcurrent device, the equipment bonding jumper shall be sized the same as the neutral conductor in 250.36(B).

**III. Grounding Electrode System and Grounding Electrode Conductor**

**250.50 Grounding Electrode System.** All grounding electrodes as described in 250.52(A)(1) through (A)(6) that are present at each building or structure served shall be bonded together to form the grounding electrode system. Where none of these grounding electrodes exist, one or more of the grounding electrodes specified in 250.52(A)(4) through (A)(7) shall be installed and used.

*Exception: Concrete-encased electrodes of existing buildings or structures shall not be required to be part of the grounding electrode system where the steel reinforcing bars or rods are not accessible for use without disturbing the concrete.*

**250.52 Grounding Electrodes.**

**(A) Electrodes Permitted for Grounding.**

**(1) Metal Underground Water Pipe.** A metal underground water pipe in direct contact with the earth for 3.0 m (10 ft) or more (including any metal well casing effectively bonded to the pipe) and electrically continuous (or made electrically continuous by bonding around insulating joints or insulating pipe) to the points of connection of the grounding electrode conductor and the bonding conductors. Interior metal water piping located more than 1.52 m (5 ft) from the point of entrance to the building shall not be used as a part of the grounding electrode system or as a conductor to interconnect electrodes that are part of the grounding electrode system.

*Exception: In industrial and commercial buildings or structures where conditions of maintenance and supervision ensure that only qualified persons service the installation, interior metal water piping located more than 1.52 m (5 ft) from the point of entrance to the building shall be permitted as a part of the grounding electrode system or as a conductor to interconnect electrodes that are part of the grounding electrode system, provided that the entire length, other than short sections passing perpendicular through walls, floors, or ceilings, of the interior metal water pipe that is being used for the conductor is exposed.*

**(2) Metal Frame of the Building or Structure.** The metal frame of the building or structure, where any of the following methods are used to make an earth connection:

(1) 3.0 m (10 ft) or more of a single structural metal member in direct contact with the earth or encased in concrete that is in direct contact with the earth

(2) The structural metal frame is bonded to one or more of the grounding electrodes as defined in 250.52(A)(1), (A)(3), or (A)(4)

(3) The structural metal frame is bonded to one or more of the grounding electrodes as defined in 250.52(A)(5) or (A)(6) that comply with 250.56, or

(4) Other approved means of establishing a connection to earth.

(3) **Concrete-Encased Electrode.** An electrode encased by at least 50 mm (2 in.) of concrete, located within and near the bottom of a concrete foundation or footing that is in direct contact with the earth, consisting of at least 6.0 m (20 ft) of one or more bare or zinc galvanized or other electrically conductive coated steel reinforcing bars or rods of not less than 13 mm (½ in.) in diameter, or consisting of at least 6.0 m (20 ft) of bare copper conductor not smaller than 4 AWG. Reinforcing bars shall be permitted to be bonded together by the usual steel tie wires or other effective means.

(4) **Ground Ring.** A ground ring encircling the building or structure, in direct contact with the earth, consisting of at least 6.0 m (20 ft) of bare copper conductor not smaller than 2 AWG.

(5) **Rod and Pipe Electrodes.** Rod and pipe electrodes shall not be less than 2.5 m (8 ft) in length and shall consist of the following materials.

(a) Electrodes of pipe or conduit shall not be smaller than metric designator 21 (trade size ¾) and, where of iron or steel, shall have the outer surface galvanized or otherwise metal-coated for corrosion protection.

(b) Electrodes of rods of iron or steel shall be at least 15.87 mm (⅝ in.) in diameter. Stainless steel rods less than 16 mm (⅝ in.) in diameter, nonferrous rods, or their equivalent shall be listed and shall not be less than 13 mm (½ in.) in diameter.

(6) **Plate Electrodes.** Each plate electrode shall expose not less than 0.186 m² (2 ft²) of surface to exterior soil. Electrodes of iron or steel plates shall be at least 6.4 mm (¼ in.) in thickness. Electrodes of nonferrous metal shall be at least 1.5 mm (0.06 in.) in thickness.

(7) **Other Local Metal Underground Systems or Structures.** Other local metal underground systems or structures such as piping systems, underground tanks, and underground metal well casings that are not effectively bonded to a metal water pipe.

(B) **Electrodes Not Permitted for Grounding.** The following shall not be used as grounding electrodes:

(1) Metal underground gas piping system

(2) Aluminum electrodes

FPN: See 250.104(B) for bonding requirements of gas piping.

### 250.53 Grounding Electrode System Installation.

FPN: See 547.9 and 547.10 for special grounding and bonding requirements for agricultural buildings.

(A) **Rod, Pipe, and Plate Electrodes.** Where practicable, rod, pipe, and plate electrodes shall be embedded below permanent moisture level. Rod, pipe, and plate electrodes shall be free from nonconductive coatings such as paint or enamel.

(B) **Electrode Spacing.** Where more than one of the electrodes of the type specified in 250.52(A)(5) or (A)(6) are used, each electrode of one grounding system (including that used for air terminals) shall not be less than 1.83 m (6 ft) from any other electrode of another grounding system. Two or more grounding electrodes that are effectively bonded together shall be considered a single grounding electrode system.

(C) **Bonding Jumper.** The bonding jumper(s) used to connect the grounding electrodes together to form the grounding electrode system shall be installed in accordance with 250.64(A), (B), and (E), shall be sized in accordance with 250.66, and shall be connected in the manner specified in 250.70.

(D) **Metal Underground Water Pipe.** Where used as a grounding electrode, metal underground water pipe shall meet the requirements of 250.53(D)(1) and (D)(2).

(1) **Continuity.** Continuity of the grounding path or the bonding connection to interior piping shall not rely on water meters or filtering devices and similar equipment.

(2) **Supplemental Electrode Required.** A metal underground water pipe shall be supplemented by an additional electrode of a type specified in 250.52(A)(2) through (A)(7). Where the supplemental electrode is a rod, pipe, or plate type, it shall comply with 250.56. The supplemental electrode shall be permitted to be bonded to the grounding electrode conductor, the grounded service-entrance conductor, the nonflexible grounded service raceway, or any grounded service enclosure.

*Exception: The supplemental electrode shall be permitted to be bonded to the interior metal water piping at any convenient point as covered in 250.52(A)(1), Exception.*

(E) **Supplemental Electrode Bonding Connection Size.** Where the supplemental electrode is a rod, pipe, or plate electrode, that portion of the bonding jumper that is the sole connection to the supplemental grounding electrode shall not be required to be larger than 6 AWG copper wire or 4 AWG aluminum wire.

(F) **Ground Ring.** The ground ring shall be buried at a depth below the earth's surface of not less than 750 mm (30 in.).

(G) **Rod and Pipe Electrodes.** The electrode shall be installed such that at least 2.44 m (8 ft) of length is in contact with the soil. It shall be driven to a depth of not less than

2.44 m (8 ft) except that, where rock bottom is encountered, the electrode shall be driven at an oblique angle not to exceed 45 degrees from the vertical or, where rock bottom is encountered at an angle up to 45 degrees, the electrode shall be permitted to be buried in a trench that is at least 750 mm (30 in.) deep. The upper end of the electrode shall be flush with or below ground level unless the aboveground end and the grounding electrode conductor attachment are protected against physical damage as specified in 250.10.

**(H) Plate Electrode.** Plate electrodes shall be installed not less than 750 mm (30 in.) below the surface of the earth.

**250.54 Supplementary Grounding Electrodes.** Supplementary grounding electrodes shall be permitted to be connected to the equipment grounding conductors specified in 250.118 and shall not be required to comply with the electrode bonding requirements of 250.50 or 250.53(C) or the resistance requirements of 250.56, but the earth shall not be used as an effective ground-fault current path as specified in 250.4(A)(5) and 250.4(B)(4).

**250.56 Resistance of Rod, Pipe, and Plate Electrodes.** A single electrode consisting of a rod, pipe, or plate that does not have a resistance to ground of 25 ohms or less shall be augmented by one additional electrode of any of the types specified by 250.52(A)(2) through (A)(7). Where multiple rod, pipe, or plate electrodes are installed to meet the requirements of this section, they shall not be less than 1.8 m (6 ft) apart.

> FPN: The paralleling efficiency of rods longer than 2.5 m (8 ft) is improved by spacing greater than 1.8 m (6 ft).

**250.58 Common Grounding Electrode.** Where an ac system is connected to a grounding electrode in or at a building or structure, the same electrode shall be used to ground conductor enclosures and equipment in or on that building or structure. Where separate services, feeders, or branch circuits supply a building and are required to be connected to a grounding electrode(s), the same grounding electrode(s) shall be used.

Two or more grounding electrodes that are effectively bonded together shall be considered as a single grounding electrode system in this sense.

**250.60 Use of Air Terminals.** Air terminal conductors and driven pipes, rods, or plate electrodes used for grounding air terminals shall not be used in lieu of the grounding electrodes required by 250.50 for grounding wiring systems and equipment. This provision shall not prohibit the required bonding together of grounding electrodes of different systems.

> FPN No. 1: See 250.106 for spacing from air terminals. See 800.100(D), 810.21(J), and 820.100(D) for bonding of electrodes.

> FPN No. 2: Bonding together of all separate grounding electrodes will limit potential differences between them and between their associated wiring systems.

**250.62 Grounding Electrode Conductor Material.** The grounding electrode conductor shall be of copper, aluminum, or copper-clad aluminum. The material selected shall be resistant to any corrosive condition existing at the installation or shall be suitably protected against corrosion. The conductor shall be solid or stranded, insulated, covered, or bare.

**250.64 Grounding Electrode Conductor Installation.** Grounding electrode conductors shall be installed as specified in 250.64(A) through (F).

**(A) Aluminum or Copper-Clad Aluminum Conductors.** Bare aluminum or copper-clad aluminum grounding conductors shall not be used where in direct contact with masonry or the earth or where subject to corrosive conditions. Where used outside, aluminum or copper-clad aluminum grounding conductors shall not be terminated within 450 mm (18 in.) of the earth.

**(B) Securing and Protection Against Physical Damage.** Where exposed, a grounding electrode conductor or its enclosure shall be securely fastened to the surface on which it is carried. A 4 AWG or larger copper or aluminum grounding electrode conductor shall be protected where exposed to physical damage. A 6 AWG grounding electrode conductor that is free from exposure to physical damage shall be permitted to be run along the surface of the building construction without metal covering or protection where it is securely fastened to the construction; otherwise, it shall be in rigid metal conduit, intermediate metal conduit, rigid nonmetallic conduit, electrical metallic tubing, or cable armor. Grounding electrode conductors smaller than 6 AWG shall be in rigid metal conduit, intermediate metal conduit, rigid nonmetallic conduit, electrical metallic tubing, or cable armor.

**(C) Continuous.** Grounding electrode conductor(s) shall be installed in one continuous length without a splice or joint except as permitted in (1) through (4):

(1) Splicing shall be permitted only by irreversible compression-type connectors listed as grounding and bonding equipment or by the exothermic welding process.

(2) Sections of busbars shall be permitted to be connected together to form a grounding electrode conductor.

(3) Bonding jumper(s) from grounding electrode(s) and grounding electrode conductor(s) shall be permitted to be connected to an aluminum or copper busbar not less than 6 mm × 50 mm (¼ in. × 2 in.). The busbar shall be securely fastened and shall be installed in an accessible location. Connections shall be made by a listed connector or by the exothermic welding process.

(4) Where aluminum busbars are used, the installation shall comply with 250.64(A).

**(D) Grounding Electrode Conductor Taps.** Where a service consists of more than a single enclosure as permitted in 230.71(A), it shall be permitted to connect taps to the common grounding electrode conductor. Each such tap conductor shall extend to the inside of each such enclosure. The common grounding electrode conductor shall be sized in accordance with 250.66, based on the sum of the circular mil area of the largest ungrounded service entrance conductors. Where more than one set of service entrance conductors as permitted by 230.40, Exception No. 2 connect directly to a service drop or lateral, the common grounding electrode conductor shall be sized in accordance with Table 250.66 Note 1. The tap conductors shall be permitted to be sized in accordance with the grounding electrode conductors specified in 250.66 for the largest conductor serving the respective enclosures. The tap conductors shall be connected to the common grounding electrode conductor in such a manner that the common grounding electrode conductor remains without a splice or joint.

**(E) Enclosures for Grounding Electrode Conductors.** Ferrous metal enclosures for grounding electrode conductors shall be electrically continuous from the point of attachment to cabinets or equipment to the grounding electrode and shall be securely fastened to the ground clamp or fitting. Nonferrous metal enclosures shall not be required to be electrically continuous. Ferrous metal enclosures that are not physically continuous from cabinets or equipment to the grounding electrode shall be made electrically continuous by bonding each end of the raceway or enclosure to the grounding electrode conductor. Bonding shall apply at each end and to all intervening ferrous raceways, boxes, and enclosures between the service equipment and the grounding electrode. The bonding jumper for a grounding electrode conductor raceway or cable armor shall be the same size as, or larger than, the required enclosed grounding electrode conductor. Where a raceway is used as protection for a grounding electrode conductor, the installation shall comply with the requirements of the appropriate raceway article.

**(F) To Electrode(s).** A grounding electrode conductor shall be permitted to be run to any convenient grounding electrode available in the grounding electrode system, or to one or more grounding electrode(s) individually, or to the aluminum or copper busbar as permitted in 250.64(C). The grounding electrode conductor shall be sized for the largest grounding electrode conductor required among all the electrodes connected to it.

**250.66 Size of Alternating-Current Grounding Electrode Conductor.** The size of the grounding electrode conductor of a grounded or ungrounded ac system shall not be less than given in Table 250.66, except as permitted in 250.66(A) through (C).

> FPN: See 250.24(C) for size of ac system conductor brought to service equipment.

**Table 250.66 Grounding Electrode Conductor for Alternating-Current Systems**

| Size of Largest Ungrounded Service-Entrance Conductor or Equivalent Area for Parallel Conductors[a] (AWG/kcmil) | | Size of Grounding Electrode Conductor (AWG/kcmil) | |
| --- | --- | --- | --- |
| Copper | Aluminum or Copper-Clad Aluminum | Copper | Aluminum or Copper-Clad Aluminum[b] |
| 2 or smaller | 1/0 or smaller | 8 | 6 |
| 1 or 1/0 | 2/0 or 3/0 | 6 | 4 |
| 2/0 or 3/0 | 4/0 or 250 | 4 | 2 |
| Over 3/0 through 350 | Over 250 through 500 | 2 | 1/0 |
| Over 350 through 600 | Over 500 through 900 | 1/0 | 3/0 |
| Over 600 through 1100 | Over 900 through 1750 | 2/0 | 4/0 |
| Over 1100 | Over 1750 | 3/0 | 250 |

Notes:
1. Where multiple sets of service-entrance conductors are used as permitted in 230.40, Exception No. 2, the equivalent size of the largest service-entrance conductor shall be determined by the largest sum of the areas of the corresponding conductors of each set.
2. Where there are no service-entrance conductors, the grounding electrode conductor size shall be determined by the equivalent size of the largest service-entrance conductor required for the load to be served.
[a]This table also applies to the derived conductors of separately derived ac systems.
[b]See installation restrictions in 250.64(A).

**(A) Connections to Rod, Pipe, or Plate Electrodes.** Where the grounding electrode conductor is connected to rod, pipe, or plate electrodes as permitted in 250.52(A)(5) or (A)(6), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than 6 AWG copper wire or 4 AWG aluminum wire.

**(B) Connections to Concrete-Encased Electrodes.** Where the grounding electrode conductor is connected to a concrete-encased electrode as permitted in 250.52(A)(3), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than 4 AWG copper wire.

**(C) Connections to Ground Rings.** Where the grounding electrode conductor is connected to a ground ring as permitted in 250.52(A)(4), that portion of the conductor that is the sole connection to the grounding electrode shall not be required to be larger than the conductor used for the ground ring.

# Exhibit 31

**STATE OF TEXAS**      )

                               )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**    )

     I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of the email and attachment from Linda Asbell to Alan Hoffmann dated March 12, 2014. The same appear of record in my office and said documents are the official records from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

     I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

     In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 26th day of March, 2014.


Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# Linda Asbell

**From:** Linda Asbell <linda@lakewoodvillagetx.us>
**Sent:** Wednesday, March 12, 2014 5:01 PM
**To:** 'Alan Hoffmann'
**Cc:** 'Harry Bizios'
**Subject:** RE: 3950 Spinnaker Run Pt
**Attachments:** 2014_03_12_16_29_29.pdf

Alan,

Attached is the document we discussed. This is a letter prepared by the Town Attorney and directly relates to your questions.

As I stated in our conversation, the building permit approval process was delayed because your HVAC contractor postponed registration. Registration of all subs is a requirement of the permit release. The plans were approved on February 6th. The permit is ready for release upon receipt of the building permit fee and attendance of a mandatory pre-construction meeting (originally scheduled for February 19th). All pre-construction meetings are scheduled for 5pm. Let me know your availability and I will be happy to reschedule the meeting with the building inspector.

Please review the attached document and let me know if you have any questions.

Linda Asbell, TRMC
Town Secretary
972-294-5555 (direct)
www.lakewoodvillagetx.us



**From:** Alan Hoffmann [mailto:alan@alanhoffmanncompany.com]
**Sent:** Wednesday, March 12, 2014 3:47 PM
**To:** Linda Asbell
**Cc:** Harry Bizios
**Subject:** Re: 3950 Spinaker Run Pt

Linda,

First of all. The building inspector never approved the plans. After the lengthy wait of your permit process, I began to do some legal research with regard Lakewood Village's ability to review plans.

My client and I believe you have misrepresented
your authority to the ETJ residents and it is my understanding and the property owner's understanding that you have no right to review plans, collect fees, inspect or visit construction sites in your ETJ.

So I will be sending a courier tomorrow to pickup all plans and engineering with respect to this project and any entrance by your city's representatives, inspectors and or employees will be considered an act of trespassing.

1

# MESSER, CAMPBELL & BRADY

### A LIMITED LIABILITY PARTNERSHIP

## ATTORNEYS

6351 PRESTON ROAD, SUITE 350
FRISCO, TEXAS 75034
972.424.7200 · TELEPHONE
972.424.7244 · FACSIMILE
www.mcblawfirm.net

August 7, 2012

*Via electronic mail:*

**Re: Town of Lakewood Village's authority to enforce building regulations in its Extraterritorial Jurisdiction**

Mr.

You recently inquired as to the Town of Lakewood Village's authority to enforce building regulations in its Extraterritorial Jurisdiction. This brief memorandum serves to respond to your inquiry.

Texas municipalities have been granted the statutory authority to apply by ordinance their subdivision regulations, including platting, building standards and permitting, in their extraterritorial jurisdiction ("ETJ"). Texas Local Government Code Section 212.003 states that:

### § 212.003 Extension of Rules to Extraterritorial Jurisdiction

(a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002... .

Section 212.002 of the Local Government Code states that "the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction." Other Local Government Code provisions support the right of Texas municipalities to enforce subdivision regulations in the ETJ. For instance, Section 214.904 governs the application of permits required by a municipality to erect or improve a building or structure in the corporate limits or ETJ. Similarly, Section 242.001 governs interlocal agreements by a municipality to regulate subdivision plats and permits in the ETJ. Additionally, Section 233.153(c), which addresses county building regulations in unincorporated areas, specifically states that "if a municipality located within [an unincorporated area of a county] has adopted a building code in the municipality's extraterritorial jurisdiction, the *building code adopted by the municipality controls* and building code standards under this subchapter have no effect in the municipality's extraterritorial jurisdiction." (emphasis added). Therefore, the Town's regulations in its ETJ control over Denton County's regulations.

In interpreting the extent of this statutory authority that has been granted to municipalities, courts in Texas have repeatedly upheld the ability of municipalities to regulate subdivisions and enforce ordinances in their ETJ. *Hartsell v. Town of Talty*, 130 S.W.3d 325, 328 (Tex. App. – Dallas 2004, pet. denied)("ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction"); *Levy v. City of Plano*, 2001 WL 1382520, *2 (Tex. App. – Dallas 2001, no pet.)(City could apply subdivision regulations to property in its ETJ); *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 823 (Tex. App. – Dallas 1986, writ ref'd n.r.e.)(city has statutory authority to extend its subdivision ordinances and ordinances regulating development, such as those specifying design, construction and maintenance standards, to its extraterritorial jurisdiction). The Supreme Court has noted that the purpose of platting and subdivision regulations is to "ensure that the subdivisions are safely constructed and to promote the orderly development of the community." *City of Round Rock v. Smith*, 687 S.W.2d 300, 302 (Tex. 1985).

In *Levy v. City of Plano, supra*, the Dallas court of appeals stated the city of Plano's subdivision regulations applied to the ETJ. In *Milestone Potranco Dev. v. City of San Antonio*, 298 S.W.3d 242, 245 (Tex. App. – San Antonio 2009, pet. denied), the San Antonio court of appeals upheld the city of San Antonio's tree preservation ordinance to the ETJ because it promoted the health of the municipality and healthful development of the community. In *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811 (Tex. App. – Dallas, writ ref'd n.r.e.), the Dallas court of appeals upheld the application of the city of Lucas' construction-related ordinances and building permits to the ETJ. The Dallas court of Appeals in *Lucas* specifically addressed the extent of a city's authority to enforce subdivision regulations in the ETJ:

> Were we to hold that building standards are not contemplated by [Section 212.003(a)], we would be left with a statute that grants authority over the laying out of streets, alleys and lot boundaries, but precludes authority over the most important part of a subdivision. Consequently, we conclude that the power over subdivisions conferred by [Section 212.003(a)] necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof. *Id.* at 823-24.

In conclusion, based on the statutory and case authorities, Lakewood Village as a Texas municipality may lawfully enforce its subdivision regulations and construction-related ordinances in its ETJ, issue building and construction-related permits for improvements in its ETJ, and enforce other non-zoning regulations in its ETJ.

Very truly yours,

Wm. Andrew Messer
Town Attorney

WAM/jms

# Exhibit 32



Ord 561
5/2002

Ord 50
3/1973

Ord 73
9/1976

Ord 791
10/2006

Ord 792
10/2006

Ord 685
1/2005

Ord 578
11/2002

Ord 337
11/1995

Ord 41
10/1971

Ord 442
6/1999

Ord 673
11/2004

Ord 40
8/1971

Ord 338
11/1995

Ord 339
11/1995

Ord 318
3/1994

Ord 39
8/1971

Ord 88
3/1977

Ord 790
10/2006

Radius created by
Ord. 88 3/1977
Distance measured with GIS
2,602

Ord 386
3/1997

Ord 19
7/1966

Ord 360
8/1996

Ord 59
9/1974

Incorporated 4/26/77
Population 620

Ord 843
8/2007

**Town of Little Elm**
**Denton County, Texas**

LITTLE ELM

ETJ Little Elm and Lakewood Village

0    950    1,900    3,800
Feet

1 inch = 1,644.16 feet

**Legend**
NAME, TYPE

Lakewood Village, CITY

Lakewood Village, ETJ

Little Elm, CITY

Little Elm, ETJ

# Exhibit 33

U. S. Army, Corps of Engineers
ATTN: CESWF-RE-M
P. O. Box 17300
Fort Worth, TX 76102-0300


January 28, 2014

Mr. Harry Bizios
3960 Spinnaker Run Point
Little Elm, Texas 75068

Dear Mr. Bizios:

Enclosed are two fully executed copies of Consent DACW63-9-14-0533 for your records. Per condition 10 of your consent a copy must be filed at the county of record under the referenced tract number. Once recorded a copy must be provided to us so that we will know the consent is officially on record. You have 90-days to provide us with proof of recording or your consent may be terminated.

If you have any questions related to your rights or responsibilities as provided for in the consent, please contact Mrs. Vicki Akers at 817-886-1114.

Joanne Murphy
Realty Specialist
Fort Worth District

Enclosures



Consent No. DACW63-9-14-0533

**DEPARTMENT OF THE ARMY
CORPS OF ENGINEERS
FORT WORTH DISTRICT**

**Project: Lewisville Lake, Texas
Tract No. E-465E**

**WHEREAS**, the United States has acquired a perpetual flowage easement over Tract No. E-465E, Lewisville Lake, Texas, recorded in Deed Records, volume 463, pp. 444, of Denton County, Texas.

**WHEREAS,** said easement grants to the United States the right of prior approval for any structure to be located within the easement area, which area is under the administrative control of the Fort Worth District, Corps of Engineers.

**WHEREAS,** the United States has been requested to grant approval for a riprap retaining wall to be placed on the above-identified tract.

**NOW THEREFORE,** the United States hereby gives consent to Mr. Harry Bizios to place a riprap retaining wall at the location shown on **Exhibits A and B**.

**PROVIDED HOWEVER,** that this consent is subject to the following conditions:

1. All activities conducted on the premises shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

2. The giving of this consent does not in any way subordinate the United States' prior easement rights. The United States shall in no case be liable for any damage or injury to the structures herein consented to, which may be caused by any action of the United States under its easement, or that may result from future operations undertaken by the United States, and no claim or right to compensation shall accrue from such exercise of the United States' easement rights.

3. The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the consented activity.

4. This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the consentee shall obtain such permission as may be required on account of any other existing rights. It is understood that this consent does not eliminate the necessity for obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat. 1151; 33

U.S.C. § 403), Section 404 of the Clean Water Act (33 U.S.C. § 1344) or any other permit or license which may be required by Federal, state, interstate or local laws in connection with the use of the premises.

5. All cut and fill material must produce at least a balanced total in volume. Construction associated with the riprap retaining wall must not result in a loss of flood storage or interfere with the operation of Lewisville Lake.

6. The retaining wall structure must not be constructed to exceed elevation 537.00' msl.

7. Each end of the retaining wall must tie in to maintain the integrity of the retaining wall.

8. The bags used must be equivalent to Sakrete Rip-Rap Scrim or better.

9. Any uncured or crushed cured cement product used, including bags will be removed from the flowage easement to prevent environmental hazards.

10. The grantee is responsible for ensuring that the fully executed consent is officially recorded and filed and a copy is provided to the undersigned Real Estate Contracting Officer within 30 days of receipt.

**IN WITNESS WHEREOF,** I have hereunto set my hand by authority of the Secretary of the Army, this 27 day of January , 2014.

Rocky D. Lee
District Chief of Real Estate
Real Estate Contracting Officer

**THIS CONSENT** is also executed by the grantee this 24 day of January , 2014.

Harry Bizios

# Consent, R- Rap Retaining Wall, Tract E 465 E
## 3960 Spinnaker Run Point , Little Elm, TX 75068



Lewisville Lake

Legend

△  Boundary Monuments

Lewisville 537' Contour

Fee Boundary

■ ■ ■  R-Rap - Erosion Control

Map Created By   Craig Kislingbury   12/9/2013

US Army Corps of Engineers

Exhibit-A

EXHIBIT A

# Exhibit 34

# DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS SUNRISE BAY AT LAKE LEWISVILLE SECTION ONE

STATE OF TEXAS          \*              **045795**

                         KNOWN ALL MEN BY THESE PRESENTS:

COUNTY OF DENTON*

This Declaration, made on the date hereinafter set forth by PROPERTIES OF THE SOUTHWEST INC., a Delaware corporation, duly authorized to do business in the State of Texas, hereinafter referred to as "Developer."

## WITNESSETH:

WHEREAS, Developer is the Owner of that certain Tract of land known as SUNRISE BAY AT LAKE LEWISVILLE of approximately 257.1573 Acres of land situated in Denton County, Texas (hereinafter referred to as the "Subdivision"), with the Plat ("Plat") of Sunrise Bay at Lake Lewisville SECTION ONE containing approximately 257.1573 acres (hereinafter referred to as "SECTION ONE"), recorded in the office of the County Clerk of Denton County, Texas on the 2ⁿᵈ day of *August*, 1995, after having been approved as provided by law, and being recorded in Cabinet _L_ , Slide _224 - 227_ of the Map Records of Denton County, Texas; and

WHEREAS, it is the desire of Developer to place certain restrictions, easements, covenants, conditions, stipulations and reservations (herein sometimes referred to as the "Restrictions") upon and against such SECTION ONE in order to establish a uniform plan for it's development, improvement and sale, and to insure the preservation of such uniform plan for the benefit of both the present and future Owners of Tracts in SECTION ONE;

NOW, THEREFORE, Developer hereby adopts, establishes and imposes upon SECTION ONE, and declares the following reservations, easements, restrictions, covenants and conditions, applicable thereto, all of which are for the purposes of enhancing and protecting the value, desirability and attractiveness of said Property, which Restrictions shall run with said Property and title or interest therein, or any part thereof, and shall insure to the benefit of each Owner thereof. Developer also declares that SECTION ONE shall be subject to the jurisdiction of the "Association" (as hereinafter defined).

## ARTICLE I
## DEFINITIONS

**Section 1.01 "Accessory Building"** shall mean and refer to a subordinate building, attached to or detached from the Dwelling (as hereinafter defined).

**Section 1.02 "Annexable Area"** shall mean and refer to any additional property made subject to the jurisdiction of the Association pursuant to the provisions set forth herein, including, without limitation, any property adjacent to or in the proximity of the Subdivision.

**Section 1.03 "Association"** shall mean and refer to the Sunrise Bay at Lake Lewisville Property Owners Association, and its successors and assigns.

ClibPDF - www.fastio.com

**Section 1.04 "Board of Directors"** shall mean and refer to the Board of Directors of the Association.

**Section 1.05 "Builders"** shall mean and refer to persons or entities that purchase Tracts and build speculative or custom homes thereon for third party purchasers.

**Section 1.06 "Common Area"** shall mean all real property (including the improvements thereto) within the Subdivision owned by the Developer and/or the Association for the common use and enjoyment of the Owners.

**Section 1.07 "Contractor"** shall mean and refer to the person or entity with whom an Owner contracts to construct a residential Dwelling on such Owner's Tract.

**Section 1.08 "Developer"** shall mean and refer to Properties of the Southwest, Inc. and its successors and assigns.

**Section 1.09 "Dwelling"** shall mean and refer to a building having accommodations for and occupied by not more than one Family (as hereinafter defined).

**Section 1.10 "Front Yard"** shall mean and refer to a space on a Tract facing a Street (as hereinafter defined) and extending across the front of the Tract between the Side Lines (as hereinafter defined) and being the horizontal distance between the Street Line (as hereinafter defined) and the Dwelling or any projection thereof other than the projection of the usual steps and eave over-hangs.

**Section 1.11 "Garage"** shall mean and refer to an Accessory Building or a portion of a Dwelling in which motor-driven vehicles are stored.

**Section 1.12 "Height"** shall mean and refer to the measurement from the average established grade at the Street Line abutting the Tract or, if higher, from the highest natural ground level of the two points where the Front Setback Line (as hereinafter defined) intersects the two Side Lines of the Tract, to the highest point of the Improvement being measured.

**Section 1.13 "Owner"** shall mean and refer to the record Owner, whether one or more persons or entities, of fee simple title to any Tract which is a part of the Subdivision, including (i) contract sellers (a seller under a Contract-for-Deed), but excluding those having such interest merely a security for the performance of an obligation, (ii) Developer (except as otherwise provided herein), and (iii) Builders.

**Section 1.14 "Plat"** shall collectively mean and refer to: (i) the Final Plat of Sunrise Bay Section 1, recorded at Cabinet _L_, Slide_224-227_Map Records, Denton County, Texas.

**Section 1.15 "Preferred Builder"** shall mean a builder who has been researched, investigated and approved by Properties of the Southwest, Inc.

**Section 1.16 "Rear Line"** shall mean the opposite of Street Line.

**Section 1.17 "Rear Yard"** shall mean and refer to a space extending across the rear of a Tract from one Side Line to the other Side Line and being the horizontal distance between the Rear Line and the Dwelling or any projection thereof other than the projection of the usual steps and eave over-hangs.

**Section 1.18 "Side Line"** shall mean and refer to any boundary line of a Tract which is not a Street Line or Rear Line.

**Section 1.19 "Street"** shall mean and refer to the roadways dedicated by the Developer to Denton County, Texas, by the Plat or any subsequent re-plat of SECTION ONE and any other portions of the Subdivision deeded or dedicated to and accepted by Denton County, Texas as public streets and roadways.

**Section 1.20 "Street Line"** shall mean and refer to that boundary line of a Tract which is also the boundary line of a Street.

**Section 1.21 "Sunrise Bay at Lake Lewisville"** shall mean and refer to SECTION ONE and any other sections of Sunrise Bay at Lake Lewisville hereafter made subject to the jurisdiction of the Association.

**Section 1.22 "Tract"** shall mean and refer to any plot of land identified as a Tract or homesite on the Plat of SECTION ONE. For purposes of this instrument, "Tract" shall not be deemed to include any portion of the "Common Areas" or "Unrestricted Reserves" (defined herein as any Common Areas and Unrestricted Reserves shown on the Plat) in SECTION ONE, regardless of the use made of such area.

**Section 1.23 "Water Front"** shall mean and refer to any property adjacent to the Corps of Engineers Property.

## ARTICLE II
## RESERVATIONS, EXCEPTION AND DEDICATIONS

**Section 2.01    Recorded Subdivision Map of the Property.** The Plat ("Plat") of SECTION ONE dedicates for use as such, subject to the limitations as set forth therein, the roads, streets and easements shown thereon. The Plat further establishes certain restrictions applicable to SECTION ONE. All dedications, restrictions and reservations created herein or shown on the Plat, replats or amendments of the Plat of SECTION ONE recorded or hereafter recorded shall be construed as being included in each contract, deed, or conveyance executed or to be executed by or on behalf of Developer, whether specifically referred to therein or not.

**Section 2.02    Easements.** Developer reserves for public use the utility easements shown on the Plat or that have been or hereafter may be created by separate instrument recorded in the Real Property Records of Denton County, Texas, for the purpose of constructing, maintaining and repairing a system or systems of electric lighting, electric power, telegraph and telephone line or lines, storm surface drainage, cable television, or any other utility the Developer sees fit to install in, across and/or under SECTION ONE for the benefit of the subdivision or any part thereof. All utility easements in SECTION ONE may be used for the construction of drainage swales in order to provide for improved surface drainage of the Reserves, Common Area, Tracts and/or all other areas of the subdivision or any part thereof. Should any utility company furnishing a service covered by the general easement herein provided request a specific easement by separate recordable document, Developer, without the joiner of any other Owner, shall have the right to grant such easement on said property without conflicting with the terms hereof. Any utility company serving the subdivision shall have the right to enter upon any utility easement for the purpose of installation, repair and maintenance of their respective facilities. Neither Developer nor any utility

3
07/11/95

ClibPDF - www.fastio.com

company, political subdivision or other authorized entity using the easements herein referred to shall be liable for any damages done by them or their assigns, agents, employees, or servants, to fences, shrubbery, trees and lawns or any other property of the Owner on the property covered by said easements.

**Section 2.03** _Title Subject to Easements_. It is expressly agreed and understood that the title conveyed by Developer to any of the Tracts by contract deed or other conveyance shall be subject to any easement affecting same for roadways or drainage, electric lighting, electric power, telegraph or telephone purposes and other easements hereafter granted affecting the Tracts. The Owners of the respective Tracts shall not be deemed to own pipes, wires, conduits or other service lines running through their Tracts which are utilized for or service other Tracts, but each Owner shall have an easement in and to the aforesaid facilities as shall be necessary for the use, maintenance and enjoyment of his Tract. The Developer may convey title to said easements to the public, a public utility company or the Association.

**Section 2.04** _Utility Easements_.

    a.    Utility ground and aerial easements have been dedicated in accordance with the Plat and by separate recorded easement documents.

    b.    No building shall be located over, under, upon or across any portion of any utility easement. The Owner of each Tract shall have the right to construct, keep and maintain concrete drives, fences, and similar improvements across any utility easement, and any public utility shall be entitled to cross such easements at all times for purposes of gaining access to and from such Tracts, provided, however, any concrete drive, fence or similar improvement placed upon such utility easement by the Owner shall be constructed, maintained and used at Owner's risk and, as such, the Owner of each Tract subject to said utility easements shall be responsible for (i) any and all repairs to the concrete drives, fences and similar improvements which cross or are located upon such utility easements and (ii) repairing any damage to said improvements caused by any public utility in the course of installing, operating, maintaining, repairing, or removing its facilities located within the utility easements.

## ARTICLE III
## USE RESTRICTIONS

**Section 3.01** _Single Family Residential Construction_. No building shall be erected, altered, placed or permitted to remain on any Tract other than one Dwelling unit per each Tract to be used for residential purposes. Detached Garages and work shops may be constructed on the property at the same time as the main Dwelling is being built, or any time thereafter, so long as they are of good construction, kept in good repair, and are not used for residential purposes. All dwellings, detached Garages and work shops must be approved in writing by the Architectural Control Committee prior to being erected, altered or placed on the property. The term "Dwelling" does not include single or double wide manufactured homes, and said manufactured homes are not permitted within the Subdivision. All dwellings must have at least 2000 square feet of living area, excluding porches, for a single story Dwelling, and 2400 square feet for a two story Dwelling, measured from the exterior walls, under one roof. The exterior walls of both the first and second stories of any

4
07/11/95

ClibPDF - www.fastio.com

Dwelling shall consist of not less than 70% masonry (including stucco) or masonry veneer construction, unless the Committee shall have granted its prior written consent to a lesser percentage which shall be in such amount as the Committee shall in it's sole discretion determine. Such masonry material shall be of quality and appearance equal or superior to standard clay, slate common brick, color pigment portland cement brick, stucco or quarried stone. Exterior material of any Dwelling, other than the required masonry portion, shall be a material which, in the sole opinion of the Committee, compliments the architecture of the Dwelling. The roof of any Dwelling shall be of either wood shingle, composition shingle, copper, tile, slate or standing seam metal. The use of sheet metal or similar material on either the roof or exterior sides of any Dwelling other than as flashing, is hereby prohibited. Each Dwelling shall be constructed so as to have not less than a two (2) car, nor more than a five (5) car Garage, which Garage may be detached from the Dwelling. No individual water system shall be permitted in the subdivision. All Dwellings must be built with new construction material. Any building, structure or improvement commenced on any Tract shall be completed as to exterior finish and appearance within six (6) months after the laying of the foundation. As used herein, the term "residential purposes" shall be construed to prohibit mobile homes or trailers being placed on said Tracts, or the use of said Tracts for duplex houses, condominiums, townhouses, or apartment houses. All Tracts shall be for residential purposes and all homes must be site constructed. No driveways will be permitted to take access directly on Garza Lane.

**Section 3.02**  Composite Building Site. Any Owner of one or more adjoining Tracts (or portions thereof) may, with the prior written approval of the Committee, and Denton County, consolidate such Tracts or portions into one building site, with the privilege of placing or constructing improvements on such resulting site, in which case the side set-back lines shall be measured from the resulting side property lines rather than from the Tract lines as indicated to the Plat.

**Section 3.03**  Location of the Improvements upon the Tract. The minimum dimension of Tracts and yards, and the minimum Tract area per family shall be as follows:

   a.   Tract area:  The minimum Tract area in this District shall be one acre.

   b.   Front Yard: There shall be a Front Yard having a depth of 50 feet.

   c.   Side Yard: The minimum distance from the side building line to the Side Line shall be 20 feet.

   d.   Rear Yard: For Tracts with areas of 1 acre or more - 20 feet.

   e.   Width of Tract: The minimum width of Tract shall be determined as follows:  (i) For Tracts with areas of 1 acre or more - 120 feet.  (ii) The width of the Tract shall be measured at the Street line. Building setback line for dwellings located on cul-de-sacs and other odd shaped Tracts may be less than those set forth immediately above if approved by the committee. The side yard of corner Tracts having adjoining two (2) sides shall have a thirty (30) foot side yard.

   f.   Height Regulations:  The maximum Height shall be two stories, but not to exceed thirty-five (35) feet per Dwelling. Height limit for any

ClibPDF - www.fastio.com

Accessory Building shall be twenty-five (25) feet. Provided, however, as to any Tract, the Architectural Control Committee may waive or alter any such setback line if, in the exercise of the Architectural Control committee's sole discretion, such waiver, or alteration is necessary to permit effective utilization of a Tract. Any such waiver or alteration must be in writing and recorded in the Deed of Records of Denton County, Texas. All such dwellings must be served with water and electricity.

**Section 3.04** Use of Temporary Structures. No structure of a temporary character, whether trailer, basement, tent, shack, Garage, barn or other outbuilding shall be maintained or used on any Tract at any time as a residence, either temporarily or permanently; provided, however, that Developer reserves the exclusive right to erect, place and maintain such facilities in or upon any property in the Subdivision that it owns as in its sole discretion may be necessary or convenient while selling Tracts, selling or constructing residences and constructing other improvements within the Subdivision. Developer reserves the right to sell the lot that the temporary sales office is located on and lease said office back from the purchaser of the lot.

**Section 3.05** Walls and Fences. Walls and fences, if any, must be approved prior to construction by the Committee. Fences are not permitted from the front line of the house to the public right-of-way, and no closer than the building setback line on the side street line. All fences must be maintained to the satisfaction of the Board of Directors. No barbed wire fences shall be located, erected or allowed to remain on any Tract. All fences fronting Garza Lane and Pinnacle Point shall be constructed in accordance with plans adopted by the Committee. A maximum Height of any fence shall not exceed six (6) feet. No fencing will be allowed along the Corps of Engineer Property lines. All mailboxes must be of masonry construction and approved by the Architectural Control Committee.

**Section 3.06** Prohibition of Offensive Activities. No Activity, whether for profit or not, shall be conducted on any Tract which is not related to single family residential purposes, unless said activity meets the following criteria:

a.      No additional exterior sign of activity is present,

b.      It is the type of action that usually happens in a home,

c.      No additional traffic, that would not be there normally, is created,

d.      The entity or activity maintains an office or place of business elsewhere, and

e.      Nothing dangerous is present that shouldn't be there. This restriction is waived in regard to the customary sales activities required to sell homes in the Subdivision.

f.      The discharge or use of firearms is expressly prohibited.

g.      The Board shall have the sole and absolute discretion to determine what constitutes a nuisance or annoyance.

**Section 3.07** Garbage and Trash Disposal. Garbage and trash or other debris accumulated in this Subdivision shall not be permitted to be dumped at any place upon adjoining land where a nuisance to any residence of this

ClibPDF - www.fastio.com

Subdivision is or may be created. No Tract shall be used or maintained as a dumping ground for rubbish. Trash, garbage or other waste shall not be allowed to accumulate, shall be kept in sanitary containers and shall be disposed of regularly. During the construction period, the builder is required to maintain a dumpster and a portable toilet on the building site. All equipment for the storage or disposal of such material shall be kept in a clean and sanitary condition.

**Section 3.08** <u>Junked Motor Vehicles Prohibited</u>. No Tract shall be used as a depository for abandoned or junked motor vehicles. No junk of any kind or character, or dilapidated structure or building of any kind or character, shall be kept on any Tract.

**Section 3.09** <u>Signs</u>. No signs, advertisement, billboards or advertising structure of any kind may be erected or maintained on any Tract without the consent in writing of the Architectural Control Committee and Properties of the Southwest, Inc., except one (1) professionally made sign not more than twenty-four inches by twenty-four inches, advertising an Owner's Tract for sale or rent, and one (1) professionally made sign, not more than twelve inches (12") wide by twenty-four inches (24") long identifying the Tract Owners name or names. However, no for sale by owner signs will be allowed until the development is completely sold out. No builder signs except Preferred Builders signs shall be allowed on any Tract. Preferred Builders shall be allowed to place one professionally made sign on his Tract, or on any Tract that he is contracted to construct a home, not more than thirty-six inches (36") by thirty-six (36") inches. A builder that is not a Preferred Builder that purchases a Tract for his or her own use, or for a speculative home, may place one sign, during the construction period only, not to exceed above mentioned size. All other signs are prohibited. Developer or any member of the Committee shall have the right to remove any such sign, advertisement or billboard or structure which is placed on any Tract in violation of these restrictions, and in doing so, shall not be liable, and are hereby expressly relieved from, any liability for trespass or other tort in connection therewith, or arising from such removal.

**Section 3.10** <u>Animal Husbandry</u>. No animals, livestock or poultry of any kind shall be raised, bred or kept on any Tract; provided however, that dogs, cats, or other common household pets may be kept on a Tract. Animals are not to be raised, bred or kept for commercial purposes or for food. Pets must be kept in a kennel, dog run, or fenced in area that confines said dog(s) to that area. Dogs will not be permitted to run loose in the subdivision and must be vaccinated for rabies according to State law once a year and registered with Denton County, Texas once a year. In no evnt shall more than four (4) dogs and/or cats and one litter thereof be permitted on any lot.

**Section 3.11** <u>Mineral Development</u>. No commercial oil drilling, oil development operations, oil refining, quarrying or mining operation of any kind shall be permitted upon or in any Tract. No derrick or other structures designed for the use of boring for oil or natural gas shall be erected, maintained or permitted upon any Tract.

**Section 3.12** <u>Drainage</u>. Natural established drainage patterns of Streets, Tracts or roadway ditches will not be impaired by any person or persons. Driveway culverts must be installed and will be of sufficient size to afford proper drainage of ditches without backing water up into ditch or diverting flow. Drainage culvert installation is subject to the inspection and approval of Denton County, and must be installed prior to any construction on Tract.

All driveways must be constructed of reinforced concrete in accordance with standard detail adopted by the Architectural Control Committee.

**Section 3.13** Re-subdividing. No Tract shall be re-subdivided and only one Dwelling and one Accessory Building may be located upon a Tract.

**Section 3.14** Leasing. Except in conjunction with the leasing or renting of the Dwelling on the Tract to the same party, no Accessory Building shall be leased or rented.

**Section 3.15** Uses and maintenance of the Tract and All Improvements Located Thereon. Without limiting the foregoing, the following restrictions shall apply to all Tracts:

> a.   No boat, jet-ski, aircraft, travel trailer, motor home, mobile home, camper body or similar vehicle or equipment may be parked for storage in the Front Yard of any Dwelling or parked on any Street in the Subdivision, nor shall any such vehicle or equipment be parked for storage in the Side Yard or Rear Yard of any Dwelling unless completely concealed from public view. All boats so parked or stored in the Side Yard or Rear Yard must at all times also be stored on a trailer. No such vehicle or equipment shall be used as a residence temporarily or permanently. This restriction shall not apply to any vehicle, machinery or equipment temporarily parked and in use for the construction, maintenance or repair of a Dwelling in the immediate vicinity.

> b.   Trucks with tonnage in excess of one and one-half tons shall not be permitted to park overnight within the Subdivision except those used by a builder during the construction of improvements. Any vehicle with painted advertisements or business placards on its body shall not be permitted to park overnight on any Street within the Subdivision except for those vehicles used by a builder during the construction of improvements.

> c.   No vehicle of any size which transports inflammatory or explosive cargo may be kept in the Subdivision at any time.

> d.   No vehicles or similar equipment shall be parked or stored in an area visible from any Street except passenger automobiles, passenger vans, motorcycles, pick-up trucks and pick-up trucks with attached bed campers that are in operating condition and have current license Plates and inspection stickers and are in daily use as motor vehicles on the streets and highways of the State of Texas.

**Section 3.16** Antennas. Antennas of any kind shall not exceed five feet above the roof of the Dwelling or Accessory Building. One satellite disc or other instrument or structure may be placed in the rear yard so long as it is completely screened from view from any Street and from the lake. However, it shall be no closer than thirty (30) foot from the corps property line.

**Section 3.17** Duty of Maintenance. Owners and occupants (including lessees) of any Tract shall jointly and severally have the duty and responsibility, at their sole cost and expense, to keep that Tract so owned or occupied, including improvements and grounds in connection therewith, in a well-maintained, safe, clean and attractive condition at all times. Such maintenance includes, but is not limited to the following:

a. Prompt removal of all litter, trash, refuse and wastes

b. Lawn mowing

c. Tree and shrub pruning

d. Watering

e. Keeping exterior lighting and mechanical facilities in working order

f. Keeping lawn and garden areas alive, free of weeds and attractive

g. Keeping driveways in good repair

h. Complying with all government health and policy requirements

i. Repair of exterior damage to improvements

**Section 3.18** Enforcement. If, in the opinion of the Board of Directors or the Committee any such Owner or occupant (including lessees) has failed to comply with any of the foregoing restrictions or has failed in any of the foregoing duties or responsibilities, then the Committee or the Association shall deliver to such Owner or occupant (including lessees) written notice of such failure and such Owner or occupant (including lessees) must within ten (10) days from and after delivery of such notice, comply with the restrictions and/or perform the care and maintenance required. Should any such Owner or occupant (including lessees) fail to fulfill this duty and responsibility within such period, then the Committee, or the Association, or their designated agents are hereby authorized to enter onto the premises and correct such violations and perform such care and maintenance as necessary without any liability for damages for wrongful entry, trespass or otherwise to any person. The Owners and occupants (including lessees) of any Tract on which such work is performed shall promptly reimburse the Committee or the Association for such cost. If such Owner or occupant (including lessees) shall fail to reimburse the Committee or the Association within 30 Days from and after delivery by the Association of an invoice setting forth the costs incurred by the association for such work, then said indebtedness shall be a debt of the Owner and occupant (including lessees) jointly and severally.

## ARTICLE IV
## ARCHITECTURAL CONTROL COMMITTEE

**Section 4.01** Basic Control.

a. No building or other improvements of any character shall be erected or placed, or the erection or placing thereof commenced or changes made in the design or exterior appearance thereof (excluding, without limitation, painting, staining or siding), or any addition or exterior alteration made thereto after original construction, or demolition or destruction by voluntary action made thereto after original construction, on any Tract in the Subdivision until the obtaining of the necessary approval (as hereinafter provided) from the Committee, and Denton County, of the construction plans and specifications for the construction or alteration of such improvements or demolition or destruction of existing improvements by voluntary action.

ClibPDF - www.fastio.com

b.    Each application made to the Committee, or to the Developer under Section 4.02. below shall be accompanied by three sets of plans and specifications for all proposed construction (initial or alteration) to be done on such Tract, including plot plans showing location on the Tract.    Upon receipt, the Architectural Control Committee shall forward one set of the plans and specifications to the Developer.

**Section 4.02**  Architectural Control Committee.

a.    The authority to grant or withhold architectural control approval as referred to above is initially vested in the Developer; provided, however, the authority of the Developer shall cease and terminate upon the election of the Architectural Control Committee of the Association (sometimes herein referred to as the "Committee"), in which event such authority shall be vested in and exercised by the Committee (as provided in (b) below), hereinafter referred to, except as to plans and specifications and plot plans theretofore submitted to the Developer which shall continue to exercise such authority over all such plans, specifications and plot plans.   The term "Committee", as used in this Declaration, shall mean or refer to the Developer until the election of the Architectural Control Committee as provided below.

b.    At such time as seventy-five percent (75%) of all of the Tracts in all Sections of the Subdivision are conveyed by Developer (from time to time hereafter referred to as the "Control Transfer Date") the Developer shall cause an instrument transferring control to the Association to be placed of record in the Real Property Records of Denton County, Texas (which instrument shall include the Control Transfer Date). Thereupon, the Association shall elect a committee of three (3) members to be known as the Sunrise Bay at Lake Lewisville Architectural Control Committee.  From and after the Control Transfer Date, each member of the Committee must be an Owner of property in some Section of Sunrise Bay at Lake Lewisville Subdivision. Additionally, the Developer shall have the right to discontinue the exercise of architectural control privileges and arrange for the transfer to the Association at any time prior to the Control Transfer Date by filing a statement and instrument to such effect in the Real Property Records of Denton County, Texas.

**Section 4.03**  Effect of Inaction.  Approval or disapproval as to architectural control matters as set forth in the preceding provisions of this Declaration shall be in writing.  In the event that the authority exercising the prerogative of approval or disapproval (whether the Developer or the Committee) fails to approve or disapprove in writing any plans and specifications and plot plans received by it in compliance with the preceding provisions within thirty (30) days following such submissions, such plans and specifications and plot plan shall be deemed approved and the construction of any such building and other improvements may be commenced and proceeded with in compliance with all such plans and specifications and plot plan and all of the other terms and provisions hereof.

**Section 4.04**  Effect of Approval.  The granting of the aforesaid approval (whether in writing or by lapse of time) shall constitute only an expression of opinion by the Committee that the terms and provisions hereof shall be complied with if the building and/or other improvements are erected in accordance with said plans and specifications and plot plan; and such approval shall not constitute any nature of waiver or estoppel either as to the persons expressing such approval or any other person in the event that such

10
07/11/95

ClibPDF - www.fastio.com

building and/or improvements are not constructed in accordance with such plans and specifications and plot plan, but, nevertheless, fail to comply with the provisions hereof. Further, no person exercising any prerogative of approval of disapproval shall incur any liability by reasons of the good faith exercise thereof.

**Section 4.05** <u>Variance</u>. The Developer and the Committee, and Denton County, may authorize variances from compliance with any of the provisions of this Declaration or minimum acceptable construction standards or regulations and requirements as promulgated from time to time by the Developer and the committee when circumstances such as topography, natural obstructions, Tract configuration, Tract size, hardship, aesthetic or environmental considerations may require a variance. The Developer, the Committee, and Denton County, reserve the right to grant variances as to building set-back lines, minimum square footage of the residence and other items. Such variances must be evidenced in writing and shall become effective when signed by the Developer or by at least a majority of the members of the Committee. If any such variances are granted, no violation of the provisions of this Declaration shall be deemed to have occurred with respect to the matter for which the variance is granted; provided, however, that the granting of a variance shall not operate to waive any of the provisions of this Declaration for any purpose except as to the particular property and particular provisions hereof covered by the variance, nor shall the granting of any variance by the Developer or the Committee, effect in any way the Owner's obligation to comply with all governmental laws and Denton County regulations affecting the property concerned and the Plat.

### ARTICLE V
### SUNRISE BAY AT LAKE LEWISVILLE
### PROPERTY OWNERS ASSOCIATION

**Section 5.01** <u>Membership</u>. Every person or entity who is a record Owner of any Tract which is subject to the Maintenance charge (or could be following the withdrawal of an exemption therefrom) and other assessments provided herein, including contract sellers, shall be a "Member" of the Association. The foregoing is not intended to include persons or entities who hold an interest merely as security for the performance of an obligation or those having only an interest in the mineral estate. Owners shall have one membership for each Tract owned by such Member. Memberships shall be appurtenant to and may not be separated from the ownership of the Tracts. Regardless of the number of persons who may own a Tract (such as husband and wife, or joint tenants, etc.) there shall be but one membership for each Tract. Additionally, the Directors of the Association must be Members of the Association (as more particularly described in the By-laws). Ownership of the Tracts shall be the sole qualification for membership. The voting rights of the Members are set forth in the Bylaws of the Association.

**Section 5.02** <u>Non-Profit Corporation</u>. Sunrise Bay at Lake Lewisville Property Owners Association, Inc., a non-profit corporation, has been (or will be) organized and it shall be governed by the Articles of Incorporation and Bylaws of said Association; and all duties, obligations, benefits, liens and rights hereunder in favor of the Association shall vest in said corporation.

**Section 5.03** <u>Bylaws</u>. The Association has adopted or may adopt whatever Bylaws it may choose to govern the organization or operation of the Subdivision and the use and enjoyment of the Tracts and Common Areas,

ClibPDF - www.fastio.com

provided that the same are not in conflict with the terms and provisions hereof.

**Section 5.04** <u>Owner's Right of Enjoyment</u>. Every Owner shall have a beneficial interest of use and enjoyment in and to the Common Areas and such right shall be appurtenant to and shall pass with the title to every assessed Tract, subject to the following provisions:

    a. The right of the Association, with respect to the Common Areas, to limit the number of guests of Owners;

    b. The right of the Association to charge reasonable admission and other fees for the use of any facility situated upon the Common Areas;

    c. The right of the Association, in accordance with its Articles and Bylaws (and until seventy-five percent (75%) of all Tracts in the Subdivision are sold, subject to the prior written approval of the Developer), to (i) borrow money for the purpose of improving and maintaining the Common Areas and facilities (including borrowing from the Developer or any entity affiliated with the Developer) and (ii) mortgage said property, however, the rights of such mortgagee of said property shall be subordinate to the rights of the Owners hereunder;

    d. The right of the Association to suspend the Member's voting rights and the Member's and "Related Users" (as hereinafter defined) right to use any recreational facilities within the Common Areas during any period in which the Maintenance Charge or any assessment against his Tract remains unpaid;

    e. The right of the Association to suspend the Member's voting rights and the Member's and Related Users' right to use any recreational facilities within the Common Area, after notice and hearing by the Board of Directors, for the infraction or violation by such Member or Related Users of this Declaration or the "Rules and Regulations", as hereinafter defined, which suspension shall continue for the duration of such infraction or violation, plus a period not to exceed sixty (60) days following the cessation or curing of such infraction or violation.

## ARTICLE VI
## MAINTENANCE FUND

**Section 6.01** <u>Maintenance Fund Obligation</u>. Each Owner of a Tract by acceptance of a deed therefore, whether or not it shall be expressed in any such deed or other conveyance, is deemed to covenant and agrees to pay to the Association a monthly maintenance charge (the "Maintenance Charge"), and any other assessments or charges hereby levied. The Maintenance Charge and any other assessments or charges hereby levied, together with such interest thereon and costs of collection thereof, as hereinafter provided, shall be a charge on the Tracts and shall be a continuing lien upon the property against which each such Maintenance Charge and other charges and assessments are made.

**Section 6.02** <u>Basis of the Maintenance Charge</u>.

    a. The Maintenance Charge referred to shall be used to create a fund to be known as the "Maintenance Fund", which shall be used as

ClibPDF - www.fastio.com

herein provided; and each such Maintenance Charge (except as otherwise hereinafter provided) shall be paid by the Owner of each Tract to the Association. The Maintenance Charge for the year of purchase shall be pro-rated at closing and then shall be paid annually, in advance, on or before the first day of the first month of each calendar year. Provided, however, that if an Owner owns more than one Tract in the Subdivision, such Owner shall pay only twice the assessment of one (1) Tract no matter how many Tracts are owned. In the event an Owner obtains consent from the Committee for a Composite Building site pursuant to Section 3.02 hereof, such Composite Building Site shall, for this purpose, be considered one Tract beginning upon the completion of the improvements thereon.

b.     Any Maintenance Charge not paid within thirty (30) days after the due date shall bear interest from the due date at the lesser of (i) the rate of eighteen percent (18%) per annum or (ii) the maximum rate permitted by law. The Association may bring an action at law against the Owner personally obligated to pay the same, or foreclose the hereinafter described lien against the Owner's Tract. No Owner may waive or otherwise escape liability for the Maintenance Charge by non-use of any Common Areas or recreational facilities available for use by Owners of the Subdivision or by the abandonment of his Tract.

c.     The exact amount of the Maintenance Charge applicable to each Tract will be determined by the Developer. All other matters relating to the Maintenance Charge and the collection, expenditures and administration of the Maintenance Fund shall be determined by the Developer or the Board of Directors of the Association, subject to contrary provisions hereof.

d.     The Association, from and after the Control Transfer Date, shall have the further right at any time, with a majority vote of all Association members, to adjust or alter said Maintenance Charge from year to year as it deems proper to meet the reasonable operation expenses and reserve requirements of the Association in order for the Association to carry out its duties hereunder.

**Section 6.03** <u>Creation of Lien and Personal Obligation</u>. In order to secure the payment of the Maintenance Charge, and other charges and assessments hereby levied, each Owner of a Tract in the Subdivision, by such party's acceptance of a deed thereto, hereby grants to the Association a contractual lien on such Tract which may be foreclosed on by non-judicial foreclosure and pursuant to the provisions of Section 51.002 of the Texas Property Code (and any successor statute); and each such Owner hereby expressly grants the Association a power of sale in connection therewith. The Association shall, whenever it proceeds with non-judicial foreclosure pursuant to the provisions of said Section 51.002 of the Texas Property Code and said power of sale, designate in writing a Trustee to post or cause to be posted all required notices of such foreclosure sale and to conduct such foreclosure sale. The Trustee may be changed at any time and from time to time by the Association by means of written instrument executed by the President or any Vice-President of the Association and filed for record in the Real Property Records of Denton County, Texas. In the event that the Association has determined to non-judicially foreclose the lien provided herein pursuant to the provisions of said Section 51.002 of the Texas Property Code and to exercise the power of sale hereby granted, the Association, or the Association's agent, shall give notice of foreclosure sale as provided by the Texas Property Code as then amended. Upon request by the Association, Trustee shall give any further

ClibPDF - www.fastio.com

notice of foreclosure sale as may be required by the Texas Property Code as then amended, and shall convey such Tract to the highest bidder for cash by General Warranty Deed. Out of the proceeds of such sale, if any, there shall first be paid all expenses incurred by the Association in connection with such default, including reasonable attorney's fees and a reasonable trustee's fee; second, from such proceeds there shall be paid to the Association an amount equal to the amount in default; and third, the remaining balance shall be paid to such Owner. Following any such foreclosure, each occupant of any such Tract foreclosed on and each occupant of any improvements thereon shall be deemed to be a tenant at sufferance and may be removed from possession by any and all lawful means, including a judgment for possession in an action of forcible detainer and the issuance of a writ of restitution thereunder.

In the event of non-payment by any Owner of any Maintenance Charge or other charge or assessment levied hereunder, the Association may, in addition to foreclosing the lien hereby retained, and exercising the remedies provided herein, upon ten (10) days prior written notice thereof to such nonpaying Owner, exercise all other rights and remedies available at law or in equity.

It is the intent of the provisions of this Section 6.03 to comply with the provisions of said Section 51.002 of the Texas Property Code relating to non-judicial sales by power of sale and, in the event of the amendment of said Section 51.002 of the Texas Property code hereafter, the President or any Vice-President of the Association, acting without joinder of any other Owner or mortgagee or other person may, by amendment to this Declaration filed in the Real Property Records of Denton County, Texas, amend the provisions hereof so as to comply with said amendments to Section 51.002 of the Texas Property Code.

**Section 6.04** Notice of Lien. In addition to the right of the Association to enforce the Maintenance Charge or other charge or assessment levied hereunder, the Association may file a claim or lien against the Tract of the delinquent Owner by recording a notice ("Notice of Lien") setting forth:

a. The amount of the claim of delinquency,

b. The interest thereon,

c. The costs of collection which have accrued thereon,

d. The legal description and Street address of the Tract against which the lien is claimed and

e. The name of the Owner thereof.

Such Notice of Lien shall be signed and acknowledged by an officer of the Association or other duly authorized agent of the Association. The lien shall continue until the amounts secured thereby and all subsequently accruing amounts are fully paid or otherwise satisfied. When all amounts claimed under the Notice of Lien and all other costs and assessments which may have accrued subsequent to the filing of the Notice of Lien have been fully paid or satisfied, the Association shall execute and record a notice releasing the lien upon payment by the Owner of a reasonable fee as fixed by the Board of Directors to cover the preparation and recordation of such release of lien instrument.

**Section 6.05** <u>Liens Subordinate to Mortgages</u>. The lien described in this Article VI shall be deemed subordinate to a first lien or other liens of any bank, insurance company, savings and loan Association, university, pension and profit sharing trusts or plans, or any other third party lender, including Developer, which may have heretofore or may hereafter lend money in good faith for the purchase or improvement of any Tract and any renewal, extension, rearrangement or refinancing thereof. Each such mortgagee of a mortgage encumbering a Tract who obtains title to such Tract pursuant to the remedies provided in the deed of trust or mortgage or by judicial foreclosure shall take title to the Tract free and clear of any claims for unpaid Maintenance Charges or other charges of assessments against such Tract which accrued prior to the time such holder acquired title to such Tract. No such sale or transfer shall relieve such holder from liability for any Maintenance Charge or other charges or assessments thereafter becoming due or from the lien thereof. Any other sale or transfer of a Tract shall not affect the Association's lien for Maintenance Charges or other charges or assessments. The Association shall make a good faith effort to give each such mortgagee sixty (60) days advance written notice of the Association's proposed foreclosure of the lien described in Section 6.01 hereof, which notice shall be sent to the nearest office of such mortgagee by prepaid United States registered or Certified mail, return receipt requested, and shall contain a statement of delinquent Maintenance Charges or other charges or assessments upon which the proposed action is based; provided, however, that the Association's failure to give such notice shall not impair or invalidate any foreclosure conducted by the Association pursuant to the provisions of this Article VI.

**Section 6.06** <u>Purpose of the Maintenance Charge</u>. The Maintenance Charge levied by the Developer or the Association shall be used exclusively for the purpose of promoting the recreation, health, safety, and welfare of the Owners of the Subdivision and other portions of the Annexable Area which hereafter may become subject to the jurisdiction of the Association. In particular, the Maintenance Charge shall be used for any improvement or services in furtherance of these purposes and the performance of the Association's duties described in Article VIII, including the maintenance of any Common Areas, any Drainage Easements and the establishment and maintenance of a reserve fund for maintenance of any Common Areas. The Maintenance Fund may be expended by the Developer or the Association for any purposes which, in the judgment of the Association, will tend to maintain the property values in the Subdivision, including, but not limited to, providing funds for the actual cost to the Association of all taxes, insurance, repairs, energy charges, replacement and maintenance of the Common Area as may from time to time be authorized by the Association. Except for the Association's use of the Maintenance Charge to perform its duties described in this Declaration and in the Bylaws, the use of the Maintenance Charge for any of these purposes is permissive and not mandatory. It is understood that the judgment of the Association as to the expenditure of said funds shall be final and conclusive so long as such judgment is exercised in good faith.

**Section 6.07** <u>Exempt Property.</u> The following property subject to this Declaration shall be exempt from the Maintenance Charge and all other charges and assessments created herein:

    a.    All properties dedicated to and accepted by a local public authority;

    b.    The Common Area and;

ClibPDF - www.fastio.com

c.     All properties owned by a charitable or nonprofit organization exempt from taxation by the laws of the State of Texas; however, no land or improvements devoted to Dwelling use shall be exempt from said Maintenance Charge.

**Section 6.08**   Handling of Maintenance Charges.   The collection and management of the Maintenance Charge or other charge or assessment levied hereunder, shall be performed by the Developer until the Control Transfer Date, at which time the Developer shall deliver to the Association all funds on hand together with all books and records of receipt and disbursements. The Developer and, upon transfer, the Association, shall maintain separate special accounts for these funds, and Owners shall be provided, at least annually, information on the Maintenance Fund.

## ARTICLE VII
## DEVELOPER'S RIGHTS AND RESERVATIONS

**Section 7.01**  Period of Developer's Rights and Reservations.  Developer shall have, retain and reserve certain rights as hereinafter set forth with respect to the Association and the Common Area from the date hereof, until the earlier to occur of

a.     The Control Transfer date or

b.     Developer's written notice to the Association of Developer's termination of the rights described in Article VII hereof.

The rights and reservations hereinafter set forth shall be deemed excepted and reserved in each conveyance of a Tract by Developer to an Owner whether or not specifically stated therein and in each deed or other instrument by which any property within the Common Area is conveyed by Developer.  The rights, reservations and easements hereafter set forth shall be prior and superior to any other provisions of this Declaration and may not, without Developer's prior written consent, be modified, amended, rescinded or affected by any amendment of this Declaration. Developer's consent to any one such amendment shall not be construed as a consent to any other or subsequent amendment.

**Section 7.02**   Right to Construct Additional Improvements in Common Area. Developer shall have and hereby reserves the right (without the consent of any other Owner), but shall not be obligated, to construct additional improvements within the Common Area at any time and from time to time in accordance with this Declaration for the improvement and enhancement thereof and for the benefit of the Association and Owners, so long as such construction does not directly result in the increase of such Maintenance Charge.  Developer shall, upon the Control Transfer Date, convey or transfer such improvements to the Association and the Association shall be obligated to accept title to, care for and maintain the same as elsewhere provided in this Declaration.

**Section 7.03**   Developer's Rights to Use Common Areas in Promotion and Marketing of the Property.  Developer shall have and hereby reserves the right to reasonable use of the Common Area and of services offered by the Association in connection with the promotion and marketing of land within the boundaries of the Subdivision.  Without limiting the generality of the foregoing, Developer may erect and maintain on any part of the Common Area such signs, temporary buildings and other structures as Developer may

16
07/11/95

ClibPDF - www.fastio.com

reasonably deem necessary or proper in connection with the promotion, development and marketing of land within the Property; may use vehicles and equipment within the Common Area for promotional purposes; and may permit prospective purchasers of property within the boundaries of the Property, who are not Owners or Members of the Association, to use the Common Area at reasonable times and in reasonable numbers; and may refer to the services offered by the Association in connection with the development, promotion and marketing of the Property.

**Section 7.04** Developer's Rights to Grant and Create Easements. Developer shall have and hereby reserves the right, without the consent of any other Owner or the Association, to grant or create temporary or permanent easements, for access, utilities, pipeline easement, cable television systems, communication and security systems, drainage, water and other purposes incidental to development, sale, operation and maintenance of the Subdivision, located in, on, under, over and across;

  a.    The Tracts or other property owned by Developer,

  b.    The Common Area, and

  c.    Existing utility easements

Developer also reserves the right, without the consent of any other Owner or the Association, to grant or create temporary or permanent easements for access over and across the streets and roads within the Subdivision.

**Section 7.05** Developer's Rights to Convey Additional Common Area to the Association. Developer shall have and hereby reserves the right, but shall not be obligated to, convey additional real property and improvements thereon, if any, to the Association as Common Area at any time and from time to time in accordance with this Declaration, without the consent of any other Owner or the Association.

**Section 7.06** Annexation of Annexable Area. Additional residential property and common areas outside of the Subdivision including, without limitation, the Annexable Area, may, at any time and from time to time, be annexed by the Developer into the real property which becomes subject to the jurisdiction and benefit of the Association, without the consent of the Owners or any other party; provided, however, such additional residential property may be made subject to the jurisdiction of the Association, shall be entitled to the use and benefit of all Common Areas that are or may become subject to the jurisdiction of the Association, provided that such annexed property is impressed with and subject to at least the Maintenance Charge imposed hereby.

# ARTICLE VIII
## DUTIES AND POWERS OF THE PROPERTY OWNERS ASSOCIATION

**Section 8.01** General Duties and Powers of the Association. The Association has been formed to further the common interest of the Members. The Association, acting through the Board of Directors or though persons to whom the Board of Directors has delegated such powers (and subject to the provisions of the Bylaws), shall have the duties and powers hereinafter set forth and, in general, the power to do anything that may be necessary or

ClibPDF - www.fastio.com

desirable to further the common interest of the members, to maintain, improve and enhance the Common Areas and to improve and enhance the attractiveness, desirability and safety of the Subdivision. The Association shall have the authority to act as the agent to enter into any and all contracts on behalf of the Members in order to carry out the duties, powers and obligations of the Association as set forth in this Declaration.

**Section 8.02** <u>Duty to Accept the Property and Facilities Transferred by Developer</u>. The Association shall accept title to any property, including any improvements thereon and personal property transferred to the Association by Developer, and equipment related thereto, together with the responsibility to perform any and all administrative functions and recreation functions associated therewith (collectively herein referred to as "Functions"), provided that such property and Functions are not inconsistent with the terms of this Declaration. Property interests transferred to the Association by Developer may include fee simple title, easements, leasehold interests and licenses to use such property. Any property or interest in property transferred to the Association by Developer shall, except to the extend otherwise specifically approved by resolution of the Board of Directors, be transferred to the Association free and clear of all liens and mortgages (other than the lien for property taxes and assessments not then due and payable), but shall be subject to the terms of this Declaration, the terms of any declaration of covenants, conditions and restrictions annexing such property to the Common Area, and all easements, covenants, conditions, restrictions and equitable servitude or other encumbrances which do not materially affect the Owners authorized to use such property. Except as otherwise specifically approved by resolution of the Board of Directors, no property or interest in property transferred to the Association by the Developer shall impose upon the Association any obligation to make monetary payments to Developer or any affiliate of Developer including, but not limited to, any purchase price, rent, charge or fee. The property or interest in property transferred to the Association by Developer shall not impose any unreasonable or special burdens of ownership of property, including the management maintenance, replacement and operation thereof.

**Section 8.03** <u>Duty to Manage and Care for the Common Area</u>. The Association shall manage, operate, care for, maintain and repair all Common Areas and keep the same in a safe, attractive and desirable condition for the use and enjoyment of the Members. The duty to operate, manage and maintain the Common Areas shall include, but not be limited to the following: establishment, operation and maintenance of a security system, if any, for the Subdivision; management, maintenance, repair and upkeep of the Subdivision entrances and other Common Areas.

**Section 8.04** <u>Other Insurance Bonds</u>. The Association shall obtain such insurance as may be required by law, including workmen's compensation insurance, and shall have the power to obtain such other insurance and such fidelity, indemnity or other bonds as the Association shall deem necessary or desirable.

**Section 8.05** <u>Duty to Prepare Budgets</u>. The Association shall prepare budgets for the Association, which budgets shall include a reserve fund for the maintenance of all Common Areas.

**Section 8.06** <u>Duty to Levy and Collect the Maintenance Charge</u>. The Association shall levy, collect and enforce the Maintenance Charge and other charges and assessments as elsewhere provided in this Declaration.

**Section 8.07** <u>Duty to Provide Annual Review</u>. The Association shall provide for an annual unaudited independent review of the accounts of the Association. Copies of the review shall be made available to any Member who requests a copy of the same upon payment by such Member of the reasonable cost of copying the same.

**Section 8.08** <u>Duties with Respect to Architectural Approvals</u>. The Association shall perform functions to assist the Committee as elsewhere provided in Article IV of this Declaration.

**Section 8.09** <u>Power to Acquire Property and Construct Improvements</u>. The Association may acquire property or an interest in property (including leases) for the common benefit of Owners including improvements and personal property. The Association may construct improvements on the Common Areas and may demolish existing improvements.

**Section 8.10** <u>Power to Adopt Rules and Regulations</u>. The Association may adopt, amend, repeal and enforce rules and regulations ("Rules and Regulations"), fines, levies and enforcement provisions as may be deemed necessary or desirable with respect to the interpretation and implementation of this Declaration, the operation of the Association, the use and enjoyment of the Common Areas, and the use of any other property, facilities or improvements owned or operated by the Association.

**Section 8.11** <u>Power to Enforce Restrictions and Rules and Regulations</u>. The Association (and any Owner with respect only to the remedies described in (b) or (c), below) shall have the power to enforce the provisions of this Declaration and the Rules and Regulations and shall take such action as the Board of Directors deems necessary or desirable to cause such compliance by each Member. Without limiting the generality of the foregoing, the Association shall have the power to enforce the provisions of this Declaration and of Rules and Regulations of the Association by any one or more of the following means:

> a.  By entry upon any property within the Subdivision after notice and hearing (unless a bona fide emergency exists in which event this right of entry may be exercised without notice, written or oral) to the Owner in such manner as to avoid any unreasonable or unnecessary interference with the lawful possession, use or enjoyment of the improvements situated thereon by the Owner or any other person, without liability by the Association to the Owner thereof, for the purpose of enforcement of this Declaration or the Rules and Regulations;

> b.  By commencing and maintaining actions and suits to restrain and enjoin any breach or threatened breach of the provisions of this Declaration or the Rules and Regulations;

> c.  By exclusion, after notice and hearing, of any Member from use of any recreational facilities within the Common Areas during and for up to sixty (60) days following any breach of this Declaration or such Rules and Regulations by such Member, unless the breach is a continuing breach in which case exclusion shall continue for so long as such breach continues;

> d.  By suspension, after notice and hearing, of the voting rights of a Member during and for up to sixty (60) days following any breach by such Member of a provision of this Declaration or such Rules and

Regulations, unless the breach is a continuing breach in which case such suspension shall continue for so long as such breach continues;

e. By levying and collecting, after notice and hearing, an assessment against any Member for breach of this Declaration or such Rules and Regulations by such Member which assessment reimbursed the Association for the costs incurred by the Association in connection with such breach;

f. By levying and collecting, after notice and hearing, reasonable and uniformly applied fines and penalties, established in advance in the Rules and Regulations of the Association, from any Member for breach of this Declaration or such Rules and Regulations by such Member; and

g. By taking action itself to cure or abate such violation and to charge the expenses thereof, if any, to such violating Members, plus attorney's fees incurred by the Association with respect to exercising such remedy.

Before the Board may invoke the remedies provided above, it shall give registered notice of such alleged violation to Owner, and shall afford the Owner a hearing. If, after the hearing, a violation is found to exist, the Board's right to proceed with the listed remedies shall become absolute. Each day a violation continues shall be deemed a separate violation. Failure of the Association, the Developer, or of any Owner to take any action upon any breach or default with respect to any of the foregoing violations shall not be deemed a waiver of their right to take enforcement action thereafter or upon a subsequent breach or default.

**Section 8.12** <u>Power to Grant Easements</u>. In addition to any blanket easements described in this Declaration, the Association shall have the power to grant access, utility, drainage, water facility and other such easements in, on, over or under the Common Area.

### ARTICLE IX
### GENERAL PROVISIONS

**Section 9.01** <u>Term</u>. The provisions hereof shall run with all property in Section One and shall be binding upon all Owners and all persons claiming under them for a period of forty (40) years from the date this Declaration is recorded, after which time said Declaration shall be automatically extended for successive periods of ten (10) years each, unless an instrument, signed by Owners (including Developer) who are entitled to cast not less than two-thirds (2/3rds) of the votes of all the Owners has been recorded agreeing to amend or change, in whole or in part, this Declaration.

**Section 9.02** <u>Amendments</u>. This Declaration may be amended or changed, in whole or in part, at any time by the written agreement or signed ballot of Owners (including the Developer) entitled to cast not less than two-thirds (2/3rds) of the votes of all of the Owners. If the Declaration is amended by a written instrument signed by those Owners entitled to cast not less than two-thirds (2/3rds) of all of the votes of the Owners of the Association, such amendment must be approved by said Owners within three hundred sixty-five (365) days of the date the first Owner executes such amendment. The date an Owner's signature is acknowledged shall constitute prima facie evidence of the date of execution of said amendment by such Owner. Those Members (Owners, including the Developer) entitled to cast not less than two-

20
07/11/95

ClibPDF - www.fastio.com

thirds (2/3rds) of all of the votes of the Members of the Association may also vote to amend this Declaration, in person, or by proxy, at a meeting of the Members (Owners, including the Declarant) duly called for such purpose, written notice of which shall be given to all Owners at least ten (10) days and not more than sixty (60) days in advance and shall set forth the purpose of such meeting. Notwithstanding any provision contained in the Bylaws to the contrary, a quorum, for purposes of such meeting, shall consist of Members (in person or by proxy) not less than seventy percent (70%) of all of the votes of the Members entitled to be cast. Any such amendment shall become effective when an instrument is filed for record in the Real Property Records of Denton County, Texas, accompanied by a certificate, signed by a majority of the Board of Directors, stating that the required number of Members (Owners, including the Developer) executed the instrument amending this Declaration or cast a written vote, in person or by proxy, in favor of said amendment at the meeting called for such purpose. Copies of the written ballots pertaining to such amendment shall be retained by the Association for a period of not less than three (3) years after the date of filing of the amendment or termination.

**Section 9.03** <u>Amendments by the Developer</u>. The Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged, and filed for record for the purpose of correcting any typographical or grammatical error, oversight, ambiguity or inconsistency appearing herein, provided that any such amendment shall be consistent with and in furtherance of the general plan and scheme of development as evidenced by this Declaration and shall not impair or adversely affect the vested property or other rights of any Owner or his mortgagee. Additionally, Developer shall have and reserves the right at any time and from time to time prior to the Control Transfer Date, without the joinder or consent of any Owner of other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of permitting the Owners to enjoy the benefits from technological advances, such as security, communications or energy-related devices or equipment which did not exist or were not in common use in residential subdivisions at the time this Declaration was adopted. Likewise, the Developer shall have and reserves the right at any time and from time to time prior to the control Transfer Date, without the joinder or consent of any Owner or other party, to amend this Declaration by an instrument in writing duly signed, acknowledged and filed for record for the purpose of prohibiting the use of any device or apparatus developed and/or available for residential use following the date of this Declaration if the use of such device or apparatus will adversely affect the Association or will adversely affect the property values within the Subdivision.

**Section 9.04** <u>Severability</u>. Each of the provisions of this Declaration shall be deemed independent and severable and the invalidity or un-enforceability or partial invalidity or partial un-enforceability of any provision or portion hereof shall not affect the validity or enforceability of any other provision.

**Section 9.05** <u>Liberal Interpretation</u>. The provisions of this Declaration shall be liberally construed as a whole to effectuate the purpose of this Declaration.

**Section 9.06** <u>Successors and Assigns</u>. The provisions hereof shall be binding upon and inure to the benefit of the Owners, the Developer and the Association, and their respective heirs, legal representatives, executors, administrators, successors and assigns.

**Section 9.07**  Effect of Violations on Mortgages.  No violation of the provisions herein contained, or any portion thereof, shall affect the lien of any mortgage or deed of trust presently or hereafter placed of record or otherwise affect the rights of the mortgagee under any such mortgage, the holder of any such lien or beneficiary of any such deed of trust; and any such mortgage, lien or deed of trust may, nevertheless, be enforced in accordance with its terms, subject, nevertheless, to the provisions herein contained.

**Section 9.08**  Terminology.  All personal pronouns used in this Declaration and all exhibits attached hereto, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa. Title of Articles and Sections are for convenience only and neither limit nor amplify the provisions of this Declaration itself.  The terms "herein", "hereof" and similar terms, as used in this instrument, refer to the entire agreement and are not limited to referring only to the specific paragraph, section or article in which such terms appear.  All references in this Declaration to Exhibits shall refer to the Exhibits attached hereto.

IN WITNESS WHEREOF, the undersigned, being the Developer herein, has hereunto set its hand of this ___12___ day of ___July___, 19_95_

PROPERTIES OF THE SOUTHWEST, INC.

BY: _____

MARCUS SMITH, VICE-PRESIDENT

STATE OF TEXAS  *
COUNTY OF DENTON *

This instrument was acknowledged before me on the ___12___ day of ___July___, 1995, by MARCUS SMITH, Vice-President of PROPERTIES OF THE SOUTHWEST INC., a Delaware corporation, on behalf of said corporation.

_____
Notary Public, State of Texas

REBECCA A. HEARN
MY COMMISSION EXPIRES
April 7, 1997

ClibPDF - www.fastio.com

Doc/Num : 95-R0045795
Doc/Type : RST
Recording: 47.00
Doc/Mgmt : 6.00
Receipt #: 21161
Deputy - CASSY

Filed for Record in:
DENTON COUNTY, TX
HONORABLE TIM HODGES/COUNTY
CLERK

On Aug 02 1995
At 9:04am

Doc/Num : 95-R0045795
Doc/Type : RST
Recording: 47.00
Doc/Mgmt : 6.00
Receipt #: 21161
Deputy - CASSY

# Exhibit 35

**STATE OF TEXAS**      )

                               )      **CERTIFICATE TO COPY OF PUBLIC RECORD**

**COUNTY OF DENTON**      )

I hereby certify, in the performance of the functions of my office, that the attached instruments are full, true and correct copies of Denton County Permit Number 2014-0123. The same appear of record in my office and said documents are the official records from the public office of the Public Works Department of Denton County, Texas, and are kept in said office.

I further certify that I am the Director of Public Works for Denton County, Texas, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand this 1st day of April, 2014.

Bennett C. Howell III, PE, CFM

Denton County

State of Texas

Denton County Flood Damage Prevention Ordinance
Planning Department, Denton County, Texas

**PART A – APPLICANT INFORMATION**    ☑ **RESIDENTIAL PERMIT**    ☐ **COMMERCIAL PERMIT**

First Name: ALAN HOFFMANN
Last Name:
Address: 7329 GASTON AVE. #725-341          Company:
City, State, Zip: Dallas, TX. 75214          Phone: 2A-325-0096
                                             Fax:
                                             Email:
                                             * 469-688-6450

**PART B – PROPERTY INFORMATION**

DCAD 'R' #: 182659          Land Area (Acres):
Owner's First Name:          Owner's Address:
Owner's Last Name:          Owner's City, State, Zip:

☒ Property is part of a Subdivision:  – or –   ☐ Property is part of an Abstract:
Name: Sunrise Bay @ Lake Lewisville    Number:
Phase:                                 Name:
Block:                                 DCAD Tract:
Lot: 84                                County Tract:

**PART C – DEVELOPMENT INFORMATION**    3960 Spinnaker Run Point

Application is for:    ☑ House    ☐ Manufactured House    ☐ Excavation/Fill
                       ☐ Other (if "Other", describe the proposed improvement on the line below)
                                                           **Building Square Footage:**

☑ Address or Road Name: 3960 Spinnaker Run    ☑ Address Requested: (Y) (N)    ☑ Precinct # 1

APPLICANT MUST ATTACH A SITE PLAN SHOWING LOCATION OF PROPOSED AND EXISTING IMPROVEMENTS, THEIR DISTANCE TO AT LEAST TWO PROPERTY LINES, **DISTANCE FROM THE ENTRY ROAD**, NORTH ARROW SHOWING ORIENTATION OF PROPERTY, PERMIT APPICATION FROM THE FIRE MARSHAL AND ANY OTHER REQUIRED DOCUMENTATION.    ☒ Lakewood Village ETJ

Acknowledgment: The Flood Insurance Rate Maps (FIRM) and other flood data used by Denton County in evaluating flood hazards to proposed developments are considered reasonable and accurate for regulatory purposes and are based on the best available scientific and engineering data. On rare occasions greater floods can and will occur and flood heights may be increased by man-made or natural causes. Issuance of a Development Permit in accordance with the Denton County Flood Damage Prevention Ordinance does not imply that development outside the areas of special flood hazard will be free from flooding or flood damage. Issuance of a permit shall not create liability on the part of Denton County or any officer or employee of Denton County in the event flooding or flood damage does occur.

Construction of improvements should not be commenced at the above location until the Owner/Applicant is in compliance with all applicable regulations regarding floodplain management, subdivision platting, and zoning for the government of Denton County. This permit does not waive any other restrictions or regulations imposed privately or by law.

Applicant verifies that she/he has signed this application in the capacity designated, if any, and further attests that she/he has read this document, and that the statement contained herein and any attachments are true, accurate and factual.

Violation of this verification may result in Applicant being prosecuted under Texas Penal Code §37.10 (a) (1)

**PART D – SIGNATURE**          ☐ **THIS PERMIT EXPIRES 2 YEARS FROM APPROVAL DATE**
Signature:
Date: 1/21/14

**PART E – DENTON COUNTY USE ONLY**        #2434          *For Office Use Only!*

Permit Number: 20140123          Fees Paid (Y) (N)
                                 Cash:
FIRM Panel #: 48121C0415G        Check #:
Reviewer: GL                     In SFHA: (Y) (N)          APPROVED BY
Engineering Review: (Y) (N)      Zone: X                   DENTON COUNTY PLANNING DEPT.
                                 NORC - 1-22-14            INITIALS GL
Fire Marshal Permit: #           NORCIC -                  DATE 2-24-14
Culvert Permit: # RBE

Denton County Planning Department                   (940) 349-2990: Main • (940) 349-2991: Fax
1505 E. McKinney St, Ste 175, Denton, TX 76209-4887   (972) 434-8868: Metro • www.dentoncounty.com

ELEVATION CERTIFICATE Required "BFE IS 537"



EXHIBIT

3960 Spinnaker Run Pointe

SCALE
1" = 60'

Subdivision
Boundary

LOT 82

PROPERTY LINE
1.15'

PROPERTY LINE
0.42'

Lot 83

PROPERTY LINE
0.55' 0.60'

522'
Elev line

F.I.R.

SPINNAKER RUN POINTE
(60' R.O.W.)

N 55°07'13" E

F.I.R.
20' SLOPE ESMT.
91.30'

20' DRNG ESMT.

CONCRETE DRIVE

F.I.R.

N 55°07'13" E 116.30'

S 43°20'43" E 585.89'

TBM SET
600 IN TREE

F.I.R.
85.85

10' UTIL & DRNG. ESMT.
10' UTIL & DRNG. ESMT.

PROPOSED RESIDENCE
3960 Spinnaker Run Pointe
proposed ff = 539.0'

Top of bank

F.I.R.

U.S.A.
Lake Lewisville Resorvoir
S 04°53'49" W 269.66'

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

Zone "X"
(Unshaded)

Zone "AE" ?

0.2'  0.9'

1.9'

537 Line as
Located in Field

522'
Elev line

Top of bank

F.I.R.

F.I.R.

10' UTIL & DRNG. ESMT.
10' UTIL & DRNG. ESMT.

N 34°54'11" W 295.77'

C.O.E.
MON.

Subdivision
Boundary

N 38°21'36" W 491.89'

U.S.A.
Lake Lewisville Resorvoir

Lot 85

| Date: | 02/21/14 |
| ASC No. | PLOT PLAN |
| Drawn/Chk | L.G. / D.L.A. |
| Client | Harry Bizios |

**PROPERTY DESCRIPTION:** Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

Harry Bizios

Arthur Surveying Company

Arthur Surveying Co., Inc.
**Professional Land Surveyors**

LEWISVILLE
220 Elm St., # 200
Lewisville, TX 75057
Ph. 972.221.9439
TFRN# 10063800
arthursurveying.com

DENTON
1172 Bent Oaks
Denton, TX 76210
Ph. 940.435.5155
TFRN# 10193866
Established 1984

STATE OF TEXAS
REGISTERED
DOUGLAS L. ARTHUR
4357
PROFESSIONAL
LAND SURVEYOR

LEGEND - C.M.= Controlling Monument, F.I.R.= Found Iron Rod, F.I.P.= Found Iron Pipe, F.C.P.= Fence Corner Post, OHP=Overhead Electric. S.I.R.= Set Iron Rods 1/2" diameter with yellow cap stamped "Arthur Surveying Company". All found iron rods are 1/2" diameter unless otherwise noted. —x— (fence/ ⌀ post) —OHE— (overhead power)

FLOOD NOTE: It is my opinion that the property described hereon is partially within the 100-year flood zone area according to the Federal Emergency Management Agency Flood Insurance Rate Map Community-Panel No. 481152 0415 G, present Effective Date of map April 18, 2011, Parcel property situated within Zone "X" (Unshaded), Zone "AE".



SITE PLAN
SCALE 1" - 30'

MASONRY
MAILBOX

LAKE LEWISVILLE
RESOVOIR

SPINNAKER RUN POINTE ROAD

| SHEET C-1 | ALAN HOFFMANN COMPANY BIZIOS RESIDENCE 3960 SPINNAKER RUN POINTE RD | PHD PESKUSKI HOME DESIGN DALLAS, TEXAS PHONE: (972) 092-8905    FAX: (972) 475-0155 | DATE 01/22/14 | PLAN NO. 7134 |



# DENTON COUNTY

# NOTICE OF RESIDENTIAL CONSTRUCTION
# IN UNINCORPORATED AREA



Received 1/22/14

Permit # 2014 0123

## BUILDER / CONTRACTOR INFORMATION

COMPANY NAME: ALAN HOFFMANN Company, LLC DBA

BUSINESS ADDRESS: MA
7399 GASTON AVE #129-371
DALLAS, TX 75214

MAILING ADDRESS (IF DIFFERENT):

PHONE NUMBER: 24.325-0046    EMAIL ADDRESS: ALAN@ALANHOFFMANNcompany.com

FAX NUMBER: 214-324-0199    CONTACT PERSON: ALAN HOFFMANN

## PROJECT INFORMATION

TYPE OF CONSTRUCTION: (CHECK ONE)
[X] New Residential Construction on Vacant Lot
[ ] Addition to an Existing Residential Unit

LOCATION ADDRESS (INCLUDING ZIP CODE):

2960 SPINNAKER RUN POINTE
LITTLE ELM, TX. 75068

OR    LOT AND BLOCK # 84    BLOCK 1

SUBDIVISION: SUNRISE BAY AT LAKE LEWISVILLE

SURVEY: _____

TRACT: _____

PLANNED DATE TO BEGIN CONSTRUCTION: JAN. 25th 2014

RESIDENTIAL CODE TO BE USED IN CONSTRUCTION: (CHECK ONE)

[X] INTERNATIONAL RESIDENTIAL CODE - published May 1, 2008
[ ] INTERNATIONAL RESIDENTIAL CODE - applicable in Denton

AUTHORIZED REPRESENTATIVE SIGNATURE    PRINTED NAME Alan Hoffman    DATE 1/21/14



## PLAT PLAN
SCALE 1" = 30'

SPINAKER RUN POINTE ROAD

LAKE LEWISVILLE
RESOVOIR

## ROOF PLAN
SCALE 1/8" = 1'

| SHEET | ALAN HOFFMANN COMPANY | PHD | DATE | PLAN NO. |
|---|---|---|---|---|
| A-6 | BIZIOS RESIDENCE<br>3950 SPINAKER RUN POINTE RD | PESKUSKI HOME DESIGN<br>DALLAS, TEXAS<br>PHONE (480) 002-0000   FAX (970) 570-9655 | 10/08/13 | 7134 |

Little Elm
R159279

R459279

Little Elm

R182653

R182656

Little Elm

R182648

R195177

3959

2007x622 R260810

3951 20100415

20062222
R182653 0090938

Little Elm ETJ

3947

R182648

3904

R182647

R182650

3951

R182669

R182659

3952

Lakewood Village ETJ

**1**

R182663

A        A

Parcil #=0415

R182661

R182670

6602

R182664

Autumn Misty Cv

Little Elm

R182669

R182665

0

R182668

R182666





Landmark GIS          Denton County

661-1

R182670

## SPINNAKER BAY POINT

DENTON COUNTY
Technology
Services
Geographic Information Systems

0    115    230              460
                                    Feet

http://gis.dentoncounty.com

N

This product is for informational purposes
and may not have been prepared for or be
suitable for legal, engineering, or surveying
purposes. It does not represent an on-the-ground
survey and represents only the approximate
relative location of property boundaries.

Denton County does not guarantee the correctness
or accuracy of any features on this product and
assumes no responsibility in connection therewith.
This product may be revised at any time without
notification to any user.

RIGHT/WEST ELEVATION

LEFT/EAST ELEVATION

ELEVATIONS 2
SCALE 3/16" = 1'

| SHEET | | | | PLAN NO. |
|---|---|---|---|---|
| A-5 | ALAN HOFFMANN COMPANY<br>BIZIOS RESIDENCE<br>3950 SPINAKER RUN POINTE RD | PHD<br>PESKUSKI HOME DESIGN<br>DALLAS, TEXAS | DATE<br>10/08/13 | 7134 |



REAR/SOUTH ELEVATION

FRONT/NORTH ELEVATION

ELEVATIONS 1
SCALE 3/16" = 1'

SHEET
A-4

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS

DATE
10/08/13

PLAN NO.
7134



PLAN NO. 7134

DATE 1008/13

PHD
PESKUSKI HOME DESIGN
DALLAS TEXAS
PHONE: (480) 084-8088   FAX: (972) 576-4626

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET A-2A

## FIRST FLOOR
### PLAN SCALE: 3/16" - 1'

## SECOND FLOOR PLAN

SCALE 3/16" = 1'

### FLOOR PLAN DISCLAIMER

### NOTES

### WALL TYPES

| | |
|---|---|
| BRICK 4" | |
| STONE 4" | |
| STONE 6" | |
| STUCCO 6" | |
| STUCCO 4" | |
| INTERIOR 6" | |
| INTERIOR 4" | |
| CODE WALL 1/2 | |
| GLASS WALL | |

---

**ALAN HOFFMANN COMPANY**
**BIZIOS RESIDENCE**
3950 SPINAKER RUN POINTE RD

**PHD**
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (469) 88 8686    FAX (972) 679 0636

SHEET **A-3**

DATE **10/08/13**

PLAN NO **7134**



FIRST FLOOR

SECOND FLOOR

FLOOR PLAN DISCLAIMER

THE GENERAL CONTRACTOR SHALL VERIFY AND VERIFY THE ACCURACY OF ALL THE DIMENSIONS AND DETAILS IN OF THESE DOCUMENTS AND SHALL NOTIFY PESKUSKI HOME DESIGN OF ANY LOCAL NOTICES AND ANY ADJUSTMENTS TO THE START OF CONSTRUCTION...

## NOTES:

1. COMPLY WITH ALL STATE, COUNTY, AND LOCAL BUILDING CODES, ORDINANCES AND REGULATIONS PERTAINING TO CONSTRUCTION

2. CONNECT WATER, GAS, AND ELECTRIC LINES TO EXISTING UTILITIES IN ACCORDANCE WITH LOCAL CITY BUILDING CODES, IF NEEDED

3. MINIMUM FINISHED FLOOR ELEVATION WILL BE AT LEAST 2' ABOVE MINIMUM FEMA 100 YEAR FLOOD ELEVATION, OR AS NOTED ON SITE

4. ALL FOOTINGS TO EXTEND BELOW GRADE MINIMUM AS PER LOCAL CODE AT BEARING WALLS. INTERIOR BEARING FOOTINGS IF INTO NATURAL GRADE UNLESS OTHERWISE NOTED

5. EXTERIOR WALLS 2" X 6" STUD FRAMING WITH VENEERS AS SELECTED

6. INTERIOR WALLS METAL 2" X 4" STUD WITH SHEETROCK FACE, EXCEPT WHERE SHOWN AS 6" WALL FOR PLUMBING SUPPLY AND VENTS

7. VENT ALL PLUMBING STACKS TO REAR OF HOUSE

8. HEADER HEIGHTS SHOWN ARE TOP OF WINDOW HEIGHTS

9. PER SECTION 907.2.10.1 IRC SMOKE DETECTOR LOCATIONS SHOWN ON ELECTRICAL PLAN

10. DIMENSIONS AND SCALE ONLY ACCURATE IF PLOTTED ON 24"X36" PAGE

## AREAS

LIVING

| | |
|---|---|
| FIRST FLOOR A/C | 5536 |
| SECOND FLOOR A/C | 1369 |
| LOFT | 229 |
| **TOTAL LIVING** | **7134** |

GARAGES

| | |
|---|---|
| 2 CARS | 618 |
| 2 CARS | 618 |
| SHOP | 221 |

PORCHES

| | |
|---|---|
| ENTRY - GATE | 175 |
| ENTRY - FRONT DOOR | 123 |
| PRIVATE | 82 |
| BACK SNGLE VOLUME | 471 |
| BACK DBL VOLUME | 505 |
| **GARAGES/PORCHES** | **2813** |
| **TOTAL UNDER ROOF** | **9947** |

# PLAN OVERVIEW

SCALE 3/32" = 1'

---

PLAN NO.

7134

DATE

10/08/13

PHD
PESKUSKI HOME DESIGN
DALLAS, TEXAS
PHONE (480) 368-8830    FAX (972) 473-1818

ALAN HOFFMANN COMPANY
BIZIOS RESIDENCE
3950 SPINAKER RUN POINTE RD

SHEET

A-1

# DENTON COUNTY CULVERT/DRIVE PERMIT APPLICATION

Landowner: _Noey Bizios_  Phone: _____

Mailing Address: _7324 Gaston Ave    Dallas Tx_____

       Street       Cit      y      State      Zip

Contact/Installer Name: _____ Phone: _____

Road Name: _____ R# _182659_____

Location Description: _____

_____

Will a septic system be installed on the property? _no_____

Is there an existing septic system? _yes_____ (This will be verified by the inspector.)

For Official Use Only

Permit Fee: $15.00 paid by: Check # _2434_____ or Cash ☐ Receipt # _37001_____

Development Permit # _____ RB West ___ RB East _✓_

It is understood that this is not a permit and is only an application for a permit once the following requirements and conditions have been met. This application expires after 60 days.

## A COPY OF THIS DOCUMENT MUST BE POSTED ON SITE
**Failure to do so will result in work stoppage.**

I have read and **understand this document** and the culvert **process** instructions.

Applicant Signature: _____ Printed: _Noey Abtman_____

For Official Use Only

Date: _1/22/14_____ Taken By: _Smollen_____

For Inspector Use Only

Pre-insp: _____ Staked: _____ Grade insp: _____

Form insp: _____ Final insp: _____ Free Insp: _____

Notes: _____

_____

_____

R 268913

R 182649

550

R182648

R182663

Panel #. = 0415

R182664

R 182665

Landmark-GIS © Denton County

3951

SPINNAKER RUN PT

560

548

546

544

542

560

3964

3968

R 182657

R182658

540

R182659

1

538

536

534

532

530

A

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.



DENTON COUNTY
Technology
Services
Geographic Information Systems



0    80    160         320
                            Feet

http://gis.dentoncounty.com

N

2014 0123

U.S. DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY
National Flood Insurance Program

# ELEVATION CERTIFICATE

**Important: Read the instructions on pages 1–9.**

OMB No. 1660-0008
Expiration Date: July 31, 2015

## SECTION A – PROPERTY INFORMATION

FOR INSURANCE COMPANY USE

Policy Number:

Company NAIC Number:

A1. Building Owner's Name

A2. Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.
3960 Spinnaker Run Point

City Little Elm    State TX    ZIP Code 75068

A3. Property Description (Lot and Block Numbers, Tax Parcel Number, Legal Description, etc.)
Lot 84, Block 1 of Sunrise Bay at Lake Lewisville - Tax Parcel Number 182659

A4. Building Use (e.g., Residential, Non-Residential, Addition, Accessory, etc.) Residential
A5. Latitude/Longitude: Lat. 33.14809 Long. 96.96500    Horizontal Datum: ☐ NAD 1927 ☐ NAD 1983
A6. Attach at least 2 photographs of the building if the Certificate is being used to obtain flood insurance.
A7. Building Diagram Number 1B
A8. For a building with a crawlspace or enclosure(s):
   a) Square footage of crawlspace or enclosure(s)    n/a    sq ft
   b) Number of permanent flood openings in the crawlspace
      or enclosure(s) within 1.0 foot above adjacent grade    n/a
   c) Total net area of flood openings in A8.b    n/a    sq in
   d) Engineered flood openings?    ☐ Yes    ☒ No

A9. For a building with an attached garage:
   a) Square footage of attached garage    n/a    sq ft
   b) Number of permanent flood openings in the attached garage
      within 1.0 foot above adjacent grade    n/a
   c) Total net area of flood openings in A9.b    n/a    sq in
   d) Engineered flood openings?    ☐ Yes    ☒ No

## SECTION B – FLOOD INSURANCE RATE MAP (FIRM) INFORMATION

B1. NFIP Community Name & Community Number
Denton County - 480774

B2. County Name
Denton

B3. State
TX

| B4. Map/Panel Number 48121C0415 | B5. Suffix G | B6. FIRM Index Date 4-18-2011 | B7. FIRM Panel Effective/Revised Date 4-18-2011 | B8. Flood Zone(s) AE | B9. Base Flood Elevation(s) (Zone AO, use base flood depth) 537 |
|---|---|---|---|---|---|

B10. Indicate the source of the Base Flood Elevation (BFE) data or base flood depth entered in Item B9.
   ☐ FIS Profile    ☒ FIRM    ☐ Community Determined    ☐ Other/Source: _____
B11. Indicate elevation datum used for BFE in Item B9: ☐ NGVD 1929    ☒ NAVD 1988    ☐ Other/Source: _____
B12. Is the building located in a Coastal Barrier Resources System (CBRS) area or Otherwise Protected Area (OPA)?    ☐ Yes    ☒ No
   Designation Date: _____    ☐ CBRS    ☐ OPA

## SECTION C – BUILDING ELEVATION INFORMATION (SURVEY REQUIRED)

C1. Building elevations are based on:    ☒ Construction Drawings*    ☐ Building Under Construction*    ☐ Finished Construction
   *A new Elevation Certificate will be required when construction of the building is complete.
C2. Elevations – Zones A1–A30, AE, AH, A (with BFE), VE, V1–V30, V (with BFE), AR, AR/A, AR/AE, AR/A1–A30, AR/AH, AR/AO. Complete Items C2.a–h
   below according to the building diagram specified in Item A7. In Puerto Rico only, enter meters.
   Benchmark Utilized: _____    Vertical Datum: _____
   Indicate elevation datum used for the elevations in items a) through h) below. ☐ NGVD 1929 ☐ NAVD 1988 ☐ Other/Source: _____
   Datum used for building elevations must be the same as that used for the BFE.

Check the measurement used.

| | | |
|---|---|---|
| a) Top of bottom floor (including basement, crawlspace, or enclosure floor) | 539.00 | ☐ feet ☐ meters |
| b) Top of the next higher floor | _____ | ☐ feet ☐ meters |
| c) Bottom of the lowest horizontal structural member (V Zones only) | _____ | ☐ feet ☐ meters |
| d) Attached garage (top of slab) | _____ | ☐ feet ☐ meters |
| e) Lowest elevation of machinery or equipment servicing the building (Describe type of equipment and location in Comments) | _____ | ☐ feet ☐ meters |
| f) Lowest adjacent (finished) grade next to building (LAG) | _____ | ☐ feet ☐ meters |
| g) Highest adjacent (finished) grade next to building (HAG) | _____ | ☐ feet ☐ meters |
| h) Lowest adjacent grade at lowest elevation of deck or stairs, including structural support | _____ | ☐ feet ☐ meters |

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION

This certification is to be signed and sealed by a land surveyor, engineer, or architect authorized by law to certify elevation information. *I certify that the information on this Certificate represents my best efforts to interpret the data available. I understand that any false statement may be punishable by fine or imprisonment under 18 U.S. Code, Section 1001.*

☐ Check here if comments are provided on back of form.
☐ Check here if attachments.

Were latitude and longitude in Section A provided by a licensed land surveyor?    ☐ Yes    ☒ No

Certifier's Name Douglas L. Arthur    License Number 4357

Title RPLS    Company Name Arthur Surveying Company

Address 220 Elm Street, St. 200    City Lewisville    State TX    ZIP Code 75067

Signature    Date 2/20/2014    Telephone 972-221-9439

*[Seal: STATE OF TEXAS, REGISTERED, DOUGLAS L. ARTHUR, 4357, PROFESSIONAL LAND SURVEYOR]*

FEMA Form 086-0-33 (7/12)    See reverse side for continuation.    Replaces all previous editions.

# ELEVATION CERTIFICATE, page 2

| IMPORTANT: In these **spaces, copy** the **corresponding** information from Section A. | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.<br>3960 Spinnaker Run Point | Policy Number: |
| City Little Elm State TX ZIP Code 75068 | Company NAIC Number: |

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION (CONTINUED)

Copy both sides of this Elevation Certificate for (1) community official, (2) insurance agent/company, and (3) building owner.

Comments

Signature _(signed)_  Date 2/20/2014

## SECTION E – BUILDING ELEVATION INFORMATION (SURVEY NOT REQUIRED) FOR ZONE AO AND ZONE A (WITHOUT BFE)

For Zones AO and A (without BFE), complete Items E1–E5. If the Certificate is intended to support a LOMA or LOMR-F request, complete Sections A, B, and C. For Items E1–E4, use natural grade, if available. Check the measurement used. In Puerto Rico only, enter meters.

E1. Provide elevation information for the following and check the appropriate boxes to show whether the elevation is above or below the highest adjacent grade (HAG) and the lowest adjacent grade (LAG).
a) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
b) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the LAG.

E2. For Building Diagrams 6–9 with permanent flood openings provided in Section A Items 8 and/or 9 (see pages 8–9 of Instructions), the next higher floor (elevation C2.b in the diagrams) of the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E3. Attached garage (top of slab) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E4. Top of platform of machinery and/or equipment servicing the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E5. Zone AO only: If no flood depth number is available, is the top of the bottom floor elevated in accordance with the community's floodplain management ordinance? ☐ Yes ☐ No ☐ Unknown. The local official must certify this information in Section G.

## SECTION F – PROPERTY OWNER (OR OWNER'S REPRESENTATIVE) CERTIFICATION

The property owner or owner's authorized representative who completes Sections A, B, and E for Zone A (without a FEMA-issued or community-issued BFE) or Zone AO must sign here. The statements in Sections A, B, and E are correct to the best of my knowledge.

Property Owner's or Owner's Authorized Representative's Name

| Address | City | State | ZIP Code |
|---|---|---|---|
| Signature | Date | Telephone | |

Comments

☐ Check here if attachments.

## SECTION G – COMMUNITY INFORMATION (OPTIONAL)

The local official who is authorized by law or ordinance to administer the community's floodplain management ordinance can complete Sections A, B, C (or E), and G of this Elevation Certificate. Complete the applicable item(s) and sign below. Check the measurement used in Items G8–G10. In Puerto Rico only, enter meters.

G1. ☐ The information in Section C was taken from other documentation that has been signed and sealed by a licensed surveyor, engineer, or architect who is authorized by law to certify elevation information. (Indicate the source and date of the elevation data in the Comments area below.)

G2. ☐ A community official completed Section E for a building located in Zone A (without a FEMA-issued or community-issued BFE) or Zone AO.

G3. ☐ The following information (Items G4–G10) is provided for community floodplain management purposes.

| G4. Permit Number | G5. Date Permit Issued | G6. Date Certificate Of Compliance/Occupancy Issued |
|---|---|---|

G7. This permit has been issued for: ☐ New Construction ☐ Substantial Improvement
G8. Elevation of as-built lowest floor (including basement) of the building: _____._____ ☐ feet ☐ meters Datum _____
G9. BFE or (in Zone AO) depth of flooding at the building site: _____._____ ☐ feet ☐ meters Datum _____
G10. Community's design flood elevation: _____._____ ☐ feet ☐ meters Datum _____

| Local Official's Name | Title |
|---|---|
| Community Name | Telephone |
| Signature | Date |

Comments

☐ Check here if attachments.

# Building Photographs

See Instructions for Item A6.

IMPORTANT: In these spaces, copy the corresponding information from Section A.

| | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No. | Policy Number: |
| City                          State          ZIP Code | Company NAIC Number: |

If using the Elevation Certificate to obtain NFIP flood insurance, affix at least 2 building photographs below according to the instructions for Item A6. Identify all photographs with date taken; "Front View" and "Rear View"; and, if required, "Right Side View" and "Left Side View." When applicable, photographs must show the foundation with representative examples of the flood openings or vents, as indicated in Section A8. If submitting more photographs than will fit on this page, use the Continuation Page.

Replaces all previous editions.

Little Elm

R182649 3951

R268916 ▲

R182647

R182657 ▲

3968

3954

SPINNAKER RUN PT

550

R182658

540

Panel # = 0415

R182660

1

R182659 ▲

0

A

A

560

AUTUMN MIST CV

R182664

R182665

R182669

620

Landmark GIS    © Denton County

R182666



20140123



DENTON COUNTY
Technology
Services
Geographic Information Systems

0    95    190    380
Feet

http://gis.dentoncounty.com

N

This product is for informational purposes and may not have been prepared for or be suitable for legal, engineering, or surveying purposes. It does not represent an on-the-ground survey and represents only the approximate relative location of property boundaries.

Denton County does not guarantee the correctness or accuracy of any features on this product and assumes no responsibility in connection therewith. This product may be revised at any time without notification to any user.



MAP SCALE 1" = 1000'

500   0        1000              2000

FEET
METERS

NFIP

PANEL 0415G

# FIRM

FLOOD INSURANCE RATE MAP

DENTON COUNTY,
TEXAS
AND INCORPORATED AREAS

PANEL 415 OF 750
(SEE MAP INDEX FOR FIRM PANEL LAYOUT)

CONTAINS:

| COMMUNITY | NUMBER | PANEL | SUFFIX |
|---|---|---|---|
| DENTON COUNTY | 480774 | 0415 | G |
| LAKEWOOD VILLAGE, TOWN OF | 481663 | 0415 | G |
| LITTLE ELM, TOWN OF | 481152 | 0415 | G |
| OAK POINT, CITY OF | 481539 | 0415 | G |
| THE COLONY, CITY OF | 481581 | 0415 | G |

Notice to User: The Map Number shown below
should be used when placing map orders; the
Community Number shown above should be
used on insurance applications for the subject
community.

MAP NUMBER
48121C0415G

MAP REVISED
APRIL 18, 2011

Federal Emergency Management Agency

NATIONAL FLOOD INSURANCE PROGRAM

This is an official copy of a portion of the above referenced flood map. It
was extracted using F-MIT On-Line. This map does not reflect changes
or amendments which may have been made subsequent to the date on the
title block. For the latest product information about National Flood Insurance
Program flood maps check the FEMA Flood Map Store at www.msc.fema.gov

## Property Details for account *182659*

## Tax Information

The Denton Central Appraisal District is not responsible for the assessment or collection of taxes for this or any other property. If you have a question regarding your tax bill please contact the **Denton County Tax Assessor / Collector**.

## General Information

| | |
|---|---|
| Property ID | 182659 |
| Geograhic ID | SN0104A-000001-0000-0084-0000 |
| Legal Description | Sunrise Bay At Lake Lewisville Blk 1 Lot 84 |
| Situs Address | 3960 Spinnaker Run Pt Tx 75068-3110 |
| Property Type | Real |
| Neighborhood | DC13012L |
| | Sunrise Bay At Lake Lewisville (lake Fr |
| Abstract/Subdivision | SN0104A |
| | All properties in SN0104A |
| | View Plat |
| Owner ID | 621297 |
| Owner Name | Langley, Kelly B |
| Percent Ownership | 100 |
| Mailing Address | 18540 Vista Del Sol Dr |
| | Dallas, TX 75287-4019 |
| Taxing Jurisdictions | G01 (Denton County) |
| | S10 (Little Elm Isd) |
| Exemptions | N/A |
| View Map | Denton CAD GIS |

## 2012 Certified Values

| | | |
|---|---|---|
| Total Improvement Value | (+) | $0 |
| Land Homesite Value | (+) | $0 |
| Land Non-Homesite Value | (-) | $474,430 |
| Agricultural Market Value | (+) | $0 |
| Timber Market Value | (+) | $0 |
| Total Market Value | (=) | $474,430 |
| Agricultural Use Reduction | (-) | $0 |
| Timber Use Reduction | (-) | $0 |
| Appraised Value | (=) | $474,430 |
| Homestead Cap What's this? | (-) | $0 |
| Assessed Value | (=) | $474,430 |

## 2012 Estimated Taxes

| Entity Name | Tax Rate Per $100 | Taxable Value | Calculated Taxes | Tax Ceiling Amount |
|---|---|---|---|---|
| Denton County | 0.282867% | $474,430.00 | $1,342.01 | N/A |
| Little ELM | 1.54% | $474,430.00 | $7,306.22 | N/A |
| Estimated Total Taxes | | | $8,648.23 | |

DO NOT PAY TAXES BASED ON THESE ESTIMATED TAXES. You will receive an official tax bill from the appropriate agency when they are prepared. Taxes are collected by the agency sending you the official tax bill. To see a listing of agencies that collect taxes for your property, click here

U. S. Army, Corps of Engineers
ATTN: CESWF-RE-M
P. O. Box 17300
Fort Worth, TX 76102-0300

January 28, 2014

Mr. Harry Bizios
3960 Spinnaker Run Point
Little Elm, Texas 75068

Dear Mr. Bizios:

Enclosed are two fully executed copies of Consent DACW63-9-14-0533 for your records. Per condition 10 of your consent a copy must be filed at the county of record under the referenced tract number. Once recorded a copy must be provided to us so that we will know the consent is officially on record. You have 90-days to provide us with proof of recording or your consent may be terminated.

If you have any questions related to your rights or responsibilities as provided for in the consent, please contact Mrs. Vicki Akers at 817-886-1114.

Joanne Murphy
Realty Specialist
Fort Worth District

Enclosures



Consent No. DACW63-9-14-0533

## DEPARTMENT OF THE ARMY
## CORPS OF ENGINEERS
## FORT WORTH DISTRICT

Project: Lewisville Lake, Texas
Tract No. E-465E

WHEREAS, the United States has acquired a perpetual flowage easement over Tract No. E-465E, Lewisville Lake, Texas, recorded in Deed Records, volume 463, pp. 444, of Denton County, Texas.

WHEREAS, said easement grants to the United States the right of prior approval for any structure to be located within the easement area, which area is under the administrative control of the Fort Worth District, Corps of Engineers.

WHEREAS, the United States has been requested to grant approval for a riprap retaining wall to be placed on the above-identified tract.

NOW THEREFORE, the United States hereby gives consent to Mr. Harry Bizios to place a riprap retaining wall at the location shown on **Exhibits A and B.**

PROVIDED HOWEVER, that this consent is subject to the following conditions:

1. All activities conducted on the premises shall comply with all applicable Federal, state, county and municipal laws, ordinances and regulations wherein the premises are located.

2. The giving of this consent does not in any way subordinate the United States' prior easement rights. The United States shall in no case be liable for any damage or injury to the structures herein consented to, which may be caused by any action of the United States under its easement, or that may result from future operations undertaken by the United States, and no claim or right to compensation shall accrue from such exercise of the United States' easement rights.

3. The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the consented activity.

4. This instrument is effective only insofar as the rights of the United States in the premises are concerned; and the consentee shall obtain such permission as may be required on account of any other existing rights. It is understood that this consent does not eliminate the necessity for obtaining any Department of the Army permit which may be required pursuant to the provisions of Section 10 of the Rivers and Harbors Act of 3 March 1899 (30 Stat 1151; 33

## Consent, R- Rap Retaining Wall, Tract E 465 E
## 3960 Spinnaker Run Point , Little Elm, TX 75068



E-424-40

E-424-38

E
465E

E-424-39

130      65      0           130 Feet

**Lewisville Lake**
Legend

Boundary Monuments

Lewisville Part Tracks

Fee Boundary

Retaining Wall

US Army Corps
of Engineers

EXHIBIT A

# Gary Cook

No issues at all.  They have already started the permit process with us.

Thank you.

Linda Asbell, TRMC
Town Secretary
972-294-5555 (direct)
www.lakewoodvillagetx.us



**From:** Gary Cook [mailto:Gary.Cook@dentoncounty.com]
**Sent:** Wednesday, February 19, 2014 4:05 PM
**To:** linda@lakewoodvillagetx.us
**Subject:** 20140123

Hey Linda – I've got a permit for a house in your ETJ. Do you have any issues with it?
Thanks Gary

**From:** PublicWorks@dentoncounty.com [mailto:PublicWorks@dentoncounty.com]
**Sent:** Wednesday, February 19, 2014 4:06 PM
**To:** Gary Cook
**Subject:** Attached Image



**Public Works**

**Denton County**

1505 E. McKinney St, Ste 175
Denton, Texas 76209
(940) 349-2990: Main
(940) 349-2991: Fax
www.dentoncounty.com

# RECEIPT

| Date |
|---|
| 22-Jan-14 |

| Employee |
|---|
| DRAWER 2 |

| Customer |
|---|
| ALAN HOFFMANN |

7324 GASTON AVE
DALLAS , TX 75214
USA

| Order Date |
|---|
| 22-Jan-14 |

| Customer ID |
|---|
| 6399 |

| Order ID |
|---|
| 37001 |

| Product Name | Category | Quantity | Unit Price | Discount | Extended Price |
|---|---|---|---|---|---|
| IN F.P. DEVELOPMENT PERMIT | PERMIT | 1 | $50.00 | 0% | $50.00 |
| CULVERT | CULVERT | 1 | $15.00 | 0% | $15.00 |

| | |
|---|---|
| Subtotal | $65.00 |
| Total Due | $65.00 |
| Payments | $65.00 |
| Check # | 2434 |
| Balance | $0.00 |

# Exhibit 36

U.S. DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY
*National Flood Insurance Program*

# ELEVATION CERTIFICATE

**Important: Read the instructions on pages 1–9.**

OMB No. 1660-0008
Expiration Date: July 31, 2015

## SECTION A – PROPERTY INFORMATION

| FOR INSURANCE COMPANY USE |
| --- |

A1. Building Owner's Name

Policy Number:

A2. Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.
3960 Spinnaker Run Point

Company NAIC Number:

City Little Elm          State TX          ZIP Code 75068

A3. Property Description (Lot and Block Numbers, Tax Parcel Number, Legal Description, etc.)
Lot 84, Block 1 of Sunrise Bay at Lake Lewisville - Tax Parcel Number 182659

A4. Building Use (e.g., Residential, Non-Residential, Addition, Accessory, etc.) Residential
A5. Latitude/Longitude: Lat. 33.14809  Long. 96.96500  Horizontal Datum: ☐ NAD 1927 ☐ NAD 1983
A6. Attach at least 2 photographs of the building if the Certificate is being used to obtain flood insurance.
A7. Building Diagram Number 1B
A8. For a building with a crawlspace or enclosure(s):
  a) Square footage of crawlspace or enclosure(s)   n/a   sq ft
  b) Number of permanent flood openings in the crawlspace or enclosure(s) within 1.0 foot above adjacent grade   n/a
  c) Total net area of flood openings in A8.b   n/a   sq in
  d) Engineered flood openings?   ☐ Yes  ☒ No

A9. For a building with an attached garage:
  a) Square footage of attached garage   n/a   sq ft
  b) Number of permanent flood openings in the attached garage within 1.0 foot above adjacent grade   n/a
  c) Total net area of flood openings in A9.b   n/a   sq in
  d) Engineered flood openings?   ☐ Yes  ☒ No

## SECTION B – FLOOD INSURANCE RATE MAP (FIRM) INFORMATION

| B1. NFIP Community Name & Community Number | B2. County Name | B3. State |
| --- | --- | --- |
| Denton County - 480774 | Denton | TX |

| B4. Map/Panel Number | B5. Suffix | B6. FIRM Index Date | B7. FIRM Panel Effective/Revised Date | B8. Flood Zone(s) | B9. Base Flood Elevation(s) (Zone AO, use base flood depth) |
| --- | --- | --- | --- | --- | --- |
| 48121C0415 | G | 4-18-2011 | 4-18-2011 | AE | 537 |

B10. Indicate the source of the Base Flood Elevation (BFE) data or base flood depth entered in Item B9.
  ☐ FIS Profile   ☒ FIRM   ☐ Community Determined   ☐ Other/Source: _____
B11. Indicate elevation datum used for BFE in Item B9: ☐ NGVD 1929  ☒ NAVD 1988  ☐ Other/Source: _____
B12. Is the building located in a Coastal Barrier Resources System (CBRS) area or Otherwise Protected Area (OPA)?   ☐ Yes  ☒ No
  Designation Date: _____   ☐ CBRS   ☐ OPA

## SECTION C – BUILDING ELEVATION INFORMATION (SURVEY REQUIRED)

C1. Building elevations are based on:   ☒ Construction Drawings*   ☐ Building Under Construction*   ☐ Finished Construction
*A new Elevation Certificate will be required when construction of the building is complete.
C2. Elevations – Zones A1–A30, AE, AH, A (with BFE), VE, V1–V30, V (with BFE), AR, AR/A, AR/AE, AR/A1–A30, AR/AH, AR/AO. Complete Items C2.a–h below according to the building diagram specified in Item A7. In Puerto Rico only, enter meters.
  Benchmark Utilized: _____   Vertical Datum: _____
  Indicate elevation datum used for the elevations in items a) through h) below. ☐ NGVD 1929  ☐ NAVD 1988  ☐ Other/Source: _____
  Datum used for building elevations must be the same as that used for the BFE.

Check the measurement used.

| | | |
| --- | --- | --- |
| a) Top of bottom floor (including basement, crawlspace, or enclosure floor) | 540.04 | ☐ feet  ☐ meters |
| b) Top of the next higher floor | n/a. _____ | ☐ feet  ☐ meters |
| c) Bottom of the lowest horizontal structural member (V Zones only) | n/a. _____ | ☐ feet  ☐ meters |
| d) Attached garage (top of slab) | n/a. _____ | ☐ feet  ☐ meters |
| e) Lowest elevation of machinery or equipment servicing the building (Describe type of equipment and location in Comments) | n/a. _____ | ☐ feet  ☐ meters |
| f) Lowest adjacent (finished) grade next to building (LAG) | 537.10 | ☐ feet  ☐ meters |
| g) Highest adjacent (finished) grade next to building (HAG) | 539.30 | ☐ feet  ☐ meters |
| h) Lowest adjacent grade at lowest elevation of deck or stairs, including structural support | n/a. _____ | ☐ feet  ☐ meters |

## SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION

This certification is to be signed and sealed by a land surveyor, engineer, or architect authorized by law to certify elevation information. *I certify that the information on this Certificate represents my best efforts to interpret the data available. I understand that any false statement may be punishable by fine or imprisonment under 18 U.S. Code, Section 1001.*

☐ Check here if comments are provided on back of form.
☐ Check here if attachments.

Were latitude and longitude in Section A provided by a licensed land surveyor?   ☐ Yes  ☒ No

Certifier's Name Douglas L. Arthur          License Number 4357

Title RPLS          Company Name Arthur Surveying Company

Address 220 Elm Street, St 200   City Lewisville   State TX   ZIP Code 75067

Signature          Date 3/7/2014.          Telephone 972-221-9439

*State of Texas Registered Professional Land Surveyor seal — DOUGLAS L. ARTHUR 4357*

## ELEVATION CERTIFICATE, page 2

| IMPORTANT: In these spaces, copy the corresponding information from Section A. | FOR INSURANCE COMPANY USE |
|---|---|
| Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.<br>3960 Spinnaker Run Point | Policy Number: |
| City Little Elm          State TX       ZIP Code 75068 | Company NAIC Number: |

### SECTION D – SURVEYOR, ENGINEER, OR ARCHITECT CERTIFICATION (CONTINUED)

Copy both sides of this Elevation Certificate for (1) community official, (2) insurance agent/company, and (3) building owner.

Comments

Signature                                                    Date

### SECTION E – BUILDING ELEVATION INFORMATION (SURVEY NOT REQUIRED) FOR ZONE AO AND ZONE A (WITHOUT BFE)

For Zones AO and A (without BFE), complete Items E1–E5. If the Certificate is intended to support a LOMA or LOMR-F request, complete Sections A, B, and C. For Items E1–E4, use natural grade, if available. Check the measurement used. In Puerto Rico only, enter meters.

E1.  Provide elevation information for the following and check the appropriate boxes to show whether the elevation is above or below the highest adjacent grade (HAG) and the lowest adjacent grade (LAG).
a) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.
b) Top of bottom floor (including basement, crawlspace, or enclosure) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the LAG.

E2.  For Building Diagrams 6–9 with permanent flood openings provided in Section A Items 8 and/or 9 (see pages 8–9 of Instructions), the next higher floor (elevation C2.b in the diagrams) of the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E3.  Attached garage (top of slab) is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E4.  Top of platform of machinery and/or equipment servicing the building is _____._____ ☐ feet ☐ meters ☐ above or ☐ below the HAG.

E5.  Zone AO only: If no flood depth number is available, is the top of the bottom floor elevated in accordance with the community's floodplain management ordinance? ☐ Yes ☐ No ☐ Unknown. The local official must certify this information in Section G.

### SECTION F – PROPERTY OWNER (OR OWNER'S REPRESENTATIVE) CERTIFICATION

The property owner or owner's authorized representative who completes Sections A, B, and E for Zone A (without a FEMA-issued or community-issued BFE) or Zone AO must sign here. The statements in Sections A, B, and E are correct to the best of my knowledge.

Property Owner's or Owner's Authorized Representative's Name

| Address | City | State | ZIP Code |
|---|---|---|---|
| Signature | Date | Telephone | |

Comments

☐ Check here if attachments.

### SECTION G – COMMUNITY INFORMATION (OPTIONAL)

The local official who is authorized by law or ordinance to administer the community's floodplain management ordinance can complete Sections A, B, C (or E), and G of this Elevation Certificate. Complete the applicable item(s) and sign below. Check the measurement used in Items G8–G10. In Puerto Rico only, enter meters.

G1. ☐    The information in Section C was taken from other documentation that has been signed and sealed by a licensed surveyor, engineer, or architect who is authorized by law to certify elevation information. (Indicate the source and date of the elevation data in the Comments area below.)

G2. ☐    A community official completed Section E for a building located in Zone A (without a FEMA-issued or community-issued BFE) or Zone AO.

G3. ☐    The following information (Items G4–G10) is provided for community floodplain management purposes.

| G4. Permit Number | G5.  Date Permit Issued | G6.  Date Certificate Of Compliance/Occupancy Issued |
|---|---|---|
| | | |

G7.  This permit has been issued for:     ☐ New Construction     ☐ Substantial Improvement

G8.  Elevation of as-built lowest floor (including basement) of the building:  _____._____  ☐ feet ☐ meters  Datum _____
G9.  BFE or (in Zone AO) depth of flooding at the building site:  _____._____  ☐ feet ☐ meters  Datum _____
G10. Community's design flood elevation:  _____._____  ☐ feet ☐ meters  Datum _____

| Local Official's Name | Title |
|---|---|
| Community Name | Telephone |
| Signature | Date |

Comments

☐ Check here if attachments.

FEMA Form 086-0-33 (7/12)                                        Replaces all previous editions.

# Building Photographs

See Instructions for Item A6.

**IMPORTANT: In these spaces, copy the corresponding information from Section A.**

Building Street Address (including Apt., Unit, Suite, and/or Bldg. No.) or P.O. Route and Box No.

City                                    State        ZIP Code

| FOR INSURANCE COMPANY USE |
| --- |
| Policy Number: |
| Company NAIC Number: |

If using the Elevation Certificate to obtain NFIP flood insurance, affix at least 2 building photographs below according to the instructions for Item A6. Identify all photographs with date taken; "Front View" and "Rear View"; and, if required, "Right Side View" and "Left Side View." When applicable, photographs must show the foundation with representative examples of the flood openings or vents, as indicated in Section A8. If submitting more photographs than will fit on this page, use the Continuation Page.

FRONT VIEW



# Exhibit 37



# FORMS SURVEY

## 3960 Spinnaker Run Pointe

SCALE
1" = 60'

LOT 82

F.I.R.

Lot 83

Subdivision Boundary

522' Elev line

F.I.R.

TBM SET BOD IN TREE

S 43°20'43" E 585.89'

F.I.R.

85.85'

Top of bank

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

91.8'

5.8'

FORMS
3960 Spinnaker
Run Pointe
top of forms = 540.04'

SPINNAKER RUN POINTE
(60' R.O.W.)

N55°07'13"E
91.30'

20' SLOPE ESMT. & UTIL. ESMT.

ER=560.6'

F.I.R.

N 55°07'13" E 116.30'

304.6'

25.0'
64.0'
14.0'

15.5'

33.6'

18.0'

16.4'

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

Zone "X"
(Unshaded)

Zone "AE"

24.0'

27.8'

19.1'

13.6'

4.0'

24.5'

5.7'

54.3'

537' Line as located
on the ground.

U.S.A.
Lake Lewisville Resorvoir
S 04°53'49" W 269.66'

Top of bank

ER=561.5'

50' BLDG. LINE

F.I.R.

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

N 34°54'11" W 295.77'

C.O.E. MON.

Subdivision Boundary

N 38°21'36" W 491.89'

F.I.R.

Lot 85

U.S.A.
Lake Lewisville Resorvoir

LEGEND - C.M.= Controlling Monument; F.I.R.= Found Iron Rod; F.I.P.= Found Iron Pipe; F.C.P.= Fence Corner Post. OHE=Overhead Electric.  S.I.R.= Set Iron Rods 1/2" diameter with yellow cap stamped "Arthur Surveying Company". All found iron rods are 1/2" diameter unless otherwise noted. ——x—— (fence/ ₵ post) —— OHE —— (overhead power)

FLOOD NOTE: It is my opinion that the property described hereon is partially within the 100-year flood zone area according to the Federal Emergency Management Agency Flood Insurance Rate Map Community-Panel No. 481152 0415 G, present Effective Date of map April 18, 2011, herein property situated within Zone "X" (Unshaded), Zone "AE".

**PROPERTY DESCRIPTION**: Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

Harry Bizios

| Date: | 03/07/14 |
| --- | --- |
| ASC No. | 140375 |
| Drawn/Chk | L.G. / D.L.A. |
| Client | Harry Bizios |

Arthur Surveying Company

Note:
- This survey was prepared without the benefit of a title search, therefore no search of recorded easements was performed on subject property. The purpose of the survey is to locate forms on shown property, therefore all other improvements may not be shown.
- The bearings shown hereon are based on the above referenced recorded map or plat unless otherwise noted.
- Elevations shown are relative to this site.

STATE OF TEXAS
REGISTERED
DOUGLAS L. ARTHUR
4357
PROFESSIONAL
LAND SURVEYOR

Arthur Surveying Co., Inc.
Professional Land Surveyors
LEWISVILLE
220 Elm St., #200
Lewisville, TX 75057
Ph. 972.221.9439
TFRN# 10063800
arthursurveying.com    Established 19__

DEFENDANT'S EXHIBITS

**Alan Hoffmann, LLC dba/Alan Hoffmann Company – Builders/Designers/Developers**

Alan Hoffmann is the founder of the Alan Hoffmann Company, a sustainable builder of residential and commercial properties. As a leader in the environmental building movement, Alan has a long list of firsts that he has brought to the marketplace. He was the first builder in 1995 to introduce Insulated Concrete Forms to North Texas. He was also the first homebuilder in the area to use this proven system for the outside walls of a single family home. Additionally, he built the first ICF homes in Dallas, Plano, Ft.Worth, Mansfield, Terrell, Gunner, Lake Whitney, Rockwall, Oak Point, Flower Mound, and Kerens, Texas. His company then went on to design and build the first two homes that were certified by the US Green Building LEED for Homes program and they were also the first two homes that were certified as Platinum in Dallas.

Alan's homes have been featured on the Discovery Channel's "Your New Home" program for several episodes, the Veria Networks' "Backyard Boomers".
They have also been featured in North Texas USGBC Tours as well as the National Homebuilders Association's International homebuilders conference. The Alan Hoffmann Company has also been voted by "D Home Magazine" as one of Dallas' Best Builders for six years running (2008, 2009, 2010, 2011 2012 and 2013). "D Magazine also featured Alan in their special issue entitled "Dallas Goes Green" and profiled him as one of the "good citizens creating a sustainable city."

In 2007, Alan was asked to assist in the creation of Dallas' first Green Building Ordinance. In helping shape this ordinance, he assisted in the creation of comprehensive ordinance that addressed all new building projects in the city. With this ordinance, Dallas became one of the first cities to address all types of structures in the building environment. He has worked with the City on the implementation of the second phase of the Dallas' Green Ordinance which was enacted by the City Council in 2008.

In 2009, for his efforts and the successes of his company, he received a Special Recognition by the Mayor of Dallas' Inaugural Environmental Award.

In August of 2010, Alan received four ARC awards from the Dallas Builders Association for a home his company built in Dallas. The ARC awards are granted by industry peers in recognition of excellence in various building categories. Also, in 2010, the company built the ICF walls for the Plano Environmental Education Center of the City of Plano as a sub-contractor tor to Turner Construction, Inc. The building received a LEED Platinum Certification and March of 2013 won a Green Ribbon project award from the North Texas Chapter of the US Green Building Council.

He is a member of the North Texas Chapter of the USGBC, and the Dallas Homebuilders Association (DBA ) on which he serves as vice-president of board's Dallas Division. He is also on the DBA Government Relations Committee.

The Alan Hoffmann Company mission is a focused effort on constructing buildings and communities that are sustainable, beautiful, efficient with processes that are cost effective and sensible.

For more information about Alan's company visit www.YourNewHybridHome.com.

7324 Gaston Avenue #124-341
Dallas, Texas 75214

Office: 214-324-0046
alan@alanhoffmanncompany.com



DEFENDANT'S
EXHIBIT



PENGAD-Bayonne, N. J.

DEFENDANT'S
EXHIBIT



kewood Village, Texas

DEFENDANT'S
EXHIBIT
3

Lakewood Village v. Bizios 4-16-14

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
6/25/2014 4:09:58 PM
DEBRA SPISAK
CLERK

No. 02-14-00143-CV

IN THE COURT OF APPEALS
FOR THE SECOND DISTRICT OF TEXAS,
FORT WORTH, TEXAS

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
6/25/2014 4:09:58 PM
DEBRA SPISAK
Clerk

HARRY BIZIOS,
*Appellant,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee.*

## BRIEF OF APPELLANT HARRY BIZIOS

ON APPEAL FROM THE 431ST JUDICIAL DISTRICT
COURT OF DENTON COUNTY, TEXAS

Trial Court Cause Number 14-01991-431

Arthur J. Anderson
WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone No.: (214) 745-5745
Fax No.: (214) 745-5390
aanderson@winstead.com
David F. Johnson
WINSTEAD PC
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Telephone No.: (817) 420-8223
Fax No.: (817) 420-8201
dfjohnson@winstead.com

ATTORNEYS FOR APPELLANT
ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), Appellant certifies that the following are the correct parties and counsel:

**PARTIES:**

| **PLAINTIFF/APPELLEE:** | **TRIAL AND APPELLATE COUNSEL:** |
|---|---|
| Town of Lakewood Village, Texas | William Andrew Messer, Esq.<br>Messer, Rockefeller & Fort, P.L.L.C.<br>6351 Preston Road<br>Suite 350<br>Frisco, TX 75034<br>(972) 668-6400<br>andy@txmunicipallaw.com |
| **DEFENDANT/APPELLANT:** | **TRIAL AND APPELLATE COUNSEL:** |
| Harry Bizios | Arthur J. Anderson<br>WINSTEAD PC<br>500 Winstead Building<br>2728 N. Harwood Street<br>Dallas, Texas 75201<br>(214) 745-5400<br>aanderson@winstead.com |
| | **APPELLATE COUNSEL:** |
| | David F. Johnson<br>WINSTEAD PC<br>777 Main Street<br>Suite 1100<br>Fort Worth, TX 76102<br>(817) 420-8200<br>dfjohnson@winstead.com |

-i-

# TABLE OF CONTENTS

**Page No.**

IDENTITY OF PARTIES AND COUNSEL ........................................................... i

TABLE OF CONTENTS ..................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. v

STATEMENT OF THE CASE ........................................................................... ix

STATEMENT REGARDING ORAL ARGUMENT ........................................... x

JURISDICTIONAL STATEMENT ..................................................................... x

ISSUES PRESENTED ...................................................................................... xi

    ISSUE I

    A general law town has no constitutional or statutory authority to
    apply its building codes in its ETJ. The Town's attempt to
    impose its expensive building permit ordinance upon
    homebuilders in its ETJ is unsupported under Texas law. The
    trial court erred in entering judgment that the Town could extend
    its building code to its ETJ pursuant to Chapter 212 of the Texas
    Local Government Code and other Texas statutes. .............................. xi

    ISSUE II

    Even if the Town had general authority to extend its building
    codes to its ETJ under Chapter 212 of the Texas Local
    Government Code, that authority does not apply here because the
    Town is prohibited from applying its subdivision regulations to
    Appellant's property pursuant to section 212.007 of the Texas
    Local Government Code. The trial court erred in holding that the
    Town's building code could be extended to the Lot pursuant to its
    platting authority under these facts. ..................................................... xi

    ISSUE III

    Chapter 245 of the Texas Local Government Code provides that
    municipalities cannot apply new ordinances or regulations to
    pending development projects with a few exceptions. The Town
    has attempted to apply its new building permit policy to Bizios'
    already permitted project where none of Chapter 245's exceptions
    apply. The Town did not introduce any evidence supporting any
    of Chapter 245's exemptions to this project. The trial court erred

in holding that the Town may impose its new building permit requirements on an already permitted subdivision project. .................. xii

STATEMENT OF FACTS ................................................................. 1

SUMMARY OF ARGUMENT ........................................................ 4

ARGUMENT AND AUTHORITY .................................................. 6

    A.    Standards of Review ........................................ 6

    B.    Trial Court Abused Its Discretion In Granting Injunctive Relief As The Town Did Not Show A Probable Right of Recovery ................................ 7

        i.    General Law Town Ordinance-Making Authority Is Extremely Limited ................ 8

        ii.    No Texas Statute Expressly Authorizes The Town To Apply Its Building Code To Its ETJ ........................................................ 9

        iii.    The Injunction Violates Texas Supreme Court Precedent .......................................... 12

        iv.    Recent Changes Limit The Application Of Municipal Building Codes Only To Buildings Within Corporate Limits ............ 14

        v.    Other State Statutes Cited By The Town Do Not Expressly Authorize The Extension Of Building Codes To The ETJ ................ 17

        vi.    The Town Has No Compelling Reason That It Should Be Able To Require Building Permits In The ETJ .............................. 19

        vii.    The Trial Court Erred In Holding That The Town Had The Authority To Extend Its Building Code To Its ETJ When The Town Had No Platting Authority Over The Subdivision .......................................... 20

viii. The Trial Court Erred In Holding That The Subdivision Project Is Not Protected From The Application Of New Town Building Permit Regulations In Accordance With The Vested Rights Statute ............................................ 21

CONCLUSION AND PRAYER ........................................................................ 29

CERTIFICATE OF SERVICE ........................................................................ 31

APPENDIX ........................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL AND STATE CASES**

*Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 2d. 1488 (1944) ...................................................................................... 10

*Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132 (Tex. 1996) .............. 10

*Butnaru v. Ford Motor Co.*, 84 S.W.3d 198 (Tex. 2002) ....................................... 6

*Cameron v. Terrell & Garrett, Inc.*, 628 S.W.2d 535 (Tex. 1981) ....................... 16

*Camp v. Shannon*, 162 Tex. 515, 348 S.W.2d 517 (Tex. 1961) ........................... 8

*Chavira v. State* (Tex. Crim. App. 1958) ............................................................. 26

*City of Houston v. State ex rel City of West University Place*, 142 Tex. 190, 176 S.W.2d 928 (1943) ......................................................................................... 8

*City of LaPorte v. Barfield*, 898 S.W.2d 288 (Tex. 1995) ..................................... 9

*City of Northlake v. East Justin JV*, 873 S.W.2d 141 (Tex. App.—Fort Worth, 1994, writ den.) ..................................................................................... 9

*City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003) ................. 12, 13

*City of Weslaco v. Carpenter*, 644 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) ....................................................................................... 14

*Dodson v. Bunton*, 81 Tex. 655, 17 S.W. 507 (1891) .............................................. 9

*Forewood v. City of Taylor*, 214 S.W.2d 282 (Tex. 1948) ..................................... 8

*Garza v. State*, No. 05-07-00176-CR, 2007 WL 3348419 (Tex. App.—Dallas Feb. 13, 2007, no pet.) ........................................................................... 28

*Goode v. Shoukfeh*, 943 S.W.2d 441 (Tex. 1997) ................................................... 7

*Greathouse Ins. Agency v. Tropical Investments, Inc.*, 718 S.W.2d 821 (Tex. App.—Houston [14th Dist.] 1986, no writ) .......................................................... x

*Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. denied)...................................................................... ix, 23, 24, 28

*IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191 (Tex. App.—Fort Worth 2005, no pet.)................................................................ 8

*Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482 (Tex. 1998)......... 9

*Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)............................................. 5, 14

*Milestone Potranco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. den.).......................................... 12

*N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ................................. 6

*Oncor Elec. Delivery Co. v. Brockriede*, No. 02-13-00071-CV, 2013 WL 6564276 (Tex. App.—Fort Worth 2013, no pet.)............................. 18

*Rhino Real Estate Investments, Inc. v. City of Runaway Bay*, No. 02-08-00340-CV, 2009 WL 219613 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.)......................................................... 11

*Shumaker Enterprises, Inc. v. City of Austin*, 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.)........................................................... 25, 26

*Stefanoff v. State*, 78 S.W.3d 496 (Tex. App.—Austin 2002, pet. den) ................. 29

*Tom James Co. v. Mendrop*, 819 S.W.2d 251 (Tex. App.—Fort Worth 1991, no writ)............................................................................. 7

*Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583 (Tex. App.—El Paso 2003, pet. denied).......................................................... 7

*Walling v. Metcalfe*, 863 S.W.2d 56 (Tex. 1993) (per curiam) ......................... 6

*Washington v. State*, 152 S.W.3d 209 (Tex. App.—Amarillo 2004, no pet.) ........ 28

**STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

TEX. AG Op. JM-169 ................................................................................ 8

TEX. LOC. GOVT. CODE ANN. § 43.002................................................... 25

TEX. LOC. GOVT. CODE § 43.003 ...................................................................... 19

TEX. LOC. GOVT. CODE § 43.021 ........................................................................ 2

TEX. LOC. GOVT. CODE CHAP. 212 ............................................................... passim

TEX. LOC. GOVT. CODE §§ 212.002 and 212.003 ........................................... 10

TEX. LOC. GOVT. CODE ANN. § 212.004 ...................................................... 27, 9

TEX. LOC. GOVT. CODE § 212.007 .................................................. x, 5, 20, 21, 29

TEX. LOC. GOVT. CODE § 214.212 ................................................................ 14, 15

TEX. LOC. GOVT. CODE § 214.904 .................................................................... 17

TEX. LOC. GOVT. CODE 216.003 ...................................................................... 16

TEX. LOC. GOVT. CODE § 216.902 .................................................................... 17

TEX. LOC. GOVT. CODE § 233.153(a) ................................................................ 17

TEX. LOC. GOVT. CODE, § 245.002 ................................................................... 23

TEX. LOC. GOVT. CODE ANN. § 245.002(a)(i) ................................................... 25

TEX. LOC. GOVT. CODE § 245.002(a)(2) ....................................................... 25, 26

TEX. LOC. GOVT. CODE ANN. § 245.004(1) ...................................................... 28

TEX. LOC. GOVT. CODE ANN. § 245.004(11) ..................................................... 28

TEX. LOC. GOVT. CODE CHAP. 245 ............................................................... passim

TEX. PROP. CODE § 21.049 .............................................................................. 18

TEX. R. APP. PROC. 39 ...................................................................................... ix

TEX. R. CIV. PROC. 21a .................................................................................... 18

**SECONDARY AUTHORITIES**

DAVID BROOKS, MUNICIPAL LAW AND PRACTICE, TEXAS PRACTICE, vol. 22 ........... 8

David Hartman, *Risky Business*: *Vested Real Property Development Rights –*
*The Texas Experience and Proposals for the Texas Legislature to*
*Improve Certainty in the Law*, 30 Tex. Tech L. Rev. 297, 299 (1999)............. 21

# STATEMENT OF THE CASE

Nature of the Case:

This case concerns a general law town's attempt to start applying its building code in its extraterritorial jurisdiction ("ETJ") to a homebuilder in a subdivision with previous plat approval. The Town of Lakewood Village ("Town") brought an injunction to enforce its building codes to the construction of a house by owned by Harry Bizios ("Bizios").

Course of Proceedings:

The Town filed its petition in the 431st District Court of Denton County, Texas, Hon. Jonathan Bailey presiding (C.R. 4-84).[1] The trial court entered an Order Granting Plaintiff's Application for Temporary Restraining Order on March 20, 2014 (C.R. 85). On April 15 and 16, 2014, a hearing was held on the Town's Application for Temporary Injunction (R.R. 1).

Trial Court's Disposition:

Judge Bailey signed a temporary injunction order on April 17, 2014 requiring Bizios to obtain building permits from the Town (with the payment of associated fees) (C.R. 651-3). Bizios timely filed his notice of appeal on May 6, 2014 (C.R. 656-7).

---

[1] References in this Brief to the record on appeal are as follows: the Clerk's Record is identified as "C.R." with a corresponding page number; the Reporter's Record is identified as "R.R." with a corresponding page number, and (R)eferences to the Exhibits, a separate volume of the Reporter's Record, will be designated as "4 R.R." with the following corresponding exhibit number designations: Stipulated Exhibits("Stip. Ex."); Plaintiff's Exhibits ("Pl. Ex."); and Defendant's Exhibits ("Def. Ex.").

## STATEMENT REGARDING ORAL ARGUMENT

This Court should grant oral argument in this appeal because the appeal deals with legal issues of importance to the State. General law towns do not have express constitutional or statutory authority to apply building codes in their ETJ. This is particularly important as to general law towns, such as Lakewood Village, who cannot annex property in their ETJ or provide those properties with any city services. Here, the Town began applying its building permit authority over land in a subdivision approved by another city without basis under Texas law. The trial court's judgment with respect to Chapter 245, Texas Local Government Code, is in contravention of the Dallas Court of Appeals holding in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. denied). Pursuant to Texas Rule of Appellate Procedure 39, oral argument will be helpful to the panel on these important issues to the homebuilding industry.

## JURISDICTIONAL STATEMENT

This case involved the appeal of a temporary injunction order. An appeal from an interlocutory order granting or refusing a temporary injunction or granting or overruling a motion to dissolve a temporary injunction is permitted. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) ("A person may appeal from an order of a district court, county court at law, or county court that: . . . (4) grants or refuses a temporary injunction or grants or overrules a motion to dissolve a

temporary injunction as provided by Chapter 65."); *Greathouse Ins. Agency v. Tropical Investments, Inc.*, 718 S.W.2d 821, 822 (Tex. App.—Houston [14th Dist.] 1986, no writ).

## ISSUES PRESENTED

### ISSUE I

A general law town has no constitutional or statutory authority to apply its building codes in its ETJ. The Town's attempt to impose its expensive building permit ordinance upon homebuilders in its ETJ is unsupported under Texas law. The trial court erred in entering judgment that the Town could extend its building code to its ETJ pursuant to Chapter 212 of the Texas Local Government Code and other Texas statutes.

### ISSUE II

Even if the Town had general authority to extend its building codes to its ETJ under Chapter 212 of the Texas Local Government Code, that authority does not apply here because the Town is prohibited from applying its subdivision regulations to Appellant's property pursuant to section 212.007 of the Texas Local Government Code. The trial court erred in holding that the Town's building code could be extended to the Lot pursuant to its platting authority under these facts.

## ISSUE III

Chapter 245 of the Texas Local Government Code provides that municipalities cannot apply new ordinances or regulations to pending development projects with a few exceptions. The Town has attempted to apply its new building permit policy to Bizios' already permitted project where none of Chapter 245's exceptions apply. The Town did not introduce any evidence supporting any of Chapter 245's exemptions to this project. The trial court erred in holding that the Town may impose its new building permit requirements on an already permitted subdivision project.

# STATEMENT OF FACTS

Lakewood Village is a small, general-law town located in Denton County, Texas (C.R. 18). Appellant Harry Bizios ("Bizios") is trying to build a house on a lot he owns ("Lot") in the Sunrise Bay at Lake Lewisville Addition ("Subdivision") located in the Town's ETJ (C.R. 5). The final plat for the Subdivision was approved by the Town of Little Elm and Denton County in 1995 (C.R. 109). Little Elm's population exceeded the Town's population at that time (2 R.R. 85). The Subdivision is located in the ETJ of both Little Elm and Lakewood Village (C.R. 109). Houses have been built on most of the lots in the Subdivision (3 R.R. 26).

Little Elm serves the Subdivision and the Lot which is within its certificate of convenience and necessity ("CCN") boundaries with water, and there is no sanitary sewer provider because the houses have septic systems (3 R.R. 14). It would cost millions of dollars for Lakewood Village to extend sanitary sewer to the Subdivision (3 R.R. 14). Denton County maintains all of the roads in the Subdivision (2 R.R. 89). The Town provides no municipal services to the Subdivision (2 R.R. 86).

The Town has a current population of approximately 620 and acknowledges that its maximum population will be 2,500 (2 R.R. 54). In the foreseeable future, the Town will never become a home rule city with the power to annex land

- 1 -

unilaterally, which requires a minimum population of 5,000 under § 43.021, Tex. Loc. Gov't Code.

Bizios began construction of a 7,000 square foot house on the Lot on or about March 10, 2014 (C.R. 109). The proposed house is an energy efficient, insulated concrete form with a construction cost of approximately $1,200,000.00 (3 R.R. 8-9). It is undisputed that Bizios will construct the house to the regulatory standards of the International Residential Code (3 R.R. 24).

Prior to commencing construction, Bizios obtained all legitimate and necessary development approvals. First, the architectural review committee for the Subdivision approved the design and construction standards for the house (3 R.R. 12-14). Second, all necessary applications to build the house foundation and retaining wall were approved by FEMA (3 R.R. 15, 16; 4 R.R. Exs. 36, 37). Third, Bizios also obtained all necessary permits from Denton County (4 R.R. 35). Regular inspections were being conducted of Bizios' house in accordance with Denton County regulations (3 C.R. 25).

Although Bizios and his contractor Alan Hoffman had discussions in early 2014 about applying for a building permit from the Town, they elected to commence construction without a permit (C.R. 109). One of the reasons is that the Town delayed permits and required all subcontractors to register in advance of permit approval contrary to the procedures in other municipalities (3 R.R. 19). The

- 2 -

Town collected approximately $1,200.00 in subcontractor fees from Bizios (3 R.R. 19). In order to obtain a building permit, Bizios would have been required to pay a permit fee of $14,646.00 (2 R.R. 92-3). But the Town's plan review and inspection fees would total only $1,200.00, leaving the Town a net profit from Bizios of $14,646.00 (2 R.R. 144). In addition, the Town's building inspector moonlights from his regular job which means that he can only perform inspections on weeknights (2 R.R. 143). When Bizios learned that the Town's extension of the building code to its ETJ was not authorized, he decided to fight the Town's illegal action: "It's a matter of principle and I wanted to take a stand on this." (3 R.R. 56).

There is no evidence in the record that Bizios' house fails to meet the requirements of the International Residential Code. The Town's part-time building inspector made advisory comments on Bizios' building plans (2 R.R. 127, 4 R.R., p. 1, Ex. 8). Except for a difference of opinion as to one type of air vent construction, both Bizios' contractor and the Town's building inspector agree as to the construction standards for the house (3 R.R. 28-31). The vent desired by Bizios's contractor is authorized by most DFW cities and the International Residential Code (3 R.R. 31).

Town Ordinance No. 08-06 extended the Town's subdivision regulations to its ETJ in 2009 (C.R. 222-243). On or about March 11, 2011, the Town Council enacted Ordinance No. 11-11 that extended the Town's subdivision ordinance and

building code to its ETJ (C.R. 307-10). The ordinance was allegedly "adopted under the authority" of Chapter 212 of the Texas Local Government Code (C.R. 308). Pursuant to that "authority," the Town extended its building code to its ETJ (C.R. 309). In 2013, the Town again extended its building code to the ETJ pursuant to the alleged authority granted under Chapter 212 (C.R. 349-50). All of these ordinances were adopted after the final plat for the Subdivision was approved (C.R. 109).

After construction of the house started, the Town filed its petition requesting the trial court to order Bizios to obtain building permits for his Lot from the Town and pay the associated fees (C.R. 4-15). Following a temporary injunction hearing, the trial court judge entered a temporary injunction order requiring Bizios to obtain building permits from the Town (C.R. 651-3).

## SUMMARY OF ARGUMENT

The Town is requiring Bizios to obtain building permits and pay fees to construct a house that will never be annexed by, or receive services from, the Town, a general law town. There is no dispute that this $1.2 million house will meet the requirements of the International Residential Code, and there is no evidence that Bizios' house is being poorly constructed or can be considered dangerous.

- 4 -

The Town's motivation to extend its building code to the ETJ is not based on health or public safety—it is based on raising revenue. By extracting over $15,750.00 in permit and license fees from Bizios and paying its part-time building official only $1,200.00 for plan review and inspection fees, the Town obtains significant revenue with no future expense. The Town provides no services to the Bizios' property, and Bizios cannot vote in city elections or utilize city facilities. This harkens back to the origin of our country: taxation without representation.

There is no express statutory language authorizing a general law town to extend its building code to its ETJ. The Town argues that this authority is implied under Chapter 212 of the Texas Local Government Code and the decision in *Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.— Dallas 1986, writ ref'd n.r.e.). There is no express language in Chapter 212, however, authorizing a general law town to require building permits in its ETJ. Because the case law since the 1994 *Lucas* opinion does not support the Town's argument, the trial court erred.

In any event, the Town is prohibited under Section 212.007 of the Texas Local Government Code from applying its subdivision regulations to Bizios' property. Therefore, the Town cannot extend its building codes to the Subdivision in its ETJ based on Chapter 212 or *Lucas*. Without platting authority, the Town lacks building code authority.

Finally, it is undisputed that the Town enacted its ordinances extending its building code to the ETJ well after the 1995 plat was approved and recorded. Bizios has vested rights to develop and construct in accordance with Town's 1995 ordinances, which did not include the building code extension. The exceptions in section 245.004 of the Texas Local Government Code do not apply.

The trial court's decision to grant the temporary injunction is extremely disappointing to Bizios because he simply happened to be on the wrong end of the judge's coin flip (3 R.R. 61). The judge admitted that he had "absolutely no idea what the proper and correct decision is." (3 R.R. 61). He also admitted that there was little doubt that this Court would reverse his decision (3 R.R. 61). This Court should do just that.

## ARGUMENT AND AUTHORITY

### A. Standards of Review

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *See Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993) (per curiam). To obtain temporary injunctive relief, an applicant must plead a cause of action against the defendant, and provide evidence to support a finding that there is a probable right to the relief sought, and a probable, imminent, and irreparable injury. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The party seeking injunctive relief has the burden to establish all of the elements for that relief. *See N. Cypress Med. Ctr. Operating Co. v. St. Laurent*, 296 S.W.3d 171, 175 (Tex. App.—Houston [14th Dist.] 2009, no pet.);

- 6 -

*Tom James Co. v. Mendrop*, 819 S.W.2d 251, 253 (Tex. App.—Fort Worth 1991, no writ). The trial court's injunction order is subject to an abuse of discretion standard. A trial court abuses its discretion if its decision is "arbitrary, unreasonable, and without reference to guiding principles." *Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex. 1997).

There are two types of injunctions: prohibitive and mandatory. *See Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 592 (Tex. App. El Paso 2003, pet. denied). A "prohibitive" injunction forbids or restrains conduct, whereas a "mandatory" injunction requires it. *Id.* (citing *Universal Health Servs., Inc. v. Thompson*, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.) and *LeFaucheur v. Williams*, 807 S.W.2d 20, 22 (Tex. App.—Austin 1991, no writ)). The issuing of a temporary mandatory injunction is proper "only if a mandatory order is necessary to prevent irreparable injury or extreme hardship." *Tri Star Petroleum*, 101 S.W.3d at 592 (citing *LeFaucheur*, 807 S.W.2d at 22). While granting a mandatory injunction is within the sound discretion of the trial court, it "should be denied absent a clear and compelling presentation of extreme necessity or hardship." *Id.* This Court should review the trial court's grant of a mandatory temporary injunction in this case under these standards.

### B. Trial Court Abused Its Discretion In Granting Injunctive Relief As The Town Did Not Show A Probable Right of Recovery

The trial court's injunction order is in error because the Town did not show a probable right of recovery. To show a probable right of recovery, an applicant need not establish that it will finally prevail in the litigation, but it must, at the very least, present some evidence that, under the applicable rules of law, tends to support its cause of action.

- 7 -

*See Camp v. Shannon.* 162 Tex. 515, 348 S.W.2d 517, 519 (Tex. 1961); *IAC, Ltd. v. Bell Helicopter Textron, Inc.*, 160 S.W.3d 191, 197 (Tex. App.—Fort Worth 2005, no pet.). Here, the Town's only cause of action was to force Appellant to apply for building permits from the Town. Therefore, it had to prove that it had authority to require the Appellant to comply with the building code.

### i. General Law Town Ordinance-Making Authority Is Extremely Limited

The two predominant classifications of cities in Texas are general law towns (like the Town) and home rule cities. As a general law town, the Town (like a county) can only exercise those governmental powers expressly delegated to it by the Texas Legislature. *See* DAVID BROOKS, MUNICIPAL LAW AND PRACTICE, TEXAS PRACTICE, Vol. 22, p. 89. The 1912 amendment to the Texas Constitution authorized cities on a local basis to adopt a charter, thus creating home rule cities as mini-legislatures unto themselves. Home rule cities have significantly broader governmental powers than general law towns. *See Forewood v. City of Taylor*, 214 S.W.2d 282 (Tex. 1948). In more than one instance, the Texas Supreme Court has recognized that the home rule amendment granted to home rule cities the "'full power of local self-government.'" *City of Houston v. State ex rel City of West University Place*, 142 Tex. 190, 176 S.W.2d 928, 929 (1943). The Town, on the other hand, derives its power from the Legislature and is restricted by the express language of state statute. *See* Tex. AG Op. JM-169. This Court has held that a

general law town must strictly comply with the language of an applicable statute. *See City of Northlake v. East Justin JV*, 873 S.W.2d 141 (Tex. App.—Fort Worth, 1994, writ den.).

### ii. No Texas Statute Expressly Authorizes The Town To Apply Its Building Code To Its ETJ

The Town claims that its authority to require building permits in the ETJ is implied under the state platting statute, Chapter 212 of the Texas Local Government Code (C.R. 506). A plat is only required to be submitted and approved under section 212.004 when a tract of land is subdivided. There is no indication that the Legislature intended to address building permits in the platting statute. "Legislative intent remains the polestar of statutory construction." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 292 (Tex. 1995). It is cardinal law in Texas that a court construes a statute, "first, by looking to the plain and common meaning of the statute's words." *Liberty Mut. Ins. Co. v. Garrison Contractors*, 966 S.W.2d 482, 484 (Tex. 1998). Further, if a statute is unambiguous, rules of construction or other extrinsic aids cannot be used to create ambiguity:

> When the purpose of a legislative enactment is obvious from the language of the law itself, there is nothing left to construction. In such case it is vain to ask the courts to attempt to liberate an invisible spirit, supposed to live concealed within the body of the law.

*Dodson v. Bunton*, 81 Tex. 655, 17 S.W. 507, 508 (1891).

Ordinary citizens should be able to rely on the plain language of a statute to mean what it says. *See Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 618, 64 S.Ct. 1215, 88 L.Ed. 2d. 1488 (1944). Typically, courts will concentrate on the literal text of a statute in order to ascertain its meaning. *See Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1996).

The Town cites Local Government Code sections 212.002 and 212.003 as authority for its assertion of the power to require builders to obtain building permits in the Town's ETJ (C.R. 506). These statutes, however, are directed at the regulation of plats and subdivisions, not building of structures. In fact, Subchapter A of Chapter 212 is entitled "Regulation of Subdivisions." This subchapter says nothing about building structures in general or permits in specific.

Subchapter B, in contrast, is titled "Regulation of Property Development," with "development" defined as "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement." TEX. LOC. GOV'T CODE § 212.043(1). This subchapter, moreover, expressly provides that "[t]his subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction." *Id.* at § 212.049.

The only way that the trial court's injunction can be sustained is by adding terms to these statutes. But, adding verbiage to statutes by implication was

expressly forbidden by the Texas Supreme Court in *M. Fitzgerald v. Advanced Spine Fixation,*:

> The manufacturer's interpretation would have us judicially amend the statute to add an exception not implicitly contained in the language of the statute. We may add words into a statutory provision only when necessary to give effect to clear legislative intent. *See Jones v. Liberty Mut. Ins. Co.,* 745 S.W.2d 901, 902 (Tex. 1988); *see also Public Util Comm'n v. Cofer,* 754 S.W.2d 121, 124 (Tex. 1988) ("A court may not write special exceptions into a statute so as to make it inapplicable under certain circumstances not mentioned in the statute."). Only truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written. *No such extraordinary circumstances are present in this case, as the rest of this opinion discusses.* (italics added) *Id.* at 867.

996 S.W.2d 865 (Tex. 1999).

In this case, neither the subdivision statute for municipalities nor any other statute expressly authorizes general law towns to extend their building codes to their ETJs. There are no "truly extraordinary circumstances" justifying the court from enforcing Chapter 212 as written. In short, the Town has not demonstrated that it has authority, and in fact it does not have authority, to require Bizios to obtain building permits for development in the ETJ.

This Court addressed similar issues in *Rhino Real Estate Investments, Inc. v. City of Runaway Bay,* No. 02-08-00340-CV, 2009 WL 219613 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.). Instead of ruling on the larger issue of a general law town's authority to extend its building codes to the ETJ, this Court held that Runaway Bay's ordinance did not expressly apply itself to the ETJ. The

Court discounted Runaway Bay's argument that an ordinance setting a fee for building permits in the ETJ equated to extending the entire building code to the ETJ. *Id.* at 3. In a footnote, the Court summarized Rhino's argument that is similar to Bizios' here that Chapter 212 of the Texas Local Government Code does not authorize a general law town to extend its building code to its ETJ. *Id.* at 4.

The Court in *Rhino* cited to *Milestone Potranco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. den.) in reference to this argument. In *Milestone*, the court determined that San Antonio's tree ordinance was a rule governing plats and subdivisions. *Id.* at 244-5. The court went on to validate the tree ordinance as a rule governing plats and subdivisions in the ETJ because its enforcement was limited solely to situations involving the subdivision and platting of land. *See id.* "[W]e conclude the Tree Ordinance was intended to, and does, govern only plats and subdivisions of land." *Id.* at 247. However, in this case, the Town's application of its building code is not commensurate with the platting of Bizios' property. As a result, the trial court erred in holding that Bizios could be required to obtain building permits from the Town under Chapter 212.

### iii. The Injunction Violates Texas Supreme Court Precedent

The Texas Supreme Court held in *City of San Antonio v. City of Boerne*, 111 S.W.3d 22 (Tex. 2003) that the authority of a county (similar to the authority of

general law towns) would not extend beyond the express grant of the statute. . It must be noted that *Boerne* was decided after the *Lucas* decision, which was relied upon by the Town. In *Boerne*, two county commissioner courts consented to the annexation of county roads to assist in a Boerne annexation. The Supreme Court held that a commissioners court can only exercise those powers "*expressly* given by either the Texas Constitution or the Legislature (italics added)." *Id.* at 28. If the Constitution or Legislature imposes an obligation, then the commissioners court has an implied authority to exercise the powers needed to fulfill the obligation. In *Boerne*, the statute authorizing "general control" of roads to counties did not authorize them to petition for annexation. Unless a commissioner court's action was restricted to providing for safer roads for public travel, its action would be deemed void as exceeding legislative authority. *Id.* at 29.Similarly, in this case, the Town does not have express authority to require that building permits be obtained in the ETJ.

The Town argues that the platting statute implies that buildings codes can be extended to a general law town's ETJ and solely relies for support on the holding in *Lucas*. The discussion about building permits in *Lucas* was brought up at the motion for rehearing and is dicta as to the points of error brought in that case. *Lucas* is almost 30 years old but has never been cited in a Texas appellate opinion. In 1986 (the date of the *Lucas* opinion), state statutes did not expressly address the

adoption and implementation of building codes by municipalities. *Lucas* is no longer good law as it relates to extension of building codes to the ETJ.

The *Lucas* court erroneously based its holding on *City of Weslaco v. Carpenter*, 644 S.W.2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). *Weslaco* involved the partitioning of land into 128 mobile home rental spaces. The developer was attempting to avoid the applicability of the subdivision statute by renting, rather than selling, spaces. The *Lucas* court cites *Weslaco's* holding on subdivisions that the "use of the term is not restricted to the division itself but also encompasses development of the divided tracts." 724 S.W.2d at 823. The development of the tracts in *Weslaco* referred to subdivision development only because there would be no construction of mobile homes as there would be with site-built housing. While the Corpus court held that the City's subdivision rules and regulations must be followed, there was no discussion in *Weslaco* that the city would be authorized to extend its building codes into its ETJ. The *Lucas* holding that a general law town has authority under Chapter 212 to extend its building codes to its ETJ has been effectively overruled by the Supreme Court's *Boerne* decision.

iv.    **Recent Changes Limit The Application Of Municipal Building Codes Only To Buildings Within Corporate Limits**

Further, since *Lucas*, the Legislature has adopted a state-wide building code requirement that limits its applicability within corporate limits. *See* § 214.212,

- 14 -

Tex. Loc. Gov't Code. At the time of the *Lucas* opinion, there were no statutes directly addressing municipal building codes. In 2001, however, the Legislature required all Texas cities pursuant to Senate Bill 365 to adopt the International Residential Code ("IRC") in § 214.212 of the Texas Local Government Code:

> (a) To protect the public health, safety, and welfare, the International Residential Code, as it existed on May 1, 2001, is adopted as a municipal residential building code in this state.
>
> (b) The International Residential Code applies to all construction, alteration, remodeling, enlargement and repair of residential structures *in a municipality* (emphasis added).

. . .

TEX. LOC. GOVT. CODE ANN. § 214.212(a)-(b).

Significantly, section 214.212 requires municipalities to adopt the IRC. It imposes a mandatory uniform residential building code, as opposed to merely providing an optional code that cities may, but are not required to, adopt. The statute expressly authorizes a municipality such as the Town to apply its building code to construction only "in a municipality," e.g., within its corporate boundaries. To imply that the Legislature intended to allow general towns to also apply their building codes in the ETJ would violate the holdings in *M. Fitzgerald* and *Boerne*.

Another indicia of legislative intent was the introduction, but lack of passage, of HB 609 (Smith) in 2007. *See* Appendix, Tab G. This bill would have expressly authorized cities to extend by ordinance their building codes to the ETJ. If the Legislature's interpretation of state statutes was that cities already had the

- 15 -

power to require building permits in the ETJ, then the introduction of HB 609 would have been unnecessary.

Further, it is significant that the Legislature has expressly stated its intent in other statutes as to when a municipality can extend its land use regulations to its ETJ. For example, section 216.003 of the Texas Local Government Code authorizes a municipality to regulate "any sign within its corporate limits or *extraterritorial jurisdiction.*" See TEX. LOC. GOVT. CODE 216.003. Similarly, section 216.902 authorizes a city to "extend the provisions of its outdoor sign regulatory ordinance and enforce the ordinance within its *extraterritorial jurisdiction.*" *Id.* at 216.903. A home rule city may define and prohibit a nuisance "within the limits of the municipality and within 5,000 feet outside the limits." Id. at 217.042.

Extending building codes to the ETJ is excluded from this list of statutes. The Latin maxim: "expressio unius est exclusio alterius" means "expression of one thing is the exclusion of another." *Cameron v. Terrell & Garrett, Inc.*, 628 S.W.2d 535 (Tex. 1981). If the Legislature intended to allow general law towns to apply the IRC in a municipality and its ETJ, it could have done so. Because extending the building code to the ETJ is not expressly addressed by the Legislature, it is clear that the Legislature did not intend for general law towns to extend their building codes to the ETJ.

- 16 -

### v. Other State Statutes Cited By The Town Do Not Expressly Authorize The Extension Of Building Codes To The ETJ

At the temporary injunction hearing, the Town argued that section 214.904(a) of the Texas Local Government Code authorizes the Town to extend its building code to its ETJ because it refers to the issuance of building permits "in the municipality or its extraterritorial jurisdiction." (C.R. 510). But this statutory provision provides neither express nor implied authority for a *general law town* to extend its building codes to its ETJ similar to sections 216.003 and 216.902 of the Texas Local Government Code and this Court's holding in *Runaway Bay*. As the HB 265 bill analysis indicates, the bill was simply intended to force cities to act on development permits instead of delaying them indefinitely. *See* Appendix, Tab H. There is no statutory language or legislative history indicating legislative intent for Section 214.904(a) to expand a general law town's authority to allow it to extend its building code to its ETJ.

The Town also cites section 233.153(a) of the Texas Local Government Code which requires homes in unincorporated areas of a county to meet International Residential Code requirements (C.R. 507). This provision states that if a city has adopted a building code in the ETJ, then the county's jurisdiction does not apply. Again, the statute does not expressly authorize general law towns to extend their building codes to the ETJ, and the Legislature could have intended the statute to apply only to home rule cities.

- 17 -

The Town incorrectly argues that the language of section 214.904 and the other referenced statutes would be "futile and useless" if the it was unable to extend its building code to its ETJ (C.R. 510). This Court recently addressed a similar argument in *Oncor Elec. Delivery Co. v. Brockriede*, No. 02-13-00071-CV, 2013 WL 6564276 (Tex. App.—Fort Worth 2013, no pet.). The issue in *Oncor* was whether section 21.049 of the Texas Property Code required that notice be sent to the landowner's counsel. Although the landowner received notice, his counsel did not. As this Court noted, the Legislature could have amended the statute to reflect the notice provisions of Texas Rule of Civil Procedure 21a, which requires that counsel receive notice. *Id.* at 3. However, enforcing the statute as written did not lead to an absurd result.

A similar analysis applies in this case. The Texas Legislature made the legislative and policy decision to not give general law towns express authority to extend their building codes to the ETJ. Home rule cities, on the other hand, have independent police powers that general law towns do not have. The Legislature could have intended that section 214.904 could apply to a home rule city that has extended its building code to the ETJ, but there is no evidence that the Legislature intended to allow general law towns like the Town the same privilege.

### vi. The Town Has No Compelling Reason That It Should Be Able To Require Building Permits In The ETJ

If the Town could attain home rule status and involuntarily annex the Lot, at least it could argue that the Town wants to protect its future housing stock. In this case, however, there is no evidence that the Town can ever gain the legal status to effectuate a unilateral annexation and obtain corporate jurisdiction over the Lot. The Town is simply extracting revenue without providing city services to the Lot.

City representatives admit that the Town cannot unilaterally annex the Addition (2 R.R. 82). Any annexation would require the consent of the homeowner, and there is no evidence that such consent would be given (2 R.R. 82).

The Town implies that it can unilaterally annex the Lot without consent pursuant to section 43.033 of the Texas Local Government Code. A prerequisite to this type of annexation is that the town provide water or sewer to the Addition. Little Elm owns the water CCN and currently provides water to the subdivision (3 R.R. 14). There is no evidence or indication that the Town will ever serve this area with water. All of the houses have septic systems, and the Town does not have a sewer CCN for this area (3 R.R. 14). It would cost the Town millions of dollars to extend sewer lines, and none of the Town's witnesses testified that the Town has the economic resources for such a project (3 R.R. 14). In addition, section 43.003(b) of the Texas Local Government Code provides that the residents

can disannex the property after one year, and the Town must disannex. Because the Lot will never be in the Town's corporate limits, there is no policy reason to require Bizios to submit building permits to the Town.

### vii. The Trial Court Erred In Holding That The Town Had The Authority To Extend Its Building Code To Its ETJ When The Town Had No Platting Authority Over The Subdivision

Both the holding in *Lucas* and Ordinance No. 13-07 state that the legal basis for extending a general law town's building code to its ETJ is based on Chapter 212 of the Local Government Code (C.R. 302). The Town, however, has no authority under Chapter 212 over the Lot or the Subdivision. Without this nexus to the platting statute, the Town has no building code authority over the Lot.

The Town has no authority under Subchapter A to regulate the Lot or the Subdivision because its population is less than Little Elm's (2 R.R. 85). Section 212.007 of the Texas Local Government Code expressly gives platting authority to only one city when a subdivision is located within two different ETJs. Because Little Elm's population has always been greater than the Town's population, it has the legislative authority to apply its subdivision regulations over the entirety of the Subdivision (C.R. 85). The Town has no platting authority over the Subdivision. In fact, Little Elm approved the final plat for the Subdivision (C.R. 109). The Legislature has foreclosed the Town's authority to extend its subdivision regulations (and consequently its building code) to the Lot.

Assuming that the Town could extend its building code as an element of Chapter 212 subdivision authority, the Code cannot be extended in this case because Bizios is not platting or subdividing his property. He is building his house on a lot shown on a recorded 1995 subdivision plat (C.R. 109). As a result, the Town is prohibited from applying its building code to the Lot because it lacks any platting authority over the Lot or the Addition under section 212.007 of the Texas Local Government Code.

> ### viii. The Trial Court Erred In Holding That The Subdivision Project Is Not Protected From The Application Of New Town Building Permit Regulations In Accordance With The Vested Rights Statute
>
> #### a. Chapter 245 Protects The Subdivision Project From Subsequently Enacted Ordinances

Historically, Texas law made it difficult for a developer or homebuilder to obtain vested rights (or grandfathering) in a previously permitted development project. The concept of vested rights refers to those circumstances where the law prevents governmental interference with a landowner's partially completed development. *See* David Hartman, *Risky Business: Vested Real Property Development Rights – The Texas Experience and Proposals for the Texas Legislature to Improve Certainty in the Law*, 30 Tex. Tech L. Rev. 297, 299 (1999). In passing the Texas vested rights statute, the Texas Legislature clearly

- 21 -

intended to protect development rights similar to Appellant's rights in the present case at the expense of municipalities such as the Town.

The Texas vested rights statute is in Chapter 245 of the Texas Local Government Code ("Chapter 245"), and its purpose was to reenact the vested rights statute previously contained in Chapter 481 of the Government Code which was inadvertently repealed by the 75th Legislature.

When the Legislature added Chapter 245 in 1999, it made several findings:

> Section 1. FINDINGS; INTENT . . . (b) The legislature finds that the repeal of former Subchapter 1, Chapter 481, Government Code, which became effective September 1, 1997, resulted in the reestablishment of administrative and legislative practices <u>that often result in unnecessary governmental regulatory uncertainty that inhibits the economic development of the state and increases the cost of housing and other forms of land development and often resulted in the repeal of previously approved permits causing decreased property and related values, bankruptcies, and failed projects . . .</u>

Act of May 11, 1999, 76th Leg., R.S. Ch. 73, 1999 Tex. Gen. Laws 432 (emph. added). The Town's position that it can apply subsequently enacted regulations to previously permitted projects and inhibit economic development and increase the cost of housing violates of the Legislature's statutory intent. A project that requires a series of permits or approvals in order to reach completion is to be governed by the rules in effect at the time that the first application in that series is made to the appropriate regulatory authority:

> Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis

of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the permit is filed.

TEX. LOC. GOVT. CODE, § 245.002.

A permit is defined as a "license, certificate, approval . . . or other form of authorization required by law that a person must have to initiate, continue or complete a project." *Id.* at § 245.001(1). The statute expressly provides that "Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project." *Id.* at § 245.002. In this case, the protected project is the Subdivision with prior plat approval.

It is undisputed that the Town started requiring building permits from Bizios after the initial permits for the Subdivision were approved (3 R.R. 53, 54, 61). As a result, the new regulations cannot be applied pursuant to section 245.002.

### b.     The Dallas Court Of Appeals' Holding In *Hartsell* Supports Bizios' Position

The facts in this case are very similar to those in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. denied.). Talty, like the Town, is a general law town. After plats were approved, lots were sold, and houses were under construction, Talty started applying its building code to the previously platted subdivision. It is undisputed in this case that the Town is attempting to

- 23 -

apply its building code after the plat for the Subdivision was approved, lots were sold, and houses were under construction. Similar to this case, the trial court in *Hartsell* ruled in favor of the municipality.

The Dallas court reversed and rendered in favor of the homebuilder on his Chapter 245 claim. *Id.* at 326. In addition, the court reversed the trial court's award of attorney's fees to Talty and remanded the issue to the trial court for its reconsideration. *Id.* The court did not reach the issue of whether a general law town could apply its building code in its ETJ. *Id.* at 329. Instead, the court held that the subdivision in that case was a protected project, which prohibited Talty from subsequently applying its building code to new housing construction in the ETJ. *Id.* at 328. Just as in the *Hartsell* case, the Town attempts to apply new ordinances to a previously platted project in its ETJ in violation of Chapter 245.

      c.      **Other Precedent Supports The Application of Vested Rights To Foreclose The Town's Attempt To Apply Its Building Codes To Appellant's Property**

A municipality may not, after annexing an area, prohibit a landowner from: (1) beginning to use land in the area in the manner that was planned for the land before the ninetieth day before the effective date of the annexation if: (a) one or more licenses, certificates, permits, approvals, or other forms of authorization by a governmental authority were required by law for the planned land use; and (b) a completed application for the initial authorization was filed with the governmental

- 24 -

entity before the date the annexation proceedings were instituted. *See* TEX. LOC. GOVT. CODE ANN. § 43.002(a) (Vernon Supp. 2006). The Texas Legislature made it clear that a municipality, particularly a general law town like the Town, cannot change the rules after a project such as the Subdivision has commenced.

The Town argues that vested rights does not apply because the final plat for the Addition was not approved by the Town (C.R. 520-1). TEX. LOC. GOVT. CODE § 245.002(a)(2) states that "each" regulatory agency will consider a permit based on the ordinances in effect at the time "a plan for development of real property or plat application is filed with *a* regulatory agency." TEX. LOC. GOVT. CODE ANN. § 245.002(a)(2) (emphasis added). In addition, vested rights accrue on the filing of a plat that "gives the regulatory agency fair notice of the project and the nature of the permit sought." *Id.* at §245.002(a-1).

The Town claims that Chapter 245 does not apply because the Town did not approve the 1995 subdivision plat pursuant to the Austin Court of Appeals' opinion in *Shumaker Enterprises, Inc. v. City of Austin*, 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.). Shumaker obtained a mining permit in 2005 from Travis County on property that was partially in Austin's ETJ. After Austin's annexation of a portion of the tract, Shumaker was required to obtain a mining permit from Austin. Shumaker objected based on Chapter 245. The court of appeals focused solely on TEX. LOC. GOVT. CODE ANN. § 245.002(a)(i) and held

that the original permit application "for the permit" refers to a permit "sought from the regulatory authority that is charged with determining whether to approve . . . the pending application." *Id.* at 815. There are no cited authorities supporting the court of appeals' opinion. Bizios submits that *Shumaker* was wrongly decided and is contrary to the express legislative intent in Chapter 245 to protect developers at the expense of municipalities. Furthermore, the court of appeals did not address the language of TEX. LOC. GOVT. CODE ANN. § 245.002(a)(2), which states that a developer's rights may also vest when a plat application is "filed with *a* regulatory agency" (emphasis added).

Under Texas case law the word "a" means "any." *Chavira v. State* (Tex. Crim. App. 1958). TEX. LOC. GOVT. CODE ANN. § 245.002(a)(2) can therefore be read as "Each regulatory agency shall consider . . . an application for a permit solely on the basis of any . . . ordinances . . . in effect at the time a . . . plat application is filed with *any* regulatory agency." Denton County and Little Elm are considered to be regulatory agencies and the 1995 plat would be considered the initial permit in the project's series of permits. Therefore, Chapter 245 provides vested rights protection to Bizios pursuant to § 245.002(a)(2).

### d. The Town had notice of the final plat for the project and the Addition

The Town weakly argues that it did not have fair "notice" of the Subdivision project and the approved 1995 plat (C.R. 517-9). Documents in the City's records prove otherwise.

Contrary to its arguments at the temporary injunction, the Town had both actual and constructive knowledge of the approval of the plat for the Subdivision. For example, the Town's official records include an ETJ map showing each of the lots in the Subdivision as shown on the recorded 1995 plat (4 R.R., Ex. 4). The Town's official documents also show the platted boundaries on Bizios' and surrounding lots on its contour map (4 R.R., Ex. 4; 3 R.R. 35-6). Town's counsel introduced certified copies of the Denton Central Appraisal District records describing Bizios' lot as Sunrise Bay at Lake Lewisville, Block 1, Lot 84 (4 R.R., Ex. 6). The City's official records included earlier building permits for tracts described as lots within the Sunrise Bay Subdivision (4 R.R., Plaintiff Exs. 4, 5).

In addition, it is obvious from a street or aerial view that the houses in the Subdivision are located on tracts less than five acres in size. As a matter of law, a plat was required to be approved for a subdivision with lots less than five acres in size pursuant to TEX. LOC. GOVT. CODE ANN. § 212.004. For Town officials to claim they did not know that Bizios' Lot was part of a previously platted subdivision is duplicitous.

- 27 -

### e. The Exemptions In Section 245.004 Do Not Apply Under These Facts

The Town argues that Bizios lacks vested rights pursuant to TEX. LOC. GOVT. CODE ANN. § 245.004(1) which exempts permits at least two years old which were "issued for the construction of a building or structure." (C.R. 518-9). The Town confuses plat approval as a permit for the construction of a building. According to Chapter 212 of the Texas Local Government Code, a plat is an approval to subdivide land and build public infrastructure, not to construct a house by issuance of a building permit.

The Dallas court addressed a similar situation in *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.). The court held that Chapter 245 prohibited Talty's extension of its building code to its ETJ after plat approval. *See id.* Both the Town and the trial court acknowledged that §245.004(1) did not apply. *Id.* at 328-9. The 1995 plat is not a permit "issued for the construction of a building or structure intended for human occupancy," and TEX. LOC. GOVT. CODE ANN. § 245.004(1) does not apply.

The Town also refers to TEX. LOC. GOVT. CODE ANN. § 245.004(11), which exempts "regulations to prevent the imminent destruction of property or injury to persons." (C.R. 519). "Imminent" contemplates a split second reaction to a pending potential harm. *See Garza v. State*, No. 05-07-00176-CR, 2007 WL 3348419 (Tex. App.—Dallas Feb. 13, 2007, no pet.) (not desig. pub.); *Washington*

- 28 -

*v. State*, 152 S.W.3d 209, 211 (Tex. App.—Amarillo 2004, no pet.); *Stefanoff v. State*, 78 S.W.3d 496, 500 (Tex. App.—Austin 2002, pet. den). There is no evidence in the record of any danger of *imminent destruction* related to the construction of a house on Bizios' lot. None of the section 245.004's exemptions apply in this case.

## CONCLUSION AND PRAYER

The trial court erred because the Town, as a general law town, (i) cannot extend its building codes to the construction of a house in its ETJ, (ii) is prohibited from applying its building code under TEX. LOC. GOVT. CODE ANN. § 212.007, and (iii) cannot apply its new ordinances to Appellant's previously permitted project under Chapter 245. The trial court abused its discretion in entering the temporary injunction because the Town failed to produce any evidence of a probable right of recovery.

Appellant prays that the trial court's temporary injunction order be reversed and rendered in favor of Appellant, that this case be remanded for final trial on the merits, that Appellant be awarded its costs, and this Court grant to Appellant such other and further relief at law and equity to which it may show itself justly entitled.

Respectfully submitted,

WINSTEAD PC
Arthur J. Anderson
State Bar No. 01165957
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax

David F. Johnson
SB No. 24002357
WINSTEAD PC
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Telephone No.: (817) 420-8223
Fax No.: (817) 420-8201


By:___/s/ Arthur J. Anderson_____
ONE OF COUNSEL

**ATTORNEYS FOR APPELLANT
HARRY BIZIOS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of June, 2014, a true and correct copy of the foregoing was served by electronic filing to the following counsel of record:

William Andrew Messer, Esq.
MESSER, ROCKEFELLER & FORT, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034

/s/ Arthur J. Anderson
ONE OF COUNSEL

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(4), I hereby certify that the above styled document contains 7,563 words, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix. Counsel is relying on a word count computer program used to prepare the document.

/s/ Arthur J. Anderson
ONE OF COUNSEL

# APPENDIX

**TAB A:** Aerial of Area

**TAB B:** Order Granting Temporary Injunction (C.R. 651-3)

**TAB C:** TEX. LOC. GOVT. CODE Chapter 245

**TAB D:** TEX. LOC. GOVT. CODE §§ 214.211 - 214.216

**TAB E:** TEX. LOC. GOVT. CODE §§ 212.001 - 212.007

**TAB F:** TEX. LOC. GOV'T CODE §§ 212.041 - 212.049

**TAB G:** Introduced (but not enacted) HB 609 by Smith in 2007 Regular Session

**TAB H:** House Research Organization Bill Analysis of HB 265 by Smith dated March 22, 2005

DALLAS 16295044v.4
56756-1 06 25 2014



EXHIBIT

A

**FILED**

2014 APR 17 AM 11: 14

SHERRI ADELSTEIN
DISTRICT CLERK DENTON CO., TX

BY ___JGP___ DEPUTY

| | | |
|---|---|---|
| TOWN OF LAKEWOOD VILLAGE, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| | § | |
| v. | § | DENTON COUNTY, TEXAS |
| | § | |
| HARRY BIZIOS, | § | |
| *Defendant.* | § | 431st JUDICIAL DISTRICT |

## ORDER GRANTING TEMPORARY INJUNCTION

On this day came to be considered the Plaintiff, the Town of Lakewood Village's, Request for Temporary Injunction against Defendant, Harry Bizios.

The Court, having considered the Request, the evidence presented, arguments of counsel, and the pleadings on file in this case, is of the opinion that Plaintiff's Request for a Temporary Injunction should be GRANTED.

**IT IS THEREFORE ORDERED** that Defendant Harry Bizios and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf, shall allow inspections by the Town of Lakewood Village's Building Official or designee on the Property, and shall immediately cease and desist any construction on the Property described as LOT 84, BLOCK 1 OF SUNRISE BAY AT LAKE LEWISVILLE, AN ADDITION TO THE CITY OF LITTLE ELM, DENTON COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET L, PAGE 224, PLAT RECORDS, DENTON, COUNTY, TEXAS (the "Property") until such time as they have (1) applied for and obtained approval from the Town of Lakewood Village of necessary permits; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

ORDER GRANTING TEMPORARY INJUNCTION – PAGE 1

**EXHIBIT**

B

651

The Court finds from the facts and evidence set forth in Plaintiff's Request and the evidence adduced at the hearing on this matter, that Plaintiff has suffered and will continue to suffer a probable injury inasmuch as harm is imminent from Defendant's violations of the Town of Lakewood Village's Ordinances, including by constructing a single family residence without a building permit issued by the Town and inspections and plan approval by the Town. Without injunctive relief, defendant will engage in the activities enjoined. The Court further finds that unless Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf are immediately enjoined as described above, Defendant will continue to violate the Town Ordinances. Injunctive relief is warranted in this cause, as the Town has suffered and will continue to suffer violations of its duly-enacted Ordinances with no recourse to prevent such violations.

The Court also finds from the facts and evidence set forth in the Request and evidence adduced at the hearing on this matter that Plaintiff has a probable right to relief at final hearing and that there is a substantial likelihood that Plaintiff will prevail on the merits at trial, that a temporary injunction issued to Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or acting on his behalf regarding the above-described acts is reasonable under the circumstances. The Court finds the violation is itself a finding of injury.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall forthwith issue a writ of Temporary Injunction in conformity with the law and terms of this Order. Plaintiff as a municipality is not required to give bond to secure a temporary injunction. Once effective, this Order shall remain in full force and effect until Defendant and his agents, servants, employees, representatives, and all persons or entities of any type whatsoever acting in concert with him or

ORDER GRANTING TEMPORARY INJUNCTION – PAGE 2

acting on his behalf fully comply with the above-described actions by allowing inspections by the Town of Lakewood Village's Building Official or designee on the Property, and immediately ceasing and desisting any construction on the Property until such time as they have (1) applied for and obtained approval from the Town of Lakewood Village of necessary permits; (2) submitted engineering inspection certificates to the Town of Lakewood Village; and (3) complied with the Town's Ordinances.

**IT IS FURTHER ORDERED** that this Temporary Injunction shall remain in effect pending entry of final judgment on the permanent injunction and final trial on the merits. It is therefore ordered that this case be set for trial on _January 5_, 2015 at _9:00_ a.m./p.m.

Rendered on April 16, 2014, at 5:00 p.m., and Signed on April 17, 2014, at 11:00 a.m.

_____
PRESIDING JUDGE

LOCAL GOVERNMENT CODE

TITLE 7. REGULATION OF LAND USE, STRUCTURES, BUSINESSES, AND RELATED ACTIVITIES

SUBTITLE C. REGULATORY AUTHORITY APPLYING TO MORE THAN ONE TYPE OF LOCAL GOVERNMENT

CHAPTER 245. ISSUANCE OF LOCAL PERMITS

Sec. 245.001. DEFINITIONS. In this chapter:

(1) "Permit" means a license, certificate, approval, registration, consent, permit, contract or other agreement for construction related to, or provision of, service from a water or wastewater utility owned, operated, or controlled by a regulatory agency, or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought.

(2) "Political subdivision" means a political subdivision of the state, including a county, a school district, or a municipality.

(3) "Project" means an endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor.

(4) "Regulatory agency" means the governing body of, or a bureau, department, division, board, commission, or other agency of, a political subdivision acting in its capacity of processing, approving, or issuing a permit.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 6 (S.B. 848), Sec. 1, eff. April 27, 2005.


Sec. 245.002. UNIFORMITY OF REQUIREMENTS. (a) Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any

EXHIBIT

C

orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:

(1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or

(2) a plan for development of real property or plat application is filed with a regulatory agency.

(a-1) Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought. An application or plan is considered filed on the date the applicant delivers the application or plan to the regulatory agency or deposits the application or plan with the United States Postal Service by certified mail addressed to the regulatory agency. A certified mail receipt obtained by the applicant at the time of deposit is prima facie evidence of the date the application or plan was deposited with the United States Postal Service.

(b) If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. All permits required for the project are considered to be a single series of permits. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project.

(c) After an application for a project is filed, a regulatory agency may not shorten the duration of any permit required for the project.

(d) Notwithstanding any provision of this chapter to the contrary, a permit holder may take advantage of recorded subdivision plat notes, recorded restrictive covenants required by a regulatory agency, or a change to the laws, rules, regulations, or ordinances of a regulatory agency that enhance or protect the project, including changes that lengthen the effective life of the permit after the date

the application for the permit was made, without forfeiting any rights under this chapter.

(e)  A regulatory agency may provide that a permit application expires on or after the 45th day after the date the application is filed if:

(1)  the applicant fails to provide documents or other information necessary to comply with the agency's technical requirements relating to the form and content of the permit application;

(2)  the agency provides to the applicant not later than the 10th business day after the date the application is filed written notice of the failure that specifies the necessary documents or other information and the date the application will expire if the documents or other information is not provided; and

(3)  the applicant fails to provide the specified documents or other information within the time provided in the notice.

(f)  This chapter does not prohibit a regulatory agency from requiring compliance with technical requirements relating to the form and content of an application in effect at the time the application was filed even though the application is filed after the date an applicant accrues rights under Subsection (a-1).

(g)  Notwithstanding Section 245.003, the change in law made to Subsection (a) and the addition of Subsections (a-1), (e), and (f) by S.B. No. 848, Acts of the 79th Legislature, Regular Session, 2005, apply only to a project commenced on or after the effective date of that Act.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999. Amended by:

Acts 2005, 79th Leg., Ch. 6 (S.B. 848), Sec. 2, eff. April 27, 2005.


Sec. 245.003.  APPLICABILITY OF CHAPTER.  This chapter applies only to a project in progress on or commenced after September 1, 1997.  For purposes of this chapter a project was in progress on September 1, 1997, if:

(1)  before September 1, 1997:

(A)   a regulatory agency approved or issued one or more permits for the project;  or

(B)   an application for a permit for the project was filed with a regulatory agency;  and

(2)   on or after September 1, 1997, a regulatory agency enacts, enforces, or otherwise imposes:

(A)   an order, regulation, ordinance, or rule that in effect retroactively changes the duration of a permit for the project;

(B)   a deadline for obtaining a permit required to continue or complete the project that was not enforced or did not apply to the project before September 1, 1997;  or

(C)   any requirement for the project that was not applicable to or enforced on the project before September 1, 1997.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999.


Sec. 245.004.  EXEMPTIONS.  This chapter does not apply to:

(1)   a permit that is at least two years old, is issued for the construction of a building or structure intended for human occupancy or habitation, and is issued under laws, ordinances, procedures, rules, or regulations adopting only:

(A)   uniform building, fire, electrical, plumbing, or mechanical codes adopted by a recognized national code organization; or

(B)   local amendments to those codes enacted solely to address imminent threats of destruction of property or injury to persons;

(2)   municipal zoning regulations that do not affect landscaping or tree preservation, open space or park dedication, property classification, lot size, lot dimensions, lot coverage, or building size or that do not change development permitted by a restrictive covenant required by a municipality;

(3)   regulations that specifically control only the use of land in a municipality that does not have zoning and that do not affect landscaping or tree preservation, open space or park dedication, lot size, lot dimensions, lot coverage, or building size;

(4)   regulations for sexually oriented businesses;

(5)  municipal or county ordinances, rules, regulations, or other requirements affecting colonias;

(6)  fees imposed in conjunction with development permits;

(7)  regulations for annexation that do not affect landscaping or tree preservation or open space or park dedication;

(8)  regulations for utility connections;

(9)  regulations to prevent imminent destruction of property or injury to persons from flooding that are effective only within a flood plain established by a federal flood control program and enacted to prevent the flooding of buildings intended for public occupancy;

(10)  construction standards for public works located on public lands or easements; or

(11)  regulations to prevent the imminent destruction of property or injury to persons if the regulations do not:

(A)  affect landscaping or tree preservation, open space or park dedication, lot size, lot dimensions, lot coverage, building size, residential or commercial density, or the timing of a project; or

(B)  change development permitted by a restrictive covenant required by a municipality.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999.
Amended by Acts 2003, 78th Leg., ch. 646, Sec. 1.
Amended by:

Acts 2005, 79th Leg., Ch. 31 (S.B. 574), Sec. 1, eff. September 1, 2005.


Sec. 245.005.  DORMANT PROJECTS.  (a)  After the first anniversary of the effective date of this chapter, a regulatory agency may enact an ordinance, rule, or regulation that places an expiration date on a permit if as of the first anniversary of the effective date of this chapter:  (i) the permit does not have an expiration date; and (ii) no progress has been made towards completion of the project.  Any ordinance, rule, or regulation enacted pursuant to this subsection shall place an expiration date of no earlier than the fifth anniversary of the effective date of this chapter.

(b)  A regulatory agency may enact an ordinance, rule, or regulation that places an expiration date of not less than two years on an individual permit if no progress has been made towards completion of the project.  Notwithstanding any other provision of this chapter, any ordinance, rule, or regulation enacted pursuant to this section shall place an expiration date on a project of no earlier than the fifth anniversary of the date the first permit application was filed for the project if no progress has been made towards completion of the project.  Nothing in this subsection shall be deemed to affect the timing of a permit issued solely under the authority of Chapter 366, Health and Safety Code, by the Texas Commission on Environmental Quality or its authorized agent.

(c)  Progress towards completion of the project shall include any one of the following:

(1)  an application for a final plat or plan is submitted to a regulatory agency;

(2)  a good-faith attempt is made to file with a regulatory agency an application for a permit necessary to begin or continue towards completion of the project;

(3)  costs have been incurred for developing the project including, without limitation, costs associated with roadway, utility, and other infrastructure facilities designed to serve, in whole or in part, the project (but exclusive of land acquisition) in the aggregate amount of five percent of the most recent appraised market value of the real property on which the project is located;

(4)  fiscal security is posted with a regulatory agency to ensure performance of an obligation required by the regulatory agency; or

(5)  utility connection fees or impact fees for the project have been paid to a regulatory agency.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999.
Amended by:
    Acts 2005, 79th Leg., Ch. 31 (S.B. 574), Sec. 1, eff. September 1, 2005.


Sec. 245.006.  ENFORCEMENT OF CHAPTER.  (a)  This chapter may be enforced only through mandamus or declaratory or injunctive relief.

(b)   A political subdivision's immunity from suit is waived in regard to an action under this chapter.

Added by Acts 1999, 76th Leg., ch. 73, Sec. 2, eff. May 11, 1999. Amended by:
     Acts 2005, 79th Leg., Ch. 31 (S.B. 574), Sec. 1, eff. September 1, 2005.


     Sec. 245.007.   CONSTRUCTION AND RENOVATION WORK ON COUNTY-OWNED BUILDINGS AND FACILITIES IN CERTAIN COUNTIES.   (a)  This section applies only to a building or facility that is owned by a county with a population of 3.3 million or more and is located within the boundaries of another political subdivision.
     (b)   A political subdivision may not require a county to notify the political subdivision or obtain a building permit for any new construction or any renovation of a building or facility owned by the county if the construction or renovation work is supervised and inspected by an engineer or architect licensed in this state.
     (c)   This section does not exempt a county from complying with the building standards of the political subdivision during the construction or renovation of the building or facility.

Added by Acts 2005, 79th Leg., Ch. 532 (H.B. 960), Sec. 1, eff. June 17, 2005.

(c) A municipality that adopts or proposes to adopt an ordinance under this section may notify permit holders that a permit holder may contract with a security services provider licensed by the Texas Private Security Board under Chapter 1702, Occupations Code, to respond to an alarm. The notice, if given, must include the board's telephone number and Internet website address.

Added by Acts 2005, 79th Leg., Ch. 808 (S.B. 568), Sec. 6, eff. September 1, 2005.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 232 (H.B. 1784), Sec. 1, eff. September 1, 2007.


Sec. 214.200. PRIORITY OR LEVEL OF RESPONSE NOT AFFECTED; LIABILITY OF MUNICIPALITY FOR NONRESPONSE. (a) Nothing in this subchapter:
    (1) affects the priority or level of response provided by a municipality to a permitted location; or
    (2) waives the governmental immunity provided by law for a municipality.
    (b) A municipality that does not respond to an alarm signal is not liable for damages that may occur relating to the cause of the alarm signal.

Added by Acts 2005, 79th Leg., Ch. 808 (S.B. 568), Sec. 6, eff. September 1, 2005.


SUBCHAPTER G. BUILDING AND REHABILITATION CODES

Sec. 214.211. DEFINITIONS. In this subchapter:
    (1) "International Residential Code" means the International Residential Code for One- and Two-Family Dwellings promulgated by the International Code Council.
    (2) "National Electrical Code" means the electrical code published by the National Fire Protection Association.
    (3) "Residential" means having the character of a detached one-family or two-family dwelling or a multiple single-family dwelling that is not more than three stories high with separate means of egress, including the accessory structures of the dwelling, and

EXHIBIT
D

that does not have the character of a facility used for the accommodation of transient guests or a structure in which medical, rehabilitative, or assisted living services are provided in connection with the occupancy of the structure.

(4)   "International Building Code" means the International Building Code promulgated by the International Code Council.

(5)   "Commercial" means a building for the use or occupation of people for:

(A)   a public purpose or economic gain; or

(B)   a residence if the building is a multifamily residence that is not defined as residential by this section.

Added by Acts 2001, 77th Leg., ch. 120, Sec. 1, eff. Jan. 1, 2002. Amended by:

Acts 2005, 79th Leg., Ch. 389 (S.B. 1458), Sec. 1, eff. January 1, 2006.


Sec. 214.212.   INTERNATIONAL RESIDENTIAL CODE.   (a)   To protect the public health, safety, and welfare, the International Residential Code, as it existed on May 1, 2001, is adopted as a municipal residential building code in this state.

(b)   The International Residential Code applies to all construction, alteration, remodeling, enlargement, and repair of residential structures in a municipality.

(c)   A municipality may establish procedures:

(1)   to adopt local amendments to the International Residential Code;   and

(2)   for the administration and enforcement of the International Residential Code.

(d)   A municipality may review and consider amendments made by the International Code Council to the International Residential Code after May 1, 2001.

Added by Acts 2001, 77th Leg., ch. 120, Sec. 1, eff. Jan. 1, 2002.


Sec. 214.213.   EXCEPTIONS.   (a)   The International Residential Code and the International Building Code do not apply to the

installation and maintenance of electrical wiring and related components.

(b)  A municipality is not required to review and consider adoption of amendments to the International Residential Code or the International Building Code regarding electrical provisions.

Added by Acts 2001, 77th Leg., ch. 120, Sec. 1, eff. Jan. 1, 2002. Amended by:

Acts 2005, 79th Leg., Ch. 389 (S.B. 1458), Sec. 2, eff. January 1, 2006.


Sec. 214.214.  NATIONAL ELECTRICAL CODE.  (a)  Except as provided by Subsection (c), the National Electrical Code, as it existed on May 1, 2001, is adopted as the municipal electrical construction code in this state and applies to all residential and commercial electrical construction applications.

(b)  A municipality may establish procedures:

(1)  to adopt local amendments to the National Electrical Code;  and

(2)  for the administration and enforcement of the National Electrical Code.

(c)  The National Electrical Code applies to all commercial buildings in a municipality for which construction begins on or after January 1, 2006, and to any alteration, remodeling, enlargement, or repair of those commercial buildings.

Added by Acts 2001, 77th Leg., ch. 120, Sec. 1, eff. Jan. 1, 2002. Amended by:

Acts 2005, 79th Leg., Ch. 389 (S.B. 1458), Sec. 3, eff. January 1, 2006.


Sec. 214.215.  ADOPTION OF REHABILITATION CODES OR PROVISIONS. (a)  In this section, "rehabilitation" means the alteration, remodeling, enlargement, or repair of an existing structure.

(b)  A municipality that adopts a building code, other than the International Residential Code adopted under Section 214.212, shall adopt one of the following:

(1)  prescriptive provisions for rehabilitation as part of the municipality's building code;  or

(2)  the rehabilitation code that accompanies the building code adopted by the municipality.

(c)  The rehabilitation code or prescriptive provisions do not apply to the rehabilitation of a structure to which the International Residential Code applies or to the construction of a new structure.

(d)  A municipality may:

(1)  adopt the rehabilitation code or prescriptive provisions for rehabilitation recommended by the Texas Board of Architectural Examiners;  or

(2)  amend its rehabilitation code or prescriptive provisions for rehabilitation.

(e)  A municipality shall enforce the prescriptive provisions for rehabilitation or the rehabilitation code in a manner consistent with the enforcement of the municipality's building code.

Added by Acts 2003, 78th Leg., ch. 331, Sec. 6.02, eff. Sept. 1, 2003.


Sec. 214.216.  INTERNATIONAL BUILDING CODE.  (a)  To protect the public health, safety, and welfare, the International Building Code, as it existed on May 1, 2003, is adopted as a municipal commercial building code in this state.

(b)  The International Building Code applies to all commercial buildings in a municipality for which construction begins on or after January 1, 2006, and to any alteration, remodeling, enlargement, or repair of those commercial buildings.

(c)  A municipality may establish procedures:

(1)  to adopt local amendments to the International Building Code;  and

(2)  for the administration and enforcement of the International Building Code.

(d)  A municipality may review and consider amendments made by the International Code Council to the International Building Code after May 1, 2003.

LOCAL GOVERNMENT CODE

TITLE 7. REGULATION OF LAND USE, STRUCTURES, BUSINESSES, AND RELATED ACTIVITIES

SUBTITLE A. MUNICIPAL REGULATORY AUTHORITY

CHAPTER 212. MUNICIPAL REGULATION OF SUBDIVISIONS AND PROPERTY DEVELOPMENT

SUBCHAPTER A. REGULATION OF SUBDIVISIONS

Sec. 212.001.  DEFINITIONS.  In this subchapter:

(1)  "Extraterritorial jurisdiction" means a municipality's extraterritorial jurisdiction as determined under Chapter 42, except that for a municipality that has a population of 5,000 or more and is located in a county bordering the Rio Grande River, "extraterritorial jurisdiction" means the area outside the municipal limits but within five miles of those limits.

(2)  "Plat" includes a replat.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.  Amended by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989.

Sec. 212.002.  RULES.  After a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.

Sec. 212.0025.  CHAPTER-WIDE PROVISION RELATING TO REGULATION OF PLATS AND SUBDIVISIONS IN EXTRATERRITORIAL JURISDICTION.  The authority of a municipality under this chapter relating to the regulation of plats or subdivisions in the municipality's extraterritorial jurisdiction is subject to any applicable limitation prescribed by an agreement under Section 242.001.

EXHIBIT
E

Added by Acts 2003, 78th Leg., ch. 523, Sec. 6, eff. June 20, 2003.

Sec. 212.003. EXTENSION OF RULES TO EXTRATERRITORIAL JURISDICTION. (a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads or the pumping, extraction, and use of groundwater by persons other than retail public utilities, as defined by Section 13.002, Water Code, for the purpose of preventing the use or contact with groundwater that presents an actual or potential threat to human health. However, unless otherwise authorized by state law, in its extraterritorial jurisdiction a municipality shall not regulate:

(1) the use of any building or property for business, industrial, residential, or other purposes;

(2) the bulk, height, or number of buildings constructed on a particular tract of land;

(3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage;

(4) the number of residential units that can be built per acre of land; or

(5) the size, type, or method of construction of a water or wastewater facility that can be constructed to serve a developed tract of land if:

(A) the facility meets the minimum standards established for water or wastewater facilities by state and federal regulatory entities; and

(B) the developed tract of land is:

(i) located in a county with a population of 2.8 million or more; and

(ii) served by:

(a) on-site septic systems constructed before September 1, 2001, that fail to provide adequate services; or

(b) on-site water wells constructed before September 1, 2001, that fail to provide an adequate supply of safe drinking water.

(b) A fine or criminal penalty prescribed by the ordinance does not apply to a violation in the extraterritorial jurisdiction.

(c) The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable in the extraterritorial jurisdiction.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989; Acts 1989, 71st Leg., ch. 822, Sec. 6, eff. Sept. 1, 1989; Acts 2001, 77th Leg., ch. 68, Sec. 1, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 731, Sec. 3, eff. Sept. 1, 2003.


Sec. 212.004. PLAT REQUIRED. (a) The owner of a tract of land located within the limits or in the extraterritorial jurisdiction of a municipality who divides the tract in two or more parts to lay out a subdivision of the tract, including an addition to a municipality, to lay out suburban, building, or other lots, or to lay out streets, alleys, squares, parks, or other parts of the tract intended to be dedicated to public use or for the use of purchasers or owners of lots fronting on or adjacent to the streets, alleys, squares, parks, or other parts must have a plat of the subdivision prepared. A division of a tract under this subsection includes a division regardless of whether it is made by using a metes and bounds description in a deed of conveyance or in a contract for a deed, by using a contract of sale or other executory contract to convey, or by using any other method. A division of land under this subsection does not include a division of land into parts greater than five acres, where each part has access and no public improvement is being dedicated.

(b) To be recorded, the plat must:

(1) describe the subdivision by metes and bounds;

(2) locate the subdivision with respect to a corner of the survey or tract or an original corner of the original survey of which it is a part; and

(3) state the dimensions of the subdivision and of each street, alley, square, park, or other part of the tract intended to be dedicated to public use or for the use of purchasers or owners of lots fronting on or adjacent to the street, alley, square, park, or other part.

(c) The owner or proprietor of the tract or the owner's or proprietor's agent must acknowledge the plat in the manner required for the acknowledgment of deeds.

(d) The plat must be filed and recorded with the county clerk of the county in which the tract is located.

(e) The plat is subject to the filing and recording provisions of Section 12.002, Property Code.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989; Acts 1989, 71st Leg., ch. 624, Sec. 3.02, eff. Sept. 1, 1989; Acts 1993, 73rd Leg., ch. 1046, Sec. 1, eff. Aug. 30, 1993.


Sec. 212.0045. EXCEPTION TO PLAT REQUIREMENT: MUNICIPAL DETERMINATION. (a) To determine whether specific divisions of land are required to be platted, a municipality may define and classify the divisions. A municipality need not require platting for every division of land otherwise within the scope of this subchapter.

(b) In lieu of a plat contemplated by this subchapter, a municipality may require the filing of a development plat under Subchapter B if that subchapter applies to the municipality.

Added by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989.


Sec. 212.0046. EXCEPTION TO PLAT REQUIREMENT: CERTAIN PROPERTY ABUTTING AIRCRAFT RUNWAY. An owner of a tract of land is not required to prepare a plat if the land:

(1) is located wholly within a municipality with a population of 5,000 or less;

(2) is divided into parts larger than 2-1/2 acres; and

(3) abuts any part of an aircraft runway.

Added by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989.

Sec. 212.005. APPROVAL BY MUNICIPALITY REQUIRED. The municipal authority responsible for approving plats must approve a plat or replat that is required to be prepared under this subchapter and that satisfies all applicable regulations.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989; Acts 1993, 73rd Leg., ch. 1046, Sec. 2, eff. Aug. 30, 1993.


Sec. 212.006. AUTHORITY RESPONSIBLE FOR APPROVAL GENERALLY. (a) The municipal authority responsible for approving plats under this subchapter is the municipal planning commission or, if the municipality has no planning commission, the governing body of the municipality. The governing body by ordinance may require the approval of the governing body in addition to that of the municipal planning commission.

(b) In a municipality with a population of more than 1.5 million, at least two members of the municipal planning commission, but not more than 25 percent of the membership of the commission, must be residents of the area outside the limits of the municipality and in which the municipality exercises its authority to approve subdivision plats.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989.


Sec. 212.0065. DELEGATION OF APPROVAL RESPONSIBILITY. (a) The governing body of a municipality may delegate to one or more officers or employees of the municipality or of a utility owned or operated by the municipality the ability to approve:

(1) amending plats described by Section 212.016;

(2) minor plats or replats involving four or fewer lots fronting on an existing street and not requiring the creation of any new street or the extension of municipal facilities; or

(3) a replat under Section 212.0145 that does not require the creation of any new street or the extension of municipal facilities.

(b)   The designated person or persons may, for any reason, elect to present the plat for approval to the municipal authority responsible for approving plats.

(c)   The person or persons shall not disapprove the plat and shall be required to refer any plat which the person or persons refuse to approve to the municipal authority responsible for approving plats within the time period specified in Section 212.009.

Added by Acts 1989, 71st Leg., ch. 345, Sec. 1, eff. Aug. 28, 1989. Amended by Acts 1995, 74th Leg., ch. 92, Sec. 1, eff. Aug. 28, 1995; Acts 1997, 75th Leg., ch. 566, Sec. 1, eff. June 2, 1997;  Acts 1999, 76th Leg., ch. 1130, Sec. 2, eff. June 18, 1999;  Acts 2001, 77th Leg., ch. 402, Sec. 13, eff. Sept. 1, 2001.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 316 (H.B. 2281), Sec. 1, eff. June 15, 2007.


    Sec. 212.007.   AUTHORITY RESPONSIBLE FOR APPROVAL:   TRACT IN EXTRATERRITORIAL JURISDICTION OF MORE THAN ONE MUNICIPALITY.   (a) For a tract located in the extraterritorial jurisdiction of more than one municipality, the authority responsible for approving a plat under this subchapter is the authority in the municipality with the largest population that under Section 212.006 has approval responsibility.   The governing body of that municipality may enter into an agreement with any other affected municipality or with any other municipality having area that, if unincorporated, would be in the extraterritorial jurisdiction of the governing body's municipality delegating to the other municipality the responsibility for plat approval within specified parts of the affected area.

    (b)   Either party to an agreement under Subsection (a) may revoke the agreement after 20 years have elapsed after the date of the agreement unless the parties agree to a shorter period.

    (c)   A copy of the agreement shall be filed with the county clerk.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.

(2)   recover damages from the owner of a tract of land in an amount adequate for the municipality to undertake any construction or other activity necessary to bring about compliance with a requirement regarding the tract and established by, or adopted by the governing body under, this subchapter.

(b)   A reference in this section to an "owner of a tract of land" does not include the owner of an individual lot in a subdivided tract of land.

Added by Acts 1989, 71st Leg., ch. 1, Sec. 46(b), eff. Aug. 28, 1989. Amended by Acts 1989, 71st Leg., ch. 624, Sec. 3.01, eff. Sept. 1, 1989.


SUBCHAPTER B. REGULATION OF PROPERTY DEVELOPMENT

Sec. 212.041.   MUNICIPALITY COVERED BY SUBCHAPTER.   This subchapter applies only to a municipality whose governing body chooses by ordinance to be covered by this subchapter or chose by ordinance to be covered by the law codified by this subchapter.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.   Amended by Acts 1993, 73rd Leg., ch. 125, Sec. 1, eff. May 11, 1993;  Acts 1993, 73rd Leg., ch. 1046, Sec. 4, eff. Aug. 30, 1993;  Acts 1995, 74th Leg., ch. 76, Sec. 10.04, eff. Sept. 1, 1995.


Sec. 212.042.   APPLICATION OF SUBCHAPTER A.   The provisions of Subchapter A that do not conflict with this subchapter apply to development plats.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.


Sec. 212.043.   DEFINITIONS.   In this subchapter:
(1)   "Development" means the new construction or the enlargement of any exterior dimension of any building, structure, or improvement.
(2)   "Extraterritorial jurisdiction" means a municipality's extraterritorial jurisdiction as determined under Chapter 42.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.



Sec. 212.044.  PLANS, RULES, AND ORDINANCES.  After a public hearing on the matter, the municipality may adopt general plans, rules, or ordinances governing development plats of land within the limits and in the extraterritorial jurisdiction of the municipality to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.


Sec. 212.045.  DEVELOPMENT PLAT REQUIRED.  (a)  Any person who proposes the development of a tract of land located within the limits or in the extraterritorial jurisdiction of the municipality must have a development plat of the tract prepared in accordance with this subchapter and the applicable plans, rules, or ordinances of the municipality.

(b)  A development plat must be prepared by a registered professional land surveyor as a boundary survey showing:

(1)  each existing or proposed building, structure, or improvement or proposed modification of the external configuration of the building, structure, or improvement involving a change of the building, structure, or improvement;

(2)  each easement and right-of-way within or abutting the boundary of the surveyed property;  and

(3)  the dimensions of each street, sidewalk, alley, square, park, or other part of the property intended to be dedicated to public use or for the use of purchasers or owners of lots fronting on or adjacent to the street, sidewalk, alley, square, park, or other part.

(c)  New development may not begin on the property until the development plat is filed with and approved by the municipality in accordance with Section 212.047.

(d)  If a person is required under Subchapter A or an ordinance of the municipality to file a subdivision plat, a development plat is not required in addition to the subdivision plat.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.  Amended by Acts 1989, 71st Leg., ch. 1091, Sec. 28, eff. Sept. 1, 1989.


Sec. 212.046.  RESTRICTION ON ISSUANCE OF BUILDING AND OTHER PERMITS BY MUNICIPALITY, COUNTY, OR OFFICIAL OF OTHER GOVERNMENTAL ENTITY.  The municipality, a county, or an official of another governmental entity may not issue a building permit or any other type of permit for development on lots or tracts subject to this subchapter until a development plat is filed with and approved by the municipality in accordance with Section 212.047.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.


Sec. 212.047.  APPROVAL OF DEVELOPMENT PLAT.  The municipality shall endorse approval on a development plat filed with it if the plat conforms to:
        (1)  the general plans, rules, and ordinances of the municipality concerning its current and future streets, sidewalks, alleys, parks, playgrounds, and public utility facilities;
        (2)  the general plans, rules, and ordinances for the extension of the municipality or the extension, improvement, or widening of its roads, streets, and public highways within the municipality and in its extraterritorial jurisdiction, taking into account access to and extension of sewer and water mains and the instrumentalities of public utilities;  and
        (3)  any general plans, rules, or ordinances adopted under Section 212.044.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.


Sec. 212.048.  EFFECT OF APPROVAL ON DEDICATION.  The approval of a development plat is not considered an acceptance of any proposed dedication for public use or use by persons other than the owner of the property covered by the plat and does not impose on the municipality any duty regarding the maintenance or improvement of any purportedly dedicated parts until the municipality's governing body makes an actual appropriation of the dedicated parts by formal acceptance, entry, use, or improvement.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.

Sec. 212.049.  BUILDING PERMITS IN EXTRATERRITORIAL JURISDICTION.  This subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction.

Acts 1987, 70th Leg., ch. 149, Sec. 1, eff. Sept. 1, 1987.

Sec. 212.050.  ENFORCEMENT; PENALTY.  (a)  If it appears that a violation or threat of a violation of this subchapter or a plan, rule, or ordinance adopted under this subchapter or consistent with this subchapter exists, the municipality is entitled to appropriate injunctive relief against the person who committed, is committing, or is threatening to commit the violation.

(b)  A suit for injunctive relief may be brought in the county in which the defendant resides, the county in which the violation or threat of violation occurs, or any county in which the municipality is wholly or partly located.

(c)  In a suit to enjoin a violation or threat of a violation of this subchapter or a plan, rule, ordinance, or other order adopted under this subchapter, the court may grant the municipality any prohibitory or mandatory injunction warranted by the facts including a temporary restraining order, temporary injunction, or permanent injunction.

(d)  A person commits an offense if the person violates this subchapter or a plan, rule, or ordinance adopted under this subchapter or consistent with this subchapter within the limits of the municipality.  An offense under this subsection is a Class C misdemeanor.  Each day the violation continues constitutes a separate offense.

(e)  A suit under this section shall be given precedence over all other cases of a different nature on the docket of the trial or appellate court.

(f)  It is no defense to a criminal or civil suit under this section that an agency of government other than the municipality issued a license or permit authorizing the construction, repair, or alteration of any building, structure, or improvement.  It also is no

By:  Smith of Tarrant                                    H.B. No. 609

A BILL TO BE ENTITLED

AN ACT

relating to the application and enforcement of municipal construction codes.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Section 214.212(b), Local Government Code, is amended to read as follows:

(b)  The International Residential Code applies to all construction, alteration, remodeling, enlargement, and repair of residential structures in a municipality. Notwithstanding Section 242.001, the governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of the International Residential Code and any amendments adopted as provided by this section.

SECTION 2.  Section 212.049, Local Government Code, is repealed.

SECTION 3.  This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2007.



EXHIBIT
G
tabbies

SUBJECT:          Deadlines for cities to act on permit applications

COMMITTEE:        Land and Resource Management — favorable, without amendment

VOTE:             6 ayes — Mowery, Blake, R. Cook, Leibowitz, Miller, Orr

                  0 nays

                  3 absent — Harper-Brown, Escobar, Pickett

WITNESSES:        For — David Mintz, Texas Apartment Association; Scott Norman, Texas
                  Association of Builders; (*Registered but did not testify:* Daniel Gonzalez,
                  Texas Association of Realtors)

                  Against — None

BACKGROUND:       Among other provisions, Local Government Code, Title 7, authorizes
                  local government entities to issue building permits. Permit applications
                  and review processes vary among cities to ensure that construction and
                  improvement plans comply with local policies and standards.

DIGEST:           HB 265 would set deadlines for municipalities to act on permits for
                  constructing or improving buildings or other structures within their
                  jurisdictions. Upon receipt of a building permit application, a municipality
                  would have to:

                  • grant or deny the permit to the applicant within 45 days;
                  • provide written notice to the applicant explaining why the
                    municipality had not acted on the application, which would add 30
                    days from the date notice was received to the municipality's
                    deadline for reaching a decision; or
                  • reach a written agreement with the applicant establishing a deadline
                    for reaching a decision.

                  If the municipality failed to act within these deadlines and/or agreements,
                  the municipality could not collect any application fees and would have to
                  refund to the applicant any fees collected.



The bill would take effect September 1, 2005, and would apply only to permit applications submitted after that date.

SUPPORTERS
SAY:

HB 265 would assist developers in efficiently managing their projects by establishing clear uniform deadlines for granting or denying permit applications. It would develop notification standards that are responsive and predictable and create a clear and transparent permit process through which a municipality and a project manager could communicate effectively.

The permit procedure set forth in HB 265 would allow for the timely identification and rectification of application errors. Rather than letting projects stall over incoherent deadlines or flaws detected late in the permit process, as under the current system, the bill would help municipalities quickly identify a sound project and resolve application flaws to speed the commencement of construction or improvements. By allowing for a more timely project initiation date, HB 265 also would assist a municipality in incorporating new property value into its tax roll.

Variation among municipalities' particular permit requirements would not be affected by the bill. Written agreements between a municipality and a developer could cover any steps required to obtain a permit while clearly delineating the responsibilities of both parties.

OPPONENTS
SAY:

HB 265 would take away local control from regulatory permit processes. Municipalities, large and small, can better determine application deadlines than the state. By requiring written agreements between municipalities and building permit applicants in order to avoid inflexible processing deadlines and resolve application flaws, this bill would slow the permit process, not expedite it. Municipalities today manage to ensure efficient regulatory processes by communicating verbally with applicants, and additional paperwork requirements would do nothing to improve this system. By mandating additional administrative duties, the bill could require some municipalities to increase permit fees to cover the increased processing costs of written agreements, including the possible need for additional personnel.

HB 265 would create unrealistic deadlines for the processing of applications. All applications are reviewed for technical revisions including engineering, building code, and public safety compliance.

Rushing the review process to meet a state-specified deadline could jeopardize technical accuracy.

The bill would not place any requirements on applicants. Applicants who submitted incomplete applications or did not respond to requests from the municipality would not be held accountable for slowing the application process. Municipalities should not have to adhere to application process deadlines if applicants are not responsive.

NOTES:     On February 28, the House passed a related bill, HB 266 by W. Smith, which would set deadlines for counties to respond to permit applications. The Senate has not yet referred this bill to committee.

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
8/8/2014 8:56:42 PM
DEBRA SPISAK
CLERK

IN THE COURT OF APPEALS
FOR THE SECOND DISTRICT OF TEXAS AT FORT WORTH

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
8/8/2014 8:56:42 PM
DEBRA SPISAK
Clerk

NO. 02-14-00143-CV

HARRY BIZIOS,

*Appellant,*

vs.

TOWN OF LAKEWOOD VILLAGE, TEXAS,

*Appellee.*

Appealed from the 431ST Judicial District Court
Denton County, Texas

_____

# APPELLEE'S BRIEF

_____

WM. ANDREW MESSER
State Bar No. 13472230
*andy@txmunicipallaw.com*
JENNIFER W. DECURTIS
State Bar No. 24045767
BRENDA N. MCDONALD
State Bar No. 14993300
MESSER, ROCKEFELLER & FORT, PLLC
6351 Preston Rd., Suite 350
Frisco, Texas 75034
972.668.6400 - Telephone
972.668.6414 - Telecopier

COUNSEL FOR APPELLEE

**Oral Argument Requested**

# IDENTITY OF PARTIES & COUNSEL

*Appellee-Plaintiff*
*Town of Lakewood Village:*

Wm. Andrew Messer
State Bar No. 13472230
*andy@txmunicipallaw.com*
Jennifer W. DeCurtis
State Bar No. 24045767
*jennifer@txmunicipallaw.com*
Brenda N. McDonald
State Bar No. 14993300
*brenda@txmunicipallaw.com*
Messer, Rockefeller & Fort, PLLC
6351 Preston Road, Suite 350
Frisco, Texas 75034
Telephone (972) 668-6400
Facsimile   (972) 668-6414


*Appellant-Defendant Harry Bizios:*

Arthur  J. Anderson
Winstead PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
214-745-5400
*aanderson@winstead.com*

David F. Johnson
Winstead PC
777 Main Street
Suite 1100
Fort Worth, Texas 76102
817-420-8200
*dfjohnson@winstead.com*

# TABLE OF CONTENTS

IDENTITY OF PARTIES & COUNSEL ........................................................... ii

INDEX OF AUTHORITIES ......................................................................... v

STATEMENT ON ORAL ARGUMENT ......................................................... xii

ISSUES PRESENTED ............................................................................... 2

STATEMENT OF FACTS .......................................................................... 2

SUMMARY OF THE ARGUMENT ................................................................ 11

STANDARD OF REVIEW ........................................................................... 14

ARGUMENT & AUTHORITIES .................................................................... 15

    I.   The Town has a probable right to relief and the injunction should be affirmed ................................................................................... 15

    II.  The Town, and all Texas municipalities, have the statutory authority to extend their subdivision rules for development to the ETJ .................... 18

        A.  The Statutes ................................................................... 19

        B.  The Legislative Intent ...................................................... 22

        C.  Local Government Code § 212.049 does not apply to the Town ............................................................................. 26

        D.  Local Government Code § 212.007 does not apply to the Town ............................................................................. 27

        E.  The International Residential Code does not limit the Town's authority in the ETJ ........................................................ 28

        F.  The Cases: *City of Boerne* does not apply; *City of Lucas* and *City of Weslaco* are instructive ....................... 30

G. Regulation of subdivision rules for development in the ETJ
is a valid exercise of police power .................................................36

III. Appellant has no vested rights in a 1995 plat................................38

A. The Town's subdivision rules are exempt from the
vested rights statute ........................................................38

B. The Town considers an application for a permit based on
regulations in effect on that date ....................................42

C. The Town had no fair notice of the plat filing ...............44

D. The Appellant cannot assert vested rights ....................45

CONCLUSION & PRAYER ................................................................45

CERTIFICATE OF SERVICE .............................................................47

APPENDIX

Maps .................................................................................. Tab A
Stop Work Orders posted at the work site ......................... Tab B
Pictures of Stop Work Orders posted at the work site ......... Tab C
Pictures of Stoop Work Order Posted with Appellant and his
contractor ......................................................................... Tab D
Lakewood Village subdivision ........................................... Tab E
Tex. Loc. Gov't Code § 212.002, .003(a) ........................... Tab F
Tex. Loc. Gov't Code § 42.001 .......................................... Tab G
Tex. Loc. Gov't Code § 214.904(a) .................................... Tab H
Tex. Loc. Gov't Code § 233.153(c) ..................................... Tab I
Tex. Loc. Gov't Code § 245.002(a), (a-1), .004(1), (6), (11), .006 .......... Tab J

# INDEX OF AUTHORITIES

**Cases**

*2218 Bryan St., Ltd. v. City of Dallas,*
  175 S.W.3d 58 (Tex. App.—Dallas, pet denied)....................................................43

*Acker v. Tex. Water Comm'n,*
  790 S.W.2d 299 (Tex.1990).................................................................................29

*Andrus v. Allard,*
  444 U.S. 51 (1979)...............................................................................................36

*Burlington Northern R.R. Co. v. Oklahoma Tax Comm.,*
  481 U.S. 454 (1987).............................................................................................24

*Butnaru v. Ford Motor Co.,*
  84 S.W. 3d 198 (Tex. 2002)......................................................................... 14, 15

*Chevron Corp. v. Redmon,*
  745 S.W.2d 314 (Tex.1987).................................................................................29

*Caso-Bercht vs. Striker Industries,*
  147 S.W. 3d 460 (Tex. App.- Corpus Christi 2004, no pet)...................................3

*City of Austin v. Quick,*
  930 S.W.2d 678 (Tex. App. – Austin 1996).........................................................35

*City of Brookside Village v. Comeau,*
  633 S.W.2d 790 (Tex. 1982)................................................................................37

*City of College Station v. Turtle Rock Corp.,*
  680 S.W.2d 802 (Tex.1984)........................................................................... 36, 37

*City of Fort Worth vs. Johnson,*
  388 S.W.2d 400 (Tex. 1964)......................................................................... 11, 17

*City of LaPorte v. Barfield,*
  898 S.W.2d 288 (Tex.1995).................................................................................29

*City of Lucas v. North Texas Municipal Water Dist.*,
   724 S.W.2d 811, 823 (Tex. App.—Dallas 1986, writ ref'd n.r.e.)................ passim

*City of Round Rock v. Smith*,
   687 S.W.2d 300 (Tex. 1985)..................................................................... 23, 32

*City of San Antonio v. City of Boerne*,
   111 S.W.3d 22 (Tex. 2003)....................................................................... 30, 31

*City of Weslaco v. Carpenter*,
   644 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.)........... passim

*Corpus Christi v. Unitarian Church*,
   436 S.W.2d 923 (Tex. Civ. App. – Corpus Christi 1968, writ ref'd n.r.e.)...........35

*Davis vs. Huey,*
   571 S.W.2d at 859 (Tex. 1978)...................................................................15

*Entergy Gulf States, Inc. vs. Summers,*
   282 S.W.3d 433 (Tex. 2009)..................................................................... 25, 26

*Ex parte Woodall,*
   154 S.W.3d 698 (Tex.App.-El Paso 2004, pet. ref'd) ................................... 37, 38

*Fitgerald v. Advanced Spine Fixation Systems*,
   996  S.W.2d 864 (Tex. 1999)........................................................................23

*FM Properties Operating Co. v. City of Austin*,
   93 F.3d 167 (5th Cir. 1996)....................................................................... 35, 39

*Hartsell v. Town of Talty*,
   130 S.W.3d 325, 328 (Tex. App. – Dallas 2004, pet. denied)....................... passim

*Hollingsworth vs. City of Dallas,*
   931 S.W.2d 699 (Tex. App. Dallas 1996, writ denied) .......................................17

*Houston Compressed Steel Corp. v. State,*
   456 S.W.2d 768 (Tex. Civ. App.—Houston [1[st] Dist.] 1970, no writ).................14

*Hunter v. Fort Worth Cap. Corp.,*
   620 S.W.2d 547 (Tex.1981)....................................................................... 25, 29

*In re Newton,*
   146 S.W. 3d 648 (Tex. 2004)..............................................................................14

*Ireland v. Franklin,*
   950 S.W.2d 155 (Tex. App.—San Antonio 1997, no writ)...................................15

*Levy v. City of Plano,*
   2001 WL 1382520 (Tex. App. – Dallas 2001, no pet.) ................................. 18, 36

*Long v. City of Fort Worth,*
   333 S.W.2d 644 (Tex. Civ. App. - Fort Worth 1960, no writ).............................17

*Loye v. Travelhost, Inc.,*
   156 S.W.3d 615 (Tex. App.—Dallas 2004, no pet.) ..................................... 14, 15

*Maloy v. City of Lewisville,*
   848 S.W.2d 380 (Tex. App. - Fort Worth 1993, no writ)....................................17

*Milestone Potranco Dev. Ltd. v. City of San Antonio,*
   298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. denied)............... 31, 32, 36

*Pennsylvania Coal Co. v. Mahon,*
   260 U.S. 393 (1922)...........................................................................................36

*Quick v. City of Austin,*
   7 S.W.3d 109 (Tex. 1998)...................................................................................35

*Rhino Real Estate Investments, Inc. v. City of Runaway Bay,*
   No. 02-08-00340-CV, 2009 WL 219613 (Tex. App.—Fort Worth July 23, 2009,
no pet.)..............................................................................................................31

*Save Our Springs Alliance v. City of Austin,*
   149 S.W.3d 674 (Tex. App.—Austin 2004, no pet.)............................................39

*Shumaker Enterprises, Inc. v. City of Austin,*
   325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.) ......................... 13, 42, 43, 44

*Swinney v. City of San Antonio,*
   483 S.W.2d 556 (Tex. App. - San Antonio 1972, no writ)............................ 11, 17

*Walker v. Packer,*
  827 S.W.2d 833 (Tex. 1992)............................................................................15

*Walling v. Metcalfe,*
  863 S.W.2d 56, 58 (Tex. 1993)........................................................................15

*Woodson Lumber Co. v. City of College Station,*
  752 S.W.2d 744 (Tex.App.—Houston [1st Dist.] 1988, no writ) ........................36

**Statutes**

TEX. GOV'T CODE § 311.021..............................................................................30

TEX. GOV'T CODE § 43.033......................................................................... 10, 11

TEX. LOC. GOV'T CODE § 1.005 .........................................................................22

TEX. LOC. GOV'T CODE § 212.002 ............................................................... passim

TEX. LOC. GOV'T CODE § 212.003 ............................................................... passim

TEX. LOC. GOV'T CODE § 212.007 .....................................................................28

TEX. LOC. GOV'T CODE § 212.041 .....................................................................26

TEX. LOC. GOV'T CODE § 212.042 .....................................................................26

TEX. LOC. GOV'T CODE § 212.045 ................................................................ 26, 27

TEX. LOC. GOV'T CODE § 212.049 ................................................................ 26, 27

TEX. LOC. GOV'T CODE § 212.212 ................................................................ 21, 28

TEX. LOC. GOV'T CODE § 212.214 .....................................................................26

TEX. LOC. GOV'T CODE § 212.904 ................................................................ 20, 22

TEX. LOC. GOV'T CODE § 214.212 ..................................................... 19, 20, 28, 29

TEX. LOC. GOV'T CODE § 214.221 .....................................................................20

TEX. LOC. GOV'T CODE § 214.904 .................................................................. passim

TEX. LOC. GOV'T CODE § 233.153 .................................................................. passim

TEX. LOC. GOV'T CODE § 245.001 ....................................................................39

TEX. LOC. GOV'T CODE § 245.002 .................................................................. passim

TEX. LOC. GOV'T CODE § 245.004 .................................................................. passim

TEX. LOC. GOV'T CODE § 245.006 ............................................................... 13, 45

TEX. LOC. GOV'T CODE § 253.153 ....................................................................29

TEX. LOC. GOV'T CODE § 42.001 ................................................................... passim

TEX. LOC. GOV'T CODE § 42.021 ....................................................................12

TEX. LOC. GOV'T CODE § 43.028 ....................................................................10

TEX. LOC. GOV'T CODE § 43.051 ............................................................... 10, 19

TEX. LOC. GOV'T CODE § 54.016 ............................................................... 11, 25

TEX. LOC. GOV'T CODE §§ 233.153 ............................................... 12, 18, 20, 21

TEX. LOC. GOV'T CODE Ch. 245 .......................................................................3

TEX. LOC. GOV'T CODE § 43.024 ....................................................................10

TEX. LOC. GOV'T CODE § 43.033 ............................................................... 10, 11

TEX. LOCAL GOV'T CODE ANN. § 245.004-245.005(Vernon Supp.2004)...............44

TEX. REV. CIV. STAT. ANN. art. 970a § 4 .................................................................33

Texas Local Government Code § 233.153 ...................................................... passim

Texas Local Government Code § 42.021 ...............................................................2

**Ordinances**

City of Copper Canyon, Copper Canyon Subdivision Ordinance § 1.1...................37

CITY OF DENTON, DEVELOPMENT ORDINANCE 35.16.3...........................................36

City of Double Oak, Code of Ordinances § 10.101................................................37

City of Fate, Code of Ordinances § 38-2 .............................................................37

City of Heath, Code of Heath § 158.01 ...............................................................37

City of Highland Village, Highland Village Subdivision Ordinance § 1.1 .............37

CITY OF LEWISVILLE, CODE OF ORDINANCES 6-23, 6-24 .........................................37

Town of Lakewood Village, Code of Ordinances § 11.16 ........................................3

Town of Lakewood Village, Code of Ordinances § 13.07 ....................................4, 5

**Other Authorities**

BLACK'S LAW DICTIONARY (5TH ED. 1979)...............................................................34

BROOKS, TEXAS MUNICIPAL LAW AND PRACTICE § 21.03 .......................................26

COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, TEX. H.B. 3187, 71ST LEG., R.S.
(1989)..............................................................................................................42

HB 609 .............................................................................................. 24, 25, 16

# STATEMENT ON ORAL ARGUMENT

The Town of Lakewood Village requests oral argument pursuant to TEXAS RULE OF APPELLATE PROCEDURE 39.1 because the legal issues involved are of importance to the 1142$^{+}$ municipalities of Texas. Appellant seeks to have the courts divest Texas municipalities, including Lakewood Village, of authority expressly granted to them by the Legislature to extend subdivision rules to their extraterritorial jurisdictions ("ETJ"), so as to ensure the safe, orderly and healthy development of municipalities in their ETJ. The Court's decision process would be significantly aided if oral argument is allowed.

HARRY BIZIOS,

*Appellant,*

vs.

TOWN OF LAKEWOOD VILLAGE, TEXAS,

*Appellee.*

Appealed from the 431ST Judicial District Court
Denton County, Texas

_____

**APPELLEE'S BRIEF**
_____

TO THE HONORABLE COURT OF APPEALS:

The Town of Lakewood Village submits this brief as appellee. For clarity, Appellee Town of Lakewood Village will be referred to as the Appellee or Town, and Appellant Harry Bizios will be referred to as the Appellant, Bizios, or Owner.

1

## ISSUES PRESENTED

Whether the trial court properly granted the Town's request for temporary injunction when the evidence showed the Town had a probable right to relief.

1. The Town has, and all Texas municipalities have, the statutory authority to apply their subdivision rules for development to the ETJ. No statute prohibits this authority.

2. The Owner does not have vested rights to a 1995 plat filed only with Denton County.

## STATEMENT OF FACTS

The Town of Lakewood Village is a Type A general law city, incorporated in 1977, and is a political subdivision of the State of Texas. [2 R.R. 54]. Surrounding its town limits, the Town by statute has a one-half mile area designated as its extraterritorial jurisdiction ("ETJ"), wherein the Town has been given authority to regulate. *Id*.; *See* Town Map [C.R. 118-119, 121-122], **Appx. A**; [2 R.R. 56]. All Texas cities, by statute, have an adjacent ETJ. Tex. Loc. Gov't Code § 42.021. The Town, by statute, has a vested interest to promote and protect the general health, safety, and welfare of those in its ETJ, including the Appellant's property. TEX. LOC. GOV'T CODE § 42.001. Regulation of the subdivision rules and building codes in the Town's ETJ is important so that safe construction and materials are guaranteed to be used. [C.R. 265, preamble to Ord. 10-01]. In the

2

Town of Lakewood Village's extraterritorial jurisdiction, there are approximately 10 subdivisions.[1] **Appx. E.**

Appellant's property is but one property that is regulated by the Town in its ETJ. [3 R.R. 9]. Appellant's property is located in the subdivision of Sunrise Bay, and is undisputedly located wholly within the Town's ETJ. [C.R. 125, 132-136]; [2 R.R. 55, 58]. The Appellant's property is located at Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, Denton County, and is more commonly known as 3950 or 3960 Spinnaker Run Point, Denton County, Texas (the "Property") [C.R. 114-115, 131-136]. The Property has a steep downfall from the front to the back of the Property (approximately 21 feet) and is partially located within the 100-year floodplain. [C.R. 127-128, 482-487]; [2 R.R. 59]; [3 R.R. 45-46]. The footprint of the residential structure on the building plans shows the structure touches the floodplain in four different places. [3 R.R. 47; see the lot in the floodplain at C.R. 159].

*Town's Building Codes*

The Town has furthered its vested interest and responsibility to the public in its ETJ through the regulation of subdivisions, development, and building codes. The Town adopted the 2006 International Residential Code under Ordinance 11-

---

[1] The Court is requested to take judicial notice of the Lakewood Village map depicting the subdivisions, a certified copy of which is in Appx. D. *See Caso-Bercht v. Striker Industries*, 147 S.W.3d 460, 463 (Tex. App.—Corpus Christi 2004, no pet.) (appellate court may take judicial notice).

16, which is published by the International Code Council and serves as a uniform building code for the Town [C.R. 319-342]; [2 R.R. 63]. Likewise, the uniform mechanical, electrical, fuel gas, and plumbing codes were adopted and extended to the Town's ETJ. [C.R. 285-291, 425-429, 313-317, 300-304]; [2 R.R. 129].The Town adopted Ordinance No. 10-01 on January 14, 2010, which extended its building codes to the Town's ETJ. [C.R. 264-283] [2 R.R. 64], and Ordinance No. 13-07 on June 13, 2013, which extended its subdivision regulations to its ETJ [C.R. 344-368](previously Ord. No. 11-11 adopted March 11, 2011 [C.R. 306-310]). The Town's building codes also include heightened standards enacted as local amendments to the national building code standards in order to increase the health, safety and welfare of those building in both the Town's limits and its ETJ [C.R. 319-342]; [2 R.R. 118-119, 131]. Examples of the heightened local Town standards include heightened floodplain regulations. [C.R. 246][2 R.R. 141]; carbon monoxide detectors [C.R. 336]; foundations on expansive soils [C.R. 337]; dryer exhaust [C.R. 340]; studor vents/ air admittance valves [C.R. 341]; increased wire size [C.R. 341]; and plumbing regulations [C.R. 279]. The heightened standards apply equally to residences built in the Town's limits and ETJ. *Id*.

*Appellant's Building Plans*

Appellant filed building plans with the Town on January 27, 2014, registered a contractor with the Town, and scheduled a pre-construction meeting with the

4

Town. [C.R. 138-158]; [2 R.R. 62-63, 67]. Registering contractors with the Town was required, and the pre-construction meeting was required before construction. [2 R.R. 62-63]. Appellant subsequently cancelled the pre-construction meeting, never obtained the required permit, and failed to comply with the Town's subdivision regulations and building codes, which are enacted to promote and protect the health, safety, and welfare of persons and property in the Sunrise Bay subdivision and other subdivisions within the ETJ. [2 R.R. 133]; [2 R.R. 63]; [3 R.R. 19, 40]. The building plans were reviewed by the Town's building inspector, who has over 16 years of experience, is a certified building inspector, and written seven national articles on building issues. [2 R.R. 111]. He found Appellant's plans would not comply with the 2006 International Residential Code and other building requirements adopted by the Town. [C.R. 138-158]; [2 R.R. 114-115]. For example:

- The plans stated that the 2003 International Residential Code would be used as the standard to construct the residential structure. [C.R. 139]; [2 R.R. 114-115]. The correct building code is the 2006 International Residential Code, with the Town's local amendments. [2 R.R. 115].

- Part of the Property is located in the 100 year flood plain, and the planned residence buts up against the 100 year flood plain. [2 R.R. 115][C.R. 128, 482-487]. The required finish floor elevation for Appellant's residence by the Town is 540 msl. [2 R.R. 116-117]. The Town requires for safety purposes a finished floor elevation of 3 feet above the 100 year flood plain. [C.R. 354]. The submitted plans show the entire structure was designed to be built too low, several feet below a finished floor elevation of 540 msl as required by the

Lakewood Village Ordinance No. 13-07(5)(d)(7). On the first day of the hearing, Appellant agreed to modify his building plans to build to the 540 msl. [C.R. 141, 483, 495]; [2 R.R. 60, 97, 117, 125]; [3 R.R. 16]. The purpose of the elevation requirement is to keep people from building in an area where a house could be flooded [2 R.R. 116]; [3 R.R. 48, 50].

- A non-engineered foundation was submitted, in violation of the Town's code. [2 R.R. 147]. Appellant indicated that the foundation did not have an engineering seal on it because the manufacturer had filed bankruptcy. [3 R.R. 31].

- A retaining wall was built on the Property without a Town permit, and Appellant failed to provide an engineering study to the Town, even when it was requested. [C.R. 491] [2 R.R. 67, 104] IRC R404; [2 R.R. 118]. This makes it impossible for the Town to determine the possibility of lateral movement of the retaining wall for protection of the Property, its residents, and adjacent property from flooding. [2 R.R. 118-119].

- The submitted plans failed to provide the correct kitchen island vents, in lieu of Studor vents, as required by the Town ordinances [C.R. 141]; [2 R.R. 121]; [3 R.R. 30]. Upon an initial inspection that was agreed upon the first day of the hearing, Appellant's construction failed inspection because studor vents had actually been constructed despite notification that they were not allowed, as well as there being no required form board survey and no copper pipe installation. [2 R.R. 102-103, 122-123]. Studor vents are not approved by the Town because they pose a danger in that if moving parts fail, sewer gas can go into the living area of the residence. [2 R.R. 121-122].

- The submitted plans violated the 2006 International Residential Code due to the top of the chimney being less than 2 feet above the roofline, as measured horizontally, and 10 feet away [from what?] [C.R. 145]; [2 R.R. 127]. This standard is required because chimneys that are not high enough pose a danger. [2 R.R. 127].

- Several other Town specific standards were noted by the building official of the Town in the plans originally submitted to the Town.

6

The purpose of the plan review is to advise the Appellant of non-compliance issues.  [2 R.R. 141-2].

*Appellant's refusal to obey the law*

The Town first learned of Appellant's construction work on the Property on March 10, 2014.  [2 R.R. 65], [C.R. 167]. No permit had been issued to Appellant from the Town to be able to do construction work. [2 R.R.62]. A permit is required by the Town. [CR 266-283] [2 R.R. 62-63, 118]. Appellant elected to commence construction without a permit. [C.R.109. Due to the ongoing work on the Property without a required building permit, the Town's Building Official placed a stop work order on the Property on March 13, 2014. **Appx B, C**; [C.R. 164, 170-180] [2 R.R. 68-69, 135]. Appellant intentionally removed the stop work order on March 14, 2014, and work continued. [C.R. 44][2 R.R. 74-76]. On March 14, 2012, the Town placed a second stop work order on the Property. [C.R. 161]; [2 R.R. 72-73]; [3 R.R. 44].  The Appellant was aware of the stop work orders and refused to abate construction. [3 R.R. 44]. The Appellant and his contractor were both standing nearby when the Town posted the second stop work order on the Property. A picture of the event is attached as **Appx D.** The Appellant removed the second stop work order, and again continued construction. [C.R. 64-75]; [2 R.R. 74-76].  The Appellant failed to meet with the Town building inspector to review comments made to the submitted plans [2 R.R. 62], failed to obtain permits for work on the property [2 R.R. 118, 80], failed to submit engineering plans for a lake-retaining

7

wall [C.R. 491] [2 R.R. 67, 104, 118], and failed to have inspections for completed work on the property. [2 R.R. 65].

*County-only regulations*

Appellant submitted his building plans to the Sunrise Bay architectural control review committee, and that committee advised him to discuss filing an initial building permit plan with the Town. [3 R.R. 14-18]. Denton County also has an order that requires property owners to submit their plans to the Town. [C.R. 213]. Denton County Commissioner's Court Order 10-0045 states that if construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls. [C.R. 213]. Denton County also gives notices to builders and home buyers, which states:

NOTICE

Home Builders and Home Buyers

On January 26, 2010, Denton County Commissioners Court approved a resolution that applies to certain residential construction in the unincorporated areas of Denton County. …

**Building in the Extra Territorial Jurisdiction (ETJ):**

If you are building in the ETJ of a municipality that has adopted a building code for the municipality's ETJ, then the builder follows the municipality's codes. However, the builder is still required to submit the necessary paperwork to Denton County Public Works.

[C.R. 212-218]; [2 R.R. 62]; [4 R.R. Ex. 18].[2]

The Appellant sought to develop his property according to County regulations. [*See* 3 R.R. 25]. But the County undisputedly requires any property owner building in an ETJ to use that municipality's building standards. [C.R. 212-218].

There is a significant difference in the building standards between the Town and the County — Denton County requires 3 third-party basic inspections and does not provide any other oversight [2 R.R. 64-65]; whereas, the Town requires approximately 14 different inspections. [2 R.R. 65]. If a property owner relies only on the County, then there would be no inspection, for instance, to make sure the brick adheres to the walls through the use of multiple brick ties or the like [2 R.R. 128], or to ensure that there is proper electrical safety. [2 R.R. 129-131].

*The Plat*

The plat which includes the Property was approved in 1995. [C.R. 133-136]. It was approved only by Little Elm and Denton County. [2 R.R. 106, 139-140]. The Town had no knowledge of the plat, and has not approved the plat. [2 R.R. 60-61]. The plat contains no signature of any Town authority indicating approval, and the Town had no actual notice of the plat. [2 R.R. 60-61, 135].

---

[2] The Notice is reflected in the record at C.R. 212-218; however, the Town had offered a second version that was certified as a public record by Denton County that included the language cited. Although the trial court admitted this exhibit as "Petitioner's Exhibit 1," it is not in the record. See R.R. 106-09. The Town is filing a motion contemporaneously with this brief to supplement the record with this document.

*Town Authority to Annex*

The Town has several interests in regulating development in its ETJ, including that portions of the ETJ may become part of the Town in the future through annexation. The Town's current population is approximately 620, and based on development within the Town's limits, it is anticipated that the Town's residency will quadruple in future growth. [2 R.R. 54]. The Town would then have the statutory authority to annex an area without consent of residents when it provides water or sewer to the area. TEX. LOC. GOV'T CODE § 43.033 [2 R.R. 54]. The Town also has various means to annex properties in its ETJ, see TEX. LOC. GOV'T CODE § 43.051, such as TEX. LOC. GOV'T CODE § 43.024 (annexation upon request of area voters) and § 43.028 (annexation of areas sparsely occupied on petition of landowners). The Town currently provides building department services to subdivisions within its ETJ, including Appellant's Property [2 R.R. 86]. This service protects neighbors from poor construction on adjacent buildings. [2 R.R. 118-19]. The Town does not provide fire or police protection as the area in an ETJ does not pay property taxes to the Town to support those services. *Id*. The permitting fee for construction supports the building services. The town of Little Elm does provide water for the Property, but not sewer. *Id*. Sewer is not currently needed because the residences within the ETJ use a septic system. [2 R.R. 101]. However, the Town has sewer infrastructure that can currently be extended to the

10

area, whereas the town of Little Elm does not. *Id*. Even if the town of Little Elm had a certificate of convenience and necessity issued by the State to provide sewer, it would be unable or incapable of doing so. *Id*. It is practicable that the Town could provide sewer services in the future to its ETJ, [2 R.R. 102], which would enable unilateral annexation of the area by the Town under TEX. GOV'T CODE § 43.033. [2 R.R. 102].

## SUMMARY OF THE ARGUMENT

The Town of Lakewood Village provided undisputed evidence that it had a probable right to relief in that it extended its subdivision rules and building codes by ordinance to its extraterritorial jurisdiction, that Appellant's Property is located exclusively in the Town's extraterritorial jurisdiction, and that Appellant violated the Town's ordinances. The Town is therefore entitled to injunctive relief. TEX. LOC. GOV'T CODE § 212.003(c) ("The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable to the extraterritorial jurisdiction"). The Texas Supreme Court and other courts have repeatedly upheld injunctive relief for violation of municipal ordinances. *See City of Fort Worth v. Johnson*, 388 S.W.2d 400, (Tex. 1964); *Swinney v. City of San Antonio*, 483 S.W.2d 556, 559 (Tex. App. – San Antonio 1972, no writ).

11

By statute, the Town has the authority as a Texas municipality to extend subdivision rules and building codes to its ETJ. Sections 212.002 & .003(a) of the Local Government Code explicitly allow municipalities to adopt subdivision rules regulating development in their ETJ; section 214.904(a) explicitly authorizes municipalities to require building permits in their ETJ; and section 233.153(c) explicitly authorizes municipalities to have building codes in their ETJ. The authority to have this regulatory authority in a municipality's ETJ has been addressed by the Dallas and Corpus Christi Courts of Appeals. Both have affirmed this principle. *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 823 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *City of Weslaco v. Carpenter*, 644 S.W.2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). No court has held otherwise.

There is good public policy behind this authority—to promote the health, safety and welfare of persons residing adjacent to municipalities in the ETJ. TEX. LOC. GOV'T CODE §§ 212.002(a), 42.001. Appellant focuses on the services he will or will not receive from the Town. The Town focuses on its responsibility, as articulated by the Texas Legislature, to protect public health, safety and welfare. Municipal regulation in the ETJ is an important function of local government in order to meet the gaps in safety that occur when property development is unsupervised or undersupervised. There is a second public policy behind this

12

authority—to have uniform regulations in both the city limits and its contiguous ETJ. This permits homogeneity in building requirements and standards upon annexation of property in the ETJ. Moreover, the regulation of building codes within the ETJ is a valid exercise of municipal police power.

Appellant's claim of vested rights under Chapter 245 of the Texas Local Government Code also fails. It can only be brought by mandamus, declaratory or injunctive relief. TEX. LOC. GOV'T CODE § 245.006. Appellant has not made this claim. As a matter of law, vested rights cannot be addressed. Even if Appellant had properly asserted this claim, the vested rights statute does not apply. Appellee's building regulations are exempted from the vested rights statute because they are current uniform building codes that apply to residential structures. TEX. LOC. GOV'T CODE § 245.004. The vested rights statute also does not require the Town to provide vested rights for a permit issued by another regulatory agency. TEX. LOC. GOV'T CODE §245.002(a); *Shumaker Enterprises, Inc. v. City of Austin*, 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.). Here, a 1995 plat was only authorized by Little Elm and Denton County. Lakewood Village cannot be bound by these other entities. Likewise, the Town had no fair notice of the plat filed in 1995, so the vested rights statute is inapplicable. TEX. LOC. GOV'T CODE § 245.002(a-1). It first learned of the plat in this lawsuit.

Finally, Appellant states that he chose to proceed without a permit from the Town. If Appellant wants to claim that the Town's permit fee and process are legally flawed, public policy dictates a recourse other than ignoring the law. As the town has proved a probable right to relief with statutory authority to apply its subdivision rules and building codes to its ETJ, and the Appellant intentionally violated the Town's rules and codes without vested rights to a decades old plat, the trial court properly granted the Town's request for temporary injunction. Its order should be affirmed.

## STANDARD OF REVIEW

The standard of review for an order granting or denying a temporary injunction is abuse of discretion. *Butnaru v. Ford Motor Co*., 84 S.W. 3d 198, 204 (Tex. 2002); *Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 618 (Tex. App.—Dallas 2004, no pet.). A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru*, 84 S.W.3d at 204. A status quo can never be a condition where there is a violation of the law, as occurred here. *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004), *citing Houston Compressed Steel Corp. v. State*, 456 S.W.2d 768, 775 (Tex. Civ. App.—Houston [1st Dist.] 1970, no writ) (where the acts sought to be enjoined violate an expressed law, "the status quo to be preserved could never be a condition of affairs where the respondent would be permitted to continue the acts constituting that violation")

14

The trial court abuses its discretion when it acts arbitrarily, unreasonably acts without reference to guiding rules or principals, or misapplies the law to the established facts of the case. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992). "The reviewing court must not substitute its judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *Butnaru*, 84 S.W.3d at 204; *Loye*, 156 S.W. 3d at 618-19. In reviewing the evidence, the Court "draw[s] all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *See Ireland v. Franklin*, 950 S.W.2d 155, 157 (Tex. App.—San Antonio 1997, no writ). In situations where "no findings of fact or conclusions of law were filed, as here, the trial court must be upheld on any legal theory supported by the record." *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978).

## ARGUMENT & AUTHORITIES

### I. The Town has a probable right to relief and the injunction should be affirmed

The Town has a probable right to relief in this case. At the hearing on the Town's application for temporary injunction, the Town proved that it is likely to succeed on the merits of its lawsuit. The Town was not required to show that it would ultimately prevail. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). At the heart of the Town's request for injunctive relief is Appellant's violation of the

15

Town's building code in that he failed to obtain a permit for construction of his house [2 R.R. 62], failed to pay permitting fees [C.R. 109], failed to attend a pre-construction conference [2 R.R. 62], failed to obtain engineering certificates [2 R.R. 118, 132, 146] [C.R.8], failed to permit inspections [2 R.R. 65], and failed to stop work after issuance of a stop work order [2 R.R. 72-73][C.R. 6-8, 64-75, 85-86, 162-164]. The Town requested injunctive relief under Section 212.003(c) of the Local Government Code. Section 212.003 provides: "The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable in the extraterritorial jurisdiction." TEX. LOC. GOV'T CODE § 212.003(c).

Almost all of the documentary evidence, 37 exhibits, were admitted by stipulation of the parties. There were stipulated facts agreed to by the parties. The Town also called as witnesses its building official and town secretary. The Town produced uncontested evidence of its adoption of the International Residential Code and local amendments and extension of those codes and ordinances into its ETJ. [C.R. 264-283, 285-291, 300-304, 313-317, 319-342, 344-368, 425-429]. The Town showed that Appellant had actual notice of these provisions and yet intentionally refused to comply with, and abate his violations of, those provisions. [3 R.R. 44]. Appellant readily admits he was not going to comply with the Town's regulations. [3 R.R. 44]. That he intentionally refused to comply with the Town's

16

ordinances is clearly depicted when the stop work order was posted on his Property with the Appellant standing nearby, **Appx. D**, yet he took the stop work order down and allowed work to continue on the Property. [2 R.R. 74-76]. The evidence is undisputed that Appellant violated the Town's ordinances. Chapter 212 of the Texas Local Government Code does not require the Town to show anything else. TEX. LOC. GOV'T CODE § 212.003(c). Proof of the violation of the Town's ordinances establishes a case for injunctive relief. *See City of Fort Worth v. Johnson*, 388 S.W.2d 400, (Tex. 1964); *Hollingsworth v. City of Dallas*, 931 S.W.2d 699, 703 (Tex. App. – Dallas 1996, writ denied); *Maloy v. City of Lewisville*, 848 S.W.2d 380, 385 (Tex. App. – Fort Worth 1993, no writ); *Long v. City of Fort Worth*, 333 S.W.2d 644, 647 (Tex. Civ.App. – Fort Worth 1960, no writ)(city is entitled to injunctive relief if it proves the violation of a zoning ordinance). In *Swinney v. City of San Antonio*, 483 S.W.2d 556, 559 (Tex. App. – San Antonio 1972, no writ), the city of San Antonio obtained a temporary injunction restraining the defendant from extending a water supply and distribution system into a subdivision located in the city's ETJ, enjoining the defendant from connecting the system to any residences in the subdivision, and ordering the defendant to submit plans and specifications of the system to the city. The trial court entered injunctive relief in favor of San Antonio. The defendant appealed. *Id.* at 557. The San Antonio Court of Appeals affirmed the injunctive relief, finding

17

"the violation of the ordinance is patent." *Id.* at 558. In this case, too, the violation by Appellants of the Town's ordinances is patent. The Town is entitled to injunctive relief.

## II. The Town, and all Texas Municipalities, have the statutory authority to extend their subdivision rules for development to the ETJ

Texas municipalities, whether home-rule or general law like the Town of Lakewood Village, have been granted the statutory authority to apply, by ordinance, their subdivision rules regarding development, including platting, building standards and permitting in their ETJ. Tex. Loc. Gov't Code §§ 212.003(a), 212.002, 214.904(a), 233.153(c); *see also Hartsell v. Town of Talty*, 130 S.W.3d 325, 328 (Tex. App. – Dallas 2004, pet. denied) ("ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction"); *Levy v. City of Plano*, 2001 WL 1382520, *2 (Tex. App. – Dallas 2001, no pet.)("city subdivision regulations apply to the city's ETJ"); *City of Lucas v. North Texas Municipal Water Dist.*, 724 S.W.2d 811, 823 (Tex. App. – Dallas 1986, writ ref'd n.r.e.) ("Article 970a [recodified; now, § 212..002, 003(a)] confers authority upon a city to extend its subdivision ordinances to its extraterritorial jurisdiction. … Consequently, ordinances regulating development, such as those specifying design, construction and maintenance standards, may be extended by a

18

city into its extraterritorial jurisdiction").

## A.    The Statutes

The authority of Texas municipalities to apply their subdivision regulations to the ETJ is contained in the Local Government Code. Section 212.003 of the Local Government Code states in pertinent part:

**§ 212.003 Extension of Rules to Extraterritorial Jurisdiction**

(a) The governing body of a municipality by ordinance may extend to the *extraterritorial jurisdiction* of the municipality *the application of municipal ordinances* adopted under Section 212.002 … .

TEX. LOC. GOV'T CODE § 212.003(a) (emphasis added). Section 212.002 states in pertinent part that:

**§ 212.002    Rules**

[T]he governing body of a municipality may adopt *rules governing plats and subdivisions of land*…to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful *development* of the municipality.

TEX. LOC. GOV'T CODE § 212.002 (emphasis added). So, the Legislature by §§ 212.002 & .003 has authorized Texas municipalities to extend their subdivision rules for development to the ETJ.   There is also statutory authority authorizing municipal permits and updated, localized building codes in the ETJ. Section 214.212 of the Local Government Code states:

**§ 214.212  International Residential Code**

(a) To protect the public health, safety, and welfare, the International

19

Residential Code, as it existed on May 1, 2001, is adopted as a municipal residential building code in this state.

(b) The International Residential Code applies to all construction, alteration remodeling, enlargement, and repair of residential structures in a municipality.

TEX. LOC. GOV'T CODE § 212.002.[3] "Municipality" is defined as "a general-law municipality, home-rule municipality, or special-law municipality." TEX. LOC. GOV'T CODE § 1.005(3) (emphasis added). A "municipality" (including a general law municipality like Lakewood Village) may adopt later versions of the International Residential Code and also adopt local amendments. TEX. LOC. GOV'T CODE § 212.002(c), (d). Lakewood Village has done that. Read in conjunction with § 212.003 which authorizes Texas municipalities to extend subdivision rules for development "to the extraterritorial jurisdiction," § 214.904(a) authorizes Texas municipalities to extend their permitting and § 214.221 authorizes Texas municipalities to extend their residential codes for development to the "extraterritorial jurisdiction." Section 214.904(a) of the Local Government Code states:

This section applies only to a permit required by a *municipality* to erect or improve a building or other structure in the municipality or its *extraterritorial jurisdiction*.

Tex. Loc. Gov't Code § 212.904(a)(emphasis added).

---

[3] Section 214.212(a)-(c) requires municipalities across the state to adopt the International Residential Code ("IRC"). It imposes a mandatory uniform residential building code, as opposed to merely providing an optional code that cities may but are not required to adopt. Municipalities may adopt amendments to the IRC that are more restrictive than the standards in the IRC. Tex. Leg. Council, letter opinion September 19, 2003.

20

The Legislature also adopted the 2008 International Residential Code in unincorporated areas of virtually every county in the State (Tex. Loc. Gov't Code § 233.153(a)) *except* where a municipality has "adopted a building code in the municipality's extraterritorial jurisdiction," in which case, the building code adopted by the municipality controls. Tex. Loc. Gov't Code § 233.153(c). Section 233.153 expressly states the Legislature's intent that municipalities have the authorization to extend application of adopted building codes into their extraterritorial jurisdiction, to the exclusion of counties. This plainly demonstrates the ability of Texas municipalities to regulate construction in their ETJ through the application and enforcement of their adopted building codes.

Indeed, Denton County has recognized by unanimous court order that:

[I]f … construction occurs in the extraterritorial jurisdiction of a municipality that has adopted a building code for the municipality's extraterritorial jurisdiction, the *building code adopted by the municipality controls*[,] and building code standards under Subchapter F of Section 233.153 of the Texas Local Government Code [applicable to Texas counties] have *no effect* in that municipality's extraterritorial jurisdiction.

CR 215; DENTON COUNTY COMM. COURT ORDER NO. 10-0045 (emphasis added). The Denton County Court Order tracks exactly the language of Local Government Code § 233.153(c):

Subchapter F. Residential Building Code Standards Applicable to Unincorporated Areas of Certain Counties

If a municipality located within a county to which this subchapter

21

applies[4] has adopted a building code in the municipality's extraterritorial jurisdiction, the building code adopted by the municipality[5] controls….

Tex. Loc. Gov't Code §§ 233.153(c). Denton County recognizes this standard. The Denton County Department of Public Works, Engineering Division, issues a Notice to "Home Builders" and "Home Buyers" stating:

**Building in the Extra Territorial Jurisdiction ("ETJ")**

If you are building in the ETJ of a municipality that has adopted a building code for the municipality's ETJ, then *the builder follows the municipality's codes*.

[C.R. 213]. Thus, Texas municipalities rules, permits and codes may be extended for use in development in the ETJ pursuant to Local Government Code §§ 212.003(a), 212.904(a), and 233.153(c).

## B.    The Legislative Intent

Lest there be any doubt that the Legislature has authorized Texas municipalities to extend subdivision rules, permits and codes regarding development to the ETJ, the Court need look no further than the expressed

---

[4] Subchapter F applies to a county with a population of more than 100 or has adopted the provisions of Subchapter F. Denton County has a population of 694,100. *See* http://dentoncounty.com/Departments/Budget/Statistical-Information-Section/10-Year Population-History.apx.

[5] It is clear that the legislature refers to a municipality in a general sense, not solely a home-rule city to the exclusion of general law cities. When a statute only applies to a home-rule city, the legislature so indicates. *Compare* § 217.041 ("applies only to a home-rule municipality") with § 217.021 ("applies only to a Type B general-law municipality"). And again, "municipality" is defined as "a general-law municipality, home-rule municipality, or special-law municipality." TEX. LOC. GOV'T CODE § 1.005(3).

statutory intent contained in the foundational "Rules" statute, § 212.002. Rules that govern subdivisions are made to promote:

the safe, orderly, and healthy *development* of the municipality.

TEX. LOC. GOV'T CODE § 212.002. This intent is buttressed by § 42.001. The Legislature has declared, **as state policy**, that a municipality's ETJ is used to promote and protect the general health, safety, and welfare of persons residing in and adjacent to a municipality. TEX. LOC. GOV'T CODE § 42.001. Thus, the State charges municipalities to protect the public health, safety, and welfare in their ETJ. Development of a Texas municipality occurs in the adjacent ETJ, including by annexation. The plain meaning of the statutory intent of §§ 212.002 and 42.001 allows the same building standards to apply both in a city's limits and in its ETJ which may become part of the city. Otherwise, there would be an incongruity of building standards between a city's limit and in its ETJ.

The Supreme Court has further noted that the purpose of subdivision regulations is to "ensure that the subdivisions are *safely constructed* and to promote the *orderly development of the community*." *City of Round Rock v. Smith*, 687 S.W.2d 300, 302 (Tex. 1985) (emphasis added). When the purpose of legislative enactment is obvious from the language of the law itself, there is nothing left to construction. *Fitgerald v. Advanced Spine Fixation Systems*, 996 S.W.2d 864, 866 (Tex. 1999). The United States Supreme Court has also stated

23

that a court should not apply rules of construction to unambiguous language barring exceptional circumstances. *See Burlington Northern R.R. Co. v. Oklahoma Tax Comm.*, 481 U.S. 454, 461 (1987). The statutory purpose for authorizing subdivision rules for development is plain; it is allowed both in city limits and the ETJ. The statutory purpose supports Lakewood Village's injunctive relief.

Appellant points to failed HB 609 (Smith) 2007 in attempt to demonstrate that Texas cities do not have authority to extend building codes to their ETJ. *See* Appellant's ("Appt.") brief at 15. The argument lacks merit. Appellant seemingly distinguishes between the ability of home-rule cities and general law cities to extend their building codes into their ETJs. *See* Appt. brief at 8, 17. Under Appellant's view, home-rule cities have this power, but general law cities do not. The language of HB 609 cuts against the Appellant's argument. HB 609 makes no distinction between home-rule and general cities. It was written to apply to all Texas cities. *See* Appt. brief at appendix G. If general law cities were the only type of Texas city without express statutory authority to regulate in the ETJ, then HB 609 would have only been drafted to target solely general law cities, and not all types of cities. The language of this bill shows that all Texas cities are treated equally regarding the ETJ.

Moreover, the proposed bill may not have passed the legislature because it was unnecessary. The Legislature had already enacted a statutory basis for Texas

24

cities to extend their building codes to their ETJs. *See* Section I, A & B *supra*. The Legislature would have been acting uselessly if it passed the HB 609, and the Legislature is never presumed to act uselessly. *Hunter v. Fort Worth Cap. Corp.*, 620 S.W.2d at 551 (a cardinal rule of statutory construction is that the legislature is never presumed to do a useless or meaningless act.). Basically, the Appellant is asking this Court to interpret the rights of cities regarding the exercise of jurisdiction in their ETJ because of the failure of a bill. The Texas Supreme Court, however, has held that an appellate court cannot interpret legislative intent from the failure of a bill, reasoning:

> [W]e eschew guesswork, and a bill's failure to pass sheds no light because, as even casual Capitol observers know, bills fall short for countless reasons, many of them 'wholly unrelated' to the bill's substantive merits or 'to the Legislature's view of what the original statute does or does not mean.' Bills rise and fall for reasons both incalculable and inscrutable, and courts' reluctance to draw inferences from subsequent legislative inaction is deeply rooted, as explained by the United States Supreme Court a half-century ago: 'Such non-action by Congress affords the most dubious foundation for drawing positive inferences.... Whether Congress thought the proposal unwise ... or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress to act.' We, too, reject searching for confirmation or contradiction in later sessions' unsuccessful bill drafts. As non-adoption infers nothing authoritative about an earlier statute's meaning, we do not consult failed bills to divine what a previous Legislature intended.

*Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 470–71 (Tex. 2009) (footnote references omitted). This Court should decline the Appellant's invitation to use failed HB 609.

### C. Local Government Code § 212.049 does not apply to the Town

Appellant argues that § 212.049 of the Local Government Code prevents the Town from regulating its building codes within its ETJ, but that is simply not the case. Two subchapters in Local Government Code chapter 212 govern platting — subdivision plats subchapter A and development plats in subchapter B. *See* TEX. LOC. GOV'T CODE § 212.042. The Town is governed by subchapter A, including §§ 212.002 & .003. A municipality may also choose to be governed by subchapter B, the development plats statutes, which formerly applied only to the city of Houston.[6] Development plats in subchapter B are different than the traditional plats in subchapter A in that development plats are not for subdividing land into multiple lots.[7] To be governed by subchapter B (in which § 212.049 is located), the provisions of subchapter B have to be specifically invoked and affirmatively adopted by ordinance. TEX. LOC. GOV'T CODE § 212.041. The

---

[6]   As first enacted, this law was applicable to any "unzoned city" with a population exceeding 1.5 million. *See*  BROOKS, TEXAS MUNICIPAL LAW AND PRACTICE §21.03 n. 78, *citing* Acts 1985, 9th Leg., p. 2187, ch. 568.

[7]   Subchapter A is entitled "Regulation of Subdivisions" and Subchapter B is entitled "Regulation of Property Development." An owner who has filed a subdivision plat to create lots under Subchapter A cannot also be required to file a development plat under Subchapter B. § 212.045(d). The two types of plats, and two subchapters, are conspicuously different.

26

Town has not adopted subchapter B, so its provisions simply do not apply.[8]

The structure of subchapters A and B is also telling. Section 212.049, which "does not authorize [a] municipality to require municipal building permits or otherwise enforce the municipality's building code" in the ETJ, is located in subchapter B. But the Legislature did not enact a similar provision like § 212.049 in subchapter A, which is the subchapter utilized by Lakewood Village. This omission further demonstrates that regulation of codes and permits is allowed in the ETJ, especially given that the Legislature plainly allows ETJ permits in § 214.904(a) and § 233.153(c).  Further, on its face, the Sunrise Bay subdivision plat fails to meet the content requirement for development plats set forth in §212.045(b)(1) of Subchapter B which requires a development plat to show "each existing or proposed building, structure, or improvement or proposed modification of external configuration of a building, structure, or improvement involving a change of the building, structure, or improvement . . . ." Reviewing the Sunrise Bay plat, alone, demonstrates it is a Subchapter A traditional plat.

### D.    Local Government Code § 212.007 does not apply to the Town

The Appellant's Property is a tract of land located in the Sunrise Bay subdivision. The Property is located exclusively within the Lakewood Village ETJ.

---

[8]    Development plats deal with development and construction of property that is not subdivided. Here, the Property has been subdivided by plat. So, development platting rules are not applicable to the Property, even if the Town had adopted subchapter B.

27

This is undisputed. [C.R. 125]. Appellant argues that Local Government Code § 212.007 applies to the Property. It does not. Section 212.007 only applies when a tract of land is located in two or more ETJ's of municipalities. Here, the Property is only in the ETJ of Lakewood Village. Although the subdivision is located partly in the ETJ of Little Elm and partly in the ETJ of Lakewood Village, the "tract" of Property at issue is located only in Lakewood Village's ETJ. Therefore, § 212.007 does not apply. Lakewood Village has authority over the Property, not Little Elm.

Appellant argues that because the original Sunrise Bay plat was approved by Little Elm over 15 years ago, that the Town is prohibited from exercising authority in its undisputed ETJ today. This argument is not supported by the language of §212.007 which speaks only to plat approval and not to the application of building codes and ordinances which are addressed by other statutory provisions as discussed herein. Local Government Code § 214.904(a), § 233.153(c) and Denton County have given the Town the exclusive authority to apply its building codes and permit requirements in its ETJ. The Town is not seeking to apply platting regulations. Rather, it seeks to enforce its building codes.

E. **Adoption of the International Residential Code does not limit the Town's authority in the ETJ**

Appellant also argues that § 214.212, by requiring municipalities to adopt the International Residential Code, somehow limits a Texas municipality's building code authority to its city limits only. *See* Appt. brief at 14. There is no

limiting language contained in § 214.212; however, the Legislature does state under a section titled "Time for Issuance of Municipal Building Permit:"

> This section applies only to a permit required by a municipality to erect or improve a building or other structure in the municipality *or its extraterritorial jurisdiction*.

TEX. LOC. GOV'T CODE § 214.904(a) (emphasis added). Appellant's interpretation is contrary to the Legislature's express handling of adoption of residential building codes in a municipality's extraterritorial jurisdiction. TEX. LOC. GOV'T CODE § 253.153(c). If Texas municipalities are unable to extend subdivision rules and building codes to their ETJ, as Appellant contends, then these provisions written by the Texas Legislature, §§ 214.904(a) and 253.153(c), would be both futile and useless. The Appellant's argument runs afoul of settled statutory construction and the Texas Legislature. *See City of LaPorte v. Barfield,* 898 S.W.2d 288, 292 (Tex.1995) (citing *Chevron Corp. v. Redmon,* 745 S.W.2d 314, 316 (Tex.1987) (courts "will not read statutory language to be pointless if it is reasonably susceptible of another construction."); *Acker v. Tex. Water Comm'n,* 790 S.W.2d 299, 300 (Tex.1990); *Hunter v. Fort Worth Cap. Corp.,* 620 S.W.2d 547, 551 (Tex.1981) (a cardinal rule of statutory construction is that the legislature is never presumed to do a useless or meaningless act). Sections 214.904(a) and 233.153(c) are specific statutory authority that building codes are authorized in the ETJ. The Appellant's argument is without merit.

29

It should also be declined for a second reason — it is contrary to the established principle that the public interest is to be favored over any private interest. TEX. GOV'T CODE § 311.021(5). Thus, the Town's responsibility to enforce its subdivision rules and building codes to promote and protect the health, safety, and welfare of persons in the Sunrise Bay subdivision (or other subdivisions) should be, by statute, favored over any single property owner in a subdivision. If Appellant's argument prevailed, a single property owner's interest would predominate over the interest of all Texas municipalities. This is not, and should not, be the law. The position advocated by the Appellant runs counter to the Texas Legislature's enactments and statutory intent.

**F.    The Cases: *City of Boerne* and *City of Runaway Bay* do not apply; *City of Lucas* and *City of Weslaco* are instructive**

Appellant cites the case of *City of San Antonio v. City of Boerne* for the premise that the authority of a county does not extend beyond the express grant of a statute regarding roadway annexation.111 S.W.3d 22 (Tex. 2003). *Boerne* is distinguishable. The issue at hand has nothing to do with a county's abilities or with a county's roadway power. It is also distinguishable because the issue in *Boerne* was one of general control versus a specific annexation authority. The Court in *Boerne* noted that "petitioning a municipality to annex portions of county roads is *unrelated* to a commissioner's court's specific duty to ensure safe travel." *Id.* at 28-29 (emphasis added).  The issue at hand deals with the exercise of

authority to ensure safe construction by enforcement of building codes for the safe, orderly, and healthy development of a municipality in its ETJ, as authorized by Tex. Loc. Gov't Code § 212.002, .003, and to promote and protect the general health, safety, and welfare of persons residing in and adjacent to a municipality in the ETJ, as authorized by TEX. LOC. GOV'T CODE § 42.001. In other words, the issues are related. The idea espoused by Appellant that *Boerne* implicitly overrules, without mentioning, *City of Lucas* (discussed below) is erroneous.

Appellant also cites a case from this Court in attempt to support the proposition that a general law city may not extend its building code regulations to its ETJ. *Rhino Real Estate Investments, Inc. v. City of Runaway Bay*, No. 02-08-00340-CV, 2009 WL 2196131 (Tex. App.—Fort Worth July 23, 2009, no pet.). This Court made no such determination in *Rhino*. The Court instead determined that the city of Runaway Bay had not adopted an ordinance that extended its building codes to its ETJ. *Id.* at **4 & n.4. Because the ordinance did not actually extend building codes to the ETJ, the issue of whether a city had authority to extend its building codes to its ETJ was never reached. *Id.* But this Court did cite to *Milestone Potranco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—San Antonio 2009, pet. denied) noting that the city of San Antonio had extended application of a "Tree Ordinance" that was related to rules governing plats and subdivisions in the ETJ. *Id.* at n. 4. In *Milestone*, the

31

San Antonio Court of Appeals determined that a tree preservation ordinance properly extended to and was enforceable in the city's ETJ. Appellant attempts to use this case to show that the codes which are extended have to be "commiserate" with the Town's platting authority. *See* Appt. brief at 12, 21. This premise is exactly what the court in *Milestone* rejected. When faced with a similar challenge of authority as here, the San Antonio court indicated that the tree preservation ordinance was a "rule governing plats and subdivisions of land that a municipality is authorized to adopt as rules that promote health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality." *Milestone Potranco Dev. Ltd.*, 298 S.W.3d at 244. The rationale adopted by the San Antonio court for enforcing a tree preservation ordinance in the ETJ is the exact same rationale Lakewood Village urges this Court to use for enforcing subdivision rules and building codes in its ETJ. This rationale has been approved by the Supreme Court in *City of Round Rock v. Smith*, 687 S.W.2d 300, 302 (Tex. 1985) (determining the purpose of platting and subdivision regulations was to "ensure that subdivisions are safely constructed and to promote the orderly development of the community").[9]

---

[9] The importance of inspections is no more evident than in the case of the city of West, Texas, a general law city. A fertilizer plant and several residential areas were located within the city's ETJ. Despite fines by state and federal authorities on certain issues, the plant lacked true oversight by any local authority. See Fernandez, Manny (2014-04023), "Lack of Oversight and Regulations Blamed in Texas Chemical Explosion." http://www.nytimes.com/2014/04/23/us/lack-of-oversight-and-regulations-blamed-in-texas-

The case involving the city of Lucas applying its building codes to the ETJ is directly on point. *City of Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 823 (Tex. App.—Dallas, 1986, writ ref. n.r.e.). Lucas, a general law town, applied its city ordinances involving subdivision rules to its ETJ. The North Texas Municipal Water District sought to construct a wastewater treatment plant on a 75 acre tract within Lucas's ETJ. The water district argued that Lucas's subdivision rules did not apply to its ETJ. The Dallas Court of Appeals disagreed. *Id.* at 817. It held that the former TEX. REV. CIV. STAT. ANN. art. 970a §4 [recodified at TEX. LOC. GOV'T CODE §§ 212.002, .003] confers authority upon a city to extend its subdivision ordinances into its ETJ. *Id.* at 817, 823. Art. 970a §4 stated: "the governing body of any city may extend by ordinance to all of the area under its extraterritorial jurisdiction the application of such city's ordinance establishing rules and regulations governing plats and subdivisions of land." *Id*. at 817. This is the same enabling language of §§ 212.002 & .003 of the Local Government Code under which the Town derives its authority. *Lucas* specifically

chemical-explosion.html. Moreover, the houses nearby had no building oversight. The city of West had no building inspection department or adopted codes and no building code or fire code extended to its ETJ. *See* http://www.cityofwest.com/city-services/planning-and-zoning; http://www.texasobserver.org/report-firefighter-deaths-west-fertilizer-plant-explosion-prevented. Tragically, the fertilizer plant blew up, and hundreds of houses within the blast radius suffered much more property damage and citizens suffered much more personal injury than necessary due to faulty construction of developers that failed to comply with uniform building codes since there were no inspections during construction. *See* "Lessons Learned from West: How Construction Impacted Structure Damage," Building Official Association of Texas Presentation at City of Irving Code Summit 2014.

holds that "ordinances regulating development, such as those specifying design, construction and maintenance standards, may be extended by a city into its extraterritorial jurisdiction." *Id*. at 823. Notably, the Dallas Court of Appeals stated:

> Were we to hold that building standards are not contemplated by article 970a, we would be left with a statute that grants authority over the laying out of streets, alleys and lot boundaries, but precludes authority over the most important part of a subdivision. Consequently, we conclude that the power over subdivisions conferred by article 970a necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof. *Id*. at 823-824.

The Corpus Christi Court of Appeals came to the same conclusion in *City of Weslaco v. Carpenter*, 644 S.W.2d 601, 603 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). The city of Weslaco sought to permanently enjoin a landowner from constructing a mobile home park located within the ETJ. Weslaco had extended its subdivision rules to the ETJ, including for "construction," "permits," "licensing," and "inspections." *Id.* at 602. Art. 970a [now, §§ 212.002, .003] authorized rules regarding "subdivision of land" to be extended to the ETJ. *Id.* at 602. Because the word "subdivision" is not defined by statute, the Corpus Christi court found: "The normal, common-sense meaning of the term 'subdivision' is expressed in Black's Law Dictionary (5th ed. 1979) as '[d]ivision into smaller parts of the same thing or subject-matter. The division of a lot, tract or parcel of land into two or more lots, tracts, parcels or other divisions of land for sale *or*

34

*development.*'" *Id.* at 603 (emphasis in original). The court noted that it had similarly found in *Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Civ. App. – Corpus Christi 1968, writ ref'd n.r.e.) that "subdivision of land" includes for *development purposes*. *Id.* at 603. It was also important that the provision of subdivision rules in the ETJ comported with the legislative findings "to promote and protect the general health, safety and welfare of persons residing within and adjacent to cities of the state… ." *Id.* at 603. The Corpus Christi court, finding that Weslaco's subdivision rules apply to the ETJ, mandated that an injunction issue in favor of the city of Weslaco:

> The injunction sought by [Weslaco] arises not only from proper interpretation of pertinent statutes and ordinances but also as a valid exercise of [Weslaco's] police power, which by its very nature involves the regulation of subdivision development 'to prevent the use thereof in a manner that is detrimental to the public interest. The police power may be loosely described as the power of the sovereign to prevent persons under its jurisdiction from conducting themselves or using their property to the detriment of the 'general welfare.'

*Id.* at 604 (citations omitted). [10] This same reasoning, the application of the Legislature's intent, and the exercise of police power applies to this case. Just as

---

[10] Texas courts have repeatedly upheld the ETJ subdivision regulation principle in other contexts. In *City of Austin v. Quick*, 930 S.W.2d 678, 689-90 (Tex. App. – Austin 1996), the Austin court of appeals upheld the city of Austin's application of its watershed pollution standards as regulations to the ETJ. This holding was affirmed by the Texas Supreme Court. *Quick v. City of Austin*, 7 S.W.3d 109, 121 (Tex. 1998). This same principle has also been acknowledged by the federal Fifth Circuit Court of Appeals in New Orleans. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167, 170 n. 2 (5th Cir. 1996)("Texas law allows municipalities to enact water quality standards applicable to the preservation and development of lands outside of the municipalities' corporate limits, in an area referred to as the

35

Dallas and Corpus Christi courts have found that a city's building standards apply to the ETJ, this Court too should make the same finding. And it is notable that the Appellant has no contrary authority to *Lucas* and *Weslaco* on point.

**G. Regulation of subdivision rules in the Town's ETJ is a valid exercise of police power**

All property is held subject to the valid exercise of the police power. *See City of College Station v. Turtle Rock Corp.,* 680 S.W.2d 802, 804 (Tex.1984) ; *Woodson Lumber Co. v. City of College Station,* 752 S.W.2d 744, 746 (Tex.App.—Houston [1st Dist.] 1988, no writ). A city may enact reasonable regulations to promote the health, safety, and general welfare of its people. *Turtle Rock Corp.,* 680 S.W.2d at 805. The United States Supreme Court has stated, "government regulation — by definition — involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property." *Andrus v. Allard,* 444 U.S. 51, 65 (1979). As Justice Holmes stated in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413 (1922): "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied

municipalities 'extraterritorial jurisdiction'"). In *Levy v. City of Plano*, 2001 WL 1382520 (Tex. App. – Dallas 2001, no pet.), the Dallas Court of Appeals stated the city of Plano's subdivision regulations applied to the ETJ. In *Milestone Potranco Dev. v. City of San Antonio*, 298 S.W.3d at 245, the San Antonio Court of Appeals upheld San Antonio's tree preservation ordinance in the ETJ. These holdings further solidify Lakewood Village's position.

limitation, and must yield to the police power." Many Texas municipalities extend the application of their subdivision regulations to their ETJ. *See* City of Fate, Code of Ordinances § 38-2; City of Heath, Code of Heath § 158.01; City of Double Oak, Code of Ordinances § 10.101; City of Highland Village, Highland Village Subdivision Ordinance § 1.1; City of Copper Canyon, Copper Canyon Subdivision Ordinance § 1.1; City of Lewisville, Code of Ordinances §§ 6-23, 6-24; City of Denton, Development Ordinance § 35.16.3 (in Denton County).[11] It is entrenched in Texas jurisprudence that a city may, as a valid exercise of its police power, enact reasonable regulations for the purpose of promoting the health, safety, and general welfare of its people. *City of Brookside Village v. Comeau,* 633 S.W.2d 790, 792 (Tex.1982), *cert. denied,* 459 U.S. 1087 (1982); *City of College Station v. Turtle Rock Corporation,* 680 S.W.2d 802, 805 (Tex.1984) ; *Ex parte Woodall,* 154

_____

[11] *See also* City of Keller, Unified Development Code § 2.03; City of Plano, Subdivision Ordinance § 1.5; City of Haslet, Subdivision Ordinance § 10.04.031; City of Weatherford, Code of Ordinances § 11-1-4; City of Hudson Oaks, Subdivision Ordinance § 1.02; City of Granbury, Subdivision Ordinance § 1.5; City of Waco, Subdivision Ordinance, Appendix B §§ 1.3, 1.5; City of Hillsboro, Subdivision Ordinance, § 1; City of Sherman, Code of Ordinances, Chapter 10 (Subdivision Regulations) Exhibit A (Subdivision Ordinance); City of Gainesville, Code of Ordinances, Appendix B (Subdivisions); City of Round Rock, Code of Ordinances § 36-3; City of McKinney, Development Regulations § 142-4; City of Celina, Code of Ordinances § 10.03.004; City of Abilene, Land Development Code § 1.1.1.3; City of Stephenville, Subdivision Ordinance § 1.13; City of Henderson, Subdivision Ordinance § 1; City of Whitehouse, Design Guidelines for Subdivision Improvements in Whitehouse, Texas and Extra-territorial Jurisdiction; City of Azle, Subdivision Ordinance § 1.5; City of Bee Cave, Code of Ordinances § 30.01.001; Town of Fairview, Code of Ordinances § 10.02.001; City of Pilot Point, Code of Ordinances § 10.02.003; City of Pittsburg, Code of Ordinances § 10.02.001; City of Grandview, Code of Ordinances § 48-1; City of Sugarland, Land Development Code § 5-1; City of New London, Code of Ordinances, Appendix A (Subdivisions), § 1; City of Abernathy, Code of Ordinances § 10.02.002; City of Colorado City, Code of Ordinances, Chapter 10 (Subdivision Regulations) Exhibit A; and City of Gunter, Code of Ordinances, Chapter 10 (Subdivision Regulations), Exhibit A (Subdivision Ordinance) § 1.3 (Authority).

S.W.3d 698, 702 (Tex. App.—El Paso 2004, pet. ref'd). Such police power occurred here. Lakewood Village extended its subdivision rules and building codes to the ETJ as a valid exercise of police power. These rules and codes should be enforced.

## III. Appellant has no vested rights in a 1995 plat

Appellant insists that he has accrued vested rights in a plat filed in 1995, which would allegedly exempt Appellant from the Town's building regulations. For this argument, defendant relies on TEX. LOC. GOV'T CODE § 245.002(b): "A project that requires a series of permits or approvals in order to reach completion is to be governed by the rules in effect at the time of the first permit in that series…." TEX. LOC. GOV'T CODE § 245.002(b). The Appellant's theory is misplaced for several reasons: outdated, decades-old building codes do not apply; the county does not regulate building, plumbing, mechanical, and electrical safety and would therefore leave the area subject to little regulation or oversight whatsoever; the plat was never filed with Lakewood Village; Lakewood Village's building codes are exempt from the vested rights statute; Lakewood Village did not have fair notice of the plat; and the Appellant has not properly pursued vested rights.

### A. The Town's subdivision rules are exempt from the vested rights statute

Texas has a vested rights statute in Local Government Code chapter 245. It does not apply here. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats must be considered collectively to be one series of permits for a "project." TEX. LOC. GOV'T CODE § 245.002(b); *Save Our Springs Alliance v. City of Austin*, 149 S.W.3d 674 (Tex. App.—Austin 2004, no pet.); TEX. ATTY GEN. OP. JC-0425 (2001). The term "project" is defined in chapter 245 as an "endeavor over which a regulatory agency exerts its jurisdiction and for which one or more permits are required to initiate, continue, or complete the endeavor." TEX. LOC. GOV'T CODE § 245.001. A plat for the Sunrise Bay subdivision was filed and approved by Denton County and the town of Little Elm in 1995. The plat was never filed with, or approved by, Lakewood Village. The plat's existence was not known by the Town until this lawsuit, some 19 years later. [2 R.R. 60-61, 135]. Appellant claims that the plat is the first permit in a series of permits. *See* Appt. brief at 23. The subdivision or platting of land is a different project than the vertical construction on existing lots. *FM Properties Operating Co. v. City of Austin*, 93 F.3d 167 (5th Cir. 1996) (interpreting former Tex. Gov't Code Ch. 481, the predecessor to Tex. Loc. Gov't Code Ch. 245, which states the same language). The court in *City of Austin* reasoned:

> If any action were to freeze development regulations…a developer would not have to build in accordance with the latest building, fire,

39

plumbing, mechanical, or electrical codes, but would be permitted to build under codes that might be years old. In addition, the developer would not be required to comply with drainage and watershed regulations. This would result in shoddy development and create an obvious public safety problem which could expose the developer, and possibly the City, to liability for personal injury. This result is contrary to the public interest in health, safety, and welfare. *Id.* at 170.

This theory of outdated building codes was called into question by the *Hartsell* case on which the Appellant relies. *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, reh. den.).[12] The Dallas Court of Appeals addressed the concern of using outdated building codes, stating "Chapter 245 addresses this concern in other sections…. See Tex. Local Gov't Code Ann. § 245.004-245.005(Vernon Supp.2004)(Chapter 245 does not apply to permits more than two years old for construction of building for human occupation where regulation at issue adopts only uniform building or similar code…)." *Id*. at 328.

Section 245.004 provides exemptions to the applicability of the vested rights state, chapter 245.  For example, § 245.004 states:

"§ 245.004 Exemptions

This chapter does not apply to:

(1)     A permit that is at least two years old, is issued for the construction of a building or structure intended for human occupancy or habitation, and is issued under laws, ordinances, procedures, rules or regulations adopting only:

---

[12] Significantly, *Hartsell* held that *"ordinances regulating development, such as those specifying design, construction and maintenance standards may be extended into a city's extraterritorial jurisdiction." Id.* at 328.

(A) Uniform building, fire, electrical, plumbing, or mechanical codes adopted by a recognized national code organization; or

(B) Local amendments to those codes enacted solely to address imminent threats of destruction of property or injury to persons;

TEX. LOC. GOV'T CODE § 245.004. Assuming, for purposes of argument, that the Town is bound by a plat it had no notice of, then the plat from 1995 is well over two years old and would be subject to the Town's current building codes. The Town adopted the International Residential Code, Building Code, Plumbing Code, Mechanical Code, Energy Code, Fuel and Gas Code, Property Maintenance Code National Electrical Code, International Fire Code and applied all of these uniform codes to its extraterritorial jurisdiction via ordinance. These codes are uniform codes as described in § 245.004(1)(A), which were adopted by the International Code Council. Several of these codes and ordinances address imminent threats of destruction of property or injury to persons as well. For example, Ordinance 11-16 is a local amendment to the National Electric Code and provides that the conductors used to conduct current must be a minimum size of 12 AWG copper. [C.R. 341 (Ord. 11-16 (p. 22), Sec. 8, Ch. 33, Sec. E3306.2-.3)]. This is a stricter guideline than the IRC made for safety to prevent imminent destruction and personal injury. The County does not regulate this issue, so absent the Town's regulation, it would be unregulated. Likewise, § 245.004(11) exempts

"regulations to prevent the imminent destruction of property or injury to persons…." if the regulations do not affect zoning issues. The Town's regulations have nothing to do with zoning issues[13] and are made to promote the public health, safety, and welfare of the citizens of the Town and the extraterritorial jurisdiction of the Town. [C.R. 265(Preamble, Ordinance No. 10-01)]. Another exemption, § 245.004(6) allows fees imposed in conjunction with development permits. Lakewood Village charges fees for building permits within its ETJ that are necessary to offset the costs of this regulation. All fees are exempt from the vested rights statute. Thus, Lakewood Village's uniform residential codes with local amendments apply to the Property; the vested rights statute utilizing almost 20 year old standards in this case does not apply.

## B. The Town considers an application for a permit based on regulations in effect on that date

Section 245.002(a) states "*[e]ach* regulatory agency shall consider the approval…." TEX. LOC. GOV'T CODE § 245.002(a)(emphasis added). This section indicates that there is a difference for filing with each individual regulatory agency (i.e., each city, each county). In *Shumaker Enterprises, Inc. v. City of Austin*, the

---

[13] In contrast to subdivision regulation power, and for clarification, Texas municipalities do not possess the statutory authority to zone property (*i.e.*, regulate the height, number, bulk or size of buildings) in their ETJ. Tex. Loc. Gov't Code § 212.003(a)(1)-(5). The legislative history of House Bill 3187, which amended Section 212.003, stated it "prohibits the application of zoning regulations in ETJ areas." COMMITTEE ON URBAN AFFAIRS, BILL ANALYSIS, Tex. H.B. 3187, 71st Leg., R.S. (1989).

42

Austin Court of Appeals ruled that filing an application with one regulatory agency (in *Shumaker* it was a county, as here), does not "freeze" or "vest" the regulations as to another regulatory agency (in *Shumaker* it was a city, as here). 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.).[14] The court stated, "under the plain language of the statute, therefore, the city must consider the application for a city permit solely on the basis of the requirements in effect at the time the application *to the city* was filed." *Id*. at 815. In *Shumaker*, the application to the city of Austin was filed July 1, 2005, and the regulations for Austin in effect on July 1, 2005, were to be applied. *Id.* at 814-15. Here, the Appellant filed a site plan application with Lakewood Village on January 27, 2014. [C.R. 109-111]. Under § 245.002(a) and *Shumaker*, Lakewood Village is entitled to enforce its regulations in effect on January 27, 2014 (its current regulations).

The *Hartsell* case, on which Appellant relies, is distinguishable because it involves a plat filed with the town of Talty and building regulations of the same town. In *Hartsell*, the town of Talty had an ordinance in place regulating the filing of plats. 130 S.W.3d at 326. The developer filed a plat with the Town, which the

---

[14]   The Dallas Court of Appeals rejected an owner's somewhat similar vesting argument in *2218 Bryan St., Ltd. v. City of Dallas,* 175 S.W.3d 58 (Tex. App.—Dallas 2005, pet denied). The *Bryan* case involved an owner who submitted an application for demolition during a moratorium while the city of Dallas was contemplating an historic overlay district.  The district was passed and Dallas denied the application.  There was no vesting because the original permit application was not "accepted" and therefore not "filed" as required by Chapter 245.  *Id.* Because the 1995 plat was never filed with the Town in this case, it did not provide an avenue for vested rights with the Town.

43

Town first approved on January 10, 2001. *Id.* The town subsequently enacted an ordinance extending its building codes into its ETJ effective December 1, 2002. *Id.* The developer then filed a suit against Talty seeking declaratory relief that it was not subject to the building code ordinance, which the court agreed. This set of facts is completely different from the present case. First, in *Hartsell* the plat was only one year old when the ordinance was passed, so the exemption under § 245.004 (1) did not apply; whereas, in this case, this exemption plainly applies. Second, the plat in this case was filed with Denton County and Little Elm, not with the Lakewood Village, which is a different regulatory agency than the County or Little Elm under § 245.002. *Hartsell* does not apply.

## C. The Town had no fair notice of the plat filing

The Austin court in *Shumaker* additionally held that the filing of a permit with a different regulatory agency does not provide fair notice to another regulatory agency as required under the vested rights statute. 325 S.W.3d at 815. Not only did the Appellant's predecessor developer file the plat with a different regulatory agency, but it failed to give the Town fair notice of the plat. Under chapter 245, vested rights only accrue on the filing of an original application or plan for development or plat application that "gives the regulatory agency fair notice of the project and the nature of the permit sought." TEX. LOC. GOV'T CODE § 245.002(a-1). When the plat was filed in 1995, the Town was never given any

44

type of notice regarding the plat filing. [2 R.R. 60-61, 135]. By his own pleadings, Appellant elected to forego a Town permit. *See* Appt. brief at 2 ("Although Bizios and his contractor Alan Hoffman had discussions in early 2014 about applying for a building permit from the Town, they elected to commence construction without a permit.").[15] The Town secretary diligently searched the Town records, agendas, and meeting minutes and found no evidence that the Town had received any type of notice regarding the plat that was filed to determine that there was no notice provided of the plat, especially prior to the adoption of the ordinance that extended the Town's building codes into its ETJ. [2 R.R. 61]. Pursuant to § 245.002(a-1), the Town is not bound by any 1995 vested rights under the plat.

## D. The Appellant cannot assert vested rights

Vested rights can only be asserted by mandamus, declaratory or injunctive relief. TEX. LOC. GOV'T CODE § 245.006. The Appellant has not asserted these claims. By statute, the appellant's vested rights issues cannot be addressed.

## CONCLUSION & PRAYER

The Town demonstrated a probable right to relief and the trial court's grant of a temporary injunction should be affirmed. Appellee met its burden with undisputed evidence. Texas Municipalities have statutory authority to extend their

---

[15] Appellant makes some statements about the cost of a permit from the Town. *See* Appt. brief at 5. The Town was prepared to present evidence demonstrating the reasonableness of its permitting costs, but trial court ruled that this evidence was inadmissible. [3 R.R. 23-24]. This ruling has not been challenged on appeal, is waived, and should therefore not be considered.

subdivision rules for development to the ETJ under the Local Government Code. *City of Lucas* and *City of Weslaco* also provide clear authority stating so. The authority is based on sound public policy that promotes and protects the general health, safety, and welfare of persons residing in and adjacent to a municipality. TEX. LOC. GOV'T CODE § 42.001. Regulation of subdivision rules in the Town's ETJ is a clear and valid exercise of police power. Moreover, Appellant does not have any 1995 vested rights as a matter of law. Therefore, the temporary injunction should be affirmed.

For the reasons stated, appellee Town of Lakewood Village requests this Court to affirm the trial court's order granting the Town' temporary injunction. The Town requests costs and all other relief to which it may be entitled.

Respectfully Submitted,

*/s/ Wm. Andrew Messer*
**WM. ANDREW MESSER**
STATE BAR NO. 13472230
andy@txmunicipallaw.com
**JENNIFER W. DECURTIS**
STATE BAR NO. 24045767
jennifer@txmunicipallaw.com
**BRENDA N. MCDONALD**
State Bar No. 14993300
brenda@txmunicipallaw.com
**MESSER ROCKEFELLER & FORT, PLLC**
6351 PRESTON ROAD, SUITE 350
FRISCO, TEXAS 75034
972.668.6400 - TELEPHONE
972.668.6414 - FACSIMILE
COUNSEL FOR APPELLEE

46

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing instrument has been sent via electronic service to all attorneys of record, in compliance with Rule 6.3 of the TEXAS RULES OF APPELLATE PROCEDURE, on August 8, 2014.

*/s/ Wm. Andrew Messer*
**WM. ANDREW MESSER**

**CERTIFICATE OF COMPLIANCE**

This is to certify that this document contains 12,995 words in compliance with Texas Rule of Appellate Procedure 9.4(i)(3).,

*s/ Wm. Andrew Messer*
**WM. ANDREW MESSER**

TAB A

# TOWN OF LAKEWOOD VILLAGE
## OFFICIAL MAP





FORMS SURVEY

3960 Spinnaker Run Pointe

SCALE
1" = 60'

LOT 82

LOT 83

Subdivision
Boundary

522'
Elev line

SPINNAKER RUN POINTE
(60' R.O.W.)

F.I.R.

N 55°07'13" E
91.30'

20' SLOPE ESMT. & UTIL. ESMT.

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

S 43°20'43" E 585.89'

TBM SET
500 IN TREE

F.I.R.

85.85'

F.I.R.
Top of
bank

U.S.A.
Lake Lewisville Resorvoir

S 04°53'49" W 269.66'

F.I.R.

FR=560.6'

N 55°07'13" E 116.30'

304.6'

25.0'
14.0'

64.0'
15.5'
33.6'
18.0'
91.6'
5.8'

16.4'

FORMS
3960 Spinnaker
Run Pointe
top of forms = 540.04'

Lot 84
Block 1
109,072 sq. ft.
2.50 acres

Zone "X"
(Unshaded)

24.0'
27.8'

4.0'
5.7'
24.5'
19.1'
13.5'

537' Line as located
on the ground.

Top of
bank

Zone "AE"

54.3'

N 38°21'36" W 491.89'

Er=561.5'

F.I.R.

10' UTIL. & DRNG. ESMT.
10' UTIL. & DRNG. ESMT.

N 34°54'11" W 295.77'

C.O.E.
MON.

Subdivision
Boundary

U.S.A.
Lake Lewisville Resorvoir

50' BLDG. LINE

Lot 85

F.I.R.

LEGEND -C.M.- Controlling Monument; F.I.R.- Found Iron Rod; F.I.P.- Found Iron Pipe; F.C.P.- Fence Corner Post, OHE- Overhead Electric. S.I.R.- Set Iron Rods 1/2" diameter with yellow cap stamped "Arthur Surveying Company". All found iron rods are 1/2" diameter unless otherwise noted. —x— (fence/ ₵ post) — OHE — (overhead power)

FLOOD NOTE: It is my opinion that the property described hereon is partially within the 100-year flood zone area according to the Federal Emergency Management Agency Flood Insurance Rate Map Community Panel No. 481132 0415 G, present Effective Date of map April 18, 2011, herein property situated within Zone "X" (Unshaded), Zone "AE".

PROPERTY DESCRIPTION: Lot 84, Block 1 of Sunrise Bay at Lake Lewisville, an addition to the Town of Little Elm, Denton County, Texas, according to the Plat thereof recorded in Cabinet L, Page 224, Plat Records of Denton County, Texas.

| Date: | 03/07/14 |
| ASC No. | 140375 |
| Drawn/Chk | L.G. / D.L.A. |
| Client | Harry Bizios |

Harry Bizios

ARTHUR Surveying Company

Arthur Surveying Co, Inc
Professional Land Surveyor

LEWISVILLE
220 Elm St., # 200
Lewisville, TX 75057
Ph. 972.221.9409
TBPLS 10053800

Note:
• This survey was prepared without the benefit of a title search, therefore no search of recorded easements was performed on subject property. The purpose of the survey is to locate forms on shown property, therefore all other improvements may not be shown.
• The bearings shown hereon are based on the above referenced recorded map or plat unless otherwise noted.
• Distances shown are relative to this site.

STATE OF TEXAS
REGISTERED
DOUGLAS L. ARTHUR
4357
PROFESSIONAL
LAND SURVEYOR

TAB B

# STOP WORK ORDER

**3950 Spinnaker Run Pl.**

IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE

AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.

COMMENTS:  Building Ordinance 11-16
obtain proper permits

TOWN OF LAKEWOOD VILLAGE, TEXAS
972-294-5555

DATE POSTED.  03/13/14  Town Representative

THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.

164

# STOP WORK ORDER

### 3950 Spinnaker Run Pt.

## IT IS A MISDEMEANOR TO CONTINUE WORK UNTIL FURTHER NOTICE

## AN INSPECTION OF THIS PROPERTY HAS INDICATED THAT IT IS IN VIOLATION OF TOWN ORDINANCE AS INDICATED BELOW. ALL WORK IS ORDERED TO STOP UNTIL THE CORRECTIVE ACTION INDICATED BELOW IS PERFORMED.

COMMENTS:  __Building Ordinance 11-16__

__obtain proper permits__

### TOWN OF LAKEWOOD VILLAGE, TEXAS
### 972-294-5555

DATE POSTED: __03/14/14__  Town Representative: _____

## THIS ORDER CAN ONLY BE REMOVED BY AN AUTHORIZED AGENT OF THE TOWN OF LAKEWOOD VILLAGE.

161

TAB C



03/13/14    17:36



03/13/14    17:36
179



# TAB D







185



03/14/14 13:11

186

TAB E

STATE OF TEXAS     )

                         )     **CERTIFICATE TO COPY OF PUBLIC RECORD**

COUNTY OF DENTON   )

I hereby certify, in the performance of the functions of my office, that the attached instrument is a full, true and correct copy of the Extra Territorial Jurisdiction Subdivisions Map as of August 5, 2014. The same appear of record in my office and said document is the official record from the public office of the Town Secretary of the Town of Lakewood Village, Denton County, Texas, and are kept in said office.

I further certify that I am the Town Secretary of the Town of Lakewood Village, that I have legal custody of said records, and that I am a lawful possessor and keeper of the records in said office.

In witness whereof I have hereunto set my hand and affixed the official seal of The Town of Lakewood Village this 7th day of August, 2014.

Linda Asbell, TRMC, Town Secretary
Town of Lakewood Village
Denton County
State of Texas

# Town of Lakewood Village
## Subdivisions in the Extra Territorial Jurisdiction



Verified Date: 08/05/2014

TAB F

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle A. Municipal Regulatory Authority
        Chapter 212. Municipal Regulation of Subdivisions and Property Development (Refs & Annos)
          Subchapter A. Regulation of Subdivisions (Refs & Annos)

V.T.C.A., Local Government Code § 212.002

§ 212.002. Rules

Currentness

After a public hearing on the matter, the governing body of a municipality may adopt rules governing plats and subdivisions of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

**Credits**
Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987.

**Editors' Notes**

**REVISOR'S NOTE**

**2008 Main Volume**

(1) The source law refers to "rules and regulations" governing plats and subdivisions. The reference to "regulations" is omitted from the revised law because under the definitions section of the Code Construction Act (Section 311.005, Government Code) a rule includes a regulation.

(2) The source law refers to a municipality's authority to "adopt and promulgate" rules. The reference to "promulgate" is omitted from the revised law because the authority to promulgate (officially publish or announce) is inherent in the authority to adopt rules.

Notes of Decisions (6)

V. T. C. A., Local Government Code § 212.002, TX LOCAL GOVT § 212.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle A. Municipal Regulatory Authority
        Chapter 212. Municipal Regulation of Subdivisions and Property Development (Refs & Annos)
          Subchapter A. Regulation of Subdivisions (Refs & Annos)

V.T.C.A., Local Government Code § 212.003

§ 212.003. Extension of Rules to Extraterritorial Jurisdiction

Effective: September 1, 2003
Currentness

(a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads or the pumping, extraction, and use of groundwater by persons other than retail public utilities, as defined by Section 13.002, Water Code, for the purpose of preventing the use or contact with groundwater that presents an actual or potential threat to human health. However, unless otherwise authorized by state law, in its extraterritorial jurisdiction a municipality shall not regulate:

(1) the use of any building or property for business, industrial, residential, or other purposes;

(2) the bulk, height, or number of buildings constructed on a particular tract of land;

(3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage;

(4) the number of residential units that can be built per acre of land; or

(5) the size, type, or method of construction of a water or wastewater facility that can be constructed to serve a developed tract of land if:

(A) the facility meets the minimum standards established for water or wastewater facilities by state and federal regulatory entities; and

(B) the developed tract of land is:

(i) located in a county with a population of 2.8 million or more; and

(ii) served by:

(a) on-site septic systems constructed before September 1, 2001, that fail to provide adequate services; or

(b) on-site water wells constructed before September 1, 2001, that fail to provide an adequate supply of safe drinking water.

(b) A fine or criminal penalty prescribed by the ordinance does not apply to a violation in the extraterritorial jurisdiction.

(c) The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable in the extraterritorial jurisdiction.

## Credits

Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987. Amended by Acts 1989, 71st Leg., ch. 1, § 46(b), eff. Aug. 28, 1989; Acts 1989, 71st Leg., ch. 822, § 6, eff. Sept. 1, 1989; Acts 2001, 77th Leg., ch. 68, § 1, eff. Sept. 1, 2001; Acts 2003, 78th Leg., ch. 731, § 3, eff. Sept. 1, 2003.

## Editors' Notes

### REVISOR'S NOTE

### 2008 Main Volume

(1) The source law reference to "regulations" is omitted from the revised law for the reason stated in Revisor's Note (1) to Section 212.002.

(2) The revised law substitutes "criminal penalty" for "misdemeanor" because the former term more accurately describes the effect and intent of the source law.

(3) The source law refers to the district court's authority to "grant any or all types of injunctive relief" in regard to a violation of an ordinance governing plats and subdivisions. The reference to the court's authority is omitted from the revised law because that authority is covered by Section 24.011, Government Code, and Section 65.021, Civil Practice and Remedies Code.

Notes of Decisions (10)

V. T. C. A., Local Government Code § 212.003, TX LOCAL GOVT § 212.003
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB G

---

Vernon's Texas Statutes and Codes Annotated
Local Government Code (Refs & Annos)
Title 2. Organization of Municipal Government
Subtitle C. Municipal Boundaries and Annexation
Chapter 42. Extraterritorial Jurisdiction of Municipalities (Refs & Annos)
Subchapter A. General Provisions

V.T.C.A., Local Government Code § 42.001

§ 42.001. Purpose of Extraterritorial Jurisdiction

Currentness

The legislature declares it the policy of the state to designate certain areas as the extraterritorial jurisdiction of municipalities to promote and protect the general health, safety, and welfare of persons residing in and adjacent to the municipalities.

**Credits**
Acts 1987, 70th Leg., ch. 149, § 1, eff. Sept. 1, 1987.

Notes of Decisions (2)

V. T. C. A., Local Government Code § 42.001, TX LOCAL GOVT § 42.001
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB H

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle A. Municipal Regulatory Authority
        Chapter 214. Municipal Regulation of Housing and Other Structures (Refs & Annos)
          Subchapter Z. Miscellaneous Powers and Duties (Refs & Annos)

V.T.C.A., Local Government Code § 214.904

§ 214.904. Time for Issuance of Municipal Building Permit

Effective: September 1, 2007
Currentness

(a) This section applies only to a permit required by a municipality to erect or improve a building or other structure in the municipality or its extraterritorial jurisdiction.

(b) Not later than the 45th day after the date an application for a permit is submitted, the municipality must:

(1) grant or deny the permit;

(2) provide written notice to the applicant stating the reasons why the municipality has been unable to grant or deny the permit application; or

(3) reach a written agreement with the applicant providing for a deadline for granting or denying the permit.

(c) For a permit application for which notice is provided under Subsection (b)(2), the municipality must grant or deny the permit not later than the 30th day after the date the notice is received.

(d) If a municipality fails to grant or deny a permit application in the time required by Subsection (c) or by an agreement under Subsection (b)(3), the municipality:

(1) may not collect any permit fees associated with the application; and

(2) shall refund to the applicant any permit fees associated with the application that have been collected.

**Credits**
Added by Acts 2005, 79th Leg., ch. 917, § 1, eff. Sept. 1, 2005.

V. T. C. A., Local Government Code § 214.904, TX LOCAL GOVT § 214.904
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB I

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 4. Finances
      Subtitle C. Financial Provisions Applying to More Than One Type of Local Government
        Chapter 133. Criminal and Civil Fees Payable to the Comptroller
          Subchapter D. Civil Fees

V.T.C.A., Local Government Code § 133.153

§ 133.153. Additional Filing Fees for Certain Actions and Proceedings in
Courts Other than District Court for Basic Civil Legal Services for Indigents

Effective: September 1, 2009
Currentness

(a) In addition to other fees authorized or required by law, the clerk of a court other than a district court, the courts of appeals, or the supreme court shall collect the following fees on the filing of any civil action or proceeding requiring a filing fee, including an appeal, and on the filing of any counterclaim, cross-action, intervention, interpleader, or third-party action requiring a filing fee:

  (1) $10 for statutory and constitutional county courts; and

  (2) $6 for justice of the peace courts.

(b) The fees shall be collected and remitted to the comptroller in the manner provided by Subchapter B.

(c) The comptroller shall deposit the fees to the credit of the basic civil legal services account of the judicial fund for use in programs approved by the supreme court that provide basic civil legal services to an indigent.

**Credits**
Added by Acts 2003, 78th Leg., ch. 209, § 62(a), eff. Jan. 1, 2004. Amended by Acts 2009, 81st Leg., ch. 1183, § 5, eff. Sept. 1, 2009.

V. T. C. A., Local Government Code § 133.153, TX LOCAL GOVT § 133.153
Current through the end of the 2013 Third Called Session of the 83rd Legislature

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB J

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle C. Regulatory Authority Applying to More Than One Type of Local Government
        Chapter 245. Issuance of Local Permits (Refs & Annos)

V.T.C.A., Local Government Code § 245.002

§ 245.002. Uniformity of Requirements

Effective: April 27, 2005
Currentness

(a) Each regulatory agency shall consider the approval, disapproval, or conditional approval of an application for a permit solely on the basis of any orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time:

  (1) the original application for the permit is filed for review for any purpose, including review for administrative completeness; or

  (2) a plan for development of real property or plat application is filed with a regulatory agency.

(a-1) Rights to which a permit applicant is entitled under this chapter accrue on the filing of an original application or plan for development or plat application that gives the regulatory agency fair notice of the project and the nature of the permit sought. An application or plan is considered filed on the date the applicant delivers the application or plan to the regulatory agency or deposits the application or plan with the United States Postal Service by certified mail addressed to the regulatory agency. A certified mail receipt obtained by the applicant at the time of deposit is prima facie evidence of the date the application or plan was deposited with the United States Postal Service.

(b) If a series of permits is required for a project, the orders, regulations, ordinances, rules, expiration dates, or other properly adopted requirements in effect at the time the original application for the first permit in that series is filed shall be the sole basis for consideration of all subsequent permits required for the completion of the project. All permits required for the project are considered to be a single series of permits. Preliminary plans and related subdivision plats, site plans, and all other development permits for land covered by the preliminary plans or subdivision plats are considered collectively to be one series of permits for a project.

(c) After an application for a project is filed, a regulatory agency may not shorten the duration of any permit required for the project.

(d) Notwithstanding any provision of this chapter to the contrary, a permit holder may take advantage of recorded subdivision plat notes, recorded restrictive covenants required by a regulatory agency, or a change to the laws, rules, regulations, or ordinances of a regulatory agency that enhance or protect the project, including changes that lengthen the effective life of the permit after the date the application for the permit was made, without forfeiting any rights under this chapter.

(e) A regulatory agency may provide that a permit application expires on or after the 45th day after the date the application is filed if:

(1) the applicant fails to provide documents or other information necessary to comply with the agency's technical requirements relating to the form and content of the permit application;

(2) the agency provides to the applicant not later than the 10th business day after the date the application is filed written notice of the failure that specifies the necessary documents or other information and the date the application will expire if the documents or other information is not provided; and

(3) the applicant fails to provide the specified documents or other information within the time provided in the notice.

(f) This chapter does not prohibit a regulatory agency from requiring compliance with technical requirements relating to the form and content of an application in effect at the time the application was filed even though the application is filed after the date an applicant accrues rights under Subsection (a-1).

(g) Notwithstanding Section 245.003, the change in law made to Subsection (a) and the addition of Subsections (a-1), (e), and (f) by S.B. No. 848, Acts of the 79th Legislature, Regular Session, 2005, apply only to a project commenced on or after the effective date of that Act.

**Credits**
Added by Acts 1999, 76th Leg., ch. 73, § 2, eff. May 11, 1999. Amended by Acts 2005, 79th Leg., ch. 6, § 2, eff. April 27, 2005.

Notes of Decisions (22)

V. T. C. A., Local Government Code § 245.002, TX LOCAL GOVT § 245.002
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Local Government Code (Refs & Annos)
    Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
      Subtitle C. Regulatory Authority Applying to More Than One Type of Local Government
        Chapter 245. Issuance of Local Permits (Refs & Annos)

V.T.C.A., Local Government Code § 245.004

§ 245.004. Exemptions

Effective: September 1, 2005
Currentness

This chapter does not apply to:

(1) a permit that is at least two years old, is issued for the construction of a building or structure intended for human occupancy or habitation, and is issued under laws, ordinances, procedures, rules, or regulations adopting only:

   (A) uniform building, fire, electrical, plumbing, or mechanical codes adopted by a recognized national code organization; or

   (B) local amendments to those codes enacted solely to address imminent threats of destruction of property or injury to persons;

(2) municipal zoning regulations that do not affect landscaping or tree preservation, open space or park dedication, property classification, lot size, lot dimensions, lot coverage, or building size or that do not change development permitted by a restrictive covenant required by a municipality;

(3) regulations that specifically control only the use of land in a municipality that does not have zoning and that do not affect landscaping or tree preservation, open space or park dedication, lot size, lot dimensions, lot coverage, or building size;

(4) regulations for sexually oriented businesses;

(5) municipal or county ordinances, rules, regulations, or other requirements affecting colonias;

(6) fees imposed in conjunction with development permits;

(7) regulations for annexation that do not affect landscaping or tree preservation or open space or park dedication;

(8) regulations for utility connections;

(9) regulations to prevent imminent destruction of property or injury to persons from flooding that are effective only within a flood plain established by a federal flood control program and enacted to prevent the flooding of buildings intended for public occupancy;

(10) construction standards for public works located on public lands or easements; or

(11) regulations to prevent the imminent destruction of property or injury to persons if the regulations do not:

(A) affect landscaping or tree preservation, open space or park dedication, lot size, lot dimensions, lot coverage, building size, residential or commercial density, or the timing of a project; or

(B) change development permitted by a restrictive covenant required by a municipality.

**Credits**

Added by Acts 1999, 76th Leg., ch. 73, § 2, eff. May 11, 1999. Amended by Acts 2003, 78th Leg., ch. 646, § 1, eff. Sept. 1, 2003; Acts 2005, 79th Leg., ch. 31, § 1, eff. Sept. 1, 2005.

Notes of Decisions (3)

V. T. C. A., Local Government Code § 245.004, TX LOCAL GOVT § 245.004
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
Local Government Code (Refs & Annos)
Title 7. Regulation of Land Use, Structures, Businesses, and Related Activities
Subtitle C. Regulatory Authority Applying to More Than One Type of Local Government
Chapter 245. Issuance of Local Permits (Refs & Annos)

V.T.C.A., Local Government Code § 245.006

§ 245.006. Enforcement of Chapter

Effective: September 1, 2005
Currentness

(a) This chapter may be enforced only through mandamus or declaratory or injunctive relief.

(b) A political subdivision's immunity from suit is waived in regard to an action under this chapter.

**Credits**
Added by Acts 1999, 76th Leg., ch. 73, § 2, eff. May 11, 1999. Amended by Acts 2005, 79th Leg., ch. 31, § 1, eff. Sept. 1, 2005.

Notes of Decisions (5)

V. T. C. A., Local Government Code § 245.006, TX LOCAL GOVT § 245.006
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2014 Thomson Reuters. No claim to original U.S. Government Works.

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
8/28/2014 3:46:16 PM
DEBRA SPISAK
CLERK

No. 02-14-00143-CV

IN THE COURT OF APPEALS
FOR THE SECOND DISTRICT OF TEXAS
FORT WORTH, TEXAS

FILED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
8/28/2014 3:46:16 PM
DEBRA SPISAK
Clerk

HARRY BIZIOS,
*Appellant,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee.*

## REPLY BRIEF OF APPELLANT HARRY BIZIOS

ON APPEAL FROM THE 431ST JUDICIAL DISTRICT
COURT OF DENTON COUNTY, TEXAS

Trial Court Cause Number 14-01991-431

Arthur J. Anderson
WINSTEAD PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone No.: (214) 745-5745
Fax No.: (214) 745-5390
aanderson@winstead.com
David F. Johnson
WINSTEAD PC
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Telephone No.: (817) 420-8223
Fax No.: (817) 420-8201
dfjohnson@winstead.com
ATTORNEYS FOR APPELLANT
ORAL ARGUMENT REQUESTED

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.2(a)(1)(A), Appellant certifies that the following are the correct parties and counsel:

**PARTIES:**

| **PLAINTIFF/APPELLEE:** | **TRIAL AND APPELLATE COUNSEL:** |
|---|---|
| Town of Lakewood Village, Texas | William Andrew Messer, Esq.<br>Messer, Rockefeller & Fort, P.L.L.C.<br>6351 Preston Road<br>Suite 350<br>Frisco, TX 75034<br>(972) 668-6400<br>andy@txmunicipallaw.com |
| **DEFENDANT/APPELLANT:** | **TRIAL AND APPELLATE COUNSEL:** |
| Harry Bizios | Arthur J. Anderson<br>WINSTEAD PC<br>500 Winstead Building<br>2728 N. Harwood Street<br>Dallas, Texas 75201<br>(214) 745-5400<br>aanderson@winstead.com |
| | **APPELLATE COUNSEL:** |
| | David F. Johnson<br>WINSTEAD PC<br>777 Main Street<br>Suite 1100<br>Fort Worth, TX 76102<br>(817) 420-8200<br>dfjohnson@winstead.com |

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL .............................................................. i

TABLE OF AUTHORITIES .............................................................................. iii

INTRODUCTION.............................................................................................. 1

DISPUTED STATEMENT OF FACTS ................................................................. 2

SUMMARY OF ARGUMENT .......................................................................... 10

ARGUMENT AND AUTHORITY ..................................................................... 12

      I.      The Legislature has not expressly authorized general law towns
           to extend building codes to the ETJ. .................................................. 12

      II.     This Court of Appeals should not follow *Lucas*. ............................... 18

      III.    If Chapter 212 applies, then § 212.007 prohibits the extension
           of the Town's building code to a platted lot....................................... 20

      IV.    Bizios has vested rights in the 1995 plat approval under
           Chapter 245......................................................................................... 22

CONCLUSION AND PRAYER .......................................................................... 24

CERTIFICATE OF SERVICE ........................................................................... 26

CERTIFICATE OF COMPLIANCE WITH RULE 9.4 ......................................... 27

APPENDIX ...................................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL AND STATE CASES**

*City of Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Cir. App.—1968, writ ref'd n.r.e.) .................................................................. 21

*City of Northlake v. East Justin*, 873 S.W.2d 413 (Tex. App.—Fort Worth 1994, writ denied) ..................................................................................... 8

*City of Round Rock v. Smith*, 687 S.W.2d 310 (Tex. 1985) ....................... 19

*City of San Antonio v. Boeme*, 111 S.W.3d 22 (Tex. 2003) ......................... 3

*City of Weslaco v. Carpenter*, 694 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) ......................................................................... 21

*Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.) .................................................................................... 7, 13, 22, 24

*Levy v. City of Plano*, 2001 WL 1382520 (Tex. App.—Dallas 1986, no pet.) (not desig. for pub.) ...................................................................... 13, 19

*Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) ......................... 10, 12, 15, 18, 19

*Milestone Potrunco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—2009, pet. den.) ............................................................................ 21

*Rhino Real Estate Investments, Inc. v. City of Runaway Bay*, No. 02-08-00340-CV, 2009 WL 219613 (Tex. App.—Ft. Worth July 23, 2009, no pet.) .............................................................................. 6, 14, 15, 24

*Shumaker Enterprises, Inc. v. City of Austin*, 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.) ................................................................................ 22

*Sitton v. Lindale*, 455 S.W.2d 939 (Tex. 1970) .......................................... 8

*Smith v. State*, 269, 272 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) ......... 23

*State of New Mexico v. Bureau of Land Management*, 563 F.3d 683 (10th Cir. 2009) ................................................................................................ 22

*Quick v. City of Austin*, 7 S.W.3d 109 (Tex. 1999) ........................................ 2


**STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

§ 42.042, Tex. Loc. Gov't Code ................................................................ 16

§ 42.044, Tex. Loc. Gov't Code ................................................................ 16

§ 42.046, Tex. Loc. Gov't Code ................................................................ 16

§§ 43.024, 43.025 and 43.028, Tex. Loc. Gov't Code ................................ 8

§ 43.033, Tex. Loc. Gov't Code ............................................................ 9, 10

§ 43.121, Tex. Loc. Gov't Code ................................................................ 16

§ 43.130, Tex. Loc. Gov't Code ................................................................ 16

Chapter 212, Tex. Loc. Gov't Code .................................................... passim

§ 212.003 Tex. Loc. Gov't Code .......................................................... 14, 19

§ 212.004, Tex. Loc. Gov't Code .............................................................. 20

§ 212.007, Tex. Loc. Gov't Code ................................................... 20, 21, 22

§ 212.013, Tex. Loc. Gov't Code .............................................................. 20

§ 212.049, Tex. Loc. Gov't Code ................................................... 12, 18, 19

§ 212.172, Tex. Loc. Gov't Code .............................................................. 16

§ 214.211, Tex. Loc. Gov't Code ................................................................ 4

§ 214.212, Tex. Loc. Gov't Code .............................................................. 15

§ 214.904(a), Tex. Loc. Gov't Code ............................... 10, 13, 15, 16, 17

§ 216.902, Tex. Loc. Gov't Code .............................................................. 16

§ 233.153, Tex. Loc. Gov't Code ................................................. 7, 10, 13, 16

Chapter 245, Tex. Loc. Gov't Code .................................................... passim

§ 245.004, Tex. Loc. Gov't Code ................................................................. 12, 23, 24

§ 245.006, Tex. Loc. Gov't Code ................................................................. 24

**OTHER AUTHORITIES**

Black's Law Dictionary (6th ed. 1990)........................................................ 12, 23

## INTRODUCTION

In the words of former President Ronald Reagan, "The nine most terrifying words in the English language are: 'I'm from the government and I'm here to help'." This case involves overreaching by a small town for financial gain. Despite the fact that numerous homes have safely been built in the Sunrise Bay Addition without obtaining building permits from Lakewood Village and Denton County already regulates homebuilding within Sunrise Bay, a general law town with a population of 620 feels constrained to apply its unique version of the International Residential Code to ensure "safe construction and materials" for Appellant's future home (Town Br., p. 2). Harry Bizios respectfully responds that he does not need or want the Town's help and is satisfied with the quality of construction planned for his $1,200,000.00 house.

In its 45-page brief, the Town fails to state valid reasons that it should be allowed to regulate homebuilding outside of its corporate limits. Bizios' lot will never be annexed by the Town, and he will never receive municipal services from Lakewood Village. The only alleged statutory authority available to a general law town to extend building codes to the ETJ is through Chapter 212, Tex. Loc. Gov't Code. Because Bizios' property is already a platted lot, Lakewood Village cannot apply its subdivision regulations or building code to the property.

- 1 -

## DISPUTED STATEMENT OF FACTS

Generally, the Town is correct in stating that the concept of extraterritorial jurisdiction ("ETJ") is provided by statute in Chapters 42 and 43 of the Texas Local Government Code (Town Br. p. 2). The ETJ concept was created by the Legislature to address the problem of overly aggressive annexations by home rule municipalities. In 1963, the Texas Legislature recognized these annexation problems and adopted the Municipal Annexation Act, Article 970a, Tex. R. Civ. Stat., now codified in the Local Government Code at Chapter 42, Extraterritorial Jurisdiction of Municipalities and Chapter 43, Municipal Annexation. Bizios disagrees, however, with the Town's assertion that it has statutory authority to extend its building code into its ETJ.

The Town is also correct in stating that it is a general law town, but it fails to point out that the distinction between a home rule city and a general law town is significant because of the extent of annexation authority. Home rule cities have the power of self-government, look to the Legislature only for specific limitations of power, and may annex territory with or without the consent of the residents if their charters so provide. *Quick v. City of Austin*, 7 S.W.3d 109, 122 (Tex. 1999). It is undisputed that Lakewood Village will never become a home rule city because it will never reach the 5,000 population threshold needed to obtain home rule status (2 RR 54). General law towns are similar to Texas counties which may exercise

- 2 -

only those powers expressly given by the Constitution or Legislature. *City of San Antonio v. Boeme*, 111 S.W.3d 22 (Tex. 2003).

The true reason and motivation for the Town's filing of this suit is revealed on page 3 of its brief where it concedes that this is an important test case because there are other platted lots in its ETJ where the Town wants to extract building permits and related fees. At no point does the Town controvert the evidence introduced at the temporary injunction hearing that the Town plans to receive a hefty fee for each building permit it issues (2 RR 92, 144). Because it incurs no future expenses for residents in the ETJ, the Town profits to the tune of $14,646.00 from Bizios' building permit fees. Multiplying that amount by the number of potential future building permits it can extract in its ETJ shows the Town's actions are financially based. It recognizes that, if the Town loses this appeal, an important revenue spigot will be turned off.

While the Town points out on page 3 of its brief that a portion of Bizios' lot has a grade differential and is located in the floodplain created by Lake Lewisville, it fails to state why this poses a problem. Bizios' neighboring lots have a similar topography and floodplain with constructed homes (CR 128, 479, 481, 482, 486). The Army Corps of Engineers regulates the take area within Lake Lewisville and approved the development of Bizios' lot and the construction of a retaining wall (483-491). Denton County acknowledged the validity of the elevation certificate

granted by the Corps and approved the house construction (CR 472). The Town has not introduced any evidence or proffered a legitimate argument that the location of Bizios' home outside the 100 year floodplain poses a health or safety issue.

Bizios acknowledges that the Town has met the legislative mandate imposed on all Texas cities to adopt the uniform International Residential Code ("IRC") as set forth in § 214.211, Tex. Loc. Gov't Code. The Town describes, without any evidentiary support, that its local amendments to the IRC represent "heightened standards" (Town Br., p. 4). Bizios submits that the IRC standards sufficiently protect the public health and safety as mandated by the Texas Legislature, and the Town's local amendments are simply unique construction standard preferences.

The Town's characterizations on pages 5-7 of its brief regarding its building official's testimony about the compliance of Bizios' home illustrate its desperate attempts to create a safety issue when none exists. It is important to note that the bullet points for the Town's brief refer to the initial (not final) set of review construction plans submitted to the Town. The Town's building official testified that even the initial plans met all of the International Residential Code requirements (2 RR 150-1). Only the Town's local IRC amendment prohibiting a certain type of vent (which the IRC and virtually all North Texas municipalities allow) was an issue for him (2 RR 151-3; RR 30-1).

- 4 -

Bizios responds to the Town's bullet points regarding alleged noncompliance with the IRC on pages 5-7 of the Town's brief as follows:

- The initial plan had a typographical error stating that the 2003 IRC would apply when actually the plans comply with the 2009 IRC which is more stringent than the Town's 2006 code (3 RR 24). Further, the Town's building official acknowledged that the initial plans complied with the 2006 IRC (2 RR 150-1).

- The Town makes several incorrect statements about the floodplain elevation. For example, the City states that Bizios' initial construction plans showed the structure to be "several feet below a finished floor elevation of 540 msl" (Town Br., p. 5). According to the City's testimony, however, the notation on the initial construction plans was "minimum finished floor elevation will *be at least* two feet above minimum FEMA 100-year floodplain elevation or as noted on site" which would be one foot below 540 msl (2 RR 125). In addition, Bizios' contractor testified without rebuttal that the house was actually being built to the level of 540 ½ msl which exceeds even the Town's standard of 540 msl (3 RR 48). The house is above the Town's requirement and not "several feet below a finished floor elevation of 540 msl".

  Second, the Town erroneously states that "on the first day of the hearing, Appellant agreed to modify his building plans to build to the 540 msl". The Town includes eight references to the record, but none of them support the Town's statement (Town Br., p. 6). In fact, the house was physically being constructed at that time at the 540 ½' msl level (3 RR 18). Further, at the TRO hearing which occurred approximately one month before the temporary injunction both sides agreed that the house was being built to at least the Town's 540 msl standard (2 RR 97).

- The Town also erroneously states that a "non-engineered foundation was submitted" (Town Br, p. 6). In fact, the foundation was properly engineered; it simply did not have the engineer's seal on the plans (3 RR 31). This issue was corrected and the plans with the engineering seal were provided (3 RR 31).

- 5 -

- Bizios acknowledges that it did not initially provide the Town with the engineered plans for the retaining wall next to the lake. The reason is that the Army Corps of Engineers, not the Town, has the legal authority to approve retaining walls within its flowage easement for Lake Lewisville (CR 490-2). The Town incorrectly states that it requested Bizios to provide it with the engineering plans for the retaining wall (Town Br., p. 6). Neither of the pages of the record cited by the Town in support of the allegation contains any such evidence.

- The Town admits that Bizios' construction complies with the IRC and is compliant with all of the Town's local amendments except as to a certain vent (2 RR 121). The IRC allows studor vents, as well as virtually every other municipality in North Texas (3 RR 30). Only Lakewood Village and Prosper (where the Town's building official also works) prohibit this type of vent (3 RR 30-1).

- The Town makes another erroneous statement that the proposed chimneys on Bizios house violate the 2006 International Residential Code (Town Br. p. 6). The Town's Building Inspector did not state that the height of the chimneys violated the Code (2 RR 127). Due to the scale of the renderings, it was difficult to provide a precise measurement. He merely marked this as an advisory comment and specifically testified that these advisory comments were not violations of the IRC (2 RR 150-1). Bizios' contractor testified that the location and height of the chimneys meet the requirements of the Town's comment and the IRC (3 RR 28).

- While the Building Official noted advisory comments on the plans, Bizios' contractor already planned to meet each comment.

Lakewood Village piously entitles its discussion in pages 7-9 of its brief as "*Appellant's refusal to obey the law*". But Bizios is not required to obey an illegal law and is in the same position as other homebuilders who refused to comply with illegal city demands to comply with unenforceable building codes and prevailed during the litigation process. *See Rhino Real Estate Investments, Inc. v. City of*

*Runaway Bay*, No. 02-08-00340-CV, 2009 WL 219613 (Tex. App.—Ft. Worth July 23, 2009, no pet.); *Hartsell v. Town of Talty*, 130 S.W.3d 325 (Tex. App.—Dallas 2004, pet. den.).

On page 9 of its brief, the Town erroneously states that "there is a significant difference in the building standards between the Town and the County". In fact, the building standards are identical. Just like the Town, the County adopted and enforces the IRC (CR 648-9). This is consistent with § 233.153, Tex. Loc. Gov't Code. Just because the Town requires 14 inspections does not mean that this number of inspections increases the safe construction of a house compared to the three county inspections (CR 648). The county inspections address "plumbing, electrical, residential, etc." as acknowledged in the Town Secretary's Letter (CR 589). Because the electrical systems in the house will be included in the county inspections, there is no substantiation for the Town's statement that "proper electrical safety" will not be reviewed (Town Br., p. 9).

Also on page 9 of the brief, the Town states that it had "no knowledge" of the 1995 plat for Sunrise Bay. While it is difficult to conceive how Town officials were unaware of a platted subdivision within its ETJ when the dedicated roads and houses constructed on lots were obvious to everyone, the Town's official records showed that it had notice of the subdivision. Monument signs for Sunrise Bay are located at the entry to the subdivision (3 RR 55). The Town's official records

include an ETJ map showing each of the lots in the subdivision as shown on the recorded 1995 plat (4 RR, Ex. 4). The Town's official documents also show the platted boundaries on Bizios' and surrounding lots on its contour map (4 RR, Ex. 4; 3 RR 35-6). Also, the Town's records included earlier building permits for tracts described as lots within the Sunrise Bay subdivision (4 RR Plaintiff Exs. 4, 5). Clearly, the Town had prior notice of the 1995 plat.

The Town correctly states that a legitimate public interest for extending its building code to the ETJ would be if the property might "become part of the Town in the future through annexation" (Town Br., pp. 10-1). This policy could be valid for a home rule city which can annex involuntarily or a general law town with the potential for reaching the 5,000 population level. *Sitton v. Lindale*, 455 S.W.2d 939 (Tex. 1970). Lakewood Village, however, will never be a home rule city because its ultimate population is capped at 2500 (2 RR 54).

General law towns typically only annex adjacent territory with the consent of the property owner if the land is occupied by less than three (3) qualified voters, or the consent of a majority of qualified voters inhabiting an occupied annexed area, if the land is occupied by three (3) or more qualified voters. *See* Tex. Loc. Gov't Code §§ 43.024, 43.025 and 43.028; *City of Northlake v. East Justin*, 873 S.W.2d 413 (Tex. App.—Fort Worth 1994, writ denied). No evidence was introduced showing any prior attempts or current interest by the residents of

- 8 -

Sunrise Bay to be annexed into Lakewood Village (3 RR 57-8). In 2011, there was an attempt by Lakewood Village to annex Sunrise Bay (App., Tab A).[1] Various residents in the ETJ attended a council meeting to oppose the annexation, and the Lakewood Village Mayor responded that the Town could not annex involuntarily. *Id.* Only by an involuntary annexation would it be possible to include the property within the Town's corporate limits.

As pointed out in the Town's brief, the only statutory way Bizios' and the other lots in Sunrise Bay can be unilaterally annexed by a general law town is through § 43.033, Tex. Loc. Gov't Code. The Town is prohibited today from exercising this power because its population is less than 1,000. Section 43.033(a)(1). In addition, the Town is currently prohibited from annexing the subdivision because it does not provide water or sewer service (2 RR 18-19).

Little Elm serves the subdivision and Bizios' lot which is within its certificate of convenience and necessity ("CCN") boundaries with water, and there is no sanitary sewer provider because the houses have septic systems (3 RR 14). There is no evidence to justify the Town's statement that it would be practicable to provide sewer service to its ETJ (Town Br., 11-2). First, the lots already have septic systems in place. Second, it would have cost millions of dollars for

---

[1] Similar to the Town's request on page 3 in its brief, Bizios asks the Court to take judicial notice of the Town Council meetings included in the Appendix. No discovery has been conducted, so the unsigned minutes are taken from the Town's official website. *See State of New Mexico v. Bureau of Land Management*, 563 F.3d 683 (10th Cir. 2009).

Lakewood Village to extend sanitary sewer to Sunrise Bay (3 RR 14). Even if it spent millions of dollars to extend sewer service to developed lots that do not need it, the residents of Runaway Bay would retain the option of disannexing from the Town after one year. Section 43.033(b), Tex. Loc. Gov't Code.

## SUMMARY OF ARGUMENT

Contrary to the Town's statement on page 12 of its brief, there is no express or "explicit" statutory language authorizing a general law town to extend its building code to its ETJ. This authority was deemed to be implied under Chapter 212 of the Texas Local Government Code in *Lucas v. North Texas Municipal Water District*, 724 S.W.2d 811 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). Sections 202.002 and 003(a), Tex. Loc. Gov't Code, do not mention building permits, and § 212.904(a) and § 233.153 do not expressly authorize general law towns to extend their building codes to the ETJ.

The Town makes a general statement that its goal is to protect Bizios' "health, safety and welfare" (Town Br., p. 12). Similar to the situation in *Hartsell*, there are no evidentiary facts which have been presented that "raise the spector" of Bizios' house not being safely constructed. 130 S.W.2d at 328. Harry Bizios testified that his house will be of the "highest quality, safest (and) most durable" (3 RR 58). If he needed regulatory protection, this lies in (a) permits and approvals through the HOA, FEMA and Denton County, (b) an experienced contractor who

builds pursuant to IRC requirements, (c) quality subcontractors, and (d) regulatory conducted inspections. Bizios is building a house with a construction cost of more than $1,000,000.00, not a substandard residence (3 RR 9).

Prior to commencing construction, Bizios obtained all legitimate and necessary development approvals. First, the architectural review committee for the Subdivision approved the design and construction standards for the house (3 RR 12-14). Second, all necessary applications to build the house foundation and retaining wall were approved by FEMA (3 RR 15, 16; 4 RR Exs. 36, 37). Third, Bizios obtained all necessary permits from Denton County (4 RR 35). Regular inspections were being conducted of Bizios' house in accordance with Denton County regulations (3 CR 25).

The Town's second stated policy of having uniformly built houses following annexation is not valid because it is nigh impossible for the Town to annex the subdivision (Town Br., p. 13). Further, the subdivision has been built out with houses that did not receive building permits from the Town and are not "uniformly" constructed (3 RR 26). The Town introduced no evidence that the houses built in Sunrise Bay without a Lakewood Village building permit have any safety issues.

With respect to the Town's Chapter 245 argument, this defense was properly brought by Bizios as to the Town's declaratory judgment and injunction causes of

action (Town Br., p. 13). The Town had prior notice of the 1995 final plat which constitutes the initial permit for the development project, and none of the § 245.004 exemptions apply in this case.

## ARGUMENT AND AUTHORITY

I. **The Legislature has not expressly authorized general law towns to extend building codes to the ETJ.**

The Town erroneously argues that the Legislature has given general law towns the express authority to extend building codes to the ETJ. There are no statutes, however, that directly provide this authority. The dictionary defines "express" as "clear; definite; explicit; plain; direct; unmistakable." Black's Law Dictionary (6th ed. 1990). The converse of this fact situation can be found in § 212.049, Tex. Loc. Gov't Code, which expressly states that "this subchapter does not authorize the municipality to require building permits . . . in its extraterritorial jurisdiction." Conversely, there are no Texas statutes with language stating that the Legislature "does authorize the municipality to require building permits . . . in its ETJ."

On page 18 of its brief, the Town mistakenly cites to certain case law for the proposition that general law towns have been given the statutory authority to extend their building codes to the ETJ. Bizios acknowledges that the Dallas Court of Appeals made such a statement in dicta in a case which is almost forty (40) years old. *City of Lucas v. North Texas Municipal Water Dist.* No subsequent

- 12 -

appellate court has supported this language, and this court of appeals is not bound by *Lucas*. Bizios is requesting this court of appeals to not follow the *Lucas* decision.

Contrary to the Town's argument, the Dallas Court of Appeals did not hold that general law towns have the statutory authority to extend building codes to the ETJ in *Hartsell v. Town of Talty*. Because Hartsell prevailed on his Chapter 245 claim, the court of appeals expressly stated that it would not address Hartsell's claim that "as a general law town, the Town had no authority to extend the Ordinance into its extraterritorial jurisdiction". 130 S.W.3d. at 327, 329. The other opinion referenced by the Town on page 18 of its brief simply holds that subdivision regulations can be applied to the ETJ. *Levy v. City of Plano*, 2001 WL 1382520 (Tex. App.—Dallas 1986, no pet.) (not desig. for publication). In fact, the Dallas Court of Appeals stated in *Levy* that "a city is statutorily prohibited from regulating land use and construction on property in its ETJ; a city may apply only its subdivision ordinances to such property". *Id.* at 3.

In addition to Chapter 212, the Town cites to §§ 214.904(a) and 233.153(c) of the Local Government Code for support. Neither of these statutes expressly states that a general law town has the requisite authority to extend building codes to the ETJ. Both the Town's pleadings and applicable case law reference solely Chapter 212 as providing this alleged authority.

- 13 -

Lakewood Village's arguments, pleadings and ordinances have been based solely upon its presumed authority under Chapter 212 to extend its building code to the ETJ. According to the Town's ordinance, it "is authorized and empowered to apply the Town's regulations for . . . property development to its ETJ *pursuant to § 212.003 of the Texas Local Government Code*" (emphasis added) (CR 23). In 2011, the Town amended its subdivision regulations under Chapter 212 to extend its building code to the ETJ (CR 307-10). The ordinance states that it is being adopted under Chapter 212 (CR 308). New subdivision regulations were adopted in 2013 (CR 345). They expressly extend the Town's building code to its ETJ pursuant to Chapter 212 (CR 346). At no point has the Town enacted an ordinance extending its building code to its ETJ other than pursuant to its implied authority under Chapter 212, Tex. Loc. Gov't Code.

This court of appeals addressed a similar issue in *Runaway Bay*. In that case, the town argued that the preamble of its ordinance stating that building permit fees should be paid with permits for houses in the ETJ necessarily extended the code to ETJ. 2009 WL 219613. The court of appeals disagreed and held that the building permit fees reference "does not seem in any way to equate to the adoption of an entire building code in the City's ETJ". *Id.* at 5. In other words, stating that building permit fees could be collected in the ETJ did not equate to actually extending the building code to the ETJ.

Every opinion that has considered the issue of requiring permits in the ETJ has been based on the implied authority set forth in Chapter 212 to regulate subdivision infrastructure "development" in the ETJ. *See Lucas, Hartsell, Rhino.* No court has ruled that a general law town has been given statutory authority, as alleged by Lakewood Village, under §§ 214.904(a) or 233.155(c), Tex. Loc. Gov't Code, to extend its building code to its ETJ.

The Town also argues on pages 19 and 20 of its brief that § 214.212 authorizes it to extend its building code to its ETJ. This position contradicts the plain meaning of the statute: "The International Residential Code applies to all construction, alteration, remodeling, enlargement, and repair of residential structures *in a municipality*" (emphasis added). Bizios' lot is not located in any municipality.

Contrary to the Town's statement on page 20 of its brief, § 214.904(a) does not expressly empower general law towns to extend building codes to the ETJ. While the statute can be implied to mean that some municipalities within the State may be requiring a permit to improve a building or "other structure" in the ETJ, there are fact situations that might be applicable other than a general law town extending its building code:

- Land in the ETJ subject to a development agreement under § 212.172, Tex. Loc. Gov't Code, which allows a city to require building permits.

- 15 -

- Land in the ETJ subject to an industrial district agreement under § 42.044, Tex. Loc. Gov't Code which can require permitting.

- Land in the ETJ subject to a planned unit district agreement under § 42.046, Tex. Loc. Gov't Code which can require permitting.

- Land in the ETJ with a special district agreement under § 42.042, Tex. Loc. Gov't Code which can require permitting.

- The Legislature could have assumed that home rule cities with their constitutional police powers (as opposed to general law towns) might require building permits in the ETJ.

- "Other structures" could refer to billboards. General law towns and home rule cities are given express authority to require building permits for signs in the ETJ. § 216.902, Tex. Loc. Gov't Code.

- The Legislature may have acknowledged that cities were extending building codes to the ETJ pursuant to *Lucas* and were awaiting future court decisions to clarify the authority issue.

To put it simply, Sec. 214.904(a) grants no express authority as argued by the Town. It is merely there to prevent cities from sitting on permits due to other pertinent sections of law. Alternatively, the Legislature may have intended to ensure a city cannot delay a building permit in its ETJ that it may legally require when it exercises limited purpose annexation under Subchapter F, Chapter 43 of the Local Government Code (see Secs. 43.121(a) and 43.130(c), which allow planning ordinances, zoning, and building permit/inspection fees in the ETJ when a city does limited purpose annexation). Since cities only have those powers in the ETJ that are given to them, § 214.904(a) is a limiting statute, not a power granting statute.

Similarly, Lakewood Village mistakenly asserts that § 233.153, Tex. Loc. Gov't Code, expressly authorizes general law towns to extend building codes to the ETJ (Town Br., p. 21). The statute does not contain language that "general law towns are authorized to extend their building codes to the ETJ". Subchapter F, Chapter 233, Local Government Code, concerns the authority of counties to mandate that houses be built to either the 2006 IRC or the county's code. Sec. 233.153(c) is also a limiting statute, not a power granting statute. As with § 214.904(a), there are various scenarios which the Legislature could have considered that did not involve general law towns unilaterally enforcing their building codes in the ETJ. Similar to the situation in *Runaway Bay*, the plain meaning of these statutes does not stand for the proposition that the Legislature has expressly authorized general law towns by statute to extend building codes to the ETJ.

In addition, Denton County cannot bestow this power. The Town's comments on pages 21 and 22 of its brief about Denton County regulations does not affect the legal analysis as to whether or not Lakewood Village has sufficient statutory authority to extend its building code to the ETJ. According to the Town Secretary, Denton County officials have refused to support the Town's authority to require building permits in the ETJ (App., Tab B). Sections 214.904(a) and 233.153(c) do not bestow statutory authority as suggested by the Town.

## II.    This Court of Appeals should not follow *Lucas*.

*Lucas* is the only appellate opinion which states that a general law town can extend building codes through Chapter 212. On pages 26 and 27 of its brief, the Town proves Bizios' point by stating that the Town does not claim authority to extend its building code to its ETJ pursuant to § 212.049, Tex. Loc. Gov't Code. Unlike Subchapter A of Chapter 212, § 212.049 expressly states the Legislature's intent on the issue: "This subchapter does not authorize the municipality to require municipal building permits . . . in its extraterritorial jurisdiction". The Fort Worth Court of Appeals summarized Bizios' argument in a footnote in the *Runaway Bay* opinion. *Id.* at p. 3, n. 4. While Subchapter B concerning development plats contains explicit language on the building permit issue, Subchapter A which concerns subdivision plats and is relied upon by the Town does not. Section 212.049 was added to Subchapter B of Chapter 212 of the Local Government Code after *Lucas*. Subchapter B of Chapter 212, Local Government Code, relates to development plats and development is defined as "the new construction or the enlargement of an exterior dimension of any building . . ." Subchapter A, on the other hand, is related solely to the regulation of subdivisions as the courts commonly define subdivisions. Because Subchapter A does not expressly address building permits like Subchapter B, the power to extend building codes by subdivision to the ETJ should not be implied by the court.

- 18 -

The Town cites on page 23 of its brief to only one Texas case other than *Lucas* to support its Chapter 212 authority argument. *City of Round Rock v. Smith*, 687 S.W.2d 310 (Tex. 1985). This case concerns solely plat approval and the construction of public infrastructure (drainage facilities) and not building permits and building codes. *Id.* at 301. The term "development" as used in *Round Rock* and Chapter 212 refers solely to development of city infrastructure.

The Dallas Court of Appeals dicta in *Lucas* has not been cited in a subsequent opinion, and this court of appeals is not bound by a decision of a sister court of appeals. In addition, the Dallas Court of Appeals appears to have overruled its dicta in *Lucas* when it held in the 2001 *Levy* opinion that § 212.003(a) does <u>not</u> authorize the extension of "land use and construction" ordinances to the ETJ. 2001 WL 138250 at 3.

On page 36 of its brief, the Town cites only to opinions involving home rule cities for the proposition that building codes may be extended to the ETJ pursuant to the police power. As stated hereinabove, a general law town's "police power" can only be exercised through statutory or constitutional authority. The validity of the other municipal ordinances listed on page 37 has not been subject to a court challenge. Bizios requests this court to hold that the Town has no statutory authority to extend its building code to the ETJ.

- 19 -

**III. If Chapter 212 applies, then § 212.007 prohibits the extension of the Town's building code to a platted lot.**

If the Court of Appeals agrees with the dicta in *Lucas* and upholds a general law town's authority to generally extend its building code to the ETJ under Chapter 212, then it should rule that the Town is prohibited from extending its building code in this case because it lacks subdivision authority as to Bizios' lot. *Lucas*, *Hartsell* and *Rhino* all addressed the extension of a general law's building code to the ETJ as part of the platting process.

The subdivision statute applies to the owner of a "tract" who divides the tract in two or more parts. § 212.004, Tex. Loc. Gov't Code. In this case, the "tract" in accordance with the terms of the statute was all of the land within the boundaries of the platted subdivision (CR 132-7). Bizios' property is no longer a "tract"; it is Lot 84 of the Sunrise Bay Addition legally platted by Little Elm (CR 114-5). It is ludicrous for the Town to misconstrue the platting statute to describe Bizios' platted lot as a "tract" waiting to be subdivided when the subdivision has already occurred.

Because Chapter 212 is triggered only by the subdivision of a "tract" into two or more parts, the platting process could only apply if Bizios' lot were divided in two. Little Elm, as the entity which originally platted the property, would be the legal entity responsible for replatting or vacating the original plat if this were to

- 20 -

occur. §§ 212.013-015, Tex. Loc. Gov't Code. The Town cites to no case law or statutory authority for exercising platting authority as to Bizios' lot.

For the Town to claim that § 212.007 does not apply because the statute deals only with plat approval is totally at odds with its ordinances, pleadings and the case law (Town Br., p. 28). If "the Town is not seeking to apply platting regulations," then the Court of Appeals should rule in Bizios' favor inasmuch as Chapter 212 is the only statutory authority arguably available to the Town.

On pages 31 and 32 of its brief, the Town misconstrues the holdings in *Milestone Potrunco Dev. Ltd. v. City of San Antonio*, 298 S.W.3d 242 (Tex. App.—2009, pet. den.), which actually supports Bizios' argument. The significance of the *Milestone* opinion is that the city's tree ordinance could be extended to the ETJ only pursuant to the platting and subdivision process. *Id.* at 247. Even a home rule city like San Antonio could extend its tree ordinance to the ETJ only if the subject property was being platted; the tree ordinance (like the building code in this case) could not be extended other than through the platting process. *Id.*

The Town wholly misconstrues the holdings in *City of Corpus Christi v. Unitarian Church*, 436 S.W.2d 923 (Tex. Cir. App.—1968, writ ref'd n.r.e.) and *City of Weslaco v. Carpenter*, 694 S.W.2d 601 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.). Both of these cases concerned the definition of a "subdivision"

- 21 -

of land triggering the platting statute and not the extension of building codes to the ETJ. Contrary to the Town's comments on page 34 of its brief, the construction permits and inspections referenced in *Carpenter* concerned the trailer park infrastructure and not the trailers themselves.[2] Because the only conceivable statutory authority available to the Town is Chapter 212, the court of appeals should rule in the alternative that § 212.007 prohibits the application of the Town's building code to Bizios' previously platted lot.

## IV. Bizios has vested rights in the 1995 plat approval under Chapter 245.

Chapter 245 protects a development project from start to finish. The Town incorrectly states on page 39 that "the subdivision or platting of land is a different project than the vertical construction on existing lots". In *Hartsell*, the Dallas Court of Appeals held that a subdivision project is "not distinct and separate from the construction of an individual residence within the subdivision". 130 S.W.3d at 327-8.

Similar to *Lucas*, Bizios requests that this court of appeals not follow the "no petition" opinion in *Shumaker Enterprises, Inc. v. City of Austin*, 325 S.W.3d 812 (Tex. App.—Austin 2010, no pet.). Contrary to the Town's statements, its own

---

[2] It is offensive for the Town to compare its desired inspections related to the construction of a $1 million house to the lack of inspections of the fertilizer plant located within the corporate limits of West and the tragedy that occurred there (Town Br., pp. 32-3). The two land uses and fact situations are not comparable in any way.

documents introduced into the record clearly show that it had prior notice that Sunrise Bay was platted in 1995 (Town Br., pp. 44-5). Sunrise Bay has been recognized by the Town as "an unutilized asset" and acknowledges that "the Town needs to make use of the asset by either annexation or 'selling' it to the Town of Little Elm" (App., Tab C, p. 4).

The Town misconstrues the exemption in § 245.004(a) concerning imminent danger. The Town has not alleged or pled that there is danger of an imminent destruction of property or injuries to persons posed by Bizios' home. According to Black's Law Dictionary, "imminent danger" means an immediate, real threat to one's safety that justifies the use of force or self-defense. This would involve somebody pulling a gun in a darkened alley or a similar type of situation which is not present in this case.

According to the case law, "imminent" means something that is impending, not pending; that is on the point of happening, not about to happen. *Smith v. State*, 269, 272 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). Harm is imminent when there is an emergency situation and it is "immediately necessary" to avoid that harm. *Id.* at 272. Neither the Town nor its witnesses have produced any evidence of imminent destruction of property or injury to persons resulting from the construction of Bizios' house.

- 23 -

In addition, the Town apparently does not understand the applicability of the exemption in § 245.004(1) (Town Br., p. 41). It exempts permits that are at least two years old and are "issued for the construction of a building or structure intended for human occupancy or habitation". The Town argues that the 1995 plat is a permit "for the construction of a building," and the exemption therefore applies (Town Br., p. 40). But the plat is not a building permit for a house which the Town has addressed in separate ordinances and by a process separate from platting. There is no building permit more than two years old involved in this case and the exemption therefore does not apply.

On page 45 of its brief, the Town incorrectly states that Bizios has not asserted relief under § 245.006, Tex. Loc. Gov't Code. In fact, Bizios pled and argued Chapter 245 as a defense to the Town's enforcement just like the homebuilder defendants in *Hartsell* and *Rhino*. Bizios requests this court to hold that the Town's building code cannot be applied to his lot under Chapter 245.

## CONCLUSION AND PRAYER

The trial court erred because the Town, as a general law town, (i) lacks statutory authority to extend its building codes to the construction of a house in its ETJ, (ii) is prohibited from applying its building code under TEX. LOC. GOVT. CODE ANN. § 212.007, and (iii) cannot apply its new ordinances to the previously permitted project under Chapter 245. The trial court abused its discretion in

- 24 -

entering the temporary injunction because the Town failed to produce any evidence of a probable right of recovery.

Appellant prays that the trial court's temporary injunction order be reversed and rendered in favor of Appellant, that this case be remanded for final trial on the merits, that Appellant be awarded its costs and attorney's fees, and this Court grant to Appellant such other and further relief at law and equity to which it may show itself justly entitled.

Respectfully submitted,

WINSTEAD PC
Arthur J. Anderson
State Bar No. 01165957
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5745 – Phone
(214) 745-5390 – Fax
aanderson@winstead.com

David F. Johnson
SB No. 24002357
WINSTEAD PC
777 Main Street, Suite 1100
Fort Worth, Texas 76102
Telephone No.: (817) 420-8223
Fax No.: (817) 420-8201
dfjohnson@winstead.com

By: /s/ Arthur J. Anderson
    ONE OF COUNSEL

**ATTORNEYS FOR APPELLANT HARRY BIZIOS**

- 25 -

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of August, 2014, a true and correct copy of the foregoing was served by electronic filing to the following counsel of record:

William Andrew Messer, Esq.
MESSER, ROCKEFELLER & FORT, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034

*/s/ Arthur J. Anderson*
ONE OF COUNSEL

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(4), I hereby certify that the above styled document contains 6,186 words, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix. Counsel is relying on a word count computer program used to prepare the document.

/s/ *Arthur J. Anderson*
ONE OF COUNSEL

# APPENDIX

Tab A      February 24, 2011 Lakewood Village Town Council Meeting Minutes

Tab B      August 11, 2011 Lakewood Village Town Council Meeting Minutes

Tab C      April 12, 2012 Lakewood Village Town Council Meeting Minutes

6351653v.2

# TAB A

# LAKEWOOD VILLAGE TOWN COUNCIL

# COUNCIL MEETING

# FEBRUARY 24, 2011

## Council Members:

Mike Schnittker, Mayor
Dr. Mark Vargus, Mayor Pro-Tem
Ken Guthrie
Harold Wood
Carl Menckhoff, M.D.
Dave Getka

## Town Staff:

Linda Asbell, Town Secretary
Andrew Messer, Town Attorney

## REGULAR SESSION - 7:00 P.M.

With a quorum of the Council Members present, Mayor Schnittker called the Town Council to order at 7:04 p.m. on Thursday, February 24, 2011, in the Council Chambers of the Lakewood Village Town Hall, 100 Highridge Drive, Lakewood Village, Texas.

**PLEDGE TO THE FLAG**                                    (Agenda Item A)

Mayor Schnittker

**VISITOR/CITIZENS FORUM:**                              (Agenda Item B)

Mayor Schnittker addressed the public stating that they were probably attending as a result of a flyer from an anonymous author that had been distributed to the residents of the ETJ regarding The Town of Lakewood Village's intent to immediately annex the area. Mayor Schnittker invited the author of the annexation flyer to come to the front for a public discussion of the facts, the author did not come forward. Mayor Schnittker stated a flyer they received was filled with inaccuracies and a flyer "Lakewood Village Facts" could be found at the back of the council chambers.

Mary Herrera, 3529 Pinnacle, Little Elm, TX: Mary spoke regarding her 16 acres on Eldorado Parkway in Lakewood Village. Ms. Herrera stated some expensive equipment stored in the barn on her property was stolen. Mayor Schnittker stated the area is patrolled by the Denton County Sheriff and Lakewood Village has a neighborhood crime watch established. Ms. Herrera stated a large truck and trailer was used to remove her equipment and asked for people to report any

suspicious activity seen. Ms. Herrera reported she will begin building a home within the next 6 weeks and requested council review the builder/building fees required in the building ordinance.

Jerry Young, 1216 Oak Street in Rocky Point: Mr. Young stated he received the flyer and asked to be filled in on the intentions of the Town of Lakewood Village. Mayor Schnittker explained the Town cannot annex property in the extra-territorial jurisdiction of the Town without first receiving a petition requesting annexation. Mayor Schnittker stated that the flyer was disparaging toward Lakewood Village and was not fact based. Mayor Schnittker reported the Town would receive approximately $125 in taxes on a $50,000 house in Rocky Point, however, the Town pays over $200 per home each year in fire protection alone. It does not make financial sense at this point to annex property in Rocky Point.

Julio Valenzuela, 1214 Point St, Rocky Point: asked if he could sign a document to opt out of annexation. Mayor Schnittker stated it was not necessary to sign anything to opt out. The only document needing a signature would be the petition requesting annexation.

Paul Stehlik, Sunrise Bay: Mr. Stehlik asked about building permits being required in the ETJ. Mr. Stehlik reported that someone in Denton County District Attorney, Civil Division told him that Lakewood Village does not have the authority to require permits from properties in the ETJ. Town Attorney Messer reported that towns do have the authority to require building permits and inspections outside their town limits. Mr. Stehlik asked if the Town has an annexation plan. Mayor Pro-Tem Vargus explained that because the size of the Town and the limits annexation authority the Town does not have an annexation plan.

**CONSENT AGENDA:**                                              (Agenda Item C)
1.  Minutes of January 13, 2011 Council Meeting
2.  Interlocal Agreement with Denton County for Rental of Voting Machines & Equipment
3.  Ordinance Calling a General Election for Council Places 1, 3, & 5 on May 14, 2011
4.  Resolution on Removal of Barricade on Shoreline Drive

**MOTION:**    Upon a motion made by Mayor Pro-Tem Vargus and seconded by Councilman Guthrie the Council voted five (5) "ayes" and no (0) "nays" to approve all items on the consent agenda. The motion carried

## REGULAR AGENDA: (Agenda Item D)

**Consideration of Resolution designating a
Municipal Service District, requested by
QuikTrip** (Agenda Item D.5)

Mayor Schnittker reported that QuikTrip has withdrawn their request and will resubmit at a future date.

**Discussion of Sewer System Maintenance** (Agenda Item D.6)

Mayor Schnittker reported that Gary Barnes with AquaMat of Texas has prepared a maintenance schedule. There was some discussion on the jet-cleaning of the sewer lines within the Town. Mayor Schnittker reported regular maintenance will be performed in the first quarter of each year and the repairs will be made during the remaining quarters of the year.

**Consideration of Budget Amendment for
Fiscal Year 2010-2011** (Agenda Item D.7)

Mayor Pro-Tem Vargus reported revenues to be higher than anticipated. Sales taxes are up 44% this year, building permits and franchise fees are higher than anticipated. Mayor Schnittker reported that Peninsula, Hillside, and Parkwood will be paved. The building inspector costs will increase due to the housing starts. There was some discussion on the utility fund revenues. There was some discussion on the 100% collection rate on property taxes and our Tax Collection Attorney's comment on how unusual that is. There was some discussion on the "water scheduled maintenance" and "sewer scheduled maintenance" line items. There was some discussion on the contingency fund. Mayor Schnittker recognized Gary Barnes of Aquamat and Town Secretary Linda Asbell for their work in the re-permitting of the sewer plant. Mayor Schnittker reported the Town received a proposal for $30,000 from the Town Engineer for the re-permitting of the sewer plant. There was some discussion on the depreciation.

**MOTION:** Upon a motion made by Councilman Menckhoff and seconded by Mayor Pro-Tem Vargus the Council voted five (5) "ayes" and no (0) "nays" to approve the ordinance amending the fiscal year 2010-2011 budget as discussed. The motion carried

**Consideration of Interlocal Agreement with
Denton County for Road Repairs** (Agenda Item D.8)

Mayor Schnittker reviewed the agreement.

**MOTION:** Upon a motion made by Councilman Getka and seconded by Councilman Guthrie the Council voted five (5) "ayes" and no (0) "nays" to approve the interlocal agreement with Denton County for Road Repairs. The motion carried.

**Consideration of Ordinance Regulating Signage**                                    (Agenda Item D.9)

There was some discussion on the need to control the size and types of permitted signs.

**MOTION:** Upon a motion made by Councilman Getka and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to approve the ordinance regulating signage. The motion carried

**Consideration of Building Ordinance**                              (Agenda Item D.10)

No action was taken on this item.

**EXECUTIVE SESSION**                                                (Agenda Item E)

In compliance with Section 551.072, Texas Government Code, Mayor Schnittker adjourned into executive session at 7:25 p.m. to deliberate the purchase, exchange, lease, or value of real property .

**RECONVENE**                                                        (Agenda Item F)

Mayor Schnittker reconvened the council and called the meeting to order at 8:58 p.m.

**COUNCIL AND STAFF COMMENTS**                                       (Agenda Item G)

Town Secretary, Linda Asbell, reported on Little Elm Area Day in Austin to be held on March 3rd.

**ADJOURNMENT**                                                      (Agenda Item H)

**MOTION:** Upon a motion made by Councilman Getka and seconded by Mayor Pro-Tem Vargus the Council voted five (5) "ayes" and no (0) "nays" to adjourn the Regular Session of the Lakewood Village Town Council at 9:03 on Thursday, February, 24, 2011. The motion carried.

These minutes approved by the Lakewood Village Town Council on the 10th day of March, 2011

APPROVED


_____
Mike Schnittker
MAYOR


ATTEST:



_____
Linda Asbell
TOWN SECRETARY

# TAB B

# LAKEWOOD VILLAGE TOWN COUNCIL

## COUNCIL MEETING

## AUGUST 11, 2011

### Council Members:

Mike Schnittker, Mayor, appeared via video conference
Dr. Mark Vargus, Mayor Pro-Tem
Ken Guthrie
Harold Wood
Carl Menckhoff, M.D.
Dave Getka

### Town Staff:

Linda Asbell, Town Secretary

### REGULAR SESSION - 7:00 P.M.

With a quorum of the Council Members present, Mayor Pro-Tem Vargus called the Town Council to order at 7:03 p.m. on Thursday, August 11, 2011, in the Council Chambers of the Lakewood Village Town Hall, 100 Highridge Drive, Lakewood Village, Texas.

### PLEDGE TO THE FLAG (Agenda Item A)

Mayor Pro-Tem Vargus led the pledge of allegiance

### VISITOR/CITIZENS FORUM: (Agenda Item B)

No one requested to speak.

### PUBLIC HEARING: (Agenda Item C)

A public hearing was held in accordance with Local Government Code § 102.006(c) on the proposed Fiscal Year 2011-2012 budget to provide an opportunity for citizen comment. Mayor Pro-Tem Vargus opened the public hearing at 7:03 p.m.

No one requested to speak.

**MOTION:** Upon a motion made by Councilman Getka and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to close the public hearing at 7:04 p.m. The motion carried.

## REGULAR AGENDA:                                    (Agenda Item D)

### Consideration of Variance Request for 760
### Meadow Lake Pool                                  (Agenda Item D.1)

Mr. Simmons reviewed his request for variance. Town ordinance requires a ten-foot distance between the house and the pool and Mr. Simmons' property configuration only allows for less than five feet. Mayor Pro-Tem Vargus verified that Mr. Simmons understands that if the pool company fails to finish the pool then he, as the property owner, is responsible for the permit and completing the work. Mayor Pro-Tem Vargus also clarified the need for a variance for the side-yard setback. There was some discussion about the requirements for obtaining a side-yard setback variance. There was some discussion about the need for engineer approval for pools placed closer than ten feet from the house.

**MOTION:** No Motion Was Made

### Discussion of Electrical Quality Concerns           (Agenda Item D.2)

Mayor Pro-Tem Vargus reported that Town Secretary Linda Asbell requested CoServ attend this meeting, however, they stated they had no one available to attend. Mayor Pro-Tem Vargus reported that CoServ said they rebalanced loads twice a year and he requested the reports and the dates of the rebalancing which CoServ refused to provide. The manufacturer recommended unbalance tolerance on the motors at the water plant is 10 percent and CoServ was providing power with a greater than 20 percent unbalance. After the rebalancing of the phases the unbalance is down to 9 percent. There was some discussion on the total bills incurred to date and the verbal agreement with CoServ that they would cover the expenses if the problem was determined to be their responsibility.

### Consideration of Ordinance Adopting the
### Fiscal Year 2011-2012 Budget                       (Agenda Item D.3)

Mayor Schnittker arrived via video conference at 7:26 p.m.

Mayor Pro-Tem Vargus reviewed the budget numbers. The building permit numbers are unknown. Council discussed the lien receipt numbers and the building permit numbers. Council discussed estimating the reserve funds of $110,000 to be included in the budget. Council discussed street repairs and crack sealing and the possibility of entering an interlocal agreement with the City of Oak Point for crack sealing. Mayor Schnittker stated that he would like to do the crack sealing as soon as possible. Mayor Schnittker reported on some new valves installed to allow water repairs to be made without turning off water to the entire town. There was some discussion on the fire/EMS agreement and the need for a new formula for computing the contract

cost. Mayor Pro-Tem Vargus reviewed some of the changes recommended by the CoServ energy audit of Town Hall. Mayor Schnittker reported that some new street signs would need to be purchased, i.e.: stop sign for Shoreline, a no lake access sign, and some speed limit signs. Mayor Schnittker reported on a resident that has volunteered to assist with cutting some walking trails at Witt Park. There was some discussion on the development of Witt Park.

Mayor Pro-Tem Vargus reviewed the Utility Fund Revenues. There was some discussion on the sewer expense of $42.50 per house per month versus the $34.00 revenue received. Council discussed raising the sewer rate to $40.00 and not following the increase with an additional incremental adjustment. There was some discussion about the solid waste cost and the amount received per house. Council discussed increasing the rate to $17.00 per house per month. There was some discussion about utility fund capital expenditures and the possibility of replacing the pressure tank as a capital expenditure. There was some discussion on the Aquamat contract. Councilman Getka requested irrigation be installed at the Town Entrance. There was some discussion on the scheduled maintenance expense for both water and sewer.

**MOTION:**    Upon a motion made by Councilman Guthrie and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to approve ordinance adopting the budget for Fiscal Year 2011-2012 as discussed. The motion carried.

**Consideration of Water / Wastewater
Ordinance**                                                            (Agenda Item D.4)

Mayor Pro-Tem Vargus reviewed the ordinance. Mayor Pro-Tem Vargus reported that the trash collection rate has been included in this ordinance since it appears on the water bill. There was some discussion on requiring a back-flow valve. There was some discussion on the new language regarding the supplemental sewage back-up coverage. The sewer rate will be $40 per month, the garbage service rate will be $17 per month. There was some discussion on amending Section M to make a resident responsible for repair costs in the event the meter or components are damaged. There was some discussion on the amount of the deposit for a water account and the possibility of increasing the deposit for a water account held by a person renting a property. Councilman Guthrie distributed a graph of the utility rates which compares billed rates against volume. There was some discussion on the rate structure for water billing.

**MOTION:**    Upon a motion made by Mayor Pro-Tem Vargus and seconded by Councilman Getka the Council voted five (5) "ayes" and no (0) "nays" to approve the water/wastewater ordinance as discussed. The motion carried.

**Consideration of Emergency Water Ordinance**                                    (Agenda Item D.5)

Mayor Pro-Tem Vargus reviewed the need for an ordinance that addresses emergency water situations that are related to drought. Mayor Schnittker reviewed green level, yellow level, and red level restrictions and the differences between the original 00-05 ordinance and the proposed ordinance. There was some discussion about including a provision for a warning prior to implementing the fine.

**MOTION:**   Upon a motion made by Councilman Getka and seconded by Councilman Menckhoff the Council voted five (5) "ayes" and no (0) "nays" to approve the emergency water ordinance as discussed. The motion carried.

**Consideration of Minutes of June 9, 2011 Council Meeting**                        (Agenda Item D.6)

**MOTION:**   Upon a motion made by Mayor Pro-Tem Vargus and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to approve the June 9, 2011 minutes. The motion carried.

**Consideration of Minutes of July 14, 2011 Council Meeting**                        (Agenda Item D.7)

**MOTION:**   Upon a motion made by Councilman Menckhoff and seconded by Mayor Pro-Tem Vargus the Council voted five (5) "ayes" and no (0) "nays" to approve the July 14, 2011 minutes as presented. The motion carried.

                                                                                (Agenda Item F)

**COUNCIL AND STAFF COMMENTS:**

Town Secretary, Linda Asbell, reported on the status of Denton County code enforcement clean-up efforts in Rocky Point.

Town Secretary, Linda Asbell, reported on an issue with Denton County issuing building permits in Lakewood Village ETJ and refusing to support the Town's authority to enforce building permits and inspections on proposed construction.

**ADJOURNMENT**                                                                  (Agenda Item G)

**MOTION:**   Upon a motion made by Councilman Getka and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to adjourn the Regular

Session of the Lakewood Village Town Council at 9:38 on Thursday, August 11, 2011. The motion carried.

These minutes approved by the Lakewood Village Town Council on the 8th day of September, 2011

APPROVED

_____
Mike Schnittker
MAYOR

ATTEST:

_____
Linda Asbell
TOWN SECRETARY

# TAB C

# LAKEWOOD VILLAGE TOWN COUNCIL

## COUNCIL MEETING

## APRIL 12, 2012

**Council Members:**

Mike Schnittker, Mayor
Dr. Mark Vargus, Mayor Pro-Tem
Ken Guthrie
Harold Wood
Carl Menckhoff, M.D.
Dave Getka

**Town Staff:**

Linda Asbell, Town Secretary

## REGULAR SESSION - 7:00 P.M.

With a quorum of the Council Members present, Mayor Schnittker called the Town Council to order at 7:00 p.m. on Thursday, April 12, 2012, in the Council Chambers of the Lakewood Village Town Hall, 100 Highridge Drive, Lakewood Village, Texas.

**PLEDGE TO THE FLAG** (Agenda Item A)

Mayor Schnittker led the pledge of allegiance

**VISITOR/CITIZENS FORUM:** (Agenda Item B)

Michele Stapleford, 419 Shady Oaks Lane, in Rocky Point spoke and requested the Council waive the $100 deposit required for 417 Shady Oaks Lane because the property has hardly any water consumption as it only contains a building used for storage. Ms. Stapleford also asked about the 291.84 TCEQ regulation that restricts water deposits to $50 and requires the deposit be refunded after 18 months. Mayor Pro-Tem Vargus explained the different regulations on for-profit water systems and municipal water system.

**CONSENT AGENDA:** (Agenda Item C)

1. Minutes of the January 19, 2012 Council Meeting
2. Minutes of the February 16, 2012 Council Meeting
3. Minutes of the March 8, 2012 Council Meeting
4. Resolution Adoption of Official Town Map
5. Ratification of Contract between Lakewood Village MDD and AquaMat of Texas

Mayor Pro-Tem Vargus explained that the ratification of the contract between the MDD and AquaMat is not a requirement, however, he wanted council to see and approve it as good practice.

**MOTION:**    Upon a motion made by Mayor Pro-Tem Vargus and seconded by Councilman Guthrie the Council voted five (5) "ayes" and no (0) "nays" to approve the items on the consent agenda. The motion carried.

REGULAR AGENDA:                                                      (Agenda Item D)

Discussion of Water/Wastewater Report by
Gary Barnes of AquaMat of Texas                                      (Agenda Item D.1)

Mayor Schnittker reported that due to illness Mr. Barnes is unable to attend the meeting therefore this item will be tabled until the next council meeting.

Consideration of Ordinance Denying Rate
Increase Requested by AquaTexas                                      (Agenda Item D.2)

**MOTION:**    Upon a motion made by Mayor Pro-Tem Vargus and seconded by Councilman Wood the Council voted five (5) "ayes" and no (0) "nays" to approve the ordinance denying the rate increase requested by AquaTexas. The motion carried.

Consideration of On-Street Parking                                   (Agenda Item D.3)

Mayor Schnittker reviewed the current regulations and the problems with people parking on the street impeding traffic. There was some discussion about possible alternatives. Councilman Getka reported on a problem with people attending practices in the baseball field and parking along Lakecrest. Councilman Menckhoff recommended the baseball league be contacted to see if they would be willing to distribute information to their participants about appropriate parking alternatives.

Discussion of Concrete Streets Proposal from
Freese and Nichols                                                   (Agenda Item D.4)

Mayor Pro-Tem Vargus reviewed the proposal received from Freese and Nichols for a concrete street project. Mayor Schnittker introduced George Stuyck a resident of Lakewood Village who is a licensed surveyor and has experience in road projects. Mr. Stuyck reviewed the typical process for road projects and the methods used. Mr. Stuyck stated that it would be important for the project to be phased properly. Mr. Stuyck stated that the road leading into Town could be completed pretty quickly; however, residential roads will be more difficult as the road will have to be done one side at a time to allow for residential access. There was some discussion on the

benefits in using Freese and Nichols to handle the entire project versus handling the project in-house and utilizing the inside engineer associated with the street contractor. There was some discussion on the phasing priorities for the project and the funding options. There was some discussion on the bidding process and pricing. Council discussed the length of the financing term. Mayor Pro-Tem Vargus reported that he will discuss financing options with a few banks. Councilman Getka asked about the possibility of grants to assist with this project. Mayor Schnittker is going to contact Freese and Nichols to inform them of Council's desire to phase the project and request a revised proposal.

## Discussion of Zoning Ordinance                                               (Agenda Item D.5)

Mayor Schnittker stated that this item is to discuss how council will revise the zoning ordinance. Mayor Pro-Tem Vargus reviewed the need for updating this ordinance in conjunction with the recent updating of the building and subdivision related ordinances. Councilman Guthrie stated that he would be part of a team to look at writing the zoning ordinance but he does not feel qualified to make zoning ordinance changes as an individual. There was some discussion on future development as regulated via planned developments. Councilman Getka stated he would also be a part of a zoning ordinance team. Councilman Getka and Councilman Guthrie will review the ordinance and report back at the next council meeting.

## Discussion of Water Efficiency Study                                          (Agenda Item D.6)

Mayor Pro-Tem Vargus reviewed the water efficiency study he recently completed. Mayor Pro-Tem Vargus reported according to the study in the month of November the old meters are only reading about 45% of the actual water usage. Based on the results of the study the average water consumption which was not being recorded was approximately 5,000 gallons per house. Mayor Pro-Tem Vargus reported the well meters have been replaced so those measurements will also be accurate.

Mayor Pro-Tem Vargus reviewed the efficiency plan for well usage. Mayor Pro-Tem Vargus reported that the wells should be sequenced so the smaller well comes on first, and the other wells come on only as needed. Based on a modified sequencing study a ten percent energy savings was realized. Several new floats will need to be purchased to regulate the sequencing and a chlorination revision will be required. Mayor Pro-Tem Vargus reported that he will put together a proposal to submit to CoServ to ask for a grant to cover the expense of this project.

## Consideration of Water/Wastewater
## Ordinance                                                                     (Agenda Item D.7)

Mayor Schnittker reported that the Rocky Point well building has been completely rebuilt, two pressure tanks are now operational, the storage tank has been sanitized and is now online. The

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 11:49:55 AM
DEBRA SPISAK
CLERK

# NO. 02-14-00143-CV

RECEIVED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 11:49:55 AM
DEBRA SPISAK
Clerk

# IN THE COURT OF APPEALS SECOND DISTRICT OF TEXAS, FORT WORTH

## HARRY BIZIOS,
### *APPELLANT*,

## V.

## TOWN OF LAKEWOOD VILLAGE, TEXAS,
### *APPELLEE*.

## BRIEF OF AMICUS CURIAE
## PROPERTY OWNERS' ASSOCIATION OF SUNRISE BAY

.

WHITEHURST & CAWLEY, L.L.P.

FRANK G. CAWLEY
State Bar No. 24006978
4560 Belt Line Road, Suite 200
Addison, Texas 75001
972/503-5455 Telephone
972/503-6155 Facsimile

**Counsel for Property Owners' Association
Of Sunrise Bay**

## IDENTITY OF PARTIES AND COUNSEL

Amicus Curiae Property Owners' Association of Sunrise Bay supplements the parties' identification of parties and counsel with the following information:

1. Amicus Curiae is Property Owners' Association of Sunrise Bay.

2. Counsel for Amicus Curiae is Frank G. Cawley, Whitehurst & Cawley, L.L.P. 4560 Beltline Rd., Suite 200, Addison, Texas 75001

## INTEREST OF AMICUS CURIAE

Pursuant to Texas Rule of Appellate Procedure 11, Amicus Curiae, Property Owners' Association of Sunrise Bay ("the Association"), submits this brief in support of Appellant, Harry Bizios because the disposition of the issues raised in this case will significantly affect the Association and its constituent property owners.

The Association is a duly organized Texas non-profit property owners association comprised of 174 properties and 171 property owners. Approximately 57 of these properties are located wholly or partially within the extra-territorial jurisdiction of the Town of Lakewood Village. (CR 527). The Association and its constituent property owners have a significant interest in the subject matter of this case. The Association is committed to maintaining sustainable property values, preserving and attracting desirable property owners, and maintaining the integrity and constituency of the Association. If this Court holds that the Town of Lakewood Village has the power to enforce its ordinances, building codes, and confiscatory building permit fees in its ETJ, it will serve as a disincentive to property ownership and transfer in the subject ETJ, reduce the pool of attractive

purchasers, and discourage the improvement of properties in the Lakewood Village ETJ. Each of these will have a deleterious effect on property values which impacts all of the 171 members of the Association.

No fees have been paid for the filing of this brief.

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL……………………………………....……ii

INTEREST OF AMICUS CURIAE……………………………………………....iii, iv

TABLE OF CONTENTS………………………………………………….……v, vi

INDEX OF AUTHORITIES…………………………………………..vii, viii, ix

ISSUES PRESENTED ......................................................................................1

**Issue 1:**
Whether a general law town has the power to enforce its building codes and building permit fees in its extraterritorial jurisdiction absent express statutory authority.

**Issue 2:**
Whether the Town established a probable right to the relief sought where the evidence establishes that its building permit fees bear no reasonable relationship to the cost of regulating construction, and thus constitute unlawful taxes.

SUMMARY OF ARGUMENT…………………………………………….......1, 2

STATEMENT OF FACTS.............................................................................2

ARGUMENT AND AUTHORITIES…………………………………………....3

Lakewood Village's Motive in Attempting to Require Permit Fees and to Enforce Building Codes is Revenue Generation, Not Health, Safety and Welfare ...............................................................3

As a General Law Town, The Powers of Lakewood Village Are Limited To Those Expressly Authorized By Statute.........................7

There is No Statutory Authority Authorizing Lakewood Village to Require Building Permits or to Enforce Building Codes in its ETJ .........8

The Authority on Which Lakewood Village Relies is Inapposite Because it is Based on a Different, Repealed Statute and is no Longer Good Law ......................................................................................11

Lakewood Village's admission that it has not adopted Subchapter B is fatal to its position ......................................................................14

The Trial Court Erred in Finding a Probable Right To Relief Because Lakewood Village's Building Permit Fees Constitute Unlawful Taxes ............................................................................15

CONCLUSION AND PRAYER ..............................................................18

CERTIFICATE OF SERVICE ...............................................................19

vi

# INDEX OF AUTHORITIES

**<u>Case Law</u>**                                                            **<u>Page(s)</u>**

*Bon Air Estates, Inc. v. Village of Suffern,*
    32 A.D.2d 921, 302 N.Y.S.2d 304 (1969) ............................................. 16

*City of Austin v. Jamail,*
    662 S.W.2d 779, 782 (Tex. App. – Austin 1983, writ dism'd)......... 7

*City of Sweetwater v. Hamner,*
    259 S.W. 191, 195 (Tex. Civ. App. – Fort Worth 1923, writ dism'd)
    .............................................................................................................. 7

*City of West Lake Hills v. Westwood Legal Defense Fund*
    598 S.W.2d 681, 683, 684 (Tex. Civ. App. – Waco 1980, no writ) .. 7

*Colonial Oaks West, Inc. v. East Brunswick,*
    296 A.2d 653, 660 (N.J. 1972) ............................................................ 16

*Daniels v. Point Pleasant,*
    23 N.J. 357, 362, 129 A.2d 265 (N.J. 1957)…………………………15, 17

*Ft. Worth v. Gulf Refining Co.,*
    125 Tex. 512 (Tex. 1935)..................................................................... 15

*Health v. King,*
    705 S.W.2d 812, 814 (Tex. App. Dallas 1986) ................................. 16

*Hope v. Laguna Vista,*
    721 S.W.2d 463, 463-464 (Tex. App. Corpus Christi 1986)............. 7

*Levy v. City of Plano,*
    2001 Tex. App. LEXIS 7515 (Tex. App. Dallas Nov. 8, 2001)...11, 12

*Lodge of Ozarks, Inc. v. Branson,*
    796 S.W.2d 646 (Mo. Ct. App. 1990)................................................. 16

*Lucas v. North Texas Municipal Water Dist.,*
    724 S.W.2d 811, 824 (Tex. App. 1986)……………………………..11, 12

*Merrelli v. City of St. Clair Shores,*
    355 Mich. 575, 96 N.W.2d 144 (Mich. 1959) .................................... 15

*Orange and Rockland Utilities v. Town of Clarkstown,*
    80 A.D.2d 846, 444 N.Y.S. 2d 670 (1981)………………………..15, 16

*Raum v. Board of Sup'rs of Tredyffrin Township,*
    29 Pa. Commw. 9, 370 A.2d 777 (Pa. Comwlth. 1977).................... 16

*Sun Oil Co. v. Whitaker,*
    424 S.W.2d 216, 218 (Tex. 1968)....................................................... 17

*Tex. DOT v. City of Sunset Valley,*
    146 S.W.3d 637, 645 (Tex. 2004)....................................................... 7

*Township of Ridley v. Ridley Arms, Inc.,*
    90 Pa. Commw. 143, 494 A.2d 870 (Pa. Comwlth. 1985)................ 16

*Trevino & Gonzalez Co. v. R.F. Muller Co.,*
    949 S.W.2d 39, 40 (Tex. App.—San Antonio 1997, no writ) .......... 15

*Vance v. Pleasanton,*
    261 S.W. 457, 459 (Tex. Civ. App. 1924)........................................... 16

## Statutes and Codes

Tex. Loc. Govt. Code §43.024....................................................................... 7
Tex. Loc. Govt. Code §13.002....................................................................... 8
Tex. Loc. Govt. Code, Chapter 212…………………………....1, 8, 10, 11, 12
Tex. Loc. Govt. Code, §212.002………………………………………….…8, 9
Tex. Loc. Govt. Code, §212.003………………………………………….…8, 9
Tex. Loc. Govt. Code, §212.041…………………………………………...14
Tex. Loc. Govt. Code, §212.049…………………………9, 10, 12, 13, 14

Tex. Loc. Govt. Code, §212.172................................................................... 13

Texas Revised Civil Statute 970a ................................................................ 11
Texas Revised Civil Statute 970a, Article 1, Section 4 ............................... 12

Texas Constitution ....................................................................................... 16

## ISSUES PRESENTED

### Issue 1

Whether a general law town has the power to enforce its building codes and building permit fees in its extraterritorial jurisdiction absent express statutory authority.

### Issue 2

Whether the Town established a probable right to the relief sought where the evidence establishes that its building permit fees bear no reasonable relationship to the cost of regulating construction, and thus constitute unlawful taxes.

## SUMMARY OF ARGUMENT

General law towns such as the Town of Lakewood Village possess only the powers expressly conferred by the legislature. Contrary to Lakewood Village's arguments, neither subchapter A nor subchapter B of Texas Local Government Code Chapter 212 authorize a general law town to require building permits or enforce building codes in an ETJ. Lakewood Village can point to no other statute that expressly authorizes a general law town to require building permits or enforce building codes in an ETJ. Thus,

1

the Town's attempt to impose its building codes and building permit fees on Bizios is unlawful, and the trial court erred in granting a temporary injunction in favor of the Town.

The Town's building permit fees constitute the imposition of an illegal tax outside of its territorial limits. The evidence establishes that the Town's building permit fees exceed the cost of issuing the permit and of inspecting and regulating construction by more than 1200 percent. The fees are so far in excess of the cost to regulate construction that they can only be classified as revenue generating taxes. The trial court erred in refusing to consider the constitutionality of these permit fees in determining whether Lakewood Village established a probable right to the relief sought.

## STATEMENT OF FACTS

The Association was created in 1995 by the developer of Sunrise Bay, Properties of the Southwest, Inc. The plat for Sunrise Bay was approved by the Town of Little Elm and Denton County in 1995. (Appellee's Brief at pg. 39). The first homes in the Lakewood Village ETJ were constructed in 1996. Of the 174 properties in Sunrise Bay, approximately 57 are located wholly or partially in the Lakewood Village ETJ. (CR 125). There are presently 34

homes constructed in the Lakewood Village ETJ. With the exception of Bizios' home, all of these homes were built before 2011 when Lakewood Village passed Ordinance 11-11 which purports to require permit fees and to enforce building codes in the ETJ. (CR 307-310).

The Association is one of only two homeowners or property owners associations in Lakewood Village's ETJ. In 2013, the Lakewood Village Town Council passed Ordinance 13-07 which amended its Subdivision Ordinance. (CR 345-367). Section 36 of Ordinance 13-07 purports to prohibit mandatory property owners associations and homeowners associations that charge mandatory fees. (CR 366). The Associations' deed restrictions require membership in the respective associations and require mandatory annual fees. (CR 454). Thus, under Ordinance 13-07, Lakewood Village purports to restrain the rights of nearly one-third of the property owners in Sunrise Bay from associating and complying with their deed restrictions.

## ARGUMENT AND AUTHORITIES

### A. Lakewood Village's Motive in Attempting to Require Permit Fees and to Enforce Building Codes is Revenue Generation, Not Health, Safety and Welfare

The controlling issue in this case is whether Lakewood Village can require permit fees and enforce building codes in its ETJ absent any statutory authorization permitting it to do so. However, Lakewood Village attempts disguise its true motive through the sophistry of promoting health, safety, and welfare. Accordingly, the Association will address this issue at the outset.

In its Brief, Lakewood Village argues that its true intent in extending its building codes into its ETJ is solely to promote the health, safety, and welfare of its citizens and the residents of the ETJ. However, Sunrise Bay has been in existence since 1995, and 34 homes have been constructed in Lakewood Village's ETJ prior to 2011 when it attempted to extend its building permits and codes into the ETJ. Conspicuously absent from Lakewood Village's Brief is any mention of any evidence of any health, safety, or welfare issues arising out of the construction of any of these 34 homes in the intervening 16 years. Certainly if any evidence existed to support Lakewood Village's purported motive, it would be cited in its Brief. Lakewood Village wholly fails to explain why, after 16 years and the

4

construction of 34 homes, it suddenly became concerned with the health, safety, and welfare of its citizens and residents of the ETJ.

Lakewood Village's true motive for extending its building permit fees and building codes into the ETJ is evidenced by the April 12, 2012 meeting minutes of the Lakewood Village Town Council in which the mayor characterized Sunrise Bay as an unrealized "asset" of the town. (See Tab C attached to Bizios Reply Brief). This motive is also evidenced by the enormous profit it receives by imposing its permit fees in the ETJ. The total cost to Lakewood Village to have building plans reviewed and inspections performed is $1200. (2 RR 144). Coincidentally, this is the exact amount Lakewood Village charged Bizios in subcontractor fees. (3 RR 19). On top of that, Lakewood Village charged Bizios $14,656.00 in building permit fees. (2 RR 92-93). Thus, Lakewood Village realized a $14,656.00 profit from the building permit fees for the construction of one home. The prospect of a similar windfall for construction on the remaining 20 or so lots in the Sunrise Bay portion of Lakewood Village's ETJ certainly qualifies as realizing an asset. Lakewood Village fails to explain why it cannot promote the health, safety, and welfare through the imposition of its

building codes with permit fees that have a more reasonable connection to the cost of regulation. This is because Lakewood Village's motive is revenue generation, and the promotion of health, safety, and welfare justification is a mere pretext.

Further, the fact that Lakewood Village seeks to prohibit homeowners and property owners associations belies its supposed interest in health, safety, and welfare. The Sunrise Bay POA has an Architectural Control Committee which is charged with approving construction plans for compliance with acceptable construction standards. (CR 452-454). In addition, the Sunrise Bay Declarations of Covenants require construction approval by Denton County. (CR 452). The abolition of the POA would remove these additional levels of construction approval which contribute to the health, safety and welfare of the residents in the POA.

Lakewood Village also attempts to justify its imposition of building codes and building permits in the ETJ by asserting that it might annex it in the future. However, because the population of Lakewood Village is less than 5000, and will always be less than 5000, it can only achieve annexation by a vote of the majority of the qualified voters in the ETJ. Tex.Loc.Govt.

Code §43.024. There is absolutely no possibility that Lakewood Village could garner the votes necessary for annexation, and Lakewood Village knows it. (See Tab A attached to Bizios' Reply Brief). Once again, Lakewood Village's stated motive is pure subterfuge.

**B. As a General Law Town, The Powers of Lakewood Village Are Limited To Those Expressly Authorized By Statute**

General law cities possess only the powers and privileges expressly conferred on them by law. *Tex. DOT v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004); *Hope v. Laguna Vista,* 721 S.W.2d 463, 463-464 (Tex. App. Corpus Christi 1986). A city cannot exercise its powers outside its limits without express statutory authority, unless the power is reasonably incident to those expressly granted. *City of Austin v. Jamail*, 662 S.W.2d 779, 782 (Tex. App. -- Austin 1983, writ dism'd); *City of Sweetwater v. Hamner*, 259 S.W. 191, 195 (Tex. Civ. App. -- Fort Worth 1923, writ dism'd). Furthermore, any fair, reasonable, or substantial doubt about the existence of a power is resolved against a city. *City of West Lake Hills v. Westwood Legal Defense Fund*, 598 S.W.2d 681, 683 (Tex. Civ. App. -- Waco 1980, no writ). The court must examine the entire statute and construe it as a whole. Id. at 684. One provision will not be given a meaning inconsistent with or out of harmony with other provisions, though it might be susceptible to such construction if standing alone. Id.

Accordingly, in order for Lakewood Village to possess the power to require building permits and building codes in the ETJ, there must be express statutory authority permitting it to do so.

**C. There is No Statutory Authority Authorizing Lakewood Village to Require Building Permits or to Enforce Building Codes in its ETJ**

Lakewood Village asserts that Texas Local Government Code Chapter 212, subchapter A provides the statutory authority to extend the town's building permit and construction related ordinances into the areas constituting the town's extraterritorial jurisdiction (ETJ). It does not.

Subchapter A of Texas Local Government Code Chapter 212 governs municipalities' regulation of subdivisions. Section 212.002 states:

> After a public hearing on the matter, the governing body of a municipality may adopt ***rules governing plats and subdivisions of land*** within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful development of the municipality.

(emphasis added).

Section 212.003 allows for the extension of ordinances adopted under Section 212.002 into the ETJ. Section 212.003 states as follows:

> (a) The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads or the pumping, extraction, and use of groundwater by persons other than retail public utilities, as defined by Section 13.002, Water Code,

8

for the purpose of preventing the use or contact with groundwater that presents an actual or potential threat to human health.

Taken together, Sections 212.002 - 212.003 only authorize a municipality to extend rules governing plats and subdivisions of land into its ETJ. Thus, the question becomes whether building codes and permit fees constitute "rules governing plats and subdivisions of land." The answer to this question lies in the legislative scheme contained in Chapter 212 wherein laws governing the regulation of subdivisions and laws governing the regulation of property development are codified in separate subchapters.

While Subchapter A of Texas Local Government Code Chapter 212 governs the regulation of subdivisions, Subchapter B governs the regulation of property development. "Property development" is defined as "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement." Further, Section 212.049 provides "This subchapter [subchapter B] does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction."

There are several important conclusions to be drawn from this statutory scheme:

1. The separation of subchapters A and B establishes that there is a distinction between the regulation of subdivisions and the regulation of property development;

2. The legislature's inclusion of Section 212.049 in subchapter B indicates that building permits and building codes fall within the realm of the regulation of property development rather than the regulation of subdivisions;

3. The express statutory authority of a municipality to regulate property development does not include the authorization to require building permits or to enforce building codes in an ETJ;

Based on these inescapable conclusions, neither subchapter A nor subchapter B authorize a municipality to require building permits or enforce building codes in an ETJ. This is because subchapter A does not address rules relating to property development such as building permits and building codes, and subchapter B expressly provides that it does not authorize a municipality to require building permits or enforce building codes in an ETJ.

As set forth above, Lakewood Village is a general law town whose powers must be expressly authorized by statute. Because neither subchapter A or subchapter B of Texas Local Government Code Chapter 212 provide authority to require building permits of enforce building codes in the ETJ, Lakewood Village is prohibited from doing so. Thus, Lakewood Village failed to show a probable right to the relief sought, and the trial court erred in granting a temporary injunction in favor of Lakewood Village.

**D. The Authority on Which Lakewood Village Relies is Inapposite Because it is Based on a Different, Repealed Statute and is no Longer Good Law**

Lakewood Village relies on *Lucas v. North Texas Municipal Water Dist.,* 724 S.W.2d 811, 824 (Tex. App. 1986) for the proposition that the power to regulate subdivisions encompasses the power to require building permits and enforce building codes. Lakewood Village's reliance on Lucas is misplaced. In *Lucas*, interpreting Texas Revised Civil Statute 970a, the Dallas Court of Appeals held "Consequently, we conclude that the power over subdivisions conferred by article 970a necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof." *Id.*

However, the Dallas Court of Appeals has since reversed course on this issue. Interpreting the current version of Chapter 212, the Dallas Court of Appeals held "A city is statutorily prohibited from regulating land use *and construction* on property in its ETJ; a city may apply only its subdivision ordinances to such property." *Levy v. City of Plano*, 2001 Tex. App. LEXIS 7515 (Tex. App. Dallas Nov. 8, 2001)(not designated for publication) (Emphasis added). The *Levy* court properly recognized that the regulation of subdivisions does not encompass the regulation of construction on property. Thus, *Lucas* is no longer good law and does not support Lakewood Village's position.

Furthermore, the statutory scheme set forth in the current version of Chapter 212 is not the same as existed when *Lucas* was decided. The *Lucas* court based its holding on the interpretation of Texas Revised Civil Statute 970a, Article 1, Section 4 which allowed a city to extend its ordinances establishing rules and regulations governing subdivisions and plats into its ETJ.[1] However, unlike the current version of Chapter 212, there was no separate subchapter relating to the regulation of property development. *Id*. Thus, the *Lucas* court's holding was based on the interpretation of a different statute and is inapplicable to the current version of Chapter 212. This explains why the Dallas Court in *Levy* held that general law towns are prohibited from regulating construction on property in an ETJ without even citing *Lucas*.

Lakewood Village contends that subchapter A provides authority to require building permits and enforce building codes in ETJs to all types of municipalities. However, if this were true, Tex.Loc.Govt. Code Section 212.049 would be meaningless. If Lakewood Village is correct, there would be no reason to state that nothing in subchapter B authorizes a municipality to require building permits and enforce building codes in the ETJ if subchapter A already authorized all municipalities to do so. Rather, section 212.049 means that municipalities that do not possess this power cannot use subchapter B as authority to require building

---

[1] See enrolled version of H.B. 13, 58th legislature, 1963
http://www.lrl.state.tx.us/LASDOCS/58R/HB13/HB13_58R.pdf#page=104

permits or to enforce building codes. Thus, Section 212.049 is a recognition that some types of municipalities cannot require building permits and enforce building codes in ETJs.

In addition, Local Government Code Section 212.172 provides that a municipality can enter into a written agreement with a land owner to enforce the municipality's development regulations in the ETJ. If all municipalities have the right to enforce development regulations in the ETJ as a matter of right as Lakewood Village contends, there would be no reason for any agreement between a municipality and a land owner. Again, Section 212.172 reflects a recognition that some types of municipalities cannot require building permits and enforce building codes in ETJs.

Lakewood Village disingenuously argues that through a resolution passed in 2010, Denton County recognized its right to require building permits and to enforce building codes in its ETJ. (CR 200-204). However, Lakewood Village's Town Council meeting minutes contradict this argument. On August 11, 2011, the Town Secretary informed the Town Council about "Denton County issuing building permits in Lakewood Village ETJ and refusing to support the town's authority to enforce building permits and inspections on proposed construction." (See Tab B attached to Bizios Reply Brief). Contrary to Lakewood Village's argument, Denton County does not support Lakewood Village's argument. In any

13

event, Lakewood Village provides no authority for the proposition that a county can confer powers on a general law town where the legislature has refused to grant such powers.

**E. Lakewood Village's admission that it has not adopted Subchapter B is fatal to its position**

Recognizing that Section 212.049 is dispositive, Lakewood Village claims that it has not adopted subchapter B as required by Section 212.041. Therefore, Lakewood Village claims that Section 212.049 is inapplicable. (Appellant's Brief at pgs. 26-27). If it is true that Lakewood Village has not adopted subchapter B, then it has no power to regulate property development at all. As set forth above, subchapter A does not address property development regulations in general or building permits or building codes specifically. Lakewood Village could only conceivably derive the power to regulate property development from subchapter B. Thus, Lakewood Village's admission that it has not adopted subchapter B is fatal to its position in this case. In other words, Section 212.049 establishes that building permits and building codes fall within the realm of property development which is governed by subchapter B. If subchapter B confers no powers on Lakewood Village, by necessity, Lakewood Village lacks the power to regulate property development, including any regulation of building permits and building codes.

**F. The Trial Court Erred in Finding a Probable Right To Relief Because Lakewood Village's Building Permit Fees Constitute Unlawful Taxes**

The trial Court's Order Granting Temporary Injunction found that Lakewood Village established a probable right to relief on its claim that Bizios is required to obtain building permits from the town, including the payment of permit fees. (CR 651-653). However, the evidence establishes that Lakewood Village's permit fees are far in excess of the cost of regulation, and thus, constitute taxes.

A building permit is simply a license authorizing construction. *Trevino & Gonzalez Co. v. R.F. Muller Co.*, 949 S.W.2d 39, 40 (Tex. App.—San Antonio 1997, no writ). A license fee cannot be excessive nor more than reasonably necessary to cover the costs of granting the license and exercising proper police regulation. *Ft. Worth v. Gulf Refining Co.*, 125 Tex. 512 (Tex. 1935). Courts across the country have analyzed whether building permit fees are in fact permissible regulatory fees or prohibited taxes. *Merrelli v. City of St. Clair Shores,* 355 Mich. 575, 96 N.W.2d 144 (Mich. 1959); *Daniels v. Point Pleasant,* 23 N.J. 357, 129 A.2d 265 (N.J. 1957); *Orange and Rockland Utilities v. Town of Clarkstown,* 80 A.D.2d 846, 444 N.Y.S.2d 670

(1981); *Bon Air Estates, Inc. v. Village of Suffern,* 32 A.D.2d 921, 302 N.Y.S.2d 304 (1969); *Township of Ridley v. Ridley Arms, Inc.,* 90 Pa. Commw. 143, 494 A.2d 870 (Pa. Comwlth. 1985); *Raum v. Board of Sup'rs of Tredyffrin Township,* 29 Pa. Commw. 9, 370 A.2d 777 (Pa. Comwlth. 1977); *Colonial Oaks West, Inc. v. East Brunswick*, 296 A.2d 653, 660 (N.J. 1972). These cases hold generally that the amount of the fee may not exceed the cost of issuing the permit and of inspecting and regulating the permitted activity and that a city does not have a power to impose a tax under the guise of a license or permit. *Id.*; *Lodge of Ozarks, Inc. v. Branson*, 796 S.W.2d 646 (Mo. Ct. App. 1990).

Municipalities are strictly limited in their power to tax by the powers granted to them by the Texas Constitution or by statute. *Heath v. King*, 705 S.W.2d 812, 814 (Tex. App. Dallas 1986). A general law town has no power to tax outside of its corporate limits. *Vance v. Pleasanton*, 261 S.W. 457, 459 (Tex. Civ. App. 1924). So if the excessive permit fees constitute taxes, they are unlawful.

In this case, there can be no question that the Town's building permit fees constitute prohibited taxes. The total cost to Lakewood Village to have

building plans reviewed and inspections performed is $1200. (2 RR 144). Lakewood Village charged Bizios $1200 in subcontractor fees. (3 RR 19). Further, Lakewood Village charged Bizios $14,656.00 in building permit fees. (2 RR 92-93). Thus, Lakewood Village realized a $14,656.00 profit from the building permit fees for the construction of one home. These fees are over 1200% in excess of the Town's inspection and plan review costs. These permit fees bear no reasonable relationship to the cost of regulation and are, therefore, taxes. *See Daniels v. Point Pleasant*, 23 N.J. 357, 362 (N.J. 1957)(holding building permit fees that exceed cost of regulation by 700% invalid tax)

Part of the relief Lakewood Village seeks is the requirement that Bizios obtain building permits from the town which includes the payment of its excessive permit fees. As the plaintiff, Lakewood Village bore the burden of proving that it had a probable right to the relief sought. *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968). Because Lakewood Village's building permit fees are unlawful taxes, the trial court erred in finding that Lakewood Village established a probable right to relief as to its claim that Bizios is required to pay impermissibly excessive permit fees.

## CONCLUSION AND PRAYER

Lakewood Village has no power to require building permits or to enforce building codes in its ETJ because there is no statutory authority granting these powers. Further, Lakewood Village's building permit fees constitute taxes which cannot be imposed outside the town limits. Accordingly, the trial court erred in granting the temporary injunction. *Amicus Curiae* prays that the Court reverse the trial court's Order Granting Temporary Injunction, and that this case be remanded for further proceedings consistent with this Court's opinion.

Respectfully Submitted,

/s/Frank G. Cawley
FRANK G. CAWLEY
State Bar No. 24006978
WHITEHURST & CAWLEY, L.L.P.
4560 Belt Line Rd., Suite 202
Addison, Texas 75001
(972) 503-5455
(972) 503-6155 - Facsimile

**Counsel for Amicus Curiae**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was forwarded to the following counsel of record and unrepresented parties via certified mail, return receipt requested, pursuant to the Texas Rule of Appellate Procedure 9.5 on the 26th day of September, 2014:

The Honorable Jonathan Bailey
431st Judicial District Court
Denton County Courts Building
1450 East McKinney Street
Denton, Texas 76209

Andrew Messer
Messer, Rockefeller & Fort, PLLC
6351 Preston Road, Suite 350
Frisco, Texas 75034

Arthur J. Anderson
Winstead, PC
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201

/s/Frank G. Cawley
Frank G. Cawley

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Procedure 9.4(i)(3), I certify that there is a total of 4,759 words in the foregoing computer-generated document. Counsel is relying on a computer generated word count.

/s/Frank G. Cawley
Frank G. Cawley

ACCEPTED
02-14-00143-CV
SECOND COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 2:30:02 PM
DEBRA SPISAK
CLERK

IN THE COURT OF APPEALS OF THE STATE OF TEXAS

SECOND APPELLATE DISTRICT

RECEIVED IN
2nd COURT OF APPEALS
FORT WORTH, TEXAS
9/26/2014 2:30:02 PM
DEBRA SPISAK
Clerk

No. 02-14-00143-CV

HARRY BIZIOS,
*Appellant/Cross Appellee,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee/Cross Appellant.*

On Appeal from the 431st Judicial District Court
Trial Court Cause No. 14-01991-431

## BRIEF *AMICUS CURIAE* TEXAS ASSOCIATION OF BUILDERS IN SUPPORT OF APPELLANT HARRY BIZIOS

Manuel Muñoz, Jr.
SB No. 24053379
Texas Association of Builders
313 E. 12th Street, Suite 210
Austin, Texas 78701
(512) 476-6346 – Phone
(512) 476-6427 – Fax
ned@texasbuilders.org

**Attorneys for Amicus Curiae Texas Association of Builders**

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

STATEMENT OF INTEREST OF AMICUS ........................................................................ 1

SUMMARY OF ARGUMENT ............................................................................................. 2

ARGUMENT AND AUTHORITIES ................................................................................... 4

    A.     The Town's True Motivation is to Generate Revenue. ................................. 4

    B.     The Town lacks statutory authority. ........................................................... 4

CONCLUSION AND PRAYER ........................................................................................... 6

CERTIFICATE OF SERVICE ............................................................................................. 7

CERTIFICATE OF COMPLIANCE WITH RULE 9.4 ....................................................... 8

APPENDIX ......................................................................................................................... 9

# TABLE OF AUTHORITIES

**Page(s)**

STATUTES

Chapter 212, Tex. Loc. Gov't Code ................................................................... 4, 5

Chapter 233, Tex. Loc. Gov't Code .................................................................... 3

§ 214.904, Tex. Loc. Gov't Code ..................................................................... 3, 5

§ 233.151, Tex. Loc. Gov't Code .................................................................. 3, 5, 6

OTHER AUTHORITIES

Tex. Const., Article VIII, Section 1(f) .................................................................. 4

IN THE COURT OF APPEALS OF THE STATE OF TEXAS

SECOND APPELLATE DISTRICT

No. 02-14-00143-CV

HARRY BIZIOS,
*Appellant/Cross Appellee,*

v.

TOWN OF LAKEWOOD VILLAGE, TEXAS,
*Appellee/Cross Appellant.*

On Appeal from the 431st Judicial District Court
Trial Court Cause No. 14-01991-431

**BRIEF *AMICUS CURIAE*
TEXAS ASSOCIATION OF BUILDERS
IN SUPPORT OF APPELLANT HARRY BIZIOS**

**TO THE HONORABLE SECOND COURT OF APPEALS OF TEXAS:**

Pursuant to Rule 11 of the Texas Rules of Appellate Procedure, the Texas

Association of Builders ("TAB") submits this Brief as *Amicus Curiae* in support of

Appellant Harry Bizios.

**STATEMENT OF INTEREST OF AMICUS**

TAB is a non-profit trade association that was founded in 1946 to help

promote the dream of home ownership and to serve the common interests of those

involved in the residential construction industry in the State of Texas. TAB's membership base of nearly 10,000 members across Texas is primarily made up of home builders, remodelers, developers, and other companies and individuals who have an interest and a stake in a healthy and vibrant homebuilding industry in the State of Texas. TAB is affiliated with the National Association of Home Builders and over 28 local associations that are located throughout the State of Texas. TAB's membership represents approximately 702,500 jobs and $31.1 billion annually of the Texas economy.

TAB, as amicus, has an interest in this case in that TAB and its members are extremely concerned about the requirement that its members obtain municipal building permits and pay fees for construction in the extraterritorial jurisdiction ("ETJ"). More specifically, TAB and its members have an interest in seeing that the Court grant the Appellant's appeal and reverse the trial court's decision granting temporary injunction.

That being said, TAB is not a party to this action and has no direct financial interest in its outcome. TAB's counsel was not paid a fee by TAB for the preparation of this brief.

## SUMMARY OF ARGUMENT

TAB's membership is dedicated to the construction of quality, safe housing. Under existing statutes, all one and two family homes built in the state's

municipalities must meet the standards of the International Residential Code ("IRC"), while every county in Texas, other than Loving County, has the authority to mandate that all one and two family homes be built to the standards of the IRC. Furthermore, Denton County has exercised its authority under Subchapter F, Chapter 233 of the Texas Local Government Code to require that all one and two family homes built in the unincorporated areas of Denton County conform to the IRC. TAB supports this standard, and Bizios' and other homes in Lakewood Village's ETJ will be constructed in accordance with the IRC without the Town's interference or oversight.

TAB strongly disagrees with the Town's argument that §§ 214.904 or 233.151, Tex. Loc. Gov't Code, provide statutory authority for the Town to extend its building code to the ETJ. The legislative history of both bills shows that they did not bestow or endow such authority on general law towns like Lakewood Village.

TAB has reviewed the Appellant's briefs in this case. TAB agrees with both the content and the arguments that are set forth in the Appellant's briefs. TAB would like to take this opportunity to incorporate the arguments that are set forth in the Appellant's briefs and to adopt them as if they were TAB's own.

## ARGUMENT AND AUTHORITIES

### A. The Town's True Motivation is to Generate Revenue.

TAB does not oppose legitimate building permit fees which cover true administrative costs in reviewing plans and making inspections. However, the Town's fees, which we understand to represent a profit to the Town of around $15,000 for Appellant's house, constitute an illegal occupation tax, in violation of Article VIII, Section 1(f) of the Texas Constitution. (2 RR 144). This fee is merely a means for the Town to raise revenue as no services are being provided by the Town. Water is provided by the Town of Little Elm and the roads are maintained by Denton County. (2 RR 89; 3 RR 14). This property can never be annexed by Lakewood Village for legal, political and engineering reasons. (2 RR 54). Furthermore, the Town's building official is a moonlighter who, due to full-time employment elsewhere, will not perform services during regular business hours. (2 RR 143). Bizios obtained approved permits from Denton County and the Corps of Engineers for his project and has employed a professional third-party firm to perform code inspections. TAB opposes the extension of municipal building codes to the ETJ by general law towns.

### B. The Town lacks statutory authority.

The Town also has no legal right to enforce its building standards in its ETJ, including fees, inspection requirements and contractor registration regulations. The Town's reliance on Subchapter A, Chapter 212 of the Texas Local

Government Code is misplaced because Subchapter A relates to a city's subdivision and platting powers. The property in question was platted in Denton County long before it came into the Town's ETJ. Consequently, Subchapter B of Chapter 212 applies because it defines development as "new construction." Subchapter B does not authorize a city to require its building standards in the ETJ. In fact, § 212.049, Tex. Loc. Gov't Code, specifically states that the subchapter does not authorize municipalities to require building permits or enforce building codes in the ETJ. General law cities, such as Lakewood Village, only have the powers expressly given to them by Texas statute or the Texas Constitution.

TAB was involved in the legislative process for enacting §§ 214.904 and 233.151, Tex. Loc. Gov't Code. Contrary to the Town's argument, there was never any discussion or statement made at a committee hearing or on the floor of either house that these bills would authorize general law towns to extend their building codes to the ETJ.

For example, HB 265 was passed in 2005 to create § 214.904. The House Research Organization bill analysis is attached as Tab A in the Appendix as shown in Exhibit A. Scott Norman of TAB testified in support of the bill which was intended to prevent cities from arbitrarily delaying taking action on building permit applications. There is no legislative history indicating that § 214.904 was intended to grant general law towns the authority to extend their building codes to the ETJ.

TAB was also involved with the 2009 legislative process in enacting HB 2833 (§ 233.151, Tex. Loc. Gov't Code, et seq.). As originally drafted, and shown in Tab C in the Appendix, the legislative intent was to address the proliferation of "colonias" along the border by authorizing commissioners courts along the border the authority to, among other things, adopt building codes. During the session, the scope of the covered counties was expanded to include virtually every Texas county and allow those counties to require that all one and two family homes built in the unincorporated areas of the county meet IRC standards. At no point was there any discussion or consideration to give general law towns the authority to require building permits in the ETJ.

## CONCLUSION AND PRAYER

*Amicus Curiae* TAB respectfully requests that this Court grant Appellant's appeal, reverse the trial court's temporary injunction order, and grant any additional relief to which the Appellant is entitled.

Respectfully submitted,

TEXAS ASSOCIATION OF
BUILDERS
313 E. 12th Street, Suite 210
Austin, Texas 78701
(512) 476-6346 – Phone
(512) 476-6427 – Fax
ned@texasbuilders.org


By: */s/ Manuel Muñoz, Jr.*
    Manuel Muñoz, Jr.,
    SB 24053379

ATTORNEYS FOR THE TEXAS
ASSOCIATION OF BUILDERS,
*AMICUS CURIAE*


## CERTIFICATE OF SERVICE

Pursuant to Tex. R. App. P. 9.5, I hereby certify that on the 26th day of September, 2014, a true and correct copy of the foregoing was served upon the following counsel of record vie electronic filing service:

William Andrew Messer
Messer, Rockefeller & Fort, P.L.L.C.
6351 Preston Road
Suite 350
Frisco, TX 75034

Arthur J. Anderson
Winstead PC
500 Winstead Building
2728 N. Harwood Street
Dallas, TX 75201

                    */s/ Manuel Muñoz, Jr.*
                    Manuel Munoz, Jr.

## CERTIFICATE OF COMPLIANCE WITH RULE 9.4

Pursuant to Texas Rule of Appellate Procedure 9.4, I hereby certify that the above styled document complies with the type-volume limitations and contains 1,147 words, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, signature, proof of service, certification, certificate of compliance, and appendix. Counsel is relying on a word count computer program used to prepare the document.

/s/ *Manuel Muñoz, Jr.*
Manuel Munoz, Jr.

# APPENDIX

**TAB A:**      March 22, 2005 House Research Organization Bill Analysis for HB 265 by Smith

**TAB B:**      2009 Senate Intergovernmental Relations Committee Witness List for HB 2833

**TAB C:**      2009 Bill Analysis for C.S.H.B. 2833 (Marquez)

# TAB A

SUBJECT:        Deadlines for cities to act on permit applications

COMMITTEE:      Land and Resource Management — favorable, without amendment

VOTE:           6 ayes — Mowery, Blake, R. Cook, Leibowitz, Miller, Orr

                0 nays

                3 absent — Harper-Brown, Escobar, Pickett

WITNESSES:      For — David Mintz, Texas Apartment Association; Scott Norman, Texas
                Association of Builders; (*Registered but did not testify:* Daniel Gonzalez,
                Texas Association of Realtors)

                Against — None

BACKGROUND:     Among other provisions, Local Government Code, Title 7, authorizes
                local government entities to issue building permits. Permit applications
                and review processes vary among cities to ensure that construction and
                improvement plans comply with local policies and standards.

DIGEST:         HB 265 would set deadlines for municipalities to act on permits for
                constructing or improving buildings or other structures within their
                jurisdictions. Upon receipt of a building permit application, a municipality
                would have to:

                • grant or deny the permit to the applicant within 45 days;
                • provide written notice to the applicant explaining why the
                  municipality had not acted on the application, which would add 30
                  days from the date notice was received to the municipality's
                  deadline for reaching a decision; or
                • reach a written agreement with the applicant establishing a deadline
                  for reaching a decision.

                If the municipality failed to act within these deadlines and/or agreements,
                the municipality could not collect any application fees and would have to
                refund to the applicant any fees collected.

The bill would take effect September 1, 2005, and would apply only to permit applications submitted after that date.

SUPPORTERS
SAY:

HB 265 would assist developers in efficiently managing their projects by establishing clear uniform deadlines for granting or denying permit applications. It would develop notification standards that are responsive and predictable and create a clear and transparent permit process through which a municipality and a project manager could communicate effectively.

The permit procedure set forth in HB 265 would allow for the timely identification and rectification of application errors. Rather than letting projects stall over incoherent deadlines or flaws detected late in the permit process, as under the current system, the bill would help municipalities quickly identify a sound project and resolve application flaws to speed the commencement of construction or improvements. By allowing for a more timely project initiation date, HB 265 also would assist a municipality in incorporating new property value into its tax roll.

Variation among municipalities' particular permit requirements would not be affected by the bill. Written agreements between a municipality and a developer could cover any steps required to obtain a permit while clearly delineating the responsibilities of both parties.

OPPONENTS
SAY:

HB 265 would take away local control from regulatory permit processes. Municipalities, large and small, can better determine application deadlines than the state. By requiring written agreements between municipalities and building permit applicants in order to avoid inflexible processing deadlines and resolve application flaws, this bill would slow the permit process, not expedite it. Municipalities today manage to ensure efficient regulatory processes by communicating verbally with applicants, and additional paperwork requirements would do nothing to improve this system. By mandating additional administrative duties, the bill could require some municipalities to increase permit fees to cover the increased processing costs of written agreements, including the possible need for additional personnel.

HB 265 would create unrealistic deadlines for the processing of applications. All applications are reviewed for technical revisions including engineering, building code, and public safety compliance.

Rushing the review process to meet a state-specified deadline could jeopardize technical accuracy.

The bill would not place any requirements on applicants. Applicants who submitted incomplete applications or did not respond to requests from the municipality would not be held accountable for slowing the application process. Municipalities should not have to adhere to application process deadlines if applicants are not responsive.

NOTES:

On February 28, the House passed a related bill, HB 266 by W. Smith, which would set deadlines for counties to respond to permit applications. The Senate has not yet referred this bill to committee.

# TAB B

WITNESS LIST

HB 2833

Senate Committee Report

Intergovernmental Relations

May 20, 2009 - 7:30 AM
>        FOR:
>                Bresnen, Steve (El Paso County), Austin, TX
>        Registering, but not testifying:
>        For:
>                Allison, Jim (County Judges & Commissioners Association of Texas), Austin, TX
>                Lee, Donald (Texas Conference of Urban Counties), Austin, TX
>                Munoz, Ned (Texas Association of Builders), Austin, TX
>                York, Van County Judge (Borden County), Gail, TX

# TAB C

C.S.H.B. 2833
By: Marquez
County Affairs
Committee Report (Substituted)

## BACKGROUND AND PURPOSE

Under current law, certain counties do not have the authority to adopt building codes in the unincorporated areas of the county. This lack of county regulatory power contributes to the growth of substandard housing in colonias throughout the Texas-Mexico border region.

C.S.H.B. 2833 authorizes certain counties along the Texas-Mexico border to adopt a building code applicable to new residential construction that begins after September 1, 2009, in the unincorporated area of the county. The bill authorizes the building codes adopted under the provisions of the bill to contain only the same requirements as the statutory warranty and building and performance standards that apply to residential construction and any rules governing those standards adopted by the Texas Residential Construction Commission.

C.S.H.B. 2833 requires a building code adopted by a commissioners court under the bill's provisions to require a person who builds new residential construction to meet specified requirements, including providing notice to the county, arranging for a third party inspection, and reporting the results of the inspection to the county and other parties. The bill provides for enforcement of such a building code, including referral of violations to the commission and injunctive relief. The bill makes it a Class C misdemeanor to violate its provisions. The bill prohibits a county from charging a fee to a person regulated by the code. The bill clarifies that the new authority granted does not affect existing county authority to adopt orders or ordinances under other law.

## RULEMAKING AUTHORITY

It is the committee's opinion that this bill does not expressly grant any additional rulemaking authority to a state officer, department, agency, or institution.

## ANALYSIS

C.S.H.B. 2833 amends the Local Government Code to authorize the commissioners court in a county that includes territory within 50 miles of an international border, has a population of 700,000 or more, contains a municipality with a population of 550,000 or more, and contains one or more colonias or other developments composed of substandard housing, and in a county whose commissioners court adopts a resolution stating that the county expects population expansion as a result of the recommendations of the federal Defense Base Closure and Realignment Commission, to adopt a building code applicable to new residential construction in the unincorporated area of the county that begins after September 1, 2009. The bill provides that if a municipality located within such a county has adopted a building code in the municipality's extraterritorial jurisdiction, the building code adopted by the municipality controls and a building code adopted by the county has no effect in the municipality's extraterritorial jurisdiction. The bill prohibits these provisions from being construed to require prior approval by the county before beginning new residential construction, to authorize the commissioners court of a county to adopt or enforce zoning regulations, or to affect the application of provisions related to the subdivision platting requirements in a county near an international border to land development.

The bill provides that in the event of a conflict between its provisions and provisions related to the subdivision platting requirements in a county near an international border, provisions related to the subdivision platting requirements in a county near an international border control.

C.S.H.B. 2833 authorizes an adopted building code to contain only the same requirements as the statutory warranty and building performance standards that apply to residential construction under the Texas Residential Construction Commission Act, and any rules governing those standards adopted by the Texas Residential Construction Commission. The bill requires the adopted building code to require a person who builds new residential construction to have the new residential construction inspected by a third-party inspector approved by the commission at the time and in the manner prescribed by rules adopted by the commission; before commencing new residential construction, to provide notice to the county of the location of the new residential construction on a form prescribed by the county, the date by which the new residential construction will be commenced, and the name of the third-party inspector who will inspect the new residential construction; and to submit not later than the 10th day after the date of each inspection a written report prepared by the third-party inspector of the inspection and describing the results of the inspection to the county employee or department or agency of the county designated by the commissioners court of the county and the person who purchased the new residential construction from the builder, if applicable.

C.S.H.B. 2833 authorizes the county, in order to enforce compliance with a building code adopted under the bill's provisions, to seek injunctive relief and impose certain penalties; to refer a builder registered under the Texas Residential Construction Commission Act who violates a provision of that act, or any rule adopted under that act, to the commission for disciplinary action; and to refer a third-party inspector approved by the commission under the Texas Residential Construction Commission Act who violates a provision of that act, or any rule adopted under that act, to that commission for disciplinary action. The bill authorizes the commission to take any action with regard to a builder or third-party inspector that it is authorized to take by any other law with regard to new residential construction in a county that has adopted a building code authorized under these provisions. The bill prohibits a county from charging a fee to a person regulated by a building code adopted under provisions of the bill to defray the costs of enforcing the code.

C.S.H.B. 2833 provides that the authority granted by these provisions does not affect the authority of a commissioners court to adopt an order under other law. The bill entitles the county, in a suit brought by the appropriate attorney representing the county in the district court, to appropriate injunctive relief to prevent the violation or threatened violation of a building code from continuing or occurring. The bill makes it a Class C misdemeanor to violate a restriction or prohibition imposed by a building code adopted under these provisions.

C.S.H.B. 2833 defines "new residential construction."

**EFFECTIVE DATE**

On passage, or, if the act does not receive the necessary vote, the act takes effect September 1, 2009.

**COMPARISON OF ORIGINAL AND SUBSTITUTE**

C.S.H.B. 2833 differs from the original by placing its provisions under law related to county regulation of housing and other structures, whereas the original places its provisions under law related to the authority of a municipality and a county to regulate subdivisions in and outside of the municipality's extraterritorial jurisdiction. The substitute adds a definition for "new residential construction" that is not in the original.

C.S.H.B. 2833 differs from the original by applying its provisions to a county that has a population of 700,000 or more, contains a municipality with a population of 550,000 or more, and contains one or more colonias or other developments composed of substandard housing, and by applying its provisions to a county whose commissioners court adopts a resolution stating that the county expects population expansion as a result of the recommendations of the federal Defense Base Closure and Realignment Commission, whereas the original applies its provisions to a municipality in a county if that county does not exercise in the municipality's extraterritorial jurisdiction the authority described by the bill and the county by resolution authorizes the municipality to exercise that authority in the municipality's extraterritorial jurisdiction.

C.S.H.B. 2833 adds a provision not in the original to authorize the commissioners court in a county to adopt a building code applicable to new residential construction in the unincorporated area of the county and to set forth building code requirements. The substitute adds a provision not in the original setting forth provisions for the enforcement of building codes.

C.S.H.B. 2833 removes a provision from the original that authorizes the commissioners court of a county to regulate residential land development in the unincorporated areas of the county and that authorizes the governing body of a municipality to regulate residential land development in the municipality's extraterritorial jurisdiction so that the municipality or county may prevent the proliferation of colonias by adopting certain types of regulations.

C.S.H.B. 2833 removes a provision from the original that requires the county or municipality to issue a building permit if the person submitting the application for the permit satisfies certain requirements.

C.S.H.B. 2833 removes a provision from the original providing that a municipal ordinance prevails within the municipality's jurisdiction to the extent of a conflict if an order adopted by the county conflicts with the municipality's ordinance.

C.S.H.B. 2833 differs from the original by making it an offense to violate the building code, rather than an order or ordinance, as in the original and by omitting an exception to the penalty in the original.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00143-CV

| | | |
|---|---|---|
| Harry Bizios | § | From the 431st District Court |
| | § | of Denton County (14-01991-431) |
| v. | § | December 31, 2014 |
| Town of Lakewood Village, Texas | § | Opinion by Justice McCoy |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was error in the trial court's order. It is ordered that the order of the trial court is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.

It is further ordered that appellee Town of Lakewood Village, Texas shall pay all of the costs of this appeal, for which let execution issue.

SECOND DISTRICT COURT OF APPEALS

By  /s/ Bob McCoy_____
        Justice Bob McCoy



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-14-00143-CV**

HARRY BIZIOS                                                                          APPELLANT

V.

TOWN OF LAKEWOOD VILLAGE,                                                APPELLEE
TEXAS

----------

FROM THE 431ST DISTRICT COURT OF DENTON COUNTY
TRIAL COURT NO. 14-01991-431

----------

## OPINION

----------

In this accelerated interlocutory appeal, Appellant Harry Bizios complains of the trial court's injunction requiring him to obtain permits from and allow building inspections by Appellee the Town of Lakewood Village pursuant to the Town's ordinances. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp. 2014). In his first of three issues, Bizios contends that the Town, as a Type-A general-law municipality with approximately 620 inhabitants, does not

have constitutional or statutory authority to apply its building code to its extraterritorial jurisdiction (ETJ). In his second issue, he argues that even if the Town had such authority, it does not apply here because the Town is prohibited from applying its subdivision regulations to his property under local government code section 212.007. *See* Tex. Loc. Gov't Code Ann. § 212.007 (West 2008).

The Town is surrounded by a half-mile ETJ[1] that encompasses a portion of the Sunrise Bay subdivision where Bizios started to build his home in March 2014.[2] The Town does not provide any services to the subdivision; Little Elm, a more populous home-rule city, provides water to the subdivision, each lot has an individual septic system, and Denton County maintains the subdivision's roads outside of Little Elm's city limits.[3] Little Elm and Denton County approved the subdivision's final plat in 1995. No plat was filed with the Town.

Bizios bought his lot, which is located entirely in the Town's ETJ, in 2013. Bizios applied for and received a development permit from Denton County. It is

---

[1]An ETJ is "the unincorporated area that is contiguous to the corporate boundaries of the municipality" and is located within a specified distance of those boundaries depending upon the municipality's population. Tex. Loc. Gov't Code Ann. § 42.021 (West Supp. 2014).

[2]The rest of the subdivision is located in Little Elm and Little Elm's ETJ.

[3]Linda Asbell, secretary for the Town, testified that the Town would charge Bizios around $14,646 as a building permit fee for his house and that the only services it would in turn supply would be "[b]uilding department services" because Bizios was not within the Town's city limits. Alan Hoffman, Bizios's homebuilder, testified that he did not see anything in the Town's building permit regulation process that would enhance the health, safety, or durability of the $1.2 million house he was building on Bizios's two-acre lot.

2

undisputed that short of the Town's building permit, Bizios had obtained all of the permits required to build his home. The Town sought and received a temporary injunction against Bizios to stop construction on his lot until he obtained the Town's building permit. The Town relied on local government code section 212.003 and "Chapter 212" to support its claim to relief in the trial court, contending that Bizios had violated ordinance 11-16.

While we review a trial court's grant of a temporary injunction for an abuse of discretion, *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g), the temporary injunction's validity here rests upon the trial court's construction of the local government code, which we review de novo. *See City of Garland v. Dallas Morning News,* 22 S.W.3d 351, 357 (Tex. 2000); *El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,* 8 S.W.3d 309, 312 (Tex. 1999). In construing a statute, our objective is to determine and give effect to the legislature's intent, looking first to the "'plain and common meaning of the statute's words.'" *State v. Gonzalez,* 82 S.W.3d 322, 327 (Tex. 2002) (quoting *Fitzgerald v. Advanced Spine Fixation Sys.*, *Inc.*, 996 S.W.2d 864, 865 (Tex. 1999)); *see also* Tex. Gov't Code Ann. § 312.005 (West 2013) ("In interpreting a statute, a court shall diligently attempt to ascertain legislative intent and shall consider at all times the old law, the evil, and the remedy."); *Am. Home Prods. Corp. v. Clark,* 38 S.W.3d 92, 95 (Tex. 2000) ("When we construe a statute, our objective is to determine and give effect to the Legislature's intent."). If a statute's meaning is unambiguous, we generally interpret the statute according to

3

its plain meaning. *Gonzalez,* 82 S.W.3d at 327. We determine legislative intent from the entire act and not just its isolated portions. *Id.* (citing *Jones v. Fowler,* 969 S.W.2d 429, 432 (Tex. 1998)). Thus, we "'read the statute as a whole and interpret it to give effect to every part.'" *Id.* (quoting *Jones,* 969 S.W.2d at 432).

The issue here is whether the Town, as a general-law municipality, has the authority to extend its building code to its ETJ.[4] The Town argues that the legislature has given it authority to regulate development and thus to extend its building code to its ETJ under local government code sections 212.002 and 212.003; it also relies on sections 214.212, 214.904(a), and 233.153(c) to support its argument. *See* Tex. Loc. Gov't Code Ann. §§ 212.002–.003, 214.212, 214.904 (West 2008), § 233.153(c) (West Supp. 2014).

Because a municipality possesses authority to regulate land development in its ETJ only to the extent it is legislatively granted that authority, legislatively-created express limitations to that grant of authority—such as local government code section 212.003—are construed strictly against the authority of the municipality and in favor of the landowner. *Town of Annetta S. v. Seadrift Dev.,*

---

[4]This is an issue of first impression in this court. *See Rhino Real Estate Invs., Inc. v. City of Runaway Bay,* No. 02-08-00340-CV, 2009 WL 2196131, at *1 n.4, *2 (Tex. App.—Fort Worth July 23, 2009, no pet.) (mem. op.) (disposing appeal on another ground and not reaching city's argument that it had authority under section 212.002 to extend its building code ordinances to its ETJ); *see also Hartsell v. Town of Talty,* 130 S.W.3d 325, 327–29 (Tex. App.—Dallas 2004, pet. denied) (resolving case under local government code chapter 245 instead of reaching whether town had authority to extend building code ordinance to its ETJ).

4

*L.P.*, No. 02-12-00171-CV, 2014 WL 5013292, at \*2 (Tex. App.—Fort Worth Sept. 25, 2014, pet. filed); *see also FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 902 (Tex. 2000) ("[A] city's authority to regulate land development in its ETJ is wholly derived from a legislative grant of authority."); *Milestone Potranco Dev., Ltd. v. City of San Antonio*, 298 S.W.3d 242, 247 (Tex. App.— San Antonio 2009, pet. denied) (stating that the similarities between zoning ordinances that a municipality may adopt under section 211.003 and the list of items a municipality is prohibited from regulating under section 212.003 reveals the legislature's intent to prohibit a municipality from regulating zoning-type uses in the ETJ).[5]

Local government code chapter 212, "Municipal Regulation of Subdivisions and Property Development," contains eight subchapters, most of which are not

---

[5]A municipality's power normally ends at the city limit and does not automatically include the ETJ; rather, a city may only extend its authority to the ETJ if authorized by the State. *See Payne v. Massey*, 145 Tex. 237, 240, 196 S.W.2d 493, 495 (1946) ("Municipalities . . . possess only such powers and privileges as have been expressly or impliedly conferred upon them. All acts done by them must find authority in the law of their creation."); *City of Lubbock v. Phillips Petroleum Co.*, 41 S.W.3d 149, 159 (Tex. App.—Amarillo 2000, no pet.) (noting that "a city may only exercise its powers within its corporate limits unless its authority is expressly extended"); *City of Sweetwater v. Hamner*, 259 S.W. 191, 195 (Tex. Civ. App.—Fort Worth 1923, writ dism'd) (holding that all the powers and privileges conferred on a municipality by the constitution and legislature apply only within the municipality's boundaries, and a municipality can only extend its power outside city limits when granted express legislative authority).

5

pertinent to the issue before us.[6]  Subchapter A, "Regulation of Subdivisions," contains section 212.002, "Rules," which provides that "a municipality may adopt rules governing *plats and subdivisions* of land within the municipality's jurisdiction to promote the health, safety, morals, or general welfare of the municipality and the safe, orderly, and healthful *development* of the municipality."[7]  Tex. Loc. Gov't Code Ann. § 212.002 (emphasis added).

Section 212.003(a), the first subsection under the heading, "Extension of Rules to Extraterritorial Jurisdiction," states,

> The governing body of a municipality by ordinance may extend to the extraterritorial jurisdiction of the municipality the application of municipal ordinances adopted under Section 212.002 and other municipal ordinances relating to access to public roads or the pumping, extraction, and use of groundwater by persons other than retail public utilities, as defined by Section 13.002, Water Code, for the purpose of preventing the use or contact with groundwater that presents an actual or potential threat to human health.  However, *unless otherwise authorized by state law*, in its extraterritorial jurisdiction a municipality *shall not regulate*:

---

[6]Chapter 212's subchapters address not only the regulation of subdivisions and property development but also enforcement of land-use restrictions in plats and other instruments, developer sureties, school land development, county-owned buildings, and apportionment of municipal infrastructure costs, among others.  *See generally* Tex. Loc. Gov't Code Ann. §§ 212.001–.904 (West 2008 & Supp. 2014).

[7]Subchapter A does not define "development."  Subchapter B defines "development" for that subchapter's purposes.  Tex. Loc. Gov't Code Ann. § 212.043(1).  Although the Town relies on "development" as mentioned in section 212.002 to support its argument, nothing in subchapter B states that its definitions apply to any other subchapter, and the Town states in its appellate brief that subchapter B does not apply to it.

(1) the use of any building or property for business, industrial, residential, or other purposes;

(2) the bulk, height, or number of buildings constructed on a particular tract of land;

(3) the size of a building that can be constructed on a particular tract of land, including without limitation any restriction on the ratio of building floor space to the land square footage;

(4) the number of residential units that can be built per acre of land; or

(5) the size, type, or method of construction of water or wastewater facility that can be constructed to serve a developed tract of land [upon various conditions not at issue here].

*Id.* § 212.003(a) (emphasis added).[8]  As we stated in *Town of Annetta South*, "The purpose of these restrictions on a municipality's authority to impose regulations on land in the municipality's ETJ is to prohibit the municipality's extension of zoning ordinances into its ETJ under the guise of cleverly drafted rules 'governing plats and subdivisions of land.'"  2014 WL 5013292, at *3. Therefore, unless otherwise authorized by state law, per section 212.003(a)'s plain language, a municipality cannot extend its ordinances as to the use of any building or the bulk, height, or size of such buildings, among other things, into its

---

[8]In comparison, local government code chapter 211 addresses general zoning regulations within a municipality and permits the governing body of a municipality to regulate the height, number of stories, and size of buildings and other structures; the percentage of a lot that may be occupied; the size of yards, courts, and other open spaces; and the location and use of buildings and land for residential purposes, among other things.  *See* Tex. Loc. Gov't Code Ann. § 211.003 (West 2008).

ETJ, which is what the Town purports to do in ordinance 10-01.[9]  *See id*.; *see also* Tex. Loc. Gov't Code Ann. § 212.003(a)(1)–(2) (prohibiting regulation in the ETJ of use of buildings or bulk, height, or number of buildings without express authorization by other state law); *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas,* 852 S.W.2d 489, 491 (Tex. 1993) (stating that an ordinance that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with a state statute).

Further, section 212.007(a) provides that for "a tract located in the extraterritorial jurisdiction of more than one municipality, *the authority responsible for approving a plat under this subchapter is the authority in the municipality with*

---

[9]Under ordinance 10-01, the Town seeks to apply its "uniform and minimum standards for the construction, erection, and maintenance of buildings and other structures in order to protect and promote the public health, safety, and welfare of the citizens of the Town and the Extraterritorial Jurisdiction of the Town."  Ordinance 10-01 contains the following new construction requirements, among others: "[t]here shall be a garage size requirement on all new construction of a minimum of 25 feet in width and 22 feet in depth," "[t]here shall be no buildings, residential or commercial, that exceed 35 foot in height," and "[s]econdary structures will be permitted as new construction with minimum square footage requirements waived as long as secondary structure is contained within the property lines of the primary residence lot(s) and required set backs are met."  For this, and other services, the Town charges the following fees: $1.25 for each square foot of the building in the ETJ for a building permit; $250 for flatwork, other than foundations, such as sidewalks, driveways, and patios for the first two inspections, followed by $75 per inspection after the second inspection; 65% of the building permit fee as a plan review fee, which "is a separate fee from all other fees and is in addition to the permit fee"; annual registration fees of $500 for a general contractor and $100 for subcontractors—the Town requires contractors to submit to its registration process to work on the construction job; $150 for a fence permit; $150 for a sprinkler permit; $150 for an electrical permit; $150 for a plumbing permit; and $500 as a Board-of-Appeals fee for structures over 5,001 square feet, among others.

8

*the largest population.*"[10]  Tex. Loc. Gov't Code Ann. § 212.007(a).  As reflected through the testimony at the hearing, Little Elm, not the Town, had the authority to approve the plat for Bizios's subdivision and did so in 1995.

Subchapter B of chapter 212, "Regulation of Property Development," grants a municipality the authority to adopt plans, rules, or ordinances governing development plats of land within its limits and in its ETJ.  *Id.* § 212.044.  "Development" under subchapter B means "the new construction or the enlargement of any exterior dimension of any building, structure, or improvement."  *Id.* § 212.043(1).  Anyone who proposes to develop a tract of land located in the municipality or its ETJ under this subchapter must have a development plat of the tract prepared in accordance with the applicable plans, rules, or ordinances of the municipality, *id.* § 212.045(a), but if a person is required under subchapter A or another ordinance to file a subdivision plat, "*a development plat is not required in addition to the subdivision plat*," *id.* § 212.045(d) (emphasis added).

---

[10]Although the Town argues that the "tract" at issue here was Bizios's lot, which was entirely within its ETJ, in the context of subchapter A of chapter 212, which covers regulation of subdivisions, we understand the reference to "tract" here to mean a larger tract that has been subdivided into lots, per the plat requirement set out in section 212.004, which states, in pertinent part, "The owner of a tract of land located within the limits or in the extraterritorial jurisdiction of a municipality who divides the tract in two or more parts to lay out a subdivision of the tract . . . must have a plat of the subdivision prepared."  Tex. Loc. Gov't Code Ann. § 212.004(a).

To obtain the authority to require a development plat under subchapter B, the municipality must adopt subchapter B, and the Town has not done so. *See id.* § 212.041. Any provisions of subchapter A that do not conflict with subchapter B apply to subchapter B's development plats. *Id.* § 212.042. While the municipality, county, or other official who issues building or other development permits may not issue a permit for lots or tracts subject to this subchapter until a development plat is filed with and approved by the municipality under section 212.047,[11] *id.* § 212.046, "[t]*his subchapter does not authorize the municipality to require municipal building permits or otherwise enforce the municipality's building code in its extraterritorial jurisdiction*," *id.* § 212.049 (emphasis added). Because the subdivision plat of Bizios's neighborhood was already approved by the municipality with authority to approve it, and because even if Little Elm had not previously approved the subdivision plat, the Town has

_____

[11]Section 212.047 provides that a municipality shall endorse approval on a development plat filed with it if the plat conforms to the general plans, rules, and ordinances of the municipality concerning its current and future streets, sidewalks, alleys, parks, playgrounds, and public utility facilities, as well as the general plans, rules and ordinances for the extension of the municipality or the extension, improvement, or widening of its roads, streets, and public highways in the municipality and its ETJ, taking into account access to and extension of sewer and water mains and instrumentalities of public utilities, as well as any general plans, rules, or ordinances adopted under section 212.044. Tex. Loc. Gov't Code Ann. § 212.047. Approval of a development plat is not considered an acceptance of any proposed dedication for public use or use by persons other than the owner of the property covered by the plat and does not impose on the municipality any duty regarding the maintenance or improvement of any purportedly dedicated parts until the municipality's governing body makes an actual appropriation of the dedicated parts by formal acceptance, entry, use, or improvement. *Id.* § 212.048.

10

not adopted subchapter B, subchapter B does not apply here, but the existence of subchapter B shows some evidence of the legislature's intent that a municipality not be authorized to enforce its building code in its ETJ.[12]  *See id.* § 212.049.

---

[12]The Town argues that under section 212.003, it can adopt a building code in its ETJ because of the use of the word "development" in section 212.002 and that subchapter A authorizes the extension because extending its building code promotes development.  However, when the legislature enacts a statute, it is presumed that "the entire statute is intended to be effective."  Tex. Gov't Code Ann. § 311.021(2) (West 2013).  If the Town's interpretation were correct and section 212.002 included the regulation of development of housing under subchapter A, then there would be no reason for Subchapter B.

Before the legislature added subchapter B, the Dallas Court of Appeals held that "subdivision of land suggests development."  *City of Lucas v. N. Tex. Mun. Water Dist.*, 724 S.W.2d 811, 818 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (op. on reh'g).  This case was decided under article 970a, section 4 of the revised civil statutes, which became section 212.003.  *Id.* at 817–18, 820.  Article 970a, section 4 provided, in pertinent part, "The governing body of any city may extend by ordinance to all of the area under its extraterritorial jurisdiction the application of such city's ordinance establishing rules and regulations governing plats and the subdivision of land."  Act of April 25, 1963, 58th Leg., R.S., ch. 160, § 4, 1963 Tex. Gen. Laws 449, 449, *repealed by* Act of April 30, 1987, 70th Leg., R.S., ch. 149, § 49, 1987 Tex. Gen. Laws 1306, 1306–08.  As set out above, section 212.003 contains substantially more limitations on a municipality's authority to extend its subdivision rules into its ETJ.  *See* Tex. Loc. Gov't Code Ann. § 212.003(a).  In *Lucas*, on rehearing, the court clarified that the city's requirement of a building permit before construction in its ETJ was supported by article 970a because "use of the term [subdivision] is not restricted to the division itself but also encompasses the development of the divided tracts."  *Id.* at 823. The court concluded that the power over subdivisions conferred by article 970a "necessarily or fairly implies a right to issue regulations governing construction of housing, buildings, and the components thereof."  *Id.* at 823–24.  When the court decided *Lucas*, it might have been logical to infer this meaning because the legislature had not spoken otherwise; after *Lucas*, however, the legislature added restrictions to section 212.003(a) and added subchapter B, distinguishing "development" as separate from "subdivision and plats."  *See* Tex. Loc. Gov't Code Ann. § 212.043(1) (defining "development"); *City of Austin v. Jamail*, 662

11

We have also reviewed chapter 214, which governs municipal regulation of housing and other structures, and chapter 233, which governs the same as to counties.  *See id.* §§ 214.001–.906 (West 2008), §§ 233.001–.901 (West 2005 & Supp. 2014).  Subchapter G of chapter 214, "Building and Rehabilitation Codes," provides that the International Residential Code "is adopted as a municipal residential building code in this state."  *Id.* §§ 214.211–.212(a).  However, the legislature restricted its application to "all construction, alteration, remodeling, enlargement, and repair of residential structures *in a municipality*."  *Id.* § 214.212(b) (emphasis added).  Although section 214.904, "Time for Issuance of Municipal Building Permit," states that "[t]his section applies only to a permit required by a municipality to erect or improve a building or other structure in the municipality or its extraterritorial jurisdiction," *id.* § 214.904, we read this section in conjunction with the rest of the subchapter to apply to the municipalities granted such capacity, i.e., home-rule municipalities, *see, e.g.*, *id.* § 214.901 (stating that a home-rule municipality may require that the construction of buildings comply with the energy conservation standards in the municipal building code), and in the context of other specific local government code provisions that expressly grant authority to extend a regulation into an ETJ.  *See*

S.W.2d 779, 781 (Tex. App.—Austin 1983, writ dism'd) (noting that the court must give effect to the more specific statute so as not to make it superfluous); *see also* Tex. Gov't Code Ann. § 311.026(a) (West 2013) ("If a general provision conflicts with a special or local provision, the provisions shall be construed, if possible, so that effect is given to both.").

12

*id.* § 216.902 (West 2008) (authorizing municipality to extend outdoor sign regulation to ETJ), § 372.003 (West Supp. 2014) (authorizing municipality to undertake improvement project in ETJ), § 377.002 (West 2005) (authorizing municipality to create municipal development district in ETJ), § 382.109 (West Supp. 2014) (requiring road projects to meet all applicable standards of each municipality in whose ETJ a district improvement project is located), § 395.011 (West 2005) (authorizing municipality to impose impact fee in ETJ).

Subchapter F of chapter 233, "Residential Building Code Standards Applicable to Unincorporated Areas of Certain Counties," was adopted by order of the Denton County Commissioners Court in January 2010 to apply to "certain residential construction in unincorporated areas of Denton County." *See id.* § 233.152. This subchapter requires new residential construction in an area of the county to which the subchapter applies to conform with the International Residential Code unless "a municipality located within a county to which this subchapter applies has adopted a building code in the municipality's extraterritorial jurisdiction," in which case the municipality's building code controls "and building code standards under this subchapter have no effect in the municipality's extraterritorial jurisdiction." *Id.* § 233.153(a), (c). Again, as nothing in the local government code explicitly authorizes a general law municipality to extend its building code to its ETJ, we read this section as applying to home-rule municipalities because a general-law municipality can exercise only those powers that the legislature confers on it by law. *See City of W. Lake Hills v.*

13

*Westwood Legal Defense Fund*, 598 S.W.2d 681, 683 (Tex. Civ. App.—Waco 1980, no writ).[13]   Because none of the statutes referenced by the Town expressly grant a general-law municipality the authority to extend its building code into its ETJ, and because we have otherwise found none that does so, the trial court abused its discretion by granting the injunction.   *See Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004) ("General-law municipalities . . . are political subdivisions created by the State and, as such, possess those powers and privileges that the State expressly confers upon them."); *cf.* Tex. Loc. Gov't Code Ann. § 51.072 (West 2008) (stating that a home-rule municipality "has full power of local self-government"); *Proctor v. Andrews*, 972 S.W.2d 729, 733 (Tex. 1998) (op. on reh'g) ("While a home rule city . . . has all the powers of the state not inconsistent with the Constitution, the general laws, or the city's charter, Tex. Const. art. XI, § 5, these broad powers may be limited by statute when the Legislature's intention to do so appears 'with

---

[13]That is, we read these sections to mean that *if* a municipality—i.e., a home-rule municipality—already has the authority to extend its building code to its ETJ, then it is subject to these sections.  *See id.* § 214.901 (allowing a home-rule municipality to require that building construction comply with its municipal building code's energy conservation standards), § 214.904(b)–(d) (setting out timing requirements for the issuance of a permit).  In order for power to be implicitly granted, it should be "reasonably incident to those expressly granted," *see City of W. Lake Hills*, 598 S.W.2d at 683, and as set out above, the local government code does not expressly grant to a general law municipality the authority to extend any portion of its building code to the ETJ.  If the legislature had intended for a general-law municipality to extend its building code into the ETJ, it would have expressly granted that authority.  *Cf.* Tex. Loc. Gov't Code Ann. §§ 216.902, 372.003, 377.002, 382.109, 395.011.

14

unmistakable clarity.'"); *Forwood v. City of Taylor,* 147 Tex. 161, 167, 214 S.W.2d 282, 286 (1948) (explaining that a home rule municipality has full authority to do anything the legislature could have authorized it to do). We sustain Bizios's first and second issues and, based on our disposition here, we do not reach his remaining issue pertaining to vested rights under local government code chapter 245. *See* Tex. R. App. P. 47.1.

Having sustained Bizios's dispositive issues, we reverse the trial court's order and remand the case to the trial court for further proceedings.

/s/ Bob McCoy
BOB MCCOY
JUSTICE

PANEL: MCCOY, MEIER, and GABRIEL, JJ.

DELIVERED: December 31, 2014

15